**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JAY ALIX,

*Plaintiff*,

-against-

MCKINSEY & CO., INC.; MCKINSEY
HOLDINGS, INC.; MCKINSEY &
COMPANY INC. UNITED STATES;
MCKINSEY RECOVERY &
TRANSFORMATION SERVICES U.S., LLC;
DOMINIC BARTON; KEVIN CARMODY;
JON GARCIA; SETH GOLDSTROM;
ALISON PROSHAN; and ROBERT
STERNFELS,

*Defendants*.

Case No. _____

# COMPLAINT AND JURY DEMAND

Sean F. O'Shea
Michael E. Petrella
**BOIES SCHILLER FLEXNER LLP**
575 Lexington Avenue, 7th Floor
New York, New York 10022
(212) 446-2300

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................................ 1

THE PARTIES ............................................................................................................... 11

JURISDICTION AND VENUE ..................................................................................... 12

FACTS ........................................................................................................................... 12

   I.   Background of Jay Alix and AP ..................................................................... 12

   II.  Bankruptcy Consulting Services Is a Multibillion Dollar Industry. ............... 13

   III.  As the World's Largest Consulting Firm,
       McKinsey Knows That a Professional Providing
       Bankruptcy Consulting Services Must Be Transparent
       About Its Connections and Have Undivided Loyalty to Its Debtor-Clients .... 14

   IV.  From 2001 through 2013, McKinsey Engaged in a
       Pattern of Racketeering Activity that Involved Crimes
       Relating to Submitting False Statements in Order to Evade Disqualification ............... 20

       A. McKinsey Unlawfully Concealed Its Connections
          and Affirmatively Misrepresented That It Was Disinterested ..................... 21

          i.   Hayes Lemmerz ............................................................... 22

          ii.   UAL (United Airlines) ...................................................... 23

          iii.  Mirant ............................................................................ 24

          iv.  Lyondell Chemical ........................................................... 26

          v.   Harry & David ............................................................... 27

          vi.  AMR ............................................................................. 29

          vii.  AMF Bowling ................................................................. 30

          viii. Edison Mission Energy ..................................................... 31

       B. McKinsey Has Unlawfully Concealed All of Its
          Connections to Interested Parties through Its Investment Arm, MIO .......... 32

   V.   Alix Confronts Barton and Sternfels, and
       McKinsey and AP Reach an Agreement ....................................................... 33

       A.    Barton Admits McKinsey's Pay-to-Play Scheme ............................... 36

       B.    McKinsey and AP Agree to a Resolution ........................................... 36

   VI.  Despite Barton's Representations to Alix,

McKinsey Unlawfully Concealed Its Disqualifying
Connections in *NII Holdings* ........................................... 39

VII. Defendants Continued Their Racketeering
Activity in *Standard Register* ........................................ 41

VIII. Defendants' Racketeering Activity Continues
in *Alpha Natural Resources* ........................................ 47

    A.    McKinsey's Failure to Disclose Its Connections
in *Alpha Natural Resources* ........................................ 48

    B.    McKinsey Simultaneously Represented the
Debtor and United States Steel, a Concealed
McKinsey Client, in Contract Negotiations ........................... 54

    C.    McKinsey Misled and Fraudulently
Induced the United States Trustee to Withdraw Two Separate
Motions Challenging Its Disclosure Declarations ................... 57

IX. McKinsey Committed Bankruptcy Fraud
and Other Crimes in *SunEdison* ................................... 59

    A.    McKinsey Unlawfully Concealed Its Connections in *SunEdison* ........ 60

    B.    McKinsey Unlawfully Concealed
Fraudulent Pre-Petition Payments That It Orchestrated
from SunEdison Affiliates ........................................... 68

    C.    McKinsey Unlawfully Concealed Pertinent
Facts Regarding its "Business Arrangement"
with the Former CEO of SunEdison ................................ 72

X. McKinsey Unlawfully Concealed Its Connections and
Committed Bankruptcy Fraud in *GenOn* ......................... 76

    A.    McKinsey Unlawfully Concealed the Fact That
NRG Energy Was a Current or Former
McKinsey Client While It Was Investigating
GenOn's Claims against NRG Energy ............................. 77

    B.    McKinsey Unlawfully Concealed the Fact That
NRG Energy Was a McKinsey Client While It Was
Negotiating on Behalf of GenOn for GenOn's
Separation from NRG Energy ..................................... 80

    C.    McKinsey Unlawfully Concealed the Depth
of Its Connections to NRG Energy and to the
Transactions and Bankruptcies that Created GenOn ............. 80

D. McKinsey Received Avoidable Preference
Payments from GenOn in Order to Avoid
Disqualification as a Creditor of GenOn, Thereby
Concealing an Interest Adverse to the Estate ...................................................... 83

E. McKinsey's Declarations Unlawfully Concealed
Numerous Connections in GenOn, Including
GenOn Creditors and Possibly Competitors ........................................................ 85

**FIRST CAUSE OF ACTION**
(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
Against All Defendants Except McKinsey RTS .......................................................... 94

A. The RICO Enterprise and Its Effect on Interstate Commerce ............................. 94

B. Pattern of Racketeering Activity ........................................................................ 97

C. Scienter ............................................................................................................. 120

D. Causation .......................................................................................................... 125

**SECOND CAUSE OF ACTION**
(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
Against Defendants Barton, Sternfels, Proshan, Garcia, Carmody, and Goldstrom ................. 125

A. The RICO Enterprise .......................................................................................... 126

B. Pattern of Racketeering Activity ........................................................................ 129

C. Scienter ............................................................................................................. 133

D. Causation .......................................................................................................... 133

**THIRD CAUSE OF ACTION**
(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
Against All Defendants ............................................................................................ 133

**FOURTH CAUSE OF ACTION**
(CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d))
Against All Defendants ............................................................................................ 136

**FIFTH CAUSE OF ACTION**
(BREACH OF CONTRACT)
Against McKinsey ................................................................................................... 141

**SIXTH CAUSE OF ACTION**
(PROMISSORY ESTOPPEL)
Against McKinsey ................................................................................................... 142

iii

**SEVENTH CAUSE OF ACTION**
(TORTIOUS INTERFERENCE WITH BUSINESS
EXPECTANCY  UNDER VIRGINIA LAW)
Against McKinsey, McKinsey Holdings, Inc.,
 McKinsey & Company, Inc. United States, and McKinsey RTS ............................................. 143

PRAYER FOR RELIEF .......................................................................................................... 144

DEMAND FOR JURY TRIAL ................................................................................................ 145

Plaintiff Jay Alix, as assignee of AlixPartners LLP ("**AP**"), by and through his attorneys Boies Schiller Flexner LLP, for his Complaint against Defendants McKinsey & Co., Inc. ("**McKinsey & Co.**"); McKinsey Holdings, Inc. ("**McKinsey Holdings**"); McKinsey & Company Inc. United States ("**McKinsey & Co. (US)**"); McKinsey Recovery & Transformation Services U.S., LLC ("**McKinsey RTS**"); Dominic Barton; Kevin Carmody; Jon Garcia; Seth Goldstrom; Alison Proshan; and Robert Sternfels, alleges as follows:

## NATURE OF THE CASE

1.      Since 2001, Defendant McKinsey & Co. and related persons and entities including, at various times, Defendants McKinsey & Co. (US), McKinsey RTS, Dominic Barton, Kevin Carmody, Jon Garcia, Seth Goldstrom, Alison Proshan, and Robert Sternfels (collectively "**McKinsey**") have unlawfully schemed to harm AP, which is McKinsey's chief competitor in the market of providing professional crisis management and consulting services in major corporate Chapter 11 bankruptcy cases involving companies with assets valued at over $1 billion.

2.      To carry out its unlawful scheme, McKinsey has conducted a criminal enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. §§ 1962(c) and (d).  Specifically, between 2001 and the present, McKinsey has knowingly and intentionally submitted false and materially misleading declarations under oath in the bankruptcy proceedings in which McKinsey & Co. and/or McKinsey RTS has been hired as a bankruptcy professional, in order to unlawfully conceal its many significant connections to "Interested Parties" identified in bankruptcy proceedings and in order to avoid revealing numerous disqualifying conflicts of interest that would preclude it from being hired as a bankruptcy professional in those proceedings.

1

3.      In executing its criminal enterprise, McKinsey's crimes have included:

- Bankruptcy fraud in violation of 18 U.S.C. §§ 152(2), 152(3), and 152(6);

- Mail fraud in violation of 18 U.S.C. § 1341;

- Wire fraud in violation of 18 U.S.C. § 1343;

- Obstruction of justice in violation of 18 U.S.C. § 1503(a);

- Witness tampering in violation of 18 U.S.C. §§ 1512(b) and 1512(c);

- Unlawful monetary transactions in violation of 18 U.S.C. §§ 1956 and 1957(a); and

- Inducement to interstate or foreign travel in violation of 18 U.S.C. § 2314.

4.      McKinsey's racketeering activity was calculated to harm AP by depriving it of valuable consultancy assignments.  McKinsey knew that if it revealed its conflicts of interest as required by Rule 2014 of the Rules of Bankruptcy Procedure, it would be disqualified from employment under 11 U.S.C. § 327 in the thirteen Chapter 11 bankruptcy cases that it has handled to date.  McKinsey also knew that by misrepresenting and concealing its conflicts, it could improperly gain a competitive advantage against AP.  Absent McKinsey's unlawful conduct, it would not have been able to effectively compete against AP in the bankruptcy restructuring market, given McKinsey's roster of clients and alumni connections, which have posed serious conflicts of interests in the high-profile bankruptcy proceedings in which McKinsey has sought employment.  By engaging in its unlawful scheme, McKinsey has profited by receiving tens of millions of dollars in bankruptcy fees that it would not have otherwise earned had it disclosed its numerous connections to Interested Parties and conflicts of interests as required by law.  Had McKinsey complied with the law and truthfully disclosed its connections to Interested Parties, it would have been precluded from being hired as a bankruptcy professional.

5.      AP is the direct victim and target of McKinsey's unlawful scheme.  McKinsey's criminal enterprise has caused AP to lose considerable revenue that it otherwise would have earned had McKinsey complied with the law and truthfully disclosed its disqualifying conflicts of interest.

6.      Through its racketeering scheme, McKinsey has unlawfully profited by at least $101 million to date, in the form of bankruptcy consulting fees.

7.      Plaintiff Jay Alix, as assignee of AP, seeks compensation for the actual damages that McKinsey's racketeering activity has caused to AP as provided for in 18 U.S.C. § 1964(a); an injunction prohibiting McKinsey from further engaging in its illegal practices; and other relief as provided for by law.

8.      Because professionals employed by bankruptcy debtors are required to act as fiduciaries, under Section 327(a) of the Bankruptcy Code a party seeking employment as a professional must establish that it is "disinterested" and that it does "not hold or represent an interest adverse to the estate."   11 U.S.C. § 327(a).   To meet those legal requirements, prospective bankruptcy professionals are obligated by Rule 2014(a) of the Federal Rules of Bankruptcy Procedure to submit in each case a sworn declaration that fully, honestly, and publicly discloses their connections to the debtor, the trustee in bankruptcy, and any creditors' committees, equity security holders' committees, creditors, equity security holders, or indenture trustees, their attorneys and accountants, and the United States Trustee (collectively, the "**Interested Parties**").

9.      Instead of conforming to these requirements, however, McKinsey affirmatively misrepresented its disinterestedness and unlawfully concealed its disqualifying connections to parties with clear financial interests in the outcome of those cases.  McKinsey has unlawfully

3

parsed and crafted its disclosure declarations to create the false and misleading appearance of both its compliance with the disclosure requirements and its disinterestedness under law.

10.     For example, McKinsey has routinely concealed its connections to competitors of the debtors in its cases.  In the field of management consulting, McKinsey readily and publicly admits that it represents competitors of its own clients.  Indeed, McKinsey markets itself by emphasizing the industry knowledge that it is able to accumulate by serving direct competitors. In the bankruptcy context, however, McKinsey's service of competitors is highly problematic because professionals in bankruptcy owe fiduciary duties to their debtor clients—which is why Section 327(a) permits the employment of only "disinterested" professionals.  Though McKinsey is thus required by Rule 2014 to disclose, in detail, its connections to any competitors, McKinsey has never done so.

11.     Indeed, as demonstrated in a recent study by the *Wall Street Journal*, entitled *McKinsey Stands Out In Bankruptcy Court—For Secrecy*, published on page A1 of the April 28-29, 2018 edition, while other professionals participating in the thirteen cases in which McKinsey was retained disclosed an average of 171 connections per case, McKinsey disclosed an average of merely *five* connections per case.:



**Disclosure Issue**

Average number of potential conflicts of interest initially named by professional firms that were part of any of McKinsey's 13 chapter 11 bankruptcy cases

12.    While McKinsey's declarations in its earliest cases simply concealed all of its connections, in later cases, McKinsey's preferred method has been to incrementally disclose its connections (all of which existed at the commencement of these cases) over a series of declarations.   Indeed, as the *Wall Street Journal* again noted, in all but two of its cases, McKinsey disclosed no connections at all in its initial disclosures, opting instead to make

incomplete partial disclosures over the course of the bankruptcy case.



**Checking for Conflicts**

Advisers, law firms and other professionals in bankruptcy cases are supposed to disclose all relationships that might give rise to a conflict of interest. In the 13 chapter 11 cases McKinsey & Co. has worked on, it has initially identified the names of far fewer such connections than other firms.

Note: Figures include disclosures of the names of companies and other relationships made by firms that worked for the debtor and the official committee of unsecured creditors.

Source: court records

13.     Invariably, McKinsey has waited until the case has progressed significantly (often waiting until after plan confirmation) before disclosing its most egregious connections which, if known at the outset, would have resulted in its disqualification from employment.  McKinsey has employed this practice to deceive bankruptcy courts and competitors at the outset because extricating it from the proceedings at a later stage would be impractical if not impossible.

14.     Consequently, McKinsey has been able to obtain bankruptcy court approval of professional engagements that it otherwise would have lost to AP had it disclosed its connections fully and truthfully from the outset.

15.     In addition to its unlawful failures to disclose, McKinsey has further committed bankruptcy fraud through its violations of 18 U.S.C. § 152(6), a RICO predicate statute that prohibits knowingly and fraudulently offering any advantage or promise of advantage for acting or forbearing to act in any bankruptcy case.  Specifically, McKinsey has offered  illegal "pay to play" arrangements to attorneys that handle high-stakes bankruptcy matters, whereby McKinsey offered to refer its vast network of consulting clients to these attorneys in exchange for the attorneys exclusively referring bankruptcy clients to McKinsey for professional employment.

16.     McKinsey's racketeering activity has become particularly egregious in its three most recent cases:

- *In re Alpha Natural Resources, Inc.*, No. 15-BR-33896 (Bankr. E.D. Va.), filed on August 3, 2015 (hereafter "***Alpha Natural Resources***");

- *In re SunEdison, Inc.*, No. 16-BR-10992 (Bankr. S.D.N.Y), filed on April 21, 2016 (hereafter "***SunEdison***"); and

- *In re GenOn Energy, Inc.*, No. 17-BR-33695 (Bankr. S.D. Tex.), filed on June 14, 2017 (hereafter "***GenOn Energy***" or "***GenOn***").

17.     For example, in *GenOn*, McKinsey's four declarations under penalty of perjury included at least 58 intentionally false or misleading statements that concealed, omitted, and lied about its connections to dozens of Interested Parties.   In *SunEdison*, McKinsey's five declarations included at least 97 intentionally false or misleading statements that concealed, omitted, and lied about its connections dozens of Interested Parties.   And in *Alpha Natural Resources*, McKinsey's five declarations included at least 114 intentionally false or misleading statements that once again concealed, omitted and lied about its connections to dozens of Interested Parties.

18.     Thus, in just these three most recent cases alone, McKinsey has submitted a total of fourteen declarations containing intentionally false or misleading statements—specifically, those declarations contain a total of at least 269 intentionally false or misleading statements.

**A.     *Alpha Natural Resources***

19.     In *Alpha Natural Resources*, McKinsey submitted false declarations that concealed, *inter alia*, the following facts:

  a.    The confirmation of the plan of reorganization that McKinsey secured provided for the sale of most of the bankruptcy estate's assets to entities including **McKinsey's own clients**; and

  b.    While it was supposed to be maximizing the value of the estate's assets, McKinsey was simultaneously helping United States Steel, one of Alpha Natural Resources largest coal customers **and a McKinsey client**, reduce the price that it paid Alpha Natural Resources for coal.

20.     In addition, over the course of *Alpha Natural Resources*, McKinsey fraudulently induced the United States Trustee to withdraw two court filings that sought to compel McKinsey to disclose its connections as required by law by representing that its disclosure declarations were complete and truthful.  This conduct constituted obstruction of justice under 18 U.S.C. § 1512(c)(2).

**B.     *SunEdison***

21.     As in its other cases, McKinsey's disclosures in *SunEdison* intentionally concealed its numerous connections to Interested Parties in that case.

22.    McKinsey committed multiple other crimes in *SunEdison*.  Specifically:

    a.    McKinsey orchestrated a massive fraud totaling $10 million to evade its disqualifying preference liability[1] to SunEdison under 11 U.S.C. § 547(b).  To consummate its cover-up of its $10 million fraudulent scheme, McKinsey lied to the bankruptcy court when it declared that it had collected its fees from certain non-debtor affiliates of SunEdison because its services were for the benefit of those affiliates.  They were not.

    b.    Through its unspecified and inadequately described "business arrangement" with former SunEdison CEO Ahmad Chatila, McKinsey likely had an undisclosed connection to FTC Solar Inc., a competitor of SunEdison that ultimately acquired assets from SunEdison in the bankruptcy case for approximately 17% of their book value.

    **C.**    ***GenOn***

23.    In *GenOn*, McKinsey's declarations unlawfully concealed, *inter alia*, that:

    a.    McKinsey was liable to GenOn for a $4.5 million preference claim;

    b.    McKinsey was investigating NRG Energy on behalf of GenOn in a matter as to which the two companies' interests were adverse without ever disclosing that NRG Energy was, in fact, a current or former McKinsey client; and

---

[1]    Under 11 U.S.C. § 547, a "preference payment" is a payment by the debtor to a creditor on account of an antecedent debt, made while the debtor was insolvent and within ninety days before the filing of the bankruptcy petition, which enables the creditor to receive more than it would have if the estate were liquidated under Chapter 7 of the Bankruptcy Code.  Preference payments are avoidable by the debtor in bankruptcy.

c.   A number of GenOn's creditors (whose claims McKinsey is presently investigating and objecting or acceding to on GenOn's behalf) are also McKinsey's clients.

24.   In the year before McKinsey was employed in *Alpha Natural Resources*, Plaintiff Jay Alix had several meetings, phone conversations and email exchanges with Defendant Dominic Barton, McKinsey's Managing Partner.  Several of these communications also included Defendant Robert Sternfels, a McKinsey senior partner.

25.   In the course of those meetings and communications, Alix repeatedly explained to Barton in detail why McKinsey's concealment of its connections was illegal.  Alix also explained why McKinsey's "pay to play" scheme was illegal.

26.   After conducting his own investigation, Barton admitted to Alix that McKinsey was intentionally concealing its clients' identities and that it was conducting the "pay to play" scheme.  He also agreed that this conduct was unlawful and promised that if Alix would forebear action until Barton's anticipated re-election as McKinsey's Managing Partner (thus solidifying Barton's ability to effectuate change at McKinsey), McKinsey would exit the bankruptcy market.

27.   Contrary to Barton's representation, however, McKinsey did not withdraw from the bankruptcy market.  Instead, McKinsey continued to market its bankruptcy services and was employed in additional bankruptcy cases (prior and subsequent to Barton's re-election) in which it not only continued but also accelerated its unlawful conduct.

28.   In sum, McKinsey has conducted a criminal enterprise through which it has unlawfully deprived AP of assignments for professional crisis management and consulting services in major corporate Chapter 11 bankruptcy cases.  McKinsey has conducted its criminal enterprise through a pattern of racketeering activity involving its commission of many federal

10

crimes for the purpose of evading its disqualification in Chapter 11 bankruptcy cases, resulting in substantial damages to AP.

## THE PARTIES

29.     Plaintiff Jay Alix, an individual, resides in Michigan.  Alix is the founder and minority equity holder of AP, and a member of AP's board of directors.  All claims asserted herein have been fully and lawfully assigned to Alix by AP.

30.     Defendant McKinsey & Co. is a New York corporation with its principal place of business in New York, New York.

31.     Defendant McKinsey Holdings is a Delaware corporation with its principal place of business in New York, New York.  It is a wholly-owned subsidiary of McKinsey & Co.

32.     Defendant McKinsey & Co. (US) is a Delaware corporation with its principal place of business in New York, New York.  It is a wholly-owned subsidiary of McKinsey & Co.

33.      Defendant McKinsey RTS is a limited liability company organized under the laws of Delaware with its principal place of business in New York, New York.  Its sole member is Defendant McKinsey & Co. (US).

34.     Defendant Dominic Barton, an individual, is a Canadian citizen domiciled in London, United Kingdom.  Barton is, and was at all times relevant hereto, the Managing Partner of McKinsey & Co.

35.     Defendant Kevin Carmody, an individual, resides in Illinois.  Carmody is a senior partner of McKinsey & Co.

36.     Defendant Jon Garcia, an individual, resides in the District of Columbia.  Garcia is a founder and the President of McKinsey RTS.  Garcia is also a senior partner of McKinsey & Co. and a member of the board of directors of McKinsey's investment arm, MIO Partners, Inc. ("**MIO**").

11

37.     Defendant Seth Goldstrom, an individual, resides in Georgia.  Goldstrom is a senior partner of McKinsey & Co.

38.     Defendant Alison Proshan, an individual, resides in New York.   Proshan is Associate General Counsel of McKinsey RTS.

39.     Defendant Robert Sternfels, an individual, resides in California.  Sternfels is a senior partner of McKinsey & Co.

## JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction over Alix's federal claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).  This Court has supplemental jurisdiction over Alix's state law claims for relief pursuant to 28 U.S.C. § 1367, as those claims are substantially related to the federal RICO claims and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

41.     This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a) because (i) there is complete diversity of citizenship between the parties, and (ii) more than $75,000, exclusive of interest and costs, is at stake.

42.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Alix's claims occurred in this District.

43.     Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact their affairs in this district.

## FACTS

### I.      Background of Jay Alix and AP

44.     In July 1981, Jay Alix formed the corporation that would later become AP. Starting as a solo practitioner, Alix worked with underperforming companies in bankruptcies, out-of-court restructurings, and corporate turnarounds.  Today, AP has over 1,750 employees in

approximately two dozen offices around the world, located in North and South America, Europe and the United Kingdom, the Middle East, and Asia.  Over the years, Alix has been involved, either directly or indirectly through AP, in helping and restructuring hundreds of companies involved in Chapter 11 proceedings.

45.     Alix has extensive experience as an Operating Trustee, Examiner, and Fraud Investigator.  He is also the co-author of two books for bankruptcy professionals, and has authored numerous articles concerning bankruptcy proceedings, corporate restructurings, and turnarounds.  Alix has also served as an instructor of United States District Judges at the Federal Judicial Training Center in Washington, D.C., and as a regular teacher for the continuing education of sitting United States Bankruptcy Judges.   During the 1990s, Alix was appointed by President Clinton to serve on the National Bankruptcy Review Commission, which reviewed and suggested changes to the federal bankruptcy laws.  These recommendations eventually led to legislative changes signed into law by President George W. Bush.

46.     Alix currently serves on the board of directors of AP and has an approximately 35% equity stake in the company.

## II.     Bankruptcy Consulting Services Is a Multibillion Dollar Industry.

47.     The field of bankruptcy consulting services as it presently exists has its genesis in the early 1980s, which saw a sharp increase in the number of large businesses filing for bankruptcy protection under Chapter 11 of the then-new Bankruptcy Code.  Companies filing for bankruptcy recognized that they needed not only advice from turnaround consultants, but also interim management to replace managers who had resigned as the company approached insolvency. Emerging leaders in this new market, such as AP, Alvarez & Marsal, and others, soon filled this void and began providing crisis and interim managers to troubled companies.

13

48.     As discussed below, McKinsey, through McKinsey & Co., first entered the field of bankruptcy consulting in or around 2001 with the *Hayes Lemmerz* bankruptcy, and later formed McKinsey RTS in or around 2010.   Since 2001, McKinsey has been engaged as a bankruptcy consultant in thirteen Chapter 11 bankruptcies.   Since 2010 alone, McKinsey has been engaged as a restructuring, turnaround, or financial advisor for six Chapter 11 bankruptcies, for which it has received over $100 million in fees—and over $125 million including pre-petition fees.

49.     McKinsey's three top competitors are AP, Alvarez & Marsal, and FTI Consulting, which collectively have provided consultancy services in approximately 75% of the bankruptcy cases since 2010 involving assets over $1 billion in which McKinsey or McKinsey RTS has not served as advisor.   Of those cases, AP obtained approximately 24.5% of the contracts.

50.     For 2016, the year last reported by the Debtwire North America Professional Fees Report, the combined bankruptcy fees of the major restructuring firms were in excess of $100 million.   However, this number does not include pre-petition or post-confirmation fees, which are typically very substantial.

### III.     As the World's Largest Consulting Firm, McKinsey Knows That a Professional Providing Bankruptcy Consulting Services Must Be Transparent About Its Connections and Have Undivided Loyalty to Its Debtor-Clients.

51.     Since 2001, in thirteen Chapter 11 bankruptcies involving billions of dollars in assets, McKinsey and McKinsey RTS have sought and obtained employment as bankruptcy "professionals" as that term is defined in the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*.

52.     Pursuant to 11 U.S.C. § 327(a), bankruptcy professionals must be persons "that do not hold or represent an interest adverse to the estate" and who are "disinterested persons." Under 11 U.S.C. § 101(14), a "disinterested person" is:

14

> a person that—(A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason."

Subsection C of this definition embraces any "interest or relationship that would even faintly color the independence and impartial attitude required by the Code."[2]

53.     In assessing whether a professional is disinterested, bankruptcy courts consider multiple factors, including i) whether the professional possesses or asserts for a client **any economic interest** that would tend to lessen the value of the bankruptcy estate **or create either an actual or potential dispute** in which the estate would be a rival claimant;[3] ii) whether the professional possesses a predisposition under the circumstances to be biased against the estate;[4] iii) whether the professional has **some interest or relationship that would even faintly color the independence and impartial attitude required by the Code**;[5] iv) whether it is likely that the professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest;[6] v) whether the professional is serving the debtors with undivided loyalty and providing untainted advice and assistance;[7] and vi) the likelihood that a potential conflict

---

[2]     *In re BH & P Inc.*, 949 F.2d 1300, 1308 (3d Cir. 1991).

[3]     *See, e.g., In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 461 (5th Cir. 2012); *In re AFI Holding, Inc.*, 530 F.3d 832, 845 (9th Cir. 2008); *In re Crivello*, 134 F.3d 831, 835 (7th Cir. 1998).

[4]     *See, e.g., Am. Int'l Refinery*, 676 F.3d at 461; *AFI Holding*, 530 F.3d at 845; *Crivello*, 134 F.3d at 835.

[5]     *See, e.g., Crivello*, 134 F.3d at 835; *Rome v. Braunstein*, 19 F.3d 54, 58 n.1 (1st Cir. 1994); *In re Lewis Rd.*, 2011 WL 6140747, at *7 (Bankr. E.D. Va. 2011).

[6]     *In re Pillowtex, Inc.*, 304 F.3d 246, 251 (3d Cir. 2002).

[7]     *See, e.g., Rome*, 19 F.3d at 58; *In re Arlan's Dept. Stores, Inc.*, 615 F.2d 925, 936-37 (2d Cir. 1979).

might turn into an actual one or the influence that a conflict might have on the professional's decision making.[8]

54.     To enforce these important limitations on the employment of professionals like McKinsey and McKinsey RTS, Bankruptcy Rule 2014 establishes strict disclosure requirements. One of these disclosure requirements is that a professional's application for employment pursuant to 11 U.S.C. § 327(a) "***shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants***[.]" (emphasis added).

55.     The term "connections" is interpreted broadly and encompasses all relationships that are not considered *de minimis*.[9]   Statements detailing connections must be explicit and complete to allow the court and other parties to ascertain the professional's disinterestedness and lack of adverse interests.[10]   To this end, a professional must disclose ***all*** facts and relationships that might potentially bear on the professional's qualification for retention.[11]   Disclosure requirements are broader than the rules governing disqualification, and a professional must

---

[8]     *See, e.g., Rome*, 19 F.3d at 58; *Am. Int'l Refinery*, 676 F.3d 455, 461 (5th Cir. 2012); *see also In re Git-N-Go Inc.*, 321 B.R. 54, 58-59 (Bankr. N.D. Okla. 2004) ("[I]f it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation, then they have a conflict and an interest adverse to the estate."); *In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) (an actual conflict exists if there is "an active competition between two interests, in which one interest can only be served at the expense of the other."); *In re BH & P, Inc.*, 103 B.R. 556, 563 (Bankr. D.N.J. 1989), *aff'd* in pertinent part, 119 B.R. 35 (D.N.J. 1990) ("As a general principle, professional persons employed by the trustee should be free of any conflicting interest which might, in the view of the trustee or the bankruptcy court, affect the performance of their services or which might impair the high degree of impartiality and detached judgment expected of them during the administration of a case."); *In re Amdura Corp.*, 121 B.R. 862, 865 (Bankr. D. Colo. 1990), quoting *Collier on Bankruptcy* ¶ 327.03 (1985).
[9]     *See, e.g., Leslie Fay*, 175 B.R. at 536.
[10]     *See, e.g., Lewis Rd.*, 2011 WL 6140747, at *8.
[11]     *See, e.g., Lewis Rd.*, 2011 WL 6140747, at *8; *see also In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998).

disclose connections regardless of whether the connections would constitute a disqualifying interest under Section 327(a).[12]   Accordingly, a bankruptcy professional cannot exercise discretion and decide itself whether connections are irrelevant or trivial.[13]

56.     Rule 2014 imposes an independent duty of full disclosure on professionals seeking employment in bankruptcy cases, as well as a continuing obligation to investigate all of their possible connections and supplement their disclosures in a timely fashion if and when additional connections arise.[14]

57.     Bankruptcy professionals' declarations pursuant to Rule 2014 are required to be made under penalty of perjury pursuant to 28 U.S.C. § 1746.

58.     Often, bankruptcy professionals must be disqualified because of a *potential* conflict.[15]   Regardless of whether a professional's judgment actually has been or will be compromised, courts are required to maintain the credibility and integrity of the bankruptcy system.[16]   Thus, the bankruptcy system must be transparent and provide a level field for all creditors and stakeholders.  Those goals require strict enforcement of Rule 2014, and bankruptcy courts are required to review professionals' Rule 2014 disclosures and determine whether the professional is "disinterested" within the meaning of Section 327(a).

---

[12]     *See, e.g., In re Olsen Indus., Inc.*, 222 B.R. 49, 60 (Bankr. D. Del. 1997).

[13]     *See, e.g., In re Citation Corp.*, 493 F.3d 1313, 1321 (11th Cir. 2007) ("bankruptcy court, not the professionals, must determine which prior connections rise to the level of an actual conflict or pose the threat of a potential conflict … professional must disclose all of its previous contacts with any party in interest"); *Rome*, 19 F.3d at 59 (noting that the "decision should not be left to…[the professional], whose judgment may be clouded by the benefits of the potential employment").

[14]     *See, e.g., Granite Partners*, 219 B.R. at 35.

[15]     *See, e.g., In re Glenn Elec. Sales Corp.*, 99 B.R. 596, 601-02 (D.N.J. 1988).

[16]     *See, e.g., Glenn*, 99 B.R. at 601-02; *United States v. Gellene*, 182 F.3d 578, 588 (7th Cir. 1999) ("The Code reflects Congress' concern that any person who might possess or assert an interest or have a predisposition that would reduce the value of the estate or delay its administration ought not have a professional relationship with the estate").

59.    Without a bankruptcy professional's full and truthful disclosure of all of its connections in its Rule 2014 disclosures, the bankruptcy court is rendered unable to accurately assess the professional's qualifications to serve as a fiduciary for the estate, stymieing the effectuation of the bankruptcy court's mandate to approve the employment of only disinterested professionals.

60.    McKinsey is the world's largest standalone business management consulting firm. It serves many of the world's largest corporations, including eighty of the top 120 banks and financial-services firms, nine of the eleven largest chemical companies, and fifteen of the twenty-two biggest health-care and pharmaceutical concerns.

61.    McKinsey's connections are extensive. According to its website, McKinsey offers its services to the following business sectors:

- Advanced Electronics
- Aerospace & Defense
- Automotive & Assembly
- Capital Projects & Infrastructure
- Chemicals
- Consumer Packaged Goods
- Electric Power & Natural Gas
- Financial Services
- Healthcare Systems & Services
- High Tech
- Media & Entertainment
- Metals & Mining
- Oil & Gas
- Paper & Forest Products

- Pharmaceuticals & Medical Products

- Private Equity & Principal Investors

- Public Sector

- Retail

- Semiconductors

- Social Sector

- Telecommunications

- Travel, Transport & Logistics

62.     McKinsey also has 30,000 "alumni"—former McKinsey employees—most of whom are now employed in other businesses and government. In fact, more Fortune 500 CEOs are alumni of McKinsey than of any other company. McKinsey actively develops and exploits its alumni for new business investment and referrals and facilitates alumni job placement.

63.     In addition, McKinsey has its own exclusive, high-performing internal investment fund, MIO.  MIO is a wholly-owned subsidiary of McKinsey & Co. that serves as McKinsey's investment arm.  According to its most recent Form ADV 2A filed with the United States Securities and Exchange Commission, MIO invests approximately $25 billion on behalf of its current and former partners and employees.  MIO has taken significant equity positions in many of McKinsey's clients.

64.     As a highly-sophisticated international corporation, McKinsey has ready access to the most sophisticated legal advice available – both as a client of, and advisor to, major law firms – and is well aware of the foregoing disclosure requirements in the bankruptcy profession. Additionally, McKinsey partners and employees who have been associated with its bankruptcy work are themselves attorneys, including Defendants Jon Garcia and Seth Goldstrom.  Several also have extensive experience with other bankruptcy consulting firms (including AP) where

19

they became familiar with Bankruptcy Code Section 327 and Bankruptcy Rule 2014, including Defendant Kevin Carmody.  Regardless, McKinsey is required and presumed to know the law applicable to its employment as a bankruptcy professional.

### IV.  From 2001 through 2013, McKinsey Engaged in a Pattern of Racketeering Activity that Involved Crimes Relating to Submitting False Statements in Order to Evade Disqualification.

65.    From 2001 to 2013, in eight separate bankruptcy proceedings, McKinsey repeatedly and deliberately violated its disclosure obligations under bankruptcy law by submitting false disclosure declarations in order to avoid disqualification and to unlawfully deprive AP of valuable assignments.

66.    During that thirteen-year window, McKinsey and/or McKinsey RTS accepted the following eight lucrative bankruptcy assignments:

  a.  *In re Hayes Lemmerz International, Inc*., No. 01-BR-11490 (Bankr. D. Del.), filed on December 5, 2001 (hereafter "***Hayes Lemmerz***" or "***Hayes***");

  b.  *In re UAL Corp. (United Airlines)*, No. 02-BR-48191 (Bankr. N.D. Ill.), filed on December 9, 2002 (hereafter "***UAL***");

  c.  *In re Mirant Corp*., No. 03-BR-46590 (Bankr. N.D. Tex.), filed on July 14, 2003 (hereafter "***Mirant***");

  d.  *In re Lyondell Chemical Co*., No. 09-BR-10023 (Bankr. S.D.N.Y.), filed on January 6, 2009 (hereafter "***Lyondell Chemical***" or "***Lyondell***");

  e.  *In re Harry & David Holdings, Inc*., No. 11-BR-10884 (Bankr. D. Del.), filed on March 28, 2011 (hereafter "***Harry & David***");

  f.  *In re AMR Corp*., No. 11-BR-15463 (Bankr. S.D.N.Y.), filed on November 29, 2011 (hereafter "***AMR***");

  g.  *In re AMF Bowling Worldwide, Inc*., No. 12-BR-36495 (Bankr. E.D. Va.), filed on November 13, 2012 (hereafter "***AMF Bowling***");

  h.  *In re Edison Mission Energy*, No. 12-BR-49219 (Bankr. N.D. Ill.), filed on December 17, 2012 (hereafter "***Edison Mission Energy***" or "***Edison Mission***");

67.     In each of these eight cases, McKinsey's disclosure declarations violated Rule 2014.  They were also false and misleading in numerous respects, detailed *seriatim* below.

**A.     McKinsey Unlawfully Concealed Its Connections and Affirmatively Misrepresented That It Was Disinterested**

68.     In each of the eight above-listed bankruptcy cases, McKinsey concealed, and failed to name, almost every one of its connections, relationships, and conflicts and affirmatively misrepresented its disinterestedness under the law.  It also failed to describe with adequate detail the nature of its connections, relationships, and conflicts.

69.     In contrast to McKinsey, the disclosure declarations filed by every other counsel for the debtor, counsel for the creditor, and their respective financial advisors retained in these eight bankruptcy cases contained exhaustive lists that identified by name the numerous connections that Rule 2014 required them to disclose, and also described the nature of the professionals' relationships with each connection. Excluding McKinsey, the bankruptcy professionals specifically identified an average of 185 connections per case.  McKinsey, however, disclosed *no* connections by name in its initial declarations for these eight cases, and only in two cases (*UAL* and *Harry & David*, discussed *infra*), through a Supplemental Declaration and a Second Supplemental Declaration, respectively, did it disclose any connections at all.

70.     Given the size and complexity of McKinsey's business and business relationships, its Rule 2014 disclosure declarations should have been voluminous.  McKinsey's declarations should have clearly named and described the nature of any of McKinsey's connections to any of the Interested Parties listed in those cases, regardless of whether those connections were creditors, suppliers, customers, or competitors of the Chapter 11 debtors, and regardless of whether the connection was a McKinsey client (or affiliate thereof), service provider (or affiliate

21

thereof), investment-related, or an employee relationship.[17]   McKinsey also should have disclosed any connections or referrals that led to its obtaining employment in each of these eight cases. As detailed below, McKinsey unlawfully failed to disclose its connections, which included many dozens, if not hundreds, of connections to Interested Parties, including financial institutions and other clients in the wide range of industries that McKinsey serves.

### i.   *Hayes Lemmerz*

71.   The *Hayes Lemmerz* bankruptcy was filed on December 5, 2001.  In *Hayes*, McKinsey filed three disclosure affidavits: an initial affidavit in support of McKinsey & Co.'s retention as a management consultant, filed on December 27, 2001; a supplemental affidavit, dated February 13, 2002; and a second supplemental affidavit, dated March 13, 2002. McKinsey's fees in *Hayes* were subsequently confirmed on May 12, 2003.

72.   Despite filing three affidavits in *Hayes*, McKinsey failed to name a **single** connection to any Interested Parties.  By doing so, McKinsey unlawfully omitted and concealed its connections to likely dozens of Interested Parties.   Simply by comparing McKinsey's disclosures dated February 27, 2003 in the overlapping *UAL* matter (discussed *infra*) to its disclosures in *Hayes*, it is apparent that McKinsey unlawfully failed to disclose several major connections to Interested Parties in *Hayes* despite the fact that they were **current McKinsey clients**, including, *inter alia*:

| Entity | Interested Party Role (*Hayes*) | McKinsey Connection |
|--------|---------------------------------|---------------------|
| Bank One Corporation | Secured Creditor | Client |

---

[17]   A list of Interested Parties is docketed early on in all bankruptcy cases to ensure that all Interested Parties have been properly identified, and to enable stakeholders to identify any conflicts that might exist among or between Interested Parties and professionals such as McKinsey.

| Entity | Interested Party Role (*Hayes*) | McKinsey Connection |
|---|---|---|
| Bank One Trust Company, N.A. | Major Bondholder | Client and/or Subsidiary and Affiliate of Clients (*JPMorgan Chase and Bank One Corporation*) |
| Chase Bank of Texas, N.A. | Major Bondholder | Client and/or Subsidiary and Affiliate of Clients (*JPMorgan Chase and Bank One Corporation*) |
| Chase Manhattan Bank | Major Bondholder | Client and/or Subsidiary and Affiliate of Clients (*JPMorgan Chase and Bank One Corporation*) |
| MDFC / Boeing | Major Lessor | Client and/or Subsidiary of Client (The Boeing Company) |

73.     All or any one of McKinsey's undisclosed connections would have disqualified McKinsey from employment. However, because of McKinsey's fraudulent concealment of those connections, neither the court, the United States Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey's potential conflicts.

74.     McKinsey also concealed connections to additional Interested Parties in *Hayes*. However, McKinsey's dishonest course of conduct makes it difficult to determine the exact number and nature of what were undoubtedly numerous undisclosed connections.  The facts needed to ascertain these connections are peculiarly within McKinsey's knowledge, but will be proven through discovery.

### ii.     UAL (United Airlines)

75.     The *UAL (United Airlines)* bankruptcy was filed on December 9, 2002, approximately one year after *Hayes Lemmerz* was filed.  In *UAL*, McKinsey filed two affidavits purportedly disclosing its connections to Interested Parties: an initial affidavit filed on December

9, 2002; and a supplemental affidavit dated February 13, 2002.  McKinsey's fees for *UAL* were subsequently confirmed on January 21, 2006.

76.     In its initial disclosure in *UAL*, filed on December 9, 2002, McKinsey once again failed to name a single connection to any Interested Parties.  Nearly three months later, on February 27, 2003—well into the case and after McKinsey's employment had been approved by the bankruptcy court—McKinsey filed a supplemental affidavit in which it admitted that at least eleven Interested Parties in *UAL* were actually ***current*** McKinsey clients—including The Boeing Company, which was listed as a Significant Secured Creditor.  And while McKinsey failed to acknowledge it in its disclosures, at least another four Interested Parties (three Significant Secured Creditors and one Significant Unsecured Creditor) were subsidiaries of a current McKinsey client and Interested Party, JPMorgan Chase.  McKinsey was required to disclose all of these connections in its initial submission, but willfully and fraudulently concealed them.

77.     McKinsey also concealed likely dozens of additional connections to the approximately 1,400 Interested Parties named in *UAL.* The facts needed to ascertain these connections are peculiarly within McKinsey's knowledge, but will be proven through discovery.

### iii.     Mirant

78.     The *Mirant* bankruptcy was filed on July 24, 2003—just months after McKinsey filed its February 27, 2003 affidavit in *UAL*.  In *Mirant*, McKinsey submitted just one disclosure affidavit, which it filed three months after the commencement of the case, on October 27, 2003. McKinsey's fees for *Mirant* were subsequently confirmed on December 9, 2005.

79.     In *Mirant*, McKinsey continued its pattern of unlawful dissemblance and completely disregarded its Rule 2014 obligations.  In its disclosure affidavit, McKinsey failed to name ***a single connection*** to any of the Interested Parties.  However, a comparison of the Interested Parties list in *Mirant* to McKinsey's own disclosures in the concurrent *UAL* matter on

February 27, 2003, reveals that McKinsey unlawfully omitted and concealed its connections to numerous Interested Parties in *Mirant* that were **current clients** of McKinsey, including, *inter alia*:

| Entity | Interested Party Role (*Mirant*) | McKinsey Connection |
|---|---|---|
| Bank One  Corporation | Lender; Bondholder | Client; Subsidiary of Client (*JPMorgan Chase*) |
| Bank One NA | Top 50 Unsecured Creditor | Client and/or Subsidiary of Clients (*JPMorgan Chase and Bank One Corporation*) |
| British Petroleum | Contract Counterparty | Client (*BP plc*) |
| BP America Production Company | Contract Counterparty | Client and/or Subsidiary of Client (*BP plc*) |
| BP Canada Energy Company | Contract Counterparty | Client and/or Subsidiary of Client (*BP plc*) |
| BP Canada Energy Marketing Corp. | Contract Counterparty | Client and/or Subsidiary of Client (*BP plc*) |
| BP Corporation North America Inc. | Contract Counterparty | Client and/or Subsidiary of Client (*BP plc*) |
| BP Energy Company | Contract Counterparty | Client and/or Subsidiary of Client (*BP plc*) |
| JPMorgan Chase Bank | Top 50 Unsecured Creditor | Client and/or Subsidiary and Affiliate of Clients (*JPMorgan Chase and Bank One Corporation*) |
| JPMorgan Securities, Inc. | Top 50 Unsecured Creditor | Client and/or Subsidiary and Affiliate of Clients (*JPMorgan Chase and Bank One Corporation*) |
| Kreditanstalt fur Wiederaufbau | Lender; Indenture Trustee | Client |

80.   McKinsey was required by law to disclose all of these connections to *Mirant* Interested Parties in its affidavit, but instead willfully and fraudulently concealed them instead.

25

81.     All or any one of McKinsey's undisclosed connections would have disqualified McKinsey from employment. However, because of McKinsey's fraudulent concealment of those connections, neither the court, the United States Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey's potential conflicts.

82.     McKinsey also concealed additional connections to the hundreds of Interested Parties in *Mirant*. The facts needed to ascertain these connections are peculiarly within McKinsey's knowledge, but will be proven through discovery.

### iv.     *Lyondell Chemical*

83.     The *Lyondell Chemical* bankruptcy was filed on January 6, 2009.  In *Lyondell*, McKinsey filed two disclosure affidavits: an initial affidavit dated June 17, 2009, and a supplemental affidavit dated September 11, 2009.   McKinsey's fees for *Lyondell* were subsequently confirmed on April 23, 2010.

84.     In *Lyondell*, McKinsey continued its pattern of unlawfully failing to disclose all of its connections to Interested Parties.  In its initial affidavit dated June 17, 2009, McKinsey once again failed to name a ***single*** connection to any of the Interested Parties in *Lyondell*—apart from a footnote stating that one McKinsey partner had previously worked at the law firm Skadden, Arps, Meagher & Flom LLP as a summer associate eight years earlier in 2001— disingenuously suggesting that McKinsey had conducted a thorough inquiry into its many conflicts when that clearly was not the case.  And in its supplemental affidavit filed three months later, McKinsey named no connections to Interested Parties.

85.     In *Lyondell*, McKinsey unlawfully concealed its connections to at least a dozen Interested Parties, including, *inter alia*:

    a.     Allianz Global (Bondholder)

    b.     Allianz Global Investors Kapitalanlagegesellschaft (Bondholder)

26

    c.    Allianz Insurance Company (Insurer)

    d.    Allianz Netherlands (Insurer)

    e.    Allianz Paint Insurance Claim (Litigation Adversary)

    f.    BlackRock (Bondholder)

    g.    Citibank / Citibank International (Lender and Co-Defendant)

    h.    Citigroup Global Markets, Inc. (Lender and Co-Defendant)

    i.    Citigroup, Inc. (Lender and Co-Defendant)

    j.    OHCCF CBNA Loan Funding (Lender)

    k.    Protean CBNA Loan Funding (Lender)

    l.    Prudential Financial, Inc. (Bondholder)

86.    McKinsey was required to disclose all of these connections in its submissions, but instead willfully and fraudulently concealed them.

87.    All or any one of McKinsey's undisclosed connections would have disqualified McKinsey from employment. However, because of McKinsey's fraudulent concealment of those connections, neither the court, the United States Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey's potential conflicts.

88.    McKinsey concealed additional connections to Interested Parties in *Lyondell*. The facts needed to ascertain these connections are peculiarly within McKinsey's knowledge, but will be proven through discovery.

        *v.*    ***Harry & David***

89.    The *Harry & David* bankruptcy was filed on March 28, 2011.  In *Harry & David*, McKinsey filed three disclosure declarations, all sworn to and signed by Defendant Seth Goldstrom: an initial Declaration filed on April 4, 2011; a Supplemental Declaration dated April

19, 2011; and a Second Supplemental Declaration dated June 17, 2011.  McKinsey's fees in *Harry & David* were subsequently confirmed on August 29, 2011.

90.     In his initial declaration in *Harry & David* filed on April 4, 2011, Goldstrom failed to name ***a single connection*** between McKinsey and any of the Interested Parties thereby continuing McKinsey's unlawful pattern of failing to disclose its connections.  Two weeks later, on April 19, 2011, in his First Supplemental Declaration, Goldstrom again failed to name a single McKinsey connection.  Months later, on June 17, 2011, in his (final) Second Supplemental Declaration, Goldstrom named *one* McKinsey connection, stating that until November 30, 2008, the Pension Benefit Guaranty Corporation had been a client of "an affiliate of McKinsey RTS." This single disclosure was woefully inadequate and misleading, as it purposefully gave the false impression that McKinsey's disclosures were so diligent and thorough that they even included all Interested Parties who were past clients from three years earlier.  In reality, McKinsey failed to disclose even its connection to recent *past* clients—much less its *current* clients or any other connections to Interested Parties.  For instance, McKinsey until in or around October 2009, McKinsey had been engaged by the parent company of at least ***thirteen companies*** named as Interested Parties in *Harry & David*.  Even a cursory effort by McKinsey to comply with its disclosure obligations would have revealed its connection to those Interested Parties.  McKinsey should have disclosed these recent connections.  Its failure to do so is further evidence of McKinsey's willful blindness to conflicts of interests and its serial, unlawful failure to disclose its connections to Interested Parties.[18]

---

[18]     In contrast to Goldstrom's disclosures on behalf of McKinsey & Co., when the law firm Jones Day LLP filed a lengthy statement in support of its *initial* application for employment as counsel for debtors in *Harry & David*, it disclosed by name, its connections to over 130 Interested Parties and their corporate affiliates.

91.     McKinsey and Goldstrom also concealed additional connections to Interested Parties in *Harry & David*.  The facts needed to ascertain these connections are peculiarly within their knowledge, but will be proven through discovery.

> ### vi.     AMR

92.     The *AMR* bankruptcy was filed on August 29, 2011.  In *AMR*, McKinsey submitted seven disclosure declarations, all of which were sworn to and signed by Seth Goldstrom: an initial Declaration filed on January 10, 2012; a First Supplemental Declaration filed on January 20, 2012; a Second Supplemental Declaration filed on February 27, 2012; a Third Supplemental Declaration filed on May 10, 2012; a Fourth Supplemental Declaration filed on November 13, 2012; a Fifth Supplemental Declaration filed on February 28, 2013; and a Sixth Supplemental Declaration filed on April 18, 2013.  McKinsey's fees in *AMR* were subsequently confirmed on October 21, 2013.

93.     In *AMR*, McKinsey and Goldstrom once again intentionally concealed McKinsey's connections to Interested Parties.  In his initial Declaration in *AMR* filed on January 10, 2012, Goldstrom failed to name a single connection between McKinsey and any of the Interested Parties.  In his First Supplemental Declaration filed on January 20, 2012, Goldstrom disclosed that until March 2011, McKinsey's former Managing Director, Rajat Gupta, had been a board member of the debtor, AMR Corporation ("**AMR**") until March 2011—facts that were known to McKinsey on the August 29, 2011 bankruptcy filing date and should have been disclosed in its initial declaration.  Goldstrom also disclosed that two McKinsey employees had "de minimis" holdings in AMR, which they had been directed to sell down immediately.  Once again, McKinsey's disclosures gave the purposefully false impression that it had conducted a thorough search for connections to Interested Parties and fully disclosed such connections.

94.     In his Second Supplemental Declaration filed on February 27, 2012, Goldstrom failed to name any further McKinsey connections.  The same is true of his Third Supplemental Declaration filed on May 10, 2012.  In his Fourth Supplemental Declaration filed on November 10, 2012, Goldstrom disclosed for the first time vendor contracts with the Debtors dating back to 2010.  In his Fifth Supplemental Declaration filed on February 28, 2013, Goldstrom did not name any further McKinsey connections.  Finally, in his Sixth Supplemental Declaration, filed on April 18, 2013, Goldstrom disclosed that McKinsey had been retained by AMR and US Airways to assist in implementing a merger agreement between the two companies.

95.     Once again, McKinsey clearly made no serious effort to uncover or disclose its connections to Interested Parties.  For instance, by early January 2012—just two months after *AMR* was filed—McKinsey was hired by Royal Bank of Scotland to assist it with downsizing. Royal Bank of Scotland was named as an Interested Party (Aircraft Lenders and Lessors) in *AMR*, yet McKinsey and Goldstrom failed to disclose that Royal Bank of Scotland was a ***current client*** during the *AMR* bankruptcy.

96.     McKinsey and Goldstrom also concealed additional connections to Interested Parties in *AMR*.  The facts needed to ascertain these connections are peculiarly within their knowledge, but will be proven through discovery.

97.     All or any one of McKinsey's undisclosed connections would have disqualified McKinsey from employment. However, because of McKinsey's fraudulent concealment of those connections, neither the court, the United States Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey's potential conflicts.

### vii.     *AMF Bowling*

98.     The *AMF Bowling* bankruptcy was filed on November 13, 2012.  In *AMF Bowling*, McKinsey filed one disclosure declaration, sworn to and signed by Defendant Kevin

Carmody, on November 21, 2012.  McKinsey's fees in *AMF Bowling* were subsequently confirmed on June 25, 2013.

99.     In its disclosures in *AMF Bowling*, McKinsey failed to name a connection to a single Interested Party, thereby concealing connections to likely dozens of Interested Parties. The facts needed to ascertain all of these specific connections are peculiarly within McKinsey's knowledge, but will be proven through discovery.

<em><strong>viii.     Edison Mission Energy</strong></em>

100.     The *Edison Mission Energy* bankruptcy was filed on December 17, 2012.  In *Edison Mission*, McKinsey filed three disclosure declarations: an initial declaration filed on December 28, 2012; a First Supplemental Declaration filed on May 15, 2013, and a Second Supplemental Declaration filed on November 23, 2013.  McKinsey's fees in *Edison Mission* were subsequently confirmed on March 11, 2014.

101.     In *Edison Mission*, McKinsey once again disingenuously failed to name a ***single*** connection to any Interested Parties, thereby concealing connections to likely dozens of Interested Parties.   The facts needed to ascertain all of these specific connections are peculiarly within McKinsey's knowledge, but will be proven through discovery.

102.     Due to McKinsey's years-long pattern of unlawfully omitting and concealing its connections to Interested Parties, the full extent of McKinsey's failures to disclose remains unknown.  However, particularly given McKinsey's much lengthier disclosures in its most recent cases, *Alpha Natural Resources*, *SunEdison*, and *GenOn Energy*, discussed *infra*, McKinsey's undisclosed connections to Interested Parties likely number in the hundreds, in addition to those identified herein.

103.     Due to McKinsey's unlawful concealment of all but a handful of its numerous connections in these eight cases, AP, the courts, the United States Trustee, and the Interested

31

Parties were unable to determine the nature and scope of its connections and, therefore, McKinsey's qualifications to serve.  Many of these connections likely constituted ongoing and actual conflicts that, if disclosed, would have required McKinsey's disqualification from employment in these cases. Instead, McKinsey was permitted to serve notwithstanding these numerous disqualifying connections due to its false and misleading statements.

104.    McKinsey's twenty-two false and incomplete Rule 2014 declarations under penalty of perjury in these eight cases demonstrate that its failure to disclose its connections was a conscious, intentional choice on its part.  Simply stated, McKinsey violated black-letter law so blatantly and so consistently that its actions could only have been deliberate and knowing.

### B.    McKinsey Has Unlawfully Concealed All of Its Connections to Interested Parties through Its Investment Arm, MIO.

105.    McKinsey has also consistently and unlawfully concealed its connections to Interested Parties through its subsidiary MIO, both in its initial eight cases and in its subsequent five engagements, as discussed further, *infra*.  MIO, which is wholly owned by McKinsey, manages billions of dollars in assets for the benefit of both current and former McKinsey employees.

106.    MIO is governed by a board of twelve directors that includes both current and former senior partners of McKinsey & Co.  Defendant Jon Garcia, who is a director and officer of McKinsey RTS, is also a member of MIO's board of directors.

107.    Many of McKinsey's 30,000 former employees for whom MIO manages assets now work in senior positions at major corporations and government agencies all over the world. Thus, these McKinsey alumni have a financial incentive to refer consulting business from their current employers to McKinsey in return for continued access to MIO's unique and unusual investment products, which are capable of generating market-beating returns over long periods

of time.  Accordingly, McKinsey's alumni referral sources receive a significant financial benefit and an indirect *quid pro quo* for referring new business to McKinsey.

108.    From 2001 through the present, McKinsey's disclosure declarations have consistently concealed these connections to former employees as well as MIO's connections to Interested Parties in its bankruptcy cases.

109.    As one concrete example, MIO has over $600 million invested in BlackRock funds.  Forms filed by McKinsey with the Department of Labor show that MIO has maintained investments in BlackRock since at least 2011.  Since 2011, BlackRock entities have been listed in as Interested Parties in four bankruptcies involving McKinsey: *NII Holdings*, *SunEdison*, *Alpha Natural Resources*, and *GenOn*.  However, McKinsey did not disclose this connection in *any* of these four cases.  Nor did McKinsey disclose its interest in *SunEdison* when Longroad Energy, which is identified on the *SunEdison* Interested Parties list as a partner of a BlackRock subsidiary, BlackRock Infrastructure, purchased SunEdison's assets in bankruptcy.  And prior to 2011, when BlackRock was named as an Interested Party in *Lyondell*, McKinsey failed to disclose that BlackRock was then a service provider to MIO.

110.    Section 327 of the Bankruptcy Code prohibits McKinsey from imposing on its debtor clients and their creditors the risk that MIO's investment in BlackRock might impact McKinsey's professional judgment.  If McKinsey had properly disclosed the facts regarding MIO that Rule 2014 requires in these cases, McKinsey would and should have been disqualified under Section 327.

**V.    Alix Confronts Barton and Sternfels, and McKinsey and AP Reach an Agreement.**

111.    On multiple occasions beginning in September 2014, Alix confronted Defendants Dominic Barton and Robert Sternfels with evidence of McKinsey's repeated violations of the bankruptcy laws.   As discussed below, during the remainder of 2014 and over the course of the

next year, Alix spoke with Barton about McKinsey's conduct in bankruptcy consulting cases on at least eleven occasions, including three lengthy in-person meetings and eight substantive and lengthy telephone conferences. Sternfels participated in at least two of these exchanges.

112.   Alix also advised Barton that he had learned of a "pay to play" scheme whereby McKinsey made offers to bankruptcy attorneys to arrange exclusive meetings between bankruptcy counsel and high-level executives from its most valued clients in exchange for exclusive referrals of bankruptcy assignments from those attorneys. Alix advised Barton that McKinsey's "pay to play" offers were illegal. Such trafficking in bankruptcy cases is expressly prohibited under 18 U.S.C § 152(6).

113.   Throughout these interactions, Alix explained to Barton (and Sternfels when present) the absolute necessity that McKinsey comply with Rule 2014 and cease its illegal "pay-to-play" marketing scheme. He also explained the grave potential consequences of McKinsey's serious past misconduct.

114.   Alix and Barton first met on September 3, 2014 in the Manhattan office of the law firm of Gibson, Dunn & Crutcher LLP. At the time, they were in the midst of litigating a dispute involving McKinsey's targeting of AP employees who had stolen trade secrets and other confidential information from AP and taken them to McKinsey (and one of whom had spoliated evidence while the litigation was pending). Sternfels also participated by telephone in that first meeting, which lasted from approximately 4:00 p.m. until approximately 6:00 p.m. Subsequently, Alix and Barton met in person on October 16, 2014 and October 15, 2015. Sternfels participated in and/or was advised by Barton regarding the issues of illegality that were discussed in these meetings.

115.    During the September 3, 2014 meeting, Alix explained to Barton and Sternfels McKinsey's disclosure obligations under bankruptcy law at length.  Alix provided a lengthy and detailed exposition of the relevant legal principles, and he demonstrated how all of McKinsey's past disclosure declarations were non-compliant and illegal because they failed to identify connections by name, and failed to describe connections in sufficient detail.  Alix also raised McKinsey's pay-to-play scheme and explained to Barton why it, too, was illegal.

116.    Alix further advised Barton and Sternfels that McKinsey's pay-to-play scheme and concealment of connections in its bankruptcy engagements constituted serious and obviously intentional misconduct and that such misconduct could potentially expose the entire firm to criminal prosecution.  Alix explained that McKinsey's representatives had signed inadequate and false disclosure declarations under penalty of perjury and that the bankruptcy process is administered and overseen by the Department of Justice, including the United States Trustee, and that failure to fully and truthfully disclose connections was a serious matter.  Alix even apprised Barton of the famous case *United States v. Gellene*, 182 F.3d 578 (7th Cir. 1999), in which a prominent New York City bankruptcy attorney was convicted of filing a false Rule 2014 disclosure declaration in violation of 18 U.S.C. § 152(3) and sentenced to fifteen months in prison.

117.    Nothing that Alix told Barton and Sternfels on September 3, 2014 should have come as a surprise.  McKinsey is a company with about $10 billion in revenue, another $25 billion in investment assets, and ongoing access to some of the most sophisticated legal counsel in the world.  And internally at McKinsey RTS, Defendant Jon Garcia, who runs all of McKinsey RTS, holds a JD from Harvard Law School, while Defendant Goldstrom, who runs

McKinsey RTS's domestic operations, was at the top of his class at the University of Virginia School of Law and is a member in good standing of the Georgia bar.

118.    In response to the information provided by Alix, Barton expressed doubt about the RTS business, while Sternfels expressed support for it and that any illegalities could be rectified.

119.    On the following day, September 4, 2014, Barton called Alix to thank him for the meeting and to advise him that McKinsey would look into the issues raised by Alix and that they would talk again.

### A.    Barton Admits McKinsey's Pay-to-Play Scheme.

120.    On October 16, 2014, Alix and Barton met in person for a second time, at McKinsey & Co.'s offices in London.  During that meeting, Barton informed Alix that he had looked into Alix's allegations regarding McKinsey's pay-to-play scheme.  Barton revealed that he had been upset and angry to learn that McKinsey had, in fact, been making pay-to-play offers to bankruptcy lawyers.

121.    Barton told Alix that he had consulted Eric Friedman, a senior partner at the law firm Skadden, Arps, Meagher & Flom LLP, who had told him that the scheme was illegal. Barton expressed incredulity that Garcia, Goldstrom, and the McKinsey RTS staff would have engaged in such conduct, acknowledged that it was wrong, and confirmed that it never should have happened.

122.    Barton added that Virginia Molino, General Counsel of McKinsey & Co., agreed with his assessment.

### B.    McKinsey and AP Agree to a Resolution.

123.    Both before and after their October 2014 meeting, Barton expressed to Alix his disdain for, and grave doubts about, the wisdom of the McKinsey RTS business.  He noted that

he did not understand why McKinsey was in the bankruptcy business at all.  Barton told Alix that

many McKinsey partners questioned why McKinsey RTS and McKinsey's involvement in the

bankruptcy business had been established in the first place.  Barton stated that he did not want

McKinsey to continue in the bankruptcy business both because he did not like it and because he

did not want McKinsey to make the legally-required disclosures, which he stated were

inconsistent with McKinsey's business model.

124.    Barton proceeded to explain that his re-election as Global Managing Partner of

McKinsey was to occur soon, in January 2015.  He asked Alix to continue to be patient, and

represented that his re-election would solidify his ability to address the issues raised by Alix.

Barton had also previously asked Alix to be patient and not act on his concerns while Barton

looked into the matter.  Barton assured Alix that after his re-election, he would be able to change

the situation very quickly, and that he had consulted his predecessor, Ian Davis, who had advised

him that the way to change the problem at McKinsey was to change the people.  Alix responded

that he could be patient if Barton was going to make a meaningful attempt to have McKinsey

make full disclosure and comply with the law.  Barton promised that McKinsey would not enter

into any further bankruptcy engagements prior to his re-election.

125.    At the October 2014 meeting, Barton (acting on behalf of McKinsey) agreed with

Alix (acting on behalf of AP) that within thirty days of Barton's re-election in January 2015,

McKinsey would remove the senior leadership of McKinsey RTS for their illegal behavior.

Barton further agreed, on behalf of McKinsey, that McKinsey would exit the RTS business by

the end of March 2015, and thus there would be no more unlawful behavior by McKinsey.  In

exchange, Alix agreed to remain patient and refrain from acting at that time on the issues he had

raised.  He did so because he felt that no legal action he could take would resolve McKinsey's conduct any quicker than the actions that Barton had promised.

126.    Barton was re-elected on January 30, 2015, but did not act on his assurances to Alix that he would remove Garcia and Goldstrom within thirty days of his re-election.  In March 2015, Alix called Barton to remind him of their agreement.  Barton advised Alix that he would not be able to move as quickly as he had previously assured Alix he would, but that he would remove Garcia and Goldstrom from their positions by the end of May 2015.

127.    Barton never fulfilled his promise. Instead, Garcia and Goldstrom remain in leadership positions at RTS, and McKinsey continues to conduct its criminal enterprise to the present day.

128.    At 11:00 a.m. on Thursday, October 15, 2015, Alix met with Barton at McKinsey's offices in New York City for their eleventh interaction and their third and final in-person meeting.  Once again, Alix confronted Barton regarding McKinsey's continued violations of its disclosure obligations.  During that meeting, Barton offered to introduce AP to Fortescue, a large iron ore mining company in Australia that needed consulting services.  Alix immediately declined.  Barton then offered to help introduce AP to Volvo in Europe, saying they needed help.  Again, Alix immediately declined Barton's offer, which he found shocking and improper.  In over four decades of experience, no competitor had ever offered Alix any restructuring assignment or introduction of any kind, let alone two very large international consulting assignments during the same meeting.  Barton's offers were blatant attempted pay-offs and bribes offered in return for dropping the issues concerning McKinsey's acknowledged pay-to-play scheme and its illegal disclosure declarations.

129.    As detailed below, it is now abundantly clear that Barton and McKinsey never intended to honor their commitments, but instead made false representations in order to forestall corrective actions by Alix as long as possible, thereby maximizing their fees and increasing McKinsey's foothold in the high-end bankruptcy business at AP's expense.

## VI.    Despite Barton's Representations to Alix, McKinsey Unlawfully Concealed Its Disqualifying Connections in *NII Holdings*.

130.    As Alix subsequently learned, during Barton and Alix's agreed-upon forbearance period, McKinsey RTS was retained as an advisor in the *NII Holdings (Nextel)*, which was filed on September 15, 2014.  Although AP sought an opportunity to bid or make a pitch for that assignment, it was never given any opportunity to do so.  As an industry leader, AP was typically afforded at least an opportunity to make a pitch for high-end restructuring assignments.  That AP was denied such an opportunity for the *NII* matter strongly suggests the influence of McKinsey's illegal "pay-to-play" scheme.

131.    On October 23, 2014, on behalf of McKinsey RTS, Defendant Kevin Carmody, who is a former AP employee, filed his initial disclosure declaration on behalf of McKinsey RTS in *NII Holdings*.  On November 6, 2014, Carmody filed a First Supplemental Declaration in *NII*.

132.    The difference between the disclosures that Carmody filed on behalf of McKinsey RTS and those he filed while at AP is striking.  When Carmody submitted declarations on AP's behalf in his previous employment, he had fully complied with the requirements of Rule 2014 and regularly identified all of AP's relevant connections by name and in detail.  For example, in *In re American Safety Razor*, No. 10-BR-12351 (Bankr. D. Del.), Carmody, while still working for AP, had filed a lengthy Rule 2014 statement that contained seven full pages disclosing specific connections by name and describing the nature of the connection to each party so disclosed.

133.    As in McKinsey's previous eight bankruptcy cases, Carmody's Rule 2014 disclosure declarations in *NII* unlawfully concealed all of McKinsey's connections to Interested Parties.  Once again, McKinsey did not identify even a single connection by name, but instead offered vague descriptions of some connections to certain *categories* of Interested Parties and Carmody represented under oath that McKinsey was "disinterested."  This statement of disinterestedness was false.  Had McKinsey and Carmody told the truth, it would have revealed, *inter alia*, McKinsey's connection to BlackRock Fund Advisors, which was identified on the *NII* Interested Parties list as a Major Noteholder.  Since at least 2011 and continuing through the present, McKinsey's investment arm, MIO Partners, has held an interest in BlackRock.  McKinsey was obviously aware of this fact, given that it disclosed this investment in its Labor Department Form 5500.

134.    Had McKinsey and Carmody disclosed McKinsey's connections, all or any one of them would have disqualified McKinsey from employment. However, because of McKinsey's and Carmody's fraudulent concealment of those connections, neither the court, the United States Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey's potential conflicts.

135.    McKinsey also concealed connections to additional Interested Parties in *NII Holdings*. The facts needed to ascertain these connections are peculiarly within McKinsey's knowledge, but will be proven through discovery.

136.    On November 3, 2014, Alix called Barton to discuss *NII Holdings*. Barton claimed that he was unaware of the matter, despite an earlier commitment by Barton to track all future McKinsey bankruptcy cases, his previous detailed discussions with Alix regarding McKinsey's inadequate disclosure declarations in other cases, and his promises to rectify

McKinsey's illegal conduct.   Barton promised Alix that he "would look into" McKinsey's involvement and disclosures in *NII Holdings*.   Barton never followed up, and McKinsey never disclosed any connections by name in *NII*.

### VII.   Defendants Continued Their Racketeering Activity in *Standard Register*.

137.   As subsequently disclosed in McKinsey's initial declaration in *Standard Register*, in or about January 2015, McKinsey was engaged for pre-petition work (and later for the bankruptcy assignment) on yet another bankruptcy case, *Standard Register*.   The *Standard Register* bankruptcy was filed on March 12, 2015.   McKinsey filed one disclosure declaration in *Standard Register*, on March 23, 2015.   On November 19, 2015, McKinsey's fees for *Standard Register* were confirmed.

138.   In *Standard Register*, Carmody, on behalf of McKinsey RTS, once again submitted an unlawfully vague, non-specific Rule 2014 disclosure declaration.   As in *NII Holdings*, McKinsey and Carmody failed to identify by name a single connection to any Interested Parties, and Carmody falsely represented under oath that McKinsey was "disinterested."

139.   In *Standard Register*, Carmody failed to disclose (*inter alia*) that the United States Department of Defense, which was on the Interested Parties list, was a major McKinsey client that had paid McKinsey millions of dollars in recent years.   In September 2014 alone, McKinsey had been awarded two two-year contracts worth more than $11 million combined, and in October 2013, it had been awarded a contract worth nearly $16 million.

140.   McKinsey also failed to disclose its connection to another Interested Party, Southern California Edison, a subsidiary of Edison International.   Less than two years earlier, McKinsey had been hired for the bankruptcy of Edison Mission Energy—also a subsidiary of Edison International. This recent connection, like its multiple large contracts with the

41

Department of Defense, was required to be disclosed and would have been obvious had McKinsey made any real effort to comply with its Rule 2014 obligations.[19]

141.    Had McKinsey and Carmody disclosed McKinsey's connections, all or any one of them likely would have disqualified McKinsey from employment. However, because of McKinsey's and Carmody's fraudulent concealment of those connections, neither the court, the United States Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey's potential conflicts.

142.    McKinsey and Carmody concealed many other connections to Interested Parties in *Standard Register*.  The facts needed to ascertain these connections are peculiarly within their knowledge, but will be proven through discovery.  However, the insufficiency of McKinsey's and Carmody's disclosures in *Standard Register* is made all the more apparent by the disclosures that McKinsey RTS later made in *Alpha Natural Resources* and *SunEdison*, beginning in *Alpha Natural Resources* just seven months after McKinsey RTS filed its last fee application in *Standard Register* on October 28, 2015.  For example, in *Alpha Natural Resources* and/or *SunEdison*, McKinsey disclosed that, *inter alia*, the following entities—all of which were named as Interested Parties in *Standard Register*—were **McKinsey clients** or service providers:

| Entity | Interested Party Role (*Standard Register*) | McKinsey Connection (as disclosed in *Alpha Natural Resources* and/or *SunEdison*) |
|---|---|---|
| Allianz SE | Insurer | Client and/or Affiliate of Client (*Allianz Global US*) |
| American Electric Power Company | Utility Provider | Client |

---

[19]    McKinsey also failed to disclose, *inter alia*, that multiple McKinsey alumni were employed by Bank of Montreal, the parent of BMO Harris Bank N.A., identified as on the Interested Party list as a Landlord; or that Sidley Austin LLP, identified as an Ordinary Course Professional, was also a service provider to McKinsey's investment arm, MIO.

| Entity | Interested Party Role (*Standard Register*) | McKinsey Connection (as disclosed in *Alpha Natural Resources* and/or *SunEdison*) |
|---|---|---|
| Anheuser Busch LLC | Parties relating to significant litigation involving the debtors | Client and/or Subsidiary of Client (*Anheuser Busch Companies, Inc.*) |
| Bank of America Corp. | 50 Largest Unsecured Creditors; Largest Customers | Client |
| Bank of America, N.A. | Secured Creditor | Client |
| Deloitte & Touche LLP | Ordinary course professional | Service Provider |
| Deloitte Tax LLC | Ordinary course professional | Service Provider and/or Affiliate of Service Provider (*Deloitte & Touche LLP*) |
| Ernst & Young LLP | Ordinary course professional | Service Provider |
| General Electric Co. | Parties relating to significant litigation involving the debtors | Client and/or Parent of Client (*GE Capital Corp.*) |
| International Business Machines (IBM) | Significant vendor; Parties relating to significant litigation involving the debtors | Client |
| McGuire Woods LLP | Ordinary course professional | Service Provider |
| ML-AI 125 Wacker LLC | Landlord | Client and/or Subsidiary of Client (*Bank of America*) |
| Monsanto Company | Parties relating to significant litigation involving the debtors | Client and/or Affiliate of Client since 2009 (*Monsanto Electronic Material Company, predecessor of SunEdison, Inc.*) |
| Monsanto Research Company | Parties relating to significant litigation involving the debtors | Client and/or Affiliate of Client since 2009 (*Monsanto Electronic Material Company, predecessor of SunEdison, Inc.*) |
| Pacific Gas & Electric Co. | Landlord | Client |
| Skadden, Arps, Slate, Meagher & Flom LLP | Counsel and other advisors retained by other significant parties | Service Provider |

| Entity | Interested Party Role (*Standard Register*) | McKinsey Connection (as disclosed in *Alpha Natural Resources* and/or *SunEdison*) |
|---|---|---|
| Thomson Reuters | Ordinary Course Professional | Client<br>Service Provider |
| United States Steel Corp. | Major Customer | Client |
| Wells Fargo & Company | Secured Creditor | Client |
| Xcel Energy | Utility provider | Client |

143.    In the declarations that it filed in *Alpha Natural Resources* and *SunEdison*, McKinsey RTS did not specify the relevant dates for its disclosed connections.  It merely stated that the disclosed entities had, at some point within the past two years, been McKinsey clients or service providers.  Given the close proximity of *Standard Register* to McKinsey RTS's filings in *Alpha Natural Resources* and *SunEdison*, it is highly likely that many, if not all, of the above-listed connections also should have been disclosed in *Standard Register*.  Further, it is implausible that McKinsey first contracted with all of the above entities in the intervening months between *Standard Register* and its disclosures in *Alpha Natural Resources* and *SunEdison*.

144.    Similarly, numerous additional entities, which were Interested Parties in both *Standard Register* and *GenOn Energy* were named by Carmody and McKinsey RTS as McKinsey clients and/or service providers in the *GenOn Energy* bankruptcy, which was filed in 2017, including, *inter alia*:

| Entity | Interested Party Role (*Standard Register*) | McKinsey Connection (as disclosed in *GenOn Energy*) |
|---|---|---|
| BW / IP International Inc. | Parties related to significant litigation involving the Debtors | Client and/or Affiliate of Client (*Flowserve Pump Division*) |
| Columbia Gas of Ohio Inc. | Utility Provider | Client |

| Entity | Interested Party Role (*Standard Register*) | McKinsey Connection (as disclosed in *GenOn Energy*) |
|---|---|---|
| Duke Energy | Utility Provider | Client |
| Duke Energy - Charlotte | Utility Provider | Client and/or Subsidiary or Affiliate of Clients (*Duke Energy and Duke Energy Field Services LP*) |
| Duke Energy - Louisville | Utility Provider | Client and/or Subsidiary or Affiliate of Clients (*Duke Energy and Duke Energy Field Services LP*) |
| Duke Energy Progress | Utility Provider | Client and/or Subsidiary or Affiliate of Clients (*Duke Energy and Duke Energy Field Services LP*) |
| Duriron Corporation | Parties related to significant litigation involving the Debtors | Client and/or Affiliate of Client (*Flowserve Pump Division*) |
| Flowserve Corp. | Parties related to significant litigation involving the Debtors | Client and/or Parent of Client (*Flowserve Pump Division*) |
| Flowserve U.S. Inc. | Parties related to significant litigation involving the Debtors | Client and/or Affiliate of Client (*Flowserve Pump Division*) |
| General Electric Co. | Parties related to significant litigation involving the Debtors | Client and/or Parent or Affiliate of Clients (*General Electric International, Inc., GE International, Inc., GE Betz Inc., GE Water & Process Technologies, GE Control Solutions, Inc., GE Infrastructuresensing, Inc., GE Inspection Technologies, Inc., and GE Energy Services*) |

145.     In the disclosure declarations filed by McKinsey RTS in *GenOn*, Carmody does not specify the relevant dates for McKinsey's belatedly disclosed connections.  Instead, Carmody merely states that those entities were, at some point in the past two years, McKinsey clients or service providers.  Given the close proximity of *GenOn* to *Standard Register* and McKinsey's failure to name a single connection in *Standard Register*, McKinsey was likely required to disclose these connections at the time of *Standard Register* as well.  In *Standard Register*, Bank of America was a particularly significant concealed connection because it was one of the debtors' fifty largest unsecured creditors and one of the debtors' largest customers.  IBM was also a significant concealed McKinsey client because it was one of the debtors' largest vendors and subcontracting vendors.

146.     In addition, although Carmody admitted in its disclosure declaration that McKinsey was serving clients with interests adverse to the debtors, Carmody and McKinsey concealed both the identities of these clients and the actual nature of these adverse interests.  Carmody's declaration in *Standard Register* stated only: "Certain members of McKinsey RTS's Staff serving the debtors currently serve or in the past three years have served one of the Parties relating to significant litigation involving the debtors."  Carmody also stated (without disclosing any names or the nature of the work performed) that: "Members of McKinsey RTS currently serve or in the past three years have served seven of the Parties relating to significant litigation involving the debtors and three affiliates of Parties relating to significant litigation involving the debtors."   In each instance, Carmody represented that these matters were "unrelated to the debtors and these Chapter 11 Cases."   However, McKinsey concealed the facts necessary to demonstrate how these matters—which were litigation matters involving the debtors—were "unrelated to the debtors."

147.    Again, all or any one of the foregoing undisclosed connections would have disqualified McKinsey.  However, because of McKinsey's fraudulent concealment, neither the court, the United States Trustee, nor any of the Interested Parties could assess the nature and extent of potential conflicts.

148.    McKinsey also concealed additional connections to Interested Parties in *Standard Register*. The facts needed to ascertain these connections are peculiarly within McKinsey's knowledge, but will be proven through discovery.

149.    Absent Defendants' misconduct, AP likely would have been employed in *Standard Register*, particularly given its market position and the fact that AP had provided services to Standard Register in the past.

150.    Alix confronted Barton regarding the Standard Register engagement in a phone call on May 14, 2015, after learning of Barton's re-election as McKinsey's Managing Partner. As with the NII Holdings engagement, Barton told Alix that he had been unaware of the case and promised that he would look into it and follow up.

151.    Barton also told Alix that he had plans to terminate Jon Garcia as President of RTS and that he would announce this decision internally on or by May 29, 2015.  He asked that Alix remain quiet until then, as his plan had not yet been announced within McKinsey.

152.    Barton did not follow up with Alix regarding these promises.  Garcia continues to lead McKinsey RTS, and McKinsey never submitted adequate disclosures in *Standard Register*.

**VIII.    Defendants' Racketeering Activity Continues in *Alpha Natural Resources*.**

153.    Alpha Natural Resources, Inc. ("**Alpha Natural Resources**") filed for bankruptcy on August 3, 2015.   In *Alpha Natural Resources*, Carmody filed five disclosure declarations: an initial declaration, filed on August 24, 2015; a First Supplemental Declaration, filed on November 9, 2015; a Second Supplemental Declaration, filed on March 25, 2016; a Third

Supplemental Declaration, filed on May 19, 2016; and a Fourth Supplemental Declaration, filed on August 5, 2016.

154. In *Alpha Natural Resources*, McKinsey not only continued, but accelerated, its racketeering activity. As discussed below, McKinsey's crimes and racketeering activity in *Alpha Natural Resources* included:

      a. Submitting declarations that unlawfully concealed and falsely denied its connections;

      b. Submitting declarations that unlawfully concealed its connections with, United States Steel, which was a major coal customer of Alpha Natural Resources, and which McKinsey was simultaneously assisting in reducing its coal costs at Alpha Natural Resources' expense; and

      c. Making false statements to the United States Department of Justice ("**DOJ**") regarding the completeness of its disclosure declarations in order to induce DOJ to withdraw its motion to compel McKinsey to comply with Rule 2014.

**A.** **McKinsey's Failure to Disclose Its Connections in *Alpha Natural Resources*.**

155. On August 24, 2015, Carmody filed an initial disclosure declaration on behalf of McKinsey RTS in support of its application for employment in *Alpha Natural Resources*. As in the disclosures submitted by McKinsey in previous bankruptcy cases, Carmody described McKinsey's connections only in vague and generic terms. For example, Carmody merely revealed that McKinsey had a connection to a "Major Customer" or "Major Competitor"—rather than identifying any of those connections by name as required by law. Indeed, McKinsey did not even describe its pre-petition relationship with Alpha Natural Resources, the debtor, as required by law.

156.    In the year that followed his initial declaration in *Alpha Natural Resources*, Carmody filed **four** Supplemental Declarations.  Egregiously, Carmody did not name **any** of McKinsey's connections to Interested Parties until he was forced to do after the United States Trustee filed a motion to compel against McKinsey, which led to Carmody filing his Third Supplemental Declaration on May 19, 2016—***nine-and-a-half months*** after his initial declaration.  In his extremely belated disclosures, Carmody revealed (*inter alia*) that at least eighteen Interested Parties were current or very recent McKinsey ***clients***, including eight Secured Term Loan Lenders; eight Revolving Facility Lenders; five Depository and Disbursement Banks; four Major Competitors; three Major Equity Holders; a Major Unsecured Noteholder; a Professional, Consultant, or Service Provider; a Lender under A/R Facility; a Party to a Joint Venture; a Major Customer; a Second Lien Noteholder; and an Insurer.

157.    The bulk of Carmody's disclosures by name were not made until August 5, 2016—***more than eleven months*** after his initial inadequate disclosure, and almost one month after the bankruptcy plan was confirmed and the case was effectively over.  In his belated disclosures, Carmody revealed ***more than two dozen additional*** McKinsey clients, including six Major Customers; five Insurers; five Parties to Material Unexpired Leases with the Debtors; three Revolving Facility Lenders; three Major Equity Holders; three Major Unsecured Noteholders; two Beneficiaries of Letters of Credit; two Secured Term Loan Lenders; one of the "Largest Unsecured Creditors (Excluding Noteholders)"; one Party to Material Contracts with Debtors; one Party to a Joint Ventures; one Material Surety; one Second Lien Noteholder; and one Major Competitor.  Carmody also revealed that more than a dozen entities identified as Professionals, Consultants and Service Providers in *Alpha Natural Resources* were also current or recent service providers to McKinsey, and at least three of them were also McKinsey clients.

49

158.    By engaging in extreme delay in submitting its required disclosures, McKinsey acted in bad faith and ensured that it would be too entrenched to be dismissed on conflict grounds at that point, with its work largely completed, and millions of fees charged already.

159.    Moreover, despite submitting *five* Declarations in *Alpha Natural Resources* and purporting to have exhaustively searched for and named its connections to Interested Parties, McKinsey clearly failed to do so once again—even though it was twice compelled to do so, by the United States Trustee and by court order.  For instance, BlackRock Advisors LLC was named as a Major Unsecured Noteholder and BlackRock Fund Advisors was named as a Major Equity Holder in *Alpha Natural Resources*.  Yet McKinsey failed to disclose that its investment arm, MIO, ***holds investments in BlackRock***.[20]  McKinsey also failed to disclose multiple connections to Interested Parties that it disclosed the same year in the concurrent *SunEdison* matter.

160.    McKinsey's known undisclosed connections in *Alpha Natural Resources* include, *inter alia*:

| Entity | Interested Party Role (*Alpha Natural Resources*) | McKinsey Connection |
|---|---|---|
| Black Rock Advisors LLC | Majored Unsecured Noteholder | Investment |
| BlackRock Fund Advisors | Major Equity Holder | Investment |
| Dominion Transmission, Inc. | Beneficiary of Letter of Credit | Subsidiary or Affiliate of McKinsey Client/Payor in *SunEdison* (*Dominion Energy, Inc.*) |
| Illinois Department of Natural Resources | Government and Regulatory Agencies | Affiliate of Client (*State of Illinois*) |
| Illinois Environmental Protection Agency | Government and Regulatory Agencies | Affiliate of Client (*State of Illinois*) |

---

[20]    McKinsey also failed to mention, *inter alia*, that in 2014, McKinsey Senior Partner Salim Ramji joined BlackRock as its global head of corporate strategy.

| Entity | Interested Party Role (*Alpha Natural Resources*) | McKinsey Connection |
|---|---|---|
| NRG Power Marketing LLC | Major Customer | Client and/or Affiliate of Clients (*NRG Energy, Inc. and NRG Yield, Inc.*) |
| Pinebridge Investments LLC | Secured Term Loan Lender | Non-Executive Chairman of Pinebridge Investments, John L. Thornton, was also a member of the McKinsey Advisory Council |
| Public Service Company of Colorado | Major Customer | Client and/or Subsidiary of Client (*Xcel Energy Inc.*) |
| Wells Fargo | Depository and Disbursement Banks | Client |
| Wells Fargo Bank, N.A. | Revolving Facility Lender | Client |

161.    McKinsey was required by law to disclose all of these connections to Interested Parties in its affidavit, but willfully and fraudulently concealed them instead.

162.    Additionally, at least one Interested Party in *Alpha Natural Resources*, Duke Energy Progress (identified as a Major Customer), was disclosed months later as a McKinsey client (or affiliate thereof) in *GenOn Energy*.   And in September 2016, Ulster Bank, a Royal Bank of Scotland subsidiary and affiliate of Interested Party RBS Greenwich Capital (a Revolving Facility Lender) was publicly reported as being a McKinsey client.   The proximity of these announcements to the *Alpha Natural Resources* suggests that the contacts may have also been disclosable in *Alpha Natural Resources*.

163.    All or any one of McKinsey's undisclosed connections would have disqualified McKinsey from employment. However, because of McKinsey's fraudulent concealment of those connections, neither the court, the United States Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey's potential conflicts.

164.    McKinsey also concealed additional connections to the hundreds of Interested Parties in *Alpha Natural Resources*. The facts needed to ascertain these connections are peculiarly within McKinsey's knowledge, but will be proven through discovery.

165.    In *Alpha Natural Resources*, McKinsey also began its practice of disclosing its connections in stages, waiting until the case had progressed significantly and its own position was deeply entrenched before naming any connections to significant Interested Parties.

166.    For example, in its declaration filed on May 19, 2016, after Alpha Natural Resources' plan was negotiated and circulated to creditors, McKinsey belatedly disclosed that it, in fact, represented most of Alpha Natural Resources' first-lien lenders, including the following entities:

- 3i Debt Management US LLC *(Secured Term Loan Lender)*

- Allianz Global US *(Secured Term Loan Lender)*

- Apollo Global Management LLC *(Secured Term Loan Lender; Revolving Facility Lender)*

- Bank of America, N.A. *(Secured Term Loan Lender)*

- Citigroup Global Markets, Inc. *(Revolving Facility Lender)*

- JPMorgan Chase Bank, N.A. *(Secured Term Loan Lender; Revolving Facility Lender)*

- Onex Credit Partners, LLC *(Secured Term Loan Lender)*

- Sumitomo Mitsui Banking Corporation *(Revolving Facility Lender)*

- UBS Stamford Branch TRS *(Revolving Facility Lender)*

167.    Although all of these entities had been named as Interested Parties from the outset of the case, Carmody failed to disclose them (or to name any other significant Interested Parties) in his initial disclosure—or in his First Supplemental Declaration, or in his Second Supplemental Declaration.  Even worse, as revealed in subsequent disclosures that McKinsey made in the

overlapping *SunEdison* case, McKinsey's clients included at least one additional creditor that acquired Alpha Natural Resources' assets in bankruptcy: Wells Fargo. McKinsey and Carmody *never* disclosed the fact that Wells Fargo was a client despite the fact that it was listed as Interested Party from the outset of *Alpha Natural Resources*—and despite the fact that Carmody supplemented McKinsey's disclosures four times, for a total of five declarations in that case.

168.   McKinsey's motivation for its egregious delays and omissions is obvious. Its undisclosed creditor connections are disqualifying under the law because they render it incapable of offering undivided loyalty to Alpha Natural Resources. The interests of a bankruptcy estate and its various creditors are classically adverse. As a bankruptcy fiduciary, McKinsey was charged with maximizing the value of the estate for the benefit of all creditors, and its advice and recommendations become tainted when McKinsey also provides service to ***particular*** estate creditors.

169.   Apart from the fact that McKinsey failed to disclose that numerous creditors were its clients, it also failed to disclose its connections to numerous McKinsey alumni who were employed by various creditors as executives. These connections further undermined McKinsey's representation of Alpha Natural Resources and should have been disclosed by McKinsey. Disclosure of these connections was required because such creditors have a potential strategic advantage by virtue of their inside knowledge of, and concealed relationships with, McKinsey, which they could leverage in negotiations over the structure of the bankruptcy plan. These interpersonal connections could also impact McKinsey's structuring of the bankruptcy plan, as McKinsey and its former employees have ongoing financial and referral relationships that extend beyond any particular bankruptcy at hand. McKinsey is likely to be sensitive to the future success and influence of its former employee network and this may color any particular

recommendation to Alpha Natural Resources, with McKinsey having an eye to advancing the interests of strategically positioned former employees.

170.    Had McKinsey timely disclosed its extensive connections to Interested Parties in *Alpha Natural Resources*, it would have been disqualified from employment.  Instead, McKinsey concealed these connections, even as it met with its own clients numerous times to negotiate their acquisition of Alpha Natural Resources' property while McKinsey earned millions in bankruptcy fees.

### B.    McKinsey Simultaneously Represented the Debtor and United States Steel, a Concealed McKinsey Client, in Contract Negotiations.

171.    One of the connections that McKinsey is known to have unlawfully concealed for nearly a year in *Alpha Natural Resources*, United States Steel, constituted yet another one of McKinsey's irreconcilable and disqualifying conflicts of interest.  While McKinsey RTS was obligated to work to use its best efforts to maximize the value of Alpha Natural Resources bankruptcy estate, McKinsey was *simultaneously* assisting United States Steel, one of Alpha Natural Resources' largest customers, in reducing the amount it paid to its coal suppliers, including Alpha Natural Resources. Accordingly, although McKinsey was tasked with maximizing the value of Alpha Natural Resources' assets, it was working to diminish the value of one of its most significant assets, its supply contract with United States Steel.  This undisclosed connection was a flagrant, direct, intentional, and disqualifying conflict of interest and a clear, unconscionable breach of McKinsey's duty of loyalty to Alpha Natural Resources. For nearly an entire year, until August 5, 2016, McKinsey failed to disclose that United States Steel was a client.  Absent McKinsey's unlawful failure to disclose this disqualifying connection, AP likely would have received the business.

172.    Moreover, at least two senior McKinsey consultants with leadership positions on the *Alpha Natural Resources* bankruptcy engagement played roles on **both sides** of Alpha Natural Resources' sales of coal to United States Steel during that period.  In connection with the *Alpha Natural Resources* bankruptcy, Rajesh Krishnan, a McKinsey Senior Vice President and McKinsey & Co. partner, and Richard Sellschop, a McKinsey & Co. partner and Practice Leader, billed Alpha Natural Resources almost $2 million in fees.  **At the same time**, Krishnan and Sellschop were also billing United States Steel on the coal cost reduction project.  Although other McKinsey consultants warned Krishan and Sellschop that this was a direct conflict, they proceeded anyway, with the support of senior leaders at McKinsey.  If these connections and conflicts of interest had been disclosed, McKinsey would have been disqualified.

173.    McKinsey's egregious conflict of interest with respect to United States Steel was never disclosed.  Carmody's references to this clear conflict in his disclosure declarations in *Alpha Natural Resources* were deliberately vague, misleading, parsed, inadequate, and plainly designed to mislead and conceal.  In his initial declaration and in his First Supplemental Declaration in *Alpha Natural Resources*, Carmody stated that "Members of McKinsey RTS, in the past three years, have served one Major Customer of the Debtors on procurement in the coal sector generally but with no specific focus on the Debtors or these chapter 11 cases."  As an initial matter, this disclosure was plainly deficient because it failed to name the "Major Customer" referenced.  Even more egregiously, however, McKinsey's seemingly innocuous disclosure about "general" work that it had performed "in the past three years" was materially misleading by failing to disclose that McKinsey RTS members were engaged in **current** work that was adverse to and sought to directly impact the value of the bankruptcy estate.

55

174.    In his Fourth Supplemental Declaration, filed on August 5, 2016, Carmody named United States Steel as a current or recent client of McKinsey.  However, he failed to identify United States Steel as the "Major Customer" that McKinsey had advised on coal procurement strategy, or that McKinsey's work was in fact concurrent with, and adverse to, McKinsey's engagement in *Alpha Natural Resources*.

175.    Thus, Carmody's statements in *Alpha Natural Resources* were designed to mislead and conceal pertinent facts in several respects:

a.    By failing to name the "Major Customer," United States Steel (an industrial powerhouse and a major, long-term client of McKinsey), Carmody and McKinsey concealed the magnitude and significance of this conflict;

b.    By stating that McKinsey RTS members "have served" the unnamed Major Customer "in the past three years," Carmody and McKinsey concealed the fact that McKinsey RTS members ***were currently serving*** that Major Customer;

c.    By referring to an unspecified project generally involving "procurement in the coal sector," Carmody and McKinsey concealed the fact that the project was in fact a ***cost-reduction*** project aimed at reducing Alpha Natural Resources' income from United States Steel; and

d.    Carmody's representation that engagement regarding "procurement in the coal sector" had "no specific focus on the Debtors" was false.  The fact that the United States Steel project did not focus on Alpha Natural Resources' ***alone*** does not mean that it did not have a "specific focus" on reducing United States

56

Steel's payments to Alpha Natural Resources and therefore Alpha Natural Resources' revenue as it struggled to survive through Chapter 11.

**C.    McKinsey Misled and Fraudulently Induced the United States Trustee to Withdraw Two Separate Motions Challenging Its Disclosure Declarations.**

176.    On May 3, 2016, after having been alerted of McKinsey's wrongdoing by Alix, the United States Trustee filed a motion in *Alpha Natural Resources* to compel McKinsey to comply with the disclosure requirements of Bankruptcy Rule 2014.  In that motion, the United States Trustee asserted that "rigorous compliance with Rule 2014 is critical to the integrity and transparency required of the bankruptcy system."  The United States Trustee further noted that "McKinsey RTS's disclosures are insufficient to satisfy Bankruptcy Rule 2014" and McKinsey's disclosure declarations "*g[a]ve the appearance of compliance without actually complying with Bankruptcy Rule 2014*."  (Emphasis added).

177.    While the motion was pending, McKinsey RTS made representations to the United States Trustee that it would file a full and detailed supplemental disclosure declaration that complied with the law.  Based on those representations, the United States Trustee withdrew its motion to compel.

178.    However, McKinsey's amended disclosure declaration, Carmody's Third Supplemental Declaration, still concealed a significant number of McKinsey's connections in violation of Rule 2014.  More specifically, Carmody's Third Supplemental Declaration, filed more than eight months after McKinsey's retention, only identified by name eleven of McKinsey's dozens of currently known connections to Interested Parties in *Alpha Natural Resources*.

179.    Alix reviewed McKinsey RTS's Third Supplemental Declaration, and immediately recognized that it was patently insufficient. Accordingly, on June 6, 2016, Alix,

through his affiliate, Mar-Bow Value Partners, LLC ("**Mar-Bow**") filed a motion in *Alpha Natural Resources* to compel McKinsey to disclose the numerous connections that it had knowingly failed to disclose in the four submissions that it had made.  No Interested Parties joined Mar-Bow's motion.

180.    On July 1, 2016, the *Alpha Natural Resources* court granted Mar-Bow's motion to compel.  Thus, on August 5, 2016, under intense pressure from Mar-Bow and the bankruptcy court, McKinsey and Carmody further identified some additional connections by name, but continued to conceal others.

181.    The many additional disclosures made in Carmody's Third and Fourth Supplemental Declarations in *Alpha Natural Resources* after motions to compel were brought against McKinsey demonstrate that McKinsey and Carmody had misled and induced the United States Trustee into abandoning its motion to compel, and was acting pursuant to a deliberate scheme to evade its obligations, complying only when forced, and even then only partially.

182.    Incredibly, despite the court's order compelling it to supplement its disclosures, McKinsey persisted in concealing the fact that it was currently assisting United States Steel, in reducing the price it would pay Alpha Natural Resources for coal while at the very same time representing Alpha Natural Resources as a fiduciary in bankruptcy.  Indeed, throughout the bankruptcy case, McKinsey continued to conceal the fact that it had *any* connection with United States Steel until its *fifth* disclosure declaration, which it filed more than one month *after* the bankruptcy case was over and Alpha Natural Resources' plan of reorganization had been confirmed—and approximately twelve months after McKinsey was hired and filed its initial disclosure declarations.

183.    McKinsey also continued to conceal its connection to NRG Energy, despite the fact that NRG Energy's subsidiary or affiliate NRG Power Marketing, LLC was listed as a Major Customer on the Interested Parties list from the outset of the *Alpha Natural Resources* bankruptcy.  NRG Energy is a company that had previously purchased the assets of several companies that McKinsey had previously represented in bankruptcy and that McKinsey was either currently representing, or had recently represented as a client—as evidenced by the fact that in the concurrent *SunEdison* case in 2016, McKinsey disclosed that NRG Energy, Inc. and NRG Yield, Inc. were then or had previously been its clients at some point in the past two years.

184.    As the bankruptcy process drew towards completion, Alpha Natural Resources' debtor-in-possession lenders—at least some of whom were McKinsey clients—ultimately acquired nearly all of Alpha Natural Resources' assets.  Ultimately, with McKinsey RTS's "turnaround" help, Alpha Natural Resources transferred assets to McKinsey's banking clients, most of whom McKinsey concealed throughout the case. Had McKinsey properly disclosed these client relationships as mandated by law, it would have been disqualified.

**IX.    McKinsey Committed Bankruptcy Fraud and Other Crimes in *SunEdison*.**

185.    SunEdison filed for bankruptcy on April 21, 2016 and retained McKinsey RTS as its restructuring advisor.  In *SunEdison*, McKinsey submitted five disclosure declarations: an initial declaration, filed on May 5, 2016; a First Supplemental Declaration, filed on June 6, 2016; a Second Supplemental Declaration, filed on June 14, 2016; a Third Supplemental Declaration, filed on December 21, 2016; and a Fourth Supplemental Declaration, filed on March 30, 2017. McKinsey's fees in *SunEdison* were confirmed on July 25, 2017.   Once again, McKinsey only belatedly revealed its connections to significant Interested Parties, after its role in the bankruptcy proceedings was deeply entrenched.  McKinsey's habit of filing of multiple amended disclosure declarations, particularly in its more recent cases, is unusual in bankruptcy proceedings, and is

further evidence of McKinsey's deliberate scheme to conceal its connections, while only appearing to comply with its disclosure obligations.

186.   McKinsey's crimes in the *SunEdison* case include:

    a.   Submitting declarations that unlawfully concealed and falsely denied and concealed dozens of known connections through vague and intentionally misleading disclosures;

    b.   Orchestrating a series of improper and deceptive pre-petition transfers from the debtor and non-debtor affiliates totaling at least $10 million to avoid disqualification and evade preference liability;

    c.   Submitting declarations that unlawfully concealed MIO's connections with Interested Parties in the case, including Blackrock, which was a SunEdison creditor; and

    d.   Submitting a declaration that unlawfully concealed likely disqualifying facts about an undefined "business arrangement" with the former CEO of SunEdison.

**A.   McKinsey Unlawfully Concealed Its Connections in *SunEdison*.**

187.   At the outset of *SunEdison*, McKinsey unlawfully concealed numerous known connections to Interested Parties.  Despite supplementing its disclosures four times, for a total of five declarations in *SunEdison*, dozens of McKinsey connections to Interested Parties ultimately remained undisclosed.

188.   In its initial disclosure declaration in *SunEdison*, dated May 5, 2016, McKinsey identified only twenty-three of its several dozen known connections.

189.   On May 12, 2016, after having been presented with a detailed analysis prepared by retired United States bankruptcy judges Steven Rhodes and Judy Fitzgerald and others, the

United States Trustee filed an objection to McKinsey's retention in *SunEdison*, on the basis that McKinsey's disclosure declarations were incomplete and inadequate under Rule 2014.

190.    In response to the United States Trustee's objection, on June 6, 2016, McKinsey filed a second declaration, disclosing an additional nineteen connections to *SunEdison* Interested Parties.  However, dozens of connections remained undisclosed.

191.    On August 5, 2016, in *Alpha Natural Resources*, the United States Trustee— relying on McKinsey's June 6, 2016 disclosures in *SunEdison*—stated to the court that in *SunEdison*, McKinsey had "disclosed the identity of *every* connection before its retention was approved."  This statement was incorrect.  In fact, McKinsey was still unlawfully concealing dozens of connections in *SunEdison*.  In making this incorrect statement to the court in *Alpha Natural Resources*, the United States Trustee relied in good faith on McKinsey's knowingly false statements that it had disclosed all of its connections in *SunEdison*.   McKinsey has never addressed nor corrected the statement that the United States Trustee made in reliance on McKinsey's false representation that it had disclosed *all* of its connections *SunEdison*.  In short, by falsely representing to the United States Trustee that it had fully disclosed its connections in *SunEdison*, McKinsey perpetrated a fraud on two separate bankruptcy courts and the Department of Justice.

192.    On December 21, 2016, McKinsey identified fourteen more connections in the *SunEdison* case.  On March 20, 2017, in its final disclosure in *SunEdison*, McKinsey disclosed two more connections by name.   However, McKinsey continued to unlawfully conceal dozens of connections that it ultimately never disclosed in *SunEdison*.

193.    In June and August of 2016, after McKinsey was hired by SunEdison and before McKinsey filed its Second and Third Supplemental Declarations in *SunEdison*, McKinsey

disclosed **two dozen** connections in *Alpha Natural Resources* that it unlawfully concealed (and never did reveal) in *SunEdison*. These cases were pending concurrently, and these McKinsey connections appeared on the Interested Parties lists in both cases.

194. The dozens of entities that McKinsey is known to have unlawfully omitted and concealed in *SunEdison* include, *inter alia* (with an asterisk [*] next to each entity that was disclosed in *Alpha Natural Resources*):

| Entity | Interested Party (in *SunEdison*) | McKinsey Connection |
|---|---|---|
| Allianz SE* | Convertible Note Holder | Client and/or Affiliate of Client (*Allianz Global US*) |
| Aon Risk Services Central | Vendor | Affiliate of Aon Consulting, a Service Provider to MIO |
| Banco Popular | Depository Bank | Client |
| Bank of America Merrill Lynch (US)* | Institutional Shareholders > 1% | Client and/or Subsidiary of Client (*Bank of America*) |
| BlackRock, Inc. | Second Lien Lender | Investment (MIO) |
| BlackRock Financial Management | Convertible Note Holder | Investment (MIO) |
| BlackRock Institutional Trust Company, N.A. | Institutional Shareholders > 1% | Investment (MIO) |
| Cerberus | Second Lien Lender | Investment (MIO) |
| Cerberus Institutional Partners | Second Lien Lender | Investment (MIO) |
| Cerberus Institutional Partners VI, L.P. | Second Lien Lender | Investment (MIO) |
| Citibank* | Customer Depository Bank | Client and/or Affiliate of Client (*Citigroup Global Markets, Inc.*) |
| Citigroup Global Markets Inc.* | Second Lien Holder | Client |
| Citigroup, Inc.* | Convertible Note Holder Second Lien Lender | Client and/or Parent of Client (*Citigroup Global Markets, Inc.*) |
| Davis Polk & Wardwell LLP* | "2002 List" | Service Provider |
| Enphase Energy | Vendor | Client |

| Entity | Interested Party (in *SunEdison*) | McKinsey Connection |
|---|---|---|
| Gamesa Renewable Private Ltd. | Vendor | Client and/or Affiliate of Clients (*Siemens Financial Services and Siemens Industry Pace Global*)<br><br>Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Internal Revenue Service | Government bodies | Client |
| Jones Day LLP* | "2002 List" | Service Provider |
| K Special Opportunity Fund L.P. | Second Lien Lender | Investment (MIO) (Blackrock) |
| Longroad Energy Partners LLC / BlackRock Infrastructure | Bidder | Investment (MIO) (Blackrock) |
| Lotte Fine Chemical Co., Ltd. | "2002 List" | Client |
| Managed Account Advisors LLC* | Convertible Note Holder | Client and/or Subsidiary of Client (*Bank of America*) |
| Moody's Investors Services Inc.* | "2002 List" | Service Provider |
| Oregon Department of Revenue | Taxing Authority | Affiliate of Client (*State of Oregon*) |
| Pennsylvania Bureau of Corporation Taxes | Taxing Authority | Affiliate of Client (*Commonwealth of Pennsylvania*) |
| Siemens Corp.* | Bidder Vendor | Client and/or Parent of Clients (*Siemens Industry Pace Global and Siemens Financial Services*)<br><br>Parent of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Energy Inc.* | Vendor | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*)<br><br>Affiliate of Service Provider (*Siemens Industry Pace Global*) |

| Entity | Interested Party (in *SunEdison*) | McKinsey Connection |
|---|---|---|
| State of Oregon Construction Contractors Board | Government body | Affiliate of client (*State of Oregon*) |
| State Street Global Advisors (US)* | Institutional Shareholders > 1% | Client |
| U.S. Attorney's Office (Department of Justice) | Government body | Client |
| U.S. Customs and Border Protection | Government body | Client |
| UBS Securities LLC* | Institutional Shareholders > 1% | Client and/or subsidiary and affiliate of clients (*UBS, UBS Financial Services, Inc., and UBS Stamford Branch TRS*) |

195.   McKinsey knew of all these dozens of connections when it filed each of its declarations in the *SunEdison* case.  Its concealment of them was therefore intentional and unlawful.[21]

196.   While *SunEdison* was pending, on or shortly after October 24, 2016, McKinsey was hired by GenOn, an NRG Energy subsidiary, to help GenOn prepare for bankruptcy.  Soon thereafter, in the *GenOn* bankruptcy in 2017, McKinsey disclosed multiple connections that McKinsey likely unlawfully concealed in *SunEdison*, including:

| Entity | Interested Party Role (in *SunEdison*) | McKinsey Connection (as disclosed in *GenOn*) |
|---|---|---|
| BP Solar International, Inc. | "2002 List" | Client and/or subsidiary of client (*BP plc*) |
| Calpine Corporation | Bidder | Employee Relationship |
| Duke Energy Corporation | Competitor | Client |

---

[21]   McKinsey also failed to disclosed, *inter alia*, that Aon Risk Services Central (identified as a Vendor in *SunEdison*) was an affiliate of Aon Consulting, which was a Service Provider to McKinsey's investment arm, MIO.

| Entity | Interested Party Role (in *SunEdison*) | McKinsey Connection (as disclosed in *GenOn*) |
|---|---|---|
| GE Energy, LLC | Bidder | Client and/or affiliate of clients (*General Electric International, Inc., GE International, Inc., GE Betz Inc., GE Water & Process Technologies, GE Control Solutions, Inc., GE Infrastructuresensing, Inc., GE Inspection Technologies, Inc., and GE Energy Services*) |
| General Electric Capital Corp. | "Uniform Commercial Code List" | Client and/or affiliate of clients (*General Electric International, Inc., GE International, Inc., GE Betz Inc., GE Water & Process Technologies, GE Control Solutions, Inc., GE Infrastructuresensing, Inc., GE Inspection Technologies, Inc., and GE Energy Services*) |
| General Electric Co. | Vendor | Client and/or parent or affiliate of clients (*General Electric International, Inc., GE International, Inc., GE Betz Inc., GE Water & Process Technologies, GE Control Solutions, Inc., GE Infrastructuresensing, Inc., GE Inspection Technologies, Inc., and GE Energy Services*) |
| Illinois Department of Revenue | Significant Vendor Taxing Authority | Client |
| Norton Rose Fulbright US LLP | "2002 List" | Service Provider |

197.    Despite McKinsey's multiple Supplemental Declarations in *SunEdison* and its

repeated assurances that it would "further supplement its declarations in the event it [became]

aware of any relationship or other information that requires disclosure," McKinsey nonetheless unlawfully concealed its connections to dozens of Interested Parties in *SunEdison*.

198.    Moreover, of the connections that McKinsey finally did disclose in *SunEdison*, many of them were not disclosed until eight or even ten months into the case, including, *inter alia*:

| Entity | Interested Party Role (in *SunEdison*) | McKinsey Connection |
|---|---|---|
| E.On SE | Bidder | Client |
| UC Berkeley | Customer | Employee Relationship |
| Wells Fargo & Company | First Lien Lender Depository Bank Letter of Credit Issuer Convertible Note Holder | Client |
| Wells Fargo Bank | Convertible Note Holder | Client |
| Wells Fargo Securities | Convertible Note Holder | Client |

199.    As evidenced by the scope of McKinsey's services in *SunEdison*, these undisclosed connections were disqualifying.  On this point, McKinsey's declaration, dated May 5, 2016 in *SunEdison* case states:

> McKinsey RTS will perform a broad range of services during these Chapter 11 Cases, including, without limitation, the following:
>
> a.  supporting the development of a strategic business plan with the Company's Chief Restructuring Officer and other key functional leaders that can be used to facilitate discussions with the Company's lenders and certain other stakeholders;
>
> b.  assisting the Company's Chief Restructuring Officer and Chief Financial Officers with matters related to financial planning and analysis, as requested;
>
> c.  assisting in developing a short-term cash flow forecasting process and implementing cash management strategies, tactics, and processes and working with the Company's treasury department and other professionals and

coordinating the activities of the representatives of other constituencies in the cash management process;

d.  assisting with the Company's financial and treasury functions as they respond to the analytical requests and other requests for information that are placed upon the Company;

e.  along with management, developing and establishing a weekly financial reporting package that provides additional transparency into the Company's near term cash position, including a forecast to actual variance analysis;

f.  providing strategic advice to support the overall restructuring process;

g.  in cooperation with the Company's officers, investment bankers and other engaged professionals and counsel, developing and preparing a Chapter 11 plan of reorganization;

h.  assisting the Company in managing its bankruptcy process including managing outside stakeholders and their professionals;

i.  assisting with the evaluation of certain near term operational cost reduction and value enhancement opportunities ( e.g., SG&A, fixed costs and procurement);

j.  planning and executing the Company's business support functions re organization and cost reduction goals;

k.  working with the Company's counsel ("Counsel") on supporting data in order for Counsel to prepare first day motions, the petitions for relief and other documents and evidence needed to implement any Chapter 11 bankruptcy case filed by the Company;

l.  assisting the Company with developing a detailed communications plan;

m.  providing local support with development of various strategic and restructuring alternatives for international operations;

n.  providing testimony and other litigation support as requested by Counsel in connection with matters upon which McKinsey RTS is providing Services; and

67

o.   assisting with all such other restructuring matters as may be requested by Counsel and/or the Board that fall within McKinsey RTS's expertise and that are mutually agreed upon between the Parties.

200.    As McKinsey itself notes, this is "a broad range of services."   Whether in relation to SunEdison's new business plan, its cash management strategies, its Chapter 11 plan, its cost reduction strategies, or testimony and litigation support—all of which McKinsey committed to provide for SunEdison—any service that McKinsey provided to SunEdison would directly and financially affect every one of its connections.  That is true regardless of whether McKinsey's service for its connections is on matters "unrelated to the debtors."

201.    Section 327 of the Bankruptcy Code prohibits McKinsey from imposing on the SunEdison bankruptcy estate the conflicts, questions, and concerns that arise because McKinsey has so many connections across so wide a scope of constituents.  McKinsey knew it was not qualified to serve in the *SunEdison* case as a professional and a fiduciary, but it sought and obtained employment nonetheless by concealing its connections and falsely representing that it was disinterested.

**B.    McKinsey Unlawfully Concealed Fraudulent Pre-Petition Payments That It Orchestrated from SunEdison Affiliates.**

202.    McKinsey orchestrated a series of complex and improper pre-petition transfers from non-debtor affiliates of SunEdison totaling over $10 million to evade disqualification and to hide its preference liability under 11 U.S.C. § 547(b).

203.    In the ninety days before SunEdison filed for bankruptcy, McKinsey RTS received payments totaling $6,250,965 for its prepetition services.  Thus, when SunEdison filed for Chapter 11 relief, McKinsey faced (a) a potential loss of over $6 million because of its liability to SunEdison for these preference payments; and (b) disqualification from the

*SunEdison* case because that liability was clearly an interest that was adverse to the bankruptcy estate under Bankruptcy Code Section 327(a).

204.    Using its insider status and knowledge, however, McKinsey succeeded in both retaining its fees and evading disqualification by way of a fraudulent scheme whereby it completely rearranged the nature of the original debt that was owed by SunEdison to McKinsey and then falsely re-invoiced that debt to four non-debtor affiliates of SunEdison: Granite Mountain Holdings, LLC; Iron Springs Holdings, LLC; Comanche Solar PV, LLC; and Four Brothers Solar, LLC (collectively, the "**Non-Debtor Affiliates**").   These sham transactions enabled McKinsey RTS to secure and retain the bankruptcy assignment with SunEdison from which it otherwise would have been disqualified.

205.    Specifically, detailed forensic analysis derived from McKinsey's First Supplemental Declaration in *SunEdison* (ECF No. 484), SunEdison's application to employ McKinsey (ECF No. 322), and a report from FTI Consulting that was commissioned by SunEdison's board regarding the company's internal operations and financial controls reveals that McKinsey retroactively and falsely re-invoiced work that was actually done for SunEdison in the first instance as work done for the Non-Debtor Affiliates.

206.    Relying on this artifice, McKinsey falsely represented to the *SunEdison* court that it did not owe a preference to the estate and was not an estate creditor.   Absent this fraud, McKinsey would have been disqualified for holding an interest adverse to the estate.   In short, McKinsey committed fraud to wrongfully secure and retain its lucrative consultancy assignment in the *SunEdison* bankruptcy at the expense of AP.

207.    More specifically, McKinsey (through McKinsey RTS) had sent invoices to SunEdison for the months September, October, and November 2015.   The services covered by

those invoices were provided pursuant to a services agreement between SunEdison and McKinsey RTS. In approximately late December 2015 or early January 2016, McKinsey still had not been paid for those services. Because SunEdison was insolvent, McKinsey and SunEdison decided that McKinsey would recall its earlier invoices to SunEdison, and falsely re-issue the invoices to the Non-Debtor Affiliates, who would then satisfy the outstanding balances despite the fact that none of them had any legal liability to, or contractual privity with, McKinsey RTS.

208.    In some instances, SunEdison actually *had* paid McKinsey's invoices. In those instances, McKinsey RTS also issued false invoices to the Non-Debtor Affiliates. The Non-Debtor Affiliates then made payments on the false, re-issued invoices, even though those affiliates were not liable for McKinsey RTS's fees and had no contract with McKinsey RTS. At that point, having been paid twice (once by SunEdison and once by the Non-Debtor Affiliates), McKinsey RTS returned SunEdison's payments.

209.    Because the Non-Debtor Affiliates were not Chapter 11 debtors, they had no ability to claim a return of the payments as preferences to McKinsey. Through this means, McKinsey fraudulently re-characterized the obvious and disqualifying preference payments from SunEdison as payments from the Non-Debtor Affiliates, and McKinsey again fraudulently laundered disqualifying preference payments from SunEdison into "clean" payments from the non-debtor affiliates.

210.    McKinsey's invoicing fraud in *SunEdison* occurred from approximately September 2015 until April 2016. All told, detailed forensic analysis discloses $10,645,166.78 of improper "round-trip" and retroactively "re-invoiced" transactions involving *SunEdison* and the Non-Debtor Affiliates during that period.

70

211.    When McKinsey orchestrated the "re-invoiced" and "round trip" payments with SunEdison's Non-Debtor Affiliates, McKinsey knew that SunEdison was severely insolvent and suffering from an extreme liquidity shortage.  Functionally, SunEdison's payments to McKinsey, through the fraudulent use of the Non-Debtor Affiliates' funds, were effectively fraudulent transfers and backdoor preference payments.

212.    McKinsey then concealed its fraud by falsely representing in its First Supplemental Declaration in *SunEdison*, that these "round trip" payments were, in fact, owed by the Non-Debtor Affiliates in the first instance and that McKinsey's services had actually been provided for the benefit of the Non-Debtor Affiliates.  In reality, however, this was revisionist history to cover up the truth and to hide the preference and the disqualifying interest that it created.

213.    Although McKinsey's disclosure declarations admitted that a September 2015 engagement letter existed between McKinsey and SunEdison, they failed to provide a copy of that document or any of the necessary detail regarding McKinsey's original billings to SunEdison, such as the true nature of the services that McKinsey had provided.  McKinsey's declarations also failed to explain how its services could have been for the Non-Debtor Affiliates when they were originally provided to and paid for by SunEdison pursuant to a contract between McKinsey and SunEdison, and no contract between McKinsey and the Non-Debtor Affiliates existed.

214.    A McKinsey employee, in an internal email, acknowledged that McKinsey's re-invoicing and round-trip payment scheme through the SunEdison's Non-Debtor Affiliates was "not ideal, but to meet all constraints we had limited degrees of freedom."  The McKinsey employee went on to note that they "should anticipate spirited opposition from some PMs that

we will need to push through."  In this email, "PMs" refers to the Project Managers of the Non-Debtor Affiliates.

215.    In connection with the *SunEdison* bankruptcy, an independent report was made to the Audit Committee of the Board of Directors of SunEdison following an investigation.  In that report, the firm conducting the investigation noted that in the above-referenced email, McKinsey "appears to be asking to get its aged [accounts payable] paid by certain project financing.  It is unclear whether the work that McKinsey did would classify as an allowable expense against these projects.  It would seem that these expenses would come as a surprise to the Project Managers. . . . If these were expected and allowable expenses, it should not come as a surprise."

216.    If payment of McKinsey's fees by SunEdison's Non-Debtor Affiliates was legitimate, as McKinsey represented, presumably McKinsey would have come forward with evidence that the members of the Non-Debtor Affiliates had approved the payments.  It never did so.

217.    As a result of McKinsey's fraudulent scheme, its liability to the SunEdison estate is as much as $22,255,246.76.  This liability is an interest adverse to the SunEdison bankruptcy estate and is disqualifying under Section 327 of the Bankruptcy Code.  McKinsey's representations to the court and the United States Trustee that it did not hold an interest adverse to the estate were false.  Had McKinsey fully disclosed the extent of its involvement, it would have been disqualified from employment in the *SunEdison* bankruptcy.

C.    **McKinsey Unlawfully Concealed Pertinent Facts Regarding its "Business Arrangement" with the Former CEO of SunEdison.**

218.    The bankruptcy court approved McKinsey's employment on June 23, 2016.  In its initial disclosure declaration to obtain that approval, filed on May 5, 2016, McKinsey made the following inadequate and misleading disclosure: "One member of McKinsey RTS serving the

debtors has known the Debtor's CEO, Ahmad Chatila, from past professional relationships prior to 2009." This minimal disclosure regarding Chatila conceals the identity of the "[o]ne member of McKinsey RTS serving the debtors[.]" The unnamed "member of McKinsey RTS" was, in fact, Defendant Robert Sternfels. McKinsey's concealment of Sternfels's name and the true nature of his relationship with Chatila raises serious questions as to why McKinsey chose to conceal that identity and the attendant details, and whether there was anything disqualifying about the relationship.

219.    Moreover, subsequent events gave rise to the very pointed and troubling question of whether Chatila, while CEO of SunEdison, had caused SunEdison to retain McKinsey RTS, on the premise that Sternfels would assist Chatila in obtaining new employment should he be fired from the insolvent SunEdison, and even whether that assistance was a *quid pro quo* for Chatila's assistance in engineering the "re-invoiced" and "round-trip" payments referenced above.

220.    Nine months after the SunEdison bankruptcy filing, on March 20, 2017, McKinsey made a second disclosure regarding Chatila. McKinsey's Third Supplemental Disclosure Declaration revealed in vague terms that McKinsey had entered into an unidentified and unexplained "business arrangement" with Chatila. Without providing any supporting details, McKinsey assured the court, the United States Trustee, and the Interested Parties that its unspecified "business arrangement" with Chatila was not disqualifying because it was "unrelated to SunEdison."

221.    In fact, Chatila is a longtime personal friend of Sternfels and Sternfels was instrumental in Chatila's elevation to CEO of SunEdison. Shortly after McKinsey had succeeded in its scheme to retain its prepetition preference payments from SunEdison (discussed *supra*),

and as it became clear that Chatila was likely to be forced out of SunEdison, Sternfels told his colleagues at McKinsey that they needed to help his friend Chatila find another position after he left SunEdison.

222.   When McKinsey revealed its "business arrangement" with Chatila on March 20, 2017, its disclosure declaration in SunEdison unlawfully concealed the following pertinent facts:

    a.   The identity of the "entity for which Ahmad Chatila is a senior officer" and the nature of its business;

    b.   Chatila's position and responsibilities with this entity;

    c.   The nature of the "business arrangement";

    d.   The identity of the "affiliate of McKinsey RTS US";

    e.   When the arrangement was entered into;

    f.   Why McKinsey delayed in disclosing it until March 20, 2017;

    g.   Whether any McKinsey personnel who were assigned to serve the debtors were also assigned to work on this "business arrangement";

    h.   The manner in which Chatila personally benefited from this "business arrangement" (include any compensation or other benefits that he received as a result);

    i.   Who was involved in the discussions and negotiations leading to this "business arrangement";

    j.   Whether the "business arrangement" involved any parties in the case;

    k.   Whether the "business arrangement" involved any competitors of the debtors;

    l.   Whether the "business arrangement" involved any creditors or investors of SunEdison;

m. Whether the "business arrangement" involved Chatila's use of any confidential information of the debtors;

n. Whether the "business arrangement" involved McKinsey's use of any information, confidential or otherwise, that it obtained from SunEdison; and

o. Whether MIO or one of its affiliates or connections financed the "business arrangement."

223.   McKinsey attempted to minimize the potential conflict, stating simply in its Third Supplemental Declaration in *SunEdison* that "[a]n affiliate of McKinsey RTS US entered into a business arrangement unrelated to SunEdison, Inc. with an entity for which Ahmad Chatila is a senior officer."  As discussed below, McKinsey's unlawful concealment of these pertinent facts was likely another part of its scheme to hide, obfuscate, withhold information, evade disqualification, and remain in the SunEdison engagement and thereby improperly collect millions of dollars in fees.

224.   The entity with which McKinsey entered into its "business arrangement" with Chatila is likely FTC Solar, Inc. ("**FTC Solar**"), for which Chatila is one of four founding directors.  A review of public records has yielded no other information regarding Chatila's activities or potential "business arrangements" since his departure from SunEdison.  FTC Solar was incorporated in Delaware on January 3, 2017 and, shortly thereafter, on January 30, 2017 purchased approximately $35 million worth of SunEdison's assets for a mere $6 million. Moreover, David Springer, the SunEdison executive that approved the "re-invoicing" and "round-trip" payments scheme in conjunction with McKinsey executive Matthew Parsons, now serves as the CEO of FTC Solar.

225.    If, as appears to be the case, McKinsey entered into this "business arrangement" with Chatila in connection with FTC Solar, then its statement that this arrangement was "unrelated to SunEdison" was materially false.

226.    If McKinsey did, in fact, have a connection with FTC Solar, which appears likely, then its failure to disclose this relationship despite FTC Solar's purchase of the assets of its fiduciary client represented yet another egregious and disqualifying conflict of interest.

## X.    McKinsey Unlawfully Concealed Its Connections and Committed Bankruptcy Fraud in *GenOn*.

227.    GenOn Energy Inc. ("**GenOn**") filed for bankruptcy on June 14, 2017.  To date, Defendant Kevin Carmody has submitted four disclosure declarations on behalf of McKinsey RTS in the *GenOn* bankruptcy: an initial declaration, filed on June 23, 2017; a First Supplemental Declaration, filed on July 13, 2017; a Second Supplemental Declaration, filed on September 15, 2017; and a Third Supplemental Declaration, filed on February 7, 2018.  The *GenOn* bankruptcy is ongoing.

228.    Carmody submitted his first two Rule 2014 declarations in *GenOn* before the bankruptcy court approved McKinsey's employment, on June 23, 2017 and July 13, 2017. Relying on these declarations, on July 13, 2017, the court authorized GenOn to employ McKinsey RTS as its restructuring advisor.  Had McKinsey fully and honestly complied with Rule 2014, however, it would have been disqualified and never hired.

229.    As discussed below, McKinsey's crimes and racketeering activity in the *GenOn* case include:

> a.    Submitting false declarations that unlawfully concealed the fact that NRG Energy, GenOn's parent company, against whom McKinsey was investigating a multi-million dollar claim on behalf of GenOn and with whom McKinsey

was negotiating GenOn's separation, was also a current or former McKinsey client;

b.   Submitting false declarations that unlawfully concealed the depth of McKinsey's connections to GenOn's parent company, NRG Energy, Inc. ("**NRG Energy**") and to the transactions and bankruptcies that had created GenOn;

c.   Submitting a false declaration that falsely represented that McKinsey was disinterested after McKinsey had received preference payments totaling $4,512,000, which gave rise to a disqualifying interest adverse to the bankruptcy estate; and

d.   Submitting false declarations that unlawfully concealed and falsely denied McKinsey's disqualifying connections to dozens of other Interested Parties.

**A.   McKinsey Unlawfully Concealed the Fact that NRG Energy Was a Current or Former McKinsey Client While It Was Investigating GenOn's Claims against NRG Energy.**

230.   McKinsey's disclosure declarations unlawfully concealed the fact that when it was investigating GenOn's potential multi-million dollar fraudulent transfer claims against NRG Energy, it was investigating a longstanding McKinsey client.

231.   In March 2016, an ad-hoc group of noteholders of GenOn Unsecured Senior Notes and GenOn Americas Generation Unsecured Senior Notes (the "**Noteholder Group**") began a conversation with GenOn regarding potential claims for fraudulent transfer, breach of fiduciary duty, and other claims that GenOn may hold against NRG Energy and current and former GenOn directors and officers, among others.  GenOn, with assistance from McKinsey and AP, began identifying and evaluating potential claims.  GenOn's potential claims concerned contracts between GenOn and NRG Energy, certain sales of GenOn power plants to NRG

Energy's affiliates and third parties, and certain development projects between GenOn and NRG Energy.

232.    In June 2016, GenOn and its attorneys retained both McKinsey RTS and AP to investigate GenOn's potential claims against NRG Energy arising from the same factual circumstances as the Noteholders' claims.  This investigation continued through GenOn's Chapter 11 bankruptcy case, which was filed a year later in June 2017.  McKinsey's post-petition fee statements reflect that, as part of the investigative team, it conferred with holders of GenOn notes about the potential claims, requested and reviewed thousands of documents from NRG Energy, and interviewed numerous NRG Energy and GenOn representatives.

233.    In the same month that GenOn retained McKinsey to investigate NRG Energy (June 2016), in the *SunEdison* case, McKinsey partner Mark Hojnacki filed an amended declaration in the *SunEdison* case (ECF No. 484) disclosing that NRG Energy was then or had previously been a McKinsey client.  McKinsey unlawfully concealed that connection throughout the course of *GenOn*.

234.    The GenOn Noteholder Group ultimately filed a lawsuit against NRG Energy and GenOn in Delaware state court on December 13, 2016.  On April 30, 2017, the Noteholder Group filed an Amended Complaint adding as defendants NRG Yield, Inc. ("**NRG Yield**"), an NRG subsidiary, and eight current or former GenOn directors and officers (the "***GenOn Individual Defendants***").  The GenOn Noteholders' Amended Complaint alleged that: (i) NRG Energy had been overcharging GenOn under a Shared Services Agreement since its execution; and (ii) GenOn did not receive reasonably equivalent value from NRG Yield for GenOn's July 22, 2013 sale of the Marsh Landing generating station (a newly developed power plant).  The Noteholder Group further alleged that (iii) the GenOn Individual Defendants breached their

fiduciary duties by allowing GenOn's purported overpayments under the Shared Services Agreement and by allowing NRG Energy to pursue new business opportunities at GenOn's Canal and Mandalay power plant sites; and (iv) that NRG Energy had aided and abetted those breaches.

235.    Ultimately, GenOn settled its fraudulent transfer claims against NRG Energy. The money derived from this settlement formed a substantial part of GenOn's Chapter 11 plan and was relied upon by the court and GenOn's other creditors, none of whom were aware of McKinsey's egregious conflict of interest involving NRG Energy.

236.    Despite this clear conflict, Carmody's initial declaration in *GenOn* on June 23, 2017 disclosed only that McKinsey serves or has served "various parties listed" on the Interested Parties List in *GenOn* as "NRG Affiliates" (of which there were over 900).   McKinsey unlawfully concealed the specific and crucial fact that, although it was in the process of investigating NRG Energy on behalf of GenOn, it then had or previously had a client relationship with NRG Energy itself.

237.    On July 13, 2017, McKinsey filed its First Supplemental Declaration in *GenOn*, in which it again unlawfully concealed its connection to NRG Energy.  McKinsey made only a minimal disclosure that a member of McKinsey RTS "assisted in maintaining a chart, which includes publicly available information concerning asset sales to NRG Energy, or one of its affiliates for a client that is not on the list of Potential Parties in Interest."

238.    Because NRG Energy, whom McKinsey was investigating for GenOn, was also a significant McKinsey client, McKinsey "represent[ed] an interest adverse to the estate," in contravention of the clear prohibition of 11 U.S.C. § 327(a).  McKinsey's connection with NRG

Energy created an actual, present, ongoing conflict of interest that required disclosure and disqualification.

**B.     McKinsey Unlawfully Concealed the Fact That NRG Energy Was a McKinsey Client While It Was Negotiating on Behalf of GenOn for GenOn's Separation from NRG Energy.**

239.    McKinsey's concealed connection with NRG Energy also concealed a second way in which that connection was an actual conflict of interest.  While McKinsey was serving NRG Energy, which was GenOn's parent company, it was also negotiating GenOn's separation from NRG Energy as part of its bankruptcy process.

240.    McKinsey's final fee application in *GenOn*, filed on March 16, 2018 (ECF No. 1516), states that it spent 7,595.8 hours and billed $4,049,978.00 in fees for a task it called "separation activity."  This was by far the greatest amount billed for any of McKinsey's tasks in *GenOn*.  Billing descriptions of "separation activity" included: "Held weekly meetings and planning sessions with the parent company's functional leads and GenOn leads to advance transition and separation efforts."  In other words, McKinsey was negotiating the separation of its fiduciary client, GenOn, from its consulting client, NRG Energy, with whom it was incentivized to preserve its client relationship, which was in direct conflict with its fiduciary obligation to assure that GenOn was able to negotiate the most favorable terms possible for the benefit of its creditors.

**C.     McKinsey Unlawfully Concealed the Depth of Its Connections to NRG Energy and to the Transactions and Bankruptcies that Created GenOn.**

241.    McKinsey also unlawfully concealed the facts surrounding its history of representing NRG Energy through various mergers and acquisitions in the energy sector, including in transactions involving GenOn.  Again, this allowed McKinsey to simultaneously

profit from its fiduciary relationship with GenOn and receive bankruptcy fees, while also acting to benefit its long-standing client, NRG Energy.

242.    Prior to *GenOn*, NRG Energy had acquired assets from at least three entities in the power and energy industries in which McKinsey had served as a fiduciary in three separate Chapter 11 bankruptcy cases: *Mirant*, *Edison Mission Energy*, and *SunEdison*.

243.    Specifically:

    a.   NRG Energy purchased most of the assets of Edison Mission Energy in the latter's 2012 bankruptcy, while Edison Mission Energy was a McKinsey client;

    b.   In 2012, NRG Energy purchased GenOn, which had been created in a merger between former McKinsey bankruptcy client Mirant and RRI Energy, Inc. (formerly Reliant Energy, Inc.) in 2010; and

    c.   During SunEdison's 2016 bankruptcy, NRG Energy purchased at least three of SunEdison's Non-Debtor Affiliates of SunEdison while SunEdison was a McKinsey client.

244.    Of the entities that participated in these transactions, at least five were McKinsey current or former clients—Mirant, NRG Energy, GenOn, Edison Mission Energy, and SunEdison.  In *GenOn*, however, McKinsey concealed its connections to these parties and transactions.  Rule 2014 requires McKinsey to disclose its "connections with the debtor."  Rule 2014 thus required McKinsey to fully disclose its role in these transactions, because that disclosure is critical to a full understanding of McKinsey's connection to GenOn itself, as well as any role that McKinsey may have played in GenOn's insolvency.  Here, McKinsey's connection to GenOn began years before GenOn first retained it to assist it with its insolvency and its

bankruptcy.  That connection began with McKinsey's involvement in the transactions that led to GenOn's creation, and its employment by GenOn in GenOn's bankruptcy case is only the latest phase of this longstanding connection.  Instead of disclosing the history of its connection to GenOn, however, McKinsey unlawfully concealed all of it.

245.    In order to obtain bankruptcy employment in *GenOn*, McKinsey also concealed the extent to which it was involved in advising the web of entities connected to GenOn and NRG Energy.  For example, when NRG Energy, purchased assets from McKinsey client Edison Mission Energy, NRG Energy was advised by multiple advisors that are themselves McKinsey clients or advisers.  Meanwhile, Edison Mission Energy was advised by JPMorgan Chase, which is also a McKinsey client, and by Kirkland & Ellis, which is a McKinsey service provider.  Of these professionals, McKinsey has disclosed only JPMorgan Chase as a connection in *GenOn*.

246.    A bankruptcy court considering whether to approve McKinsey's application for employment would likely find these connections disqualifying because they reveal a pattern of McKinsey's clients receiving one another's assets—with the fiduciary, McKinsey, improperly standing in the middle and making money on all sides.  A professional seeking bankruptcy employment must not only be disinterested, but also the court must find that the employment would be in the best interests of the estate.  Given McKinsey's history of recommending that its undisclosed clients purchase failing entities where McKinsey is a court-appointed fiduciary for other clients selling their assets, the court likely would have found McKinsey's employment not in the best interests of GenOn's bankruptcy estate, if not an actual, direct, and currently undisclosed conflict.

**D.      McKinsey Received Avoidable Preference Payments from GenOn in Order to Avoid Disqualification as a Creditor of GenOn, Thereby Concealing an Interest Adverse to the Estate.**

247.     In *GenOn*, if McKinsey had made truthful disclosures, it also would have been disqualified as either a creditor of GenOn or for preference liability to GenOn.  McKinsey ensured that the debts that GenOn owed it were paid ahead of other creditors before GenOn filed for bankruptcy in order for McKinsey to avoid disqualification as a creditor of the estate.  Further, in order to avoid disqualification, McKinsey then falsely treated these payments as ordinary course payments to avoid preference liability.

248.     McKinsey received avoidable preferences in the ninety days leading up to the Petition Date totaling $4,512,000.  It therefore held . . . "an interest adverse to the estate," and was not qualified for employment as a professional under Section 327(a).

249.     GenOn's application to employ McKinsey states that, "[d]uring the ninety days prior to the commencement of the Chapter 11 cases, the debtors paid McKinsey RTS a total of $6,012,000 (inclusive of reimbursable expenses) incurred in providing services to the debtors in contemplation of, and in connection with, prepetition restructuring activities[.]"[22]

250.     More specifically, GenOn (**not** McKinsey) disclosed these five payments to McKinsey totaling $4,512,000 within the ninety days before its bankruptcy filing on June 14, 2017.  They are:

    a.   $510,000 on April 25, 2017 (for an invoice dated January 15, 2017);

    b.   $510,000 on June 5, 2017 (for an invoice dated January 30, 2017);

    c.   $900,000 on June 9, 2017 (for an invoice dated June 2, 2017);

---

[22]     The application also states, "[a]s of the Petition Date, McKinsey RTS holds a credit balance of $1.5 million (the aggregate amount of the Retainers), which McKinsey RTS intends to retain until the end of these Chapter 11 cases and apply to its final application for payment in these proceedings."

d.   $900,000 on June 12, 2017 (for an invoice dated June 5, 2017); and

e.   $1,692,000 on June 13, 2017 (for an invoice dated June 12, 2017).

251.   As a result, McKinsey is not listed as a prepetition creditor in GenOn's bankruptcy schedules.  However, none of these payments were made pursuant to ordinary business terms, as required to avoid preference liability under 11 U.S.C. § 547(c)(2).  The first two payments were late, made more than three and a half months after the invoices while the last three invoices were issued and paid just days before the bankruptcy filing, and much quicker than ordinary course for McKinsey and GenOn.  Specifically, the third payment was made seven days after invoice and just five days before the bankruptcy filing, the fourth payment was made seven days after invoice and just two days before the bankruptcy filing, and the fifth and final payment was made the day after invoice and the day before the bankruptcy filing.  Each payment was a voidable preference payment under 11 U.S.C. § 547(b).

252.   These preference payments created "an interest adverse to the estate," thus disqualifying McKinsey under 11 U.S.C. § 327.  In its rush to obtain these prepetition payments and avoid disqualification as a prepetition creditor, McKinsey merely transformed the payments into preference payments, which are also disqualifying.

253.   McKinsey's declaration to the court falsely stated: "We are disinterested."  This was an intentionally false statement because McKinsey knowingly collected preference payments from the Debtor on the eve of bankruptcy in order to eliminate its status both as an unsecured creditor and did not advise the court that it was the recipient of millions of dollars in what were effectively preference payments, either of which status would have disqualified McKinsey as not disinterested.  Accordingly, McKinsey's description of these payments was

materially false and McKinsey's affirmative statement that it is disinterested was an intentionally false statement that worked a fraud on the bankruptcy court.

**E.     McKinsey's Declarations Unlawfully Concealed Numerous Connections in *GenOn*, Including GenOn Creditors and Possibly Competitors.**

254.    Carmody's various delayed and incomplete declarations in *GenOn* ultimately disclosed approximately eighty-five connections with Interested Parties.  However, McKinsey continued to conceal many other connections.  In Carmody's initial declaration in *GenOn*, he stated that McKinsey was disinterested because the services it provides to clients who were Interested Parties "specifically do not focus on direct commercial relationships or transactions between such companies and the debtors."  Rule 2014, however, does not limit its disclosure requirements to "direct commercial relationships or transactions between such companies and the debtors."  Rather, the law mandates that ***all*** connections must be disclosed.

255.    As a result of McKinsey's unlawful concealment of these connections, McKinsey's disclosure declarations include numerous false or materially misleading statements.

256.    For instance, Carmody's initial declaration in *GenOn*, dated June 23, 2017, falsely states that McKinsey has ***no*** connections to the following nine categories of Interested Parties in *GenOn*:

- Bank and Indenture Trustees;

- DIP Lenders;

- Government-Regulatory Agencies;

- Insurers;

- Joint Venture Parties;

- Litigation Parties;

- Noteholders;

- Surety Bonds; and

- Taxing Authorities.

257.    In his initial declaration in *GenOn*, dated June 23, 2017, Carmody disclosed a handful of McKinsey's client connections to certain categories of Interested Parties: twelve contractual counterparties; four Significant Vendors; three Utility Providers; three Shippers; two Significant Customers; two Professionals; one Lienholder; one Beneficiary of Letter of Credit; and one Largest Unsecured Creditor.  Carmody further disclosed that three law firms listed as Professionals in *GenOn* were also service providers to McKinsey.   Carmody stated that McKinsey had ***no further connections***, despite having "***conducted a global database search of the Potential Parties in Interest***" in *GenOn* prior to its engagement.  Carmody further stated that McKinsey had "***searched its global client database, which covers clients of all its consulting affiliates, to determine the existence of any client service provided by McKinsey RTS US or affiliates*** within the last two years to Potential Parties in Interest."  Based on the demonstrated extreme and obvious deficiencies in McKinsey's disclosures, both as discussed above and as listed below, Carmody's statements are demonstrably false.

258.    Carmody further contributed to creating a false impression that McKinsey had conducted a diligent, thorough, and exhaustive search of McKinsey's potential connections by stating that in addition to searching a "global database," McKinsey had also written to both "members of McKinsey RTS" and to "partners at its affiliates worldwide that provide consulting services"—unlawfully excepting MIO and all other McKinsey non-"consulting" affiliates from the scope of its search—in order to ascertain McKinsey's connections to Interested Parties.

259.    McKinsey's known concealed connections in *GenOn* include, *inter alia*:[23]

| Entity | Interested Party Roles(s) (in *GenOn Energy*) | McKinsey Connection(s) |
|---|---|---|
| Aspen American Insurance Company | Surety Bonds | Client |
| Aspen Specialty Insurance Company | Insurer | Client |
| BlackRock | Banks and Indenture Trustees | Investment (MIO) |
| BlackRock Fund Advisors | Major Equity Holder Noteholder | Investment (MIO) |
| Commonwealth of Pennsylvania | Contractual Counterparty | Client |
| Dominion Cove Point LNG LP | Beneficiary of Letter of Credit; Contractual Counterparty; Shipper | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (*Dominion Resources, Inc.*) |
| Dominion Energy Generation Marketing Inc. | Contractual Counterparty | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (*Dominion Resources, Inc.*) |
| Dominion Energy Marketing Inc. | Contractual Counterparty | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (*Dominion Resources, Inc.*) |
| Dominion Transmission, Inc. | Beneficiary of Letter of Credit Contractual Counterparty | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (*Dominion Resources, Inc.*) |
| Intesa San Paolo, f/k/a Banca Intesa | Litigation Party | Client |
| iShares $ High Yield Corporate Bond UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares 0-5 Year High Yield Corporate Bond ETF | Noteholder | Investment (MIO) (BlackRock) |

---

[23]    McKinsey also failed to identify that in 2014, McKinsey partner Veronique McCaroll joined Credit Agricole (identified on the *GenOn Energy* Interested Parties list as a Litigation Party) as an executive.

| Entity | Interested Party Roles(s) (in *GenOn Energy*) | McKinsey Connection(s) |
|---|---|---|
| iShares Core Total USD Bond Market ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corp Bond CHF Hedged UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corp Bond GBP Hedged UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corp Bond UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corporate Bond ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares iBoxx $ High Yield Corporate  Bond ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares iBoxx $ High Yield ex Oil & Gas | Noteholder | Investment (MIO) (BlackRock) |
| iShares U.S. High Yield Bond Index ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares USD Short Duration High Yield | Noteholder | Investment (MIO) (BlackRock) |
| Oregon Public Utility Commission | Government-Regulatory Agency | Affiliate of Client (*State of Oregon*) |
| Pennsylvania Bureau of Waste Management | Government-Regulatory Agency | Affiliate of Client (*Commonwealth of Pennsylvania*) |
| Pennsylvania Department of Revenue | Government-Regulatory Agency | Affiliate of Client (*Commonwealth of Pennsylvania*) |
| Royal Bank of Scotland | Litigation Party | Client and/or Parent of Client (*Ulster Bank*) |
| Royal Bank of Scotland N.V., f/k/a ABN AMRO Bank NV | Litigation Party | Client and/or Affiliate of Client (*Ulster Bank*) |
| State of West Virginia | Taxing Authority | Client |
| United States Attorney's Office (Department of Justice) | Contractual Counterparty | Client |

260.    Any or all of McKinsey's undisclosed connections in *GenOn* would have disqualified McKinsey.

261.    Notably, as indicated both above and in Carmody's belated disclosures on behalf of McKinsey RTS, just as in McKinsey's other bankruptcy cases, multiple McKinsey clients were among the creditors of the bankruptcy debtor.  For example, on February 7, 2018, McKinsey's fourth disclosure declaration in *GenOn* (ECF 1429 in that case), filed after that case was over and the plan had been confirmed in 2017, Carmody finally disclosed McKinsey's relationship with two GenOn creditors who are also its clients, Bank of America N.A. and Merrill Lynch.  Both companies were on the Interested Parties List docketed more than seven months earlier on June 23, 2017.  McKinsey's extreme delay in disclosing these connections is consistent with its chronic pattern of withholding and then incrementally and belatedly disclosing critical information in order to evade disqualification, and waiting until it is too late for McKinsey's disclosures to be acted upon in the bankruptcy proceedings.

262.    The services that McKinsey provides for GenOn directly and adversely impact McKinsey's own clients who are also creditors of GenOn.

263.    McKinsey RTS's scope of services in the *GenOn* bankruptcy, as described in GenOn's June 23, 2017 application to employ McKinsey (ECF 123 in that case), obligated McKinsey to "provide strategic advice and develop relevant analyses to support the overall restructuring process[.]"  McKinsey was also obligated, in cooperation with others, to "develop and prepare a Chapter 11 plan of reorganization[.]"  *Id.*  Due to McKinsey's many conflicts of interests, it was not possible for McKinsey to carry out these services in an impartial manner. Every one of McKinsey's numerous clients who are creditors in *GenOn* will be adversely

impacted by the "restructuring process" by GenOn's plan of reorganization.  At the same time, McKinsey RTS is obligated to prepare that plan of reorganization *with full loyalty to GenOn*.

264.   Additionally, McKinsey RTS's obligations to GenOn include "assist[ing] the debtors in managing the Chapter 11 bankruptcy process, including managing outside stakeholders[.]" *Id.*  Again, this is a task that McKinsey cannot perform with full loyalty to the bankruptcy estate.  Among the outside stakeholders that McKinsey is thereby committed to "managing" are *its own clients*.

265.   McKinsey RTS is also charged with "assist[ing] in development of supporting diligence materials and presentations for use in various stakeholder meetings, attend diligence sessions and working meetings with various stakeholders and constituents[.]" *Id.*  In other words, although McKinsey is obligated to serve as a fiduciary for GenOn, it was in meetings facing *its own clients* who are indisputably adverse to, and have numerous connections with the bankruptcy estate, with significant financial interests hanging in the balance.

266.   And in perhaps the ultimate conflict of interest, by virtue of its appointment as a *GenOn* bankruptcy advisor, McKinsey is committed to "provide testimony" against *its own client connections* in adversarial litigation.  *Id.*  This obligation means that McKinsey might have to choose between using or withholding confidential information gained from its clients that may be useful or relevant to the bankruptcy estate.  If McKinsey decides or is obligated to withhold confidential information from its client that it could otherwise use for GenOn's benefit, it would be violating its fiduciary duty to GenOn and would be obligated to withdraw from the engagement.

267.   As a bankruptcy advisor and court-appointed fiduciary, McKinsey is obligated to assist GenOn in a bankruptcy reorganization process, the goal of which is a negotiated (or

imposed) plan to reduce or eliminate the debt owed to McKinsey's clients.   Under these circumstances, McKinsey's client relationships with numerous creditors of the estate were, and are, disqualifying.

268.   In addition to the above-mentioned known (but concealed) contemporaneous McKinsey client or investment connections in *GenOn*, dozens of *GenOn* Interested Parties (or affiliates thereof) were disclosed by McKinsey in *Alpha Natural Resources* and/or in *SunEdison*, but not disclosed in *GenOn*, including, *inter alia*:

| Entity | Interested Party Role (in *GenOn Energy*) | McKinsey Connection (as disclosed in *Alpha Natural Resources* or *SunEdison*) |
|---|---|---|
| AEP Energy Partners Inc. | Significant Customer | Client and/or Subsidiary of Client (*American Electric Power Co.*) |
| American Alternative Insurance Corporation | Insurer | Client and/or Subsidiary of Client (*MunichRe*) |
| Australia and New Zealand Banking Group Ltd. | Litigation Party | Client |
| Citigroup Global Markets Inc. | DIP Lender Noteholder Contractual Counterparty | Client |
| Davis Polk & Wardwell LLP | Professional | Service Provider |
| Kirkland & Ellis LLP | Professional | Service Provider |
| KPMG LLP | Professional | Service Provider |
| McGuire Woods LLP | Contractual Counterparty | Service Provider |
| Moody's Investors Services Inc. | Contractual Counterparty | Service Provider |
| Onex Inc. | Contractual Counterparty | Client |
| Progress Rail Leasing Corp. | Noteholder Contractual Counterparty | Client and/or Affiliate of Client (*Caterpillar Financial Services*) |

| Entity | Interested Party Role (in *GenOn Energy*) | McKinsey Connection (as disclosed in *Alpha Natural Resources* or *SunEdison*) |
|---|---|---|
| Siemens Demag Delaval | Significant Vendor | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Energy Inc. | Largest Unsecured Creditors; Contractual Counterparty | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*) Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Industry Inc. | Significant Vendor | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*) Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Power Generation Inc. | Contractual Counterparty | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*) Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Westinghouse | Contractual Counterparty | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*) Affiliate of Service Provider (*Siemens Industry Pace Global*) |

| Entity | Interested Party Role (in *GenOn Energy*) | McKinsey Connection (as disclosed in *Alpha Natural Resources* or *SunEdison*) |
|---|---|---|
| Southern California Edison Company | Beneficiary of Letter of Credit<br><br>Significant Customer<br><br>Contractual Counterparty<br><br>Utility Provider | Client |
| Standard & Poor's Rating Services | Contractual Counterparty | Service Provider; Employee Relationship |
| State Street Bank and Trust Company | Bank and Indenture Trustees<br><br>Contractual Counterparty | Client and/or Affiliate of Client (*State Street Global Advisors*) |
| State Street Bank and Trust Company of CT, N.A. | Contractual Counterparty; Landlord | Client and/or Affiliate of Client (*State Street Global Advisors*) |
| State Street Global Advisors | Noteholder | Client |
| Thyssenkrupp Elevator Corp. | Contractual Counterparty | Client and/or Subsidiary of Client (*Thyssenkrupp AG*) |
| UBS Warburg LLC | Contractual Counterparty | Client and/or Subsidiary and/or Affiliate of Clients (*UBS, UBS Financial Services, Inc., UBS Stamford Branch TRS*) |
| United States Trust Company of NY | Contractual Counterparty | Client and/or Subsidiary of Client (*Bank of America*) |
| Wells Fargo Bank, N.A. | Contractual Counterparty; Banks and Indenture Trustees | Client |

269.    Given the temporal proximity of *GenOn* to *Alpha Natural Resources* and *SunEdison*—and McKinsey's demonstrated pattern of failing to disclose its connections to Interested Parties—many, if not all, of the *GenOn* Interested Parties disclosed in *Alpha Natural Resources* and *SunEdison*, but not disclosed in *GenOn*, should have been disclosed by McKinsey in *GenOn* but were instead unlawfully concealed.

**FIRST CAUSE OF ACTION**
(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
Against All Defendants Except McKinsey RTS

270.     Alix repeats and realleges paragraphs 1 through 269 as if fully set forth herein.

271.     This cause of action is asserted against all Defendants except McKinsey RTS (the

"**Count 1 Defendants**"), and is asserted in addition to and in the alternative to the Second and

Third Causes of Action, *infra*.

272.     Section 1962(c) of Title 18 of the United States Code makes it illegal for "any

person employed by or associated with any enterprise engaged in, or the activities of which

affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity or collection of

unlawful debt."

273.     At all relevant times, each of the Count 1 Defendants was, and is, a person within

the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

274.     At all relevant times, AP was, and is, a person within the meaning of 18 U.S.C.

§§ 1961(3) and 1964(c).

**A.      The RICO Enterprise and Its Effect on Interstate Commerce**

275.     From its formation and continuing to the present, McKinsey RTS has constituted

an enterprise within the meaning of 18 U.S.C. § 1961(4).  McKinsey RTS was, and is, distinct

from McKinsey & Co. McKinsey Holdings, McKinsey & Co. (US), and the other Defendants

because McKinsey RTS was formed for the purpose of facilitating, committing, perpetuating, and

concealing the fraudulent and other criminal conduct alleged herein with the aim of unlawfully

depriving AP of bankruptcy consulting engagements it otherwise would have obtained.  By

encapsulating its bankruptcy consulting activities in a separately-incorporated legal entity—

McKinsey RTS— McKinsey & Co., McKinsey Holdings, and McKinsey & Co. (US) purported to add a veneer of indirectness between them and bankruptcy debtors and other bankruptcy proceeding participants, and used McKinsey RTS as a pretext to withhold their own multiplicity of connections to debtors and bankruptcy proceeding participants.  Forming McKinsey RTS also allowed them to conduct the illegal scheme from a separate legal entity and thereby attempt to wall off its illegal activities from the larger McKinsey operation.

276.    Beginning in or around 2011, McKinsey RTS participated in the following bankruptcy proceedings, involving bankruptcy debtors with assets, liabilities, revenues, employee totals, and states of operations as indicated in the chart below:

| Matter | Assets (Millions) | Liabilities (Millions) | Revenue (Millions) | Employees | Affected States[24] |
|--------|-------------------|------------------------|--------------------|-----------| --------------------|
| Harry & David Holdings[25] | $243 | $1,050 | $427 | 1,026 | *Twenty-two affected states:* Alabama, California, Colorado, Delaware, Florida, Iowa, Illinois, Indiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, New Jersey, New York, Ohio (main distribution center),* Oregon (headquarters),* Pennsylvania, South Carolina, Tennessee, Virginia, and Wisconsin (stores). |
| AMR Corp.[26] | $25,088 | $103,000 | $22,170 | 78,250 | *Seven affected states:* debtor's primary operations in New York, California, Illinois, Florida, Missouri, Puerto Rico, and Texas.* |
| AMF Bowling[27] | $100 | $279 | $387 | 7,000 | *Thirty-four affected states:* Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, New Jersey, New York, North Carolina, |

---

[24]    Debtors' headquarters are noted with an asterisk (*).
[25]    *In re Harry & David Holdings, Inc.*, No. 11-10884 (Bankr. D. Del. filed Mar. 28, 2011).
[26]    *In re AMR Corp.*, No. 11-15463 (Bankr. S.D.N.Y. filed Nov. 29, 2011).
[27]    *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (Bankr. E.D. Va. filed November 13, 2012).

| Matter | Assets (Millions) | Liabilities (Millions) | Revenue (Millions) | Employees | Affected States[24] |
|---|---|---|---|---|---|
| | | | | | Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia,* Washington, and Wisconsin. |
| Edison Mission Energy[28] | $8,323 | $12,304 | $9,321 | 1,783 | *Twelve affected states:* Illinois,* California,* and operations in twelve states total according to the Plan Sponsor Agreement. |
| NII Holdings, Inc.[29] | $2,887 | $4,593 | $4,773 | 3,870 | *One affected state:* Virginia* |
| Standard Register Company[30] | $481 | $592 | $720 | 3,700 | *All fifty states affected:* Ohio,* and operations in all 50 states according to Disclosure Statement (Dkt 1063). |
| Alpha Natural Resources[31] | $10,736 | $9,834 | $4,955 | 8,900 | *Six states affected:* Wyoming, Kentucky, Pennsylvania, Tennessee, Virginia, and West Virginia.* |
| SunEdison, Inc.[32] | $11,500 | $16,100 | $2,484 | 7,260 | *Twenty affected states:* California (operational and solar business headquarters),* New York, Missouri (corporate headquarters),* Texas, Utah, Minnesota, Hawaii, Maine, Vermont, Idaho, Washington, Massachusetts, Oregon, Ohio, Maryland, North Carolina, Illinois, Nevada, Nebraska, and Arizona. |
| GenOn Energy, Inc.[33] | $2,435 | $2,131 | $1,862 | 1,581 | *Ten affected states:* Maryland, New Jersey,* Pennsylvania, Texas (headquarters of parent company, NRG Energy, Inc.), California, Florida, Massachusetts, Mississippi, New York, and Ohio. |
| **TOTAL** | **$61,793** | **$149,883** | **$47,099** | **$113,370** | *All fifty states* |

277.    Additionally, the conflicts of interests disqualifying McKinsey RTS from serving

---

[28]    *In re Edison Mission Energy*, No. 12-49219 (Bankr. N.D. Ill. filed Dec. 17, 2012).

[29]    *In re NII Holdings, Inc*., No. 14-12611 (Bankr. S.D.N.Y. filed Sept. 15, 2014).

[30]    *In re The Standard Register Co*., No. 15-10541 (Bankr. D. Del. filed Mar. 12, 2015).

[31]    *In re Alpha Natural Resources, Inc*., No. 15-33896 (Bankr. E.D. Va. filed Aug. 3, 2015).

[32]    *In re SunEdison*, No. 16-10992 (Bankr. S.D.N.Y. filed Apr. 21, 2016).

[33]    *In re GenOn Energy, Inc*., No. 17-33695 (Bankr. S.D. Tex. filed June 14, 2017).

the various debtor-clients typically arose from McKinsey's relationships with business entities located in States or nations other than those in which the debtor-clients operated.

278.    Accordingly, at all relevant times, McKinsey RTS was engaged in, and its activities affected, interstate commerce.

279.    At all relevant times, the conduct of the Count 1 Defendants and their coconspirators has taken place in and has directly, substantially and foreseeably affected and restrained interstate commerce.

**B.    Pattern of Racketeering Activity**

280.    Each of the Count 1 Defendants conducted or participated in, directly or indirectly, the management or operation of McKinsey RTS and its affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c); to wit, they have consistently and regularly committed multiple predicate acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D), and/or conspired with other Defendants to commit and/or aided and abetted other Defendants' commission of the same, since at least 2010 and continuing to the present day.

281.    As discussed below in detail in paragraph 282, *infra*, since 2010, each of the Count 1 Defendants has engaged in two or more predicate acts of racketeering.

282.    The Count 1 Defendants played the following roles in the racketeering scheme:

a.    McKinsey & Co. owns and controls McKinsey Holdings, which, in turn, owns and controls McKinsey & Co. (US).

b.    McKinsey & Co. (US), in turn, owns and controls McKinsey RTS.

c.    Directly and through its agent officers, directors, board members, employees, and representatives, McKinsey & Co. (including its subsidiaries McKinsey Holdings

and McKinsey & Co. (US)) has been an active participant and central figure in the operation of McKinsey RTS and its affairs, and in the orchestration, planning, perpetuation, and execution of the unlawful scheme to deprive AP of valuable bankruptcy consulting engagements:

    i.   McKinsey & Co. owns, either directly or indirectly, all of its affiliates, including McKinsey RTS.

    ii.   A board of thirty shareholders controls McKinsey & Co. and all of its affiliates, including McKinsey RTS.

    iii.   McKinsey & Co. subsidiaries all rely on the McKinsey brand for marketing.

    iv.   McKinsey's disclosure declarations, which were submitted as part of the debtors' applications for court approval of its employment, prominently and extensively promote McKinsey & Co.'s skills and staff.

    v.   McKinsey shares the same in-house counsel. For example, defendant Proshan is employed by McKinsey & Co. and also serves as counsel for McKinsey RTS.

    vi.   McKinsey RTS is dependent on McKinsey & Co. to provide its business services in its bankruptcy cases. As a result, McKinsey & Co. provides client service personnel to McKinsey RTS.

d.  Each of the predicate acts alleged herein were performed by employees of McKinsey & Co., McKinsey Holdings, or McKinsey & Co. (US) acting within the scope of their employment.  McKinsey's personnel (including Defendants Carmody and Goldstrom) filed materially false or incomplete Bankruptcy Rule

2014 disclosures concealing conflicts of interests and, in some instances, fraudulent behavior, which, if truthfully and fully disclosed, would disqualify McKinsey RTS from all or substantially all of the bankruptcy crisis management and consulting engagements it has secured from 2001 to the present.  McKinsey also initiated the "pay-to-play" scheme with certain legal professionals through which McKinsey engaged in and offered commercial bribes and failed to disclose these bribes to the various Bankruptcy Courts despite the conflicts of interest they created.

e.  Defendant Barton was, from the inception of the scheme through the present, the Managing Partner of McKinsey & Co., and, given his senior-most executive position at McKinsey, had ultimate executive authority over McKinsey's as well as the individual Defendants in this action.  Barton also personally participated in the fraudulent efforts to deflect and delay Alix's 2014-2015 attempt to remediate McKinsey's unlawful bankruptcy consulting practices.  At a minimum, Barton had express notice of the unlawful nature of the unlawful bankruptcy consulting business practices of McKinsey and its subsidiaries by September 2014 when informed of such by Alix.  As a participant in the scheme to defraud, Barton was complicit as a principal in the acts of mail and wire fraud set forth below.

f.  Defendant Sternfels is a senior partner in McKinsey & Co. and had during the relevant time period a high degree of executive authority over the bankruptcy consultancy activities of McKinsey, including the submission of false and misleading Rule 2014(a) declarations by Defendants Carmody and Goldstrom and other McKinsey RTS employees.  Sternfels also personally participated in the

efforts to deflect and delay Alix's 2014-2015 attempt to remediate McKinsey's unlawful bankruptcy consulting practices.  At a minimum, Sternfels had express notice of the unlawful nature of the unlawful bankruptcy consulting business practices of McKinsey by September 2014 when informed of such by Alix.  Additionally, Sternfels likely participated in an unlawful quid pro quo with SunEdison CEO Chatila through which McKinsey obtained post-bankruptcy employment for Chatila in exchange for Chatila's acquiescence in McKinsey's concealment of voidable preferences through the "re-invoiced" and "round-trip" payment scheme.  As a participant in the scheme to defraud, Sternfels was complicit as a principal in the acts of mail and wire fraud set forth below.

g.  Defendant Garcia is a senior partner in McKinsey & Co., a founding executive of McKinsey RTS, and has a high degree of executive authority over the bankruptcy consultancy activities of McKinsey, including the knowledge and approval of the submission of false and misleading Rule 2014(a) declarations by Defendants Carmody and Goldstrom and other McKinsey RTS employees.  As a participant in the scheme to defraud, Garcia was complicit as a principal in the acts of mail and wire fraud set forth below.

h.  Defendant Proshan, an associate general counsel for McKinsey, furnishes in-house legal services to McKinsey and knowingly participated in the preparation of materially false and incomplete Rule 2014(a) submissions by McKinsey & Co. (US) and McKinsey RTS.  Proshan is complicit in each of the violations of 18 U.S.C. §§ 152(2), 152(3), 1341, and 1343 set forth below.   As a participant in the scheme to defraud, Proshan was complicit as a principal in the acts of mail and

wire fraud set forth below.

i.   Defendant Goldstrom is a senior partner in McKinsey & Co. and Board member of McKinsey RTS, and submitted ten knowingly and materially false and/or incomplete Rule 2014(a) declarations under penalty of perjury on behalf of McKinsey RTS, as set forth in paragraph 284, *infra*, in furtherance of the fraudulent and unlawful scheme.   At a minimum, therefore, Goldstrom, committed nine of the violations of 18 U.S.C. §§ 152(2) and 152(3), below, and nine of the violations of 18 U.S.C. §§ 1341, and 1343 set forth below.   As a participant in the scheme to defraud, Goldstrom also was complicit as a principal in the remaining acts of mail and wire fraud set forth below.

j.   Defendant Carmody is a partner in McKinsey & Co. and a senior executive of McKinsey RTS, and submitted thirteen knowingly and materially false and/or incomplete Rule 2014(a) declarations under penalty of perjury on behalf of McKinsey RTS, as set forth in paragraph 284, *infra*, in furtherance of the fraudulent and unlawful scheme.   Carmody had previously been employed by AP and had signed Rule 2014(a) declarations on AP's behalf which fully and lawfully disclosed AP's connections.   Accordingly, Carmody would have known the palpably deficient nature of McKinsey's bare-bones disclosures.   At a minimum, therefore, Carmody, committed twelve of the violations of 18 U.S.C. §§ 152(2) and 152(3), below, and twelve of the violations of 18 U.S.C. §§ 1341, and 1343 set forth below.  As a participant in the scheme to defraud, Carmody also was complicit as a principal in the remaining acts of mail and wire fraud set forth below.

283.    Defendants' predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing or obfuscating McKinsey's disqualifying conflicts of interest in order to enable McKinsey & Co. (US) and McKinsey RTS to obtain bankruptcy consulting assignments that they would not have received had the Count 1 Defendants behaved lawfully, and through offering unlawful "pay-to-play" arrangements to bankruptcy attorneys; (2) thereby depriving AP of remunerative bankruptcy consulting engagements; and (3) after the scheme was discovered, forestalling remedial litigation by AP and Alix by means of Barton's duplicitous interactions with Alix.  These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission, which are described below:

> 1. *False Declarations, Certifications, Verifications or Statements under Penalty of Perjury in Violation of 18 U.S.C. §§ 152(2) and 152(3).*

284.    With respect to each of its engagements by debtors in bankruptcy, Bankruptcy Rule 2014(a) obligated McKinsey RTS to provide, as part of the application for employment that the debtors filed with the bankruptcy courts, "a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."  To satisfy its obligations under Rule 2014(a), McKinsey RTS was obligated to fully disclose all such interrelationships regardless of materiality.  As more fully described above, on the following occasions, the Count 1 Defendants submitted, caused McKinsey RTS to submit, and/or conspired in and/or aided and abetted the submission of, affidavits or declarations under penalty of perjury on behalf  McKinsey RTS which the Count 1 Defendants knew to be materially false or misleadingly incomplete, for the purposes of concealing McKinsey's disqualifying conflicts of interest:

102

| | | 1. Harry & David[34] | |
|---|---|---|---|
| | **Date** | **Dkt. No.** | **Name Of Document** |
| 1 | Apr. 4, 2011 | 105 | Declaration of Seth Goldstrom in Support of the Debtors' Application to Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC as Management Consultants *Nunc Pro Tunc* As Of The Petition Date |
| 2 | Apr. 26, 2011 | 208 | Supplemental Declaration of Seth Goldstrom in Support of the Debtors' Application to Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC as Management Consultants *Nunc Pro Tunc* As Of The Petition Date |
| 3 | June 20, 2011 | 457 | Second Supplemental Declaration of Seth Goldstrom in Support of the Debtors' Application to Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC as Management Consultants *Nunc Pro Tunc* As Of The Petition Date |
| | | | |
| | | 2. AMR Corp[35] | |
| 4 | Jan. 10, 2012 | 581 | Declaration Of Seth Goldstrom In Support Of The Debtors' Application To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, And McKinsey & Company, Inc. Japan As Management Consultants *Nunc Pro Tunc* As Of December 12, 2011 |
| 5 | Jan. 20, 2012 | 697 | Supplemental Declaration Of Seth Goldstrom In Support Of The Debtors' Application To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, And McKinsey & Company, Inc. Japan As Management Consultants *Nunc Pro Tunc* As Of December 12, 2011 |
| 6 | Feb. 27, 2012 | 1468 | Second Supplemental Declaration Of Seth Goldstrom In Support Of The Debtors' Application To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, And McKinsey & Company, Inc. Japan As Management Consultants *Nunc Pro Tunc* As Of December 12, 2011 |
| 7 | May 10, 2012 | 2695 | Third Supplemental Declaration Of Seth Goldstrom In Support Of The Debtors' Application To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, And McKinsey & Company, Inc. Japan As Management Consultants *Nunc Pro Tunc* As Of December 12, 2011 |

---

[34]     *In re Harry & David Holdings, Inc*., No. 11-10884 (Bankr. D. Del. filed Mar. 28, 2011).
[35]     *In re AMR Corp*., No. 11-15463 (Bankr. S.D.N.Y. filed Nov. 29, 2011).

| 8 | Nov. 13, 2012 | 5344 | Fourth Supplemental Declaration Of Seth Goldstrom In Support Of The Debtors' Second Supplemental Application To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, And McKinsey & Company, Inc. Japan As Management Consultants |
| 9 | Feb. 28, 2013 | 6896 | Fifth Supplemental Declaration Of Seth Goldstrom In Support Of The Debtors' Application To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, And McKinsey & Company, Inc. Japan, McKinsey & Company Canada, McKinsey & Company, Inc. Belgium, McKinsey & Company, Inc. Italy, And McKinsey & Company, S.L. As Management Consultants *Nunc Pro Tunc* As Of December 12, 2011 |
| 10 | Apr. 18, 2013 | 7697 | Sixth Supplemental Declaration Of Seth Goldstrom In Support Of The Debtors' Application To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, And McKinsey & Company, Inc. Japan, McKinsey & Company Canada, McKinsey & Company, Inc. Belgium, McKinsey & Company, Inc. Italy, And McKinsey & Company, S.L. As Management Consultants *Nunc Pro Tunc* As Of December 12, 2011 |
| | | | |
| | **3. AMF Bowling Worldwide[36]** | | |
| 11 | Nov. 21, 2012 | 125 | Declaration Of Kevin Carmody In Support Of The Application Of The Debtors For Entry Of An Order Authorizing The Employment And Retention Of McKinsey Recovery & Transformation Services U.S., LLC, As Restructuring Advisor To The Debtors And Debtors In Possession *Nunc Pro Tunc* To The Petition Date |
| | | | |
| | **4. Edison Mission Energy[37]** | | |
| 12 | Dec. 28, 2012 | 175 | Declaration of Jared D. Yerian In Support Of Debtors' Application To Employ And Retain McKinsey Recovery & Transformation Services U.S., LLC As Restructuring Advisor For The Debtors And Debtors In Possession Nunc Pro Tunc To The Petition Date |
| 13 | May 15, 2013 | 756 | First Supplemental Declaration Of Jared D. Yerian In Support Of Debtors' Application To Employ And Retain McKinsey Recovery & Transformation Services U.S., LLC As |

---

[36]   *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (Bankr. E.D. Va. filed Nov. 13, 2012).
[37]   *In re Edison Mission Energy*, No. 12-49219 (Bankr. N.D. Ill. filed Dec. 17, 2012).

| | | | |
|---|---|---|---|
| | | | Restructuring Advisor For The Debtors And Debtors In Possession *Nunc Pro Tunc* To The Petition Date |
| 14 | Nov. 22, 2013 | 1615 | Second Supplemental Declaration Of Jared D. Yerian In Support Of Debtors' Application To Employ And Retain McKinsey Recovery & Transformation Services U.S., LLC As Restructuring Advisor For The Debtors And Debtors In Possession *Nunc Pro Tunc* To The Petition Date |
| | | | |
| **5. NII Holdings**[38] | | | |
| 15 | Oct. 23, 2014 | 153 | Declaration of Kevin Carmody in Support of Application of Debtors and Debtors In Possession, Pursuant to Sections 327(a), 328, 330, 331 and 1107(b) Of The Bankruptcy Code, Bankruptcy Rules 2014(a) And 2016(b) And Local Bankruptcy Rules 2014-1 and 2016-1, For An Order Authorizing Them To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC As Turnaround Advisor For The Debtors *Nunc Pro Tunc* To October 23, 2014 |
| 16 | Nov. 6, 2014 | 196 | Supplemental Declaration of Kevin Carmody in Support of Application of Debtors and Debtors In Possession, Pursuant to Sections 327(a), 328, 330, 331 and 1107(b) Of The Bankruptcy Code, Bankruptcy Rules 2014(a) And 2016(b) And Local Bankruptcy Rules 2014-1 and 2016-1, For An Order Authorizing Them To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC As Turnaround Advisor For The Debtors *Nunc Pro Tunc* To October 23, 2014 |
| | | | |
| **6. Standard Register**[39] | | | |
| 17 | Mar. 23, 2015 | 87 | Declaration Of Kevin Carmody In Support Of Debtors' Motion For Order Authorizing The Debtors To (I) Employ And Retain McKinsey Recovery & Transformation Services U.S., LLC To Provide Interim Management Services Pursuant To 11 U.S.C. § 363 And (II) Designate Kevin Carmody As Chief Restructuring Officer Nunc Pro Tunc To The Petition Date |
| | | | |
| **7. Alpha Natural Resources**[40] | | | |
| 18 | Aug. 24, 2015 | 212 | Declaration Of Kevin Carmody In Support Of Application Of The Debtors, Pursuant To Sections 327(A), 328(a) And 1107(b) Of The Bankruptcy Code, Bankruptcy Rule 2014(a) |

---

[38]   *In re NII Holdings, Inc.*, No. 14-12611 (Bankr. S.D.N.Y. filed Sept. 15, 2014).

[39]   *In re The Standard Register Co.*, No. 15-10541 (Bankr. D. Del. filed Mar. 12, 2015).

[40]   *In re Alpha Natural Resources, Inc.*, No. 15-33896 (Bankr. E.D. Va. filed Aug. 3, 2015).

| | | | |
|---|---|---|---|
| | | | And Local Bankruptcy Rule 2014-1, For An Order Authorizing Them To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC As Turnaround Advisor For The Debtors, Effective As Of The Petition Date |
| 19 | Nov. 9, 2015 | 865 | Supplemental Declaration Of Kevin Carmody In Support Of Application Of The Debtors, Pursuant To Sections 327(a), 328(a) And 1107(b) Of The Bankruptcy Code, Bankruptcy Rule 2014(a) And Local Bankruptcy Rule 2014-1, For An Order Authorizing Them To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC As Turnaround Advisor For The Debtors, Effective As Of The Petition Date |
| 20 | Mar. 25, 2016 | 1854 | Second Supplemental Declaration Of Kevin Carmody In Support Of Application Of The Debtors, Pursuant To Sections 327(a), 328(a) And 1107(b) Of The Bankruptcy Code, Bankruptcy Rule 2014(a) And Local Bankruptcy Rule 2014-1, For An Order Authorizing Them To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC As Turnaround Advisor For The Debtors, Effective As Of The Petition Date |
| 21 | May 19, 2016 | 2464 | Third Supplemental Declaration Of Kevin Carmody In Support Of Application Of The Debtors, Pursuant To Sections 327(a), 328(a) And 1107(b) Of The Bankruptcy Code, Bankruptcy Rule 2014(a) And Local Bankruptcy Rule 2014-1, For An Order Authorizing Them To Retain And Employ McKinsey Recovery & Transformation Services U.S., LLC As Turnaround Advisor For The Debtors, Effective As Of The Petition Date |
| 22 | Aug. 5, 2016 | 3223 | Declaration Of Kevin Carmody In Respect Of Recommendation Of United States Trustee Pursuant To Paragraph 'D' Of Order Dated July 15, 2016 [Docket # 3055] |
| | | | |
| **8. SunEdison**[41] | | | |
| 23 | May 5, 2016 | 202 | Declaration Of Mark W. Hojnacki In Support Of Debtors' Application For Order Pursuant To Sections 327(a), 328, 330, 331, And 1107(b) Of The Bankruptcy Code, Bankruptcy Rules 2014(a) And 2016(b) And Local Bankruptcy Rules 2014-1 And 2016-1 Authorizing The Employment And Retention Of McKinsey Recovery & Transformation Services U.S., LLC As Restructuring Advisor For The Debtors, Nunc Pro Tunc To The Petition Date |
| 24 | June 6, 2016 | 484 | Amended Declaration Of Mark W. Hojnacki In Support Of |

---

[41] *In re SunEdison*, No. 16-10992 (Bankr. S.D.N.Y. filed Apr. 21, 2016).

| | | | |
|---|---|---|---|
| | | | Debtors' Application For Order Pursuant To Sections 327(a), 328, 330, 331, And 1107(b) Of The Bankruptcy Code, Bankruptcy Rules 2014(a) And 2016(b) And Local Bankruptcy Rules 2014-1 And 2016-1 Authorizing The Employment And Retention Of McKinsey Recovery & Transformation Services U.S., LLC As Restructuring Advisor For The Debtors, Nunc Pro Tunc To The Petition Date |
| 25 | June 14, 2016 | 586 | Supplement To Amended Declaration Of Mark W. Hojnacki In Support Of Debtors' Application For Order Pursuant To Sections 327(a), 328, 330, 331, And 1107(b) Of The Bankruptcy Code, Bankruptcy Rules 2014(a) And 2016(b) And Local Bankruptcy Rules 2014-1 And 2016-1 Authorizing The Employment And Retention Of McKinsey Recovery & Transformation Services U.S., LLC As Restructuring Advisor For The Debtors, Nunc Pro Tunc To The Petition Date |
| 26 | Dec. 21, 2016 | 1958 | Second Supplement To Amended Declaration Of Mark W. Hojnacki In Support Of Debtors' Application For Order Pursuant To Sections 327(a), 328, 330, 331, And 1107(b) Of The Bankruptcy Code, Bankruptcy Rules 2014(a) And 2016(b) And Local Bankruptcy Rules 2014-1 And 2016-1 Authorizing The Employment And Retention Of McKinsey Recovery & Transformation Services U.S., LLC As Restructuring Advisor For The Debtors, Nunc Pro Tunc To The Petition Date |
| 27 | Mar. 20, 2017 | 2614 | Third Supplement To Amended Declaration Of Mark W. Hojnacki In Support Of Debtors' Application For Order Pursuant To Sections 327(a), 328, 330, 331, And 1107(b) Of The Bankruptcy Code, Bankruptcy Rules 2014(a) And 2016(b) And Local Bankruptcy Rules 2014-1 And 2016-1 Authorizing The Employment And Retention Of McKinsey Recovery & Transformation Services U.S., LLC As Restructuring Advisor For The Debtors, Nunc Pro Tunc To The Petition Date |
| | | | |
| **9. GenOn Energy**[42] | | | |
| 28 | June 23, 2017 | 123 | Declaration Of Kevin M. Carmody In Support Of Debtors' Application For Entry Of An Order (I) Authorizing The Retention And Employment Of McKinsey Restructuring & Transformation Services U.S., LLC As Restructuring Advisor For The Debtors Nunc Pro Tunc To The Petition Date And (II) Granting Related Relief |
| 29 | July 13, 2017 | 221 | First Supplement To Declaration Of Kevin M. Carmody In Support Of Debtors' Application For Entry Of An Order (I) Authorizing The Retention And Employment |

---

[42]    *In re GenOn Energy, Inc.*, No. 17-33695 (Bankr. S.D. Tex. filed June 14, 2017).

| | | | Of McKinsey Recovery & Transformation Services U.S., LLC As Restructuring Advisor For The Debtors Nunc Pro Tunc To The Petition Date And (II) Granting Related Relief |
|---|---|---|---|
| 30 | Sept. 15, 2017 | 771 | Second Supplement To Declaration Of Kevin M. Carmody In Support Of Debtors' Application For Entry Of An Order (I) Authorizing The Retention And Employment Of McKinsey Recovery & Transformation Services U.S., LLC As Restructuring Advisor For The Debtors Nunc Pro Tunc To The Petition Date And (II) Granting Related Relief |
| 31 | Feb. 7, 2018 | 1429 | Third Supplement To Declaration Of Kevin M. Carmody In Support Of Debtors' Application For Entry Of An Order (I) Authorizing The Retention And Employment Of McKinsey Recovery & Transformation Services U.S., LLC As Restructuring Advisor For The Debtors Nunc Pro Tunc To The Petition Date And (II) Granting Related Relief |

285.   The individual false and misleading statements within each of the foregoing thirty-one submissions are identified in Exhibit A and Schedules 1-12, attached hereto.[43]

286.   Each of the thirty-one submissions constituted the knowing and fraudulent making of a false oath, declaration, certificate, verification, or statement under penalty of perjury pursuant to 28 U.S.C. § 1746, in or in relation to any case under the Bankruptcy Code, within the meaning of 18 U.S.C. §§ 152(2) or 152(3).

### 2.   Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343.

287.   The Count 1 Defendants engaged in a scheme to defraud AP and others through the false denial, concealment, and obfuscation of disqualifying conflicts of interest, which thereby deprived AP of remunerative consulting engagements it would otherwise have obtained.  The Count 1 Defendants accomplished their scheme to defraud AP by:

---

[43]   Exhibit A and Schedules 1-12 are not intended as an exhaustive exposition of Defendants' false and misleading statements in their Rule 2014(a) submissions.  Further, Plaintiff's investigation is ongoing and he reserves the right to supplement this material following further investigation and discovery herein.

a.  Causing McKinsey RTS to systematically file with the various Bankruptcy Courts thirty-one Rule 2014(a) disclosure statements which the Count 1 Defendants knew to be materially false or incomplete in that such statements omitted, concealed, or distorted facts which would necessitate disqualification of McKinsey & Co. (US) and McKinsey RTS.

b.  Using fraudulently-engineered "re-invoiced" and "round trip" payments from non-debtor affiliates of SunEdison in order to avoid disqualification from the SunEdison engagement.  This deception may have been furthered by an undisclosed quid pro quo pursuant to which SunEdison CEO Chatila acceded to the scheme in exchange for McKinsey's assistance in finding post-bankruptcy employment for Chatila.

c.  Concealing voidable preferences, and thus avoiding disqualification in the *GenOn* bankruptcy, by falsely representing such preferences as ordinary-course payments.

d.  Offering exclusive referral relationships to one or more prominent attorneys practicing in the United States, while failing to disclose these disqualifying contacts to the Bankruptcy Courts.

288.    The Count 1 Defendants later fraudulently perpetuated their scheme when, confronted by Alix with evidence of their wrongdoing, the Count 1 Defendants, through Defendant Barton, repeatedly promised to cease their unlawful activity while secretly intending to continue it.

289.    In furtherance of the scheme, and as described herein, the Count 1 Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343, and

also caused matters and things to be placed in a post office or authorized depository or deposited

or caused to be deposited matters or things to be sent or delivered by a private or commercial

interstate carrier, in violation of 18 U.S.C. § 1341.  The Count 1 Defendants' specific mailings

and interstate wirings in furtherance of the scheme to defraud included, but are not limited to, the

following:

  a. Each of the affidavits or declarations under penalty of perjury identified in items 1,
2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 15, 16, 17, 18, 19, 20, 21, 22, 28, 29, 30, and 31 in the
table set forth in Paragraph 284, *supra*, were transmitted by interstate wire, by
United States mail, and/or by private interstate commercial carrier, as evidenced by
the fact that each such affidavit or declaration was signed, or the affiant or
declarant resided, in a State different from that in which the document was
judicially filed;

  b. Each of the affidavits or declarations under penalty of perjury enumerated in items
12, 13, 14, 23, 24, 25, 26, and 27 in the table set forth in Paragraph 284, *supra*, or
preliminary drafts thereof,  were transmitted by interstate wire, by United States
mail, and/or by private interstate commercial carrier, given the likelihood that they
were prepared, reviewed, or  edited by employees of McKinsey, their respective
legal counsel, and likely other firms or individuals located in States other than that
in which the documents ultimately were judicially filed.

  c. Barton and Sternfels, acting on behalf of McKinsey, used or caused the use of the
interstate or international wires in communications with Alix concerning his
allegations of unlawful conduct by McKinsey.  These communications furthered
the scheme by fostering in Alix the false impression that McKinsey was pursuing

corrective action in light of Alix's admonishments to Barton and Sternfels concerning McKinsey's illegal bankruptcy consulting engagements.  By stringing Alix along in this fashion, Barton and Sternfels sought to (and did) forestall legal action by AP and thereby prolonged their scheme.  These communications include the following:

    i.   August 20, 2014 e-mail from Barton's assistant in London, Katharine Bowerman, conveying to Alix[44] a message from Barton concerning Alix's request for a meeting to discuss McKinsey's bankruptcy consulting activities;

   ii.   August 20, 2014 e-mail from Alix to Barton responding to Barton's earlier message and discussing the parameters of a meeting between representatives of the two firms.

  iii.   August 20, 2014 e-mail from Bowerman in London to Alix concerning the contemplated meeting;

  iv.   August 21, 2014 e-mail from Alix to Barton and Bowerman in Europe concerning the contemplated meeting;

   v.   August 24, 2014 e-mail from Barton in Krakow, Poland to Alix;

  vi.   August 27, 2014 e-mail from Barton's assistant in London, Katharine

---

[44]    All e-mails referenced in this paragraph 289(c) were sent to or from Alix at his e-mail address at Lakeview Capital Inc. (JAlix@lakeviewcapitalinc.com).  Lakeview Capital's e-mail servers were hosted in the United States during the relevant time.   Accordingly, any e-mail sent to or from JAlix@lakeviewcapitalinc.com would have been routed through the United States notwithstanding the geographical location of the device used by the sender or recipient to originate or read the e-mail.  Upon information and belief, the e-mail server for Barton and Bowerman's e-mail addresses (Dominic_Barton@mckinsey.com and katharine_bowerman@mckinsey.com) as well as that of another Barton assistant, Charlotte Phillips (charlotte_phillips@mckinsey.com) were hosted in the United Kingdom or otherwise outside of the United States.

Bowerman, to Alix in Michigan, conveying a message from Barton concerning the contemplated meeting;

vii. September 3, 2014 telephone call between Sternfels in San Francisco and Alix and Barton in New York City, during which AP's concerns about McKinsey's bankruptcy consulting practices were conveyed and Alix received assurances from Barton that the concerns would be addressed and remedied;

viii. September 4, 2014 e-mail from Barton in Canada to Alix in the United States;

ix. September 4, 2014 e-mail from Barton's assistant, Charlotte Phillips, in London to Alix in the United States, conveying a message from Barton concerning a follow-up discussion of AP's concerns;

x. September 4, 2014 telephone call between Barton in Ireland and Alix and Sternfels in New York City during which AP's concerns about McKinsey's bankruptcy consulting practices were conveyed and Alix received assurances from Barton that the concerns would be addressed and remedied;

xi. September 5, 2014 telephone call between Barton in Ottawa, Canada and Alix in Boston, Massachusetts, during which Barton reiterated that AP's concerns about McKinsey's bankruptcy consulting practices would be addressed and remedied;

xii. September 24, 2014 e-mail from Bowerman in London to Alix conveying Barton's enumeration of dates and times for a meeting to further address

AP's concerns about McKinsey's bankruptcy consulting practices;

xiii.  June 15, 2015 e-mail from Alix in Michigan to Barton, requesting a follow-up discussion to address Barton's promise to bring RTS into compliance with the law.

d.  Upon information and belief, the Count 1 Defendants also used the interstate wires, United States mail, or private interstate commercial carrier to convey to one or more bankruptcy attorneys located in the United States offers of unlawful exclusive referral agreements.  Evidence of such transactions is peculiarly within the Count 1 Defendants' knowledge and control and will be proven at trial following discovery.

e.  The Count 1 Defendants also used the interstate wires, United States mail, or private interstate commercial carrier to transfer illegally obtained funds within the United States for the purpose of furthering the objectives of McKinsey RTS. These transfers include the movement of funds in connection with McKinsey's "re-invoiced" and "round-trip" payments from SunEdison and its affiliates in or about September 2015 through April 2016, as well as the transmission of fees from the various bankruptcy debtor-clients to McKinsey RTS throughout the course of the scheme since 2010.   Evidence of such transactions and others is peculiarly within Defendants' knowledge and control and will be proven at trial following discovery.

290.  Each of the Count 1 Defendants, through their direct or indirect corporate or executive control of McKinsey RTS, knew of, and participated in, numerous acts of mail and wire fraud.  In particular, each of the Count 1 Defendants, through their control of and/or participation

in McKinsey RTS, sent or caused to be sent numerous mail or wire communications, or acted with knowledge that mail or wire communications would follow in the ordinary operation of McKinsey RTS, or could reasonably have foreseen that the mails or wires would be used in the ordinary course of business as a result of the Count 1 Defendants' acts in furtherance of the transactions discussed above, including the uses of the mails and interstate wires enumerated in paragraph 289, *supra*. Defendants Carmody and Goldstrom knew that their various Rule 2014(a) declarations or preliminary drafts thereof would be transmitted by the mails or interstate wires, as did Defendant Proshan, who oversaw the preparation of these documents. Each of the Count 1 Defendants committed numerous additional and similar acts of mail or wire fraud in furtherance of their scheme or artifice that will be proven at trial following discovery.

291.    To the extent proof of reliance is legally required, in engaging in the aforementioned mail and wire fraud, the Count 1 Defendants knew and intended that their debtor-clients, the various bankruptcy judges, the Department of Justice, the United States Trustee, AP, and other McKinsey competitors would reasonably rely on the Count 1 Defendants' misrepresentations and omissions, which would result in McKinsey RTS obtaining and retaining consulting engagements to which it was not entitled and which likely would have been secured by AP. The Count 1 Defendants also knew and intended that AP would rely on Barton's false promises to Alix that McKinsey would cease its unlawful bankruptcy consulting practices and that in reliance thereon AP would refrain from seeking legal remedies.

> 3.    *Inducement to Interstate or Foreign Travel in Violation of 18 U.S.C. § 2314.*

292.    The Count 1 Defendants' scheme to unlawfully compete with AP—including by depriving AP of remunerative consulting engagements it would otherwise have obtained—through concealment, obfuscation, and fraudulent misrepresentation of disqualifying conflicts of

interest, and to prolong the unlawful conduct by lying to Alix when he attempted to instigate corrective action by McKinsey, constitutes a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, within the meaning of 18 U.S.C. § 2314.

293.    Having devised or intending to devise such a scheme, by which the Count 1 Defendants sought to defraud AP of money or property having a value in excess of $5,000, and in execution or concealment of the scheme, Barton induced Alix to travel in interstate or foreign commerce in violation of 18 U.S.C. § 2314.  Specifically, in response to Alix's request for a meeting to discuss remediation of McKinsey RTS's continued unlawful bankruptcy consulting engagements, Barton induced Alix to travel from Michigan to New York City to meet with Barton on October 15, 2015, at which meeting Barton offered business referrals to AP in exchange for Alix and AP dropping the issues concerning McKinsey's pay-to-play scheme and its illegal disclosure declarations.

294.    The Count 1 Defendants induced Alix to attend these meetings in order to foster the false impression that McKinsey was pursuing corrective action in light of Alix's admonishments to Barton and Sternfels concerning McKinsey & Co. (US)'s and McKinsey RTS's illegal bankruptcy consulting engagements.  By stringing Alix along in this fashion, the Count 1 Defendants sought to (and did) forestall legal action by AP, and thereby prolonged their scheme.

> 4.    *Unlawful Offers of Remuneration, Compensation, Reward, or Advantage in Violation of 18 U.S.C. § 152(6) and Felony Commercial Bribery under State Law.*

295.    The Count 1 Defendants offered to one or more major bankruptcy attorneys located in the United States an arrangement under which McKinsey would introduce its clients to

such attorneys on an exclusive basis in exchange for the attorneys exclusively recommending McKinsey & Co. (US) and/or McKinsey RTS to the attorneys' bankruptcy debtor clients for bankruptcy consulting services.

296.    The Count 1 Defendants made such offers knowing and intending that: neither they nor the recipient attorney(s) would disclose the arrangement to their mutual debtor-client or the bankruptcy court (via a Rule 2014(a) disclosure or otherwise); through such nondisclosure, McKinsey RTS would avoid disqualification as an advisor to the debtor(s); and such actions would operate as a fraud against McKinsey & Co. (US)'s and McKinsey RTS's competitor, AP, which could have secured such consulting engagements in the absence of the unlawful referral agreement between the Count 1 Defendants and the attorneys.

297.    With respect to each such offer, the Count 1 Defendants knowingly and fraudulently gave, offered, or attempted to obtain money or property, remuneration, compensation, reward, advantage, or promise thereof (in the form of valuable exclusive referrals to high-level executives from McKinsey's coveted stable of corporate clients) for acting or forbearing to act in any case under the Bankruptcy Code, within the meaning of 18 U.S.C. § 152(6).

298.    Additionally, the foregoing conduct constituted felony commercial bribery under the laws of Texas, New York, and Illinois:

   a.  Texas Penal Code § 32.43(b) provides that "a person who is a fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary."   Pursuant to Texas Penal Code

§ 32.43(d), a violation of § 32.43(b) is a felony offense.

b.   New York Penal Law § 180.03 provides that "A person is guilty of commercial bribing in the first degree when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs, and when the value of the benefit conferred or offered or agreed to be conferred exceeds one thousand dollars and causes economic harm to the employer or principal in an amount exceeding two hundred fifty dollars."  A violation of § 180.03 is a felony offense.

c.   Illinois Criminal Code § 720 ILCS 5/29A-1 provides that: "[a] person commits commercial bribery when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs."  Pursuant to Illinois Criminal Code § 720 ILCS § 5/29A-3, a violation of § 5/29A-1 is a felony offense if the value conferred equals or exceeds $500,000.

299.   The value offered by the Count 1 Defendants to the bankruptcy attorneys that it sought to recruit for its "pay-to-play" scheme exceeded $500,000, given the magnitude of fees that bankruptcy attorneys could expect from an engagement by one or more of McKinsey's Fortune 500-class clientele.

300.   By making an offer of such a benefit to a fiduciary (a bankruptcy attorney) with the agreement or understanding that that the benefit would influence the conduct of the fiduciary in relation to the affairs of the fiduciary's beneficiary (the bankruptcy attorney's debtor client) and

without the consent of the bankruptcy debtor client in the *GenOn* bankruptcy proceeding (venued in Texas); the *SunEdison*, *NII Holdings*, and *AMR* proceedings (venued in New York); and the *Edison Mission Energy* proceeding (venued in Illinois), the Count 1 Defendants violated the aforementioned bribery statutes.

301.    The particular details of the Count 1 Defendants' violations of 18 U.S.C. § 152(6) and state commercial bribery statutes, including the specific details of such offers and the identities of the attorneys, are peculiarly within the Count 1 Defendants' knowledge and will be proven at trial following discovery.  At a minimum, Barton admitted to Alix at their October 16, 2014 meeting that McKinsey had in fact made one or more such "pay-to-play" offers.

>    5. *Obstruction of Justice and Witness Tampering in Violation of 18 U.S.C. §§ 1503(a), 1512(b), and 1512(c).*

302.    McKinsey and Defendant Carmody, acting through McKinsey RTS, fraudulently induced the United States Trustee to withdraw two court filings seeking to compel McKinsey to disclose its connections as required by law in the *ANR* bankruptcy case, by representing to the Court and the United States Trustee that McKinsey RTS's disclosure declarations were complete and truthful.  Specifically, in response to a May 3, 2016 motion by the United States Trustee to compel McKinsey RTS's compliance with Rule 2014(a), Defendant Carmody filed, on behalf of McKinsey RTS, a May 19, 2016 supplemental disclosure which still concealed most of McKinsey's connections to Interested Parties.  In response to a July 1, 2016 order from the Bankruptcy Court compelling additional disclosure, Defendant Carmody filed, on behalf of McKinsey RTS, an August 5, 2016 supplemental disclosure which identified a few addition connections between McKinsey and Interested Parties.  In reliance on the ostensible truthfulness and completeness of that supplemental disclosure, the United States Trustee abandoned its efforts to compel full compliance with Rule 2014(a) by McKinsey RTS.  However, McKinsey had still

concealed material connections with Interested Parties.

303.    Through this conduct, McKinsey, its subsidiaries, Carmody and Proshan (who assisted in the preparation of these supplemental disclosures knowing of their false and misleading nature) corruptly endeavored to influence or impede an officer in or of the Bankruptcy Court, to wit, the United States Trustee, who was acting as an officer in or of the court, in the discharge of his duty in violation of 18 U.S.C. § 1503(a).

304.    Further, through this conduct, McKinsey, Carmody and Proshan (who assisted in the preparation of these supplemental disclosures knowing of their false and misleading nature) corruptly obstructed, influenced, or impeded an official proceeding in violation of 18 U.S.C. § 1512(c).

### 6.   Money Laundering in Violation of 18 U.S.C. §§ 1956 and 1957.

305.    McKinsey RTS received tens of millions of dollars in fees for its bankruptcy consulting engagements.  A substantial portion of these monies were remitted directly or indirectly to McKinsey RTS's parent, McKinsey & Co. (US), to McKinsey Holdings and McKinsey & Co., and to one or more of the individual  Count 1 Defendants, in amounts exceeding $10,000.  The Count 1 Defendants' receipt of fees from the bankruptcy engagements described above and their subsequent deposit or other financial transfers of such monies constituted violations of 18 U.S.C. § 1957(a) in that the Count 1 Defendants knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(f)(3) and 18 U.S.C. § 1956(c)(7).  Such specified unlawful activity includes, without limitation, the violations of 18 U.S.C. §§ 152, 1341, and 1343 set forth above.  The specific chains of monetary transactions are within Defendants' exclusive knowledge and will be identified in discovery and

proven at trial.

306.     Additionally, the Count 1 Defendants' participation in "re-invoiced" and "round trip" payments from non-debtor affiliates of SunEdison constituted violations of 18 U.S.C. § 1956(a)(1)(B).  The Count 1 Defendants' falsification of invoices issued to SunEdison constituted the knowing and fraudulent concealment, falsification, or false entry in recorded information relating to the property or financial affairs of SunEdison in contemplation of SunEdison's pending bankruptcy proceeding, in violation of 18 U.S.C. §152(8).  Alternately, the Count 1 Defendants caused the submission of the June 6, 2016 and June 14, 2016 Hojnacki Rule 2014(a) declarations identified above, which declarations fraudulently mischaracterized McKinsey RTS's services and billing.  These submissions violated 18 U.S.C. § 152(3) and 18 U.S.C. §§ 1341 and/or 1343, as shown above.

307.     The Count 1 Defendants' violations of 18 U.S.C. §§152(3), 152(8), 1341, and 1343 constituted specified unlawful activity within the meaning of 18 U.S.C. § 1956(c)(7).

308.     The Count 1 Defendants funneled the proceeds of these acts of specified unlawful activity to McKinsey RTS by means of payments from SunEdison's non-debtor affiliates.  The Count 1 Defendants knew that the funneled monies represented the proceeds of specified unlawful activity and knew that the transactions were designed in whole or in part to conceal or disguise the nature, source, ownership or control of the such proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  The specific details of the monetary transactions are within Defendants' exclusive knowledge and will be identified in discovery and proven at trial.

### C.    Scienter

309.     The Count 1 Defendants had the motive to commit the violations of 18 U.S.C.

§§ 152(3), 152(6), and 2314 and to commit acts of mail and wire fraud alleged above, as demonstrated by, *inter alia*:

  a. McKinsey, McKinsey Holdings, and McKinsey & Co. (US), together with the individual Count 1 Defendants, stood to earn tens of millions of dollars in consulting fees in bankruptcy cases.  Bankruptcy consulting was and is a domain which, unlike McKinsey's general business consulting practices, requires complete disclosure of client identities and other connections.  McKinsey and the other Count 1 Defendants would have been debarred from this domain had its disqualifying conflicts been disclosed fully and honestly;

  b. Bankruptcy consulting was one of the few areas of the business consulting domain in which McKinsey was a small player, and its actions as detailed herein demonstrate the Count 1 Defendants' motivation for McKinsey  break into this new market and gain market dominance by any means necessary;

  c. By adding bankruptcy consulting services to its roster of offerings, McKinsey obtained a firmer grip on its existing clients because they would not have to look elsewhere in the event of a bankruptcy.  And by retaining such clients, McKinsey also obtained additional post-bankruptcy work from them.  Accordingly, bankruptcy consulting services created a virtuous cycle for McKinsey and the other Count 1 Defendants.

  d. McKinsey & Co., McKinsey Holdings, McKinsey & Co. (US) and the other Count 1 Defendants decided to continue with their pattern of unlawful conduct through McKinsey RTS even after Barton expressly acknowledged to Alix the unlawful nature of the conduct and falsely promised to desist and dissolve McKinsey RTS.

This decision to proceed with known unlawful conduct in the face of good faith admonition by an industry peer suggests that McKinsey, Barton, and the other Count 1 Defendants were powerfully motivated to break the law.

e. Barton's attempts to lull Alix and AP into forgoing corrective litigation permitted the Count 1 Defendants to continue the lucrative scheme for at least a year.

310. Defendants had the opportunity to commit the violations of 18 U.S.C. § 152(3) and 152(6) and to commit acts of mail and wire fraud alleged above, as demonstrated by the fact that McKinsey's jealous protection of client identities makes it exceedingly difficult for outsiders to identify disqualifying connections without full and honest disclosure by McKinsey & Co. (US), McKinsey RTS, and their employees and officers, including the other Count 1 Defendants. And because of the fiduciary nature of McKinsey's advisory relationships, its clients were dependent on McKinsey's honesty.

311. McKinsey & Co. and the other Count 1 Defendants also had the opportunity to effectuate other components of the fraudulent scheme. Concerning the "pay-to-play" arrangement, the prospect of access to McKinsey's unparalleled portfolio of clientele would have been extremely tempting to bankruptcy attorneys, while McKinsey & Co. would have gained an easy way to "jump start" its bankruptcy consulting practice in a way nearly undetectable by competitors or the authorities. And lulling AP into inaction by deceiving Alix concerning his efforts to dissuade McKinsey from unlawful conduct also afforded valuable breathing space to Defendants, given the accelerated growth of McKinsey RTS's bankruptcy practice in the last several years.

312. In addition, the circumstances surrounding the violations of 18 U.S.C. §§ 152(3), 152(6), and 2314 and the acts of mail and wire fraud alleged above demonstrate conscious

misbehavior and knowledge by the Count 1 Defendants that they were engaging in a scheme to defraud AP as demonstrated by, *inter alia*:

    a. McKinsey RTS, part of a global enterprise with a vast array of large, diversified companies as clients and with an expansive network of McKinsey "alumni" connections, and a concomitantly large set of connections requiring disclosure, nonetheless repeatedly filed grossly inadequate Rule 2014(a) disclosures in comparison with those of considerably smaller, less interconnected firms such as AP;

    b. McKinsey RTS's conflict-checking processes, as described in its Rule 2014(a) submissions, are conspicuously primitive and deficient in comparison with other large professional institutions that submitted Rule 2014(a) disclosures in the bankruptcy proceedings enumerated *supra*. The rudimentary nature of these procedures, which is irreconcilable with McKinsey's claims to be a global information management leader, indicates that the system represented a deliberate attempt to conceal relevant connections by limiting internal inquiries in a manner ensuring that relevant connections would be missed. At a minimum, the Count 1 Defendants acted with willful blindness to disqualifying conflicts.

    c. McKinsey RTS's repeated failure to meet its disclosure obligations over the course of more than sixteen years and thirteen different bankruptcies, despite access to the most sophisticated legal advice available, demonstrates that its failure is systemic and intentional rather than the result of sporadic lapses in judgment or execution;

    d. By the time of McKinsey RTS's participation in the *NII Holdings* bankruptcy in October 2014, McKinsey was on explicit notice at the highest executive level—

Barton—that its disclosure practices were unlawful and afforded it an unfair and illegal competitive advantage over AP. Barton repeatedly admitted to Alix that the disclosure practices of McKinsey and McKinsey RTS and their "pay-to-play" offers to bankruptcy attorneys were unlawful, and even promised to shutter McKinsey RTS and abandon bankruptcy consulting during his tenure. Sternfels also participated in these exchanges. That the Count 1 Defendants continued their unlawful conduct unabated demonstrates not only that their unlawful behavior was willful but also that their earlier unlawful conduct was not the result of advertence or mere sloppiness.

e.  Barton's unusual offer to broker client introductions to AP, a proffered bribe intended to cause Alix and AP to remain silent, shows that the Count 1 Defendants knew they were engaging in illegal conduct and that they had to go to unusual lengths to silence a complainant.

f.  Defendants Garcia, Goldstrom, and Proshan have legal training and/or have practiced law and therefore are highly sophisticated actors. Accordingly, they knew that McKinsey & Co. (US)'s and McKinsey RTS's bankruptcy disclosures did not comply with the obligations imposed by law and that by failing to disclose relevant connections McKinsey & Co. (US) and McKinsey RTS would avoid disqualification, to the prejudice of competitors such as AP.

g.  Defendant Carmody had previously been employed by AP and had signed Rule 2014(a) declarations on AP's behalf that were far more robust than those he signed on behalf of McKinsey RTS. Accordingly, Carmody would have known the palpably deficient nature of McKinsey RTS's bare-bones disclosures.

### D.     Causation

313.     As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by the Count 1 Defendants, AP has been injured in its business or property, suffering damages in an amount to be determined at trial. The damages to AP include, but are not limited to, fees from bankruptcy consulting engagements AP would have earned in the absence of the Count 1 Defendants' unlawful conduct; other lost business opportunities (including pre- and post-bankruptcy work AP might have garnered had it been able to forge a client relationship with a debtor in the first instance); and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for the Count 1 Defendants' criminal activities.

314.     Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Alix, as assignee of AP, is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**
(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
Against Defendants Barton, Sternfels, Proshan, Garcia, Carmody, and Goldstrom

315.     Alix repeats and realleges paragraphs 1 through 314 as if fully set forth herein.

316.     This cause of action is asserted against all Defendants except McKinsey & Co., McKinsey Holdings, McKinsey & Co. (US),  and McKinsey RTS (the "**Count 2 Defendants**"), and is asserted in addition to and in the alternative to the First Cause of Action, *supra*, and Third Cause of Action, *infra*.

317.     At all relevant times, AP was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

318.     At all relevant times, each of the Count 2 Defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### A.     The RICO Enterprise

319.    From December 27, 2001 (said date being approximate and inclusive) and continuing to the present, Defendants McKinsey & Co., McKinsey Holdings, McKinsey & Co. (US) and (beginning in or about 2010) McKinsey RTS collectively have constituted an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) or, alternatively, an association-in fact enterprise within the meaning of those provisions (the "**Count 2 Enterprise**").

320.    The Count 2 Enterprise is structured through the formal corporate ownership relationships among Defendants McKinsey & Co., McKinsey Holdings, McKinsey & Co. (US), and McKinsey RTS.

321.    At all relevant times, each of the Count 2 Defendants was, and is, a person that exists separate and distinct from the Count 2 Enterprise.

322.    Beginning in or around 2011, the Count 2 Enterprise participated in the following bankruptcy proceedings, involving bankruptcy debtors with assets, liabilities, revenues, employee totals, and states of operations as indicated in the chart below:

| Matter | Assets (Millions) | Liabilities (Millions) | Revenue (Millions) | Employees | Affected States[45] |
|---|---|---|---|---|---|
| Hayes Lemmerz[46] | $1,096 | $1,389 | $2,296 | 67,400 | *Seven affected states:* California, Georgia, Indiana, Kentucky, Michigan,* Ohio, and Texas. |
| UAL Corp. (United Airlines)[47] | $25,197 | $22,164 | $19,352 | 84,000 | *Primary operations in eight states and the District of Columbia:* California, Colorado, Delaware, Hawaii, Illinois,* New Jersey, Texas, Washington DC, and Washington. |
| Mirant Corp.[48] | $19,415 | $21,440 | $6,436 | 7,000 | *Eight affected states:* California, Georgia,* Maine, Maryland, |

---

[45]     Debtors' headquarters are noted with an asterisk (*).
[46]     *In re Hayes Lemmerz International, Inc.*, No. 01-11490 (Bankr. D. Del. filed Dec. 5, 2001).
[47]     *In re UAL Corp.*, No. 02-48191 (Bankr. N.D. Ill. filed Dec. 9, 2002).
[48]     *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex. filed July 14, 2003).

| Matter | Assets (Millions) | Liabilities (Millions) | Revenue (Millions) | Employees | Affected States[45] |
|---|---|---|---|---|---|
| | | | | | Massachusetts, Michigan, New York, and Virginia. |
| Lyondell Chemical[49] | $27,392 | $35,900 | $28,603 | 7,340 | *Eight affected states:* Illinois, Iowa, Louisiana, Michigan, New Jersey, Ohio, Tennessee, and Texas.* |
| Harry & David Holdings[50] | $243 | $1,050 | $427 | 1,026 | *Twenty-two affected states:* Alabama, California, Colorado, Delaware, Florida, Iowa, Illinois, Indiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, New Jersey, New York, Ohio (main distribution center),* Oregon (headquarters),* Pennsylvania, South Carolina, Tennessee, Virginia, and Wisconsin (stores). |
| AMR Corp.[51] | $25,088 | $103,000 | $22,170 | 78,250 | *Seven affected states:* debtor's primary operations in New York, California, Illinois, Florida, Missouri, Puerto Rico, and Texas.* |
| AMF Bowling[52] | $100,000 | $279,000 | $387,000 | 7,000 | *Thirty-four affected states*: Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia,* Washington, and Wisconsin. |
| Edison Mission Energy[53] | $8,323 | $12,304 | $9,321 | 1,783 | *Twelve affected states:* Illinois,* California,* and operations in twelve states total according to the Plan Sponsor Agreement. |

---

[49]     *In re Lyondell Chemical Co.*, No. 09-10023 (Bankr. S.D.N.Y. filed Jan. 6, 2009).
[50]     *In re Harry & David Holdings, Inc.*, No. 11-10884 (Bankr. D. Del. filed Mar. 28, 2011).
[51]     *In re AMR Corp.*, No. 11-15463 (Bankr. S.D.N.Y. filed Nov. 29, 2011).
[52]     *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (Bankr. E.D. Va. filed November 13, 2012).
[53]     *In re Edison Mission Energy*, No. 12-49219 (Bankr. N.D. Ill. filed Dec. 17, 2012).

| Matter | Assets (Millions) | Liabilities (Millions) | Revenue (Millions) | Employees | Affected States[45] |
|---|---|---|---|---|---|
| NII Holdings, Inc.[54] | $2,887 | $4,593 | $4,773 | 3,870 | *One affected state:* Virginia* |
| Standard Register Company[55] | $481 | $592 | $720 | 3,700 | *All fifty states affected:* Ohio,* and operations in all 50 states according to Disclosure Statement (Dkt 1063). |
| Alpha Natural Resources[56] | $10,736 | $9,834 | $4,955 | 8,900 | *Six states affected:* Wyoming, Kentucky, Pennsylvania, Tennessee, Virginia, and West Virginia.* |
| SunEdison, Inc.[57] | $11,500 | $16,100 | $2,484 | 7,260 | *Twenty affected states:* California (operational and solar business headquarters),* New York, Missouri (corporate headquarters),* Texas, Utah, Minnesota, Hawaii, Maine, Vermont, Idaho, Washington, Massachusetts, Oregon, Ohio, Maryland, North Carolina, Illinois, Nevada, Nebraska, and Arizona. |
| GenOn Energy, Inc.[58] | $2,435 | $2,131 | $1,862 | 1,581 | *Ten affected states:* Maryland, New Jersey,* Pennsylvania, Texas (headquarters of parent company, NRG Energy, Inc.), California, Florida, Massachusetts, Mississippi, New York, and Ohio. |
| **TOTAL** | **$134,893** | **$230,777** | **$103,784** | **279,110** | ***All fifty states*** |

323.     Additionally, the conflicts of interests disqualifying the Count 2 Enterprise and its constituent entities from serving the various debtor-clients typically arose from these entities' relationships with business entities located in states or nations other than those in which the debtor-clients operated.

---

54      *In re NII Holdings, Inc.*, No. 14-12611 (Bankr. S.D.N.Y. filed Sept. 15, 2014).
55      *In re The Standard Register Co.*, No. 15-10541 (Bankr. D. Del. filed Mar. 12, 2015).
56      *In re Alpha Natural Resources, Inc.*, No. 15-33896 (Bankr. E.D. Va. filed Aug. 3, 2015)
57      *In re SunEdison*, No. 16-10992 (Bankr. S.D.N.Y. filed Apr. 21, 2016).
58      *In re GenOn Energy, Inc.*, No. 17-33695 (Bankr. S.D. Tex. filed June 14, 2017).

324.     Accordingly, at all relevant times, the Count 2 Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

325.     During the period of this Complaint, the conduct of the Count 2 Defendants and their coconspirators has taken place in and affected the interstate commerce of the United States.

326.     The conduct of the Count 2 Defendants has directly, substantially and foreseeably restrained such interstate trade and commerce.

**B.     Pattern of Racketeering Activity**

327.     Between 2001 and the present, each of the Count 2 Defendants engaged in a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described in paragraphs 284-308, *supra*, additional predicate acts set forth below, and other predicate acts to be identified after further investigation and discovery herein.

328.     Each of the Count 2 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO.  The Count 2 Defendants played the same roles in the scheme and pattern of racketeering activity as set forth in the First Cause of Action, *supra*.  The predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing or obfuscating McKinsey's disqualifying conflicts of interest in order to enable McKinsey & Co. (US) and McKinsey RTS to obtain bankruptcy consulting assignments that they would not have received had the Count 2 Defendants behaved lawfully, and by attempting to obtain such engagements by offering unlawful "pay-to-play" arrangements to bankruptcy attorneys; (2) thereby depriving AP of remunerative bankruptcy consulting engagements; and (3) after the scheme was discovered, forestalling remedial litigation by AP and Alix by means of Barton's duplicitous interactions with

Alix.  These acts, and others to be identified after further investigation and discovery herein,

shared a common or related purpose, goal, result, participants, victim, and method of commission.

329.    Through such patterns of racketeering activity, each of the Count 2 Defendants

conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 2

Enterprise in violation of 18 U.S.C. § 1962(c).

      1.   *Additional False Declarations, Certifications, Verifications or Statements*
          *under Penalty of Perjury in Violation of 18 U.S.C. §§ 152(2) and 152(3).*

330.    In addition to the violations of 18 U.S.C. §§ 152(2) and 152(3) set forth in

paragraphs 284-286, *supra*, the Count 2 Defendants also submitted, caused McKinsey & Co. (US)

to submit, and/or conspired in and/or aided and abetted the submission of, the following

additional affidavits or declarations under penalty of perjury on behalf McKinsey & Co. (US)

which the Count 2 Defendants knew to be materially false or misleadingly incomplete, for the

purposes of concealing McKinsey's, McKinsey Holdings, and McKinsey & Co. (US)'s

disqualifying conflicts of interest:

| 1. Hayes Lemmerz[59] | | | |
|---|---|---|---|
| | **Date** | **Dkt. No.** | **Name Of Document** |
| 1 | Dec. 27, 2001 | 103 | Affidavit of Richard K. Sykes in Support of Debtors' Application For Order Under 11 U.S.C. §§ 327(a) and 328(a) And Fed. R. Bankr. P. 2014(a) Authorizing Employment And Retention Of McKinsey & Company, Inc. United States As Management Consultant To The Debtors |
| 2 | Feb. 14, 2002 | 365 | Supplemental Affidavit of Richard K. Sykes in Support of Debtors' Application For Order Under 11 U.S.C. §§ 327(a) and 328(a) And Fed. R. Bankr. P. 2014(a) Authorizing Employment And Retention Of McKinsey & Company, Inc. United States As Management Consultant To The Debtors |
| 3 | Mar. 13, 2002 | 479 | Second Supplemental Affidavit Of Richard K. Sykes Pursuant To Order Under 11 U.S.C. §§ 327(a) And 328(a) And Fed. R. Bankr. P. 2014(a) And 2016 Authorizing Employment And Retention Of |

---

[59]    *In re Hayes Lemmerz International, Inc*., No. 01-11490 (Bankr. D. Del. filed Dec. 5, 2001).

|   |   |   | McKinsey & Company, Inc. United States As Management Consultant For Debtors-In-Possession, <u>Nunc</u> <u>Pro</u> <u>Tunc</u> To The Petition Date |
|---|---|---|---|
| | | | |
| **2. United Airlines (UAL)**[60] | | | |
| 4 | Dec. 9, 2002 | 52 | Affidavit Of Gerhard J. Bette In Support Of Debtors' Application For Order Under 11 U.S.C. §§ 327(a) and 328(a) And Fed. R. Bankr. P. 2014(a) Authorizing Employment And Retention Of McKinsey & Company, Inc. United States As Management Consultant To The Debtors |
| 5 | Feb. 27, 2003 | 1606 | Supplemental Affidavit Of Nikolaus D. Semaca In Support Of Debtors' Application For Order Under 11 U.S.C. §§ 327(a) And 328(a) And Fed. R. Bankr. P. 2014(a) Authorizing Employment And Retention Of McKinsey & Company, Inc. United States As Management Consultant To The Debtors |
| | | | |
| **3. Mirant**[61] | | | |
| 6 | Oct. 27, 2003 | 1457 | Affidavit Of Kenneth J. Ostrowski In Support Of Debtors' Application To Retain McKinsey & Company, Inc. United States As Management Consultant To The Debtors |
| | | | |
| **4. Lyondell Chemical**[62] | | | |
| 7 | June 26, 2009 | 2090 | Affidavit Of Thomas Hundertmark In Support Of Debtors' Application For Order Under 11 U.S.C. §§ 327(a) And 328(a) And Federal Rule Of Bankruptcy Procedure 2014(a) Authorizing Employment And Retention Of McKinsey & Company, Inc. United States As Management Consultants To The Debtors |
| 8 | Sept. 15, 2009 | 2752 | Affidavit Of Thomas Hundertmark In Support Of The Application Of The Debtors Pursuant To Sections 327(a) And 328(a) Of The Bankruptcy Code And Rule 2014 Of The Federal Rules Of Bankruptcy Procedure For Authorization To Expand The Scope Of McKinsey & Company, Inc. United States' Retention As Management Consultant To The Debtors |
| | | | |

331.   The individual false and misleading statements within each of the foregoing eight

submissions (together with the additional thirty-one such submissions set forth in paragraph 284,

---

[60]   *In re UAL Corp.*, No. 02-48191 (Bankr. N.D. Ill. filed Dec. 9, 2002).
[61]   *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex. filed July 14, 2003).
[62]   *In re Lyondell Chemical Co.*, No. 09-10023 (Bankr. S.D.N.Y. filed Jan. 6, 2009).

*supra*) are identified in Exhibit A, attached hereto.

332.    Each of the foregoing eight submissions constituted the knowing and fraudulent making of a false oath, declaration, certificate, verification, or statement under penalty of perjury pursuant to 28 U.S.C. § 1746, in or in relation to any case under the Bankruptcy Code, within the meaning of 18 U.S.C. §§ 152(2) or 152(3).

> 2.  *Additional Acts of Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343.*

333.    The scheme or artifice to defraud AP is described in paragraphs 282 and 287-289, *supra*.  In addition to the predicate acts of mail and wire fraud set forth therein and in furtherance of the scheme or artifice to defraud AP, the Count 2 Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343, and also caused matters and things to be placed in a post office or authorized depository or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, in violation of 18 U.S.C. § 1341, including, but are not limited to, the following:

a.  Upon information and belief, each of the affidavits or declarations under penalty of perjury identified in items 1, 2, 3, 6, 7, and 8 in the table set forth in Paragraph 330, *supra*, were transmitted by interstate wire, by United States mail, and/or by private interstate commercial carrier, as evidenced by the fact that each such affidavit or declaration was signed, or the affiant or declarant resided, in a State different from that in which the document was judicially filed;

b.  Upon information and belief, each of the affidavits or declarations under penalty of perjury enumerated in items 4 and 5 in the table set forth in Paragraph 330, *supra*, or preliminary drafts thereof,  were transmitted by interstate wire, by United States

mail, and/or by private interstate commercial carrier, given the likelihood that they

were prepared, reviewed, or  edited by employees of McKinsey & Co., McKinsey

Holdings, McKinsey & Co. (US), their respective legal counsel, and likely other

firms or individuals located in States other than that in which the documents

ultimately were judicially filed.

## C.  Scienter

334.    Defendants' scienter is demonstrated by the facts set forth in paragraphs 309-312,

*supra*.

## D.  Causation

335.    As a direct and proximate result of RICO violations of 18 U.S.C. § 1962(c) by the

Count 2 Defendants, AP has been injured in its business or property, suffering damages in an

amount to be determined at trial. The damages to AP include, but are not limited to, fees from

bankruptcy consulting engagements AP would have earned in the absence of the Count 2

Defendants' unlawful conduct; other lost business opportunities; and attorneys' fees and costs,

including attorneys' fees and costs associated with exposing and pursuing redress for Defendants'

criminal activities.

336.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Alix, as assignee

of AP, is thereby entitled to recover treble damages, together with the costs of this suit and

reasonable attorneys' fees.

### <u>THIRD CAUSE OF ACTION</u>
(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
Against All Defendants

337.    Alix repeats and realleges paragraphs 1 through 336 as if fully set forth herein.

338.    This cause of action is asserted in addition to and in the alternative to the First and

Second Causes of Action, *supra*.

339.    At all relevant times, AP was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

340.    At all relevant times, each of the Defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

341.    From December 27, 2001 (said date being approximate and inclusive) and continuing to the present, McKinsey and the bankruptcy consulting clients of McKinsey & Co. (US) and McKinsey RTS identified in paragraphs 276 and 322, *supra*, have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "**Count 3 Enterprise**").

342.    The Count 3 Enterprise is structured through (1) the formal corporate ownership relationships among Defendants McKinsey & Co., McKinsey Holdings., McKinsey & Co. (US), and McKinsey RTS; (2) the terms of the retention agreements between McKinsey & Co. (US) or McKinsey RTS, on the one hand, and each bankruptcy consulting client, on the other; and (3) the interrelated management structure resulting from the assignment of McKinsey personnel to management positions in the bankruptcy consulting clients.  Although the precise composition of the Count 3 Enterprise changed over time with the inception and termination of particular bankruptcy proceedings and the formation of McKinsey RTS in 2010, the overall character and purpose of the Count 3 Enterprise was consistent.

343.    At all relevant times, each of the Count 3 Defendants was, and is, a person that exists separate and distinct from the Count 3 Enterprise.

344.    The Count 3 Enterprise was engaged in, and its activities affected, interstate and foreign commerce as demonstrated in, *inter alia*, paragraph 322, *supra*.

134

345.    Each of the Count 3 Defendants engaged in a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described in paragraphs 284-308 and 330-333, *supra*, and others to be identified after further investigation and discovery herein, *supra*.   Each of the Count 3 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO.   The Count 3 Defendants played the same roles in the scheme and pattern of racketeering activity as set forth in the First Cause of Action, *supra*.

346.    The predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing or obfuscating McKinsey's disqualifying conflicts of interest in order to enable McKinsey & Co. (US) and McKinsey RTS to obtain bankruptcy consulting assignments that they would not have received had the Count 3 Defendants behaved lawfully, and by attempting to obtain such engagements by offering unlawful "pay-to-play" arrangements to bankruptcy attorneys; (2) thereby depriving AP of remunerative bankruptcy consulting engagements; and, (3) after the scheme was discovered, forestalling remedial litigation by AP and Alix by means of Barton's duplicitous interactions with Alix.   These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission.

347.    Through such patterns of racketeering activity, each of the Count 3 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 3 Enterprise in violation of 18 U.S.C. § 1962(c).

348.    As a direct and proximate result of RICO violations of 18 U.S.C. § 1962(c) by the Defendants, AP has been injured in its business or property, suffering damages in an amount to be

determined at trial.  The damages to AP include, but are not limited to, fees from bankruptcy consulting engagements AP would have earned in the absence of Defendants' unlawful conduct; other lost business opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

349.     Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Alix as assignee of AP, is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

**FOURTH CAUSE OF ACTION**
(CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d))
Against All Defendants

350.     Alix repeats and realleges paragraphs 1 through 349 as if fully set forth herein.

351.     Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

352.     By and through each of the Defendants' close business and employment relationships with one another, and their close coordination with one another in the affairs of McKinsey RTS and the Count 2 and Count 3 Enterprises described above, each Defendant knew the nature of these enterprises and each Defendant knew that these enterprises extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to commit predicate acts, including those set forth above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

353.     Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the affairs of the McKinsey RTS, the Count 2 Enterprise, and/or the

Count 3 Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). In particular, each Defendant was a knowing, willing, and active participant in one or more such Enterprises and their affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, perpetuation, and execution of the scheme to victimize AP.

354.    The Defendants played the following roles in the racketeering conspiracy:

a.    McKinsey & Co. owns and controls McKinsey Holdings, which, in turn, owns and controls McKinsey & Co. (US).

b.    McKinsey & Co. (US), in turn, owns and controls McKinsey RTS.

c.    Directly and through its agent officers, directors, board members, employees, and representatives, McKinsey (including its subsidiaries McKinsey Holdings, and McKinsey & Co. (US)) has been an active participant and central figure in the operation of McKinsey RTS and its affairs, and in the orchestration, planning, perpetuation, and execution of the unlawful scheme to deprive AP of valuable bankruptcy consulting engagements:

i.    McKinsey & Co. owns, either directly or indirectly, all of its affiliates, including McKinsey RTS.

ii.    A board of thirty shareholders controls McKinsey & Co. and all of its affiliates, including McKinsey RTS.

iii.    McKinsey & Co. subsidiaries all rely on the McKinsey brand for marketing.

iv.    McKinsey's disclosure declarations, which were submitted as part of the debtors' applications for court approval of its employment, prominently and extensively promote McKinsey & Co.'s skills and staff.

  v. McKinsey shares the same in-house counsel. For example, defendant Proshan is employed by McKinsey and also serves as counsel for McKinsey RTS.

  vi. McKinsey RTS is dependent on McKinsey & Co. to provide its business services in its bankruptcy cases. As a result, McKinsey & Co. provides client service personnel to McKinsey RTS.

d. Each of the predicate acts alleged herein were performed by employees of McKinsey & Co., McKinsey Holding, McKinsey & Co. (US), or McKinsey RTS acting within the scope of their employment.  McKinsey's personnel (including Defendants Carmody and Goldstrom) file materially false or incomplete Bankruptcy Rule 2014 disclosures concealing conflicts of interests and, in some instances, fraudulent behavior, which, if truthfully and fully disclosed, would disqualify McKinsey & Co. (US) and McKinsey RTS from all or substantially all of the bankruptcy crisis management and consulting engagements they have secured from 2001 to the present.  McKinsey also initiated the "pay-to-play" scheme with certain legal professionals through which McKinsey engaged in and offered commercial bribes and failed to disclose these bribes to the various Bankruptcy Courts despite the conflicts of interest they created.

e. Defendant Barton was, from the inception of the scheme through the present, the Managing Partner of McKinsey & Co., and, given his senior-most executive position at McKinsey, had ultimate executive authority over McKinsey's bankruptcy consultancy activities as well as the other corporate and individual Defendants in this action.  Barton also personally participated in the fraudulent

efforts to deflect and delay Alix's 2014-2015 attempt to remediate McKinsey's unlawful bankruptcy consulting practices.  At a minimum, Barton had express notice of the unlawful nature of the unlawful bankruptcy consulting business practices of McKinsey and its subsidiaries by September 2014 when informed of such by Alix.

f.   Defendant Sternfels is a senior partner in McKinsey & Co. and had during the relevant time period a degree of executive authority over the bankruptcy consultancy activities of McKinsey.  Sternfels also personally participated in the efforts to deflect and delay Alix's 2014-2015 attempt to remediate McKinsey's unlawful bankruptcy consulting practices.  At a minimum, Sternfels had express notice of the unlawful nature of the unlawful bankruptcy consulting business practices of McKinsey by September 2014 when informed of such by Alix. Additionally, Sternfels likely participated in an unlawful quid pro quo with SunEdison CEO Chatila through which McKinsey obtained post-bankruptcy employment for Chatila in exchange for Chatila's acquiescence in McKinsey's concealment of voidable preferences through the "re-invoiced" and "round-trip" payment scheme.

g.   Defendant Garcia is a senior partner in McKinsey & Co., a founding executive of McKinsey RTS, and has a degree of executive authority over the bankruptcy consultancy activities of McKinsey, including the submission of false and misleading Rule 2014(a) declarations by Defendants Carmody and Goldstrom and other McKinsey RTS employees.

h.   Defendant Proshan, an associate general counsel for McKinsey, furnishes in-house

legal services to McKinsey and McKinsey RTS and knowingly participated in the preparation of materially false and incomplete Rule 2014(a) submissions by McKinsey & Co. (US) and McKinsey RTS.

i. Defendant Goldstrom is a senior partner in McKinsey & Co. and Board member of McKinsey RTS, and submitted ten knowingly and materially false and/or incomplete Rule 2014(a) declarations under penalty of perjury on behalf of McKinsey RTS, as set forth in paragraph 284, *supra*, in furtherance of the fraudulent and unlawful scheme.

j. Defendant Carmody is a partner in McKinsey & Co. and a senior executive of McKinsey RTS, and submitted thirteen knowingly and materially false and/or incomplete Rule 2014(a) declarations under penalty of perjury on behalf of McKinsey RTS, as set forth in paragraph 284, *supra*, in furtherance of the fraudulent and unlawful scheme.

355. Further evidence of an agreement among the Defendants is particularly within the knowledge and control of the Defendants.

356. The participation and agreement of each of the Defendants was necessary to allow the commission of this pattern of racketeering activity.

357. AP has been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.  The injuries to AP directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, fees from bankruptcy consulting engagements AP would have earned in the absence of Defendants' unlawful conduct; other lost business opportunities; and attorneys' fees and costs, including attorneys' fees and

costs associated with exposing and pursuing redress for Defendants' criminal activities.

358.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Alix, as assignee

of AP, is thereby entitled to recover treble damages, together with the costs of this suit and

reasonable attorneys' fees.

### FIFTH CAUSE OF ACTION
(BREACH OF CONTRACT)
Against McKinsey & Co., McKinsey Holdings, McKinsey & Co. (US), and McKinsey RTS

359.    Alix repeats and realleges paragraphs 1 through 358 as if fully set forth herein.

360.    McKinsey & Co., McKinsey Holdings, McKinsey & Co. (US), and McKinsey

RTS (the "**Count 5 Defendants**"), through Barton, and AP, through Alix, entered into a binding,

valid, and enforceable contract pursuant to which (a) the Count 5 Defendants, on the condition

that Barton were to be re-elected as its Managing Partner in or about January 2015, would

remove Garcia and Goldstrom from their positions at RTS within thirty days of his re-election

and exit the RTS business by the end of March 2015 for the duration of Barton's term as

Managing Partner commencing in or about January 2015, in exchange for (b) AP's forbearance

from instituting legal action against Defendants on account of their unlawful activity as

described herein.

361.    AP has performed and complied with its obligations under the contract by

forbearing from legal action against Defendants.

362.    Following Barton's re-election as Managing Partner of McKinsey in January

2015, there were no unsatisfied conditions precedent to the Count 5 Defendants' performance of

their obligations under the contract.

363.    The Count 5 Defendants materially breached the contract by failing to dissolve

McKinsey RTS and by continuing to offer consulting services to debtors in bankruptcy.

364.    AP was damaged by the Count 5 Defendants' breach in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
#### (PROMISSORY ESTOPPEL)
Against McKinsey & Co., McKinsey Holdings, McKinsey & Co. (US), and McKinsey RTS

365.    Alix repeats and realleges paragraphs 1 through 364 as if fully set forth herein.

366.    This Sixth Cause of Action is pled in the alternative to the Fifth Cause of Action, *supra*.

367.    On or about October 16, 2014, McKinsey & Co., McKinsey Holdings, McKinsey & Co. (US), and McKinsey RTS (the "**Count 6 Defendants**"), through Barton, clearly and unambiguously promised AP that they would dissolve McKinsey RTS because  of its unlawful activity, and cease providing bankruptcy consulting services to debtors in bankruptcy commencing in or about January 2015.

368.    In reliance on the Count 6 Defendants' promise, AP refrained from commencing litigation against McKinsey and the other Defendants herein seeking redress for McKinsey's unlawful bankruptcy practices and illegal means of competition against AP.

369.    AP's reliance on the Count 6 Defendants' promise was reasonable and foreseeable.

370.    the Count 6 Defendants have breached this promise by failing to dissolve McKinsey RTS and cease providing bankruptcy consulting services to debtors in bankruptcy commencing after January 2015.

371.    AP is entitled to equitable relief enjoining the Count 6 Defendants to honor their promise.  Additionally, AP has suffered damages as a direct and proximate result of the Count 6 Defendants' breach of their promise in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
(TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
UNDER VIRGINIA LAW)
Against McKinsey, McKinsey Holdings, Inc.,
McKinsey & Company, Inc. United States, and McKinsey RTS

372.    Alix repeats and realleges paragraphs 1 through 371 as if fully set forth herein.

373.    AP had an expectancy that it would be retained by Alpha Natural Resources, Inc. and/or AMF Bowling Worldwide, Inc. to provide bankruptcy consulting services in connection with their respective bankruptcy proceedings in the United States Bankruptcy Court for the Eastern District of Virginia.

374.    McKinsey & Co., McKinsey Holdings, McKinsey & Co. (US), and McKinsey RTS (the "**Count 7 Defendants**") each knew that AP offered bankruptcy consulting services in high-end bankruptcy proceedings and likely would have been retained by one or both of Alpha Natural Resources, Inc. and/or AMF Bowling Worldwide, Inc.

375.    The Count 7 Defendants, acting individually or in concert, intentionally interfered with this expectancy by knowingly and intentionally concealing their disqualifying conflicts of interest in order to secure engagements by Alpha Natural Resources, Inc. and AMF Bowling Worldwide, Inc. and thereby depriving AP of the engagements.

376.    The Count 7 Defendants, acting individually or in concert, used improper means or methods to interfere with AP's expectancy, including, without limitation, the materially false, misleading, and incomplete submissions set forth in paragraphs 284 and 330, *supra*, in violation of 11 U.S.C. § 327(a), Federal Rule of Bankruptcy Procedure 2014(a), and 18 U.S.C. §§ 152(2) and (3).

377.    As a direct and proximate result of violations of the tortious interference with AP's business expectancies by the Count 7 Defendants, AP has been injured in its business or property,

suffering damages in an amount to be determined at trial. The damages to AP include, but are not limited to, fees from bankruptcy consulting engagements AP would have earned in the absence of the Count 7 Defendants' unlawful conduct; other lost business opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and prosecuting the Count 7 Defendants' tortious activities.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment as follows::

(a) General and compensatory damages according to proof at trial;

(b) Treble damages pursuant to 18 U.S.C. § 1964(c);

(c) Necessary and appropriate injunctive relief, including an injunction requiring full compliance by McKinsey RTS, McKinsey & Company, Inc. United States, or any other McKinsey affiliate with 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014(a) in any ongoing bankruptcy proceedings in the United States (including the territories and possessions thereof) and any future  such proceedings in which they may seek retention as a professional;

(d) Disgorgement of all moneys received by Defendants as a result of their unlawful activities;

(e) An award of Plaintiffs reasonable attorneys' fees and costs and expenses, pursuant to 18 U.S.C. § 1964(c);

(f) Punitive damages;

(g) Prejudgment interest; and

(h) Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this

action of all issues so triable.

Dated:  New York, New York
        May 9, 2018

                                                           **BOIES SCHILLER FLEXNER LLP**

                                                          By:  /s/ *Sean F. O'Shea*
                                                          Sean F. O'Shea (soshea@bsfllp.com)
                                                          Michael E. Petrella (mpetrella@bsfllp.com)
                                                          575 Lexington Avenue
                                                          7th Floor
                                                          New York, New York 10022
                                                          Tel: (212) 446-2300
                                                          Fax: (212) 446-2350

                                                          *Attorneys for Plaintiff*