UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAY ALIX,

*Plaintiff*,

-against-

MCKINSEY & CO., INC.; MCKINSEY
HOLDINGS, INC.; MCKINSEY &
COMPANY INC. UNITED STATES;
MCKINSEY RECOVERY &
TRANSFORMATION SERVICES U.S.,
LLC; DOMINIC BARTON; KEVIN
CARMODY; JON GARCIA; SETH
GOLDSTROM; ALISON PROSHAN;
ROBERT STERNFELS; and JARED D.
YERIAN,

*Defendants*.

**<u>AMENDED COMPLAINT</u>**

Jury Trial Demanded

Case No. 18-CV-04141(JMF)

BOIES SCHILLER FLEXNER LLP
575 LEXINGTON AVENUE, 7th FLOOR
NEW YORK, NEW YORK 10022

# TABLE OF CONTENTS

NATURE OF THE CASE ............................................................................................. 1

THE PARTIES ........................................................................................................... 13

JURISDICTION AND VENUE ................................................................................. 14

FACTS ........................................................................................................................ 15

    I.    Background of Jay Alix and AP ................................................................. 15

    II.   Bankruptcy Consulting Services Is
         a Multi-Billion Dollar Industry ................................................................ 16

    III.  As the World's Largest Consulting Firm,
         McKinsey Knows that Professionals Providing
         Bankruptcy Consulting Services Must Be Transparent
         about Their Connections and Have Undivided Loyalty
         to Their Debtor-Clients .............................................................................. 17

    IV.  From 2001 through 2013, Defendants Engaged in a
         Pattern of Racketeering Activity that Involved Crimes
         Related to Submitting False Statements in Order to Evade
         Disqualification as Bankruptcy Professionals ......................................... 24

         A.    Defendants Unlawfully Concealed
                McKinsey's Connections and
                Affirmatively Misrepresented that
                McKinsey Was Disinterested ...................................................... 25

                i.     *Hayes Lemmerz* ............................................................. 26

                ii.    *UAL (United Airlines)* ................................................... 28

                iii.   *Mirant* ............................................................................ 30

                iv.   *Lyondell Chemical* ........................................................ 32

                v.     *Harry & David* ............................................................. 34

                vi.   *AMR* ............................................................................... 36

                vii.  *AMF Bowling* ............................................................... 38

                viii. *Edison Mission Energy* ................................................ 39

                B.    Defendants Have Unlawfully Concealed
                All of McKinsey's Connections to Interested Parties
                through Its Investment Arm, MIO ............................................. 41

V.    Alix Confronts Barton and Sternfels, and
      McKinsey and AP Reach an Agreement ................................................. 42

      A.    Barton Admits McKinsey's Pay-to-Play Scheme ..................................... 45

      B.    McKinsey and AP Agree to a Resolution .................................. 45

VI.   Despite Barton's Representations to Alix,
      Defendants Unlawfully Conceal McKinsey's
      Disqualifying Connections in *NII Holdings* ......................................... 48

VII.  Defendants Continue Their Racketeering
      Activity in *Standard Register* ......................................................... 50

VIII. Defendants' Racketeering Activity
      Continues in *Alpha Natural Resources* ................................................ 57

      A.    McKinsey RTS's Failure to Disclose Its
            Connections in *Alpha Natural Resources* ................................. 58

      B.    McKinsey Simultaneously Represents
            the Debtor and United States Steel, a
            Concealed McKinsey Client,
            in Contract Negotiations ........................................................ 65

      C.    Defendants Mislead and Fraudulently
            Induce the U.S. Trustee to Withdraw
            Two Separate Motions Challenging
            McKinsey RTS's Disclosure Declarations ............................... 67

      D.    Defendants Fail to Disclose McKinsey's
            Direct Financial Interest in the Outcome
            of the *Alpha Natural Resources* Bankruptcy ........................... 70

IX.   Defendants Commit Bankruptcy Fraud
      and Other Crimes in *SunEdison* ..................................................... 74

      A.    Defendants Unlawfully Conceal
            McKinsey's Connections in *SunEdison* ................................... 75

      B.    McKinsey Unlawfully Conceals
            Fraudulent Pre-Petition Payments That It
            Orchestrated from SunEdison Affiliates ................................... 83

      C.    McKinsey Unlawfully Conceals Pertinent Facts
            Regarding its "Business Arrangement" with
            SunEdison's Former CEO ....................................................... 87

ii

X.  Defendants Unlawfully Conceal McKinsey's
    Connections and Commit Bankruptcy Fraud in *GenOn* .......................................... 91

    A.  Defendants Unlawfully Conceal that NRG Energy
        Is a Current or Former McKinsey Client
        While McKinsey RTS Is Investigating
        GenOn's Claims against NRG Energy ..................................... 92

    B.  Defendants Unlawfully Conceal that NRG Energy
        Is a McKinsey Client While McKinsey RTS
        Is Negotiating on Behalf of GenOn for
        GenOn's Separation from NRG Energy .................................... 95

    C.  Defendants Unlawfully Conceal the Depth of
        McKinsey's Connections to NRG Energy and the
        Transactions and Bankruptcies that Created GenOn ............................... 96

    D.  McKinsey Receives Avoidable Preference Payments
        from GenOn to Avoid Disqualification as a
        GenOn Creditor, thereby Concealing an
        Interest Adverse to the Bankruptcy Estate ................................. 98

    E.  Carmody's Declarations on Behalf of McKinsey
        in *GenOn* Unlawfully Conceal Numerous Connections,
        Including GenOn Creditors and Possibly Competitors .......................... 100

**FIRST CAUSE OF ACTION**
VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
*Against All Defendants Except McKinsey RTS* ..................................................... 108

    A.  The Count 1 RICO Enterprise and
        Its Effect on Interstate Commerce ........................................ 108

    B.  Pattern of Racketeering Activity ............................................. 111

    C.  RICO Predicate Acts ......................................................... 120

        i.   False Declarations, Certifications,
             Verifications or Statements under
             Penalty of Perjury in Violation of
             18 U.S.C. §§ 152(2) and 152(3) ..................................... 121

        ii.  Mail and Wire Fraud in Violation of
             18 U.S.C. §§ 1341 and 1343 ........................................ 130

        iii. Obstruction of Justice in Violation of
             18 U.S.C. § 1503(a) ............................................... 130

        iv.  Witness Tampering in Violation of
             18 U.S.C. § 1512(b) ............................................... 146

        v.    Obstruction of Justice in Violation of
18 U.S.C. § 1512(c) ............................................... 148

        vi.   Unlawful Offers of Remuneration,
Compensation, Reward, or Advantage in
Violation of 18 U.S.C. § 152(6) and
Felony Commercial Bribery under State Law ................................ 148

        vii.  Inducement to Interstate or Foreign Travel
in Violation of 18 U.S.C. § 2314 .................................... 151

        viii. Money Laundering in Violation of
18 U.S.C. § 1957 ............................................... 152

    D.    Scienter ................................................................. 154

    E.    Vicarious Liability ................................................. 159

    F.    Causation and Damages ......................................... 159

**SECOND CAUSE OF ACTION**
VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
*Against Barton, Sternfels, Proshan, Garcia,*
*Carmody, Goldstrom, and Yerian* ............................................. 162

    A.    The Count 2 RICO Enterprise and
Its Effect on Interstate Commerce ......................... 162

    B.    Pattern of Racketeering Activity .......................... 165

    C.    RICO Predicate Acts ............................................. 166

        i.    False Declarations, Certifications,
Verifications or Statements under
Penalty of Perjury in Violation of
18 U.S.C. §§ 152(2) and 152(3) ..................... 168

        ii.   Mail and Wire Fraud in Violation of
18 U.S.C. §§ 1341 and 1343 ....................... 170

        iii.  Obstruction of Justice in Violation of
18 U.S.C. § 1503(a) ..................................... 171

        iv.   Witness Tampering in Violation of
18 U.S.C. § 1512(b) ..................................... 173

        v.    Obstruction of Justice in Violation of
18 U.S.C. § 1512(c) ..................................... 173

        vi.   Inducement to Interstate or Foreign Travel
in Violation of 18 U.S.C. § 2314 .................... 174

vii.    Money Laundering in Violation of
18 U.S.C. § 1957 ........................................ 175

D.    Scienter ................................................................. 176

E.    Vicarious Liability ................................................ 177

F.    Causation and Damages ......................................... 177

**THIRD CAUSE OF ACTION**
VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
*Against All Defendants* ........................................................ 179

A.    The Count 3 RICO Enterprise and
Its Effect on Interstate Commerce ....................... 180

B.    Pattern of Racketeering ......................................... 181

C.    RICO Predicate Acts ............................................. 181

i.    False Declarations, Certifications,
Verifications or Statements under
Penalty of Perjury in Violation of
18 U.S.C. §§ 152(2) and 152(3) ................... 182

ii.    Mail and Wire Fraud in Violation of
18 U.S.C. §§ 1341 and 1343 ........................ 184

iii.    Obstruction of Justice in Violation of
18 U.S.C. § 1503(a) ..................................... 187

iv.    Witness Tampering in Violation of
18 U.S.C. § 1512(b) ..................................... 190

v.    Obstruction of Justice in Violation of
18 U.S.C. § 1512(c) ..................................... 193

vi.    Unlawful Offers of Remuneration,
Compensation, Reward, or Advantage in
Violation of 18 U.S.C. § 152(6) and
Felony Commercial Bribery under State Law ................................. 193

vii.    Inducement to Interstate or Foreign Travel
in Violation of 18 U.S.C. § 2314 ................... 196

viii.    Money Laundering in Violation of
18 U.S.C. § 1957 ......................................... 197

D.    Scienter ................................................................. 199

E.    Vicarious Liability ................................................ 202

F.      Causation and Damages ........................................................................ 204

**FOURTH CAUSE OF ACTION**
CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)
*Against All Defendants* ................................................................................... 206

        A.      Count 1:  McKinsey & Co., McKinsey US,
                and McKinsey Holdings ............................................................ 206

        B.      Count 3: McKinsey & Co., McKinsey US,
                McKinsey Holdings, and McKinsey RTS ............................................ 208

        C.      Counts 1 through 3: Individual Defendants ........................................... 209

        D.      Vicarious Liability ............................................................... 217

        E.      Causation and Damages ........................................................ 218

**FIFTH CAUSE OF ACTION**
BREACH OF CONTRACT
*Against McKinsey & Co., McKinsey Holdings,*
*McKinsey US, and McKinsey RTS* .................................................................... 219

**SIXTH CAUSE OF ACTION**
PROMISSORY ESTOPPEL
*Against McKinsey & Co., McKinsey Holdings,*
*McKinsey US, and McKinsey RTS* .................................................................... 220

**SEVENTH CAUSE OF ACTIO**N
TORTIOUS INTERFERENCE WITH BUSINESS
EXPECTANCY  UNDER VIRGINIA LAW
*Against McKinsey, McKinsey Holdings,*
*McKinsey US, and McKinsey RTS* .................................................................... 221

PRAYER FOR RELIEF ................................................................................... 223

DEMAND FOR JURY TRIAL ............................................................................. 223

Plaintiff Jay Alix, as assignee of AlixPartners LLP ("**AP**"), by and through his attorneys Boies Schiller Flexner LLP, for his Complaint against Defendants McKinsey & Co., Inc. ("**McKinsey & Co.**"); McKinsey Holdings, Inc. ("**McKinsey Holdings**"); McKinsey & Company Inc. United States ("**McKinsey US**"); McKinsey Recovery & Transformation Services U.S., LLC ("**McKinsey RTS**" and, collectively with McKinsey & Co., McKinsey Holdings, and McKinsey US, "**McKinsey**"); Dominic Barton; Kevin Carmody; Jon Garcia; Seth Goldstrom; Alison Proshan; Robert Sternfels; and Jared D. Yerian, alleges as follows:

## NATURE OF THE CASE

1.      Since 2001, Defendant McKinsey & Co. and related persons and entities including, at various times, Defendants McKinsey Holdings, McKinsey US, McKinsey RTS, Dominic Barton, Kevin Carmody, Jon Garcia, Seth Goldstrom, Alison Proshan, Robert Sternfels, and Jared D. Yerian have unlawfully schemed to harm AP, which is McKinsey's chief competitor in the market of providing professional crisis management and consulting services in major corporate Chapter 11 bankruptcy cases involving companies with assets valued at over $1 billion.

2.      To carry out their unlawful scheme, Defendants have conducted a criminal enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. §§ 1962(c) and (d).  Specifically, between 2001 and the present, Defendants have knowingly and intentionally submitted false and materially misleading affidavits and declarations under oath in the bankruptcy proceedings in which McKinsey US and/or McKinsey RTS has been hired as a bankruptcy professional, in order to unlawfully conceal its many significant connections to "Interested Parties" identified in bankruptcy proceedings and in order to avoid revealing numerous conflicts of interest that would

disqualify McKinsey US and McKinsey RTS from being hired as bankruptcy professionals in those proceedings.[1]

3.      In executing their criminal enterprise, Defendants' crimes have included:

- Bankruptcy fraud in violation of 18 U.S.C. §§ 152(2), 152(3), and 152(6);

- Mail fraud in violation of 18 U.S.C. § 1341;

- Wire fraud in violation of 18 U.S.C. § 1343;

- Obstruction of justice in violation of 18 U.S.C. §§ 1503(a) and 1512(c);

- Witness tampering in violation of 18 U.S.C. § 1512(b);

- Unlawful monetary transactions in violation of 18 U.S.C. § 1957(a); and

- Inducement to interstate or foreign travel in violation of 18 U.S.C. § 2314.

4.      Defendants' racketeering activity was calculated to harm AP by depriving it of valuable consultancy assignments.  Defendants knew that if they revealed McKinsey's conflicts of interest as required by Rule 2014 of the Federal Rules of Bankruptcy Procedure and Section 327 of the Bankruptcy Code, McKinsey would be disqualified from employment under 11 U.S.C. § 327 in the thirteen Chapter 11 bankruptcy cases that it has handled to date.  Defendants also knew that by misrepresenting and concealing those disqualifying conflicts, they could improperly gain large bankruptcy assignments instead of AP.  Absent Defendants' unlawful conduct, McKinsey would not have been able to effectively compete against AP in the bankruptcy restructuring market, given McKinsey's roster of clients and alumni connections, which have posed serious conflicts of interests in the high-profile bankruptcy proceedings in which McKinsey

---

[1]      Those affidavits and declarations are identified in "**Exhibit A**" hereto.  Specific false and/or misleading statements within those affidavits and declarations are identified in "**Exhibit B**" hereto.  Exhibit B and Schedules 1-12 are not intended as an exhaustive exposition of the many false and/or misleading statements in McKinsey RTS's Rule 2014(a) submissions.  Further, Alix's investigation is ongoing, and he reserves the right to supplement this material following further investigation and discovery herein.

has sought employment.  Through Defendants' unlawful scheme, McKinsey has profited by receiving tens of millions of dollars in bankruptcy fees that it would not have otherwise earned had it disclosed its numerous disqualifying connections to Interested Parties and conflicts of interests as required by law.  Had Defendants complied with the law and truthfully disclosed McKinsey's connections to Interested Parties, McKinsey US and McKinsey RTS would have been precluded from being hired as bankruptcy professionals.

5.     AP is the direct victim and target of Defendants' unlawful scheme.  Defendants' criminal enterprise has caused AP to lose considerable revenue that it otherwise would have earned had Defendants complied with the law and truthfully disclosed McKinsey's disqualifying conflicts of interest.

6.     Through Defendants' racketeering scheme, McKinsey has unlawfully profited by at least $101 million to date, in the form of bankruptcy consulting fees.

7.     Plaintiff Jay Alix, as assignee of AP, seeks compensation for the actual damages that Defendants' racketeering activity has caused to AP as provided for in 18 U.S.C. § 1964(a); an injunction prohibiting McKinsey from further engaging in its illegal practices; and other relief as provided for by law.

8.     Because professionals employed by bankruptcy debtors are required to act as fiduciaries, under the Bankruptcy Code a party seeking qualification for employment as a professional must establish that it is "disinterested" and that it does "not hold or represent an interest adverse to the estate."  11 U.S.C. § 327(a).  To meet those legal requirements, prospective bankruptcy professionals are obligated by Federal Rule of Bankruptcy Procedure 2014(a) to submit, in each case, a sworn declaration that fully, honestly, and publicly discloses all of their connections to the debtor, the trustee in bankruptcy, and any creditors' committees, equity security

holders' committees, creditors, equity security holders, or indenture trustees, their attorneys and accountants, and the United States Trustee (collectively, the "**Interested Parties**").

9.      Instead of conforming to these requirements, however, Defendants have affirmatively misrepresented McKinsey's disinterestedness and unlawfully concealed McKinsey's disqualifying connections to parties with clear financial interests in the outcome of those cases. Defendants have unlawfully and deliberately parsed and crafted disclosure declarations to create the false and misleading appearance of McKinsey's qualification, compliance with the disclosure requirements, and disinterestedness under law.  Driven by hubris and greed, Defendants schemed to create their own separate set of bankruptcy disclosure rules designed to excuse McKinsey from the requirements that all other professionals must follow under the assumption that few would be willing to question the consultancy powerhouse.  In so doing, McKinsey's disclosure declarations often cited the pretext of "client confidentiality."  Defendants admit, however, that McKinsey's contracts with clients expressly authorize it to make any disclosures (such as those mandated by Bankruptcy Rule 2014) that are required by law.  Accordingly, Defendants understood that full disclosure of McKinsey's connections would inevitably lead to McKinsey's disqualification. Thus, Defendants deliberately crafted false and misleading disclosures to retain lucrative assignments and collect fees that rightfully should have gone to AP.

10.     Defendants, in order to qualify McKinsey for large bankruptcy reorganization assignments, have routinely concealed McKinsey's connections to competitors of the debtors in cases in which McKinsey US and/or McKinsey RTS has been hired.  In the field of management consulting, McKinsey readily and publicly admits that it represents competitors of its own clients. Indeed, McKinsey markets itself by emphasizing the industry knowledge that it is able to accumulate by serving direct competitors.  In the bankruptcy context, however, McKinsey's

4

service of debtors' competitors is highly problematic because bankruptcy professionals owe

fiduciary duties to their debtor-clients—which is why Section 327(a) of the Bankruptcy Code

permits the employment of only "disinterested" professionals.  Although McKinsey is required by

Rule 2014 to disclose, in detail, its connections to any competitors, it has never done so.

11.     As demonstrated in a recent study by the Wall Street Journal, published on page

A1 of the April 28, 2018 edition, other professionals participating in the thirteen Chapter 11

bankruptcies in which McKinsey was retained disclosed an average of 171 connections per case;

McKinsey disclosed an average of just *five* connections per case:



12.     McKinsey's declarations in its earliest cases simply concealed all of its

connections.  In later cases, McKinsey implemented a new form of disclosure hitherto unknown

to any bankruptcy judge or practitioner, called "disclosure by category."  When Defendants were forced to stop this novel practice, they began to incrementally disclose some of McKinsey's connections over a series of declarations, even though those connections existed at the commencement of the cases, while continuing to conceal many others.  Indeed, as the Wall Street Journal noted, in all but two cases, McKinsey disclosed no connections in its initial disclosures, opting instead to make incomplete, piecemeal disclosures over the course of the bankruptcy case:



13.     Invariably, Defendants have waited until a bankruptcy has progressed significantly (often waiting until after plan confirmation) before disclosing McKinsey's most egregious connections which, if known at the outset, would have resulted in McKinsey's disqualification from employment.  Defendants employ this practice to deceive bankruptcy courts and McKinsey's

competitors at the outset of each case because Defendants know that extricating McKinsey from the bankruptcy proceedings at a later stage would be impractical, if not impossible.  Consequently, Defendants have been able to orchestrate for McKinsey bankruptcy court authorization of professional engagements that McKinsey otherwise would have lost to AP had Defendants disclosed McKinsey's connections fully and truthfully from the outset.

14.     In the wake of the Wall Street Journal's investigatory work and the filing of this lawsuit in May 2018, McKinsey's pattern of flouting the requirements of Rule 2014 has drawn Congressional attention.  In July 2018, a member of the House Judiciary Committee, referring to McKinsey RTS, asked the U.S. Trustee to investigate "undisclosed conflicts at McKinsey & Co.'s restructuring unit [that] may be compromising the nation's bankruptcy system."

15.     In addition to Defendants' unlawful failures to disclose connections to Interested Parties, McKinsey has committed bankruptcy fraud by violating 18 U.S.C. § 152(6), a RICO predicate statute that prohibits knowingly and fraudulently offering any advantage or promise of advantage for acting or forbearing to act in any bankruptcy case.  Specifically, McKinsey has offered illegal "pay-to-play" arrangements to attorneys that handle high-stakes bankruptcy matters, whereby McKinsey offered to refer its vast network of consulting clients to those attorneys in exchange for the attorneys exclusively referring bankruptcy clients to McKinsey US and/or McKinsey RTS for professional employment.  In this way, McKinsey has avoided competition, as well as the traditional "beauty contest" through which the overwhelming majority of bankruptcy consulting assignments are made.

16.     Defendants' racketeering activity has become particularly egregious in McKinsey RTS's three most recent cases:

- *In re Alpha Natural Resources, Inc.*, No. 15-BK-33896 (Bankr. E.D. Va.), filed on August 3, 2015 (hereafter "***Alpha Natural Resources***");

- *In re SunEdison, Inc.*, No. 16-BK-10992 (Bankr. S.D.N.Y.), filed on April 21, 2016 (hereafter "***SunEdison***"); and

- *In re GenOn Energy, Inc.*, No. 17-BK-33695 (Bankr. S.D. Tex.), filed on June 14, 2017 (hereafter "***GenOn Energy***" or "***GenOn***").

17.    For example, in *GenOn*, McKinsey RTS's four declarations under penalty of perjury included at least 58 intentionally false or misleading statements that concealed, omitted, and lied about McKinsey's connections to dozens of Interested Parties.  *See* Ex. B at 78-101.   In *SunEdison*, McKinsey RTS's five declarations included at least 97 intentionally false or misleading statements that concealed, omitted, and lied about McKinsey's connections dozens of Interested Parties.  Ex. B at 56-77.   And in *Alpha Natural Resources*, McKinsey RTS's five declarations included at least 114 intentionally false or misleading statements that once again concealed, omitted, and lied about McKinsey's connections to dozens of Interested Parties.   Ex. B at 24-56.   Thus, in just its three most recent cases alone, McKinsey RTS has submitted a total of fourteen (14) declarations containing at least 269 intentionally false or misleading statements.

### A.  *Alpha Natural Resources*

18.    In *Alpha Natural Resources*, Defendants submitted, or caused to be submitted on behalf of McKinsey RTS, false and misleading declarations that concealed, *inter alia*, the following facts:

   a.    While McKinsey RTS was supposed to be maximizing the value of the bankruptcy estate's assets, McKinsey was simultaneously helping United States Steel, one of debtor Alpha Natural Resources, Inc.'s' ("**Alpha Natural Resources**") largest coal customers ***and a McKinsey client***, reduce the price it paid the Alpha Natural Resources for coal.

b.   The confirmation of the plan of reorganization that McKinsey RTS secured provided for the sale of most of the bankruptcy estate's assets to entities including ***McKinsey's own clients***;

c.   A McKinsey affiliate had a direct financial interest in the outcome of the bankruptcy via a $110 million investment, and through this and other undisclosed interests, McKinsey used its fiduciary role as consultant to profit from its debtor-client's restructuring;

d.   McKinsey was a pre-petition holder of the debtor's securities; and

e.   While the case was pending, a McKinsey & Co. partner overseeing its investments in Alpha Natural Resources' securities also served on the Board of Directors of Royal Bank of Canada, which held an equity interest in debtor Alpha Natural Resources.

19.   In addition, as described further below, over the course of the *Alpha Natural Resources* bankruptcy, McKinsey, along with Defendants Kevin Carmody and Alison Proshan, fraudulently induced the U.S. Trustee to withdraw two court filings that sought to compel McKinsey RTS to disclose McKinsey's connections as required by law by representing that Carmody's existing  disclosure declarations on behalf of McKinsey RTS (which were prepared at least in part by Proshan) were complete and truthful; in fact, those representations were false, materially misleading, and continued to omit and conceal McKinsey's connections.  This conduct constituted obstruction of justice and witness tampering under 18 U.S.C. §§ 1503(a), 1512(b)(2), and 1512(c)(2).

20.   Defendants' assertions that McKinsey RTS's disclosures complied with Rule 2014 are belied by the fact that on July 31, 2018, following the filing of Alix's original Complaint in

this action and investigative reporting by the Wall Street Journal regarding deficiencies in McKinsey RTS's disclosures in *Alpha Natural Resources*, the Acting U.S. Trustee for Region 4, John P. Fitzgerald, III, filed a submission supporting the re-opening of the *Alpha Natural Resources* case so that the U.S. Trustee may "undertake an independent investigation" regarding McKinsey's undisclosed connections.   The U.S. Trustee's July 31, 2018 filing focuses, in particular, on a McKinsey connection first uncovered by the Wall Street Journal in 2018: an investment by McKinsey's investing arm, MIO Partners, Inc. ("**MIO**"), that McKinsey RTS failed to disclose.[2]

21.     In his July 31, 2018 filing, the U.S. Trustee emphasizes that "***rigorous compliance with Rule 2014 is critical to the integrity and transparency of the bankruptcy system***."[3]   The U.S. Trustee then states that he has become aware of "***new allegations that may call into question both the settlement of the Motion to Compel and the Court's finding of disinterestedness.***  Thus, the U.S. Trustee supports the Motion to Reopen in order to investigate these previously unknown allegations."  *Id.* at 2 (emphasis added).  The U.S. Trustee further notes that McKinsey "RTS has maintained through these cases that it had no information about or access to MIO's investments because MIO operates as a blind trust."  *Id.* at 3.  The U.S. Trustee then calls into question that representation, observing that "at least some MIO investment information is available through MIO's public reports to the United States Department of Labor."  *Id.*

---

[2]       "MIO" stands for "McKinsey Investment Office."
[3]       *Alpha Natural Resources*, Dkt. No. 4126 (emphasis added; internal quotations and alteration omitted).

**B. *SunEdison***

22.     As in McKinsey's other bankruptcy matters, Defendants, to avoid disqualification of McKinsey RTS, made, or caused to be made, disclosures in *SunEdison* that intentionally concealed McKinsey's numerous connections to Interested Parties in that case.

23.     McKinsey also committed multiple collateral crimes in *SunEdison*, and its illegal conduct disqualified McKinsey RTS from serving as a restructuring consultant.  Specifically:

a.     McKinsey orchestrated a massive fraud totaling $10 million to evade disqualifying preference liability[4] to SunEdison under 11 U.S.C. § 547(b).  To consummate its cover-up of its $10 million fraudulent scheme, McKinsey RTS lied to the bankruptcy court when it declared that McKinsey had collected its fees from certain non-debtor affiliates of SunEdison because its services were for the benefit of those affiliates.  They were not.

b.     Through its unspecified and inadequately described "business arrangement" with former SunEdison CEO Ahmad Chatila, McKinsey had an undisclosed connection to FTC Solar, Inc., a competitor of SunEdison that ultimately acquired assets from SunEdison in the bankruptcy case for approximately 17% of their book value.

**C. *GenOn***

24.     In *GenOn*, Defendants, to avoid disqualification of McKinsey RTS, made or caused to be made declarations unlawfully concealing, *inter alia*, that:

---

[4]     Under 11 U.S.C. § 547, a "preference payment" is a payment by the debtor to a creditor on account of an antecedent debt, made while the debtor was insolvent and within ninety days before the filing of the bankruptcy petition, which enables the creditor to receive more than it would have if the estate were liquidated under Chapter 7 of the Bankruptcy Code.  Preference payments are avoidable by the debtor in bankruptcy.

a.   McKinsey was liable to the debtor GenOn Energy, Inc. ("**GenOn**") for a $4.5 million preference claim;

b.   McKinsey RTS was investigating GenOn's parent company, NRG Energy, Inc. ("**NRG Energy**"), on behalf of GenOn in a matter as to which the two companies' interests were adverse, without ever disclosing that NRG Energy was, in fact, a current or former McKinsey client; and

c.   A number of GenOn's creditors (whose claims McKinsey RTS is presently investigating and objecting or acceding to on GenOn's behalf) are also McKinsey clients.

25.   In the year before McKinsey RTS was employed in *Alpha Natural Resources*, Plaintiff Jay Alix had several meetings, phone conversations, and email exchanges with Defendant Dominic Barton, who served as McKinsey & Co.'s Managing Partner from 2009 until mid-2018. Several of those communications also included Defendant Robert Sternfels, a Senior Partner at McKinsey & Co.  During those meetings and communications, Alix repeatedly explained to Barton, in detail, why Defendants' concealment of McKinsey's connections was illegal.  Alix also explained why McKinsey's "pay-to-play" scheme was illegal.

26.   After conducting his own investigation, Barton admitted to Alix that McKinsey was, in fact, intentionally concealing its clients' identities and conducting the "pay-to-play" scheme.  Barton agreed that this conduct was unlawful and promised that if Alix would forebear action until Barton's anticipated re-election as McKinsey & Co.'s Managing Partner (thus solidifying Barton's ability to effectuate change at McKinsey), McKinsey would exit the bankruptcy market.

27.     Contrary to Barton's representations, however, McKinsey did not withdraw from the bankruptcy market.  Instead, McKinsey continued to market its bankruptcy services and was employed (both prior and subsequent to Barton's re-election) in additional bankruptcy cases, in which Defendants not only continued but accelerated their unlawful conduct.

28.     In sum, Defendants have conducted a criminal enterprise through which they have unlawfully deprived AP of assignments for professional crisis management and consulting services in major corporate Chapter 11 bankruptcy cases.  As described herein in detail, Defendants have conducted their criminal enterprise through a pattern of racketeering activity involving the commission of multiple federal crimes by each Defendant for the purpose of evading McKinsey's disqualification in Chapter 11 bankruptcy cases, resulting in substantial damages to AP.

## THE PARTIES

29.     Plaintiff Jay Alix, an individual, resides in Michigan.  Alix is the founder and a minority equity holder of AP, and a member of AP's board of directors.  All claims asserted herein have been fully and lawfully assigned to Alix by AP.

30.     Defendant McKinsey & Co. is a New York corporation with its principal place of business in New York, New York.

31.     Defendant McKinsey Holdings is a Delaware corporation with its principal place of business in New York, New York.  It is a wholly-owned subsidiary of McKinsey & Co.

32.     Defendant McKinsey US is a Delaware corporation with its principal place of business in New York, New York.  It is a wholly-owned subsidiary of McKinsey & Co.

33.      Defendant McKinsey RTS is a limited liability company organized under the laws of Delaware with its principal place of business in New York, New York.  Its sole member is McKinsey US.

34.     Defendant Dominic Barton, an individual, is a Canadian citizen domiciled in London, United Kingdom.  Barton was the Managing Partner of McKinsey & Co. from 2009 until mid-2018.

35.     Defendant Kevin Carmody, an individual, resides in Illinois.  Carmody is a Senior Partner of McKinsey & Co. and the global leader of McKinsey RTS's corporate restructuring practice.

36.     Defendant Jon Garcia, an individual, resides in the District of Columbia.  Garcia is a founder and the President of McKinsey RTS.  Garcia is also a Senior Partner of McKinsey & Co., and from 2006 to 2017 served as a member of the board of directors of McKinsey's investment arm, MIO.

37.     Defendant Seth Goldstrom, an individual, resides in Georgia.  Goldstrom is a Senior Partner of McKinsey & Co., the global leader of McKinsey & Co.'s enterprise transformation practice, and a board member of McKinsey RTS.

38.     Defendant Alison Proshan, an individual, resides in New York.  Proshan is a Senior Vice President of and Associate General Counsel to McKinsey & Co., and, in that capacity, provides extensive legal and management services to McKinsey RTS.

39.     Defendant Robert Sternfels, an individual, resides in California.  Sternfels is a Senior Partner of McKinsey & Co. and a member of McKinsey & Co.'s Shareholders' Council.

40.     Defendant Jared D. Yerian, an individual, resides in Illinois.  Until March 2016, Yerian was a Partner of McKinsey & Co., and was a founder of and Practice Leader at McKinsey RTS.

## JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction over Alix's federal claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

42.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because (i) there is complete diversity of citizenship between the parties, and (ii) more than $75,000, exclusive of interest and costs, is at stake.

43.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Alix's claims occurred in this District.

44.     Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact their affairs in this District.

**FACTS**

**I.     Background of Jay Alix and AP**

45.     In July 1981, Jay Alix formed the corporation that would later become AP.  Starting as a solo practitioner, Alix worked with underperforming companies in bankruptcies, out-of-court restructurings, and corporate turnarounds.  Today, AP has approximately 2,000 employees in approximately two dozen offices around the world, in North and South America, Europe, the Middle East, and Asia.  Over the years, Alix has been involved, either directly or indirectly through AP, in helping and restructuring hundreds of companies involved in Chapter 11 bankruptcy proceedings.  Alix currently serves on the board of directors of AP and has an approximately 35% equity stake in the company.

46.     Alix has extensive experience as an Operating Trustee, Examiner, and Fraud Investigator.  He has co-authored two books for bankruptcy professionals and has authored numerous articles concerning bankruptcy proceedings, corporate restructurings, and turnarounds.  Alix has served as an instructor of United States District Judges at the Federal Judicial Training Center in Washington, D.C., and as a regular teacher for the continuing education of sitting United States Bankruptcy Judges, also through the Federal Judicial Training Center.   In the 1990s, Alix was appointed by President Clinton to serve on the National Bankruptcy Review Commission,

which reviewed and suggested changes to the federal bankruptcy laws.  These recommendations eventually led to legislative changes that were signed into law by President George W. Bush.

## II.     Bankruptcy Consulting Services Is a Multi-Billion Dollar Industry.

47.     The field of bankruptcy consulting, as it presently exists, has its genesis in the early 1980s, which saw a sharp increase in the number of large businesses filing for bankruptcy protection under Chapter 11 of the then-new Bankruptcy Code.  Companies filing for bankruptcy recognized that they needed not only advice from turnaround consultants, but also interim management to replace managers who resigned as the companies approached insolvency. Emerging leaders in this new market, such as AP, Alvarez & Marsal, and others, soon filled this void and began providing crisis and interim managers to troubled companies.

48.     McKinsey first entered the field of bankruptcy consulting in or around 2001, when McKinsey US was engaged in the *Hayes Lemmerz* bankruptcy; McKinsey later formed McKinsey RTS in or around 2010.  Since 2001, McKinsey, through McKinsey US and/or McKinsey RTS, has been engaged as a bankruptcy consultant in thirteen Chapter 11 bankruptcies.  Since 2010, McKinsey RTS has been engaged as a restructuring, turnaround, or financial advisor for nine Chapter 11 bankruptcies, for which it has received over $100 million in fees—and over $125 million including pre-petition and post-petition fees.

49.     McKinsey's three top competitors in the field of bankruptcy consulting are AP, Alvarez & Marsal, and FTI Consulting, which collectively have provided consultancy services in approximately 75% of the bankruptcy cases since 2010 involving assets over $1 billion in which neither McKinsey US nor McKinsey RTS have served as advisors.  Of those cases, AP obtained approximately 24.5% of the contracts.

50.     For 2016, the last year reported by the Debtwire North America Professional Fees Report, the combined bankruptcy fees of the major restructuring firms exceeded $100 million.

However, this number does not include pre-petition or post-confirmation fees, which are typically very substantial.

III.   **As the World's Largest Consulting Firm, McKinsey Knows that Professionals Providing Bankruptcy Consulting Services Must Be Transparent about Their Connections and Have Undivided Loyalty to Their Debtor-Clients.**

51.   Since 2001, in thirteen Chapter 11 bankruptcies involving billions of dollars in assets, McKinsey US and McKinsey RTS have sought and obtained employment as bankruptcy "professionals" as that term is defined in the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

52.   Pursuant to 11 U.S.C. § 327(a), bankruptcy professionals must be persons "that do not hold or represent an interest adverse to the estate" and who are "disinterested persons."  Under 11 U.S.C. § 101(14), a "disinterested person" is:

> a person that—(A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason."

Subsection C of this definition embraces any "interest or relationship that would even faintly color the independence and impartial attitude required by the Code."[5]

53.   In assessing whether a professional is disinterested, bankruptcy courts consider multiple factors, including i) whether the professional possesses or asserts for a client *any economic interest* that would tend to lessen the value of the bankruptcy estate *or create either an actual or potential dispute* in which the estate would be a rival claimant;[6] ii) whether the

---

[5]   *In re BH & P Inc.*, 949 F.2d 1300, 1308 (3d Cir. 1991).
[6]   *See, e.g., In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 461 (5th Cir. 2012); *In re AFI Holding, Inc.*, 530 F.3d 832, 845 (9th Cir. 2008); *In re Crivello*, 134 F.3d 831, 835 (7th Cir. 1998).

professional possesses a predisposition under the circumstances to be biased against the estate;[7] iii) whether the professional has *some interest or relationship that would even faintly color the independence and impartial attitude required by the Bankruptcy Code*;[8] iv) whether it is likely that the professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest;[9]   v) whether the professional is serving the debtors with undivided loyalty and providing untainted advice and assistance;[10] and vi) the likelihood that a potential conflict might turn into an actual one or the influence that a conflict might have on the professional's decision making.[11]

54.     To enforce these important limitations on the employment of professionals like McKinsey US and McKinsey RTS, Bankruptcy Rule 2014 establishes strict disclosure requirements. One of those disclosure requirements is that a professional's application for employment pursuant to 11 U.S.C. § 327(a) "*shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other*

---

[7]     *See, e.g., Am. Int'l Refinery*, 676 F.3d at 461; *AFI Holding*, 530 F.3d at 845; *Crivello*, 134 F.3d at 835.

[8]     *See, e.g., Crivello*, 134 F.3d at 835; *Rome v. Braunstein*, 19 F.3d 54, 58 n.1 (1st Cir. 1994); *In re Lewis Rd., LLC*, 2011 WL 6140747, at *7 (Bankr. E.D. Va. Dec. 9, 2011).

[9]     *In re Pillowtex, Inc.*, 304 F.3d 246, 251 (3d Cir. 2002).

[10]     *See, e.g., Rome*, 19 F.3d at 58; *In re Arlan's Dept. Stores, Inc.*, 615 F.2d 925, 936-37 (2d Cir. 1979).

[11]     *See, e.g., Rome*, 19 F.3d at 58; *Am. Int'l Refinery*, 676 F.3d at461; *see also In re Git-N-Go Inc.*, 321 B.R. 54, 58-59 (Bankr. N.D. Okla. 2004) ("[I]f it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation, then they have a conflict and an interest adverse to the estate."); *In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) (an actual conflict exists if there is "an active competition between two interests, in which one interest can only be served at the expense of the other."); *In re BH & P, Inc.*, 103 B.R. 556, 563 (Bankr. D.N.J. 1989), *aff'd in pertinent part*, 119 B.R. 35 (D.N.J. 1990) ("As a general principle, professional persons employed by the trustee should be free of any conflicting interest which might, in the view of the trustee or the bankruptcy court, affect the performance of their services or which might impair the high degree of impartiality and detached judgment expected of them during the administration of a case."); *In re Amdura Corp.*, 121 B.R. 862, 865 (Bankr. D. Colo. 1990) (quoting *Collier on Bankruptcy* ¶ 327.03 (1985)).

*party in interest, their respective attorneys and accountants*[.]" Fed. R. Bankr. P. 2014 (emphasis added).

55.     The term "connections" is interpreted broadly and encompasses all relationships that are not considered *de minimis*.[12]  Statements detailing connections must be explicit and complete to allow the bankruptcy court and other parties to ascertain the professional's disinterestedness and lack of adverse interests.[13]  To this end, bankruptcy professionals must disclose *all* facts and relationships that might potentially bear on their qualification for retention.[14]  Disclosure requirements are broader than the rules governing disqualification, and bankruptcy professionals must disclose connections regardless of whether the connections would constitute disqualifying interests under Section 327(a).[15]  Accordingly, a bankruptcy professional cannot exercise discretion and decide itself whether connections are irrelevant or trivial.[16]  Nor can it invent special methods of disclosure, such as "disclosure by category," to avoid the disqualification that would ensue if it complied with the statute and implementing rule's strict disclosure requirements.  *See* Joint Declaration, attached hereto as "**Exhibit C**" ("**Ex. C**") ¶¶ 22, 39, 45-48.  Nor can it make incomplete disclosures and later claim exoneration by virtue of the court's or other stakeholders' failure to demand additional information.[17]

---

[12]     *See, e.g., Leslie Fay*, 175 B.R. at 536.
[13]     *See, e.g., Lewis Rd.*, 2011 WL 6140747, at *8.
[14]     *See, e.g., Lewis Rd.*, 2011 WL 6140747, at *8; *see also In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998).
[15]     *See, e.g., In re Olsen Indus., Inc.*, 222 B.R. 49, 60 (Bankr. D. Del. 1997).
[16]     *See, e.g., In re Citation Corp.*, 493 F.3d 1313, 1321 (11th Cir. 2007) ("bankruptcy court, not the professionals, must determine which prior connections rise to the level of an actual conflict or pose the threat of a potential conflict . . .  professional must disclose all of its previous contacts with any party in interest"); *Rome*, 19 F.3d at 59 (noting that the "decision should not be left to . . . [the professional], whose judgment may be clouded by the benefits of the potential employment").
[17]     *See, e.g., In re Matco Elecs. Grp., Inc.*, 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008) (Rule "2014 is not intended to condone a game of cat and mouse where the professional seeking appointment provides

56.     Rule 2014 imposes an independent duty of full disclosure on professionals seeking employment in bankruptcy cases, as well as a continuing obligation to investigate all of their possible connections and to supplement their disclosures in a timely, if not immediate, fashion if, and when, additional connections arise.[18]

57.     Bankruptcy professionals' declarations pursuant to Rule 2014 must be made under penalty of perjury, pursuant to 28 U.S.C. § 1746.

58.     Often, bankruptcy professionals must be disqualified because of a *potential* conflict.[19]   Regardless of whether a professional's judgment actually has been or will be compromised, courts are required to maintain the credibility and integrity of the bankruptcy system.[20]   Thus, the bankruptcy system must be transparent and provide a level field for all creditors and stakeholders.  Those goals require strict enforcement of Rule 2014, and bankruptcy courts are required to review professionals' Rule 2014 disclosures and determine whether the professional is "disinterested" within the meaning of Section 327(a).[21]   These rules, when followed, also provide a level playing field for professionals in bankruptcy, such as AP.

59.     Without bankruptcy professionals' full and truthful disclosure of all their connections in their Rule 2014 disclosures, the bankruptcy court is rendered unable to accurately

---

only enough disclosure to whet the appetite of the UST, the court or other parties interest, and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure.").

[18]     *See, e.g., Granite Partners*, 219 B.R. at 35.

[19]     *See, e.g., In re Glenn Elec. Sales Corp.*, 99 B.R. 596, 601-02 (D.N.J. 1988).

[20]     *See, e.g., Glenn*, 99 B.R. at 601-02; *United States v. Gellene*, 182 F.3d 578, 588 (7th Cir. 1999) ("The Code reflects Congress' concern that any person who might possess or assert an interest or have a predisposition that would reduce the value of the estate or delay its administration ought not have a professional relationship with the estate").

[21]     Additionally, the Local Rules for the United States Bankruptcy Court for the District of Delaware (where the *Hayes*, *Harry & David*, and *Standard Register* bankruptcies were filed) provide that "[p]romptly after learning of any additional material information relating to such employment (such as potential or actual conflicts of interest) the professional employed or to be employed shall file and serve a supplemental affidavit setting forth the additional information."

assess professionals' qualifications to serve as fiduciaries for the estate, stymieing the effectuation of the bankruptcy court's mandate to authorize the employment of only disinterested professionals.

60.     McKinsey & Co. is the world's largest standalone business management consulting firm.  It serves many of the world's largest corporations, including eighty of the top 120 banks and financial services firms, nine of the eleven largest chemical companies, and fifteen of the twenty-two biggest healthcare and pharmaceutical concerns.   McKinsey's connections are extensive. According to its website, McKinsey provides services to the following business sectors:

- Advanced Electronics
- Aerospace & Defense
- Automotive & Assembly
- Capital Projects & Infrastructure
- Chemicals
- Consumer Packaged Goods
- Electric Power & Natural Gas
- Financial Services
- Healthcare Systems & Services
- High Tech
- Media & Entertainment
- Metals & Mining
- Oil & Gas
- Paper & Forest Products
- Pharmaceuticals & Medical Products
- Private Equity & Principal Investors
- Public Sector
- Retail
- Semiconductors
- Social Sector
- Telecommunications
- Travel, Transport & Logistics

61.     McKinsey also has 30,000 "alumni"—former McKinsey employees—most of whom are now employed in other businesses or government.  More Fortune 500 CEOs are alumni of McKinsey than of any other company.  McKinsey actively develops and exploits its alumni for new business investment and referrals and facilitates alumni job placement.

62.     McKinsey has its own exclusive, high-performing internal investment funds, managed by MIO.  MIO is a wholly-owned subsidiary of McKinsey & Co. that serves as

McKinsey's investment arm. According to its most recent Form ADV 2A filed with the United States Securities and Exchange Commission, MIO invests approximately $25 billion on behalf of McKinsey's current and former partners and employees. MIO has taken significant equity positions in many of McKinsey's clients.

63.    As a highly sophisticated international corporation, McKinsey has ready access to the most sophisticated legal advice available—both as a client of and as advisor to major law firms—and is well aware of the foregoing disclosure requirements in the bankruptcy profession. Additionally, some McKinsey partners and employees who perform McKinsey's bankruptcy work are themselves attorneys, including Defendants Jon Garcia and Seth Goldstrom. Several McKinsey bankruptcy professionals also have extensive work experience at other bankruptcy consulting firms where they became familiar with Bankruptcy Code Section 327 and Bankruptcy Rule 2014, including Defendants Kevin Carmody and Jared Yerian, who worked for AP before joining McKinsey. While not an attorney, Yerian holds finance and accounting degrees and is a faculty member at the Practicing Law Institute. Regardless, McKinsey is required and presumed to know the law applicable to its employment as a bankruptcy professional. Yet McKinsey has purposefully maintained a substandard system for identifying conflicts. McKinsey does not use a centralized conflicts identification process. Maintaining a centralized conflicts checking database with conflict checking software is the industry practice among professional firms that seek employment in large bankruptcy cases. McKinsey refuses to maintain a basic, centralized conflicts checking system despite having the expertise and means needed to create one. Instead, McKinsey simply emails employees and then waits for responses. Moreover, McKinsey's emails, which are sent to only relatively few employees, only address some, very specific connections, contrary to the expansive disclosure requirement of Rule 2014. McKinsey's system of checking for conflicts by

email is inadequate by design and intended to conceal rather than uncover adverse interests and is in stark contrast to every other professional who seeks employment subject to § 327 and who understands the necessity of complying with Rule 2014.

64.     As alleged in detail, *infra*, Defendants have repeatedly, flagrantly, and deliberately flouted the laws applicable to professionals acting in bankruptcy matters.  McKinsey's extreme aversion to disclosure has been a persistent theme of its interactions with the bankruptcy system.  In fact, McKinsey formed McKinsey RTS so that, *inter alia*, it could make "limited" disclosures of only those connections specific to McKinsey RTS itself and avoid disclosure of connections to other McKinsey entities.  The Bankruptcy Code, however, does not permit professionals to pick and choose which of their affiliates' connections to disclose and which to withhold; indeed, professionals are required to disclose *all* connections, including any connections of their affiliates.  In other words, McKinsey RTS was founded for the express purpose of skirting the Bankruptcy Code's disclosure rules.

65.     Throughout the course of McKinsey's various bankruptcy assignments, the topic of disclosure has been repeatedly discussed by and among senior leadership at McKinsey & Co., including, upon information and belief, Garcia, Goldstrom, Sternfels, and Barton, who have consistently sought to prevent McKinsey US and McKinsey RTS from making the substantive disclosures that the law requires—namely, all pertinent connections of McKinsey & Co. and its affiliates.  The foregoing individuals and the other individual Defendants have all deliberately conspired to circumvent the requirements of Rule 2014 under the guise of protecting "client confidentiality."  As set forth in greater detail, *infra*, Carmody, Goldstrom, Garcia, Proshan, Sternfels, Yerian, and others peculiarly known to McKinsey, have intentionally and unlawfully

devised ways for McKinsey US and McKinsey RTS, to participate in the bankruptcy consultancy marketplace without adhering to the applicable bankruptcy law and rules, including Rule 2014.

IV.    **From 2001 through 2013, Defendants Engaged in a Pattern of Racketeering Activity that Involved Crimes Related to Submitting False Statements in Order to Evade Disqualification as Bankruptcy Professionals.**

66.    From 2001 to 2013, in eight separate bankruptcy proceedings, Defendants repeatedly and deliberately violated disclosure obligations under bankruptcy law by submitting, or causing to be submitted, false disclosure affidavits and declarations, in order to avoid disqualification of McKinsey US and/or McKinsey RTS and to unlawfully deprive AP of valuable assignments.

67.    During that thirteen-year window, McKinsey US and/or McKinsey RTS accepted the following eight lucrative bankruptcy assignments:

a.   *In re Hayes Lemmerz International, Inc*., No. 01-BK-11490 (Bankr. D. Del.), filed on December 5, 2001 (hereafter "***Hayes Lemmerz***" or "***Hayes***");

b.   *In re UAL Corp*. (*United Airlines*), No. 02-BK-48191 (Bankr. N.D. Ill.), filed on December 9, 2002 (hereafter "***UAL***");

c.   *In re Mirant Corp*., No. 03-BK-46590 (Bankr. N.D. Tex.), filed on July 14, 2003 (hereafter "***Mirant***");

d.   *In re Lyondell Chemical Co*., No. 09-BK-10023 (Bankr. S.D.N.Y.), filed on January 6, 2009 (hereafter "***Lyondell Chemical***" or "***Lyondell***");

e.   *In re Harry & David Holdings, Inc*., No. 11-BK-10884 (Bankr. D. Del.), filed on March 28, 2011 (hereafter "***Harry & David***");

f.   *In re AMR Corp*., No. 11-BK-15463 (Bankr. S.D.N.Y.), filed on November 29, 2011 (hereafter "***AMR***" or "***AMR Corp.***");

g.   *In re AMF Bowling Worldwide, Inc*., No. 12-BK-36495 (Bankr. E.D. Va.), filed on November 13, 2012 (hereafter "***AMF Bowling***"); and

h.   *In re Edison Mission Energy*, No. 12-BK-49219 (Bankr. N.D. Ill.), filed on December 17, 2012 (hereafter "***Edison Mission Energy***" or "***Edison Mission***").

68.     In each of these eight cases, McKinsey's disclosure affidavits and declarations violated Rule 2014.  They were also false and misleading in numerous respects, detailed *seriatim* below.[22]

### A.  Defendants Unlawfully Concealed McKinsey's Connections and Affirmatively Misrepresented that McKinsey Was Disinterested.

69.     In each of the eight above-listed bankruptcy cases, in the disclosure affidavits and declarations submitted on behalf of McKinsey US and/or McKinsey RTS, Defendants concealed, and failed to name, almost every one of McKinsey's connections, relationships, and conflicts and affirmatively misrepresented McKinsey's disinterestedness under the law.  Defendants also failed to describe with adequate detail the nature of McKinsey's connections, relationships, and conflicts.

70.     In contrast to McKinsey US and McKinsey RTS, the disclosure declarations filed by every other counsel for the debtor, counsel for the creditor, and their respective financial advisors retained in these eight bankruptcy cases contained exhaustive lists that identified, by name, the numerous connections that Rule 2014 required them to disclose, and described the nature of the professionals' relationships with each connection.  Excluding McKinsey US and McKinsey RTS, bankruptcy professionals specifically identified an average of 185 connections per case. McKinsey US and McKinsey RTS, however, disclosed **no** connections by name in its initial declarations for these eight cases, and only in two cases (*UAL* and *Harry & David*, discussed *infra*), through a Supplemental Declaration and a Second Supplemental Declaration, respectively, did it disclose any connections at all.

---

[22]     McKinsey's disclosure affidavits and declarations in those eight cases are identified as items No. 1-22 in Exhibit A hereto.  Specific false and misleading statements in those affidavits and declarations are set forth in pages 1-17 of Exhibit B hereto.

71.     Given the size and complexity of McKinsey's business and business relationships, its Rule 2014 disclosure declarations should have been voluminous.  McKinsey's declarations should have clearly named and described the nature of any of McKinsey's connections to any Interested Parties in those cases, regardless of whether those connections were creditors, suppliers, customers, or competitors of the Chapter 11 debtors, and regardless of whether the connection was a McKinsey client (or affiliate thereof), service provider (or affiliate thereof), investment-related, or an employee relationship.[23]  McKinsey also should have disclosed any connections or referrals that led to it obtaining employment in each case.  As detailed below, Defendants unlawfully failed to disclose McKinsey's connections, which included many dozens, if not hundreds, of connections to Interested Parties, including financial institutions and other clients in the wide range of industries that McKinsey serves.  *See* Ex. C ¶¶ 40-41.

*i.     Hayes Lemmerz*

72.     The *Hayes Lemmerz* bankruptcy was filed in the United States Bankruptcy Court for the District of Delaware on December 5, 2001.  In *Hayes*, McKinsey US filed three disclosure affidavits: an initial affidavit in support of the retention of McKinsey US as a management consultant, filed on December 27, 2001; a supplemental affidavit, dated February 13, 2002; and a second supplemental affidavit, dated March 13, 2002.  McKinsey US's fees in *Hayes* were approved on May 12, 2003.  McKinsey US's disclosure affidavits are identified as items No. 1-3 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 1-2 of Exhibit B hereto.

---

[23]     A list of Interested Parties is docketed early on in all bankruptcy cases to ensure that all Interested Parties have been properly identified and to enable stakeholders to identify any conflicts that might exist among or between Interested Parties and professionals such as McKinsey.

73.     Despite filing three affidavits in *Hayes*, McKinsey US failed to name a ***single*** connection to any Interested Parties.   By doing so, McKinsey US unlawfully omitted and concealed its connections to likely dozens of Interested Parties.  *See* Ex. C ¶ 40.

74.     McKinsey US unlawfully failed to disclose several major connections to Interested Parties in *Hayes* even though they were ***current McKinsey clients***, including, *inter alia*, the following connections:

| Entity | Interested Party Role (*Hayes*) | McKinsey Connection |
|---|---|---|
| Bank One Corporation | Secured Creditor | Client |
| Bank One Trust Company, N.A. | Major Bondholder | Client and/or Subsidiary and Affiliate of Clients (*JPMorgan Chase and Bank One Corporation*) |
| Chase Bank of Texas, N.A. | Major Bondholder | Client and/or Subsidiary and Affiliate of Clients (*JPMorgan Chase and Bank One Corporation*) |
| Chase Manhattan Bank | Major Bondholder | Client and/or Subsidiary and Affiliate of Clients (*JPMorgan Chase and Bank One Corporation*) |
| MDFC / Boeing | Major Lessor | Client and/or Subsidiary of Client (*The Boeing Company*) |

75.     All or any one of McKinsey's undisclosed connections would have disqualified McKinsey US from employment as a bankruptcy professional in *Hayes*.   However, because of Defendants' fraudulent concealment of those connections, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could meaningfully assess the nature and extent of McKinsey's conflicts.  *See* Ex. C ¶¶ 26, 40-44.

76.     Defendants, including McKinsey & Co. and McKinsey US, also concealed additional conflicts and connections to Interested Parties in *Hayes*.   However, Defendants' dishonest course of conduct makes it difficult to determine the exact number and nature of what

were undoubtedly numerous undisclosed conflicts and connections to Interested Parties.  The facts needed to ascertain all these numerous conflicts and connections are peculiarly within the knowledge of Defendants, including McKinsey & Co. and McKinsey US, but will be proven through discovery.

*ii.    UAL (United Airlines)*

77.    The *UAL (United Airlines)* bankruptcy was filed in the United States Bankruptcy Court for the Northern District of Illinois on December 9, 2002, approximately one year after *Hayes Lemmerz* was filed.  In *UAL*, McKinsey US filed two affidavits purportedly disclosing its connections to Interested Parties: an initial affidavit filed on December 9, 2002; and a supplemental affidavit dated February 13, 2002.  McKinsey US's fees for *UAL* were approved on January 21, 2006.  McKinsey US's disclosure affidavits are identified as items No. 4-5 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 3-4 of Exhibit B hereto.

78.    In its initial disclosure affidavit in *UAL*, filed on December 9, 2002, McKinsey US once again failed to name a single connection to any Interested Parties.  Instead, McKinsey US vaguely stated:

> McKinsey currently serves numerous clients that are included on the lists of parties-in-interest provided by the Debtors, or that may be determined in the future to be parties-in-interest in these cases. ***Because of its responsibility to maintain strict client confidentiality, McKinsey cannot disclose the services performed, or even in some instances the fact that services were provided for clients***.  If additional disclosure is required of McKinsey as a condition to its retention by the Debtors which runs afoul of such responsibilities, McKinsey may be required to withdraw from the representation of the Debtors.  In addition, it is possible that one or more of such clients may request McKinsey to engage in services focusing on direct commercial transactions or relationships with the Debtors.  In such an event, McKinsey would either give notice or withdrawal or notify the Debtors and other key parties-in-interest of the fact that it has been requested to perform services for another client whose posture is adverse to the estates to determine whether such parties-in-interest would be willing to waive any claims of

28

> conflict.  If the Debtors and other parties-in-interest were unable or
> unwilling to waive their claims of conflict with respect to
> McKinsey's performance of such services, McKinsey might have to
> withdraw from its representation of the Debtors.

*UAL*, Dkt. 52-1 ¶ 19 (emphasis added).   This statement was purposefully vague and false and

misleading, because McKinsey's engagement agreements explicitly permit it to disclose client

identities and other otherwise confidential information concerning the engagement in order to

comply with the law.

79.     Nearly three months later, as part of its scheme to withhold pertinent connections

to avoid disqualification, on February 27, 2003, McKinsey US filed a supplemental affidavit in

which it admitted that at least **ten** Interested Parties in *UAL* were **current McKinsey clients**,

including The Boeing Company, which was listed as a Significant Secured Creditor.  This belated

disclosure came well into the case, after McKinsey US's employment had been authorized by the

bankruptcy court.  And McKinsey US never disclosed that at least another four Interested Parties

(three Significant Secured Creditors and one Significant Unsecured Creditor) were subsidiaries of

a current McKinsey client and Interested Party, JPMorgan Chase.  McKinsey US was required to

disclose all of these connections and conflicts in its initial submission, but willfully and

fraudulently concealed them.   Because of Defendants' fraudulent concealment of those

connections, neither the *UAL* bankruptcy court, the U.S. Trustee, nor any of the Interested Parties

could meaningfully assess the nature and extent of McKinsey's conflicts.  *See* Ex. C ¶¶ 26, 40-44.

80.     Defendants (including McKinsey & Co. and McKinsey US) also concealed likely

dozens of additional McKinsey connections and conflicts related to the approximately 1,400

Interested Parties named in *UAL*.  The facts needed to ascertain the full extent of those connections

are peculiarly within the knowledge of Defendants, including McKinsey & Co. and McKinsey US,

but will be proven through discovery.

*iii.    Mirant*

81.    The *Mirant* bankruptcy was filed in the United States Bankruptcy Court for the Northern District of Texas on July 24, 2003, just months after McKinsey US filed its February 27, 2003 affidavit in *UAL*.  In *Mirant*, McKinsey US submitted just one disclosure affidavit, which it filed three months after the commencement of the case, on October 27, 2003.  McKinsey US's fees for *Mirant* were approved on December 9, 2005.  McKinsey US's disclosure affidavit in *Mirant* is identified as item No. 6 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 5-6 of Exhibit B hereto.

82.    In *Mirant*, Defendants (including McKinsey & Co. and McKinsey US) continued their pattern of unlawful dissemblance and complete disregard for Rule 2014 obligations.  In its disclosure affidavit, McKinsey US failed to name *a single connection* to any Interested Parties. Defendants unlawfully omitted and concealed McKinsey's connections to numerous Interested Parties in *Mirant* that were *current clients* of McKinsey, including, *inter alia*:

| Entity | Interested Party Role (*Mirant*) | McKinsey Connection |
|---|---|---|
| Bank One Corporation | Lender; Bondholder | Client; Subsidiary of Client (*JPMorgan Chase*) |
| Bank One NA | Top 50 Unsecured Creditor | Client and/or Subsidiary of Clients (*JPMorgan Chase and Bank One Corporation*) |
| British Petroleum | Contract Counterparty | Client (*BP plc*) |
| BP America Production Company | Contract Counterparty | Client and/or Subsidiary of Client (*BP plc*) |
| BP Canada Energy Company | Contract Counterparty | Client and/or Subsidiary of Client (*BP plc*) |
| BP Canada Energy Marketing Corp. | Contract Counterparty | Client and/or Subsidiary of Client (*BP plc*) |
| BP Corporation North America Inc. | Contract Counterparty | Client and/or Subsidiary of Client (*BP plc*) |

30

| Entity | Interested Party Role (*Mirant*) | McKinsey Connection |
|---|---|---|
| BP Energy Company | Contract Counterparty | Client and/or Subsidiary of Client (*BP plc*) |
| JPMorgan Chase Bank | Top 50 Unsecured Creditor | Client and/or Subsidiary and Affiliate of Clients (*JPMorgan Chase and Bank One Corporation*) |
| JPMorgan Securities, Inc. | Top 50 Unsecured Creditor | Client and/or Subsidiary and Affiliate of Clients (*JPMorgan Chase and Bank One Corporation*) |
| Kreditanstalt fur Wiederaufbau | Lender; Indenture Trustee | Client |

83.    McKinsey US was required by law to disclose all of these McKinsey connections to *Mirant* Interested Parties in its disclosure affidavit, *see* Ex. C ¶¶ 26-35, 45, but Defendants (including McKinsey & Co. and McKinsey US) willfully and fraudulently concealed them instead.

84.    Once again, McKinsey US falsely stated in its *Mirant* disclosure affidavit that "[b]ecause of its responsibility to maintain strict client confidentiality, McKinsey cannot disclose the services performed, or even in some instances the fact that services were provided for clients." *Mirant*, Dkt. 1457 ¶ 16.   Again, this statement was false or misleading because McKinsey's engagement agreements in fact permit disclosures necessary to comply with the law. *See, e.g.*, Ex. C ¶ 49-50.

85.    McKinsey US's decision to disclose some connections by name months earlier in *UAL* while disclosing none in *Mirant* was driven by the severity of the conflicts represented by the undisclosed connections in the context of the *Mirant* bankruptcy.   All or any one of McKinsey's undisclosed connections would have disqualified McKinsey US from employment as a bankruptcy professional in *Mirant*.   However, because of Defendants' (including McKinsey & Co. and McKinsey US) fraudulent concealment of those connections, neither the bankruptcy court, the U.S.

Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey US's potential conflicts.  *See* Ex. C ¶¶ 26, 40-44.

86.    Defendants (including McKinsey & Co. and McKinsey US) also concealed additional conflicts and connections to the hundreds of Interested Parties in *Mirant*.  The facts needed to ascertain these connections are peculiarly within the knowledge of Defendants, including McKinsey & Co. and McKinsey US, but will be proven through discovery.

<em>iv.    Lyondell Chemical</em>

87.    The *Lyondell Chemical* bankruptcy was filed in the United States Bankruptcy Court for the Southern District of New York on January 6, 2009.  In *Lyondell*, McKinsey US filed two disclosure affidavits: an initial affidavit dated June 17, 2009, and a supplemental affidavit dated September 11, 2009.  McKinsey US's fees for *Lyondell* were approved on April 23, 2010. McKinsey US's disclosure affidavits in *Lyondell* are identified as items No. 7-8 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 6-7 of Exhibit B hereto.

88.    In *Lyondell*, Defendants (including McKinsey & Co. and McKinsey RTS) continued their pattern of unlawfully failing to disclose all of McKinsey's connections to Interested Parties.  In its initial affidavit dated June 17, 2009, McKinsey US once again failed to name a **single** connection to any of the Interested Parties in *Lyondell*—apart from a footnote stating that one McKinsey partner had previously worked at the law firm Skadden, Arps, Meagher & Flom LLP as a summer associate eight years earlier, in 2001—disingenuously suggesting that McKinsey US had conducted a thorough, searching inquiry into McKinsey's many conflicts that yielded only a tenuous connection in the form of a single summer internship.  That clearly was not the case. And in its supplemental affidavit filed three months later, McKinsey US named no connections to Interested Parties.

32

89.     In *Lyondell*, Defendants (including McKinsey & Co. and McKinsey U.S.) unlawfully concealed McKinsey's connections to at least a dozen Interested Parties, including, *inter alia*:

      a.    Allianz Global (*Bondholder*)

      b.    Allianz Global Investors Kapitalanlagegesellschaft (*Bondholder*)

      c.    Allianz Insurance Company (*Insurer*)

      d.    Allianz Netherlands (*Insurer*)

      e.    Allianz Paint Insurance Claim (*Litigation Adversary*)

      f.    BlackRock (*Bondholder*)

      g.    Citibank / Citibank International (*Lender and Co-Defendant*)

      h.    Citigroup Global Markets, Inc. (*Lender and Co-Defendant*)

      i.    Citigroup, Inc. (*Lender and Co-Defendant*)

      j.    OHCCF CBNA Loan Funding (*Lender*)

      k.    Protean CBNA Loan Funding (*Lender*)

      l.    Prudential Financial, Inc. (*Bondholder*)

90.     McKinsey US was required to disclose all of these connections in its submissions in *Lyondell*, *see* Ex. C ¶¶ 26-35, 45, but Defendants (including McKinsey & Co. and McKinsey US) instead willfully and fraudulently concealed them.

91.     As it did in its *UAL* and *Mirant* filings, McKinsey US again sought to excuse its lack of specificity with the false or misleading assertion that "[b]ecause of its responsibility to maintain strict client confidentiality, McKinsey US cannot disclose the services performed, or even in some instances the fact that services were provided for clients." *Lyondell*, Dkt. 2090 ¶ 17.

92.     All or any one of McKinsey's undisclosed connections would have disqualified McKinsey US from employment as a bankruptcy professional in *Lyondell*.   However, because of Defendants' (including McKinsey & Co. and McKinsey US) fraudulent concealment of those connections, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey US's potential conflicts.   *See* Ex. C ¶¶ 26, 40-44.

93.     Defendants (including McKinsey & Co. and McKinsey US) also concealed additional McKinsey conflicts and connections to Interested Parties in *Lyondell*.   The facts needed to ascertain these additional connections are peculiarly within the knowledge of Defendants, including McKinsey & Co. and McKinsey US, but will be proven through discovery.

*v.     Harry & David*

94.     The *Harry & David* bankruptcy was filed in the United States Bankruptcy Court for the District of Delaware on March 28, 2011.   In *Harry & David*, McKinsey RTS filed three false and misleading disclosure declarations, all sworn to and signed by Defendant Seth Goldstrom: an initial Declaration filed on April 4, 2011; a Supplemental Declaration dated April 19, 2011; and a Second Supplemental Declaration dated June 17, 2011.   McKinsey RTS's fees in *Harry & David* were approved on August 29, 2011.   McKinsey RTS's disclosure declarations in *Harry & David* are identified as items No. 9-11 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 7-11 of Exhibit B hereto.

95.     In his initial declaration in *Harry & David* filed on April 4, 2011, Goldstrom failed to name ***a single connection*** between McKinsey and any Interested Parties, thereby continuing Defendants' unlawful pattern of failing to disclose McKinsey's connections.   Two weeks later, on April 19, 2011, in his First Supplemental Declaration, Goldstrom again failed to name a single McKinsey connection.   Two months later, on June 17, 2011, in his (final) Second Supplemental Declaration, Goldstrom named *one* McKinsey connection, stating that until November 30, 2008,

34

the Pension Benefit Guaranty Corporation had been a client of "an affiliate of McKinsey RTS." This single disclosure was woefully inadequate and misleading, as it purposefully gave the false impression that McKinsey RTS's disclosures in *Harry & David* were so diligent and thorough that they even included all Interested Parties who were past McKinsey clients from three years earlier. In reality, Goldstrom failed to disclose even McKinsey's connections to *recent* past clients—much less McKinsey's *current* clients or any other connections to Interested Parties.  For instance, until in or around October 2009, McKinsey had been engaged by the parent company of at least **thirteen companies** named as Interested Parties in *Harry & David*.  Even a cursory effort by Defendants to comply with their disclosure obligations would have revealed McKinsey's connections to those Interested Parties.  Goldstrom's disclosures on behalf of McKinsey RTS should have disclosed these recent connections.  *See* Ex. C ¶¶ 26-35, 45.  Their failure to do so despite McKinsey's experience in multiple bankruptcy cases by this point is further evidence of Defendants' willful disregard of the law regarding conflicts of interest and their serial, unlawful failure to disclose McKinsey's connections to Interested Parties.[24]

96.     Defendants (including McKinsey and Goldstrom) also concealed additional conflicts and connections to Interested Parties in *Harry & David*.  The facts needed to ascertain the full extent of these additional connections are peculiarly within Defendants' knowledge but will be proven through discovery.

---

[24]     In contrast to Goldstrom's disclosures on behalf of McKinsey RTS, when the law firm Jones Day LLP filed a lengthy statement in support of its *initial* application for employment as counsel for debtors in *Harry & David*, it disclosed, by name, connections to over 130 Interested Parties and their corporate affiliates.

<em>vi.    AMR</em>

97.     The *AMR* bankruptcy was filed in the United States Bankruptcy Court for the Southern District of New York on August 29, 2011.   In *AMR*, McKinsey submitted seven disclosure declarations in support of the retention of McKinsey RTS, McKinsey US, and McKinsey & Co., Inc. Japan, and at least four other McKinsey affiliates.[25]   All seven of McKinsey's disclosure declarations were sworn to and signed by Goldstrom: an initial Declaration, filed on January 10, 2012; a First Supplemental Declaration, filed on January 20, 2012; a Second Supplemental Declaration, filed on February 27, 2012; a Third Supplemental Declaration, filed on May 10, 2012; a Fourth Supplemental Declaration, filed on November 13, 2012; a Fifth Supplemental Declaration, filed on February 28, 2013; and a Sixth Supplemental Declaration, filed on April 18, 2013.  McKinsey's fees in *AMR* were approved on October 21, 2013.  McKinsey's disclosure declarations in *AMR* are identified as items No. 12-18 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 11-14 of Exhibit B hereto.

98.     In addition to Goldstrom, Carmody and Proshan were substantially involved in McKinsey's engagement in *AMR* throughout 2012 and 2013, as reflected in McKinsey's five fee applications in *AMR*.  The detail for McKinsey's fee applications in *AMR* reflects that Proshan was the primary person responsible for preparing and revising Goldstrom's disclosure declarations (including gathering relevant information) and that Proshan was in frequent communication with Goldstrom and Carmody as part of that process.

99.     In *AMR*, McKinsey, Goldstrom, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, and Sternfels, intentionally concealed McKinsey's connections to

---

[25]     In McKinsey's Fourth Supplemental Declaration in *AMR*, it amended its disclosures to include, among the McKinsey entities that were retained in that matter, McKinsey & Company Canada; McKinsey & Company, Inc. Belgium; McKinsey & Company, Inc. Italy; and McKinsey & Company, S.L.

36

Interested Parties.  In his initial disclosure declaration in *AMR*, filed on January 10, 2012, Goldstrom failed to name a single connection between McKinsey and any Interested Parties.  In his First Supplemental Declaration, filed on January 20, 2012, Goldstrom disclosed that until March 2011, McKinsey & Co.'s former Managing Director (Rajat Gupta, whom McKinsey did not actually name) had been a board member of the debtor, AMR Corporation ("**AMR**")—a fact that was known to McKinsey on the August 29, 2011 bankruptcy filing date and should have been disclosed in Goldstrom's initial declaration.  Goldstrom also disclosed that two unnamed McKinsey employees had "de minimis" holdings in AMR, which they had been directed to sell down.  Once again, Goldstrom's disclosures gave the purposefully false impression that Defendants had conducted a thorough search for McKinsey's connections to Interested Parties and fully disclosed such connections when they had done neither of those things.

100.  In his Second Supplemental Declaration in *AMR*, filed on February 27, 2012, Goldstrom failed to name any further McKinsey connections.  The same is true of his Third Supplemental Declaration, filed on May 10, 2012.  In his Fourth Supplemental Declaration, filed on November 10, 2012, Goldstrom disclosed, for the first time, vendor contracts with the debtors dating back to 2010.  In his Fifth Supplemental Declaration, filed on February 28, 2013, Goldstrom did not name any McKinsey connections.  Finally, in his Sixth Supplemental Declaration, filed on April 18, 2013, Goldstrom disclosed that McKinsey had been retained by AMR and US Airways to assist in implementing a merger agreement between the two companies.

101.  To avoid disqualification, Defendants clearly made no serious effort to uncover or disclose McKinsey's conflicts and connections to Interested Parties in *AMR*.  For instance, by early January 2012—just two months after *AMR* was filed—McKinsey & Co. was hired by Royal Bank of Scotland to assist it with downsizing.  Royal Bank of Scotland was named as an Interested Party

(Aircraft Lenders and Lessors) in *AMR*, yet Goldstrom never disclosed that Royal Bank of Scotland was a ***current client*** of McKinsey during the *AMR* bankruptcy.

102.    Defendants McKinsey, Goldstrom, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, and Sternfels, also concealed additional disqualifying conflicts and connections to Interested Parties in *AMR*.  The facts needed to ascertain the full extent of these connections are peculiarly within Defendants' knowledge but will be proven through discovery.

103.    All or any one of McKinsey's undisclosed connections would have disqualified McKinsey RTS, McKinsey US, and McKinsey's other affiliates from employment as bankruptcy professionals in *AMR*.  *See* Ex. C ¶ 26.  However, because of knowingly fraudulent concealment of those connections by Defendants (including McKinsey, Goldstrom, Proshan, and Carmody, authorized and aided and abetted by Garcia, Barton and Sternfels) neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey's potential conflicts in order to assess its qualifications or appoint AP or another competitor in McKinsey's stead.  *See* Ex. C ¶¶ 26, 40-44.

### vii.    *AMF Bowling*

104.    The *AMF Bowling* bankruptcy was filed in the United States Bankruptcy Court for the Eastern District of Virginia on November 13, 2012.  In *AMF Bowling*, McKinsey RTS filed one disclosure declaration, sworn to and signed by Carmody, on November 21, 2012.  McKinsey RTS's fees in *AMF Bowling* were approved on June 25, 2013.   McKinsey RTS's disclosure declaration in *AMF Bowling* is identified as item No. 19 in Exhibit A hereto, and specific false and misleading statements therein are identified at page 15 of Exhibit B hereto.

105.    In addition to Carmody, Proshan had substantial involvement in the *AMF Bowling* matter.  The detail for McKinsey RTS's fee applications in *AMF Bowling* reflects that Proshan was the primary person responsible for preparing and revising disclosure affidavits (including

gathering relevant information) in that case, and that Proshan was in frequent communication with Carmody and also in communication with Goldstrom as part of that process.

106. In McKinsey RTS's disclosures in *AMF Bowling*, Defendants (including McKinsey, Carmody, Proshan, and Goldstrom, authorized and aided and abetted by Garcia, Barton, and Sternfels) failed to name a connection to a single Interested Party, thereby concealing McKinsey's connections to likely dozens of Interested Parties. The facts needed to ascertain the full extent of these specific connections are peculiarly within the knowledge of Defendants, including McKinsey, Carmody, Proshan, Garcia, and Goldstrom, but will be proven through discovery.

*viii.    Edison Mission Energy*

107. The *Edison Mission Energy* bankruptcy was filed in the United States Bankruptcy Court for the Northern District of Illinois on December 17, 2012. In *Edison Mission*, McKinsey RTS filed three disclosure declarations, sworn to and signed by Defendant Jared Yerian: an initial declaration filed on December 28, 2012; a First Supplemental Declaration, filed on May 15, 2013; and a Second Supplemental Declaration, filed on November 23, 2013. McKinsey RTS's fees in *Edison Mission* were approved on March 11, 2014. McKinsey RTS's disclosure declarations in *Edison Mission* are identified as items No. 20-22 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 15-17 of Exhibit B hereto.

108. The detail for McKinsey RTS's fee applications for *Edison Mission* reflects that Proshan was instrumental in preparing and revising McKinsey RTS's false and fraudulent disclosures for that case, and that Proshan was in communication with Garcia and Yerian during that process.

109. Yerian was an experienced bankruptcy professional, having worked for twelve years in AP's restructuring practice. In particular, during his tenure at AP, Yerian participated

numerous times in the gathering of disclosure information for Rule 2014(a) submissions and, as a condition of his employment as an AP bankruptcy team member, was familiar with the compliance and disclosure obligations to which bankruptcy professionals are subject.  Despite this experience, in McKinsey RTS's disclosures in *Edison Mission*, Yerian disingenuously failed to name a ***single*** connection to any Interested Parties, and Defendants (including McKinsey, Yerian, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, Goldstrom, and Carmody) thereby concealing connections to likely dozens of Interested Parties.  The facts needed to ascertain all these specific connections are peculiarly within the knowledge of Defendants but will be proven through discovery.

110.    Due to Defendants' years-long pattern of unlawfully omitting and concealing McKinsey's connections to Interested Parties, the full extent of McKinsey's failures to disclose remains unknown.  However, particularly given McKinsey RTS's much lengthier disclosures (which it began to file only after challenges by Alix) in its most recent cases, *Alpha Natural Resources*, *SunEdison*, and *GenOn Energy*, discussed *infra*, McKinsey's undisclosed conflicts and connections to Interested Parties likely number in the hundreds, in addition to those identified herein.

111.    Due to Defendants' unlawful concealment of all but a handful of McKinsey's numerous connections in the eight bankruptcy cases discussed above, AP, the bankruptcy courts, the U.S. Trustee, and the Interested Parties were all unable to determine the nature and scope of McKinsey's conflicts and connections to Interested Parties and, therefore, the qualifications of McKinsey US, McKinsey RTS, or any other McKinsey entity to serve as a bankruptcy professional in those cases.  Many of McKinsey's undisclosed connections constituted ongoing and actual conflicts that, if disclosed, would have required McKinsey's disqualification from employment in

these cases.  Instead, McKinsey obtained employment by virtue of Defendants' unlawful scheme to deliberately conceal McKinsey's numerous conflicts and connections to Interested Parties.

112.    McKinsey's twenty-two false and incomplete Rule 2014 declarations under penalty of perjury in those eight cases, as well as witness testimony, demonstrate that the failure to disclose McKinsey's connections was a conscious, intentional choice by Defendants.  Simply stated, Defendants violated black-letter law so blatantly and so consistently that their actions could only have been deliberate and knowing.

### B. Defendants Have Unlawfully Concealed All of McKinsey's Connections to Interested Parties through Its Investment Arm, MIO.

113.    Defendants have also consistently and unlawfully concealed McKinsey's connections to Interested Parties through its subsidiary MIO, both in its initial eight cases and in its subsequent five engagements, as discussed further, *infra*.

114.    MIO, which is wholly owned by McKinsey & Co., manages billions of dollars in assets for the benefit of both current and former McKinsey employees and partners.

115.    MIO is governed by a board of twelve directors that includes both current and former senior partners of McKinsey & Co.  Garcia, who is a director and officer of McKinsey RTS and a Senior Partner of McKinsey & Co., and who (as President of McKinsey RTS) was involved in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, was also a member of MIO's board of directors from 2006 to 2017—a fact that he had a duty to disclose (but never did).

116.    Many of McKinsey's 30,000 former employees for whom MIO manages assets now work in senior positions at major corporations and government agencies all over the world. From 2001 through the present, McKinsey's disclosure declarations have consistently concealed

41

connections to former McKinsey employees and partners, as well as MIO's connections to Interested Parties in the bankruptcies in which McKinsey has been employed.

117.    As one concrete example, MIO has over $600 million invested in BlackRock funds. Forms filed by McKinsey with the Department of Labor show that MIO has maintained investments in BlackRock since at least 2011.  Since 2011, BlackRock entities have been listed as Interested Parties in four bankruptcies in which McKinsey RTS was hired: *NII Holdings*, *SunEdison*, *Alpha Natural Resources*, and *GenOn*.  However, McKinsey RTS did not disclose this connection in ***any*** of those four cases.  Nor did McKinsey RTS disclose this connection in *SunEdison* when Longroad Energy, which is identified on the *SunEdison* Interested Parties list as a partner of a BlackRock subsidiary, BlackRock Infrastructure, purchased SunEdison's assets in bankruptcy.  And prior to 2011, when BlackRock was named as an Interested Party in *Lyondell*, McKinsey US failed to disclose that BlackRock was a service provider for MIO.

118.    Section 327 of the Bankruptcy Code prohibits McKinsey, as a bankruptcy professional, from imposing on debtor-clients and the debtors' creditors the risk that MIO's investment in BlackRock might impact their professional judgment.  Had Defendants properly disclosed the facts regarding MIO that Rule 2014 requires, McKinsey would and should have been disqualified under Section 327 in each of these cases.  *See* Ex. C ¶ 65.

## V.    Alix Confronts Barton and Sternfels, and McKinsey and AP Reach an Agreement.

119.    On multiple occasions beginning in September 2014, Alix confronted Barton and Sternfels with evidence of McKinsey's repeated violations of bankruptcy law.   As discussed below, during the remainder of 2014 and over the course of the next year, Alix spoke with Barton about McKinsey's conduct in bankruptcy consulting cases on at least eleven occasions, including three lengthy in-person meetings and eight substantive and lengthy telephone conferences. Sternfels participated in at least two of those exchanges.

120.    Alix also advised Barton and Sternfels that he had learned of an unlawful "pay-to-play" scheme whereby McKinsey made offers to bankruptcy attorneys to arrange exclusive meetings between bankruptcy counsel and high-level executives from McKinsey's most valued clients in exchange for exclusive referrals of bankruptcy assignments from those attorneys. These McKinsey clients did not necessarily have current bankruptcy issues, but the introductions were valuable currency to trade for early access and "sole source" selection of McKinsey for the bankruptcy attorneys' matters. It was also valuable to the firm attorneys without bankruptcy practices to gain access to referrals from bankruptcy attorneys. Alix advised Barton and Sternfels that McKinsey's "pay-to-play" offers were illegal. Such trafficking in bankruptcy cases is expressly prohibited under 18 U.S.C § 152(6). *See* Ex. C ¶¶ 87-91.

121.    Throughout these interactions, Alix explained to Barton (and Sternfels when present) the absolute necessity that McKinsey comply with Rule 2014 and cease its illegal "pay-to-play" marketing scheme. He also explained the grave potential consequences of McKinsey's serious past misconduct.

122.    Alix and Barton first met on September 3, 2014 in the Manhattan office of the law firm Gibson, Dunn & Crutcher LLP. At the time, they were in the midst of litigating a dispute involving McKinsey RTS's poaching of AP employees (one of whom, while he was a McKinsey RTS partner, had spoliated evidence while the litigation was pending) who had stolen trade secrets and other confidential information from AP, which they had taken to McKinsey RTS. Sternfels participated by telephone in that first meeting, which lasted from approximately 4:00 p.m. until approximately 6:00 p.m. Subsequently, Alix and Barton met in person on October 16, 2014 and October 15, 2015. Sternfels participated in and/or was advised by Barton regarding the issues of illegality that were discussed during those meetings.

43

123.     During the September 3, 2014 meeting, Alix explained McKinsey's disclosure obligations under bankruptcy law at length to Barton and Sternfels.  Alix provided a lengthy and detailed exposition of the relevant legal principles and demonstrated how all of McKinsey's past disclosure declarations were non-compliant and illegal because they failed to identify connections by name and failed to describe connections in sufficient detail.  Alix also raised McKinsey's pay-to-play scheme and explained to Barton and Sternfels why it, too, was illegal.

124.     Alix further advised Barton and Sternfels that McKinsey's pay-to-play scheme and concealment of connections in its bankruptcy engagements constituted serious and obviously intentional misconduct and that such misconduct could potentially expose the entire firm to criminal prosecution.  Alix explained that McKinsey's representatives had signed inadequate and false disclosure declarations under penalty of perjury and that the bankruptcy process is administered and overseen by the Department of Justice, including the U.S. Trustee, and that failure to fully and truthfully disclose connections is a serious matter.  Alix even apprised Barton and Sternfels of the famous case *United States v. Gellene*, 182 F.3d 578 (7th Cir. 1999), in which a prominent New York City bankruptcy attorney was convicted of filing a false Rule 2014 disclosure declaration in violation of 18 U.S.C. § 152(3) and sentenced to fifteen months in prison.

125.     Nothing that Alix told Barton and Sternfels on September 3, 2014 should have come as a surprise.  McKinsey is a company with around $10 billion in revenue, another $25 billion in investment assets, and ongoing access to some of the most sophisticated legal counsel in the world.  And internally at McKinsey RTS, Garcia, who runs all of McKinsey RTS, holds a JD from Harvard Law School, while Goldstrom, who runs McKinsey RTS's domestic operations, was at the top of his class at the University of Virginia School of Law and is a member in good standing of the Georgia bar.

126.    In response to the information provided by Alix, Barton frankly expressed doubt about McKinsey RTS as a business, while Sternfels expressed support for it and asserted that any illegalities could be rectified.

127.    On the following day, September 4, 2014, Barton called Alix to thank him for the meeting and to advise him that he would look into the issues raised by Alix and they would talk again.

### A.  Barton Admits McKinsey's Pay-to-Play Scheme.

128.    On October 16, 2014, Alix and Barton met in person a second time, at McKinsey & Co.'s offices in London.  During that meeting, Barton informed Alix that he had looked into Alix's allegations regarding McKinsey's pay-to-play scheme.  Barton revealed that he had been upset and angry to learn that McKinsey had, in fact, been making pay-to-play offers to bankruptcy lawyers.  Barton told Alix that he had consulted Eric Friedman, a senior partner at the law firm Skadden, Arps, Meagher & Flom LLP, who advised him that the scheme was illegal.  Barton expressed incredulity that Garcia, Goldstrom, and the McKinsey RTS staff would have engaged in such conduct, acknowledged it was wrong, and confirmed that it never should have happened.  Barton added that Virginia Molino, General Counsel of McKinsey & Co., agreed with his assessment.

### B.  McKinsey and AP Agree to a Resolution.

129.    Both before and after their October 2014 meeting, Barton expressed to Alix his personal disdain for, and grave doubts about, the wisdom of the McKinsey RTS business.  Barton said he did not understand why McKinsey was in the bankruptcy business at all.  He told Alix that many McKinsey partners questioned why McKinsey RTS was created and why McKinsey had gotten involved in the bankruptcy business in the first place.  Barton further stated three times that he personally did not believe McKinsey RTS should continue performing bankruptcy work, which

45

he viewed as inconsistent with McKinsey's "brand."  Barton went on to explain his view that the disclosures legally required of bankruptcy professionals were inconsistent with McKinsey's business model and, accordingly, he did not believe McKinsey should be engaged in businesses where such broad disclosures were required, thereby unwittingly revealing McKinsey's motive for flouting the Bankruptcy Code's disclosure requirements.

130.    Barton proceeded to explain that his re-election as Global Managing Partner of McKinsey & Co. would occur in three months, in January 2015.  He represented that his re-election would solidify his ability to rectify the issues raised by Alix, and implored Alix to hold off on taking action and continue to be patient.  Previously, Barton had asked Alix to be patient and not act on his concerns while Barton looked into the matter.  Barton assured Alix that after his re-election, he would be able to change the situation very quickly, and said he had consulted his predecessor, Ian Davis, who advised him that the way to change problems at McKinsey was to change the people.  Alix responded that he could be patient only if Barton was going to make a meaningful attempt to have McKinsey make full disclosure and comply with the law.  In response, Barton promised that McKinsey would not enter into any further bankruptcy engagements prior to his re-election.

131.    At the October 2014 meeting, Barton (acting on behalf of McKinsey & Co., McKinsey Holdings, and McKinsey US) agreed with Alix (acting on behalf of AP) that within thirty days of Barton's re-election in January 2015, the senior leadership of McKinsey RTS (including Garcia, Carmody, Goldstrom, Mark Hojnacki, and Doug Yakola) would be removed on account of their illegal behavior.  Barton and Alix further agreed that by March 2015, McKinsey would exit the bankruptcy consulting business (including by withdrawing from active McKinsey RTS bankruptcy consulting engagements due to numerous undisclosed conflicts) and transfer

McKinsey RTS's personnel to other McKinsey units.  In exchange, Alix agreed to remain patient and refrain from acting at that time on the issues he had raised, including forbearance from legal action.  Alix did so because he believed that no legal action he could take would resolve McKinsey's conduct any quicker than the actions that Barton had promised.  Barton and Alix each intended to bind their respective firms to this contract and had the requisite authority to do so.

132.    Barton was re-elected on January 30, 2015 but failed to act on his promises to Alix that he would remove Garcia and Goldstrom within thirty days of his re-election.  In March 2015, Alix called Barton to remind him of their agreement.  Barton advised Alix that he would not be able to move as quickly as he had assured Alix he would, but Barton said he would remove Garcia and Goldstrom from their positions by the end of May 2015.

133.    Barton broke his promise.  Garcia and Goldstrom remain in leadership positions at McKinsey RTS, and Defendants continue to conduct their criminal enterprise to the present day.

134.    At 11:00 a.m. on Thursday, October 15, 2015, Alix met with Barton at McKinsey & Co.'s offices in New York City for their eleventh interaction and their third and final in-person meeting.  Once again, Alix confronted Barton regarding McKinsey RTS's continued violations of its disclosure obligations, but Barton deflected Alix's expressions of concern.  Instead, he offered Alix bribes to keep quiet.  Specifically, Barton offered to introduce AP to Fortescue, a large iron ore mining company in Australia that needed consulting services.  Alix immediately declined. Barton then offered to introduce AP to Volvo in Europe, saying they needed AP's help.  Again, Alix immediately declined Barton's offer, which he viewed as a shocking and improper attempt to bribe him.  In over four decades of experience in bankruptcy consulting, no competitor had ever offered Alix any restructuring assignment or introduction of any kind, let alone two very large international consulting assignments during the same meeting.  Barton's offers were blatant

attempted pay-offs and bribes offered in return for Alix dropping the issues he had raised concerning McKinsey's acknowledged pay-to-play scheme and its illegal disclosure declarations. Indeed, these offers followed the same pattern as the pay-to-play allegation that Alix had raised.

135.    As detailed below, it is now abundantly clear that Barton and McKinsey never intended to honor their commitments, but instead made false representations in order to forestall corrective actions by Alix as long as possible, thereby maximizing their fees and increasing McKinsey RTS's foothold in the high-end bankruptcy business at AP's expense.

## VI.    Despite Barton's Representations to Alix, Defendants Unlawfully Conceal McKinsey's Disqualifying Connections in *NII Holdings*.

136.    As Alix subsequently learned, during Barton and Alix's agreed-upon forbearance period, McKinsey RTS was retained as an advisor in the *NII Holdings (Nextel)* bankruptcy, which was filed in the United States Bankruptcy Court for the Southern District of New York on September 15, 2014.   Although AP sought an opportunity to bid or make a pitch for that assignment, it was never given any opportunity to do so.   As an industry leader, AP is typically afforded at least an opportunity to make a pitch for high-end restructuring assignments such as the *NII Holdings* case.   That AP was denied such an opportunity for the *NII Holdings* matter strongly suggests that the influence of McKinsey's illegal "pay-to-play" scheme resulted in a pre-selection of McKinsey RTS.

137.    In *NII Holdings*, Carmody filed two disclosure declarations on behalf of McKinsey RTS: his initial disclosure declaration on October 23, 2014, and a First Supplemental Declaration on November 6, 2014.   Those declarations are identified as items No. 23-24 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 18-22 of Exhibit B hereto.   McKinsey RTS's fees in *NII Holdings* were approved on June 19, 2015.

138.   The difference between the disclosures that Carmody filed on behalf of McKinsey RTS in *NII Holdings* and other matters and those he filed while employed by AP is striking.  When Carmody submitted declarations on AP's behalf in his previous employment, he fully complied with Rule 2014's requirements and regularly identified all of AP's relevant connections by name and in detail.  For example, in *In re American Safety Razor*, No. 10-BK-12351 (Bankr. D. Del.), Carmody, while still working for AP, filed a lengthy Rule 2014 statement that contained seven full pages disclosing specific connections by name and describing the nature of the connection to each party so disclosed.

139.   As in McKinsey's eight previous bankruptcy cases, Carmody's Rule 2014 disclosure declarations in *NII Holdings* unlawfully concealed all of McKinsey's conflicts and connections to Interested Parties.  Once again, McKinsey RTS's disclosures did not identify even a single connection by name, but instead offered vague descriptions of some connections to certain *categories* of Interested Parties, and Carmody represented under oath that McKinsey RTS was "disinterested."  This statement of disinterestedness was false.  Had McKinsey RTS and Carmody told the truth, they would have revealed, *inter alia*, McKinsey's connection to BlackRock Fund Advisors, which was identified on the *NII Holdings* Interested Parties list as a Major Noteholder.  In concealing this conflict in *NII Holdings*, Defendants overlooked MIO's disclosure of its BlackRock investment to the U.S. Department of Labor in its required Form 5500.  But for that disclosure, which was entirely unrelated to the *NII Holdings* bankruptcy, McKinsey's BlackRock conflict would still be hidden.

140.   Had Carmody disclosed all of McKinsey's connections, all or any one of them would have disqualified McKinsey RTS from employment as a bankruptcy professional in *NII Holdings*.  However, because of Defendants' (including McKinsey, Carmody, and Proshan,

authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) fraudulent concealment of those connections, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey RTS's potential conflicts.  *See* Ex. C ¶¶ 26, 40-44.

141.    Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) also concealed additional conflicts and connections to Interested Parties in *NII Holdings*.  The facts needed to ascertain these connections are peculiarly within the knowledge of Defendants but will be proven through discovery.

142.    On November 3, 2014, Alix called Barton to discuss *NII Holdings*.  Barton claimed that he was unaware of the matter, despite his earlier commitment to track all future McKinsey bankruptcy cases, his detailed discussions with Alix regarding McKinsey's inadequate disclosure declarations in other cases, and his promises to rectify McKinsey's illegal conduct.   Barton promised Alix that he "would look into" McKinsey RTS's involvement and disclosures in *NII Holdings*.   Barton never followed up, and McKinsey RTS and Carmody never disclosed any connections by name in *NII Holdings*.

VII.    **Defendants Continue Their Racketeering Activity in *Standard Register*.**

143.    As subsequently disclosed in Carmody's disclosure declaration in *Standard Register*, in or about January 2015, McKinsey RTS was engaged for pre-petition work (and later for the bankruptcy assignment) on yet another bankruptcy case, *Standard Register*.  The *Standard Register* bankruptcy was filed in the United States Bankruptcy Court for the District of Delaware on March 12, 2015.  McKinsey RTS filed one disclosure declaration in *Standard Register*, on March 23, 2015.  That declaration is identified as item No. 25 in Exhibit A hereto and specific false and misleading statements therein are identified at pages 22-23 of Exhibit B hereto.  In

connection with *Standard Register*, McKinsey RTS continues to perform work on claims management and claims evaluation.

144.     The detail for McKinsey RTS's fee applications in *Standard Register* reflects that, in addition to swearing to and signing McKinsey RTS's disclosure declaration, Carmody performed substantial work on the engagement, including by serving as the debtor's Chief Restructuring Officer.

145.     In *Standard Register*, Carmody, on behalf of McKinsey RTS, once again submitted an unlawfully vague, non-specific Rule 2014 disclosure declaration.  As in *NII Holdings*, Carmody and McKinsey RTS failed to identify by name a single connection to any Interested Parties, and Carmody falsely represented under oath that McKinsey RTS was "disinterested."

146.     In *Standard Register*, Carmody failed to disclose (*inter alia*) that the United States Department of Defense, which was on the Interested Parties list, was a major McKinsey client that had paid McKinsey millions of dollars in recent years.  In September 2014 alone, McKinsey had been awarded two two-year contracts worth more than $11 million combined, and in October 2013, it had been awarded a contract worth nearly $16 million.

147.     Carmody also failed to disclose McKinsey's connection to another Interested Party, Southern California Edison, a subsidiary of Edison International.  Less than two years earlier, McKinsey RTS had been hired for the bankruptcy of Edison Mission Energy—also a subsidiary of Edison International.  This recent connection, like McKinsey's multiple large contracts with the Department of Defense, was required to be disclosed and would have been obvious had Defendants made any real effort to comply with their Rule 2014 obligations.[26]

---

[26]     Carmody also failed to disclose, *inter alia*, that multiple McKinsey alumni were employed by Bank of Montreal, the parent of BMO Harris Bank N.A., which was identified on the Interested Party list as a Landlord; or that Sidley Austin LLP, identified as an Ordinary Course Professional, was a service provider to McKinsey's investment arm, MIO.

148.    Had McKinsey RTS and Carmody disclosed McKinsey's connections, all or any one of those connections likely would have disqualified McKinsey RTS from employment as a bankruptcy professional in *Standard Register*.   However, because of Defendants' (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) fraudulent concealment of those connections, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey RTS's potential conflicts.  *See* Ex. C ¶¶ 26, 40-44.

149.    Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) also concealed many other connections to Interested Parties in *Standard Register*.  The facts needed to ascertain those connections are peculiarly within Defendants' knowledge but will be proven through discovery.  However, the insufficiency of Carmody's disclosures in *Standard Register* is made even more apparent by the disclosures that McKinsey RTS later made in *Alpha Natural Resources* and *SunEdison*, beginning with Carmody's initial disclosure declaration in *Alpha Natural Resources* just seven months after McKinsey RTS filed its last fee application in *Standard Register* on October 28, 2015.  In *Alpha Natural Resources* and/or *SunEdison*, McKinsey RTS disclosed that, *inter alia*, the following entities—all of which were named as Interested Parties in *Standard Register*—were **McKinsey clients** or service providers:

| Entity | Interested Party Role(s) (*Standard Register*) | McKinsey Connection(s) (as disclosed in *Alpha Natural Resources* and/or *SunEdison*) |
|---|---|---|
| Allianz SE | Insurer | Client and/or Affiliate of Client (*Allianz Global US*) |
| American Electric Power Company | Utility Provider | Client |
| Anheuser Busch LLC | Parties relating to significant litigation involving the debtors | Client and/or Subsidiary of Client (*Anheuser Busch Companies, Inc.*) |

| Entity | Interested Party Role(s) (*Standard Register*) | McKinsey Connection(s) (as disclosed in *Alpha Natural Resources* and/or *SunEdison*) |
|---|---|---|
| Bank of America Corp. | 50 Largest Unsecured Creditors; Largest Customers | Client |
| Bank of America, N.A. | Secured Creditor | Client |
| Deloitte & Touche LLP | Ordinary Course Professional | Service Provider |
| Deloitte Tax LLC | Ordinary Course Professional | Service Provider and/or Affiliate of Service Provider (*Deloitte & Touche LLP*) |
| Ernst & Young LLP | Ordinary Course Professional | Service Provider |
| General Electric Co. | Parties relating to significant litigation involving the debtors | Client and/or Parent of Client (*GE Capital Corp.*) |
| International Business Machines (IBM) | Significant vendor; Parties relating to significant litigation involving the debtors | Client |
| McGuire Woods LLP | Ordinary Course Professional | Service Provider |
| ML-AI 125 Wacker LLC | Landlord | Client and/or Subsidiary of Client (*Bank of America*) |
| Monsanto Company | Parties relating to significant litigation involving the debtors | Client and/or Affiliate of Client since 2009 (*Monsanto Electronic Material Company, predecessor of SunEdison, Inc.*) |
| Monsanto Research Company | Parties relating to significant litigation involving the debtors | Client and/or Affiliate of Client since 2009 (*Monsanto Electronic Material Company, predecessor of SunEdison, Inc.*) |
| Pacific Gas & Electric Co. | Landlord | Client |
| Skadden, Arps, Slate, Meagher & Flom LLP | Counsel and other advisors retained by other significant parties | Service Provider |
| Thomson Reuters | Ordinary Course Professional | Client; Service Provider |
| United States Steel Corp. | Major Customer | Client |
| Wells Fargo & Company | Secured Creditor | Client |
| Xcel Energy | Utility provider | Client |

150.   In the declarations that it filed in *Alpha Natural Resources* and *SunEdison*, McKinsey RTS did not specify the relevant dates for its disclosed connections.   It merely stated that the disclosed entities had, at some point within the past two years, been McKinsey clients or service providers.   Given the close proximity of *Standard Register* to McKinsey RTS's filings in *Alpha Natural Resources* and *SunEdison*, it is highly likely that many, if not all, of the above-listed connections also should have been disclosed in *Standard Register*.   Further, it is implausible that McKinsey first contracted with all of the above entities in the intervening months between *Standard Register* and McKinsey RTS's disclosures in *Alpha Natural Resources* and *SunEdison*.

151.   Similarly, numerous additional entities which were Interested Parties in both *Standard Register* and *GenOn* were named by Carmody and McKinsey RTS as McKinsey clients and/or service providers in the *GenOn* bankruptcy, which was filed in 2017, including, *inter alia*:

| Entity | Interested Party Role (*Standard Register*) | McKinsey Connection (as disclosed in *GenOn*) |
|---|---|---|
| BW / IP International Inc. | Parties related to significant litigation involving the Debtors | Client and/or Affiliate of Client (*Flowserve Pump Division*) |
| Columbia Gas of Ohio Inc. | Utility Provider | Client |
| Duke Energy | Utility Provider | Client |
| Duke Energy – Charlotte | Utility Provider | Client and/or Subsidiary or Affiliate of Clients (*Duke Energy and Duke Energy Field Services LP*) |
| Duke Energy – Louisville | Utility Provider | Client and/or Subsidiary or Affiliate of Clients (*Duke Energy and Duke Energy Field Services LP*) |
| Duke Energy Progress | Utility Provider | Client and/or Subsidiary or Affiliate of Clients (*Duke Energy and Duke Energy Field Services LP*) |
| Duriron Corporation | Parties related to significant litigation involving the Debtors | Client and/or Affiliate of Client (*Flowserve Pump Division*) |

| Entity | Interested Party Role (*Standard Register*) | McKinsey Connection (as disclosed in *GenOn*) |
|---|---|---|
| Flowserve Corp. | Parties related to significant litigation involving the Debtors | Client and/or Parent of Client (*Flowserve Pump Division*) |
| Flowserve U.S. Inc. | Parties related to significant litigation involving the Debtors | Client and/or Affiliate of Client (*Flowserve Pump Division*) |
| General Electric Co. | Parties related to significant litigation involving the Debtors | Client and/or Parent or Affiliate of Clients (*General Electric International, Inc., GE International, Inc., GE Betz Inc., GE Water & Process Technologies, GE Control Solutions, Inc., GE Infrastructuresensing, Inc., GE Inspection Technologies, Inc., and GE Energy Services*) |

152.     In Carmody's Rule 2014 declarations filed on behalf of McKinsey RTS in *GenOn*, Carmody does not specify the relevant dates for McKinsey's belatedly disclosed connections. Instead, Carmody merely states that those entities were, at some point in the past two years, McKinsey clients or service providers.  Given the close proximity of *GenOn* to *Standard Register* and McKinsey RTS's failure to name a single connection in *Standard Register*, McKinsey's *GenOn* connections almost certainly existed at the time it was required to make its *Standard Register* disclosures, but Carmody failed to disclose those connections.  In *Standard Register*, Bank of America was a particularly significant concealed connection because it was one of the debtors' fifty largest unsecured creditors and one of the debtors' largest customers.  Another significant concealed McKinsey client was IBM, which was one of the debtors' largest vendors and subcontracting vendors.

153.     In addition, although Carmody admitted in purposefully vague terms in his *Standard Register* disclosure declaration that McKinsey was serving clients with interests adverse to the debtors, Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and

abetted by Garcia, Barton, Sternfels, and Goldstrom) concealed both the identities of these clients and the actual nature of these adverse interests.  Carmody's declaration in *Standard Register* stated only: "Certain members of McKinsey RTS's Staff serving the debtors currently serve or in the past three years have served one of the Parties relating to significant litigation involving the debtors."  Carmody also stated (without disclosing any names or the nature of the work performed): "Members of McKinsey RTS currently serve or in the past three years have served seven of the Parties relating to significant litigation involving the debtors and three affiliates of Parties relating to significant litigation involving the debtors."  In each instance, Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) concealed the facts necessary to ascertain whether these matters—which were litigation matters involving the debtors—posed disqualifying conflicts.

154.    Again, all or any one of the foregoing undisclosed connections would have disqualified McKinsey RTS from acting as a bankruptcy professional in *Standard Register*. However, because of Defendants' fraudulent concealment, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey's conflicts and connections to Interested Parties.  *See* Ex. C ¶¶ 26, 40-44.

155.    Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) also concealed additional conflicts and connections to Interested Parties in *Standard Register*.  The facts needed to ascertain these connections are peculiarly within Defendants' knowledge but will be proven through discovery.

156.    Absent Defendants' misconduct, there is a strong likelihood that AP would have been employed in *Standard Register*, particularly given its market position and the fact that AP had provided services to Standard Register in the past.

157.    Alix confronted Barton regarding McKinsey RTS's *Standard Register* engagement during a phone call on May 14, 2015.  As with the *NII Holdings* engagement, Barton told Alix that he had been unaware of the case and promised that he would look into it and follow up.  Barton also told Alix that he would announce his decision to terminate Garcia as President of McKinsey RTS internally on or by May 29, 2015.  He asked Alix to remain quiet until then, as his plan had not yet been announced within McKinsey.

158.    Barton broke those promises to Alix.  Garcia continues to lead McKinsey RTS, and McKinsey RTS never submitted adequate disclosures in *Standard Register*.

**VIII.    Defendants' Racketeering Activity Continues in *Alpha Natural Resources*.**

159.    Alpha Natural Resources filed for bankruptcy in the United States Bankruptcy Court for the Eastern District of Virginia on August 3, 2015.   Carmody filed five disclosure declarations on behalf of McKinsey RTS in that case: an initial declaration, filed on August 24, 2015; a First Supplemental Declaration, filed on November 9, 2015; a Second Supplemental Declaration, filed on March 25, 2016; a Third Supplemental Declaration, filed on May 19, 2016; and a fourth supplemental declaration, filed on August 5, 2016.  Those declarations are identified as items No. 26-28, 30, and 33 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 24-56 of Exhibit B hereto.

160.    In *Alpha Natural Resources*, Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) not only continued, but accelerated, their racketeering activity.  As discussed below, Defendants' crimes and racketeering activity in *Alpha Natural Resources* included:

    a.    Submitting declarations that unlawfully concealed and falsely denied McKinsey's connections to Interested Parties;

b.    Submitting declarations that unlawfully concealed McKinsey's connection to its client United States Steel Corporation ("**United States Steel**"), which was a major coal customer of debtor Alpha Natural Resources, and which McKinsey was simultaneously assisting in reducing its coal costs at Alpha Natural Resources' expense; and

c.    Making false statements to the U.S. Trustee's Office, which is part of the United States Department of Justice, regarding the completeness of McKinsey RTS's disclosure declarations in order to induce the U.S. Trustee to withdraw its motion to compel McKinsey RTS to comply with Rule 2014.

### A.  McKinsey RTS's Failure to Disclose Its Connections in *Alpha Natural Resources*.

161.   On August 24, 2015, Carmody filed an initial disclosure declaration on behalf of McKinsey RTS in support of its application for employment in *Alpha Natural Resources*.  As in the disclosures submitted by McKinsey in previous bankruptcy cases, Carmody described McKinsey's connections only in vague and generic terms.  For example, Carmody merely revealed that McKinsey had a connection to a "Major Customer" or "Major Competitor"—rather than identifying any of those connections by name as required by law.  Indeed, Carmody did not even describe McKinsey's pre-petition relationship with the debtor, Alpha Natural Resources, as required by law.

162.   In the year that followed his initial declaration, Carmody filed ***four*** supplemental declarations in *Alpha Natural Resources*.  Yet he failed to name ***any*** of McKinsey's connections to Interested Parties until he was forced to do so after the U.S. Trustee filed a motion to compel against McKinsey RTS, which led to Carmody filing his Third Supplemental Declaration on May 19, 2016, nine-and-a-half months after his initial declaration.  In his extremely belated disclosures,

Carmody revealed (*inter alia*) that at least eighteen (18) Interested Parties were current or very recent McKinsey **clients**, including eight Secured Term Loan Lenders; eight Revolving Facility Lenders; five Depository and Disbursement Banks; four Major Competitors; three Major Equity Holders; a Major Unsecured Noteholder; a Professional, Consultant, or Service Provider; a Lender under A/R Facility; a Party to a Joint Venture; a Major Customer; a Second Lien Noteholder; and an Insurer.

163.    Carmody's initial and supplemental declarations were drafted in close consultation with Proshan with the intent of minimizing McKinsey RTS's disclosures, in flagrant and deliberate violation of Section 327 and Rule 2014.

164.    The bulk of Carmody's disclosures by name in *Alpha Natural Resources* were not made until August 5, 2016—**more than eleven months** after his initial inadequate disclosure, and almost one month after the bankruptcy plan was confirmed and the case was effectively over.  In his extremely belated disclosures, Carmody further revealed **more than two dozen additional McKinsey clients**, including six Major Customers; five Insurers; five Parties to Material Unexpired Leases with the Debtors; three Revolving Facility Lenders; three Major Equity Holders; three Major Unsecured Noteholders; two Beneficiaries of Letters of Credit; two Secured Term Loan Lenders; one of the "Largest Unsecured Creditors (Excluding Noteholders)"; one Party to a Material Contract with Debtors; one Party to a Joint Venture; one Material Surety; one Second Lien Noteholder; and one Major Competitor.  Carmody also revealed that more than a dozen entities identified as Professionals, Consultants and Service Providers in *Alpha Natural Resources* were also current or recent service providers to McKinsey, and at least three of them were also McKinsey clients.

165.    By engaging in extreme delay in submitting McKinsey RTS's required disclosures in *Alpha Natural Resources*, Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) acted in bad faith and ensured that McKinsey RTS would be too entrenched to be dismissed on conflict grounds at that point, with its work largely completed, and millions of fees already charged.  *See* Ex. C ¶ 33.

166.    Moreover, despite submitting *five* declarations by Carmody in *Alpha Natural Resources* and purporting to have exhaustively searched for and named all its connections to Interested Parties, McKinsey RTS clearly failed to do so once again—even though it was compelled three times to do so by the U.S. Trustee and by order of the bankruptcy court.  For instance, in the Interested Parties list for *Alpha Natural Resources*, BlackRock Advisors LLC was named as a Major Unsecured Noteholder and BlackRock Fund Advisors was named as a Major Equity Holder.  Yet McKinsey RTS and Carmody failed to disclose that McKinsey's investment arm, MIO, ***holds investments in BlackRock, and BlackRock is a McKinsey client***.[27]

167.    McKinsey's known but undisclosed connections in *Alpha Natural Resources* include, *inter alia*:

| Entity | Interested Party Role (*Alpha Natural Resources*) | McKinsey Connection(s) |
| --- | --- | --- |
| Black Rock Advisors LLC | Majored Unsecured Noteholder | Investment (through MIO); Client or Affiliate of Client |
| BlackRock Fund Advisors | Major Equity Holder | Investment (through MIO); Client or Affiliate of Client |
| Dominion Transmission, Inc. | Beneficiary of Letter of Credit | Subsidiary or Affiliate of McKinsey Client/Payor in *SunEdison* bankruptcy (*Dominion Energy, Inc.*) |
| Hudson Bay Capital Management | Major Equity Holder | Investment (through MIO) |

---

[27]    McKinsey RTS and Carmody also failed to mention, *inter alia*, that in 2014, McKinsey Senior Partner Salim Ramji joined BlackRock as its global head of corporate strategy.

| Entity | Interested Party Role (*Alpha Natural Resources*) | McKinsey Connection(s) |
|---|---|---|
| Illinois Department of Natural Resources | Government and Regulatory Agencies | Affiliate of Client (*State of Illinois*) |
| Illinois Environmental Protection Agency | Government and Regulatory Agencies | Affiliate of Client (*State of Illinois*) |
| Nomura Securities Co., Ltd. | Major Equity Holder | Investment (through MIO) |
| NRG Power Marketing LLC | Major Customer | Client and/or Affiliate of Clients (*NRG Energy, Inc. and NRG Yield, Inc.*) |
| Pinebridge Investments LLC | Secured Term Loan Lender | Non-Executive Chairman of Pinebridge Investments LLC, *John L. Thornton*, was also a member of the McKinsey Advisory Council |
| Public Service Company of Colorado | Major Customer | Client and/or Subsidiary of Client (*Xcel Energy Inc.*) |
| RBC Global Asset Management, Inc. | Major Equity Holder | *Toos Daruvala*, a McKinsey partner who is now Co-CEO of MIO, began serving on the board of directors of parent company the Royal Bank of Canada since 2015. |
| SSgA Funds Management, Inc. | Major Equity Holder | Investment (through MIO) |
| UBS Financial Services, Inc. | Major Equity Holder | Investment (through MIO) |
| Wells Fargo | Depository and Disbursement Banks | Client |
| Wells Fargo Bank, N.A. | Revolving Facility Lender | Client |

168.    McKinsey RTS was required by law to disclose all of its connections to Interested Parties, including those described above, *see* Ex. C ¶¶ 29-34, 45, but Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) willfully and fraudulently concealed them instead.

169.    Additionally, at least one Interested Party in *Alpha Natural Resources*, Duke Energy Progress (identified as a Major Customer), was disclosed months later as a McKinsey client

(or affiliate thereof) in *GenOn*.  And in September 2016, Ulster Bank, a Royal Bank of Scotland subsidiary and affiliate of Interested Party RBS Greenwich Capital (a Revolving Facility Lender) was publicly reported as being a McKinsey client.  The proximity of these announcements to McKinsey RTS's disclosures in *Alpha Natural Resources* suggests these contacts may have also been disclosable in *Alpha Natural Resources*.

170.    All or any one of McKinsey's undisclosed connections would have disqualified McKinsey RTS from employment in *Alpha Natural Resources*.  However, because of Defendants' (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) fraudulent concealment of those connections, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey RTS's potential conflicts.  *See* Ex. C ¶¶ 79-80.

171.    Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) also concealed additional connections to Interested Parties in *Alpha Natural Resources*.  The facts needed to ascertain these connections are peculiarly within Defendants' knowledge but will be proven through discovery.

172.    In *Alpha Natural Resources*, McKinsey RTS also began its practice of disclosing connections in stages, waiting until the case had progressed significantly and its own position was deeply entrenched before identifying any connections to significant Interested Parties by name.

173.    For example, in his third supplemental declaration filed on behalf of McKinsey RTS on May 19, 2016, after Alpha Natural Resources' plan had already been negotiated and circulated to creditors, Carmody belatedly disclosed that ***McKinsey, in fact, represented most of Alpha Natural Resources' first-lien lenders***, including the following entities:

- 3i Debt Management US LLC (*Secured Term Loan Lender*)
- Allianz Global US (*Secured Term Loan Lender*)

- Apollo Global Management LLC (*Secured Term Loan Lender; Revolving Facility Lender*)

- Bank of America, N.A. (*Secured Term Loan Lender*)

- Citigroup Global Markets, Inc. (*Revolving Facility Lender*)

- JPMorgan Chase Bank, N.A. (*Secured Term Loan Lender; Revolving Facility Lender*)

- Onex Credit Partners, LLC (*Secured Term Loan Lender*)

- Sumitomo Mitsui Banking Corporation (*Revolving Facility Lender*)

- UBS Stamford Branch TRS (*Revolving Facility Lender*)

174.    Although all of these entities were named as Interested Parties at the outset of the case, Carmody failed to disclose them (or to name any other significant Interested Parties) in his initial disclosure declaration—or in his First Supplemental Declaration, or in his Second Supplemental Declaration.  Even worse, McKinsey's undisclosed clients included at least one additional creditor that acquired Alpha Natural Resources' assets in bankruptcy: Wells Fargo. McKinsey RTS and Carmody *never* disclosed that Wells Fargo was a McKinsey client, even though Wells Fargo was listed as an Interested Party at the outset of *Alpha Natural Resources*— and even though Carmody supplemented his disclosures on behalf of McKinsey RTS four times, for a total of five declarations in that case.

175.    Defendants' motivation for the egregious delays and omissions in Carmody's disclosures in *Alpha Natural Resources* is obvious.  McKinsey RTS's undisclosed creditor connections were disqualifying under the law because they rendered McKinsey incapable of offering undivided loyalty to debtor Alpha Natural Resources.  The interests of a bankruptcy estate and its various creditors are classically adverse. As a bankruptcy fiduciary, McKinsey RTS was charged with maximizing the value of the estate for the benefit of all creditors; its advice and

recommendations become tainted when McKinsey also provides service to *particular* estate creditors and has undisclosed relationships from which it benefits.

176.    Apart from the fact that McKinsey RTS and Carmody failed to disclose that numerous creditors were McKinsey clients, they also failed to disclose that numerous McKinsey alumni were employed by various creditors as executives.  These connections further undermined McKinsey RTS's representation of Alpha Natural Resources and should have been disclosed.  Disclosure of these connections was required because such creditors have a potential strategic advantage by virtue of their inside knowledge of, and concealed relationships with, McKinsey, which they could leverage in negotiations over the structure of the bankruptcy plan.  These interpersonal connections could also impact McKinsey RTS's structuring of the bankruptcy plan, as McKinsey and its former employees have ongoing financial and referral relationships that extend beyond any particular bankruptcy at hand.  McKinsey is likely to be sensitive to the future success and influence of its former employee network and this may color any particular recommendation to Alpha Natural Resources, with McKinsey having an eye to advancing the interests of strategically positioned former employees.

177.    Had McKinsey RTS and Carmody timely disclosed McKinsey's extensive connections to Interested Parties in *Alpha Natural Resources*, McKinsey RTS would have been disqualified from employment.  *See* Ex. C ¶¶ 79-80.  Instead, Defendants (Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) concealed these connections, even as McKinsey met numerous times with its own clients (to whom it owed separate duties) to negotiate those clients' acquisition of the debtor Alpha Natural Resources' property while McKinsey RTS was earning millions in fees from Alpha Natural Resources' bankruptcy estate.

### B. McKinsey Simultaneously Represents the Debtor and United States Steel, a Concealed McKinsey Client, in Contract Negotiations.

178.    One of the many connections that Defendants (including McKinsey, Carmody, Garcia, and Proshan) are known to have unlawfully concealed for nearly a year in *Alpha Natural Resources*, United States Steel, constituted yet another one of McKinsey RTS's irreconcilable and disqualifying conflicts of interest.  While McKinsey RTS was obligated to work to use its best efforts to maximize the value of Alpha Natural Resources' bankruptcy estate, McKinsey was ***simultaneously*** assisting one of Alpha Natural Resources' largest customers, United States Steel, in reducing the amount it paid to its coal suppliers, including Alpha Natural Resources. Accordingly, although McKinsey was being paid to maximize the value of Alpha Natural Resources' assets, it was simultaneously being paid to diminish the value of one of those same assets: its supply contract with United States Steel.  This undisclosed connection was a flagrant, direct, intentional, and disqualifying conflict of interest and a clear, unconscionable breach of McKinsey RTS's duty of loyalty to Alpha Natural Resources—a direct conflict.  For nearly an entire year, until August 5, 2016, McKinsey RTS and Carmody failed to disclose that United States Steel was a client.  Absent this unlawful failure to disclose this disqualifying connection, AP likely would have received the business.

179.    Moreover, at least two senior McKinsey RTS consultants with leadership positions on the *Alpha Natural Resources* bankruptcy engagement played roles on ***both sides*** of Alpha Natural Resources' sales of coal to United States Steel during that period.  In connection with the *Alpha Natural Resources* bankruptcy, Rajesh Krishnan, a McKinsey Senior Vice President and McKinsey & Co. partner, and Richard Sellschop, a McKinsey & Co. partner and Practice Leader, billed Alpha Natural Resources almost $2 million in bankruptcy fees on behalf of McKinsey RTS.  ***At the same time***, Krishnan and Sellschop were also billing United States Steel on its coal cost

reduction project.  Although other McKinsey consultants warned Krishan and Sellschop that this was a direct conflict, they proceeded anyway, with the support of senior leaders at McKinsey.  If these connections and conflicts of interest had been disclosed, McKinsey RTS would have been disqualified.

180.   McKinsey RTS's egregious conflict of interest with respect to United States Steel was never disclosed.  Carmody's references to this clear conflict in his disclosure declarations in *Alpha Natural Resources* were deliberately vague, misleading, parsed, inadequate, and plainly designed to mislead and conceal.  In both his initial declaration and his First Supplemental Declaration in *Alpha Natural Resources*, Carmody stated: "Members of McKinsey RTS, in the past three years, have served one Major Customer of the Debtors on procurement in the coal sector generally but with no specific focus on the Debtors or these chapter 11 cases."  As an initial matter, this disclosure was plainly deficient because it failed to name the "Major Customer" referenced.  Even more egregiously, Carmody's seemingly innocuous disclosure about "general" work that McKinsey RTS team members had performed "in the past three years" was materially misleading because it failed to disclose that McKinsey RTS members were engaged in ***current*** work that was adverse to and sought to directly impact the value of the bankruptcy estate.  *See* Ex. C ¶¶ 79-80.

181.   In his fourth supplemental declaration, filed on August 5, 2016, Carmody named United States Steel as a current or recent client of McKinsey.  However, Carmody failed to identify United States Steel as the "Major Customer" that McKinsey had advised on coal procurement strategy, or that McKinsey's work was in fact concurrent with, and adverse to, McKinsey RTS's engagement in *Alpha Natural Resources*.

182.   Thus, Carmody's statements in *Alpha Natural Resources* were designed to mislead and conceal pertinent facts in several respects:

a.   By failing to name the "Major Customer," United States Steel (an industrial powerhouse and a major, long-term client of McKinsey), Carmody's declarations concealed the magnitude and significance of this serious conflict;

b.   By stating that McKinsey RTS members "have served" an unnamed "Major Customer" of the debtor "in the past three years," Carmody's declarations concealed that McKinsey RTS members *were currently serving* that Major Customer;

c.   By referring to an unspecified project generally involving "procurement in the coal sector," Carmody's declarations concealed that the project was, in fact, an explicit *cost-reduction* project aimed at reducing Alpha Natural Resources' income from United States Steel; and

d.   Carmody's representation that McKinsey's engagement involving "procurement in the coal sector" had "no specific focus on the Debtors" was false.  The fact that the United States Steel project did not focus on Alpha Natural Resources *alone* does not mean that it did not have a "specific focus" on reducing United States Steel's payments to Alpha Natural Resources and, therefore, a direct impact on Alpha Natural Resources' revenue as it struggled to survive through Chapter 11.

**C. Defendants Mislead and Fraudulently Induce the U.S. Trustee to Withdraw Two Separate Motions Challenging McKinsey RTS's Disclosure Declarations.**

183.   On May 3, 2016, after having been alerted of McKinsey RTS's wrongdoing by Alix, the U.S. Trustee filed a motion in *Alpha Natural Resources* to compel McKinsey RTS to comply with Rule 2014's disclosure requirements.  In that motion, the U.S. Trustee asserted: "Rigorous compliance with Rule 2014 is critical to the integrity and transparency required of the

bankruptcy system." *Alpha Natural Resources*, Dkt. 2308 at 2.  The U.S. Trustee further stated that "McKinsey RTS's disclosures are insufficient to satisfy Bankruptcy Rule 2014" and Carmody's disclosure declarations on behalf of McKinsey RTS "***give the appearance of compliance without actually complying with Bankruptcy Rule 2014***." *Id.* at 11 (emphasis added).

184.    While that motion was pending, McKinsey RTS made representations to the U.S. Trustee that it would file a full and detailed supplemental disclosure declaration that complied with the law.  Based on those representations, the U.S. Trustee withdrew its motion to compel.

185.    However, McKinsey RTS's amended disclosure declaration, Carmody's Third Supplemental Declaration, filed on May 19, 2016, more than eight months after McKinsey RTS's retention, continued to conceal a significant number of McKinsey's connections in violation of Rule 2014.  Carmody's Third Supplemental Declaration only identified by name only a small number of McKinsey's dozens of currently known connections to Interested Parties in *Alpha Natural Resources*.

186.    On June 6, 2016, Alix, through his affiliate, Mar-Bow Value Partners, LLC ("**Mar-Bow**"), filed a motion to compel McKinsey RTS to disclose the numerous connections that it had knowingly failed to disclose in its four prior submissions in *Alpha Natural Resources*.  No Interested Parties joined Mar-Bow's motion.

187.    On July 1, 2016, the *Alpha Natural Resources* court granted Mar-Bow's motion to compel.  In so doing, the bankruptcy court expressly ruled that McKinsey's longstanding and self-invented approach to Rule 2014—disclosure by "descriptive category" rather than by specific identification of connections by name—was invalid.[28]

---

[28]    *Alpha Natural Resources*, Dkt. 2895 (Order Compelling McKinsey Recovery & Transformation Services U.S., LLC, Turnaround Advisor for the Debtors, to Comply with the Requirements of Bankruptcy Rule 2014).

188.    Thus, on August 5, 2016, under intense pressure from Mar-Bow, the U.S. Trustee, and the bankruptcy court, in his fourth supplemental declaration submitted on behalf of McKinsey RTS in *Alpha Natural Resources*, Carmody further identified some additional connections by name, but continued to conceal others, misleading the court, the U.S. Trustee, and all other parties.

189.    The many additional disclosures made in Carmody's third and fourth supplemental declarations in *Alpha Natural Resources*, made only after motions to compel were brought against McKinsey RTS, demonstrate that Defendants (including McKinsey, Carmody and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) misled and induced the U.S. Trustee to abandon its motion to compel, and were acting pursuant to a deliberate scheme to evade McKinsey's Rule 2014 obligations, complying only when forced by an adverse federal court order, and even then only partially and incrementally.

190.    Despite the bankruptcy court's order compelling McKinsey RTS to supplement its disclosures, Defendants persisted in concealing that McKinsey was simultaneously assisting United States Steel in reducing the price it would pay Alpha Natural Resources for coal ***and*** representing Alpha Natural Resources as a fiduciary in the bankruptcy.  Indeed, throughout the bankruptcy case, Defendants (including McKinsey, Carmody and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) continued to conceal the fact that McKinsey had ***any*** connections with United States Steel until Carmody's ***fifth*** disclosure declaration, which was filed more than one month ***after*** the bankruptcy case ***was over*** and Alpha Natural Resources' plan of reorganization had been confirmed—approximately twelve months after McKinsey RTS had been hired and filed Carmody's initial disclosure declaration.

191.    Defendants (including McKinsey, Carmody and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) also continued to conceal McKinsey's

connection to NRG Energy, even though NRG Energy's subsidiary or affiliate NRG Power Marketing, LLC was listed as a Major Customer on the Interested Parties list at the outset of the *Alpha Natural Resources* bankruptcy. NRG Energy and its affiliate NRG Yield, Inc. were current or recent clients of McKinsey, and NRG Energy had purchased assets of several companies that McKinsey had previously represented in bankruptcy and which were current or recent past clients of McKinsey.

192.    As the bankruptcy process drew towards completion, Alpha Natural Resources' debtor-in-possession lenders—at least some of whom were also McKinsey clients—ultimately acquired nearly all of Alpha Natural Resources' assets. Ultimately, with McKinsey RTS's "turnaround" help, Alpha Natural Resources transferred its best assets to McKinsey's banking clients, most of whom Defendants concealed throughout the case. Had McKinsey RTS and Carmody properly disclosed these client relationships as mandated by law, McKinsey RTS would have been disqualified.

### D.  Defendants Fail to Disclose McKinsey's Direct Financial Interest in the Outcome of the *Alpha Natural Resources* Bankruptcy.

193.    At the conclusion of the *Alpha Natural Resources* bankruptcy, a company named Contura, on behalf of Alpha Natural Resources' First Lien Lenders, acquired Alpha Natural Resources' most valuable assets pursuant to the plan of reorganization. Contura was incorporated in the State of Delaware on June 10, 2016 for the specific purpose of acquiring and operating Alpha Natural Resources' core coal operations as part of Alpha Natural Resources' restructuring. On July 26, 2016, Contura acquired certain assets of Alpha Natural Resources, including its ongoing coal mining operations, and began coal mining operations that same day. This date, July 26, 2016, coincided with Alpha Natural Resources' emergence from Chapter 11 bankruptcy protection.

194.     In furtherance of Alpha Natural Resources' bankruptcy restructuring, hedge fund company Whitebox Advisors LLC ("**Whitebox**") purchased enough First Lender Lien claims to receive 11% of the original shares of the newly formed Contura.  The price of Contura's shares, which traded at $16.88 on August 18, 2016, rose to $71.00 per share on December 30, 2016, a mere four months later.  This represented an increase of 321%.

195.     Incredibly, McKinsey Master Retirement Trust, which is administered by the nine current and three former senior leaders at McKinsey who comprise MIO's board, owned a $110 million interest in Whitebox.  Whitebox, in turn, owned an 11.1% interest in Contura, and McKinsey's investment in Whitebox increased in value by $50,488,357 as a result of its interest in Contura between its first trading date in mid-2016 and the end of 2016.

196.     In *Alpha Natural Resources*, McKinsey RTS was required to disclose its connection with Whitebox and the First Lien Lender claims that resulted in Contura shares under the plan to the bankruptcy court and the U.S. Trustee *in camera*, pursuant to the bankruptcy court's order granting Mar-Bow's motion to compel.  Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) deliberately ensured that McKinsey RTS failed to do so.

197.     Throughout the *Alpha Natural Resources* bankruptcy, Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) unlawfully concealed McKinsey's disqualifying connections with Whitebox and the First Lien Lender claims that resulted in Whitebox acquiring Contura shares under the plan. By the time the plan took effect, Whitebox was one of the largest First Lien Lenders.  That position enabled Whitebox to acquire over 11% of Contura's common stock through Alpha Natural Resources' plan.

198.    On July 6, 2016, Carmody provided critical written "feasibility" testimony[29] supporting confirmation of Alpha Natural Resources' reorganization plan—a plan that ultimately profited McKinsey (as an investor) by over $50 million.   Then, one month later, during his deposition on August 16, 2016, Carmody confirmed his knowledge of this undisclosed but immensely profitable McKinsey connection:

> Q. . . . Well, do you know who any of the first lien lenders are in the ANR case or were?
>
> A. Yeah. I have a few of the names, yeah.
>
> Q. Okay. Tell us the names you do have.
>
> A. So Highbridge was involved in the first lien. ***Whitebox would have been another fund that was in the first lien.*** Davidson Kempner.  I think at some point Citi.  I'm not sure if they still are, but they were involved in the first lien.  Those are the four that come to mind right now.

*Alpha Natural Resources*, Dkt. 3360-1 (Carmody Deposition Tr., Aug. 16, 2016) at 110:24-111:8 (emphasis added).   In neither instance did Carmody or McKinsey RTS disclose McKinsey's interest in Whitebox or its other concealed connections.

199.    Carmody and McKinsey RTS violated their fiduciary obligations to the bankruptcy court and their disclosure obligations under Rule 2014 when they concealed from the bankruptcy court at plan confirmation their knowledge that Whitebox was a first lien creditor; that as a result, Whitebox would acquire a valuable equity position in Contura; and that MIO had an undisclosed $110 million investment in Whitebox and, therefore, a financial stake in Contura.

200.    Notably, if McKinsey RTS and Carmody had timely disclosed McKinsey's known connections to Whitebox, then McKinsey's connection to the First Lien Lender claims that resulted

---

[29]    *Alpha Natural Resources*, Dkt. 2960 (Declaration of Kevin Carmody in Support of Confirmation of Second Amended Joint Plan of Reorganization of Debtors and Debtors in Possession).

in McKinsey's interest in Contura shares under the plan through Whitebox would also have come to light.  As Defendants knew, those disclosures necessarily would have resulted in McKinsey RTS's disqualification under 11 U.S.C. § 327.  *See* Ex. C ¶¶ 79-80.

201.   As a June 19, 2018 Wall Street Journal article revealed, McKinsey's investments in Whitebox also gave it a stake in five other bankruptcies in which Defendants concealed McKinsey's connection to Whitebox: *UAL*, *AMR*, *Edison Mission*, *NII Holdings*, and *SunEdison*.

202.   Although the *Alpha Natural Resources* court and the U.S. Trustee were actually deceived by Defendants into concluding that McKinsey RTS was disinterested and proceeded to finalize Alpha Natural Resources' reorganization, the Whitebox revelations set forth above eventually became public.  As a result, on July 31, 2018, the U.S. Trustee acknowledged that McKinsey RTS's disclosures in *Alpha Natural Resources* were inadequate and warrant additional investigation.  Specifically, regarding the ties between McKinsey RTS, Whitebox, and Contura, the U.S. Trustee stated, in its July 31, 2018 filing supporting the re-opening of *Alpha Natural Resources*:

> In its Motions, Mar-Bow has raised new allegations that may call into question both the settlement of the Motion to Compel and this Court's finding of disinterestedness. Thus, the U.S. Trustee supports the Motion to Reopen in order to investigate these previously unknown allegations.
>
> In particular, Mar-Bow alleges that "McKinsey profited over $50 million for its partners and other pension beneficiaries as a result of its interest in Whitebox" and, further, that "McKinsey's ownership interest in Whitebox and thus indirect acquisition of estate assets under the plan has a direct bearing on McKinsey's disinterestedness and had to be fully disclosed." Judgment Relief Motion, pp. 4-5.
>
> In making these allegations, Mar-Bow asserts that RTS had knowledge of an MIO investment in Whitebox. By contrast, RTS has maintained throughout these cases that it had no information about or access to MIO's investments because MIO operates as a blind trust.

> The Judgment Relief Motion shows that at least some MIO investment information is available through MIO's public reports to the United States Department of Labor (the "Labor Department"). The Labor Department has described its reporting form as, among other things, "a disclosure document for plan participants and beneficiaries . . . to protect the rights and benefits of participants and beneficiaries under employee benefit plans." Department of Labor, Instructions for Form 5500 Annual Return/Report of Employee Benefit Plan at 40 (2016), https://www.dol.gov/sites/ default/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2016-instructions.pdf.
>
> At a minimum, the Labor Department disclosures raise new questions about whether RTS and its employees had knowledge about MIO's investments in interested parties when it made both its public and its in-camera disclosures in this case.
>
> For these reasons, the U.S. Trustee supports the Motion to Reopen because doing so will allow the U.S. Trustee an opportunity to undertake an independent investigation.

*Alpha Natural Resources*, Dkt. No. 4126 at 2-3 ¶¶ 3-8 (footnotes and citations omitted).

## IX. Defendants Commit Bankruptcy Fraud and Other Crimes in *SunEdison*.

203.     SunEdison, Inc. ("**SunEdison**") filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York on April 21, 2016 and retained McKinsey RTS as its restructuring advisor.    In *SunEdison*, McKinsey RTS submitted five disclosure declarations: an initial declaration, filed on May 5, 2016; an Amended Declaration, filed on June 6, 2016; a First Supplemental Declaration, filed on June 14, 2016; a Second Supplemental Declaration, filed on December 21, 2016; and a Third Supplemental Declaration, filed on March 30, 2017.  McKinsey RTS's fees in *SunEdison* were approved on July 25, 2017.

204.     Once again, McKinsey RTS only belatedly revealed its connections to significant Interested Parties, after its role in the bankruptcy proceedings was deeply entrenched.  McKinsey's habit of filing multiple amended disclosure declarations, particularly in McKinsey RTS's more recent cases, is unusual in bankruptcy proceedings, and is further evidence of Defendants'

deliberate scheme to conceal McKinsey's connections, with McKinsey only appearing to comply with its disclosure obligations.

205.   McKinsey RTS's fee applications reveal that Sternfels played a major role in McKinsey RTS's engagement for the *SunEdison* bankruptcy; that Sternfels and others consulted Proshan and Goldstrom regarding McKinsey RTS's disclosures in that matter; and that Carmody also worked on McKinsey RTS's retention application.

206.   Defendants' (including McKinsey, Sternfels, Carmody, Goldstrom, and Proshan, authorized and aided and abetted by Garcia and Barton) crimes in the *SunEdison* case include:

   a.   Submitting declarations that unlawfully concealed and falsely denied dozens of McKinsey's known connections through vague and intentionally misleading disclosures;

   b.   Orchestrating a series of improper and deceptive pre-petition transfers from the debtor and non-debtor affiliates totaling at least $10 million to avoid disqualification and evade preference liability;

   c.   Submitting declarations that unlawfully concealed MIO's connections with Interested Parties, including Blackrock, which was a SunEdison creditor; and

   d.   Submitting a declaration that unlawfully concealed likely disqualifying facts about an undefined "business arrangement" between McKinsey and the former CEO of SunEdison.

   **A. Defendants Unlawfully Conceal McKinsey's Connections in *SunEdison*.**

207.   At the outset of *SunEdison*, Defendants (including McKinsey, Carmody, Proshan Goldstrom, and Sternfels, authorized and aided and abetted by Garcia and Barton) unlawfully concealed McKinsey's numerous known connections to Interested Parties.  Although McKinsey

RTS supplemented its disclosures four times, for a total of five declarations in *SunEdison*, dozens of McKinsey connections to Interested Parties ultimately remained undisclosed.

208.    In its initial disclosure declaration in *SunEdison*, dated May 5, 2016, McKinsey RTS identified only twenty-three of its several dozen known connections.

209.    On May 12, 2016, after having been presented with a detailed analysis prepared by retired United States bankruptcy judges Steven Rhodes and Judith Fitzgerald and others, the U.S. Trustee filed an objection to McKinsey RTS's retention in *SunEdison*, on the basis that its disclosure declarations were incomplete and inadequate under Rule 2014, and "gave the appearance of compliance without actually complying with Bankruptcy Rule 2014."

210.    In response to the U.S. Trustee's objection, on June 6, 2016, McKinsey RTS filed a second declaration, disclosing an additional eighteen connections to Interested Parties in *SunEdison*.  However, dozens of connections remained undisclosed.

211.    On August 5, 2016, in *Alpha Natural Resources*, the U.S. Trustee—relying on McKinsey RTS's June 6, 2016 disclosures in *SunEdison*—stated to the *Alpha Natural Resources* bankruptcy court that in *SunEdison*, McKinsey RTS had "disclosed the identity of *every* connection before its retention was approved."  This statement was incorrect.  In fact, Defendants were still unlawfully from the U.S. Trustee concealing dozens of McKinsey's connections in *SunEdison*.  In making this incorrect statement to *Alpha Natural Resources* court, the U.S. Trustee relied in good faith on McKinsey RTS's knowingly false statements that it had disclosed all of its connections in *SunEdison*.  McKinsey RTS has never addressed nor corrected the statement that the U.S. Trustee made in reliance on McKinsey RTS's false representation that it had disclosed *all* of its connections *SunEdison*.  In short, by falsely representing to the U.S. Trustee that McKinsey

RTS had fully disclosed its connections in *SunEdison*, Defendants perpetrated a fraud on two separate bankruptcy courts and the Department of Justice.

212.    On December 21, 2016, McKinsey RTS identified seventeen more connections in the *SunEdison* case.  On March 20, 2017, in its final disclosure in *SunEdison*, McKinsey RTS disclosed two more connections by name.   However, Defendants continued to unlawfully conceal dozens of connections that McKinsey RTS ultimately never disclosed in *SunEdison*.

213.    In June and August of 2016, after McKinsey RTS was hired by SunEdison and before McKinsey filed its Second and Third Supplemental Declarations in *SunEdison*, McKinsey and Carmody disclosed ***two dozen*** connections in *Alpha Natural Resources* that Defendants unlawfully concealed (and never did reveal) in *SunEdison*. Those cases were pending concurrently, and these McKinsey connections appeared on the Interested Parties lists in both cases.  This demonstrates not only that McKinsey RTS's disclosures were incomplete, but also that Defendants' illegal scheme included concealing a connection when they believed it was likely to lead to disqualification but revealing the same connection in cases where they believed it posed no danger of disqualification in that particular matter.

214.    The dozens of entities that Defendants are known to have unlawfully omitted and concealed in *SunEdison* include, *inter alia*:

| Entity | Interested Party Role(s) (in *SunEdison*) | McKinsey Connection(s) |
|---|---|---|
| Allianz SE | Convertible Note Holder | Client and/or Affiliate of Client (*Allianz Global US*) |
| Aon Risk Services Central | Vendor | Affiliate of Aon Consulting, a Service Provider to MIO |
| Banco Popular | Depository Bank | Client |
| Bank of America Merrill Lynch (US) | Institutional Shareholders > 1% | Client and/or Subsidiary of Client (*Bank of America*) |
| BlackRock, Inc. | Second Lien Lender | Investment (MIO) |

| Entity | Interested Party Role(s) (in *SunEdison*) | McKinsey Connection(s) |
|---|---|---|
| BlackRock Financial Management | Convertible Note Holder | Investment (MIO) |
| BlackRock Institutional Trust Company, N.A. | Institutional Shareholders > 1% | Investment (MIO) |
| BP Solar International, Inc. | "2002 List" | Client and/or subsidiary of client (*BP plc*) |
| Calpine Corporation | Bidder | Employee Relationship |
| Cerberus | Second Lien Lender | Investment (MIO) |
| Cerberus Institutional Partners | Second Lien Lender | Investment (MIO) |
| Cerberus Institutional Partners VI, L.P. | Second Lien Lender | Investment (MIO) |
| Citibank | Customer Depository Bank | Client and/or Affiliate of Client (*Citigroup Global Markets, Inc.*) |
| Citigroup Global Markets Inc. | Second Lien Holder | Client |
| Citigroup, Inc. | Convertible Note Holder; Second Lien Lender | Client and/or Parent of Client (*Citigroup Global Markets, Inc.*) |
| Davis Polk & Wardwell LLP | "2002 List" | Service Provider |
| Duke Energy Corporation | Competitor | Client |
| Enphase Energy | Vendor | Client |
| Gamesa Renewable Private Ltd. | Vendor | Client and/or Affiliate of Clients (*Siemens Financial Services and Siemens Industry Pace Global*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| GE Energy, LLC | Bidder | Client and/or affiliate of clients (*General Electric International, Inc., GE International, Inc., GE Betz Inc., GE Water & Process Technologies, GE Control Solutions, Inc., GE Infrastructuresensing, Inc., GE Inspection Technologies, Inc., and GE Energy Services*) |

| Entity | Interested Party Role(s) (in *SunEdison*) | McKinsey Connection(s) |
|---|---|---|
| General Electric Capital Corp. | "Uniform Commercial Code List" | Client and/or affiliate of clients (*General Electric International, Inc., GE International, Inc., GE Betz Inc., GE Water & Process Technologies, GE Control Solutions, Inc., GE Infrastructuresensing, Inc., GE Inspection Technologies, Inc., and GE Energy Services*) |
| General Electric Co. | Vendor | Client and/or parent or affiliate of clients (*General Electric International, Inc., GE International, Inc., GE Betz Inc., GE Water & Process Technologies, GE Control Solutions, Inc., GE Infrastructuresensing, Inc., GE Inspection Technologies, Inc., and GE Energy Services*) |
| Illinois Department of Revenue | Significant Vendor; Taxing Authority | Client |
| Internal Revenue Service | Government bodies | Client |
| Jones Day LLP | "2002 List" | Service Provider |
| K Special Opportunity Fund L.P. | Second Lien Lender | Investment (MIO) (Blackrock) |
| Longroad Energy Partners LLC / BlackRock Infrastructure | Bidder | Investment (MIO) (Blackrock) |
| Lotte Fine Chemical Co., Ltd. | "2002 List" | Client |
| Managed Account Advisors LLC | Convertible Note Holder | Client and/or Subsidiary of Client (*Bank of America*) |
| Moody's Investors Services Inc. | "2002 List" | Service Provider |
| Norton Rose Fulbright US LLP | "2002 List" | Service Provider |
| Oregon Department of Revenue | Taxing Authority | Affiliate of Client (*State of Oregon*) |
| Pennsylvania Bureau of Corporation Taxes | Taxing Authority | Affiliate of Client (*Commonwealth of Pennsylvania*) |

| Entity | Interested Party Role(s) (in *SunEdison*) | McKinsey Connection(s) |
|---|---|---|
| Siemens Corp. | Bidder Vendor | Client and/or Parent of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Parent of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Energy Inc. | Vendor | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| State of Oregon Construction Contractors Board | Government body | Affiliate of client (*State of Oregon*) |
| State Street Global Advisors (US) | Institutional Shareholders > 1% | Client |
| U.S. Attorney's Office (Department of Justice) | Government body | Client |
| U.S. Customs and Border Protection | Government body | Client |
| UBS Securities LLC | Institutional Shareholders > 1% | Client and/or Subsidiary and Affiliate of Clients (*UBS; UBS Financial Services, Inc.; UBS Stamford Branch TRS*) |

215.    Defendants (including McKinsey, Sternfels, Carmody, Goldstrom, Barton, Garcia, and Proshan) were aware of all of these dozens of connections when McKinsey RTS filed each of its declarations in *SunEdison*.   Defendants' concealment of the connections was, therefore, intentional and unlawful.

216.    Despite McKinsey RTS's multiple supplemental disclosure declarations in *SunEdison* and repeated assurances that it would "further supplement its declarations in the event it [became] aware of any relationship or other information that requires disclosure," Defendants nonetheless unlawfully concealed McKinsey's connections to dozens of Interested Parties in *SunEdison*.  Moreover, the inconsistency of McKinsey's disclosures among different bankruptcy proceedings indicates a deliberate policy by Defendants to conceal a connection where it posed a

severe conflict in a particular context.  At a bare minimum, it shows that McKinsey's disclosures were false.

217.   Further, of the connections that McKinsey RTS finally disclosed in *SunEdison*, many were not disclosed until eight or even ten months into the case, including, *inter alia*, the following connections:

| Entity | Interested Party Role(s) (*SunEdison*) | McKinsey Connection |
|---|---|---|
| E.On SE | Bidder | Client |
| UC Berkeley | Customer | Employee Relationship |
| Wells Fargo & Company | First Lien Lender; Depository Bank; Letter of Credit Issuer; Convertible Note Holder | Client |
| Wells Fargo Bank | Convertible Note Holder | Client |
| Wells Fargo Securities | Convertible Note Holder | Client |

218.   As evidenced by the scope of McKinsey RTS's services in *SunEdison*, these undisclosed connections were disqualifying.  *See* Ex. C ¶¶ 41, 78, 84.  McKinsey RTS's declaration, dated May 5, 2016 in *SunEdison* case states:

> McKinsey RTS will perform a broad range of services during these Chapter 11 Cases, including, without limitation, the following:
>
> a.   supporting the development of a strategic business plan with the Company's Chief Restructuring Officer and other key functional leaders that can be used to facilitate discussions with the Company's lenders and certain other stakeholders;
>
> b.   assisting the Company's Chief Restructuring Officer and Chief Financial Officers with matters related to financial planning and analysis, as requested;
>
> c.   assisting in developing a short-term cash flow forecasting process and implementing cash management strategies, tactics, and processes and working with the Company's treasury department and other professionals and coordinating the activities of the representatives of other constituencies in the cash management process;
>
> d.   assisting with the Company's financial and treasury

functions as they respond to the analytical requests and other requests for information that are placed upon the Company;

e.  along with management, developing and establishing a weekly financial reporting package that provides additional transparency into the Company's near term cash position, including a forecast to actual variance analysis;

f.  providing strategic advice to support the overall restructuring process;

g.  in cooperation with the Company's officers, investment bankers and other engaged professionals and counsel, developing and preparing a Chapter 11 plan of reorganization;

h.  assisting the Company in managing its bankruptcy process including managing outside stakeholders and their professionals;

i.  assisting with the evaluation of certain near term operational cost reduction and value enhancement opportunities (e.g., SG&A, fixed costs and procurement);

j.  planning and executing the Company's business support functions re organization and cost reduction goals;

k.  working with the Company's counsel ("Counsel") on supporting data in order for Counsel to prepare first day motions, the petitions for relief and other documents and evidence needed to implement any Chapter 11 bankruptcy case filed by the Company;

l.  assisting the Company with developing a detailed communications plan;

m. providing local support with development of various strategic and restructuring alternatives for international operations;

n.  providing testimony and other litigation support as requested by Counsel in connection with matters upon which McKinsey RTS is providing Services; and

o.  assisting with all such other restructuring matters as may be requested by Counsel and/or the Board that fall within McKinsey RTS's expertise and that are mutually agreed upon between the Parties.

219.    As McKinsey RTS itself notes, this is "a broad range of services."   Whether in relation to SunEdison's new business plan, its cash management strategies, its Chapter 11 plan, its cost reduction strategies, or testimony and litigation support—all of which McKinsey RTS committed to provide for SunEdison—any service that McKinsey RTS provided to SunEdison would directly and financially affect every one of its connections.   That is true regardless of whether McKinsey's services for its connections were on matters "unrelated to the debtors."

220.    Section 327 of the Bankruptcy Code prohibits McKinsey RTS from imposing on the SunEdison bankruptcy estate the conflicts, questions, and concerns that arise because McKinsey RTS has so many connections across so wide a scope of constituents.   Defendants knew that McKinsey RTS was not qualified to serve in the *SunEdison* case as a bankruptcy professional and fiduciary but sought and obtained employment for McKinsey RTS nonetheless by concealing its conflicts and connections and falsely representing that it was disinterested.

### B.  McKinsey Unlawfully Conceals Fraudulent Pre-Petition Payments That It Orchestrated from SunEdison Affiliates.

221.    McKinsey RTS's fraudulent Rule 2014 filings also enabled McKinsey to orchestrate a series of complex and improper pre-petition transfers from non-debtor affiliates of SunEdison totaling over $10 million to evade disqualification and to hide its preference liability under 11 U.S.C. § 547(b).

222.    In the ninety days before SunEdison filed for bankruptcy, SunEdison paid McKinsey RTS a total of $6,250,965 for its prepetition services.   Thus, when SunEdison filed for Chapter 11 relief, McKinsey RTS faced (a) a potential loss of over $6 million because of its liability to SunEdison for these preference payments; and (b) disqualification from the *SunEdison* case because that liability was clearly an interest adverse to the bankruptcy estate under Bankruptcy Code Section 327(a).

83

223.    In addition to the fraud described in the preceding paragraph, using its insider status and knowledge, McKinsey orchestrated a complex fraud to evade disqualification whereby it completely rearranged the nature of other debts owed by SunEdison to McKinsey RTS and then falsely re-invoiced to collect that debt from four non-debtor affiliates of SunEdison: Granite Mountain Holdings, LLC; Iron Springs Holdings, LLC; Comanche Solar PV, LLC; and Four Brothers Solar, LLC (collectively, the "**Non-Debtor Affiliates**").   These sham transactions enabled McKinsey RTS to secure and retain the bankruptcy assignment with SunEdison when it otherwise would have been disqualified.

224.    Specifically, detailed forensic analysis derived from McKinsey RTS's First Supplemental Declaration in *SunEdison*, SunEdison's application to employ McKinsey RTS (*SunEdison*, Dkt. 322), and a report from FTI Consulting that was commissioned by SunEdison's board of directors regarding the company's internal operations and financial controls, reveal that McKinsey RTS retroactively and falsely re-invoiced work that was actually done for SunEdison in the first instance as work done for the Non-Debtor Affiliates.

225.    Relying on this artifice, McKinsey RTS falsely represented to the *SunEdison* court that it did not owe a preference to the estate and was not an estate creditor.   Absent this fraud, McKinsey RTS would have been disqualified for holding an interest adverse to the estate.   *See* Ex. C ¶ 81, 84.   In short, McKinsey designed and committed a series of complex financial frauds to wrongfully secure and retain McKinsey RTS's lucrative consultancy assignment in the *SunEdison* bankruptcy.

226.    More specifically, McKinsey (through McKinsey RTS) had sent invoices to SunEdison for the months of September, October, and December 2015.   The services covered by those invoices were provided pursuant to a services agreement between SunEdison and McKinsey

RTS.  In approximately late December 2015 or early January 2016, McKinsey RTS still had not been paid for those services.  Because SunEdison was insolvent, McKinsey and SunEdison decided that McKinsey RTS would recall its earlier invoices to SunEdison and falsely re-issue the invoices to the Non-Debtor Affiliates, who would then satisfy the outstanding balances even though none of them had hired McKinsey RTS and thus had no legal liability to, or contractual privity with, McKinsey RTS.

227.    In yet other instances in early 2016, SunEdison actually *had* paid McKinsey RTS's invoices.  In those instances, McKinsey RTS also issued false invoices to the Non-Debtor Affiliates.  The Non-Debtor Affiliates then made payments on the false, re-issued invoices, even though they were not liable for McKinsey RTS's fees and had no contract with McKinsey RTS.  At that point, having been paid *twice* (once by SunEdison and once by the Non-Debtor Affiliates), McKinsey RTS returned SunEdison's original payments.

228.    Because the Non-Debtor Affiliates were not Chapter 11 debtors, they had no ability to claim a return of the payments as preferences to McKinsey RTS.  Through this means, McKinsey fraudulently re-characterized the obvious and disqualifying preference payments from SunEdison as payments from the Non-Debtor Affiliates, and McKinsey again fraudulently laundered disqualifying preference payments from SunEdison into "clean" payments from the Non-Debtor Affiliates.

229.    McKinsey's complex invoicing fraud in *SunEdison* occurred from approximately September 2015 until April 2016.  All told, detailed forensic analysis discloses $10,645,166.78 of improper "round-trip" and retroactively "re-invoiced" transactions involving SunEdison and the Non-Debtor Affiliates during that period.

230.    When McKinsey orchestrated the "re-invoiced" and "round trip" payments with SunEdison's Non-Debtor Affiliates, McKinsey possessed and used insider knowledge that SunEdison was severely insolvent and suffering from an extreme liquidity shortage.  McKinsey used its insider knowledge to gain a $10,645,166.78 advantage over SunEdison's other creditors. Functionally, SunEdison's payments to McKinsey RTS, through the fraudulent use of the Non-Debtor Affiliates' funds, were effectively fraudulent transfers and backdoor preference payments.

231.    Defendants (including McKinsey, Proshan, Sternfels, Goldstrom, and Carmody, authorized and aided and abetted by Garcia and Barton) concealed this ongoing complex fraud in McKinsey RTS's initial disclosures and then continued their deception by falsely representing in McKinsey RTS's First Supplemental Declaration in *SunEdison* that the "round trip" payments were, in fact, owed by the Non-Debtor Affiliates in the first instance and McKinsey RTS's services had been provided for the benefit of the Non-Debtor Affiliates.  In reality, however, this was revisionist history to cover up McKinsey's financial manipulations and to conceal the preference and the disqualifying interest that it created.

232.    Although McKinsey RTS's disclosure declarations admitted to a September 2015 engagement letter between McKinsey RTS and SunEdison, they failed to provide a copy of that document or any necessary detail regarding McKinsey RTS's original billings to SunEdison, such as the true nature of the services that McKinsey RTS had provided.  McKinsey RTS's declarations also failed to explain how its services could have been for the Non-Debtor Affiliates when they were originally provided to and paid for by SunEdison pursuant to a contract between McKinsey RTS and SunEdison, and no contract between McKinsey RTS and the Non-Debtor Affiliates existed.

233.    A McKinsey employee, in an internal email, admitted that McKinsey's re-invoicing and round-trip payment scheme through SunEdison's Non-Debtor Affiliates was improper, and noted that significant resistance should be expected from the Non-Debtor Affiliates' Project Managers.

234.    Further, in connection with the *SunEdison* bankruptcy, in an independent report to the Audit Committee of the Board of Directors of SunEdison, investigators flagged the above-described payments as irregular and highly questionable, as referenced in the employee email described above.

235.    If payment of McKinsey RTS's fees by SunEdison's Non-Debtor Affiliates was legitimate, as McKinsey RTS represented to the court and the U.S. Trustee, while being questioned by the U.S. Trustee, presumably McKinsey RTS would have come forward with evidence that members of the Non-Debtor Affiliates had approved the payments.  It never did so.

236.    As a result of McKinsey's fraudulent financial scheme and Defendants' concealment thereof, McKinsey's liability to the SunEdison estate is as much as $22,255,246.76. This liability is an interest adverse to the SunEdison bankruptcy estate and is disqualifying under Section 327 of the Bankruptcy Code.  McKinsey RTS's representations to the bankruptcy court and the U.S. Trustee that it did not hold an interest adverse to the estate were false.  Had McKinsey fully disclosed the extent of its involvement, McKinsey RTS would have been disqualified from employment in *SunEdison*.  *See* Ex. C ¶ 81, 84.  It also likely would have been ordered to return funds to the SunEdison estate.

### C.  McKinsey Unlawfully Conceals Pertinent Facts Regarding its "Business Arrangement" with SunEdison's Former CEO.

237.    The *SunEdison* bankruptcy court authorized McKinsey RTS's employment on June 23, 2016.  In its initial disclosure declaration to obtain that employment, filed on May 5, 2016,

McKinsey RTS made the following inadequate and misleading disclosure: "One member of McKinsey RTS serving the debtors has known the Debtor's CEO, Ahmad Chatila, from past professional relationships prior to 2009." This minimal disclosure regarding Chatila conceals the identity of the "[o]ne member of McKinsey RTS serving the debtors[.]" The unnamed "member of McKinsey RTS" was, in fact, Defendant Robert Sternfels. Defendants' concealment of Sternfels's name and the true nature of his relationship with Chatila raises serious questions as to why McKinsey RTS would conceal Sternfels's identity and the attendant details, and whether there was anything disqualifying about the relationship.

238. Moreover, subsequent events gave rise to the very pointed and troubling question of whether Chatila, while CEO of SunEdison, caused SunEdison to retain McKinsey RTS on the premise that Sternfels would assist Chatila in obtaining new employment should he be fired from the insolvent SunEdison, and whether such assistance was a *quid pro quo* for Chatila's assistance in engineering the "re-invoiced" and "round-trip" payments referenced above.

239. Nine months after SunEdison filed for bankruptcy, on March 20, 2017, McKinsey RTS made a second cryptic disclosure regarding Chatila. McKinsey RTS's Third Supplemental Disclosure Declaration revealed in vague terms that McKinsey had entered into an unidentified and unexplained "business arrangement" with Chatila. McKinsey RTS's disclosure, however, provided no supporting details with which the bankruptcy court, the U.S. Trustee, or the Interested Parties could ascertain whether McKinsey's unspecified "business arrangement" with Chatila was disqualifying. *See* Ex. C ¶¶ 82-83.

240. In fact, Chatila is a longtime personal friend of Sternfels, who was instrumental in Chatila's elevation to CEO of SunEdison. Shortly after McKinsey succeeded in its scheme to retain its prepetition preference payments from SunEdison (discussed *supra*) and as it became clear

that Chatila would likely be forced out of SunEdison, Sternfels told his colleagues at McKinsey that they needed to help his friend Chatila find another position after he left SunEdison.

241. When McKinsey RTS revealed McKinsey's "business arrangement" with Chatila on March 20, 2017, its disclosure declaration unlawfully concealed the following pertinent facts:

    a.   The identity of the "entity for which Ahmad Chatila is a senior officer" and the nature of its business;

    b.   Chatila's position and responsibilities with that entity;

    c.   The nature of the "business arrangement";

    d.   The identity of the "affiliate of McKinsey RTS US";

    e.   When the "business arrangement" was entered into;

    f.   Why McKinsey RTS delayed disclosing the "business arrangement" until March 20, 2017;

    g.   Whether any McKinsey personnel who were assigned to serve the *SunEdison* debtors were also assigned to work on the "business arrangement";

    h.   The manner in which Chatila personally benefited from the "business arrangement" (including any compensation or other benefits that Chatila received as a result of the arrangement);

    i.   Who was involved in the discussions and negotiations leading to the "business arrangement";

    j.   Whether the "business arrangement" involved any parties in the *SunEdison* case;

    k.   Whether the "business arrangement" involved any competitors of the debtors;

    l.   Whether the "business arrangement" involved any creditors or investors of SunEdison;

     m.  Whether the "business arrangement" involved Chatila's use of any confidential

information of the debtors;

     n.  Whether the "business arrangement" involved use by McKinsey, Sternfels, or any

other Defendants, of any information, confidential or otherwise, that McKinsey

RTS had obtained from SunEdison; and

     o.  Whether MIO or one of its affiliates or connections financed the "business

arrangement."

242.    As discussed below, Defendants' unlawful concealment of these pertinent facts was likely another part of Defendants' scheme to hide, obfuscate, withhold information, evade disqualification, and enable McKinsey RTS to remain in the *SunEdison* engagement and thereby improperly collect millions of dollars in bankruptcy fees.

243.    McKinsey RTS attempted to minimize the potential conflict created by this "business arrangement," stating simply in its Third Supplemental Declaration in *SunEdison* that "[a]n affiliate of McKinsey RTS US entered into a business arrangement unrelated to SunEdison, Inc. with an entity for which Ahmad Chatila is a senior officer."

244.    The entity with which McKinsey entered into its "business arrangement" with Chatila is likely FTC Solar, Inc. ("**FTC Solar**"), for which Chatila is one of four founding directors.  A review of public records has yielded no other information regarding Chatila's activities or any other potential "business arrangements" since his departure from SunEdison.  FTC Solar was incorporated in Delaware on January 3, 2017 and, shortly thereafter, on January 30, 2017, it purchased approximately $35 million worth of SunEdison's assets for a mere $6 million. David Springer, the SunEdison executive who approved the "re-invoicing" and "round-trip" payments scheme in conjunction with McKinsey executive Matthew Parsons, now serves as the

CEO of FTC Solar. If McKinsey entered into its "business arrangement" with Chatila in connection with FTC Solar, then McKinsey RTS's statement to the bankruptcy court that this arrangement was "unrelated to SunEdison" was materially false.  If McKinsey did, in fact, have a connection with FTC Solar, then McKinsey RTS's failure to disclose this relationship despite FTC Solar's purchase of the assets of its fiduciary client represented yet another egregious and disqualifying conflict of interest.

## X.   Defendants Unlawfully Conceal McKinsey's Connections and Commit Bankruptcy Fraud in *GenOn*.

245.    GenOn filed for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas on June 14, 2017.  To date, Carmody has submitted four disclosure declarations on behalf of McKinsey RTS in the *GenOn* bankruptcy: an initial declaration, filed on June 23, 2017; a First Supplemental Declaration, filed on July 13, 2017; a Second Supplemental Declaration, filed on September 15, 2017; and a Third Supplemental Declaration, filed on February 7, 2018.  The *GenOn* bankruptcy is ongoing.

246.    Carmody submitted his first two Rule 2014 declarations on behalf of McKinsey RTS in *GenOn* before the bankruptcy court authorized McKinsey RTS's employment, on June 23, 2017 and July 13, 2017.  Relying on these declarations, on July 13, 2017, the bankruptcy court authorized GenOn to employ McKinsey RTS as its restructuring advisor.

247.    In addition to Carmody, Proshan prepared McKinsey's disclosures in the *GenOn* matter.

248.    Had Defendants fully and honestly complied with Rule 2014, McKinsey RTS would have been disqualified and never hired in *GenOn*.  *See* Ex. C ¶¶ 85-86.

249.    As discussed below, Defendants' (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) crimes and racketeering activity in *GenOn* include:

    a.    Submitting false declarations that unlawfully concealed the fact that NRG Energy, GenOn's parent company, against whom McKinsey RTS was investigating a multi-million dollar claim on behalf of GenOn and with whom McKinsey RTS was negotiating GenOn's separation, was also a current or former McKinsey client;

    b.    Submitting false declarations that unlawfully concealed the depth of McKinsey's connections to GenOn's parent company, NRG Energy, and to the transactions and bankruptcies that had created GenOn;

    c.    Submitting a declaration that falsely represented that McKinsey RTS was disinterested after it received preference payments totaling $4,512,000, which gave rise to a disqualifying interest adverse to the bankruptcy estate; and

    d.    Submitting false declarations that unlawfully concealed and falsely denied McKinsey's disqualifying connections to dozens of other Interested Parties.

**A.   Defendants Unlawfully Conceal that NRG Energy Is a Current or Former McKinsey Client While McKinsey RTS Is Investigating GenOn's Claims against NRG Energy.**

250.    Carmody's disclosure declarations on behalf of McKinsey RTS in *GenOn* unlawfully concealed that when McKinsey was investigating GenOn's potential multi-million dollar fraudulent transfer claims against NRG Energy, McKinsey was investigating its own longstanding client.

251.    In March 2016, an ad hoc group of noteholders of GenOn Unsecured Senior Notes and GenOn Americas Generation Unsecured Senior Notes (the "**Noteholder Group**") began a

92

conversation with GenOn regarding potential claims for fraudulent transfer, breach of fiduciary duty, and other claims that GenOn may hold against NRG Energy and current and former GenOn directors and officers, among others.  GenOn, with assistance from McKinsey RTS and AP, began identifying and evaluating potential claims.  GenOn's potential claims concerned contracts between GenOn and NRG Energy, certain sales of GenOn power plants to NRG Energy's affiliates and third parties, and certain development projects between GenOn and NRG Energy.

252.    In June 2016, GenOn and its attorneys retained both McKinsey RTS and AP to investigate GenOn's potential claims against NRG Energy arising from the same factual circumstances as the Noteholders' claims.  That investigation continued through GenOn's Chapter 11 bankruptcy case, which was filed a year later in June 2017.  McKinsey RTS's post-petition fee statements reflect that, as part of the investigative team, McKinsey RTS conferred with GenOn noteholders about the potential claims, requested and reviewed thousands of documents from NRG Energy, and interviewed numerous NRG Energy and GenOn representatives.

253.    In the same month that GenOn retained McKinsey RTS to investigate NRG Energy (June 2016), in the *SunEdison* case, McKinsey & Co. partner Mark Hojnacki filed an amended declaration on behalf of McKinsey RTS disclosing that NRG Energy was a current or former McKinsey client.  However, Defendants unlawfully concealed that connection throughout the course of *GenOn*.

254.    The GenOn Noteholder Group ultimately filed a lawsuit against NRG Energy and GenOn in Delaware state court on December 13, 2016.  On April 30, 2017, the Noteholder Group filed an Amended Complaint adding as defendants NRG Yield (an NRG subsidiary), and eight current or former GenOn directors and officers (the "***GenOn* Individual Defendants**").  The GenOn Noteholders' Amended Complaint alleged: (i) NRG Energy had been overcharging GenOn

under a Shared Services Agreement since its execution; and (ii) GenOn did not receive reasonably equivalent value from NRG Yield for GenOn's July 22, 2013 sale of the Marsh Landing generating station (a newly developed power plant).  The Noteholder Group further alleged that (iii) the GenOn Individual Defendants breached their fiduciary duties by allowing GenOn's purported overpayments under the Shared Services Agreement and by allowing NRG Energy to pursue new business opportunities at GenOn's Canal and Mandalay power plant sites; and (iv) NRG Energy aided and abetted those breaches.

255.    Ultimately, GenOn settled its fraudulent transfer claims against NRG Energy.  The money derived from that settlement formed a substantial part of GenOn's Chapter 11 plan and was relied upon by the bankruptcy court and GenOn's other creditors, none of whom were aware of McKinsey RTS's egregious conflict of interest involving NRG Energy.

256.    Despite this clear conflict, Carmody's initial declaration on behalf of McKinsey RTS in *GenOn*, dated June 23, 2017, disclosed only that McKinsey serves or has served "various parties listed" on the Interested Parties List in *GenOn* as "NRG Affiliates" (of which there were over 900).  Thus, Defendants (including McKinsey, Garcia, Proshan, and Carmody) unlawfully concealed the specific and crucial fact that, although McKinsey RTS was in the process of investigating NRG Energy on behalf of GenOn, McKinsey then had or previously had a client relationship with NRG Energy itself.

257.    On July 13, 2017, Carmody filed his First Supplemental Declaration on behalf of McKinsey RTS in *GenOn*, in which Defendants again unlawfully concealed McKinsey's connection to NRG Energy.  Carmody made only a minimal disclosure that a member of McKinsey RTS "assisted in maintaining a chart, which includes publicly available information concerning

asset sales to NRG Energy, or one of its affiliates for a client that is not on the list of Potential Parties in Interest."

258.    Because NRG Energy, whom McKinsey RTS was investigating for GenOn, was also a significant McKinsey client, McKinsey "represent[ed] an interest adverse to the estate," in contravention of the clear prohibition of 11 U.S.C. § 327(a).  McKinsey's connection with NRG Energy created an actual, present, ongoing conflict of interest that required disclosure and disqualification of McKinsey RTS in *GenOn*.  *See* Ex. C ¶¶ 85-86.

### B. Defendants Unlawfully Conceal that NRG Energy Is a McKinsey Client While McKinsey RTS Is Negotiating on Behalf of GenOn for GenOn's Separation from NRG Energy.

259.    While McKinsey was serving GenOn's parent company, NRG Energy, McKinsey RTS was negotiating GenOn's separation from NRG Energy as part of the bankruptcy process.

260.    McKinsey RTS's final fee application in *GenOn*, filed on March 16, 2018 (*GenOn*, Dkt. 1516), states that McKinsey RTS spent 7,595.8 hours and billed $4,049,978.00 in fees for a task it called "separation activity."  This was by far the greatest amount billed for any of McKinsey RTS's tasks in *GenOn*.  Billing descriptions of "separation activity" included: "Held weekly meetings and planning sessions with the parent company's functional leads and GenOn leads to advance transition and separation efforts."  In other words, McKinsey RTS was negotiating the separation of its fiduciary client, GenOn, from McKinsey's consulting client, NRG Energy, with whom it was incentivized to preserve its client relationship, which was in direct conflict with McKinsey RTS's fiduciary obligation to assure that GenOn was able to negotiate the most favorable terms possible for the benefit of its creditors.

**C. Defendants Unlawfully Conceal the Depth of McKinsey's Connections to NRG Energy and the Transactions and Bankruptcies that Created GenOn.**

261.    Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) also unlawfully concealed the facts surrounding McKinsey's history of representing NRG Energy through various mergers and acquisitions in the energy sector, including in transactions involving GenOn.  Again, this allowed McKinsey to simultaneously profit from its fiduciary relationship with GenOn and receive bankruptcy fees, while also acting to benefit its long-standing client, NRG Energy.

262.    Prior to *GenOn*, NRG Energy had acquired assets from at least three entities in the power and energy industries in which McKinsey US or McKinsey RTS had served as a fiduciary in three separate Chapter 11 bankruptcy cases: *Mirant*, *Edison Mission Energy*, and *SunEdison*.

263.    Specifically:

   a.  NRG Energy purchased most of the assets of Edison Mission Energy in the latter's 2012 bankruptcy while Edison Mission Energy was a McKinsey RTS client;

   b.  In 2012, NRG Energy purchased GenOn, which was created in a merger between former McKinsey US bankruptcy client Mirant and RRI Energy, Inc. (formerly Reliant Energy, Inc.) in 2010; and

   c.  During SunEdison's 2016 bankruptcy, NRG Energy purchased at least three of SunEdison's non-debtor affiliates while SunEdison was a McKinsey RTS client.

264.    Of the entities that participated in these transactions, at least five were current or former McKinsey clients: Mirant, NRG Energy, GenOn, Edison Mission Energy, and SunEdison. In *GenOn*, however, Defendants concealed McKinsey's connections to those parties and

transactions.  Rule 2014 requires bankruptcy professionals to disclose their "connections with the debtor."  Rule 2014 thus required McKinsey RTS and Carmody to fully disclose McKinsey's role in those transactions because such disclosure is critical to a full understanding of McKinsey RTS's connection to GenOn itself, as well as any role that McKinsey may have played in GenOn's insolvency.  Here, McKinsey's connection to GenOn began years before GenOn retained it to assist with GenOn's insolvency and bankruptcy.  That connection began with McKinsey's involvement in the transactions that led to GenOn's creation, and McKinsey's employment by GenOn for GenOn's bankruptcy case is only the latest phase of this longstanding connection. Instead of disclosing the history of McKinsey's connections to GenOn, however, Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) unlawfully concealed all of it.

265.    To enable McKinsey RTS to obtain bankruptcy employment in *GenOn*, Defendants also concealed the extent to which McKinsey was involved in advising the web of entities connected to GenOn and NRG Energy.  For example, when NRG Energy purchased assets from McKinsey RTS client Edison Mission Energy, it was advised by multiple advisors that are themselves McKinsey clients or advisers.  Meanwhile, Edison Mission Energy was advised by JPMorgan Chase, which is a McKinsey client, and by Kirkland & Ellis, which is a McKinsey service provider.  Of these professionals, McKinsey RTS and Carmody have disclosed only JPMorgan Chase as a McKinsey connection in *GenOn*.

266.    A bankruptcy court considering whether to authorize McKinsey RTS's application for employment would likely find these connections disqualifying because they reveal a pattern of McKinsey's clients receiving one another's assets—with the fiduciary, McKinsey, improperly standing in the middle and making money on all sides.  A professional seeking bankruptcy

employment must not only be disinterested, but also the bankruptcy court must find that the employment would be in the best interests of the estate.   Given McKinsey's history of recommending that its undisclosed clients purchase failing entities where McKinsey is a court-appointed fiduciary for other clients selling their assets, the bankruptcy court likely would have found McKinsey RTS's employment not in the best interests of GenOn's bankruptcy estate, if not an actual, direct, and currently undisclosed conflict.  *See* Ex. C ¶¶ 85-86.

### D. McKinsey Receives Avoidable Preference Payments from GenOn to Avoid Disqualification as a GenOn Creditor, thereby Concealing an Interest Adverse to the Bankruptcy Estate.

267.   Had McKinsey RTS and Carmody made truthful disclosures in *GenOn*, McKinsey RTS also would have been disqualified as either a creditor of GenOn or for preference liability to GenOn.  McKinsey ensured that the debts GenOn owed to McKinsey RTS were paid ahead of other creditors before GenOn filed for bankruptcy, in order for McKinsey RTS to avoid disqualification as a creditor of the estate.  Further, to avoid disqualification, McKinsey then falsely treated these payments as ordinary course payments to avoid preference liability.

268.   McKinsey RTS received avoidable preferences totaling $4,512,000 in the ninety days leading up to the *GenOn* petition date.  Thus, McKinsey RTS held . . . "an interest adverse to the estate," and was not qualified for employment as a professional under Section 327(a).

269.   GenOn's application to employ McKinsey RTS states that "[d]uring the ninety days prior to the commencement of the Chapter 11 cases, the debtors paid McKinsey RTS a total of $6,012,000 (inclusive of reimbursable expenses) incurred in providing services to the debtors in contemplation of, and in connection with, prepetition restructuring activities[.]"[30]

---

[30]   The application also states, "[a]s of the Petition Date, McKinsey RTS holds a credit balance of $1.5 million (the aggregate amount of the Retainers), which McKinsey RTS intends to retain until the end of these Chapter 11 cases and apply to its final application for payment in these proceedings."

270.   More specifically, GenOn (*not* McKinsey RTS or Carmody) disclosed these five payments to McKinsey RTS totaling $4,512,000 within the ninety days before its bankruptcy filing on June 14, 2017:

  a.   $510,000 on April 25, 2017 (for an invoice dated January 15, 2017);

  b.   $510,000 on June 5, 2017 (for an invoice dated January 30, 2017);

  c.   $900,000 on June 9, 2017 (for an invoice dated June 2, 2017);

  d.   $900,000 on June 12, 2017 (for an invoice dated June 5, 2017); and

  e.   $1,692,000 on June 13, 2017 (for an invoice dated June 12, 2017).

271.   As a result of those concealed payments, McKinsey RTS is not listed as a prepetition creditor in GenOn's bankruptcy schedules.  However, none of these payments were made pursuant to ordinary business terms, as required to avoid preference liability under 11 U.S.C. § 547(c)(2).  The first two payments were late, having been made more than three and a half months after invoices were issued, while the last three invoices were issued and paid just days before the bankruptcy filing and much quicker than ordinary course for McKinsey RTS and GenOn.  Specifically, the third payment was made seven days after the invoice was issued and just five days before the bankruptcy filing; the fourth payment was made seven days after the invoice was issued and just two days before the bankruptcy filing; and the fifth and final payment was made the day after the invoice was issued and the day before the bankruptcy filing.  Each payment was a voidable preference payment under 11 U.S.C. § 547(b).

272.   These preference payments created "an interest adverse to the estate," thus disqualifying McKinsey RTS under 11 U.S.C. § 327.  In its rush to obtain these prepetition payments and avoid disqualification as a prepetition creditor, McKinsey merely transformed the payments into preference payments, which are also disqualifying.

273.    Carmody's declaration to the *GenOn* bankruptcy court on behalf of McKinsey RTS falsely stated: "We are disinterested." This was an intentionally false statement because McKinsey RTS knowingly collected preference payments from the debtor on the eve of bankruptcy in order to eliminate its status as an unsecured creditor and did not advise the bankruptcy court that it was the recipient of millions of dollars in what were effectively preference payments, either of which status would have disqualified McKinsey RTS as not disinterested. Accordingly, Carmody's description of these payments was materially false and Carmody's affirmative statement that McKinsey RTS was disinterested was an intentionally false statement that worked a fraud on the bankruptcy court.

**E. Carmody's Declarations on Behalf of McKinsey in *GenOn* Unlawfully Conceal Numerous Connections, Including GenOn Creditors and Possibly Competitors.**

274.    McKinsey RTS's and Carmody's various delayed and incomplete declarations in *GenOn* ultimately disclosed approximately eighty-five connections with Interested Parties. However, Defendants continued to conceal many other connections. In Carmody's initial declaration in *GenOn*, he stated that McKinsey RTS was disinterested because the services it provides to clients who were Interested Parties "specifically do not focus on direct commercial relationships or transactions between such companies and the debtors." Rule 2014, however, does not limit its disclosure requirements to "direct commercial relationships or transactions between such companies and the debtors." Rather, the law mandates that *all* connections must be disclosed.

275.    As a result of Defendants' unlawful concealment of McKinsey's connections, Carmody's disclosure declarations on behalf of McKinsey RTS in *GenOn* include numerous false or materially misleading statements.

276.    For instance, Carmody's initial declaration on behalf of McKinsey RTS in *GenOn*, dated June 23, 2017, falsely states that McKinsey has **no** connections to the following nine categories of Interested Parties in *GenOn*:

- Bank and Indenture Trustees;

- DIP Lenders;

- Government-Regulatory Agencies;

- Insurers;

- Joint Venture Parties;

- Litigation Parties;

- Noteholders;

- Surety Bonds; and

- Taxing Authorities.

277.    In that initial declaration, Carmody and McKinsey RTS disclosed a handful of McKinsey's client connections to certain categories of Interested Parties: twelve contractual counterparties; four Significant Vendors; three Utility Providers; three Shippers; two Significant Customers; two Professionals; one Lienholder; one Beneficiary of Letter of Credit; and one Largest Unsecured Creditor.  Carmody further disclosed that three law firms listed as Professionals in *GenOn* were also service providers to McKinsey.  Carmody stated that McKinsey had ***no further connections***, despite having "***conducted a global database search of the Potential Parties in Interest***" in *GenOn* prior to its engagement.  Carmody further stated that McKinsey had "***searched its global client database, which covers clients of all its consulting affiliates, to determine the existence of any client service provided by McKinsey RTS US or affiliates*** within the last two years to Potential Parties in Interest."  Based on the demonstrated extreme and obvious deficiencies

in McKinsey's disclosures, both as discussed above and as listed below, Carmody's statements are demonstrably false.

278.  Carmody further contributed to creating a false impression that McKinsey had conducted a diligent, thorough, and exhaustive search of its potential connections by stating that in addition to searching a "global database," McKinsey had also written to both "members of McKinsey RTS" and to "partners at its affiliates worldwide that provide consulting services"— unlawfully excepting MIO and all other McKinsey non-"consulting" affiliates from the scope of its search—in order to ascertain McKinsey's connections to Interested Parties. *See* Ex. C ¶ 31, 54-67.

279.  McKinsey's known concealed connections in *GenOn* include, *inter alia*:[31]

| Entity | Interested Party Roles(s) (in *GenOn Energy*) | McKinsey Connection(s) |
|---|---|---|
| AEP Energy Partners Inc. | Significant Customer | Client and/or Subsidiary of Client (*American Electric Power Co.*) |
| American Alternative Insurance Corporation | Insurer | Client and/or Subsidiary of Client (*MunichRe*) |
| Aspen American Insurance Company | Surety Bonds | Client |
| Aspen Specialty Insurance Company | Insurer | Client |
| Australia and New Zealand Banking Group Ltd. | Litigation Party | Client |
| BlackRock | Banks and Indenture Trustees | Investment (MIO) |
| BlackRock Fund Advisors | Major Equity Holder Noteholder | Investment (MIO) |
| Citigroup Global Markets Inc. | DIP Lender; Noteholder; Contractual Counterparty | Client |
| Commonwealth of Pennsylvania | Contractual Counterparty | Client |

---

[31]     McKinsey RTS and Carmody also failed to disclose that in 2014, McKinsey partner Veronique McCaroll joined Credit Agricole (identified on the *GenOn* Interested Parties List as a Litigation Party) as an executive.

| Entity | Interested Party Roles(s) (in *GenOn Energy*) | McKinsey Connection(s) |
|---|---|---|
| Davis Polk & Wardwell LLP | Professional | Service Provider |
| Dominion Cove Point LNG LP | Beneficiary of Letter of Credit; Contractual Counterparty; Shipper | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (*Dominion Resources, Inc.*) |
| Dominion Energy Generation Marketing Inc. | Contractual Counterparty | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (*Dominion Resources, Inc.*) |
| Dominion Energy Marketing Inc. | Contractual Counterparty | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (*Dominion Resources, Inc.*) |
| Dominion Transmission, Inc. | Beneficiary of Letter of Credit Contractual Counterparty | Subsidiary or Affiliate of Client/Payor of McKinsey in *SunEdison* bankruptcy (*Dominion Resources, Inc.*) |
| Intesa San Paolo, f/k/a Banca Intesa | Litigation Party | Client |
| iShares $ High Yield Corporate Bond UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares 0-5 Year High Yield Corporate Bond ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Core Total USD Bond Market ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corp Bond CHF Hedged UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corp Bond GBP Hedged UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corp Bond UCITS ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares Global High Yield Corporate Bond ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares iBoxx $ High Yield Corporate Bond ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares iBoxx $ High Yield ex Oil & Gas | Noteholder | Investment (MIO) (BlackRock) |
| iShares U.S. High Yield Bond Index ETF | Noteholder | Investment (MIO) (BlackRock) |
| iShares USD Short Duration High Yield | Noteholder | Investment (MIO) (BlackRock) |

| Entity | Interested Party Roles(s) (in *GenOn Energy*) | McKinsey Connection(s) |
|---|---|---|
| Kirkland & Ellis LLP | Professional | Service Provider |
| KPMG LLP | Professional | Service Provider |
| McGuire Woods LLP | Contractual Counterparty | Service Provider |
| Moody's Investors Services Inc. | Contractual Counterparty | Service Provider |
| Onex Inc. | Contractual Counterparty | Client |
| Oregon Public Utility Commission | Government-Regulatory Agency | Affiliate of Client (*State of Oregon*) |
| Pennsylvania Bureau of Waste Management | Government-Regulatory Agency | Affiliate of Client (*Commonwealth of Pennsylvania*) |
| Pennsylvania Department of Revenue | Government-Regulatory Agency | Affiliate of Client (*Commonwealth of Pennsylvania*) |
| Progress Rail Leasing Corp. | Noteholder; Contractual Counterparty | Client and/or Affiliate of Client (*Caterpillar Financial Services*) |
| Royal Bank of Scotland | Litigation Party | Client and/or Parent of Client (*Ulster Bank*) |
| Royal Bank of Scotland N.V., f/k/a ABN AMRO Bank NV | Litigation Party | Client and/or Affiliate of Client (*Ulster Bank*) |
| Siemens Demag Delaval | Significant Vendor | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Energy Inc. | Largest Unsecured Creditors; Contractual Counterparty | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Industry Inc. | Significant Vendor | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |

| Entity | Interested Party Roles(s) (in *GenOn Energy*) | McKinsey Connection(s) |
|---|---|---|
| Siemens Power Generation Inc. | Contractual Counterparty | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Westinghouse | Contractual Counterparty | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Southern California Edison Company | Beneficiary of Letter of Credit; Significant Customer; Contractual Counterparty; Utility Provider | Client |
| Standard & Poor's Rating Services | Contractual Counterparty | Service Provider; Employee Relationship |
| State of West Virginia | Taxing Authority | Client |
| State Street Bank and Trust Company | Bank and Indenture Trustees; Contractual Counterparty | Client and/or Affiliate of Client (*State Street Global Advisors*) |
| State Street Bank and Trust Company of CT, N.A. | Contractual Counterparty; Landlord | Client and/or Affiliate of Client (*State Street Global Advisors*) |
| State Street Global Advisors | Noteholder | Client |
| Thyssenkrupp Elevator Corp. | Contractual Counterparty | Client and/or Subsidiary of Client (*Thyssenkrupp AG*) |
| UBS Warburg LLC | Contractual Counterparty | Client and/or Subsidiary and/or Affiliate of Clients (*UBS*; *UBS Financial Services, Inc.; UBS Stamford Branch TRS*) |
| United States Attorney's Office (Department of Justice) | Contractual Counterparty | Client |
| United States Trust Company of NY | Contractual Counterparty | Client and/or Subsidiary of Client (*Bank of America*) |
| Wells Fargo Bank, N.A. | Contractual Counterparty; Banks and Indenture Trustees | Client |

280.    Any or all of McKinsey's undisclosed connections in *GenOn* would have disqualified McKinsey RTS from employment as a bankruptcy professional in that case.  *See* Ex. C ¶¶ 85-86.

281.    Notably, as indicated both above and in Carmody's belated disclosures on behalf of McKinsey RTS, just as in McKinsey's other bankruptcy cases, multiple McKinsey clients were among the creditors of the bankruptcy debtor.  For example, on February 7, 2018, in his fourth disclosure declaration in *GenOn* (filed after the debtor's plan of reorganization had been confirmed by the bankruptcy court and the case had ended but while McKinsey RTS was continuing to perform claims management work on the estate's behalf), Carmody finally disclosed McKinsey's relationship with two large GenOn creditors who are also McKinsey clients: Bank of America N.A. and Merrill Lynch.  Both companies were on the Interested Parties List docketed more than seven months earlier on June 23, 2017.  McKinsey RTS's and Carmody's extreme delay in disclosing these connections until after the plan had been confirmed is consistent with Defendants' chronic pattern of withholding and then incrementally and belatedly disclosing critical information in order to evade disqualification of McKinsey and waiting until it is too late for McKinsey's disclosures to be acted upon in the bankruptcy proceedings.

282.    The services that McKinsey RTS provides for GenOn directly and adversely impact McKinsey's own clients who are also creditors of GenOn.

283.    McKinsey RTS's scope of services in the *GenOn* bankruptcy, as described in GenOn's June 23, 2017 application to employ McKinsey RTS (*GenOn*, Dkt. 123), obligated McKinsey RTS to "provide strategic advice and develop relevant analyses to support the overall restructuring process[.]"  McKinsey RTS was also obligated, in cooperation with others, to "develop and prepare a Chapter 11 plan of reorganization[.]"  *Id.* Due to McKinsey RTS's many

conflicts of interests, it was not possible for McKinsey RTS to carry out these services in an impartial manner. Every one of McKinsey's numerous clients who is a *GenOn* creditor will be adversely impacted by the "restructuring process" by GenOn's plan of reorganization. At the same time, McKinsey RTS is obligated to prepare that plan of reorganization *with full loyalty to GenOn*.

284.    Additionally, McKinsey RTS's obligations to GenOn include "assist[ing] the debtors in managing the Chapter 11 bankruptcy process, including managing outside stakeholders[.]" *Id.* Again, this is a task that McKinsey RTS cannot perform with full loyalty to the bankruptcy estate. Among the outside stakeholders that McKinsey RTS is thereby committed to "managing" are ***McKinsey's own clients***.

285.    McKinsey RTS is also charged with "assist[ing] in development of supporting diligence materials and presentations for use in various stakeholder meetings, attend[ing] diligence sessions and working meetings with various stakeholders and constituents[.]" *Id.* In other words, although McKinsey RTS is obligated to serve as a fiduciary for GenOn, it was in meetings facing ***McKinsey's own clients*** who are indisputably adverse to, and have numerous connections with, the bankruptcy estate, with significant financial interests hanging in the balance.

286.    And in perhaps the ultimate conflict of interest, by virtue of its appointment as a *GenOn* bankruptcy advisor, McKinsey RTS is committed to "provide testimony" against ***its own client connections*** in adversarial litigation. *Id.* This obligation means that McKinsey RTS might have to choose between using and withholding confidential information gained from McKinsey's clients that may be useful or relevant to the bankruptcy estate. If McKinsey decides it is obligated to withhold confidential information from its client that it could otherwise use for GenOn's benefit, it would be violating its fiduciary duty to GenOn and would be obligated to withdraw from the engagement.

287.     As a bankruptcy advisor and court-appointed fiduciary, McKinsey RTS is obligated to assist GenOn in the bankruptcy reorganization process, the goal of which is a negotiated (or imposed) plan to reduce or eliminate the debt owed by GenOn to McKinsey's clients.  Under these circumstances, McKinsey's client relationships with numerous creditors of the estate were, and are, disqualifying.  *See* Ex. C ¶¶ 85-86.

**FIRST CAUSE OF ACTION**
VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
*Against All Defendants Except McKinsey RTS*

288.     Alix repeats and realleges paragraphs 1 through 287 as if fully set forth herein.

289.     This cause of action is asserted against all Defendants except McKinsey RTS (the "**Count 1 Defendants**") and is asserted in addition to and in the alternative to the Second and Third Causes of Action, *infra*.

290.     Section 1962(c) of Title 18 of the United States Code makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

291.     At all relevant times, each of the Count 1 Defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

292.     At all relevant times, AP was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

**A.  The Count 1 RICO Enterprise and Its Effect on Interstate Commerce**

293.     From its formation in or around 2010 and continuing to the present, McKinsey RTS has constituted an enterprise (the "**Count 1 Enterprise**") within the meaning of 18 U.S.C. § 1961(4).  McKinsey RTS was, and is, distinct from McKinsey & Co., McKinsey Holdings, McKinsey US, and the other Defendants because McKinsey RTS was formed for the purpose of

facilitating, committing, perpetuating, and concealing the fraudulent and other criminal conduct alleged herein with the aim of unlawfully depriving AP of bankruptcy consulting engagements it otherwise would have obtained.  By encapsulating bankruptcy consulting activities in a separately incorporated legal entity—McKinsey RTS—McKinsey & Co., McKinsey Holdings, and McKinsey US purported to add a veneer of indirectness between them and bankruptcy debtors and other bankruptcy proceeding participants and used McKinsey RTS as a pretext to withhold their own multiplicity of connections to debtors and bankruptcy proceeding participants.  Forming McKinsey RTS also allowed them to conduct the illegal scheme from a separate legal entity and thereby attempt to wall off its illegal activities from the larger McKinsey operation.

294.   Beginning in or around 2011, McKinsey RTS participated in the following bankruptcy proceedings, involving bankruptcy debtors with assets, liabilities, revenues, employee totals, and states of operations as indicated in the chart below:

| Matter | Assets (Millions) | Liabilities (Millions) | Revenue (Millions) | Employees | No. of Affected States |
|---|---|---|---|---|---|
| *Harry & David* | $243 | $1,050 | $427 | 1,026 | 22 states[32] |
| *AMR* | $25,088 | $103,000 | $22,170 | 78,250 | Six states and Puerto Rico[33] |
| *AMF Bowling* | $100,000 | $279,000 | $387,000 | 7,000 | 34 states[34] |
| *Edison Mission* | $8,323 | $12,304 | $9,321 | 1,783 | 12 states[35] |

---

[32]   Alabama, California, Colorado, Delaware *(state of filing)*, Florida, Iowa, Illinois, Indiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, New Jersey, New York, Ohio *(debtors' headquarters and main distribution center)* Oregon *(debtors' headquarters)*, Pennsylvania, South Carolina, Tennessee, Virginia, and Wisconsin *(stores)*.

[33]   Debtor's primary operations in New York *(state of filing)*, California, Illinois, Florida, Missouri, Texas *(debtor's headquarters)*, and Puerto Rico.

[34]   Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia *(debtors' headquarters and state of filing)*, Washington, and Wisconsin.

[35]   Debtors' headquarters in Illinois *(state of filing)* and California, and operations in 12 states total according to Plan Sponsor Agreement.

| Matter | Assets (Millions) | Liabilities (Millions) | Revenue (Millions) | Employees | No. of Affected States |
|---|---|---|---|---|---|
| *NII Holdings* | $2,887 | $4,593 | $4,773 | 3,870 | One state: Virginia *(debtor's headquarters)* *(Plus state of filing:* New York) |
| *Standard Register* | $481 | $592 | $720 | 3,700 | 50 states[36] |
| *Alpha Natural Resources* | $10,736 | $9,834 | $4,955 | 8,900 | 6 states[37] |
| *SunEdison* | $11,500 | $16,100 | $2,484 | 7,260 | 20 states[38] |
| *GenOn* | $2,435 | $2,131 | $1,862 | 1,581 | 10 states[39] |
| **TOTAL** | **$61,793** | **$149,883** | **$47,099** | **113,370** | **All 50 states plus Puerto Rico** |

295.    Additionally, the conflicts of interests disqualifying McKinsey RTS from serving the various debtor-clients typically arose from McKinsey's relationships with business entities located in states or nations other than those in which the debtor-clients operated.

296.    Accordingly, at all relevant times, McKinsey RTS was engaged in, and its activities affected, interstate commerce.

297.    At all relevant times, the conduct of the Count 1 Defendants and their co-conspirators has taken place in and has directly, substantially, and foreseeably affected and restrained interstate commerce.

---

[36]    Debtors had operations in all 50 states according to plan documents, including Ohio *(debtors' headquarters)* and Delaware *(place of filing)*.

[37]    Kentucky, Pennsylvania, Tennessee, Virginia *(place of filing)*, West Virginia *(debtors' headquarters)*, and Wyoming.

[38]    Arizona, California *(debtors' operational and solar business headquarters)*, Hawaii, Idaho, Illinois, Maine, Maryland, Massachusetts, Minnesota, Missouri *(debtors' corporate headquarters)*, Nebraska, Nevada, New York *(place of filing)*, North Carolina, Ohio, Oregon, Texas, Utah, Vermont, and Washington.

[39]    California, Florida, Maryland, Massachusetts, Mississippi, New Jersey *(debtors' headquarters)*, New York, Ohio, Pennsylvania, and Texas *(place of filing and headquarters of parent company, NRG Energy, Inc.)*.

## B.  Pattern of Racketeering Activity

298.    Each of the Count 1 Defendants conducted or participated in, directly or indirectly, the management or operation of McKinsey RTS and its affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c); to wit, each has committed multiple predicate acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D), and conspired with other Count 1 Defendants to commit and aid and abet other Count 1 Defendants' commission of the same, since at least 2010 and continuing to the present day.

299.    The Count 1 Defendants played the following roles in the racketeering scheme:

a.    McKinsey & Co. owns and controls McKinsey Holdings, which, in turn, owns and controls McKinsey US.  McKinsey US, in turn, owns and controls McKinsey RTS.

b.    Directly and through its agent officers, directors, board members, employees, and representatives, McKinsey & Co. (including its subsidiaries McKinsey Holdings and McKinsey US) has been an active participant and central figure in the operation of McKinsey RTS and its affairs, and in the orchestration, planning, perpetuation, and execution of the unlawful scheme to deprive AP of valuable bankruptcy consulting engagements:

    i.    McKinsey & Co. owns, either directly or indirectly, all of its affiliates, including McKinsey RTS.

    ii.    A board of thirty shareholders controls McKinsey & Co. and all of its affiliates, including McKinsey RTS.

    iii.    McKinsey & Co.'s subsidiaries all rely on the McKinsey brand for marketing.

iv.  McKinsey RTS's disclosure declarations, which were submitted as part of the debtors' applications for bankruptcy court authorization of McKinsey RTS's employment, prominently and extensively promote McKinsey & Co.'s skills and staff.

v.  McKinsey entities share the same in-house counsel.  For example, Proshan is a Senior Vice President of and Associate General Counsel to McKinsey & Co. and also serves as counsel for McKinsey RTS.

vi.  McKinsey RTS is dependent on McKinsey & Co. to provide its business services in its bankruptcy cases.  As a result, McKinsey & Co. and its subsidiaries provide client service personnel to McKinsey RTS.

c.  Each of the predicate acts alleged herein was performed by McKinsey & Co., McKinsey Holdings, or McKinsey US, or employees of those entities acting within the scope of their employment.  McKinsey & Co. personnel (including Carmody, Goldstrom, and Yerian) filed materially false or incomplete Bankruptcy Rule 2014 disclosures concealing conflicts of interests and, in some instances, fraudulent behavior, which, if truthfully and fully disclosed, would disqualify McKinsey RTS from all or substantially all of the bankruptcy crisis management and consulting engagements it has secured from 2010 to the present.  McKinsey & Co., McKinsey Holdings, and McKinsey US also initiated the "pay-to-play" scheme with certain legal professionals through which those Defendants engaged in and offered commercial bribes and failed to disclose those bribes to the various bankruptcy courts despite the conflicts of interest they created.

d.  As participants in the Count 1 Defendants' unlawful scheme, as described below,

McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted acts of bankruptcy fraud, mail and wire fraud, obstruction of justice, and money laundering in violation of 18 U.S.C. §§ 152(2), 152(3), 152(6), 1341, 1343, 1503(a), and 1957, and committed commercial bribery under state law in connection with the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies; committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in connection with the *Alpha Natural Resources* and *SunEdison* bankruptcies; committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in the *Alpha Natural Resources* bankruptcy; and McKinsey & Co. committed, and McKinsey Holdings and McKinsey US aided and abetted, violations of 18 U.S.C. § 2314.

e. Barton was, from the inception of the Count 1 Enterprise through mid-2018, the Managing Partner of McKinsey & Co. and, given his senior-most executive position at McKinsey, he had ultimate executive authority over McKinsey's bankruptcy engagement activities as well as the other individual Defendants in this action. Barton thus had knowledge of the various McKinsey connections and conflicts that McKinsey RTS failed to disclose and facilitated and authorized those unlawful failures to disclose, beginning at least with the *Harry & David* bankruptcy and continuing through the *GenOn* bankruptcy. Barton also personally participated in fraudulent efforts to deflect and delay Alix's 2014-2015 attempt to remediate McKinsey's unlawful bankruptcy consulting practices. This conduct demonstrates Barton's desire and intention that the unlawful activities of the other Defendants

succeed and suggests that Barton previously had authorized these activities. At a minimum, Barton had express notice of the unlawful nature of McKinsey's bankruptcy consulting business practices by September 2014 when informed of such by Alix. Despite this knowledge, Barton did nothing to stop McKinsey's unlawful practices. As set forth below, as a participant in the Count 1 Defendants' scheme to defraud, Barton committed and aided and abetted acts of mail and wire fraud and money laundering in violation of 18 U.S.C. §§ 1341, 1343, and 1957, and aided and abetted acts of bankruptcy fraud and obstruction of justice in violation of 18 U.S.C. §§ 152(2), 153(3), and 1503(a) in connection with the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies; aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* and *SunEdison* bankruptcies; aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in *Alpha Natural Resources*; and committed and aided and abetted violations of 18 U.S.C. § 2314.

f.  Sternfels is a Senior Partner of McKinsey & Co. and had, during the relevant period, a high degree of executive authority over the bankruptcy consultancy activities of McKinsey, including the submission of false and misleading Rule 2014(a) declarations by Carmody, Goldstrom, and Yerian and other McKinsey & Co., McKinsey US, and McKinsey RTS employees. Sternfels personally participated in the preparation of false and misleading Rule 2014(a) declarations on behalf of McKinsey RTS in the *SunEdison* bankruptcy. He also personally participated in fraudulent efforts to deflect and delay Alix's 2014-2015 attempt to remediate

114

McKinsey's unlawful bankruptcy consulting practices.  At a minimum, Sternfels had express notice of the unlawful nature of the McKinsey's bankruptcy consulting business practices by September 2014 when informed of such by Alix.  Despite this knowledge, Sternfels did nothing to stop McKinsey's unlawful practices, even when he became substantially involved in McKinsey RTS's engagement for *SunEdison* and McKinsey RTS's disclosures for that case.  Additionally, Sternfels likely participated in an unlawful *quid pro quo* with SunEdison CEO Chatila through which McKinsey obtained post-bankruptcy employment for Chatila in exchange for Chatila's acquiescence in McKinsey's concealment of voidable preferences through a "re-invoiced" and "round-trip" payment scheme.  Moreover, as a Senior Partner of McKinsey & Co. with a high level of executive authority over McKinsey RTS and its President, Garcia, during the relevant period, Sternfels had knowledge of McKinsey RTS's bankruptcy practices and the various connections and conflicts of McKinsey that McKinsey RTS unlawfully failed to disclose, and Sternfels facilitated and authorized those unlawful failures to disclose, beginning at least with the *Harry & David* bankruptcy and continuing through the present.  As set forth below, as a participant in the Count 1 Defendants' scheme to defraud, Sternfels committed and aided and abetted acts of mail and wire fraud and money laundering in violation of 18 U.S.C. §§ 1341, 1343, and 1957, and aided and abetted acts of bankruptcy fraud and obstruction of justice in violation of 18 U.S.C. § 152(2), 152(3), and 1503(a) in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* bankruptcies; committed and aided and abetted acts of abetting bankruptcy fraud,

obstruction of justice, and witness tampering in violation of 18 U.S.C. § 152(2), 152(3), 1503(a), and 1512(b) in the *SunEdison* bankruptcy; violated 18 U.S.C. §§ 1512(b) and 1512(c) by aiding and abetting witness tampering and obstruction of justice in the *Alpha Natural Resources* bankruptcy; and aided and abetted violations of 18 U.S.C. § 2314 by Barton and McKinsey.

g.  Garcia is a Senior Partner of McKinsey & Co., a founder and the President of McKinsey RTS; and a former board member (from 2006 to 2017) of MIO.  As such, Garcia has at all relevant times had a high degree of executive authority over the bankruptcy consultancy activities of McKinsey RTS, including the knowledge, facilitation, authorization, and approval of the submission of false and misleading Rule 2014(a) declarations by Carmody, Goldstrom, Yerian, and others on behalf of McKinsey RTS, beginning with the *Harry & David* bankruptcy and continuing through the present.  As set forth below, as a participant in the Count 1 Defendants' scheme to defraud, Garcia committed and aided and abetted acts of mail and wire fraud and money laundering in violation of  18 U.S.C. §§ 1341, 1343, and 1957, and aided and abetted acts of bankruptcy fraud and obstruction of justice in violation of 18 U.S.C. § 152(2), 152(3), and 1503(a) in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies; aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* and *SunEdison* bankruptcies; and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in *Alpha Natural Resources*.

h.  Goldstrom is a Senior Partner of McKinsey & Co. and a board member of McKinsey

RTS and has at all relevant times had a high degree of executive authority over the bankruptcy consultancy activities of McKinsey RTS.  Goldstrom submitted at least 10 knowingly and materially false and misleading Rule 2014(a) declarations under penalty of perjury on behalf of McKinsey RTS in *Harry & David* and *AMR*, in furtherance of the Count 1 Defendants' fraudulent and unlawful scheme.  As set forth below, as a participant in the Count 1 Defendants' scheme to defraud, Goldstrom committed acts of bankruptcy fraud and obstruction of justice in violation of 18 U.S.C. §§ 152(2), 152(3), and 1503(a) in the *Harry & David*, *AMR*, *AMF Bowling*, and *SunEdison* bankruptcies; committed and aided and abetted acts of mail and wire fraud and money laundering in violation of 18 U.S.C. §§ 1341, 1343, and 1957, and aided and abetted acts of bankruptcy fraud and obstruction of justice in violation of 18 U.S.C. §§ 152(2), 152(3), and 1503(a) in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies; aided and abetted acts witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* and *SunEdison* bankruptcies; and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in *Alpha Natural Resources*.

i.  Proshan, a Senior Vice President of and Associate General Counsel to McKinsey & Co., furnishes in-house legal services to McKinsey entities including McKinsey RTS and knowingly participated in the preparation of materially false and incomplete Rule 2014(a) submissions by McKinsey RTS on numerous occasions. As an officer of McKinsey & Co., Proshan has at all relevant times had a degree of executive authority over the bankruptcy consultancy activities of McKinsey RTS.

117

As set forth below, as a participant in the scheme to defraud, Proshan committed and aided and abetted acts of bankruptcy fraud, mail and wire fraud, obstruction of justice, and money laundering in violation of 18 U.S.C. §§ 152(3), 153(3), 1341, 1343, 1503(a), and 1957 in connection with the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies; committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in *Alpha Natural Resources* and *SunEdison*; and committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(b) in *Alpha Natural Resources*.

j. Carmody is a Senior Partner at McKinsey & Co. and a senior executive of McKinsey RTS and has at all relevant times had a high degree of executive authority over the bankruptcy consultancy activities of McKinsey RTS.  Carmody has submitted at least 13 knowingly and materially false and misleading Rule 2014(a) declarations under penalty of perjury on behalf of McKinsey RTS in the *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* bankruptcies in furtherance of the Count 1 Defendants' fraudulent and unlawful scheme.  Carmody had previously been employed by AP and had signed Rule 2014(a) declarations on AP's behalf which fully and lawfully disclosed AP's connections.  Carmody also worked closely with attorney Proshan in preparing his Rule 2014(a) declarations, including the decision to disclose particular connections.  Accordingly, Carmody knew the palpably deficient nature of McKinsey's disclosure statements.   As set forth below, as a participant in the scheme to defraud, Carmody committed acts of bankruptcy fraud and obstruction of justice in violation of 18 U.S.C. §§ 152(2),

118

152(3), and 1503(a) in connection with the *AMR*, *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies; committed and aided and abetted acts of mail and wire fraud and money laundering in violation of 18 U.S.C. §§ 1341, 1343, and 1957, and aided and abetted acts of bankruptcy fraud and obstruction of justice in violation of 18 U.S.C. §§ 152(2), 152(3), and 1503(a) in connection with the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies; committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. 1512(b) in the *Alpha Natural Resources* and *SunEdison* bankruptcies; and committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in *Alpha Natural Resources*.

k.  Yerian was a founder of and Practice Leader at McKinsey RTS and a Partner at McKinsey & Co. from 2011 to March 2016.  Yerian submitted at least three knowingly and materially false and misleading Rule 2014(a) declarations under penalty of perjury on behalf of McKinsey RTS in furtherance of the Count 1 Defendants' fraudulent and unlawful scheme.  Yerian had previously been employed by AP and had participated in the preparation of Rule 2014(a) declarations on AP's behalf which fully and lawfully disclosed AP's connections, and was required to be familiar with the compliance and disclosure obligations imposed on bankruptcy professionals.  Accordingly, Yerian knew the palpably deficient nature of McKinsey RTS's disclosure statements.   As set forth below, as a participant in the Count 1 Defendants' unlawful scheme, at a minimum, Yerian committed and aided and abetted acts of bankruptcy fraud, mail and wire fraud, obstruction of

justice, and money laundering in violation of 18 U.S.C. §§ 152(2), 152(3), 1341, 1343, 1503(a), and 1957 in connection with the *Edison Mission* bankruptcy.

300.    The Count 1 Defendants' predicate acts of racketeering activity were all related in that they were all committed for the purpose of (1) concealing or obfuscating McKinsey's disqualifying conflicts of interest in order to enable McKinsey RTS to obtain bankruptcy consulting assignments that it would not have received had the Count 1 Defendants behaved lawfully, and through offering unlawful "pay-to-play" arrangements to bankruptcy attorneys; (2) thereby depriving AP of remunerative bankruptcy consulting engagements; and (3) after the scheme was discovered, forestalling remedial litigation by AP and Alix by means of Barton's duplicitous interactions with Alix.  These acts, and others to be identified after further investigation and discovery herein, also shared a common or related result, participants, victim, and method of commission, which are described below.

### C.  RICO Predicate Acts

301.    Barton committed and aided and abetted the predicate acts described below in his capacity as Managing Partner of McKinsey & Co. and within the scope of his employment by or agency for McKinsey & Co.

302.    Garcia committed and aided and abetted the predicate acts described below in his capacity as the President of McKinsey RTS, a Senior Partner of McKinsey & Co., and (between 2006 and 2017) a board member of MIO, and within the scope of his employment by or agency for those entities.

303.    Proshan committed and aided and abetted the predicate acts described below in her capacity as a Senior Vice President of and Associate General Counsel to McKinsey & Co. with primary responsibility for providing legal services to McKinsey RTS, and within the scope of her employment by or agency for those entities.

304.    Carmody committed and aided and abetted the predicate acts described below in his capacity as a Senior Partner and executive of McKinsey & Co. and executive of McKinsey RTS, and within the scope of his employment by or agency for those entities.

305.    Goldstrom committed and aided and abetted the predicate acts described below in his capacity as a Senior Partner and executive of McKinsey & Co. and as an executive and board member of McKinsey RTS, and within the scope of his employment by or agency for those entities.

306.    Sternfels committed and aided and abetted the predicate acts described below in his capacity as a Senior Partner and executive of McKinsey & Co., and within the scope of his employment by or agency for McKinsey & Co.

307.    Yerian committed and aided and abetted the predicate acts described below occurring prior to April 2016 in his capacity as a Partner of McKinsey & Co. and Practice Leader at McKinsey RTS, and within the scope of his employment by or agency for those entities.

> i.    *False Declarations, Certifications, Verifications or Statements under Penalty of Perjury in Violation of 18 U.S.C. §§ 152(2) and 152(3).*

308.    With respect to each of its engagements by debtors in bankruptcy, McKinsey RTS was obligated by Bankruptcy Rule 2014(a) to provide, as part of the application for employment that the debtors filed with the bankruptcy court in each case, "a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."   To satisfy its obligations under Rule 2014(a), McKinsey RTS was required to fully disclose all such connections or interrelationships regardless of materiality.  As described below, each of the Count 1 Defendants submitted, caused McKinsey RTS to submit, and aided and abetted the submission of affidavits or declarations under penalty of perjury on behalf of McKinsey RTS which each of the Count 1 Defendants knew to be materially

false or misleadingly incomplete, for the purposes of concealing McKinsey's disqualifying conflicts of interest, in violation of 18 U.S.C. §§ 152(2) and 153(3), in the 31 disclosure declarations submitted on behalf of McKinsey RTS in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, which are identified as Nos. 9-39 in the chart attached hereto as Exhibit A. The individual false and misleading statements within each of those 31 submissions are identified in Exhibit B and Schedules 1-12, attached hereto.

309.    Each of the 31 submissions constituted the knowing and fraudulent making of a false oath, declaration, certificate, verification, or statement under penalty of perjury pursuant to 28 U.S.C. § 1746, in or in relation to any case under the Bankruptcy Code, within the meaning of 18 U.S.C. §§ 152(2) and 152(3).

310.    Each Count 1 Defendant committed and aided and abetted the aforementioned violations of 18 U.S.C. §§ 152(2) and 152(3) as follows, with the numbers below referring to the numbered declarations listed in Exhibit A hereto:

| Defendant | Committed Violations | Aided and Abetted Violations |
|---|---|---|
| McKinsey & Co. | 9-39 | 9-39 |
| McKinsey Holdings | 9-39 | 9-39 |
| McKinsey US | 9-39 | 9-39 |
| Garcia | | 9-39 |
| Proshan | 12-39 | 12-39 |
| Carmody | 12-39 | 12-39 |
| Goldstrom | 9-19, 29, 31-32, 34-35 | 9-39 |
| Sternfels | 29, 31-32, 34-35 | 9-39 |
| Barton | | 9-39 |
| Yerian | 20-22 | 20-22 |

311.    Garcia aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing and authorizing at least 31 false and misleading declarations regarding McKinsey's connections to Interested Parties to be filed on behalf of

McKinsey RTS in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.  Garcia was President of McKinsey RTS and a Senior Partner of McKinsey & Co. at all relevant times and a board member of MIO from 2006 to 2017.  The nine aforementioned Chapter 11 bankruptcies represent all, or nearly all, of McKinsey RTS's bankruptcy-related business in the United States during the relevant period, and McKinsey RTS received tens of millions of dollars in fees in connection with those bankruptcies.  As President of McKinsey RTS, a Senior Partner of McKinsey & Co., a member of MIO's board, and an experienced bankruptcy practitioner, Garcia was aware of and/or willfully blind to McKinsey's many undisclosed conflicts and connections to Interested Parties in those nine bankruptcies.  As President of McKinsey RTS, Garcia was aware of, and authorized, McKinsey RTS's deficient and unlawful disclosures in those bankruptcies. Indeed, the detail for McKinsey RTS's fee application in the *Edison Mission* bankruptcy explicitly shows that Proshan consulted with Garcia regarding McKinsey RTS's disclosures in that case. Accordingly, at a minimum, Garcia aided and abetted the commission of these predicate acts. Further evidence of Garcia's involvement is peculiarly within Defendants' knowledge and control and will be proven at trial following discovery.

312.  Proshan committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing at least 28 false and misleading declarations regarding McKinsey's connections to Interested Parties to be filed on behalf of McKinsey RTS in the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.  At all relevant times, Proshan was employed as Associate General Counsel for McKinsey & Co. and served as in-house counsel to McKinsey RTS in connection with its bankruptcy disclosure declarations in the eight aforementioned bankruptcies.

123

As an experienced attorney working for bankruptcy consultancy McKinsey RTS, Proshan was aware of the requirements of Bankruptcy Rule 2014. As in-house counsel for McKinsey & Co. and McKinsey RTS, Proshan was also aware of McKinsey's numerous conflicts and connections that Defendants unlawfully failed to disclose in each of those bankruptcies. McKinsey RTS's fee applications in the first two of those bankruptcies, *AMR* and *AMF Bowling*, show Proshan played a lead role in drafting, revising, supervising, and gathering information for McKinsey RTS's disclosures in those cases and Proshan was in communication with the declarants (Goldstrom in *AMR* and Carmody in *AMF Bowling*) regarding disclosures in both cases. McKinsey RTS's fee applications for its six subsequent bankruptcy engagements (*Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn*) provide little detail regarding the preparation of McKinsey RTS's disclosures for those cases. However, McKinsey RTS's fee applications reveal that Proshan worked on and consulted with Garcia and Yerian regarding McKinsey RTS's disclosures in *Edison Mission*; with Sternfels regarding McKinsey RTS's disclosures in *SunEdison*; and with Carmody regarding McKinsey RTS's disclosures in *GenOn*. Proshan also worked closely with Carmody regarding McKinsey RTS's false and incomplete declarations in *Alpha Natural Resources*. Thus, it is likely that Proshan has played a key role in planning, drafting, and revising McKinsey RTS's false and misleading disclosures in at least all eight bankruptcies beginning with *AMR*. Accordingly, Proshan is liable as a principal for these predicate acts and aided and abetted their commission. Further evidence of Proshan's involvement is peculiarly within Defendants' knowledge and control and will be proven at trial following discovery.

313. Carmody committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing and authorizing at least 28 false and

misleading declarations regarding McKinsey's connections to Interested Parties to be filed on behalf of McKinsey RTS in the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.  At all relevant times, Carmody was an executive of both McKinsey RTS and McKinsey & Co. and an experienced bankruptcy practitioner. Carmody also worked closely with attorney Proshan in preparing his Rule 2014(a) declarations, including the decision to disclose particular connections.  Thus, Carmody was aware of the requirements of Bankruptcy Rule 2014.  Carmody signed and swore to McKinsey RTS's false and misleading declarations in the *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* bankruptcies.  Additionally, the detail for McKinsey RTS's fee applications in *AMR* and *SunEdison* shows Carmody played a substantial role in those matters, including the preparation of McKinsey RTS's disclosures and applications for retention.  Therefore, it is likely that Carmody played a lead role in the preparation of McKinsey RTS's false and misleading declarations in at least all eight bankruptcies beginning with *AMR*.  As an executive of both McKinsey & Co. and McKinsey RTS, and as the declarant in *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn*, Carmody was aware of the numerous McKinsey connections to Interested Parties that were concealed or omitted from McKinsey RTS's declarations in all eight bankruptcies beginning with *AMR*.  Accordingly, Carmody is liable as a principal for these predicate acts in at least the *AMR*, *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, and he aided and abetted their commission in the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies. Further evidence regarding the details of Goldstrom's involvement is peculiarly within the knowledge and control of Defendants and will be proven at trial after discovery.

314.    Goldstrom committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing and authorizing at least 15 false and misleading declarations regarding McKinsey's connections to Interested Parties to be filed on behalf of McKinsey RTS in the *Harry & David*, *AMR*, *AMF Bowling*, and *SunEdison* bankruptcies, and by knowingly causing and authorizing false and misleading declarations regarding McKinsey's connections to Interested Parties to be filed on behalf of McKinsey RTS in the *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* bankruptcies.    At all relevant times, Goldstrom was an executive of both McKinsey RTS and McKinsey & Co., a member of McKinsey RTS's board of directors, and an experienced bankruptcy practitioner.  Thus, Goldstrom was aware of the requirements of Bankruptcy Rule 2014.  Goldstrom signed and swore to McKinsey RTS's false and misleading declarations in the *Harry & David* and *AMR* bankruptcies.  The detail for McKinsey RTS's fee applications shows Goldstrom also played a role in the preparation of McKinsey RTS's false and misleading declarations in at least *AMF Bowling* (in which he consulted with Proshan regarding McKinsey RTS's disclosures) and *SunEdison* (in which he consulted with Sternfels regarding McKinsey RTS's disclosures).  As an executive of both McKinsey & Co. and McKinsey RTS, and as the declarant in *Harry & David* and *AMR*, Goldstrom was aware of the numerous McKinsey connections to Interested Parties that were concealed or omitted from McKinsey RTS's declarations in at least the *Harry & David*, *AMR*, *AMF Bowling*, and *SunEdison* matters.  Moreover, given his continuous role as an executive of both McKinsey & Co. and McKinsey RTS and as a board member of McKinsey RTS, Goldstrom was likely aware of, and knowingly facilitated, McKinsey RTS's false and misleading declarations in all nine bankruptcies beginning with *Harry & David*.  Accordingly, Goldstrom is liable as a principal for these predicate acts in the *Harry & David*, *AMR*, *AMF Bowling*, and *SunEdison* bankruptcies, and aided and abetted

their commission in all nine bankruptcies beginning with *Harry & David*. Further evidence regarding the details of Goldstrom's involvement is peculiarly within the knowledge and control of Defendants and will be proven at trial after discovery.

315.   Sternfels committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and causing at least four false and misleading declarations regarding McKinsey's connections to Interested Parties to be filed on behalf of McKinsey RTS in the *SunEdison* bankruptcy, and by knowingly authorizing false and misleading declarations to be filed on behalf of McKinsey RTS in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* bankruptcies.   At all relevant times, Sternfels was a Senior Partner of McKinsey & Co. and exercised significant executive authority over McKinsey RTS's President, Garcia.  By September 2014, Sternfels was indisputably aware of the deficient and unlawful nature of McKinsey RTS's bankruptcy disclosures.  Despite that knowledge, Sternfels took no action to remediate McKinsey RTS's disclosure practices and McKinsey RTS went on to file fraudulent disclosures and obtain bankruptcy consultancy work in *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn*.  The detail for McKinsey RTS's fee applications in *SunEdison* shows that Sternfels played a significant managerial role in that engagement, including communications with Proshan, Carmody, and Goldstrom regarding McKinsey RTS's disclosures in that matter.  As a longtime McKinsey & Co. executive and a key person in the *SunEdison* engagement (including on matters regarding McKinsey RTS's disclosures), Sternfels was aware of the numerous connections that McKinsey RTS unlawfully omitted or concealed in its disclosures in *SunEdison*.  Additionally, given his senior executive role at McKinsey & Co. and executive authority over Garcia, and given his failure to remediate McKinsey RTS's unlawful practices after they were raised by AP, it is likely

that Sternfels also knowingly authorized and facilitated McKinsey RTS's filing of false and misleading declarations in other bankruptcies, beginning with the *Harry & David* matter and continuing through the present.  Accordingly, Sternfels aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in all nine of McKinsey RTS's bankruptcy matters, beginning with *Harry & David*, and committed acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in *SunEdison*.   Further evidence regarding the details of Sternfels's involvement is peculiarly within the knowledge and control of Defendants and will be proven at trial after discovery.

316.     Barton aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in connection with all of McKinsey RTS's nine bankruptcy matters beginning with *Harry & David*.  As a longtime McKinsey & Co. executive, Barton was aware of the numerous connections that McKinsey RTS unlawfully omitted or concealed in its disclosures in all nine bankruptcies beginning with *Harry & David* and continuing through *GenOn*.  By September 2014, Barton was indisputably aware of the deficient and unlawful nature of McKinsey RTS's bankruptcy disclosures.   Despite that knowledge, Barton took no action to remediate McKinsey RTS's disclosure practices and McKinsey RTS went on to file fraudulent disclosures and obtain bankruptcy consultancy work in *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn*.  Given his role as McKinsey & Co.'s Managing Partner from 2009 through mid-2018 and his executive authority over the other individual Defendants, including Sternfels and Garcia, and given his failure to remediate McKinsey RTS's unlawful practices after they were raised by AP, it is likely that Barton also knowingly authorized and facilitated McKinsey RTS's filing of false and misleading declarations in other bankruptcies, beginning with the *Harry & David* bankruptcy and continuing through the *GenOn* bankruptcy, and aided and abetted the commission

of the violations of 18 U.S.C. §§ 152(2) and 152(3) in connection with those bankruptcies.  Further evidence regarding the details of Barton's involvement is peculiarly within the knowledge and control of Defendants and will be proven at trial after discovery.

317.    Yerian committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) knowingly causing at least three false and misleading declarations regarding McKinsey's connections to Interested Parties to be filed on behalf of McKinsey RTS in the *Edison Mission* bankruptcy.  At all relevant times, Yerian was a Practice Leader at McKinsey RTS, a Partner of McKinsey & Co., and an experienced bankruptcy practitioner.  Thus, Yerian was aware of the requirements of Bankruptcy Rule 2014.  Yerian signed and swore to McKinsey RTS's false and misleading declarations in the *Edison Mission* bankruptcy.  The detail for McKinsey RTS's fee applications shows that Yerian also played a role in the preparation of McKinsey RTS's false and misleading declarations in the *Edison Mission* bankruptcy (in which he consulted with Proshan regarding McKinsey RTS's disclosures).  As an executive of both McKinsey & Co. and McKinsey RTS, and as the declarant in *Edison Mission*, Yerian was aware of the numerous McKinsey connections to Interested Parties that were concealed or omitted from McKinsey RTS's declarations in that matter.  Accordingly, Yerian is liable as a principal for these predicate acts and aided and abetted their commission.  Further evidence regarding the details of Yerian's involvement is peculiarly within the knowledge and control of Defendants and will be proven at trial after discovery.

318.    McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted the aforementioned violations of 18 U.S.C. §§ 152(2) or 152(3) in each of McKinsey RTS's nine bankruptcies beginning with *Harry & David* because Garcia, Proshan, Carmody, Goldstrom, Sternfels, Barton, and Yerian each committed these predicate acts within the

scope of their formal positions at, and for the benefit of, these entities, and in furtherance of deliberate corporate policy sanctioned and actively furthered by senior management.

*ii.    Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343.*

319.    Each of the Count 1 Defendants engaged in a scheme to defraud AP through the false denial, concealment, and obfuscation of disqualifying conflicts of interest, which thereby deprived AP of remunerative consulting engagements it would otherwise have obtained.    The Count 1 Defendants accomplished their scheme to defraud AP by:

    a.  Causing McKinsey RTS to systematically file with various bankruptcy courts 31 Rule 2014(a) disclosure statements which the Count 1 Defendants each knew to be materially false and misleading or incomplete in that such statements omitted, concealed, or distorted facts which would necessitate disqualification of McKinsey RTS in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* matters. Those disclosure statements are identified as Nos. 9-39 in Exhibit A hereto, and false and misleading statements contained therein are listed in Exhibit B hereto.

    b.  Using fraudulently engineered "re-invoiced" and "round trip" payments from non-debtor affiliates of SunEdison to avoid disqualification of McKinsey RTS from the *SunEdison* engagement.  This deception was likely furthered by an undisclosed *quid pro quo* engineered by Sternfels pursuant to which SunEdison CEO Chatila acceded to the scheme in exchange for McKinsey's assistance in finding post-bankruptcy employment for Chatila.

    c.  Concealing voidable preferences, and thus avoiding disqualification of McKinsey RTS in the *GenOn* bankruptcy, by falsely representing such preferences as ordinary-

130

course payments.

  d. Offering exclusive referral relationships to one or more prominent attorneys practicing in the United States, while failing to disclose these disqualifying contacts to bankruptcy courts.

320. The Count 1 Defendants later fraudulently perpetuated their scheme when, confronted by Alix with evidence of their wrongdoing, Count 1 Defendants Barton and McKinsey & Co. repeatedly promised to cease their unlawful activity while secretly intending to continue it.

321. In furtherance of the scheme, and as described herein, the Count 1 Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343; and also caused matters and things to be placed in a post office or authorized depository or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier in violation of 18 U.S.C. § 1341.  The Count 1 Defendants' specific mailings and interstate wirings in furtherance of the scheme to defraud include, but are not limited to, the following:

  a. Each of the declarations under penalty of perjury identified as Nos. 9-19, 23-28, 30, 33, and 36-39 in the table set forth in Exhibit A hereto were transmitted by interstate wire, by United States mail, and/or by private interstate commercial carrier, as evidenced by the fact that each such affidavit or declaration was signed, or the affiant or declarant resided, in a state different from that in which the document was judicially filed, as evidenced by the locations indicated on the signature page and/or the fax numbers on the declarants' signature pages:

| No(s). | Case | Declarant | Location of Declarant | Location of Case |
|---|---|---|---|---|
| 9, 10 | *Harry & David* | Goldstrom | Georgia | Delaware |
| 11 | *Harry & David* | Goldstrom | North Carolina or Georgia | Delaware |
| 12, 13 | *AMR Corp.* | Goldstrom | Texas | New York |
| 14-18 6-10 | *AMR Corp.* | Goldstrom | Georgia | New York |
| 19 | *AMF Bowling* | Carmody | Illinois | Virginia |
| 23, 24 | *NII Holdings* | Carmody | Illinois | New York |
| 25 | *Standard Register* | Carmody | Illinois | Delaware |
| 26-28, 30, 33 | *Alpha Natural Resources* | Carmody | Illinois | Delaware |
| 36-39 | *GenOn* | Carmody | Illinois | Texas |

b. Additionally, each of the declarations under penalty of perjury enumerated in items Nos. 9-11, 19-22, 25-28, 30, 33, and 36-39 in the table set forth in Exhibit A hereto, or preliminary drafts thereof, were transmitted by interstate wire, by United States mail, and/or by private interstate commercial carrier, given the likelihood that they were prepared, reviewed, or edited by employees of McKinsey in addition to the declarant, their respective legal counsel, and likely other firms or individuals located in states other than that in which the documents ultimately were judicially filed:

| No(s). | Case | Location of McKinsey employees or counsel preparing documents | Location of case |
|---|---|---|---|
| 1, 2 | *Harry & David* | New York | Delaware |
| 3 | *Harry & David* | New York | Delaware |
| 11 | *AMF Bowling* | New York | Virginia |
| 12-14 | *Edison Mission* | New York | Illinois |

| No(s). | Case | Location of McKinsey employees or counsel preparing documents | Location of case |
|--------|------|----------------------------------------------------------------|-------------------|
| 17 | *Standard Register* | New York | Delaware |
| 18-20, 22, 25 | *Alpha Natural Resources* | New York; Ohio *(debtors' counsel)* | Delaware |
| 21, 23-24, 26-27 | *SunEdison* | New York; California *(Sternfels)* | New York |
| 28-31 | *GenOn* | New York | Texas |

322.    The specific false and misleading statements in each of McKinsey RTS's disclosure declarations are noted in Exhibit B to this Amended Complaint and the schedules thereto.

323.    Accordingly, the following Count 1 Defendants committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the following items from the chart set forth in Exhibit A hereto:

| Defendant | Violations Nos. |
|-----------|------------------|
| McKinsey & Co. | 9-39 |
| McKinsey Holdings | 9-39 |
| McKinsey US | 9-39 |
| Garcia | 9-39 |
| Proshan | 12-39 |
| Carmody | 12-39 |
| Goldstrom | 9-39 |
| Barton | 9-39 |
| Sternfels | 9-39 |
| Yerian | 20-22 |

324.    Further, it is likely that each of the false and misleading declarations submitted by McKinsey RTS in each of its Chapter 11 bankruptcies was transmitted by mail and/or by interstate wire, particularly given that the individual Defendants are spread across different states. Accordingly, in addition to the foregoing instances of mail and wire fraud, it is likely that each of the Defendants committed and aided and abetted mail and/or wire fraud in connection with the false and misleading declarations submitted by McKinsey RTS in *SunEdison*, particularly given that

Sternfels is located in California while the *SunEdison* bankruptcy and the declarant in that proceeding were located in New York.

325.    Thus, McKinsey & Co., McKinsey Holdings, McKinsey US, Barton, Sternfels, Garcia, and Goldstrom each committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with all nine of McKinsey RTS's bankruptcy matters; Proshan and Carmody each committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcy matters; and Yerian committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the *Edison Mission* bankruptcy.

326.    Additionally, Barton, Sternfels, and McKinsey & Co. each committed and aided and abetted further acts of mail and wire fraud.  Barton and Sternfels, acting on behalf of McKinsey & Co., used or caused the use of the interstate or international wires in communications with Alix concerning his allegations of unlawful conduct by McKinsey.  These communications furthered the scheme by fostering in Alix the false impression that McKinsey was pursuing corrective action in light of Alix's admonishments to Barton and Sternfels concerning McKinsey's illegal bankruptcy consulting engagements.  By stringing Alix along in this fashion, Barton and Sternfels sought to (and did) forestall legal action by AP and thereby prolonged their scheme.  These communications include the following:

a. August 20, 2014 e-mail from Barton's assistant in London, Katharine Bowerman, conveying to Alix a message from Barton concerning Alix's request for a meeting to discuss McKinsey's bankruptcy consulting activities;[40]

b. August 20, 2014 e-mail from Alix to Barton responding to Barton's earlier message and discussing the parameters of a meeting between representatives of the two firms;

c. August 20, 2014 e-mail from Bowerman in London to Alix concerning the contemplated meeting;

d. August 21, 2014 e-mail from Alix to Barton and Bowerman in Europe concerning the contemplated meeting;

e. August 24, 2014 e-mail from Barton in Krakow, Poland to Alix;

f. August 27, 2014 e-mail from Barton's assistant in London, Katharine Bowerman, to Alix in Michigan, conveying a message from Barton concerning the contemplated meeting;

g. September 3, 2014 telephone call between Sternfels in San Francisco and Alix and Barton in New York City, during which AP's concerns about McKinsey's bankruptcy consulting practices were conveyed and Alix received assurances from Barton that AP's concerns would be addressed and remedied by McKinsey;

---

[40] All e-mails referenced in this paragraph 326 were sent to or from Alix at his e-mail address at Lakeview Capital Inc. (JAlix@lakeviewcapitalinc.com). Lakeview Capital's e-mail servers were hosted in the United States during the relevant time. Accordingly, any e-mail sent to or from JAlix@lakeviewcapitalinc.com would have been routed through the United States notwithstanding the geographical location of the device used by the sender or recipient to originate or read the e-mail. Upon information and belief, the e-mail server for Barton and Bowerman's e-mail addresses (Dominic_Barton@mckinsey.com and katharine_bowerman@mckinsey.com) as well as that of another Barton assistant, Charlotte Phillips (charlotte_phillips@mckinsey.com) were hosted in the United Kingdom or otherwise outside of the United States.

h. September 4, 2014 e-mail from Barton in Canada to Alix in the United States;

i. September 4, 2014 e-mail from Barton's assistant, Charlotte Phillips, in London to Alix in the United States, conveying a message from Barton concerning a follow-up discussion of AP's concerns;

j. September 4, 2014 telephone call between Barton in Ireland and Alix and Sternfels in New York City during which AP's concerns about McKinsey's bankruptcy consulting practices were conveyed and Alix received assurances from Barton that AP's concerns would be addressed and remedied by McKinsey;

k. September 5, 2014 telephone call between Barton in Ottawa, Canada and Alix in Boston, Massachusetts, during which Barton reiterated that AP's concerns about McKinsey's bankruptcy consulting practices would be addressed and remedied;

l. September 24, 2014 e-mail from Bowerman in London to Alix conveying Barton's enumeration of dates and times for a meeting to further address AP's concerns about McKinsey's bankruptcy consulting practices;

m. June 15, 2015 e-mail from Alix in Michigan to Barton, requesting a follow-up discussion to address Barton's promise to bring McKinsey into compliance with the law.

327.   Upon information and belief, the Count 1 Defendants (including specifically McKinsey & Co.) also used the interstate wires, United States mail, or private interstate commercial carrier to convey to one or more bankruptcy attorneys located in the United States offers of unlawful exclusive referral agreements.   Evidence of such transactions is peculiarly within Defendants' knowledge and control and will be proven at trial following discovery.

328.     The Count 1 Defendants also used the interstate wires, United States mail, or private interstate commercial carrier to transfer illegally obtained funds within the United States for the purpose of furthering the objectives of McKinsey RTS.  These transfers include the movement of funds in connection with McKinsey's "re-invoiced" and "round-trip" payments from SunEdison and its affiliates in or about September 2015 through April 2016, as well as the transmission of fees from various bankruptcy debtor-clients to McKinsey RTS throughout the course of the scheme since 2010.   Evidence of such transactions and others is peculiarly within Defendants' knowledge and control and will be proven at trial following discovery.

329.     Each of the Count 1 Defendants, through their direct or indirect corporate or executive control of McKinsey RTS, knew of, and participated in, numerous acts of mail and wire fraud.  In particular, each of the Count 1 Defendants, through their control of and/or participation in McKinsey RTS, sent or caused to be sent numerous mail or wire communications, or acted with knowledge that mail or wire communications would follow in the ordinary operation of McKinsey RTS, or could reasonably have foreseen that the mails or wires would be used in the ordinary course of business as a result of the Count 1 Defendants' acts in furtherance of the transactions discussed above, including the uses of the mails and interstate wires enumerated above.  Carmody, Goldstrom, and Yerian knew that their various Rule 2014(a) declarations or preliminary drafts thereof would be transmitted by the mails or interstate wires, as did Proshan, who oversaw the preparation of these documents, and Garcia, Barton, and Sternfels, who authorized and facilitated them; in addition to Proshan, Sternfels, Carmody, Garcia, and Goldstrom contributed directly to the creation of the false and misleading declarations described above, including in cases in which they were not the declarants.  McKinsey & Co. committed the aforementioned acts of mail or wire fraud because Garcia, Proshan, Carmody, Goldstrom, Sternfels, Barton, and Yerian each committed these

predicate acts within the scope of their formal positions at and for the benefit of McKinsey & Co., and in furtherance of deliberate corporate policy sanctioned and furthered by senior management. Each of the Count 1 Defendants committed numerous additional and similar acts of mail or wire fraud in furtherance of their scheme or artifice that will be proven at trial following discovery.

330.    To the extent proof of reliance is legally required, in engaging in the aforementioned mail and wire fraud, the Count 1 Defendants knew and intended that their debtor-clients, the various bankruptcy judges, the Department of Justice, the U.S. Trustee, AP, and other McKinsey RTS competitors would reasonably rely on the Count 1 Defendants' misrepresentations and omissions, which would result in McKinsey RTS obtaining and retaining consulting engagements to which it was not entitled and which would have otherwise been secured by AP.  The Count 1 Defendants also knew and intended that AP would rely on Barton's false promises to Alix that McKinsey would cease its unlawful bankruptcy consulting practices and that in reliance thereon AP would refrain from seeking legal remedies.

### iii.    Obstruction of Justice in Violation of 18 U.S.C. § 1503(a).

331.    In connection with the *Alpha Natural Resources* bankruptcy, McKinsey & Co., McKinsey US, McKinsey Holdings, Carmody and Proshan (collectively, the "***ANR* Obstruction Defendants**") violated 18 U.S.C. § 1503(a), which makes it unlawful to influence, obstruct, or impede the due administration of justice, or to endeavor to do so, or to endeavor to influence or impede any officer in or of any court of the United States.  Garcia, Sternfels, Barton, and Goldstrom aided and abetted those violations by authorizing and facilitating the ANR Obstruction Defendants' acts of obstruction of justice.

332.    The *Alpha Natural Resources* bankruptcy was a judicial proceeding constituting the administration of justice as required by 18 U.S.C. § 1503(a).

333. The U.S. Trustee in the *Alpha Natural Resources* case is an officer in or of a federal court for purposes of 18 U.S.C. § 1503(a).

334. Defendants (including each of the *ANR* Obstruction Defendants), were aware of or had notice of the *Alpha Natural Resources* case, as demonstrated by the following facts: McKinsey RTS (which is owned by McKinsey US, McKinsey Holdings, and McKinsey & Co.) was hired as a bankruptcy professional in that proceeding; Carmody (a Senior Partner of McKinsey & Co.) filed sworn statements in connection with that engagement on behalf of McKinsey RTS; Proshan (who served as in-house counsel for McKinsey RTS) assisted in preparing declarations for filing in that proceeding; and Garcia was the President of McKinsey RTS, as well as a Senior Partner at McKinsey & Co.; Sternfels had significant executive authority over McKinsey RTS, including Garcia; Barton had ultimate executive authority over McKinsey RTS and the other Defendants; and both Sternfels and Barton had been made aware of McKinsey RTS's pattern of unlawful bankruptcy disclosures. Additionally, members of the McKinsey RTS team for the *Alpha Natural Resources* engagement were, at the time, employees of various McKinsey & Co. affiliates, including McKinsey US; McKinsey & Company, Inc. Canada; McKinsey & Company, Inc. France; McKinsey Solutions SPRL; McKinsey Knowledge Centre Belgium, Inc., LLC; McKinsey & Company CIS; McKinsey Knowledge Centre India Private Limited; McKinsey & C Inc. do Brasil Consultoria Ltda; McKinsey & Company, Inc. United Kingdom; McKinsey & Company, Inc. (Malaysia); and McKinsey & Consulting Company Inc., Shanghai.

335. The *ANR* Obstruction Defendants, acting through McKinsey RTS, acted with wrongful intent or improper purpose to influence the *Alpha Natural Resources* bankruptcy proceedings and corruptly intended to impede the administration of that judicial proceeding. Specifically, by representing to the bankruptcy court and the U.S. Trustee that McKinsey RTS's

existing disclosures of its connections in *Alpha Natural Resources* were complete and truthful, the *ANR* Obstruction Defendants endeavored to, and did, fraudulently induce the U.S. Trustee to withdraw two court filings in which it sought to compel McKinsey RTS to disclose its connections as required by law.

336.    Between August 24, 2015 and March 25, 2016, Carmody filed three disclosure declarations pursuant to Rule 2014(a) in *Alpha Natural Resources*.  None of those declarations disclosed the names of any of McKinsey's connections to Interested Parties.

337.    On May 3, 2016, in *Alpha Natural Resources*, the U.S. Trustee (Judy A. Robbins)[41] filed a motion seeking an order compelling McKinsey RTS to comply with Rule 2014(a).[42]  In the "Introduction" to that motion, the U.S. Trustee stated:

> Bankruptcy Rule 2014 requires that professionals to be employed file a verified statement of "all of the person's connections" to the debtor, creditors, and other parties interest.  The Debtors retained McKinsey RTS as their turnaround advisor, ***but its declarations disclosed only vague and amorphous connections*** to creditors and other major parties in interest—first lien lenders, other secured creditors, and the Debtors' major competitors.  McKinsey RTS has neither identified these connections by name nor provided any insight into the nature of the connections.   But Bankruptcy Rule 2014 requires that disclosures be sufficiently explicit for a court and other parties to determine whether a professional is disinterested or holds or represents an adverse interest.   ***An indeterminate statement of connections with a creditor does not satisfy Bankruptcy Rule 2014***.  Rather, "complete and candid disclosure . . . is indispensable to the court's discharge of its duty to assure the [professional's] eligibility for employment under section 327(a) . . . ."  In re eToys, Inc., 331 B.R. 176, 189 (Bankr. D. Del. 2005).  ***Rigorous compliance with Rule 2014 is critical to the integrity and transparency required of the bankruptcy system***.  And in the context of the debtors' current push toward major asset sales and plan confirmation, these

---

[41]    Before her retirement at the end of 2017 after a 34-year career in government, Ms. Robbins was the U.S. Trustee for both Region 4 (the District of Columbia, Maryland, South Carolina, Virginia, and West Virginia) and Region 7 (the Southern and Western Districts of Texas).  Ms. Robbins was succeeded on January 1, 2018 by Acting U.S. Trustee for Region Four John P. Fitzgerald III.  Mr. Fitzgerald previously served as the Assistant U.S. Trustee in the Boston office of the U.S. Trustee Program.
[42]    *Alpha Natural Resources*, Dkt. No. 2308.

disclosures are of particular and concrete importance. Accordingly, ***McKinsey RTS should be compelled to comply with Bankruptcy Rule 2014 like other professionals*** by filing a supplemental declaration stating, ***at a minimum***, (a) ***the identity*** of the entities on the Interested Parties List (as defined below) with which McKinsey RTS and any of its affiliates have a connection (even if unrelated to the Debtors or these chapter 11 cases) and (b) a general description of the connection with or work performed for these entities.

*Id.* at 1-2 (emphasis added; footnote omitted; ellipses and alteration in original).[43]

338.    The U.S. Trustee explained that Carmody's prior disclosures made only "a vague and generalized disclosure about the materiality of McKinsey's connections," and while they "alluded to the existence of known connections with interested parties" they "***do not identify any specific interested parties by name, nor do they provide any useful context***." *Id.* at 3 (emphasis added).[44]  The U.S. Trustee further emphasized that McKinsey RTS's disclosures "appeared to have been purposefully vague" and stated:

> Even if such connections ultimately prove unrelated to the Debtors or these chapter 11 cases, McKinsey RTS's disclosures are insufficient to satisfy Bankruptcy Rule 2014. There is no information regarding the identity, nature, or scope of the connections. Stated another way, ***the Carmody Declarations give the appearance of compliance without actually complying with Bankruptcy Rule 2014***.

*Id.* at 11 (emphasis added).

---

[43]    Accordingly, Defendants' statement in their July 30, 2018 motion to dismiss in this action (ECF 63) that, in *Alpha Natural Resources*, McKinsey RTS submitted a declaration that was "[c]onsistent with its Rule 2014(a) obligations" (*id.* at 13) is inaccurate, as are its statements that Alix and McKinsey merely have a difference of opinion over the proper way to comply with Rule 2014.

[44]    In their motion to dismiss dated July 30, 2018 (ECF 63), Defendants' primary argument was that their disclosures did, in fact, comply with Rule 2014(a), and dismisses Alix as someone "acting alone" (*id.* at 11) and "the only party unsatisfied" (*id.* at 14) with an "obsessive nature" (*id.* at 13 n. 10) regarding "Alix's uniquely personal interpretation of that rule" (*id.* at 12) whose allegations are "baseless and reckless" (*id.* at 2) and "incendiary" (*id.* at 14).  Defendants further describe their disclosures as "robust" and having the ability to "defeat any inference of falsity."  (*Id.* at 2-3; *see also, e.g., id.* at 9 ("McKinsey made robust and comprehensive disclosures").  The statements in the U.S. Trustee's motion to compel and the *Alpha Natural Resources* court's July 1, 2016 Order eviscerate these arguments.

339.   In response to the U.S. Trustee's motion to compel, on May 19, 2016, Carmody filed, on behalf of McKinsey RTS, a Third Supplemental Disclosure, purportedly to satisfy the U.S. Trustee and cure the deficiencies in his three prior declarations, in which he named a handful of McKinsey's connections to Interested Parties—approximately nine months after McKinsey RTS first appeared in *Alpha Natural Resources*.

340.   On July 1, 2016, the *Alpha Natural Resources* court compelled McKinsey RTS to produce, for *in camera* review, multiple items that Carmody had failed to provide in the several declarations he had filed over the past year, including the names and nature of McKinsey's "***121 undisclosed connections discussed at the hearing***"; "Identification of Interested Parties that manage investments for MIO Partners, Inc. or its investment affiliates"; "Identification of Interested Parties in which MIO owns securities"; and information and documents concerning McKinsey's alleged email surveys through which it purportedly conducted its bankruptcy conflict checks.[45]

341.   The *Alpha Natural Resources* court also held:

    **A.   *Generally, Bankruptcy 2014 requires professional persons to disclose their connections by name.***

    **B.   *There are no different standards of disclosure for lawyers and other professional persons.***

*Id.* at 2 (emphasis added).

342.   In response to the *Alpha Natural Resources* court's July 1, 2016 Order, the U.S. Trustee's motion to compel, and the U.S. Trustee's recommendation, Carmody filed on August 5, 2016, on behalf of McKinsey RTS, a fourth supplemental disclosure, naming a few additional connections and purportedly curing the deficiencies in the four previous declarations he had filed over the past year in *Alpha Natural Resources*.

---

[45]   *Alpha Natural Resources*, Dkt. 2895 at 2-3 (emphasis added).

343.    Proshan assisted in the preparation and drafting of Carmody's supplemental disclosures in *Alpha Natural Resources*, knowing of their false and misleading nature.

344.    Garcia, as President of McKinsey RTS and a Senior Partner of McKinsey & Co., and Sternfels and Barton, as executives with authority over Garcia and McKinsey RTS and with knowledge of McKinsey RTS's pattern of unlawful false disclosures, knowingly authorized Carmody's false and misleading declarations in the *Alpha Natural Resources* bankruptcy.

345.    All of the *ANR* Obstruction Defendants and Garcia, Sternfels, and Barton were aware of Rule 2014's disclosure requirements and had access to information—including the identities of the McKinsey connections that Carmody failed to name—that would have enabled them to cause McKinsey RTS to file complete and truthful declarations in the *Alpha Natural Resources* case had they chosen to comply with the law.  As bankruptcy practitioners and executives of both McKinsey RTS and McKinsey & Co., both Garcia and Carmody knew that all of Carmody's declarations in *Alpha Natural Resources* were intentionally false and misleading because they omitted and concealed numerous material connections between McKinsey and its affiliates and Interested Parties, and thus failed to comply with Rule 2014.  As an experienced attorney at a sophisticated company specializing in bankruptcy, Proshan likewise knew that Carmody's declarations were intentionally false and misleading and did not comply with Rule 2014.

346.    In reliance on the ostensible truthfulness and completeness of McKinsey RTS's fourth supplemental disclosure, which was attested to by Carmody under penalty of perjury and pursuant to a court order, the U.S. Trustee abandoned any further efforts at that time to compel McKinsey RTS to comply with Rule 2014(a) in *Alpha Natural Resources*.

347.    In reality, however, the *ANR* Obstruction Defendants were knowingly and fraudulently continuing to conceal material connections between McKinsey and Interested Parties.

348.    In knowingly causing multiple materially false and misleading declarations to be filed, the *ANR* Obstruction Defendants acted corruptly and with wrongful intent to mislead the U.S. Trustee and the bankruptcy court so that McKinsey RTS's connections and disqualifying conflicts would not be discovered and so that McKinsey RTS could continue to profit from the bankruptcy engagement and avoid disqualification.

349.    Through this fraudulent conduct, the *ANR* Obstruction Defendants corruptly endeavored to obstruct, influence, or impede an officer in or of the bankruptcy court, to wit, the U.S. Trustee, who was acting as an officer in or of the court in the discharge of her duty, in violation of 18 U.S.C. § 1503(a).

350.    Additionally, certain Defendants also committed and aided and abetted further acts of obstruction of justice in violation of 18 U.S.C. § 1503(a) in the other Chapter 11 bankruptcies in which McKinsey RTS has been engaged, by knowingly and wrongfully authorizing and causing false and misleading declarations to be filed on behalf of McKinsey RTS:

     a.    In ***Harry & David***, McKinsey & Co., McKinsey Holdings, McKinsey US, and Goldstrom knowingly and wrongfully filed or caused to be filed three false and materially misleading disclosure affidavits by Goldstrom in support of McKinsey RTS's retention as a management consultant, and Garcia, Sternfels, and Barton each aided and abetted those violations by knowingly authorizing those filings;

     b.    In ***AMR***, McKinsey & Co., McKinsey Holdings, McKinsey US, Goldstrom, Carmody, and Proshan knowingly and wrongfully filed or caused to be filed seven false and materially misleading disclosure affidavits by Goldstrom on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates, in support of those entities' retention as management consultants, and Garcia, Sternfels, and Barton

each aided and abetted those violations by knowingly authorizing those filings;

c.    In ***AMF Bowling***, McKinsey & Co., McKinsey Holdings, McKinsey US, Goldstrom, Proshan and Carmody knowingly and wrongfully filed or caused to be filed a false and materially misleading disclosure affidavit by Carmody in support of McKinsey RTS's retention as a management consultant, and Garcia, Sternfels, and Barton each aided and abetted those violations by knowingly authorizing those filings;

d.    In ***Edison Mission***, McKinsey & Co., McKinsey Holdings, McKinsey US, Proshan, and Yerian knowingly and wrongfully caused to be filed three false and materially misleading disclosure affidavits by Yerian in support of McKinsey RTS's retention as a restructuring advisor, and Garcia, Sternfels, Barton, Goldstrom, and Carmody aided and abetted those violations by knowingly authorizing those filings;

e.    In ***NII Holdings***, McKinsey & Co., McKinsey Holdings, McKinsey US, Proshan, and Carmody knowingly and wrongfully filed or caused to be filed two false and materially misleading disclosure affidavits by Carmody in support of McKinsey RTS's retention as a turnaround advisor in that proceeding, and Garcia, Sternfels, Barton, and Goldstrom aided and abetted those violations;

f.    In ***Standard Register***, McKinsey & Co., McKinsey Holdings, McKinsey US, Proshan, and Carmody knowingly and wrongfully filed or caused to be filed a false and materially misleading disclosure affidavit by Carmody in support of McKinsey RTS's application to provide interim management services to the debtor and to designate Carmody as the debtor's Chief Restructuring Officer, and Garcia, Goldstrom, Sternfels, and Barton aided and abetted those violations;

g.  In *SunEdison*, McKinsey & Co., McKinsey Holdings, McKinsey US, and Proshan, Sternfels, Carmody, and Goldstrom knowingly and wrongfully caused to be filed five false and materially misleading disclosure affidavits by McKinsey RTS Practice Leader Mark Hojnacki in support of McKinsey RTS's retention as a restructuring advisor, and Garcia and Barton aided and abetted those violations; and

h.  In *GenOn*, McKinsey & Co., McKinsey Holdings, McKinsey US, Proshan, and Carmody knowingly and wrongfully filed or caused to be filed four false and materially misleading disclosure affidavits by Carmody on behalf of McKinsey RTS in support of its retention as a restructuring advisor in that proceeding, and Garcia, Goldstrom, Sternfels, and Barton aided and abetted those violations.

351.  Barton, Sternfels, and Garcia each aided and abetted all of the foregoing violations of 18 U.S.C. § 1503(a) by authorizing Proshan, Goldstrom, Carmody, Yerian, and others (and Barton and Sternfels by authorizing Garcia) to file documents which Barton, Sternfels, and Garcia each knew to be false and misleading and intended to obstruct the administration of justice by the bankruptcy courts and to impede the U.S. Trustee in the execution of its duties.

*iv.    Witness Tampering in Violation of 18 U.S.C. § 1512(b).*

352.  Through their above-described conduct in the *Alpha Natural Resources* bankruptcy, the *ANR* Obstruction Defendants each committed violations of 18 U.S.C. § 1512(b) by knowingly and corruptly persuading another person and by knowingly engaging in misleading conduct toward another person, and attempting to do so, with an intent to influence, delay, or prevent testimony or cause any person to withhold a record, object, document, or testimony from an official proceeding; and Barton, Sternfels, Garcia, and Goldstrom aided and abetted those violations by authorizing those actions by Carmody and Proshan (and Barton and Sternfels by authorizing Garcia).

146

353.    *First*, the *ANR* Obstruction Defendants each violated Section 1512(b) by engaging in misleading conduct in the *Alpha Natural Resources* bankruptcy by knowingly making false statements and intentionally omitting information or intentionally concealing materially facts concerning McKinsey's connections to Interested Parties and the completeness and truthfulness of McKinsey RTS's disclosures in that proceeding.  This misleading conduct was directed at the U.S. Trustee and the *Alpha Natural Resources* court.

354.    *Second*, the *ANR* Obstruction Defendants attempted to, and did, persuade the U.S. Trustee to abandon its efforts in 2016 to seek further disclosures from McKinsey RTS in *Alpha Natural Resources*.  In doing so, they acted corruptly and with the improper intent of deterring the U.S. Trustee from continuing to litigate against McKinsey RTS regarding its Rule 2014 disclosures.

355.    In each instance, each of the *ANR* Obstruction Defendants acted knowingly and with the wrongful intent that Carmody's false and misleading testimony on behalf of McKinsey RTS would obstruct the bankruptcy proceedings by allowing McKinsey RTS to avoid disqualification.

356.    In addition, McKinsey & Co., McKinsey Holdings, McKinsey US, Sternfels, Goldstrom, Carmody, and Proshan committed and aided and abetted acts of witness tampering in violation of Section 1512(b) by knowingly influencing or impeding truthful testimony by Mark Hojnacki and corruptly persuading Hojnacki to cause him to provide non-truthful or misleading testimony in the five false and materially misleading disclosure declarations filed by Hojnacki on behalf of McKinsey RTS in the *SunEdison* proceeding; and Barton, Sternfels, and Garcia aided and abetted those violations by authorizing those actions by Goldstrom, Carmody, and Proshan (and Barton and Sternfels by authorizing Garcia).  Barton, Sternfels, Garcia, and Goldstrom each aided and abetted the foregoing violations of 18 U.S.C. § 1512(b) in *Alpha Natural Resources* and *SunEdison* by authorizing Proshan and Carmody (and Barton and Sternfels by authorizing Garcia

and Goldstrom) to file documents which Barton, Sternfels, Garcia, and Goldstrom each knew to be false and misleading and intended to obstruct the administration of justice by the bankruptcy courts and to impede the U.S. Trustee in the execution of its duties, and by authorizing Proshan and Carmody (and Barton and Sternfels by authorizing Garcia and Goldstrom) to influence or impede testimony by Mark Hojnacki in *SunEdison*.

> v.   *Obstruction of Justice in Violation of 18 U.S.C. § 1512(c).*

357.   Further, through their above-described conduct in *Alpha Natural Resources*, each of the *ANR* Obstruction Defendants violated Section 1512(c) by corruptly obstructing, influencing, and/or impeding the *Alpha Natural Resources* bankruptcy, and/or by attempting to do so; and Barton, Sternfels, Garcia, and Goldstrom each aided and abetted those violations.

358.   Barton, Sternfels, Garcia, and Goldstrom each aided and abetted the foregoing violations of 18 U.S.C. § 1512(c) by authorizing Carmody and Proshan (and Barton and Sternfels by authorizing Garcia and Goldstrom) to file documents which Barton, Sternfels, Garcia, and Goldstrom each knew to be false and misleading and intended to obstruct, influence, or impede the *Alpha Natural Resources* bankruptcy.

> vi.   *Unlawful Offers of Remuneration, Compensation, Reward, or Advantage in Violation of 18 U.S.C. § 152(6) and Felony Commercial Bribery under State Law.*

359.   McKinsey & Co., McKinsey Holdings, and McKinsey US offered to one or more major bankruptcy attorneys located in the United States an arrangement under which McKinsey would introduce its clients to such attorneys on an exclusive basis in exchange for the attorneys exclusively recommending McKinsey RTS to the attorneys' bankruptcy debtor clients for bankruptcy consulting services.

360.   McKinsey & Co., McKinsey Holdings, and McKinsey US made such offers knowing and intending that: neither they nor the recipient attorney(s) would disclose the

arrangement to their mutual debtor-client or the bankruptcy court (via a Rule 2014(a) disclosure or otherwise); through such nondisclosure, McKinsey RTS would avoid disqualification as an advisor to the debtor(s); and such actions would operate as a fraud against McKinsey RTS's competitor, AP, which would have secured such bankruptcy consulting engagements in the absence of the unlawful referral agreements between McKinsey & Co., McKinsey Holdings, and McKinsey US and the bankruptcy attorneys.

361.    With respect to each such offer, McKinsey & Co., McKinsey Holdings, and McKinsey US knowingly and fraudulently gave, offered, or attempted to obtain money or property, remuneration, compensation, reward, advantage, or promise thereof (in the form of valuable exclusive referrals to high-level executives from McKinsey's coveted stable of corporate clients) for acting or forbearing to act in any case under the Bankruptcy Code, within the meaning of 18 U.S.C. § 152(6).

362.    Additionally, the foregoing conduct constituted felony commercial bribery under the laws of Texas, New York, and Illinois:

    a.    Texas Penal Code § 32.43(b) provides that "a person who is a fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary." Pursuant to Texas Penal Code § 32.43(d), a violation of § 32.43(b) is a felony offense.

    b.    New York Penal Law § 180.03 provides: "A person is guilty of commercial bribing in the first degree when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's

employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs, and when the value of the benefit conferred or offered or agreed to be conferred exceeds one thousand dollars and causes economic harm to the employer or principal in an amount exceeding two hundred fifty dollars." A violation of § 180.03 is a felony offense.

c.  Illinois Criminal Code § 720 ILCS 5/29A-1 provides: "A person commits commercial bribery when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs." Pursuant to Illinois Criminal Code § 720 ILCS § 5/29A-3, a violation of § 5/29A-1 is a felony offense if the value conferred equals or exceeds $500,000.

363.  The value offered by McKinsey & Co., McKinsey Holdings, and McKinsey US to the bankruptcy attorneys that they sought to recruit for their "pay-to-play" scheme exceeded $500,000, given the magnitude of fees that bankruptcy attorneys could expect from an engagement by one or more of McKinsey's Fortune 500-class clientele.

364.  By making an offer of such a benefit to a fiduciary (a bankruptcy attorney) with the agreement or understanding that the benefit would influence the fiduciary's conduct in the affairs of the fiduciary's beneficiary (the bankruptcy attorney's debtor-client) and without the consent of the bankruptcy debtor-client in *GenOn* (venued in Texas); *SunEdison*, *NII Holdings*, and *AMR* (venued in New York); and *Edison Mission* (venued in Illinois), McKinsey & Co., McKinsey Holdings, and McKinsey US violated the aforementioned bribery statutes.

365.    The particular details of the violations of 18 U.S.C. § 152(6) and state commercial bribery statutes by McKinsey & Co., McKinsey Holdings, and McKinsey US, including the specific details of such offers and the identities of the bankruptcy attorneys, are peculiarly within these Defendants' knowledge and will be proven at trial following discovery.  At a minimum, Barton admitted to Alix at their October 16, 2014 meeting that McKinsey had, in fact, made one or more such "pay-to-play" offers.

> vii.    *Inducement to Interstate or Foreign Travel in Violation of 18 U.S.C. § 2314.*

366.    The Count 1 Defendants' scheme to unlawfully compete with AP—including by depriving AP of remunerative consulting engagements it otherwise would have obtained—through concealment, obfuscation, and fraudulent misrepresentation of disqualifying conflicts of interest, and to prolong that unlawful conduct by lying to Alix when he attempted to instigate corrective action by McKinsey, constitutes a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, within the meaning of 18 U.S.C. § 2314.

367.    The Count 1 Defendants having devised or intended to devise such a scheme, by which the Count 1 Defendants sought to defraud AP of money or property having a value in excess of $5,000, in execution or concealment of the scheme Barton and McKinsey & Co., aided and abetted by Sternfels, McKinsey US, and McKinsey Holdings,  induced Alix to travel in interstate or foreign commerce in violation of 18 U.S.C. § 2314.  Specifically, in response to Alix's request for a meeting to discuss remediation of McKinsey's continued unlawful bankruptcy consulting engagements, Barton and McKinsey & Co. induced Alix to travel from Michigan to New York City to meet with Barton on October 15, 2015, at which meeting Barton offered business referrals from

McKinsey to AP in exchange for Alix and AP dropping the issues concerning McKinsey's pay-to-play scheme and its illegal disclosure declarations.

368.    Barton and McKinsey & Co. induced Alix to attend these meetings in order to foster the false impression that McKinsey was pursuing corrective action in light of Alix's admonishments to Barton and Sternfels concerning McKinsey RTS's illegal bankruptcy consulting engagements. By stringing Alix along in this fashion, Barton and McKinsey & Co. sought to (and did) forestall legal action by AP, and thereby prolonged the Count 1 Defendants' scheme.

> *viii.    Money Laundering in Violation of 18 U.S.C. § 1957.*

369.    As described below, McKinsey & Co., McKinsey Holdings, McKinsey US, Barton, Sternfels, Garcia, and Goldstrom each committed and aided and abetted acts of money laundering in violation of 18 U.S.C. § 1957 in connection with all nine of McKinsey RTS's bankruptcies beginning with *Harry & David*; Carmody and Proshan each committed and aided and abetted acts of money laundering in violation of 18 U.S.C. § 1957 in connection with McKinsey RTS's eight bankruptcies beginning with *AMR*; and Yerian committed and aided and abetted acts of money laundering in violation of 18 U.S.C. § 1957 in connection with the *Edison Mission* bankruptcy.

370.    McKinsey RTS received tens of millions of dollars in fees for its bankruptcy consulting engagements.  A substantial portion of those monies were remitted directly or indirectly to McKinsey RTS's parent, McKinsey US, to McKinsey Holdings and McKinsey & Co., and to one or more of the individual Count 1 Defendants, in amounts exceeding $10,000.  The Count 1 Defendants' receipt of fees from McKinsey RTS's bankruptcy engagements described above and their subsequent deposit or other financial transfers of such monies constituted violations of 18 U.S.C. § 1957(a) in that the Count 1 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(f)(3) and 18 U.S.C. § 1956(c)(7).  Such specified

unlawful activity includes, without limitation, the violations of 18 U.S.C. §§ 152, 1341, and 1343 set forth above.  The specific chains of monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

371.    Additionally, the Count 1 Defendants' participation in "re-invoiced" and "round trip" payments from non-debtor affiliates of SunEdison constituted separate violations of 18 U.S.C. § 1957(a).  The Count 1 Defendants' falsification of invoices issued to SunEdison constituted the knowing and fraudulent concealment, falsification, or false entry in recorded information relating to the property or financial affairs of SunEdison in contemplation of SunEdison's pending bankruptcy proceeding, in violation of 18 U.S.C. §152(8).  The specific chains of monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.  Alternately, the Count 1 Defendants (and specifically, McKinsey & Co., McKinsey Holdings, McKinsey US, Garcia, Proshan, Sternfels, and Goldstrom) caused the submission of the June 6, 2016 and June 14, 2016 Hojnacki Rule 2014(a) declarations identified above in the *SunEdison* case, which declarations fraudulently mischaracterized McKinsey RTS's services and billing.  These submissions violated 18 U.S.C. § 152(3) and 18 U.S.C. §§ 1341 and/or 1343, as shown above.

372.    The Count 1 Defendants' violations of 18 U.S.C. §§152(3), 152(8), 1341, and/or 1343 constituted specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and 1957(f)(3).

373.    The Count 1 Defendants' receipt of the proceeds of these specified unlawful activities, totaling $3,563,167.78, and their subsequent deposit or other financial transfers of such proceeds violated 18 U.S.C. § 1957(a) in that the Count 1 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived

from specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and 1957(f)(3). The specific details of the monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

### D.  Scienter

374.    The Count 1 Defendants had the motive to commit the aforementioned violations of 18 U.S.C. §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314 and acts of mail and wire fraud, as demonstrated by, *inter alia* the following facts:

    a.  McKinsey & Co., McKinsey Holdings, and McKinsey US, together with each of the individual Count 1 Defendants, stood to earn tens of millions of dollars in consulting fees in bankruptcy cases as a result of the Count Defendants' unlawful scheme. Bankruptcy consulting was and is a domain which, unlike McKinsey's general business consulting practices, requires complete disclosure of client identities and all other connections.  McKinsey and the other Count 1 Defendants would have been debarred from this domain had McKinsey's disqualifying conflicts been disclosed fully and honestly.

    b.  Bankruptcy consulting was one of the few areas of the business consulting domain in which McKinsey was a non-player, and its actions as detailed herein demonstrate the Count 1 Defendants' motivation for McKinsey to break into this new market and gain market dominance by any means necessary.

    c.  By adding bankruptcy consulting services to its roster of offerings, McKinsey obtained a firmer grip on its existing clients because they would not have to look elsewhere in the event of a bankruptcy.  And by retaining such clients, McKinsey also obtained additional post-bankruptcy work from them.  Accordingly, bankruptcy

consulting services created a virtuous cycle for McKinsey and the other Count 1 Defendants.

d.   McKinsey & Co., McKinsey Holdings, McKinsey US, and the individual Count 1 Defendants decided to continue with their pattern of unlawful conduct through McKinsey RTS even after Barton expressly acknowledged to Alix the unlawful nature of the conduct and falsely promised to desist and dissolve McKinsey RTS. This decision to proceed with known unlawful conduct in the face of good faith admonition by a well-known industry expert and peer suggests that McKinsey & Co., Barton, and the other Count 1 Defendants were powerfully motivated to break the law.

e.   Barton's attempts to lull Alix and AP into forgoing corrective litigation permitted the Count 1 Defendants to continue their lucrative but unlawful scheme uninterrupted for at least another year.

375.   Each of the Count 1 Defendants had the opportunity to commit the aforementioned violations of 18 U.S.C. §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314  and acts of mail and wire fraud, as demonstrated by the fact that McKinsey's jealous protection of client identities makes it exceedingly difficult for outsiders to identify disqualifying connections without full and honest disclosure by McKinsey and its employees and officers, including each of the Count 1 Defendants.  And because of the fiduciary nature of McKinsey's advisory relationships, its clients were dependent on McKinsey's honesty.

376.   Each of the Count 1 Defendants also had the opportunity to effectuate other components of the fraudulent scheme.  Concerning the "pay-to-play" arrangement, the prospect of access to McKinsey & Co.'s unparalleled portfolio of clientele would have been almost irresistible

to bankruptcy attorneys, while McKinsey would have gained an easy way to "jump start" its bankruptcy consulting practice in a way nearly undetectable by competitors or the authorities. And lulling AP into inaction by deceiving Alix concerning his efforts to dissuade McKinsey from unlawful conduct also afforded valuable breathing space to Defendants, given the accelerated growth of McKinsey RTS's bankruptcy practice in the last several years.

377.   In addition, the circumstances surrounding the aforementioned violations of 18 U.S.C. §§ §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314 and acts of mail and wire fraud demonstrate conscious misbehavior and knowledge by each of the Count 1 Defendants that they were engaging in a scheme to defraud AP as demonstrated by, *inter alia* the following facts:

    a.   McKinsey RTS, which is part of a global enterprise with a vast array of large, diversified companies as clients and an expansive network of McKinsey "alumni" connections, and which thus has a concomitantly large set of connections requiring disclosure, nonetheless repeatedly filed grossly inadequate Rule 2014(a) disclosures in comparison with those of considerably smaller, less interconnected firms such as AP;

    b.   McKinsey RTS's conflict-checking processes, as described in its Rule 2014(a) submissions, are conspicuously primitive and deficient in comparison with other large, sophisticated professional institutions that submitted Rule 2014(a) disclosures in the bankruptcy proceedings enumerated *supra*. The rudimentary nature of these procedures, which is irreconcilable with McKinsey's claims to be a global information management leader, indicates that the system represented a deliberate attempt to conceal relevant connections by limiting internal inquiries in a manner ensuring that relevant connections would be missed. At a minimum, each of the

156

Count 1 Defendants acted with willful blindness to disqualifying conflicts.

c.  The repeated failure of McKinsey RTS to meet its disclosure obligations over the course of several years and nine different bankruptcies, and the combined failure of McKinsey US and McKinsey RTS to meet their disclosure obligations over the course of more than sixteen years and thirteen different bankruptcies, despite external and internal access to the most sophisticated legal advice available, demonstrates that this failure to disclose was systemic and intentional rather than the result of sporadic lapses in judgment or execution.

d.  By the time of McKinsey RTS's participation in the *NII Holdings* bankruptcy in October 2014, McKinsey was on explicit notice at the highest executive level— Barton—that McKinsey RTS's disclosure practices were unlawful and afforded it an unfair and illegal competitive advantage over AP.  Barton repeatedly admitted to Alix that the disclosure practices of McKinsey US and McKinsey RTS and McKinsey's "pay-to-play" offers to bankruptcy attorneys were unlawful, and even promised to shutter McKinsey RTS and abandon bankruptcy consulting during his tenure.  Sternfels also participated in these exchanges.  That each of the Count 1 Defendants continued their unlawful conduct unabated demonstrates not only that their unlawful behavior was willful but also that their earlier unlawful conduct prior to Alix's conversations with Barton and Sternfels was not inadvertent or the result of mere sloppiness.

e.  Barton's unusual offer to broker client introductions to AP, a proffered bribe intended to cause Alix and AP to remain silent, shows that the Count 1 Defendants knew they were engaging in illegal conduct and were determined to go to unusual

lengths to silence a complainant.

f.   Garcia, Goldstrom, and Proshan have legal training and/or have practiced law and, therefore, are highly sophisticated actors.  Accordingly, they knew that McKinsey RTS's bankruptcy disclosures (and McKinsey RTS's and McKinsey US's bankruptcy disclosures in *AMR*) did not comply with the obligations imposed by law and that by failing to disclose relevant connections McKinsey RTS would avoid disqualification, to the prejudice of competitors such as AP.

g.   Carmody had previously been employed by AP and had signed Rule 2014(a) declarations on AP's behalf that were far more robust than those he signed on behalf of McKinsey RTS.  Carmody also worked closely with attorney Proshan in preparing his Rule 2014(a) declarations and in deciding which of McKinsey's connections to disclose.  Accordingly, Carmody knew the palpably deficient nature of McKinsey RTS's false and misleading disclosure statements.

h.   Yerian had previously been employed by AP, had participated in the preparation of Rule 2014(a) declarations on AP's behalf that were far more robust than those he signed on behalf of McKinsey RTS, and was familiar with the disclosure and compliance obligations imposed on bankruptcy professionals.  Accordingly, Yerian knew the palpably deficient nature of McKinsey RTS's false and misleading disclosure statements.

378.   Each Count 1 Defendant committed and aided and abetted the foregoing predicate violations of 18 U.S.C. §§ §§ 152(2), 152(3), 152(6), 1341, 1343, 1503(a), 1512(b), 1512(c), and 2314 with the specific intent to defraud AP of valuable bankruptcy consulting engagements and the fees therefrom.

### E.  Vicarious Liability

379.    Each of the predicate acts by Barton, Sternfels, Garcia, Carmody, Goldstrom, Proshan, and Yerian were committed within the scope of their employment, officership, or directorship positions at, or agency relationship with, McKinsey & Co.   Each of these individuals was a high-level member of McKinsey & Co.'s management, and each committed and aided and abetted the commission of predicate acts as described above.   The predicate acts were each committed in furtherance of a scheme intended to and which did in fact benefit McKinsey & Co. and its subsidiaries by obtaining fees for bankruptcy engagements from which it was disqualified. Accordingly, McKinsey & Co. is vicariously liable for the RICO violations of the individual defendants herein.

380.    McKinsey & Co. orchestrated the Count 1 Defendants' unlawful scheme through its subsidiaries, McKinsey Holdings and McKinsey US, which in turn orchestrated the scheme through McKinsey RTS.   Accordingly, McKinsey Holdings and McKinsey US are vicariously liable for RICO violations by their subsidiary, McKinsey RTS.

### F.  Causation and Damages

381.    As a direct and proximate result of foregoing violations of 18 U.S.C. § 1962(c) by the Count 1 Defendants, AP suffered an immediate and direct injury from the Count 1 Defendants' racketeering activity.   Specifically, AP suffered the loss of property related to the restructuring assignments it would have acquired, and the profits flowing therefrom, had the Count 1 Defendants not implemented their scheme and acquired for McKinsey RTS restructuring assignments for which it was not qualified through their violations of Rule 2014 and related predicate acts.

382.    Given AP's 25% share in the market for high-end bankruptcy consulting services, absent the Count 1 Defendants' misconduct, AP would have obtained at least 25% of the work on

the bankruptcies that the Count 1 Defendants were able to obtain for McKinsey RTS through their willfully criminal conduct.

383.    Moreover, beyond its position as a market leader, specific circumstances in the following bankruptcies made AP's chances of obtaining the assignments effectively 100% had McKinsey RTS been disqualified:

a.    In *GenOn*, AP competed directly against McKinsey RTS for the assignment through multiple stages until the last stage, when AP and McKinsey RTS were the only competitors remaining.  In addition to having a strong relationship with debtor GenOn, AP has a broad range of experience in the energy sector and has served as a consultant in many other similar bankruptcy cases, making AP the clear and logical next choice had McKinsey RTS been disqualified from its assignment in *GenOn*.

b.    In *Alpha Natural Resources*, the case was once again in an industry (coal) in which AP has extensive experience, yet AP was never even asked to pitch, again suggesting the influence of McKinsey's pay-to-play scheme.  Once again, AP's relevant industry experience made it the clear and logical next choice if McKinsey RTS was disqualified.

c.    *Standard Register* involved a debtor with which AP had a strong relationship and for which AP had previously performed a variety of work, making AP the clear and logical next choice if McKinsey was disqualified.

d.    *NII Holdings* was yet another case in an industry (telecommunications) in which AP has extensive experience, yet AP was never even asked to pitch, again suggesting the influence of McKinsey's pay-to-play scheme.  Once again, AP's

relevant industry experience made it the clear and logical next choice if
McKinsey RTS was disqualified.

e. ***Edison Mission Energy*** was another case involving an energy company, an
area in which AP has broad experience.  Moreover, AP had a strong relationship
with high-level personnel at the debtor.  Despite this, AP was never even asked
to pitch for the work, strongly suggesting the influence of McKinsey's pay-to-
play scheme.  Given AP's relevant industry experience and relationships with
the debtor, it is highly likely that it would have received the *Edison Mission
Energy* assignment had McKinsey RTS been disqualified.

f. ***AMF Bowling*** also involved a market in which AP employees at the time had
deep and broad-ranging experience that made AP extremely well-suited to
advise the debtors.  At the time, AP's professional team included the leading
consultant in the bowling industry. Again, AP's relevant industry experience
made it the clear and logical next choice if McKinsey was disqualified.

384.   The damages to AP include, but are not limited to, fees from bankruptcy consulting
engagements AP would have earned in the absence of the Count 1 Defendants' unlawful conduct;
other lost business opportunities (including pre- and post-bankruptcy work); and attorneys' fees
and costs, including attorneys' fees and costs associated with exposing and pursuing redress for
the Count 1 Defendants' criminal activities.

385.   It was a foreseeable, natural, direct, and intended consequence of the Count 1
Defendants' scheme that McKinsey RTS would obtain more restructuring assignments (for which
it was not qualified) and that AP would receive fewer.  There are no independent factors that
account for AP's injury, nor is that injury in any way derivative of any injury to any Interested

Case 1:18-cv-04141-JMF  Document 73  Filed 09/04/18  Page 169 of 231

Party.  No immediate victim is better situated than Plaintiff to sue—and indeed the Count 1 Defendants' misconduct has been brought to light solely because of Plaintiff's efforts – nor is there any risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violations.

386.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Alix, as assignee of AP, is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**
VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
*Against Barton, Sternfels, Proshan, Garcia, Carmody, Goldstrom, and Yerian*

387.    Alix repeats and realleges paragraphs 1 through 386 as if fully set forth herein.

388.    This cause of action is asserted against Barton, Sternfels, Proshan, Garcia, Carmody, Goldstrom, and Yerian (collectively, the "**Count 2 Defendants**"), and is asserted in addition to and in the alternative to the First Cause of Action, *supra*, and the Third Cause of Action, *infra*.

389.    At all relevant times, AP was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

390.    At all relevant times, each of the Count 2 Defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

**A.  The Count 2 RICO Enterprise and Its Effect on Interstate Commerce**

391.    From December 27, 2001 (said date being approximate and inclusive) and continuing to the present, McKinsey & Co., McKinsey Holdings, McKinsey US, and (beginning in or about 2010) McKinsey RTS collectively have constituted an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) or, alternatively, an association-in-fact enterprise within the meaning of those provisions (the "**Count 2 Enterprise**").

162

392.    The Count 2 Enterprise is structured through the formal corporate ownership relationships among McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS. At all relevant times, each of the Count 2 Defendants was, and is, a person that exists separate and distinct from the Count 2 Enterprise.

393.    Beginning in or around 2001, the Count 2 Enterprise participated in the following bankruptcy proceedings, involving bankruptcy debtors with assets, liabilities, revenues, employee totals, and states of operations as indicated in the chart below:

| Matter | Assets (Millions) | Liabilities (Millions) | Revenue (Millions) | Employees | No. of Affected States |
|---|---|---|---|---|---|
| *Hayes Lemmerz* | $1,096 | $1,389 | $2,296 | 67,400 | 7 states[46] *(Plus state of filing*: Delaware) |
| *UAL* | $25,197 | $22,164 | $19,352 | 84,000 | 8 states and the District of Columbia[47] |
| *Mirant* | $19,415 | $21,440 | $6,436 | 7,000 | 8 states[48] *(Plus state of filing*: Texas) |
| *Lyondell Chemical* | $27,392 | $35,900 | $28,603 | 7,340 | 8 states[49] *(Plus state of filing:* New York) |
| *Harry & David* | $243 | $1,050 | $427 | 1,026 | 22 states[50] |
| *AMR Corp.* | $25,088 | $103,000 | $22,170 | 78,250 | Six states and Puerto Rico[51] |

---

[46]    California, Georgia, Indiana, Kentucky, Michigan *(debtors' headquarters)*, Ohio, and Texas.

[47]    California, Colorado, Delaware, Hawaii, Illinois *(debtor's headquarters and state of filing)*, New Jersey, Texas, Washington, and the District of Columbia.

[48]    California, Georgia *(debtors' headquarters)* Maine, Maryland, Massachusetts, Michigan, New York, and Virginia.

[49]    Illinois, Iowa, Louisiana, Michigan, New Jersey, Ohio, Tennessee, and Texas *(debtors' headquarters)*.

[50]    Alabama, California, Colorado, Delaware *(state of filing)*, Florida, Iowa, Illinois, Indiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, New Jersey, New York, Ohio *(debtors' headquarters and main distribution center)* Oregon *(debtors' headquarters)*, Pennsylvania, South Carolina, Tennessee, Virginia, and Wisconsin *(stores)*.

[51]    Debtor's primary operations in New York *(state of filing)*, California, Illinois, Florida, Missouri, Texas *(debtor's headquarters)*, and Puerto Rico.

| Matter | Assets (Millions) | Liabilities (Millions) | Revenue (Millions) | Employees | No. of Affected States |
|---|---|---|---|---|---|
| *AMF Bowling* | $100,000 | $279,000 | $387,000 | 7,000 | 34 states[52] |
| *Edison Mission* | $8,323 | $12,304 | $9,321 | 1,783 | 12 states[53] |
| *NII Holdings* | $2,887 | $4,593 | $4,773 | 3,870 | One state: Virginia *(debtor's headquarters)* *(Plus state of filing:* New York) |
| *Standard Register* | $481 | $592 | $720 | 3,700 | 50 states[54] |
| *Alpha Natural Resources* | $10,736 | $9,834 | $4,955 | 8,900 | 6 states[55] |
| *SunEdison* | $11,500 | $16,100 | $2,484 | 7,260 | 20 states[56] |
| *GenOn* | $2,435 | $2,131 | $1,862 | 1,581 | 10 states[57] |
| **TOTAL** | **$134,893** | **$230,777** | **$103,784** | **279,110** | **All 50 states, plus the District of Columbia and Puerto Rico** |

394.    Additionally, undisclosed connections and conflicts of interests disqualifying the

Count 2 Enterprise and its constituent entities from serving the various debtor-clients typically arose

from these entities' relationships with business entities located in states or nations other than those

in which the debtor-clients operated.

---

[52]    Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia *(debtors' headquarters and state of filing)*, Washington, and Wisconsin.

[53]    Debtors' headquarters in Illinois *(state of filing)* and California, and operations in 12 states total according to Plan Sponsor Agreement.

[54]    Debtors had operations in all 50 states according to plan documents, including Ohio *(debtors' headquarters)* and Delaware *(place of filing)*.

[55]    Kentucky, Pennsylvania, Tennessee, Virginia *(place of filing)*, West Virginia *(debtors' headquarters)*, and Wyoming.

[56]    Arizona, California *(debtors' operational and solar business headquarters)*, Hawaii, Idaho, Illinois, Maine, Maryland, Massachusetts, Minnesota, Missouri *(debtors' corporate headquarters)*, Nebraska, Nevada, New York *(place of filing)*, North Carolina, Ohio, Oregon, Texas, Utah, Vermont, and Washington.

[57]    California, Florida, Maryland, Massachusetts, Mississippi, New Jersey *(debtors' headquarters)*, New York, Ohio, Pennsylvania, and Texas *(place of filing and headquarters of parent company, NRG Energy, Inc.)*.

395.    Accordingly, at all relevant times, the Count 2 Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

396.    At all relevant times, the conduct of the Count 2 Defendants and their co-conspirators has taken place in and affected the interstate commerce of the United States.

397.    The conduct of the Count 2 Defendants has directly, substantially, and foreseeably restrained such interstate trade and commerce.

### B.  Pattern of Racketeering Activity

398.    Between at least 2010 and the present, the Count 2 Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described in Count 1, *supra*, in paragraphs 308-17 (bankruptcy fraud), 319-30 (mail and wire fraud), 331-58 (obstruction of justice and witness tampering), 366-68 (inducement to interstate or foreign travel), and 369-73 (money laundering), and other predicate acts to be identified after further investigation and discovery herein.

399.    Each of the Count 2 Defendants engaged in and aided and abetted two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO.  The Count 2 Defendants played the same roles in the scheme and pattern of racketeering activity as set forth in the First Cause of Action, *supra*.  The predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing or obfuscating McKinsey's disqualifying conflicts of interest in order to enable McKinsey US and McKinsey RTS to obtain bankruptcy consulting assignments that they would not have received had the Count 2 Defendants behaved lawfully, and by attempting to obtain such engagements by offering unlawful "pay-to-play" arrangements to bankruptcy attorneys; (2) thereby depriving AP of remunerative bankruptcy consulting engagements; and (3) after the scheme was discovered,

forestalling remedial litigation by AP and Alix by means of Barton's duplicitous interactions with Alix.  These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission.

400.    Through such patterns of racketeering activity, each of the Count 2 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 2 Enterprise in violation of 18 U.S.C. § 1962(c).

### C.  RICO Predicate Acts

401.    Barton committed and aided and abetted the predicate acts described below and in Count 1 *supra*, in paragraphs 308-310 and 316 (bankruptcy fraud), 319-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), 366-368 (inducement to interstate or foreign travel), 369-373 (money laundering) in his capacity as Managing Partner of McKinsey & Co., and within the scope of his employment by or agency for McKinsey & Co.

402.    Garcia committed and aided and abetted the predicate acts described below and in Count 1, *supra*, in paragraphs 308-311 (bankruptcy fraud), 319-325 and 327-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), and 369-373 (money laundering) in his capacity as President of McKinsey RTS, a Senior Partner of McKinsey & Co., and (from 2006 to 2017) a board member of MIO, and within the scope of his employment by or agency for those entities.

403.    Proshan committed and aided and abetted the predicate acts described below and in Count 1, *supra*, in paragraphs 308-10 and 312 (bankruptcy fraud), 319-325 and 327-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), and 369-373 (money laundering) in her capacity as a Senior Vice President and Associate General Counsel to McKinsey & Co. with primary responsibility for the provision of legal services to McKinsey RTS, and within the scope of her employment by or agency for those entities.

404.     Carmody committed and aided and abetted the predicate acts described below and in Count 1, *supra*, in paragraphs 308-310 and 313 (bankruptcy fraud), 319-325 and 327-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), and 369-373 (money laundering) in his capacity as a Senior Partner and executive of McKinsey & Co. and executive of McKinsey RTS, and within the scope of his employment by or agency for those entities.

405.     Goldstrom committed and aided and abetted the predicate acts described below and in Count 1, *supra*, in paragraphs 308-310 and 314 (bankruptcy fraud), 319-325 and 327-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), and 369-373 (money laundering) in his capacity as a Senior Partner and executive of McKinsey & Co. and executive and board member of McKinsey RTS, and within the scope of his employment by or agency for those entities.

406.     Sternfels committed and aided and abetted the predicate acts described below and in Count 1, *supra*, in paragraphs 308-310 and 315 (bankruptcy fraud), 319-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), 366-68 (inducement to interstate or foreign travel), 369-373 (money laundering) in his capacity as a Senior Partner of McKinsey & Co., and within the scope of his employment by or agency for McKinsey & Co.

407.     Yerian committed and aided and abetted the predicate acts described in Count 1, *supra*, paragraphs 308-310 and 317 (bankruptcy fraud), 319-325 and 327-330 (mail and wire fraud), 350(d) (obstruction of justice), and 369-373 (money laundering) in his capacity as a Partner of McKinsey & Co. and Practice Leader at McKinsey RTS, and within the scope of his employment by or agency for those entities.

167

i.      *False Declarations, Certifications, Verifications or Statements under*
        *Penalty of Perjury in Violation of 18 U.S.C. §§ 152(2) and 152(3).*

408.    The Count 2 Defendants' violations of 18 U.S.C. §§ 152(2) and 152(3) and aiding

and abetting of same are set forth in Count 1, *supra*, in paragraphs 308-317.

409.    As set forth in Count 1, *supra*, in paragraphs 308-311 and 316, Barton and Garcia

each aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by

knowingly authorizing and facilitating the filing of false and misleading disclosure declarations to

be filed on behalf of McKinsey RTS in the *Harry & David*, *AMF Bowling*, *Edison Mission*, *NII*

*Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, and

on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy.

410.    As set forth in Count 1, *supra*, in paragraphs 308-310 and 312, Proshan committed

and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by

knowingly causing false and misleading disclosure declarations to be filed on behalf of McKinsey

RTS in the *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural*

*Resources*, *SunEdison*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US,

and other McKinsey affiliates in the *AMR* bankruptcy.

411.    As set forth in Count 1, *supra*, in paragraphs 308-310 and 314, Goldstrom

committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and

152(3) by knowingly causing false and misleading disclosure declarations to be filed on behalf of

McKinsey RTS in the *Harry & David*, *AMF Bowling*, and *SunEdison* bankruptcies, and on behalf

of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy; and aided

and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly

authorizing and facilitating false and misleading disclosure declarations filed on behalf of

McKinsey RTS in the *Edison Mission*, *NII Holdings*, *Standard Register*, and *Alpha Natural Resources* bankruptcies.

412.    As set forth in Count 1, *supra*, in paragraphs 308-310 and 315, Sternfels committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing false and misleading disclosure declarations to be filed on behalf of McKinsey RTS in the *SunEdison* bankruptcy; and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and facilitating false and misleading disclosure declarations filed on behalf of McKinsey RTS in the *Harry & David*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy.

413.    As set forth in Count 1, *supra*, in paragraphs 308-310 and 313, Carmody committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and causing false and misleading disclosure declarations to be filed on behalf of McKinsey RTS in the *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy; and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and facilitating false and misleading disclosure declarations filed on behalf of McKinsey RTS in the *Edison Mission* bankruptcy.

414.    As set forth in Count 1, *supra*, in paragraphs 308-310 and 317, Yerian committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in connection with the *Edison Mission* bankruptcy.

ii.     *Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343.*

415.    The scheme or artifice to defraud AP and the predicate acts of mail and wire fraud committed and aided and abetted by the Count 2 Defendants are set forth in Count 1, *supra*, in paragraphs 319-330.

416.    Specifically, as set forth in Count 1, *supra*, in paragraphs 319-325 and 327-330, Barton, Sternfels, Garcia, and Goldstrom each committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the false and misleading disclosure declarations filed on behalf of McKinsey RTS in the *Harry & David*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy.

417.    As set forth in Count 1, *supra*, in paragraphs 319-325 and 327-330, Proshan and Carmody each committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the false and misleading disclosure declarations filed on behalf of McKinsey RTS in the *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy.

418.    As set forth in Count 1, *supra*, in paragraphs 319-325 and 327-330, Yerian committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the *Edison Mission* bankruptcy.

419.    As set forth in Count 1, *supra*, in paragraph 326, beginning in or around September 2014 and continuing through 2015, Barton and Sternfels further committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with their

efforts to mislead Alix and prevent him from taking action to remediate McKinsey's unlawful bankruptcy consulting practices.

420.    Upon information and belief, one or more of the Count 2 Defendants also used the interstate wires, United States mail, or private interstate commercial carrier to convey to one or more bankruptcy attorneys located in the United States offers of unlawful exclusive referral agreements.  Upon information and belief, one or more of the Count 2 Defendants also used or caused the use of the interstate wires, United States mail, or private interstate commercial carrier to transfer illegally obtained funds within the United States for the purpose of furthering the objectives of the Count 2 Enterprise.  These transfers include the movement of funds in connection with McKinsey's "re-invoiced" and "round-trip" payments from SunEdison and its affiliates in or about September 2015 through April 2016, as well as the transmission of fees from various bankruptcy debtor-clients to McKinsey RTS throughout the course of the scheme since 2010.  Each of the Count 2 Defendants committed numerous additional and similar acts of mail or wire fraud in furtherance of their scheme or artifice.  Evidence of such transactions and others is peculiarly within Defendants' knowledge and control and will be proven at trial following discovery.

### iii.    Obstruction of Justice in Violation of 18 U.S.C. § 1503(a).

421.    The Count 2 Defendants' violations of 18 U.S.C. § 1503(a) and aiding and abetting of the same are set forth, *supra*, in Count 1 in paragraphs 331-351.

422.    Specifically, as set forth in Count 1, *supra*, in paragraphs 331-351, Goldstrom committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *Harry & David*, *AMR*, *AMF Bowling*, and *SunEdison* cases, including by knowingly swearing to false and misleading disclosure declarations on behalf of McKinsey RTS in *Harry David* and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in *AMR*; and

aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* cases.

423.    As set forth in Count 1, *supra*, in paragraphs 331-351, Carmody committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *AMR*, *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* cases, including by knowingly swearing to false and misleading disclosure declarations in the *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn cases*, and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Edison Mission* bankruptcy.

424.    As set forth in Count 1, *supra*, in paragraphs 331-351, Proshan committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *AMR*, *AMF Bowling*, *Edison Mission*, *Standard Register*, *NII Holdings*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* cases.

425.    As set forth in Count 1, *supra*, in paragraph 350(d), Yerian committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *Edison Mission* bankruptcy, including by knowingly swearing to false and misleading declarations in that case.

426.    As set forth in Count 1, *supra*, in paragraphs 331-351, Sternfels committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *SunEdison* bankruptcy and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* cases.

427.    As set forth in Count 1, *supra*, in paragraphs 331-351, Barton and Garcia each aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *Harry & David*,

*AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* cases.

iv.    *Witness Tampering in Violation of 18 U.S.C. § 1512(b).*

428.    The Count 2 Defendants' violations of 18 U.S.C. § 1512(b) and aiding and abetting of the same are set forth, *supra*, in Count 1 in paragraphs 352-356.

429.    Specifically, as set forth in Count 1, *supra*, in paragraphs 352-356, Proshan committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *SunEdison* and *Alpha Natural Resources* bankruptcies.

430.    As set forth in Count 1, *supra*, in paragraphs 352-356, Carmody committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* bankruptcy, and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *SunEdison* bankruptcy.

431.    As set forth in Count 1, *supra*, in paragraphs 352-356, Sternfels committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *SunEdison* bankruptcy, and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* bankruptcy.

432.    As set forth in Count 1, *supra*, in paragraphs 352-356, Barton, Garcia, and Goldstrom each aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *SunEdison* and *Alpha Natural Resources* bankruptcies.

v.    *Obstruction of Justice in Violation of 18 U.S.C. § 1512(c).*

433.    The Count 2 Defendants' violations of 18 U.S.C. § 1512(c) and aiding and abetting of the same are set forth in Count 1, *supra*, in paragraphs 357-358.

434.     Specifically, as set forth in Count 1, *supra*, in paragraphs 357-358, Proshan and Carmody each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in the *Alpha Natural Resources* bankruptcy.

435.     As set forth in Count 1, *supra*, in paragraphs 357-358, Barton, Sternfels, Garcia, and Goldstrom each aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in the *Alpha Natural Resources* bankruptcy.

> vi.     *Inducement to Interstate or Foreign Travel in Violation of 18 U.S.C. § 2314.*

436.     The Count 2 Defendants' scheme to unlawfully compete with AP—including by depriving AP of remunerative consulting engagements it otherwise would have obtained—through concealment, obfuscation, and fraudulent misrepresentation of disqualifying conflicts of interest, and to prolong that unlawful conduct by lying to Alix when he attempted to instigate corrective action by McKinsey, constitutes a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, within the meaning of 18 U.S.C. § 2314.

437.     The Count 2 Defendants having devised or intending to devise such a scheme, by which the Count 2 Defendants sought to defraud AP of money or property having a value in excess of $5,000, in execution or concealment of the scheme, Barton, aided and abetted by Sternfels, induced Alix to travel in interstate or foreign commerce in violation of 18 U.S.C. § 2314. Specifically, in response to Alix's request for a meeting to discuss remediation of McKinsey's continued unlawful bankruptcy consulting engagements, Barton induced Alix to travel from Michigan to New York City to meet with Barton on October 15, 2015, at which meeting Barton offered business referrals to AP in exchange for Alix and AP dropping the issues concerning McKinsey's pay-to-play scheme and its illegal disclosure declarations.

438.    Barton induced Alix to attend these meetings in order to foster the false impression that McKinsey was pursuing corrective action in light of Alix's admonishments to Barton and Sternfels concerning McKinsey US's and McKinsey RTS's illegal bankruptcy consulting engagements.  By stringing Alix along in this fashion, the Barton sought to (and did) forestall legal action by AP, and thereby prolonged the Count 2 Defendants' scheme.

*vii.    Money Laundering in Violation of 18 U.S.C. § 1957.*

439.    McKinsey US and McKinsey RTS received tens of millions of dollars in fees for their bankruptcy consulting engagements.  A substantial portion of those monies were remitted directly or indirectly to each of the individual Count 2 Defendants in amounts exceeding $10,000.  These receipts of fees from McKinsey RTS's and McKinsey US's bankruptcy engagements described above and the subsequent deposit or other financial transfers of such monies constituted violations of 18 U.S.C. § 1957(a) in that the Count 2 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(f)(3) and 18 U.S.C. § 1956(c)(7) by virtue of their commission of, provision of assistance in the commission of, involvement in a conspiracy the object of which was the commission of, and actual knowledge of the commission of, the specified unlawful activity through which such proceeds were created; to wit, the Count 2 Defendants' unlawful scheme to fraudulently obtain Chapter 11 bankruptcy assignments for  McKinsey US and McKinsey RTS.

440.    The Count 2 Defendants' violations of, *inter alia*, 18 U.S.C. §§152(3), 1341, and 1343 constituted specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and 1957(f)(3).

441.    The specific chains of monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

442.     Additionally, the participation of the Count 2 Defendants (excluding Yerian) in "re-invoiced" and "round trip" payments from non-debtor affiliates of SunEdison constitute separate and further violations of 18 U.S.C. § 1957(a).  Count 2 Defendants Proshan, Sternfels, Goldstrom, and Carmody, authorized and aided and abetted by Barton and Garcia, caused the McKinsey RTS to submit the June 6, 2016 and June 14, 2016 Hojnacki Rule 2014(a) declarations (identified as items No. 31-32 in Exhibit A hereto) in the *SunEdison* bankruptcy, which declarations fraudulently mischaracterized McKinsey RTS's services and billing.   Each of those submissions violated 18 U.S.C. §§ 152(3), 1341 and 1343, as shown above.  The proceeds of this particular specified unlawful activity totaling $3,563,167.78 were received by McKinsey RTS and subsequently remitted directly or indirectly to one or more of the Count 2 Defendants in the form of salary or other compensation in amounts exceeding $10,000 dollars.  The Count 2 Defendants' receipt of those proceeds and their subsequent deposit or other financial transfers of such proceeds violated 18 U.S.C. § 1957(a) in that the Count 2 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and 1957(f)(3) by virtue of their commission of, provision of assistance in the commission of, involvement in a conspiracy the object of which was the commission of, and actual knowledge of the commission of, the specified unlawful activity through which such proceeds were created.  The specific details of the monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

### D.  Scienter

443.     Each of the Count 2 Defendants' scienter is demonstrated by the facts set forth in Count 1, *supra*, in paragraphs 374-378.

### E.  Vicarious Liability

444.    Each of the predicate acts by Barton, Sternfels, Garcia, Carmody, Goldstrom, Proshan, and Yerian were committed within the scope of their employment, officership, or directorship positions at, or agency relationship with, McKinsey & Co., McKinsey Holdings, McKinsey US, and/or McKinsey RTS.    Each of these individuals was a high-level member of McKinsey management, and each committed and aided and abetted the commission of predicate acts as described above.  The predicate acts were each committed in furtherance of a scheme intended to and which did in fact benefit McKinsey & Co. and its subsidiaries by obtaining fees for bankruptcy engagements from which these entities were disqualified.  Accordingly, McKinsey & Co., McKinsey Holdings, McKinsey US, and/or McKinsey RTS are vicariously liable for the RICO violations of Barton, Sternfels, Garcia, Carmody, Goldstrom, Proshan, and Yerian.

### F.  Causation and Damages

445.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by the Count 2 Defendants, AP suffered an immediate and direct injury from the Count 2 Defendants' racketeering activity.  Specifically, AP suffered the loss of property related to the restructuring assignments it would have acquired, and the profits flowing therefrom, had the Count 2 Defendants not implemented their scheme and acquired for McKinsey US and McKinsey RTS restructuring assignments for which they were not qualified through their violations of Rule 2014 and related predicate acts.

446.    Given AP's 25% share in the market for high-end bankruptcy consulting services, absent the Count 2 Enterprise and the Count 2 Defendants' willfully criminal conduct, AP would have obtained at least 25% of the work on the bankruptcies that McKinsey US and/or McKinsey RTS obtained in connection with the Count 2 Enterprise.

447.    As described in Count 1, *supra*, in paragraph 383, in addition to AP's position as a market leader, due to specific circumstances surrounding the *GenOn*, *Alpha Natural Resources*, *Standard Register*, *NII Holdings*, *Edison Mission*, and *AMF Bowling*, AP's chances of obtaining the work assigned to McKinsey RTS were effectively 100% had McKinsey RTS been disqualified in those cases.

448.    Moreover, in addition to AP's position as a market leader, due to specific circumstances surrounding the *Hayes*, *Mirant*, and *Lyondell* bankruptcies, AP's chances of obtaining the work assigned to McKinsey US were effectively 100% had McKinsey RTS been disqualified in those cases:

      a.   In ***Lyondell***, AP performed extensive work for the debtor, including by supplying a Chief Restructuring Officer, performing contingency planning work, performing valuations, and evaluating the debtor company's sourcing and purchasing costs—none of which would have precluded AP from performing the work that McKinsey US wrongfully obtained, and all which made AP the obvious choice to replace McKinsey US upon disqualification.

      b.   In ***Mirant***, AP also performed extensive work for the debtor, including by advising the debtor regarding the financial, turnaround, organizational, and technology transformation components of the debtor's restructuring plan.  Due to its market experience, AP was well-positioned to obtain and handle any additional assignment, including the assignment that McKinsey US wrongfully obtained.

      c.   In ***Hayes Lemmerz***, AP also performed extensive work for the debtor, including by furnishing a Chief Restructuring Officer and an interim Chief Financial

Officer.   As a trusted professional with an existing substantial role in the bankruptcy, AP was the clear and logical replacement had McKinsey US been disqualified.

449.    AP's damages include, but are not limited to, fees from bankruptcy consulting engagements that AP would have earned in the absence of the Count 2 Defendants' criminal conduct and Count 2 Enterprise; other lost business opportunities (including pre- and post-bankruptcy work); and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for the Count 2 Defendants' criminal activities.

450.    It was a foreseeable, natural, direct, and intended consequence of the Count 2 Defendants' scheme that McKinsey US and McKinsey RTS would obtain more restructuring assignments (for which they were not qualified) and AP would receive fewer.   There are no independent factors that account for AP's injury, nor is that injury in any way derivative of any injury to any Interested Party.   No immediate victim is better situated than Plaintiff to sue--and indeed the Count 2 Defendants' misconduct has been brought to light solely because of Plaintiff's efforts--nor is there any risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violations.

451.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Alix, as assignee of AP, is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
*Against All Defendants*

452.    Alix repeats and realleges paragraphs 1 through 451 as if fully set forth herein.

453.    This cause of action is asserted in addition to and in the alternative to the First and Second Causes of Action, *supra*.

454. At all relevant times, AP was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

455. At all relevant times, each of the Defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### A. The Count 3 RICO Enterprise and Its Effect on Interstate Commerce

456. From December 27, 2001 (said date being approximate and inclusive) and continuing to the present, McKinsey and the bankruptcy consulting clients of McKinsey US and McKinsey RTS identified above have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "**Count 3 Enterprise**").

457. The Count 3 Enterprise is structured through (1) the formal corporate ownership relationships among McKinsey & Co., McKinsey Holdings, McKinsey US, and (after its formation in 2010) McKinsey RTS; (2) the terms of the retention agreements between McKinsey US and/or McKinsey RTS, on the one hand, and each bankruptcy consulting client, on the other; and (3) the interrelated management structure resulting from the assignment of McKinsey personnel to management positions in the bankruptcy consulting clients. Although the precise composition of the Count 3 Enterprise changed over time with the inception and termination of particular bankruptcy proceedings and the formation of McKinsey RTS in 2010, the overall character and purpose of the Count 3 Enterprise was consistent.

458. At all relevant times, each of the Count 3 Defendants was, and is, a person that exists separate and distinct from the Count 3 Enterprise.

459. The Count 3 Enterprise was engaged in, and its activities affected, interstate and foreign commerce as demonstrated in, *inter alia*, paragraphs 294-295 and 393, *supra*.

### B.  Pattern of Racketeering

460.    Each of the Count 3 Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described below and in Counts 1 and 2, *supra*, and others to be identified after further investigation and discovery herein.  Each of the Count 3 Defendants engaged in two or more RICO predicate acts, and each committed at least one such act after the effective date of RICO.  The Count 3 Defendants played the same roles in the scheme and pattern of racketeering activity as set forth in the First and Second Causes of Action, *supra*.

### C.  RICO Predicate Acts

461.    Barton committed and aided and abetted the predicate acts described below and in Counts 1 and 2, *supra*, in his capacity as Managing Partner of McKinsey & Co. from 2009 to mid-2018, and within the scope of his employment by or agency for McKinsey & Co.

462.    Garcia committed and aided and abetted the predicate acts described below and in Counts 1 and 2, *supra*, in his capacity as President of McKinsey RTS, a Senior Partner of McKinsey & Co., and (from 2006 to 2017) a board member of MIO, and within the scope of his employment by or agency for those entities.

463.    Proshan committed and aided and abetted the predicate acts described below and in Counts 1 and 2, *supra*, in her capacity as a Senior Vice President of and Associate General Counsel to McKinsey & Co. with primary responsibility for the provision of legal services to McKinsey RTS, and within the scope of her employment by or agency for those entities.

464.    Carmody committed and aided and abetted the predicate acts described below and in Counts 1 and 2, *supra*, in his capacity as a Senior Partner and executive of McKinsey & Co. and

executive of McKinsey RTS, and within the scope of his employment by or agency for those entities.

465.     Goldstrom committed and aided and abetted the predicate acts described below and in Counts 1 and 2, *supra*, in his capacity as a Senior Partner and executive of McKinsey & Co. and as an executive and board member of McKinsey RTS, and within the scope of his employment by or agency for those entities.

466.     Sternfels committed and aided and abetted the predicate acts described below and in Counts 1 and 2, *supra*, in his capacity as a Senior Partner of McKinsey & Co. and within the scope of his employment by or agency for McKinsey & Co.

467.     Yerian committed and aided and abetted the predicate acts described below and in Counts 1 and 2, *supra*, in his capacity as a Partner at McKinsey & Co. and Practice Leader at McKinsey RTS, and within the scope of his employment by or agency for those entities.

> i.   *False Declarations, Certifications, Verifications or Statements under Penalty of Perjury in Violation of 18 U.S.C. §§ 152(2) and 152(3).*

468.     McKinsey RTS committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and causing to be filed 31 false and misleading declarations in nine bankruptcies:  *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn*.  Those specific declarations are identified as items No. 9-39 in the chart set forth in Exhibit A hereto, and false and misleading statements in those declarations are set forth in Exhibit B hereto.

469.     As set forth in Count 1, *supra*, in paragraphs 308-310 and 312, Proshan committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.

470.   As set forth in Count 1, *supra*, in paragraphs 308-310 and 314, Goldstrom committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.

471.   As set forth in Count 1, *supra*, in paragraphs 308-310 and 315, Sternfels committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in the *SunEdison* bankruptcy, and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* bankruptcies.

472.   As set forth in Count 1, *supra*, in paragraphs 308-310 and 313, Carmody committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in the *AMR*, *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in the *Edison Mission* bankruptcy.

473.   As set forth in Count 1, *supra*, in paragraphs 308-310 and 317, Yerian committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in *Edison Mission*.

474.   As set forth in Count 1, *supra*, in paragraphs 308-311 and 316, Barton and Garcia each aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in connection with the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.

475.   As described in Count 1 in paragraphs 308-317, *supra*, McKinsey & Co. McKinsey Holdings, and McKinsey US each committed and aided and abetted acts of bankruptcy fraud in

violation of 18 U.S.C. §§ 152(2) and 152(3) in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.

476.   McKinsey & Co., McKinsey Holdings, and McKinsey US each violated 18 U.S.C. §§ 152(2) and 152(3) and aided and abetted McKinsey RTS's violations of same in that the individual Defendants, acting at least in part in their capacities as employees and executives of McKinsey & Co., McKinsey Holdings, and/or McKinsey US, caused McKinsey RTS to file the Rule 2014(a) declarations described above and identified in Exhibit A hereto.

477.   As described below, McKinsey & Co., McKinsey Holdings, and McKinsey US committed and aided and abetted further violations of 18 U.S.C. §§ 152(2) and 152(3) by causing to be filed at least eight false and misleading disclosure affidavits in the *Hayes*, *UAL*, *Mirant*, and *Lyondell* bankruptcies.  Those specific affidavits are identified as items No. 1-8 in the chart set forth in Exhibit A hereto, and false and misleading statements contained in those affidavits are identified in Exhibit B hereto. Among other things, the Rule 2014(a) affidavits identified as Nos. 4, 6, and 7 in the chart set forth in Exhibit A falsely asserted that McKinsey US could not identify connections by name or provide other details of its engagements on account of "[McKinsey's] responsibility to maintain strict client confidentiality."  In fact, McKinsey's engagement agreements with clients permit it to make all disclosures required by law.

### ii.   *Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343*

478.   McKinsey RTS committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by authorizing, facilitating, filing and causing to be filed the 31 false and misleading declarations filed on behalf of McKinsey RTS in the *Harry & David*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other

McKinsey affiliates in the *AMR* bankruptcy. Those declarations are identified as items No. 9-39 in the chart set forth in Exhibit A hereto, and false and misleading statements contained in those declarations are identified in Exhibit B hereto.

479.    As set forth in Count 1 in paragraphs 319-325 and 327-330, *supra*, Barton, Sternfels, Garcia, and Goldstrom each committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.

480.    As set forth in Count 1 in paragraphs 319-325 and 327-330, *supra*, Carmody and Proshan each committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.

481.    As set forth in Count 1 in paragraphs 319-325 and 327-330, *supra*, Yerian committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the *Edison Mission* bankruptcy.

482.    As set forth in Count 1 in paragraphs 319-330, *supra*, McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the 31 false and misleading declarations filed on behalf of McKinsey RTS in the *Harry & David*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy.

483.     As set forth in Count 1 in paragraph 326, *supra*, beginning in or around September 2014 and continuing through 2015, Barton and Sternfels each committed and aided and abetted numerous violations of mail fraud and wire fraud in connection with their efforts to mislead Alix and prevent him and AP from taking action to remediate McKinsey's unlawful bankruptcy consulting practices.

484.     McKinsey & Co., McKinsey US, and McKinsey Holdings further committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by knowingly authorizing and causing to be filed the eight false and misleading affidavits filed on behalf of McKinsey US in the *Hayes*, *UAL*, *Mirant*, and *Lyondell* bankruptcies by individuals acting within the scope of their employment by or agency for McKinsey & Co., McKinsey US, and/or McKinsey Holdings.  Those specific affidavits are identified as items No. 1-8 in Exhibit A hereto and the specific false and misleading statements in those affidavits are identified in Exhibit B hereto.  The specific operational interrelationships between these three corporate Defendants and the specific capacities in which the employees and/or agents acted in filing the eight affidavits is within these Defendants' exclusive knowledge and will be identified after further investigation and discovery herein.

   a.   Each of the affidavits or declarations under penalty of perjury identified in items No. 1-3 and 6-8 in the chart set forth in Exhibit A hereto were transmitted by interstate wire, by United States mail, and/or by private interstate commercial carrier, as evidenced by the fact that each such affidavit or declaration was signed, or the affiant or declarant resided, in a state different from that in which the document was judicially filed, as evidenced by the locations indicated on

the signature page and/or the fax numbers and/or the locations of the notaries indicated on the declarants' signature pages:

| No(s). | Case | Declarant | Location of Declarant | Location of Case |
|---|---|---|---|---|
| 1 | *Hayes Lemmerz* | Sykes | Illinois *(Notary)* | Delaware |
| 2 | *Hayes Lemmerz* | Sykes | Michigan *(Notary)* | Delaware |
| 3 | *Hayes Lemmerz* | Sykes | Illinois *(Notary)* | Delaware |
| 6 | *Mirant* | Ostrowski | Georgia | Texas |
| 7-8 | *Lyondell* | Hundertmark | Texas | New York |

    b.    Additionally, it is likely that the affidavits submitted by McKinsey US in the *UAL* bankruptcy were also mailed and/or wired across state lines, given that McKinsey & Co., McKinsey US, and McKinsey Holdings and their respective attorneys were based in New York, while the *UAL* bankruptcy was filed in Illinois.

    c.    Further evidence regarding the details of these Defendants' acts of mail and wire fraud is peculiarly within the knowledge and control of these Defendants and will be proven at trial after discovery.

    *iii.    Obstruction of Justice in Violation of 18 U.S.C. § 1503(a).*

485.    McKinsey RTS committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed the false and misleading disclosure declarations filed on behalf of McKinsey RTS in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies. Those specific declarations are identified as items No. 9-39 in Exhibit A hereto, and specific misleading and false statements therein are identified in Exhibit B hereto.

486.     As set forth in Count 1, *supra*, in paragraphs 331-351, Barton and Garcia aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.

487.     As set forth in Count 1, *supra*, in paragraphs 331-351, Goldstrom committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *Harry & David*, *AMR*, *AMF Bowling*, and *SunEdison* bankruptcies, and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* bankruptcies.

488.     As set forth in Count 1, *supra*, in paragraphs 331-351, Carmody committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *AMR*, *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* bankruptcies, and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Edison Mission* bankruptcy.

489.     As set forth in Count 1, *supra*, in paragraphs 331-351, Proshan committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.

490.     As set forth in Count 1, *supra*, in paragraph 350(d), Yerian committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *Edison Mission* bankruptcy.

491.     As set forth in Count 1, *supra*, in paragraphs 331-351, Sternfels committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) the *SunEdison* bankruptcy and

aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* bankruptcies.

492.     As set forth in Count 1, *supra*, McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Harry & David*, *AMR*, *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.

493.     As described below, McKinsey & Co., McKinsey Holdings, and McKinsey US each further committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed by McKinsey US personnel in on behalf of McKinsey US at least eight false and materially misleading disclosure affidavits to be filed the *Hayes*, *UAL*, *Mirant*, and *Lyondell* bankruptcy proceedings.  Those specific affidavits are identified as items No. 1-8 in Exhibit A hereto, and the false and misleading statements contained therein are identified at pages 1-7 of Exhibit B hereto.

494.     In the *Hayes* bankruptcy, McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed at least three false and materially misleading disclosure affidavits by McKinsey US principal Richard Sykes in support of McKinsey US's retention as a management consultant in that case.  Those affidavits are identified as items No. 1-3 in Exhibit A hereto.

495.     In the *UAL* bankruptcy, McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed at least two false and

materially misleading disclosure affidavits—one by McKinsey US executive Gerhard Bette, and one by McKinsey in-house counsel Nikolaus Semaca—in support of McKinsey US's retention as a management consultant in that case.  Those affidavits are identified as items No. 4 and 5 in Exhibit A hereto.

496.    In the *Mirant* bankruptcy, McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed at least one false and materially misleading disclosure affidavit by McKinsey US executive Kenneth Ostrowski in support of McKinsey US's retention as a management consultant in that case.  That affidavit is identified as item No. 6 in Exhibit A hereto.

497.    In the *Lyondell* bankruptcy, McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed at least two false and materially misleading disclosure affidavits by McKinsey US executive Thomas Hundertmark in support of McKinsey US's retention as a management consultant in that case.  Those affidavits are identified as items No. 7 and 8 in Exhibit A hereto.

*iv.    Witness Tampering in Violation of 18 U.S.C. § 1512(b).*

498.    McKinsey RTS committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* and *SunEdison* cases, by knowingly and corruptly persuading another person and by knowingly engaging in misleading conduct toward another person, and attempting to do so, with an intent to influence, delay, or prevent testimony or cause any person to withhold a record, object, document, or testimony from an official proceeding.  Specifically:

a. In the *Alpha Natural Resources* bankruptcy, McKinsey RTS engaged in misleading conduct by knowingly submitting or causing to be submitted false and misleading statements, including disclosure declarations signed by Carmody, and intentionally omitting information or intentionally concealing materially facts concerning McKinsey's connections to Interested Parties and the completeness and truthfulness of McKinsey RTS's disclosures in that proceeding. This misleading conduct was directed at the U.S. Trustee and the *Alpha Natural Resources* court. McKinsey RTS attempted to, and did, persuade the U.S. Trustee to abandon its efforts in 2016 to seek further disclosures from McKinsey RTS in *Alpha Natural Resources*. In doing so, McKinsey RTS acted corruptly and with the improper intent of deterring the U.S. Trustee from continuing to litigate against McKinsey RTS regarding its Rule 2014 disclosures.

b. In *SunEdison*, McKinsey RTS committed and aided and abetted acts of witness tampering in violation of Section 1512(b) by knowingly influencing or impeding truthful testimony by Mark Hojnacki and corruptly persuading Hojnacki to cause him to provide non-truthful or misleading testimony in the five false and materially misleading disclosure declarations filed by Hojnacki on behalf of McKinsey RTS in *SunEdison* proceeding;

c. In each instance, McKinsey acted knowingly and with the wrongful intent that the false and misleading testimony on behalf of McKinsey RTS would obstruct the bankruptcy proceedings by allowing McKinsey RTS to avoid disqualification in *Alpha Natural Resources* and *SunEdison*.

499.     As set forth in Count 1, *supra*, in paragraphs 352-356, McKinsey & Co., McKinsey Holdings, McKinsey US, and Proshan each committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* and *SunEdison* cases.

500.     As set forth in Count 1, *supra*, in paragraphs 352-356, Barton, Garcia, and Goldstrom each aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* and *SunEdison* cases.

501.     As set forth in Count 1, *supra*, in paragraphs 352-356, Carmody committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* case and by aiding and abetting acts of witness tampering in the *SunEdison* case.

502.     As set forth in Count 1, *supra*, in paragraphs 352-356, Sternfels committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *SunEdison* case and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* case.

503.     McKinsey & Co., McKinsey US, and McKinsey Holdings each further committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) by knowingly influencing or impeding truthful testimony by the individuals who provided affidavits on behalf of McKinsey US in the *Hayes*, *UAL*, *Mirant* and *Lyondell* cases, and/or by corruptly persuading or misleading those individuals to cause them to provide non-truthful or misleading testimony in the above-described false and materially misleading disclosure affidavits that were filed on behalf of McKinsey US in those proceedings, and by aiding and abetting each other's witness tampering. Those eight affidavits are identified as items No. 1-8 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 1-7 of Exhibit B hereto.

v.    *Obstruction of Justice in Violation of 18 U.S.C. § 1512(c).*

504.    As set forth in Count 1, *supra*, in paragraphs 357-358, McKinsey & Co., McKinsey US, McKinsey Holdings, Proshan, and Carmody each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c), and Barton, Sternfels, Garcia, and Goldstrom aided and abetted such obstruction of justice, in the *Alpha Natural Resources* bankruptcy.

505.    McKinsey RTS committed and obstruction of justice in violation of 18 U.S.C. § 1512(c) by corruptly obstructing, influencing, and/or impeding the *Alpha Natural Resources* bankruptcy and/or by attempting to do so by filing or causing to be filed false and misleading declarations in that case which were intended to (and did) fraudulently induce the U.S. Trustee to withdraw its motion to compel in 2016; and McKinsey RTS aided and abetted the ANR Obstruction Defendants' violations of 18 U.S.C. § 1512(c) by authorizing and facilitating their unlawful conduct on behalf of McKinsey RTS in the *Alpha Natural Resources* bankruptcy.

vi.    *Unlawful Offers of Remuneration, Compensation, Reward, or Advantage in Violation of 18 U.S.C. § 152(6) and Felony Commercial Bribery under State Law.*

506.    McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS offered to one or more major bankruptcy attorneys located in the United States an arrangement under which McKinsey would introduce its clients to such attorneys on an exclusive basis in exchange for the attorneys exclusively recommending McKinsey to the attorneys' bankruptcy debtor clients for bankruptcy consulting services.

507.    McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS made such offers knowing and intending that: neither they nor the recipient attorney(s) would disclose the arrangement to their mutual debtor-client or the bankruptcy court (via a Rule 2014(a) disclosure or otherwise); through such nondisclosure, McKinsey would avoid disqualification as an advisor to the debtor(s); and such actions would operate as a fraud against McKinsey's competitor, AP, which

would have secured such bankruptcy consulting engagements in the absence of the unlawful referral agreements between McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS and the bankruptcy attorneys.

508.    With respect to each such offer, McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS knowingly and fraudulently gave, offered, or attempted to obtain money or property, remuneration, compensation, reward, advantage, or promise thereof (in the form of valuable exclusive referrals to high-level executives from McKinsey's coveted stable of corporate clients) for acting or forbearing to act in any case under the Bankruptcy Code, within the meaning of 18 U.S.C. § 152(6).

509.    Additionally, the foregoing conduct constituted felony commercial bribery under the laws of Texas, New York, and Illinois:

    a.    Texas Penal Code § 32.43(b) provides that "a person who is a fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary."  Pursuant to Texas Penal Code § 32.43(d), a violation of § 32.43(b) is a felony offense.

    b.    New York Penal Law § 180.03 provides: "A person is guilty of commercial bribing in the first degree when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs, and when the value of the benefit conferred or offered or agreed to be conferred exceeds one thousand dollars and causes

economic harm to the employer or principal in an amount exceeding two hundred fifty dollars." A violation of § 180.03 is a felony offense.

    c.    Illinois Criminal Code § 720 ILCS 5/29A-1 provides: "A person commits commercial bribery when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs." Pursuant to Illinois Criminal Code § 720 ILCS § 5/29A-3, a violation of § 5/29A-1 is a felony offense if the value conferred equals or exceeds $500,000.

510.    The value offered by McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS to the bankruptcy attorneys that they sought to recruit for their "pay-to-play" scheme exceeded $500,000, given the magnitude of fees that bankruptcy attorneys could expect from an engagement by one or more of McKinsey's Fortune 500-class clientele.

511.    By making an offer of such a benefit to a fiduciary (a bankruptcy attorney) with the agreement or understanding that the benefit would influence the fiduciary's conduct in the affairs of the fiduciary's beneficiary (the bankruptcy attorney's debtor-client) and without the consent of the bankruptcy debtor-client in *GenOn* (venued in Texas); *SunEdison*, *NII Holdings*, and *AMR* (venued in New York); and *Edison Mission* (venued in Illinois), McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS violated the aforementioned bribery statutes.

512.    The particular details of the violations of 18 U.S.C. § 152(6) and state commercial bribery statutes by McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS including the specific details of such offers and the identities of the bankruptcy attorneys, are peculiarly within Defendants' knowledge and will be proven at trial following discovery. At a

minimum, Barton admitted to Alix at their October 16, 2014 meeting that McKinsey had, in fact, made one or more such "pay-to-play" offers.

> vii. *Inducement to Interstate or Foreign Travel in Violation of 18 U.S.C. § 2314.*

513.    The Count 3 Defendants' scheme to unlawfully compete with AP—including by depriving AP of remunerative consulting engagements it otherwise would have obtained—through concealment, obfuscation, and fraudulent misrepresentation of disqualifying conflicts of interest, and to prolong that unlawful conduct by lying to Alix when he attempted to instigate corrective action by McKinsey, constitutes a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, within the meaning of 18 U.S.C. § 2314.

514.    The Count 3 Defendants having devised or intending to devise such a scheme, by which the Count 3 Defendants sought to defraud AP of money or property having a value in excess of $5,000, in execution or concealment of the scheme, Barton and McKinsey & Co., aided and abetted by Sternfels, McKinsey US, McKinsey Holdings, and McKinsey RTS, induced Alix to travel in interstate or foreign commerce in violation of 18 U.S.C. § 2314. Specifically, in response to Alix's request for a meeting to discuss remediation of McKinsey's continued unlawful bankruptcy consulting engagements, Barton and McKinsey & Co. induced Alix to travel from Michigan to New York City to meet with Barton on October 15, 2015, at which meeting Barton offered business referrals from McKinsey to AP in exchange for Alix and AP dropping the issues concerning McKinsey's pay-to-play scheme and its illegal disclosure declarations.

515.    Barton and McKinsey & Co. induced Alix to attend these meetings in order to foster the false impression that McKinsey was pursuing corrective action in light of Alix's admonishments to Barton and Sternfels concerning McKinsey US's and McKinsey RTS's illegal bankruptcy

consulting engagements and McKinsey's pay-to-play scheme.  By stringing Alix along in this fashion, Barton and McKinsey & Co. sought to (and did) forestall legal action by AP, and thereby prolonged the Count 3 Defendants' scheme.

*viii.  Money Laundering in Violation of 18 U.S.C. § 1957.*

516.    McKinsey US and McKinsey RTS received tens of millions of dollars in fees for their bankruptcy consulting engagements.  A substantial portion of those monies were remitted directly or indirectly to McKinsey RTS's parent, McKinsey US, and to McKinsey Holdings and McKinsey & Co., and to one or more of the individual Count 3 Defendants, in amounts exceeding $10,000.    These receipts of fees from McKinsey RTS's and McKinsey US's bankruptcy engagements described above and the subsequent deposit or other financial transfers of such monies constituted violations of 18 U.S.C. § 1957(a) in that the Count 3 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(f)(3) and 18 U.S.C. § 1956(c)(7).  Such specified unlawful activity includes, without limitation, the violations of 18 U.S.C. §§ 152, 1341, and 1343 set forth above.  The specific chains of monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

517.    Additionally, McKinsey's participation in "re-invoiced" and "round trip" payments from non-debtor affiliates of SunEdison constituted separate violations of 18 U.S.C. § 1957(a). McKinsey's falsification of McKinsey RTS invoices issued to SunEdison constituted the knowing and fraudulent concealment, falsification, or false entry in recorded information relating to the property or financial affairs of SunEdison in contemplation of SunEdison's pending bankruptcy proceeding, in violation of 18 U.S.C. §152(8).  The specific chains of monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven

197

at trial. Alternately, the Count 3 Defendants (and specifically, McKinsey & Co., McKinsey Holdings, McKinsey US, McKinsey RTS, Proshan, Sternfels, Carmody and Goldstrom, authorized and facilitated by Garcia and Barton) caused the submission of the June 6, 2016 and June 14, 2016 Hojnacki Rule 2014(a) declarations identified above in the *SunEdison* case, which declarations fraudulently mischaracterized McKinsey RTS's services and billing. These submissions violated 18 U.S.C. § 152(3) and 18 U.S.C. §§ 1341 and/or 1343, as shown above.

518. The Count 3 Defendants' violations of 18 U.S.C. §§152(3), 1341, and/or 1343 constituted specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and 1957(f)(3).

519. The Count 3 Defendants' receipt of the proceeds of these specified unlawful activities and their subsequent deposit or other financial transfers of such proceeds violated 18 U.S.C. § 1957(a) in that the Count 3 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and 1957(f)(3). The specific details of the monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

520. The Count 3 Defendants' predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing or obfuscating McKinsey's disqualifying conflicts of interest in order to enable McKinsey US and/or McKinsey RTS to obtain bankruptcy consulting assignments that they would not have received had the Count 3 Defendants behaved lawfully, and by attempting to obtain such engagements by offering unlawful "pay-to-play" arrangements to bankruptcy attorneys; (2) thereby depriving AP of remunerative bankruptcy consulting engagements; and, (3) after the scheme was discovered, forestalling remedial litigation

198

by AP and Alix by means of Barton's duplicitous interactions with Alix.  These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission.

521.     Through such patterns of racketeering activity, each of the Count 3 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 3 Enterprise in violation of 18 U.S.C. § 1962(c).

### D.  Scienter

522.     McKinsey RTS had the motive to commit the aforementioned violations of 18 U.S.C. §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314 and acts of mail and wire fraud, as demonstrated by, *inter alia*, the following facts:

    a.     McKinsey RTS stood to earn tens of millions of dollars in bankruptcy consulting fees as a result of the Count 3 Defendants' unlawful scheme.  Had McKinsey RTS full disclosed its connections as required by bankruptcy law, McKinsey RTS would have been disqualified from acting as a bankruptcy professional in each of the nine Chapter 11 cases in which it was been employed.

    b.     McKinsey RTS was formed for the express purpose of skirting bankruptcy disclosure requirements.

    c.      By fraudulently obtaining bankruptcy assignments, McKinsey RTS was able to assist its parent companies, McKinsey & Co., McKinsey Holdings, and McKinsey US, and other McKinsey affiliates in maintaining a firmer grip on existing clients and in obtaining, for McKinsey, additional post-bankruptcy work from bankruptcy clients.  Accordingly, bankruptcy consulting services created a virtuous cycle for McKinsey RTS and the other Count 3 Defendants.

     d.    McKinsey RTS, along with the other Count 3 Defendants, continued with its pattern of unlawful conduct even after McKinsey's global Managing Partner Barton acknowledged and promised to put an end to McKinsey's unlawful bankruptcy practices, demonstrating that McKinsey RTS and the other Count 3 Defendants were powerfully motivated to break the law.

     e.    Barton's attempts to lull Alix and AP into forgoing corrective litigation permitted McKinsey RTS and the other Count 3 Defendants to continue their lucrative but unlawful scheme uninterrupted for at least another year.

523.    McKinsey RTS had the opportunity to commit the aforementioned violations of 18 U.S.C. §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314 and acts of mail and wire fraud, as demonstrated by the fact that McKinsey's jealous protection of client identities makes it exceedingly difficult for outsiders to identify disqualifying connections without full and honest disclosure by McKinsey RTS and its employees and officers.  And because of the fiduciary nature of McKinsey RTS's advisory relationships, its clients were dependent on its honesty.

524.    McKinsey RTS also had the opportunity to effectuate other components of the Count 3 Defendants' fraudulent scheme.  Concerning McKinsey's "pay-to-play" arrangement, the prospect of access to McKinsey's unparalleled portfolio of clientele would have been almost irresistible to bankruptcy attorneys, while McKinsey would have gained an easy way to "jump start" McKinsey RTS's bankruptcy consulting practice in a way nearly undetectable by competitors or the authorities.  And lulling AP into inaction by deceiving Alix concerning his efforts to dissuade McKinsey from unlawful conduct also afforded valuable breathing space to Defendants, given the accelerated growth of McKinsey RTS's bankruptcy practice in the last several years.

525.     In addition, the circumstances surrounding the aforementioned violations of 18 U.S.C. §§ §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314 and acts of mail and wire fraud demonstrate conscious misbehavior and knowledge by McKinsey RTS that it, along with the other Count 3 Defendants, was engaging in a scheme to defraud AP as demonstrated by, *inter alia* the following facts:

    a.  McKinsey RTS, which is part of a global enterprise with a vast array of large, diversified companies as clients and an expansive network of McKinsey "alumni" connections, and which thus has a concomitantly large set of connections requiring disclosure, nonetheless repeatedly filed grossly inadequate Rule 2014(a) disclosures in comparison with those of considerably smaller, less interconnected firms such as AP.  McKinsey RTS's conflict-checking processes, as described in its Rule 2014(a) submissions, are conspicuously primitive and deficient. The rudimentary nature of these procedures, which is irreconcilable with McKinsey's claims to be a global information management leader, indicates that the system represented a deliberate attempt to conceal relevant connections by limiting internal inquiries in a manner ensuring that relevant connections would be missed.  At a minimum, McKinsey RTS acted with willful blindness to disqualifying conflicts.

    b.  McKinsey RTS's failure to meet its disclosure obligations over the course of several years and nine different bankruptcies, combined with the failure of McKinsey US to meet its disclosure obligations over the course of several years and four different bankruptcies, despite external and internal access to the most sophisticated legal advice available, demonstrates that this failure to disclose was systemic and intentional rather than the result of sporadic lapses in judgment or execution.

c. By the time of McKinsey RTS's participation in the *NII Holdings* bankruptcy in October 2014, McKinsey was on explicit notice at the highest executive level— Barton—that McKinsey RTS's disclosure practices were unlawful and afforded it an unfair and illegal competitive advantage over AP.  Barton repeatedly admitted to Alix that the disclosure practices of McKinsey US and McKinsey RTS and McKinsey's "pay-to-play" offers to bankruptcy attorneys were unlawful, and even promised to shutter McKinsey RTS and abandon bankruptcy consulting during his tenure.  That McKinsey RTS continued its unlawful conduct unabated demonstrates not only that its unlawful behavior was willful but also that its earlier unlawful conduct prior to Alix's conversations with Barton and Sternfels was not inadvertent or the result of mere sloppiness.

526. The remaining Count 3 Defendants' scienter is demonstrated by the facts set forth in Count 1, *supra*, in paragraphs 374-378.

527. Each Count 3 Defendant committed and aided and abetted the foregoing predicate violations of 18 U.S.C. §§ §§ 152(2), 152(3), 152(6), 1341, 1343, 1503(a), 1512(b), 1512(c), and 2314 with the specific intent to defraud AP of valuable bankruptcy consulting engagements and the fees therefrom.

### E.  Vicarious Liability

528. Each of the foregoing predicate acts committed in connection with the filing of false and misleading affidavits in the *Hayes*, *UAL*, *Mirant*, and *Lyondell* bankruptcies was committed by individuals acting within the scope of their employment, officership, or directorship positions at or agency relationship with McKinsey US.  The acts were committed with the knowledge of McKinsey US's upper management and in furtherance of a scheme intended to and which did in

202

fact benefit McKinsey US and its corporate parents by obtaining fees for bankruptcy engagements from which it was disqualified. Accordingly, McKinsey US is vicariously liable for RICO violations by its employees and agents.

529. Each of the aforementioned predicate acts committed by Barton, Sternfels, Garcia, Carmody, Goldstrom, Proshan, and Yerian was committed within the scope of their employment, officership, or directorship positions at or agency relationship with McKinsey & Co. Each of these individuals was a high-level member of McKinsey & Co.'s management, and each either participated directly in and aided and abetted the commission of predicate acts as described above. The predicate acts were each committed in furtherance of a scheme intended to and which did in fact benefit McKinsey & Co. and its subsidiaries by obtaining fees for bankruptcy engagements from which it and its subsidiaries were disqualified. Accordingly, McKinsey & Co. is vicariously liable for the RICO violations of each of the individual Defendants herein.

530. Alternatively, each of the aforementioned predicate acts by Barton, Sternfels, Garcia, Carmody, Goldstrom, Proshan, and Yerian was committed within the scope of their employment, officership, or directorship positions at or agency relationship with McKinsey RTS. Garcia and Proshan each was a high-level member of McKinsey RTS's management, and each committed and aided and abetted the commission of predicate acts described above. The predicate acts were each committed in furtherance of a scheme intended to and which did in fact benefit McKinsey RTS and its corporate parents by obtaining fees for bankruptcy engagements from which it was disqualified. Accordingly, McKinsey RTS is vicariously liable for the RICO violations of each of the individual Defendants herein.

531. In the *Hayes Lemmerz*, *UAL*, *Mirant*, and *Lyondell* bankruptcies, McKinsey & Co. and McKinsey Holdings orchestrated the scheme through their subsidiary, McKinsey US.

Accordingly, McKinsey & Co. and McKinsey Holdings are each vicariously liable for RICO violations by their indirect or direct subsidiary, McKinsey US.

532.    In the *Harry David*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, McKinsey & Co. orchestrated the scheme through its subsidiaries, McKinsey Holdings and McKinsey US, which in turn orchestrated the scheme through McKinsey RTS.  Accordingly, McKinsey & Co., McKinsey Holdings, and McKinsey US are vicariously liable for RICO violations by their indirect or direct subsidiaries.

533.    In the *AMR* bankruptcy, McKinsey & Co. orchestrated the scheme through its subsidiaries, McKinsey Holdings and McKinsey US, which in turn orchestrated the scheme through McKinsey RTS, and through various other McKinsey & Co. subsidiaries.  Accordingly, McKinsey & Co., McKinsey Holdings, and McKinsey US are vicariously liable for RICO violations by their indirect or direct subsidiaries.

## F.  Causation and Damages

534.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by the Count 3 Defendants, AP suffered an immediate and direct injury from the Count 3 Defendants' racketeering activity.  Specifically, AP suffered the loss of property related to the restructuring assignments it would have acquired, and the profits flowing therefrom, had the Count 3 Defendants not implemented their scheme and acquired for McKinsey US and McKinsey RTS restructuring assignments for which they were not qualified through their violations of Rule 2014 and related predicate acts.

535.    Given AP's 25% share in the market for high-end bankruptcy consulting services, absent the Count 3 Defendants' willfully criminal conduct, AP would have obtained at least 25%

of the work on the bankruptcies that McKinsey US and/or McKinsey RTS obtained as a result of the Count 3 Defendants' unlawful conduct.

536.    As described in Counts 1 and 2, *supra*, in paragraphs 383 and 447, in addition to AP's position as a market leader, due to specific circumstances surrounding the *Hayes Lemmerz*, *Mirant*, *Lyondell AMF Bowling GenOn*,  *Alpha Natural Resources*, *Standard Register*, *NII Holdings*, and *Edison Mission* bankruptcies, AP's chances of obtaining the work assigned to McKinsey US and McKinsey RTS in those cases were effectively 100% had McKinsey US and McKinsey RTS been disqualified in those cases.

537.    AP's damages include, but are not limited to, fees from bankruptcy consulting engagements that AP would have earned in the absence of the Count 3 Defendants' criminal conduct; other lost business opportunities (including pre- and post-bankruptcy work); and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for the Count 3 Defendants' criminal activities.

538.    It was a foreseeable, natural, direct, and intended consequence of the Count 3 Defendants' scheme that McKinsey US and McKinsey RTS would obtain more restructuring assignments (for which they were not qualified) and AP would receive fewer.  There are no independent factors that account for AP's injury, nor is that injury in any way derivative of any injury to any Interested Party.  No immediate victim is better situated than Plaintiff to sue--and indeed the Count 3 Defendants' misconduct has been brought to light solely because of Plaintiff's efforts--nor is there any risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violations.

539.   Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Alix, as assignee of AP, is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION
CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)
*Against All Defendants*

540.   Alix repeats and realleges paragraphs 1 through 539 as if fully set forth herein.

541.   Defendants have each unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

542.   As described in each of Counts 1 through 3, *supra*, two or more people, including each of the Defendants, agreed to (and did) commit numerous violations of 18 U.S.C. § 1962(c) to further their unlawful schemes.

543.   As described below, each Defendant agreed to further the unlawful endeavor described in Count 1, Count 2, and/or Count 3.

### A.   Count 1:  McKinsey & Co., McKinsey US, and McKinsey Holdings

544.   With respect to the unlawful scheme described above in Count 1, McKinsey & Co., McKinsey US, and McKinsey Holdings each agreed to further the scheme, as demonstrated by, *inter alia*, the following facts: a) they each knew of the illegal activity—specifically, that McKinsey RTS was not fully and truthfully disclosing its connections and disqualifying conflicts of interest as required under Rule 2014, and McKinsey entities and employees were committing numerous RICO predicate acts in support of the scheme; and b) they each facilitated and engaged in the illegal activity described in Count 1.

545.   Directly and through its agent officers, directors, board members, employees, and representatives, McKinsey & Co., and its wholly-owned and controlled subsidiaries McKinsey

Holdings and McKinsey US, have been active participants and central figures in the formation and operation of McKinsey RTS and its affairs, and in the orchestration, planning, perpetuation, and execution of the unlawful scheme to deprive AP of valuable bankruptcy consulting engagements.

546.     As described above in Count 1, the RICO predicate acts alleged in Count 1 were performed by McKinsey & Co., McKinsey US, McKinsey Holdings, and/or one or more of the individual Defendants (Barton, Sternfels, Proshan, Garcia, Goldstrom, Carmody, and Yerian), each of whom was a McKinsey & Co. employee.  In each of the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, McKinsey RTS filed false declarations attested to by McKinsey & Co. employees, including Carmody and Goldstrom who were Senior Partners of McKinsey & Co., and Yerian, who was a Partner of McKinsey & Co.  At all relevant times, Garcia was McKinsey RTS's President and a Senior Partner of McKinsey & Co., and Goldstrom sat on McKinsey RTS's board of directors.  McKinsey RTS was formed by McKinsey & Co., McKinsey Holdings, and McKinsey US and their respective executives to fraudulently obtain bankruptcy engagements. The many disqualifying connections that McKinsey RTS unlawfully failed to disclose include connections of McKinsey & Co. and McKinsey US; and many individuals who were in fact employed by McKinsey & Co., McKinsey US, or another subsidiary of McKinsey & Co. performed work as part of the "McKinsey RTS teams" for the Chapter 11 bankruptcies at issue in this litigation.  Further, McKinsey & Co. initiated the "pay-to-play" scheme through which it offered commercial bribes to certain bankruptcy attorneys (which McKinsey RTS failed to disclose to the various bankruptcy courts in which it sought employment).  Accordingly, there can be no question (and at a bare minimum, there is a strong inference) that McKinsey & Co., McKinsey US, and McKinsey

Holdings each agreed to further the unlawful scheme described in Count 1, given that they each clearly had knowledge of the scheme and each facilitated and directly engaged in it.

### B. Count 3: McKinsey & Co., McKinsey US, McKinsey Holdings, and McKinsey RTS

547.  With respect to the unlawful scheme described above in Count 3, Defendants McKinsey & Co., McKinsey US, McKinsey Holdings, and (beginning in or about 2010) McKinsey RTS each  agreed to further the scheme, as demonstrated by, *inter alia,* the following facts: a) they each knew of the illegal activity—specifically, that McKinsey US and McKinsey RTS were not fully and truthfully disclosing McKinsey's connections and disqualifying conflicts of interest as required under Rule 2014, and McKinsey entities and employees were committing numerous RICO predicate acts in support of the scheme; and b) they each facilitated and engaged in the illegal activity described in Count 3.

548.  As described above in Count 3, the RICO predicate acts alleged in Count 3 were performed by McKinsey & Co., McKinsey US, McKinsey Holdings, McKinsey RTS and/or one or more of the individual Defendants (Barton, Sternfels, Proshan, Garcia, Goldstrom, Carmody, and Yerian), each of whom was a McKinsey & Co., McKinsey US, and/or McKinsey RTS employee. In the *Hayes*, *UAL*, *Mirant*, and *Lyondell* bankruptcies, McKinsey US knowingly and corruptly filed false declarations attested to by McKinsey US employees; and in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, McKinsey RTS knowingly and corruptly filed false declarations attested to by McKinsey & Co. employees, including Carmody and Goldstrom, who were Senior Partners of McKinsey & Co., and Yerian, who was a Partner of McKinsey & Co. Additionally, McKinsey RTS's President at all times was Garcia, at all relevant times was a Senior Partner of McKinsey & Co. and who served on the MIO's from approximately 2006 to 2017.  The

many disqualifying connections that McKinsey US and McKinsey RTS unlawfully failed to disclose included connections to Interested Parties by McKinsey & Co., McKinsey US, and other McKinsey subsidiaries; current and former McKinsey employees; and MIO and its investments. Further, individuals who were in fact employed by other McKinsey entities, including, *inter alia*, McKinsey & Co. and McKinsey US, performed work as part of the "McKinsey RTS team" for nine of the Chapter 11 bankruptcies at issue in this litigation.  Additionally, McKinsey & Co. initiated the "pay-to-play" scheme through which it offered commercial bribes to certain bankruptcy attorneys (which McKinsey RTS failed to disclose to the various bankruptcy courts in which it sought employment).  Accordingly, there can be no question (and at a bare minimum, there is a strong inference) that McKinsey & Co., McKinsey US, McKinsey Holdings, and McKinsey RTS each agreed to further the unlawful scheme described in Count 3, given that they each clearly had knowledge of the scheme and each facilitated and/or directly engaged in it.

### C.  Counts 1 through 3: Individual Defendants

549.    Garcia agreed to further the unlawful schemes described above in Counts 1 through 3, as demonstrated by the fact that he clearly had knowledge of and facilitated and authorized the unlawful endeavors with respect to at least the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies.  At the time of each of those bankruptcies, Garcia was both President of McKinsey RTS and a longtime Senior Partner of McKinsey & Co.; and from approximately 2006 to 2017 Garcia sat on the board of directors of MIO, McKinsey's investment arm whose connections McKinsey RTS has unlawfully failed to disclose in its bankruptcies.  As President of McKinsey RTS, Garcia was aware of and responsible for McKinsey RTS's engagements—including its conflicts checks and disclosures of conflicts and Interested Party connections—in the nine Chapter 11 bankruptcies in which McKinsey RTS has been engaged since its formation.  Indeed, the detail

for McKinsey RTS's fee applications in the *Edison Mission* bankruptcy show that Proshan consulted with Garcia regarding McKinsey RTS's disclosures.  As a longtime Senior Partner of McKinsey & Co. and a member of MIO's board, Garcia knew that McKinsey had many connections and disqualifying conflicts of interest which were being unlawfully concealed or omitted from McKinsey RTS's filings.  Accordingly, there can be no question (and at a bare minimum, there is a strong inference) that Garcia agreed to further the unlawful schemes described in Counts 1 through 3, as he was clearly aware of the unlawful behavior and facilitated and/or directly engaged in it at least with respect to the nine Chapter 11 bankruptcies for which McKinsey RTS has been hired; and Garcia agreed to, and played a key role in, the commission of numerous RICO predicate acts described in Counts 1 through 3, beginning at least with the *Harry & David* bankruptcy.

550.    Carmody agreed to further the unlawful schemes described in Counts 1 through 3, as demonstrated by the fact that he clearly had knowledge of and authorized, facilitated and directly engaged in the unlawful endeavors with respect to at least the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies. At the time of those bankruptcies, Carmody was an executive of McKinsey RTS as well as a partner at McKinsey & Co.  Moreover, Carmody had prior work experience at AP and thus was well aware of the requirements of Rule 2014.  Despite knowing what Rule 2014 required, Carmody knowingly filed thirteen false and misleading declarations in the *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn* bankruptcies.  Further, the detail for McKinsey's fee applications in *AMR* and *SunEdison* reveals that Carmody played a key role in those matters, including with respect to McKinsey RTS's disclosures.  For instance, McKinsey's fee applications in *AMR* reveal that Carmody (then an Executive Vice President at McKinsey & Co.) personally billed 1,350.2 hours on that matter, generating $962,515 in fees, and Proshan corresponded with

210

Carmody regarding Goldstrom's disclosure declaration.   In *SunEdison*, McKinsey RTS's fee applications reveal that Carmody billed dozens of hours to that matter in a management role as a Practice Leader.   As an executive of both McKinsey RTS and McKinsey & Co., and as the declarant in *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn*, Carmody knew that McKinsey US and McKinsey RTS had connections and disqualifying conflicts of interest that they were failing to disclose.   Accordingly, there can be no question (and at a bare minimum, there is a strong inference) that Carmody agreed to further the unlawful schemes described in Counts 1 through 3, as he was clearly aware of the unlawful behavior and authorized, facilitated, and directly engaged in it at least with respect to the eight aforementioned bankruptcies; and Carmody agreed to, and played a key role in, the commission of multiple RICO predicate acts as described in Counts 1 through 3.

551.   Goldstrom agreed to further the unlawful schemes described in Counts 1 through 3, as demonstrated by the fact that he clearly had knowledge of and authorized and facilitated the unlawful endeavors with respect to at least all of McKinsey RTS's nine bankruptcies, he and directly engaged in the unlawful endeavors with respect to at least the *Harry & David*, *AMR*, *AMF Bowling*, and *SunEdison* bankruptcies.   At the time of each of those bankruptcies, Goldstrom was a McKinsey RTS board member and a Senior Partner at McKinsey & Co.   As an experienced bankruptcy practitioner, Goldstrom was well aware of the requirements of Rule 2014.   Despite knowing what Rule 2014 required, Goldstrom knowingly filed at least ten false and misleading disclosure declarations in *Harry & David* and *AMR*.   Moreover, the detail of McKinsey RTS's fee applications in *AMF Bowling* and *SunEdison* reveal that Goldstrom provided guidance regarding McKinsey RTS's disclosures in those matters.   As an executive of both McKinsey RTS and McKinsey & Co., and as the declarant in *Harry & David* and *AMR*, Goldstrom knew that McKinsey

US and McKinsey RTS had connections and disqualifying conflicts of interest that they were failing to disclose.  Accordingly, there can be no question that Goldstrom agreed to further the unlawful schemes described in Counts 1 through 3, as he was clearly aware of the unlawful behavior, authorized and facilitated it, and  directly engaged in it; and Goldstrom agreed to, and played a role in, the commission of multiple RICO predicate acts as described in Counts 1 through 3, beginning at least with the *Harry & David* bankruptcy.

552.    Proshan agreed to further the unlawful schemes described in Counts 1 through 3, as demonstrated by the fact that she clearly had knowledge of and facilitated and directly engaged in the unlawful endeavors at least with respect to the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies. Proshan, who is a Senior Vice President and Associate General Counsel to McKinsey & Co., also furnishes in-house legal services to McKinsey RTS, and knowingly participated in and supervised the drafting of materially false and incomplete Rule 2014(a) submissions by McKinsey RTS and McKinsey US in the aforementioned matters.  At all relevant times, Proshan was an experienced in-house attorney and was well aware of the requirements of Rule 2014.  Despite knowing what Rule 2014 required, Proshan knowingly prepared, supervised, and caused to be filed multiple false and misleading affidavits in the aforementioned bankruptcies.  The detail for McKinsey's fee applications in *AMR*, *AMF Bowling*, and *Edison Mission* show that Proshan was the key person involved in preparing McKinsey US's and RTS's disclosures in those cases, and McKinsey RTS's fee applications for *SunEdison* and *GenOn* show that Proshan provided guidance regarding McKinsey RTS's disclosures in those matters as well.  While McKinsey RTS's fee applications for *NII Holdings*, *Standard Register*, and *Alpha Natural Resources* do not indicate who prepared its disclosures for those cases or how they were prepared, it is highly likely that Proshan prepared

and/or provided guidance regarding those unlawful disclosures as well, particularly given the detailed time entries showing Proshan driving that process in *AMR*, which preceded those matters, and her continued involvement in *SunEdison* and *GenOn*, which post-date those matters. Proshan also discussed McKinsey RTS's disclosures in *Alpha Natural Resources* with Carmody and others in which Proshan and Carmody acknowledged the requirements of Rule 2014 and agreed that they would find ways to circumvent that rule in preparing McKinsey RTS's disclosures in the proceeding. As an experienced attorney at both McKinsey RTS and McKinsey & Co., Proshan knew that McKinsey US and McKinsey RTS had connections and disqualifying conflicts of interest that they were failing to disclose. Accordingly, there can be no question that Proshan agreed to further the unlawful schemes described in Counts 1 through 3, as she was clearly aware of the unlawful behavior and facilitated and directly engaged in it at least with respect to the bankruptcies beginning with *AMR*.

553.    Sternfels agreed to further the unlawful schemes described in Counts 1 through 3, as demonstrated by the fact that he clearly had knowledge of and authorized and facilitated the unlawful endeavors with respect to at least the nine bankruptcies in which McKinsey RTS was engaged, and he directly engaged in the unlawful endeavors with respect to at least the *SunEdison* bankruptcy. At all relevant times, Sternfels was a Senior Partner of McKinsey & Co. and had a significant degree of executive authority over McKinsey RTS's bankruptcy consultancy activities. Sternfels became aware of the unlawful nature of McKinsey's scheme no later than September 2014, when Alix explained to Sternfels and Barton the illegality of McKinsey's conduct and its failure to comply with Rule 2014 in bankruptcies filed prior to that date. Despite this knowledge of the illegality of the scheme, Sternfels (to whom Garcia reported) knowingly caused, encouraged, and allowed the illegal scheme to continue in the bankruptcies in which McKinsey RTS was

subsequently hired.  At no time did Sternfels take any steps to stop the unlawful scheme or to ensure that McKinsey RTS complied with the law.  Indeed, the detail for McKinsey RTS's fee application for the *SunEdison* case reflects that Sternfels had substantial involvement in that matter in a managerial capacity, including work regarding McKinsey RTS's insufficient and unlawful Rule 2014 disclosures in that case.  Moreover, Sternfels' time entries in *SunEdison* show that he participated in multiple communications (including what appear to be one-on-one telephone calls) with former SunEdison CEO Chatila, with whom Sternfels had an undisclosed prior connection and with whom Sternfels likely engaged in an unlawful *quid pro quo* obtaining Chatila post-bankruptcy employment in exchange for Chatila's acquiescence in McKinsey's concealment of voidable preferences through its "re-invoiced" and "round-trip" payments scheme.  Accordingly, there can be no question (and at a bare minimum, there is a strong inference) that Sternfels agreed to further the illegal schemes described in Counts 1 through 3, given that he authorized and facilitated the schemes beginning at least with the *Harry & David* matter; he clearly knew about the schemes and authorized,  facilitated, and directly engaged in the schemes, beginning at least by September 2014; and that Sternfels agreed to, and played a key role in, the commission of multiple RICO predicate acts, including those in connection with McKinsey RTS's continued filing of false declarations in bankruptcies filed beginning at least by September 2014 and including through his direct involvement in *SunEdison*.

554.    Barton agreed to further the unlawful schemes described in Counts 1 through 3, as demonstrated by the fact that he clearly had knowledge of and authorized, facilitated, and directly engaged in the unlawful endeavors at least with respect to the nine bankruptcies in which McKinsey RTS was engaged.  From 2009 through mid-2018, Barton was Managing Partner of McKinsey & Co. and, given his senior-most executive position at McKinsey, had ultimate executive authority

over McKinsey's bankruptcy consultancy activities as well as the other corporate and individual Defendants in this litigation. Barton became aware of the unlawful nature of McKinsey's scheme no later than September 2014, when Alix explained to Sternfels and Barton the illegality of McKinsey's conduct and its failure to comply with Rule 2014 in bankruptcies filed prior to that date. Despite this knowledge of the illegality of the schemes, and despite making unequivocal promises to Alix that he would stop McKinsey's schemes, Barton personally engaged in efforts to mislead Alix and to fraudulently deflect and delay Alix's attempts to remediate McKinsey's bankruptcy consulting practices. Barton knowingly caused, encouraged, and allowed the illegal schemes to continue in the bankruptcies in which McKinsey RTS was subsequently hired. At no time did Barton take any steps to stop the unlawful schemes or to ensure that McKinsey RTS complied with the law. To the contrary, Barton actively misled Alix in order to prevent Alix from acting and to buy McKinsey RTS more time to engage in its unlawful schemes. Accordingly, there can be no question that Barton agreed to further the illegal schemes described in Counts 1 through 3, given that he clearly knew about the schemes and authorized and facilitated them, and directly engaged in them, beginning at least by September 2014; and Barton agreed, and played a key role in, the commission of multiple RICO predicate acts, including those in connection with McKinsey RTS's continued filing of false declarations in bankruptcies beginning at least in September 2014.

555.    By and through each of the Defendants' close business and employment relationships with one another, and their close coordination with one another in the affairs of McKinsey RTS, the Count 2 Enterprise, and/or the Count 3 Enterprise, each Defendant knew the nature of each of these enterprises and each Defendant knew that these enterprises extended beyond their own individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to commit predicate acts,

including those set forth above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

556.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the affairs of McKinsey RTS, the Count 2 Enterprise, and/or the Count 3 Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). In particular, each Defendant was a knowing, willing, and active participant in one or more of the three Enterprises and its affairs, and each of the Defendants shared a common purpose and agreed to further the same overall objective, namely, the orchestration, planning, perpetuation, and execution of the unlawful schemes to victimize AP.

557.    Further evidence of an agreement among Defendants is peculiarly within the knowledge and control of Defendants.

558.    The participation and agreement of each Defendant was necessary to allow the commission of this pattern of racketeering activity.  Specifically, Carmody, Goldstrom, Yerian, McKinsey US, and McKinsey RTS played key roles by filing false and unlawful declarations; Proshan played a key role by preparing false and unlawful declarations; Sternfels, Garcia, Proshan, Goldstrom, and Carmody all provided guidance regarding the false declarations; and Barton, Sternfels Garcia, Goldstrom, Carmody, and the entity Defendants all authorized the schemes. McKinsey & Co., McKinsey US, McKinsey Holdings, McKinsey RTS, Garcia, Barton and Sternfels also played key roles because they all had knowledge of the unlawful scheme and given their executive authority over the affairs of McKinsey US and/or McKinsey RTS and their respective employees and executives, the schemes would not have been allowed to continue without their consent and active encouragement and participation.

### D. Vicarious Liability

559.    To the extent any one or more of the entity Defendants (McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS) is not directly liable for conspiring to violate RICO's substantive provisions in violation of 18 U.S.C. § 1962(d), they are vicariously liable for the Section 1962(d) violations of the other Defendants.

560.    Each of the predicate acts by Barton, Sternfels, Garcia, Carmody, Goldstrom, Yerian, and Proshan was committed within the scope of those individuals' employment, officership, or directorship positions at or agency relationship with McKinsey & Co.   Each of these individuals was a high-level member of McKinsey & Co.'s management, and each committed and aided and abetted the commission of RICO predicate acts as described above.  The predicate acts were each committed in furtherance of a scheme intended to and which did in fact benefit McKinsey & Co. and its subsidiaries by obtaining fees for bankruptcy engagements from which McKinsey entities were disqualified.  Accordingly, McKinsey & Co. is vicariously liable for the RICO violations of the individual Defendants herein with respect to Counts 1 through 4.

561.    Each of the predicate acts by Barton, Sternfels, Garcia, Carmody, Goldstrom, Yerian, and Proshan was committed within the scope of those individuals' employment, officership, or directorship positions at or agency relationship with McKinsey RTS.  Garcia, Proshan, Carmody, Goldstrom, and Yerian, in particular, were each high-level members of McKinsey RTS's management.  Each of the individual Defendants either participated directly in and aided and abetted the commission of predicate acts as described above.  The predicate acts were each committed in furtherance of schemes intended to and which did in fact benefit McKinsey RTS and its corporate parents by obtaining fees for bankruptcy engagements for which it was disqualified.  Accordingly, McKinsey RTS is vicariously liable for the RICO violations of each the individual Defendants herein.

562.    McKinsey & Co. orchestrated the scheme through its subsidiaries, McKinsey Holdings and McKinsey US, which in turn orchestrated the scheme through McKinsey RTS, and through various other McKinsey subsidiaries.    Accordingly, McKinsey & Co., McKinsey Holdings, and McKinsey US are each vicariously liable for RICO violations by their indirect or direct subsidiaries.

### E.  Causation and Damages

563.    As a direct and proximate result of violations of 18 U.S.C. § 1962(d) by Defendants, AP suffered an immediate and direct injury from the Defendants' racketeering activity.  Specifically, AP suffered the loss of property related to the restructuring assignments it would have acquired, and the profits flowing therefrom, had the Defendants not implemented their schemes and acquired for McKinsey US McKinsey RTS restructuring assignments for which it was not qualified through their violations of Rule 2014 and related predicate acts.

564.    As described in Counts 1 through 3, *supra*, given AP's 25% share in the market for high-end bankruptcy consulting services, absent Defendants' willfully criminal conduct, AP would have obtained at least 25% of the work on the bankruptcies that McKinsey US and McKinsey RTS obtained in connection with Defendants' misconduct.  As described in Counts 1 and 2, *supra*, in paragraphs 383 and 447, in addition to AP's position as a market leader, due to specific circumstances surrounding the *Hayes Lemmerz*, *Mirant*, *Lyondell AMF Bowling GenOn*, *Alpha Natural Resources*, *Standard Register*, *NII Holdings*, and *Edison Mission* bankruptcies, AP's chances of obtaining the work assigned to McKinsey US and McKinsey RTS in those cases were effectively 100% had McKinsey US and McKinsey RTS been disqualified in those cases.

565.    AP's damages include, but are not limited to, fees from bankruptcy consulting engagements that AP would have earned in the absence of Defendants' criminal conduct; other lost business opportunities (including pre- and post-bankruptcy work); and attorneys' fees and

costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

566.    It was a foreseeable, natural, direct, and intended consequence of Defendants' schemes that McKinsey US and McKinsey RTS would obtain more restructuring assignments (for which they were not qualified) and AP would receive fewer.  There are no independent factors that account for AP's injury, nor is that injury in any way derivative of any injury to any Interested Party.  No immediate victim is better situated than Plaintiff to sue—and indeed Defendants' misconduct has been brought to light solely because of Plaintiff's efforts—nor is there any risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violations.

567.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Alix, as assignee of AP, is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

568.    Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), Alix, as assignee of AP, is entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

**FIFTH CAUSE OF ACTION**
BREACH OF CONTRACT
*Against McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS*

569.    Alix repeats and realleges paragraphs 1 through 568 as if fully set forth herein.

570.    McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS (the "**Count 5 Defendants**"), through Barton, and AP, through Alix, entered into a binding, valid, and enforceable contract pursuant to which (a) the Count 5 Defendants, on the condition that Barton were to be reelected as McKinsey & Co.'s Managing Partner in or about January 2015, would remove Garcia, Carmody, Goldstrom, and other senior managers from their positions at McKinsey RTS within thirty days of Barton's reelection; cause McKinsey to withdraw from its active

engagements due to its conflicts of interest;  and exit the bankruptcy consulting business by the end of March 2015 and for at least the duration of the duration of Barton's new term as Managing Partner, in exchange for (b) AP's forbearance from instituting legal action against Defendants on account of their unlawful activity as described herein.

571.    AP has performed and complied with its obligations under the contract by forbearing from legal action against Defendants.

572.    Following Barton's re-election as Managing Partner of McKinsey & Co. in January 2015, there were no unsatisfied conditions precedent to the Count 5 Defendants' performance of their obligations under the contract.

573.    The Count 5 Defendants materially breached the contract by failing to dissolve McKinsey RTS and by continuing to offer consulting services to debtors in bankruptcy.

574.    As a direct and proximate result of the breach of contract by the Count 5 Defendants, AP has been damaged, including, *inter alia*, the loss of fees from bankruptcy engagements unlawfully secured or maintained by McKinsey RTS subsequent to October 2014. The amount of damages will be proven at trial.

### SIXTH CAUSE OF ACTION
PROMISSORY ESTOPPEL
*Against McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS*

575.    Alix repeats and realleges paragraphs 1 through 574 as if fully set forth herein.

576.    This Sixth Cause of Action is pled in the alternative to the Fifth Cause of Action, *supra*.

577.    On or about October 16, 2014, McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS (the "**Count 6 Defendants**"), through Barton, clearly and unambiguously promised AP that they would dissolve McKinsey RTS because of its unlawful activity, and cease

providing bankruptcy consulting services to debtors in bankruptcy commencing in or about January 2015.

578.    In reliance on the Count 6 Defendants' promise, AP refrained from commencing litigation against McKinsey and the other Defendants herein seeking redress for McKinsey's unlawful bankruptcy practices and illegal means of competition against AP.

579.    AP's reliance on the Count 6 Defendants' promise was reasonable and foreseeable.

580.    The Count 6 Defendants breached their promise by failing to dissolve McKinsey RTS and by failing to cease providing bankruptcy consulting services to debtors in bankruptcy commencing after January 2015.

581.    AP is entitled to equitable relief enjoining the Count 6 Defendants to honor their promise.  Additionally, as a direct and proximate result of its reliance on the Count 6 Defendants' promise and their breach of same, AP has been damaged, including, *inter alia*, the loss of fees from bankruptcy engagements unlawfully secured or maintained by McKinsey RTS subsequent to October 2014.  The amount of damages will be proven at trial.

### SEVENTH CAUSE OF ACTION
TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
UNDER VIRGINIA LAW
*Against McKinsey, McKinsey Holdings,
McKinsey US, and McKinsey RTS*

582.    Alix repeats and realleges paragraphs 1 through 581 as if fully set forth herein.

583.    AP had an expectancy that it would be retained by Alpha Natural Resources and/or AMF Bowling Worldwide, Inc. ("**AMF Bowling**") to provide bankruptcy consulting services in connection with their respective bankruptcy proceedings in the United States Bankruptcy Court for the Eastern District of Virginia in Richmond, Virginia.

584.    McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS (the "**Count 7 Defendants**") each knew that AP offered bankruptcy consulting services in high-end

bankruptcy proceedings and likely would have been retained by one or both of Alpha Natural Resources and/or AMF Bowling.  In addition to AP's position as a market leader, *AMF Bowling* involved a market in which AP employees at the time had deep and broad-ranging experience that made AP extremely well-suited to advise the debtors.  At the time, AP's professional team included the leading consultant in the bowling industry, and thus AP's relevant industry experience made it the clear and logical next choice if McKinsey was disqualified.

585.     The Count 7 Defendants, acting individually or in concert, intentionally interfered with this expectancy by knowingly and intentionally concealing their disqualifying conflicts of interest in order to secure engagements for McKinsey RTS from Alpha Natural Resources and AMF Bowling and thereby depriving AP of those engagements.

586.     The Count 7 Defendants, acting individually or in concert, used improper means or methods to interfere with AP's expectancy, including, without limitation, the materially false, misleading, and incomplete submissions set forth in Exhibit B hereto, in violation of 11 U.S.C. § 327(a), Federal Rule of Bankruptcy Procedure 2014(a), and 18 U.S.C. §§ 152(2)- (3), and 1343.

587.     The wrongful conduct underlying this cause of action occurred in the Commonwealth of Virginia, where McKinsey RTS filed false and misleading disclosures in the *Alpha Natural Resources* and *AMF Bowling* bankruptcies.

588.     As a direct and proximate result of violations of the Count 7 Defendants' tortious interference with AP's business expectancies, AP has been injured in its business or property, suffering damages in an amount to be determined at trial.  AP's damages include, but are not limited to, fees from bankruptcy consulting engagements AP would have earned in the absence of the Count 7 Defendants' unlawful conduct; other lost business opportunities; and attorneys' fees and costs,

including attorneys' fees and costs associated with exposing and prosecuting the Count 7 Defendants' tortious activities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

(a)  General and compensatory damages according to proof at trial;

(b)  Treble damages pursuant to 18 U.S.C. § 1964(c);

(c)  Necessary and appropriate injunctive relief, including an injunction requiring full compliance by McKinsey RTS, McKinsey & Co., McKinsey Holdings, McKinsey US, and/or any other McKinsey affiliate with 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014(a) in any ongoing bankruptcy proceedings in the United States (including the territories and possessions thereof) and any future such proceedings in which they may seek retention as a professional;

(d)  Disgorgement of all moneys received by Defendants as a result of their unlawful activities;

(e)  An award of Plaintiffs' reasonable attorneys' fees and costs and expenses, pursuant to 18 U.S.C. § 1964(c);

(f)  Punitive damages;

(g)  Prejudgment interest; and

(h)  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: New York, New York
September 4, 2018

BOIES SCHILLER FLEXNER LLP

By: /s/ *Sean F. O'Shea*
Sean F. O'Shea (soshea@bsfllp.com)
Michael E. Petrella (mpetrella@bsfllp.com)
575 Lexington Avenue
7th Floor
New York, New York 10022
Tel: (212) 446-2300
Fax: (212) 446-2350

*Attorneys for Plaintiff*

224