# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAY ALIX,<br><br>*Plaintiff*,<br><br>-against-<br><br>MCKINSEY & CO., INC.; MCKINSEY HOLDINGS, INC.; MCKINSEY & COMPANY INC. UNITED STATES; MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC; DOMINIC BARTON; KEVIN CARMODY; JON GARCIA; SETH GOLDSTROM; ALISON PROSHAN; ROBERT STERNFELS; and JARED D. YERIAN,<br><br>*Defendants*. | No. 18-CV-04141(JMF) |

**JOINT DECLARATION OF
STEVEN RHODES, JUDITH FITZGERALD,
LOIS R. LUPICA, AND JOHN A. E. POTTOW**

## Table of Contents

I.      Biographical Information ................................................................1

        A.      Steven Rhodes .........................................................................1

        B.      Judith Fitzgerald.......................................................................3

        C.      Lois R. Lupica...........................................................................5

        D.      John A. E. Pottow .....................................................................6

II.     Introduction....................................................................................8

III.    McKinsey's Rule 2014 Disclosure Declarations
        Are Deficient in Numerous Ways ................................................16

        A.      McKinsey's Boilerplate Nondisclosures......................................17

        B.      Client Confidentiality and
                Disclosure by Category..............................................................20

        C.      McKinsey's Investigations of Its Connections
                Were Incomplete and Deficient ..................................................25

        D.      McKinsey's Connections with
                Competitors of Its Chapter 11 Clients ........................................30

        E.      McKinsey's Work for Its
                Connections on "Unrelated Matters"...........................................31

        F.      Past Clients...............................................................................31

        G.      Waivers ....................................................................................32

IV.     McKinsey's Additional Disqualifying
        Actual Conflicts of Interest in
        *Alpha Natural Resources*, *SunEdison* and *GenOn*.....................33

        A.      Alpha Natural Resources ............................................................33

        B.      SunEdison .................................................................................35

        C.      GenOn ......................................................................................36

V.      The "Pay for Play" Scheme Was Likely Disqualifying............................37

VI.     Conclusion ....................................................................................38

WE, STEVEN RHODES, JUDITH FITZGERALD, LOIS R. LUPICA, and JOHN A. E. POTTOW, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct to the best of our knowledge, information and belief and that if called to testify, each is competent to testify as follows:[1]

## I. Biographical Information

### A. *Steven Rhodes*

1.      I have been retained by the Plaintiff as an expert in connection with the above-captioned litigation.  I express opinions based on my actual knowledge and information of the type reasonably relied on by experts that was provided to me to enable me to form my opinions.  I express my opinions to a reasonable degree of professional certainty based on the information available to me.  My professional background and experience are detailed in my curriculum vitae, a true and accurate copy of which is attached as Appendix A to this declaration.  I submit this declaration in support of Plaintiff's Amended Complaint in the above-captioned proceeding.

2.      I received my Bachelor of Science in Mechanical Engineering from Purdue University in 1970, and my Juris Doctor from the University of Michigan Law School in 1972.

3.      After a clerkship for the Honorable John Feikens, United States District Judge, Eastern District of Michigan, I served as an Assistant United States Attorney for the Eastern District of Michigan.  After several years in private practice, I was appointed as a United States Magistrate Judge for the Eastern District of Michigan in 1981.

---

[1]      With respect to this Section I, each individual signatory hereto only verifies the statements in his or her subsection.

Joint Declaration
September 4, 2018

4.      I was appointed as a United States Bankruptcy Judge, Eastern District of Michigan,

in 1985.  I served as Chief Judge of the United States Bankruptcy Court for the Eastern District of

Michigan from 2002 to 2009.  I served on the Bankruptcy Appellate Panel for the United States

Court of Appeals for the Sixth Circuit from 1997 to 2004 and from 2008 to 2011, and I was Chief

Judge of the Bankruptcy Appellate Panel from 2002 to 2004.  I also served as a visiting bankruptcy

judge in the Western District of Michigan, the Eastern District of Tennessee, and the District of

Colorado.  In July 2013, I was appointed by the Chief Judge of the Sixth Circuit Court of Appeals

to preside over the *City of Detroit* bankruptcy case, the largest municipal bankruptcy case in

history.

5.      I retired in 2015, after 33 years of service in the federal judiciary.  After my

retirement, I served as the City of Detroit Public Schools Transition Manager, an office created to

lead the City's public schools out of financial difficulty in the wake of the larger bankruptcy.  I

presently serve as a neutral for JAMS.

6.      I have presided over several large bankruptcies, including the following matters:

- *In re Addison Cmty. Hosp. Auth.*, No. 92-BK-02336 (Bankr. E.D. Mich.);

- *In re Apex Global Information Servs., Inc.*, No. 00-BK-42839 (Bankr. E.D. Mich.);

- *In re Buttermilk Towne Ctr., LLC*, No. 10-8036 (6th Cir. BAP);

- *In re Big Buck Brewery & Steakhouse, Inc.*, No. 07-BK-04213 (Bankr. E.D. Mich.);

- *In re City of Detroit*, No 13-BK-53846 (Bankr. E.D. Mich.);

- *In re Collins & Aikman Corp.*, No. 05-BK-55927 (Bankr. E.D. Mich.);

- *In re Glen Eden Hosp., Inc.*, No. 93-BK-50572 (Bankr. E.D. Mich.);

- *In re Key Plastics, LLC*, No. 00-BK-44478 (Bankr. E.D. Mich.);

- *In re Maislin Indus., U.S., Inc.*, No. 85-BK-0096 (Bankr. E.D. Mich.);

- *In re MCA Fin. Corp.*, No. 99-BK-42172 (Bankr. E.D. Mich.);

2

Joint Declaration
September 4, 2018

- *In re Mich. Interstate Rwy. Co., Inc.*, No. 84-BK-01043 (Bankr. E.D. Mich.);

- *In re Omega Door Co., Inc.*, No. 07-8047 (6th Cir. BAP);

- *In re Oxford Auto., Inc.*, No. 02-BK-41400 (Bankr. E.D. Mich.);

- *In re Oxford Auto., Inc.*, 04-BK-74377 (Bankr. E.D. Mich.);

- *In re Talon Auto. Grp., Inc.*, No. 01-BK-52629 (Bankr. E.D. Mich.);

- *In re United Trucking, Inc.*, No. 83-BK-04665 (Bankr. E.D. Mich.); and

- *In re U.S. Truck Co., Inc.*, No. 82-BK-03561 (Bankr. E.D. Mich.).

**B. *Judith Fitzgerald***

7.     I have been retained by the Plaintiff as an expert in connection with the above-captioned litigation.  I express opinions based on my actual knowledge and information of the type reasonably relied on by experts that was provided to me to enable me to form my opinions.  I express my opinions to a reasonable degree of professional certainty based on the information available to me.  My professional background and experience are detailed in my curriculum vitae, a true and accurate copy of which is attached as Appendix B to this declaration.  I submit this declaration in support of Plaintiff's Amended Complaint in the above-captioned proceeding.

8.     I received a B.S. in Psychology and a B.A in English Writing from the University of Pittsburgh, and a J.D. from the University of Pittsburgh School of Law.

9.     I served as a law clerk and then worked as an Assistant United States Attorney in the Western District of Pennsylvania, with a concentration in complex frauds and criminal tax cases before being appointed as a bankruptcy judge in 1987.

10.     I have more than twenty-five years' experience as a bankruptcy judge, including in the Western District of Pennsylvania, the District of Delaware, the Eastern District of Pennsylvania, and the U.S. Virgin Islands.  I was Chief Judge in the Western District of Pennsylvania for five years.

Joint Declaration
September 4, 2018

11.     I have presided over many significant bankruptcy cases, including the following:

- *In re Am. Pad & Paper Co.*, No. 00-BK-00066 (Bankr. D. Del.)

- *In re Armstrong World Indus.*, No. 00-BK-04471 (Bankr. D. Del.)

- *In re Busy Beaver Bldg. Ctrs.*, No. 90-BK-23924 (Bankr. W.D. Pa.)

- *In re Color Tile Inc.*, No. 96-BK-000749 (Bankr. D. Del.)

- *In re Combustion Eng'g, Inc.*, No. 03-BK-10495 (Bankr. D. Del.)

- *In re Dresser Indus.*, No. 03-BK-03072 (Bankr. W.D. Pa.)

- *In re Federal-Mogul Global*, No. 01-BK-10578 (Bankr. D. Del.)

- *In re Fleming Steel Co.*, No. 11-BK-22292 (Bankr. W.D. Pa.)

- *In re Flintkote*, No. 04-BK-12440 (Bankr. D. Del.)

- *In re Global Indus. Techs.*, No. 02-BK-21626 (Bankr. W.D. Pa.)

- *In re Innovative Commc'ns Corp.*, No. 06-BK-10133 (Bankr. D.V.I.)

- *In re Italian Oven*, No. 97-BK-21180 (Bankr. W.D. Pa.)

- *In re Just for Feet, Inc.*, No. 99-BK-04110 (Bankr. D. Del.)

- *In re Kaiser Aluminum Corp.*, No. 02-BK-10429 (Bankr. D. Del.)

- *In re Maronda Homes*, No. 11-BK-22422 (Bankr. W.D. Pa.)

- *In re MidValley*, No. 11-BK-13918 (Bankr. D. Del.)

- *In re N. Am. Refractories.*, No. 02-BK-20198 (Bankr. W.D. Pa.)

- *In re Owens Corning*, No. 00-BK-03837 (Bankr. D. Del.)

- *In re Peregrine Sys.*, No. 02-BK-12740 (Bankr. D. Del.)

- *In re PHP Healthcare Corp.*, No. 98-BK-02608 (Bankr. D. Del.)

- *In re Pittsburgh Corning Corp.*, No. 00-BK-22876 (Bankr. W.D. Pa.)

- *In re Shannopin Mining*, No. 91-BK-23513 (Bankr. W.D. Pa.)

Joint Declaration
September 4, 2018

- *In re Specialty Prods. Holding Corp.*, No. 10-BK-11780 (Bankr. D. Del.)

- *In re W.R. Grace*, No. 01-BK-01139 (Bankr. D. Del.)

- *In re U.S. Gypsum.*, No. 01-BK-02095 (Bankr. D. Del.)

- *In re U.S. Mineral Prods.*, No. 01-BK-02471 (Bankr. D. Del.)

- *In re WorldClass Processing, Inc.*, No. 98-BK-29986 (Bankr. W.D. Pa.)

12.     I am now in private practice at Tucker Arensberg, P.C. in Pittsburgh, Pennsylvania.

**C. *Lois R. Lupica***

13.     I have been retained by the Plaintiff as an expert in connection with the above-captioned litigation.  I express opinions based on my actual knowledge and information of the type reasonably relied on by experts that was provided to me to enable me to form my opinions.  I express my opinions to a reasonable degree of professional certainty based on the information available to me. My professional background and experience are detailed in my curriculum vitae, a true and accurate copy of which is attached as Appendix C to this declaration.  I submit this declaration in support of Plaintiff's Amended Complaint in the above-captioned proceeding.

14.     I received a B.S. in Consumer Economics from Cornell University in 1981 and a J.D. *magna cum laude* from Boston University School of Law in 1987.

15.     As the Maine Law Foundation Professor of Law at the University of Maine School of Law, I have taught, researched, and written on bankruptcy practice and procedure and legal ethics issues for over twenty years.  I was also a Resident Scholar at the American Bankruptcy Institute, where I served as an academic expert, in 2007 and 2014.  I am a fellow in the American College of Bankruptcy and a member of Board of Directors of the American Bankruptcy Institute.

Joint Declaration
September 4, 2018

16.     I am the author of numerous articles focusing on bankruptcy and legal ethics, and I

have written a casebook on bankruptcy law.  I have also written or contributed to a number of other

books in the field:

- DEVELOPING PROFESSIONAL SKILLS – BANKRUPTCY (with M. Howard) (2016);

- Smaller Practices and Consumer Debt Issues under the United States Bankruptcy Code, CONSUMER DEBT REPORT II REPORT OF FINDINGS AND RECOMMENDATIONS (published by the International Association of Restructuring, Insolvency and Bankruptcy Professionals) (2013);

- Recent First Circuit Developments in Consumer Bankruptcy, AMERICAN COLLEGE OF BANKRUPTCY CIRCUIT REVIEW 2013/2014; and

- BANKRUPTCY AND ITS IMPACT ON INTELLECTUAL PROPERTY – 2007 (published by the American Bankruptcy Institute) (L.R. Lupica, ed.).

17.     I also served as Co-Reporter (with Professor Nancy Rapoport) for the American

Bankruptcy Institute's National Ethics Task Force.  In that capacity, I, together with members of

the Task Force, carefully researched and examined the issue, among others, of the necessity of

disclosure of connections when professionals are seeking approval of employment in a bankruptcy

case.  I have also practiced law with the law firms of White & Case LLP, Arnold & Porter LLP,

and, more recently, Thompson & Knight LLP, in their bankruptcy practice group.

### D. *John A. E. Pottow*

18.     I have been retained by the Plaintiff as an expert in connection with the above-

captioned litigation.  I express opinions based on my actual knowledge and information of the type

reasonably relied on by experts that was provided to me to enable me to form my opinions.  I

express my opinions to a reasonable degree of professional certainty based on the information

available to me.  My professional background and experience are detailed in my curriculum vitae,

a true and accurate copy of which is attached as Appendix D to this declaration.  I submit this

declaration in support of Plaintiff's Amended Complaint in the above-captioned proceeding.

Joint Declaration
September 4, 2018

19.     I am the John Philip Dawson Collegiate Professor of Law at the University of

Michigan Law School.  On behalf of the United States, I serve on its insolvency delegation to the

United Nations Commission on International Trade Law (UNCITRAL).  I have published in

prominent legal journals in the United States and Canada, testified before Congress regarding

bankruptcy matters, and presented at academic conferences around the world.  I have also litigated

bankruptcy cases before the U.S. Supreme Court, including a successful pro bono argument on

behalf of the respondent in *Executive Benefits Insurance Agency v. Arkison* (2014).

20.     I joined the faculty at the University of Michigan Law School in 2003.  Before that, I

practiced bankruptcy law at several law firms, including Weil, Gotshal & Manges LLP of New

York and the former Hill & Barlow LLP of Boston.  My practice focused on debtor representation

in complex Chapter 11 restructurings.

21.     I hold an AB in psychology, *summa cum laude*, from Harvard College and a JD,

*magna cum laude*, from Harvard Law School, where I served as treasurer of the Harvard Law

Review.  I clerked for the Right Honorable Beverley McLachlin, Chief Justice of Canada, and the

Honorable Guido Calabresi, U.S. Court of Appeals for the Second Circuit.  I am licensed as a

barrister and solicitor in Ontario, Canada and as an attorney in Massachusetts and Michigan.  I am

a fellow of the American College of Bankruptcy and a member of the International Insolvency

Institute.

Joint Declaration
September 4, 2018

## II.   Introduction

22.     "Unprecedented" is the best way to describe the scope and scale of McKinsey's[2]

attempts to evade the requirements of Federal Rule of Bankruptcy Procedure 2014(a) ("**Rule 2014**"

or "**Rule 2014(a)**") to avoid disqualification under Section 327(a) of the Bankruptcy Code, 11

U.S.C. § 327(a).[3]   In our collective experience, we have never seen anything like it, nor have we

ever seen any reference to anything like it in the case law or in any secondary sources.   We have

seen many cases in which a professional has negligently, recklessly, or even intentionally failed to

disclose a connection.   But, in our collective experience, no professional has ever made the

conscious decision not to specifically identify *any* of its connections that Rule 2014 requires it to

identify as McKinsey did in its initial disclosures for its first eleven Chapter 11 bankruptcy cases

---

[2]     Unless otherwise noted, the term "McKinsey" refers collectively to McKinsey & Co., Inc. ("**McKinsey & Co.**"); McKinsey & Co., Inc. (US) ("**McKinsey US**"); and McKinsey Recovery and Transformation Services LLC (US) ("**McKinsey RTS**") and their respective affiliates.   Because McKinsey RTS and McKinsey US are units of McKinsey & Co., the connections that Rule 2014(a) requires McKinsey RTS and McKinsey US to disclose are the connections of McKinsey & Co., McKinsey RTS and McKinsey US in each case, as well as those of all of their other affiliates.   Accordingly, this declaration uses "McKinsey" to refer to McKinsey & Co., McKinsey RTS, and McKinsey US.

[3]     Section 327 of the Bankruptcy Code provides that professionals employed by a bankruptcy estate must be "disinterested persons" who "do not hold or represent an interest adverse to the estate."   11 U.S.C. § 327.   Bankruptcy Rule 2014, which is designed to facilitate compliance with Section 327, requires that an application for an order approving the employment of a professional "shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."   Fed. R. Bankr. P. 2014.   The term "disinterested person" is defined in Section 101(14) of the Bankruptcy Code as a person who:

> (A) is not a creditor, an equity security holder, or an insider;
>
> (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
>
> (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

Joint Declaration
September 4, 2018

and in nearly all of its disclosures for its first ten Chapter 11 cases.[4]  Nor has any other professional engaged in the kind of serial, large-scale obfuscation of connections (including the extremely belated disclosures of connections in McKinsey's most recent three cases) alleged throughout the Amended Complaint in this action.

23.     Moreover, there is *no* support in bankruptcy law for McKinsey's unique disclosure practices (or lack thereof) under Bankruptcy Rule 2014 and Section 327 of the Bankruptcy Code, including the inadequate, antiquated, and ineffective process for checking for connections that it described in its various disclosure affidavits and declarations; its practice of disclosing connections by category rather than by name; its claim that it (unlike all other bankruptcy professionals) is exempt from naming clients who are bankruptcy interested parties due to concerns of client confidentiality; its assertions that it need not identify any interested parties who are past rather than current clients or other connections; and (in some cases) its assertion that while it may have *actual* conflicts of interest, it would seek a waiver—a practice that simply is not permitted in Chapter 11 bankruptcy, as all actual conflicts of interest are *per se* disqualifying and nonwaivable.

24.     Under Section 327, bankruptcy courts are the gatekeepers for professionals seeking employment by the debtor in a Chapter 11 case.  The disclosure requirement of Bankruptcy Rule 2014 is the tool that enables bankruptcy courts to carry out their gatekeeping function by identifying and disqualifying professionals with conflicts of interest.  Rule 2014, when followed,

---

[4]     In eight of its first ten cases, McKinsey identified no connections to interested parties by name, apart from noting, in its initial disclosures in *Lyondell*, that a McKinsey US partner had had been employed by law firm that was an interested party some eight years earlier.  *See Lyondell*, Dkt. 2090 at 3 n.3.  In its first ten cases, McKinsey only identified connections by name on two occasions: in a supplemental affidavit in *UAL* submitted three months after McKinsey's initial disclosures, which belatedly identified ten interested parties as current McKinsey clients, *UAL*, Dkt. 1606-1 ¶ 3; and in a second supplemental declaration in *Harry David* noting that one interested party, Pension Benefit Guaranty Corporation, had been a McKinsey client some three years earlier, *Harry & David*, Dkt. 457 ¶ 4.

Joint Declaration
September 4, 2018

effectively creates a level playing field for qualified, disinterested professionals seeking employment in a Chapter 11 case, while preventing the retention of professionals who are disqualified due to divided loyalties.  By failing to fully disclose its connections and comply with Rule 2014, McKinsey improperly secured employment as a bankruptcy professional.  Assuming the truth of the facts in the Amended Complaint, after McKinsey was hired, McKinsey's concealed connections and adverse interests also caused further damage "downstream" to other parties.

25.     Although in each of McKinsey's cases the bankruptcy court entered an order approving McKinsey's employment, it is erroneous to suggest that the bankruptcy court in every case found that McKinsey's disclosure declarations complied with Rule 2014.  In fact, *no* order approving McKinsey's employment in any of McKinsey's cases specifically found that a McKinsey disclosure declaration complied with Rule 2014.  Indeed, it is impossible for bankruptcy courts to know whether a professional's disclosures are, in fact, complete and truthful.

26.     We have carefully reviewed the material allegations of the Amended Complaint in this action (including the exhibits thereto), as well as the disclosure declarations filed by McKinsey and related filings (including the orders approving McKinsey's employment) in each of the thirteen Chapter 11 bankruptcy matters referenced in the Amended Complaint.  In the first ten cases in which McKinsey was hired, each one of McKinsey's disclosure affidavits and declarations in those matters was grossly deficient.  Likewise, McKinsey's initial disclosure declaration in its eleventh case, *Alpha Natural Resources*, was also grossly deficient.  Assuming the truth of the facts alleged in the Amended Complaint, McKinsey's disclosure declarations in *SunEdison* and *GenOn* and its supplemental disclosure declarations in *Alpha Natural Resources* were also grossly deficient.  Moreover, assuming the truth of the facts alleged in the Amended Complaint regarding McKinsey's undisclosed connections to bankruptcy interested parties and other connections and

Joint Declaration
September 4, 2018

adverse interests,[5] many of those concealed conflicts and connections, if disclosed, would have been factors of disqualification as a bankruptcy professional in each of the thirteen Chapter 11 bankruptcy cases in which McKinsey has appeared.

27.     Any suggestion that applicants have no specific rules or guidance in how to comply with Rule 2014(a)'s disclosure requirements is also erroneous.  Rule 2014 requires bankruptcy professionals to "set[] forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."  Moreover, as the Amended Complaint asserts,[6] there is *uniform* case law that fills in Rule 2014's requirements with specificity and with a view toward carrying out the purposes of the Rule.

28.     It is axiomatic that the *process* that a bankruptcy professional employs to identify its connections must be exhaustive to be effective in identifying all of its connections.  As Section III.C below describes, in our respective opinions, as shown by the deficient disclosures that McKinsey made, McKinsey's process is inadequate to and ineffectual in identifying its connections.

29.     Bankruptcy professionals are not permitted to evade their Rule 2014 obligations to name *all* connections with interested parties by merely providing bare-bones information and then inviting the bankruptcy court and interested parties to seek further information from the bankruptcy professional regarding its connections.[7]  Neither Rule 2014 nor the extensive body of case law

---

[5]     *See, e.g.,* Am. Compl. ¶¶ 9-10, Ex. B.
[6]     *See, e.g.,* Am. Compl. ¶¶ 52-59.
[7]     Courts have interpreted the term "disinterested" broadly to exclude from employment as a bankruptcy professional for a Chapter 11 debtor any professional with any "interest or relationship that would even faintly color the independence and impartial attitude required by the Code."  *In re EH & P, Inc.*, 949 F.2d 1300, 1314 (3d Cir. 1991) (citation omitted).  *See also, e.g., In re Citation Corp.*, 493 F.3d

interpreting and applying it states or suggests that it is sufficient to simply provide a rough overview of a professional's connections and then to rely on others to shoulder the burdens of asking follow-up questions for more detail.  To the contrary, the very purpose of the disclosure declaration is to *answer* upfront all questions about a professional's qualifications to serve.[8]  Thus, it is erroneous to suggest that by giving parties an opportunity to ask questions about its connections, a bankruptcy professional has satisfied Rule 2014's requirement to *disclose* its connections.  It is also incorrect to suggest that Rule 2014(a) creates an obligation for the other parties to the bankruptcy matter to question or investigate disclosures made by bankruptcy professionals.  Rather, Rule 2014(a) squarely places the burden of compliance on the bankruptcy professional seeking employment; it is the bankruptcy professional who must thoroughly investigate and promptly disclose by name all of its connections.  There is no "burden-shifting" approach where the professional makes only a prima facie disclosure of general categories of interested parties and the other parties (and court) have to follow up when they consider knowledge of the related parties' identities to be important.[9]

_____

1313, 1315 (11th Cir. 2007) ("The bankruptcy court, not the professionals, must determine which prior connections rise to the level of an actual conflict or pose the threat of a potential conflict.  Therefore, the professional must disclose *all* of its previous contacts with any party in interest.") (emphasis added); *In re Gulf Coast Orthopedic Ctr.*, 265 B.R. 318, 323 (Bankr. M.D. Fla. 2001) ("Under the Rule the applicant and the professional must disclose all connections[.]") (citing *Halbert v. Yousif*, 225 B.R. 336 (E.D. Mich. 1998); *In re Keller Fin. Servs. of Fla., Inc.*, 243 B.R. 806 (Bankr. M.D. Fla. 1999); and *In re Granite Partners, L.P.*, 219 B.R. 22 (Bankr. S.D.N.Y 1998)).

[8]      *See, e.g.*, *In re Midway Indus. Contractors, Inc.,* 272 B.R. 651, 662 (Bankr. N.D. Ill. 2001) ("The disclosure in the Rule 2014 Affidavit must be explicit enough for the court and other parties to gauge whether the person to be employed is not disinterested or holds an adverse interest. . . .  The disclosures must be explicit and complete.  'Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient.'") (quoting *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991)).

[9]      *In re Matco Elecs. Grp., Inc.*, 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008) ("Fed.R.Bankr.P.2014 is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST, the court or other parties interest, and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure.").

Joint Declaration
September 4, 2018

30.     As a bankruptcy professional, McKinsey is required to self-report and disclose *all* of its connections anytime it chooses to seek employment as a bankruptcy professional for a debtor in a Chapter 11 bankruptcy case.[10]  McKinsey is required to disclose these connections fully and promptly at the outset of a matter so that the bankruptcy court can efficiently and effectively determine whether it is qualified to serve.[11]

31.     This disclosure obligation extends not only to the specific corporate entity retained as a bankruptcy professional (*e.g.*, McKinsey US or McKinsey RTS), but to all of McKinsey's affiliates (including McKinsey & Co. and its subsidiaries and affiliates; McKinsey Holdings, Inc.; McKinsey US; McKinsey RTS; and MIO Partners, Inc. ("**MIO**")) and each of those entities' employees, directors, and officers.[12]  Otherwise, a professional could evade the disclosure requirements of Rule 2014(a) by simply creating a new affiliate entity for each new bankruptcy engagement.

---

[10]     *See, e.g., Neben & Starrett, Inc. v. Chartwell Fin. Corp.* (*In re Park-Helena Corp.*), 63 F.3d 877, 882 (9th Cir. 1995); *In re Lee Way Holding*, 100 B.R. 950, 956 (Bankr. S.D. Ohio 1989) (The "requirement of full disclosure arises from the fiduciary obligation that [a professional] ultimately employed in a bankruptcy proceeding owes to the court.").

[11]     *See, e.g., Midway,* 272 B.R. at 662 ("A professional cannot usurp the court's function by choosing, *ipse dixit*, which connections impact disinterestedness and which do not.") (citation and internal quotation marks omitted).

[12]     *See In re Trust Am. Serv. Corp.*, 175 B.R. 413, 420 (Bankr. M.D. Fla. 1994) ("To ensure themselves no conflict existed with respect to related debtors, the duty was not solely limited to Coopers and Lybrand in Tampa, but was a duty of the whole organization of Coopers and Lybrand. Coopers and Lybrand had a duty to ensure themselves of no conflict with all departments and locations of its partnership."); *In re Gen. Wireless Operations Inc.*, 2017 WL 5404534, at *2 (Bankr. D. Del. Apr. 6, 2017) ("A & G Realty shall disclose any and all facts that may have a bearing on whether A & G Realty, its affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to the Debtors, their creditors, or other parties in interest.").

Joint Declaration
September 4, 2018

32.    This disclosure obligation includes not only present connections but also past connections which could reasonably have an effect on the bankruptcy professional's judgment in the case.[13]

33.    A bankruptcy professional must timely disclose all connections and is not permitted to "slow-walk" disclosures of connections over the course of a case in order to minimize their chances of being disqualified once they are entrenched in the case.[14]

34.    This disclosure obligation is ongoing for so long as a bankruptcy professional is retained in a matter, and bankruptcy professionals are required to fully and promptly disclose any new connections that arise during the pendency of a matter.[15]

35.    Under no circumstances is it sufficient for a bankruptcy professional to declare itself "disinterested" and aver that it does not hold or represent an interest adverse to the estate when that professional has not thoroughly investigated and fully disclosed all connections to interested parties.[16]

---

[13]    *See, e.g., Kagan v. Stubbe (In re San Juan Hotel Corp.)*, 239 B.R. 635, 647 (1st Cir. BAP 1999) ("Although an attorney need not disclose every past or remote connection with every party in interest, he must disclose those presently or recently existing, whether they are of business or personal in nature, which could reasonably have an effect on the attorney's judgment in the case.").

[14]    *Rome v. Braunstein*, 19 F.3d 54, 59 (1st Cir. 1994) ("Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed.R.Bankr.P. 2014(a), court-appointed counsel proceed at their own risk."); *In re Harris Agency, LLC*, 451 B.R. 378, 395 (Bankr. E.D. Pa.), *aff'd sub nom., In re The Harris Agency, LLC*, 462 B.R. 514 (E.D. Pa. 2011) (Professionals "must give full, updated, and timely disclosure to the court[.]"); *In re C & C Demo, Inc.*, 273 B.R. 502, 508 (Bankr. E.D. Tex. 2001) ("[T]he duty to disclose under Rule 2014 in a timely and complete fashion is placed solely upon the professional proposed to be employed under § 327[.]").

[15]    *In re GSC Grp., Inc.*, 502 B.R. 673, 725 (Bankr. S.D.N.Y. 2013) ("A professional's continuing disclosure of conflicts under Rule 2014(a) is necessary to preserve the integrity of the bankruptcy system and to ensure that professionals remain 'conflict free.'"); *Granite Partners*, 219 B.R. at 35 ("[S]ection 327(a) implies a duty of continuing disclosure, and requires professionals to reveal connections that arise after their retention.").

[16]    *See, e.g., In re Leslie Fay Cos.*, 175 B.R. 525, 537 (Bankr. S.D.N.Y. 1994) (professional may not "arrogat[e] to itself the decision as to whether it had a conflict of interest"); *In re Arlan's Dep't Stores, Inc.*,

Joint Declaration
September 4, 2018

36.     The Amended Complaint in this action alleges that in each of the thirteen Chapter

11 bankruptcy cases in which McKinsey has served as a bankruptcy professional, it has failed to

disclose numerous connections between McKinsey entities and their employees and bankruptcy

interested parties.[17]  Assuming those facts to be true, McKinsey's omission of its connections was

by itself, in each case, *highly* material because Rule 2014 required it to fully disclose all such

connections.  In some of those cases, McKinsey stated in its disclosure declarations that it could

not disclose its connections because of confidentiality obligations to McKinsey clients (which does

not excuse McKinsey's compliance with Rule 2014 but rather disqualifies it), despite the fact that,

according to the Amended Complaint, McKinsey acknowledges that it had express written

permission to make legally required disclosures.[18]  In other cases, according to the Amended

Complaint, McKinsey deliberately concealed many connections and conflicts while disclosing

others.[19]  In any event, assuming the truth of the facts alleged in the Amended Complaint, all the

declarations submitted on behalf of McKinsey in each bankruptcy were misleading in their

material omissions and in many cases, false in their explicit representations.  McKinsey's

declarations were materially misleading because they (1) were attempts to secure employment as

a bankruptcy professional in a Chapter 11 case by giving the appearance of Rule 2014 compliance

without actually complying; (2) misrepresented that client confidentiality was a sufficient reason

for non-disclosure (which it is not); and (3) gave the false impression that McKinsey had conducted

a searching and thorough inquiry into its connections and made a full an honest disclosure.  As a

result, in each case, McKinsey was in no position to declare under penalty of perjury that it was

---

615 F.2d 925, 932 (2nd Cir. 1979) (counsel may not make a "unilateral determination" of a connection's
relevance).
[17]     *See, e.g.,* Am. Compl. ¶¶ 9-13, Ex. A.
[18]     *See* Am. Compl. ¶¶ 78, 84.
[19]     *See id.* ¶¶ 207-210.

Joint Declaration
September 4, 2018

"disinterested" and did not hold or represent an interest adverse to the estate.  Its declarations so

stating, therefore, were false declarations.

37.     Finally, in the Chapter 11 bankruptcy context, an actual conflict is, without

exception, *per se* disqualifying; and no mitigation or waiver of such conflicts is permitted.[20]

Therefore, any attempt by McKinsey to "mitigate" its actual conflicts of interest by obtaining

waivers would have been unavailing.

## III.   McKinsey's Rule 2014 Disclosure Declarations are Deficient in Numerous Ways.

38.     Since 2001, McKinsey has been employed as a bankruptcy professional in thirteen

Chapter 11 bankruptcy matters:

a. *In re Hayes Lemmerz Int'l, Inc.*, No. 01-BK-11490 (Bankr. D. Del., filed Dec. 5, 2001) ("***Hayes Lemmerz***");

b. *In re UAL Corp.*, No. 02-BK-48191 (Bankr. N.D. Ill., filed Dec. 9. 2002) ("***UAL***");

c. *In re Mirant Corp.*, No. 03-BR-46590 (Bankr. N.D. Tex., filed on July 14, 2003) ("***Mirant***");

d. *In re Lyondell Chem. Co.*, No. 09-BK-10023 (Bankr. S.D.N.Y., filed Jan. 6, 2009) ("***Lyondell***");

e. *In re Harry & David Holdings, Inc.*, No. 11-BK-10884 (Bankr. D. Del., filed Mar. 28, 2011) ("***Harry & David***");

f. *In re AMR Corp.*, No. 11-BK-15463 (Bankr. S.D.N.Y., filed Nov. 29, 2011) ("***AMR***");

g. *In re AMF Bowling Worldwide, Inc.*, No. 12-BK-36495 (Bankr. E.D. Va., filed Nov. 13, 2012) ("***AMF Bowling***");

h. *In re Edison Mission Energy*, No. 12-BK-49219 (Bankr. N.D. Ill., filed Dec. 17, 2012) ("***Edison Mission***");

i. *In re NII Holdings, Inc.*, No. 14-BK-12611 (Bankr. S.D.N.Y., filed Sept. 15, 2014) ("***NII Holdings***");

---

[20]     *See, e.g.*, *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 476 (3d Cir. 1998); *Harris Agency*, 462 B.R. at 522.

Joint Declaration
September 4, 2018

> j.  *In re Standard Register Co.*, No. 15-BK-10541 (Bankr. D. Del., filed Mar. 12, 2015) ("***Standard Register***"); and
>
> k.  *In re Alpha Natural Resources, Inc.*, No. 15-BK-33896 (Bankr. E.D. Va., filed Aug. 3, 2015) ("***Alpha Natural Resources***");
>
> l.  *In re SunEdison, Inc.*, No. 16-BK-10992 (Bankr. S.D.N.Y., filed Apr. 21, 2016) ("***SunEdison***"); and
>
> m.  *In re GenOn Energy, Inc.*, No. 17-BK-33695 (Bankr. S.D. Tex., filed June 14, 2017) ("***GenOn***").

39.  As discussed below in detail, McKinsey's disclosure affidavits and declarations in those matters are deficient in numerous ways and do not meet the requirements of Rule 2014.

**A. *McKinsey's Boilerplate Nondisclosures***

40.  In McKinsey's first eleven Chapter 11 cases (*Hayes Lemmerz* through *Alpha Natural Resources*), its initial disclosure affidavits or declarations consistently concealed the specific identity of every connection that Rule 2014(a) required it to disclose.  McKinsey accomplished this by making a broad and vague statement that it had connections with parties in some category or categories of interested parties, but never disclosing the identities of any of those connections.[21]  McKinsey's disclosures in all of those cases, therefore, did not comply with Bankruptcy Rule 2014.

---

[21]   *See Hayes Lemmerz*, Dkt. 103-3 ¶ 8; *UAL* Dkt. 52-1 ¶¶ 14(b)-(d); *Mirant*, Dkt. 1457-1 ¶ 11; *Lyondell*, Dkt. 2090 ¶ 11(b); *Harry & David*, Dkt. 105-3 ¶¶ 7, 10; *AMR*, Dkt. 581 ¶ 17(a)-(d), (9), 23-27, 30; *AMF Bowling*, Dkt. 125 ¶¶ 19-20, 24; *Edison Mission*, Dkt. 175-3 ¶ 17(b)-(c); *NII Holdings*, Dkt. 153 ¶ 25(a)-(g), 25(k), 32; *Standard Register*, Dkt. 87-3 ¶ 24(a)-(e); *Alpha Natural Resources*, Dkt. 212 ¶ 20(a)-(i), 20(k)-(n); *see also Alpha Natural Resources*, Dkt. 865 (Supplemental Declaration of Kevin Carmody, filed November 9, 2015) ¶ 7 (admitting, but failing to identify, further connections to interested parties). Additionally, in its first ten cases (*Hayes Lemmerz* through *Standard Register*), McKinsey also failed, in its supplemental disclosures, to disclose the identities of any of the connections referenced in its initial disclosure affidavits and declarations.  *See Hayes Lemmerz*, Dkt. 365 (Supplemental Affidavit of Richard K. Sykes, dated February 13, 2002); *Hayes Lemmerz*, Dkt. 479 (Second Supplemental Affidavit of Richard K. Sykes, dated March 13, 2002); *UAL*, Dkt. 1606 (Supplemental Affidavit of Nikolaus D. Semaca, filed February 27, 2003); *Harry & David*, Dkt. 208 (Supplemental Declaration of Seth Goldstrom, filed March 28, 2011); *Harry & David*, Dkt. 457 (Second Supplemental Declaration of Seth Goldstrom, filed June 17, 2011); *AMR*, Dkt. 697 (Supplemental Declaration of Seth Goldstrom, filed January 20, 2012); *AMR*, Dkt.

Joint Declaration
September 4, 2018

41.     The Amended Complaint in this action also describes how, in the *Alpha Natural Resources* bankruptcy, despite filing multiple supplemental disclosure declarations and a court order compelling it to comply with Rule 2014, McKinsey knowingly failed to disclose (or to timely disclose) a large number of connections and conflicts of interests, with more likely unknown at this time.[22]  Similarly, the Amended Complaint describes how, in the *SunEdison* bankruptcy, McKinsey had a large number of undisclosed connections in many of the classes of creditors of SunEdison, with more likely unknown at this time.[23]  The Amended Complaint further describes how, in *GenOn*, McKinsey RTS submitted declarations that failed to disclose and otherwise concealed or falsely denied McKinsey's connections to dozens of interested parties.[24]  Assuming those facts to be be true, McKinsey RTS's concealment of those undisclosed connections in the *Alpha Natural Resources*, *SunEdison* and *GenOn* cases violated Bankruptcy Rule 2014(a).

42.     Similarly, each of McKinsey's initial disclosure affidavits or declarations in all of its cases contains the following boilerplate language, in some instances with minor variations, generically admitting that McKinsey may have had connections with virtually all conceivable kinds of interested parties:

> McKinsey US may in the past have been retained by, may presently be retained by, and may in the future perform services for, entities that are determined to be creditors, lenders, shareholders, insurers,

---

1468 (Second Supplemental Declaration of Seth Goldstrom, filed February 27, 2012); *AMR*, Dkt. 2695 (Third Supplemental Declaration of Seth Goldstrom, filed May 10, 2012); *AMR*, Dkt. 5344 (Fourth Supplemental Declaration of Seth Goldstrom, filed November 13, 2012); *AMR*, Dkt. 6896 (Fifth Supplemental Declaration of Seth Goldstrom, filed February 28, 2013); *AMR*, Dkt. 7697 (Sixth Supplemental Declaration of Seth Goldstrom, filed April 18, 2013); *Edison Mission*, Dkt. 756 (First Supplemental Declaration of Jared D. Yerian, filed May 15, 2013); *Edison Mission*, Dkt. 1615 (Second Supplemental Declaration of Jared D. Yerian, filed November 22, 2013); *NII Holdings*, Dkt. 196 (Supplemental Declaration of Kevin Carmody, filed November 6, 2014).

[22]     *See* Am. Compl. ¶¶ 162-192.

[23]     *See* Am. Compl. ¶¶ 214-217.

[24]     *See* Am. Compl. ¶¶ 279.

Joint Declaration
September 4, 2018

> customers, competitors, vendors, contract counterparties, or otherwise Interested Parties with respect to the Debtors' bankruptcy estates.[25]

43.     Additionally, in many of its cases, McKinsey's initial disclosure affidavits or declarations contained some variation of the following boilerplate language:

> Similarly, certain members of McKinsey may have business associations with certain of the Debtors' creditors or other Interested Parties herein, or interests adverse to such creditors or Interested Parties herein[.][26]

44.     These admissions are extraordinary in both their breadth and in their imperious disdain to elaborate.  McKinsey admitted that it may have provided consulting services for any of the interested parties and that it may have had business associations with them.  Yet, its initial disclosure affidavits and declarations never disclosed the specific identity of even a single such connection, foisting this burden onto the other parties, the United States Trustee or the busy bankruptcy courts.  This practice violates Rule 2014(a).[27]

---

[25]     *See Hayes Lemmerz*, Dkt. 103-3 (Declaration of Richard K. Sykes, filed Dec. 27, 2001) ¶¶ 8, 11; *UAL*, Dkt. 52-1 (Declaration of Gerhard J. Bette, filed Dec. 9, 2002 ¶¶ 12, 14c, and 19; *Mirant*, Dkt. 1457-1 (Declaration of Kenneth J. Ostrowski, filed Oct. 27, 2003) ¶ 11; *Lyondell*, Dkt. 2090 (Declaration of Thomas Hundertmark, filed June 26, 2009) ¶¶ 9, 17; *Harry & David*, Dkt. 105-3 (Declaration of Seth Goldstrom, filed Apr. 4, 2011) ¶ 11; *AMR*, Dkt. 581 (Declaration of Seth Goldstrom, filed Jan. 10, 2012) ¶ 17d; *AMF Bowling*, Dkt.125 (Declaration of Kevin Carmody, filed Nov. 21, 2012) ¶ 19; *Edison Mission*, Dkt. 175-3 (Declaration of Jared D. Yerian, filed Dec. 28, 2012) ¶ 21; *NII Holdings*, Dkt. 153 (Declaration of Kevin Carmody, filed Oct. 23, 2014) ¶¶ 18, 26, 35; *Standard Register*, Dkt. 87-3 (Declaration of Kevin M. Carmody, filed Mar. 23, 2015) ¶¶ 25, 33; *Alpha Natural Resources*, Dkt. 212 (Declaration of Kevin Carmody, filed Aug. 24, 2015) ¶ 29; *SunEdison*, Dkt. 202 (Declaration of Mark W. Hojnacki, filed May 5, 2016) ¶ 55; *GenOn*, Dkt. 123-2 (Declaration of Kevin M. Carmody, filed June 23, 2017) ¶ 58.

[26]     *See Hayes Lemmerz*, Dkt. 103-3 ¶ 8; *UAL*, Dkt. 52-1 ¶ 12; *Mirant*, Dkt. 1457-1 ¶ 11; *Lyondell*, Dkt. 2090 ¶ 9; *AMR*, Dkt. 581 ¶ 19; *AMF Bowling*, Dkt. 125 ¶ 21; *Edison Mission*, Dkt. 175-3 ¶ 18; *NII Holdings*, Dkt. 153 ¶ 27; *Standard Register*, Dkt. 87-3 ¶ 26.

[27]     *See, e.g., Leslie Fay*, 175 B.R. at 537 (finding violations of Rule 2014 where "boilerplate language to the effect that Weil Gotshal may have in the past represented, currently represents, and may in the future represent entities which are claimants of the debtors" failed to disclose relationship with a significant creditor; "[b]y not disclosing its connection with Forstmann [a significant creditor] Weil Gotshal caused the court to skip over an area which deserved some attention"); *see also, e.g., In re Matco Eleccs. Grp., Inc.*, 383 B.R. 848, 850 (Bankr. N.D.N.Y. 2008); *In re Filene's Basement, Inc.*, 239 B.R. 845, 847 (Bankr.

Joint Declaration
September 4, 2018

**B.   *Client Confidentiality and Disclosure by Category***

45.     Neither the language of Rule 2014 nor the case law applying it permits, supports, or justifies a bankruptcy professional like McKinsey listing or referring to its connections to interested parties by category rather than by name (*e.g.*, by stating that the professional has a connection to an unspecified "Major Competitor" or "Secured Creditor"). [28]

46.     In its disclosure affidavits and declarations, McKinsey attempted to justify its practice by claiming that its other clients did not permit it to disclose their specific identities.  For example:

> a. In *UAL*, *Mirant*, and *Lyondell*, McKinsey US stated: "Because of its responsibility to maintain strict client confidentiality, McKinsey US cannot disclose the services performed, or even in some instances the fact that services were provided for clients."[29]
>
> b. In all of its cases, McKinsey stated that it serves each of its clients "in a manner that protects the confidentiality of each client's information[.]"[30]  In

---

D. Mass. 1999); *Granite Partners*, 219 B.R. at 28; *In re Southmark Corp.*, 181 B.R. 291, 293 (Bankr. N.D. Tex. 1995).

[28]     *See, e.g.*, *Alpha Natural Resources*, Dkt. 2895 (Order Compelling McKinsey "to Comply with the Requirements of Bankruptcy Rule 2014," Dkt. 2895, filed July 1, 2016) at 2 ("Generally, Bankruptcy Rule 2014 requires professional persons to disclose their connections by name.").

[29]     *UAL*, Dkt. 52-1 ¶ 19; *Mirant*, Dkt. 1457-1 ¶ 16; *Lyondell*, Dkt. 2090 ¶ 17; *cf. Hayes Lemmerz*, Dkt. 103-3 ¶ 9 ("McKinsey has a long-standing policy of serving competing companies and does so in a manner that protects the confidentiality of each client's information.  Thus, McKinsey does not have in place any centralized conflicts identification process.").

[30]     *Hayes Lemmerz*, Dkt. 103-3 ¶ 9; *UAL*, Dkt 52-1 ¶ 13; *Mirant*, Dkt. 1457-1 ¶ 12; *Lyondell*, Dkt. 2090 ¶ 10; *Harry & David*, Dkt. 105-3 ¶ 9; *AMR*, Dkt. 581 ¶ 19; *AMF Bowling*, Dkt. 125 ¶ 21; *Edison Mission*, Dkt. 175 ¶ 18; *NII Holdings*, Dkt. 153 ¶ 26; *Standard Register*, Dkt. 87-3 ¶ 25; *Alpha Natural Resources*, Dkt. 212 ¶ 21; *SunEdison*, Dkt. 202 ¶ 55; *GenOn*, Dkt. 123-2 ¶ 58.

Joint Declaration
September 4, 2018

*Harry & David* and in all of its subsequent cases, McKinsey added that it also protects "the confidentiality of the engagement itself[.]"[31]

c.   In *Alpha Natural Resources*, McKinsey RTS stated in its Third Supplemental Declaration that it had "reviewed its confidentiality obligations to each of its clients identified as a Major Stakeholder or Major Competitor" and that clients who had not provided McKinsey RTS with their consent to disclose their names were referred to as "confidential clients."[32]

d.   In *SunEdison*, McKinsey RTS stated that for each client it promises that "it will 'not make public client names, client materials, or reports prepared for clients without their permission' and (ii) to the extent it becomes involved in a legal action, McKinsey RTS will, 'where permitted by law, advise you promptly [of such legal action] and work with you and your legal counsel to respond appropriately to any disclosures regarding such client that may be prompted by the proceedings of such legal action."[33]

e.   In *GenOn*, McKinsey RTS referred to various connections that were interested parties in that matter as "confidential clients" of McKinsey, without naming those clients.  Specifically, McKinsey RTS stated that "affiliates of a confidential client" were contractual counterparties of the

---

[31]   *Id.*

[32]   *Alpha Natural Resources*, Dkt. 2464 ¶ 12.  McKinsey further stated that "one confidential client was a Major Stakeholder; "two confidential clients" were Major Competitors; "[o]ne confidential client" was a "Major Competitor' of debtors' that accounted for more than 1% of McKinsey's annual gross revenue in the prior year. *Id.* ¶¶ 9, 13(xviii)-(xix).

[33]   *SunEdison*, Dkt. 484 ¶ 31 (alteration in original).

Joint Declaration
September 4, 2018

debtor; "a confidential client" of McKinsey RTS was an interested party who accounted for more than 1% of McKinsey RTS's gross annual revenue as of May 2017.[34]

47.     The case law makes it clear that it is not permissible for bankruptcy professionals to refuse to disclose a connection by name on the ground that the professional feels a responsibility to maintain client confidentiality.[35]  Private contracts, however profitable for the professional service provider, do not and cannot supersede the disclosure requirements of the Bankruptcy Code and Rules when that professional seeks judicial approval for service to a bankruptcy estate.[36] Indeed, professionals in all disciplines related to the law already have obligations to clients to retain confidentiality.  Yet, when seeking bankruptcy court approval for their retentions, they honor their disclosure obligations under Rule 2014, which take necessary priority.  The Bankruptcy Code and rules require the applicant to make full disclosure and impose no undue burden on anyone to discover and disclose those connections.

48.     In fact, McKinsey has only actually litigated the issue of whether it is permitted to disclose connections by category rather than by name in one case, *Alpha Natural Resources*.  That bankruptcy court ruled *against* McKinsey, holding: "Generally, Bankruptcy Rule 2014 requires professional persons to disclose their connections by name."  *Alpha Natural Resources*, Dkt. 2895 (Order Compelling McKinsey "to Comply with the Requirements of Bankruptcy Rule 2014," filed

---

[34]     *GenOn*, Dkt. 123 ¶¶ 32, 64.
[35]     *See, e.g.*, *Alpha Natural Resources*, Dkt. 2895 at 2.
[36]     *See, e.g.*, *In re Diamond Mortg. Corp. of Ill.*, 135 B.R. 78, 90 (Bankr. N.D. Ill. 1990) ("In addition, certain conflicts that a client could waive after full disclosure outside of the bankruptcy context, such as simultaneous representation of the client and client's creditor, are prohibited by the Bankruptcy Code itself from being waived."); *In re Project Orange*, 431 B.R. 363, 374 (Bankr. S.D.N.Y. 2010) ("an agreement between [the firm] and GE, *i.e.*, the Conflicts Waiver, cannot trump the requirements of section 327(a)").

Joint Declaration
September 4, 2018

July 1, 2016) at 2.  In that Order, the bankruptcy court further emphasized: "There are no different standards of disclosure for lawyers and other professional persons."  (*Id*.)

49.     Moreover, by its own admission, McKinsey's assertion that it is obligated to maintain the confidentiality of its clients in the context of Rule 2014 disclosures is false.  As the Amended Complaint alleges, McKinsey has admitted that its confidentiality agreements with its clients contain an exception for legal compliance.[37]  By way of example, McKinsey's Amended and Restated Agreement with Alpha Natural Resources, dated August 3, 2015, stated:

> ***Confidential Information shall not include information that*** is or becomes publicly available, is already known to McKinsey RTS through means not involving a breach by any party of an obligation to keep such information confidential, is independently acquired by McKinsey RTS or ***is legally required to be disclosed***.

*Alpha Natural Resources*, Dkt. 212, Ex. A at 3 (emphasis added).

50.     Because McKinsey had express authorization from its clients to disclose confidential information when legally required, its representations to the bankruptcy courts in the Chapter 11 cases that it was obligated not to disclose its clients' identities were false.  If McKinsey perceives that its responsibility of confidentiality to existing and prior clients overrides its obligation to the court to comply with its disclosure requirements of Rule 2014(a), its only option is to decline the engagement that the Chapter 11 debtor has requested of it.

51.     More importantly, McKinsey's coyness and subterfuge are wholly unnecessary.  The Bankruptcy Code has a specific mechanism and process for the protection of confidential commercial information.  Section 107 states:

> (a) Except as provided in subsections (b) and (c) and subject to section 112, a paper filed in a case under this title and the dockets of

---

[37]     *See* Am. Compl. ¶¶ 84.

Joint Declaration
September 4, 2018

> a bankruptcy court are public records and open to examination by
> an entity at reasonable times without charge.
>
> (b) On request of a party in interest, the bankruptcy court shall, and
> on the bankruptcy court's own motion, the bankruptcy court may—
>
> (1) protect an entity with respect to a trade secret or confidential
> research, development, or commercial information[.]

11 U.S.C. § 107; *see also* Fed. R. Bankr. P. 9018.

52.     Yet, in the Chapter 11 cases in which it has been retained as a professional,
McKinsey has never sought relief under Section 107(b) by motion or otherwise.  Instead, in several
of McKinsey's disclosure declarations, it has simply asserted its alleged need to maintain the
confidentiality of its clients.  That is likely because any such request under Section 107 would
almost certainly fail.  No caselaw supports a blanket exception for "client confidentiality" as
justifying a default practice of withholding interested party identity.  This is unsurprising.
Granting such relief would undermine one of the major purposes of Rule 2014(a) – to give the
parties and the public confidence in the integrity of the bankruptcy process.

53.     The United States Trustee holds a position that enables it to review every Rule 2014
disclosure filed in every case.  We note the statement of the United States Trustee in his May 3,
2016 Motion to Compel in *Alpha Natural Resources*: "McKinsey RTS, to the U.S. Trustee's
knowledge, is the only professional firm claiming contractual confidentiality as a blanket shield
from, and superior to, the disclosure requirements applicable to every bankruptcy professional."
*Alpha Natural Resources*, Dkt. 2308 at 13.  In our collective experience, we have likewise never
seen any professional firm claim "contractual confidentiality as a blanket shield from, and superior
to, the disclosure requirements applicable to every bankruptcy professional."  *Id*.

24

Joint Declaration
September 4, 2018

### C. *McKinsey's Investigations of Its Connections Were Incomplete and Deficient.*

54.     As indicated by its own declarations, McKinsey's investigations into its connections to bankruptcy interested parties have been incomplete.

55.     For example, in the disclosure declaration that it submitted in the *UAL* case, McKinsey US stated:

- "McKinsey has initiated, although not yet completed, the following steps in order to make the representations contained herein:" *UAL*, Dkt. 52-1 ¶ 14.

- "Responses have been received from most but not all of those management group members of whom inquiry was made" *Id.* ¶ 14(b).

- "McKinsey has examined a list of all of its significant clients, that is, those that represented greater than 1% of McKinsey's revenues over the last year[.]" *Id.* ¶ 14(d).

- "McKinsey sent a memo to its over 100 North American-based directors as well as to the leaders of its Travel & Logistics, Banking & Securities, and Insurance practices . . .  McKinsey is still in the process of collecting responses to this inquiry." *Id.* ¶ 15.

56.     McKinsey US similarly admitted in its disclosure affidavits in *Hayes Lemmerz* and *Mirant* that its investigations were incomplete in those matters.[38]

57.     Similarly, in *Lyondell*, McKinsey US stated:

- McKinsey US asked "approximately 100 of its partners in its petroleum, chemicals and private equity practices about whether it currently provides consulting services to other entities that focus on any direct commercial relationship or transaction with the Debtors and determined that it is not currently providing any such services." *Lyondell*, Dkt. 2090 ¶ 11(a).

---

[38]     *See, e.g., Hayes Lemmerz*, Dkt. 105-3 ¶ 10 (stating that McKinsey had investigated its connections with "*significant* shareholders," "*major* secured creditors," "*major* bondholders," and "*significant* lessors") (emphasis added); *Mirant*, Dkt. 1457 ¶ 13 (stating that McKinsey had "initiated, although not yet completed" a search); *id.* ¶ 13(d) "McKinsey has examined a list of its significant clients, that is, those that represented greater than 1% of McKinsey's revenues over the last year").

Joint Declaration
September 4, 2018

- "McKinsey US compared a list of its clients, during the prior three years, that represented greater than 1% of McKinsey US's revenues in any such year, with the Searched Parties." *Id.* ¶ 11(b).

- "McKinsey US conducted an inquiry among the leading partners in the relevant practices to determine whether there had been any historic projects that focused on a direct commercial relationship or transaction with the Debtors." *Id.* ¶ 12.

58.    Nothing in Rule 2014(a) justifies McKinsey's limiting its investigation into its disclosable connections to "100 partners" in the relevant practice, or to clients "that represented greater than 1% of McKinsey US's revenues," or to "leading partners in the relevant practices." To comply with the requirements of Rule 2014(a), McKinsey should have made that inquiry of *all* of its partners in all of its affiliates regarding all of its connections.[39] Nor does anything permit an applicant to limit its search to "direct commercial relationship[s] or transactions with the Debtor." These restrictions, qualifications, and thresholds are not part of existing law and whether or not they may become of interest to Congress or the Supreme Court in future amendments to Rule 2014, nothing in the current law even remotely allows parties to intentionally arrogate to themselves the authority to make these sorts of compliance "self-screens."

59.    Beginning with *Harry & David*, filed in 2011, McKinsey did not actually disclose the extent to which its investigations were completed. Its new practice became to first disclose the inquiries that McKinsey RTS had made by email and then to preface its disclosure by stating: "Based on these searches . . . ."[40] By this obfuscation, McKinsey stopped disclosing even the

---

[39]    *See, e.g., In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987) (A professional seeking employment by a bankruptcy estate and the resulting benefits "has a responsibility to leave no reasonable stone unturned" when investigating and disclosing potential connections under Rule 2014); *In re Miners Oil Co., Inc.*, 502 B.R. 285, 302 (Bankr. W.D. Va. 2013) ("any close or debatable issue ought to be resolved in favor of disclosure") (quotation omitted).

[40]    *See Harry & David*, Dkt. 105-3 ¶¶ 6-7; *AMR*, Dkt. 581 ¶¶ 16, 17 (stating that "McKinsey RTS emailed the RTS Team"); *AMF Bowling*, Dkt. 125 ¶ 17; *Edison Mission*, Dkt. 175-3 ¶ 16; *NII Holdings*, Dkt. 153 ¶¶ 23-24; *Standard Register*, Dkt. 87-3 ¶¶ 22-23; *Alpha Natural Resources*, Dkt. 212 ¶¶ 19-20; *SunEdison*, Dkt. 202 ¶¶ 24-25; *GenOn*, Dkt. 123 ¶¶ 27-28.

Joint Declaration
September 4, 2018

extent of the responses that it received to its inquiries about its connections and, as a result, whether

its investigations were complete, as required.

60.     In the *Alpha Natural Resources* case, McKinsey made the extraordinary admission

that its investigation into its potential connections was inadequate and incomplete:

> McKinsey RTS did not seek information as to whether any
> employee of McKinsey RTS or its affiliates or member of his/her
> immediate family: (a) indirectly owns, through a public mutual fund
> or through partnerships in which certain employees have invested
> but as to which such professionals have no control over or
> knowledge of investment decisions, securities of the Debtors; or (b)
> has engaged in any ordinary course consumer transaction with any
> party in interest.[41]

61.     Additionally, although McKinsey has recently stated that it has a "global client

database,"[42] McKinsey has also claimed that it "does not have in place any centralized conflicts

identification process."[43]

62.     The Amended Complaint alleges that McKinsey has made the conscious decision

not to create an efficient and modern conflicts identification process in order to create an "excuse"

for its failure to comply with Rule 2014(a).[44]   In our collective experience, that is a more than

reasonable inference.  For instance, the webpage for McKinsey's "McKinsey Digital" unit states:

> Our Operations practice assists our clients in solving complex
> operational challenges.  Blending strategic thinking with hands-on
> practicality, our teams of consultants and experts work to develop
> and implement operational strategies that solve our clients' most
> critical problems.

---

[41]     *Alpha Natural Resources*, Dkt. 212 at 16 n.7.
[42]     *NII Holdings*, Dkt. 153 ¶¶ 23; *Standard Register*, Dkt. 87-3 ¶¶ 22; *Alpha Natural Resources*, Dkt.
212 ¶ 19; *SunEdison*, Dkt 202 ¶24; *GenOn*, Dkt 123-3 ¶ 27.
[43]     *See Hayes Lemmerz*, Dkt. 105-3 ¶ 9; *UAL*, Dkt. 52-1 ¶ 13; *Mirant*, Dkt. 1457 ¶ 12; *Lyondell*, Dkt.
2090 ¶ 10; *Harry & David*, Dkt. 105-3 ¶ 9; *AMR*, Dkt. 581 ¶ 20; *AMF Bowling*, Dkt. 125 ¶ 22; *Edison
Mission*, Dkt. 175-3 ¶ 19; *NII Holdings*, Dkt. 153 ¶ 28; *Standard Register*, Dkt. 87-3 ¶ 27; *Alpha Natural
Resources*, Dkt. 212 ¶ 23; *SunEdison*, Dkt. 202 ¶ 57.
[44]     *See* Am. Compl. ¶¶ 62.

27

Joint Declaration
September 4, 2018

> Responding to the digital challenge that companies now face on a global scale, the McKinsey Operations Practice is seeking to leverage digital efforts and bring them to the next level. The Digital Operations group combines strategic thinking and technology expertise to deliver accelerated outcomes."[45]

63.     If McKinsey can bring such robust technology to bear for its clients, then there appears to be no reason why it cannot do so for itself when it seeks to serve as a bankruptcy professional. Instead, McKinsey has decided to rely on a process of sending out hundreds or even thousands of emails and then waiting for responses. This "email system" places the burden on each email recipient to understand the importance of compliance with bankruptcy law's requirement to disclose and update connections and to act on the request. But many of the email recipients are likely not familiar with the Bankruptcy Code and rules and lack an understanding of the importance of the request. Thus the "email system" of connection identification may result in an inadequate response or no response at all from individual recipients. Further, without an examination of response rates and detailed tracking, it is impossible to know whether a failure to respond is indicates a denial of a conflict or simply an unread email. All of this strongly suggests that the process of discovering connections using an "email system" is bound to result in McKinsey's non-compliance with the disclosure requirements of Rule 2014.

64.     Similarly, because McKinsey's primitive system of checking for conflicts by email fails to email all necessary parties, it cannot produce comprehensive and meaningful responses. For example, in the *GenOn Energy* bankruptcy, McKinsey RTS stated in its initial disclosure declaration that it had emailed unspecified "members of McKinsey RTS" and "partners at its affiliates worldwide that provide consulting services."[46] At a minimum, McKinsey thereby

---

[45]     https://www.mckinsey.com/careers/search-jobs/jobs/consultant-digital-strategy-industry-40-8660.
[46]     *GenOn*, Dkt. 123-2 ¶ 27. McKinsey RTS does not specify how many members or partners it emailed as part of its search or how they were selected.

Joint Declaration
September 4, 2018

inexcusably excluded the MIO and all other McKinsey non-"consulting" affiliates from the scope

of its search.

65.     Additionally, the Amended Complaint alleges that McKinsey, through MIO, has

held substantial investments in interested parties in multiple bankruptcies which McKinsey has

consistently failed to disclose.[47]  Assuming the truth of those allegations, McKinsey's failure to

disclose those connections violated Rule 2014 and prevented the bankruptcy court and interested

parties from accurately assessing whether McKinsey was qualified to serve.  Had McKinsey fully

disclosed those connections, it could (and likely would) have been disqualified in each instance.

66.     McKinsey's decision not to create an adequate conflicts identification process is in

stark contrast to the decision made by every other professional who seeks employment subject to

Section 327(a) and who understands the necessity of complying with Rule 2014(a).

67.     A related justification that McKinsey offered in its early declarations was that "it is

difficult if not impossible in the current time frame for McKinsey US to directly ascertain whether

any of its over 1000 current clients are Interested Parties and whether McKinsey US provides or

may have been asked to provide services which focus on a direct commercial relationship or

transaction with the Debtors."[48]  However, Rule 2014(a) allows no exception to its disclosure

obligations if disclosure is "difficult if not impossible."  If McKinsey cannot comply with Rule

2014(a), then it should not apply for professional restructuring work in Chapter 11 cases.  In

addition, McKinsey's statement that it is difficult or impossible for it to identify its connections

cannot be reconciled with McKinsey's hollow assurances to the bankruptcy courts, discussed in

paragraphs 58 and 58 above, that "all such services are or will be focused on matters other than

---

[47]     *See* Am. Compl. ¶¶ 113-118.
[48]     *See Hayes Lemmerz*, Dkt. 103-3 ¶ 9; *UAL*, Dkt. 52-1 ¶ 13; *Lyondell*, Dkt. 2090 ¶ 10; *Harry & David*, Dkt. 105-3 ¶ 9.

Joint Declaration
September 4, 2018

existing commercial relationships or transactions between such companies and the Debtors." McKinsey cannot verifiably make that assurance without knowing the identities of its connections.[49]  But even if it could credibly make that assurance, Rule 2014 requires McKinsey to disclose connections, not to give assurances.

### D.  *McKinsey's Connections with Competitors of Its Chapter 11 Clients*

68.     In its disclosure affidavits and declarations, McKinsey has repeatedly indicated that it provides services for the debtors' competitors, while failing to identify those competitors by name—let alone precisely how McKinsey would fulfill its fiduciary obligations to the debtor while also serving those unnamed competitors.[50]  However, Rule 2014(a) permits no exceptions to its strict requirement that a professional must disclose all of its connections.

69.     As a bankruptcy professional, McKinsey is required to disclose the nature of the work that it does for competing companies.  Only through those disclosures can a bankruptcy court determine and monitor McKinsey's qualifications under Section 327(a).  McKinsey's disclosure declarations do not comply with this requirement.  The importance of this requirement is well-illustrated in the example of McKinsey's concealment of its connection to United States Steel, a competitor of the debtor in the *Alpha Natural Resources* case, discussed in Section IV.A. below.

---

[49]     In any event, it is likely that at some point, McKinsey recognized that this excuse had no credibility; it dropped it after the *Harry & David* case and no longer asserts it.

[50]     *See UAL*, Dkt. 52-1 ¶¶ 3, 12; *Mirant*, Dkt. 1457-1 ¶ 11; *Lyondell*, Dkt. 2090 ¶ 9; *AMR*, Dkt. 581 ¶¶ 13, 7(d), 19; *AMF Bowling*, Dkt. 125 ¶ 21; *Edison Mission*, Dkt. 175-3 ¶¶ 5, 18; *NII Holdings*, Dkt. 153 ¶¶ 4, 26-27; *Standard Register*, Dkt. 87-3 ¶¶ 25-27; *Alpha Natural Resources*, Dkt. 212 ¶¶ 3-4, 20(b)-(d), 20(f)-(g), 20(i), 20(l), 21, 23; *SunEdison*, Dkt. 202 ¶ 32 ("one confidential client"); *id.* ¶¶ 55, 57; *GenOn*, Dkt. 123 ¶¶ 58, 60.

Joint Declaration
September 4, 2018

### E. *McKinsey's Work for Its Connections on "Unrelated Matters."*

70. When addressing McKinsey's work for bankruptcy interested parties, McKinsey's disclosure declarations fairly uniformly attempt to justify its failure to identify McKinsey's connections by stating: "[A]ll such services are or will be focused on matters other than existing commercial relationships or transactions between such companies and the Debtors."[51]

71. However, under Section 327(a) and Rule 2014(a), the bankruptcy court, and not McKinsey, has the responsibility to determine whether all of McKinsey is qualified to serve and to consider whether its "services are or will be focused on matters other than existing commercial relationships or transactions between such companies and the Debtors." McKinsey cannot merely assert that its relationships with interested parties do not disqualify it under Section 327(a) or shift the burden of ascertaining the nature of its connections to other parties and their identities, in lieu of actually identifying the professional's connections by name. McKinsey must state its connections affirmatively and specifically so that anyone looking at its disclosure can determine who its connections are, why they are connections, and whether any connections should be disqualifying.

### F. *Past Clients*

72. In many cases, McKinsey has asserted in its disclosure declarations that its "inquiry revealed that McKinsey US previously provided services to parties concerning their commercial

---

[51]   *See Hayes Lemmerz*, Dkt. 103-3 ¶¶ 8, 11; *UAL*, Dkt. 52-1 ¶ 12; *Lyondell*, Dkt. 2090 ¶ 9; *Harry & David*, Dkt. 105-3 ¶¶ 7, 12; *AMR*, Dkt. 581 ¶¶ 17, 23, 30; *AMF Bowling*, Dkt. 125 ¶¶ 18, 19, 20, 27; *Edison Mission*, Dkt. 175-3 ¶ 17; *NII Holdings*, Dkt. 153 ¶ 25; *Standard Register*, Dkt. 87-3 ¶ 24; *Alpha Natural Resources*, Dkt. 212 ¶ 20.

Joint Declaration
September 4, 2018

relations with the Debtors or possible transactions with certain of the Debtors.  Those engagements

have concluded[.]"[52]

73.    Again however, nothing in Rule 2014(a) justifies McKinsey's refusal to disclose a

connection just because it asserts that its relationship with that connection has "concluded."  It is

for the bankruptcy court, not the professional, to determine whether a concluded relationship is

disqualifying under Section 327(a).

### G.    *Waivers*

74.    In *UAL*, McKinsey US stated:

> In addition, it is possible that one or more of such clients may
> request McKinsey to engage in services focusing on direct
> commercial transactions or relationships with the Debtors.  In such
> an event, ***McKinsey would*** either give notice of withdrawal or notify
> the Debtors and other key Interested Parties of the fact that it has
> been requested to perform services for another client whose posture
> is adverse to the estates ***to determine whether such Interested
> Parties would be willing to waive any claims of conflict***.  If the
> Debtors and other Interested Parties were unable or unwilling to
> waive their claims of conflict with respect to McKinsey's
> performance of such services, McKinsey might have to withdraw
> from its representation of the Debtors.

*UAL*, Dkt. 52-1 ¶ 19 (emphasis added).

75.    Similarly, in *Lyondell*, McKinsey US stated: "Additionally, it is possible that one

or more of such clients may request that McKinsey US engage in services focusing on direct

commercial transactions or relationships with the Debtors.  ***Absent a waiver from the Debtors***,

McKinsey US will decline such engagement."  *Lyondell*, Dkt. 2090 ¶ 17 (emphasis added).

76.    In *Mirant*, McKinsey US stated: "***If the Debtors and other parties-in-interest were***

***unable or unwilling to waive their claims of conflict*** with respect to McKinsey's performance of

---

[52]    *See Hayes Lemmerz*, Dkt. 103-3 ¶¶ 11, 12; *Lyondell*, Dkt. 2090 ¶ 12; *Harry & David*, Dkt. 105-3
¶ 15; *AMR*, Dkt. 581 ¶ 17; *NII Holdings*, Dkt. 153 ¶ 25; *Standard Register*, Dkt. 87-3 ¶ 24.

Joint Declaration
September 4, 2018

such services, McKinsey might have to withdraw from its service to the Debtors." *Mirant*, Dkt.

1457-1 ¶ 16 (emphasis added).

77.    Nothing in Section 327(a), however, permits either the parties **or even the**

***bankruptcy court*** to waive its qualification requirements.[53]   In apparent recognition of this

important point of law, McKinsey abandoned this offer in its disclosures in cases after *Mirant*.

## IV.   McKinsey's Additional Disqualifying Actual Conflicts of Interest in *Alpha Natural Resources*, *SunEdison* and *GenOn*

78.    The Amended Complaint in this action describes how, in its three most recent

Chapter 11 bankruptcy cases (*Alpha Natural Resources*, *SunEdison*, and *GenOn*), McKinsey RTS

failed to disclose and concealed numerous connections.[54]   Assuming those facts to be true, those

connections were debilitating and likely would have resulted in McKinsey RTS's disqualification

in each of those cases had McKinsey RTS fully disclosed them as required by Rule 2014.

### A.  *Alpha Natural Resources*

79.    The Amended Complaint in this action describes how, throughout the *Alpha*

*Natural Resources* bankruptcy proceeding, McKinsey held substantial financial interests in the

debtor, Alpha Natural Resources.  Specifically, the Amended Complaint describes the following

undisclosed interests that McKinsey had in the *Alpha Natural Resources* bankruptcy:

> a.  McKinsey had a financial interest in the debtor Alpha Natural Resources
>
>     through investments of the MIO in Hudson Bay Capital Management;
>
>     Nomura Securities Co., Ltd.; SSgA Funds Management, Inc.; UBS
>
>     Financial Services, Inc.; and Whitebox, each of which held equity interests

---

[53]    *See, e.g., Granite Partners*, 219 B.R. at 34.
[54]    *See* Am. Compl. ¶¶ 161-200, 207-217, 274-287.

33

Joint Declaration
September 4, 2018

in Alpha Natural Resources; McKinsey may have also held equity interests in Alpha Natural Resources through the MIO's investments in Blackrock and Compass.[55]

b.  McKinsey held substantial financial interests in Contura, the entity that acquired Alpha Natural Resources' most valuable assets through Alpha Natural Resources' Chapter 11 plan, with McKinsey later profiting by at least $50 million through its financial interests in Contura.[56]

c.  Two McKinsey partners consulted with one of Alpha Natural Resources' largest customers, United States Steel, on reducing its coal prices, including its coal prices with Alpha Natural Resources, at the same time that those same partners were providing consulting services to Alpha Natural Resources in the Chapter 11 case with the legal and fiduciary responsibility to help Alpha Natural Resources to enhance its financial position.[57]

d.  Through MIO, McKinsey's partners and employees had investments in numerous interested parties in the *Alpha Natural Resources* case.[58]

e.  During the *Alpha Natural Resources* case, a McKinsey partner overseeing its investments in Alpha Natural Resources securities also served on the Board of Directors of Royal Bank of Canada, which held an equity interest in Alpha Natural Resources.[59]

---

[55]   *See id.* ¶¶ 167.
[56]   *See id.* ¶¶ 193-198.
[57]   *See id.* ¶¶ 178-182.
[58]   *See id.* ¶¶ 193-202.
[59]   *See id.* ¶¶ 167.

Joint Declaration
September 4, 2018

80.     If the foregoing facts are true, then because of McKinsey's "interest in the debtor," McKinsey RTS was not "disinterested" as that term is defined in 11 U.S.C. § 101(14) and as is required by 11 U.S.C. § 327. Each of those connections is a disabling connection under 11 U.S.C. §§ 327 and 101(14), and McKinsey RTS could and likely would have been disqualified had it disclosed any of those connections in *Alpha Natural Resources*. McKinsey's failure to disclose those connections meant that no interested party (let alone the court) knew of these disqualifying McKinsey connections at any critical phase of the bankruptcy proceedings, including on July 7, 2016, when Kevin Carmody, on behalf of McKinsey, provided critical testimony supporting confirmation of Alpha Natural Resources' plan.

### B. *SunEdison*

81.     The Amended Complaint describes McKinsey's fraudulent billings to SunEdison's non-debtor affiliates.[60] Assuming those facts to be true, this created for McKinsey a disqualifying "interest adverse to the estate" under 11 U.S.C. § 327. Had McKinsey RTS disclosed this connection as Rule 2014 requires, it could and likely would have been disqualified in *SunEdison*.

82.     The Amended Complaint further alleges that by making minimal disclosures concerning its connections to former SunEdison CEO Ahmad Chatila, FTC Solar, and David Springer, McKinsey concealed important information concerning details of those connections.[61] McKinsey RTS's Third Supplemental Declaration states: "An affiliate of McKinsey RTS US entered into a business arrangement unrelated to SunEdison, Inc. with an entity for which Mr. Ahmad Chatila is a senior officer."[62]

---

[60]    *See* Am. Compl. ¶¶ 221-236.
[61]    *See* Am. Compl. ¶¶ 237-244.
[62]    *SunEdison*, Dkt. 2614 ¶ 7.

Joint Declaration
September 4, 2018

83.     McKinsey RTS's disclosure regarding Chatila is vague and does not provide sufficient detail for the bankruptcy court, U.S. Trustee, or other interested parties to determine whether that connection posed a conflict of interest.  If the "business arrangement" that McKinsey entered into with Chatila was, in fact, in relation to FTC Solar, which purchased assets from SunEdison, then that connection was likely disqualifying under Section 327, and thus McKinsey's disclosures violated Rule 2014 by failing to disclose all of the pertinent details concerning those connections.

84.     Each of these connections, if true, was a debilitating connection under 11 U.S.C. §§ 327 and 101(14), and McKinsey RTS could and likely would have been disqualified had it disclosed any of these connections in *SunEdison*.  McKinsey's failure to disclose those connections would mean that no interested party knew of these disabling McKinsey connections at any critical phase of the bankruptcy proceedings.

## C.  *GenOn*

85.     The Amended Complaint describes how, in *GenOn*, McKinsey RTS failed to disclose and concealed the following connections and interests:

> a.  NRG Energy, Inc., GenOn's parent company against whom McKinsey was investigating a multi-million dollar claim on behalf of GenOn and with whom McKinsey was negotiating GenOn's separation, was also a current or former McKinsey client.[63]
>
> b.  McKinsey had various connections to the entities, transactions and bankruptcies that created GenOn.[64]

---

[63]    *See* Am. Compl. ¶¶ 250-260.
[64]    *See id.* ¶¶ 261-266.

Joint Declaration
September 4, 2018

       c.  McKinsey had received preference payments totaling $4,512,000.[65]

86.    Assuming those facts to be true, each of these connections was a disqualifying connection under 11 U.S.C. §§ 327 and 101(14). In addition, the preference payments to McKinsey further gave rise to a disqualifying interest adverse to the *GenOn* bankruptcy estate. Had McKinsey RTS complied with Rule 2014 and fully disclosed the full extent of its connections in *GenOn*, it could and likely would have been disqualified under 11 U.S.C. § 327 because it held and represented interests adverse to the estate and its obligation of loyalty to the GenOn bankruptcy estate directly conflicted with its obligations to its clients who were creditors of GenOn. Moreover, failure to disclose these connections by McKinsey would mean that no interested party knew of these disqualifying McKinsey connections at any critical phase of the bankruptcy proceedings.

## V.   The "Pay for Play" Scheme Was Likely Disqualifying.

87.    The Amended Complaint alleges that McKinsey engaged in a "pay for play" scheme in which McKinsey solicited bankruptcy attorneys to enter into exclusive referral arrangements whereby the bankruptcy attorneys would agree to refer their Chapter 11 restructuring clients exclusively to McKinsey RTS in exchange for referrals from McKinsey's large stable of clients.[66] The Amended Complaint further alleges that McKinsey & Co.'s Managing Partner at the time, Dominic Barton, admitted to Plaintiff Jay Alix that McKinsey had, in fact, engaged in this scheme.[67] Additionally, the Amended Complaint alleges that Barton offered to introduce AP to Fortescue and Volvo, in an attempt to "pay off" or bribe Alix and AP to remain silent regarding McKinsey's disclosures and its "pay for play" scheme by offering AP two large international consulting assignments.

---

[65]    *See id.* ¶¶ 267-273.
[66]    *See id.* ¶¶ 120.
[67]    *See id.* ¶¶ 128.

Joint Declaration
September 4, 2018

88.     McKinsey's alleged "pay for play" scheme, if true, may well have disqualified it from serving as a bankruptcy professional under Section 327. The decision to employ McKinsey, rather than another, professional must be based solely on whether the employment of McKinsey is in the best interest of the estate. It cannot be based on whether McKinsey paid the debtor's attorney (in cash or in valuable referrals) for the employment. McKinsey is not permitted to induce the debtor's attorney to secure its employment for a debtor by offering that attorney some valuable consideration. Likewise, the debtor's attorney is not permitted to accept any consideration from McKinsey for that purpose.

89.     McKinsey's "pay for play" scheme could, therefore, give the debtor's estate claims against McKinsey for both breach of fiduciary duties and aiding and abetting the attorney's breach of fiduciary duties. As a result, McKinsey would hold an interest adverse to the debtor's estate and would not be "disinterested." Accordingly, McKinsey could and likely would have been disqualified under Section 327.

90.     Further, Rule 2014 would require McKinsey to disclose the details of its "pay for play" scheme and the connection with the debtor's attorney that resulted from it.

91.     If McKinsey's scheme allowed it to become a professional for a Chapter 11 debtor, its failure to disclose this conflicting connection could be found to be a fraud on the bankruptcy court.

## VI.     Conclusion

92.     In our respective expert opinions, McKinsey's disclosures have been deficient in a breadth and scope that is unprecedented in Chapter 11 proceedings. In our collective experience, no other professional has so consistently and pervasively violated Rule 2014.

Joint Declaration
September 4, 2018

93.     In *Alpha Natural Resources*, the United States Trustee appropriately stated:[68]

> McKinsey RTS filed not one, not two, but three declarations that are
> similarly vague; they disclose the existence of various connections
> without disclosing the identity of the connections. *See supra* at ¶¶ 4-
> 7.  Even if such connections ultimately prove unrelated to the
> Debtors or these chapter 11 cases, McKinsey RTS's disclosures are
> insufficient to satisfy Bankruptcy Rule 2014.   There is no
> information regarding the identity, nature, or scope of the
> connections.  *Stated another way, the Carmody Declarations give
> the appearance of compliance without actually complying with
> Bankruptcy Rule 2014.*

(Emphasis added.)

94.     In our respective expert opinions, McKinsey's disclosures in its bankruptcy cases

violated Bankruptcy Rule 2014(a) and Section 327 and were grossly insufficient to satisfy their

purposes.  Had the conflicts been properly disclosed in each of the above-referenced cases,

McKinsey could and likely would have been disqualified in any or all of them.

95.     In our respective expert opinions, McKinsey's repeated failure to comply with

Bankruptcy Rule 2014 and disclose its connections has effectively prevented the United States

Trustees, the parties, and the courts from weighing McKinsey's connections and conflicts in the

context of the proceedings and from taking appropriate and timely action.

---

[68]     *Alpha Natural Resources*, Dkt. 2308 (Motion to Compel, filed May 3, 2016).  In July 2018, the
U.S. Trustee supported the re-opening of the *Alpha Natural Resources* bankruptcy after further information
regarding McKinsey's failures to disclose came to light.

Joint Declaration
September 4, 2018


I declare under penalty of perjury that the foregoing is true and correct.


Dated: September 4, 2018




By: _____

        Steven W. Rhodes

Joint Declaration
September 4, 2018

I declare under penalty of perjury that the foregoing is true and correct.


Dated: September 4, 2018




By: *Judith K. Fitzgerald*

Judith Fitzgerald

Joint Declaration
September 4, 2018

I declare under penalty of perjury that the foregoing is true and correct.


Dated: September 4, 2018


By:_____

Lois R. Lupica

Joint Declaration
September 4, 2018

I declare under penalty of perjury that the foregoing is true and correct.


Dated: September 4, 2018




By: _____

John A. E. Pottow

# APPENDIX A

**STEVEN RHODES**
JAMS
150 West Jefferson Ave.
Suite 850
Detroit, MI 48243
P: 313.872.1100
E: srhodes@jamsadr.com



Neutral, Mediator & Arbitrator, JAMS

Emergency Manager and Transition Manager, Detroit Public Schools and Detroit Public Schools Community District, appointed by Gov. Rick Snyder, March 2016-December 2016

United States Bankruptcy Judge, Eastern District of Michigan-Detroit, appointed 1985, reappointed 1999 and 2013, retired February 2015

Appointed by the chief judge of the Sixth Circuit Court of Appeals in July 2013 to preside over the City of Detroit bankruptcy case; confirmed the City's plan of adjustment in November 2014

Chief Judge, United States Bankruptcy Court, Eastern District of Michigan, 2002-2009

Bankruptcy Appellate Panel of the Sixth Circuit, 1997-2004 and 2008-2011

Chief Judge of the Bankruptcy Appellate Panel, 2002-2004

### Honors and Awards

Detroit Metropolitan Bar Association Foundation, 2015 Dennis Archer Community Service Award, November 19, 2015, article available here

The Detroit News, A 2015 Michiganian of the Year, November, 11, 2015, article available here

Commercial Law League of America, Lawrence P. King Award for Excellence in the Field of Bankruptcy, September 29, 2015

Goodwill Industries Barbara R. Smith Lifetime Achievement Award, May 18, 2015

Michigan Lawyers Weekly, 2015 Michigan Lawyer of the Year, March 26, 2015, article available here

Crain's Detroit Business 2014 Newsmaker of the Year Award, February 25, 2015, article available here

Walsh College, Honorary Doctor of Laws, January 10, 2015, article available here

Sixth Circuit Judicial Conference, Life Member, 2015

National Association of Bankruptcy Trustees, Dedication and Contribution to the Chapter 7 Community and to the NABT, 2014

Distinguished Service Award, American Bankruptcy Institute, 2009

Michigan Bar Foundation, Fellow, 2000

American College of Bankruptcy, Fellow, 1995, article available here

## Positions

Bankruptcy Judges Representative, Judicial Council of Sixth Circuit, 2011-2014

Sixth Circuit Representative, Board of Governors, National Conference of Bankruptcy Judges, 1999-2002; 2011-2014

Judicial Chair, American Bankruptcy Institute, Consumer Bankruptcy Association Veterans Day Consumer Conference, 2006-2012

Member, Advisory Board, American Bankruptcy Institute Central States Conference, 1997-2013; Judicial Chair, 1997-2005

Chair, Advisory Board, American Bankruptcy Institute Consumer Fee Study, 2009-2011

Chair, American Bankruptcy Institute Consumer Task Force, 2009

Judicial Advisor, National Association of Bankruptcy Trustees Ethics Committee, 2005-2013

Vice President for Research, American Bankruptcy Institute, 2005-2009

Chair, National Conference of Bankruptcy Judges Endowment for Education, 2002-2004

Associate Editor, American Bankruptcy Law Journal, published by the National Conference of Bankruptcy Judges, 1994-1996

## Publications

*From a Doodle to the Grand Bargain*, Michigan Lawyers Weekly, May 1, 2017, co-authored with Hon. Gerald Rosen (Ret.)

Chapter, *In Pari Delicto: Solutions to an Inequity Plaguing Bankruptcy Trustees and Innocent Creditors*, Norton Annual Survey of Bankruptcy Law (West 2015), co-authored with Kathy Bazoian Phelps

Chapter, *Effective Expert Testimony*, FRAUD AND FORENSICS: PIERCING THROUGH THE DECEPTION IN A COMMERCIAL FRAUD CASE (American Bankruptcy Institute 2015)

*Equity Receivers and the In Pari Delicto Defense*, 69 Bus. Law. 699 (American Bar Association May 2014), co-authored with Kathy Bazoian Phelps

*Obtaining the Release of Grand Jury Evidence in Ponzi Cases*, 42 Golden Gate U. L. Rev. 657 (2012)

*Coordination Agreements in Parallel Forfeiture and Bankruptcy Proceedings*, American Bar Association Business Law Section's Online Resource, Business Law Today, June 21, 2012

*Supplementing the Tools in the Trustee's Toolbox*, NABTalk, The Journal of the National Conference of Bankruptcy Trustees, Spring 2012, co-authored with Kathy Bazoian Phelps

*The Ponzi Book: A Legal Resource for Unraveling Ponzi Schemes*, LexisNexis (2012), co-authored with Kathy Bazoian Phelps

*The Ethical Obligations of a Chapter 7 Trustee*, 80 Am. Bankr. L.J. 147 (2006)

*A Preview of "Demonstrating a Serious Problem with Undisclosed Assets in Chapters 7 Cases,"* May 2002 Norton Bankr. L. Advisor 1

*An Empirical Study of Consumer Bankruptcy Papers*, 73 Am. Bankr. L.J. 653 (1999)

*Eight Statutory Causes of Delay and Expense in Chapter 11 Cases*, 67 Am. Bankr. L.J. 287 (1993)

## Speaking on Bankruptcy and Commercial Law
## Issues at Conferences and Seminars

American Bankruptcy Institute

American Bar Association

Association of Insolvency and Restructuring Accountants

Byrne Judicial Clerkship Institute at Pepperdine Law School

Commercial Law League of America

Consumer Bankruptcy Association

Federal Judicial Center

International Women's Insolvency and Restructuring Confederation

Michigan Institute for Continuing Legal Education

National Association of Attorneys General

National Association of Bankruptcy Trustees

National Association of Chapter Thirteen Trustees

National Association of Federal Equity Receivers

National Conference of Bankruptcy Judges

Turnaround Management Association

United States District Court Eastern District of Michigan Historical Society

United States Trustee Program

Western District of Michigan Federal Bar Association Bankruptcy Section

State and local bar organizations in California, Florida, Georgia, Kansas, Kentucky, Michigan, Minnesota, Ohio, Oregon, Tennessee and Wisconsin

**Speaking on the City of Detroit Bankruptcy Case**

University of Michigan Law School Faculty, Ann Arbor, MI, February 18, 2014

Third Circuit Judicial Conference, Hershey, PA, May 8, 2014

American Bankruptcy Institute Conference, San Antonio, TX, July 28, 2014

National Conference of Bankruptcy Judges Conference, Chicago, IL, October 9, 2014

Michigan State University Law School, East Lansing, MI, November 4, 2014

Walsh College Commencement Address, Troy, MI, January 10, 2015, video available here

Los Angeles Bankruptcy Foundation, Los Angeles, CA, February 9, 2015

Sacramento Bankruptcy Bar Association, Sacramento, CA, February 10, 2015

Turnaround Management Association Distressed Investing Conference, Las Vegas, NV, February 12, 2015

M&A Advisors Distressed Investing Summit, Palm Beach, FL, February 23, 2015

University of Michigan Law School Faculty, Ann Arbor, MI, February 24, 2015

Gasparillo Island Community Event, Gasparillo Island, FL, March 5, 2015, article available here

Wayne State University Law School, Detroit, MI, March 23, 2015, video available here

New York Federal Reserve Bank, New York City, NY, April 14, 2015

Keynote Speech, American Bankruptcy Institute, Annual Spring Meeting, Washington, DC, April 19, 2015, video available here

Bank of Ann Arbor, Ann Arbor, MI, April 22, 2015

Turnaround Management Association, San Antonio, TX, April 23, 2015

New York University Law School, New York City, NY, April 27, 2015

Ann Arbor Kiwanis Club Meeting, Ann Arbor, MI, May 11, 2015

Sixth Circuit Judicial Conference, Detroit, MI, May 13, 2015, video available here

Keynote Speech, National Tax Association Conference, Washington, DC, May 14, 2015

Michigan Association of Certified Public Accountants Seminar, Livonia, MI, May 19, 2015

Cleveland Bankruptcy Bar Association Seminar, Cleveland, OH, May 20, 2015

American Bankruptcy Institute Mediation Training Conference, New York City, NY, May 21, 2015

Mackinac Policy Conference, Mackinac Island, MI, May 28, 2015, video available here

Oakland County Community College Commencement Address, Auburn Hills, MI, May 30 2015

State Bar of Michigan Debtor Creditor Rights Committee, Southfield, MI, July 14, 2015

Midwest Bankruptcy Institute, Cincinnati, OH, August 28, 2015

American College of Bond Counsel Conference, Chicago, IL, September 9, 2015

Federal Bar Historical Society Lunch, Detroit, MI, September 16, 2015

International Women's Insolvency Conference, Miami Beach, FL, September 27, 2015

American Bankruptcy Institute, Miami Beach, FL, September 29, 2015

American College of Trial Lawyers, Chicago, IL, October 3, 2015

Lewis & Clark Law School, Portland, OR, October 13, 2015

Oregon State Bar Debtor-Creditor Section, Portland, OR, October 13, 2015

Encuentro Nacional de la Diáspora Puertorriqueña, Orlando, FL, October 14, 2015

National Association of Federal Equity Receivers, San Diego, CA, October 16, 2015

University of Michigan Business School, Ann Arbor, MI October 21, 2015, video available here

Osher Lifelong Learning Institute, Ann Arbor, MI, October 28, 2015

The Hill: Puerto Rico's Fiscal Future: What's Next for America's Largest Territory?, Washington DC, November 17, 2015, video available here

Hellenic Bar Association, Detroit, MI, November 17, 2015

American Bankruptcy Institute, Winter Leadership Conference, Phoenix, AZ, December 4, 2015

Turnaround Management Association, Birmingham, MI, February 25, 2015

Henry Ford Hospital, Detroit, MI, March 4, 2016

American Bankruptcy Institute, VALCON Conference, Las Vegas, NV, March 15, 2016

American College of Bankruptcy, Annual Induction Conference, Washington, DC, March 18, 2016

George Mason University Law School, Judicial Symposium on the Economics and Law of Public Pension Reform, Charleston, SC, March 21, 2016

Michigan Municipal League, Capital Conference, Lansing, MI, March 23, 2016

Bentley Historical Library, Ann Arbor, MI, April 7, 2016

Seventh Circuit Judicial Conference, Chicago, IL, May 3, 2016

National Federation of Municipal Analysts, Chicago, IL, May 4, 2016

Friends of the Plymouth Public Library, Plymouth, MI, May 12, 2016

Federal Bar Association National Conference, Cleveland, OH, September 15, 2016

American Bar Association, Young Lawyers Division Annual Conference, Detroit, MI October 21, 2016

Michigan Psychoanalytic Foundation, Detroit, MI, November 13, 2016

American Bankruptcy Institute, Alexander L. Paskay Memorial Bankruptcy Seminar, Tampa FL, February 3, 2017

Jonathan Club, Los Angeles, CA, February 14, 2017

Wisconsin Law School Bankruptcy Class, Madison, WI, February 28, 2018

Wisconsin Bar Association Bankruptcy Section, Kohler, WI, March 1, 2018

JAMS CLE Day, Chicago, IL, June 15, 2017

American Bar Association Dispute Resolution Section, Washington, DC, April 6, 2018

### Media Interviews on the City of Detroit Bankruptcy Case

WDET, Detroit Public Radio, February 17, 2015, audio available here

Detroit Free Press, front page story, February 20, 2015, available here

Bloomberg Radio Taking Stock Program and on Bloomberg TV, February 23, 2015

Flashpoint with Devan Scillian, WDIV, Detroit, MI, March 22, 2015, video available here

Tavis Smiley Show, Public Television, March 24, 2014, video available here

Bloomberg <GO> with David Westin and Stephanie Ruhle, Bloomberg TV, October 9, 2015, video available here

WDET, Detroit Public Radio, November 16, 2015, audio available here

### TV and Radio Interviews on the Detroit Public Schools

WDET, Detroit Public Radio, March 1, 2016, audio available here

The Frank Beckman Show, WJR, Detroit, March 2, 2106

WXYZ TV, Detroit, March 2, 2013, video available here

Detroit Today, WDET, Detroit Public Radio, March 3, 2016, audio available here

The Paul W. Smith Show, WJR, Detroit, March 4, 2016

Flashpoint with Devan Scillian, WDIV, Detroit, MI, March 6, 2016, video available here

MiWeek, Detroit Public TV, March 24, 2016, video available here

The Paul W. Smith Show, WJR, Detroit, May 11, 2016

"Off the Record," hosted by Tim Skubick, Michigan Public TV, May 13, 2016, video available here

The Paul W. Smith Show, WJR, Detroit, June 10, 2016

The Warren Pierce Show, WJR, July 3, 2016

Sascha Raiyn, WDET, July 25, 2016

"Spotlight on the News" with Chuck Stokes, WXYZ-TV, October 16, 2016, video available here

### Other Employment

Adjunct Professor, University of Michigan Law School, teaching bankruptcy law, 1992-2003; 2013

Adjunct Professor, University of Detroit Law School, teaching ethics, 1986

United States Magistrate, Eastern District of Michigan, 1981-1985

Private Practice, 1977-1981

Assistant United States Attorney, Eastern District of Michigan, 1974-1977

Law Clerk, Honorable John Feikens, United States District Judge, the Eastern District of Michigan, 1973-1974

### Memberships

American Bankruptcy Institute

American Bar Association

Federal Bar Association, Detroit Chapter

National Association of Federal Equity Receivers

### Bar Admissions

State Bar of Michigan, 1973

United States District Court Eastern District of Michigan, 1973

### Education

University of Michigan Law School, Juris Doctor, *cum laude*, 1972; Associate Editor, Michigan Law Review

Purdue University, Bachelor of Science in Mechanical Engineering, 1970; *Tau Beta Pi*, The Engineering Honor Society; *Pi Tau Sigma* International Mechanical Engineering Honor Society

# APPENDIX B

**Hon. JUDITH KLASWICK FITZGERALD (RET.)**
jfitzgerald@tuckerlaw.com

Tucker Arensberg, P.C.
Suite 1500, 1 PPG Place
Pittsburgh, PA  15222
(412) 594-3933 (office)
(412) 559-2987 (mobile)

## PROFILE - CHAPTER 11 BANKRUPTCY EXPERIENCE (INCLUDING COMPLEX COMMERCIAL MATTERS AND  MASS TORT)

As a sitting U.S. Bankruptcy Judge for over 26 years, I presided over and confirmed hundreds of chapter 11 plans of reorganization.  Those cases included more asbestos and mass tort chapter 11 plans, most that utilized § 524 and § 105 injunctions, than any other sitting judge.  I presided over a broad range of bankruptcies that encompassed both large and small companies and hundreds of their affiliates. Among them were substantially sized companies with mass tort legacy liabilities including Federal Mogul, Owens Corning, W.R. Grace, United States Minerals, USG, Armstrong World Industries, Kaiser Aluminum, AC&S, Combustion Engineering, AB Lummus Global, MidValley, Dresser Industries, Pittsburgh Corning, Swan Transportation, North American Refractories, Global Industrial Technologies, Specialty Products Holding Co., Flintkote and others.  I have addressed legal, business, insurance and financial issues and business practices confronting companies facing legacy asbestos claims.  In Chapter 11 and 7 cases I also addressed issues pertinent to reorganizing and liquidating debtors, including financing issues, contract issues, indemnity issues, insurance claims, settlement issues and fee allowances and disallowances.

Since returning to private practice, I have served as an expert witness and as an advisor regarding the postconfirmation impact of certain plan or trust provisions on various matters as diverse as contract or indemnity damages, settlement negotiation practices, malpractice claims, allocation of fees, restructuring, and insurance/reinsurance disputes.  I have testified as an expert in the United States District Court for the Western District of PA, in the Court of Common Pleas of Allegheny County, PA, and in an arbitration conducted in Dallas, TX as well as in depositions in New York, Arizona, Texas and Pennsylvania.  In one case, my expert report was accepted, without testimony, by the United States Bankruptcy Court for the Southern District of NY.

## PROFESSIONAL EXPERIENCE

Member of the Board and Shareholder
Tucker Arensberg, P.C.
(previously Of Counsel from December 1, 2013 – August 31, 2015)

Representative Engagements:
- Representing Debtor-in-Possession in chapter 11 reorganization with over 11,500 potential creditors and notice parties
- Representing not-for-profit Debtors-in-Possession in chapter 11 reorganizations
- Representing secured creditor in federal receivership and foreclosure of four hotel properties
- Representing administrative claimant in settlement negotiations with debtor

<u>Expert witness in bankruptcy and bankruptcy-related matters</u>
- Testifying in a breach of contract/bad faith insurance dispute regarding reasonableness of fees
- Testifying in arbitration regarding the effect of bankruptcy on a contractual indemnity obligations
- Testifying in a legal malpractice action and professional responsibility dispute
- Testifying regarding customary mediation procedures in a dispute regarding good faith insurance negotiations
- Serving as a court-appointed expert in a 16 million dollar fee dispute
- Serving as court-appointed expert in asbestos trust budget and discovery disputes
- Serving as a judge in a moot oral argument involving a billion dollar ISDA dispute
- Advising a large asbestos trust regarding administration and claims matters
- Assisting counsel to the board of a public company on restructuring proposals
- Serving as mediator in several disputes regarding provisions of asbestos trust agreements, trust distribution procedures and personal injury claims

<u>Consultant</u>
- Consulting regarding reasonableness of RMBS settlements in multi-billion dollar dispute
- Consulting regarding reasonableness of Indenture Trustee fees
- Consulting in a quarter-billion dollar insurance/re-insurance litigation
- Consulting regarding various contract interpretation disputes
- Consulting regarding lien perfection and priority dispute
- Consulting regarding various bankruptcy confirmation, post-confirmation and claims matters: PBGC and collective bargaining issues; disclosure and confirmation requirements; professional responsibility; domestic support obligations and other disputes

<u>Court-appointed Receiver</u>
- Liquidating receiver for a not-for-profit cultural organization

<u>Mediator and Arbitrator in numerous bankruptcy, civil and criminal cases and post-confirmation trust matters</u>
- Hold a Certificate of Completion of Bankruptcy Mediation Training (40 hours) from St. John's University and the American Bankruptcy Institute
- Complete mediation training with other organizations on an on-going basis

<u>Other Professional Qualifications</u>:

- Panel Mediator, U.S. Bankruptcy Court, District of Delaware
- Alternative Dispute Resolution, Neutral Evaluation, Mediation Panel Member, U. S. District Court, Western District of PA
- Panel Mediator, U.S. Bankruptcy Court, Western District of PA
  Member of FedArb (Federal Arbitration, Inc.), an association of former federal judges

who now serve as arbitrators and mediators in complex commercial cases
- Mediation Council of Western Pennsylvania
- PA Council of Mediators

May 18, 2015 - Present

<u>Professor of Practice</u>
University of Pittsburgh School of Law
3900 Forbes Avenue
Pittsburgh, PA 15260

- Teaching Bankruptcy and Advanced Bankruptcy; other courses to be determined

July 8, 2013 - July 5, 2015

<u>Tenured, Full Professor of Law</u>
Indiana Tech Law School
1600 East Washington Blvd.
Fort Wayne, IN 46803

- Teaching Contracts, Commercial Transactions and Bankruptcy
- Faculty responsibilities included Faculty Secretary; Promotion and Tenure Committee; Dean's Search Committee; Long Range Planning Committee; Admissions Committee (chair); Library Advisory Committee (chair); Faculty Senate (law school representative); Graduate Council (law school representative); Mentoring Committee; Experiential Learning Task Force (chair of cross-curricular hypothetical development for Fall 2014-15 1L class and Spring  2L class); various other task forces established by the Dean to address particular needs; student mentor; junior faculty mentor;  advisor to assigned students at risk; CLE presentations to bench and bar

October 30, 1987 - May 31, 2013
<u>Judge, United States Bankruptcy Court Western District of Pennsylvania</u>
5490 U.S. Steel Tower, 600 Grant Street Pittsburgh, PA  15219
(Chief Judge Jan. 8, 2000 through Dec. 31, 2004)

October 1, 1991 - June 30, 1996 and January 1, 1998 - May 31, 2013
<u>Judge, sitting by special designation in the United States Bankruptcy Court District of Delaware</u>
Marine Midland Plaza
824 Market Street
Wilmington, DE 19801

May 13, 1993 - June 30, 2001
<u>Judge, sitting by special designation in the United States Bankruptcy Court Eastern District of Pennsylvania</u>
900 Market Street, Suite 400

Philadelphia, PA 19107

July 1, 2004 - December 31, 2008 (and completing assigned cases until retirement on May 31, 2013)

<u>Judge, sitting by special designation in the District Court of the Virgin Islands</u>
Bankruptcy Division, District of St. Thomas and St. John
5500 Veterans Drive, Room 310
St. Thomas, Virgin Islands 00802

2004 - 2014
<u>Adjunct Professor of Law</u>
Bankruptcy since 2004 and Advanced Bankruptcy since 2008
Secured Transactions (Fall Term, 1997)
University of Pittsburgh School of Law
3900 Forbes Avenue
Pittsburgh, PA 15260

January 1976 - October 1987
<u>Assistant United States Attorney</u>
633 U.S. Post Office & Courthouse Seventh & Grant Street
Pittsburgh, PA 15219

- Supervisor of the Erie branch office
- Responsible for all civil and criminal litigation in the seven counties of northwestern Pennsylvania
- Grand jury investigations and prosecution of complex criminal matters, including tax fraud, RICO, narcotics, and major white collar crimes
- Prosecution and defense of civil matters, including torts, medical malpractice, admiralty, immigration and environmental claims, bankruptcies, injunctions, Social Security appeals
- Appellate brief writing and oral argument of cases before the U.S. Court of Appeals for the Third Circuit
- Lecturer for and participant in various seminars conducted by the U.S. Department of Justice and various universities

March 1974 - December 1975
<u>Law Clerk to Judge Gwilym A. Price, Jr.</u>
Superior Court of Pennsylvania
Pittsburgh, PA 15219

July 1973 - February 1974
<u>Law Clerk to President Judge John N. Sawyer</u>
Beaver County Court of Common Pleas
Beaver, PA 15009

## **COURT ADMISSIONS**

Pennsylvania Supreme Court, October 4, 1973
United States District Court, Western District of Pennsylvania, October 4, 1973
United States Court of Appeals for the Third Circuit, February 11, 1976
United States Tax Court, December 14, 1983
United States Supreme Court, July 1, 1985
Eastern District of Pennsylvania, March 14, 2018
*Pro hac vice* admissions in Norther and Southern Districts of West Virginia and Eastern District of Virginia

## EDUCATION

University of Pittsburgh School of Law
1973 - Juris Doctor (University Scholarship and Pitman Fellowship recipient)

University of Pittsburgh
1970, 1971 - Political Science Graduate Courses on Fellowship

University of Pittsburgh
1970 - B.S. Psychology, B.A. English Writing

## GRADUATE AWARDS AND ACTIVITIES (Available Upon Request)

## PROFESSIONAL RECOGNITIONS AND AWARDS

- Recognition in *The Best Lawyers in America*, Bankruptcy and Creditor Debtor Rights / Insolvency and Reorganization Law
- Advisory Member to UPSOLVE, 2017 - present
- Law 360 Honorable Mention as one of the Top Ten Bankruptcy Judges in History
- Western Pennsylvania Trial Lawyers Recognition for Dedicated Judicial Service, 2014
- The Judith K. Fitzgerald Bankruptcy American Inn of Court named in my honor, 2013
- Debtors' Bar Association of Western Pennsylvania Recognition for Dedicated Judicial Service, 2013
- Lawrence P. King Award for Excellence in the Field of Bankruptcy, 2011
- NCBJ Eagle Award, 2011
- Elected to Membership in the American Law Institute, 2008
- Association of Insolvency & Restructuring Advisors, 2007
- Conrad B. Duberstein "Mensch" Award, Presented by NCBJ, 2006
- Elected as a Fellow of the American College of Bankruptcy, 2004
- Turnarounds & Workouts - Top Ten Bankruptcy Judges (3 years)
- Who's Who of American Women, 1991 - present
- Oxford's Who's Who, 1992 – present
- Barron's Who's Who of Distinguished Professionals, 2015 - present

- United States Department of Justice Special Achievement Awards
- Federal Criminal Investigators Special Service Award, 1988
- United States Department of Commerce Operation Exodus Outstanding Performance Award, 1986
- Pittsburgh Magazine Special Recognition Award, 1980

## PROFESSIONAL ACTIVITIES (GOVERNMENT RELATED)

| | |
|---|---|
| 1992 - 1998 | Advisory Committee of Bankruptcy Judges<br>Administrative Office of the United States Courts, Chair, 1994 - 1996 |
| 1993 - 1997 | Chambers and Courtroom Umbrella Group<br>Administrative Office of the United States Courts<br>(Dealt with automation and technology matters in the federal courts) |
| 1994 - 1998 | Chambers Case Management User Group, Chair, 1995 - 1998<br>(Monitored automation and technology projects under the auspices of the Chambers and Courtroom Umbrella Group) |
| 1994 - 2002 | Executive Sponsor, BK CHASER Automation Project<br>Bankruptcy CHASER Ad Hoc Working Group<br>(A project that enhanced the utility of information in the court's databases for purposes of judicial case management and ended upon implementation.) |
| 1994 - 1998 | Education Committee<br>United States Court of Appeals for the Third Circuit |
| 1995 - 1996 | Bankruptcy Case Management & Statistics Umbrella Group<br>Administrative Office of the United States Courts<br>(Dealt with automation and technology matters in the bankruptcy courts, particularly regarding the clerk's offices) |
| 1997 | Bankruptcy Statistics and Data Collection Project<br>Administrative Office of the United States Courts<br>(Evaluated bankruptcy data needs of various constituencies as part of a technology modernization project) |
| 1998 - 2002 | Program Planner, Bankruptcy and Commercial Law Presentations<br>Third Circuit Judicial Conferences |
| 2001 - 2005 | Nonvoting Bankruptcy Judge Representative<br>Third Circuit Judicial Council |
| 2002 - 2005 | Member, Judicial Council<br>Bankruptcy and Magistrate Judges Committee of the United States Court of Appeals for the Third Circuit |

2006 - Present   <u>Founding Member and Program Planner,</u> Third Circuit Bankruptcy Education Committee

Various          <u>Program Planner,</u> PA Bar Institute; Commercial Law League of America, ABI, Inns of Court

## PROFESSIONAL ACTIVITIES (NON-GOVERNMENT RELATED)

1973 - present          <u>Allegheny County Bar Association</u>
Member of Audit and Technology Utilization Committees
Member, Federal Court, Bankruptcy and Commercial Litigation, and Women and the Law Sections
Formerly Chair, Audit Committee
Member, Finance Committee, Continuing Legal Education,
Speakers' Bureau and Public Relations Committees; Trustee, Criminal          Trial Lawyers of Allegheny County; Editor of Newsletter of Criminal Trial Lawyers Association Nominating Committee

1987 - present          <u>National Conference of Bankruptcy Judges</u>
2010 - 2012, Associate Editor, American Bankruptcy Law Journal
2008 - 2015,  Founder and Inaugural Chair, NCBJ Next Generation Program
2002 - 2003, Immediate Past President
2001 - 2002, President
2000 - 2001, Vice President/President Elect; Chair of Elections and Site Selection
1995 - 1998, Treasurer
1999 - 2000, Chair, Endowment for Education
1987 - present - various committees and task forces

1988 - present          <u>American Bankruptcy Institute</u>
2002 - 2007 - Director
Various - Co-chair, Committee on Mass Torts; Member, Nominations Committee
Originator of Law Student Writing Competition for Bankruptcy Litigation Committee, now a competition of the ABI itself
Originator of Mid-Atlantic Regional Program and First Judicial Chair Judicial Liaison
Planner, Caribbean Conference
Member, Education and Membership Committees
Member, Bankruptcy Litigation Committee and Chair of Project Subcommittee Liaison with Commercial Law League of America
Member, Mediation Committee

1988 - 1993          <u>Federal Investigators Association</u>

| | |
|---|---|
| various | <u>American Bar Association</u><br>Member, National Conference of Federal Trial Judges, Public Education Committee, Business Litigation Section |
| 1991 - present | <u>Commercial Law League of America</u><br>2002 - present    Member of Bankruptcy Section Executive Council<br>2004 - 2006      Member of National Ethics Committee |
| 1992 - 2014 | <u>National Conference of Bankruptcy Clerks</u> |
| 1992 - present | <u>Women's Bar Association of Western PA</u><br>Founding Member |
| 1992 - 2014 | <u>American Inns of Court, Honorable Amy Reynolds  Hay Chapter</u><br>Founding Member and Master (Since 1995, Honorary Master) |
| 1995 - present | <u>International Women's Insolvency and Restructuring Confederation (IWIRC)</u><br>Charter Member, Pittsburgh Chapter |
| 2000 - present | <u>Federal Bar Association</u><br>Awarded Lifetime Honorary Membership, 2001 |
| 2001 - 2006 | <u>Association of Trial Lawyers of America</u><br>Judicial Fellow - Position discontinued by the Association |
| 2001 – 2010, 2013 – present | <u>Turnaround Management Association</u>, Pittsburgh Chapter |
| 2002 - 2006 | <u>International Bar Association</u> |
| 2004 - present | <u>American College of Bankruptcy</u><br>Chair, Liaisons Committee<br>Program Developer for Law School Liaison Subcommittee<br>Program Developer for Third Circuit Education Program (October 12, 2012)<br>Member, Judicial Outreach Committee<br>Member, Third Circuit Education Committee |
| 2008 - present | <u>American Law Institute</u><br>Elected Member<br>Currently Consultative Group Member for Consumer Contracts |
| 2010 - present | <u>The Judith K. Fitzgerald Western Pennsylvania Bankruptcy American   Inn of Court</u><br>Founding Member and Counselor |

> Chair at various times of Program, Membership and Business Planning Committees

2013 - present    The Pennsylvania Bar Association

2013 - 2015       The Allen County [Indiana] Bar Association

2013 - 2015       The Benjamin Harrison American Inn of Court

2015 - present    FedArb (Federal Arbitration, Inc.)
                  An organization of former federal judges who serve as arbitrators and mediators in complex civil cases

2015 - present    Mediation Council of Western Pennsylvania

2016 - present    Bar Association of the Third Federal Circuit

2018 – present    PA Council of Mediators


## MISCELLANEOUS

Various Interviews in TV, radio and print news media regarding bankruptcy and insolvency matters

Various podcasts and debates on bankruptcy topics including commentary on U.S. Supreme Court cases and matters of current interest to insolvency practitioners

Participant in various symposia on insolvency matters, including The DePaul Institute Symposium; the View from the Bench in Washington, D.C.; colloquium on international issues regarding chapter 11 reorganization in Washington, D.C. at the French Embassy; judicial roundtable on international insolvency issues in Dublin, Ireland and cross-border mass tort judicial perspectives in London, United Kingdom

Judge, Moot Court Trial and Appellate Competitions for University of Pittsburgh School of Law

Judge, Tax Moot Court Competition at Duquesne University School of Law

Former Lecturer substituting for the Adjunct Professor, Trial Tactics Duquesne University Law School

Guest Lecturer in Bankruptcy, University of Miami School of Law

Instructor and Lecturer for professional groups including:
The Federal Judicial Center; U.S. Attorney General's Advocacy Institute; University of Pittsburgh School of Law Intensive Trial Advocacy Course; Third Circuit Court of Appeals

Judicial Conference; National Conference of Bankruptcy Judges; The American Inns of Court; The Commercial Law League of America; IWIRC; Law Education Institute; American Bankruptcy Institute; The Pennsylvania Bar Association; Allegheny County Bar Association; Pennsylvania Bar Institute; Professional Education Systems, Inc.; Pennsylvania Institute of Certified Public Accountants;  The Association of Insolvency & Restructuring Advisors; The Bar Association of the U.S. Virgin Islands; The Internal Revenue Service; The Bankruptcy Bar Association of the Southern District of Florida; The State Bar Association of Nevada (Family Law Practitioners); The Kentucky Bar Association; National Association of Chapter 13 Trustees; Georgetown University Law Center; The Advanced E-Discovery Institute and Views from the Bench; LexisNexis Mealey Conference Groups; DePaul University Business and Commercial Law Symposium; Southern Illinois University School of Law; The Association of Insolvency & Restructuring Advisors; Turnaround Management Association; Commercial Finance Association; Perrin Conferences; Emory Bankruptcy Developments Journal Symposium; The National Association of Attorneys General; The Indiana Tech Law School Lunch and Learn; The Judith K. Fitzgerald Bankruptcy American Inn of Court; American College of Bankruptcy; Equipment Leasing and Finance Agency; The American Bar Association; Allen County Bar Association; Energy and Mineral Law Foundation

## SELECTED CIVIC ACTIVITIES including service on not-for-profit boards (Available on Request)

## SELECTED PUBLICATIONS

American Bankruptcy Institute Mediation Committee Newsletter: "Perspectives On Mediation: Which Do You Endorse?" (July, 2018)

Commercial Law League and Tucker Arensberg Blogposts: "Creating a Circuit Split Regarding the Fair Debt Collection Practices Act: *Rotkiske v. Klemm*, --- F.3d ----, 2018 WL 2209120 (3d Cir. May 15, 2018)" (May 2018)

Commercial Law League and Tucker Arensberg Blogposts: "Pre-Petition 'New Value' Counts Toward The Preference Defense; Post-Petition 'New Value' Does Not" (May 2018)

Commercial Law League and Tucker Arensberg Blogposts: "No Monkeying Around With This Opinion - *Naruto v. Slater*, No. 16-15469, 2018 WL 1902414 (9th Cir. Apr. 23, 2018)" (Apr. 2018)

Commercial Law League and Tucker Arensberg Blogposts: "Something Amazing – A Unanimous Opinion by the United States Supreme Court in a Bankruptcy Case, Affirming and Remanding to the Seventh Circuit Regarding the Safe harbor of 11 U.S.C. § 546(e): *Merit Management Group, LP v. FTI Consulting, Inc.*" (Mar. 2018)

Tucker Arensberg Blogpost: Secured Lenders, Take Note!  *In Re Sunnyslope* Is Something You Want To Know About (Oct. 2017)

*Oh Dear! What Can The Matter Be? What Will Become Of My Oil And Gas Lease In Bankruptcy?*, 37 Energy & Min.L.Instit.237 (2017) (co-author with James W. Kane)

*The Powers of The U.S. Congress: Where Its Constitutional Authority Begins and Ends*, in progress with Brien Hallett as primary author, to be published by ABC-CLIO (co-author of Chapter 5, "The Power to Regulate Bankruptcies" with Professor Nancy Marcus)

Commercial League and Tucker Arensberg Blogposts: "Third Circuit Rules that A Homeowner's Mortgage Insurance Obligation Is Not Modified By A Mortgage Modification" (Mar. 2017)

Commercial Law League and Tucker Arensberg Blogposts: "Alternative Dispute Resolution (ADR):  Is it Right for You?" (Jan. 2016)

Commercial Law League Blogpost:  "The Last Screen: A Cautionary Tale" (Nov. 2015)

Commercial Law League Blogpost: "Growing Medical Marijuana, Problematic In Bankruptcy, and Out" (Aug. 2015)

The National Edition, Rutter Group, Practice Guide, Bankruptcy (2010 - present) (co-editor with U.S. Bankruptcy Judge Mary Walrath and Retired U.S. Bankruptcy Judge and Law Professor Arthur Gonzalez)

Planning for the Time of Trouble:  *Cabrera v. Collazo*, A Case in Point (Commercial Law World Magazine, Summer 2014)

Bankruptcy and Divorce:  Support and Property Division, Second Edition, Aspen Law Business (1994) (co-author) (with annual supplements through 2003)

"When Worlds Collide: Bankruptcy and Its Impact on Domestic Relations and Family Law, Second Edition, American Bankruptcy Institute (2003) (co-author)

Bankruptcy Issues for State Trial Court Judges: A Publication of the American Bankruptcy Institute supported by a grant from the National Conference of Bankruptcy Judges Endowment Fund for Education (c.1995) (co-author)

"Wrestling With Bankruptcy and Divorce Laws in Property Division and Support Issues," 6 JOURNAL OF THE AMERICAN ACADEMY OF MATRIMONIAL LAWYERS 1 (1990) (co-author)

"Wrestling With Bankruptcy and Divorce Laws in Property Division and Support Issues," 6 AMERICAN JOURNAL OF FAMILY LAW, No. 2, 109 (1992) (co-author)

Closing Bankruptcy Cases (a manual for the Federal Judicial Center) (1991) (author)

"Litigating Property Settlement and Support Issues -- A Perspective From the Bankruptcy Bench" Published as a chapter in BANKRUPTCY ISSUES IN MATRIMONIAL CASES: A PRACTICAL GUIDE, Prentice Hall Law & Business (1992) (co-author)

"The Appraiser In Bankruptcy Court:  Getting Appointed, Getting Paid and Testifying as Experts,"Vol. 5 AMEA APPRAISER, No. 2 (Summer 1992) (author)

"The Judge's Role in Insolvency Proceedings: The View From the Bench; The View From the Bar," Symposium in conjunction with St. John's University School of Law, published at Vol. 10, No.2 Am. Bankr. Inst. L. Rev.511 (Winter 2002)

"Forum Shopping, First Day Order and Case Management Issues in Bankruptcy," (Symposium at DePaul University Law School), published at Vol. 1, No. 4 DePaul Business and Commercial Law Journal 515 (Summer 2003)

"We All Live in a Yellow Submarine: BAPCPA's Impact on Family Law Matters," (Symposium at Southern Illinois School of Law) (author), published at 31 Southern Illinois University Law Journal 563 (Spring 2007)

"Chapter 11 Reorganization Processes in Mass Tort Cases:  Success or Failure?" (Mealey's) (author)

"Caswell and Leser, Polar Approaches to Support Arrearages in Chapter 13," 10 Norton Bankruptcy Law Adviser, Clark Boardman Callaghan (Oct. 1992) (co-author)

Chapter 5, "Abstention," Chapter 11 Theory and Practice - A Guide to Reorganization, Queenan, Hendel and Hillinger, eds. (1994)

"Evaluating Involuntary Bankruptcies," Commercial Law League of America (1996)

"Snippets," a column in The Conference News, a quarterly publication of and for the National Conference of Bankruptcy Judges (1998 - 2013) (author)

A Local Rules Guide for Pennsylvania Western District Bankruptcy Court, Pennsylvania Education Systems, Inc., 1989 (collection of forms) (author)

Pennsylvania Law of Juvenile Delinquency & Deprivation, Bisel, 1976 (editor and senior researcher, annual supplement preparer)

U.S. Attorney's Office Forms Manual, 1979-1985 (contributor)

Ideas and Figures, University of Pittsburgh Literary Magazine, 1968 (contributor)

# APPENDIX C

**Lois R. Lupica**
lupica@maine.edu
_____

**Professional Positions**

**Maine Law Foundation Professor of Law, University of Maine School of Law (1994 to present)**
Expertise in Consumer Bankruptcy Law & Practice, Professional Responsibility of Lawyers, Bankruptcy Ethics, Consumer Credit, Access to Justice through Technology, Secured Transactions, Sales of Goods, and Negotiation and Conflict Management.  Recent scholarship involves empirical studies and theoretical policy exploration of the consumer bankruptcy system, the access to justice crisis, and consumers in financial distress.

**Affiliated Faculty, Harvard Law School Access to Justice Lab (2013 to present)**
Co-Principal Investigator on A2J Lab's signature research study, a large-scale randomized control trial evaluating the effectiveness of legal and counseling interventions (self-help tools) to help individuals in financial distress.

**System Design Consultant, Institute for the Advancement of the Legal System (2017 to present)**
Working with a team to re-imagine and re-design a domestic relations legal system that will remove barriers to access to justice.

**Associate Dean, University of Maine School of Law (2005 to 2007)**
Established and executed policy initiatives in support of law faculty's professional development.

**Acting Provost, Southern Vermont College (2007)**
Served as chief academic officer, with the mission of advancing SVC's academic progress and intellectual life. Collaborated with President, senior administrative staff, faculty and students to formulate university policy and academic priorities.

**Resident Scholar, American Bankruptcy Institute (2007 and 2014)**
Served as academic expert for think-tank, whose mission it is to support the analysis of insolvency issues, to provide a source of education regarding these issues and to serve as a forum for the exchange of ideas among participants in the insolvency process.

**Special Counsel, Thompson & Knight, LLP (2008 to 2013)**
Served as counsel on a variety of business reorganizations and financing transactions.

**Associate Clinical Professor of Law, Seton Hall University Law School (1992 to 1994)**
Established, designed and served as Director of transactional clinical program.

**Attorney, Arnold & Porter, LLP (1988 to 1992)**
Served as counsel on a variety of domestic and cross-border transactions.

**Attorney, White & Case, LLP (1987 to 1988)**
Served as counsel on a variety of domestic corporate and real estate transactions.

## Selected Publications & Manuscripts

*The Apps for Justice Project: Deploying Design Thinking to Narrow the Access to Justice Gap*, 44 FORDHAM URBAN LAW JOURNAL 1363 (2017) (with S. Friedman et. al.)

*Self-Help, Reimagined*, 92 INDIANA L. J. 1119 (2017) (with J. Greiner & D. Jiménez)

*Engaging Financially Distressed Consumers*, COMMUNITIES AND BANKING, (2015) (with Greiner, et. al.)

*Access to Justice: A Randomized Control Trial Study of Credit Counseling, Legal Representation and Debt Collection Practices*, GEORGETOWN J. ON POVERTY LAW, (2013) (with J. Greiner & D. Jiménez et. al.)

*Unsecured Creditor Distributions under BAPCPA: An Empirical Study* (with M. R. Donihue) (2016)

*The Consumer Bankruptcy Fee Study: The Final Report*, 20 AM. BANKR. INST. L. REV.  17  (2012)

*Credit Rating Agencies, Structured Securities and The Abyss*, 28 B. U. BANK. & FIN. 639 (2010)

*The Consumer Debt Crisis & the Reinforcement of Class Structures*, 40 LOY.U. CHI. L. REV. 557 (2009)

*The Effect of Bankruptcy upon a Firm using Patents and Trademarks as Collateral, Symposium*, 41 IDEA J. OF LAW & TECH. (2002)

*Revised Article 9, The Proposed Bankruptcy Code Amendments and Securitizing Debtors and their Creditors, Symposium*, FORD. J. OF CORP.  FIN. LAW (2002)

*Article 9, Securitization Transactions & the Bankruptcy Dynamic*, 9 AM.BANKR.L.REV. 287 (2001)

*The Technology-rich .com in Bankruptcy: The Debtor as Owner of Intellectual Property, Symposium Issue on Financing the Enterprises on the Internet*, 53 ME. L. REV. 362 (2001)

*Circumvention of the Bankruptcy Process: Institutionalization of Securitization,* 33 CONN.L.REV. (2001)

*Transition Losses in the Electric Power Market: A Challenge to the Premises Underlying the Arguments for Compensation*, 52 RUTGERS L. REV. 649 (2000)

*Asset Securitization: The Unsecured Creditor's Perspective*, 76 TEXAS L. REV. 595 (1998)

## Books & Book Chapters

BANKRUPTCY – CASES AND MATERIALS (6th ed.) (2016) (with M. Howard)

DEVELOPING PROFESSIONAL SKILLS – BANKRUPTCY (2016) (with M. Howard)

THE YEAR IN CONSUMER BANKRUPTCY – 2014 (published by the Amer. Bankr. Institute) (L.R. Lupica, ed.)

*Smaller Practices and Consumer Debt Issues under the United States Bankruptcy Code*, CONSUMER DEBT REPORT II REPORT OF FINDINGS AND RECOMMENDATIONS, (published by International Association of Restructuring, Insolvency and Bankruptcy Professionals, 2013)

*Recent First Circuit Developments in Consumer Bankruptcy*, AMERICAN COLLEGE OF BANKRUPTCY CIRCUIT REVIEW 2013/2014

BANKRUPTCY AND ITS IMPACT ON INTELLECTUAL PROPERTY – 2007 (published by the American Bankruptcy Institute) (L.R. Lupica, ed.)

## Grants Received

**Fulbright Commission,** Fulbright Senior Scholar, University of Melbourne (2018-2019)
**National Science Foundation, ~$260,000**
Improving the Lives of Consumers in Financial Distress (2014 – 2018)
**Arnold Foundation, $600,000**
Improving the Lives of Consumers in Financial Distress (2016 – 2018)
**Maine Economic Improvement Fund, $176,000**
Apps for Justice Project (2016 – 2017)
**American Bankruptcy Institute Endowment, $265,000**
Improving the Lives of Consumers in Financial Distress (2015 – 2018)
**Sears Consumer Protection and Education Fund, $25,000**
Improving the Lives of Consumers in Financial Distress (2016 – 2018)
**Abdul Latif Jameel Poverty Action Lab, $75,000**
Improving the Lives of Consumers in Financial Distress (2015)
**National Conference of Bankruptcy Judges Education Foundation, $26,000**
Improving the Lives of Consumers in Financial Distress (2014)
**Safra Center, Harvard University, $50,000**
Improving the Lives of Consumers in Financial Distress (2014)
**American Bankruptcy Institute Endowment, $300,000**
Consumer Bankruptcy Study (2011)
**National Conference of Bankruptcy Judges Education Foundation, $18,000**
Consumer Bankruptcy Study (2009)

## Honors, Awards and Appointments

**Principal Investigator**, The Apps for Justice Project, University of Maine (2016 – 2017)
**Co-Principal Investigator**, Financial Distress Research Study (with Greiner & Jimenez) (2013 – present)
**Hon. Wesley W. Steen Prize for Best Scholarly Article in Bankruptcy** (2012)
**Fellow, American College of Bankruptcy**, Class 23 (2012)
**Co-Reporter, ABI Task Force on Ethics Standards for Bankruptcy** (2011 to 2013)
**The Maine Law Foundation Professor of Law** (2007 to present)
**Reporter, Maine Task Force on Ethics 2000** (2005 to 2008)
**National Award for Innovation and Excellence in Teaching Professionalism**, ABA (2005)
**Faculty Senate Prize for Excellence in Scholarship,** Maine School of Law (2004)
**Glassman Scholar**, University of Maine School of Law (2001)
**First Place, Cape Elizabeth Education Foundation Spelling Bee** (2003 & 2004)
**Certificate of Completion, LE CORDON BLEU,** French Regional Cooking Paris, France (1989)
**Artist, Juried Art Show, Global Warming**, Museum of Encaustic Art, Santa Fe, NM (2017)
**Artist, Juried Art Show, Wax Stories II**, Niza Knoll Gallery, Denver, CO (2018)
**Artist, Juried Art Show, Synchronicity,** Sync Gallery, Denver, CO (2018)
**Artist, Juried Art Show,** Summer Art Market, Art Student League, Denver, CO (2018)
**Artist, Members' Gallery**, Museum of Encaustic Art, Santa Fe, New Mexico (2017 - 2018)

## Board Membership & Leadership Positions

**Board of Directors**, American Bankruptcy Institute (2014 -2017)
**Programming Committee,** National Conference of Bankruptcy Judges (2014)
**Education Committee**, First Circuit, American College of Bankruptcy (2012 - 2017)
**Advisory Board**, AMERICAN BANKRUPTCY INSTITUTE LAW REVIEW **(**2008 – 2017)
**Board of Directors**, Community Housing of Maine (1995 – 2006)
**University of Southern Maine,** Institutional Review Board (1995 – 2000)
**Dean of Faculty & Board of Directors**, American Board of Certification (2000 - 2003)

## Selected Presentations

***Access to Justice: Using Behavioral Economics & Technology***, AALS, San Diego, CA (2018)
***Access to Justice: Innovative Strategies***, Georgia State University College of Law, Atlanta, GA (2018)
***Innovations in Law Practice***, ABI Annual Spring Meeting, Washington, DC (2018).
***Access to Justice and Lawyers' Professional Responsibilities,*** University of Texas, Austin, TX (2017)
***Access to Justice Through Technology***, Microsoft & Kettering Foundation, Palo Alto, CA (2017)
***Apps for Justice: A Solution to the Problem that the Poor Pay More,*** Fordham Law School, NY, NY (2017)
***Securitizing Non-Performing Loans***, World Bank Symposium, Hanoi, Vietnam (2015)
***Access to Civil Justice***, Maine State Bar Association (2015)
***Celebrating Differences,*** Wells Fargo PRIDE Ally Event (with N. Lupica), Boston, MA (2015)
***Social Media and Legal Ethics***, ABI Winter Leadership Conference, CA (2014)
***Using Data to Maximize Impact on Vulnerable Populations***, Nat'l Legal Aid and Defenders (2014)
***The Problem with Pro se Litigants***, ABI Winter Leadership Conference (2013)
***Ethical Issues in Business Bankruptcy***, ABI NY Conference (2013)
***Too Poor to File***, National Association of Consumer Bankruptcy Attorneys, San Diego, CA (2012)
***The Mortgage Foreclosure Morass***, American College of Bankruptcy, Third Circuit Program (2012)
***The Government's Role in the Auto Bankruptcies***, National Federation of Municipal Analysts (2009)
***The Commercialization of Intellectual Property***, University College of Cork, Cork, Ireland (2008)
***Interdisciplinary Approaches to the Crisis of Over-indebtedness***, AALS/NCBJ Annual Meeting (2007)
***Consumer Finance and the Reinforcement of Class Structures***, Law & Society, Berlin, Germany (2007)
***Constitutional Principles,*** Southern Vermont College (2006)
***Legal Issues in Cyberspace***, 1999 Cyberposium, Harvard Business School, Cambridge, MA (1999)
***Intellectual Property in the Marketspace***, 1998 Cyberposium, Harvard Business School (1998)

## Selected Media Appearances, Interviews, Podcasts, Blog Posts & Op-Eds

***Congress Must Protect Working Families from Payday Predators***, THE HILL (2018)
***Sexual and Financial Predators Use Forced Arbitration to Hide Misconduct***, AMER. FOR FIN. REFORM (2017)
***Maine's Credit Unions and Community Banks Can Support Mainers' Day in Court,*** Lewiston Sun J. (2017)
***Project Launches to Test New Kind of Self-Help for Consumers***, Inside ARM (2017)
***How the affordable care act drove down personal bankruptcy,*** CONSUMER REPORTS (2017)
***The impact of the insurance mandate on personal bankruptcy***, KCBS San Francisco, WRVA (2017)
***Technology offers Solution to Unequal Access to Justice***, PORTLAND PRESS HERALD (2016)
**Zombie Debts,** Here & Now**,** WBUR (NPR Station), Meghna Chakrabarti (2015)
***The Costs of Access to the Consumer Bankruptcy System,*** Bloomberg Television, Lee Pacchia (2012)

***National Bankruptcy Association Honors Maine Professor Lupica,*** Feature Story, Mover of the Week, Dow Jones Bankruptcy News (2012)
***The Cost of Consumer Bankruptcy***, Maine Public Broadcasting (2010)
***Too Poor for Bankruptcy,*** Maine Public Broadcasting (2012)
***Cost of Access to the Consumer Bankruptcy System***, Podcast Interview, ABI Studios (2007)
***Consumers in Debt***, Television Interview, NBC Affiliate, Portland ME (2005)
***Bankruptcy Bill Targets Wrong People,*** PORTLAND PRESS HERALD (2005)
***Moral Values, Social Justice,*** PORTLAND PRESS HERALD, BANGOR DAILY NEWS (with Cullen Ryan) (2004)
***Bankruptcy Reform -- Bad Deal for Consumers,*** PORTLAND PRESS HERALD  (with T. Ward) (2001)
**Podcast Interviews with Judge Steven Rhodes** (Presiding Judge, Detroit Chapter 9 case), **Jake Halpern** (author, BAD PAPER**), Theresa Payton** (author, PRIVACY IN THE AGE OF BIG DATA) (as interviewer) (2014)
*Regularly interviewed by news media, including The New York Times, The Wall Street Journal, USA Today, The Portland Press Herald, Maine Biz, Maine Public Radio, Bloomberg Television, and other national and regional newspapers and publications* (1998 to present)


## Education

**Boston University School of Law, J.D. *magna cum laude*, 1987**
   Honors:
        Case & Note Editor, AMERICAN JOURNAL OF LAW AND MEDICINE
        G. Joseph Tauro Scholar
        Paul J. Liacos Distinguished Scholar
        Edward F. Hennessey Scholar
        American Jurisprudence Award in Property

**Cornell University, B.S. 1981**
College of Human Ecology
Major: Consumer Economics

## Bar Admission

New York State (1988)
Federal District Court, Southern District of New York (1989)
Federal District Court, Eastern District of New York (1989)

# APPENDIX D

**JOHN A. E. POTTOW**
University of Michigan Law School
625 South State Street
Ann Arbor, MI 48109
(734) 647-3736
pottow@umich.edu

# WORK EXPERIENCE

2003 - Present **UNIVERSITY OF MICHIGAN LAW SCHOOL** **ANN ARBOR, MI**
John Philip Dawson Collegiate Professor of Law.  Chaired faculty member specializing in commercial law and contracts.  L. Hart Wright Teaching Award.

2008 (Fall) **HARVARD LAW SCHOOL** **CAMBRIDGE, MA**
Visiting Professor of Law.  Taught first-year contracts section and specialty seminar in international bankruptcy.

2002 - 2003 **WEIL, GOTSHAL & MANGES LLP** **NEW YORK, NY**
Of counsel legal consultant to nation's premier corporate bankruptcy law firm.  Worked on Enron, Worldcom, and other multi-billion-dollar business reorganizations.

1999 - 2002 **HILL & BARLOW, A PROFESSIONAL CORPORATION** **BOSTON, MA**
Associate in litigation department.  Drafted successful lead appellate brief for $250 million, 69-party bankruptcy litigation before the U.S. Court of Appeals, First Circuit.  Lead counsel for successful asylum trial involving Afghan female terrorized by *Taliban*.

1998 - 1999 **THE RT. HON. BEVERLEY McLACHLIN** **OTTAWA, ON**
Law clerk, Supreme Court of Canada.

1997 - 1998 **THE HON. GUIDO CALABRESI** **NEW HAVEN, CT**
Law clerk, U.S. Court of Appeals for the Second Circuit.

1993 - 1994 **EOS PARTNERS, LP** **NEW YORK, NY**
Chief Financial Officer of a private equity hedge fund that manages over $400 million.

# EDUCATION

1994 - 1997 **HARVARD LAW SCHOOL** **CAMBRIDGE, MA**
J.D. degree, *magna cum laude*, top 1% of class (approx.).  National Scholar.  Treasurer, *Harvard Law Review*.  Research assistant to Prof. Arthur R. Miller.

1989 - 1993 **HARVARD COLLEGE** **CAMBRIDGE, MA**
A.B. in Psychology, *summa cum laude, Phi Beta Kappa*.  Awarded National Entrance Scholarship, John Harvard Annual Scholarships, Thomas Hoopes Prize for Undergraduate Research, Gordon Allport Prize in Psychology for original empirical investigation.

## SELECTED PUBLICATIONS

*A New Approach to Executory Contracts*, __ TEX. L. REV. __ (Forthcoming 2018).  Proposes new approach to seemingly intractable "executoriness" debate in bankruptcy premised upon proper bankruptcy treatment of "non-executory" contracts to enable reduction of perverse litigation incentives.

*Fiduciary Duties in Bankruptcy and Insolvency*, in THE OXFORD HANDBOOK OF FIDUCIARY LAW , edited by E. J. Criddle, P. B Biller, and R. H. Sitkoff, eds.) (Forthcoming 2018).  Presents theory of insolvency law's fiduciary duties as grounded on mediating "internal" conflicts of loyalty amongst heterogeneous creditors.

*International Insolvency Law's Cross-Roads and the New Modularity,* in UNITED NATIONS 50TH ANNIVERSARY WORLD CONGRESS COLLECTION (Caroline Nicholas, ed.) (2017).  Suggests international insolvency law is using "modularity" to disaggregate (and customize) new instruments of cross-border cooperation.

*Rethinking Criminal Contempt in the Bankruptcy Courts*, 92 AM. BANKR. L.J. 311-74 (2017) (Jason S. Levin, student co-author).  Reconstructs history of restriction on contempt authority of bankruptcy judges and argues neither statutory nor constitutional constraints correctly imposed are well reasoned.

*What Bankruptcy Law Can and Cannot Do for Puerto Rico,* Rev. Jur. UPR 85, no. 3 (2016): 689-704.  Presents and critiques options available under U.S. Bankruptcy Code and proposed amendments to federal and commonwealth law.

*Implementing Symmetric Treatment of Financial Contracts in Bankruptcy and Bank Resolution*, 10 BROOK. J. CORP. FIN. & COMMC'L. L. 155-82 (2015) (Edward J. Janger, co-author).  Proposes Bankruptcy Code modifications that could mimic an FDIC-style "short-stay" approach to protect derivatives contracts from closeout netting yet at the same time preserve counterparties' benefits of their bargains through backstop credit enhancements, such as debtor-in-possession financing.

*Two Cheers for Universalism:* Nortel*'s Nifty Novelty*, in ANNUAL REVIEW OF INSOLVENCY LAW, 333-68 (Janis P. Sarra & Barbara Romaine, eds.) (2015).  Contends seminal *Nortel Networks* cross-border insolvency proceedings' "modified pro rata" distribution will further advance normatively desirable universalist approach to international insolvency.

*Book Review: Sovereign Defaults Before International Courts and Tribunals,* 30 BANKING & FIN. L. REV. 395-400 (2015).  (Emily Iversen, student co-author.)  Reviews Michael Waibel's recent manuscript on the history of sovereign debt legal disputes.

*Beyond Carve-Outs and Toward Reliance: A Normative Framework for Cross-Border Insolvency Choice of Law*, 9 BROOK. J. CORP. FIN. & COMMC'L. L. 197-220 (2014).  Proposes new approach based on actual, defensive litigant reliance to cross-border insolvency choice of law disputes.

THE LAW OF DEBTORS AND CREDITORS *(7th edition) (Aspen, 2014).* (Elizabeth Warren, Jay Lawrence Westbrook, and Katherine Porter, co-authors) (leading law school textbook on bankruptcy law).  Covers both consumer and business bankruptcy law.

*The Long-Term Financial Burden of Breast Cancer: experiences of a diverse cohort of survivors identified through population-based registries.* J. OF CLIN. ONC., 2014 Apr 20;32(12):1269-76. (Co-author listing: R. Jagsi, J.A.E. Pottow, K.A. Griffith, A.S. Hamilton, J.J. Graff, S.J. Katz, T. Hawley.) Reports empirical findings of long-term financial distress among breast cancer survivors.

*Mitigating the Problem of Vulture Holdout: International Certification Boards for Sovereign Debt Restructurings.* 49 TEX. INT'L L. J. 221-43 (2014). Challenges contractualist solutions to holdout problem in sovereign debt restructurings and proposes new soft-law approach of international "certification boards."

*A Presumptively Better Approach to Arbitrability,* 53 CAN. BUS. L.J. 323-59 (2013) (Jacob Brege and Tara Hawley, student co-authors). Compares approaches to the "arbitrability" problem in the United States and Canada and proposes new normative and doctrinal framework based on consent.

*Financial Literacy or Financial Castigation?*, 51 CAN. BUS. L.J. 394-406 (2011). Offers detailed critique of popular financial literacy/education campaigns in consumer finance law reform; offers alternative proposal of emotionally terrorizing over-indebted consumers with horror stories deliberately designed to provoke visceral response.

*Ability to Pay,* 8 BERKELEY BUS. L. J. 175-208 (2011). Analyzes sleeper provision of Dodd-Frank financial reform requiring lenders to gauge debtors' repayment ability as an affirmatively enforceable duty and compares its historical and international pedigree before offering (supportive) critique.

*Malpractice Suits and Physician Apologies in Cancer Care*, 7 J. ONCOLOGY PRAC. 389-93 (2011). (Co-authored with Eugene Chung, Jill R. Horwitz, and Reshma Jagsi.) Analyzes "I'm sorry" programs' effect on and interaction with physician malpractice litigation.

*A New Role for Secondary Proceedings in International Bankruptcies*, 46 TEX. INT'L L. J. 579-99 (2011). Proposes "synthetic" approach to secondary bankruptcy proceedings as method to combat local law priority problems and suggests design of an international priority registry.

*The Rise in Elder Bankruptcy Filings and the Failure of U.S. Bankruptcy Law*, 19 ELDER L. J. 219-58 (2011). Presents new data both linking dramatic rise in elder American bankruptcies to credit card use and suggesting casual influences; proposes reforms.

*Interpreting Data: A Reply to Professor Pardo,* 83 AMER. BANKR. L. J. 47-62 (2009). (Co-authored with Robert M. Lawless, Angela K. Littwin, Katherine M. Porter, Deborah K. Thorne, and Elizabeth Warren.) Responds to methodological and conceptual critiques of Consumer Bankruptcy Project.

*Did Bankruptcy Reform Fail? An Empirical Study of Consumer Debtors,* 82 AMER. BANKR. L. J. 349-406 (2008). (Co-authored with Robert M. Lawless, Angela K. Littwin, Kathleen M. Porter, Deborah K. Thorne, and Elizabeth Warren.) Reports findings of original dataset that casts doubt whether 2005 bankruptcy amendments drove high-income debtors from bankruptcy courts.

*The Myth (and Realities) of Forum Shopping in Transnational Insolvency,* 32 BROOK. J. OF INT'L LAW, 785-817 (2007). Debunks myth that "universalist" system of regulating cross-border insolvency would foster forum shopping and outlines case that forum shopping under "territorialist" system may be much worse.

*A U.S. Perspective on the Contextual Terrain of Political Economy in Insolvency Reform, in* CANADIAN BANKRUPTCY AND INSOLVENCY LAW: BILL C-55, STATUTE C.47 AND BEYOND 373-95 (S. Ben-Ishai & T. Duggan eds., 2007).  Compares political economy behind recent legislative reforms to consumer bankruptcy laws in United States and Canada and constructs theory to explain counterintuitive result of Canadian law being more debtor-friendly.  Book prompted a symposium of comparative commercial law at University of Toronto in October 2007 with a panel convened specifically to respond to this chapter.

*The Maxwell Case, in* BANKRUPTCY LAW STORIES 221-44 (Robert K. Rasmussen ed., 2007).  Probes the "back story" and personality behind the famous bankruptcy case and analyzes the jurisprudential significance to cross-border insolvency regulation.

*Private Liability For Reckless Consumer Lending*, 2007 U. ILL. L. REV. 405-66.  Proposes new legal remedies to intervene in dysfunctional consumer credit market based on private law, ex post regulation, as a new mechanism of bankruptcy reform.

*The Nondischargeability of Student Loans in Personal Bankruptcy Proceedings: In Search of a Theory*, 44 CAN. BUS. L.J. 245-78 (2006).  Explores potential theoretical bases for extraordinary bankruptcy treatment of nondischargeability for student loans.  Examines available comparative and empirical research in critiquing theories and criticizing U.S. approach.

*The Totality of the Circumstances of the Debtor's Financial Situation in a Post-Means Test World: Trying to Bridge the Wedoff/Culhane&White Divide*, 71 MO. L. REV. 1053-67 (no. 4, 2006).  Confronts statutory and policy debate regarding equitable dismissal of debtors from bankruptcy and proposes new asset-based approach.

*Greed and Pride in International Bankruptcy:* 104 MICH. L. REV. 1899-1950 (2006).  Analyzes problem of "local interests" in cross-border insolvency proceedings.  Proposes first-best theoretical model for assuaging these interests as well as more pragmatically viable alternative.  Awarded 2005 prize by International Insolvency Institute.

*On the Stickiness of Default Rules:* 33 FLA. STATE L. REV. 651-82 (2005).  (Co-authored with Omri Ben-Shahar.)  Proposes a new model to explain the persistence of defaults (legal rules or contract terms) in commercial contracts.  Employs a comparative, cross-jurisdictional methodology to explore "economically surprising" stickiness (*i.e.*, avoidance of non-default contract terms with positive economic value).

*Un primer estudio de los cambios de la ley concursal estadounidense de 2005*, REVISTA DE DERECHO CONCURSAL Y PARACONCURSAL, 355-364 (Vol. 3, 2005).  Provides overview for foreign scholars and practitioners on highlights of the 2005 U.S. Bankruptcy Code changes.

*Procedural Incrementalism: A Model for International Bankruptcy:* 45 V. J. INT'L L. 935-1015 (2005).  Examines international efforts to draft protocols, treaties, and model laws that cover cross-border insolvency proceedings.  Proposes model (animated by choice of law theory and success of UNCITRAL's model law) of incremental reform targeted at procedural laws.

# SELECTED PRESENTATIONS

| | |
|---|---|
| *Brooklyn, 3/18* | Invited presenter Decision Making and Legitimacy in Public Bankruptcies (Prof. Edward Janger, Convenor). |
| Austin, 2/18 | Convenor (and presenter) of Festschrift for Professor Jay Lawrence Westbrook, possibly the largest U.S. academic bankruptcy conference ever assembled. |
| *Cambridge, 11/17* | Invited presenter at Harvard Fiduciary Duties Conference (Prof. Robert Sitkoff, Convenor). |
| *Las Vegas, 10/17* | Invited Keynote Presenter, National Conference of Bankruptcy Judges Annual Conference (Hon. Mel Hoffman, Convenor). |
| *Philadelphia, 10/17* | Invited guest by University of Pennsylvani Law Review's  Bankruptcy New Frontiers Symposium (Prof. David Skeel, Convenor). |
| *Ottawa, 8/17* | Invited presenter at Carrying Debt to the Grave Conference, Carleton University (Prof. Saul Schwartz, Convenor). |
| *Vienna, 7/17* | Invited presenter at UNCITRAL 50th Anniversary World Congress (Caroline Nicholas, Esq., Convenor). |
| *New Orleans, 4/17* | Invited Panelist for ABA Spring Business Committee Meeting (Andrew Troop, Esq., Convenor). |
| *Detroit, 4*/17 | Invited moderator for delegation from Court of Justice for the European Union on the Public Bankruptcy of Detroit (Prof. Daniel Halberstam, Convenor). |
| *Berlin, 4/17* | Invited international presenter on impact of "Brexit" on cross-border insolvency law (Prof. Christoph Paulus, Convenor.) |
| *Miami, 3/17* | Invited presenter at Offshore Alert Conference on insolvency proceedings (Mr. David Marchant, Convenor). |
| *Philadelphia, 2/17* | Invited academic participant at Secured Transactions Coordination Conference: Advances, Global Reforms (Prof. Charles Mooney, Convenor). |
| *San Francisco, 1/17* | Invited presenter at Bankruptcy Law Section of Association of American Law Schools (Prof. Anthony Casey, Convenor). |
| *San Francisco, 10/16* | Invited speaker at plenary session at National Conference of Bankruptcy Judges – American Bankruptcy Institute Joint Meeting (Hons. Colleen Brown and Mel Hoffman, Convenors). |
| New York, 10/16 | Invited commentator at American Bankruptcy Institute – Brooklyn Law School conference on Public Insolvency (Prof. Edward Janger, Convenor). |

| | |
|---|---|
| *New York, 9/16* | Invited panelist at small-table New York University Bankruptcy Priorities Conference (Prof. Barry Adler, Convenor). |
| *Tokyo, 6/16* | Invited presenter at International Insolvency Institute conference on multinational corporate group insolvency (Hon. James Peck, Convenor.) |
| *Durham, 5/16* | Invited reviewer at conference focusing on minority legal academic job applicants (Prof. Dorothy Brown, Convenor.) |
| *Chicago, 4/16* | Invited panelist of Supreme Court litigators for American Bar Association Section of Litigation Annual Conference (Hon. John Hoffman, Convenor.) |
| *Washington*, 3/16 | Invited presenter at Law/Business Roundtable on Ethics of Bankruptcy (Profs. Ralph Brubaker, John Hasnas, and Heidi Hurd, Convenors.) |
| *San Juan, 2/16* | Invited keynote speaker at University of Puerto Rico School of Law's Conference on Financial Crisis (Dean Vivian Neptune Rivera, Convenor.) |
| *Vancouver*, 2/16 | Invited presented at Annual Review of Insolvency Law (Prof. Janis Sarra, Convenor.) |
| *Washington*, 1/16 | Invited presenter at Inaugural "DebtCon" Conference on Sovereign Debt (Profs. Anna Gelpern and Mitu Gulati, Convenors.) |
| *Napoli, 6/15* | Invited presenter at Annual Conference of International Insolvency Institute (E. Bruce Leonard, Esq., Convenor.) |
| *Lexington, 6/15* | Invited keynote speaker at 15th Annual Judge Joe Lee Biannual Bankruptcy Conference (Kevin Bucknam, Esq., Convenor.) |
| *Cleveland, 5/15* | Invited keynote speaker at O'Neill Bankruptcy Bankruptcy Conference (Hon. Mary Ann Whipple, Convenor.) |
| *Chicago, 4/15* | Invited presenter at National Association of Consumer Bankruptcy Attorneys Annual Meeting (Henry Sommer, Esq., Convenor.) |
| *London, 3/15* | Invited panelist at Sovereign Debt Conference (Prof. Charles Mooney, Convenor.) |
| *Brooklyn, 3/15* | Invited presenter at Financial Instruments and Insolvency Conference (Prof. Edward Janger, Convenor.) |
| *New York, 11/14* | Invited Senior Reviewer and Commentator at Junior Bankruptcy Scholars Conference (Prof. Edward Janger, Convenor.) |
| *New York, 9/14* | Invited presenter at Seligson-NYU Conference. (Prof. Barry Adler, Convenor.) |
| *Harbor Springs, 8/14* | Invited keynote speaker at Federal Bar Association Annual Meeting. (Hon. Scott Dales, Convenor.) |

| | |
|---|---|
| *Los Angeles, 7/14* | Invited keynote panelist for First Annual James T. King Bankruptcy Symposium Conference.<br>(Jon Hayes, Esq., Convenor.) |
| *Brooklyn, 3/14* | Invited presenter at "Choice of Law in Cross-Border Bankruptcy Cases" at Brooklyn Law School.<br>(Prof. Edward Janger, Convenor.) |
| *Vancouver, 2/14* | Invited presenter on U.S. municipal bankruptcy at Annual Review of Insolvency Law.<br>(Prof. Janis Sarra, Convenor.) |
| *Cleveland, 11/13* | Invited keynote speaker at "Emerging Trends in Turnarounds and Insolvencies" sponsored by CMBA and TMA.<br>(Eric Goodman, Esq., Convenor.) |
| *New York, 10/13* | Invited presenter at Fordham Law School, Urban Law Journal Cooper-Walsh Colloquium "Legal Liabilities and Municipal Financial Distress."<br>(Prof. Susan Block-Lieb, Convenor). |
| *Washington, 10/13* | Invited presenter at Congressional Black Caucus on Detroit Bankruptcy.<br>(Hon. John Conyers, Convenor.) |
| *Detroit, 9/13* | Invited moderator at "Shifting Gears in Restructuring: From Automotive to Healthcare and Government," Turnaround Management Association.<br>(Paul Hage, Esq. Convenor.) |
| *Grand Rapids, 4/13* | Invited keynote speaker at "Eurozone in Crisis."<br>(Patrick Mears, Esq., Convenor, for cosponsors World Affairs Conference and Turnaround Management Association). |
| *Austin, 2/13* | Invited presenter at "The Nation State and Its Banks" symposium.<br>(Prof. Henry Hu, Convenor.) |
| *Paris, 6/12* | Inaugural faculty for "NextGen" training school for upcoming bankruptcy professionals from around the world.<br>(Prof. B. Wessels, Mr. B. Leonard, Esq., Convenors.) |
| *Traverse City, 6/12* | Invited keynote speaker at ABI Central States (Regional) Annual Conference.<br>(Hon. Marcy McIvor, Convenor.) |
| *Palm Springs, 12/11* | Invited presenter on cross-border insolvencies at ABI Annual Leadership Conference.<br>(Mr. J. Good, Convenor.) |
| *Toronto, 10/11* | Invited presenter at University of Toronto Legal Theory Workshop/ Annual Commercial Law Conference.<br>(Prof. J. Ziegel, Convenor.) |
| *Berkeley, 03/11* | Invited presenter at Financial Regulatory Reform: Dodd-Frank and |

7

|  |  |
|---|---|
| | Beyond Conference.<br>(Prof. Eric Talley, Berkeley, Convenor.) |
| *Toronto, 10/10* | Invited presenter at 40th Annual Commercial Law Conference.<br>(Prof. J. Ziegel, University of Toronto, Convenor.) |
| *Austin, 05/10* | Invited presenter at Bankruptcy Priorities Conference.<br>(Prof. Jay Westbrook, UT-Austin, Convenor.) |
| *Paris, 03/10* | Invited presenter at Fondation pour le droit continental Conference on Comparative Business Law.<br>(Hon. Jean-Marc Baïsus, Convenor.) |
| *San Diego, 5/09* | Invited Selection Committee Chair (Bankruptcy) for American Law and Economics Association annual meeting.<br>(Prof. Michelle White, Univ. of San Diego, President.) |
| *Cambridge, 11/08* | Invited presenter at Harvard Law School Faculty Workshop.<br>(Prof. Rob Sitkoff, Convenor.) |
| *Champaign, 5/08* | Invited distinguished participant at Interdisciplinary Bankruptcy Conference.   (Prof. Ralph Brubaker, Univ. of Illinois, Convenor.) |
| *Charlottesville, 2/08* | Invited presenter at consumer credit conference.<br>(Prof. Richard Hynes, Univ. of Virginia, Convenor). |
| *New York, 11/07* | Invited commentator at Conference on Empirical Legal Studies.<br>(Prof. Theodore Eisenberg, Cornell, Convenor.) |
| *Atlanta, 09/07* | Invited presenter at Emory Law School Faculty Workshop.<br>(Prof. Fred Tung, Emory, Convenor.) |
| *New York, 10/06* | Invited presenter at Bankruptcy in the Global Village II: The Second Decade.<br>(Prof. Edward Janger, Brooklyn Law School, Convenor.) |
| *Toronto, 09/06* | Invited presenter at Canadian Law & Economics Association Annual Meeting.<br>(Prof. Edward Iacobucci, Univ. of Toronto, Convenor.) |
| *Berkeley, 05/06* | Invited panel chair at American Law & Economics Association Annual Meeting.<br>(Prof. Daniel Rubinfeld, Berkeley, Convenor.) |
| *Cambridge, 04/06* | Invited presenter at Realities in Commercial Law.<br>(Profs. Elizabeth Warren, Harvard, and Jay Westbrook, Univ. of Texas, Convenors.) |
| *Chicago, 04/06* | Invited presenter at University of Illinois bankruptcy conference.<br>(Prof. Charles Tabb, Univ. of Illinois, Convenor.) |
| *Columbia, MO, 02/06* | Invited presenter at conference on new BAPCPA legislation.<br>(Prof. Michelle Cecil, Univ. of Missouri, Convenor.) |

*Toronto, 10/05*        Invited presenter at 35th Annual Commercial Law Conference.
                        (Prof. Jacob Ziegel, Univ. of Toronto, Convenor.)

*Palo Alto, 04/05*      Invited presenter at Stanford Law School Faculty Workshop.
                        (Prof. Mariano-Florentino Cuellar, Stanford, Convenor.)

*Sydney, 03/05*         Invited presenter at Quadrennial INSOL Academic Conference.
                        (Prof. Ian Fletcher, Univ. College, London, Convenor.)

## MISCELLANEOUS

Licensed in two countries to practice law (Canada and United States).  Successfully litigated constitutional bankruptcy matters before U.S. Supreme Court, including as oralist.   United States Delegate to United Nations UNCITRAL Working Group V (Insolvency).  Merit Selection Committee for Bankruptcy Judges (Sixth Circuit).  Presented expert testimony to Congress on bankruptcy laws.  Commissioned to offer legal opinion on HAMP/TARP program by Congressional Oversight Panel.  Expert witness in several commercial litigations and policy consultant to various governments pursuing bankruptcy law reform.  Requested as mediator for public debt restructuring negotiations.  Member of American College of Bankruptcy and International Insolvency Institute.  Recipient of Pro Bono Service Award from U.S. District Court, Eastern District of Michigan.  Co-founded bankruptcy blog: www.creditslips.org. Frequent media commentator (BBC, CNN, NPR, etc.).  Sabbatical at Brasenose College, Oxford, Spring 2014.  Languages include French and American Sign Language.