**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

JAY ALIX,

                *Plaintiff,*

       v.

MCKINSEY & CO., INC.; MCKINSEY
HOLDINGS, INC.; MCKINSEY &
COMPANY INC. UNITED STATES;
MCKINSEY RECOVERY &
TRANSFORMATION SERVICES U.S.,
LLC; DOMINIC BARTON; KEVIN
CARMODY; JON GARCIA; SETH
GOLDSTROM; ALISON PROSHAN;
ROBERT STERNFELS; and JARED
YERIAN,

                *Defendants.*

Case No. 18-cv-04141 (JMF)

**ORAL ARGUMENT REQUESTED**

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS THE AMENDED COMPLAINT**

Faith E. Gay
Jennifer M. Selendy
David S. Flugman
Nicholas J. Klenow
SELENDY & GAY PLLC
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 390-9000

Robert J. Cleary
Mark D. Harris
Brian S. Rosen
Jordan B. Leader
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000

*Attorneys for Defendants McKinsey & Co.,
Inc.; McKinsey Holdings, Inc.; McKinsey &
Company Inc. United States; McKinsey
Recovery & Transformation Services U.S.,
LLC; Dominic Barton; Kevin Carmody; Jon
Garcia; Seth Goldstrom; Alison Proshan; and
Robert Sternfels*

Catherine L. Redlich
DRISCOLL & REDLICH
110 West 40th Street, Suite 1900
New York, New York 10018
Telephone: (212) 986-4030

*Attorney for Defendant Dominic Barton*

Richard A. Sauber
Ariel N. Lavinbuk
Michael L. Waldman
Lukman Azeez
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER, & SAUBER LLP
1801 K Street, NW, Suite 411L
Washington, D.C. 20006
Telephone: (202) 775-4500

*Attorneys for Defendants Kevin Carmody, Jon Garcia, Alison Proshan, and Robert Sternfels*

Reid M. Figel
Bradley E. Oppenheimer
Robert C. Klipper
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK P.L.L.C.
1615 M Street, NW, Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7968

*Attorney for Defendant Seth Goldstrom*

Micah Marcus
Christopher Dean
McDONALD HOPKINS LLP
300 North LaSalle Street, Suite 1400
Chicago, Illinois 60654
Telephone: (312) 280-0111

*Attorneys for Defendant Jared Yerian*

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND .................................................................................. 6

ARGUMENT ......................................................................................................... 14

I.      ALIX FAILS TO PLEAD ANY RICO CLAIM (COUNTS 1-4).................................. 16

      A.      Alix Fails to Plead Proximate Causation. ................................................. 16

      B.      Alix Fails to Plead Actual Causation. ...................................................... 23

      C.      Alix Fails to Plead Any RICO Predicate Acts Against the Corporate Defendants. .......................................................................................... 27

            1.      Alix Fails to Plead the Duty to Disclose Required to State a Claim Based on Fraudulent Omission. ...................................................... 28

            2.      Alix Fails to Allege Scienter Properly. ......................................... 33

            3.      Alix's Fraud-Based Predicate Acts Fail for Additional Reasons............... 38

                  a.      Alix Fails to Plead Mail Fraud or Wire Fraud. ............................. 38

                  b.      Alix Fails to Plead Bankruptcy Fraud or Bribery. ........................ 39

                  c.      Alix Fails to Plead Inducement to Violate 18 U.S.C. § 2314.......................................................................................... 40

            4.      Alix Also Fails to Plead Any Non-Fraud-Based Predicate Acts. ............. 41

                  a.      Alix Fails to Plead Obstruction of Justice or Witness Tampering. .................................................................................... 41

                  b.      Alix Fails to Plead Money Laundering. ......................................... 42

      D.      Alix Fails to Plead Any Racketeering Acts by Any Individual Defendant. .......... 43

            1.      There is No Claim for Aiding and Abetting a RICO Violation. ............... 44

            2.      Alix Fails to Plead Primary Liability Against Any Individual. ................. 45

                  a.      Dominic Barton....................................................................... 47

                  b.      Kevin Carmody ....................................................................... 48

i

c.     Jon Garcia ............................................................................. 50

d.     Seth Goldstrom ..................................................................... 51

e.     Alison Proshan ...................................................................... 54

f.     Robert Sternfels .................................................................... 55

g.     Jared Yerian ......................................................................... 56

E.     Alix Fails to Plead a RICO Enterprise Against the Corporate Defendants. .......... 57

F.     Alix Fails to Plead that Any of the Individual Defendants Conducted or Participated in the Conduct of a RICO Enterprise. ................................. 60

G.     Alix Fails to Plead a RICO Conspiracy Under Section 1962(d). ........................ 65

H.     Alix's RICO Claims Are Barred, in Substantial Part, by the Four-Year RICO Statute of Limitations. ................................................................. 67

II.     THE STATE LAW CLAIMS FAIL (COUNTS 5-7). ........................................ 70

A.     Alix's Contract-Based Claims Fail (Counts 5 and 6). ........................................ 70

B.     Alix's Tortious Interference Claim Fails (Count 7)............................................. 72

CONCLUSION .......................................................................................................... 75

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*17th St. Assocs., LLP v. Markel Int'l Ins. Co.*,
    373 F. Supp. 2d 584 (E.D. Va. 2005) ............................................................. 73

*4 K & D Corp. v. Concierge Auctions, LLC*,
    2 F. Supp. 3d 525 (S.D.N.Y. 2014).......................................................... 22, 66

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*,
    731 F.2d 112 (2d Cir. 1984)..................................................................... 27

*ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*,
    957 F. Supp. 1308 (S.D.N.Y. 1997)........................................................ 36

*Air et Chaleur, S.A. v. Janeway*,
    757 F.2d 489 (2d Cir. 1985)..................................................................... 72

*Amsterdam Tobacco Inc. v. Philip Morris Inc.*,
    107 F. Supp. 2d 210 (S.D.N.Y. 2000)..................................................... 64

*Anatian v. Coutts Bank (Switz.) Ltd.*,
    193 F.3d 85 (2d Cir. 1999)....................................................................... 57

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006)......................................................................... *passim*

*Aqua Master Enters., Inc. v. Anderson*,
    No. 16-cv-6776 (LGS), 2018 WL 1009264 (S.D.N.Y. Jan. 30, 2018)............................ 73

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................... 15, 48, 53

*Astor Holdings v. Roski*,
    325 F. Supp. 2d 251 (S.D.N.Y. 2003)..................................................... 74

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*,
    No. 03-cv-1537 (MBM), 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003)........................ 71

*Baron v. Rabinovici*,
    No. 05-cv-110 (TCP), 2006 WL 1318426 (E.D.N.Y. May 12, 2006).............................. 39

*Baumer v. Pachl*,
    8 F.3d 1341 (9th Cir. 1993) .................................................................... 62

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................... 14, 15, 48, 49

*Bennett v. U.S. Tr. Co.*,
   770 F.2d 308 (2d Cir. 1985).......................................................................... 57

*Bigsby v. Barclays Capital Real Estate, Inc.*,
   170 F. Supp. 3d 568 (S.D.N.Y. 2016)...................................................... 34, 50

*Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*,
   832 F. Supp 585 (E.D.N.Y. 1993) ............................................................ 62, 63

*Bridge v. Phx. Bond & Indem. Co.*,
   553 U.S. 639 (2008).......................................................................................... 18

*Burke v. Dowling*,
   944 F. Supp. 1036 (E.D.N.Y. 1995) .............................................................. 39

*Central Bank of Denver v. First Interstate Bank*,
   511 U.S. 164 (1994)..................................................................................... 44, 45

*Charmac Props., Inc. v. Pike*,
   No. 86-cv-7919, 1993 WL 427137 (S.D.N.Y. Oct. 19, 1993)......................... 45

*City of Phila. v. Fleming Cos., Inc.*,
   264 F.2d 1245 (10th Cir. 2001) .................................................................... 46

*City of Roseville Emps. Ret. Sys. v. Nokia Corp.*,
   No. 10-cv-00967 (GBD), 2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011) ......... 28

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)................................................................................ 25, 26, 27

*Crab House of Douglaston Inc. v. Newsday, Inc.*,
   418 F. Supp. 2d 193 (E.D.N.Y. 2006) ...................................................... 60, 62

*Crawford v. Franklin Credit Mgmt.*,
   758 F.3d 473 (2d Cir. 2014)............................................................................. 65

*Cruz v. FXDirectDealer, LLC*,
   720 F.3d 115 (2d Cir. 2013)................................................................ 16, 58, 60

*Dalton v. Lee Publ'ns, Inc.*,
   No. 08-cv-1072, 2011 WL 1045107 (S.D. Cal. Mar. 22, 2011) ...................... 35

*DeFalco v. Bernas*,
   244 F.3d 286 (2d Cir. 2001).......................................................................... 16

*Dep't of Econ. Dev. v. Arthur Andersen & Co.*,
    924 F. Supp. 449 (S.D.N.Y. 1996)............................................................................ 44, 45

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010)...................................................................................... 9, 15

*Discon, Inc. v. NYNEX Corp.*,
    93 F.3d 1055 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998)............... 65

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
    822 F.2d 1242 (2d Cir. 1987).................................................................................... 43, 45

*DLJ Mortg. Capital v. Kontogiannis*,
    594 F. Supp. 2d 308 (E.D.N.Y. 2009) ........................................................................... 37

*Doe v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016)............................................................................................ 24

*Estate of Gottdiener v. Sater*,
    35 F. Supp. 3d 386 (S.D.N.Y. 2014)............................................................................. 45

*Ferri v. Berkowitz*,
    678 F. Supp. 2d 66 (E.D.N.Y. 2009) ............................................................................ 39

*Fezzani v. Bear Stearns & Co., Inc.*,
    592 F. Supp. 2d 410 (S.D.N.Y. 2008)........................................................................... 48

*First Capital Asset Mgmt. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004)................................................................................... *passim*

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994).......................................................................................... 23

*Globalnet Financial.com, Inc. v. Frank Crystal & Co.*,
    449 F.3d 377 (2d Cir. 2006)........................................................................................ 73

*Gonzales v. Parks*,
    830 F.2d 1033 (9th Cir. 1987) .................................................................................... 74

*Grauberger v. St. Francis Hosp.*,
    169 F. Supp. 2d 1172 (N.D. Cal. 2001) ...................................................................... 35

*Grewal v. Cuneo*,
    No. 13-cv-6836 (RA), 2015 WL 4103660 (S.D.N.Y. July 7, 2015)................................ 42

*Handeen v. Lamaire*,
    112 F.3d 1339 (8th Cir. 1997) .................................................................................... 60

*Hannex Corp. v. GMI Inc.*,
　　140 F.3d 194 (2d Cir. 1998)........................................................................... 73

*Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*,
　　955 F. Supp. 248 (S.D.N.Y. 1997)................................................................... 45

*Hecht v. Commerce Clearing House, Inc.*,
　　897 F.2d 21 (2d Cir. 1990).............................................................................. 65

*Hemi Grp. LLC v. City of N.Y.*,
　　559 U.S. 1 (2010)............................................................................... 18, 19, 22

*Holloway v. Household Auto. Fin. Corp.*,
　　227 B.R. 501 (N.D. Ill. 1998) ......................................................................... 74

*Holmes v. Secs. Inv'r Prot. Corp.*,
　　503 U.S. 258 (1992)................................................................................ *passim*

*House of Eur. Funding I, Ltd. v. Wells Fargo Bank, N.A.*,
　　No. 13-cv-519 (RJS), 2014 WL 1383703 (S.D.N.Y. Mar. 31, 2014).............. 72

*In re Advanta Corp. Secs. Litig.*,
　　180 F.3d 525 (3d Cir 1999)............................................................................. 46

*In re Agape Litig.*,
　　681 F. Supp. 2d 352 (E.D.N.Y. 2010) ............................................................ 64

*In re Criimi Mae, Inc. Secs. Litig.*,
　　94 F. Supp. 2d 652 (D. Md. 2000) .................................................................. 46

*In re E. Equip. & Servs. Corp.*,
　　236 F.3d 117 (2d Cir. 2001)............................................................................ 74

*In re Enron Corp.*,
　　No. 01-16034 (AJG), 2002 WL 32034346 (Bankr. S.D.N.Y. May 23, 2002) ........... 17, 30

*In re eToys, Inc.*,
　　331 B.R. 176 (Bankr. D. Del. 2005) ............................................................... 42

*In re Express Scripts Holding Co. Secs. Litig.*, No. 16-cv-3338 (ER),
　　2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017).................................................... 28

*In re Fibermark*,
　　No. 04-10463, 2006 WL 723495 (D. Vt. Mar. 11, 2006)................................. 30

*In re GM LLC Ignition Switch Litig.*,
　　No. 14-md-2543 (JMF), 2016 WL 3920353 (S.D.N.Y. July 15, 2016). ........ 57, 58, 59, 60

*In re Integrated Res. Real Estate Ltd. P'ships Secs. Litig.*,
    851 F. Supp. 556 (S.D.N.Y. 1994)..................................................................... 67

*In re Leslie Fay Cos., Inc.*,
    175 B.R. 525 (Bankr. S.D.N.Y. 1994) ............................................................... 33

*In re Merrill Lynch Auction Rate Secs. Litig.*,
    886 F. Supp. 2d 340 (S.D.N.Y. 2012)............................................................... 71

*In re Motel 6 Secs. Litig.*,
    161 F. Supp. 2d 227 (S.D.N.Y. 2001)............................................................... 45

*In re One Commc'ns Corp.*,
    2009 WL 857535 (S.D.N.Y. Mar. 31 2009) ...................................................... 46

*Jenson v. Nat'l Air Traffic Controller's Ass'n*,
    No. 09-cv-336 (LRS), 2010 WL 1608678 (E.D. Wash. Apr. 15, 2010)........................ 70

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)........................................................................... 50

*Kaye v. Grossman*,
    202 F.3d 611 (2d Cir. 2000)........................................................................... 72

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)...................................................................................... 68

*Koch v. Christie's Int'l*,
    699 F.3d 141 (2d. Cir. 2012).......................................................................... 67

*Kriss v. Bayrock Grp. LLC*,
    No. 10-cv-3959 (LGS), 2016 WL 7046816 (S.D.N.Y. Dec. 2, 2016)............................ 66

*Kriss v. Bayrock Grp. LLC*,
    No. 10-cv-3959 (LGS), 2017 WL 1901966 (S.D.N.Y. May 8, 2017)............................ 67

*Krock v. Lipsay*,
    97 F.3d 640 (2d Cir. 1996)............................................................................. 73

*Licci v. Lebanese Canadian Bank, SAL*,
    672 F.3d 155 (2d Cir. 2012)........................................................................... 73

*Ling v. Deutsche Bank*,
    No. 04-cv-4566, 2005 WL 1244689 (S.D.N.Y. May 26, 2005) ................................. 45

*Little v. City of N.Y.*,
    487 F. Supp. 2d 426 (S.D.N.Y. 2007)............................................................... 67

*Madonna v. United States*,
　878 F.2d 62 (2d Cir. 1989)............................................................................... 47

*Maldonado v. Dominguez*,
　137 F.3d 1 (1st Cir. 1998)............................................................................... 46

*Mangiafico v. Blumenthal*,
　471 F.3d 391 (2d Cir. 2006)............................................................................. 9

*Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US LLC*,
　736 F. App'x 412 (4th Cir. 2018) .................................................................. 13

*Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US, LLC*,
　578 B.R. 325 (E.D. Va. 2017)............................................................. 11, 12, 13

*Medgar Evers Houses Tenants Ass'n v. Medgar Evers Houses Assocs., L.P.*,
　25 F. Supp. 2d 116 (E.D.N.Y. 1998) ............................................................ 23

*Merhej v. I.C.S. Int'l Custody Sys., Inc.*,
　No. 13-cv-869 (JGK), 2014 WL 104908 (S.D.N.Y. Jan. 9, 2014) ................... 66

*Methodist Hosp. of S. Cal. v. Blue Cross of Cal.*,
　No. CV 09-05612, 2010 WL 11508022 (C.D. Cal. Feb. 26, 2010)................... 34

*Mills v. Polar Molecular Corp.*,
　12 F.3d 1170 (2d Cir. 1993)............................................................................ 34

*Milton Abeles, Inc. v. Farmers Pride, Inc.*,
　No. 03-CV-6111 (DLI) (WDW), 2007 WL 2028069 (E.D.N.Y. July 11, 2007) ............ 71

*Morin v. Trupin*,
　711 F. Supp. 97 (S.D.N.Y. 1989)............................................................... 54, 66

*Morin v. Trupin*,
　778 F. Supp. 711 (S.D.N.Y. 1991)................................................................... 45

*Music Sales Corp. v. Morris*,
　73 F. Supp. 2d 364 (S.D.N.Y. 1999)................................................................ 30

*Nadel v. Play-By-Play Toys & Novelties, Inc.*,
　208 F.3d 368 (2d Cir. 2000)............................................................................ 73

*Naso v. Park*,
　850 F. Supp. 264 (S.D.N.Y. 1994)................................................................... 66

*Nichols v. Mahoney*,
　608 F. Supp. 2d 526 (S.D.N.Y. 2009).............................................................. 15

*Nightingale Grp., LLC v. CW Capital Mgmt., LLC*,
  No. 11-cv-9293 (PAE), 2012 WL 2674539 (S.D.N.Y. July 5, 2012).............................. 15

*Nikchemny v. Allstate Ins. Co.*,
  No. 16-cv-00407 (NGG), 2016 WL 6082034 (E.D.N.Y. Oct. 17, 2016) ........................ 69

*Niles v. Palmer*,
  No. 97-cv-7573 (JSM), 1999 WL 1419042 (S.D.N.Y. Oct. 22, 1999)........................... 45

*Nolte v. Pearson*,
  994 F.2d 1311 (8th Cir. 1993) ...................................................................................... 62

*Nurridin v. Bolden*,
  818 F.3d 751 (D.C. Cir. 2016)...................................................................................... 23

*Oliver Wyman, Inc. v. Eielson*,
  No. 15-cv-5305 (RJS), 2016 WL 5339549 (S.D.N.Y. Sep. 22, 2016) ........................... 73

*Pasquantino v. United States*,
  544 U.S. 349 (2005).................................................................................................... 38

*Pearce v. Manhattan Ensemble Theater, Inc.*,
  528 F. Supp. 2d 175 (S.D.N.Y. 2007)........................................................................... 70

*PetEdge, Inc. v. Garg*,
  No. 15-cv-9606 (GHW), 2017 WL 564088 (S.D.N.Y. Feb. 10, 2017) ........................... 34

*Powers v. British Vita, P.L.C.*,
  57 F.3d 176 (2d Cir. 1995)........................................................................................... 50

*Productores Asociados de Café Rio Claro, C.A. v. Barnett*,
  No. 98-cv-499 (DAB), 1999 WL 287389 (S.D.N.Y. May 7, 1999) ............................... 60

*Rambarran v. Mount Sinai Hosp.*,
  No. 06-cv-5109 (DF), 2008 WL 850478 (S.D.N.Y. Mar. 28, 2008)............................... 41

*Redtail Leasing v. Bellezza*,
  No. 95-cv-5191 (JFK), 1997 WL 603496 (S.D.N.Y. Sept. 30, 1997)............................ 62

*Reich v. Lopez*,
  38 F. Supp. 3d 436 (S.D.N.Y. 2014).............................................................................. 67

*Resnik v. Swartz*,
  303 F.3d 147 (2d Cir. 2002).......................................................................................... 28

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993)................................................................................................*passim*

*Rite Aid Corp. v. Am. Express Travel Related Servs. Co., Inc.*,
   708 F. Supp. 2d 257 (E.D.N.Y. Mar. 3, 2010)................................................. 67

*Ritter v. Klisivitch*,
   No. 06-cv-5511 (DRH), 2008 WL 2967627 (E.D.N.Y. July 30, 2008) ......................... 39

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
   30 F.3d 339 (2d Cir. 1994)................................................................. 58

*Roberto's Fruit Mkt., Inc. v. Schaffer*,
   13 F. Supp. 2d 390 (E.D.N.Y. 1998) ....................................................... 40

*Rostropovich v. Koch Int'l Corp.*,
   No. 94-cv-2674 (JFK), 1995 WL 104123 (S.D.N.Y. Mar. 7, 1995) ........................... 73

*Rotella v. Wood*,
   528 U.S. 549 (2000)........................................................................ 68

*RSM Prod. Corp. v. Fridman*,
   643 F. Supp. 2d 382 (S.D.N.Y. 2009) ...................................................... 73

*Sanchez v. ASA Coll., Inc.*,
   No. 14-cv-5006 (JMF), 2015 WL 3540836 (S.D.N.Y. June 5, 2015) ..................... *passim*

*Schmid, Inc. v. Zucker's Gifts, Inc.*,
   766 F. Supp. 118 (S.D.N.Y. 1991)......................................................... 15

*Schmidt v. Fleet Bank*,
   16 F. Supp. 2d 340 (S.D.N.Y. 1998)....................................................... 64

*Schmidt v. Fleet Bank*,
   No. 96-cv-5030 (AGS), 1998 WL 47827 (S.D.N.Y. Feb. 4, 1998)............................. 45

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
   806 F.3d 71 (2d Cir. 2015)............................................................... 16

*Shields v. Citytrust Bancorp*,
   25 F.3d 1124 (2d Cir. 1994).............................................................. 37

*Smith v. Cingular Wireless*,
   No. 05-cv-1149 (MRK), 2006 WL 1272612 (D. Conn. Apr. 10, 2006)......................... 69

*Southwick Clothing LLC v. GFT (USA) Corp.*,
   No. 99-cv-10452 (GBD), 2004 WL 2914093 (S.D.N.Y. Dec. 13, 2004)....................... 72

*Spinale v. United States*,
   No. 03-cv-1704, 2004 WL 50873 (S.D.N.Y. Jan. 9, 2004) ................................. 44

*Spithogianis v. Haj-Darwish*,
    No. 07-cv-4609 (PAC), 2008 WL 82188 (S.D.N.Y. Jan. 7, 2008)................................. 70

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178, 182 (2d Cir. 2008) .................................................................. 15

*Stein v. Gelfand*,
    476 F. Supp. 2d 427 (S.D.N.Y 2007) ............................................................. 72

*Targum v. Citrin Cooperman & Co.*,
    No. 12-cv-6909 (SAS), 2013 WL 6087400 (S.D.N.Y. Nov. 19, 2013)..................... 45, 48

*Thai Airways Int'l v. United Aviation Leasing B.V.*,
    891 F. Supp. 113 (S.D.N.Y. 1994)................................................................ 41

*Thompson v. Jasas Corp.*,
    212 F. Supp. 2d 21 (D.D.C. 2002) ............................................................... 69

*Turkmen v. Hasty*,
    789 F.3d 218 (2d Cir. 2015)....................................................................... 66

*Tymoshenko v. Firtash*,
    57 F. Supp. 3d 311 (S.D.N.Y. 2014).......................................................... 38, 43

*U.S. ex rel. Miller v. Weston Educ., Inc.*,
    840 F.3d 494 (8th Cir. 2016) ..................................................................... 34

*U.S. ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2017).................................................................... 34

*U.S. ex rel. Raffington v. Bon Secours Health Sys., Inc.*,
    285 F. Supp. 3d 759 (S.D.N.Y. 2018)........................................................... 47

*U1it4less, Inc. v. FedEx Corp.*,
    871 F.3d 199 (2d Cir. 2017).................................................................. 57, 58

*United States v. Diaz*,
    176 F.3d 52 (2d Cir. 1999)........................................................................ 62

*United States v. Evans*,
    844 F.2d 36 (2d Cir. 1988)........................................................................ 38

*United States v. Gotti*,
    459 F.3d 296 (2d Cir. 2006)...................................................................... 43

*United States v. Henry*,
    29 F.3d 112 (3d Cir. 1994) ........................................................................ 38

*United States v. Larkin*,
    227 F. Supp. 3d 1091 (N.D. Cal. 2016) ......................................................... 66

*United States v. Markiewicz*,
    No. 96-cv-122 (RSP), 1996 WL 663894 (N.D.N.Y. Nov. 6, 1996) ................................. 39

*United States v. Melchor-Lopez*,
    627 F.2d 886 (9th Cir. 1980) ......................................................................... 66

*United States v. Monserrate-Valentin*,
    729 F.3d 31 (1st Cir. 2013) ........................................................................... 66

*United States v. Myerson*,
    18 F.3d 153 (2d Cir. 1994) ........................................................................... 41

*United States v. Pierce*,
    224 F.3d 158 (2d Cir. 2000) ......................................................................... 38

*United States v. Reich*,
    479 F.3d 179 (2d Cir. 2007) ......................................................................... 42

*United States v. Rodriguez*,
    No. 00-cr-91-01 (RWS), 2002 WL 31426311 (S.D.N.Y. Oct. 23, 2002) ......................... 42

*United States v. Sabbeth*,
    125 F. Supp. 2d 33 (E.D.N.Y. 2000) ............................................................... 39

*United States v. Svoboda*,
    347 F.3d 471 (2d Cir. 2003) ......................................................................... 66

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) ........................................................................... 38

*United States v. Viola*,
    35 F.3d 37 (2d Cir. 1994) ....................................................................... 60, 61

*United States v. Weiss*,
    168 F. Supp. 728 (W.D. Pa. 1958) ................................................................. 39

*Vaughn v. Air Line Pilots Ass'n, Int'l*,
    395 B.R. 520 (Bankr. E.D.N.Y. 2008) ............................................................. 35

*Vaughn v. Air Line Pilots Ass'n, Int'l*,
    No. 08-4173-cv, 2010 WL 3582661 (2d Cir. May 14, 2010) ..................................... 34

*Vickers Stock Res. Corp. v. Quotron Sys., Inc.*,
    No. 96-cv-2269 (HB), 1997 WL 420265 (S.D.N.Y. July 25, 1997) ......................... 61, 63

*Walter v. Drayson*,
 538 F.3d 1244 (9th Cir. 2008) ................................................................ 61, 64

*Whitmore v. Arkansas*,
 495 U.S. 149 (1990).............................................................................. 26, 27

*Wood v. Gen. Motors Corp.*,
 No. 08-cv-5224 (PKC), 2015 WL 1396437 (E.D.N.Y. Mar. 25, 2015) .......................... 65

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
 328 F. App'x 695 (2d Cir. 2009) .............................................................. 67

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*,
 530 F. Supp. 2d 486 (S.D.N.Y. 2007).......................................................... 25

*Worldwide Directories, S.A. de C.V. v. Yahoo! Inc.*,
 No. 14-cv-7349 (AJN), 2016 WL 1298987 (S.D.N.Y. Mar. 31, 2016)........................... 45

*Zigman v. Giacobbe*,
 944 F. Supp. 147 (E.D.N.Y. 1997) ........................................................... 15, 40

*Zikakis v. Staubach Retail Servs., Inc.*,
 No. 04-cv-9609 (NRB), 2005 WL 2347852 (S.D.N.Y. Sept. 26, 2005) ......................... 71

*Zurich Ins. Grp. v. Grandurismo, Inc.*,
 No. 00-cv-980 (AGS), 2000 WL 1677941 (S.D.N.Y. Nov. 8, 2000)............................. 70

**Statutes**

11 U.S.C. § 101................................................................................... 29, 30

11 U.S.C. § 307................................................................................... 20

11 U.S.C. § 326................................................................................... 21

11 U.S.C. § 327................................................................................... *passim*

11 U.S.C. § 328................................................................................... 74

11 U.S.C. § 1109.................................................................................. 20

18 U.S.C. § 2..................................................................................... 44

18 U.S.C. § 152................................................................................... 39

18 U.S.C. § 1341.................................................................................. 38

18 U.S.C. § 1343.................................................................................. 38

18 U.S.C. § 1503 ........................................................................................ 41, 42

18 U.S.C. § 1512 ........................................................................................ 41, 42

18 U.S.C. § 1962 ........................................................................................ *passim*

18 U.S.C. § 2314 .............................................................................................. 40

28 U.S.C. § 586 .................................................................................................. 8

28 U.S.C. § 1334 .............................................................................................. 17

**Other Authorities**

H.R. REP. 99-764, 99th Cong., 2d Sess. (1986) ............................................... 8

Restatement (Second) of Contracts § 186 ....................................................... 71

U.S. Dep't of Justice, Criminal Resource Manual (2018) § 855 .................... 39

**Rules**

Fed. R. Bankr. P. 2014(a) ......................................................................... *passim*

Fed. R. Bankr. P. 9001 ................................................................................... 30

Fed. R. Bankr. P. 9011 ................................................................................... 74

Fed. R. Civ. P. 12(b)(6) ....................................................................... 1, 9, 14, 15

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants McKinsey & Co., Inc., McKinsey Holdings, Inc., McKinsey & Company Inc. United States ("McKinsey US"), and McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS" or "RTS") (collectively, "McKinsey" or the "Corporate Defendants"), and Dominic Barton, Kevin Carmody, Jon Garcia, Seth Goldstrom, Alison Proshan, Robert Sternfels, and Jared Yerian (collectively the "Individual Defendants"), respectfully move this Court to dismiss with prejudice the Amended Complaint of Plaintiff Jay Alix ("Alix" or "Plaintiff"), as assignee of his namesake firm, AlixPartners LLP ("AlixPartners").

## PRELIMINARY STATEMENT

Despite having had the opportunity to amend his prolix complaint with Defendants' initial motion to dismiss papers as a guide, Jay Alix has done little to address the fatal shortcomings of his RICO claims.  The explanation for his failure is simple: the deficiencies in Alix's claims are manifestly incurable.  It is easy to see why neither AlixPartners nor any other debtor adviser has joined Jay Alix in this action: black letter law dictates that the RICO statute is unavailable to business competitors such as AlixPartners in this context.  And there is still not a single fact alleged in the sprawling Amended Complaint that supports its headline accusation that McKinsey has "unlawfully schemed to harm" AlixPartners or any of its other competitors.  (Amended Complaint (hereinafter "AC") ¶ 1.)

To be sure, Alix's second bite at the proverbial apple includes new allegations splayed over many additional pages—the Amended Complaint has expanded to 224 pages from the original 150, not counting the new 43-page "joint declaration" appended to his new pleading.  The most remarkable aspect of this declaration is not that it has been filed in support of an amended complaint (though that is indeed remarkable), but that Alix seeks to pass off its authors as experts.

In fact, they are all *counsel* to Alix's alter ego Mar-Bow in the *Alpha Natural Resources* case at issue in the Amended Complaint, including one who currently is representing him in the courtroom.[1]  The filing of this highly unusual declaration speaks volumes about the real purpose of Alix's new pleading, which certainly is not to address the legal infirmities identified in Defendants' initial motion to dismiss.  Rather, its purpose is to generate more media headlines in furtherance of Alix's personal campaign against a successful competitor to the company he founded.

The Amended Complaint rests on the insupportable premise that AlixPartners has standing to pursue a civil RICO claim for competitive injuries purportedly suffered as a result of McKinsey's Rule 2014(a) disclosures in thirteen bankruptcy cases.  Those RICO claims fly in the face of settled Supreme Court precedent that precludes a competitor like AlixPartners from suing under that statute for indirect harms like those of which Alix complains.  The alleged injuries are not only indirect, and thus incapable of satisfying RICO's proximate cause requirement, but they are so attenuated that the Amended Complaint fails to plead actual, "but-for" causation.  The alleged chain of actual causation is facially implausible given, among other things, Alix's failure to allege that (in all but one case) AlixPartners even applied for the thirteen bankruptcy assignments won by McKinsey and his inability ever to prove that any debtor would have retained AlixPartners or that any bankruptcy court would have approved such a retention.

At its inception—and to this day—the core of Alix's dispute with McKinsey has been simple and hardly the stuff of fraud, let alone RICO, claims: he disagrees with what he asserts is McKinsey's inadequate disclosure of "connections" to Interested Parties under Bankruptcy Rule

---

[1] Ex. 22, *ANR* Doc. 4127 (listing Steven Rhodes as counsel to Mar-Bow Value Partners, LLC); Ex. 16, *ANR* Doc. 3675 (listing Steven Rhodes, Judith K. Fitzgerald, Lois R. Lupica, and John A. E. Pottow as of counsel for Mar-Bow Value Partners, LLC).  All exhibits submitted in conjunction with this motion are attached to the Declaration of Jennifer M. Selendy dated October 10, 2018 and are referred to herein as "Ex. _."

2014(a).  That rule requires professionals proposed to be hired by a debtor in chapter 11 bankruptcy cases to disclose connections to parties involved in the case to ensure disinterested service to the debtor.  It does not specify *how* those disclosures must be made, and until mid-2016, in order to protect the confidentiality of its consulting clients, McKinsey listed its Rule 2014(a) "connections" by descriptive category rather than by name.   While McKinsey's practice was accepted by bankruptcy courts for fifteen years, and the text of Rule 2014(a) has remained the same, Alix now insists that all disclosures must be made by name and must include connections of any and all affiliates.

Alix's reckless use of the RICO statute is the latest installment in an escalating pattern of anticompetitive behavior directed toward McKinsey.  Alix first advanced his objection to McKinsey's form of disclosure directly to McKinsey, which disagreed with him.  He then formed a special purpose company (Mar-Bow) for the sole purpose of making the same objection to McKinsey's Rule 2014(a) disclosures in a Virginia bankruptcy case.  Despite multiple adverse rulings in the bankruptcy court, the district court, and the Fourth Circuit Court of Appeals, he continues to try to relitigate the same Rule 2014(a) issue in that case.  In the instant action, Alix has aggressively transformed his dispute over the interpretation of a bankruptcy disclosure rule into claims that the entire family of McKinsey companies and seven professionals are racketeers who have engaged in, among other things, fraud, obstruction of justice, money laundering, bribery, and witness tampering.

While the Amended Complaint characterizes McKinsey's disclosures as virtually non-existent, the actual Rule 2014(a) disclosure documents, referenced throughout the Amended Complaint (but curiously not attached to it), demonstrate that McKinsey complied with Rule 2014(a).  From the first, the disclosures not only identified McKinsey US's and RTS's connections

and those of their affiliates, but also described, in detail, the specific methodology employed to identify connections to Interested Parties in each bankruptcy.  They also provided sufficient information for Interested Parties (be they debtor(s), creditors, the U.S. Trustee, or the bankruptcy court) to assess McKinsey's disinterestedness without violating the confidentiality of McKinsey clients.  What the earlier disclosures typically did not do—and this is the crux of Alix's grievance against McKinsey—is publicly disclose the identity of McKinsey clients by name.  While Alix may believe that McKinsey's decision to disclose by descriptive category rather than by name was insufficient under Rule 2014(a), the law is not so rigid.[2]

Setting aside Alix's reckless and unfounded use of the RICO statute, his pleading is also a vicious personal attack on the good names and reputations of the seven current and former McKinsey professionals named as Individual Defendants.  The Amended Complaint accuses them of violating federal and state statutes hundreds of times over.  "[T]he mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants."  *Sanchez v. ASA Coll., Inc.*, No. 14-cv-5006 (JMF), 2015 WL 3540836, at *5 (S.D.N.Y. June 5, 2015).  Unfortunately for those individuals, the public record of Alix's baseless accusations that they engaged in extensive racketeering activity will far outlast the Amended Complaint.

Defendants address in detail below, as they must, all of the defects in the Amended Complaint.  But in broad strokes, the Amended Complaint suffers from two overarching fatal flaws: (1) a business competitor like AlixPartners is not the type of party to whom RICO provides a cause of action here because it has not been *directly* injured; and (2) a dispute over the interpretation of a bankruptcy rule is not the type of allegation that amounts to fraud.  Alix places

---

[2] Since mid-2016, RTS has modified its practice to disclose direct connections by name, rather than by category.  It has done so in its last three engagements.

4

the first defect in sharp relief with his self-centered and misguided allegation that the purpose of Rule 2014(a) is to "provide a level playing field for professionals [like AlixPartners] in bankruptcy." (AC ¶ 58.) That is wrong: the rule protects the interests of the parties to chapter 11 cases, not the interests of competitors of the advisor retained by the chapter 11 debtor. Alix attempts to obscure the second defect by making sweeping pronouncements of what the law is, without actual support. Most importantly, regardless of whose interpretation of Rule 2014(a) is determined to be the better one in the bankruptcy courts, where all the Interested Parties have every opportunity and incentive to be heard, McKinsey's pursuit of its interpretation cannot plausibly support the sweeping racketeering allegations in Alix's Amended Complaint.

Each of the claims in the Amended Complaint is deficient and must be dismissed. First and foremost, the RICO claims (Counts 1 through 4) must be dismissed in their entirety for failure to plead either proximate or actual (but-for) causation. (*See infra* §§ I.A-B.) Independently, all the fraud-based RICO predicates must be dismissed because Alix fails to allege a valid legal duty to disclose—the *sine qua non* of each of the alleged omissions essential to his racketeering claim against McKinsey. (*See infra* § I.C.1.) Likewise, Alix's allegations of fraud—which reflect nothing more than a dispute over the proper interpretation of the bankruptcy disclosure rules—fail to meet the heightened pleading burden for scienter in this Circuit. (*See infra* § I.C.2.)

The Amended Complaint also is rife with additional defects mandating dismissal as to both the Corporate and Individual Defendants. Each of the predicate acts suffers from its own, independent faults requiring dismissal. (*See infra* § I.C.3-4.) Moreover, the Amended Complaint fails to plead adequately any racketeering act against any of the Individual Defendants. While all the arguments mentioned above are fully applicable to the individuals, the pleading failures are particularly acute as to them. The Amended Complaint fails to allege facts giving rise to a

5

plausible inference that the Individual Defendants engaged in any crimes at all, let alone facts of sufficient particularity to support the many fraud-based allegations.  (*See infra* § I.D.)  Alix also fails to plead a viable RICO enterprise against the Corporate Defendants (*see infra* § I.E), that any of the Individual Defendants conducted or participated in the conduct of any enterprise (*see infra* § I.F), or that any of the Defendants conspired to commit RICO violations.  (*See infra* § I.G.)  And the RICO claims are barred in substantial part (and wholly as to Individual Defendants Yerian, Goldstrom, and Garcia) by the four-year RICO statute of limitations.  (*See infra* § I.H.)

Finally, the state law claims, alleged solely against the Corporate Defendants, all fail.  The oral contract that Alix tries to create from certain conversations is not only unenforceable but fails to meet the most basic elements of contract formation, and his attempt to enforce that nonexistent agreement through a breach of contract or promissory estoppel theory (Counts 5 and 6, respectively) fails.  And his claim for tortious interference with business expectancy (Count 7) is both inadequately pleaded and preempted by federal law.  (*See infra* § II.)

For these and all the reasons set forth below, the Amended Complaint should be dismissed in its entirety with prejudice.

## FACTUAL BACKGROUND[3]

### *McKinsey and Its Client Service Model*

McKinsey & Co., Inc. is a global management consulting firm with almost 30,000 employees working in more than 120 cities worldwide.  For nearly a century, some of the world's most well-known institutions have relied upon McKinsey's broad industry and functional expertise to enhance their performance.  These clients often require that McKinsey's involvement with their

---

[3] For purposes of this motion to dismiss, McKinsey accepts the well-pleaded facts as alleged in the Amended Complaint.  To the extent any portion of this case survives this motion, McKinsey can and will demonstrate the falsity of the allegations in the Amended Complaint.

organizations remains confidential, so as not to affect their operations and business strategies adversely.  One manifestation of McKinsey's commitment to maintaining the confidentiality of client names is that its consulting contracts typically include provisions limiting McKinsey's ability to disclose the identity of the client absent consent or other narrow exceptions (such as when identity is otherwise public or such disclosure is required by law).

As part of its diverse and wide-ranging client service portfolio, McKinsey serves chapter 11 debtors.  McKinsey began doing so in 2001 through its wholly-owned subsidiary McKinsey US.  Since 2011, it has done so through another wholly-owned subsidiary, RTS.  (AC ¶ 48.) McKinsey US and RTS have been retained as a bankruptcy professional in thirteen chapter 11 cases to date.  (*Id*.)  As Alix acknowledges, McKinsey US and RTS have been successful in helping distressed companies emerge from bankruptcy.  (*Id.* at ¶ 4.)  With deep functional and industry expertise and unmatched scale, McKinsey has much broader experience than other restructuring advisors, which positions it well to advise chapter 11 debtors.

### *Disclosures Required by Bankruptcy Rule 2014(a)*

The retention of qualified and disinterested professionals in chapter 11 cases is overseen by the bankruptcy court.  (*Id*. at ¶¶ 52-53.)  Section 327 of the Bankruptcy Code, which governs such retentions, requires professionals to submit a "verified statement" pursuant to Bankruptcy Rule 2014(a) "*setting forth the person's connections* with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."  Fed. R. Bankr. P. 2014(a) (emphasis added). Rule 2014(a) includes no specific requirements about the content of professionals' disclosures: it does not define "connections," sets forth no required process for professionals to employ to

identify connections, is silent on the form the disclosures must take (including whether they must be by name), and does not specify that connections of affiliates must be disclosed.  *See id.*

The U.S. Trustee plays a particularly important role in ensuring that bankruptcy professionals comply with Rule 2014(a).  It is empowered with "important oversight and watchdog responsibilities to ensure honesty and fairness in the administration of bankruptcy cases and to prevent and ferret out fraud."  H.R. REP. 99-764, 99th Cong., 2d Sess. at 18 (1986).  Among them is "monitoring applications filed under section 327 of title 11."  28 U.S.C. § 586(a)(3)(I).  At the same time, all other parties to a bankruptcy case—including the debtor(s) and creditors, and of course the bankruptcy court itself—also are authorized to challenge, or seek additional information with respect to, any professionals' Rule 2014(a) disclosure.  (AC ¶ 176.)  No professional can be retained without obtaining the approval of the presiding bankruptcy judge.  *See* 11 U.S.C. § 327(a).

### *McKinsey's Rule 2014(a) Disclosures*

Alix alleges that McKinsey US and RTS have "submitted false and materially misleading affidavits and declarations" in thirteen chapter 11 cases.[4]  (AC ¶ 2.)  He asserts, among other things, that RTS was "founded for the express purpose of skirting the Bankruptcy Code's disclosure rules" (*id.* ¶ 64), that McKinsey US and RTS "failed to name almost every one of [their] connections, relationships, and conflicts" (*id.* at ¶ 69), failed to be "exhaustive" and "voluminous"

---

[4] The thirteen bankruptcies at issue in the Amended Complaint are: *In re Hayes Lemmerz Int'l, Inc.*, No. 01-BR-11490 (Bankr. D. Del. filed Dec. 5, 2001) ("*Hayes Lemmerz*"); *In re UAL Corp. (United Airlines)*, No. 02-BR-48191 (Bankr. N.D. Ill. filed Dec. 9, 2002) ("*United*"); *In re Mirant Corp.*, No. 03-BR-46590 (Bankr. N.D. Tex. filed July 14, 2003) ("*Mirant*"); *In re Lyondell Chem. Co.*, No. 09-BR-10023 (Bankr. S.D.N.Y. filed Jan. 6, 2009) ("*Lyondell*"); *In re Harry & David Holdings, Inc.*, No. 11-BR-10884 (Bankr. D. Del. filed Mar. 28, 2011) ("*Harry & David*"); *In re AMR Corp.*, No. 11-BR-15463 (Bankr. S.D.N.Y. filed Nov. 29, 2011) ("*AMR*"); *In re AMF Bowling Worldwide, Inc.*, No. 12-BR-36495 (Bankr. E.D. Va. filed Nov. 13, 2012) ("*AMF*" or "*AMF Bowling*"); *In re Edison Mission Energy*, No. 12-BR-49219 (Bankr. N.D. Ill. filed Dec. 17, 2012) ("*Edison Mission*" or "*Edison Mission Energy*"); *In re NII Holdings, Inc.*, No. 14-BR-12611 (Bankr. S.D.N.Y. filed Sept. 15, 2014) ("*NII Holdings*"); *In re The Standard Register Co.*, No. 15-BR-10541 (Bankr. D. Del. filed Mar. 12, 2015) ("*Standard Register*"); *In re Alpha Natural Resources, Inc.*, No. 15-BR-33896 (Bankr. E.D. Va. filed Aug. 3, 2015) ("*ANR*" or "*Alpha Natural Resources*"); *In re SunEdison*, No. 16-BR-10992 (Bankr. S.D.N.Y. filed Apr. 21, 2016) ("*SunEdison*"); *In re GenOn Energy, Inc.*, No. 17-BR-33695 (Bankr. S.D. Tex. filed June 14, 2017) ("*GenOn*").

in their disclosures (*id*. at ¶¶ 70-71), "failed to describe [connections] with adequate detail" (*id*. at ¶ 69), and failed to *identify by name* any connections to "Interested Parties."[5]   (*See, e.g.*, *id*. at ¶¶ 72, 76, 79.)  Alix asserts that McKinsey acted to "unlawfully conceal" its connections to avoid "disqualification from employment" (*id*. at ¶¶ 2, 9) and that McKinsey US and RTS instead made "piecemeal disclosures" to hide conflicts.  (*Id*. at ¶ 12.)

        The Rule 2014(a) disclosures, which are submitted with this motion,[6] show the opposite.  McKinsey disclosed its connections to Interested Parties, complying fully with Rule 2014(a).  Until mid-2016, most McKinsey US and RTS disclosures revealed connections to Interested Parties by descriptive category (*e.g.*, "Major Customer" or "Major Bank Lender"); consistently since mid-2016, RTS's policy has been to disclose connections by name with rare exceptions.  In all cases, the disclosures were robust, comprehensive, and fully explained what was being disclosed, what was not, and why.  (*See, e.g.*, Ex. 5-A, *Harry & David* Doc. 105-3 ¶ 9; Ex. 6-A, *AMR* Doc 581 ¶ 19; Ex. 9-A, *NII Holdings* Doc. 153 ¶ 26.)  Across the thirteen bankruptcies at issue, McKinsey US and RTS publicly filed 39 declarations, totaling more than 498 pages, that both disclosed their connections to Interested Parties and set forth the process they undertook to identify them.[7]  (*See,*

---

[5] In each bankruptcy case, the debtor produces a list of "Interested Parties," which includes creditors, major customers, law firms, and other parties who have connections to the debtor(s).  This list may change over the course of the case.

[6] In ruling upon Defendants' motion to dismiss under Rule 12(b)(6), this Court may consider documents referenced in the Amended Complaint and those that are "integral" to it.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (in deciding a motion to dismiss, "a district court may consider . . . documents incorporated by reference in the complaint" and those the plaintiff "relies heavily upon . . . thereby rendering the document 'integral' to the complaint") (citing *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).  The McKinsey US and RTS Rule 2014(a) disclosures are attached as Exhibits 1-A through 13-D to the Selendy Declaration.

[7] For example, in *AMF Bowling*, RTS disclosed that it: (1) emailed employees of RTS and employees of RTS affiliates "to determine the existence of any client service provided by such employees within the last three years to parties-in-interest" (Ex. 7, *AMF Bowling* Doc. 125 ¶ 17); (2) emailed employees of RTS and RTS affiliates to "determine the existence of client services provided by such employees within the last three years to any client that focused on a direct commercial relationship or transaction with the Debtors," (*id.*); (3) emailed "employees of McKinsey RTS and its affiliates to . . . request information on any relationships with the Debtors, the U.S. Trustee and the Court, as well as equity ownership in the Debtors," (*id.*); (4) "made inquiry to all partners at its client service affiliates worldwide about whether they currently provide consulting services to entities that focus on a direct commercial relationship or transaction with the Debtors," (*id.* at ¶ 23(a)); (5) emailed "all employees at all its client service affiliates worldwide as to whether such employee or a member of his/her immediate family is related to or employed by the Debtors, the

*e.g.*, AC ¶¶ 71, 75, 78, 83, 89.)   The declarations also made explicit, among other things, that McKinsey advises Interested Parties in matters unrelated to the bankruptcy.  (*See, e.g.*, *id.*)[8]

### Jay Alix's Campaign to Drive McKinsey Out of the Restructuring Advisory Market

From 2001, when McKinsey entered the restructuring advisory market, until 2016, McKinsey US's (and later RTS's) method of disclosing connections was accepted—without exception—by all parties to each bankruptcy in which it was retained as debtor's advisor.  After RTS's market share began to grow,[9] however, Alix—acting alone and without the support of any of the hundreds of Interested Parties in these bankruptcies—began a campaign to undermine RTS's ability to provide consulting services to chapter 11 debtors and to eliminate it as one of AlixPartners's principal competitors.  (AC ¶¶ 1, 49.)

### a.   Alix Lectures McKinsey's Managing Partner.

Starting in September 2014, Alix began "confront[ing]" McKinsey leaders about RTS's Rule 2014(a) disclosures.  (*Id.* at ¶ 119.)  In the first such encounter, Alix lectured Dominic Barton, McKinsey's then-managing partner, about Alix's interpretation of Rule 2014(a)'s requirements.  (*Id.* at ¶ 120.)  Alix "provided a lengthy and detailed exposition of the relevant legal principles" underlying the disclosure obligations in bankruptcy cases, and "demonstrated how [in his view] all of McKinsey's past disclosure declarations were non-compliant and illegal because they failed to identify connections by name and failed to describe connections in sufficient detail."  (*Id.* at

---

U.S. Trustee, and/or the Court . . . [or] whether such employee or a member of his/her immediate family owns equity securities of the Debtors," (*id.* at ¶¶ 23(c), (d)); and (6) inquired with partners at RTS affiliates "responsible for those clients appearing on the [Interested Parties List]" to determine the scope of such services within the past three years, (*id.* at ¶ 23(b)).

[8] *See also* Ex. 1-A, *Hayes Lemmerz* Doc. 103-3 ¶¶ 11, 12; Ex. 7, *AMF Bowling* Doc. 125 ¶ 27; Ex. 6-A, *AMR* Doc. 581 ¶ 30; Ex. 10, *Standard Register* Doc. 87-3 ¶ 33.

[9] From 2001 until RTS was formed in 2011, McKinsey was retained in four bankruptcies.  In the seven years since it was formed, RTS has been retained in nine bankruptcies.

¶ 123.)  A month later, Alix flew to London to confront Barton about RTS's disclosures and to press McKinsey to "exit the bankruptcy consulting business."  (*Id*. at ¶ 131.)  Alix continued to hector Barton over the next year (*id*. at ¶¶ 134, 157), repeating his claim that RTS was failing to comply with Alix's interpretation of Rule 2014(a).

Despite numerous personal entreaties, McKinsey did not "shutter McKinsey RTS and abandon bankruptcy consulting," as Alix demanded.  Rather, RTS continued to formulate Rule 2014(a) disclosures as it believed appropriate and to seek court approval to advise debtors in chapter 11 cases.  (*Id*. at ¶¶ 377, 525.)  And bankruptcy courts continued approving RTS to provide such advice without any objection from parties to the bankruptcy cases.

### b.  *Alix Forms Mar-Bow to Continue His Attacks on McKinsey's Disclosure Practices.*

After failing to persuade McKinsey's leadership to shut down RTS, Alix shifted tactics. He decided to challenge McKinsey's bankruptcy disclosures in bankruptcy court.  To obtain the standing required to do so, Alix formed Mar-Bow Value Partners, LLC ("Mar-Bow")[10] in 2016 and purchased a creditor claim in the *ANR* bankruptcy.  (AC ¶ 179; Ex. 14, *ANR* Doc. 2603); *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US, LLC*, 578 B.R. 325 (E.D. Va. 2017).  In that case, the debtors, Alpha Natural Resources and its affiliates, had filed an application requesting permission to employ RTS as an advisor "to assist the Debtors with the development and refinement of their strategic business plan."  *Id*. at 330.

Consistent with its Rule 2014(a) obligations, RTS provided a declaration explaining the process it undertook to identify connections with Interested Parties.  As was its practice at the time, RTS disclosed by descriptive category its own connections, and those of its client service affiliates

---

[10] Underscoring the obsessive nature of his conduct, Alix named his special-purpose company after Marvin Bower, one of McKinsey's iconic senior leaders during the 1930s.

where the service focused on a direct commercial relationship with the debtors.  (AC ¶ 187); *Mar-Bow Value Partners*, 578 B.R. at 332.  The bankruptcy court, like every other court in which McKinsey US's or RTS's retention had been considered, examined RTS's disclosures, determined that RTS was a "disinterested person," and granted the unopposed application to retain RTS.  *Id*. at 333.

Through Mar-Bow, Alix began complaining to the U.S. Trustee about RTS's disclosures.  (AC ¶ 183.)  No other parties to the *ANR* case joined Alix's complaint.  On May 3, 2016, nine months after the bankruptcy case began, the U.S. Trustee filed a motion to compel RTS to make additional disclosures, including the disclosure of Interested Parties by name.  (*Id*.)[11]  RTS promptly engaged with the U.S. Trustee to address its issues, and sixteen days later, reached a stipulation with the U.S. Trustee resolving the motion to compel.  Specifically, RTS agreed to make a supplemental disclosure that satisfied the U.S. Trustee that RTS's disclosures "complied with Rule 2014."  (Ex. 18, *ANR* Doc. 2474.)

Alix was the only party unsatisfied with this result.  On June 6, 2016, Mar-Bow filed a motion to compel additional disclosures (AC ¶ 186) and also asked the bankruptcy court to "suspend payment of McKinsey's fees, and to disgorge all of McKinsey's previously paid fees. . . ."  *Mar-Bow Value Partners*, 578 B.R. at 335.  In response to Mar-Bow's motion, the court required RTS to disclose the names of certain connections and additional confidential information *in camera*.  *Id*. at 336; (AC ¶ 340).  RTS immediately complied and, indeed, modified its approach to disclosures going forward, including in subsequent bankruptcies.  *Mar-Bow Value Partners*, 578 B.R. at 336.  Upon submission of those materials, the court stated that it was "completely

---

[11] Alix was in contact with the U.S. Trustee even before Mar-Bow appeared in the case.  *See Mar-Bow Value Partners*, 578 B.R. at 333 n.19; *see also id.* (noting that "[t]he record indicates that the U.S. Trustee filed its Motion to Compel at least partially at Mar-Bow's urging").

satisfied that there is not any type of disinterestedness problem with McKinsey going forward" and that it was "very satisfied with the information" RTS had furnished.  *Id.* at 338.

Undeterred, Mar-Bow then filed a motion to "clarify," which asked the bankruptcy court for the right to review McKinsey's confidential and competitively sensitive client information that RTS had submitted *in camera*.  *Id.* at 337.  Mar-Bow also escalated the dispute and challenged the debtor's *entire plan of reorganization*, which left the court "confus[ed]" and the debtor's counsel "bewilder[ed]."  *Id.*  The court rejected both of Alix's challenges.

Still undeterred, Mar-Bow moved to stay the implementation of the plan.  That too failed, with the court noting that Mar-Bow "threaten[ed] to disrupt the hard-fought global peace achieved among the Debtors and all of their major stakeholders."  *Id.* at 343.  Mar-Bow then brought a flurry of appeals to the district court, once again challenging McKinsey's disclosures.  *Id.* at 342-44.  In a thirty-page reported opinion, the district court recounted the history of Alix-*qua*-Mar-Bow's failed attempts to obtain access to the names of McKinsey's confidential clients in the form of further public disclosures.  *Id.*  It then rejected all of Mar-Bow's appeals on the grounds of equitable mootness or standing, but added that it had "no reservation about," among other things, the bankruptcy court's decision to refuse to require RTS to file publicly the full list of *in camera* disclosures.  *Id.* at 349, 354 n.46.  Mar-Bow then appealed to the Fourth Circuit, where it lost again.  *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US LLC*, 736 F. App'x 412 (Mem) (4th Cir. 2018).

In the meantime, Alix also moved in the bankruptcy court to reopen the case, alleging a fraud on the court by RTS arising from many of the same allegations repeated in this Amended Complaint.  (Exs. 19-20, *ANR* Docs. 4122, 4124.)[12]  The U.S. Trustee filed a response to Mar-

---

[12] The gravamen of Mar-Bow's motion was that RTS improperly failed to disclose a connection to "Whitebox," a third-party investment manager with whom McKinsey's investment affiliate—MIO Partners, Inc. ("MIO")—had

Bow's motion posing a limited set of questions that it wished to investigate.  (Ex. 21, *ANR* Doc. 4126.)  RTS filed a response to Mar-Bow's motion explaining why Mar-Bow had not come close to establishing a fraud on the court.  And the debtors filed a response to Mar-Bow's motion arguing that the bankruptcy court should not indulge Mar-Bow's "own agenda against McKinsey that is completely unrelated to these bankruptcy cases" and that its motion represented "Mar-Bow's latest attempt to hijack these closed cases to continue its vendetta against McKinsey."  (Ex. 24, *ANR* Doc. 4148 ¶¶ 4-5.)  Mar-Bow's motions remain pending before the bankruptcy court in the Eastern District of Virginia as of the date of this filing.

### c.   *Alix Escalates His Attack on McKinsey by Filing This Civil RICO Action.*

Having first failed to impose his will on McKinsey directly, and then having failed to get three different courts in the *ANR* case to impose the interpretation of Rule 2014(a) he prefers, Alix now has ratcheted up the intensity of his anticompetitive campaign against McKinsey by recasting his statutory interpretation disagreements as a set of RICO claims.  Specifically, McKinsey's past practice of disclosing its connections by descriptive category, and of disclosing certain "connections" of its client service affiliates as well, has now been mischaracterized as a decades-long series of racketeering acts.  As explained below, this escalation is a misuse of process: the Amended Complaint fails to state a cognizable claim of any sort, let alone a RICO violation.

### ARGUMENT

To survive a Rule 12(b)(6) motion, a plaintiff must plead facts sufficient "to state a claim for relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw

---

placed some funds.  However, as McKinsey explained in its response, Whitebox was not on the Interested Parties list that the debtors provided to RTS and that RTS used to check for connections.  (*See* Ex. 24, *ANR* Doc. 4149.)

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). By contrast, a court must dismiss a pleading where the plaintiff has failed to "nudge" a claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. The Supreme Court's holdings and concerns in *Twombly* "are equally, if not moreso, applicable to civil RICO claims," because "[i]f *Twombly* means anything, it means that bald assertions and conclusions of law will not suffice." *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 536 (S.D.N.Y. 2009). RICO pleadings, like others, "must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). Moreover, Alix's allegations that sound in fraud—including the predicate acts of bankruptcy fraud, mail fraud, wire fraud, and violations of the Travel Act—must be pleaded with particularity, as mandated by Rule 9(b). *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 179 (2d Cir. 2004). Rule 9(b) "concerns are even more immediate in civil RICO actions, because such suits implicate the reputation interests of defendants accused of committing racketeering offenses." *Zigman v. Giacobbe*, 944 F. Supp. 147, 153 (E.D.N.Y. 1997); *Schmid, Inc. v. Zucker's Gifts, Inc.*, 766 F. Supp. 118, 123 (S.D.N.Y. 1991) (same).

While a court must accept well-pleaded allegations as true in considering a motion to dismiss, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. As noted above, on a motion made pursuant to Rule 12(b)(6), this Court may consider documents referenced in the Amended Complaint and those upon which a plaintiff "relies heavily . . . thereby rendering the document 'integral' to the [Amended C]omplaint." *DiFolco*, 622 F.3d at 111 (internal quotation and citation omitted). The Court also may take judicial notice of court filings. *See, e.g.*, *Nightingale Grp., LLC v. CW Capital Mgmt., LLC*, No. 11-cv-9293 (PAE), 2012 WL 2674539, at *4 n.9 (S.D.N.Y. July 5, 2012).

## I.      ALIX FAILS TO PLEAD ANY RICO CLAIM (COUNTS 1-4).

The RICO statute requires a plaintiff to plead "(1) a substantive RICO violation under § 1962; (2) injury to the plaintiff's 'business or property;' and (3) that such injury was 'by reason of' the substantive RICO violation." *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 86 (2d Cir. 2015).  A RICO plaintiff must plead facts that support a plausible inference of both proximate and but-for causation. *Holmes v. Secs. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).  To state a violation of Section 1962(c), a RICO plaintiff must plead, among other things, that the defendant conducted or participated in the conduct of the affairs of an enterprise through a pattern of racketeering activity.  18 U.S.C. § 1962(c); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013).  Each of these requirements must be alleged as to each defendant. *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).  Because Alix has not alleged any of the requisite elements of any RICO claim, Counts 1 through 4 should be dismissed.

### A.      Alix Fails to Plead Proximate Causation.

As the Supreme Court has made clear, a RICO plaintiff must allege that the defendant's violation "led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). This "proximate causation" requirement narrows the universe of actionable harms under RICO, excluding "suits by parties who have been injured only indirectly." *Id.* at 460.  The Amended Complaint continues to lack *any* well-pleaded allegation that any act or purported omission of McKinsey US or RTS relating to its Rule 2014(a) disclosures directly injured AlixPartners.

Alix's theory of harm remains unchanged from his original complaint: he claims lost "profits" that AlixPartners "otherwise would have earned" had McKinsey "truthfully disclosed [its] disqualifying conflicts of interest" and had the debtor retained AlixPartners instead of

16

McKinsey US or RTS.  (AC ¶ 5; *see also id.* at ¶¶ 381, 445, 534 (alleging, in conclusory fashion, damages consisting of fees AlixPartners would have earned but for Defendants' conduct and other lost business opportunities).)  Despite Alix's newly-added conclusory allegation that his injuries are not "derivative of any injury to any Interested Party," (AC ¶¶ 385, 450, 538), it is plain from his amended pleading (as it was from his original complaint), that the direct victims of McKinsey's alleged omissions, if any, would have been the entities that Rule 2014(a) was designed to protect— such as debtors, creditors, and other Interested Parties in each of the thirteen chapter 11 cases.[13] *See, e.g., In re Enron Corp.*, No. 01-16034 (AJG), 2002 WL 32034346, at *5 (Bankr. S.D.N.Y. May 23, 2002).

Thus, even if Alix's view of Rule 2014(a) were correct and McKinsey's Rule 2014(a) disclosures amounted to fraudulent omissions (which they do not (*infra* § I.C.1)), and even if he had alleged adequately that those disclosures caused injury to AlixPartners through an actual lost business opportunity (which he has not (*infra* § I.B)), Alix remains unable to allege that McKinsey's purported violation led *directly* to those injuries.  The law is clear that "[a] RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming"—as Alix has here—"that the defendant's aim was to increase market share at a competitor's expense."  *Anza*, 547 U.S. at 460.  Alix's Amended Complaint does not cure this defect which, standing alone, requires the Court to dismiss all of the RICO claims as to all Defendants.

The Supreme Court's decision in *Anza* compels this result.  In *Anza*, Ideal Steel Supply Corp. ("Ideal") brought a RICO claim against the owners of its principal competitor, National Steel

---

[13] Moreover, these parties have a statutorily-mandated forum where they are directed to bring any claims relating to McKinsey US and RTS's Rule 2014(a) disclosures: in the district where the bankruptcy was brought or is pending. *See* 28 U.S.C. § 1334(e)(2) ("The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction . . . over all claims or causes of action that involve construction of section 327 of title 11, United States Code, or rules relating to disclosure requirements under section 327.").

Supply, Inc. ("National"), contending that National systematically failed to collect sales tax on cash sales, in violation of New York law.  Ideal argued that by underpaying sales tax, National could lower its prices while maintaining its profit margin, thereby depriving Ideal of market share it otherwise would have obtained.  *Id.* at 454.  The Supreme Court affirmed the dismissal of the RICO claim because it failed to allege a direct injury to Ideal: "[t]he direct victim of this conduct was the State of New York, not Ideal.  It was the State that was being defrauded and the State that lost tax revenue as a result."  *Id.* at 458.  The Court explained that although "Ideal asserts it suffered its own harms when [its competitor] failed to charge customers for the applicable sales tax," the "cause of Ideal's asserted harms . . . is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)."  *Id.*  The Court's conclusion was "confirmed by considering the directness requirement's underlying premises"—the difficulty of ascertaining the portion of damages attributable to the defendant's conduct given the "attenuated connection" between such alleged conduct and injury, and the fact that the more immediate victim (the State) could itself vindicate the law.  *See id.* at 458–60.

As in *Anza*, AlixPartners was not the direct victim of McKinsey's alleged conduct, and "[t]he cause of [AlixPartners's] alleged harms . . . is a set of actions"—*i.e.*, not being selected as a restructuring advisor by a debtor—that is "entirely distinct from the alleged RICO violations"—*i.e.*, supposedly defrauding the parties to the bankruptcy by filing misleading Rule 2014(a) disclosures.  *Id.* at 458; *see also, e.g., Holmes*, 503 U.S. at 272 (proximate causation not satisfied in RICO suit alleging defendants' stock manipulation caused broker-dealer bankruptcies and thereby caused harm to broker-dealer customers); *Hemi Grp. LLC v. City of N.Y.*, 559 U.S. 1, 14 (2010) (defendants' failure to file required reports with state did not lead directly to city's injuries); *cf. Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) (defendants' scheme to unlawfully

18

submit multiple bids in tax auction directly injured losing bidders who otherwise would be guaranteed to win at least some bids solely by participating in the auction and, thus, were "the *only* parties injured" by the misrepresentations (emphasis in original)).  Indeed, the fact that Alix had to form Mar-Bow and purchase a creditor claim to litigate the propriety of RTS's Rule 2014(a) disclosures in *ANR* demonstrates that AlixPartners—the assignor plaintiff here—had not been directly injured by McKinsey's Rule 2014(a) disclosures in *ANR* or any of the other cases.

Importantly, the purposes underlying the Supreme Court's directness requirement are promoted by rejecting Alix's claims.  *Anza* instructs that "[o]ne motivating principle [of the directness requirement] is the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action."  547 U.S. at 458; *see also Holmes*, 503 U.S. at 271-72 ("[T]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.").  The alleged connection between McKinsey's conduct and AlixPartners's harm is equally "attenuated" as that alleged in *Anza*, if not more so.  To credit Alix's theory, this Court would have to find, among other things, that the bankruptcy court would have decided to disqualify McKinsey based on a conflict; that the debtor would have, in that event, sought AlixPartners's services; and that AlixPartners would have been qualified and disinterested.[14]  *See Anza*, 547 U.S. at 460 (proximate causation "is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation"); *Hemi Grp.*, 559 U.S. at 11 (the "disconnect" between injury and a RICO violation is particularly attenuated when plaintiff's theory of liability "rests not just on separate *actions*, but separate actions carried out by separate *parties*" (emphasis in original)).

---

[14] Alix ignores these numerous intervening and separate actions—all of which Alix would have to prove to show any harm from McKinsey's alleged conduct—in simplistically alleging that AlixPartners's purported "25% share in the market for high-end bankruptcy consulting services" means it necessarily "would have obtained at least 25% of the work on the bankruptcies that McKinsey US and/or McKinsey RTS obtained . . . absent [Defendants'] willful criminal conduct."  (*E.g.*, AC ¶ 535.)

The "speculative nature" of the harm alleged, *Anza*, 547 U.S. at 459, is also apparent from the fact that the business decisions of debtors not to hire AlixPartners could have occurred for a host of reasons wholly unrelated to McKinsey's disclosures, such as AlixPartners's own failure to compete for the business, conflicts or lack of experience that disqualified AlixPartners, or a preference for the skills or expertise of McKinsey.[15]  *See id.* at 458 (plaintiff's competitor "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud"); *see also id.* at 458-59 ("Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [plaintiff's] lost sales were the product of [defendant's] decreased prices.").  The Supreme Court has stated that the proximate causation requirement "has particular resonance when applied to claims brought by economic competitors" because such claims of competitive harm, "if left unchecked, could blur the line between RICO and the antitrust laws." *Id.* at 460.  That line is fully in play here.

*Anza* further instructs that the "requirement of a direct causal connection is especially important where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Id.* at 460.  Here, the parties to the bankruptcy cases—the debtor(s), creditors, and the U.S. Trustee—are fully capable of enforcing Rule 2014(a) and are best situated to do so.  Indeed, there is a specific statutory provision empowering these parties to challenge the disclosures at issue.  *See* 11 U.S.C. §§ 307, 1109(b) (permitting "any party in interest," including the U.S. Trustee and the "debtor, the [debtor's] trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture

---

[15] Tellingly, in many of the bankruptcies at issue in this case, the debtors had hired *multiple* restructuring advisors, such that RTS would work alongside another competitor, such as Alvarez & Marsal.  (Ex. 15, *Harry & David* Doc. 101 (Application to Employ/Retain Alvarez & Marsal North America, LLC as Interim Chief Executive Officer and Chief Restructuring Officer).)  This belies Alix's contention that McKinsey US's or RTS's retention necessarily precluded retention of AlixPartners.

trustee" to appear in the bankruptcy court and be heard on any matter).  Moreover, the bankruptcy court, U.S. Trustee, and debtor are directed under the Bankruptcy Code to determine whether bankruptcy advisors are disinterested.  *See* 11 U.S.C. §§ 326(d), 327(a).  A challenge to McKinsey's disclosures by the parties to the bankruptcy or the bankruptcy court would not involve any of the causal gymnastics presented by Alix's claims.  As in *Anza*, Alix's claim fails because Alix is outside the ambit of those directly harmed: "[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly."  *Anza*, 547 U.S. at 460.

The Amended Complaint tries to inoculate its RICO claims against this doctrine by asserting that "it was a foreseeable, natural, direct, and intended consequence of [Defendants'] scheme that McKinsey US and McKinsey RTS would obtain more restructuring assignments . . . and [AlixPartners] would receive fewer," that "no independent factors" account for AlixPartners's injury, and that "[n]o immediate victim is better situated than Plaintiff to sue." (AC ¶ 450.)  But a conclusory allegation of directness cannot alter the reality that the parties directly injured by the alleged racketeering acts are the parties to the proceeding in which the challenged disclosures were made.  A conclusory allegation that Jay Alix is best suited to vindicate the alleged violations of Rule 2014(a) cannot alter the reality that those parties, the U.S. Trustee, and the bankruptcy court are obviously better suited to do so.  (*Id*. at ¶¶ 385, 450, 538.)  In short, the Amended Complaint serves only to cement the conclusion that Alix has not—and cannot— plead the proximate cause element of his claim.

A second Supreme Court case, decided after *Anza*, further underscores that the remote injury alleged by Alix does not satisfy the proximate cause requirement under RICO.  In *Hemi Group*, the City of New York sought to recoup lost tax collections that it traced to the alleged

RICO violations of an out-of-state cigarette vendor. Under the City's theory of injury, the out-of-state vendor committed predicate acts by failing to disclose to New York State the identities of New York State purchasers (as required by law), thereby preventing the State from reporting to the City the names of purchasers that resided in the City and resulting in the City being unable to collect taxes from those purchasers. *Hemi Group*, 559 U.S. at 6-7.

The Supreme Court affirmed the trial court's dismissal of the claims, finding that the City did not show that its injury of lost tax revenue was caused "by reason of" the defendant's unlawful failure to report its sales of cigarettes to New York residents. *Id*. at 5. Citing the traditional common law proximate causation principles as well as *Holmes* and *Anza*, the Supreme Court found that the New York City purchasers' failure to pay taxes was responsible for the City's injury, not the out-of-state vendor's allegedly fraudulent failure to report sales. Noting that the City's theory "requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City)," the Court declined to "stretch the causal chain of a RICO violation" in such an unprecedented fashion. *Id.* at 11 (emphasis in original).

Since the key rulings in *Anza* and *Hemi Group*, courts in this Circuit have followed the proximate cause rulings of the Supreme Court under RICO and dismissed Section 1962(c) claims premised upon proximate causation theories like those on which Alix's allegations rely. For example, in *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525 (S.D.N.Y. 2014), Grand Estates, a real estate company, brought a RICO claim against a competitor, Concierge, claiming that Concierge fraudulently misrepresented itself to potential customers and that, as a result, Grand Estates lost business. *Id.* at 540-41. Dismissing the claim, the court found that Grand Estates had "suffered only indirect injury that was derivative of the injury to the property sellers. Grand Estates

was injured only because the property owners were allegedly deceived into using Concierge's auction services." *Id*. at 541.  Finding *Anza* "analogous" and applying its reasoning, the court explained that the "defrauded seller is presumably capable of bringing suit on his or her own" and that "there could be many reasons for which [the] property sellers did not choose Grand Estates, and there was no guarantee that those who contracted with Concierge would otherwise have chosen Grand Estates." *Id.* at 541-42.  The court reached this conclusion notwithstanding that "the number of auction houses in the business of luxury estate auctions may not be large."[16]  *Id.*

Alix cannot distinguish these cases in any meaningful way, and the same result should follow here.  There is no direct injury to AlixPartners from McKinsey's purportedly inadequate Rule 2014(a) disclosures.  This defect cannot be cured and, thus, Counts 1 through 4 should be dismissed with prejudice.

### B.     Alix Fails to Plead Actual Causation.

The Amended Complaint also fails to adequately plead actual—or "but-for"—causation, an independent element of the RICO claims.  *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994).  Alix's naked assertion that McKinsey's disclosures were the "but-for" cause of AlixPartners's alleged injury fails to state a claim because some of the multitude of intervening events that would have had to occur for the debtor to retain AlixPartners instead of McKinsey in each respective bankruptcy case are not even alleged, while others could never be proven.  *See Nurriddin v. Bolden*, 818 F.3d 751, 757 (D.C. Cir. 2016) (plaintiff "plead[ed] himself

---

[16] Another case in this Circuit decided after *Holmes* but before *Anza* is similarly on point.  In *Medgar Evers Houses Tenants Association v. Medgar Evers Houses Associates, L.P.*, 25 F. Supp. 2d 116, 121 (E.D.N.Y. 1998), the court rejected a RICO claim premised on allegedly false statements made in regulatory filings to the U.S. Department of Housing and Urban Development ("HUD") for lack of a direct injury.  The court held that the plaintiffs, tenants who complained that the defendants were operating a RICO enterprise by submitting false declarations to HUD, sustained only "second level injuries," noting that "the fact finder would be required to determine whether the complained of conditions at the Medgar Evers Houses in fact resulted from the false statements to HUD, as opposed to, for example, the defendants' poor management of the housing project. . . . [T]he law need not shoulder these difficulties.  HUD itself can deter fraudulent statements to HUD."  *Id*. at 121-22.

out of court by alleging facts that render success on the merits impossible"); *see also Doe v. Backpage.com, LLC*, 817 F.3d 12, 24-25 (1st Cir. 2016) (plaintiff failed to plead causation where the "causal chain is shot through with conjecture: it pyramids speculative inference upon speculative inference" including as to "the effect . . . on on an indeterminate number of third parties").  Among the myriad independent causes of AlixPartners's alleged harms is its own failure to bid for the work in question (which Alix implicitly has admitted by alleging that AlixPartners actually competed in only one of the thirteen bankruptcy cases).  (AC ¶ 383(a).)  That gaping hole in the causal chain between McKinsey's alleged misconduct and the supposed injury to AlixPartners cannot be plugged.  In addition, thirteen debtors would have had to choose AlixPartners over other rivals and thirteen bankruptcy courts would have had to approve AlixPartners as an advisor, which as Alix admits (AC ¶¶ 53-54) is not automatic, but subject to statutory requirements and the discretion of the bankruptcy court.

Indeed, before AlixPartners could have been retained in any of the bankruptcies at issue, all the following would have had to occur:

1. Had McKinsey disclosed its connections in all cases as Alix contends it should have, someone with standing (*e.g.*, the U.S. Trustee, the debtor, or a creditor) would have objected (despite not objecting previously);

2. McKinsey would not have been able to mitigate the concern raised by the objector, including through screens or other prophylactic procedures;

3. Considering the disclosure and any available mitigation efforts, the bankruptcy court, in its discretion, would have disqualified McKinsey from the assignment;

4. With McKinsey unavailable, the debtor would have chosen to hire a different advisor rather than complete the work itself;

5. The debtor would have considered AlixPartners, and not one of its many other competitors, as its second choice for the consulting work for which McKinsey had been selected;

6. AlixPartners would have been qualified for the assignment;

7. AlixPartners would not itself have been conflicted from taking the assignment;

8. No Interested Party would have objected to AlixPartners's disclosures, or any such objections would have been overruled; and

9. The bankruptcy court, in its discretion, would have approved AlixPartners as the debtor's advisor and approved its fee application.

AlixPartners's implicit admission that it did not compete for twelve of the thirteen assignments at issue is a decisive intervening cause of its alleged injury that requires dismissal. *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 523 (S.D.N.Y. 2007) ("Plaintiff does not have a crystal ball or any plausible way to allege facts that would establish the outcome of the bidding process.").

In addition, each step in the causal chain that would require this Court to speculate, retrospectively, about how third parties (including bankruptcy courts) would have exercised discretion precludes proof of but-for causation. In analogous circumstances relating to Article III standing, the Supreme Court has ruled that the causal nexus between allegedly unlawful conduct and plaintiffs' injury that is essential to any theory of standing cannot be established where the court would be "required to speculate" as to how independent decisionmakers would exercise their judgment. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). *Clapper* involved a facial constitutional challenge to the Foreign Intelligence Surveillance Act ("FISA"). The government argued that plaintiffs lacked standing. The Supreme Court agreed, finding that the claim was premised on a series of speculative fears about how the FISA court would decide requests for surveillance authorization. At the core of the court's reasoning was that too many speculative steps, depending on determinations by third parties, were needed to establish causation:

> Even if respondents could show that the Government will seek the Foreign Intelligence Surveillance Court's authorization to acquire the communications of respondents' foreign contacts under § 1881a, respondents can only speculate as to whether that court will

25

> authorize such surveillance.  In the past we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.

568 U.S. at 413; *see also Whitmore v. Arkansas*, 495 U.S. 149, 159-60 (1990) ("It is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case.").

Alix attempts to gloss over these multiple, speculative steps in the causal chain by boldly alleging that in nine of the thirteen bankruptcies at issue (*GenOn*, *ANR*, *Standard Register*, *NII Holdings*, *Edison Mission Energy*, *AMF Bowling*, *Lyondell*, *Mirant*, and *Hayes Lemmerz*) certain "specific circumstances . . . made AlixPartners'[s] chances of obtaining the assignments effectively 100%."[17]  (AC ¶¶ 383, 448.)  With one exception, where Alix alleges that AlixPartners had directly competed with RTS[18] (*see id*. at ¶ 383(a) (*GenOn*)), these so-called special circumstances fall into two categories: AlixPartners's purported "extensive experience" in a particular industry—*e.g.*, coal (*ANR*), telecommunications (*NII Holdings*), energy (*Edison Mission*), and bowling (*AMF*) (*id*. at ¶ 383(b), (d), (e), (f))—or its previous work for the debtor.[19] (*Id*. at ¶¶ 383(c) (*Standard Register*), 448 (*Lyondell, Mirant, Hayes Lemmerz*).)  Even if true, these conclusory allegations overlook multiple other steps in the causal chain: not only that McKinsey

---

[17] In the remaining four bankruptcies—*UAL*, *Harry & David*, *AMR*, and *SunEdison*—Alix does not attempt to argue any "specific circumstances" that would have resulted in AlixPartners's retention, tacitly admitting that none exist.

[18] Alix concedes that in *ANR*, *NII Holdings*, and *Edison Mission*, AlixPartners was not invited to pitch for the business. Alix blames this lack of interest not on any shortcoming of AlixPartners, or preference of the debtors, but, instead, on a "pay to play" scheme (which he invents out of whole cloth).  (AC ¶ 383(b), (d)-(e).)

[19] Alix also pleads in Count 7 that AlixPartners had an "expectancy that it would be retained by Alpha Natural Resources and/or AMF Bowling Worldwide, Inc. to provide bankruptcy consulting services in connection with their respective bankruptcy proceedings."  (*Id*. at ¶ 583.)  This allegation is not only speculative and devoid of any support in the Amended Complaint, it is also a tacit admission that AlixPartners had no such expectancy in any of the other eleven bankruptcies, further undermining the Amended Complaint's allegations of actual causation.  What is more, public filings show that Alix could not have been retained to advise the debtor in some of these bankruptcies *as it already was advising other Interested Parties in the case*.  (*See, e.g.*, Ex. 17, *Sun Edison* Doc. 50 at 6 (stating that Sun Edison's non-debtor affiliates had "[r]etain[ed] Alix Partners, LLP ("AlixPartners") . . . to assist the[m] with their contingency planning for a SunEdison restructuring or bankruptcy").)

US's and RTS's allegedly undisclosed connections would have resulted in multiple bankruptcy courts exercising their discretion to disqualify McKinsey, but also that the bankruptcy courts would have concluded that AlixPartners was disinterested and qualified to serve the debtor after addressing AlixPartners's own "connections," which are never addressed in the Amended Complaint.

As in *Clapper* and *Whitmore*, this Court should conclude that it is "just not possible" for Alix to prove that AlixPartners would have been engaged by the debtor and approved by the bankruptcy court, even if McKinsey had made disclosures in the way Alix insists it should have. Alix fails to sufficiently allege that "but-for" McKinsey's allegedly incomplete disclosures, AlixPartners would have been retained and approved in each of the thirteen bankruptcies. All the RICO claims against all Defendants should be dismissed for this independent reason.

### C.  Alix Fails to Plead Any RICO Predicate Acts Against the Corporate Defendants.

This Court can and should dismiss all the RICO claims for lack of causation alone. But, in addition to the fatal defects above, there are several other independent bases to dispose of Counts 1 through 4. *First*, Alix's RICO claims—which are now predicated on a theory of omission—fail for the fundamental reason that there is no legal duty to disclose information about "connections" under Rule 2014(a) in the precise manner that Alix alleges. The plain language of Rule 2014(a) does not require disclosure by name or disclosure of all of a professional's affiliates' connections, nor do any of the cases cited by Alix in his Amended Complaint stand for the proposition that such disclosure is mandatory in all cases. Because there can be no actionable omission without a clearly defined duty, Alix cannot premise any predicate act on the Rule 2014(a) disclosures at issue here, which in every case *did* disclose McKinsey US's and RTS's connections. *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 123 (2d Cir. 1984) ("Before [an]

27

omission can be labelled fraudulent, however, there must be a showing that a duty of disclosure existed."); *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) (dismissing allegations that defendant made material misrepresentations where defendant had no duty to disclose the purportedly omitted information). *Second*, Alix fails to plead scienter, which is a necessary element of all fraud-based predicates. *Third*, Alix's fraud-based predicate acts fail, not just for lack of scienter, but for additional, independent reasons. *Fourth*, Alix also fails to state a claim against the Corporate Defendants with respect to any of his non-fraud-based predicate acts.[20]

## 1.    Alix Fails to Plead the Duty to Disclose Required to State a Claim Based on Fraudulent Omission.

The gravamen of Alix's Amended Complaint is that McKinsey US and RTS failed to provide the court in each of the thirteen bankruptcy cases at issue with information that they were legally required to provide by Bankruptcy Rule 2014(a).  For this theory to amount to fraud, Alix must plead not only that Rule 2014(a) imposed a duty to disclose on McKinsey, but that the scope of that duty was clear under the law *and that it was precisely as Alix alleges it to be*.  It is well settled that fraud by omission presupposes a duty to speak, and where no such duty exists no claim will lie.[21]  *See, e.g.*, *Resnik*, 303 F.3d at 154; *In re Express Scripts Holding Co. Secs. Litig.*, No. 16-cv-3338 (ER), 2017 WL 3278930, at *11 (S.D.N.Y. Aug. 1, 2017) ("With respect to material omissions, a defendant's silence is not misleading absent a duty to disclose."); *City of Roseville Emps. Ret. Sys. v. Nokia Corp.*, No. 10-cv-00967 (GBD), 2011 WL 7158548, at *8 (S.D.N.Y. Sept. 6, 2011) ("An omission is actionable only if: (a) the omitted fact is material; and (b) the speaker had a duty to disclose the omitted fact.").  Here, because Alix did not, and cannot, plead a statutory

---

[20] Because Alix fails to adequately plead any predicate act, he likewise fails to satisfy the RICO pattern requirement.

[21] In *Resnik*, for example, the Second Circuit upheld dismissal of a securities fraud suit alleging that a proxy statement failed to disclose the grant-date value of stock options proposed to be awarded to non-employee directors because there was no express statutory requirement to disclose that information and, in any case, the omission was not materially misleading in the context of what was disclosed.  303 F.3d at 154.

duty obligating McKinsey US and RTS to disclose all connections by name and for their affiliates, his fraud claim fails.  This is true as to each purported flaw with McKinsey US and RTS's disclosures.

According to Alix, Rule 2014(a) requires bankruptcy professionals to disclose—by name—"all relationships that are not considered *de minimis*," including "*all* facts and relationships that might potentially bear on their qualification for retention," including those of all affiliates. (AC ¶ 55 (emphasis in original).)  But Rule 2014(a) does not require bankruptcy professionals to disclose connections by name, let alone to undertake the type of unbounded and impractical probe for possible connections—no matter how "irrelevant or trivial"—that Alix envisions.  The plain text of the Rule provides Alix no support; rather, it requires, in non-specific terms, that bankruptcy professionals disclose

> to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a).  Apart from being "verified," the Rule does not specify any particular form or manner that the disclosures must take—such as by name.

Nor does Rule 2014(a) require a professional to search for and disclose the connections of its affiliates.  The Rule on its face applies to "persons," defined in the Bankruptcy Code to include an "individual, partnership, and corporation," *see* 11 U.S.C. § 101(41), and does not purport to require disclosures relating to all "affiliates" irrespective of the separateness from the applicant and whether the affiliate was serving the debtors.  "Affiliates" is a separately defined term that the

drafters of Rule 2014(a) could have included in the Rule if they wished.[22]  *See* 11 U.S.C. § 101(2)

(setting forth elaborate definition of "affiliate").  Again, Alix cites no case holding otherwise.[23]

On the contrary, far from supporting the far-reaching and oppressive "duty" that Alix seeks

to impose on McKinsey, the case law recognizes that Rule 2014(a) is flexible:

> [C]ourt[s] will weigh an applicant's obligation to disclose
> connections with other parties in interest in the case . . . against the
> burden that this obligation will impose, on a case by case basis.
> [Courts] will continue to rely on the U.S. Trustee and other parties
> in interest to move for additional disclosure when those parties have
> reason to believe that the additional level of disclosure is warranted
> to ensure the disinterestedness of all professionals appointed in
> bankruptcy cases.

*In re Fibermark*, No. 04-10463, 2006 WL 723495, at *10 (D. Vt. Mar. 11, 2006); *see also In re*

*Enron*, 2002 WL 32034346, at *5 (there is no requirement "to disclose every conceivable

interpretation of [ ] connections and possible consequence resulting from the connections . . .").

As the *Fibermark* court recognized, "[i]f professionals seeking employment in bankruptcy cases

are required to disclose every connection, no matter how trivial *or remote*, the costs of such

disclosure could drive qualified professionals out of the bankruptcy practice," *id.* at *9 (emphasis

added)—exactly what Alix is trying to do here.

Each of the three types of omissions alleged by Alix are fatally deficient because of the

absence of a corresponding legal duty to disclose.

---

[22] The definitions of words and phrases contained in Section 101 of the Bankruptcy Code govern their use in the Bankruptcy Rules, including Rule 2014(a).  *See* Fed. R. Bankr. P. 9001.

[23] Alix's submission of the "joint declaration" along with his Amended Complaint is unusual indeed.  Separate and apart from the obvious point that this Court need not consider an expert report to determine what the law is, *Music Sales Corp. v. Morris*, 73 F. Supp. 2d 364, 381 (S.D.N.Y. 1999), this particular document is hardly an expert report.  Its authors are four advocates who have served and, in one case, is *currently serving* as counsel of record to Alix's alter ego Mar-Bow.  The submission amounts essentially to a memorandum of law filed in support of an Amended Complaint, and this Court should disregard it.

***Alleged failure to disclose connections by name.*** Alix's primary allegation is that McKinsey did not identify connections by name. (*See, e.g.*, AC ¶ 70 ("McKinsey US and McKinsey RTS, however, disclosed ***no*** connections by name . . .") (emphasis in original); *see also id.* at ¶¶ 71, 73, 78, 82, 95, 123.) Yet, as explained above, Rule 2014(a) does not mandate disclosure by name, and in each of the instances where McKinsey US or RTS disclosed by category rather than by name, it did so because of its obligations to maintain client confidentiality.[24] The only citation offered in the Amended Complaint in support of the proposition that disclosure must be by name is to the so-called "joint declaration" signed by Alix's counsel. (*Id.* at ¶ 55.) And even there, the only citation for the point is a decision in *ANR* rendered in 2016 (after ten of the bankruptcy cases at issue), that was the first to find—in the context of that case—that disclosure by category was lacking and that the affiliate connections RTS originally disclosed by category must be disclosed by name *in camera*. (*Id.* at ¶ 196.) The practice of disclosing connections by category is not one that McKinsey "invent[ed]" (*id.* at ¶ 55) and is in no way unique to McKinsey— in fact, *AlixPartners has itself refused to disclose the names of its own consulting clients* in Rule 2014(a) disclosures, as have other bankruptcy professionals.[25]

---

[24] *See, e.g.*, Ex. 12-A, *SunEdison* Doc. 202 ¶ 57 ("McKinsey RTS and its affiliates have a long-standing policy of serving competing companies and do so in a manner that protects the confidentiality of each client's information."); Ex. 6-A, *AMR* Doc. 581 ¶ 20 (same). Alix tries to marginalize this legitimate concern by arguing that "McKinsey's engagement agreements explicitly permit it to disclose client identities and other otherwise confidential information concerning the engagement in order to comply with the law." (AC ¶ 78.) But this falsely presupposes that a legal requirement to disclose by name exists.

[25] *See* Ex. 26, *In re Altegrity, Inc.*, No. 15-10226-LSS (Bankr. D. Del. filed Feb. 17, 2015) Doc. 89-3 ("There are five confidential clients of AlixPartners that are vendors and landlords to the Debtors as well as professionals in interest in the bankruptcy matter."); Ex. 28, *In re Basic Energy Servs., Inc.*, No. 16-12320-KJC (Bankr. D. Del. filed Oct. 28, 2016) Doc. 93-4 ¶ 26 ("AlixPartners has two confidential clients that are utility providers to the Debtors and professionals in interest in this bankruptcy matter."); *see also* Ex. 31, *In re Cumulus Media*, No. 17-13381 (SCC) (Bankr. S.D.N.Y. filed Jan. 11, 2018) Doc. 203 Schedule 2 (Moelis & Co. identifying assignments for Potential Parties in Interest as "confidential," broken down by category); Ex. 29, *In re Azure Midstream Partners*, No. 17-30461 (DRJ) (Bankr. S.D. Tex. filed Feb. 23, 2017) Doc. 120 Schedule 2 (Evercore disclosing nine confidential Parties in Interest by category in an application); Ex. 27, *In re Atlas Resource Partners*, No. 16-12149 (SHL) (Bankr. S.D.N.Y. filed Aug. 12, 2016) Doc. 83 Ex. B ¶ 16(i) (Perella Weinberg stating in their application that they are "unable to disclose the identities of Clients who may be Parties in Interest, or have connections to the Debtors, due to confidentiality obligations to such Clients.").

***Alleged failure to disclose connections of affiliates.***  Alix focuses on MIO, an affiliate of McKinsey that invests the pension and personal funds of current and former McKinsey & Co. employees.  (AC ¶¶ 113, 116.)  Again, Alix cites no law compelling disclosure of all connections of all affiliates, particularly those not performing work for the debtors and separated from McKinsey US or RTS, and indeed the plain text of Rule 2014(a) suggests that no such disclosure is mandated.  In each of the thirteen bankruptcies at issue in this case, the "person" being retained as the bankruptcy professional was either McKinsey US or RTS—not MIO.  As such, the relevant connections are those of McKinsey US or RTS—all of which were disclosed (not in the precise form upon which Alix insists, but unquestionably disclosed nonetheless).

***Alleged failure to explain discrepancies between cases.***  Alix's third area of focus is on the fact that a McKinsey connection is sometimes disclosed in one bankruptcy case but not another, which he cites as evidence of widespread fraudulent omissions by McKinsey.  (AC ¶¶ 150, 152, 169, 216.)  But no such inference can be drawn.  McKinsey US's and RTS's disclosures, which because they are referenced in the Amended Complaint may be considered here, make plain that they differ from engagement to engagement because the members of the client service team serving a debtor change from bankruptcy to bankruptcy; therefore, a connection that appears because of a client service team member in one case may not appear in another case where that person was not involved.  (*See* Ex. 10, *Standard Register* Doc. 87-3, ¶¶ 10 n.3, 21-22 (noting that the employees working on the bankruptcy (the "Retained Staff") may change and noting connections of "Retained Staff" to Interested Parties); Ex. 11-A, *ANR* Doc. 212, ¶ 2 (defining the McKinsey RTS Team as "McKinsey RTS along with *certain consultants borrowed from affiliates*") (emphasis added).)  The fact that RTS assembles teams of individuals borrowed from other McKinsey affiliates who have particular expertise should not be controversial, and the fact that RTS has serviced debtors in

a variety of industries will mean that different individuals will comprise the client service team in each case.  The connections also differ between bankruptcies for more obvious reasons, such as McKinsey's clients changing over time.[26]

In any case, McKinsey was fully transparent about what it was and was not disclosing. (*See, e.g.*, Ex. 7, *AMF* Doc. 125 ¶ 23(a) ("McKinsey RTS made inquiry to all partners at its client service affiliates worldwide. . . ."); Ex. 8-A, *Edison Mission* Doc. 175-3 ¶ 20(a) (same).)  When the composition of its teams changed, or when additional connections were discovered, McKinsey US and RTS supplemented their disclosures.  (*E.g.*, Ex. 11-D, *ANR* Doc. 2464 ¶ 22 ("The Second Supplemental Declaration updated McKinsey RTS's disclosures to reflect the addition of new individuals . . ."); Ex. 12-E, *SunEdison* Doc. 2614 ¶ 5 ("McKinsey RTS reviewed the additional parties added to the Interested Parties List . . . against its records . . .").)  And, as is appropriate, McKinsey included extensive disclosures stating that it and its affiliates may have in the past represented, may currently represent, or may in the future represent Interested Parties.[27]  *See In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 537 (Bankr. S.D.N.Y. 1994).  Given this, and the absence of the duty Alix claims exists, the fraud by omission theory underlying his RICO claims is not viable.

## 2. Alix Fails to Allege Scienter Properly.

Even if Alix could identify a duty that McKinsey US or RTS purportedly violated when it filed its Rule 2014(a) disclosures, he has not alleged scienter—a requisite element of all his fraud-based claims—with the particularity demanded by Federal Rule of Civil Procedure 9(b).

---

[26] Alix also contends that RTS's filing of supplemental disclosures was part of its bankruptcy fraud scheme.  (AC ¶ 343, 346.)  Yet, Alix surely would complain if RTS did not continue during the course of bankruptcy cases to monitor and update its disclosures.  It also is no surprise that RTS's Rule 2014(a) disclosures needed to be supplemented over the course of the bankruptcy case as RTS's and the debtors' circumstances changed.  Like other professionals, AlixPartners also files supplemental disclosures in cases where it has been retained.  *See, e.g.*, Ex. 30, *In re Pac. Drillings S.A.*, No. 17-13193 (Bankr. S.D.N.Y. 2017) Doc. 58; Ex. 25, *In re TMT Procurement Corp.*, No. 13-33764 (Bankr. S.D. Tex. 2013) Doc. 622.

[27] *See, e.g.*, Ex. 10, *Standard Register* Doc. 87; Ex. 9-A, *NII Holdings* Doc. 153; Ex. 13-A, *GenOn*, Doc. 123.

Second Circuit law is clear that a plaintiff alleging fraud, like Alix, must plead facts giving rise to a "strong inference of fraudulent intent." *First Capital Asset Mgmt.*, 385 F.3d at 179; *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (same); *see also PetEdge, Inc. v. Garg*, No. 15-cv-9606 (GHW), 2017 WL 564088, at *12 (S.D.N.Y. Feb. 10, 2017) (dismissing fraud claim where pleading did not give rise to "a strong inference of fraudulent intent").  To survive a motion to dismiss, a plaintiff's allegations of fraudulent intent must either "allege a motive for committing fraud and a clear opportunity for doing so" or "identify[] circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly higher." *Vaughn v. Air Line Pilots Ass'n, Int'l*, No. 08-4173-cv, 2010 WL 3582661, at *2 (2d Cir. May 14, 2010) (Summary Order); *Bigsby v. Barclays Capital Real Estate, Inc.*, 170 F. Supp. 3d 568, 578 (S.D.N.Y. 2016).  The Amended Complaint fails to allege scienter properly under this standard for multiple reasons.

*First*, and foremost, because the dispute between Alix and McKinsey boils down to a difference of opinion over statutory interpretation in which the Defendants' interpretation of Rule 2014(a) was reasonable, Alix cannot plead that Defendants acted with fraudulent intent. *See U.S. ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 500 (8th Cir. 2016) ("A defendant's reasonable interpretation of any ambiguity inherent in the regulations belies the scienter necessary to establish a claim of fraud."); *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2017) (fraud "does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation" or claims "based on reasonable but erroneous interpretations of a defendant's legal obligations"); *Methodist Hosp. of S. Cal. v. Blue Cross of Cal.*, No. CV 09-05612, 2010 WL 11508022, at *12 (C.D. Cal. Feb. 26, 2010) ("[T]o the extent [the case] can be viewed as a dispute over the parties' respective rights, duties and obligations under governing statutes and regulations,

it would not appear to provide any basis for asserting a claim of fraud."); *Dalton v. Lee Publ'ns, Inc.*, No. 08-cv-1072, 2011 WL 1045107, at *5 (S.D. Cal. Mar. 22, 2011) (a "good faith dispute as to [a statute's meaning] precludes a finding that defendant acted with the requisite scienter of knowing and intentional").  As courts have recognized, "Congress did not intend to turn garden variety disputes over statutory interpretation into criminal acts sufficient to justify a RICO claim." *Grauberger v. St. Francis Hosp.*, 169 F. Supp. 2d 1172, 1177 (N.D. Cal. 2001).[28]

Here, no one challenged the good faith of McKinsey US or RTS's disclosures prior to *ANR*, and after the court in *ANR* required RTS to supplement its disclosures by revealing names of client connections, RTS altered its going-forward practice and made disclosures by name in *SunEdison* and *GenOn*.[29]  This modification highlights McKinsey's efforts to *comply* with Rule 2014(a), not to thwart it.

*Second*, the Amended Complaint fails to adequately plead the motive necessary to show the requisite "strong inference of fraudulent intent."  Alix contends that Defendants were motivated by a desire to earn fees through bankruptcy engagements.  (AC ¶¶ 4, 242, 312 (alleging that McKinsey earned "millions of dollars in fees").)  But the goal of earning fees for business engagements that would flow to a corporation is "wholly inadequate to create any inference of [ ] fraudulent intent, let alone a strong inference." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 395 B.R. 520, 548-49 (Bankr. E.D.N.Y. 2008) (dismissing RICO claim for failure to establish fraudulent

---

[28] By contrast, Alix's efforts to allege wrongful knowledge on the part of Defendants miss the mark.  Alix's scienter allegations fall into one of two buckets: either a Defendant (1) knew McKinsey US's and RTS's disclosures purportedly were deficient because Alix told them so (AC ¶¶ 315-16); or (2) should have known that the disclosures were deficient because of circumstantial factors—*e.g.*, legal training, access to sophisticated counsel, or former employment at AlixPartners.  (*E.g., id*. at ¶¶ 311-14.)  These non-particularized, conclusory allegations fall far short of "strong inference" of actual knowledge on the part of any Defendant that McKinsey US or RTS's disclosures violated Rule 2014(a).  Indeed, Alix's allegations are equally likely to reflect a disagreement between Alix and McKinsey regarding the requirements under Rule 2014(a).

[29] Ex. 12-A, *SunEdison* Doc. 202 Ex. B ¶¶ 27-54; Ex. 13-A, *GenOn* Doc. 123-2 ¶¶ 31-57.

intent for predicate acts where sole allegation was that defendants would earn "substantial fees"); *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1326-27 (S.D.N.Y. 1997) (dismissing fraud claim alleging that a "fee structure allegedly gave [defendant] a motive to [make] misrepresent[ations]" because "allegations that a defendant stands to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)").

*Third*, the content of McKinsey US's and RTS's disclosure declarations defeat any inference that any Defendant intended to defraud anyone.  Rather, each of the McKinsey US and RTS disclosures is transparent about how connections to Interested Parties were identified.  For example, the Rule 2014(a) disclosures pre-dating the *ANR* decision that changed RTS policy made clear where McKinsey US and RTS were disclosing by category and not by name.  (Ex. 11-A, *ANR* Doc. 212 Ex. B ¶¶ 21, 23.)  McKinsey US and RTS consistently have disclosed that only client service affiliate connections were being disclosed, (*id*. at ¶ 23), and further have made explicit that McKinsey advises Interested Parties in matters unrelated to the bankruptcy.  (*See, e.g.*, *id*. at ¶ 29.)  The disclosures also make clear that the concern motivating the form of McKinsey US's and RTS's disclosures was client confidentiality: "Because of its responsibility to maintain strict client confidentiality, McKinsey US cannot disclose the services performed, or even in some instances the fact that services were provided for clients."  (Ex. 4-A, *Lyondell* Doc. No. 2090 ¶ 17.) And the disclosures state that "McKinsey RTS and its affiliates serve clients across a broad range of industries, functions, and geographies, and, within industries, serve competitors and do so in a manner that protects the confidentiality of each client's information (including the confidentiality of the engagement itself).  (Ex. 11-A, *ANR*, Doc. 212 ¶ 21.)[30]  McKinsey US's and RTS's express,

---

[30] *See also* Ex. 13-A, *GenOn* Doc. 123-2; Ex. 10, *Standard Register* Doc. 87; Ex. 9-A, *NII Holdings* Doc. 153; Ex. 8-A, *Edison Mission* Doc. 175; Ex. 7, *AMF* Doc. 125; Ex. 5-A, *Harry & David* Doc. 105; Ex. 6-A, *AMR* Doc. 581; Ex. 3, *Mirant* Doc. 1457; Ex. 12-A, *SunEdison* Doc. 202.

detailed descriptions of precisely what was and was not being disclosed defeat any inference that they intended to mislead through omissions.

*Fourth*, Alix's conclusory allegations of intent to defraud are implausible in light of admitted and public facts that each of the thirteen bankruptcies concerned estates valued in excess of $1 billion (AC ¶ 1) and consequently involved scores of seasoned participants in chapter 11 cases represented by sophisticated counsel.[31]  McKinsey US and RTS knew that their detailed Rule 2014(a) disclosures would be scrutinized by experienced bankruptcy counsel, in addition to the U.S. Trustee and the bankruptcy courts.

*Finally*, Alix fails to satisfy the pleading requirements for scienter through his collective allegations regarding the formation of RTS or other acts purportedly taken by "McKinsey" or an indiscriminate grouping of individuals to obscure connections to Interested Parties.  Rule 9(b)'s requirement of particularity is not satisfied by conclusory allegations that "McKinsey has purposefully maintained a substandard system for identifying conflicts" and that McKinsey formed RTS "for the express purpose of skirting the Bankruptcy Code's disclosure rules."  (AC ¶¶ 63, 522(b).)  *See Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1128 (2d Cir. 1994) (Rule 9(b) protects reputations "from improvident charges of wrongdoing"); *Sanchez*, 2015 WL 3540836, *13; *DLJ Mortg. Capital v. Kontogiannis*, 594 F. Supp. 2d 308, 326 (E.D.N.Y. 2009).  Alix fails to plead facts that are plausible to suggest that any Defendant purposely designed a deficient conflict system as part of an elaborate fraud to win business from a competitor, let alone facts that give rise to a strong inference of scienter.

---

[31] The debtors in these cases were represented by some of the most highly-skilled bankruptcy counsel available, including Skadden (*Hayes Lemmerz* and *SunEdison*), Kirkland & Ellis (*United*, *Edison Mission*, and *GenOn*), White & Case (*Mirant*), Jones Day (*Harry & David*, *NII Holdings*, and *ANR*), Gibson Dunn (*Standard Register*), and Weil Gotshal (*American*).

### 3.   Alix's Fraud-Based Predicate Acts Fail for Additional Reasons.

#### a.   Alix Fails to Plead Mail Fraud or Wire Fraud.

The Amended Complaint fails to cure the fundamental, glaring defect in Alix's mail and

wire fraud predicates: the inability to plead that Defendants sought to deprive Alix of "[money or]

property in the victim's [AlixPartners's] hands."[32]   *Pasquantino v. United States*, 544 U.S. 349,

355 (2005).   The Amended Complaint does not and cannot allege that AlixPartners had any actual,

protected property interest that McKinsey sought to misappropriate, and just as Alix cannot plead

a direct injury that AlixPartners actually suffered, he similarly fails to plead that McKinsey's

disclosures injured AlixPartners by depriving it of property it had held.   The Amended Complaint

alleges only that McKinsey's Rule 2014(a) disclosures somehow deprived AlixPartners of the

ability to bid on (and secure) the bankruptcy assignments in question.   (AC ¶¶ 381, 445, 534.)   A

competitor's "interest in a fair bidding opportunity," however, is "not a property right."   *United

States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994) (finding that the right to a fair bidding process is

not a type of property that "the law traditionally has recognized and enforced . . . as a property

right." (citing *United States v. Evans*, 844 F.2d 36, 41 (2d Cir. 1988))); *see also United States v.

Pierce*, 224 F.3d 158, 165 (2d Cir. 2000) ("A scheme to deceive, however dishonest the methods

employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere

with.").   Accordingly, for this additional reason, Alix's mail and wire fraud predicates fail.

---

[32] "The elements of wire fraud under 18 U.S.C. § 1343 are (i) a scheme to defraud, (ii) to get money or property, (iii) furthered by the use of interstate wires." *Tymoshenko v. Firtash*, 57 F. Supp. 3d 311, 321 (S.D.N.Y. 2014) (quoting *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000)). "The elements of mail fraud under 18 U.S.C. § 1341 are identical, except that mail fraud must be furthered by use of the mails." *Tymoshenko*, 57 F. Supp. 3d at 321 (citing *United States v. Vilar*, 729 F.3d 62, 91 n.26 (2d Cir. 2013)).

#### b.      Alix Fails to Plead Bankruptcy Fraud or Bribery.

Alix's bankruptcy fraud predicate acts—which allege violations of 18 U.S.C. §§ 152(2) and 152(3)—fare no better.[33]  Subsections 152(2) and 152(3) both require that Alix plead (1) that each Defendant submitted a materially false statement to the bankruptcy court and (2) did so knowingly, with fraudulent intent.  *See United States v. Sabbeth*, 125 F. Supp. 2d 33, 43 (E.D.N.Y. 2000); *United States v. Markiewicz*, No. 96-cv-122 (RSP), 1996 WL 663894, at *2 (N.D.N.Y. Nov. 6, 1996).  Among other things, Alix fails to allege with particularity that any Defendant intentionally submitted a materially false or incomplete statement to a court.  (*Supra* § I.B.)

Nor has Alix alleged a violation of 18 U.S.C. § 152(6), which prohibits "knowingly and fraudulently" giving, offering, or receiving money or other remuneration for acting or forbearing to act in a case under title 11.  Alix levels this accusation collectively against all Defendants based on the novel theory that McKinsey's offer to introduce bankruptcy attorneys to consulting clients if those attorneys would help McKinsey's efforts to be retained by the attorneys' debtor clients in chapter 11 cases constituted a "pay to play" scheme in violation of Section 152(6) and state bribery laws.  (AC ¶¶ 359-65, 506-12.)  As the Department of Justice's United States Attorney's Criminal Resource Manual makes clear, Section 152(6) is the "extortion and bribery" provision of the statute.  U.S. Dep't of Justice, Criminal Resource Manual (2018) § 855.[34]  "For example," the manual instructs, "a bidder agreeing to withdraw the bid in return for money is covered" by the section.  *Id*. (citing *United States v. Weiss*, 168 F. Supp. 728 (W.D. Pa. 1958)).  Even taken as true,

---

[33] Courts in this Circuit interpret the term "bankruptcy fraud" as the manifestation of a defendant's intent to frustrate or "defeat the provisions of the bankruptcy code," *First Capital Asset Mgmt.*, 385 F.3d 179, and are particularly wary of RICO claims premised on bankruptcy fraud, routinely dismissing them at the pleadings stage.  *E.g.*, *id.*; *Ferri v. Berkowitz*, 678 F. Supp. 2d 66 (E.D.N.Y. 2009); *Ritter v. Klisivitch*, No. 06-cv-5511 (DRH), 2008 WL 2967627 (E.D.N.Y. July 30, 2008); *Baron v. Rabinovici*, No. 05-cv-110 (TCP), 2006 WL 1318426 (E.D.N.Y. May 12, 2006); *Burke v. Dowling*, 944 F. Supp. 1036 (E.D.N.Y. 1995).

[34] Available at www.justice.gov/jm/criminal-resource-manual-855-extortion-and-bribery-18-usc-1526.

a company offering to introduce a lawyer to the company's clients in exchange for the lawyer putting in a good word for the company with the lawyer's client—no matter what catchphrase Alix wants to give that activity—does not plausibly constitute extortion or bribery.  Moreover, the allegations fail because they provide no specifics of any alleged "bribes": Alix does not plead the terms, the Defendants involved, the lawyers, the clients, or how or when any supposed *quid pro quo* occurred.  *See Zigman*, 944 F. Supp. at 156 (rejecting bribery predicate act where complaint lacked "one single factual allegation of a specific bribe paid"); *Roberto's Fruit Mkt., Inc. v. Schaffer*, 13 F. Supp. 2d 390, 399-400 (E.D.N.Y. 1998) (rejecting bribery claims).  In short, these baseless and conclusory allegations fail to convert everyday professional conduct into an illicit bribery scheme.

### c.      Alix Fails to Plead Inducement to Violate 18 U.S.C. § 2314.

Alix's Travel Act predicate is the entire case in microcosm.  It alleges that Alix traveled to New York on October 15, 2015, to once again lecture Dominic Barton about McKinsey's disclosure practices.  But instead of "pursuing corrective action in light of Alix's admonishments," Barton offered to introduce AlixPartners to two McKinsey clients in need of consulting services. (AC ¶¶ 367-68.)  Thus, the allegation continues, Barton must have induced Alix to attend the meeting to string him along and thereby "forestall legal action," making the travel itself an integral part of McKinsey's "scheme to unlawfully compete" by disclosing connections to Interested Parties by name rather than by category.

Alix has stated no Travel Act claim.  Indeed, it is more plausible that Barton simply disagreed with Alix.  Like the rest of the Amended Complaint, this predicate simply conveys Alix's apparent belief that every act of McKinsey that did not comport with his preferences must be a RICO violation.  In any event, Alix must allege with particularity "(1) that the defendant devised a scheme intending to defraud a victim of money or property of a minimum value of $5,000, and

(2) that as a result of this scheme, a victim was induced to travel." *United States v. Myerson*, 18 F.3d 153, 164 (2d Cir. 1994); *Thai Airways Int'l v. United Aviation Leasing B.V.*, 891 F. Supp. 113, 118 (S.D.N.Y. 1994). Alix admits that *he* requested the meeting with Barton in order "to discuss remediation of McKinsey's continued unlawful bankruptcy consulting engagements." (AC ¶ 367.) This allegation alone is fatal, because the defendant must have been "the efficient cause" and "a motivating force in the victim's transportation." *Myerson*, 18 F.3d at 164. Having requested the meeting, Alix was not "induced" to travel and his Travel Act claim fails.

### 4.   Alix Also Fails to Plead Any Non-Fraud-Based Predicate Acts.

#### a.   Alix Fails to Plead Obstruction of Justice or Witness Tampering.

Alix contends that Defendants violated three separate obstruction of justice provisions—18 U.S.C. §§ 1503(a), 1512(b), and 1512(c). In his original Complaint, Alix premised this predicate act on a single absurd allegation: that RTS fraudulently induced the U.S. Trustee in the *ANR* case to withdraw its motion to compel a sworn supplemental disclosure by *providing the very information requested by the U.S. Trustee*. (Complaint (Dkt. #1) ¶ 302.) He now additionally alleges that each Rule 2014(a) disclosure constituted an obstruction of justice. (AC ¶¶ 3, 299(d), 331-58.)

Section 1512(b), concerning witness tampering, is clearly inapplicable here. That section makes it illegal to "use intimidation, to threaten or corruptly persuade another person, or engage in misleading conduct toward another person, with intent to influence, delay or prevent the testimony of any person in an official proceeding." *Rambarran v. Mount Sinai Hosp.*, No. 06-cv-5109 (DF), 2008 WL 850478, at *7 (S.D.N.Y. Mar. 28, 2008). To show "corrupt persuasion," the plaintiff must show that the conduct was "motivated by an improper purpose." *Id.* Alix comes

nowhere close to alleging any of these things; there is no allegation that any Defendant interfered with anyone's testimony, let alone did so with a corrupt purpose.[35]

Nor has he pleaded a violation of Sections 1503(a) or 1512(c).[36]  Because, as explained above, there is no duty to disclose under Rule 2014(a) in the manner Alix posits, there likewise can be no obstruction of justice arising from those same disclosures.  *See In re eToys, Inc.*, 331 B.R. 176, 202 (Bankr. D. Del. 2005) (allegedly deficient Rule 2014(a) filings did not constitute obstruction where "no rule existed at [the] time requiring an officer of the debtor to disclose any relationship in a case.  Therefore, the failure to disclose cannot be considered perjury or any other bankruptcy crime.").  Indeed, courts recognize that even a false bankruptcy filing does not per se constitute an obstruction of justice.  *United States v. Rodriguez*, No. 00-cr-91-01 (RWS), 2002 WL 31426311, at *11, *15 (S.D.N.Y. Oct. 23, 2002) (even where defendant "committed perjury in connection with [a] bankruptcy filing . . . [t]here [was] no information to suggest that the defendant impeded or obstructed justice . . .").

### b.    Alix Fails to Plead Money Laundering.

Alix also has not pleaded a money laundering violation.  As explained above, Alix has not pleaded that McKinsey obtained any money unlawfully, and therefore he cannot satisfy the core

---

[35] Alix fails to allege any actual interaction between any Defendant (including Kevin Carmody, who signed the disclosure) and the U.S. Trustee, let alone that anyone acted with a nefarious purpose in any such interaction.  The best Alix can do is allege, without any explanation or support, that the supplemental disclosure McKinsey submitted continued to omit connections to Interested Parties.  (AC ¶¶ 162-64, 166.)  The Amended Complaint fails to attach the McKinsey disclosure in question, which explains, in precise language, what it is and is not disclosing and why.  (Ex. 11-D, *ANR* Doc. 2464; Ex. 11-E, *ANR* Doc. 3223.)  This is the same kind of dispute over form that, as discussed above, cannot state a fraud.  (*Supra* § I.C.1.)

[36] Section 1503(a) applies where a defendant is alleged to have, or endeavored to have "corruptly . . . influenced [or] obstructed the due administration of justice" by "acting with wrongful intent or improper purpose to influence [a] judicial or grand jury proceeding."  *Grewal v. Cuneo*, No. 13-cv-6836 (RA), 2015 WL 4103660, at *18 (S.D.N.Y. July 7, 2015) (a plaintiff failed to plead a violation of § 1503(a) where defendants were alleged to "falsely represent" to courts that they were partners when they were not).  Likewise, Section 1512(c) prohibits "corruptly" tampering with a document or object with the intent to prevent its use in an official proceeding, or otherwise obstruct or impede an official proceeding.  *United States v. Reich*, 479 F.3d 179, 186 (2d Cir. 2007) (the relevant language of Section 1512(c) "is substantially similar to the . . . language of Section 1503(a)").

requirement of a money laundering claim.  *See Tymoshenko*, 57 F. Supp. 3d at 322 (setting out elements, including that "the transaction in fact involved the proceeds of specified unlawful activity as defined in § 1956(c)(7)"); *United States v. Gotti*, 459 F.3d 296, 334 (2d Cir. 2006) (same).  Moreover, Alix has not satisfied the intent requirement: the "transactions" Alix alleges constitute money laundering were ordinary-course transfers of fees between McKinsey entities earned for legitimate work.[37]  There is no suggestion that the purpose of these transactions was to disguise or conceal the source of the funds—indeed, the fees earned by McKinsey for its work were all approved by the bankruptcy courts after the public filing of fee applications and a full opportunity for any party with standing to object.  There is no plausible basis to infer that McKinsey's internal handling of money obtained as compensation for its professional services constituted anything other than the ordinary course of business.

### D. Alix Fails to Plead Any Racketeering Acts by Any Individual Defendant.

All of the arguments advanced above, including those in Section I.C as to Alix's failure to allege racketeering acts against the Corporate Defendants, apply with equal force to the Individual Defendants and mandate their dismissal.  Beyond those fatal deficiencies, Alix also fails to plead non-conclusory facts showing that any Individual Defendant actually committed a predicate act, including facts that show the "individual roles" played by each individual in the alleged scheme. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

---

[37] The only other allegations Alix ties to purported money laundering are those involving purported "re-invoiced" and "round trip" payments in connection with the *SunEdison* bankruptcy.  (AC ¶ 371.)  But the Amended Complaint is bereft of facts explaining why the work that McKinsey did was not legitimate or why SunEdison affiliates should not have been billed for the work McKinsey performed.  The pleading actually negates the intent requirement by affirmatively stating the reason the invoices were re-issued: because the services were originally billed to the wrong entity.  (*Id*. at ¶¶ 23(a), 231)

### 1. There is No Claim for Aiding and Abetting a RICO Violation.

Defendants' first motion to dismiss demonstrated that the original complaint failed to plead fraud with particularity because it failed to allege facts showing that the Individual Defendants knowingly committed the charged RICO offenses.  Rather than plead additional facts, the Amended Complaint instead alleges more than 150 times that the individuals "aided and abetted" each other's and McKinsey's RICO violations.  Indeed, for two Individual Defendants—Barton and Garcia—the Amended Complaint alleges *only* that they "aided and abetted acts of bankruptcy fraud," not that they actually committed any such fraud themselves.[38]  (*See* AC ¶ 311.)

It is well-settled, however, that there is no aiding and abetting liability under RICO.  In *Central Bank of Denver v. First Interstate Bank*, the Supreme Court held that a private plaintiff may not maintain a suit for aiding and abetting under § 10(b) of the Securities Exchange Act of 1934.  511 U.S. 164 (1994).  It reasoned that the Act does not reference aiding and abetting and declined "to extend liability beyond the scope of conduct prohibited by the statutory text."  It then further noted that "Congress knew how to impose aiding and abetting liability when it chose to do so," and that imposing some form of secondary liability under the securities laws but not others indicates a "congressional choice with which the courts should not interfere."  *Id.* at 176.

Applying *Central Bank*'s reasoning to civil RICO,[39] "[c]ourts in this district have routinely held that 'aiding and abetting' a RICO enterprise is not a valid cause of action."  *Spinale v. United States*, No. 03-cv-1704, 2004 WL 50873, at *6 (S.D.N.Y. Jan. 9, 2004) ("plaintiffs cannot bring

---

[38] The aiding and abetting allegations as to Yerian are limited to alleged actions arising out of the *Edison Mission* case, which, as discussed below (*see infra* § I.H), concluded in March 2014, beyond RICO's four-year statute of limitations.

[39] Section 1962(c), which is the basis for Alix's aiding and abetting claims, does not include any reference to aiding and abetting as a form of racketeering activity.  This stands in contrast to Section 1962(a)—a separate basis for RICO liability that Alix does not allege—which expressly defines participation in a racketeering activity to encompass aiding and abetting as defined by the general criminal aiding and abetting statute, 18 U.S.C. § 2.  The contrast further demonstrates that "there is no reason to believe that the omission of language in RICO covering aiders and abettors was inadvertent."  *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 476 (S.D.N.Y. 1996).

aiding and abetting claims under RICO statutes"); *see also Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,* 955 F. Supp. 248, 256 (S.D.N.Y. 1997) ("Following the reasoning in *Central Bank*, this Court declines to create a private right of action for aiding and abetting a RICO violation."); *Dep't of Econ. Dev.,* 924 F. Supp. at 475-77; *Niles v. Palmer*, No. 97-cv-7573 (JSM), 1999 WL 1419042 at *9 (S.D.N.Y. Oct. 22, 1999); *In re Motel 6 Secs. Litig.,* 161 F. Supp. 2d 227, 235 n.7 (S.D.N.Y. 2001); *Ling v. Deutsche Bank*, No. 04-cv-4566, 2005 WL 1244689, at *3 (S.D.N.Y. May 26, 2005); *Estate of Gottdiener v. Sater*, 35 F. Supp. 3d 386, 396 (S.D.N.Y. 2014). Consistent with this substantial line of authority, Alix's aiding and abetting allegations cannot be the basis of a viable RICO claim.[40]

### 2.   Alix Fails to Plead Primary Liability Against Any Individual.

Alix must plead specific facts showing that each Individual Defendant committed two or more predicate acts—including identifying the "individual role[ ]" each played in the alleged scheme. *DiVittorio*, 822 F.2d at 1247; *see also Worldwide Directories,* 2016 WL 1298987, at *4 ("Each element of a RICO violation . . . must be plausibly alleged as to each defendant rather than simply to the enterprise as a whole."); *Targum v. Citrin Cooperman & Co.*, No. 12-cv-6909 (SAS), 2013 WL 6087400, at *4 (S.D.N.Y. Nov. 19, 2013) (same with respect to fraudulent intent). Because of the stigma associated with racketeering allegations, "Rule 9(b)'s particularity requirements have 'even greater urgency' in civil RICO actions." *Schmidt v. Fleet Bank*, No. 96-cv-5030 (AGS), 1998 WL 47827, at *5 (S.D.N.Y. Feb. 4, 1998) (quoting *Morin v. Trupin*, 778 F. Supp. 711, 716 (S.D.N.Y. 1991)).

---

[40] Alix's claims also fail because he has not pleaded any substantive RICO claims under Section 1962(c).  *See supra* § I.C; *Charmac Props., Inc. v. Pike*, No. 86-cv-7919, 1993 WL 427137, at *4 (S.D.N.Y. Oct. 19, 1993) ("[T]o properly allege a claim for aiding and abetting, the plaintiff must show: . . . a primary violation.").

Alix's allegations fail to specify the actions the Individual Defendants allegedly took. Instead, the Amended Complaint emphasizes the high-level positions held by certain of the Individual Defendants[41] and contends that, as a consequence, they must have knowingly participated in the alleged scheme. (*See, e.g.*, AC ¶¶ 299(e)-(k), 311-17.) But this Court previously has rejected this same pleading formula as inadequate under Rule 9(b):

> [A] Complaint's mere recitation of fraudulent practices, coupled with conclusory allegations that [d]efendants were aware of these practices by virtue of their positions . . . , fails to state with particularity facts giving rise to a strong inference that any Defendant [made] false[] represent[ations], with scienter.

*Sanchez*, 2015 WL 3540836 at * 10 (quoting *In re One Commc'ns Corp.*, 2009 WL 857535, at *11 (S.D.N.Y. Mar. 31 2009)). "[A] plaintiff may not rely solely upon defendants' 'positions of control' in an enterprise, and may not link individual defendants to fraudulent activities 'by stating only that defendants were officers' of the organization." *Id.* at *6; *see also City of Phila. v. Fleming Cos., Inc.*, 264 F.2d 1245, 1264 (10th Cir. 2001) (fact of having "occupied senior positions in the company . . . is not sufficient to imply knowledge of the specific fact of materiality").[42] Under the approach adopted by Alix here, "every corporate executive who participates in the day-to-day management of his company would be exposed to liability for . . . fraud."[43] *In re Criimi Mae, Inc. Secs. Litig.*, 94 F. Supp. 2d 652, 661 (D. Md. 2000).

---

[41] Alix is unable to allege even that as to Proshan.  (*Compare* AC ¶ 299(i) (not alleging Proshan had any executive authority) *with* AC ¶ 299(e)-(g), (j) (alleging other Individual Defendants had "high degree of executive authority").)

[42] *See also In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) (quoting *Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir. 1998)) ("[A]llegations that a securities fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.").

[43] In the "Scienter" portion of the Amended Complaint—a scant twelve paragraphs in a 588-paragraph pleading—Alix relies solely on the fact that "Garcia, Goldstrom, and Proshan have legal training and/or have practiced law and, therefore, are sophisticated actors."  (AC ¶ 377(f).)  Having been "at the top of his class" in law school twenty-five years ago or even having passed the bar examination before becoming a management consultant (*id.*), is not a plausible allegation of intent.

Besides pointing to their senior positions at McKinsey (along with the conclusory and legally invalid refrain that the individuals "aided and abetted"), the Amended Complaint has little to say about the Individual Defendants.  An examination of the allegations against each reveals the Amended Complaint's glaring lack of particularity as to them.[44]

### a.  Dominic Barton

The allegations against Dominic Barton, McKinsey's former global managing partner, are largely unchanged in the Amended Complaint and still fail to state a claim of fraud or plausibly allege any wrongdoing. The Amended Complaint does not allege that Barton was involved in formulating or filing any of McKinsey's Rule 2014(a) disclosures, or that he played any role in any of the bankruptcy cases at issue.  To the contrary, Alix alleges that when he raised his concerns with Barton in September 2014, more than a decade after the purported RICO conspiracy began, Barton was unfamiliar with both U.S. bankruptcy law and the firm's bankruptcy procedures. Alix had to "explain[] McKinsey's disclosure obligations under bankruptcy law at length to Barton," as well as provide a "detailed exposition of the relevant legal principles . . ." (AC ¶ 123.)  When Alix phoned Barton to complain about RTS's disclosures in *NII Holdings* in 2014 and *Standard Register* in 2015, Barton was unaware even of McKinsey having been retained in those matters.[45] (*Id*. at ¶¶ 142, 157.)

---

[44] Tacitly recognizing this failure, Alix contends that the alleged fraudulent conduct "will be proven through discovery." (*E.g.*, AC ¶ 141.)  This is insufficient to save his claims.  *Madonna v. United* States, 878 F.2d 62, 66 (2d Cir. 1989) (noting that the "contention that discovery will unearth information tending to prove his contention of fraud is precisely what Rule 9(b) attempts to discourage"); *U.S. ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759, 774 (S.D.N.Y. 2018) ("[A] party who cannot meet the pleading requirements of Rule 9(b) is not entitled to discovery in order to flesh out the missing elements.").

[45] McKinsey serves roughly 2,000 clients per year on average, and the bankruptcy cases at issue here thus represented less than 0.1% of McKinsey's firm-wide clients.  As the firm's global managing partner, Barton was not involved on a granular level in the day-to-day operation of the firm's many functional and industry practices, and his lack of knowledge about two bankruptcy engagements is not surprising. Indeed, it underscores the implausibility of Alix's claim that the firm's managing partner had promised to undertake the task of "track[ing] all future McKinsey bankruptcy cases."  (AC ¶ 142.)

The Amended Complaint also alleges that, during other meetings and phone conversations in which Alix made additional complaints, Barton "foster[ed] in Alix the false impression that McKinsey was pursuing corrective action in light of Alix's admonishments." (*Id.* at ¶¶ 326, 368, 438, 515.)  But an assertion that Barton took no remedial action after purportedly saying that he would do so is insufficient to state a fraud claim. *Fezzani v. Bear Stearns & Co., Inc.*, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008) ("Where a defendant owes no fiduciary duty to a plaintiff, mere inaction by the defendant cannot constitute actionable participation in [fraud].").

The Amended Complaint alleges no other facts "giv[ing] rise to a strong inference of fraudulent intent" on Barton's part. *First Capital Asset Mgmt.*, 385 F.3d at 179.  Alix's bald assertion that Barton never intended to change RTS's bankruptcy procedures, but instead was intent on "forestalling remedial litigation by [AlixPartners] and Alix by means of [his] duplicitous interactions" (AC ¶ 520) is unsupported by any factual pleading.  Merely characterizing Barton's inaction as a manifestation of fraudulent intent, where other plausible and wholly innocent reasons for any purported change of mind or failure to act exist, does not satisfy Rule 9(b). *Targum*, 2013 WL 6087400, at *4.  Alix's own inaction in commencing his threatened "remedial litigation" reinforces the substantial doubt over the plausibility of his claims.

### b.   Kevin Carmody

The allegations against Kevin Carmody, a senior McKinsey partner, also fail to state a claim, whether under the plausibility standards of *Iqbal* and *Twombly* or the particularity requirements of Rule 9(b).  Besides alleging that Carmody was a "senior executive" at RTS, the only substantive allegations leveled against Carmody are that he played a role in preparing and then signed certain of RTS's Rule 2014(a) disclosures.  (AC ¶¶ 104, 299(j), 313, 377(g).)  As explained above, the contention that those disclosures contained actionable misrepresentations or material omissions fails as a matter of law.  (*Supra* § I.C.1.)

48

Moreover, the suggestion that an intent to defraud can plausibly be inferred from the fact that Carmody signed certain RTS disclosures does not pass muster.  Carmody did not join McKinsey until 2011 and the earliest allegations relating to him are from 2012 (*see* AC ¶ 105)—meaning that the disclosures he signed used a methodology that McKinsey had been using for a decade, as a means of protecting McKinsey's commitment to serving its clients "in a manner that protects the confidentiality of each client's information (including the confidentiality of the engagement itself)." (*See, e.g*., Ex. 11-A, *ANR* Doc. 212 ¶ 21.)  The theretofore unchallenged use of this methodology, by any party or bankruptcy court, provides a "natural explanation" as to why Carmody would have relied upon it in good faith.  *Twombly*, 550 U.S. at 567-68.  And, according to the Amended Complaint, McKinsey was advised by "some of the most sophisticated legal counsel in the world."  (AC ¶ 125.)  Given these concessions, the Amended Complaint offers "no reason to infer" that Carmody did anything other than follow McKinsey's standard form for disclosures—"what was only natural anyway," *Twombly*, 550 U.S. at 566—let alone pleads facts consistent with a "strong inference of fraudulent intent."  *First Capital Asset Mgmt.,* 385 F.3d at 179.[46]

The Amended Complaint is also silent about whether (and, if so, how) Carmody was aware of any alleged falsity in the submissions he signed.  Alix fails to allege that Carmody had personal knowledge of any specific connections to Interested Parties that he failed to disclose[47] or that he

---

[46] Also insufficient is the allegation that Carmody previously had worked at AlixPartners and he "would have known" that AlixPartners's Rule 2014(a) disclosures were "far more robust" than McKinsey's "bare-bones" disclosures.  (AC ¶ 377(g).)  Awareness of differences in disclosure practices between competitors is hardly an allegation that Carmody knowingly submitted false declarations while at McKinsey.

[47] For example, the Amended Complaint cites Carmody's deposition testimony as evidence that he was able to recall the names of a few of the first lien lenders—including Whitebox—in the *ANR* bankruptcy case.  But there is no allegation that Carmody had personal knowledge that MIO had an interest in Whitebox or believed that there was any need to disclose MIO's connections, particularly since Whitebox was not on the Interested Party list given to RTS by the Debtor.  (*See, e.g*., Ex. 11-A, *ANR* Doc. 212.).

had any motive or reason to submit false declarations to the bankruptcy courts.[48]  That Carmody worked for RTS and might benefit generally from its success is patently inadequate: "[i]n the corporate context . . . [m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a *concrete and personal benefit* to the individual defendants resulting from the fraud." *Bigsby*, 170 F. Supp. 3d at 578 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).  The Amended Complaint lacks any such allegations.

To the extent Alix alleges that McKinsey's conflict-checking process was "substandard" and "inadequate," (AC ¶ 63) and thus "ensur[ed] that relevant connections would be missed," (*id.* at ¶ 377(b)), he also alleges that the process was created *before* Carmody's employment began. This concession is fatal to Alix's attempt to plead that Carmody's reliance on that process is a fact making plausible his intent to defraud.  *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995) (intent requires allegation of either "a motive for committing fraud and a clear opportunity for doing so" or "circumstances indicating conscious behavior by the defendant").

### c.   Jon Garcia

Remarkably, the Amended Complaint does not allege any specific act that Jon Garcia engaged in.  Garcia, who is a senior McKinsey partner and the President of RTS, is never alleged to have made a telephone call, sent an email, reviewed a document, or taken any other action.  The Amended Complaint alleges only that Garcia engaged in aiding and abetting (*see, e.g.*, AC ¶ 310), which as discussed above, fails to state a civil RICO claim as a matter of law.  (*See supra* § I.D.1.) The aiding and abetting allegation is also conclusory, as there is no specification of how Garcia caused, authorized, or substantially assisted any allegedly false or misleading submissions.

---

[48] Even assuming, *arguendo*, that the Amended Complaint supports an inference that Carmody had a motive to obtain more business for McKinsey because of his status as a McKinsey partner, that fails to satisfy Rule 9(b).  *Sanchez*, 2015 WL 3540836, at *20-21.

As to intent to defraud, the allegations against Garcia are almost exclusively in regard to his position at the firm and the fact that he has legal training, (AC ¶¶ 299(g), 377(f))—neither of which is adequate to plead fraud.  *Sanchez*, 2015 WL 3540836, at *6.  There are no facts alleged that connect Garcia to any Rule 2014(a) disclosure, let alone any from which one could infer that Garcia knew such disclosures were false.  Garcia is smeared with the charge of being a racketeer, despite the absence of any allegation of wrongdoing or even action.

### d.    Seth Goldstrom

Stripped of conclusory rhetoric and legal argument, the Amended Complaint's few scattered references to Seth Goldstrom, another senior McKinsey partner, establish nothing more than that he signed disclosures as RTS's corporate representative in the *Harry & David* and *AMR* bankruptcies in 2011 and 2013—well beyond the statute of limitations period for RICO.  (*Infra* § I.H.)  These allegations are insufficient to state a plausible and particularized claim that he committed predicate violations of bankruptcy, wire, and mail fraud as part of the conduct of a racketeering enterprise.

The Amended Complaint includes, at most, nine unique paragraphs in the statement of facts that even arguably could be read to describe *any* conduct by Goldstrom personally.  (AC ¶¶ 94-95, 97-101, 105, 205.)  These paragraphs, however, allege nothing more than that Goldstrom signed the *Harry & David* and *AMR* disclosures (*id.* ¶¶ 94-95, 97, 99-101), and that he communicated with his colleagues about their work.  (*Id.* at ¶¶ 98, 105, 205.)[49]  The balance of the

---

[49] The Amended Complaint alleges that McKinsey RTS's fee applications in the *AMF Bowling* and *SunEdison* bankruptcies show that Goldstrom's colleagues were "in communication with" Goldstrom or "consulted" him in connection with those engagements.  (AC ¶¶ 105, 205, 302, 312, 314-15.)  The fee application in *AMF Bowling* does not reflect any time entry for Goldstrom and mentions Goldstrom only indirectly in connection with unspecified "correspondence" with Proshan.  A non-specific allegation of "correspondence" or "communication" with a colleague is plainly insufficient to state any claim, much less satisfy Rule 9(b)'s particularity requirement when alleging fraud.  And, contrary to the Amended Complaint's representations, Goldstrom's name does not appear at all in in the *SunEdison* fee application.

allegations is that Goldstrom is a lawyer (*id.* at ¶¶ 63, 125, 377(f), 551), a "Senior Partner" and "executive of McKinsey & Co.," and "executive" and "board member of McKinsey RTS." (*Id.* at ¶ 37.)  These allegations are insufficient to state a claim.  There are no allegations that Goldstrom knew or believed the disclosures he signed were incomplete or misleading, or that he acted for the purpose of depriving AlixPartners of money or property (just as with Carmody, *see supra* § I.D.2.b).  The Amended Complaint also does not allege that Goldstrom personally researched every potential connection in the disclosures he signed, drafted the disclosures, or had any reason to believe he could not rely in good faith on the judgment of the professionals who did.[50]

The only non-conclusory factual allegations against Goldstrom are fully consistent with a good faith intent to further RTS's legitimate business activities.  Among other things, the Amended Complaint acknowledges that the methodology used to prepare RTS's disclosures in *Harry & David* and *AMR* had been in place for more than a decade before Goldstrom is alleged to have participated in submitting any bankruptcy-related disclosures (*id.* at ¶¶ 67(a)-(e), 72-83, Ex. A), that McKinsey's business relationships were "complex[]" (*id.* at ¶ 71), that McKinsey was advised by "some of the most sophisticated legal counsel in the world" (*id.* at ¶ 125), and that neither AlixPartners nor any of the parties to the bankruptcy cases questioned or challenged RTS's methodology until after the *Harry & David* and *AMR* cases.  (*Id.* at ¶ 119.)

Further, the only disclosures that Goldstrom actually signed—in *Harry & David* and *AMR*—expressly stated that McKinsey was disclosing its connections by descriptive category, rather than by name, and set forth the *bona fide* reason for doing so (*i.e.*, to maintain McKinsey's

---

[50] Indeed, the disclosures Goldstrom signed expressly state that they are based on information compiled by other McKinsey employees.  (*E.g.*, Ex. 5-A, *Harry & David* Doc. 105-3 ¶ 2 (disclosures based on the "knowledge of professionals working under my direction"); *id.* at ¶ 10 ("McKinsey RTS made inquiry to all of its partner professionals and its affiliates' partner professionals about whether they currently provide consulting services to entities with a direct commercial relationship with the Debtors.").

confidentiality obligations to its management consulting clients).  (*E.g.*, Ex. 5-A, *Harry & David* Doc. 105-3 ¶¶ 6, 9 (describing confidentiality obligations associated with McKinsey's engagements), 10.)  The limited non-conclusory allegations about Goldstrom in the Amended Complaint are thus fully consistent with a finding that he signed these disclosures on behalf of RTS in a representative capacity as part of a good faith effort to provide services to debtors who previously had selected McKinsey (and not AlixPartners) to provide management consulting services.

The limited allegations regarding the *AMF Bowling* and *SunEdison* bankruptcies are similarly insufficient.  Those allegations—that Goldstrom "consulted" with (AC ¶ 205) or was in "communication" with (*id*. at ¶ 105) his colleagues, without any particularization of the content of the communication—are fully consistent with lawful conduct in the ordinary course of business. Taken in their entirety, the allegations against Goldstrom are "not only compatible with, but indeed . . . more likely explained by, lawful, unchoreographed free-market behavior," and so cannot state a plausible racketeering claim.  *Iqbal*, 556 U.S. at 680.  All the claims against Goldstrom must be dismissed for this reason alone.

The Amended Complaint also falls far short of Rule 9(b)'s requirement to provide particularized allegations of intent to defraud.  There are no non-conclusory allegations that Goldstrom was aware of any undisclosed connections, or that he believed that any of the Rule 2014(a) disclosures he signed, which were prepared by McKinsey with the benefit of "access to some of the most sophisticated legal counsel in the world" (AC ¶ 125), were false or misleading. The Amended Complaint fails to allege that Goldstrom even had reason to know that Alix believed RTS's disclosures to be inadequate, as it alleges that Alix did not raise this issue with any court or the U.S. Trustee until after the *Harry & David* and *AMR* bankruptcies.  (*See* AC ¶ 119 (alleging

that Alix raised concerns for the first time in September 2014).)  Nor is there any allegation that

Goldstrom had any motive or any reason to believe that Alix or AlixPartners posed any competitive

threat to RTS with respect to these engagements, that Goldstrom believed disclosure of

connections by name was required, or that McKinsey would be disqualified if it had made its

disclosures by name.[51]  Thus, there are no facts pleaded that provide the "strong inference" of

intent to defraud required by Rule 9(b).

### e.    Alison Proshan

The extent of the allegations against Alison Proshan is that she is an "associate general

counsel to McKinsey" who "assisted in the preparation of [Rule 2014] disclosures."

(AC ¶¶ 282(h), 343.)  The mere allegation that she provided such assistance in connection with

Rule 2014 disclosures does not even conceivably (much less plausibly) state a claim that she

knowingly engaged in a pattern of racketeering activity.  Not only does the Amended Complaint

fail to allege facts suggesting that she did anything wrong in the course of her legal work, it

affirmatively alleges that the work she performed was reviewed both by "some of the most

sophisticated legal counsel in the world" (*id.* at ¶ 125) and her supervisor, the General Counsel of

McKinsey.  (*Id.* at ¶ 128.)  Moreover, McKinsey's approach to disclosures (justified by its *bona

fide* commercial rationale) was established long before Proshan even joined McKinsey in 2009.

The Amended Complaint thus acknowledges that Proshan was doing her job as a lawyer, assisting

her client with its bankruptcy submissions consistent with McKinsey policy.  (*Id.* at ¶ ¶ 318, 329,

379.)  That cannot form the basis of any claim, let alone a fraud-based racketeering charge.  *Morin

v. Trupin*, 711 F. Supp. 97, 105 (S.D.N.Y. 1989) ("[A]lthough attorneys are not immune from

---

[51] Nor can fraudulent intent be inferred from a generalized profit motive.  (*See supra* § I.D.2.)

liability simply because they represent a client, legitimate acts of attorneys on behalf of clients cannot form the basis of a RICO claim.").

Moreover, the Amended Complaint alleges no facts from which one could draw an inference, let alone a "strong inference," of fraudulent intent. *Sanchez*, 2015 WL 3540836 at *10. Despite its length, the Amended Complaint contains not a single factual allegation—no emails, memoranda, conversations, or other evidence—that indicates Proshan was aware that any Rule 2014 disclosure was false or misleading, much less that she intended them to be so.

Nor, for that matter, does the Amended Complaint offer any motive for her participation in the alleged fraudulent scheme. It provides not a scintilla of explanation for what Proshan would have stood to gain from willfully engaging in fraud. Mere employment by McKinsey is, as a matter of law, not enough: "[A] generalized profit motive that could be imputed to any company has been consistently rejected as a basis for inferring fraudulent intent" by such company's employees. *Sanchez*, 2015 WL 3540836 at *8; *supra* § I.D.2.b. Absent specific facts supporting Alix's allegations of wrongful knowledge, intent, or motive on her part, the RICO charges against Proshan should be dismissed.

### f.    Robert Sternfels

The Amended Complaint contains only the slimmest of allegations as to Robert Sternfels, besides that he, too, is a senior McKinsey partner. It alleges no facts indicating that Sternfels had any role drafting or filing Rule 2014(a) disclosures. Rather, the principal accusation is that he allegedly listened in on two telephone calls between Alix and Barton in September 2014. (AC ¶¶ 25, 119, 299(f).) The Amended Complaint does not attribute any improper actions to Sternfels's role in the calls, where he was a passive participant. Nor does it assert that Sternfels did anything during or as a result of the two calls. Listening in on two phone conversations where one's business

rival vented about perceived misdeeds is not sufficient to constitute racketeering, and it certainly does not satisfy the Rule 9(b) standard for pleading fraud.[52]

### g.    Jared Yerian

The only thing Jared Yerian, a former Executive Vice President of RTS, is alleged to have done is sign RTS's Rule 2014(a) disclosures in *Edison Mission* in 2012 and 2013 (beyond the applicable statute of limitations).[53]  Notably, there are no allegations that Yerian personally failed to disclose known connections by category, that he misrepresented the scope, nature, or quantity of connections that were disclosed, or that he misstated the way that RTS searched for connections. Nor are there allegations that Yerian personally researched connections or could not reasonably rely on those who did.  Remarkably, unlike in some other cases identified in the Amended Complaint, Alix fails to identify any specific connection in *Edison Mission* that purportedly was not disclosed.  Rather, Alix alleges vaguely that Yerian "conceal[ed] connections to *likely* dozens of Interested Parties (*id.* at ¶ 109 (emphasis added)) and that the declarations Yerian signed were false or misleading solely because they "[f]ailed to identify connections by name and provide details of relationships."[54]  (*Id*. at Ex. B at 22-24.)

---

[52] The only other allegation as to Sternfels is that because he knew Ahmad Chatila, the CEO of SunEdison (a fact disclosed in RTS's disclosures (AC ¶ 237)), and because almost a year after the *SunEdison* bankruptcy McKinsey disclosed that an affiliate entered into a business arrangement with Chatila (who had since left SunEdison (*id.* at ¶ 239)), Sternfels may have engaged in misconduct.  Alix hypothesizes that "subsequent events" raised a "troubling *question*" of whether Chatila, while CEO of SunEdison, had caused SunEdison to retain McKinsey RTS, as a *quid pro quo* for assisting Chatila in obtaining new employment should he be fired from the insolvent SunEdison." (*Id.* at ¶¶ 219 (emphasis added), 238.)  This rank speculation gives rise to no plausible inference of fraud.  Alix does not allege a single email, memo, telephone call, meeting, or other fact supporting his accusation that Sternfels was "likely" involved in an unlawful *quid pro quo* with Chatila.  (AC ¶ 299(f).)

[53] Alix's other allegations relating to Yerian are that he is a trained accountant (AC ¶ 63) and an experienced bankruptcy professional who, by virtue of having worked at AlixPartners should have known that RTS's disclosures were inadequate.  (*Id*. at ¶¶ 109, 299(k), 317, 377(h).)

[54] Like RTS's other disclosures, those in *Edison Mission* transparently disclosed that RTS listed its connections by descriptive category and explained that the reason for doing so was client confidentiality.  (Ex. 8-A, *Edison Mission* Doc. 175-3 ¶¶ 18-19.)

These speculative and conclusory allegations come nowhere close to showing that Yerian knowingly participated in a vast RICO scheme. Indeed, the allegations regarding Yerian are more plausibly consistent with his good faith belief that he was executing legitimate business activities of RTS.[55] The Amended Complaint concedes that RTS's disclosure methodology had been in place for more than a decade before Yerian joined RTS (*id*. at ¶¶ 72-106, Ex. A), that RTS was advised by "some of the most sophisticated legal counsel in the world" (*id*. at ¶ 125), that McKinsey's business relationships were "complex[]" (*id.* at ¶ 71), and that Alix did not question RTS's disclosures until September 2014, long after the *Edison Mission* assignment was complete. (*Id*. at ¶ 119.) Simply put, Alix fails to allege that Yerian knew that RTS's disclosures in *Edison Mission* (or otherwise) violated Rule 2014(a), let alone that had the disclosures been by name, RTS would have been disqualified.

### E.     Alix Fails to Plead a RICO Enterprise Against the Corporate Defendants.

A Section 1962(c) RICO "enterprise must be separate from the pattern of racketeering activity, and distinct from the person conducting the affairs of the enterprise." *In re GM LLC Ignition Switch Litig.*, No. 14-md-2543 (JMF), 2016 WL 3920353, at *12 (S.D.N.Y. July 15, 2016). The Second Circuit repeatedly has affirmed that "the same entity cannot be <u>both</u> the RICO person and the enterprise." *U1it4less, Inc. v. FedEx Corp.*, 871 F.3d 199, 205 (2d Cir. 2017) (citing *Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 89 (2d Cir. 1999)) (emphasis in original); *see also Bennett v. U.S. Tr. Co.*, 770 F.2d 308, 315 (2d Cir. 1985). Alix names the Corporate Defendants in two of the three substantive RICO counts—1 and 3—and the Amended Complaint

---

[55] In fact, a disclosure Yerian signed advised the bankruptcy court that McKinsey affiliates performed ongoing work for the debtors' competitors and other Interested Parties, and would continue to do so. (Ex. 8-A, *Edison Mission* RTS Retention letter (incorporated by reference into Doc. 175-3) ¶ 19 ("It is McKinsey's long-standing policy to serve competing clients and clients with potentially conflicting interests . . . Consistent with such practice and McKinsey's confidentiality obligations to its other clients, McKinsey is not able to advise or consult with the Client about McKinsey serving the Client's competitors or other parties . . .").)

does not alter the way in which either of the purported enterprises in these counts allegedly are structured.  In Count 1, RTS is the purported enterprise and the remaining Corporate Defendants are accused of conducting RTS's affairs through a series of predicate acts.  (AC ¶¶ 293, 299.)  In Count 3, all Defendants are accused of operating an enterprise consisting of "McKinsey and the bankruptcy consulting clients of McKinsey US and McKinsey RTS" in the thirteen cases.  (*Id.* at ¶ 456.)  Because the McKinsey entities named as "persons" in each of these counts are not distinct from the alleged RICO "enterprises," both counts fail as to them.

The Count 1 Enterprise fails under the well-established rule in this Circuit that "a corporation carrying out its own activities (even fraudulent ones) only through its agents and employees does not constitute an enterprise."  *In re GM*, 2016 WL 3920353, at *12; *see also Cruz*, 720 F.3d at 120 (defendant corporation, its COO, and its corporate counsel cannot form an enterprise); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("[B]y alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented.").  A plaintiff cannot artificially manufacture distinctness between a corporate subsidiary and its parents, affiliates, and employees by relying upon the fact of the subsidiary's separate incorporation.  *U1it4less*, 871 F.3d at 206, 208.

That is exactly what the Amended Complaint attempts to do.  In *U1it4less*, the plaintiff alleged that FedEx Corp. and FedEx Services conducted the affairs of FedEx Ground, FedEx Corp.'s wholly-owned subsidiary, through a pattern of racketeering activity.  871 F.3d at 206.  The court dismissed the Section 1962(c) claim, holding that the three companies comprised a unified corporate structure "guided by a single corporate consciousness."  *Id.* at 206-07.  The same is true here.  The alleged enterprise in Count 1 is RTS, a Delaware limited liability company whose sole

58

member is McKinsey & Co. (US) (a wholly-owned subsidiary of McKinsey Holdings, Inc., which is itself a wholly-owned subsidiary of McKinsey & Co., Inc.).  (AC ¶¶ 30-33; *see also* Dkt. 58 (Rule 7.1 Corporate Disclosure Statement).)  Nowhere does Alix allege facts giving rise to a plausible inference that RTS operated outside of the McKinsey & Co., Inc. corporate structure; to the contrary, he alleges that the Corporate Defendants (and the Individual Defendants) are liable as RICO persons because of their relationships or positions within the McKinsey corporate structure.  (AC ¶ 299.)  As such, RTS is not distinct from the rest of McKinsey and, therefore, Count 1 must be dismissed as to the Corporate Defendants for failure to plead a RICO enterprise.

Alix's attempt to plead an association-in-fact enterprise in Count 3 consisting of "McKinsey" and the "bankruptcy consulting clients of McKinsey US and McKinsey RTS" (*id.* at ¶ 456) also fails.  Alix contends that this enterprise is structured around (1) the corporate relationships among McKinsey entities, (2) the "terms of the retention agreements" between McKinsey and its restructuring clients, and (3) the fact that some McKinsey personnel are sometimes placed onsite at the client to assist with the restructuring assignment.  (*Id*. at ¶ 457.)  As explained above, there can be no RICO enterprise among corporations that are part of a unified corporate structure.  *In re GM*, 2016 WL 3920353, at *14.  Moreover, there is no basis to infer a RICO enterprise from the (undisclosed) terms of a consulting contract or the fact that personnel may work onsite while completing an assignment.  The Amended Complaint continues to lack any factual allegations explaining how or why (or even which among) any of McKinsey's restructuring clients—or any of the purported Count 3 Enterprise members—joined together with a "common purpose" to operate a RICO enterprise to deprive AlixPartners of bankruptcy assignments.  *Id.* And without pleading any facts to show how McKinsey's clients joined McKinsey in any common purpose—other than for the legitimate business purpose of advising and restructuring the clients'

businesses—the only entities left to occupy this purported enterprise "operate as part of a single, unified corporate structure and are, as such, not sufficiently distinct to demonstrate the existence of a RICO enterprise."  *Cruz*, 720 F.3d at 121; *In re GM*, 2016 WL 3920353, at *14.

### F.   Alix Fails to Plead that Any of the Individual Defendants Conducted or Participated in the Conduct of a RICO Enterprise.

To properly plead a Section 1962(c) violation, a plaintiff must allege that each defendant "conduct[ed], or participat[ed] in the conduct of the affairs of the enterprise" through a pattern of racketeering activity.  18 U.S.C. § 1962(c).  The Supreme Court held in *Reves v. Ernst & Young*, 507 U.S. 170, 178-79 (1993), that this requirement limits liability to those persons who "operated or managed" the affairs of the enterprise.  "[P]erformance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." *United States v. Viola*, 35 F.3d 37, 41 (2d Cir. 1994).  Having a formal position in a corporate structure is not enough; rather, a plaintiff must make specific allegations showing that a defendant played "some part in directing the enterprise's affairs."  *See Crab House of Douglaston Inc. v. Newsday, Inc.*, 418 F. Supp. 2d 193, 206 (E.D.N.Y. 2006) (plaintiff did not satisfy the *Reves* test where it failed to attach any specific allegation to directors of a corporation).  "The polestar is the *activity in question, not the defendant's status*," title, or position in the corporate structure. *Handeen v. Lamaire*, 112 F.3d 1339, 1349 (8th Cir. 1997) (emphasis added).[56]

Here, Alix fails to allege facts sufficient to establish that any Individual Defendant operated or managed the alleged racketeering enterprises.

---

[56] *See also Sanchez* 2015 WL 3540836, at *6 ("[P]laintiff may not rely solely upon . . . stating only that defendants were officers and shareholders of the organization.") (quotation and citation omitted); *Productores Asociados de Café Rio Claro, C.A. v. Barnett*, No. 98-cv-499 (DAB), 1999 WL 287389, at *3 (S.D.N.Y. May 7, 1999) (it is insufficient to conflate an individual's title or position in an organization with "directing" the affairs of the entirely separate RICO enterprise).

**Alison Proshan**.  The Amended Complaint is most obviously deficient under *Reves* in its allegations against Alison Proshan.  It merely alleges that Proshan was "an associate general counsel [who] furnishes in-house legal services to McKinsey," including in connection with Rule 2014(a) disclosures.  (AC ¶¶ 299(i), 552.)  The Amended Complaint does not allege she was an executive or partner of McKinsey or RTS or had any managerial responsibilities whatsoever (neither of which would be legally sufficient, in any event), much less that she supervised or directed the activities of the alleged enterprises.  In fact, the Amended Complaint rightfully omits Proshan from its definition of senior leadership.  (*Id*. at ¶¶ 65, 131.)

Moreover, the Amended Complaint alleges that Proshan acted "within the scope of [her] formal position[] . . . in furtherance of deliberate corporate policy sanctioned and actively furthered by senior management."  (*Id*. at ¶ 318 (emphasis added).)  But an attorney does "not become a participant in directing the enterprise's affairs by knowingly implementing decisions of upper management."[57]  *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008).  There are simply no allegations that remotely suggest that Proshan operated or managed any aspect of the alleged enterprises—a fatal defect under *Reves*.

At most, the Amended Complaint suggests that Proshan provided legal assistance in preparing the Rule 2014(a) disclosures as part of her job responsibilities as an associate general counsel.  (AC ¶ 303.)  The "performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)."  *Viola*, 35 F.3d at 41; *see also Vickers Stock Res. Corp. v. Quotron Sys., Inc.*, No. 96-cv-2269 (HB), 1997 WL 420265, at *4 (S.D.N.Y. July 25, 1997).  ("RICO liability will not be imposed upon a defendant

---

[57] The fact that individuals were acting within the scope of their employment, without more, "hardly conjures the specter of enterprise-conductor."  *Crab House*, 418 F. Supp. at 208.

simply because [she] provides goods and services that benefit the RICO enterprise.").[58]  Proshan's legal work in helping in the preparation of the Rule 2014(a) disclosures may or may not have been "necessary and helpful," but none of the Amended Complaint's allegations support the inference that she played a role in managing or controlling the alleged enterprises.  *See Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993) (attorney's assistance in bankruptcy case as part of limited partnership's fraudulent scheme did not satisfy *Reves*); *Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*, 832 F. Supp 585, 591 (E.D.N.Y. 1993) (no RICO liability where enterprise was attorney's sole client and attorney incorporated two corporate defendants involved in scheme and served as director and officer for both); *Nolte v. Pearson*, 994 F.2d 1311, 1317 (8th Cir. 1993) (attorneys who prepared false opinion letters did not "operate or manage" the enterprise).

**Seth Goldstrom, Kevin Carmody, and Jared Yerian.**  Similarly, the Amended Complaint fails to allege any act by Goldstrom, Carmody, or Yerian that constitutes operation or management of any enterprise.  Aside from amorphous allegations of "aiding and abetting" various purported acts of others,[59] the Amended Complaint's allegations against these Defendants relate exclusively to signing certain Rule 2014(a) disclosures.  (AC ¶¶ 304-05, 307.)  As previously noted, however, "performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)."  *Crab House,* 418 F. Supp. 207 (quoting *United States v. Diaz,* 176 F.3d 52, 92 (2d Cir. 1999)).  There is no non-conclusory allegation that any of these three individuals played any role in the alleged enterprises beyond this.  The Amended Complaint emphasizes the number of allegedly false Rule 2014(a) disclosures made by them

---

[58]  *See also Dep't of Econ. Dev.*, 924 F. Supp. at 466 ("[P]roviding important services to a racketeering enterprise is not the same as directing the affairs of the enterprise."); *Redtail Leasing v. Bellezza*, No. 95-cv-5191 (JFK), 1997 WL 603496, at *5 (S.D.N.Y. Sept. 30, 1997) ("A defendant does not 'direct' an enterprise's affairs under § 1962(c) merely by engaging in wrongful conduct that assists the enterprise.").

[59]  The aiding and abetting allegations as to Yerian are limited to the *Edison Mission* case.  (AC ¶ 299(k).)

(ignoring the fact that these submissions were made in only a handful of bankruptcy cases), but the number of signed declarations is legally irrelevant on this issue: "[i]n determining whether or not a defendant participated in the operation or management of the RICO enterprise, the . . . focus [is] on the *degree of control* the defendant exerted over the enterprise rather than the *amount of* defendant's involvement in the enterprise." *Vickers*, 1997 WL 420265, at *4 (emphasis in original). The Amended Complaint fails under *Reves* for not alleging facts showing that Goldstrom, Carmody, or Yerian directed or managed any of the alleged RICO enterprises.

**_Jon Garcia and Robert Sternfels_.** Besides emphasizing their positions and titles at McKinsey, the Amended Complaint has little to say about Garcia and Sternfels. No specific acts of any sort are leveled against Garcia, much less acts that reflect his direction or management of the enterprise. There are no allegations as to when, where, or how he exercised control over the enterprise or the submission of any allegedly false Rule 2014(a) disclosures. Because there are no facts pleaded in the Amended Complaint from which one could reasonably infer that Garcia exerted direction or control as required under *Reves*, the Amended Complaint fails as to him.

The allegations against Sternfels are also lacking. Sternfels is alleged to have joined two telephone calls between Alix and Barton, and he "likely" was involved in some unidentified way in a business arrangement with former SunEdison CEO Ahmad Chatila almost one year after the *SunEdison* bankruptcy filing. These allegations, taken individually or together, do not amount to directing or controlling a RICO enterprise. *See, e.g., Biofeedtrac, Inc.,* 832 F. Supp. at 591-92 ("Plaintiff has adduced no facts to suggest that [defendant's] actual or projected role was to 'lead, run, manage, or direct' any part of the enterprise. Thus, he did not participate in the 'conduct' of an enterprise and did not violate § 1962(c).").

**Dominic Barton.** Similarly, none of the allegations against Barton indicate that he was conducting or managing the RICO enterprise. Alix does not allege that Barton directly managed the bankruptcy consulting practice and concedes that Barton first learned about the supposed falsity of McKinsey's bankruptcy disclosures in the latter half of 2014, some thirteen years after the inception of the purported racketeering activity. (AC ¶¶ 119-127.) Nor is it alleged that, upon learning of an already existing RICO enterprise, Barton elected to join and direct its affairs. Being put on notice of a fraudulent scheme and doing nothing to put a stop to it are insufficient to satisfy the *Reves* "operation or management" test. *See In re Agape Litig.*, 681 F. Supp. 2d 352, 369 (E.D.N.Y. 2010) (dismissing RICO claim where, "[e]ven if the Court assumes that [the defendant] consciously ignored the fraud or provided important services to aid its commission, this would still be insufficient to show that [the defendant] directed or operated [the] scheme"); *Walter*, 538 F.3d at 1248 ("It is not enough that [defendant] failed to stop illegal activity, for *Reves* requires some degree of direction." (citation omitted)); *Amsterdam Tobacco Inc. v. Philip Morris Inc.*, 107 F. Supp. 2d 210, 218 (S.D.N.Y. 2000) ("[E]ven if it [is] accepted as true . . . that [defendant] w[as] aware of smuggling activity, that would not suffice to support a RICO claim."). Equally insufficient to satisfy *Reves* is the speculative claim that Barton sought to "deflect and delay" Alix's remediation efforts to prolong the life of the fraudulent scheme. Even if Barton harbored such an intent (which he did not) and acted on it, at best it might constitute assistance to the enterprise, not the management or direction of it. *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 347 (S.D.N.Y. 1998) ("There is no doubt that plaintiffs have alleged wrongful acts that were allegedly of real importance to Schick's scheme . . . . However, when reduced to their essentials, these are really allegations of *assistance* to the alleged RICO enterprise, not direction of it.") (emphasis in original).

### G.      Alix Fails to Plead a RICO Conspiracy Under Section 1962(d).

Because Alix has not pleaded any substantive RICO claim under Section 1962(c), his "claim of conspiracy under Section 1962(d) must fail as well."  *Sanchez*, 2015 WL 3540836, at *12; *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998).  Moreover, the Section 1962(d) claim fails for two additional reasons.

*First*, the Amended Complaint fails to plead that any Defendant "agreed with at least one other entity to commit a substantive RICO offense."  *Crawford v. Franklin Credit Mgmt.*, 758 F.3d 473, 487 (2d Cir. 2014); *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990) ("Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement.").  While the Amended Complaint adds much text to Count 4, the circumstances—time, date, place, etc.— under which Defendants allegedly formulated their conspiratorial agreement remain conspicuously absent.  Instead, Alix once again substitutes innuendo for facts; he alleges that each of the McKinsey entities and Individual Defendants "knew of" and "facilitated" illegal activity (AC ¶¶ 544, 549-54) and that based on the scope of the purported wrongful activity, and the "close business and employment relationships" between the Defendants, "there can be no question (and at a bare minimum, there is a strong inference)" that there was an agreement to further the unlawful scheme.  (*Id*. at ¶¶ 546, 555.)  He further alleges, in conclusory fashion, that "[e]ach Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the affairs of McKinsey RTS, the Count 2 Enterprise, and/or the Count 3 Enterprise through a pattern of racketeering activity."  (*Id*. at ¶ 556.)

This is insufficient to plead the core of a conspiracy claim: a "conscious agreement" between any of the Defendants.  *Hecht*, 897 F.2d at 25 n.4; *Wood v. Gen. Motors Corp.*, No. 08-cv-5224 (PKC), 2015 WL 1396437, at *10 (E.D.N.Y. Mar. 25, 2015) (rejecting RICO conspiracy

claim where plaintiff failed to allege a "meeting of the minds with respect to the alleged violations"). There is not a hint as to when each Defendant joined the alleged conspiracy, with whom he or she reached an agreement to join, what was agreed to, or any other specifics about circumstances by which each individual supposedly joined. *See Morin*, 711 F. Supp. at 111; *Naso v. Park*, 850 F. Supp. 264, 275 (S.D.N.Y. 1994) (rejecting Section 1962(d) claim that did "not make specific factual allegations from which [the court] can conclude that defendants consciously agreed to commit predicate acts with knowledge of the scope of the enterprise and intent to further its affairs"). Nor are the allegations of the Defendants' business and employment relationships "sufficient to establish that each defendant consciously agreed to commit the specified predicate acts."[60] *4 K & D Corp.*, 2 F. Supp. 3d at 545.

*Second*, the RICO conspiracy claim is defeated by application of the intracorporate conspiracy doctrine. A plaintiff cannot sustain a RICO conspiracy claim naming only a corporation, its subsidiaries, and its agents. *See Kriss v. Bayrock Grp. LLC*, No. 10-cv-3959 (LGS), 2016 WL 7046816, at *19 (S.D.N.Y. Dec. 2, 2016) ("The intracorporate conspiracy doctrine holds that a corporation cannot conspire with its agents.") (citing *Turkmen v. Hasty*, 789 F.3d 218, 263 (2d Cir. 2015)); *Merhej v. I.C.S. Int'l Custody Sys., Inc.*, No. 13-cv-869 (JGK), 2014 WL 104908, at *4 (S.D.N.Y. Jan. 9, 2014) ("As a matter of law, a corporation cannot conspire

---

[60] Moreover, Alix makes the conclusory allegation that each Individual Defendant agreed to further the alleged conspiracy based on his or her "knowledge" of the fraudulent scheme. (AC ¶¶ 549-554.) But as demonstrated repeatedly (*see supra* § I.D), Alix has not sufficiently alleged fraudulent intent. And even were the Amended Complaint found to allege knowledge of the fraud, that would not overcome its failure to allege any facts to show that a defendant had agreed to join the conspiracy to accomplish a specific illegal objective. *United States v. Monserrate-Valentin*, 729 F.3d 31, 41 (1st Cir. 2013) ("The defendant's agreement to join the conspiracy 'is the *sine qua non* of a conspiracy' and it is 'not supplied by mere knowledge of an illegal activity, let alone by mere association with other conspirators or mere presence at the scene of the conspiratorial deeds.'"); *see also United States v. Svoboda*, 347 F.3d 471, 479 (2d Cir. 2003) ("actual knowledge of the illegal purpose of a conspiracy is insufficient to prove a defendant's joinder in a conspiracy"); *United States v. Larkin*, 227 F. Supp. 3d 1091, 1094 (N.D. Cal. 2016) ("Mere association with members of a conspiracy or knowledge of the conspiracy, 'without an intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator.'" (quoting *United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th Cir. 1980))).

with itself."); *Rite Aid Corp. v. Am. Express Travel Related Servs. Co., Inc.*, 708 F. Supp. 2d 257,

265 n.9 (E.D.N.Y. Mar. 3, 2010) ("[A] parent corporation cannot conspire with its wholly-owned

subsidiary."); *Little v. City of N.Y.*, 487 F. Supp. 2d 426, 441-42 (S.D.N.Y. 2007) (finding that

"officers, agents, and employees of a single corporate entity, each acting within the scope of [their]

employment are legally incapable of conspiring together").   Here, all the Corporate Defendants

are McKinsey entities, and all the Individual Defendants are alleged to have acted within the scope

of their authority as McKinsey employees.[61]   (*See* AC ¶¶ 30-33, 561.)

### H.   Alix's RICO Claims Are Barred, in Substantial Part, by the Four-Year RICO Statute of Limitations.

RICO claims are subject to a four-year statute of limitations, running from the date the

plaintiff discovered, or should have discovered, the *injury*—not the claim.   *Koch v. Christie's Int'l*,

699 F.3d 141, 148, 150 (2d. Cir. 2012).   The clock begins running "when a reasonably diligent

investigation would have revealed the injury to a person of reasonable intelligence."   *Id.* at 153;

*see also In re Integrated Res. Real Estate Ltd. P'ships Secs. Litig.*, 851 F. Supp. 556, 567 (S.D.N.Y.

1994) ("The limitations period for a fraud-based RICO action commences when Plaintiffs are

placed on notice of facts which should arouse suspicion.").   This is the case even where a plaintiff

has not actually discovered its injury yet and where "the full extent of the RICO scheme is not

discovered until a later date."   *Koch*, 699 F.3d at 153 (quoting *World Wrestling Entm't, Inc. v.

Jakks Pac., Inc.*, 328 F. App'x 695, 697 (2d Cir. 2009)).   Even where a "pattern of predicate acts

may well be complex, concealed, or fraudulent," it nonetheless is "discovery of the injury, not

---

[61] Although some courts have recognized an exception to the intracorporate conspiracy doctrine where the corporate employees are acting for their own independent, personal reasons, *Reich v. Lopez*, 38 F. Supp. 3d 436, 463 (S.D.N.Y. 2014); *Kriss v. Bayrock Grp. LLC*, No. 10-cv-3959 (LGS), 2017 WL 1901966 at *3 (S.D.N.Y. May 8, 2017), this exception is not implicated here.   The Amended Complaint does not allege that any of the Individual Defendants' participation in the conspiracy was driven by any improper personal interest distinct from their employment by McKinsey, and it does allege expressly that the alleged predicate acts were committed by individuals acting within the scope of their employment.   (Am. Compl. ¶ 561.)

discovery of the other elements of a claim [which] starts the clock." *Rotella v. Wood*, 528 U.S. 549, 555-56 (2000).  Moreover, a "plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 181 (1997).

The Amended Complaint alleges that AlixPartners was injured when McKinsey—rather than AlixPartners—was approved to provide bankruptcy consulting services in each bankruptcy. (*See, e.g.*, AC ¶ 384 (identifying as damages "fees from bankruptcy consulting engagements [AlixPartners] would have earned in the absence of [McKinsey's] unlawful conduct").) Accordingly, the limitations period with regard to the alleged RICO predicates in connection with each bankruptcy began when McKinsey's retention was approved by the court—and certainly no later than the time McKinsey's fees were confirmed for those bankruptcies—because by each such date it was apparent (indeed, a matter of public record) that McKinsey had been approved to serve the debtors and was receiving consultancy fees for its work in that particular bankruptcy.

Alix filed this action on May 9, 2018; therefore, any RICO claim based on disclosures in the following bankruptcies must be dismissed as time-barred:

| Case | Last Disclosure Filed | Fees Confirmed | Amended Complaint Paragraph |
|---|---|---|---|
| *Hayes Lemmerz* | March 13, 2002 | May 12, 2003 | 72 |
| *United* | February 13, 2002 | January 21, 2006 | 77 |
| *Mirant* | October 27, 2003 | December 9, 2005 | 81 |
| *Lyondell* | September 11, 2009 | April 23, 2010 | 87 |
| *Harry & David* | June 17, 2011 | August 29, 2011 | 94 |
| *AMR* | April 18, 2013 | October 21, 2013 | 97 |
| *AMF Bowling* | November 21, 2012 | June 25, 2013 | 104 |
| *Edison Mission* | November 23, 2013 | March 11, 2014 | 107 |

Significantly, the Amended Complaint fails to allege any predicate acts purportedly committed by Goldstrom, Yerian, or Garcia that occurred after May 9, 2014.  Yerian is alleged to have signed Rule 2014(a) disclosures only in connection with *Edison Mission*.  The Amended

Complaint alleges that RTS's fees in that case were confirmed on March 11, 2014; therefore, the latest the statute of limitations for a RICO claim relating to *Edison Mission* ran was March 11, 2018.  Alix did not assert claims against Yerian until September 4, 2018—well after the statute ran—and, consequently, the Amended Complaint is untimely as to him.  *Smith v. Cingular Wireless*, No. 05-cv-1149 (MRK), 2006 WL 1272612, at *1 (D. Conn. Apr. 10, 2006); *Nikchemny v. Allstate Ins. Co.*, No. 16-cv-00407 (NGG), 2016 WL 6082034, at *3 (E.D.N.Y. Oct. 17, 2016).

Goldstrom is alleged to have signed disclosure affidavits only in connection with the *Harry & David* and *AMR* bankruptcies.[62]  Alix alleges that McKinsey's fees for the *Harry & David* bankruptcy were confirmed on August 29, 2011, and that its fees for the *AMR* bankruptcy were confirmed on October 21, 2013.  (AC ¶¶ 94, 97.)  Accordingly, the statute of limitations for a RICO claim relating to those bankruptcies expired on August 29, 2015 and October 21, 2017, respectively.  Alix did not assert claims against Goldstrom until May 9, 2018; the Amended Complaint therefore is untimely as to him as well.  *Smith*, 2006 WL 1272612, at *1; *Nikchemny*, 2016 WL 6082034, at *3.

As for Garcia, the Amended Complaint is devoid of any allegations as to when he engaged in *any* RICO predicate act (save for the legally insufficient claims of aiding and abetting liability). It does not allege that he was involved in any specific bankruptcy case or filing, let alone *when* he was involved.  In fact, it fails to allege any dates or actionable time frame for *any* conduct on Garcia's part.  Garcia thus should be dismissed. *Thompson v. Jasas Corp.*, 212 F. Supp. 2d 21, 26 (D.D.C. 2002) ("[P]laintiff has failed to specify an actionable time frame for the alleged

---

[62] Goldstrom is also alleged to have "aided and abetted" a RICO scheme (AC ¶ 299(h)), which cannot form a basis for liability under RICO (*see supra* § I.D.1) and to have been "in communication with" other McKinsey employees (*id.* at ¶¶ 105, 205) with respect to the *AMF* and *Sun Edison* bankruptcies.  The *AMF* bankruptcy is also outside the statute of limitations, and in any event, the conclusory allegations concerning those other bankruptcies are insufficient to state a claim for the reasons stated above.  (*See supra* § I.D.2.g.)

defamation.  Because plaintiff has not alleged conduct within the . . . statute of limitations . . . [the] claim will be dismissed as time-barred."); *Jenson v. Nat'l Air Traffic Controller's Ass'n*, No. 09-cv-336 (LRS), 2010 WL 1608678, at *1 (E.D. Wash. Apr. 15, 2010) (dismissing in part where "there [were] no dates in conjunction with the alleged facts for the Court to review for statute of limitations issues").

## II.   THE STATE LAW CLAIMS FAIL (COUNTS 5-7).

### A.   Alix's Contract-Based Claims Fail (Counts 5 and 6).

Counts 5 and 6 plead breach of contract and promissory estoppel claims against all the Corporate Defendants based on an alleged agreement arising from oral discussions between Alix and Dominic Barton.  Specifically, Barton allegedly promised that, in exchange for delaying this lawsuit, McKinsey would remove the senior leadership of McKinsey RTS and "exit the bankruptcy consulting business by the end of March 2015."  (AC ¶ 570; *see also id.* at ¶¶ 26, 577.)

To state a breach of contract claim "[w]here there is no written agreement between the parties, the plaintiff must establish, 'through the words and/or conduct of the parties, that a contract was made and that its terms are definite.'"  *Spithogianis v. Haj-Darwish*, No. 07-cv-4609 (PAC), 2008 WL 82188, at *4 (S.D.N.Y. Jan. 7, 2008) (quoting *Zurich Ins. Grp. v. Grandurismo, Inc.*, No. 00-cv-980 (AGS), 2000 WL 1677941, at *3 (S.D.N.Y. Nov. 8, 2000)).  Courts consider four factors when determining whether parties intended to be bound by a purported oral agreement: (1) whether an explicit statement that only a writing shall be binding exists; (2) partial performance; (3) complete negotiation of all terms; and (4) whether the subject matter of the contract is one that normally requires a written agreement.  *Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 179 (S.D.N.Y. 2007).  Likewise, a promissory estoppel claim requires "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance."  *Banco*

70

*Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03-cv-1537 (MBM), 2003 WL 23018888, at *6 (S.D.N.Y. Dec. 22, 2003).

The alleged conversations between Alix and Barton described in the Amended Complaint fail to plead an enforceable agreement under either traditional contract or estoppel theories. *First*, an agreement for McKinsey not to compete with a competitor would be unreasonably in restraint of trade and, therefore, unenforceable on grounds of public policy. *See* Restatement (Second) of Contracts § 186. *Second*, the terms of the purported agreement are indefinite and vague: the definition of "senior management," the length of time in which Alix supposedly agreed to "forebear[] from instituting legal action," the details of how RTS would exit the market (including what would happen to its clients and employees), and other key details of the supposed agreement are missing. *In re Merrill Lynch Auction Rate Secs. Litig.*, 886 F. Supp. 2d 340, 346 (S.D.N.Y. 2012) (dismissing claim for breach of oral contract where alleged oral promise was "highly general and prospective in nature" such that enforcement would be "unreasonable"); *Zikakis v. Staubach Retail Servs., Inc.*, No. 04-cv-9609 (NRB), 2005 WL 2347852, at *6 (S.D.N.Y. Sept. 26, 2005) (same in promissory estoppel context). *Third*, the subsequent actions of the parties belie the formation of a contract. Alix contends that he refrained from filing this lawsuit in reliance on a promise that McKinsey would exit the restructuring market by the Spring of 2015; but after that did not happen, and RTS continued to obtain chapter 11 assignments, he waited over three years to bring this action. And Barton took no action following the purported contract that indicates any intent to be bound by the alleged agreement. *Milton Abeles, Inc. v. Farmers Pride, Inc.*, No. 03-CV-6111 (DLI) (WDW), 2007 WL 2028069, at *2 (E.D.N.Y. July 11, 2007) (dismissing breach of contract claim that violated statute of frauds because plaintiff presented no evidence defendant took action consistent with formation of an oral contract). *Fourth*, an agreement that involved

dismantling an entire McKinsey business unit which, as alleged by Alix, has earned more than $100 million in fees, is not the kind of agreement that possibly could be oral. *See Stein v. Gelfand*, 476 F. Supp. 2d 427, 432 (S.D.N.Y 2007) (noting that transactions implicating "a host of other matters that quite plainly had to be dealt with in a multimillion dollar transaction before anyone was legally committed" would be written); *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-cv-10452 (GBD), 2004 WL 2914093, at *15 (S.D.N.Y. Dec. 13, 2004) (dismissing promissory estoppel claim where "reliance on [promises] would be unreasonable, given the complex commercial venture at issue"). *Fifth*, Alix pleads no facts to show that Barton had authority to cause RTS to leave the bankruptcy consulting business. *Finally*, Alix has not alleged any harm flowing from the breach of these promises and his forbearance from suing, but even if he had, his failure to mitigate any such damages by promptly bringing suit would bar his recovery. *House of Eur. Funding I, Ltd. v. Wells Fargo Bank, N.A.*, No. 13-cv-519 (RJS), 2014 WL 1383703, at *10 (S.D.N.Y. Mar. 31, 2014); *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000); *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985) ("New York's courts adhere to the universally accepted principle that a harmed plaintiff must mitigate damages.").

## B.    Alix's Tortious Interference Claim Fails (Count 7).

Finally, in Count 7, Alix alleges a tortious interference with business expectancy claim against all the Corporate Defendants.  He rests this claim on the naked allegations that (1) "[AlixPartners] had an expectancy that it would be retained by Alpha Natural Resources and/or AMF Bowling Worldwide, Inc.," (2) "*AMF Bowling* involved a market in which [AlixPartners] employees at the time had deep and broad-ranging experience that made [AlixPartners] well-suited to advise the debtors," and (3) the Corporate Defendants "each knew that [AlixPartners] offered bankruptcy consulting services in high-end bankruptcy proceedings and likely would have been retained by one or both" debtors.  (AC ¶¶ 583-84.)  To say that these allegations fail to plead facts

in support of this claim is an understatement.   Nowhere in the Amended Complaint does Alix

allege, as he must, that AlixPartners had any interactions with these debtors regarding the supposed

"business expectancy" or even bid on the assignments in these bankruptcies.[63]   *RSM Prod. Corp.*

*v. Fridman*, 643 F. Supp. 2d 382, 411 (S.D.N.Y. 2009) ("Plaintiffs must demonstrate that, at the

time of Defendants' alleged interference, Plaintiffs were engaged in 'a continuing business or other

customary relationship not amounting to a formal contract' with the third party.") (quoting *Hannex*

*Corp. v. GMI Inc.*, 140 F.3d 194, 205 (2d Cir. 1998)); *Nadel v. Play-By-Play Toys & Novelties,*

*Inc.*, 208 F.3d 368, 382 (2d Cir. 2000) (setting forth pleading requirements).   Nor does Alix allege,

as he must, that McKinsey purposefully interfered with AlixPartners's hypothetical retention by

filing purportedly misleading disclosures with the "sole purpose of harming" AlixPartners.   *See*

*RSM*, 643 F. Supp. 2d at 412 ("An action taken in economic self-interest is not an action taken 'for

the sole purpose of inflicting intentional harm on plaintiffs."); *Nadel*, 208 F.3d at 382 (setting forth

elements of tortious interference under New York law).[64]   The disclosures on which the claims are

---

[63] Indeed, Alix alleges that AlixPartners was not even asked to pitch in *ANR* (AC ¶ 383(b)), making his claim of a business expectancy in being hired even more dubious.

[64] Although Alix styles his claim under Virginia law (likely to avoid the more stringent requirement under New York law of showing that McKinsey acted with the sole purpose of harming AlixPartners), New York law applies.  "[I]n diversity cases, federal courts must look to the laws of the forum state to resolve issues regarding conflicts of law." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996).  The same principle applies where a federal court exercises supplemental jurisdiction over state law claims. *Rostropovich v. Koch Int'l Corp.*, No. 94-cv-2674 (JFK), 1995 WL 104123, at *8 (S.D.N.Y. Mar. 7, 1995).  The forum state here is New York, which applies an "interests analysis" where the substantive law differs between the possible jurisdictions. *Globalnet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006).  In fraud cases, New York courts look to the place where the injury occurred—not the place where the alleged fraud was committed—to determine the forum with the greater "interest." *See, e.g.*, *Oliver Wyman, Inc. v. Eielson*, No. 15-cv-5305 (RJS), 2016 WL 5339549, at *4 (S.D.N.Y. Sep. 22, 2016).  Purported injuries to AlixPartners would have flowed to New York (where AlixPartners is headquartered), and thus New York law should apply.  Even if this Court applied the law of the place of the alleged tort, *e.g.*, *Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012) (applying New York law to tort claim because "challenged conduct" occurred in New York), New York law would apply because the gravamen of this Action concerns purported racketeering conduct emanating from New York. *Aqua Master Enters., Inc. v. Anderson*, No. 16-cv-6776 (LGS), 2018 WL 1009264, at *3 (S.D.N.Y. Jan. 30, 2018).  And the claim fails even under Virginia law, because Alix has not pleaded the existence of a valid contractual relationship or business expectancy, knowledge of the relationship or expectancy on the part of Defendants, intentional interference, or resulting damage to AlixPartners. *See 17th St. Assocs., LLP v. Markel Int'l Ins. Co.*, 373 F. Supp. 2d 584, 600 (E.D. Va. 2005).

based establish that the purpose in disclosing connections by category, rather than by name, was to protect the confidentiality interests of McKinsey clients.

Moreover, Alix's state law tortious interference claim, which purports to impose liability on a bankruptcy professional for procuring a retention through improper disclosures, is preempted by federal law. As explained above, the federal Bankruptcy Code and the bankruptcy rules promulgated thereunder address the method by which bankruptcy professionals are hired, approved, and supervised, and also provide for a host of remedies that the bankruptcy court can impose for violations of these provisions. *See* 11 U.S.C. §§ 327, 328(c); Fed. R. Bankr. P. 9011. Given this complex scheme, courts have rejected attempts by plaintiffs to seek state law remedies for conduct in a bankruptcy case—including with respect to the filing of pleadings. *See Astor Holdings v. Roski*, 325 F. Supp. 2d 251, 263 (S.D.N.Y. 2003) (federal law preempts state tort claim relating to alleged filing of bankruptcy pleadings in bad faith); *see also In re E. Equip. & Servs. Corp.*, 236 F.3d 117, 121-22 (2d Cir. 2001) (bankruptcy sanctions provisions preempt state law remedies for violation of automatic stay); *Gonzales v. Parks*, 830 F.2d 1033 (9th Cir. 1987) (state law remedies for abuse of process in bankruptcy court preempted). This is the case even where a fraud on the bankruptcy court is alleged. *See, e.g.*, *Holloway v. Household Auto. Fin. Corp.*, 227 B.R. 501, 507 (N.D. Ill. 1998) (claimant's state law claim for violation of the Illinois Consumer Fraud and Deceptive Practices Act relating to a fraudulent filing of proof of claim preempted as "the expansive reach of the Code preempts virtually all claims relating to alleged misconduct in the bankruptcy courts"). Because Alix seeks to impose state law remedies for a claim that requires adjudication of whether McKinsey's disclosures in the *ANR* and *AMF Bowling* bankruptcies comported with federal bankruptcy law, Count 7 is preempted and should be dismissed.

## CONCLUSION

For all the reasons stated above, Defendants respectfully request that the Court dismiss each of Counts 1 through 4, for violations of RICO Sections 1962(c) and 1962(d), with prejudice as to all Defendants, and Counts 5, 6, and 7, for breach of contract, promissory estoppel, and tortious interference with business expectancy, respectively, with prejudice as to the Corporate Defendants.[65]

Dated:   October 10, 2018                    Respectfully submitted,
         New York, New York
                                             SELENDY & GAY PLLC


                                    By:    /s Faith E. Gay
                                           Faith E. Gay
                                           Jennifer M. Selendy
                                           David S. Flugman
                                           Nicholas J. Klenow
                                           1290 Avenue of the Americas
                                           New York, New York 10104
                                           Telephone: (212) 390-9000
                                           E-mail: fgay@selendygay.com

                                           Robert J. Cleary
                                           Mark D. Harris
                                           Brian S. Rosen
                                           Jordan B. Leader
                                           PROSKAUER ROSE LLP
                                           Eleven Times Square
                                           New York, New York 10036
                                           Telephone: (212) 969-3000

                                           *Attorneys for Defendants McKinsey & Co., Inc.;
                                           McKinsey Holdings, Inc.; McKinsey & Company
                                           Inc. United States; McKinsey Recovery &
                                           Transformation Services U.S., LLC; Dominic
                                           Barton; Kevin Carmody; Jon Garcia; Seth
                                           Goldstrom; Alison Proshan; and Robert Sternfels*

---

[65] This Court's August 1, 2018 Order specifies that, after amending, "Plaintiff will not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss."  (Dkt. #66.)

Catherine L. Redlich
DRISCOLL & REDLICH
110 West 40th Street, Suite 1900
New York, New York 10018
Telephone: (212) 986-4030

*Attorney for Defendant Dominic Barton*

Richard A. Sauber
Ariel N. Lavinbuk
Michael L. Waldman
Lukman Azeez
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, NW, Suite 411L
Washington, D.C. 20006
Telephone: (202) 775-4500

*Attorneys for Defendants Kevin Carmody, Jon
Garcia, Alison Proshan, and Robert Sternfels*

Reid M. Figel
Bradley E. Oppenheimer
Robert C. Klipper
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK P.L.L.C.
1615 M Street, NW, Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7968

*Attorney for Defendant Seth Goldstrom*


*s/ Micah Marcus*
Micah Marcus
Christopher Dean
McDONALD HOPKINS LLP
300 North LaSalle Street, Suite 1400
Chicago, Illinois 60654
Telephone: (312) 280-0111

*Attorneys for Defendant Jared Yerian*

76