UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                      :

JAY ALIX,                                :

                       Plaintiff,         :

                                 :            18-CV-4141 (JMF)

              -v-               :

                                 :          <u>OPINION AND ORDER</u>

MCKINSEY & CO., INC., et al.,       :

                                 :

                     Defendants.      :

                                 :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiff Jay Alix is the founder, thirty-five-percent owner, and a director of a company now known as AlixPartners LLP ("AlixPartners"). Docket No. 73 ("Am. Compl."), ¶ 45. AlixPartners specializes in bankruptcy consulting, and particularly in "providing professional crisis management and consulting services in major corporate Chapter 11 bankruptcy cases involving companies with assets valued at over $1 billion." *Id.* ¶¶ 1, 47. AlixPartners is one of only a few companies operating in that market. Among its competitors are two subsidiaries of McKinsey & Co., Inc.: McKinsey & Company Inc., U.S. ("McKinsey US") and McKinsey Recovery & Transformation Services U.S., LLC ("McKinsey RTS"), of which McKinsey US is the sole member. *Id.* ¶¶ 32-33, 48-49. Those McKinsey entities are Defendants here, as is a third subsidiary, McKinsey Holdings, Inc. (collectively, "McKinsey" or the "McKinsey Defendants"), and various McKinsey employees (the "Individual Defendants"). *Id.* ¶¶ 30-40.

      The Bankruptcy Code permits the trustee of a bankruptcy estate to hire bankruptcy "professional[s]" such as AlixPartners and McKinsey, but only "with the court's approval." 11 U.S.C. § 327(a). Bankruptcy professionals must "not hold or represent an interest adverse to the

estate," and must also be "disinterested persons" within the meaning of the Code. *Id.*; *see id.*
§ 101(14). To help bankruptcy courts ensure compliance with those requirements, Rule 2014 of
the Federal Rules of Bankruptcy Procedure ("Rule 2014") provides that when a bankruptcy
trustee or committee applies for an order approving the employment of a bankruptcy
professional, the trustee's application must disclose "to the best of the applicant's knowledge, all
of the person's connections with the debtor, creditors, any other party in interest, their respective
attorneys and accountants, the United States trustee, or any person employed in the office of the
United States trustee." Fed. R. Bankr. P. 2014(a). Rule 2014 requires that any such application
"be accompanied by a verified statement of the person to be employed" — that is, the
bankruptcy professional — "setting forth" those same connections. *Id.* Such declarations are
submitted under penalty of perjury pursuant to 28 U.S.C. § 1746, and are also subject to the
criminal bankruptcy fraud statute, 18 U.S.C. §§ 152(2)-(3). *See* Am. Compl. ¶¶ 57, 468-77.

Alix brings this lawsuit because he believes that McKinsey has won bankruptcy-
consulting business at the expense of AlixPartners by filing incomplete or misleading Rule 2014
disclosure statements. According to Alix — to whom AlixPartners has assigned each of the
claims asserted here — every time McKinsey filed an incomplete or misleading statement with
the bankruptcy courts, it committed an act of criminal fraud. Am. Compl. ¶ 3. More important
for present purposes, Alix alleges that Defendants' Rule 2014 filings constituted predicate acts of
racketeering activity under the Racketeer Influenced and Corrupt Organizations Act ("RICO"),
18 U.S.C. §§ 1961-1968, which provides a private right of action to "[a]ny person injured in his
business or property by reason of a violation" of RICO, *id.* § 1964(c). Simplifying matters
somewhat, Alix's theory is that AlixPartners was "injured it [its] business or property by reason
of" a RICO violation because Defendants won business from bankruptcy estates, then filed

fraudulent Rule 2014 statements, on the basis of which they obtained court approval to do work that otherwise would have been secured by AlixPartners. The question presented here, on Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, is not whether, as Alix puts it, the facts alleged are "deeply concerning." ECF No. 93 ("Alix Opp'n"), at 2. If true — and for purposes of Defendants' motion, the Court is required to assume they are true — the facts are indeed concerning. Instead, the principal question presented is whether the facts alleged are sufficient for Alix to satisfy RICO's proximate-cause standard. In light of binding Supreme Court and Second Circuit precedent, the Court concludes that they are not and thus dismisses Alix's federal claims. The Court defers judgment on Alix's state-law claims pending supplemental briefing on the question of subject-matter jurisdiction.

## BACKGROUND

The following brief factual summary is drawn from the facts alleged in the Amended Complaint — which are taken as true and construed in the light most favorable to Alix for purposes of this motion to dismiss — and from documents attached to the complaint, statements or documents incorporated into the complaint by reference or relied upon so heavily for their terms and effect as to be "integral" to the complaint, and matters of which judicial notice may be taken. *See, e.g.*, *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018); *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

McKinsey first entered the bankruptcy-consulting market "in or around 2001," and now competes with a small group of companies for lucrative business at the top of that market. Am. Compl. ¶ 48. McKinsey has three primary competitors at that level: FTI Consulting, Alvarez & Marsal, and AlixPartners. *Id.* ¶ 49. More specifically, "in approximately 75% of the bankruptcy cases since 2010 involving assets over $1 billion in which" McKinsey did *not* serve as a

bankruptcy professional, one of these companies did.  *Id.*  Of those cases, AlixPartners obtained

approximately twenty-five percent of "the contracts."  *Id.*

Alix's allegations concern thirteen of the bankruptcy proceedings in which McKinsey has

been employed as a bankruptcy professional since it first entered the market.  *See* Am. Compl.

¶¶ 16, 48, 67, 136, 143.[1]  Alix alleges that, in each of those cases, "McKinsey's disclosure

affidavits and declarations violated Rule 2014" and "were also false and misleading in numerous

respects."  *Id.* ¶¶ 68, 113.  "All or any one of McKinsey's undisclosed connections," Alix

repeatedly asserts, "would have disqualified [McKinsey] from employment as a bankruptcy

professional . . . .  However, because of Defendants' fraudulent concealment of those

connections, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties

could meaningfully assess the nature and extent of McKinsey's conflicts."  *Id.* ¶ 75; *accord id.*

¶¶ 79, 85, 92, 103, 111, 118.  The net result, Alix alleges, is that AlixPartners was deprived of

work it otherwise would have secured.  More specifically, McKinsey's fraudulent Rule 2014

statements "caused [AlixPartners] to lose considerable revenue that it otherwise would have

earned had Defendants complied with the law and truthfully disclosed McKinsey's disqualifying

conflicts of interest."  *Id.* ¶ 5.

---

[1]      The thirteen cases are as follows: *In re GenOn Energy, Inc.*, No. 17-BK-33695 (Bankr. S.D. Tex. June 14, 2017); *In re SunEdison, Inc.*, No. 16-BK-10992 (Bankr. S.D.N.Y. Apr. 21, 2016); *In re Alpha Natural Resources, Inc.*, No. 15-BK-33896 (Bankr. E.D. Va. Aug. 3, 2015); *In re Standard Register Co.*, No. 15-BK-10541 (Bankr. D. Del. Mar. 12, 2015); *In re NII Holdings (Nextel)*, No. 14-12611 (Bankr. S.D.N.Y. Sept. 15, 2014); *In re Edison Mission Energy*, No. 12-BK-49219 (Bankr. N.D. Ill. Dec. 17, 2012); *In re AMF Bowling Worldwide, Inc.*, No. 12-BK-36495 (Bankr. E.D. Va. Nov. 13, 2012); *In re AMR Corp.*, No. 11-BK-15463 (Bankr. S.D.N.Y. Nov. 29, 2011); *In re Harry & David Holdings, Inc.*, No. 11-BK-10884 (Bankr. D. Del. Mar. 28, 2011); *In re Lyondell Chemical Co.*, No. 09-BK-10023 (Bankr. S.D.N.Y. Jan 6, 2009); *In re Mirant Corp.*, No. 03-BK-46590 (Bankr. N.D. Tex. July 14, 2003); *In re UAL Corp. (United Airlines)*, No. 02-BK-48191 (Bankr. N.D. Ill. Dec. 9, 2002); and *In re Hayes Lemmerz International, Inc.*, No. 01-BK-11490 (Bankr. D. Del. Dec. 5, 2001).

Additionally, in highly general terms, Alix alleges an "unlawful 'pay-to-play' scheme whereby McKinsey made offers to bankruptcy attorneys to arrange exclusive meetings between bankruptcy counsel and high-level executives from McKinsey's most valued clients in exchange for exclusive referrals of bankruptcy assignments from those attorneys." *Id.* ¶ 120. Alix alleges that he confronted Individual Defendants Dominic Barton and Robert Sternfels on several occasions in late 2014, informed them of the "pay-to-play" scheme, advised them that the scheme was illegal, and warned them of the "grave potential consequences of McKinsey's serious past misconduct." *Id.* ¶¶ 119-21. At one of those meetings, Alix "explained McKinsey's disclosure obligations under bankruptcy law at length to Barton and Sternfels," "provided a lengthy and detailed exposition of the relevant legal principles and demonstrated how all of McKinsey's past disclosure declarations were non-compliant and illegal because they failed to identify connections by name and failed to describe connections in sufficient detail," "raised McKinsey's pay-to-play scheme," and "explained . . . why it, too, was illegal." *Id.* ¶ 123. According to Alix, Barton responded by "frankly express[ing] doubt about McKinsey RTS as a business," called him the next day to thank him, and later admitted the wrongdoing. *Id.* ¶¶ 126-28. Thereafter, Barton promised that, once he was reelected as McKinsey's Global Managing Partner, he would remove the individual wrongdoers from their posts and that "by March 2015, McKinsey would exit the bankruptcy consulting business" altogether, including from active consulting engagements. *Id.* ¶¶ 130-31. In consideration for that promise, Alix allegedly agreed on behalf of AlixPartners "to remain patient and refrain from acting at that time on the issues he had raised, including forbearance from legal action." *Id.* ¶ 131. When Barton did not hold up his end of the alleged deal, Alix and Barton met one final time; at that meeting, Alix alleges, Barton

"offered Alix bribes" — in the form of introductions to potential clients — "to keep quiet." *Id.*
¶ 134. Alix refused the overture, and negotiations apparently broke down. *Id.*

Since then, McKinsey has continued to handle bankruptcy consulting work. *See* Am.
Compl. ¶¶ 159-77; *see also, e.g.*, *In re Westmoreland Coal Co.*, No. 18-35672 (Bankr. S.D. Tex.
Oct. 9, 2018), ECF No. 452. Eventually, Alix brought this action as AlixPartners' assignee,
seeking treble damages under RICO alongside an assortment of state-law claims. Am. Compl.
¶¶ 539, 569-88. According to Alix, each of Defendants' misleading Rule 2014 filings
constituted a predicate act of racketeering activity for purposes of RICO, making them liable to
Alix for the damage Defendants' alleged scheme caused to AlixPartners.[2] Defendants now move
to dismiss. ECF No. 88; *see* ECF No. 89 ("Defs.' Mem.").

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts
set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See*,
*e.g.*, *Empire Merchants*, 902 F.3d at 139; *In re Barclays Liquidity Cross & High Frequency*
*Trading Litig.*, — F. Supp. 3d —, No. 14-MD-2589 (JMF), 2019 WL 2269929, at *4 (S.D.N.Y.
May 28, 2019). The Supreme Court has made clear, however, that a court should not accept

---

[2]       Although not directly relevant to the issues discussed in this Opinion, the Court notes that
Alix (through an entity he owns called Mar-Bow Value Partners, LLC ("Mar-Bow")) has also
sought to challenge McKinsey's Rule 2014 disclosure practices by purchasing claims and
litigating in the bankruptcies themselves. Bankruptcy courts have largely, if not unanimously,
rejected those attempts without reaching the merits of Mar-Bow's allegations. *See, e.g.*, *In re*
*SunEdison, Inc.*, No. 16-10992 (SMB), 2019 WL 2572250 (Bankr. S.D.N.Y. June 21, 2019)
(denying Mar-Bow's Rule 60(d) motion for relief from prior orders approving McKinsey's
retention for lack of standing); *In re Old ANR, LLC*, No. 19-00302 (KRH), 2019 WL 2179717, at
*1 (Bankr. E.D. Va. May 17, 2019) (same), *reconsideration denied*, No. 19-00302 (KRH), 2019
WL 3264576 (Bankr. E.D. Va. July 18, 2019); *Mar-Bow Value Partners, LLC v. McKinsey*
*Recovery & Transformation Servs. US, LLC*, 578 B.R. 325, 347 (E.D. Va. 2017) (dismissing
Mar-Bow's appeals of Rule 2014 orders for lack of standing), *aff'd sub nom. In re Alpha Nat.*
*Res., Inc.*, 736 F. App'x 412 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1601 (2019).

*non*-factual matter or "conclusory statements" set forth in a complaint as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009). And the Court must "consider the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

## RICO CLAIMS

The Court begins with Alix's federal claims, brought under RICO.[3] RICO creates a private cause of action for "[a]ny person injured in his business or property by reason of a

---

[3]     Before turning to the parties' arguments, the Court is compelled to express its misgivings about one feature of Alix's briefing: its excessive use of footnotes. (The irony of doing so in a footnote is not, of course, lost on the Court, but — in contrast to many of the items relegated to footnotes in Alix's briefing — the point is indeed a marginal one here.) Alix's principal brief contains a whopping 154 footnotes that comprise, by the Court's calculation (assisted by Microsoft Word's word-count function), approximately forty-six percent of the brief's text. Making matters worse, despite having been granted leave to file a seventy-five page brief, *see* ECF No. 81, Alix does not even include a fact section in his brief, simply (and unhelpfully) "refer[ring] the Court" to the Amended Complaint "for the relevant facts." Alix Opp'n 2. The net result is that Alix's brief is approximately twenty-three percent longer (by word count) than Defendants' principal brief — tantamount to a self-granted enlargement of the page limits. This is, to put it mildly, an unacceptable abuse of the briefing limitations set by the Court (and the fact that those limitations are by page rather than by word), and the Court would be on firm ground either in striking Alix's brief or in disregarding all arguments relegated to footnotes. *See, e.g.*, *Gramercy Advisors, LLC v. Ripley*, No. 13-CV-9070 (VEC), 2014 WL 5847444, at *2 (S.D.N.Y. Nov. 12, 2014) ("[C]ourts generally do not consider an argument mentioned only in a footnote to be adequately raised." (collecting cases)); *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 314 (S.D.N.Y. 2015) (noting that courts are "under no obligation to consider" an argument mentioned only in a footnote (collecting cases)). Because Alix's arguments fall short even with

violation of section 1962" of the statute. 18 U.S.C. § 1964(c). Section 1962, in turn, makes it

"unlawful for any person employed by or associated with any enterprise engaged in, or the

activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

*Id.* § 1962(c). "[R]acketeering activity" is defined to include a wide variety of criminal offenses,

including, as relevant here, bankruptcy fraud, wire fraud, and mail fraud. *Id.* § 1961(1); *see, e.g.*,

*Empire Merchants*, 902 F.3d at 139.

## A. The RICO Proximate Cause Standard

To show injury "by reason of" a statutory violation, a civil RICO plaintiff must allege

and ultimately prove that the violation was both a "but-for" *and* a "proximate cause" of its

injury. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992); *UFCW*

*Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010). Significantly, however, the

term "proximate cause" in this context does not mean precisely what it means at common law.

*See, e.g.*, *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 654-55 (2008); *see also, e.g.*,

*Hemi Group, LLC v. City of New York*, 559 U.S. 1, 24 (2010) (Breyer, J., dissenting)

(recognizing "that some of our opinions may be read to suggest that the words 'by reason of' in

RICO do not perfectly track common-law notions of proximate cause"); *BCS Servs., Inc. v.*

*Heartwood 88, LLC*, 637 F.3d 750, 754 (7th Cir. 2011) (Posner, J.) (noting that the term

arguably "muddie[s] the waters"). Instead, it "requires some direct relation between the injury

asserted and the injurious conduct alleged." *Empire Merchants*, 902 F.3d at 141 (internal

quotation marks and alterations omitted); *see Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451,

all of the footnotes, the Court will do neither. But it cautions counsel that similar conduct will
not be tolerated and may result in the imposition of sanctions.

461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").  Put differently, "a link that is too remote, purely contingent, or indirect is insufficient."  *Empire Merchants*, 902 F.3d at 141 (internal quotation marks and alterations omitted).

Perhaps mindful of the Supreme Court's observation that "proximate cause is generally not amenable to bright-line rules," *Bridge*, 553 U.S. at 659, the Second Circuit has looked for guidance to the few Supreme Court cases that have applied the standard.  *See Empire Merchants*, 902 F.3d at 141-44.  For example, in *Anza*, the plaintiff alleged that the defendants had caused the plaintiff harm by defrauding New York tax authorities, and using the proceeds to lower prices and outcompete the plaintiff for customers.  *See* 547 U.S. at 457-58.  But because "[t]he cause of [the plaintiff's] asserted harms . . . [was] a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)," the Court held that New York — not the plaintiff — was "[t]he direct victim" of the RICO violation and that proximate cause was lacking.  *Id.* at 458.  In *Hemi*, a plurality of the Court held that the City of New York could not recover against a cigarette merchant whose alleged RICO violations — failing to submit customer information to New York State — deprived the City of the chance to enforce its cigarette taxes against those customers.  The plurality found that causal chain too indirect: The City's injuries were most directly caused by the delinquent taxpayers, not by the defendant, while the State, not the City, was most directly injured by the cigarette manufacturer's alleged fraud.  559 U.S. at 11 (plurality opinion).  And in both *Hemi* and *Anza*, the Court's conclusion was reinforced by the observation that the more directly injured victim was also a preferable plaintiff under the RICO statute.  *Id.* at 11-12; *Anza*, 547 U.S. at 460.

The Supreme Court has found sufficient allegations of proximate cause for purposes of RICO only once, in *Bridge*. *Bridge* involved an Illinois county's system for auctioning tax liens to private buyers: interested parties would bid on the liens, but for complex reasons not relevant here, the auctions frequently ended with multiple bidders tied for the lowest bid (at zero, no less). 553 U.S. at 642-43. The plaintiffs alleged that the county would handle that situation by allocating liens to the tied zero-bidders on a fixed, rotational basis. *Id.* at 643. The plaintiffs brought suit in *Bridge* against defendants who took advantage of that system by fraudulently placing extra zero-bids, thereby obtaining extra rotational shares of tax liens at the other zero-bidders' expense. *Id.* at 643-45. The Court held that those allegations satisfied RICO's proximate-cause requirement because the plaintiffs' losses were "the direct result of [the defendants'] fraud." *Id.* at 658. In particular, the Court explained, the plaintiffs' losses were "a foreseeable and natural consequence of [the defendants'] scheme," there were "no independent factors that account[ed] for [the plaintiffs'] injury, there [was] no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim [was] better situated to sue." *Id.*

The Second Circuit examined and applied these cases most recently in *Empire Merchants*. In that case, a company with exclusive rights to distribute certain brands of liquor in New York sued competing distributors for unlawfully smuggling liquor into the state from Maryland. *See Empire Merchants*, 902 F.3d at 136. The plaintiff contended that because the smuggled liquor was not subject to New York excise taxes, the defendants were able to sell it at a lower price to retailers, thus costing the plaintiff sales. *See id.* at 137. The Second Circuit cited "three principal reasons" in support of its conclusion that the complaint did not adequately plead proximate cause. *Id.* at 142. "First, just like in *Anza*, the cause of Empire's asserted harms

is a set of actions (not buying Empire liquor) entirely distinct from the alleged RICO violation (smuggling liquor into New York)." *Id.* (internal quotation marks, ellipsis, and alterations omitted). "Second, the predicate act of smuggling and the separate act of not buying Empire's liquor do not *necessarily* follow from one another, as was true in *Bridge*." *Id.* at 143 (internal quotation marks, citation, and alterations omitted). That is, "Empire's 'lost sales could [thus] have resulted from factors other than petitioners' alleged acts of fraud.'" *Id.* (quoting *Anza*, 547 U.S. at 459). And third, "New York State was a more direct victim of the smuggling operation." *Id.* at 144.

## B. Discussion

Applying the foregoing principles and cases here, the Court is compelled to conclude that Alix's claims fail as a matter of law. First and foremost, Alix's allegations share the same flaw that the Supreme Court found to be fatal in *Anza*, that a plurality of the Court found to be fatal in *Hemi*, and that the Second Circuit found to be fatal in *Empire Merchants*: the conduct that directly caused the alleged harm to AlixPartners was distinct from the conduct giving rise to McKinsey's alleged fraud. *See Empire Merchants*, 902 F.3d at 142; *Hemi*, 559 U.S. at 11; *Anza*, 547 U.S. at 458-59. Put differently, Alix's alleged injuries were the result of independent, intervening third-party conduct. AlixPartners alleges that McKinsey filed fraudulent Rule 2014 statements in order to obtain court approval to work on behalf of the bankruptcy estates. But it was the decisions of those debtors' trustees not to hire AlixPartners that most directly inflicted harm to AlixPartners "business or property" (assuming, of course, that AlixPartners suffered such harm). Moreover, even before a trustee could "not hire" AlixPartners, the bankruptcy court would have had to reject the trustee's application for approval of its first choice, McKinsey.

To illustrate the problem with Alix's allegations, consider what would have had to happen in order for AlixPartners to have avoided its claimed injuries. *First*, having been chosen by the trustee to work on behalf of the bankruptcy estate, McKinsey would have had to file a compliant Rule 2014 statement (instead of a fraudulent one). *Second*, the bankruptcy court would have had to exercise its discretion and reject the trustee's application to retain McKinsey (instead of approving it). *Third*, the trustee would have had to choose to hire AlixPartners — rather than one of its other competitors or no one at all. And *fourth*, the bankruptcy court would have had to exercise its discretion to approve the trustee's application to retain AlixPartners. Defendants describe an even more complex, though no less convincing, chain of events in their principal brief, *see* Defs.' Mem. 24-25, but the foregoing list is enough to make the point. As that counterfactual causal chain makes plain, McKinsey's filing of fraudulent Rule 2014 statements could not have been a sufficient cause of AlixPartners' injuries. And, of the several steps between McKinsey's alleged RICO violations and AlixPartners' injuries, at least three are sufficient to render the link far too indirect to satisfy the statute's proximate-cause requirement.

First, two steps in the causal chain (rejection of the trustee's decision to retain McKinsey and approval of the trustee's alternative decision to retain AlixPartners) depend on a bankruptcy court's exercising its discretion in a particular way. Courts are understandably reluctant — and indeed generally refuse — to predict how other courts will decide issues presented to them. *See, e.g.*, *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 203 (2d Cir. 2006) ("We cannot guess with any degree of assurance what the Federal Circuit would have done . . . ."), *abrogated on other grounds by FTC v. Actavis, Inc.*, 570 U.S. 136 (2013); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 201 (E.D.N.Y. 2003); *see also, e.g.*, *Eddystone Rail Co., LLC v. Jamex Transfer Servs., LLC*, 289 F. Supp. 3d 582, 590 (S.D.N.Y.

2018); *In re Qualcomm Antitrust Litig.*, No. 17-MD-02773-LHK, 2018 WL 4110498, at *12 (N.D. Cal. Aug. 29, 2018); *Berrian v. Pataki*, 510 F. Supp. 2d 348, 355 (S.D.N.Y. 2007); *In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. 231, 262 (Bankr. S.D.N.Y. 2008); *In re Malese 18 Corp.*, No. 8-02-80586-478, 2009 WL 1044556, at *6 (Bankr. E.D.N.Y. Apr. 16, 2009). That principle has even more force in an area where, as here, the decision of the other tribunal is one over which it has broad discretion. *See, e.g.*, *In re AroChem Corp.*, 176 F.3d 610, 621 (2d Cir. 1999) (explaining that a bankruptcy court exercises "discretionary powers" in evaluating the proposed retention of bankruptcy professionals under Section 327); *see generally* 3 Collier on Bankruptcy ¶¶ 327.02, 327.04; 9 Collier on Bankruptcy ¶ 2014.05; *see also* Fed. R. Bankr. P. 2014 advisory committee's notes to 1991 amendments.

Trying to overcome this obstacle, Alix points out that "courts routinely make . . . determinations" of "what would have happened" in other courts in the unique context of legal malpractice litigation. Alix Opp'n 17. For three reasons, however, the Court concludes that civil RICO does not work the same way. First, in legal malpractice cases, "the objective . . . is to determine what the result *should have* been (an objective standard) not what the result *would have* been by a particular judge or jury (a subjective standard)." 4 Ronald E. Mallen, LEGAL MALPRACTICE § 37:87 (Westlaw 2019 ed.). If a legal malpractice claim turned on the proper application of Rule 2014 (*i.e.*, how it "should" have been applied), this Court would be competent to adjudicate it. But that is not the same thing as predicting which cases, or what percentage of them, *would* have gone AlixPartners's way but for Defendants' conduct, which would be the relevant inquiry in assessing Alix's RICO damages. Second, legal malpractice is "a species of negligence," *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004), meaning that a malpractice plaintiff's recovery (unlike a RICO plaintiff's) is therefore governed by ordinary

common-law limitations on causation and damages.  The civil RICO statute is not so broad, and protects only injuries to "business or property" — which, as the Second Circuit has "made clear," does not include a "mere expectation."  *Villoldo v. BNP Paribas S.A.*, 648 F. App'x 53, 55 (2d Cir. 2016) (internal quotation marks omitted) (citing *McLaughlin v. Am. Tobacco Corp.*, 522 F.3d 215, 228 (2d Cir. 2008), *abrogated on other grounds by Bridge*, 553 U.S. 639).  Indeed, the Second Circuit has all but held that "[t]he hope of collecting upon a judgment if one's suit proves successful is precisely the sort of mere expectation that is too speculative to constitute a property right within the meaning of 18 U.S.C. § 1962."  *Id.*  Where discretionary judicial intervention stands between a plaintiff and his recovery, it is hard to see how the interest at stake amounts to more than a "mere expectation."  Finally, and in any event, the proximate-cause analysis applicable in the civil RICO context renders any analogies beyond that context beside the point: The bankruptcy court's intervening discretionary approval decisions are "independent factors" distinct from the underlying RICO violations that account for AlixPartners' alleged injuries.

Separate and apart from the hazards of predicting how bankruptcy judges would exercise their discretion in different scenarios, Alix's theory of harm depends on another set of independent intervening decisions: those of the various bankruptcy trustees not to hire AlixPartners.  But "[b]usinesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of" AlixPartners' lost business, or even lost business expectancy, was attributable to McKinsey's alleged fraud.  *Anza*, 547 U.S. at 459.  That is, even if it were possible to identify specific bankruptcy assignments that AlixPartners would have secured in the absence of Defendants' conduct, or to pin down how likely AlixPartners might have been to secure them in a fraud-free marketplace, the Court would also have to

contend with the multitude of other factors that might have led the trustees to deny AlixPartners the assignments. In sum, "[s]orting out" AlixPartners' "counterfactual" business deals in the absence of Defendants' conduct would "prove speculative in the extreme." *Empire Merchants*, 902 F.3d at 143 (internal quotation marks omitted); *cf. Medgar Evers Houses Tenants Ass'n v. Medgar Evers Houses Assocs., L.P.*, 25 F. Supp. 2d 116, 121-22 (E.D.N.Y. 1998), *aff'd sub nom. Abbott v. Medgar Evers Houses Assocs., L.P.*, 201 F.3d 430 (2d Cir. 1999) ("[A]s in *Holmes*, the law need not shoulder these difficulties. HUD itself can deter fraudulent statements to HUD. Owners who make the fraudulent statements face criminal prosecution under 18 U.S.C. § 1001, and remain subject to civil penalties and other remedies under the HUD regulations." (citation omitted)).

Alix attempts to solve this problem by intimating that the trustees' decisions not to hire AlixPartners were not *really* independent of Defendants' bad acts. As discussed, Alix alleges that Defendants won several bankruptcy estates' business in the first instance through an unlawful "pay-to-play" scheme. Am. Compl. ¶ 383. If true, that would at least narrow the gap between the trustees' decisions to hire McKinsey and AlixPartners' business losses. (Even then, however, it would not eliminate the gap given the bankruptcy courts' role in approving the trustees' applications.) But there are several problems with this attempt. First, as a simple matter of pleading, Alix's pay-to-play allegations are devoid of any supporting specifics. In particular, Alix fails to specify any single act of "paying" or "playing" involved in that alleged sub-scheme, or to connect any specific allegations of corruption to any of the particular bankruptcies at issue here. That lack of supporting factual allegations renders Alix's allegations of an unlawful "pay-to-play" scheme insufficient as a simple matter of pleading. *See, e.g.*, *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (holding a claim inadequate under the

plausibility standard where it was not supported by any "nonconclusory allegation in the Complaint").

More broadly, Alix fails to allege facts plausibly suggesting a connection between Defendants' alleged pay-to-play conduct and AlixPartners' losses. With respect to the *NII Holdings* bankruptcy, for example, Alix alleges that

> [a]lthough [AlixPartners] sought an opportunity to bid or make a pitch for that assignment, it was never given any opportunity to do so. As an industry leader, [AlixPartners] is typically afforded at least an opportunity to make a pitch for high-end restructuring assignments such as the *NII Holdings* case. That [AlixPartners] was denied such an opportunity for the *NII Holdings* matter strongly suggests that the influence of McKinsey's illegal "pay-to-play" scheme resulted in a pre-selection of McKinsey RTS.

Am. Compl. ¶ 136; *see also id.* ¶ 156 ("Absent Defendants' misconduct, there is a strong likelihood that AP would have been employed in *Standard Register*, particularly given its market position and the fact that AP had provided services to Standard Register in the past."). Without additional factual support, however, such allegations of "strong likelihoods" and "strong suggestions" are simply too speculative to "nudge[]" Alix's claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *see id.* at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citation, footnote, and internal quotation marks omitted)); *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 315 (2d Cir. 2012) (affirming the dismissal of a complaint under the *Twombly/Iqbal* standard "because the Complaint did not allege factual content that would have allowed the district court to draw a plausible inference that defendants paid kickbacks for business referrals"); *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-CV-4665 (PGG), 2014 WL 4832321, at *20 (S.D.N.Y. Sept. 29, 2014) ("[C]onclusory allegations that [a defendant] 'could not have obtained' meetings . . .

without the payment of a bribe — absent further detail or explanation regarding how these meetings were arranged and where and when they took place — are not sufficient to demonstrate that these meetings were, in fact, obtained through the payment of bribes.").

Finally, as in *Empire Merchants* and *Anza*, there are "better situated plaintiff[s]" who were "more directly harmed by the defendants' alleged racketeering." *Empire Merchants*, 902 F.3d at 142. Recent developments in three bankruptcies — *SunEdison*, *In re Alpha Natural Resources*, and *In re Westmoreland Coal Co.* — illustrate the point. As described in Alix's "Status Report" of March 25, 2019, the U.S. Trustee sought various forms of relief in each of these three bankruptcies, all relating to McKinsey's allegedly incomplete Rule 2014 disclosures. *See* Docket No. 102. As of March 25, 2019, McKinsey had reached a preliminary settlement with the U.S. Trustee, to which Alix "plan[ned] to file fulsome objections" through Mar-Bow Value Partners, LLC (an entity wholly owned by Alix that purchased claims in each bankruptcy). *Id.* at 3; *see id.* at 1 n.1. In the end, Mar-Bow filed only a "limited objection," seeking an acknowledgement from the bankruptcy courts that the settlement would not prejudice Mar-Bow's rights to pursue further relief. *See* Limited Objection of Mar-Bow Value Partners, LLC to the Proposed Settlement, *In re Westmoreland Coal Co.*, No. 18-34672, ECF No. 1663. On April 18, 2019, the three bankruptcy courts jointly approved the settlement, which provided for $5 million payments by McKinsey to the reorganized debtors or estates in each of the three bankruptcies and a general release by the U.S. Trustee of any claims arising from McKinsey's Rule 2014 disclosures in fourteen bankruptcies, including all thirteen at issue in this case. *See* Order Approving Settlement Agreement Between U.S. Trustee Program & McKinsey & Co., Inc. and Certain of Its Affiliates, *In re Westmoreland Coal Co.*, No. 18-34672, ECF No. 1763. The settlement did not contain Mar-Bow's proposed language reserving its rights to pursue other

relief, but that is of no moment here. The critical point is that the U.S. Trustee's pursuit of relief illustrates that there is at least one "better situated" party who can seek appropriate remedies for the most direct consequences of McKinsey's alleged misconduct. It is precisely such "directly injured victims," not plaintiffs like AlixPartners who are "injured more remotely," that RICO "count[s] on to vindicate the law as private attorneys general." *Bridge*, 553 U.S. at 654-55 (internal quotation marks omitted).

In sum, the link between McKinsey's allegedly unlawful conduct and AlixPartners' alleged injury is too remote, contingent, and indirect to sustain a RICO claim. Not surprisingly, in arguing otherwise, Alix relies most heavily on the Supreme Court's decision in *Bridge*, the one and only case in which the Supreme Court found allegations sufficient to establish proximate cause. *See* Alix Opp'n 3-6. But *Bridge* is easily distinguished from this case for the same reasons that the Second Circuit found it distinguishable in *Empire Merchants*. As the Second Circuit pointed out, the system alleged in *Bridge* "mechanically allocate[d] liens 'on a rotational basis' between the tying bidders." 902 F.3d at 142 (quoting *Bridge*, 553 U.S. at 643). As a result, to award a lien to one such bidder was "*necessarily*" to deny it to the plaintiff, whose portion of the rotational allocation was thereby diluted on a predictable, *pro rata* basis. *Id.* at 143; *see also Bridge*, 553 U.S. at 658 (observing that because of that auction structure, there were "no independent factors that account for [plaintiffs'] injury"). "[N]or," the Second Circuit observed, "was there a 'more immediate victim [] better situated to sue,' as the county was not financially injured by the fraud." 902 F.3d at 142 (quoting *Bridge*, 553 U.S. at 658). Here, by contrast, it is not the case that by fraudulently obtaining approval to work on behalf of a bankruptcy estate, Defendants "necessarily" deprived AlixPartners of that, or any, business. After all, because, "[a]s the Court recognized in *Anza*, '[b]usinesses lose and gain customers for

many reasons,'" *Empire Merchants*, 902 F.3d at 143 (quoting *Anza*, 547 U.S. at 459), no factfinder could connect the dots between Defendants' conduct and AlixPartners' lost business without engaging in an analysis that would be "speculative in the extreme," *id.* (internal quotation marks omitted).  Far from being "directly on point," Alix Opp'n 5, *Bridge* involved an unusual degree of predictability over a markedly direct causal chain that only serves to highlight the relative complexities and indirectness of the causal chain alleged in this case.

Alix also relies on Judge Posner's decision in *BCS Services*, which reversed the district court's grant of summary judgment to defendants following the Supreme Court's remand in *Bridge*.  Although *Bridge* was decided on the assumption that the plaintiff had lost a fixed rotational share of the available tax liens, the *BCS Services* court construed the summary-judgment record  to mean that the liens were actually distributed randomly among tied bidders. *BCS Servs.*, 637 F.3d at 753.  As Judge Posner explained, however, the fact that the plaintiff's losses would only be capable of probabilistic estimation made no difference as far as the RICO proximate-cause standard was concerned, because those losses (however estimated) were still a direct result of the defendant's conduct.  *Id.* at 757-59.  That is, whether the defendant's conduct caused the plaintiff to lose a fixed, rotational share or an uncertain, random share of the available bids, RICO's proximate-cause standard was still satisfied because the defendant caused the loss directly.  Here, by contrast, Defendants did not cause AlixPartners' injuries directly enough for RICO purposes, no matter how certainly (or probabilistically) those losses could be quantified. Alix tries to capitalize on Judge Posner's hypothetical of a gambler who loses an unknown sum when a building contractor's negligence causes the casino to collapse just as he is about to spin the roulette wheel.  Alix Opp'n 5-6; *see BCS Servs.*, 637 F.3d at 758-59.  But Alix misses the point of the hypothetical: The building contractor's negligence directly caused the gambler's lost

chance; only the *magnitude* of the loss remains uncertain and subject to probabilistic estimation. Put differently, unlike the disappointed gambler in Judge Posner's hypothetical, Alix relies on probabilistic allegations to prove not just the extent of his alleged damages, but also the fact that Defendants' alleged RICO violations caused them. *Cf. BCS Services*, 637 F.3d at 759 (distinguishing between "proof of damages" — as to which probabilistic evidence is appropriate — and "proof of cause" — as to which the normal directness requirements apply). In any event, even if *BCS Services* would permit Alix to allege a probabilistic harm to AlixPartners' business expectations in the Seventh Circuit, the decision is obviously not binding here, and indeed it is questionable whether such probabilistic harms to "mere expectation[s]" are cognizable injuries for purposes of RICO in the Second Circuit. *See Villoldo*, 648 F. App'x at 55.

In sum, in every relevant respect, this case and the Second Circuit's decision in *Empire Merchants* are on all fours. In both cases, the plaintiff "was harmed by [a third party's] decisions to purchase less" from the plaintiff, decisions which are "not [themselves] racketeering activity"; in both cases, "the asserted causal relationship between the alleged racketeering and [third parties'] decisions to purchase less . . . from [the plaintiff] is intricate and uncertain, as in *Anza* and *Hemi*, and not *Bridge*"; and in both cases, there is "a better situated plaintiff that was more directly harmed by the defendants' alleged racketeering." *Empire Merchants*, 902 F.3d at 142. Accordingly, Alix's RICO claims must be and are dismissed. Further, that dismissal is without leave to amend. Among the many arguments hidden in Alix's footnotes is an assertion that any dismissal should be "without prejudice and with leave to amend." Alix Opp'n 75 n.154. Even had that request been raised properly, the Court would deny Alix leave to replead his RICO claims. *See, e.g.*, *Ritchie Capital Mgmt., LLC v. Gen. Elec. Capital Corp.*, 821 F.3d 349, 351-52 (2d Cir. 2016) (per curiam) (holding that it was not an abuse of discretion to deny the plaintiff an

opportunity to amend its complaint *sua sponte*). Among other things, because the problems with those claims are substantive, amendment would be futile. *See, e.g.*, *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *Maragh v. Roosevelt Island Operating Corp.*, No. 16-CV-7530 (JMF), 2018 WL 6573452, at *6 (S.D.N.Y. Dec. 13, 2018); *Croft v. AXA Equitable Life Ins. Co.*, No. 17-CV-9355 (JMF), 2018 WL 4007646, at *5 (S.D.N.Y. Aug. 22, 2018). Moreover, Alix does not identify any additional facts he might add to an amended complaint, much less facts that might change the Court's conclusions set forth above. And finally, when Defendants moved to dismiss the original Complaint, the Court ordered that Alix file any amended complaint by August 20, 2018, and warned that he would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss." Docket No. 66. Among the issues raised by Defendants' motion to dismiss the original Complaint was that it failed to allege facts sufficient to satisfy the proximate-cause requirement. *See* Docket No. 63, at 17-23. Alix took advantage of that opportunity to amend, but it was his last one. *See Empire Merchants*, 802 F.3d at 146 (affirming a denial of leave to amend where the plaintiff "already had one opportunity to amend its complaint" and "identified no additional facts or legal theories it might assert if given leave to amend that would alter [the court's] proximate cause analysis" (internal quotation marks omitted). The Court will therefore dismiss Alix's RICO claims with prejudice.

## STATE-LAW CLAIMS

That leaves Alix's state-law claims, which are asserted only against the McKinsey Defendants (that is, the corporate entities). Absent an independent basis for federal jurisdiction, the Court would ordinarily decline to exercise supplemental jurisdiction over state-law claims where, as here, it has dismissed all federal claims. *See, e.g.*, *Banco Safra S.A.-Cayman Islands Branch v. Andrade Gutierrez Int'l S.A.*, No. 16-CV-9997 (JMF), 2018 WL 1276847, at *5

(S.D.N.Y. Mar. 8, 2018).  But Alix does invoke an independent basis for federal jurisdiction: the Court's diversity jurisdiction under 28 U.S.C. § 1332(a).  Am. Compl. ¶ 42.  For several reasons, however, it is not clear whether that invocation is proper.

First, and perhaps most easily cured, Alix does not actually allege the state of his citizenship; he merely alleges that he "resides in Michigan."  *Id.* ¶ 29.  That does not cut it.  *See, e.g.*, *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 47 (2d Cir. 1996) ("[A] statement of the parties' residence is insufficient to establish their citizenship.").  Second, and potentially more substantial, it is not clear that Alix's citizenship is what matters because he brings his claims here as the assignee of AlixPartners.  *See* FAC ¶ 29.  Under 28 U.S.C. § 1359, "[a] district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."  28 U.S.C. § 1359.  Applying that provision, the Second Circuit has held that assignments between parent companies and their subsidiaries should be treated as "presumptively ineffective" and that assignments between other entities with similarly "close ties" may also trigger the presumption.  *Airlines Reporting Corp. v. S & N Travel, Inc.*, 58 F.3d 857, 862-63 (2d Cir. 1995).  Among the closely related pairs that draw such suspicion under Section 1359 are corporate entities and their directors, officers, and significant shareholders.  *See, e.g.*, *Falow v. Cucci*, No. 00-CV-4754 (GBD), 2003 WL 22999458, at *6 (S.D.N.Y. Dec. 19, 2003) (citing cases); *see generally* 13F Charles A. Wright et al., Federal Practice & Procedure § 3639 (3d ed. Westlaw 2019).  That raises the prospect that, for purposes of diversity jurisdiction, the assignment to Alix is ineffective, as Alix is a director and substantial minority equity holder of AlixPartners.  *See* Am. Compl. ¶ 29.  And if it is AlixPartners's citizenship that matters, that raises a third complication: The citizenship of AlixPartners —

which, as a limited liability partnership, is derivative of the citizenship of its partners, *see, e.g.*, *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 52 (2d Cir. 2000) — is not alleged in the Amended Complaint.

Although the parties do not address these issues, the Court has an independent obligation to confirm that it has jurisdiction before addressing the merits of Alix's claims. *See, e.g.*, *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S.83, 94-95 (1998)). Accordingly, the Court will defer ruling on Defendants' motion to dismiss Alix's state-law claims pending supplemental briefing on the foregoing issues. Specifically, no later than **two weeks** from the date of this Opinion and Order, Alix shall file a supplemental brief, not to exceed ten pages, addressing the Court's jurisdiction over the state-law claims. To the extent that an amendment of the complaint is necessary to establish such jurisdiction (as the Court suspects — assuming jurisdiction is possible at all), Alix shall file a proposed amended complaint (limited to new jurisdictional allegations and showing any proposed changes in redline form) by the **same date**. The McKinsey Defendants shall file any response, not to exceed ten pages, within **two weeks** of Alix's supplemental submission. No reply may be filed absent leave of Court.

## CONCLUSION

If Alix's allegations in this case are true (as the Court has assumed they are for purposes of this motion), they are certainly troubling. Moreover, Alix and AlixPartners may well have good reason to be upset about Defendants' alleged misconduct and may indeed have genuinely public-spirited reasons for seeking to deter it going forward. But that is not enough to state a claim for relief, much less a claim under the civil RICO statute, which provides a remedy only to those whose injuries directly resulted from a defendant's scheme. Defendants' motion to dismiss

is accordingly GRANTED as to Alix's federal claims and those claims — the First, Second, Third, and Fourth Causes of Action — are dismissed with prejudice. The Court defers ruling on Defendants' motion to dismiss Alix's state-law claims until it confirms, following the parties' supplemental briefing in accordance with the schedule set forth above, that it has diversity jurisdiction over those claims.

The Clerk of Court is directed to terminate the Individual Defendants — Dominic Barton, Kevin Carmody, Jon Garcia, Seth Goldstrom, Alison Proshan, Robert Sternfels, and Jared D. Yerian — as parties and to terminate ECF No. 88.

SO ORDERED.

Dated: August 19, 2019
New York, New York

_____
JESSE M. FURMAN
United States District Judge