20-2548-cv
*Alix v. McKinsey & Co., Inc., et al*

# In the
# United States Court of Appeals
## For the Second Circuit

———————————————

August Term 2020

No. 20-2548-cv

Jay Alix,

*Plaintiff-Appellant,*

v.

McKinsey & Co., Inc., McKinsey Holdings, Inc., McKinsey & Company Inc.
United States, McKinsey Recovery & Transformation Services U.S., LLC,
Dominic Barton, Kevin Carmody, Jon Garcia, Seth Goldstrom, Alison Proshan,
Jared D. Yerian, Robert Sternfels,

*Defendants-Appellees.*

———————————————

Appeal from the United States District Court
for the Southern District of New York
No. 18-cv-4141, Jesse M. Furman, District Judge, Presiding.
(Argued June 22, 2021; Decided January 19, 2022)

B e f o r e:

NEWMAN, CABRANES, PARKER, *Circuit Judges.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>January 19, 2022</u>

CERTIFIED COPY ISSUED ON 01/19/2022

1
2          Plaintiff Jay Alix appeals from a judgment of the United States District
3    Court for the Southern District of New York (Furman, *J.*), dismissing the
4    amended complaint against McKinsey & Co., Inc., three of its subsidiaries, and
5    several of its current or former employees. Alix sued under the Racketeer
6    Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*,
7    alleging that McKinsey filed false and misleading disclosure statements in the
8    bankruptcy court to obtain lucrative consulting appointments and that, as a
9    result, AlixPartners LLP lost business and profits it otherwise would have
10   secured. The district court held that Alix failed to meet RICO's proximate cause
11   requirement. We disagree. We hold that the amended complaint plausibly
12   alleges proximate cause with respect to all 13 bankruptcies in which McKinsey
13   filed false statements as well as the pay-to-play scheme. Accordingly, we
14   VACATE and REMAND for further proceedings.
15
16                         _____
17
18
19                         SEAN F. O'SHEA (Michael E. Petrella, Amanda L.
20                         Devereux, *on the brief),* Cadwalader, Wickersham & Taft
21                         LLP, New York, NY, *for Plaintiff-Appellant.*
22
23                         FAITH E. GAY (Jennifer M. Selendy, Maria Ginzburg,
24                         Caitlin J. Halligan, David S. Flugman, *on the brief*),
25                         Selendy & Gay, PLLC, New York, NY and
26
27                         JOHN GLEESON (Andrew J. Ceresney, Erica S.
28                         Weisgerber, Nathan S. Richards, *on the brief*), Debevoise
29                         & Plimpton LLP, New York, NY, *for Defendants-*
30                         *Appellees McKinsey & Co., Inc., McKinsey Holdings, Inc.,*
31                         *McKinsey & Company Inc. United States, and McKinsey*
32                         *Recovery & Transformation Services U.S., LLC.*
33
34                         ROY T. ENGLERT, JR. (Ariel N. Lavinbuk, Richard A.
35                         Sauber, *on the brief*), Robbins, Russell, Englert, Orseck,
36                         Untereiner & Sauber, LLP, Washington, DC, *for*

1      *Defendants-Appellees Kevin Carmody, Jon Garcia, Alison*
2      *Proshan, and Robert Sternfels.*
3
4      REID M. FIGEL (Bradley E. Oppenheimer, *on the brief*),
5      Kellogg, Hansen, Todd, Figel & Frederick, PLLC,
6      Washington, DC, *for Defendant-Appellee Seth Goldstrom.*
7
8      CATHERINE L. REDLICH, Driscoll & Redlich, New York,
9      NY, *for Defendant-Appellee Dominic Barton.*
10
11     MICAH E. MARCUS (Christopher Dean, *on the brief*),
12     McDonald Hopkins LLC, Chicago, IL, *for Defendant-*
13     *Appellee Jared D. Yerian.*
14
15     _____
16
17     BARRINGTON D. PARKER, *Circuit Judge*:

18          AlixPartners LLP and McKinsey & Co., Inc. are major competitors in a

19     niche bankruptcy advising market involving estates with assets in excess of one

20     billion dollars. Jay Alix, as assignee of AlixPartners, sued McKinsey & Co., Inc.,

21     three of its subsidiaries (together, "McKinsey"), and several current or former

22     McKinsey employees under the Racketeer Influenced and Corrupt Organizations

23     Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and state law. The amended complaint

24     alleges that McKinsey secured lucrative consulting assignments in this market by

25     knowingly and repeatedly filing disclosure statements in the Bankruptcy Court

26     containing incomplete, misleading, or false representations concerning conflicts

1   of interest. Alix alleges that this pattern of misrepresentations to the Bankruptcy

2   Court resulted in injury to AlixPartners through the loss of engagements it

3   otherwise would have secured and of substantial revenues those assignments

4   would have generated, as well as through the loss of the opportunity to compete

5   for them in an unrigged market.

6       RICO affords a private right of action to "[a]ny person injured in his

7   business or property by reason of a [RICO] violation." 18 U.S.C. § 1964(c). Alix

8   alleges that AlixPartners was directly harmed by McKinsey's conduct because,

9   had McKinsey truthfully and timely disclosed its conflicts to the Bankruptcy

10  Court, McKinsey would have been disqualified from obtaining at least some of

11  the assignments it secured. In turn, Alix alleges that AlixPartners, because of its

12  major presence in this niche market, would have been retained in at least some of

13  the cases.

14      Alix also alleges a "pay-to-play" scheme under which McKinsey arranged

15  meetings between its clients and bankruptcy attorneys in exchange for exclusive

16  bankruptcy assignment referrals from those attorneys. Consistent with this

17  scheme, Alix alleges that McKinsey offered to introduce AlixPartners to its

4

1    clients if Alix would "drop[] the issues he had raised concerning McKinsey's

2    acknowledged pay-to-play scheme and its illegal disclosure declarations."

3          The District Court for the Southern District of New York (Jesse M. Furman,

4    District Judge) dismissed Alix's RICO claims under Federal Rule of Civil

5    Procedure 12(b)(6). The court concluded that Alix's allegations were insufficient

6    to establish the required causal connection between McKinsey's purported RICO

7    violations and AlixPartners's injury. This appeal followed. The dispositive issue

8    is whether the amended complaint adequately alleges proximate causation under

9    RICO. We hold that it does and, consequently, we vacate and remand for further

10    proceedings.

11                               **BACKGROUND**

12          Alix is the founder and a minority equity holder of AlixPartners, one of a

13    handful of consulting firms operating in a high-end corporate bankruptcy

14    advising market. McKinsey Recovery & Transformation Services U.S., LLC

15    ("McKinsey RTS"), a subsidiary of McKinsey & Co., Inc., along with FIT

16    Consulting, and Alvarez & Marsal are among the other major competitors in this

17    market. The amended complaint alleges that AlixPartners, FIT Consulting, and

18    Alvarez & Marsal were retained in 75% of the bankruptcy cases since 2010

1    involving assets over $1 billion in which McKinsey did not serve as the advisor.

2    Of those cases, AlixPartners obtained about 24% of the contracts.

3         In order to secure engagements, bankruptcy advisors must demonstrate

4    that they "do not hold or represent an interest adverse to the estate" and are

5    "disinterested persons" within the meaning of the Bankruptcy Code. 11 U.S.C. §

6    327(a); *see also id.* § 101(14).[1] When these requirements are satisfied, a bankruptcy

7    professional may be retained "with the court's approval." *Id.* § 327(a). In

8    addition, bankruptcy courts require that an application for retention be

9    "accompanied by a verified statement of the person to be employed setting forth

10   the person's connections with the debtor, creditor, any other party in interest,

11   their respective attorneys and accountants, the United States trustee, or any

12   person employed in the office of the United States trustee." Fed. R. Bankr. P.

13   2014(a). The statements requiring these detailed disclosures are submitted under

14   penalties of perjury and are subject to the bankruptcy fraud statute. *See* 28 U.S.C.

15   § 1746; 18 U.S.C. §§ 152(2)-(3).

---

[1] "The term 'disinterested person' means a person that (A) is not a creditor, an equity security holder, or an insider; (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14).

1    Alix alleges that McKinsey violated these disclosure requirements by

2    submitting to the Bankruptcy Court false statements in thirteen bankruptcy

3    proceedings in which it was appointed advisor.[2] Specifically, Alix alleges that,

4    despite "the size and complexity of McKinsey's business and business

5    relationships" as one of the world's largest consulting firms, it "disclosed **no**

6    connections by name in its initial declarations for these eight cases" and

7    disclosed only a few in supplemental declarations filed in only two of the cases.

8    Given AlixPartners's significant market share, Alix argues, if McKinsey had filed

9    compliant disclosure statements, it would have been disqualified from certain

10   assignments and AlixPartners would have secured at least some of the

11   assignments from which McKinsey would have been disqualified. In other

12   words, Alix contends that AlixPartners's injury was a foreseeable and direct

---

[2] The thirteen assignments are: *In re Hayes Lemmerz International, Inc.*, No. 01-BK-11490 (Bankr. D. Del. Dec. 5, 2001); *In re UAL Corp. (United Airlines)*, No. 02-BK-48191 (Bankr. N.D. Ill. Dec. 9, 2002); *In re Mirant Corp.*, No. 03-BK-46590 (Bankr. N.D. Tex. Jul. 14, 2003); *In re Lyondell Chemical Co.*, No. 09-BK-10023 (Bankr. S.D.N.Y. Jan. 6, 2009); *In re Harry & David Holdings, Inc.*, No. 11-BK-10884 (Bankr. D. Del. Mar. 28, 2011); *In re AMR Corp.*, No. 11-BK-15463 (Bankr. S.D.N.Y. Nov. 29, 2011); *In re AMF Bowling Worldwide, Inc.*, No. 12-BK-36495 (Bankr. E.D. Va. Nov. 13, 2012); *In re Edison Mission Energy*, No. 12-BK-49219 (Bankr. N.D. Ill. Dec. 17, 2012); *In re NII Holdings, Inc.*, No. 14-BK-12611 (Bankr. S.D.N.Y. Aug. 15, 2019); *In re SunEdison, Inc.*, No. 16-BK-10992 (Bankr. S.D.N.Y. Apr. 21, 2016); *In re Alpha Natural Resources*, No. 15-BK-33896 (Bankr. E.D. Va. Jul. 15, 2016); *In re GenOn Energy, Inc.*, No. 17-BK-33695 (Bankr. S.D. Tex. Jun. 14, 2017); and *In re SRC Liquidation LLC*, No. 15-BK-10541 (Bankr. D. Del. Sep. 12, 2019).

1    consequence of McKinsey's failure to follow the law and a fraud on the

2    Bankruptcy Court.

3         The amended complaint includes additional allegations concerning a pay-

4    to-play scheme orchestrated by McKinsey. On September 3, 2014, Alix alleges

5    that he met with two former or current McKinsey partners, defendants Dominic

6    Barton and Robert Sternfels. During that meeting, Alix allegedly told Barton and

7    Sternfels that he had become aware of McKinsey's practice of agreeing to host

8    meetings between its clients and bankruptcy attorneys in exchange for exclusive

9    referrals of bankruptcy assignments from those attorneys, which, Alix warned

10    them, was illegal.

11         The following month, Barton allegedly admitted the existence of, and

12    McKinsey RTS's participation in, the scheme and also admitted that his outside

13    counsel confirmed its illegality. Barton, acting on behalf of McKinsey, then

14    agreed to remove the senior leadership of McKinsey RTS for this illegal conduct

15    within 30 days of Barton's re-election as Global Managing Partner of McKinsey &

16    Co. in January 2015, and to remove McKinsey from the bankruptcy consulting

17    business by March 2015. In exchange, McKinsey allegedly asked Alix to "refrain

18    from acting at that time." In other words, Alix alleged that McKinsey asked him

1    not to pursue legal action targeting the pay-to-play scheme or McKinsey's

2    allegedly fraudulent disclosure statements. But Barton, according to Alix, did not

3    keep his end of the bargain. When Alix confronted him in October 2015

4    regarding McKinsey's continued misconduct, Barton allegedly offered to

5    introduce AlixPartners to Fortescue—a large Australian iron ore mining

6    company—and Volvo Europe for possible consulting assignments. Alix alleges

7    that he declined these offers because he construed them as "blatant attempted

8    pay-offs and bribes" intended to silence him.

9         Alix argues that McKinsey's pay-to-play scheme was aimed at eliminating

10   the competitive process by which debtors and their trustees select a bankruptcy

11   advisor. Additionally, Alix alleges that AlixPartners "was never even asked to

12   pitch" in three cases where it typically would have competed for a contract and

13   attributes this to McKinsey's alleged scheme.

14        McKinsey moved to dismiss the complaint under Rule 12(b)(6) and the

15   district court granted the motion, while nevertheless noting that Alix's

16   allegations were "indeed concerning." Still, the district court, in a careful opinion

17   navigating a body of case law that, charitably speaking, is less than pellucid,

18   found the allegations insufficient to satisfy RICO's proximate cause requirement.

1    The court concluded that "independent intervening decisions" of the trustees

2    and the bankruptcy court rendered the causal connection between the alleged

3    misconduct and injury "too remote, contingent, and indirect to sustain a RICO

4    claim." As to the pay-to-play allegations, the court concluded that they too failed

5    to meet the pleading standards and suffered from the same defects as the

6    allegations concerning fraudulent disclosures because they did not sufficiently

7    narrow the gap between the alleged fraud and the alleged resulting injury. This

8    appeal followed.

9         We review *de novo* a district court's dismissal of a complaint pursuant to

10   Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations

11   in the complaint as true, and drawing all reasonable inferences in the plaintiff's

12   favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).[3] However,

13   those allegations must meet the plausibility standard set out in *Aschroft v. Iqbal*,

14   556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

15                              **DISCUSSION**

16                                   I.

---

[3] Unless otherwise indicated, when quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

1    This case comes to us on an unusual procedural path; thus, we first

2    consider whether we have jurisdiction to review it. *See New York State Dep't of*

3    *Env't Conservation v. Fed. Energy Regul. Comm'n*, 991 F.3d 439, 445 (2d Cir. 2021).

4    The amended complaint initially contained several state-law claims in

5    addition to the federal RICO claims at issue on this appeal. After the district

6    court dismissed the federal claims under Rule 12(b)(6), it directed the parties to

7    brief whether an independent basis for federal jurisdiction over the remaining

8    state law claims existed. Alix responded by filing a notice to dismiss without

9    prejudice, under Federal Rule of Civil Procedure 41, his state law claims, which

10   he later attempted to retract. In response, the district court ruled that Alix's

11   voluntary Rule 41 dismissal of state law claims was effective and could not be

12   withdrawn. The court also denied Alix's motion for entry of judgment on his

13   federal RICO claims and his alternative request to revive the state law claims.

14   Ordinarily, immediate appeal is unavailable to a plaintiff, such as Alix,

15   who seeks review of an adverse decision on some of his claims by voluntarily

16   dismissing the others without prejudice. *Rabbi Jacob Joseph Sch. v. Province of*

17   *Mendoza*, 425 F.3d 207, 210 (2d Cir. 2005). That is because our jurisdiction is

18   limited to appeals from final decisions of the district court, which are orders that

11

1    end the litigation on the merits and leave nothing for the court to do but execute

2    the judgment. *Hallock v. Bonner*, 387 F.3d 147, 152 (2d Cir. 2004); *Coopers &*

3    *Lybrand v. Livesay*, 437 U.S. 463, 467 (1978); 28 U.S.C. § 1291. Because dismissal

4    without prejudice does not preclude reinstatement of the same claims, we do not

5    generally permit an appeal upon dismissal without prejudice. *Rabbi Jacob Joseph*

6    *Sch.*, 425 F.3d at 210 ("Tolerance of that practice would violate the long-

7    recognized federal policy against piecemeal appeals.").

8         However, we have previously held that "a plaintiff may cure such defect

9    in appellate jurisdiction by disclaiming an intent to revive the dismissed claim

10   (effectively, converting it to a dismissal *with prejudice*, for reasons of estoppel)."

11   *Jewish People for the Betterment of Westhampton Beach v. Vill. of Westhampton Beach*,

12   778 F.3d 390, 394 (2d Cir. 2015) (upholding jurisdiction where the appellants

13   "disclaim[ed] any intent to revive their dismissed claim" in a reply brief); *16 Casa*

14   *Duse, LLC v. Merkin*, 791 F.3d 247, 255 (2d Cir. 2015) (upholding jurisdiction

15   where the appellant "agreed to a dismissal of his remaining claim . . . with

16   prejudice" at oral argument); *see also Atlanta Shipping Corp. v. Chemical Bank*, 818

17   F.2d 240, 246 (2d Cir. 1987) ("A party who loses on a dispositive issue that affects

12

1    only a portion of his claims may elect to abandon the unaffected claims, invite a

2    final judgment, and thereby secure review of the adverse ruling.").

3            Alix made a similar effort to cure the jurisdictional defect in this case.

4    When filing this appeal, he disclaimed his state law claims by filing an

5    addendum to Form C, which states that he would "not pursue his appeal of the

6    district court's July 6, 2020 ruling" and that he "hereby discontinues with

7    prejudice the State Law Claims." Doc. 10-4. This statement was sufficient to cure

8    any defect in appellate jurisdiction and to permit us to review the district court's

9    order dismissing Alix's RICO claims. *See Jewish People for the Betterment of*

10   *Westhampton Beach*, 778 F.3d at 394.

11                                          II.

12           To establish a RICO claim, a plaintiff must prove: (1) a violation of the

13   RICO statute, (2) an injury to business or property, and (3) that the injury was

14   caused by the RICO violation. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d

15   Cir. 2013); 18 U.S.C. § 1962.  This appeal implicates the causation element,

16   pursuant to which a plaintiff must plausibly allege that the RICO violations were

17   (1) "the proximate cause of his injury, meaning there was a direct relationship

18   between the plaintiff's injury and the defendant's injurious conduct"; and that

13

1    they were (2) "the but-for (or transactional) cause of his injury, meaning that but

2    for the RICO violation, he would not have been injured." *UFCW Loc. 1776 v. Eli*

3    *Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010). The dispositive issue here is whether

4    Alix plausibly alleges proximate cause.

5         The district court concluded that Alix failed to allege proximate cause for

6    three reasons. First, the alleged harm to AlixPartners, it concluded, was directly

7    caused by the decisions of the various debtors' trustees not to hire AlixPartners

8    rather than by McKinsey's misconduct. Second and relatedly, the court

9    concluded that the existence of several intervening factors rendered the

10   relationship between the alleged fraud and injury too indirect and remote.

11   Lastly, the court believed that there was "at least one 'better situated' party,"

12   such as the U.S. Trustee, "who can seek appropriate remedies for the most direct

13   consequences of McKinsey's alleged misconduct."

14        We disagree with the district court's analysis and conclusions as to the

15   thirteen engagements. In general, we conclude that its analysis conflated proof of

16   causation and proof of damages and that it did not draw all reasonable

17   inferences in Alix's favor. More specifically (and more importantly) we believe

18   the district court gave insufficient consideration to the fact that McKinsey's

14

1   alleged misconduct targeted the federal judiciary. As a consequence, this case

2   requires us to focus on the responsibilities that Article III courts must shoulder to

3   ensure the integrity of the Bankruptcy Court and its processes. Litigants in all of

4   our courts are entitled to expect that the rules will be followed, the required

5   disclosures will be made, and that the court's decisions will be based on a record

6   that contains all the information applicable law and regulations require. If

7   McKinsey's conduct has corrupted the process of engaging bankruptcy advisors,

8   as Alix plausibly alleges, then the unsuccessful participants in that process are

9   directly harmed. The fact that this case invokes our supervisory responsibilities

10  makes our resolution of it *sui generis* and of little, if any, application to

11  "ordinary" RICO cases where these responsibilities are not front and center. But

12  in light of these special considerations, we hold that Alix has plausibly alleged

13  proximate cause with respect to all thirteen engagements.

14          The fact that this case is not within the mine-run of civil RICO cases means

15  that its proximate cause analysis differs somewhat from the analysis in cases

16  such as *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), *Anza v. Ideal Steel*

17  *Supply Co.*, 547 U.S. 451 (2006), or *Empire Merchants, LLC v. Reliable Churchill*

18  *LLLP*, 902 F.3d 132 (2d Cir. 2018).

1    *Bridge*, for example, involved a scheme to undermine a county law

2    restricting bidders at tax lien auctions to one representative. When two or more

3    bids were equal, which happened frequently,[4] the county allocated the liens "on

4    a rotational basis" among the tying bidders. *Id.* at 643. The defendants in *Bridge*

5    used straw bidders to give themselves a larger presence and increase their odds

6    of obtaining successful bids. *Id.* at 643–44. The Court held that the plaintiffs'

7    "alleged injury—the loss of valuable liens—[wa]s the direct result of [the

8    defendants'] fraud." *Id.* at 658.

9    Alix argues that the causal chain in this case is likewise sufficiently direct

10   for Rule 12(b)(6) purposes. Alix reasons that, because causation "need only be

11   probable," *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011),

12   he sufficiently alleged proximate causation by showing that AlixPartners would

13   have received at least one of the engagements from which McKinsey likely

---

[4] At these public auctions, prospective buyers bid on the percentage of penalties the delinquent property owner must pay in order to clear the tax lien on the property. If the owner failed to redeem the property within the statutory period by paying the lienholder (successful bidder) the delinquent taxes and penalty established at the auction, then the lienholder could obtain the deed for the property, effectively purchasing the property by paying only the delinquent taxes. For these reasons, the liens were profitable even at the lowest possible bid, resulting in multiple zero percent bids for many parcels. *See Bridge*, 553 U.S. at 643.

16

1    would have been disqualified based on AlixPartners's record of success in

2    securing engagements.

3           The district court held that Alix failed to plead proximate cause because

4    intervening events might have broken the chain of causation, such as the

5    Bankruptcy Judge determining whether an advisor was necessary at all and the

6    Trustee selecting a particular advisor, which might not have been AlixPartners.

7    We agree that these might have been intervening events if Alix had somehow

8    learned, before any assignments had been made, that McKinsey had been filing

9    false statements and then sued for the fees it anticipated it would have received if

10   McKinsey had told the truth.

11          However, this is not such a case. Alix sued after the assignments had

12   already been awarded. Consequently, we need not speculate whether the

13   Bankruptcy Judge and the Trustee would have thought an advisor was

14   necessary. We know that they did think so in the thirteen bankruptcies at issue

15   because they awarded assignments to McKinsey. It is certainly reasonable to

16   infer that the Bankruptcy Court, the U.S. Trustee, and the parties involved who

17   thought an advisor was needed in thirteen cases would continue to think so after

18   learning that their selected advisor was ineligible because of fraud and that they

1    would, at that point, make an alternative selection. And it is also a reasonable

2    inference that, in making another selection, they would likely have awarded

3    assignments to eligible firms in approximately the same ratio they had been

4    using in the past. Of course, McKinsey might ultimately prove the existence of

5    intervening factors, but that showing must await summary judgment or trial.

6         Similarly, this case differs in significant respects from *Anza v. Ideal Steel*

7    *Supply Co.*, 547 U.S. 451 (2006), where the plaintiff claimed it lost sales because

8    the competitor did not pay sales tax and therefore sold product at lower prices.

9    The Supreme Court noted that the plaintiff's competitor could have lowered its

10   prices for many reasons, not necessarily because it did not pay sales taxes. These

11   other possible reasons for lowering prices were thought to be the potential

12   intervening events that broke the chain of causation between the tax crime and

13   the plaintiff's alleged injury. *Anza* would have been more like this case if an

14   internal document in Anza's files had stated, "If we do not pay sales taxes, we

15   can and will lower our prices, but we will not lower our prices for any other

16   reason." Anza would also be more like this case if the defendants had allegedly

17   defrauded one of the courts we oversee. Finally, *Empire Merchants, LLC v. Reliable*

18   *Churchill LLLP*, 902 F.3d 132 (2d Cir. 2018), does not preclude a finding of

18

1    proximate cause. In *Empire*, the defendant smuggled liquor into New York to

2    avoid excise taxes, and the plaintiff, a liquor distributor with exclusive

3    distribution rights in New York, alleged that the smuggling caused it to lose

4    sales. Our Court observed that "Empire's 'lost sales could [thus] have resulted

5    from factors other than [the defendants'] alleged acts of fraud.'" *Id.* at 143

6    (quoting *Anza*, 547 U.S. at 459). As examples of other possible causes, Empire

7    mentioned bootlegging from states with even lower taxes or retailers responding

8    to changing customers' tastes by offering product not subject to Empire's

9    exclusive distributorship. *Id.*

10    Here, by contrast, the loss to AlixPartners and the other large advising

11    firms is plausibly alleged to flow directly from McKinsey's fraud on the

12    Bankruptcy Court. If the thirteen assignments had not been awarded to

13    McKinsey, it is entirely plausible that they would have been awarded to other

14    advising firms, and the large advising firms would, following past practice, have

15    received 75% of these assignments and resulting revenue (and that AlixPartners

16    would have received a 24% share of these assignments and resulting revenue).

17    And, of course, none of these prior cases involved allegations of fraud on a court

18    whose operations we superintend.

1       Although we hold that Alix sufficiently alleges proximate cause with

2  respect to the thirteen bankruptcies, proximate cause is especially conspicuous in

3  the case of *GenOn*. Specifically, Alix plausibly alleges that had McKinsey filed

4  proper disclosure statements, GenOn would not have hired McKinsey and, even

5  if it had, the bankruptcy court would not have approved McKinsey's retention.

6  Moreover, Alix plausibly alleges that had McKinsey been disqualified,

7  AlixPartners would have been hired.

8       According to the amended complaint, McKinsey, prior to and at the time

9  of the filing of the *GenOn* bankruptcy, had extensive connections to NRG Energy,

10  GenOn's parent company and a current or former McKinsey client. Prior to its

11  bankruptcy, GenOn had a multi-million-dollar fraudulent transfer claim against

12  NRG Energy. Had McKinsey made truthful disclosures, Alix alleges, GenOn

13  would not have hired McKinsey RTS to investigate GenOn's fraudulent transfer

14  claim against NRG Energy, McKinsey's own client. Nor would it have hired

15  McKinsey to negotiate GenOn's separation from NRG Energy during bankruptcy

16  proceedings. Alix further alleges that, in addition to failing to disclose its

17  connection to NRG Energy, McKinsey also concealed at least 53 other known

18  conflicts and connections, some of which would have revealed that multiple

1 McKinsey clients were GenOn's creditors. Alix further alleges that in order to

2 avoid being listed as a creditor of the estate, McKinsey received avoidable

3 preference payments from GenOn and intentionally concealed an interest

4 adverse to the estate.

5      Based on these alleged facts, it is implausible to conclude that GenOn

6 would have retained McKinsey with knowledge of these serious conflicts of

7 interests. We are even more hard-pressed to conclude that the Bankruptcy Court,

8 given these facts, could or would have found that McKinsey was "disinterested"

9 and did not "hold or represent an interest adverse to the estate." 11 U.S.C. §

10 327(a).

11      McKinsey contends that the causal chains in these thirteen bankruptcies

12 are too tenuous to meet the proximate cause standard because debtors do not

13 have to hire a bankruptcy consultant at all or may hire more than one. In its

14 view, this discretion makes any causal relationship too speculative. We disagree.

15 As the Supreme Court has explained, proximate cause is a "flexible concept" that

16 is "generally not amenable to bright-line rules." *Bridge*, 553 U.S. at 654, 659.

17 Although the existence of an intervening decision-maker "may in some cases

18 tend to show that an injury was not sufficiently direct to satisfy [the] proximate-

1   cause requirement, . . . it is not in and of itself dispositive." *Bridge*, 553 U.S. at 659.

2   On our review of a Rule 12(b)(6) dismissal, which requires us to draw all

3   reasonable inferences in Alix's favor, we see nothing implausible or speculative

4   about the conclusion that AlixPartners and the other competitors would have

5   secured additional engagements absent McKinsey's alleged misconduct.

6          Although proximate cause is most clearly alleged with respect to *GenOn*,

7   the remaining twelve engagements also meet the proximate cause requirement.

8   This is because, as we have noted (*see* pp. 13- 18*)*, Alix plausibly alleges that Alix

9   Partners and the other two firms that compete for assignments in large

10  bankruptcies would have been in direct competition for the other twelve

11  bankruptcies if McKinsey had not submitted allegedly fraudulent statements to

12  the Bankruptcy Court. Then, plausibly, the firms would have received

13  assignments roughly in accordance with their historical market shares.

14  Moreover, fraud on the Bankruptcy Court committed in the manner alleged by

15  Alix causes direct harm to litigants who are entitled to a level playing field and

16  calls into play our unique supervisory responsibilities.

17         The congruence of these concerns has not been at play in any of the

18  authorities cited by the parties—*Bridge*, *Anza*, or *Empire Merchants*—or, for that

22

1    matter, in any other relevant authority.  But the fact that this case is a "one off"

2    does not reduce our responsibility to superintend the integrity of bankruptcy

3    processes.   Of course, proximate cause is merely one hurdle. McKinsey might

4    well prevail on summary judgment or at trial, and to be sure, uncertainties at

5    those stages might exist.  But in light of our supervisory responsibilities, we

6    remand in order for a more complete record to be developed: one that will

7    disclose more about who did what, when, and with what reasonably likely

8    consequences.

9         For the guidance of the parties on remand, we note that uncertainty on

10    how to calculate damages should not be confused with proximate cause because

11    they are distinct concepts. *See Anza*, 547 U.S. at 466 ("Proximate cause and

12    certainty of damages, while both related to the plaintiff's responsibility to prove

13    that the amount of damages he seeks is fairly attributable to the defendant, are

14    distinct requirements.")

15         Alix alleges that if McKinsey had disclosed what it was required to

16    disclose, McKinsey would have been disqualified and the thirteen assignments

17    would have been added to the pool available to Alix Partners and McKinsey's

18    other competitors.  McKinsey's three largest competitors would have received

1    75% of these assignments (and revenue), just as they historically received 75% of

2    assignments and revenue.

3         Of course, we cannot tell which particular assignments would have been

4    within AlixPartners' 24% and therefore cannot determine exactly its losses. But

5    certainty as to the amount of damages is not required at the pleading stage. And

6    whatever uncertainty exists does not undermine the fact that Alix plausibly

7    alleged that McKinsey's fraud caused Alix some damage.

8         The law is well-settled that uncertainty as to amount of damages is not a

9    reason to deny a plaintiff some recovery. *Story Parchment Co. v. Paterson*

10   *Parchment Co.*, 282 U.S. 555, 251-52 (1931). There the Court said that "[t]he

11   wrongdoer is not entitled to complain that [damages] cannot be measured with

12   the exactness and precision that would be possible if the case, which he alone is

13   responsible for making, were otherwise…the risk of the uncertainty should be

14   thrown upon the wrongdoer instead of upon the injured party." *Id.; see also*

15   *Eastman Kodak Co. of New York v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927).

16   Uncertainty as to the amount of damages can arise in a somewhat

17   analogous context where wrongdoing has injured one member of a group, but it

18   is not known which one. The Seventh Circuit has offered the example of several

24

1    job applicants who were passed over on racial grounds for one promotion. "If

2    four people competing for one position lost an equal chance to get it, then each

3    should receive 25% of the benefits available." *Biondo v. City of Chicago*, 382 F.3d

4    680, 688 (7th Cir. 2004). *See BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750,

5    758 (7th Cir. 2011).

6         Finally, McKinsey has not demonstrated that anyone else is "better

7    situated to sue" than Alix. *See Empire Merchants*, 902 F.3d at 144. Unlike in *Empire*

8    *Merchants* or in *Anza* where the alternative and "more immediate victim" was the

9    state with its plenary enforcement authority to address tax evasion, *see id.*, we are

10   not persuaded that the Bankruptcy Court or the U.S. Trustee, which McKinsey

11   argues would be a more appropriate alternative plaintiff, would be in a position

12   to gather information about McKinsey's conduct were Alix not in the picture.

13   Although the Bankruptcy Court has the inherent authority to investigate and

14   remedy fraud on the court, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, (1991),

15   we have no reason to believe that a belated investigation may be launched into

16   an already-closed matter.[5] That task is usually assigned to the United States

---

[5] The *GenOn* bankruptcy matter, for example, is closed and has not been active since June 30, 2020, when the Final Decree was filed. Final Decree Closing the Remainder of the Chapter 11 Cases, *In re: GenOn Energy, Inc., et al.* (S.D. Tx. June 30, 2020) (No. 17-

1 Attorney's Office. To be sure, in an ordinary civil or criminal case, a court would

2 "vacate its own judgment upon proof that a fraud has been perpetrated upon the

3 court." *Chambers*, 501 U.S. at 44. While, theoretically, that may also be possible

4 here, we are not persuaded that, under the circumstances presented here, either

5 the Bankruptcy Court or the U.S. Trustee would be in a superior position to find

6 out what McKinsey did (or did not do).  In other words, adjudicating any

7 potential claims of the U.S. Trustee or the Bankruptcy Court would not be more

8 "straightforward" than adjudicating Alix's claims.  *See Empire Merchants*, 902

9 F.3d at 144 (quoting *Anza*, 547 U.S. at 460). For these reasons, we conclude that

10 Alix has alleged a sufficiently direct relationship between the asserted injury to

11 AlixPartners and McKinsey's purported racketeering activities in all thirteen

12 bankruptcies**.**

13                                           III.

14         The district court dismissed Alix's RICO claims predicated on the pay-to-

15 play scheme because it found that the allegations failed to meet the pleading and

16 proximate cause standards. It concluded that the pay-to-play allegations were

---

33695), ECF No. 2176. Even when the case was active, nothing in the record suggests
that the U.S. Trustee or any of the private parties with pecuniary interests filed an
objection or otherwise tried to vindicate the integrity of the bankruptcy system in that
case.

1    "devoid of any supporting specifics" and inadequate to meet the pleading

2    requirements, and that even if they did, that they failed to show a sufficiently

3    direct link between the allegedly unlawful conduct and injury. We disagree. We

4    hold that Alix adequately pleaded bankruptcy fraud under Federal Rule of Civil

5    Procedure 9(b) and that the allegations show a sufficiently direct link between

6    the alleged fraud and injury.

7                                        A.

8         Alix alleges that McKinsey's pay-to-play scheme violated 18 U.S.C. §

9    152(6), which requires a showing that the defendant acted "fraudulently" in

10   "giv[ing], offer[ing], receiv[ing], or attempt[ing] to obtain any money or

11   property, renumeration, compensation, reward, advantage, or promise thereof

12   for acting or forbearing to act in any [bankruptcy cases]." In alleging that

13   McKinsey violated this statute, Alix was required to plead with sufficient

14   particularity the circumstances constituting the fraud. *See* Fed. R. Civ. P. 9(b).

15   Crucially, however, "allegations may be based on information and belief when

16   facts are particularly within the opposing party's knowledge," provided that

17   they "adduce specific facts supporting a strong inference of fraud." *Wexner v.*

18   *First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).

1    The district court found Alix's pay-to-play allegations insufficient because

2    they did not "specify any single act of 'paying' or 'playing'" or connect instances

3    of corruption to a particular bankruptcy case. However, the amended complaint

4    does identify several engagements that Alix believes had been influenced by the

5    pay-to-play scheme. For example, it specifically alleges the influence of the pay-

6    to-play scheme in the Alpha Natural Resources, NII Holdings, and Edison

7    Mission Energy bankruptcies because AlixPartners was "never even asked to

8    pitch for the work" despite its strong relationship with the debtors or extensive

9    expertise in the relevant industries.

10    Moreover, the details that the district court found lacking are rarely within

11    the knowledge of a victim of fraud and are more appropriately left for discovery.

12    At this stage, Alix's pay-to-play allegations need only suggest "a strong inference

13    of fraud." *Wexner*, 902 F.2d at 172. The allegations in the complaint about specific

14    cases, when combined with the unusually detailed allegations (*see* pp. 8-10)

15    regarding Alix's meetings with Barton, one of which allegedly led to Barton

16    admitting McKinsey's role and participation in an illegal scheme and supposed

17    agreement to take steps to end that scheme, easily raise a strong inference of

18    fraud. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171

1    (2d Cir. 2015) ("In determining the adequacy of [a plaintiff's] fraud pleading[] . . .

2    [a court] view[s] the alleged facts in their totality, not in isolation."). Accordingly,

3    we conclude that Alix's detailed pay-to-play allegations comfortably meet the

4    Rule 9(b) standard.

5                                         B.

6            Even if they are adequately pleaded, McKinsey contends that the pay-to-

7    play allegations suffer from the same problem of insufficient causal connection as

8    the allegations concerning fraudulent disclosure statements. The pay-to-play

9    allegations, McKinsey argues, "narrow" the gap between the alleged predicate

10   acts and injury but fall short of "eliminat[ing]" that gap because of the

11   independent decisions of debtors and the bankruptcy court. Specifically,

12   McKinsey contends that Alix's RICO claim predicated on the pay-to-play scheme

13   necessarily fails when the allegations do not show that the debtors would have

14   hired AlixPartners in the absence of the scheme.

15           We disagree. At the motion to dismiss stage, Alix need only plausibly

16   allege that the pay-to-play scheme proximately caused AlixPartners' harm. We

17   believe that the pay-to-play allegations are sufficiently robust to plausibly allege

18   that the causal connection has been met. Whether Alix can substantiate his

1    allegations is a question for summary judgment or trial, but at this juncture we

2    find that the allegations are sufficient to allege proximate cause.

3          The injury alleged due to the fraudulent disclosure statements is, as we

4    have discussed, the loss of assignments as a bankruptcy consultant. [6] Pay-to-play

5    is different because the purported injury is the lost opportunity to compete in an

6    unrigged "beauty contest." Where this occurs, competitors who do not pay are

7    *ipso facto* harmed. In this sense, the allegations concerning the pay-to-play

8    scheme are like those in *Bridge*, where the Court recognized the existence of an

9    injury resulting from the rigged lottery system. Here, Alix likewise plausibly

10   alleges a direct causal chain between AlixPartners's loss (the opportunity to

11   participate in an unrigged contest) and McKinsey's pay-to-play scheme that was

12   intended to buy off the competition. For each pay-to-play engagement, Alix

13   specifically alleges that AlixPartners "was never even asked to pitch for the

14   work" in cases in which it ordinarily would have competed for an assignment

15   absent the scheme. Furthermore, it follows from Alix's pay-to-play allegations,

16   which we must accept as true at this point, that McKinsey eviscerated what had

---

[6] Of the thirteen total engagements in dispute, all of which the amended complaint alleges have been affected by McKinsey's fraudulent disclosure statements, three engagements are alleged to also have been influenced by the pay-to-play scheme.

1 historically been an even playing field in the bankruptcy advising marketplace.

2 Suffice it to say that it is implausible—indeed inconceivable—that any

3 Bankruptcy Court would have approved McKinsey's retention if Alix's

4 allegations were substantiated. There is accordingly a plausibly alleged direct

5 causal link between McKinsey's purported marketplace manipulation and the

6 harm to Alix of being excluded from a market that had been rigged.

7     In view of Alix's allegations that competitors had been bought off, we, in

8 the absence of discovery and on an undeveloped record, are not in a position to

9 identify intervening causes that could have severed this causal chain. And given

10 this Court's responsibility to oversee the integrity of the bankruptcy process, we

11 see no other victims with the appropriate incentive to remedy the harm caused

12 by McKinsey's scheme as alleged by Alix. Accordingly, we hold that the pay-to-

13 play allegations plausibly allege RICO proximate causation.

14                          **CONCLUSION**

15     For the foregoing reasons, we **VACATE and REMAND** for further

16 proceedings consistent with this opinion.

17

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

18