**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JAY ALIX,<br><br>    *Plaintiff*,<br><br>  v.<br><br>MCKINSEY & CO., INC.; MCKINSEY HOLDINGS, INC.; MCKINSEY & COMPANY INC. UNITED STATES; MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC; DOMINIC BARTON; KEVIN CARMODY; JON GARCIA; SETH GOLDSTROM; MARK HOJNACKI; VIRGINIA MOLINO; ALISON PROSHAN; ROBERT STERNFELS; and JARED YERIAN,<br><br>    *Defendants.* | Case No. 18-cv-04141 (JMF)<br><br><br>**Oral Argument Requested** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

| | |
|---|---|
| John Gleeson | Matthew I. Menchel |
| Mark P. Goodman | Jonathan D. Cogan |
| Andrew J. Ceresney | Danielle L. Rose |
| Erica S. Weisgerber | Benjamin Sirota |
| Nathan S. Richards | Christen M. Martosella |
| DEBEVOISE & PLIMPTON LLP | KOBRE & KIM LLP |
| 919 Third Avenue | 800 Third Avenue |
| New York, New York 10022 | New York, New York 10022 |
| (212) 909-6000 | (212) 488-1200 |

*Counsel for McKinsey & Company, Inc., McKinsey Holdings, Inc., McKinsey & Company Inc. United States, and McKinsey Recovery & Transformation Services U.S., LLC*

Ariel N. Lavinbuk
Jennifer S. Windom
Brandon L. Arnold
KRAMER LEVIN NAFTALIS & FRANKEL LLP
2000 K Street NW, 4th Floor
Washington, D.C. 20006
(202) 775-4500

*Counsel for Jon Garcia, Alison Proshan,
and Robert Sternfels*

Reid M. Figel
Bradley E. Oppenheimer
Robert C. Klipper
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK P.L.L.C.
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7968

*Counsel for Kevin Carmody and Seth
Goldstrom*

Catherine L. Redlich
DRISCOLL & REDLICH
110 West 40th Street, Suite 1900
New York, New York 10018
(212) 986-4030

*Counsel for Dominic Barton*

Micah E. Marcus
Christopher G. Dean
MCDONALD HOPKINS LLP
300 North LaSalle Street, Suite 1400
Chicago, Illinois 60654
(312) 280-0111

*Counsel for Jared D. Yerian*

Linda Imes
Christopher W. Dysard
Reed M. Keefe
SPEARS & IMES LLP
767 Third Avenue
New York, New York 10017
(212) 213-6996

*Counsel for Mark Hojnacki*

Jed I. Bergman
Olga Lucia Fuentes-Skinner
Richard C. Ramirez
GLENN AGRE BERGMAN & FUENTES LLP
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
(212) 970-1600

*Counsel for Virginia "Jean" Molino*

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ....................................................................................................6

    A.    Disclosures Required by Bankruptcy Rule 2014 ...................................6

    B.    McKinsey's Rule 2014 Disclosures........................................................7

    C.    Alix's Effort to Drive McKinsey Out of the Restructuring Advisory
        Business .................................................................................................9

    D.    Alix's RICO Complaint, This Court's Dismissal Order, and the Second
        Circuit's Reversal................................................................................12

ARGUMENT .......................................................................................................13

I.    Alix Fails to Plead That Defendants' Bankruptcy Court Conduct Constitutes Any
    RICO Predicate Act .........................................................................................14

    A.    Alix Fails to Plead Fraud Because McKinsey Was Transparent About
        What It Was and Was Not Disclosing ..................................................14

        1.    Alleged Failure to Disclose Names and "Details" of Connections............17

        2.    Alleged Failure to Disclose Affiliate Connections or Connections
            Beyond the Lookback Period.............................................................18

        3.    Alleged Insufficient Connection-Checking Process ..................................20

        4.    Alleged Misrepresentations Regarding MIO ..............................................20

        5.    Alleged Misrepresentation of Disinterestedness........................................21

    B.    Alix Fails to Adequately Allege Scienter ............................................24

        1.    McKinsey's Objectively Reasonable Interpretation of Rule 2014
            Precludes a Finding of Scienter .......................................................25

        2.    The Content and Context of the Declarations Demonstrate a Lack
            of Fraudulent Intent..........................................................................29

        3.    Alix Fails to Adequately Plead Motive......................................................30

    C.    For Additional and Independent Reasons, Alix Fails to Plead Certain
        Predicate Acts ......................................................................................30

D. RICO Liability Cannot Be Based on Aiding and Abetting Predicate Acts ..........32

E. For Additional and Independent Reasons, Alix Fails to Plead Any Racketeering Acts by Any Individual Defendant ...................................34

    1. Dominic Barton.............................................................................36

    2. Kevin Carmody..............................................................................38

    3. Jon Garcia .....................................................................................42

    4. Seth Goldstrom ..............................................................................45

    5. Mark Hojnacki ..............................................................................53

    6. Jean Molino...................................................................................58

    7. Alison Proshan ..............................................................................61

    8. Robert Sternfels ............................................................................64

    9. Jared Yerian ..................................................................................66

II. Alix's RICO Claims Are Barred in Substantial Part by the Statute of Limitations..........67

A. Alix's Claims Based on the Earliest Eight Bankruptcy Cases Are Time-Barred Against All Defendants....................................................68

B. The Statute of Limitations Bars All of Alix's Claims Against Defendants Yerian, Goldstrom, and Garcia ..............................................69

    1. Jared Yerian ..................................................................................69

    2. Seth Goldstrom ..............................................................................70

    3. Jon Garcia .....................................................................................71

C. Alix's Claims Based on All but the *Westmoreland* Bankruptcy Are Time-Barred Against Defendants Hojnacki and Molino............................72

III. *ANR*-Related Claims Are Barred by Collateral Estoppel ...................................73

IV. Alix Fails to Allege Any RICO Enterprise Against the Corporate Defendants and Fails to Allege a Count 3 Enterprise Against All Defendants ...........................75

A. Count 1 Fails to Allege an Enterprise Distinct from the Corporate Defendants. ..............................................................................75

B. Count 3 Fails to Allege an Association-In-Fact Enterprise. ...................77

V.    Alix Fails to Plead That Any of the Individual Defendants Conducted or
      Participated in the Conduct of a RICO Enterprise ................................................78

      A.    Alison Proshan ...............................................................................................79

      B.    Seth Goldstrom, Kevin Carmody, and Jared Yerian ................................82

      C.    Jon Garcia and Robert Sternfels ..................................................................84

      D.    Dominic Barton ...............................................................................................85

      E.    Jean Molino .......................................................................................................87

      F.    Mark Hojnacki ..................................................................................................89

VI.   Alix's Claims Fall Outside the Zone of Interests Protected by the Bankruptcy
      Disclosure Provisions on Which Alix Relies ...................................................90

VII.  Alix Fails to Plausibly Plead Each Step in His Alleged Causal Chain ...........91

VIII. Alix Fails to Plead a RICO Conspiracy Under § 1962(d) ...............................94

IX.   The "Joint Declaration" From Alix's Bankruptcy Attorneys Should Be Stricken ...........94

CONCLUSION ....................................................................................................................95

## <u>TABLE OF AUTHORITIES</u>

<u>Pages</u>

**Cases**

*Abrahams v. Young & Rubicam, Inc.*,
  79 F.3d 234 (2d Cir. 1996)......................................................................90, 91

*AJ Energy LLC v. Woori Bank*,
  2019 WL 4688629 (S.D.N.Y. Sept. 26, 2019).........................................90

*Alix v. McKinsey*,
  23 F.4th 196 (2d Cir. 2022) ................................................... *passim*

*Amsterdam Tobacco Inc. v. Philip Morris Inc.*,
  107 F. Supp. 2d 210 (S.D.N.Y. 2000)....................................................86

*Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*,
  660 F. Supp. 1362 (D. Conn. 1987)......................................................83

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................14, 38, 39, 48

*Atl. Gypsum Co. v. Lloyds Int'l Corp.*,
  753 F. Supp. 505 (S.D.N.Y. 1990) .......................................................14

*Azrielli v. Cohen Law Offices*,
  21 F.3d 512 (2d Cir. 1994)............................................................79, 80, 88

*Baisch v. Gallina*,
  346 F.3d 366 (2d Cir. 2003)..................................................................91

*Baumer v. Pachl*,
  8 F.3d 1341 (9th Cir. 1993) ..................................................................81

*Bernstein v. O'Reilly*,
  2019 WL 10995111 (S.D.N.Y. Mar. 5, 2019) .......................................6

*Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.*,
  832 F. Supp. 585 (E.D.N.Y. 1993) ..................................... *passim*

*Blitz v. Bliss*,
  1987 WL 14634 (S.D.N.Y. July 15, 1987) ...........................................59

*Boda v. Phelan*,
  2012 WL 3241213 (E.D.N.Y. Aug. 6, 2012)........................................73

*Bristol v. Nassau Cnty.*,
685 F. App'x 26 (2d Cir. 2017) ...................................................................74

*Cedar Swamp Holdings, Inc. v. Zaman*,
487 F. Supp. 2d 444 (S.D.N.Y. 2007) ............................................................1

*Celotex Corp. v. Edwards*,
514 U.S. 300 (1995) ....................................................................................50

*City of Philadelphia v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ...................................................................35

*Crab House of Douglaston Inc. v. Newsday, Inc.*,
418 F. Supp. 2d 193 (E.D.N.Y. 2006) ....................................................78, 82

*Craig Outdoor Advert., Inc. v. Viacom Outdoor*,
2005 WL 1279046 (W.D. Mo. May 25, 2005) ..............................................33

*Crawford v. Franklin Credit Mgmt.*,
758 F.3d 473 (2d Cir. 2014) ........................................................................94

*Crown Chevrolet v. Gen. Motors, LLC*,
637 F. App'x 446 (9th Cir. 2016) .................................................................68

*Cruz v. FXDirectDealer, LLC*,
720 F.3d 115 (2d Cir. 2013) ....................................................13, 76, 77, 78

*DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*,
770 F. Supp. 2d 497 (E.D.N.Y. 2011) ....................................................30, 40

*Discon, Inc. v. NYNEX Corp.*,
93 F.3d 1055 (2d Cir. 1996) ........................................................................94

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
822 F.2d 1242 (2d Cir. 1987) ......................................................................34

*DLJ Mortg. Cap. v. Kontogiannis*,
594 F. Supp. 2d 308 (E.D.N.Y. 2009) ..........................................................34

*Drummond v. Zimmerman*,
454 F. Supp. 3d 1210 (S.D. Fla. 2020) ........................................................87

*Eliahu v. Jewish Agency for Israel*,
919 F.3d 709 (2d Cir. 2019) ........................................................................33

*Fink v. Time Warner Cable*,
714 F.3d 739 (2d Cir. 2014) ........................................................................15

*First Cap. Asset Mgmt., Inc. v. Brickelbush, Inc.*,
   150 F. Supp. 2d 624 (S.D.N.Y. 2001) .............................................................56

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004) ...........................................................................14

*First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*,
   110 F.R.D. 557 (S.D.N.Y. 1986) ....................................................................62

*Flame S.A. v. Indus. Carriers, Inc.*,
   24 F. Supp. 3d 513 (E.D. Va. 2014) ...............................................................50

*Gerstenfeld v. Nitsberg*,
   190 F.R.D. 127 (S.D.N.Y. 1999) ...............................................................38, 48

*Gilmore v. Berg*,
   820 F. Supp. 179 (D.N.J. 1993) .................................................................80, 82

*Gottdiener v. Sater*,
   35 F. Supp. 3d 386 (S.D.N.Y. 2014)................................................................33

*Grauberger v. St. Francis Hosp.*,
   169 F. Supp. 2d 1172 (N.D. Cal. 2001) ..........................................................25

*Hahn v. Office & Prof. Emps. Int'l Union*,
   107 F. Supp. 3d 379 (S.D.N.Y. 2015)..............................................................73

*Handeen v. Lemaire*,
   112 F.3d 1339 (8th Cir. 1997) ...................................................................79, 83

*Hao Zhe Wang v. Verizon Commc'ns Inc.*,
   2020 WL 5982882 (S.D.N.Y. Oct. 8, 2020) ....................................................57

*Harbinger Cap. Partners LLC v. Ergen*,
   103 F. Supp. 3d 1251 (D. Colo. 2015)........................................................49, 50

*Harborview Master Fund, LP v. Lightpath Techs., Inc.*,
   601 F. Supp. 2d 537 (S.D.N.Y. 2009)..............................................................15

*Hart v. City of New York*,
   2012 WL 5877436 (S.D.N.Y. Nov. 20, 2012)...................................................73

*Hecht v. Com. Clearing House, Inc.*,
   897 F.2d 21 (2d Cir. 1990).........................................................................48, 94

*Hemi Grp. LLC v. City of New York*,
   559 U.S. 1 (2010).............................................................................................91

*Hendrick v. Avent*,
   891 F.2d 583 (5th Cir. 1990) ...................................................................................49, 50

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085 (2d Cir. 1995)..............................................................................................6

*Holmes v. Sec. Inv. Prot. Corp.*,
   503 U.S. 258 (1992)..................................................................................................13, 90

*In re Advanta Corp. Secs. Litig.*,
   180 F.3d 525 (3d Cir. 1999).............................................................................................35

*In re Agape Litig.*,
   681 F. Supp. 2d 352 (E.D.N.Y. 2010) .............................................................................86

*In re Agrokor d.d.*,
   591 B.R. 163 (S.D.N.Y. Bankr. 2018) .............................................................................50

*In re AroChem Corp.*,
   176 F.3d 610 (2d Cir. 1999)......................................................................................91, 92

*In re Bemis Co. Sec. Litig.*,
   512 F. Supp. 3d 518 (S.D.N.Y. 2021)..............................................................................15

*In re Edison Mission*,
   610 B.R. 871 (Bankr. N.D. Ill. 2020) ..............................................................................12

*In re Fibermark*,
   2006 WL 723495 (D. Vt. Mar. 11, 2006) ........................................................................26

*In re Gen. Motors LLC Ignition Switch Litig.*,
   2016 WL 3920353 (S.D.N.Y. July 15, 2016) ...........................................................60, 61, 77

*In re Integrated Res. Real Est. L.P. Sec. Litig.*,
   815 F. Supp. 620 (S.D.N.Y. 1993) ..................................................................................72

*In re Lawrence*,
   293 F.3d 615 (2d Cir. 2002)......................................................................................50, 51

*In re Met-L-Wood Corp.*,
   861 F.2d 1012 (7th Cir. 1988) ..................................................................................49, 52

*In re Old ANR, LLC*,
   2019 WL 2179717 (Bankr. E.D. Va. May 17, 2019)........................................................12

*In re SRC Liquidation LLC*,
   2019 WL 4386373 (Bankr. D. Del. Sept. 12, 2019) .........................................................12

*In re Steffen*,
    464 B.R. 450 (M.D. Fla. Bankr. 2012) .................................................................50

*In re SunEdison, Inc.*,
    2019 WL 2572250 (Bankr. S.D.N.Y. June 21, 2019) ...........................................12

*In re Trigee Found., Inc.*,
    2018 WL 3719144 (D.D.C. Aug. 3, 2018) ............................................................51

*In re Vouzianas*,
    259 F.3d 103 (2d Cir. 2001).................................................................................92

*Jensen v. Kimble*,
    1 F.3d 1073 (10th Cir. 1993) .........................................................................15, 17

*Jus Punjabi, LLC v. Get Punjabi Inc.*,
    2015 WL 2400182 (S.D.N.Y. May 20, 2015) ......................................................54

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)......................................................................................68, 71

*Knight v. Mooring Cap. Fund, LLC*,
    749 F.3d 1180 (10th Cir. 2014) ...........................................................................49

*Koch v. Christie's Int'l*,
    699 F.3d 141 (2d Cir. 2012)................................................................................68

*Kriss v. Bayrock Grp.*,
    2016 WL 7046816 (S.D.N.Y. Dec. 2, 2016) ........................................................94

*Lerner v. Fleet Bank, N.A.*,
    146 F. Supp. 2d 224 (E.D.N.Y. 2001) ...........................................................90, 91

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)....................................................................25, 39, 91

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)......................................................................................90, 91

*Lum v. Bank of Am.*,
    361 F.3d 217 (3d Cir. 2004).................................................................................25

*Lundy v. Cath. Health Sys. of Long Island Inc.*,
    711 F.3d 106 (2d Cir. 2013).................................................................................13

*Lynn v. McCormick*,
    760 F. App'x 51 (2d Cir. 2019) .....................................................................77, 78

*Madonna v. United States*,
 878 F.2d 62 (2d Cir. 1989)............................................................................22, 36

*Manhattan Telecomms. v. Dial Am. Mktg., Inc.*,
 156 F. Supp. 2d 376 (S.D.N.Y. 2001)...................................................................78

*Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs.
 US, LLC*,
 2017 WL 4414155 (E.D. Va. Sept. 30, 2017).................................................11, 74

*Mar-Bow Value Partners LLC v. McKinsey Recovery & Transformation Servs.
 US, LLC*,
 578 B.R. 325 (E.D. Va. 2017)..........................................................10, 11, 23, 74

*Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs.
 US LLC*,
 736 F. App'x 412 (4th Cir. 2018) ........................................................................11

*Mazzei v. The Money Store*,
 2021 WL 4429631 (S.D.N.Y. Sept. 27, 2021).......................................................51

*McCormick v. Fund Am. Cos.*,
 26 F.3d 869 (9th Cir. 1994) ................................................................................17

*Morales v. Dep't of Educ. of City of New York*,
 2019 WL 1228075 (S.D.N.Y. Mar. 15, 2019) ......................................................74

*Morin v. Trupin*,
 835 F. Supp. 126 (S.D.N.Y. 1993) ..........................................................80, 82, 87

*Moses v. Martin*,
 360 F. Supp. 2d 533 (S.D.N.Y. 2005)...................................................................75

*Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*,
 420 F. Supp. 2d 253 (S.D.N.Y. 2006)...................................................................69

*New Hampshire v. Maine*,
 532 U.S. 742 (2001)......................................................................................73, 74

*Newton v. Tyson Foods, Inc.*,
 207 F.3d 444 (8th Cir. 2000) ..............................................................................90

*Nichols v. Mahoney*,
 608 F. Supp. 2d 526 (S.D.N.Y. 2009)...................................................................92

*Nightingale Grp. LLC v. CW Cap. Mgmt., LLC*,
 2012 WL 2674539 (S.D.N.Y. July 5, 2012) ...........................................................6

*O'Malley v. New York City Transit Auth.*,
  896 F.2d 704 (2d Cir. 1990)..........................................................................24

*Olson v. M.L.B.*,
  29 F. 4th 59 (2d Cir. 2022) ...........................................................................15

*Omnicare, Inc. v. Laborers Dist. Council Cost. Indus. Pension Fund*,
  575 U.S. 175 (2015)........................................................................................15

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018)............................................................94

*Orland Acquisitions, LLC v. Hilco Indus., LLC*,
  2010 WL 987223 (N.D. Ind. Mar. 15, 2010)..................................................50

*Palatkevich v. Choupak*,
  2014 WL 1509236 (S.D.N.Y. Jan. 24, 2014) .................................................83

*Pennsylvania Ass'n of Edwards Heirs v. Rightenour*,
  235 F.3d 839 (3d Cir. 2000) ..........................................................................33

*Rabang v. Kelly*,
  2017 WL 1496415 (W.D. Wash. Apr. 26, 2017).............................................80

*Rambarran v. Mt. Sinai Hosp.*,
  2008 WL 850478 (S.D.N.Y. Mar. 28, 2008) ..................................................31

*Rapoport v. Asia Elec. Holding Co.*,
  88 F. Supp. 2d 179 (S.D.N.Y. 2000)...............................................................6

*Redtail Leasing, Inc. v. Bellezza*,
  1997 WL 603496 (S.D.N.Y. Sept. 30, 1997)..................................................79

*Regions Bank v. J.R. Oil Co.*,
  387 F.3d 721 (8th Cir. 2004) ...................................................................49, 50

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993)............................................................................. *passim*

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
  30 F.3d 339 (2d Cir. 1994).............................................................................76

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)......................................................................14, 35

*Ross v. Patrusky, Mintz & Semel*,
  1997 WL 214957 (S.D.N.Y. Apr. 29, 1997) ..................................................33

*Rotella v. Wood*,
    528 U.S. 549 (2000) ............................................................................................68

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) ..............................................................................................26

*Salas v. Int'l Union of Op'g Eng'rs*,
    2015 WL 728365 (C.D. Cal. Feb. 18, 2015) ......................................................33

*Sanchez v. ASA Coll., Inc.*,
    2015 WL 3540836 (S.D.N.Y. June 5, 2015) ............................................... *passim*

*Schiro v. Cemex, S.A.B. de C.V.*,
    438 F. Supp. 3d 194 (S.D.N.Y. 2020) ...........................................................70, 73

*Schmidt v. Fleet Bank*,
    16 F. Supp. 2d 340 (S.D.N.Y. 1998) ..................................................................86

*Schmidt v. Fleet Bank*,
    1998 WL 47827 (S.D.N.Y. Feb. 4, 1998) ..........................................................35

*SEC v. Gellas*,
    1 F. Supp. 2d 333 (S.D.N.Y. 1998) ...............................................................50, 51

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 1129 (2d Cir. 1994) .................................................................47, 60

*Shimon v. Equifax Info. Servs. LLC*,
    994 F.3d 88 (2d Cir. 2021) ................................................................................25

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017) ...............................................................55

*Singh v. Parnes*,
    199 F. Supp. 2d 152 (S.D.N.Y. 2002) ...............................................................75

*Smith v. Hogan*,
    794 F.3d 249 (2d Cir. 2015) ..............................................................................94

*Souza v. Exotic Island Enters.*,
    2021 WL 3501162 (S.D.N.Y. Aug. 9, 2021) .....................................................91

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008) ..............................................................................14

*State Farm Mut. Auto. Ins. Co. v. Abrams*,
    2000 WL 574466 (N.D. Ill. May 11, 2000) ..................................................81, 82

*Sunwealth Glob. HK Ltd. v. Pinder Int'l, Inc.*,
2021 WL 1145245 (S.D.N.Y. Mar. 23, 2021) ....................................................................76

*Swanhart v. New York*,
2022 WL 875846 (S.D.N.Y. Mar. 24, 2022) .....................................................................58

*Targum v. Citrin Cooperman & Co.*,
2013 WL 6087400 (S.D.N.Y. Nov. 19, 2013) ...................................................................34

*Thai Airways Int'l Ltd. v. United Aviation Leasing B.V.*,
891 F. Supp. 113 (S.D.N.Y. 1994) ...................................................................................57

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)....................................................................................15, 22

*U.S. ex rel. Raffington v. Bon Secours Health Sys., Inc.*,
285 F. Supp. 3d 759 (S.D.N.Y. 2018).............................................................................36

*U.S. Fire Ins. Co. v. United Limo. Serv., Inc.*,
303 F. Supp. 2d 432 (S.D.N.Y. 2004).............................................................................47

*U1it4less, Inc. v. Fedex Corp.*,
871 F.3d 199 (2d Cir. 2017)..................................................................................76, 77

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000)..........................................................................................22

*United States v. Lavi*,
2006 WL 1305288 (E.D.N.Y. Mar. 30, 2006) ................................................................51

*United States v. Myerson*,
18 F.3d 153 (2d Cir. 1994)............................................................................................31

*United States v. Pipola*,
83 F.3d 556 (2d Cir. 1996)............................................................................................48

*United States v. Schafrick*,
871 F.2d 300 (2d Cir. 1989)..........................................................................................15

*United States v. Viola*,
35 F.3d 37 (2d Cir. 1994)..............................................................................................79

*Vaughn v. Air Line Pilots Ass'n, Int'l*,
395 B.R. 520 (E.D.N.Y. 2008) ......................................................................................30

*Vickers Stock Rsch. Corp. v. Quotron Sys., Inc.*,
1997 WL 420265 (S.D.N.Y. July 25, 1997) ..............................................................83, 84

*Walter v. Drayson,*
   538 F.3d 1244 (9th Cir. 2008) ........................................................................81, 86

*Weir v. Cenlar FSB,*
   2018 WL 3443173 (S.D.N.Y. July 17, 2018) ........................................................76

*Wesse v. Schukman,*
   98 F.3d 542 (10th Cir. 2002) ................................................................................52

*Williams v. WMX Techs., Inc.,*
   112 F.3d 175 (5th Cir. 1997) ................................................................................16

*Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.,*
   2016 WL 1298987 (S.D.N.Y. Mar. 31, 2016) .......................................................34

*Wyly v. Weiss,*
   697 F.3d 131 (2d Cir. 2012)..........................................................................74, 75

*Young v. Wells Fargo & Co.,*
   671 F. Supp. 2d 1006 (S.D. Iowa 2009) ..............................................................33

**Statutes and Rules**

11 U.S.C. § 101(14) ......................................................................................................6

11 U.S.C. § 101(41) ....................................................................................................28

11 U.S.C. § 307 ............................................................................................................7

11 U.S.C. § 327(a) ............................................................................................. *passim*

11 U.S.C. § 1109(b) ......................................................................................................7

18 U.S.C. § 2 ..............................................................................................................33

18 U.S.C. § 152................................................................................14, 24, 30, 31

18 U.S.C. § 1503 ........................................................................................................31

18 U.S.C. § 1512 ........................................................................................................31

18 U.S.C. § 1956(c)(7) ...............................................................................................32

18 U.S.C. § 1957(a) ...................................................................................................32

18 U.S.C. § 1961 ........................................................................................................33

18 U.S.C. § 1962................................................................................................ *passim*

18 U.S.C. § 2314 ......................................................................................................31

28 U.S.C. § 586(a)(3)(I) ...........................................................................................7

28 U.S.C. § 1334(e)(2) ...........................................................................................52

Fed. R. Bankr. P. 2014(a) .............................................................................. *passim*

Fed. R. Bankr. P. 7007.1(a) ..................................................................................28

Fed. R. Bankr. P. 9024 ..........................................................................................49

Fed. R. Civ. P. 8 ........................................................................................... *passim*

Fed. R. Civ. P. 9 ........................................................................................... *passim*

Fed. R. Civ. P. 15 ...........................................................................................72, 73

Fed. R. Civ. P. 17 .....................................................................................................2

Fed. R. Civ. P. 60 ...........................................................................49, 50, 51, 52

## Other Authorities

1 *Collier on Bankruptcy* ¶ 7.02 (2022) .................................................................30

1 Whitman L. Holt & Harris B. Winsberg, *Collier Compensation, Employment and Appointment of Trustees and Professionals in Bankruptcy Cases* ¶ 1.03 ......................26

McKinsey & Co., Inc., McKinsey Holdings, Inc., McKinsey & Company Inc. United

States ("McKinsey US"), and McKinsey Recovery & Transformation Services U.S., LLC

("RTS" and together with the other McKinsey defendants, the "Corporate Defendants," and

collectively with their affiliates, "McKinsey"); and Dominic Barton, Kevin Carmody, Jon

Garcia, Seth Goldstrom, Mark Hojnacki, Virginia Molino, Alison Proshan, Robert Sternfels, and

Jared Yerian (together, the "Individual Defendants" and with the Corporate Defendants,

"Defendants") hereby move to dismiss the Second Amended Complaint ("SAC"), Dkt. 177, for

failure to state a claim.

## PRELIMINARY STATEMENT

This lawsuit is the cornerstone of a years-long campaign waged by Plaintiff Jay Alix

against McKinsey, a competitor to AlixPartners LLP ("AlixPartners"), the consulting firm Alix

founded.[1]  Having failed to muscle out McKinsey with other anticompetitive tactics, Alix

launched "the litigation equivalent of a thermonuclear device"[2] for AlixPartners' benefit:  an

action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

("RICO"), accusing McKinsey entities and professionals of participating in a criminal enterprise

to facilitate the firm's approval as a professional advisor in Chapter 11 bankruptcies.  The SAC

spends hundreds of pages attempting to transform a technical dispute over the interpretation of a

bankruptcy rule into a wide-ranging RICO fraud.  But it does not come close to stating a

plausible RICO claim, let alone one that complies with Rule 9(b)'s heightened pleading standard.

A core defect is Alix's failure to allege facts from which it could be reasonably inferred

that Defendants engaged in fraud.  The gravamen of Alix's allegations is that McKinsey did not

---

[1] As Defendants informed the Court in their July 14 letter, Defendants intend to seek a ruling, pursuant to Rule 17, that AlixPartners, not Jay Alix, is the real party in interest in this case.  Dkt. 183.

[2] *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 449 (S.D.N.Y. 2007) (citation omitted).

sufficiently comply with a particular bankruptcy disclosure rule known as Rule 2014, which

provides that bankruptcy professionals seeking retention should state their "connections" with

certain parties in interest in the bankruptcy.  The rule does not specify the required form, content,

or time period for such disclosures.  According to Alix's interpretation of Rule 2014, a

bankruptcy professional must disclose all connections that it or its affiliates have ever had, no

matter how long ago; moreover, he says, those disclosures must identify all such connections by

name, and include extensive detail about each connection.  Based on McKinsey's failure to make

disclosures in Alix's preferred manner, Alix asks this Court to draw the unwarranted conclusion

that McKinsey's disclosures were criminal acts of bankruptcy, mail, and wire fraud, and that

McKinsey's other day-to-day consulting activities constituted a host of other criminal offenses

(including witness tampering, obstruction, and money laundering).  But an alleged violation of

bankruptcy rules is not nearly enough to support a plausible *fraud* claim.

To plead fraud, Alix must explain how any supposed deficiencies in McKinsey's

bankruptcy disclosures rendered the statements that McKinsey actually made intentionally false

or misleading.  But McKinsey's disclosures—properly considered on this motion—dispel any

claims of fraud.  Those disclosures explicitly stated when they identified connections by

descriptive category rather than by name.  They also explicitly stated that they disclosed

connections for particular persons and entities over an identified time period.  Bankruptcy courts

repeatedly approved—and bankruptcy litigants, including the U.S. Trustee, repeatedly

accepted—McKinsey's retention without ever hinting that its disclosures ran afoul of Rule 2014.

And, other bankruptcy professionals—including AlixPartners—have, at times, used the same

disclosure methods that Alix now derides.  While Alix alleges that McKinsey's out-in-the-open

practices violated bankruptcy rules, that is a question for bankruptcy courts, which never once

rejected a McKinsey bankruptcy application after receiving its disclosures. Alix's allegations—no matter how overheated his rhetoric—fail to plausibly plead that any of McKinsey's statements were fraudulently misleading.

Alix's remaining predicates rise and fall with his fraud claims, and thus founder for the same reasons (as well as others). For example, absent a plausible fraud claim, Alix cannot allege a corrupt or improper purpose to support his obstruction or witness-tampering predicates, nor can he allege that the fees earned by McKinsey in bankruptcy cases were the product of unlawful activity, as required for his money-laundering predicate.

Another fatal defect of the SAC is its absence of any facts supporting the requisite strong inference of scienter. Reasonable disputes about the interpretation of Rule 2014 cannot, as a matter of law, give rise to an inference of illicit intent. Whatever Alix may assert Rule 2014 requires, his purported requirements appear nowhere in the text of the Rule, and no controlling authority requires them. A decade's worth of bankruptcy filings show that McKinsey's disclosure practices were well within the realm of reasonableness. Indeed, when mediating nearly identical claims made by the U.S. Trustee in bankruptcy court about McKinsey's disclosures, Bankruptcy Judge Marvin Isgur twice characterized them as nothing more than a "good-faith dispute" regarding Rule 2014. And the SAC itself undermines any inference of scienter, confirming that McKinsey uniformly disclosed *more* information when the U.S. Trustee or bankruptcy courts so requested. *See, e.g.*, SAC ¶¶ 83, 244.

Alix's pleading failures are particularly acute as to the current and former McKinsey professionals he labels as criminals. The SAC is a vicious attack on their names and reputations, but provides very little in the way of details. Unable to offer any plausible, particularized allegations that the Individual Defendants knowingly engaged in criminal activity, the SAC

accuses them of crimes based primarily on their titles and roles.  Thus, certain defendants are tarred as racketeers because they were senior executives (Barton, Garcia, and Sternfels), others because they signed disclosure declarations (Carmody, Goldstrom, Hojnacki, and Yerian), and the remainder because they were in-house attorneys providing legal advice (Molino and Proshan).  None of this is sufficient to allege fraud or create an inference—let alone the required "strong inference"—that anyone acted with an improper motive.  Unfortunately, the "stigmatizing effect"[3] of being named RICO defendants—and the public record of Alix's baseless accusations—will linger long after these claims are dismissed.

Alix attempts to paper over the deficiencies in his pleading with sweeping generalizations and impermissible group allegations.  He also relies on conclusory aiding-and-abetting claims, even though RICO liability cannot, as a matter of law, be premised on allegations of aiding and abetting predicates.  Nor has Alix adequately alleged that any Individual Defendant "operated" or "managed" the affairs of the alleged RICO enterprises, as *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993), requires.

Beyond his failure to plead fraud, Alix's claims suffer from other flaws, including:

First, RICO's four-year statute of limitations bars Alix's claims against *all* Defendants for the earliest eight bankruptcies addressed in the SAC, because the limitations period began to run when McKinsey's retention was approved in those bankruptcies—which ranged from five to sixteen years before Alix filed this suit in 2018.  Any claims relating to five of the remaining six bankruptcies are untimely as to the two Individual Defendants who were only added to this lawsuit in the SAC, Molino and Hojnacki (as to whom there are only allegations concerning three of those bankruptcies).  For three Individual Defendants—Goldstrom, Yerian, and

---

[3] *Sanchez v. ASA Coll., Inc.*, 2015 WL 3540836, at *5 (S.D.N.Y. June 5, 2015) (Furman, J.).

Garcia—Alix alleges no wrongdoing whatsoever (and therefore no RICO injury) in the four years before he filed this suit, and so his claims against them are barred entirely.

Second, Alix has not alleged a cognizable RICO enterprise against the Corporate Defendants or a Count 3 enterprise against any Defendant.  It is well settled that purported enterprises comprised merely of corporate affiliates and their employees or a business and its clients are not actionable under RICO.

Third, Alix's claims based on fraud within bankruptcy proceedings are barred because his demand for AlixPartners' purportedly lost fees falls well outside the zone of interests protected by the statutory predicates he invokes.  Relatedly, although the Second Circuit held that Alix's causal theory was not too attenuated to plead proximate causation, *Alix v. McKinsey*, 23 F.4th 196, 203 (2d Cir. 2022), an examination of Alix's own allegations in the SAC, as well as facts of which the Court may take judicial notice, reveals that Alix has failed to plausibly plead actual causation as to each step in his alleged causal chain.

Alix's unfounded use of the RICO statute is a transparent bid to gain a competitive advantage in the bankruptcy consulting space.  By Alix's own telling, he demanded that McKinsey's former global managing director (Barton) shut down the firm's emerging bankruptcy consulting practice and fire its leader (Garcia); when that was unsuccessful, he purchased creditor claims (and allegedly took assignment of AlixPartners' claims) solely to pursue litigation against McKinsey.  It is also no coincidence that three Individual Defendants are former AlixPartners employees who had the temerity to leave Alix's firm for McKinsey.

This newly amended complaint is the next step in Alix's anti-competitive crusade.  But he has not come close to adequately pleading a RICO case.  Defendants respectfully request that the Court dismiss the SAC in its entirety, with prejudice.

## BACKGROUND

On this motion, Defendants assume the truth of the facts alleged in the SAC, except where they are contradicted by:  (i) documents cited in or otherwise integral to the SAC;[4] (ii) other allegations in the SAC;[5] or (iii) "facts of which [the Court] may take judicial notice."[6] Notably, the Court may take judicial notice of the declarations that AlixPartners (and other professionals) filed in bankruptcy courts.[7]

### A.    Disclosures Required by Bankruptcy Rule 2014

Debtors often retain professionals to provide services in a bankruptcy.  Before doing so, the debtor must seek bankruptcy court approval for the retention of that professional, which the court issues upon a satisfactory showing that the professional is "disinterested" and does "not hold or represent an interest adverse to the estate."  11 U.S.C. § 327(a); *see also id.* § 101(14) (defining "disinterested person" as someone who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders"); SAC ¶¶ 58–59.

To assist the court in determining whether professionals are disinterested, Bankruptcy Rule 2014(a) requires that each professional provide "a verified statement" that "set[s] forth [that] person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee" (collectively, the "Interested Parties").  *See* Fed. R. Bankr. P. 2014(a). Rule 2014(a) does not prescribe the form or content of disclosures, does not define "connections" or require a particular process for their identification, and does not specify that

---

[4] *See Rapoport v. Asia Elec. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000); *Bernstein v. O'Reilly*, 2019 WL 10995111, at *4 (S.D.N.Y. Mar. 5, 2019).

[5] *See, e.g., Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995).

[6] *Id.*

[7] *See Nightingale Grp. LLC v. CW Cap. Mgmt., LLC*, 2012 WL 2674539, at *4 n.9 (S.D.N.Y. July 5, 2012).

connections of the professional's affiliates must be disclosed.

The debtor's application to retain a professional is publicly filed and provided to the U.S. Trustee, *see id.*, whose duties include "monitoring applications" filed under § 327 and "filing with the court comments with respect to the approval of such applications," 28 U.S.C. § 586(a)(3)(I). All parties to a bankruptcy case—including the debtor, creditors, the U.S. Trustee, and the court itself—can (and often do) seek additional information concerning professionals' Rule 2014 disclosures. SAC ¶ 62; 11 U.S.C. §§ 307, 1109(b). The disclosure process is routinely iterative, with the debtor updating its list of Interested Parties ("IP List") and professionals filing subsequent declarations as the IP List is updated and other circumstances change, or as further information is requested or questions are posed. *See* SAC ¶¶ 62 & 64 n.26.

## B.    McKinsey's Rule 2014 Disclosures

In 2001, McKinsey, a management consulting firm, began serving Chapter 11 debtors. SAC ¶¶ 54, 66, 70. For ten years, McKinsey served as a restructuring advisor to debtors through its subsidiary McKinsey US; since 2011, it has done so through a different subsidiary, RTS. SAC ¶ 54. When Alix first filed this action in 2018, McKinsey had advised debtors in thirteen bankruptcy cases.[8] In the SAC, Alix added allegations regarding a fourteenth bankruptcy case.[9]

Across those bankruptcies, McKinsey publicly filed 43 declarations, which disclosed connections to Interested Parties and the process used to identify them. *See* Ex. 1-A–14-C; SAC,

---

[8] *In re Hayes Lemmerz Int'l, Inc.*, No. 01-11490 (Bankr. D. Del. filed Dec. 5, 2001) ("*Hayes*"); *In re UAL Corp. (UAL)*, No. 02-48191 (Bankr. N.D. Ill. filed Dec. 9, 2002) ("*UAL*"); *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex. filed July 14, 2003) ("*Mirant*"); *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. filed Jan. 6, 2009) ("*Lyondell*"); *In re Harry & David Holdings, Inc.*, No. 11-10884 (Bankr. D. Del. filed Mar. 28, 2011) ("*Harry & David*"); *In re AMR Corp.*, No. 11-15463 (Bankr. S.D.N.Y. filed Nov. 29, 2011) ("*AMR*"); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (Bankr. E.D. Va. filed Nov. 13, 2012) ("*AMF Bowling*"); *In re Edison Mission Energy*, No. 12-49219 (Bankr. N.D. Ill. filed Dec. 17, 2012) ("*Edison Mission*"); *In re NII Holdings, Inc.*, No. 14-12611 (Bankr. S.D.N.Y. filed Sept. 15, 2014) ("*NII*"); *In re The Standard Register Co.*, No. 15-10541 (Bankr. D. Del. filed Mar. 12, 2015) ("*Standard Register*"); *In re Alpha Natural Resources, Inc.*, No. 15-33896 (Bankr. E.D. Va. filed Aug. 3, 2015) ("*ANR*"); *In re SunEdison*, No. 16-10992 (Bankr. S.D.N.Y. filed Apr. 21, 2016) ("*SunEdison*"); *In re GenOn Energy, Inc.*, No. 17-33695 (Bankr. S.D. Tex. filed June 14, 2017) ("*GenOn*").

[9] *In re Westmoreland Coal Co.*, No. 18-BK-35672 (Bankr. S.D. Tex. filed Oct. 9, 2018) ("*Westmoreland*").

Ex. A.[10]  As described in those declarations, in each bankruptcy, McKinsey used the IP List

distributed by debtor's counsel to identify possible connections.  SAC ¶¶ 9 & n.3, 91 n.28.  Each

declaration detailed the specific connection-checking process used in that particular bankruptcy.

In general, McKinsey's process involved both checking the IP List against corporate databases

and surveying employees.  SAC ¶ 71.  The declarations explained that McKinsey searched for

connections arising a certain number of years before the bankruptcy (typically, two or three

years) (the "Lookback Period") and disclosed connections of (i) the individual consultants

working on the matter, (ii) the McKinsey consulting affiliate(s) serving the debtor, and (iii) other

McKinsey consulting affiliates when such affiliates' work involved a direct commercial

relationship with the debtor.  *See, e.g.*, Ex. 5-A, *Harry & David* Dkt. 105-3 ¶ 10; Ex. 6-A, *AMR*

Dkt. 581 ¶ 16; Ex. 9-A, *NII* Dkt. 153 ¶ 23.  McKinsey often filed supplemental declarations to

disclose connections to new Interested Parties.  *See, e.g.*, Ex. 12-E, *SunEdison* Dkt. 2614 ¶ 5

("McKinsey RTS reviewed the additional parties added to the [IP] List . . . against its records.").

In the declarations, McKinsey also explained how it disclosed connections to Interested

Parties.  Until mid-2016, McKinsey typically disclosed connections by reference to the

descriptive categories used by the debtor to organize its IP List.  For example, the debtor's IP

List in *AMF Bowling* listed nineteen "Utilities" and twenty-three "Lenders" involved in its case.

Ex. 7, *AMF Bowling* Dkt. 125, Ex. 1 at 6–7, 11.  In its Rule 2014 declaration in that case, RTS

disclosed, among many other things, that it "currently serves or in the last three years has served

an affiliate of a utility and an affiliate of a lender on the [IP List], in each case on matters

unrelated to the Debtors and their chapter 11 cases."  *See* Ex. 7, *AMF Bowling* Dkt. 125 ¶ 19.

McKinsey did not include the names of its clients to protect client confidentiality.  *E.g.*, SAC

_____

[10] Each exhibit to this motion ("Ex. __") is attached to the Declaration of Erica S. Weisgerber, dated Sept. 9, 2022. McKinsey's Rule 2014 disclosures at issue in this case are Exhibits 1-A through 14-C.

¶¶ 10, 73.  Alix does not allege that, prior to 2016, the U.S. Trustee or any Interested Party ever objected to this manner of disclosure.

Since 2016, McKinsey has identified connections by name in its disclosures, with only rare exceptions where a client engagement required a high level of confidentiality.  *See* SAC, Ex. A at 7–11.  And, as before, McKinsey's disclosures specifically described what McKinsey was and was not checking and disclosing—including by detailing the applicable Lookback Period and which affiliate connections it checked and disclosed.

**C.**     **Alix's Effort to Drive McKinsey Out of the Restructuring Advisory Business**

Alix founded AlixPartners in 1981, and today continues to own 35% of the company and sits on its board of directors.  SAC ¶¶ 34, 51.  Since at least 2014, Alix has, "on behalf of" AlixPartners, taken steps to undermine McKinsey's ability to provide services to Chapter 11 debtors and to eliminate RTS as AlixPartners' competitor.  SAC ¶¶ 1, 55, 143, 156.  The claims in the SAC were purportedly assigned to Alix to redress alleged injuries to AlixPartners, although the SAC is conspicuously lacking in detail about such assignment.  SAC ¶¶ 8, 34.

In September 2014, during settlement talks on an unrelated matter, Alix unexpectedly "confronted" McKinsey leaders about RTS's Rule 2014 disclosures.  SAC ¶¶ 143, 146.  Over the next year, during two additional meetings and a handful of phone calls with McKinsey's then-Managing Partner (Barton), Alix continued to claim that McKinsey was failing to comply with Alix's interpretation of Rule 2014 and to press McKinsey to "exit the bankruptcy consulting business."  SAC ¶¶ 146, 151, 153, 156, 157, 159, 169, 186, 432(k).  But McKinsey did not exit the business, and it continued to be selected by debtors and receive bankruptcy court approval to advise those debtors in Chapter 11 cases.  *See* SAC, Ex. A at 7–11.

Having failed to persuade Barton to shut down RTS, Alix created Mar-Bow Value

Partners, LLC ("Mar-Bow"),[11] and through it purchased creditor claims to gain standing to challenge McKinsey's disclosures, beginning in 2016 in *ANR*.  *See* SAC ¶ 216.

Months after the bankruptcy court approved RTS's retention in *ANR*, Alix complained to the U.S. Trustee about RTS's disclosures.  SAC ¶ 213.  In response—more than seven months *after* the bankruptcy court approved RTS's retention, notwithstanding RTS's use of categorical disclosures—the U.S. Trustee moved to compel McKinsey to disclose connections by name.  SAC ¶ 213; *see* Order Authorizing Retention, *ANR*, No. 15-33896 (Bankr. E.D. Va. Sept. 17, 2015), Dkt. 476.  Pursuant to a stipulation with the U.S. Trustee resolving its motion, RTS made supplemental disclosures that identified connections by name.  SAC ¶¶ 214–15.  In addition, the supplemental disclosures provided background information about MIO Partners, Inc. ("MIO"), a non-consulting affiliate of McKinsey that provides investment services to current and former McKinsey employees.  The supplement stated that "MIO investors make investments with MIO essentially on a 'blind trust' basis, with such MIO investors having no access to information about the underlying holdings in the third-party funds."  Ex. 11-D, *ANR* Dkt. 2464 ¶ 20.  It also noted that MIO was managed separately from McKinsey's consulting operations and that "[c]ertain members of MIO's board of directors are also employees of McKinsey RTS and its affiliates, including one director who is also a director and officer of McKinsey RTS."  *Id.*  The supplement did not purport to disclose any MIO connections to Interested Parties.  After reviewing the supplemental disclosures, the U.S. Trustee declared that it was "satisfied" that RTS had "complied with Rule 2014."  *Mar-Bow Value Partners LLC v. McKinsey Recovery & Transformation Servs. US, LLC*, 578 B.R. 325, 335 (E.D. Va. 2017).

Unhappy with that outcome, Mar-Bow filed its own motion to compel additional

---

[11] Alix named Mar-Bow after former McKinsey leader Marvin Bower.

disclosures, SAC ¶ 216, and challenged RTS's fees in the case. *Mar-Bow*, 578 B.R. at 335. In response, RTS disclosed to the court *in camera* additional information, including the names of certain RTS connections and certain MIO connections. *Id*. at 337; SAC ¶¶ 218–19, 447. After that additional disclosure, the court reported that it was "completely satisfied that there is not any type of disinterestedness problem with McKinsey going forward." *Mar-Bow*, 578 B.R. at 338. The court did not require RTS to disclose MIO's connections publicly, nor did the U.S. Trustee request such a disclosure. *See id.*; Ex. 15, *ANR* Dkt. 3222.

Undeterred, Alix (through Mar-Bow) sought disclosure of RTS's *in camera* submission and challenged the debtor's entire plan of reorganization, leaving the court "confus[ed]" and debtor's counsel "bewilder[ed]." *Mar-Bow*, 578 B.R. at 341. The court rejected both challenges. Alix also tried and failed to stay implementation of the debtor's plan, with the court noting that such actions "threaten[ed] to disrupt the hard-fought global peace achieved among the Debtors and all of their major stakeholders." *Id*. at 343. Alix appealed and lost again—multiple times. *See Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US LLC*, 736 F. App'x 412 (4th Cir. 2018), *cert. denied*. 139 S. Ct. 1601 (2019); *see also Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US, LLC*, 2017 WL 4414155, at *20 (E.D. Va. Sept. 30, 2017).

Alix (through Mar-Bow) then launched *post hoc* challenges to McKinsey's disclosures in *ANR* and *SunEdison*. After peddling his claims of McKinsey's purported fraud, Alix was joined by the U.S. Trustee in challenging McKinsey's retention in *Westmoreland*. SAC ¶¶ 331, 333.

In January 2019, the *SunEdison*, *ANR*, and *Westmoreland* courts jointly ordered Mar-Bow, McKinsey, and the U.S. Trustee to mediate before Bankruptcy Judge Marvin Isgur. SAC ¶¶ 345–46. McKinsey and the U.S. Trustee reached a settlement regarding all fourteen

11

bankruptcy cases at issue here, which Judge Isgur characterized as resolving "good faith disputes concerning the application of Bankruptcy Rule 2014." Mediator's Notice ¶ 3, *SunEdison*, No. 16-10992 (Bankr. S.D.N.Y. Feb. 19, 2019), Dkt. 5802; SAC ¶¶ 348–49. Mar-Bow did not join the settlement, SAC ¶ 348, and instead pursued motions to reopen the *ANR*, *SunEdison*, *Standard Register*, *NII*, and *Edison Mission* cases, seeking to investigate the purported frauds that Alix alleges here. Each of those courts rejected Alix's challenges.[12]

Following McKinsey's settlement with the U.S. Trustee, the *Westmoreland* debtors again applied to retain McKinsey, supported by a new McKinsey declaration that followed a protocol independently developed by renowned bankruptcy expert Jan Baker. SAC ¶¶ 351, 354; Ex. 14-C, *Westmoreland* Dkt. 2120. Mar-Bow objected to the new retention application, joined in part by the U.S. Trustee, who now sought—for the first time ever—disclosures from all McKinsey affiliates, including those with no employees serving the debtor. While the trial on that objection was halted due to the COVID pandemic, the court ordered further mediation. SAC ¶¶ 375–76; *Westmoreland*, No. 18-35672 (Bankr. S.D. Tex. July 8, 2020), Dkt. 3027. McKinsey and the U.S. Trustee reached another settlement, which Judge Isgur again reported as resolving "good faith disputes." Mediator's Second Notice at 1, *Westmoreland*, No. 18-35672 (Bankr. S.D. Tex. Dec. 3, 2020), Dkt. 3184. Pursuant to the settlement (which Mar-Bow again did not join), McKinsey agreed to withdrawal of the retention application. *See id.*; SAC ¶ 378.

### D.     Alix's RICO Complaint, This Court's Dismissal Order, and the Second Circuit's Reversal

In May 2018, Alix brought this action, attempting to recast his challenges to McKinsey's

---

[12] *See In re Edison Mission*, 610 B.R. 871, 880 (Bankr. N.D. Ill. 2020); *In re SRC Liquidation LLC*, 2019 WL 4386373, at *6 (Bankr. D. Del. Sept. 12, 2019); Order, *NII*, No. 14-12611 (Bankr. S.D.N.Y. Aug. 15, 2019), Dkt. 1041; *In re SunEdison, Inc.*, 2019 WL 2572250, at *11 (Bankr. S.D.N.Y. June 21, 2019); *In re Old ANR, LLC*, 2019 WL 2179717, at *8 (Bankr. E.D. Va. May 17, 2019), *appeal dismissed*, *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. U.S., LLC*, 2020 WL 3473641 (E.D. Va. June 25, 2020).

Rule 2014 disclosures as claims of criminal racketeering.  In September 2018, Alix amended his complaint, adding Yerian, and the then-named Defendants moved to dismiss.  Dkt. 73, 88–90. This Court dismissed Alix's RICO claims with prejudice for failing to adequately allege proximate causation, and further found that Alix's "pay-to-play" allegations failed to meet Rule 8's pleading requirements because Alix had not alleged "any single act of 'paying' or 'playing.'"  Dkt. 104, at 3, 11, 15.[13]  The Second Circuit reversed, holding that Alix plausibly alleged proximate cause, without reaching the question of but-for causation.  23 F.4th at 203.[14]  It also held that Alix's pay-to-play allegations regarding *ANR*, *NII*, and *Edison Mission* met Rule 9(b)'s pleading requirement.  *Id.* at 209–10, n.6.  The Second Circuit did not have before it and did not consider Defendants' other arguments for dismissal.

## ARGUMENT

To state a RICO claim under § 1962(c), a plaintiff must plead, among other things, that the defendant (1) "conduct[ed]" (2) the affairs "of an enterprise (3) through a pattern (4) of racketeering activity."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013).  Each element must be sufficiently alleged as to each defendant.  *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (affirming dismissal of RICO claims where plaintiffs failed to "allege[] what any particular Defendant did to advance the RICO scheme").  The plaintiff must also allege an injury to business or property that was caused by the RICO violation.  *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) (requiring both but-for and proximate causation).

RICO pleadings "must create the possibility of a right to relief that is more than

---

[13] Alix voluntarily dismissed his state-law claims and abandoned them on appeal.  23 F.4th at 202–03.

[14] Defendants filed a petition for certiorari to the U.S. Supreme Court on June 28, 2022, and Alix filed his brief in opposition on August 29, 2022.

speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Alix alleges racketeering "premised on allegations of a fraud"—a purported "scheme to defraud" AlixPartners, *e.g.*, SAC ¶ 489—he must also satisfy Rule 9(b)'s heightened pleading requirements. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004). Rule 9(b) "concerns are even more immediate in civil RICO actions, because such suits implicate the reputation interests of defendants accused of committing racketeering offenses." *Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 512 (S.D.N.Y. 1990).

## I.   Alix Fails to Plead That Defendants' Bankruptcy Court Conduct Constitutes Any RICO Predicate Act

Relying on a grab-bag of legal theories, the SAC seeks to transform a dispute about the interpretation of a bankruptcy rule into a multi-decade fraud.[15] But the SAC's verbosity and repetition of legal buzzwords—*e.g.*, "false and misleading" (122 times), "unlawful scheme" (42 times), "knowingly and wrongfully" (22 times)—cannot disguise the utter lack of well-pleaded allegations about why the disclosures at issue were supposedly *fraudulent*, as opposed to merely inconsistent with Alix's preferred reading of Rule 2014, or how and why Defendants allegedly acted with *fraudulent* intent. Alix also fails to plead other elements of his chosen predicate acts, and he has not adequately alleged any racketeering acts by any of the Individual Defendants. Given these defects, the SAC has not adequately alleged that any Defendant committed a RICO predicate act—much less a "pattern" of racketeering.

### A.   Alix Fails to Plead Fraud Because McKinsey Was Transparent About What It Was and Was Not Disclosing

Alix's fraud theory is a moving target, pleaded without clarity. No matter which fraud

---

[15] While the Second Circuit found that Alix's pay-to-play allegations adequately pleaded a § 152(6) bribery predicate against certain Corporate Defendants, Alix pointedly does not allege anything about any of the Individual Defendants in connection with those claims. *See* SAC ¶¶ 471–77, 645–51.

theory he hopes to adopt—falsity, misleading-by-omission, or something else—it is defeated by McKinsey's declarations themselves, which were fully transparent about what they were and were not disclosing.  *See, e.g.*, *Jensen v. Kimble*, 1 F.3d 1073, 1078 (10th Cir. 1993) (rejecting fraud claim where, "by virtue of the disclosures that [defendant] did make," the other party "knew what he didn't know"); *see also Harborview Master Fund, LP v. Lightpath Techs., Inc.*, 601 F. Supp. 2d 537, 545–47 (S.D.N.Y. 2009) (dismissing complaint because omissions "could not have been materially misleading" where transaction document "clearly notified plaintiff that defendants were not disclosing certain information").

To plead fraud, Alix cannot merely complain about "details" purportedly omitted from McKinsey's disclosures.  Rule 8 and Rule 9(b) require Alix to allege *how* and *why* any purported omissions made McKinsey's disclosures misleading.  *Olson v. M.L.B.*, 29 F. 4th 59, 71 (2d Cir. 2022) (Rule 9(b) "requires that the plaintiff explain why the statements (or omissions) are fraudulent"); *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 539 (S.D.N.Y. 2021) (Rule 8 requires the complaint to "give the reasons why those claims were misleading ").

Moreover, any purported omissions cannot be evaluated in isolation; "context is crucial." *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2014); *see also United States v. Schafrick*, 871 F.2d 300, 303–04 (2d Cir. 1989) (court must "examine the context in which the[] words were spoken").  The court must consider the disclosures in "light of all [their] surrounding text, including hedges [and] disclaimers." *Omnicare, Inc. v. Laborers Dist. Council Cost. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).  Critically, an omission is not false or misleading itself; instead, it renders a statement misleading only if it "conflict[s] with what [the audience] would take from the statement" that was actually made. *Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016).

Here, far from misleading anyone, McKinsey transparently stated what it was and was not disclosing.  In each of its declarations, McKinsey:

- identified the McKinsey entities and employees for which it was disclosing connections;

- specified the "Lookback Period" it was applying to the declaration;

- made explicit that McKinsey affiliates advised Interested Parties in matters unrelated to the bankruptcy in which the declarations were filed; and

- for the disclosures made prior to mid-2016, explicitly disclosed connections by descriptive category, rather than by name.

*See, e.g.*, Ex. 6-A, *AMR* Dkt. 581 ¶¶ 1, 3, 15, 17, 22.

The SAC devotes hundreds of paragraphs to alleging that those explicit "disclosure practices" fell short of what Rule 2014 requires.  *See, e.g.*, SAC ¶¶ 81–82.  Alix attempts to substitute volume for specificity, identifying hundreds of purportedly false or misleading statements across dozens of disclosures.  SAC ¶ 429 & Ex. B.[16]  Yet "[a] complaint can be long-winded, even prolix, without pleading with particularity."  *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997).

Alix is wrong about what Rule 2014 mandates.  But even if he were correct, the alleged insufficiency of McKinsey's disclosures fails to state a claim because non-compliance with Rule 2014 is not a RICO predicate.  The SAC tries to dress up Alix's bankruptcy rule based claims into different predicate acts, but they all fail for the same reason:  Alix does not explain how McKinsey's disclosures were misleading, he misrepresents what McKinsey actually disclosed, or both.

---

[16] Notably, he does not do even that with McKinsey's final declaration in *Westmoreland*, which is omitted from Exhibit B.  Alix alleges that the bankruptcy court in *Westmoreland* stated that McKinsey's first two declarations in that case contained statements that are "not true."  SAC ¶ 335.  But the *Westmoreland* court never identified any particular statement that it believed was false or made any factual findings.  Repeating a general, isolated statement by the court does not relieve Alix of his burden to plead *facts* that plausibly support a fraud claim.

16

### 1.    Alleged Failure to Disclose Names and "Details" of Connections

The bulk of the SAC rehashes the theme that McKinsey "[f]ailed to identify

connection[s] by name and to provide details of relationship."  SAC, Ex. B at 11–15 (*Harry &*

*David*), at 16-25 (*Edison Mission*); *see also, e.g.*, SAC ¶¶ 522, 607 (*Hayes*, *UAL*, *Mirant*, and

*Lyondell*).[17]  Even if Rule 2014 requires these details (and it does not), that does not amount to a

*fraud* claim.  *Olson*, 29 F.4th at 71.  The declarations were clear on their face that they were

disclosing by descriptive category, rather than by name, and that details of each specific

relationship were not being provided.  *See, e.g.*, Ex. 5-A, *Harry & David* Dkt. 105-3 ¶ 10

(disclosing connections to "three Bankcard Agreement Counterparties, three Real Party Lessors,

seven Depository and Disbursement Banks, eight Utility Companies").  No one could plausibly

claim to have been misled by these declarations because any reader would have known what "he

didn't know." *Jensen*, 1 F.3d at 1078; *see also McCormick v. Fund Am. Cos.*, 26 F.3d 869, 879–

80 (9th Cir. 1994) (because plaintiff "knew that he didn't know the name of the buyer,"

"defendant's failure to disclose it was not misleading" even if name "may have been material").

Perhaps recognizing these inadequacies, Alix contends that McKinsey's explanations for

why it was and was not disclosing certain information were themselves false.  As he tells it,

McKinsey US's disclosures in *UAL*, *Mirant*, and *Lyondell*—three bankruptcy cases that are well

over a decade old—stated that McKinsey was contractually bound to keep client names

confidential when, in fact, the client engagement letters permitted disclosures required by law.

SAC ¶¶ 99, 108, 115.  But those disclosures stated only that McKinsey wished to maintain client

confidentiality and, if "additional disclosure [were] required," McKinsey would likely choose to

withdraw from the bankruptcy.  Ex. 2-A, *UAL* Dkt. 52-1 ¶ 19; Ex. 3, *Mirant* Dkt. 1457-1 ¶ 16;

---

[17] *See also, e.g.*, SAC, Ex. B at 12–119 (making similar allegations about the other bankruptcies).

Ex. 4-A, *Lyondell* Dkt. 2090 ¶ 17.  No reasonable person would read that statement as anything

other than an effort to "disclose[] this right of withdrawal so that the [c]ourt and parties-in-

interest are aware of" the circumstances "which could cause McKinsey [US] to have to resign."

Ex. 2-A, *UAL* Dkt. 52-1 ¶ 19.  There is absolutely nothing misleading about that.  In any event,

allegations about those three bankruptcies do nothing to help Alix's claims for the other eleven.[18]

### 2.    Alleged Failure to Disclose Affiliate Connections or Connections Beyond the Lookback Period

Also insufficient is Alix's repeated claim that McKinsey failed to disclose the

connections of unretained McKinsey affiliates or connections outside the stated Lookback

Period.  *E.g.*, SAC ¶¶ 72, 84, 360, 418.[19]  Again, that supposed omission is not misleading,

because McKinsey's declarations stated explicitly that they were disclosing *only* the connections

of particular individuals and entities, for a specified Lookback Period.  *See supra* Background

§ B.  And Alix cannot credibly attack McKinsey's use of a Lookback Period or disclosure of

connections of only certain affiliates, as these disclosure practices are common among

bankruptcy professionals, including AlixPartners itself.[20]  Alix's quibbles about McKinsey's

disclosure methodology do not amount to allegations of fraud, whatever one's view of Rule

2014's requirements.

---

[18] Alix also has alleged that RTS misleadingly described its confidentiality agreements in *SunEdison*.  SAC, Ex. C ¶ 46(d).  But McKinsey's *SunEdison* declaration plainly stated that "there are no confidential clients in this case."  Ex. 12-B, *SunEdison* Dkt. 484 ¶ 31.  Alix fails to explain how a statement about connections that did not exist could possibly be misleading.

[19] Grasping further, Alix claims that these disclosures were misleading for not disclosing *former employees*' connections.  *See* SAC ¶¶ 175 n.30, 206, 489(a) (alleging fraud based on failure to disclose "McKinsey 'alumni' connections").  Alix does not explain why anyone would have expected McKinsey to make such disclosures or why not doing so was fraudulent when the declarations never purported to disclose such connections.

[20] *E.g.*, Decl. of Kenneth Hiltz ¶¶ 25–26, *In re Molycorp, Inc.*, No. 15-11357 (Bankr. D. Del. July 1, 2015), Dkt. 120-3 (stating that AlixPartners searched for connections to Interested Parties only within a Lookback Period and, with limited exceptions, had "not undertaken to determine the existence, nature and/or full scope of any business relationships or connections" to Interested Parties within the managed funds or portfolio companies of the "private equity and investment advisory firm" that owned "a controlling stake" in its parent).

Nor can Alix salvage these allegations by claiming that purported inconsistencies in McKinsey's declarations—for example, disclosing a connection in one bankruptcy case but not another—are indicative of fraud.  *E.g.*, SAC ¶ 179.  Those differences can result from differences in Lookback Periods or the personnel and affiliates involved in each case.  For example, disclosures made in 2015 using a two-year Lookback Period might identify a client from 2013 that disclosures filed in 2016 using a two-year Lookback Period would not.  And the declarations were clear that they were identifying the connections of the particular McKinsey personnel working on a particular debtor's case and thus differed, as well.  *See, e.g.*, Ex. 10, *Standard Register* Dkt. 87-3 ¶ 10 n.3; *see also id.* ¶ 24 (noting connections of employees working on the bankruptcy to Interested Parties).  Far from supporting an inference of fraud, such "inconsistencies" are commonplace in bankruptcy practice—indeed, similar examples can be found in AlixPartners' own disclosures.[21]

To adequately allege fraud, Alix must allege with specificity *how* each alleged omission was misleading *in light of what the declarations said was being disclosed*.  Alix does not allege that the claimed omissions (i) should have been disclosed through the process McKinsey stated it was using in each declaration, (ii) were connections of an affiliate or individual for which McKinsey told the bankruptcy court that it was disclosing, or (iii) were within the Lookback Period McKinsey expressly applied in each declaration.  Without such allegations, Alix's observations of alleged differences between declarations fail to plausibly plead "the fraud claims

---

[21] For example, in *In re Dendreon Corp.* AlixPartners did not identify connections to more than a dozen Interested Parties—including a *current* client—that it had disclosed in a different case six months earlier.  *Compare* Appl. to Employ AlixPartners, LLP., Ex. A ¶ 16, *In re MPM Silicones, LLC*, No. 14-22503 (Bankr. S.D.N.Y. Apr. 28, 2014), Dkt. 99 (disclosing AlixPartners' connections to AIG, Allianz, Bank of America, Catlin (Lloyds) Syndicate 2003, Chartis, Chubb Group of Insurance Companies, Fidelity, Goldman Sachs, National Union Fire Insurance of Pittsburgh PA, Starr, State Street Global Advisors, UBS, Vanguard 500 Index Fund INV Class and Vanguard Extended Market Index, and XL) *with* Holtz Decl. ¶ 17, *In re Dendreon Corp.*, No. 14-12515 (Bankr. D. Del. Nov. 12, 2014), Dkt. 74-3 (not disclosing those connections).

under the *Twombly* standard pursuant to Rule 8," let alone "the stricter particularity requirement of Rule 9(b)" that applies here.  *Olson*, 29 F.4th at 76 n.9 (dismissing common law fraud claims).

### 3.   Alleged Insufficient Connection-Checking Process

Alix also argues that McKinsey's connection-checking process itself was "substandard." SAC ¶¶ 71, 75–77.  But allegedly "substandard" business practices do not amount to fraud. McKinsey's disclosures detailed the methods it used to find connections.  *See supra* Argument § I.A.  They also openly acknowledged that McKinsey has a "central database of clients" but not a "centralized conflicts identification process," *e.g.*, Ex. 12-A, *SunEdison* Dkt. 202 ¶ 57—the basis of Alix's critique, *e.g.*, SAC ¶¶ 75, 489(b).  Nowhere does Alix allege that McKinsey misrepresented its process or used some other undisclosed method.  Even if Rule 2014 mandates Alix's preferred method for connection-checking (and it does not), his critique of McKinsey's truthfully-disclosed process falls well short of alleging fraud.  *See, e.g.*, *In re RBS Grp. plc Sec. Litig.*, 2012 WL 3826261, at *8 (S.D.N.Y. Sept. 4, 2012) ("[A] plaintiff challenging a defendant's disclosures regarding its . . . processes must allege facts showing that the descriptions of the processes were false or misleading" or "the processes were not followed.").

### 4.   Alleged Misrepresentations Regarding MIO

Alix's allegations that McKinsey made fraudulent misrepresentations regarding MIO fare no better.  Alix contends that McKinsey "consistently and unlawfully concealed McKinsey's connections" through MIO, SAC ¶ 137, but, again, McKinsey's declarations were clear about which entities' connections they were, and were not, disclosing.  *See supra* Argument § I.A. Each declaration made clear if it was purporting to disclose MIO connections (most were not).

Alix also misleadingly suggests that McKinsey made an unqualified representation that MIO operated as a "blind trust" and that it "never disclosed, until late 2018 . . . that McKinsey RTS's President, Jon Garcia, was a member of MIO's board of directors and Investment

20

Committee from 2006-2017 and in that capacity ratified MIO's investments." SAC ¶ 24. But

that is not what McKinsey said: it disclosed that "*MIO investors* make investments with MIO

*essentially* on a 'blind trust' basis, with such MIO investors having no access to information

about the underlying holdings in the third-party funds," while specifically disclosing that MIO

had "one director who is also a director and officer of McKinsey RTS." Ex. 11-D, *ANR* Dkt.

2464 ¶ 20 (emphasis added). Alix speculates that McKinsey consultants *theoretically* could have

dug through filings with federal regulatory agencies to learn certain *historical*, not current,

information about MIO, *see* SAC ¶ 371(l), (m), but the SAC is devoid of allegations that any

relevant McKinsey employee knew about those obscure regulatory filings, let alone actually

accessed them or otherwise learned about MIO's current holdings such that MIO was not

"essentially a blind trust" from their perspective.

Likewise, McKinsey disclosed that MIO's board of directors was responsible for

overseeing "MIO's overall allocation amongst the various MIO managed investment products,"

and that "[c]ertain members of MIO's board of directors are also employees of McKinsey RTS

and its affiliates, *including* one director who is also a director and officer of McKinsey RTS."

Ex. 11-D, *ANR* Dkt. 2464 ¶ 20 (emphasis added). Alix does not explain how identifying Garcia

by title and position, but not by name, was misleading.

### 5.    Alleged Misrepresentation of Disinterestedness

As a final gambit, Alix adds conclusory and cumulative allegations that various

disclosures "misrepresented McKinsey's disinterestedness under the law" by offering a bottom-

line statement that McKinsey was sufficiently disinterested; he contends that "[a]ll or any one of

McKinsey's undisclosed connections would have disqualified it" from being retained. SAC

¶¶ 89, 95. But those conclusory allegations are entitled to no weight because Alix fails to

explain *why* the supposedly undisclosed connections were disqualifying. For several cases, he

does not even allege *which* specific connections were concealed. For example, he does not name even one of the supposedly "dozens of Interested Parties" to which RTS allegedly "conceal[ed]" a connection in the *AMF Bowling* case—conceding that he merely hopes to uncover something in discovery. SAC ¶ 130 (alleging that the "facts needed to ascertain the full extent of these specific connections . . . will be proven through discovery"). These speculative allegations do not satisfy Rule 9(b). *See, e.g.*, *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989) (noting that plaintiff's "contention that discovery will unearth information tending to prove his contention of fraud, is precisely what Rule 9(b) attempts to discourage").

Beyond that, Alix targets disclosures that are classic statements of *subjective belief* that do not give rise to a fraud claim. Each declarant made clear, after describing the nature and scope of McKinsey's inquiry, that "to the best of [the declarant's] knowledge and belief" or "information" he "*believe[d]* that McKinsey RTS does not hold an adverse interest to the Debtors' estates, and that McKinsey RTS is a 'disinterested person.'" *See, e.g.*, Ex. 7, *AMF Bowling* Dkt. 125 ¶¶ 15–28 (emphasis added); *see also, e.g.*, Ex. 6-A, *AMR* Dkt. 581 ¶¶ 19–31; Ex. 8-A, *Edison Mission* Dkt. 175-3 ¶¶ 14–24; Ex. 9-A, *NII* Dkt. 153 ¶¶ 22–38. Those statements were not false unless the speaker did not hold the stated belief, which the SAC fails to plausibly allege, making only glancing reference (if at all) to what the declarants actually knew. *See Tongue*, 816 F.3d at 210; *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) (opinion actionable where representations "contradicted [defendant's] honest view"). Alix's blatant mischaracterizations of what the disclosures *actually* said do not render them actionable.[22]

---

[22] For example, Alix criticizes RTS for supposedly failing to disclose in its initial *AMR* declaration that McKinsey's former managing director had been a board member of the debtor (and for failing to identify him by name in later declarations). SAC ¶ 123. But RTS's initial declaration in fact disclosed this connection. *See* Ex. 6-A, *AMR* Dkt. 581 ¶ 7 ("[A] former member of the Debtors' board of directors served as the managing director of McKinsey RTS affiliates for nine years . . . .").

To the extent Alix attempts to make more concrete allegations about McKinsey's disinterestedness in the *ANR*, *SunEdison*, and *GenOn* cases, such claims are implausible based on facts of which the Court can take judicial notice.  Specifically:

- Alix alleges that McKinsey concealed supposedly disqualifying connections to U.S. Steel ("USS") and Whitebox in *ANR*.  SAC ¶¶ 189(b), 208, 219.  But McKinsey did disclose its connection to USS.  *See* Ex. 11-E, *ANR* Dkt. 4195 at 15; SAC ¶ 222 (admitting connection *was* disclosed).  And while MIO's connection to ANR's first-lien lender Whitebox was inadvertently omitted because Whitebox was not on the *ANR* IP List provided to RTS, Ex. 11-A, *ANR* Dkt. 212, RTS disclosed MIO's connections to other first-lien lenders in its *in camera* disclosures.  Ex. 11-E, *ANR* Dkt. 4195 ¶¶ 2-3.  The *ANR* court reviewed those disclosures and the connections to USS and stated that it was "completely satisfied that there is not any type of disinterested problem with McKinsey going forward."[23]

- In *SunEdison*, Alix claims RTS "orchestrate[d] a series of complex and improper pre-petition transfers from non-debtor affiliates of SunEdison" to "evade disqualification and to hide its preference liability."  SAC ¶ 255.  But RTS disclosed each payment and refund, describing that "the Debtors determined that [the Non-Debtor Project Affiliates] were receiving the benefit of McKinsey U.S.'s prepetition services and thus were the more appropriate payors of McKinsey U.S.'s fees relating to those services," Ex. 12-B, *SunEdison* Dkt. 484 ¶¶ 22–24, and the court approved RTS's retention, Ex. 18, *SunEdison* Dkt. 639.  Alix presents no "evidence" to the contrary other than his own say-so and speculation.  *See* SAC ¶¶ 255–71.

- In *GenOn*, Alix argues that RTS did not disclose a disqualifying connection to GenOn's parent, NRG Energy ("NRG").  SAC ¶ 290.  But RTS's declaration disclosed that "members

---

[23] Ex. 17, *ANR* Dkt. 3009 ¶¶ 21:23–25, 121:18–122:5; *see also Mar-Bow*, 578 B.R. at 338.

of McKinsey RTS currently serve, or in the past two years have served, various parties listed in [the NRG Affiliates] category that are affiliates of the Debtors." Ex. 13-A, *GenOn* Dkt. 123-2 ¶ 47.  (That category included NRG.)  The court approved the retention of RTS, *see* Retention Order, *GenOn*, No. 17-33695 (Bankr. S.D. Tex. July 13, 2017), Dkt. 231, and four other professionals who disclosed connections to NRG, including one firm that also represented GenOn in disputes with NRG.[24]  *See* Kirkland Decl. ¶¶ 33–34, *GenOn*, No. 17-33695 (Bankr. S.D. Tex. June 23, 2017), Dkt. 121-2; Credit Suisse Decl. ¶ 24, *GenOn,* No. 17-33695 (Bankr. S.D. Tex. Aug. 31, 2017), Dkt. 685-2; A&M Decl. ¶ 4(d), *GenOn,* No. 17-33695 (Bankr. S.D. Tex. Nov. 6, 2018), Dkt. 1968-5, PWC Decl., *GenOn,* No. 17-33695 (Bankr. S.D. Tex. June 23, 2017), Dkt. 120-2.

- In *GenOn*, Alix claims that RTS received preferential payments that were disqualifying. SAC ¶¶ 305-08.  But Alix admits that the payments at issue were disclosed, *see* SAC ¶ 308; Ex. 13-A, *GenOn* Dkt. 123-2 ¶ 90.  No Interested Party claimed such disclosed payments were preferences, and the court approved RTS's retention.  Retention Order, *GenOn* Dkt. 231.  Alix cannot re-litigate in this Court whether such disclosed payments were preferences.

### B.    Alix Fails to Adequately Allege Scienter

Most of the predicate acts alleged by Alix sound in fraud.  *See, e.g.*, *O'Malley v. New York City Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990) (mail fraud statute requires "[a] showing of intentional fraud" or "reckless indifference to the truth"); 18 U.S.C. § 152 (requiring "knowing[] and fraudulent[]" wrongdoing).  Yet Alix has failed to allege facts that give rise to the "strong inference of fraudulent intent" required by Rule 9(b).  *First Cap.*, 385 F.3d at 179 (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999)).  A plaintiff cannot

---

[24] *See* NRG Energy, Inc. SEC Form 8-K (Dec. 12, 2017) Ex. 10.1, Settlement Agreement between GenOn and NRG Energy, https://www.sec.gov/Archives/edgar/data/1013871/000110465917073701/a17-28575_1ex10d1.htm (identifying Kirkland as GenOn's counsel).

meet that requirement and survive dismissal without "alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness" or that "show that defendants

had both motive and opportunity to commit fraud." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273,

290–91 (2d Cir. 2006).

The SAC fails to allege scienter for three independent dispositive reasons. *First*, Alix has

not plausibly pleaded a knowing violation of Rule 2014, let alone intent to violate it to defraud

anyone, because McKinsey's interpretation of Rule 2014 was objectively reasonable. *Second*,

the content of McKinsey's declarations belies any inference of fraud. *Third*, Alix has not

pleaded any motive sufficient to demonstrate a strong inference of scienter.

### 1. McKinsey's Objectively Reasonable Interpretation of Rule 2014 Precludes a Finding of Scienter

Rule 2014 lacks explicit textual guidance prescribing the form, content, or time period

that a professional should use in disclosing its "connections." The language is sufficiently

unclear that Alix (improperly) attached to the SAC an expert declaration intended to bolster his

interpretation of the rule. Even assuming Alix's interpretation of the rule were correct—and it is

not—"disputes over statutory interpretation" are not "criminal acts sufficient to justify a RICO

claim." *Grauberger v. St. Francis Hosp.*, 169 F. Supp. 2d 1172, 1177 (N.D. Cal. 2001); *Lum v.

Bank of Am.*, 361 F.3d 217, 226–27 (3d Cir. 2004) (RICO allegations that "boil[] down to a

disagreement about the meaning of" statements "do[] not rise to the level of fraud").

To the contrary, a defendant does not act even in "reckless disregard" of a statutory

obligation if its interpretation "was not objectively unreasonable." *Shimon v. Equifax Info.

Servs. LLC*, 994 F.3d 88, 94 (2d Cir. 2021) (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47,

70 (2007)). An objectively reasonable interpretation refutes intent as a matter of law; even

"evidence of subjective bad faith" cannot "create liability in the face of objectively reasonable

interpretations." *Id.*  That is because, absent controlling authority from "the courts of appeals" or an agency with "substantive rulemaking authority," "it would defy history and current thinking to treat [a] defendant" who acts consistent with an objectively reasonable interpretation of the law "as a knowing or reckless violator."  *Safeco*, 551 U.S. at 70 & n.20.

Here, Alix has failed to plead that McKinsey's interpretation of Rule 2014 was objectively unreasonable.  The supposed "requirements" that Alix invokes are absent from Rule 2014's text, and he cites no contemporaneous controlling authority mandating his interpretation.  Courts and commentators in fact have noted that Rule 2014 compliance requires flexibility and practicality.  Courts "weigh an applicant's obligation to disclose connections . . . against the burden that this obligation will impose, on a case by case basis."  *In re Fibermark*, 2006 WL 723495, at *10 (D. Vt. Mar. 11, 2006).  Commentators have described § 327(a) and Rule 2014 as an "unworkable set of Code Provisions and Rules" and noted that the case law on conflicts of interest, "including the decisions from the federal courts of appeals, does not lend itself to consistency or predictability in approach or result."  1 Whitman L. Holt & Harris B. Winsberg, *Collier Compensation, Employment and Appointment of Trustees and Professionals in Bankruptcy Cases* ¶ 1.03[5][a] (2022).  This uncertain legal landscape, the fact that other professionals employed the practices Alix derides, and the fact that McKinsey's disclosures were accepted and its retentions were repeatedly approved in bankruptcy cases with experienced counsel and learned judges, all underscore that McKinsey's disclosure practices were not an unreasonable interpretation of Rule 2014, much less fraud, including as to the following:

(a)   *Alleged Failure to Disclose Connections by Name*

The text of Rule 2014 does not mandate disclosure by name.  Instead, it requires, in non-specific terms, that bankruptcy professionals disclose "to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their

respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee."  Fed. R. Bankr. P. 2014(a).  Apart from being "verified," the Rule does not specify a form that such disclosures must take.  *Id.*

It is implausible that Rule 2014 is a black-and-white rule *requiring* disclosure by name given that McKinsey disclosed connections by category, without objection, for years—as have other bankruptcy professionals,[25] including AlixPartners.[26]  If Alix were right that Rule 2014 unambiguously requires disclosure by name in every circumstance, then professionals (including AlixPartners itself) have been violating the law, in courts across the country, for many years— and sophisticated counsel, the U.S. Trustee, and bankruptcy courts have all condoned it.  That is not plausible.  The fact that McKinsey ended its practice of disclosing by category in 2016, at the prompting of the U.S. Trustee and bankruptcy court in *ANR*, does not render its prior practice objectively unreasonable.  The far more plausible inference from these facts is that McKinsey was simply being responsive to evolving preferences of the U.S. Trustee and the courts.

### (b)      *Alleged Failure to Disclose Connections of Affiliates*

It also was not objectively unreasonable for McKinsey to interpret Rule 2014 as requiring a professional to search for and disclose the connections only of the entity engaged by the debtor (and the individuals serving the debtor), as opposed to all of the entity's affiliates.  On its face, Rule 2014(a) requires disclosures by the "person" to be employed, which the Bankruptcy Code

---

[25] *E.g.*, Schedule of Searched Parties, *In re Cumulus Media*, No. 17-13381 (Bankr. S.D.N.Y. Jan. 11, 2018), Dkt. 203 (Moelis & Co. LLC identifying assignments for Potential Parties in Interest as "confidential", broken down by category); Cofsky Decl. ¶ 16(i), *In re Atlas Res. Partners*, No. 16-12149 (Bankr. S.D.N.Y. Aug. 12, 2016), Dkt. 83 (Perella Weinberg stating in their retention application that they are "unable to disclose the identities of Clients who may be Parties in Interest, or have connections to the Debtors, due to confidentiality obligations to such Clients").

[26] *E.g.*, McShea Decl. ¶ 16, *In re Altegrity, Inc.*, No. 15-10226 (Bankr. D. Del. Feb. 17, 2015), Dkt. 89-3 ("There are five confidential clients of AlixPartners that are vendors and landlords to the Debtors as well as professionals in interest in the bankruptcy matter."); Johnston Decl. ¶ 26, *In re Basic Energy Servs., Inc.*, No. 16-12320 (Bankr. D. Del. Oct. 28, 2016), Dkt. 93-4 ("AlixPartners has two confidential clients that are utility providers to the Debtors and professionals in interest in this bankruptcy matter.").

defines to include an "individual, partnership, and corporation." 11 U.S.C. § 101(41). Nothing in the Rule purports to require disclosure by a person's "affiliates"—unlike other rules that *do* require such disclosures. *E.g.*, Fed. R. Bankr. P. 7007.1(a) (requiring each corporate party to "file a statement that identifies any parent corporation and any publicly held corporation that owns 10% or more of its stock"). Alix cites no controlling authority otherwise.

Similarly, Alix's focus on MIO's alleged connections is misplaced. *E.g.*, SAC ¶¶ 138, 141. In the bankruptcies here, the "person" being retained by each debtor was, for example, McKinsey US or RTS—not MIO—and Alix does not allege that MIO had any involvement in advising the debtor in *any* bankruptcy. As such, it was not objectively unreasonable for McKinsey to view the relevant connections as those of McKinsey US or RTS, not MIO. Once again, McKinsey's practice was consistent with that of many other respected bankruptcy professionals who did not disclose connections of their non-retained affiliates,[27] including investment affiliates.[28]

### (c)    *Alleged Inadequate Connection-Checking Process*

Alix further claims that McKinsey's internal connection-checking process was

---

[27] *E.g.*, Order Authorizing Retention of Guggenheim Securities, LLC, *In re Mattress Firm, Inc.,* No. 18-12241 (Bankr. D. Del. Nov. 7, 2018), Dkt. 771 (approving retention where connections-checking process only searched retained affiliates, *see* Savini Decl. ¶ 18, Dkt. 341-3); Order Authorizing the Retention of Lazard Frères & Co. LLC, *In re Sears Holdings Corp.*, No. 18-23538 (Bankr. S.D.N.Y. Nov. 9, 2018), Dkt. 607 (same, *see* Aebersold Decl. ¶ 7, Dkt. 345); Order Authorizing Retention of Rothschild Inc., *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y. Mar. 8, 2018), Dkt. 177 (same, *see* Antinelli Decl. ¶ 20, Dkt. 88); Order Authorizing Retention of Credit Suisse Securities (USA) LLC, *In re GenOn Energy, Inc.*, No. 17-33695 (Bankr. S.D. Tex. Oct. 5, 2017), Dkt. 861 (same, *see* Kaufman Decl. ¶ 19, Dkt. 685-2); Order Authorizing Retention of Jefferies LLC, *In re Forbes Energy Servs. LTD*, No. 17-20023 (Bankr. S.D. Tex. Mar. 14, 2017), Dkt. 179 (same, *see* White Decl. ¶ 16, Dkt. 106).

[28] *E.g.*, Am. Order Authorizing Retention of Evercore Group L.L.C., *In re Vanguard Nat. Resources, Inc.,* No. 19-31786 (Bankr. S.D. Tex. June 5, 2019), Dkt. 449 (approving retention where connections-checking process excluded investment affiliates, *see* Shah Decl. ¶ 23, Dkt. 197-2); Order Authorizing Retention of Rothschild Inc., *In re GenOn Energy, Inc.*, No. 17-33695 (Bankr. S.D. Tex. July 14, 2018), Dkt. 247 (same, *see* Snyder Decl. ¶ 26(d), Dkt. 122-2); Order Authorizing Retention of Lazard Frères & Co. LLC, *In re Toys "R" Us, Inc.*, No. 17-34665 (Bankr. E.D. Va. Oct. 25, 2017), Dkt. 732 (same, *see* Kurtz Decl. ¶ 9, Dkt. 213); Order Authorizing Retention of Rothschild Inc., *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y. Mar. 8, 2018), Dkt. 177 (same, *see* Antinelli Decl. ¶ 25(d), Dkt. 88); Order Authorizing Retention of Moelis & Co. LLC, *In re Aegean Marine Petroleum Network, Inc.*, No. 18-13374 (Bankr. S.D.N.Y. Feb 20, 2019), Dkt. 394 (same, *see* Jamal Decl. ¶ 29, Dkt. 289).

"substandard" because McKinsey used "email surveys" and searched its "database of clients" but lacked specialized "conflict checking software."  SAC ¶ 71.  Rule 2014's text does not require specific software and Alix again fails to cite any controlling authority mandating his preferred connection-checking process.  Yet again, it is common practice among bankruptcy professionals (including AlixPartners) to use email surveys.[29]  These allegations, too, come nowhere close to alleging that McKinsey's approach was an objectively unreasonable application of Rule 2014.

### 2.    The Content and Context of the Declarations Demonstrate a Lack of Fraudulent Intent

The content and context of McKinsey's declarations likewise defeat any inference that any Defendant intended to defraud anyone.  As explained above, McKinsey was transparent about what it was disclosing.  This undermines any inference that Defendants intended to mislead.  *See, e.g.*, *Phillips v. Am. Intern. Grp., Inc.*, 498 F. Supp. 2d 690, 697 (plaintiff could not allege intent to defraud annuitants where "disclosures in the [] contract" "expressly provide[d]" the allegedly omitted bonus rate structure).

Moreover, as Alix acknowledges, the declarations were explicit that McKinsey's approach to disclosure was informed by the desire to protect client confidences.  *See, e.g.*, Ex. 9-A, *NII* Dkt. 153 ¶ 28; *see also* SAC ¶ 164 (alleging that McKinsey approached disclosures differently than AlixPartners in order to protect "client confidentiality"); SAC ¶ 487 (noting "McKinsey's jealous protection of client identities").  Alix's conclusory assertion that confidentiality was a "guise," SAC ¶ 73, is insufficient to dispel the far more plausible and obvious inference that McKinsey acted to protect clients' interests in confidentiality, not to

---

[29] *E.g.*, Application for Retention of AlixPartners, LLP, *In re MD Helicopters, Inc.*, Case No. 22-10263 (KBO) (Bankr. D. Del.), Dkt. 121 (noting that AlixPartners used "the Initial Disclosures and the parties in interest list to draft a firmwide email for each bankruptcy filing"); Application for Retention of Kirkland & Ellis LLP, *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del.), Dkt. 130 (noting that, "after Kirkland identified all client connections with the parties in interest over a specified time period, Kirkland circulated a survey email to all Kirkland attorneys who billed 10 or more hours to such clients during the prior six years").

defraud any party or court.

### 3.    Alix Fails to Adequately Plead Motive

Nor does Alix satisfy his burden to plead a "strong inference" of scienter by alleging motive and opportunity to defraud.  The SAC's allegations that Defendants were motivated by a desire to earn fees through bankruptcy engagements, SAC ¶¶ 5, 277, 416 (alleging that McKinsey earned "millions of dollars in fees"), are insufficient as a matter of law.  The reasonable and wholly unexceptional goal of earning fees for a company's business engagements is "wholly inadequate to create any inference of [ ] fraudulent intent, let alone a strong inference." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 395 B.R. 520, 548–49 (E.D.N.Y. 2008) (dismissing RICO claim for failure to establish fraudulent intent); *see also DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 528 (E.D.N.Y. 2011) ("[A] generalized profit motive that could be imputed to any company . . . has been consistently rejected as a basis for inferring fraudulent intent.").

### C.    For Additional and Independent Reasons, Alix Fails to Plead Certain Predicate Acts

While the failure to adequately allege any knowingly fraudulent statement dooms all of the fraud-based predicates based on McKinsey's bankruptcy court conduct, Alix also fails to plead certain predicate acts for additional reasons, as follows:

**Alix fails to adequately plead bankruptcy fraud under 18 U.S.C. § 152(2)** because he cannot allege that any defendant made a false "oath or account."  The disclosure declarations did not provide an account (*i.e.*, a "reconciliation of financial activities"), nor do they qualify as "oaths" under the statute.  *See* 1 *Collier on Bankruptcy* ¶¶ 7.02[2][i] & [3][a] (2022) (Section 152(2) requires "a formal oath sworn before an appropriate official," which is distinct from "declarations under penalty of perjury," governed by § 152(3) "in which a formal oath is

30

not administered").

**Alix fails to adequately plead bankruptcy fraud under 18 U.S.C. § 152(3)** against Barton, Garcia, Molino, Proshan, or Sternfels because he does not allege that any of them made a "declaration, certificate, verification, or statement under penalty of perjury."

**Alix fails to adequately plead travel fraud under the National Stolen Property Act (18 U.S.C. § 2314)** against Barton or the Corporate Defendants.  To state such a claim, Alix must allege with particularity that Defendants "induced [him] to travel" as part of a scheme to obtain money or property.  *United States v. Myerson*, 18 F.3d 153, 164–65 (2d Cir. 1994).  But far from pleading that Barton "cause[d]" him to travel, *id.*, Alix alleges that he chose to travel to New York *on his own initiative* after requesting a meeting with Barton, *see* SAC ¶ 479.  That alone defeats his § 2314 claim.

**Alix fails to adequately plead witness tampering under 18 U.S.C. § 1512(b)**, which makes it unlawful to "use intimidation, to threaten or corruptly persuade another person, or engage in misleading conduct toward another person, with intent to influence, delay or prevent the testimony of any person in an official proceeding."  Alix does not allege any facts indicating that any Defendant interfered with testimony, let alone with a corrupt purpose.  *See Rambarran v. Mt. Sinai Hosp.*, 2008 WL 850478, at *8 (S.D.N.Y. Mar. 28, 2008).

**Alix fails to adequately plead the "corrupt" and "improper" influencing of an official proceeding under 18 U.S.C. §§ 1503(a) and 1512(c)**.  First, neither statute is implicated by McKinsey's filings, which were transparent about McKinsey's disclosure practices.  *See supra* Argument § I.A.  Alix's further allegation that, in *ANR*, RTS fraudulently induced the U.S. Trustee to withdraw its motion to compel by *disclosing the very information that the U.S. Trustee requested* is absurd on its face.  SAC ¶¶ 191, 455.  And Alix's complaint that

McKinsey's supplemental disclosure did not identify certain connections by name, SAC ¶¶ 190–92, 195, simply repeats Alix's dispute over the form of McKinsey's disclosures, which does not constitute criminal activity.

      **Alix fails to adequately plead money laundering under 18 U.S.C. § 1957(a)**, which prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property . . . from specified unlawful activity."  Because the fees earned by McKinsey for its work serving Chapter 11 debtors were lawfully obtained, Alix cannot establish the substantive element of his money-laundering claim.  Alix's allegations about purported "re-invoiced" and "round trip" payments in *SunEdison*, SAC ¶ 483, merely claim that such payments violated § 327 and Rule 2014—which are not included in 18 U.S.C. § 1956(c)(7)'s definition of "specified unlawful activity."  Alix thus has not alleged that the payments were "criminally derived property . . . from specified unlawful activity."  18 U.S.C. § 1957(a).  In any event, Alix fails to allege a money laundering predicate as to any Individual Defendant; a monetary transaction is an essential component of a § 1957(a) claim, and Alix alleges no facts about any monetary transaction in which any Individual Defendant engaged.

      **D.**    **RICO Liability Cannot Be Based on Aiding and Abetting Predicate Acts**

      The SAC alleges nearly 300 times that Defendants "aided and abetted" each other's purported RICO violations.  Indeed, for two Individual Defendants—Barton and Garcia—the SAC alleges only that they "aided and abetted acts of bankruptcy fraud," not that they actually committed any such fraud themselves.[30]  SAC ¶¶ 414, 415.  Putting aside that Alix fails to plead the predicate offenses for anyone to aid and abet in the first place, *see supra* Argument §§ I.A–

---

[30] Alix's aiding-and-abetting allegations as to Yerian—which relate solely to *Edison Mission*—are untimely because that case concluded in March 2014, outside RICO's four-year statute of limitations.  *See infra* Argument § II.B.1.

I.C, *infra* Argument § I.E, a RICO claim under § 1962(c) cannot be based on the aiding and abetting of predicate acts.

It is well established that "there is no private cause of action . . . for aiding and abetting a civil RICO violation." *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 713 (2d Cir. 2019). Alix tries to end-run this rule by alleging that the Individual Defendants aided and abetted *predicate acts*—as opposed to the RICO violations more generally—but courts have rightly recognized that such an exception "would swallow" the prohibition and render it no more than a low hurdle that can be easily cleared by artful pleading. *Salas v. Int'l Union of Op'g Eng'rs*, 2015 WL 728365, at *8 (C.D. Cal. Feb. 18, 2015); *Craig Outdoor Advert., Inc. v. Viacom Outdoor*, 2005 WL 1279046, at *4 (W.D. Mo. May 25, 2005).[31]

Simple statutory construction also dictates this result. Unlike § 1962(a) (a separate basis for RICO liability not alleged here), § 1962(c) "does not contain any references to aiding and abetting as a form of prohibited racketeering activity." *Sater*, 35 F. Supp. 3d at 396. Moreover, "nothing in the language" of § 1961(1)—which defines "racketeering activity"—"suggests that aiding and abetting a predicate act itself constitutes a predicate act." *Id.* That definition includes a laundry list of RICO predicates, and "aiding," "abetting," or 18 U.S.C. § 2 (providing for criminal liability for aiding and abetting other offenses) are not included. 18 U.S.C. § 1961(1). The same is true of § 1962(d), which is limited to RICO co-conspirators. 18 U.S.C. § 1962(d).

In any event, Alix's aiding-and-abetting allegations fail because they are conclusory; Alix does not allege *how* anyone supposedly aided and abetted anything. *See Browning Ave. Realty*

---

[31] While some courts have permitted allegations of aiding and abetting of predicate acts, "the majority of recent case law . . . holds that RICO does not recognize civil liability for persons who merely aid and abet the underlying predicate offenses." *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1028–29 (S.D. Iowa 2009); *Pennsylvania Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 840 (3d Cir. 2000); *Gottdiener v. Sater*, 35 F. Supp. 3d 386, 396 (S.D.N.Y. 2014); *Ross v. Patrusky, Mintz & Semel*, 1997 WL 214957, at *11 (S.D.N.Y. Apr. 29, 1997).

*Corp. v. Rosenshein*, 774 F. Supp. 129, 139 (S.D.N.Y. 1991) ("conclusory assertions of aider and

abettor liability referring to . . . general charges of wrongdoing . . . do[] not satisfy [Rule] 9(b)").

<blockquote>

**E.    For Additional and Independent Reasons, Alix Fails to Plead Any Racketeering Acts by Any Individual Defendant**

</blockquote>

The arguments advanced above regarding the insufficiency of Alix's allegations

concerning predicate acts apply with equal force to the Individual Defendants.  Beyond those

fatal deficiencies, Alix also fails to plead non-conclusory facts showing that any Individual

Defendant committed two predicate acts with scienter, including facts sufficient to show the

"individual role" played by each individual in the alleged scheme.  *See, e.g.*, *DiVittorio v.

Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (complaint must specify

the individual role of each defendant); *Targum v. Citrin Cooperman & Co.*, 2013 WL 6087400,

at *4 (S.D.N.Y. Nov. 19, 2013) (same with respect to fraudulent intent).

Alix cannot circumvent these pleading requirements with collective allegations that

indiscriminately lump together groups of individuals or allege actions purportedly taken by

"McKinsey" generally.  Instead, "[e]ach element of a RICO violation . . . must be plausibly

alleged as to each defendant rather than simply to the enterprise as a whole," *Worldwide

Directories, S.A. De C.V. v. Yahoo! Inc.*, 2016 WL 1298987, at *4 (S.D.N.Y. Mar. 31, 2016)

(Nathan, J.), and Rule 9(b) must also be met as to "each defendant" "asked to respond to

allegations of fraud," *DiVittorio*, 822 F.2d at 1247; *see also DLJ Mortg. Cap. v. Kontogiannis*,

594 F. Supp. 2d 308, 326 (E.D.N.Y. 2009) ("[G]roup pleading . . . fails to satisfy the heightened

pleading requirements of Rule 9(b).").[32]

Indeed, Rule 9(b) "safeguard[s] a defendant's reputation from improvident charges of

---

[32] Alix makes no allegations whatsoever about any of the Individual Defendants in connection with his (baseless) claims of pay-to-play bribery.  SAC ¶¶ 471–77, 645–51; *see also infra* Argument § V.

wrongdoing." *Rombach*, 355 F.3d at 171.  Because of the stigma associated with racketeering allegations, "Rule 9(b)'s particularity requirements have even greater urgency in civil RICO actions." *Schmidt v. Fleet Bank*, 1998 WL 47827, at *5 (S.D.N.Y. Feb. 4, 1998) (quoting *Decker v. Massey–Ferguson. Ltd.*, 681 F.2d 111, 114 (2d Cir. 1982)).

The SAC fails to adequately allege relevant actions taken by the Individual Defendants. Instead, it recites their high-level positions (though Alix cannot plausibly allege even that as to Proshan, who is not a partner, or Hojnacki, whom Alix admits was not made a McKinsey partner until 2016) and contends that, as a consequence, they must have knowingly participated in the alleged scheme. *See, e.g.*, SAC ¶¶ 401(e)–(k), 415–24.  But as this Court has explained: "[A] Complaint's mere recitation of fraudulent practices, coupled with conclusory allegations that [d]efendants were aware of these practices by virtue of their positions . . . , fails to state with particularity facts giving rise to a strong inference that any Defendant [made] false[] represent[ations], with scienter." *Sanchez*, 2015 WL 3540836, at *6, 10 (quotations omitted); *see also City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1264 (10th Cir. 2001) (having "occupied senior positions in the company . . . is not sufficient to imply knowledge of the specific fact of materiality"); *In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("[A]llegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are . . . inadequate to withstand Rule 9(b) scrutiny.") (citation omitted).

Besides noting their job titles (and the conclusory and legally invalid refrain that they "aided and abetted" the alleged scheme), the SAC alleges little about the Individual Defendants. Tacitly recognizing this failure, Alix contends that the alleged fraudulent conduct "will be proven through discovery." *E.g.*, SAC ¶ 168.  But "a party who cannot meet the pleading

requirements of Rule 9(b) is not entitled to discovery in order to flesh out the missing elements."

*U.S. ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759, 774 (S.D.N.Y.

2018); *see also Madonna*, 878 F.2d at 66.  A closer examination of the allegations made, and not

made, about each Individual Defendant reveals the SAC's glaring deficiencies.

### 1. Dominic Barton

The allegations against Dominic Barton, McKinsey's former global managing partner,[33]

form a narrative largely removed from the core allegations of the SAC.  The crux of Alix's

assertion that Barton aided and abetted bankruptcy fraud, and other predicates, is Barton's

refusal to do Alix's bidding when confronted by Alix about McKinsey's disclosure practices.

Alix does not allege that Barton was involved in formulating or filing any of McKinsey's

Rule 2014(a) disclosures, nor does he allege that Barton played any role in the bankruptcy cases

at issue.  Indeed, Alix himself acknowledges that when he raised his concerns regarding

McKinsey's bankruptcy practice in September 2014—over a decade after the purported RICO

conspiracy began—Barton was unfamiliar with both the technicalities of U.S. bankruptcy law

and the firm's disclosure methodology.  Alix alleges that he had to "explain[] McKinsey's

disclosure obligations under bankruptcy law at length to Barton," as well as provide a "detailed

exposition of the relevant legal principles."  SAC ¶ 147.  Alix also admits that when he phoned

Barton in November 2014 and May 2015 to complain about RTS's disclosures in *NII* and

*Standard Register*, Barton was unaware of McKinsey's retention in those two matters.  SAC

¶¶ 169, 186.

Unable to allege any facts supporting a claim that Barton participated directly in the

purported bankruptcy fraud, Alix speculates that Barton made "false representations in order to

---

[33] Barton left McKinsey in 2018 to become Canada's ambassador to China.

forestall corrective actions . . . as long as possible, thereby maximizing [McKinsey's] fees and increasing McKinsey RTS's foothold in the high-end bankruptcy business at AP's expense." SAC ¶ 160.  Alix alleges that during an October 2014 meeting, Barton "agreed that by March 2015, McKinsey RTS would exit the bankruptcy consulting business"; "withdraw[ ] from active McKinsey RTS bankruptcy consulting engagements"; and Barton would "[remove] the senior leadership of McKinsey RTS."  SAC ¶ 156.  Despite the improbability, if not impossibility, of Barton's being able to shut down an entire business unit, terminate its senior leadership, and withdraw from active bankruptcy engagements, all within the space of five months, Alix alleges that, in reliance on these purported representations, he "agreed to remain patient and refrain from acting at that time on the issues he had raised, including forbearance from legal action." *Id.*  Alix piles speculation upon speculation when he further alleges that Barton's failure to do what Alix demanded "demonstrates Barton's desire and intention that the unlawful activities of the other Defendants succeed and suggests that Barton previously had authorized these activities."  SAC ¶ 401(e).

Stripped of Alix's imaginative theorizing, the facts alleged, at most, state that Barton agreed to undertake certain acts but did not follow through, much to Alix's annoyance. Characterizing Barton's inaction as a manifestation of fraudulent intent, where other plausible and wholly innocent reasons for any purported change of mind or failure to act exist, does not satisfy Rule 9(b)'s required "strong inference" of intent, and no amount of discovery will remedy that, given that Barton's predicate acts are premised solely on the meetings and phone calls that Alix personally participated in.

Alix's claims against Barton do not "create the possibility of a right to relief that is more than speculative," *Spool*, 520 F.3d at 183, nor do they have the requisite particularity required

under Rule 9(b).  Accordingly, they should be dismissed with prejudice.

### 2.     Kevin Carmody

Kevin Carmody is a Senior Partner at RTS who left AlixPartners to join McKinsey. SAC ¶¶ 417, 489(k).  In retaliation, Alix now alleges that Carmody engaged in criminal acts in furtherance of a racketeering enterprise.  The basis for those claims is that Carmody signed, as a corporate representative, McKinsey's Rule 2014 disclosures—each of which was prepared by company lawyers who were in turn advised by outside counsel.  Each of those disclosures were prepared using a procedure that McKinsey developed a decade before Carmody joined the firm, and that had been repeatedly approved by bankruptcy courts.  This is precisely the kind of overreach that requires this Court's strict application of Rule 9(b)'s requirement that fraud be pleaded with particularly.  *See Gerstenfeld v. Nitsberg*, 190 F.R.D. 127, 131–32 (S.D.N.Y. 1999) (Rule 9(b) meant to derail anti-competitive strike suits).  The claim that Carmody engaged in criminal conduct is so far-fetched that dismissal is required for failure to satisfy the particularity requirements of Rule 9(b), as well as the plausibility requirements of *Iqbal* and *Twombly*.

As explained above, Alix has not plausibly identified *how* the declarations Carmody signed as a corporate representative were fraudulent, much less that he had the specific intent required to allege a violation of the federal mail, wire, and bankruptcy fraud statutes.  *See supra* Argument § I.A.  Indeed, a cursory review of Carmody's declarations makes clear that the vast majority of allegedly fraudulent statements are neither false nor misleading, because they explicitly inform the bankruptcy court what information McKinsey RTS was and was not providing.  *Id.*  Equally fatal, the SAC does not include facts sufficient to allege that Carmody knew these declarations contained false statements, or that he signed them with the specific intent to cause a bankruptcy court to find McKinsey disinterested on any improper basis, or to deprive any party to a bankruptcy proceeding of information relevant to McKinsey's

disinterestedness.

At most, the SAC alleges the declarations Carmody signed did not comport with Alix's unique beliefs about what Rule 2014 required. Those beliefs are legal conclusions entitled to no weight, and cannot support a plausible inference that Carmody engaged in fraud. *Iqbal*, 556 U.S. at 678. To take just one example, the SAC alleges that Carmody's initial declaration in *ANR* disclosed McKinsey's connection to a "Major Customer," but that McKinsey declined—as the declaration expressly informed the court– to identify the Major Customer by name. SAC ¶ 210. The SAC next alleges Carmody's supplemental *ANR* declaration *did* identify the Major Customer by name, but alleges the disclosure was fraudulent because McKinsey should have provided yet more detail (detail which, as Alix himself alleges, was included in the initial declaration).[34] SAC ¶ 211. Alix is, of course, free to pontificate about what Rule 2014 requires, but his legal conclusions are irrelevant to whether the SAC sufficiently alleges Carmody made false or misleading statements. This Court must make that determination as a matter of law.

The SAC's failure to include facts sufficient to allege that Carmody both knew of the objective falsity of McKinsey's declarations, and signed them with the specific intent to defraud the court or other parties, requires dismissal of Alix's claims against Carmody.[35] The SAC does not include facts sufficient to allege that Carmody "had both motive and opportunity to commit fraud" or "that constitute strong circumstantial evidence of [Carmody's] conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 290–91. There are no allegations that plausibly allege that

---

[34] In a similar vein, Alix alleges that Defendants "continued to conceal" McKinsey's connection to a certain Interested Party in *ANR*, "apart from the extremely belated . . . *in camera* disclosures" it made. SAC ¶ 223. In other words, Alix's allegation is that McKinsey concealed that connection except for when it disclosed it *in camera*.

[35] The Second Circuit held the first amended complaint alleged proximate causation with respect to *GenOn*, and observed that it was plausible that had McKinsey made additional disclosures GenOn might have elected not to hire McKinsey. *Alix*, 23 F.4th at 206. But the Second Circuit's opinion made this observation in determining whether the complaint sufficiently alleged proximate causation. The Court never addressed, much less made a finding, whether Carmody or any other individual defendant acted with scienter. Indeed, the opinion never mentions Carmody by name.

Carmody stood to benefit personally from signing false declarations, or that he had a reason to engage in criminal conduct to help McKinsey win a bankruptcy engagement. The allegations that Carmody was an RTS employee, and therefore might obtain some indirect financial benefit if McKinsey were retained, are insufficient to allege that Carmody acted with a specific intent to defraud. *See DeSilva*, 770 F. Supp. 2d at 528 ("[A] generalized profit motive that could be imputed to any company . . . has been consistently rejected as a basis for inferring fraudulent intent.").

The SAC similarly lacks facts sufficient to create even circumstantial evidence of conscious misbehavior or recklessness by Carmody. The SAC alleges that, because Carmody previously worked at AlixPartners, he "would have known" that AlixPartners' Rule 2014 disclosures were "far more robust" than McKinsey's. SAC ¶ 489(k). But Carmody's alleged familiarity with AlixPartners' disclosure practices is irrelevant to whether Carmody knew that McKinsey's declarations—which employed a methodology in place for a decade before Carmody joined McKinsey—were false or misleading.

The SAC alleges that Carmody was "in possession of an internal McKinsey document titled 'Bankruptcy 101,'" which "detailed how to disclose bankruptcy connections" and stated the importance of properly disclosing relevant connections. SAC ¶ 170. The allegations regarding the "Bankruptcy 101" document, again, are insufficient to create any inference that Carmody signed declarations with the specific intent to defraud. As the SAC alleges, this document emphasized the importance of complying with disclosure requirements. There are no allegations that Carmody disregarded any guidance set forth in the document, much less that he did so with intent to defraud.

The SAC also cites to deposition testimony that suggests Carmody knew that an entity

40

called Whitebox was a lender in the *ANR* bankruptcy case.  From this unexceptional observation, the SAC alleges that Carmody fraudulently omitted information about McKinsey's "connection" to Whitebox.  SAC ¶ 230.  But nowhere does the SAC allege that Carmody knew Whitebox had any connection to McKinsey (the alleged connection was through an investment held by McKinsey's investment affiliate, MIO).  Indeed, the SAC does not even allege that Carmody knew that McKinsey's indirect connection to Whitebox needed to be disclosed at all, given that Whitebox was not included on the IP List given to RTS by the Debtor.  *See, e.g.,* Ex. 11-A, *ANR* Dkt. 212.  There are no allegations to suggest that Carmody made a decision to exclude information about Whitebox, much less that he did so to defraud the bankruptcy court.

Finally, the SAC alleges that Carmody informed a colleague working on McKinsey's *Westmoreland* disclosures that including a McKinsey client was unnecessary "because McKinsey's last engagement for that company purportedly fell ***just one day*** outside the arbitrary two-year 'lookback' period."  SAC ¶ 418 (emphasis in original).  This allegation does not remotely suggest that Carmody acted with fraudulent intent—there is no logical basis to infer that because Carmody provided a colleague with accurate information relevant to the criteria McKinsey used to make disclosures that Carmody formed a specific intent to defraud.  There are no facts to suggest that identifying this client in McKinsey's disclosure was material to McKinsey's disinterestedness, much less that Carmody sought to conceal that information because he sought to influence the courts' disinterestedness determinations.

Read in its totality, there is no plausible basis to infer that Carmody engaged in intentionally fraudulent acts.  Carmody's declarations were prepared using an approach to Rule 2014 disclosures that existed at McKinsey for a decade *before* Carmody joined the company.  Allegations that Carmody signed declarations prepared in compliance with this

existing methodology, which had been reviewed and approved by courts for years, demonstrates good faith and lawful behavior—not "recklessness" or "conscious misbehavior." The SAC further alleges that Carmody worked with McKinsey in-house lawyers, including McKinsey's General Counsel, in preparing each and every one of Carmody's declarations.[36] McKinsey's lawyers themselves had access to "the most sophisticated legal counsel in the world." SAC ¶ 149. These allegations undermine, rather than support, any inference that Carmody acted with an intent to defraud.

A complaint alleging fraud requires more than conclusory allegations that a declarant made statements that were false or misleading. It requires factual allegations "that give rise to a strong inference of [the declarant's] fraudulent intent." *First Cap.*, 385 F.3d at 179. For the third time now, the Complaint has failed to satisfy these pleading requirements as to Carmody. The claims against him should thus be dismissed with prejudice.[37]

### 3. Jon Garcia

Jon Garcia is the President of RTS and a Senior Partner at McKinsey. SAC ¶ 41. Alix alleges that Garcia had "a high degree of executive authority over [RTS's] bankruptcy consultancy activities," including serving as a member of McKinsey's Recovery Oversight Committee ("ROC") prior to 2018. *E.g.*, SAC ¶ 401(g). But while Alix vents at length about how he has unsuccessfully crusaded for years to have Garcia fired from McKinsey, *e.g.*, SAC ¶¶ 156–58, 186–87, 693, he alleges remarkably little about anything that Garcia supposedly *did*

---

[36] In *AMF Bowling*, a McKinsey lawyer "was the primary person responsible for preparing and revising disclosure affidavits (including gathering relevant information)." SAC ¶ 129. In *NII*, *Standard Register*, and *ANR*, Carmody was "assisted" by or "in close consultation with" McKinsey lawyers including the General Counsel. SAC ¶¶ 162, 173, 192. And in *GenOn*, McKinsey lawyers—again including the General Counsel—"prepared McKinsey's disclosures." SAC ¶ 285.

[37] The non-fraud predicate acts Alix alleges against Carmody fail for reasons explained above, *see supra* I.C, and because Alix alleges no facts about Carmody that support those predicates. The total absence of allegations about Carmody extends to the purported "pay-to-play" scheme.

in connection with the fourteen bankruptcies addressed in the SAC.  And even in the vanishingly few instances where Alix alleges actual action by Garcia, he fails to allege facts sufficient to create a strong inference that Garcia ever acted with fraudulent intent—much less took any relevant actions within the applicable statute of limitations, *see infra* Argument § II.B.3.

Alix's few allegations regarding Garcia are generalized and insufficient to state a claim. For example, Alix alleges that Garcia occasionally communicated with others at McKinsey. Without alleging any details whatsoever, Alix contends that Garcia discussed the "topic of disclosure" with senior leadership, SAC ¶ 73, and had a single, unspecified "communication" with a lawyer during the *Edison Mission* bankruptcy, SAC ¶ 132.  Alix also alleges that Garcia discussed McKinsey's "values" and "how McKinsey was different than any other place and other firms" with Carmody during Carmody's "onboarding process" in 2012.  SAC ¶ 164.  But there is nothing unlawful about one McKinsey employee communicating with another, and Alix does not even attempt to tie these communications to the alleged broader enterprise.  Moreover, it is not surprising that Garcia—as President of RTS—may have spoken about the "topic of disclosure" or the firm's "values" with a colleague, and may have communicated with McKinsey's counsel about his own connections relating to a possible bankruptcy retention. Alix's allegations of common, workplace interactions cannot serve as the basis for any RICO predicate under Rule 8, much less Rule 9(b).

Alix also alleges that Garcia personally signed the *Edison Mission* engagement letter, SAC ¶ 132, and was a member of the ROC when it allegedly approved certain bankruptcy engagements and the disclosure declaration for *Westmoreland*, SAC ¶¶ 326, 339.  But Alix does not explain how these alleged run-of-the-mill corporate approvals constitute fraud.  Indeed, notably, Alix does not allege that Garcia himself personally committed any acts of bankruptcy

fraud.  *See* SAC ¶ 414.

Instead, Alix puts substantial weight on his allegations that Garcia sat on MIO's board, served on its Investment Committee, and "in that capacity[,] ratified MIO's investments."  *E.g.*, SAC ¶¶ 24, 139, 217, 282, 401(g), 405.  But Alix's own allegations show that Garcia had little direct involvement in MIO's investments because MIO's board "delegates its investment authority to MIO's CEO," who "reported to" and was "assessed by" the Chair of MIO's board (not Garcia).  SAC ¶ 371(b)–(c).  Alix does not allege that Garcia took any actions in any of the RTS bankruptcies to further MIO's investment interests.  Nor does Alix allege that Garcia ever shared MIO information with anyone at RTS.  To the contrary, he expressly alleges that Garcia "determined" that the RTS declarant in *Westmoreland* "would not be provided with [MIO] information."  SAC ¶ 369.[38]  No matter how hard he tries, Alix cannot spin Garcia's title or position into a plausible allegation of criminality because wearing two hats in a corporate group (RTS President and MIO board member) is not a crime.

The remainder of the SAC alleges that Garcia "aided and abetted" dozens of predicate acts committed by others.  *E.g.*, SAC ¶ 415.  That is insufficient to state a RICO claim against him.  *See supra* Argument § I.D.  Alix's aiding-and-abetting allegation is also impermissibly conclusory.  Alix again focuses on Garcia's title, alleging that Garcia was a member of the ROC and asserting that the ROC authorized RTS's disclosures.  *See* SAC ¶ 415.  But Alix never alleges any specific actions by Garcia to cause, authorize, or substantially assist anyone in making allegedly false or misleading submissions in any bankruptcy case.  *See id.*

Finally, Alix also does not adequately plead scienter as to Garcia.  The allegations against

---

[38] Alix repeatedly cites the SEC's consent order, *e.g.*, SAC ¶¶ 384–89, but it does not help him.  The SEC charged only that MIO's policies were not sufficiently designed to prevent the "***risk***" of MNPI being misused, or of other violations.  *See* SAC ¶¶ 383, 386, 387 n.41.  While the SEC found that MIO's policies did not meet the relevant statutory requirements, the order does not state that anyone at MIO or RTS actually misused MNPI or committed fraud of any sort.  *See id.*

Garcia focus almost entirely on Garcia's position at the firm and his prior legal training, SAC ¶ 489(g)—neither of which suffices to plead fraud. *Sanchez*, 2015 WL 3540836, at *6. The SAC alleges no facts connecting Garcia to any particular Rule 2014 disclosure, let alone facts from which one could infer that Garcia knew such disclosures were allegedly false. Garcia is smeared with the charge of being a racketeer, despite Alix's failure to allege any actual wrongdoing. The claims against him should be dismissed.

### 4. Seth Goldstrom

#### (a) *Alix Fails to Plead Any Predicate Act by Goldstrom.*

Alix again fails to state a plausible and particularized claim that Goldstrom committed any predicate act of bankruptcy, wire, or mail fraud as part of the conduct of a racketeering enterprise. Preliminarily, as shown below, all of Alix's claims against Goldstrom are time-barred. *Infra* Argument § II.B.2. The SAC alleges only that Goldstrom signed declarations in two bankruptcies, both of which fall outside the limitations period, SAC ¶¶ 118–19, 121, 123, and that he communicated with his colleagues about their work, SAC ¶¶ 122, 129, 239. Apart from those allegations, the balance of the SAC's content relating to Goldstrom individually is that he is a lawyer, SAC ¶¶ 70, 149, 489(h), 690, a "Senior Partner" and "executive of McKinsey & Co.," and an "executive" and "board member of" RTS, SAC ¶ 42. These allegations are insufficient to state a claim Goldstrom committed any predicate racketeering act.

The SAC fails to satisfy Rule 9(b) with respect to its fraud-based predicate allegations against Goldstrom for several reasons. First, the SAC does not allege with specificity how any of the declarations Goldstrom signed were false or misleading. Alix alleges merely that the declarations signed by Goldstrom, which listed RTS's connections by descriptive category, "[f]ailed to identify connection[s] by name and to provide details of relationship." SAC, Ex. B, at 8–11. As an initial point, the declarations signed by Goldstrom expressly disprove the SAC's

allegation that they "failed to provide details" about McKinsey's relationships.[39]  But even putting that aside, the alleged failure to provide those details does not make the declarations false or misleading, much less fraudulent.  The declarations expressly state that McKinsey was disclosing connections by descriptive category rather than by name, and explain the *bona fide* reason for not identifying McKinsey clients by name (the confidentiality of client engagements). *See, e.g.*, Ex. 5-A, *Harry & David* Dkt. 105-3, ¶ 9 (describing how McKinsey protects the confidentiality of client information).  In other words, Goldstrom's declarations informed participants in the bankruptcy proceedings what information was and was not being disclosed, and why.  These disclosures are the antithesis of an intentional misrepresentation or knowing concealment, and foreclose a plausible allegation of fraud under Rule 9(b).

The SAC also fails to allege Goldstrom took any action whatsoever as part of the purported "pay-to-play" scheme the Second Circuit found to be plausibly alleged *as to McKinsey*.  Indeed, this alleged scheme relates solely to three bankruptcies, none of which Goldstrom is alleged to have participated in.  *Alix*, 23 F.4th at 209–10 & n.6.  There are no plausible allegations in the SAC, and certainly none sufficient to satisfy Rule 9(b), that Goldstrom participated in fraudulent conduct in furtherance of this or any other alleged scheme.[40]

The SAC also fails to satisfy Rule 9(b) as to Goldstrom because there are no plausible, particularized, allegations that create the necessary strong inference that Goldstrom acted with scienter.  The SAC includes no particularized facts with respect to Goldstrom creating a

---

[39] *See, e.g.*, *AMR* Dkt. 581, ¶ 17 ("A member of the RTS Team serves a non U.S. airline client on matters relating to post-merger management of such client's announced business combination with another non-U.S. airline. One workstream of that client service may impact the Debtors as it relates to the decision of which airline alliance the combined entity will join.").

[40] The non-fraud predicate acts the SAC alleges against Goldstrom fail for reasons explained above, *see supra* Argument § I.C, and because there are no facts alleged that remotely suggest Goldstrom engaged in those acts.

plausible inference he knew the disclosures he signed were incomplete or misleading, or even that disclosure by descriptive category was improper (much less done with fraudulent intent). Instead, Alix "couple[s] a factual statement"—that Goldstrom signed disclosures—"with a conclusory allegation of fraudulent intent," which is wholly inadequate under Rule 9(b).  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994).  Further, Alix does not allege Goldstrom ever had an intent or motive to injure AlixPartners, much less that he intended to deprive AlixPartners of money or property, as is required to state a RICO claim based on predicates sounding in fraud.  *See U.S. Fire Ins. Co. v. United Limo. Serv., Inc.*, 303 F. Supp. 2d 432, 444 (S.D.N.Y. 2004) ("[A]llegations of scienter must be supported by facts giving rise to a strong inference that the defendant knew the statements to be false and intended to defraud the plaintiff." (internal quotation omitted)).

On the contrary, the allegations in the SAC confirm that any inference of fraudulent intent is implausible.  Alix alleges that a McKinsey lawyer (not Goldstrom) "was the primary person responsible for preparing and revising Goldstrom's disclosure declarations (including gathering relevant information)," SAC ¶ 122, and that McKinsey's General Counsel—who had "ultimate legal responsibility for McKinsey's compliance with bankruptcy laws," SAC ¶ 96— "worked closely" with the lawyers who prepared Goldstrom's disclosures, SAC ¶ 423.  The SAC includes no allegations remotely sufficient to establish Goldstrom did not rely in good faith on the professionals who identified potential connections and made legal judgments on how disclosures should be made.  Indeed, the declarations Goldstrom signed expressly disclose that he was relying on information compiled by other McKinsey employees.  *E.g.*, Ex. 5-A, *Harry & David* Dkt 105-3, ¶¶ 2, 10.  Further, there are no allegations in the SAC remotely suggesting the courts, the U.S. Trustee, or any party to the bankruptcy proceedings ever questioned the

47

adequacy of the disclosures or the expressly disclosed methodology until well *after* Goldstrom signed his last declaration in April 2013.  The SAC fails to allege Goldstrom engaged in a scheme to defraud AlixPartners by signing declarations that were transparent to the court and the parties, and that were extensively vetted by McKinsey's lawyers.

The SAC cannot cure these obvious pleading deficiencies by including the allegation Goldstrom and other Individual Defendants "aided and abetted," or conspired with one another. *See, e.g.*, SAC ¶¶ 223, 228, 287.  These allegations "are not entitled to the assumption of truth" because they are "no more than conclusions."  *Iqbal*, 556 U.S. at 679.  None describes in any plausible way how Goldstrom "t[ook] some conscious action that furthered the commission of the underlying crime," *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996), the standard for aiding-and-abetting liability.[41]  Similarly, the SAC does not include allegations sufficient to establish that Goldstrom entered into an unlawful conspiracy or committed any overt act with the intent to participate in criminal racketeering activity.  *See Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25–26 (2d Cir. 1990) (affirming district court's dismissal of RICO conspiracy claim for failure to "plead a RICO conspiracy with sufficient particularity").  The SAC's failure to satisfy Rule 9(b) requires this Court to reject Alix's calculated efforts to smear Goldstrom and eight other Individual Defendants with the threat of RICO liability—all in service of his anticompetitive campaign against McKinsey.  *See Gerstenfeld*, 190 F.R.D. at 131–32 (Rule 9(b) meant to derail anti-competitive strike suits).

(b)     ***Rule 60 Bars Alix's Claims.***[42]

All of Alix's claims against Goldstrom fail for an independent reason: they are improper collateral attacks on the orders of bankruptcy courts from around the country.  As the Second

---

[41] As discussed, supra Argument § I.D, there is in any case no aiding-and-abetting liability under RICO.

[42] The argument in Section I.E.4.b is raised by Defendant Goldstrom only.

Circuit recognized, Alix's theory of proximate cause—and therefore his right to obtain relief on his RICO claims—requires a judicial determination that each of the bankruptcy courts would not have entered their retention, fee award, and final plan confirmation orders had those courts been aware of the allegations in the SAC. *Alix*, 23 F.4th at 205–06. Alix's claims are therefore necessarily collateral attacks on final orders subject to Rule 60, and are time-barred.

By its terms, Rule 60(b)(3) requires that any collateral attack on a prior final order by a federal court based on claims of fraud be brought to the specific court that issued the final order, within one year of the date of the order. This rule reflects principles of judicial comity, under which it is improper—and illogical—for this Court (or any other) to speculate as to whether the allegations Alix raises in fact would have caused another court to exercise its power differently.

Accordingly, a "final judicial order," including in a bankruptcy case, "can be set aside only under Rule 60(b)." *In re Met-L-Wood Corp.*, 861 F.2d 1012, 1018 (7th Cir. 1988) (Posner, J.) ("a thinly disguised attack on the judgment confirming the [bankruptcy asset] sale," even if not formally seeking rescission of a bankruptcy court order, "may be done only by [Rule 60,] the route provided for collateral attacks on judgments"); Fed. R. Bankr. P. 9024 & advisory committee note ("For the purpose of this rule all orders of the bankruptcy court are subject to Rule 60[.]"). Dressing up a challenge to a prior judicial order as a RICO claim does not avoid this rule. *See, e.g.*, *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1187 (10th Cir. 2014) ("[R]emedies under RICO do not include setting aside a prior judgment or undermining its preclusive effect by a collateral attack."); *see also Hendrick v. Avent*, 891 F.2d 583, 585–87 (5th Cir. 1990) (precluding RICO claim in second suit alleging fraud connected to bankruptcy court order); *Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 731–32 (8th Cir. 2004) (same); *Harbinger Cap. Partners LLC v. Ergen*, 103 F. Supp. 3d 1251, 1265–66 (D. Colo. 2015) (to succeed on

RICO claim, plaintiff "need[ed] to prove that" bankruptcy court's order "was improperly obtained," a showing that "necessarily attack[ed]" order's "validity"). As these decisions show, Rule 60 applies even though Alix does not expressly request final orders to be vacated.

Rule 60's limits apply strictly and with special force in the context of bankruptcy cases, "a forum where finality of court orders is particularly important."[43] *In re Lawrence*, 293 F.3d 615, 621 (2d Cir. 2002). "A successful reorganization would not be possible if creditors could simply ignore the bankruptcy proceeding and then seek to recover on their prior claims." *In re Agrokor d.d.*, 591 B.R. 163, 185 (S.D.N.Y. Bankr. 2018). For the same reason, bars on collateral attacks apply even to a nonparty to the bankruptcy. *See, e.g.*, *Regions Bank*, 387 F.3d at 731–32 (nonparty's RICO claim barred as collateral attack).[44] Permitting Alix—or any litigant—to ask a court to second-guess the integrity of final orders entered by a different bankruptcy court, without complying with Rule 60, would "open the floodgates to future litigation attacking the final orders . . . in bankruptcy court proceeding[s]". *Lawrence*, 293 F.3d at 621–22 & n. 4.

Alix's claims each depend on collateral attacks on prior orders, because his claims of RICO injury require a finding that each of the relevant retention, fee award, and plan confirmation orders were entered improperly as a result of McKinsey's alleged misconduct. *See Alix*, 23 F.4th at 205–06. Rule 60 establishes the "only method" for seeking this relief, *Avent*, 891 F.2d at 588, and the SAC ignores Rule 60 in two ways, each fatal. *First*, a collateral attack "must be brought in the court that rendered the disputed order." *SEC v. Gellas*, 1 F. Supp. 2d 333, 335 (S.D.N.Y. 1998). This requires that each of Alix's bankruptcy-specific challenges be

---

[43] Notably, independent of Rule 60, the Supreme Court barred collateral attacks on bankruptcy orders in *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995).

[44] *See also, e.g., In re Steffen*, 464 B.R. 450, 458-59 (Bankr. M.D. Fla. 2012) (nonparty IRS's "sole remedy" "is under [Rule 60]"); *Orland Acquisitions, LLC v. Hilco Indus., LLC*, 2010 WL 987223, at *8 (N.D. Ind. Mar. 15, 2010) (Rule 60 is the "only way" nonparty "could attack" final bankruptcy order); *cf. Flame S.A. v. Indus. Carriers, Inc.*, 24 F. Supp. 3d 513, 516-17 (E.D. Va. 2014) ("[N]onparties must bring 60(b) challenges in the rendering court.").

presented to the bankruptcy court that issued the orders Alix now attacks—not to this Court.

*Second*, Rule 60(c)(1) sets a strict one-year time limit from the date a challenged order is entered

to raise a collateral attack based on fraud. *Lawrence*, 293 F.3d at 626 n.9 (action alleging fraud

related to prior bankruptcy order would face "automatic disqualification" under Rule 60 if

brought more than one year after the order). But Alix has failed to seek Rule 60 relief in any

court within the one-year requirement set forth in Rule 60(c)(1).[45]  His challenges to the final

orders entered in those cases are thus untimely. *See also In re Trigee Found., Inc.*, 2018 WL

3719144, at *1–3 (D.D.C. Aug. 3, 2018) (subsequent action asserting advisor's Rule 2014

violation time-barred by Rule 60 because brought more than a year after retention order).  This

Court should deny Alix's claims as untimely under Rule 60(b).[46]  *See United States v. Lavi*, 2006

WL 1305288, at *4 (E.D.N.Y. Mar. 30, 2006) (rejecting 60(b) motion because it was both

untimely and filed in wrong court).

    To be sure, Rule 60 contains a proviso stating that it does not "limit a court's power" to

"set aside a judgment for fraud on the court."  Fed. R. Civ. P. 60(d)(3).  That does not rescue

Alix's claims.  First, any claim for relief pursuant to Rule 60(d)(3) still needs to be made before

the court that issued the order.  *See Gellas*, 1 F. Supp. 2d at 333, 335.  Second, Rule 60(d)(3)'s

"fraud on the court" exception applies only to cases presenting "a 'grave miscarriage of justice'"

that cannot be addressed within "ordinary processes," such as "bribery of a judge" or "jury

tampering."  *Mazzei v. The Money Store*, 2021 WL 4429631, at *3 (S.D.N.Y. Sept. 27, 2021).

---

[45] Alix initially brought his RICO claims on May 9, 2018.  For each bankruptcy other than *Westmoreland* (where there was no final order), and *GenOn*, the orders finding McKinsey disinterested were entered more than one year prior to that date.  Alix failed to seek relief in those proceedings under Rule 60 within one year.  Nor did Alix actually file any motion under Rule 60 in *GenOn*, and there is no basis to conclude that Alix's RICO complaint somehow serves as an adequate substitute for a Rule 60 motion.

[46] Rule 60's time limit should apply with full force here:  the SAC alleges Alix (an AlixPartners board member) was aware of McKinsey's alleged inadequate Rule 2014 disclosures at the time they were filed, SAC ¶¶ 30, 143.  Despite this, AlixPartners failed to take any action to vindicate its claims during the bankruptcy proceedings.

That narrow interpretation is required under the Federal Rules, because otherwise there would be no distinction between Rule 60(d)(3) and Rule 60(b)(3), which already expressly covers fraud, misrepresentation, and misconduct.  *Met-L-Wood*, 861 F.2d at 1012 (undisclosed bid-rigging could not rise to level of "fraud on the court" under Rule 60(d)(3) "without erasing the distinction between two concepts that Rule 60(b) carefully separates").  As a matter of law, the SAC's allegations regarding McKinsey's disclosures do not present the type of miscarriage of justice necessary to allege "fraud on the court" under Rule 60(d)(3).  *See Wesse v. Schukman*, 98 F.3d 542, 553 (10th Cir. 2002) ("[N]ondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court." (citation omitted)).

> **(c)**     ***Pursuant to Section 1334(e)(2), This Court Lacks Jurisdiction to Adjudicate Alix's Claims Based on Bankruptcy Cases Outside This District***[47]

This Court lacks jurisdiction to adjudicate Alix's challenges to Goldstrom's conduct in any bankruptcy case conducted in federal districts outside the Southern District of New York. Under 28 U.S.C. § 1334(e)(2), the "district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction . . . over all claims or causes of action that involve construction of section 327 . . . or rules relating to disclosure requirements under section 327," such as Bankruptcy Rule 2014.  Alix's claims plainly require construction of Rule 2014 and § 327.[48]  As a result, Alix's claims related to every bankruptcy other than *SunEdison*, *NII Holdings*, *AMR*, and *Lyondell* are not justiciable by this Court and must be dismissed.

---

[47] The argument in Section I.E.4.c is raised by Defendant Goldstrom only.

[48] The SAC invokes Rule 2014 well over 100 times, and § 327 many times as well.  It alleges at length what Alix believes to be the proper construction of those provisions.  *See, e.g.*, SAC ¶¶ 60–64.

### 5.    Mark Hojnacki

Mark Hojnacki—one of two newly-added Defendants—became a McKinsey partner in 2016 and subsequently signed declarations filed in two cases:  *SunEdison* and *Westmoreland*. SAC ¶¶ 43, 237, 329, 401(l).  Based primarily on those facts, Alix brands Hojnacki a racketeer, alleging that he committed or aided and abetted the following predicate acts in connection with those two cases:  bankruptcy fraud, mail and wire fraud, obstruction of justice, and money laundering.  SAC ¶ 401(l).  Incomprehensibly, Alix also attempts to link Hojnacki to two other bankruptcy cases, *ANR* and *GenOn*, with conclusory and improper allegations that he aided and abetted bankruptcy fraud, and committed or aided and abetted obstruction of justice and witness tampering in those two cases.  SAC ¶¶ 414, 438, 461, 469.  In addition to the SAC's deficiencies discussed *supra*, §§ I.A–I.C, Alix's attempt to allege Hojnacki's involvement in these predicate acts falls well short of the standards set out in Rules 8(a) and 9(b), and all substantive RICO claims against Hojnacki should be dismissed.

Alix alleges that Hojnacki engaged in two broad categories of wrongdoing in *SunEdison* and *Westmoreland*:  filing purportedly false declarations concerning McKinsey's connections to other parties in those bankruptcies, *see* SAC ¶¶ 240(a), (c)–(d), 241–44, 246–54, 272–82, 326–39, and concealing a "round trip" invoicing scheme McKinsey supposedly employed prior to SunEdison's bankruptcy petition, *see* SAC ¶¶ 265, 483.  All of Alix's claims based on these allegations can be dispensed with on the basis that Alix's allegations concerning Hojnacki's role in *SunEdison* are time-barred, *see infra* Argument § II.C, and because Alix has failed to adequately allege injury or causation in either bankruptcy, *see infra* Argument § VII.  But even apart from those fatal defects, the SAC's allegations are laced with impermissible group and

conclusory pleading—particularly as to whether Hojnacki had, at any point, the requisite fraudulent intent to be held liable under RICO—and should be dismissed on that basis, as well.[49]

As to the *SunEdison* declarations, in addition to failing to allege what was misleading about Hojnacki's filings, *see supra* Argument § I.A, Alix does not allege any fact that gives rise to an inference—let alone the requisite strong inference—that Hojnacki acted with scienter. Alix alleges in conclusory fashion that "Hojnacki . . . [was] aware of all of these dozens of connections" that were not disclosed in *SunEdison*, SAC ¶ 249, but provides no factual basis for this assertion or, further, for any claim that Hojnacki knew that such connections were required to be disclosed. Alix similarly provides no basis for his allegation that Hojnacki made a "misleading" disclosure about McKinsey's business arrangement with SunEdison's CEO or knew about allegedly improper invoices. Crucially, Alix never even alleges that Hojnacki knew those allegedly pertinent facts.[50] *See* SAC ¶¶ 255–64, 272–77. This is insufficient as a matter of law to allege Hojnacki's fraudulent intent in *SunEdison*. *See, e.g.*, *Jus Punjabi, LLC v. Get Punjabi Inc.*, 2015 WL 2400182, at *7 (S.D.N.Y. May 20, 2015) (dismissing claims because plaintiffs "fail[ed] to allege that any of the defendants had *knowledge*" of those acts (emphasis in original)), *aff'd*, 640 F. App'x 56 (2d Cir. 2016).

As to *Westmoreland*, Alix describes at length Hojnacki's declarations, his deposition in that case, and the court hearings concerning McKinsey's retention, SAC ¶¶ 326–53, but he does not offer a single fact to suggest that Hojnacki knew that any statement he made was even inaccurate, let alone fraudulent. Alix asserts that because Hojnacki read a *Wall Street Journal*

---

[49] The SAC also fails to allege that Hojnacki acted with the requisite intent to deprive anyone of money or property.

[50] McKinsey openly disclosed that an RTS member knew the SunEdison CEO, Ahmad Chatila, SAC ¶ 272, and that "[a]n affiliate of McKinsey RTS US entered into a business arrangement unrelated to SunEdison, Inc. with an entity for which Mr. Ahmad Chatila is a senior officer," Ex. 12-E, *SunEdison*, Dkt. 2614 ¶ 7. Although Alix now asserts that it was fraudulent for McKinsey not to disclose every detail of Sternfels' and Chatila's friendship and the "business arrangement" with Chatila's company, SAC ¶¶ 275–76, Alix's idle curiosity and conspiratorial speculation do not render McKinsey's actual disclosures fraudulent. *See also infra* Argument § I.E.8.

article that discussed MIO's investment in a hedge fund that, in turn, held an interest in a company formed as a result of the *ANR* bankruptcy, and did not disclose this interest in *Westmoreland*, he intended to mislead the court.  SAC ¶ 424.  But Alix glosses over the fact that Hojnacki disclosed that McKinsey was aware of the *Journal* article in the very first declaration he filed in *Westmoreland*.  *See* Ex. 14-A, *Westmoreland* Dkt. 452 ¶ 41.  Far from giving rise to a strong inference of fraudulent intent, Hojnacki's disclosure indicates that he did not intend to mislead anyone.[51]  Alix's allegations as to *Westmoreland* thus fail to plead that Hojnacki acted with the requisite scienter.  *See, e.g.*, *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 439 (S.D.N.Y. 2017) ("In making [a] determination [regarding the adequacy of pleading intent], the Court must . . . take into account plausible opposing inferences." (quotations omitted)).

A raft of Alix's other allegations also undermine any inference that Hojnacki acted with an intent to defraud.  In fact, the most plausible inference to draw from the allegations is that Hojnacki acted in good faith, relying upon the judgment of legal professionals who devised McKinsey's disclosure methodology and prepared and reviewed his declarations.  For example, the SAC repeatedly alleges that McKinsey's attorneys, including the General Counsel, were "intimately involved in preparing Hojnacki's" declarations.  SAC ¶ 239; *see also* SAC ¶¶ 44 (alleging that the General Counsel "was intimately involved with McKinsey's bankruptcy disclosures and was a primary architect" of McKinsey's disclosure methodology); ¶¶ 84–85 (alleging the General Counsel "devised the manner in which McKinsey searched for connections to Interested Parties" in *SunEdison* and *Westmoreland*); ¶ 96 (alleging that the General Counsel

---

[51] Additionally, Alix's allegations that a senior partner at McKinsey made the decision not to disclose MIO connections in *Westmoreland*, SAC ¶ 338, as well as his allegations concerning the role of counsel in the preparation and review of the *Westmoreland* declarations, *see, e.g.*, SAC ¶¶ 327, 339, 423, 489(i); *see also infra*, belie the notion that any failure to disclose an MIO connection was an intentionally fraudulent act by Hojnacki.

"was involved in the Rule 2014 disclosures filed by McKinsey ever since McKinsey started performing bankruptcy work" and "had ultimate legal responsibility for McKinsey's compliance with bankruptcy laws"); ¶ 132 (alleging the General Counsel's "involvement in the preparation of" McKinsey declarations "through at least the Hojnacki declarations in *Westmoreland*"); ¶ 239 (alleging a McKinsey lawyer consulted with the U.S. Trustee "before and after Hojnacki filed his first declaration in *SunEdison*"); ¶ 401(k) (alleging McKinsey's General Counsel "was directly involved in the preparation of and approval of all declarations filed on behalf of McKinsey RTS" and "devised McKinsey's methods for disclosures"); ¶ 416 (alleging a McKinsey lawyer "worked on . . . disclosures in *SunEdison*" and "draft[ed] the SunEd Protocol," *i.e.*, the manner in which McKinsey approached disclosures beginning with that case). Alix even alleges repeated consultation by McKinsey's General Counsel with company personnel senior to Hojnacki about his *Westmoreland* declarations, which employed the same approach as that used in *SunEdison*. SAC ¶ 327; *see also* SAC ¶ 418 (discussing the "McKinsey personnel preparing" the Hojnacki declarations in *Westmoreland*" without reference to Hojnacki). These allegations inescapably give rise to the inference that Hojnacki participated in good faith in the disclosure process, with the advice and oversight of his colleagues (including lawyers)—*not* that he acted with any fraudulent intent. *See, e.g.*, *First Cap. Asset Mgmt., Inc. v. Brickelbush, Inc.*, 150 F. Supp. 2d 624, 632 (S.D.N.Y. 2001) (dismissing RICO claim where there was a "dearth of facts supporting such an inference [of fraudulent intent], but several allegations undermine it"), *aff'd*, 385 F.3d 159 (2d Cir. 2004).

In an attempt to rescue these deficient allegations, Alix uses Hojnacki's former employment at AlixPartners as a proxy for the claim that he knowingly engaged in RICO predicate acts. SAC ¶ 489(m). This allegation—which does not even provide any details

concerning Hojnacki's role at AlixPartners over a decade ago—is entirely devoid of content in terms of what Hojnacki knew or intended in engaging in any act alleged in the SAC.  Similarly, there is absolutely no allegation in the SAC that Hojnacki had a particularized motive to submit fraudulent declarations in any bankruptcy.  *See, e.g.*, *supra* Argument § I.B.3.

For all these reasons, Alix fails to adequately allege any RICO predicates against Hojnacki in connection with the *SunEdison* or *Westmoreland* cases, or otherwise.[52]  *See Thai Airways Int'l Ltd. v. United Aviation Leasing B.V.*, 891 F. Supp. 113, 119 (S.D.N.Y. 1994) ("A pattern of racketeering can be comprised of only those fraud-based predicate acts which survive the Rule 9(b) analysis."), *aff'd*, 59 F.3d 20 (2d Cir. 1995).

Although Alix, at times, makes glancing references to Hojnacki in the claims concerning certain other bankruptcies, those allegations are patently deficient.  To begin, undifferentiated group allegations concerning "Defendants," *see, e.g.*, SAC ¶¶ 86, 185, fail as a matter of law to state a claim against Hojnacki.  *See, e.g.*, *Hao Zhe Wang v. Verizon Commc'ns Inc.*, 2020 WL 5982882, at *2 (S.D.N.Y. Oct. 8, 2020) (Furman, J.) (plaintiff fails to satisfy Rule 8 standard "[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct" (quoting *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001))); *see also supra* Argument § I.E.

Although the SAC is purposefully muddy as to exactly which bankruptcies Hojnacki had any involvement in, what is clear is that eight of the fourteen bankruptcy applications at issue occurred before Hojnacki even joined McKinsey in 2013.  Further, Alix does not allege that Hojnacki had even a shred of involvement with two of the remaining six bankruptcies:  *NII* and *Standard Register*.  And while Alix summarily alleges that Hojnacki aided and abetted

---

[52] Nor is Hojnacki alleged to have had any involvement in either the purported "pay-to-play" scheme or the discussions between Alix and Barton, which are alleged to have occurred at a time when Hojnacki was not even a partner at McKinsey.

bankruptcy fraud in *ANR* and *GenOn*, SAC ¶ 414, Alix nowhere alleges anything that Hojnacki himself actually *did* in those cases.  To the contrary, Alix elsewhere pleads that Hojnacki's involvement was limited to *SunEdison* and *Westmoreland*.  SAC ¶ 424.  Nor does Alix allege any facts to support the curious inclusion of Hojnacki on the SAC's list of so-called "ANR Obstruction Defendants," SAC ¶ 438, who are alleged to have obstructed justice and engaged in witness tampering in that case, SAC ¶¶ 438, 461, 469.

Because, like the allegations relating to *SunEdison* and *Westmoreland*, the allegations regarding Hojnacki's purported role in *ANR* and *GenOn* are wholly unsupported, all substantive RICO claims against Hojnacki should be dismissed.  *See, e.g.*, *Swanhart v. New York*, 2022 WL 875846, at *9 (S.D.N.Y. Mar. 24, 2022) ("[T]he [C]ourt cannot simply 'fill in the blanks' to supply what is missing, on a motion to dismiss, or follow a bread crumb trail of a represented plaintiff.  Put differently, at this stage, the Court is not required to either speculate or puzzle out Plaintiffs' allegations in such a way that the Court would be effectively pleading Plaintiffs' claim for them." (quotations omitted)).

### 6.      Jean Molino

The allegations against Jean Molino, McKinsey's former General Counsel—newly named as a defendant in the SAC, over four years after this case was commenced—are likewise incurably deficient.  Preliminarily, all of Alix's claims against Molino are time-barred with the exception of those predicated on the *Westmoreland* bankruptcy.  *Infra* Argument § II.C

In addition, the SAC is devoid of any viable allegations of predicate acts by Molino. There is no allegation that Molino herself ever signed (or even drafted) any disclosure affidavit, sought out bankruptcy engagements on McKinsey's behalf, or contacted any debtor or its advisors in any McKinsey bankruptcy matter, let alone engaged in "pay-to-play" bribery or

witness tampering.  Likewise, there is not a single non-conclusory allegation that Molino knew

that any of McKinsey's challenged disclosures were misleading, intentionally or otherwise.

At most, Molino is alleged to have "invented" McKinsey's "direct commercial

relationship" test (in 2022), and to have been "intimately involved" with preparing McKinsey's

bankruptcy disclosures and declarations.  SAC ¶¶ 44, 80, 239, 336, 339.[53]  But these allegations

do not come close to meeting the specificity required by Rule 9(b).  The SAC is particularly

lacking in viable allegations that Molino knew the "direct commercial relationship test" or any of

McKinsey's disclosures or declarations were fraudulent, beyond conclusory allegations that

Molino was "aware" or "fully aware" of certain (conclusory) facts.  SAC ¶¶ 77, 80, 82, 102, 110,

249.

Molino's alleged invention of the "direct commercial transaction or relationship" test is

not a predicate act under any cognizable legal theory.  SAC ¶¶ 79–80.  For one, Alix fails to

sufficiently allege how or why the test—which McKinsey openly employed *and* disclosed

contemporaneously to the relevant bankruptcy courts—could possibly be deemed fraudulent.

*See Blitz v. Bliss*, 1987 WL 14634, at *23 (S.D.N.Y. July 15, 1987) ("[A] review of [the

individual defendants'] 'scheme of fraud' reveals a series of legitimate business decisions,"

rather than fraud); *Sanchez*, 2015 WL 3540836, at *11 (granting dismissal for failure to satisfy

Rule 9(b) where reports were "alleged to be fraudulent in and of themselves," but plaintiffs failed

to allege, *inter alia*, how and why the reports were false or misleading).

Nor does Alix allege that in (allegedly) creating that test, Molino had an intent to defraud

anyone.  *See supra* Argument § I.B (RICO claims require plaintiff to plead facts supporting a

"strong inference" of fraudulent intent.").  McKinsey's disclosures openly informed the court

---

[53] As discussed *supra* Argument § I.A, the SAC does not adequately state a cause of action predicated on
McKinsey's bankruptcy disclosures or the methodology they openly employed and disclosed.

and other participants in the bankruptcy proceedings (1) what McKinsey was disclosing; (2) what McKinsey was not disclosing; and (3) why.  Alix does not—and cannot—allege that Molino acted with fraudulent intent in devising such disclosures, or was doing anything other than working with outside counsel and others in her role as an attorney.  *Cf. In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *15 (S.D.N.Y. July 15, 2016) ("'[A]lthough attorneys are not immune from liability simply because they represent a client, legitimate acts of attorneys on behalf of clients cannot form the basis of a RICO claim.'" (quoting *Morin v. Trupin*, 711 F. Supp. 97, 105 (S.D.N.Y. 1989)).  By the same token, Molino also is not alleged to have had any profit motive to "devise[]" the purported test, or to have benefited personally, other than generically as a McKinsey partner, from its use.  SAC ¶ 79.

The SAC also contains no particularized allegations that Molino knew the disclosures she supposedly "reviewed" and "signed-off on" were fraudulent, or knew that other McKinsey employees were intentionally drafting fraudulent affidavits.  Even for those declarations that Molino allegedly assisted in "prepar[ing]" in *Westmoreland* (SAC ¶¶ 129, 132), the SAC fails to state any non-conclusory predicate act committed by Molino outside of her role as General Counsel.  The SAC attempts to dodge this deficiency by alleging that Molino was "informed" of Alix's accusations concerning McKinsey's disclosure practices via discussions with other McKinsey executives.  SAC ¶ 152.  But this allegation falls well short of creating the requisite "strong inference" that Molino in some way *knew* (or even believed) the disclosures were fraudulent.  *See Shields*, 25 F.3d at 1129 (finding "conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b)" because "such allegations are so broad and conclusory as to be meaningless" (quotations omitted)).

At most—even if the allegations could meet the particularity requirements of Rule 9(b)—the SAC's accusations of advising, reviewing, or providing legal sign-off on the purportedly fraudulent Rule 2014 disclosures are tantamount to claims for aiding-and-abetting predicate acts. *See* SAC ¶¶ 162, 170, 173, 190, 192, 441, 451.  But as discussed above, *see supra* Argument § I.D, a RICO claim under § 1962(c) cannot be based on the aiding and abetting of predicate acts.  Alix thus fails to meet his pleading burden as to Molino's commission of any predicate acts and the claims against her should be dismissed.

### 7.   Alison Proshan

Conspicuously absent from the allegations against Alison Proshan—an in-house lawyer for McKinsey and the only Defendant who is not a McKinsey partner—is what she actually did beyond helping to prepare Rule 2014 disclosures under the supervision of the company's General Counsel and the declarants themselves.  *See, e.g.*, SAC ¶ 162 ("Carmody was assisted in preparing those . . . disclosures by Proshan and Molino"); ¶ 173 ("And once again, Proshan and Molino assisted Carmody in preparing his . . . disclosures."); ¶ 190 (similar).  Alix does not allege with specificity anything Proshan actually said to anyone (deceptive or otherwise), much less facts that would support a "strong inference" that she knew statements made by others were false or misleading.  Nor does Alix allege that Proshan created McKinsey's approach to bankruptcy disclosure—which by the SAC's own account was developed by others years before Proshan joined the firm.  *See, e.g.*, SAC ¶¶ 44, 79.  Rather, the SAC simply alleges (over and over again) that Proshan, in her capacity as a lawyer, assisted her client with bankruptcy submissions in accord with an approach developed by her employer and accepted by bankruptcy courts for a decade before she came to McKinsey.  Such allegations do not, without more, plausibly state any claim, let alone one for fraud-based racketeering.  *See Gen. Motors*, 2016 WL 3920353, at *15 ("[A]lthough attorneys are not immune from liability simply because they

represent a client, legitimate acts of attorneys on behalf of clients cannot form the basis of a RICO claim." (quoting *Morin*, 711 F. Supp. at 105)).[54]

And there is nothing more here. The SAC does not contain a single factual allegation plausibly tying Proshan to any alleged witness tampering, obstruction of justice, money laundering, or "pay-to-play" bribery. Moreover, Proshan did not sign any bankruptcy declarations and therefore could not herself have committed bankruptcy fraud. *See supra* Argument § I.C.1. And while the SAC alleges that Proshan was in "contact" with the U.S. Trustee's office (SAC ¶ 691), and together with Carmody "fraudulently induced" it to withdraw certain legal filings (SAC ¶ 21), it does not identify what she supposedly said (much less why it was misleading), and therefore flunks the basic requirements of Rule 9(b). *See supra* Argument § I.B.[55]

Thus, the *sole* ground for Proshan's inclusion in this case is Alix's assertion that her legal advice amounted to mail and wire fraud. But even setting aside that McKinsey's disclosures were neither false nor misleading, *see supra* Argument § I.A, the SAC alleges no facts from which one could draw an inference, let alone a "strong inference," that Proshan provided legal advice with even a scintilla of fraudulent intent. *Sanchez*, 2015 WL 3540836, at *10; *see supra* Argument § I.B. Despite its length, the SAC does not plausibly suggest that Proshan was aware that any of RTS's Rule 2014 disclosures were false or misleading, much less that she intended any of them to be so. To the contrary, it primarily offers the plainly insufficient allegation that she was involved in the preparation of disclosures that Alix maintains are deficient—and from

---

[54] Indeed, one is left to wonder whether Alix asserts claims against Proshan "for the sole purpose of forcing counsel to divulge confidential material in order to defend" herself. *First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 110 F.R.D. 557, 566 (S.D.N.Y. 1986).

[55] Similarly insufficient is Alix's generalized allegation that Proshan and others provided "false" information to McKinsey's counsel in connection with a court hearing. *See* SAC ¶ 217.

that alone asserts in conclusory fashion that Proshan therefore must have intentionally committed or aided and abetted multiple predicate acts.

Alix falls far short even in the rare instances he attempts to provide specificity.  For example, Alix alleges Proshan knew that McKinsey failed to disclose that MIO had invested in a hedge fund (Whitebox) that in turn had invested in a company formed with debtor assets in the *ANR* reorganization.  *See, e.g.*, SAC ¶ 452.  All the SAC actually alleges, however, is that Proshan could have known that the hedge fund was an interested party because she attended a deposition—*after* McKinsey filed its declarations—where the deponent identified once in passing multiple entities, including the fund, as lenders in *ANR*.  *See* SAC ¶¶ 230, 452.  The SAC conspicuously does not allege that Proshan knew that MIO had invested in the hedge fund or that the hedge fund was invested in an entity that had purchased the *ANR* debtor's assets, let alone that connections to the hedge fund even needed to be disclosed, given the fund's absence from the IP List provided to RTS.  *See also supra* Argument § I.E.2.  Alix's allegations are plainly insufficient.[56]

Nor does the SAC allege facts suggesting that Proshan acted with reckless disregard or consciously avoided the truth in providing legal services.  To the contrary, the few specific allegations about Proshan's legal advice demonstrate that she took seriously McKinsey's disclosure obligations.  For example, Alix alleges that Proshan co-authored McKinsey's internal "Bankruptcy 101" guide, which, by Alix's own account, "detailed how to disclose"—and stressed the importance of disclosing—"bankruptcy connections."  SAC ¶¶ 170, 489(j).  In addition, the "*SunEd* Protocol" allegedly "draft[ed]" by Proshan (SAC ¶ 416) resulted in greater, not lesser, disclosure, because it called for the identification of connections by name; it also

---

[56] Indeed, even if the Court were constrained to assume otherwise at this stage, allegations regarding a single disclosure would not suffice to establish that Proshan engaged in the requisite "pattern" of RICO predicates.

continued McKinsey's fully transparent (and neither false nor misleading) practice of saying what it was, and was not, disclosing, *supra* Argument § I.A.[57]

Finally, the SAC does not offer any motive as to why Proshan would have chosen to participate in any RICO enterprise or alleged fraudulent scheme. It nowhere alleges that she received a share of any profits from bankruptcy engagements. Indeed, Proshan was not a McKinsey partner, and mere employment by McKinsey is, as a matter of law, insufficient to allege the requisite intent. *Sanchez*, 2015 WL 3540836, at *8; *supra* Argument § I.B.3. Because the SAC is entirely devoid of any specific facts supporting an inference of wrongful knowledge, intent, or motive on Proshan's part, the RICO claims against her should be dismissed.

### 8.    Robert Sternfels

The SAC likewise has little to say about Robert Sternfels, besides that he was a senior McKinsey partner. *See* SAC ¶ 46. (He is now McKinsey's Global Managing Partner.) Instead of alleging that Sternfels did some wrongful act, Alix focuses on Sternfels' position at the firm, alleging that he had "ultimate authority and oversight," "a high degree of executive authority," and "a significant managerial role." SAC ¶¶ 401(f), 420. Even more plainly highlighting the deficiency of his pleading, Alix repeatedly alleges that Sternfels "did nothing to stop McKinsey's [supposedly] unlawful practices." SAC ¶¶ 401(f), 692. But no matter how Alix dresses it up, he cannot spin allegations of inaction into RICO predicate acts.

The few specific allegations lodged against Sternfels are plainly deficient. For example, Alix alleges that Sternfels listened in on two telephone calls between Alix and Barton in September 2014, and that he told others about those calls. SAC ¶¶ 30, 143–149, 152, 401(f). But absent some allegation that Sternfels did something improper on those calls (and there is

---

[57] In any event, the SAC alleges that the protocol was "devised" by Proshan's supervisor (SAC ¶ 85), attributing to Proshan the more limited role of "drafting" or "author[ing]" it (SAC ¶¶ 416, 691).

none), *id.*, listening in on calls where one's business rival rants about perceived misdeeds is not relevant to anything—certainly not fraud.  Alix also alleges that Sternfels led "the SunEdison bankruptcy engagement" for RTS.  SAC ¶ 239.  But apart from barebones allegations that Sternfels "consulted" with Goldstrom and Proshan "regarding [] RTS's disclosures in that matter," Alix does not allege anything Sternfels actually did in that supposedly "major role."  *Id.* And Alix does not allege how consulting an in-house lawyer or an RTS employee constitutes fraud.  Finally, Alix claims that Sternfels "corruptly persuad[ed] Hojnacki" to provide "non-truthful or misleading testimony in the . . . disclosure declarations filed" in *SunEdison*. SAC ¶ 465.  But that too is nakedly conclusory.  Alix never even bothers to allege which of the five RTS declarations Sternfels supposedly influenced—much less how Sternfels did so or what purportedly false statements he elicited.

In a truly breathtaking turn, the SAC concocts a wild tale of "unlawful quid pro quo" based on Sternfels' alleged "longtime personal friend[ship]" with the then-CEO of SunEdison. SAC ¶¶ 275, 401(f).  Because RTS's *SunEdison* declaration disclosed a "business arrangement" with that CEO, Alix speculates that RTS must have promised him "post-bankruptcy employment" in exchange for getting RTS's pre-petition invoices paid.  *See* SAC ¶¶ 276, 401(f). But Alix explicitly acknowledges that these allegations present nothing more than a "troubling question" about what might have happened.  SAC ¶ 273.  Stretching further still, Alix alleges merely that Sternfels "likely participated" in this alleged scheme.  SAC ¶ 401(f).  To adequately state a claim, however, Alix must plead facts that plausibly constitute a RICO predicate, not just delve into conspiratorial "questions."  The claims against Sternfels should be dismissed.

### 9.    Jared Yerian

The allegations against Jared Yerian, a former McKinsey partner,[58] fare no better. Stripped of its rhetoric, conclusions, and irrelevant filler, the SAC's factual allegations as to Yerian are that he signed Rule 2014(a) disclosures in the *Edison Mission* bankruptcy in 2012 and 2013—well beyond the statute of limitations period—that identified McKinsey connections by category rather than by name, and that those disclosures supposedly understated the number of connections to certain categories of Interested Parties.  *See* SAC ¶¶ 131–36, 401(m), 422, 459(d).

Each of the disclosures Yerian signed plainly explained RTS's search methodology and what was being disclosed, *i.e.*, the connections over the past three years of the RTS team members serving the Debtors.  *See* Ex. 8-A, *Edison Mission* Dkt. 175-3 ¶¶ 20–21; Ex. 8-B, *Edison Mission* Dkt. 756 ¶¶ 8–9; Ex. 8-C, *Edison Mission* Dkt. 1615 ¶ 8.  Critically, there are no allegations that Yerian misstated the way in which RTS sought to identify its connections.  Nor are there allegations that Yerian personally researched potential connections; knew he could not rely on the judgment of those who did; believed the rules required disclosure of connections by name; or thought McKinsey would be disqualified had it made disclosures by name.  And importantly, although the SAC lists supposed connections that were not contained in the *Edison Mission* disclosures, SAC, Ex. B at 16–31, it does not allege that any of those allegedly omitted connections were within the scope of what was being disclosed—three years of connections of the RTS team members serving the Debtors.  Finally, there are no allegations that Yerian was involved in (and/or aided and abetted any acts in connection with) any bankruptcy case other than *Edison Mission* (SAC ¶ 414), let alone that he directed the criminal enterprise Alix now

---

[58]  Yerian left McKinsey in March 2016.  SAC ¶ 47.

claims existed.[59]

Against this backdrop, the factual allegations in the SAC regarding Yerian are wholly consistent with his good-faith belief that he was executing RTS's legitimate business activities. Among other things, the SAC concedes that the methodology used to prepare the disclosures in *Edison Mission* had been in place for more than a decade before Yerian joined RTS, SAC ¶¶ 92–136 & Ex. A, that McKinsey and Yerian were advised by "some of the most sophisticated legal counsel in the world," SAC ¶ 149, that McKinsey's in-house and general counsel were "instrumental in preparing and revising" the declarations he executed on behalf of McKinsey RTS, SAC ¶ 132, that McKinsey's business relationships were "complex[]," SAC ¶ 91, and that Alix did not question or challenge RTS's methodology until September 2014—well after the *Edison Mission* case, SAC ¶ 143.  Again, the disclosures Yerian signed stated the scope of RTS's disclosures, that RTS disclosed its connections by descriptive category, rather than by name, and the reason for doing so.  *E.g.*, Ex. 8-A, *Edison Mission* Dkt. 175-3 ¶¶ 18–19 (describing the confidential nature of McKinsey's and RTS's engagements).  The allegations concerning Yerian are thus fully consistent with the conclusion that he signed the disclosures as a representative of RTS as part of a good-faith effort to provide services to debtors.

## II. Alix's RICO Claims Are Barred in Substantial Part by the Statute of Limitations

RICO's statute of limitations bars claims based on the earliest eight bankruptcy engagements at issue in the case.  Moreover, all claims should be dismissed against three Individual Defendants whose alleged actions (if any) are limited to those time-barred engagements, and claims based on all but one bankruptcy should be dismissed as to the two

---

[59] Remarkably, the only allegations of "aiding and abetting" against Yerian are with respect to his filing of the declarations in *Edison Mission* (SAC ¶ 422), *i.e.*, the identical—untimely—actions alleged as his purported predicate acts.  How one can aid and abet one's own actions is a question for another day.  Suffice to say, Alix's boilerplate, conclusory allegations as to Yerian's aiding and abetting of his own conduct does nothing to save Alix's otherwise infirm claims.

Individual Defendants named for the first time in the SAC.

### A.      Alix's Claims Based on the Earliest Eight Bankruptcy Cases Are Time-Barred Against All Defendants

RICO claims are subject to a four-year statute of limitations, *Rotella v. Wood*, 528 U.S. 549, 552 (2000), which begins to run when the plaintiff discovered, or should have discovered, his claimed injury. *Koch v. Christie's Int'l*, 699 F.3d 141, 148, 150 (2d Cir. 2012) (this strict accrual rule "hold[s] plaintiffs to a high standard"). Even if a plaintiff does not know of his injury when it first occurs, the limitations period still begins when, based on reasonable diligence, he was on "inquiry notice" of the injury. *Id.* at 150–53. Each alleged RICO injury must satisfy the statute of limitations, because a "plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 181 (1997).

According to Alix, the injuries at issue are AlixPartners' loss of "restructuring assignments it would have acquired" in each bankruptcy case. SAC ¶ 493. Where, as here, a plaintiff claims RICO injury based on known lost business, the limitations period begins when the business was lost, whether or not the plaintiff knew that the cause was alleged wrongdoing. *E.g.*, *Crown Chevrolet v. Gen. Motors, LLC*, 637 F. App'x 446, 446–47 (9th Cir. 2016) (applying *Rotella* and affirming dismissal of RICO claim). Thus, the limitations period for the alleged harm here was triggered—at the latest—when each bankruptcy court approved McKinsey's retention. The purported injuries would have been apparent to AlixPartners—and a matter of public record—at that time, giving AlixPartners four years to pursue a RICO claim based on those alleged injuries. In the first eight of the fourteen bankruptcies at issue, courts approved McKinsey's retention more than four years before Alix filed this action on May 9, 2018:

| Case | Retention Approved |
|---|---|
| *Hayes* | February 14, 2002 (Dkt. 375) |
| *UAL* | February 27, 2003 (Dkt. 1607) |
| *Mirant* | December 4, 2003 (Dkt. 2036) |
| *Lyondell* | July 23, 2009 (Dkt. 2327) |
| *Harry & David* | April 26, 2011 (Dkt. 218) |
| *AMR* | March 2, 2012 (Dkt. 1553) |
| *AMF Bowling* | December 17, 2012 (Dkt. 256) |
| *Edison Mission* | January 17, 2013 (Dkt. 329) |

Alix's claims against all Defendants therefore should be dismissed to the extent that they are based on the earliest eight bankruptcy cases in the SAC.

### B.   The Statute of Limitations Bars All of Alix's Claims Against Defendants Yerian, Goldstrom, and Garcia

The statute of limitations requires dismissal of all claims against Yerian, Goldstrom, and Garcia, who are not alleged to have committed any predicate acts that caused AlixPartners injury within the four-year limitations period.  *See, e.g.*, *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 266 (S.D.N.Y. 2006) (explaining that where defendant was "only alleged to have engaged in predicate acts related to" a time-barred injury, "the claims against him must be dismissed from this action on statute of limitations grounds").

### 1.   Jared Yerian

Yerian is alleged to have signed Rule 2014(a) disclosures in connection with only *Edison Mission*.  As noted in the preceding section, McKinsey's retention was more than five years before Alix filed his initial complaint (which did not name Yerian as a defendant), and almost six years before he added Yerian as a defendant in the first amended complaint on September 4, 2018.  Because Alix did not assert claims against Yerian until after the limitations period ran, the SAC is untimely as to him.

Indeed, even if the statute of limitations did not run until Alix was on actual notice of both the fraud and the injury (which is not the case), Yerian still must be dismissed.  Alix openly

admits that he was aware of the Defendants' alleged illegal scheme by no later than September 3, 2014, when he claims to have lectured Barton and Sternfels on McKinsey's supposed criminal acts.  SAC ¶ 148.  Alix, however, did not file his complaint against Yerian until September 4, 2018, *four years and one day later*.[60]

### 2.    Seth Goldstrom

The SAC's few scattered allegations that address Goldstrom specifically are not only inadequate to plead racketeering violations, but also untimely.  Read fairly, the SAC alleges nothing more than that Goldstrom signed disclosures as RTS's corporate representative in the *Harry & David* and *AMR* bankruptcies in 2011 and 2013.  All of his declarations in those two cases were signed more than four years before the Complaint was filed, and are well outside the four-year RICO statute of limitations period.

These allegations effectively plead Alix out of court on statute of limitations grounds as to claims against Goldstrom.  McKinsey was retained in *Harry & David* on April 26, 2011, and in *AMR* on March 2, 2012; by those dates, AlixPartners knew it had not been retained.  RTS's final disclosures (signed by Goldstrom) in *Harry & David* and *AMR* were filed and available for AlixPartners to inspect on June 17, 2011 and April 18, 2013, respectively.  And RTS's fees for the *Harry & David* and *AMR* bankruptcies were confirmed on August 29, 2011 and October 21, 2013, respectively.  SAC ¶¶ 118, 121.  AlixPartners knew or with reasonable diligence could have discovered, by the time McKinsey was retained (and certainly by the time McKinsey was awarded fees) in those bankruptcies, the loss Alix claims here.  Because each of the dates above was more than four years before the Complaint was filed on May 9, 2018, Alix's claims against Goldstrom are time-barred and must be dismissed.

---

[60] The relation-back doctrine does not save Alix here as his decision to not include Yerian in his initial complaint was intentional, not a mistake.  *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 202 (S.D.N.Y. 2020) (quoting *Krupski v. Costa Crociere SPA*, 560 U.S. 538, 552 (2010)).

The SAC's other stray allegations about Goldstrom individually relate either to events outside the limitations period, or involve conduct insufficient to allege that Goldstrom engaged in predicate racketeering acts. These allegations are insufficient to allege any misconduct by Goldstrom within the limitations period. *See Klehr*, 521 U.S. at 181 (plaintiffs may recover for new injury caused by new *predicate act* within limitations period). For instance, Alix alleges that RTS's fee applications show Goldstrom's colleagues were "in communication with" Goldstrom or "consulted" him in connection with the *AMF Bowling* and *SunEdison* bankruptcies. SAC ¶¶ 129, 239, 416–20. The *SunEdison* fee application is 298 pages long and describes 14,784 hours of work for the debtor. *See* Ex. 16, *SunEdison* Dkt. 1421-6 at 237. The allegation as to Goldstrom's role is based on a single 30-minute time entry, referring to a discussion between Sternfels and "Seth Goldsrom [sic]" regarding disclosures. *Id.* at 98. Similarly, RTS's fee application in *AMF Bowling*—a case outside the limitations period— mentions Goldstrom only indirectly in connection with unspecified "correspondence" with Proshan, a McKinsey lawyer. Reference to a non-specific discussion or "correspondence" about disclosures is inadequate to allege that Goldstrom engaged in criminal conduct. Finally, the SAC does not allege that Goldstrom took any action in connection with the purported "pay-to-play" scheme, and therefore does not allege any related activity within the limitations period. Accordingly, Alix's claims against Goldstrom are untimely.

### 3.    Jon Garcia

The SAC makes no timely allegations against Garcia. The few allegations about Garcia focus almost exclusively on his title, position, or membership on various corporate boards. The only bankruptcy in which he is alleged to have taken any actions personally was *Edison Mission*, for which the four-year limitations period expired more than a year before this suit was filed. Even more untimely is any claim against Garcia based on Alix's allegation that Garcia spoke to

Carmody about McKinsey's "values" during Carmody's 2012 "onboarding process."  SAC

¶ 164.  And while Alix alleges that Garcia participated in some undisclosed senior-management

discussions about "the topic of disclosure," SAC ¶ 73, the SAC does not allege that those

conversations occurred within the limitations period.  Because Alix does not plead that any

alleged actions by Garcia fall within the limitations period, the claims against him should be

dismissed entirely.

### C.    Alix's Claims Based on All but the *Westmoreland* Bankruptcy Are Time-Barred Against Defendants Hojnacki and Molino

Claims concerning five more bankruptcies should be dismissed as to the newly-added

Defendants, Hojnacki and Molino, because the statute of limitations expired before Alix moved

for leave to file the SAC on June 30, 2022.[61]  *See In re Integrated Res. Real Est. L.P. Sec. Litig*.,

815 F. Supp. 620, 645 (S.D.N.Y. 1993).  The retention dates in those five cases are as follows:

| Case | Retention Approved |
|---|---|
| *NII* | November 12, 2014 (Dkt. 212) |
| *ANR* | September 17, 2015 (Dkt. 476) |
| *Standard Register* | June 23, 2016 (Dkt. 257) |
| *SunEdison* | June 23, 2016 (Dkt. 639) |
| *GenOn* | July 19, 2017 (Dkt. 231) |

Accordingly, the statute of limitations for any RICO claims against Hojnacki and Molino based

on those five additional bankruptcies expired well before June 30, 2022, and such claims are

time-barred.  In other words, out of the fourteen bankruptcies addressed in the SAC, Alix's

claims against Hojnacki and Molino are time-barred as to all but one (*Westmoreland*).

Nor can Alix invoke relation-back.  Under Federal Rule 15, relation-back applies where a

plaintiff "changes the party or the naming of the party against whom a claim is asserted," Fed. R.

Civ. P. 15(c)(1)(C), but in this case there has been no change in name or change of party.  Alix

---

[61] As discussed *supra* in Argument § I.E.5, there are no substantive allegations concerning Hojnacki's involvement in the *NII* or *Standard Register* matters, but were there any such allegations, they would be time-barred.

has simply added two additional parties.  Indeed, Alix identified Hojnacki and Molino both by name and job title in his prior complaints, yet chose not to name them as defendants.  *See* AC ¶¶ 128 (Molino), 131, 253, 350(g), 356 (Hojnacki).  Thus, Alix cannot show that his failure to name Hojnacki and Molino as defendants in his original complaint or first amended complaint was the result of a "mistake" about their identities as opposed to litigation strategy.  "'When the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision as opposed to a mistake concerning the proper defendant's identity, the requirements of Rule 15(c)(1)(C)(ii) are not met.'"  *Schiro*, 438 F. Supp. 3d at 202 (quoting *Krupski*, 560 U.S. at 552); *Boda v. Phelan*, 2012 WL 3241213, at *6 (E.D.N.Y. Aug. 6, 2012) (holding new claims did not relate back when the new defendant was identified "by name in the original complaint, demonstrating that plaintiff clearly knew of her identity and her role in the events giving rise to the claims at issue").  Because "[n]othing on the face of the original complaint suggests" that Alix made a mistake in naming the defendants, *Hart v. City of New York*, 2012 WL 5877436, at *3 (S.D.N.Y. Nov. 20, 2012), there is no relation-back.  *See Hahn v. Office & Prof. Emps. Int'l Union*, 107 F. Supp. 3d 379, 385 (S.D.N.Y. 2015) (no relation back when "[r]ather than suing the *wrong* party . . . [t]he plaintiff sued [what he believes is] the right defendant[s], and simply neglected to sue another defendant who might also be liable").

## III.   *ANR*-Related Claims Are Barred by Collateral Estoppel

In addition, claims based on McKinsey's disclosures and disinterestedness in the *ANR* bankruptcy case are foreclosed by the doctrine of collateral estoppel because Alix already litigated and lost on these very same issues in that litigation.

Collateral estoppel (or issue preclusion) prohibits "successive litigation of an issue or fact actually litigated," "whether or not the issue arises on the same or a different claim."  *New*

*Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  It applies where:  "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the part[ies] had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits."  *Wyly v. Weiss*, 697 F.3d 131, 141 (2d Cir. 2012).  The Court can dismiss claims based on issue preclusion "where, as here, the defense clearly applies on the face of the pleadings (and matters of which the Court can take judicial notice)."  *Morales v. Dep't of Educ. of City of New York*, 2019 WL 1228075, at *1–2 & n.3 (S.D.N.Y. Mar. 15, 2019) (Furman, J.) (dismissing due process claim because "issue preclusion bars [plaintiff] from asserting that she received anything less than an adequate hearing"); *see also, e.g.*, *Bristol v. Nassau Cty.*, 685 F. App'x 26, 28 (2d Cir. 2017) (district court properly considered public records that "bore directly on the question of issue preclusion").

Here, collateral estoppel precludes the SAC's claims related to *ANR*.  In *ANR*, Alix (through his wholly-owned bankruptcy-litigation vehicle, Mar-Bow) litigated McKinsey's disclosures and disinterestedness via objections to various bankruptcy court orders, and those arguments were repeatedly rejected by the court.  *See, e.g.*, *Mar-Bow*, 2017 WL 4414155, at *14 ("After patiently hearing Mar–Bow's challenge of McKinsey's Rule 2014 disclosures—now for at least the fourth time—the Bankruptcy Court granted McKinsey's Third Fee Application.").  In this RICO suit, Alix now tries to re-argue "the identical issue"—McKinsey's disinterestedness and the sufficiency of its bankruptcy disclosures, SAC ¶¶ 189(a), 207—which was both "actually litigated and decided" in *ANR* and was necessary to support the bankruptcy court's entry of a final plan confirmation order in that case.  *Mar-Bow*, 578 B.R. at 341 (bankruptcy court overruled Mar-Bow objection and stated "I'm absolutely satisfied, as I said before, McKinsey is

[a] disinterested party").  Moreover, Alix had a "full and fair opportunity to litigate" these issues in *ANR*, as shown by the multiple court hearings on his objections and unsuccessful appeals.

Those bankruptcy orders therefore bar relitigating *ANR* issues in this RICO action.  *See, e.g.*, *Wyly*, 697 F.3d at 144 (malpractice claims precluded by finding on "class counsel's adequacy" because it was "necessary to its judgment accepting the settlement"); *Singh v. Parnes*, 199 F. Supp. 2d 152, 158–60 (S.D.N.Y. 2002) (party cannot avoid preclusion by "recasting" prior claims "under the label of a federal RICO action").  Any claims in this lawsuit based on *ANR* should therefore be dismissed.

## IV.  Alix Fails to Allege Any RICO Enterprise Against the Corporate Defendants and Fails to Allege a Count 3 Enterprise Against All Defendants

Count 1—which pleads that RTS is the RICO enterprise—should be dismissed against the Corporate Defendants because it fails to adequately plead an "enterprise" that is separate and distinct from the Corporate Defendants named as RICO "persons."[62]  Likewise, Count 3—which attempts to plead an association-in-fact enterprise comprised of McKinsey and its bankruptcy consulting clients (and is the only other substantive count against the Corporate Defendants)— should be dismissed entirely because it alleges no facts supporting an inference that McKinsey and its clients joined together to pursue a common illegal end.

### A.  Count 1 Fails to Allege an Enterprise Distinct from the Corporate Defendants.

Count 1 fails to plead the existence of an enterprise that is separate and distinct from the Corporate Defendants themselves (the alleged RICO "persons").  Because § 1962(c) makes it unlawful for a "person employed by or associated with any enterprise" to conduct the

---

[62]  Alix cannot circumvent this failure by alleging that the Corporate Defendants are vicariously liable for the alleged RICO violations of the Individual Defendants.  SAC ¶¶ 491, 569, 667–72.  "[A] corporation may not be held vicariously liable under section 1962(c) for the acts of its employees if the corporation is also named as the RICO enterprise."  *Moses v. Martin*, 360 F. Supp. 2d 533, 551 (S.D.N.Y. 2005).  And, in any event, Alix fails to allege a RICO violation against any Individual Defendant.  *See supra* Argument § I.E.

"enterprise's affairs through a pattern of racketeering," a plaintiff claiming the violation of this

statute (as Alix does here) "must allege . . . the existence of *two distinct entities*: (1) a 'person';

and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."

*U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017) (emphasis added).

　　This "so-called 'distinctness' requirement," *Cruz*, 720 F.3d at 120, is critical where, as

here, a corporation is named as one of the RICO persons:  "Because a corporation can only

function through its employees and agents, any act of the corporation can be viewed as an act of

[a RICO] enterprise, and the enterprise is in reality no more than the defendant itself."

*Riverwoods Chappaqua Corp. v. Marine Midland Bank*, *N.A.*, 30 F.3d 339, 344 (2d Cir. 1994).

Accordingly, "where employees of a corporation associate together to commit a pattern of

predicate acts in the course of their employment and on behalf of the corporation, the employees

in association with the corporation do not form an enterprise distinct from the corporation."  *Id.*

For the same reason, "corporations that are legally separate but 'operate within a unified

corporate structure' and 'guided by a single corporate consciousness' cannot be both the

'enterprise' and the 'person' under § 1962(c)."  *Cruz*, 720 F.3d at 121 (quoting *Discon, Inc. v.

NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996)).

　　Count 1 alleges that RTS is the enterprise through which the other Defendants allegedly

conducted RICO predicate acts.  *See* SAC ¶¶ 395, 400.  RTS, however, is a wholly owned

subsidiary of the other Corporate Defendants.  *See* SAC ¶¶ 35–38; Dkt. 58.  Those entities are

therefore all part of a "unified corporate structure."  *Cruz*, 720 F.3d at 121.  Thus, Count 1

should be dismissed as to the Corporate Defendants for failure to allege RICO distinctness.  *See,

e.g.*, *Cruz*, 720 F.3d at 121; *Weir v. Cenlar FSB*, 2018 WL 3443173, at *7 (S.D.N.Y. July 17,

2018) ("Wholly owned subsidiaries are not distinct from their parent company."); *Sunwealth*

*Glob. HK Ltd. v. Pinder Int'l, Inc.*, 2021 WL 1145245, at \*10 (S.D.N.Y. Mar. 23, 2021) ("related companies" and "corporate siblings" do not satisfy the "distinctness requirement"); *Gen. Motors*, 2016 WL 3920353, at \*14 (dismissing claim for failure to allege "a common purpose or organized conduct separate and apart from New GM's ordinary affairs").

To the extent Alix argues that the Corporate Defendants used RTS's separate incorporation to "facilitate" allegedly wrongful conduct, the Second Circuit has considered and refused to adopt this very argument.  *U1it4less*, 871 F.3d at 208 n.12 ("[W]e do not here endorse the 'facilitation' test."); *id.* at 210 (Woods, J., concurring) (adding that the facilitation test "has no foundation in the jurisprudence of the Second Circuit").  In any event, Alix's allegation that RTS "was formed for the purpose of facilitating" the alleged "fraudulent and other criminal conduct . . . with the aim of unlawfully depriving [AlixPartners] of bankruptcy consulting engagements," SAC ¶ 395, is conclusory, facially absurd, and entitled to no weight.  Alix pleads nothing "fraudulent" about a company forming a subsidiary to engage in a particular line of business, which in any event occurred here a decade after the alleged scheme began and was prominently disclosed in RTS's declarations.  *See supra* Background § B; Argument § I.A.

**B.**     **Count 3 Fails to Allege an Association-In-Fact Enterprise.**

Count 3, purporting to allege an association-in-fact of "McKinsey" and its "bankruptcy consulting clients," SAC ¶¶ 581–82, also fails to allege a RICO enterprise.  The SAC does not plead specific facts showing that McKinsey *and its clients* shared "a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Cruz*, 720 F.3d at 120; *see also Gen. Motors*, 2016 WL 3920353, at \*14 (enterprise participants must be "devoted to the alleged illicit purpose" such "that the resulting whole functioned as a continuing unit"); *Lynn v. McCormick*, 760 F. App'x 51, 53 (2d Cir. 2019) (affirming dismissal where enterprise participants did not "share[] the goal of illegally depriving the plaintiffs of their

property [and] there [was] no suggestion as to why [the participants] would share that purpose").

　　The SAC alleges no facts supporting an inference that McKinsey and its bankruptcy consulting clients joined together "in a particular fraudulent course of conduct" to accomplish an illegal end. *Cruz*, 720 F.3d at 120. *Indeed, it alleges no specific conduct by any debtor client, at all.* All Alix alleges is that McKinsey personnel served as their clients' restructuring officers, including working onsite for certain assignments, SAC ¶¶ 581–82, indicating nothing more than a legitimate business relationship between McKinsey and its clients. *See Manhattan Telecomms. v. Dial Am. Mktg., Inc.*, 156 F. Supp. 2d 376, 383 (S.D.N.Y. 2001) (alleged enterprise consisting of corporation and its customers held insufficient because it "would essentially delete the enterprise element from the statute as every company would become a potential RICO 'person' associated in an enterprise with its customers"). Because Alix fails to allege a Count 3 enterprise at all, this failure compels its dismissal against all Defendants.

## V.    Alix Fails to Plead That Any of the Individual Defendants Conducted or Participated in the Conduct of a RICO Enterprise

　　All three substantive counts of the SAC fail as to all Individual Defendants because Alix does not plausibly allege that any Individual Defendants "conduct[ed], or participat[ed] . . . in the conduct of [the] enterprise's affairs" through a pattern of racketeering activity, as required to properly plead a § 1962(c) violation. 18 U.S.C. § 1962(c). The Supreme Court held in *Reves* that this requirement limits liability to those persons who "operated or managed" the affairs of the enterprise. 507 U.S. at 178–79.

　　Having a formal position in a corporate structure is not sufficient. Rather, a plaintiff must make specific allegations that a defendant played "some part in directing the enterprise's affairs." *See Crab House of Douglaston Inc. v. Newsday, Inc.*, 418 F. Supp. 2d 193, 206 (E.D.N.Y. 2006) (plaintiff did not satisfy *Reves* test where it failed to make any specific

allegation as to directors of a corporation).  "The polestar is *the activity in question*, not the defendant's status," title, or position in the corporate structure.  *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997) (emphasis added).  A plaintiff "may not rely solely upon defendants' 'positions of control' in an enterprise, and may not link individual defendants to fraudulent activities 'by stating only that [d]efendants were officers and shareholders" of the organization. *Sanchez*, 2015 WL 3540836, at *6 (quoting *Productores Asociados de Café Rio Claro, C.A. v. Barnett*, 1999 WL 287389, at *3 (S.D.N.Y. May 7, 1999)).  Further, "performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)."  *United States v. Viola*, 35 F.3d 37, 41 (2d Cir. 1994).

Here, Alix fails to allege facts sufficient to establish that any Individual Defendant operated or managed a purported RICO enterprise.  *See, e.g.*, *Redtail Leasing, Inc. v. Bellezza*, 1997 WL 603496, at *5 (S.D.N.Y. Sept. 30, 1997) (dismissing RICO claims against individuals where complaint failed to allege that they had a role in directing the affairs of the enterprise).

### A.    Alison Proshan

The SAC is patently deficient under *Reves* in its allegations against Proshan—the only Individual Defendant who is not a McKinsey partner—because the SAC alleges nothing more than that she provided legal services as an in-house McKinsey lawyer.  Time and again, courts have made clear that simply performing legal work in the course of one's employment—even where (unlike here) the legal work is intended to further or cover-up the frauds of others—is not sufficient to establish that the lawyer managed or directed a RICO enterprise.  *See, e.g.*, *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994).

The decision in *Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.*, 832 F. Supp. 585 (E.D.N.Y. 1993) is instructive.  There, an attorney was alleged to have known that his clients "were engaged in a fraudulent scheme."  *Id.* at 589.  The lawyer allegedly

79

"advised [his clients] how to avoid detection . . . , negotiated with [others] . . . to prevent [them] from discovering the scheme, . . . and advised one [client] that he could mislead th[e] court." *Id.* The allegations nevertheless failed to meet the requirements of *Reves* because the lawyer's alleged "role was confined, at all times, to providing legal advice and legal services," *id.* at 591—*no*t directing the affairs of the enterprise that used such services to commit fraud.

Other courts have similarly found that allegations of lawyers acting as lawyers fail to satisfy *Reves*. *Morin v. Trupin*, for example, granted a motion to dismiss a RICO claim where the plaintiff alleged that attorneys "facilitated the operation of the enterprise" by drafting key documents and directing other defendants on how to execute them. 835 F. Supp. 126 at 135. The court in *Gilmore v. Berg*, 820 F. Supp. 179, 183 (D.N.J. 1993) found that, even where an attorney made "alleged misrepresentations . . . which might constitute fraud in the sale of securities," such actions "did not constitute participation in the management or operation of a RICO enterprise" because the attorney was not alleged to have "direct[ed] the legal entities he represented to engage in [any] particular transactions." Whatever fault may lie with a lawyer in such circumstances, "courts d[o] not hold the attorney defendant[ ] liable for treble damages and attorneys fees under the RICO Act." *Biofeedtrac*, 832 F. Supp. at 591; *see also Azrielli*, 21 F.3d at 522–23 (RICO claims against defendant who "acted as no more than [an] attorney" properly dismissed even where he "may [still] be subject to liability under the securities laws" for allegedly false statements).

The requirements of *Reves* do not differ as between in-house and outside counsel. In *Rabang v. Kelly*, 2017 WL 1496415 (W.D. Wash. Apr. 26, 2017), for example, the court granted a motion to dismiss a RICO claim against an in-house lawyer who was alleged to have defrauded the plaintiffs out of their homes using the local court and housing authority. *Id.* at *8. Since the

allegations against the in-house lawyer concerned only the provision of legal services (including

the filing of an unlawful detainer action), the court concluded that he did not "direct" the

enterprise, as required under *Reves*.  *Id.*  "Performance of limited legal services," the court

explained, "may not constitute 'operation and management' of an enterprise."  *Id.* (citing *Baumer*

*v. Pachl*, 8 F.3d 1341 (9th Cir. 1993)).

So too, here.  The SAC alleges only that Proshan acted as an "associate general counsel"

for McKinsey and, in that role, "furnishe[d] in-house legal services to McKinsey," including

with respect to Rule 2014 disclosures.  SAC ¶¶ 401(i), 406.  But it does *not* allege that Proshan

did *anything* in connection with a supposed sprawling criminal enterprise other than provide

legal advice to, and serve as an attorney for, her employer.  At bottom, Alix's only attempt to tie

Proshan to the alleged enterprise is his vague assertion that her legal advice was given "in

furtherance of deliberate corporate policy sanctioned and actively furthered by senior

management."  SAC ¶ 425.  But an attorney does "not become a participant in directing the

enterprise's affairs by knowingly implementing decisions of upper management."  *Walter v.

Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008); *see also Baumer*, 8 F.3d at 1344 (attorney's

assistance in bankruptcy case as part of limited partnership's fraudulent scheme did not satisfy

*Reves*).  Moreover, as in *Biofeedtrac*, there is no allegation here that Proshan "was to receive

[any] remuneration other than ordinary fees for legal services, had the enterprise succeeded," 832

F. Supp. at 591—further distinguishing her provision of legal services from participation in an

alleged enterprise.

To be sure, "[a]n attorney . . . is not exempt from RICO liability . . . simply by virtue of

the attorney's . . . professional status."  *State Farm Mut. Auto. Ins. Co. v. Abrams*, 2000 WL

574466, at *11 (N.D. Ill. May 11, 2000).  But to direct the affairs of an enterprise, the attorney

must provide "services that go to the heart of the allegedly fraudulent scheme"—and "merely . . .

providing professional services" ("even with knowledge of the illicit nature of the alleged

enterprise") is not enough.  *Id*.  Thus, in *Abrams*, the attorney-defendants were alleged to have

taken numerous non-legal actions to facilitate the filing of false medical insurance claims, in

addition to "exert[ing] some level of financial control" over the larger alleged enterprise.  *Id*. at

*12-13.  Those non-legal activities served to distinguish the defendants in *Abrams* from those

dismissed in *Biofeedtrac*, *Morin*, and *Berg*—and from the allegations against Proshan here,

which do not claim that Proshan exercised any control over (or even participated in) the

operations or finances of McKinsey's bankruptcy advisory work.  Indeed, there is no allegation

that she took a single such action.

In sum, because the allegations against Proshan relate *solely* to her provision of legal

services, the claims against her must be dismissed for failure to satisfy *Reves*.

### B.     Seth Goldstrom, Kevin Carmody, and Jared Yerian

Similarly, the SAC fails to allege any act by Goldstrom, Carmody, or Yerian sufficient to

charge that they were responsible for the operation or management of any enterprise.  Aside from

amorphous allegations that these defendants "aided and abetted" undefined illegal acts of others,

the actual allegations regarding these Defendants are almost exclusively limited to signing

Rule 2014(a) disclosures.  SAC ¶¶ 407, 409, 411.  It is well-settled that the "performance of

tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a

defendant within the scope of § 1962(c)."  *Crab House*, 418 F. Supp. 2d at 207 (quoting *United

States v. Diaz,* 176 F.3d 52, 92 (2d Cir. 1999)).

The SAC includes no non-conclusory allegations that any of these three individuals

operated or managed a racketeering enterprise.  The SAC emphasizes the number of allegedly

false Rule 2014(a) disclosures executed by them, but the number of signed declarations has no

legal significance on this issue: "[i]n determining whether or not a defendant participated in the operation or management of the RICO enterprise, the . . . focus [is] on the *degree of control* the defendant exerted over the enterprise rather than the *amount of* defendant's involvement in the enterprise." *Vickers Stock Rsch. Corp. v. Quotron Sys., Inc.*, 1997 WL 420265, at *4 (S.D.N.Y. July 25, 1997) (emphasis in original); *see also Palatkevich v. Choupak*, 2014 WL 1509236, at *16 (S.D.N.Y. Jan. 24, 2014) (dismissing RICO claims against minority shareholder of corporate defendant where complaint alleged that, at the direction of others, the shareholder aided the scheme by providing false information to appraisal company and forced plaintiffs out of the business). In any event, even "reckless disregard of the truth when drafting documents does not justify a finding of RICO civil liability on the basis that the party participated in the illegal enterprise." *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F. Supp. 1362, 1370 (D. Conn. 1987).

The SAC alleges no concrete facts to show Goldstrom or Carmody exercised the requisite "degree of control" over the alleged enterprise. Rather, the SAC identifies certain "senior leaders" at McKinsey—not including Goldstrom or Carmody—who made the "final decision[s]" regarding McKinsey bankruptcy engagements, SAC ¶ 327, and alleges McKinsey's General Counsel not only "devised" McKinsey's approach to disclosures, SAC ¶¶ 79, 423, but also had "ultimate legal responsibility for McKinsey's compliance with bankruptcy laws," SAC ¶ 96. As to Goldstrom and Carmody, the SAC makes only innocuous allegations observing they were "Senior Partner[s]" of McKinsey & Co. and held leadership positions in RTS, SAC ¶¶ 401(h), (j). These allegations are wholly inadequate to allege that either "operated or managed" the affairs of an alleged racketeering enterprise. *See Handeen*, 112 F.3d at 1349.

The SAC's only specific allegations regarding Yerian's purported involvement in

operating the putative enterprises relate to his signing of Rule 2014(a) disclosures within the scope of his employment in the *Edison Mission* case.  SAC ¶¶ 401(c), (m).  Setting aside that Yerian is alleged to have been involved in only one case, the fact that he signed three separate declarations in that case is, as noted, irrelevant to his alleged "*degree of control*" over the alleged enterprise.  *Vickers*, 1997 WL 420265, at *4.  Notably, Alix does not allege that Yerian exercised any authority over McKinsey US's or RTS's activities.  *See* SAC ¶ 401.  Nor does he allege that Yerian was in RTS's senior leadership.  *See* SAC ¶ 156.  Alix thus implicitly concedes that Yerian was not at the level where he was directing or controlling the affairs of the purported enterprise.  This concession is dispositive as to the claims against Yerian.

In sum, the SAC fails under *Reves* for not alleging facts showing that Goldstrom, Carmody, or Yerian directed or managed any of the alleged RICO enterprises.

### C.    Jon Garcia and Robert Sternfels

Besides emphasizing their positions and titles at McKinsey, the SAC has little to say about Garcia and Sternfels.  Few allegations of specific acts of any sort are leveled against Garcia, much less acts that reflect his direction or management of a supposed RICO enterprise.  There are simply no allegations as to when, where, or how he exercised control over any of the three flavors of enterprise that Alix concocts in the SAC.  The best the SAC has to offer is that Garcia was allegedly in "communication" with in-house counsel about the fee application in a single case, *Edison Mission*, SAC ¶ 132, and a member of the ROC when it allegedly approved the filing of a disclosure declaration in *Westmoreland*, SAC ¶ 339.  But nothing in those allegations demonstrates that Garcia was aware of—much less managed—any purported fraud scheme.  Because Alix does not plead facts from which one could plausibly infer that Garcia exerted direction or control as required under *Reves*, the SAC fails to state a RICO claim against

him.[63]

The allegations against Sternfels are similarly lacking.  Apart from the repeated invocation of his title and conclusory allegations about his "ultimate authority," Sternfels is alleged to have joined two telephone calls between Alix and Barton, and to have "likely" been involved in some unidentified way in a "business arrangement" with the former SunEdison CEO almost one year after the *SunEdison* bankruptcy filing.  SAC ¶ 401(f).  But an unspecified business arrangement with someone outside of McKinsey who is not alleged to have been a member of any of the three supposed RICO enterprises does not establish that Sternfels operated or managed the enterprises alleged here.  Alix's allegations do not plausibly suggest that Sternfels directed or controlled the purportedly fraudulent scheme.  *See, e.g.*, *Biofeedtrac*, 832 F. Supp. at 591–92 ("[P]laintiff has adduced no facts to suggest that [defendant's] actual or projected role was to 'lead, run, manage, or direct' any part of the enterprise. Thus, he did not participate in the 'conduct' of an enterprise and did not violate § 1962(c).").

### D.    Dominic Barton

The allegations against Barton are insufficient to allege that he "operated or managed" the affairs of an alleged enterprise.  Alix's characterization of Barton as occupying the "senior-most executive position at McKinsey," and his claim that Barton had "ultimate executive authority over McKinsey's bankruptcy engagement activities as well as the other individual Defendants in this action," SAC ¶ 401(e), do nothing to change that.  Alix does not allege that Barton directly managed the bankruptcy consulting practice, and he concedes that Barton first learned about the supposed falsity of McKinsey's bankruptcy disclosures in the latter half of 2014, some thirteen years after the inception of the purported racketeering activity.  SAC

---

[63] Alix's allegation that Barton said he would fire RTS leadership because of their supposedly "illegal behavior," SAC ¶¶ 156–57, says absolutely nothing about whether Garcia "operated or managed" an alleged RICO enterprise under *Reves*.

¶¶ 143–52.  Nor is it alleged that, upon learning of an already existing RICO enterprise, Barton elected to join and direct its affairs.  Being put on notice of a fraudulent scheme and doing nothing to put a stop to it are insufficient to satisfy the *Reves* "operation or management" test. *See In re Agape Litig.*, 681 F. Supp. 2d 352, 369–70 (E.D.N.Y. 2010) (dismissing RICO claim where "[e]ven if the Court assumes that [the defendant] consciously ignored the fraud or provided important services to aid its commission, this would still be insufficient to show that [the defendant] directed or operated [the] scheme"); *Walter*, 538 F.3d at 1248 ("It is not enough that [defendant] failed to stop illegal activity, for *Reves* requires some degree of direction." (quotations omitted)); *Amsterdam Tobacco Inc. v. Philip Morris Inc.*, 107 F. Supp. 2d 210, 218 (S.D.N.Y. 2000) ("[E]ven if it [is] accepted as true . . . that [defendant] w[as] aware of smuggling activity, that would not suffice to support a RICO claim.").

Equally insufficient to satisfy *Reves* is the speculative claim that Barton sought to "deflect and delay" Alix's remediation efforts to prolong the life of the fraudulent scheme.  Even if Barton harbored such an intent and acted on it, at best it might constitute assistance to the enterprise, not the management or direction of it.  *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 347 (S.D.N.Y. 1998) ("There is no doubt that plaintiffs have alleged wrongful acts that were allegedly of real importance to Schick's scheme. . . .  However, when reduced to their essentials, these are really allegations of *assistance* to the alleged RICO enterprise, not direction of it.").  Accordingly, the SAC fails to allege that Barton conducted or participated in the conduct of a RICO enterprise, and the claims against him should be dismissed.

### E.     Jean Molino

The SAC fails to allege facts plausibly showing that Molino was even *aware* of any properly pleaded enterprise,[64] much less that she operated or managed one.  In fact, the SAC fails to advance a single allegation that Molino "managed" or "directed" the alleged fraudulent scheme, or to attribute any role to Molino beyond her position as General Counsel.  But that is not enough.  An attorney's involvement in a RICO enterprise, even when substantial, is insufficient as a matter of law when that attorney is providing legal services.  *See Morin*, 835 F. Supp. at 134 ("[A]ttorneys may be substantially involved in an enterprise's activities without risking liability under Section 1962(c).").[65]  In *Morin*, for example, the Court dismissed a RICO claim against attorneys even though the plaintiff alleged that the attorneys had "facilitated the operation of the enterprise" by drafting key documents and directing other defendants how to execute them.  *Id*. at 135.  In the *Morin* Court's view, such conduct amounted to "legal services" and was insufficient to violate § 1962(c).  *Id*.  So too here.  The SAC's conclusory statements allege only that Molino provided legal services, and thus fail to establish any degree of "management" by Molino.

The SAC acknowledges that as McKinsey's chief in-house attorney, Molino served in a general advisory role.  *See, e.g.*, SAC ¶¶ 326, 339, 691 (alleging Molino "apprised" McKinsey personnel and "reviewed" bankruptcy disclosures).  But the SAC is devoid of any non-conclusory allegation that Molino used her position as General Counsel to operate or manage the purported fraudulent activities.  Even if the alleged activities were fraudulent (they were not), Alix does not allege that Molino ever acted as anything other than McKinsey's General Counsel.

---

[64] As discussed *supra* Argument § IV, Alix fails to allege an enterprise distinct from the Corporate Defendants, let alone an association-in-fact enterprise of McKinsey and its bankruptcy clients.

[65] Even an attorney's awareness of alleged illegality is inadequate.  *See Drummond v. Zimmerman*, 454 F. Supp. 3d 1210, 1219 (S.D. Fla. 2020).

That is not enough.  *See Azrielli*, 21 F.3d at 521 (RICO claims against defendant who "acted as no more than [an] attorney" properly dismissed even where, unlike here, attorney "may [still] be subject to liability under the securities laws" for allegedly false statements); *Biofeedtrac*, 832 F. Supp. at 591 ("[Attorney's] role was confined, at time, to providing legal advice and legal services.").[66]

Finally, Alix's allegation that Molino "was a primary architect" of McKinsey's bankruptcy disclosure protocols is of no consequence.  SAC ¶ 44.  Legal advice that Molino is alleged to have given as General Counsel regarding McKinsey's disclosure practices is separate and distinct from exercising *control or decision-making authority*.  Here too, *Biofeedtrac* is instructive.  The Court there found that even when an attorney advised his client to enter into a transaction (in that case, contract negotiations) in order to mask an allegedly fraudulent scheme, such conduct *still* constituted legal advice and did not violate § 1962(c).  *See Biofeedtrac*, 832 F. Supp. at 590–92 (finding even when attorney "intentionally assisted a scheme to defraud," there were no facts to suggest attorney "was to 'lead, run, manage, or direct' any part of the enterprise").  Here, any role that Molino's legal advice is alleged to have played in the purported fraud scheme is not enough to allege Molino somehow *"operated"* or *"managed"* the fraud scheme Alix charges.

The SAC's allegations thus fail to allege Molino "operated" or "managed" the alleged RICO enterprise and the claims against her should be dismissed.

---

[66] The SAC's allegations that Molino "knowingly and wrongfully authoriz[ed] and fil[ed] or caus[ed] to be filed" the purportedly false affidavits further fail to allege that Molino "directed" a RICO enterprise.  *See, e.g.*, SAC ¶¶ 543–47.  At most, these allegations allege Molino furnished legal services for McKinsey and, as noted, such allegations are insufficient even when (unlike here) those services facilitated a RICO scheme.

### F.     Mark Hojnacki

Alix asserts—with no discernible basis—that Hojnacki conducted or participated in the conduct of the three RICO enterprises alleged in the SAC.  SAC ¶¶ 400, 512, 660.  There is absolutely no meat on the bones of these conclusory allegations, which fail to satisfy even Rule 8(a)'s pleading standard.  And, as with Goldstrom, Carmody, and Yerian, allegations in the SAC that Hojnacki signed disclosure declarations do not equate to allegations that he operated or managed any purported enterprise.  *See supra* Argument § V.B.

Indeed, Alix's own allegations contradict the premise that Hojnacki operated or managed a RICO enterprise.  For example, as to both *SunEdison* and *Westmoreland*, Alix alleges (without a single supporting fact) that *others* coerced Hojnacki into providing false declarations, *see* SAC ¶ 465 (alleging that McKinsey and others "corruptly persuad[ed] Hojnacki to cause him to provide non-truthful or misleading testimony in the five false and materially misleading disclosure declarations filed by Hojnacki on behalf of McKinsey RTS in the *SunEdison* proceeding"); ¶ 467 (alleging the same as to Hojnacki's *Westmoreland* declarations).  Additionally, as discussed *supra* in Argument § I.E.5, Alix alleges that others at McKinsey devised McKinsey's disclosure methodology and prepared and approved Hojnacki's declarations.  *See, e.g.*, SAC ¶¶ 132, 239, 327, 418.

Nor is Hojnacki's role at McKinsey suggestive of his ability to "have some part in directing [the] affairs" of the alleged enterprises.  *Reves*, 507 U.S. at 179.  Hojnacki, who only became a McKinsey partner around the time he signed the declarations in *SunEdison*, SAC ¶ 43, is conspicuously absent from discussions of McKinsey senior leadership in the pleading.  *See, e.g.*, SAC ¶¶ 73, 152, 227, 326–27, 369 (omitting Hojnacki from this category).[67]  In fact, Alix

---

[67] The lone allegation in the SAC that links Hojnacki with senior McKinsey leadership is wholly improbable:  Alix alleges that Barton agreed to remove McKinsey's senior leadership, "including . . . Mark Hojnacki," because of their

goes out of his way to minimize and disparage Hojnacki's experience, boasting that AlixPartners

"had many more senior personnel with far more restructuring experience than Hojnacki."

SAC ¶ 495(a).  The total deficiency of Alix's allegations as to this element of RICO liability

warrants dismissal of the claims against Hojnacki.

## VI.    Alix's Claims Fall Outside the Zone of Interests Protected by the Bankruptcy Disclosure Provisions on Which Alix Relies

Alix's RICO claims based on fraud within bankruptcy proceedings also fail because they

fall outside the zone of interests of the statutes on which he relies.  A statutory cause of action is

available only to "plaintiffs whose interests fall within the zone of interests protected by the law

invoked."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014).

The relevant zone of interests for a RICO claim depends on the predicate acts alleged.

*See Holmes*, at 288 (Scalia, J., concurring) ("the applicable zone-of-interests test" for a RICO

claim will "vary with the underlying violation"); *see also Lexmark*, 572 U.S. at 130 ("[T]he

breadth of the zone of interests varies according to the provisions of law at issue.").  The Second

Circuit has previously dismissed RICO claims on zone-of-interests reasoning, holding that

"RICO was not intended to protect" a plaintiff who was not "an intended beneficiary of the laws

prohibiting" the alleged conduct.  *Abrahams v. Young & Rubicam, Inc.*, 79 F.3d 234, 238–39 (2d

Cir. 1996); *see also, e.g.*, *Newton v. Tyson Foods, Inc.*, 207 F.3d 444, 447 (8th Cir. 2000) (under

"zone of interests," the "only parties with standing to bring" a RICO claim alleging corruption

"within a statutory framework designed to protect consumers" are "those consumers"); *Lerner v.*

*Fleet Bank, N.A.*, 146 F. Supp. 2d 224, 230–32 (E.D.N.Y. 2001) (dismissing RICO claims where

---

purportedly illegal behavior.  SAC ¶ 156.  The notion that in 2014—two years before Hojnacki became a partner at McKinsey and signed his first declaration on behalf of RTS—Hojnacki's name was mentioned at this high-level meeting is nothing short of preposterous.  *See, e.g.*, *AJ Energy LLC v. Woori Bank*, 2019 WL 4688629, at *3 (S.D.N.Y. Sept. 26, 2019) (Furman, J.) ("Significantly, a district court reviewing a motion to dismiss is not required to credit conclusory allegations unsupported by facts . . . or to suspend common sense in conducting its analysis"), *aff'd*, 829 F. App'x 533 (2d Cir. 2020).

plaintiff's claimed harm fell outside the relevant banking regulations' zone of interests), *vacated in part on other grounds by Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003).  The question is "one of statutory intent: was the plaintiff (even though foreseeably injured) in the category the statute meant to protect, and was the harm that occurred (again, even if foreseeable), the mischief the statute sought to avoid."  *Abrahams*, 79 F.3d at 237 (quotations omitted).[68]

Here, Alix's claim for AlixPartners' alleged lost fees is not within the zone of interests protected by the bankruptcy disclosure provisions, including § 327 and Rule 2014.  AlixPartners was not a party to any of the bankruptcies at issue, and nothing in these rules suggests that they protect non-party competitors of a debtor's chosen advisor.  To the contrary, Alix has conceded that the purpose of the disclosure rules is to protect courts and the parties to bankruptcy proceedings from conflicts of interest.  *See* SAC ¶¶ 9, 11; *In re AroChem Corp.*, 176 F.3d 610, 621 (2d Cir. 1999) (Section 327 "ensur[es] that all professionals appointed to represent the trustee tender undivided loyalty and provide untainted advice and assistance").  AlixPartners' inability to enforce § 327 or Rule 2014 directly is conclusive proof "that its claim is outside the scope of the very statute on which it builds its RICO suit."  *Hemi Grp. LLC v. City of New York*, 559 U.S. 1, 18–19 (2010) (Ginsburg, J., concurring).

## VII.   Alix Fails to Plausibly Plead Each Step in His Alleged Causal Chain

As the Second Circuit explained in this case, to plead a RICO claim, Alix must plausibly plead both (1) "a direct relationship between [AlixPartners'] injury and defendant's injurious conduct" (proximate causation), and (2) that but for that violation AlixPartners "would not have

---

[68] Though the Second Circuit later held that *Abrahams*' zone-of-interests analysis was subsumed by the Circuit's then-standard for RICO proximate causation, *see Baisch v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003), that holding is no longer good law.  *Lexmark* has since confirmed that zone of interests is separate from proximate causation.  *See* 572 U.S. at 129; *e.g.*, *Souza v. Exotic Island Enters.*, 2021 WL 3501162, at *15 (S.D.N.Y. Aug. 9, 2021) (citing *Lexmark* to explain that "proximate cause" and "zone of interests" are "distinct").  And "the substance of the analysis in *Abrahams* has never been doubted."  *Lerner*, 459 F.3d at 284 n.4.

been injured" (actual causation).  23 F.4th at 203.  The Second Circuit addressed the adequacy of

Alix's pleading on proximate causation, holding that his alleged causal chain was not too

attenuated, at least at the pleading stage.  *See id.*  Yet it assumed but did not reach whether Alix

adequately pleads each step in his alleged causal chain.  He has not done so.

>    ***Alix fails to plausibly plead that McKinsey would have been disqualified if it had***
>
> ***disclosed additional connections.***  Alix fails to make non-conclusory allegations explaining why
>
> McKinsey's purportedly omitted disclosures were disqualifying.  Bankruptcy courts have
>
> discretion over disqualifications, and disqualifying conflicts are rare.  *In re Vouzianas*, 259 F.3d
>
> 103, 107 (2d Cir. 2001) (Section 327(a) "vests discretion" in a bankruptcy court to determine
>
> whether a professional is disinterested or has an adverse interest); *AroChem*, 176 F.3d at 621,
>
> 628–29 (discussing bankruptcy court's "discretionary powers over the approval of professionals"
>
> and explaining that "conflict of interest questions" require "delicate judgment calls").  In the first
>
> 13 bankruptcies, there were no denials of debtors' applications to retain professionals—even
>
> though Alix alleges that those professionals "disclosed on average of 171 connections per case."
>
> SAC ¶ 12.  Alix's conclusory allegations that McKinsey would have been disqualified, *e.g.*, SAC
>
> ¶ 95, are thus facially implausible and insufficient as a matter of law.  *Nichols v. Mahoney*, 608
>
> F. Supp. 2d 526, 536 (S.D.N.Y. 2009) ("bald assertions and conclusions of law will not suffice"
>
> to state a RICO claim).

>    ***Alix fails to allege that AlixPartners would have been qualified under Alix's exacting***
>
> ***interpretation of Rule 2014.***  The SAC never alleges that AlixPartners was available to work on
>
> each of these bankruptcies—much less that it was conflict-free such that its retention would have
>
> been approved by the bankruptcy courts.  The absence of such an allegation is no surprise

because it would force Alix to grapple with the fact that in at least some cases, AlixPartners could not have been retained.

  ***Most obviously, AlixPartners had a disqualifying conflict in SunEdison***.  A filing on the public docket in *SunEdison* and SEC filings show that before SunEdison filed for bankruptcy, AlixPartners had been retained by two of SunEdison's non-debtor affiliates, who were adverse in material respects to the debtors, "to assist the[m] with their contingency planning for a SunEdison restructuring or bankruptcy."  *See* Ex. 19, *Sun Edison* Dkt. 50 ¶ 6.B; TerraForm Power, Inc., Form 8-K (July 7, 2016) (TerraForm Power "entered into an engagement letter on February 27, 2016 . . . for the engagement of AlixPartners to provide financial advisory and consulting services to" its board's conflicts committee); TerraForm Global, Inc., Form 8-K (July 7, 2016) (same).  These SEC filings—which the Court may consider on this motion, *see, supra* n.6–9—render implausible (indeed, ***impossible***) Alix's claim of lost fees in *SunEdison*.

  ***Moreover, Alix does not even plead that four of the bankruptcies fit into his own self-defined market of $1 billion or more in assets.***  To bridge his inability to allege (let alone prove) that AlixPartners would have actually been retained in any case at issue, Alix alleges that AlixPartners holds 24.5% of a purported "market of providing professional crisis management and consulting services in major corporate Chapter 11 bankruptcy cases ***involving companies with assets valued at over $1 billion***."  SAC ¶ 1 (emphasis added).  But the SAC acknowledges that four cases did not fall within that market—*Westmoreland* ($770 million); *AMF Bowling* ($100 million); *Harry & David* ($243 million); and *Standard Register* ($481 million).  SAC ¶ 505.  Alix's market-share proxy is therefore inapplicable on its own terms.  The SAC does not allege any facts that would permit an inference of harm for bankruptcy cases involving assets *less than* $1 billion.  Alix thus fails to plausibly plead AlixPartners' injury as to those cases.

## VIII.   Alix Fails to Plead a RICO Conspiracy Under § 1962(d)

Because Alix has not pleaded a substantive claim under § 1962(c), his "claim of conspiracy under Section 1962(d) must fail as well." *Sanchez*, 2015 WL 3540836, at *12; *Discon*, 93 F.3d at 1063.  The § 1962(d) claim fails for two additional reasons.  *First*, a plaintiff cannot sustain a RICO conspiracy claim naming only corporate affiliates and their agents or employees.  *Kriss v. Bayrock Grp.*, 2016 WL 7046816, at *19 (S.D.N.Y. Dec. 2, 2016) ("The intracorporate conspiracy doctrine holds that a corporation cannot conspire with its agents." (citing *Turkmen v. Hasty*, 789 F.3d 218, 263 (2d Cir. 2015))).  *Second*, the SAC fails to plead that any Defendant "agreed with at least one other entity to commit a substantive RICO offense." *Crawford v. Franklin Credit Mgmt.*, 758 F.3d 473, 487 (2d Cir. 2014).  There is no detail as to where, when, or how each Defendant joined any conspiracy; with whom each reached an agreement to join; or what was agreed to.  Alix merely asserts that each Defendant "knew of" and "facilitated" illegal activity, SAC ¶¶ 683, 686–98, and that based on the scope of the purported conduct and "close business and employment relationships" between the Defendants, "there can be no question (and at a bare minimum, there is a strong inference)" that there was an agreement to further the unlawful scheme, *e.g.*, SAC ¶¶ 685, 695.  This is insufficient to plead a "conscious agreement" between any Defendants.  *Hecht*, 897 F.2d at 25 n.4.

## IX.   The "Joint Declaration" From Alix's Bankruptcy Attorneys Should Be Stricken

Attached to the SAC is a "joint declaration" from bankruptcy attorneys who represented Mar-Bow in *ANR* and other cases.  SAC, Ex. C.  That declaration purports to opine on various legal matters and is plainly improper at the pleading stage and is irrelevant in any event.  *See, e.g.*, *Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015) (affidavit not properly part of complaint); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 223-24 (S.D.N.Y. 2018) (striking expert declaration attached to complaint).  The Court should therefore strike it.

**CONCLUSION**

For all the above-stated reasons, Defendants respectfully request that the Court dismiss all four Counts of the SAC, with prejudice, as to all Defendants.

Dated:    September 9, 2022                          Respectfully submitted,
          New York, New York


/s/ John Gleeson_____          /s/ Jonathan D. Cogan_____
John Gleeson                               Jonathan D. Cogan
Mark P. Goodman                            Matthew I. Menchel
Andrew J. Ceresney                         Danielle L. Rose
Erica S. Weisgerber                        Benjamin Sirota
Nathan S. Richards                         Christen M. Martosella
DEBEVOISE & PLIMPTON LLP                   KOBRE & KIM LLP
919 Third Avenue                           800 Third Avenue
New York, New York 10022                   New York, New York 10022
(212) 909-6000                             (212) 488-1200
jgleeson@debevoise.com                     jonathan.cogan@kobrekim.com

*Counsel for McKinsey & Company, Inc.,*
*McKinsey Holdings, Inc., McKinsey &*
*Company Inc. United States, and McKinsey*
*Recovery & Transformation Services U.S.,*
*LLC*


/s/ Ariel N. Lavinbuk_____      /s/ Reid M. Figel_____
Ariel N. Lavinbuk                          Reid M. Figel
Jennifer S. Windom                         Bradley E. Oppenheimer
Brandon L. Arnold                          Robert C. Klipper
KRAMER LEVIN NAFTALIS & FRANKEL LLP         KELLOGG, HANSEN, TODD, FIGEL &
2000 K Street NW, 4th Floor                FREDERICK P.L.L.C.
Washington, D.C. 20006                     1615 M Street, NW, Suite 400
(202) 775-4500                             Washington, D.C. 20036
alavinbuk@kramerlevin.com                  (202) 326-7968
                                           rfigel@kellogghansen.com

*Counsel for Jon Garcia, Alison Proshan,*  *Counsel for Kevin Carmody and Seth*
*and Robert Sternfels*                     *Goldstrom*


95

/s/ _Catherine L. Redlich_____
Catherine L. Redlich
DRISCOLL & REDLICH
110 West 40th Street, Suite 1900
New York, New York 10018
(212) 986-4030
CRedlich@driscollredlich.com


*Counsel for Dominic Barton*

/s/ Micah E. Marcus_____
Micah E. Marcus
Christopher G. Dean
MCDONALD HOPKINS LLP
300 North LaSalle Street, Suite 1400
Chicago, Illinois 60654
(312) 280-0111
mmarcus@mcdonaldhopkins.com


*Counsel for Jared D. Yerian*

/s/ Linda Imes_____
Linda Imes
Christopher W. Dysard
Reed M. Keefe
SPEARS & IMES LLP
767 Third Avenue
New York, New York 10017
(212) 213-6996
limes@spearsimes.com


*Counsel for Mark Hojnacki*

/s/ Jed I. Bergman_____
Jed I. Bergman
Olga Lucia Fuentes-Skinner
Richard C. Ramirez
GLENN AGRE BERGMAN & FUENTES LLP
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
(212) 970-1600
jbergman@glennagre.com


*Counsel for Virginia "Jean" Molino*