UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAY ALIX,

*Plaintiff*,

-against-

MCKINSEY & CO., INC.; MCKINSEY
HOLDINGS, INC.; MCKINSEY &
COMPANY INC. UNITED STATES;
MCKINSEY RECOVERY &
TRANSFORMATION SERVICES U.S.,
LLC; DOMINIC BARTON; KEVIN
CARMODY; JON GARCIA; SETH
GOLDSTROM; MARK HOJNACKI;
VIRGINIA MOLINO; ALISON
PROSHAN; ROBERT STERNFELS;
and JARED YERIAN,

*Defendants*.

No. 18-CV-04141 (JMF)

---

## PLAINTIFF JAY ALIX'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, New York 10281
*Counsel for Plaintiff Jay Alix*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND OF FEDERAL BANKRUPTCY RULE 2014....................................4

FACTUAL BACKGROUND ..............................................................................................9

    A.    Defendants' Fraudulent Scheme to Conceal McKinsey's Connections .................9

    B.    Defendants' Concealment of Connections Through MIO ....................................14

    C.    Alix Attempts to Bring McKinsey into Compliance ..........................................15

    D.    The Westmoreland Objections and Reopening of ANR........................................15

    E.    Individual Defendants ..........................................................................................18

ARGUMENT .......................................................................................................................21

I.    ALIX ADEQUATELY PLEADS RICO PREDICATE ACTS ....................................21

    A.    Alix Adequately Alleges a Scheme to Defraud under the Mail and Wire Fraud Statutes, 18 U.S.C. §§ 1341 and 1343 ........................................................22

    B.    Alix Adequately Alleges Bankruptcy Fraud under 18 U.S.C. §§ 152(2)-(3) ........33

    C.    Alix Adequately Alleges Scienter.......................................................................34

        1.    The SAC gives rise to a strong inference of fraudulent intent ..........................................................................................................35

        2.    Alix also adequately pleads motive and opportunity....................44

    D.    Alix Adequately Pleads a Violation of 18 U.S.C. § 2314......................................45

    E.    Alix Adequately Pleads Violations of 18 U.S.C. § 1512(b) .................................46

    F.    Alix Adequately Pleads Violations of 18 U.S.C. §§ 1503(a) and 1512(c) ...........48

    G.    Alix Adequately Pleads Violations of 18 U.S.C. § 1957(a) .................................50

    H.    Alix Adequately Alleges RICO Liability Based on Aiding and Abetting Predicate Acts .....................................................................................................52

II.    ALIX VALIDLY PLEADS MULTIPLE RICO ENTERPRISES....................................56

    A.    McKinsey RTS Is a Well-Pleaded RICO Enterprise (Count 1)............................57

    B.    McKinsey and Its Clients Are an Association-in-Fact Enterprise ........................60

III.    ALIX'S RICO CLAIMS ARE TIMELY .....................................................................61

    A.    Alix's Claims Based on Pre-2014 Bankruptcy Retentions Are Timely ...............62

    B.    Alix's Claims Against the Individual Defendants Are Timely.............................65

# TABLE OF CONTENTS (cont'd)

**Page**

IV. COLLATERAL ESTOPPEL DOES NOT APPLY TO THE *ANR* BANKRUPTCY ...................................................................................67

V. ALIX'S CLAIMS ARE SQUARELY WITHIN THE RICO ZONE OF INTERESTS ...............................................................................................70

VI. ALIX ADEQUATELY ALLEGES BUT-FOR CAUSATION.........................71

VII. ALIX'S RICO CONSPIRACY CLAIM IS WELL-PLEADED ......................74

VIII. ALIX PLEADS THAT EACH INDIVIDUAL DEFENDANT CONDUCTED AND PARTICIPATED IN THE CONDUCT OF THE RICO ENTERPRISE THROUGH PREDICATE ACTS.........................................................................76

    A. Barton.........................................................................................78

    B. Carmody.....................................................................................79

    C. Garcia.........................................................................................82

    D. Goldstrom .................................................................................84

    E. Hojnacki ....................................................................................86

    F. Molino........................................................................................87

    G. Proshan......................................................................................90

    H. Sternfels ....................................................................................92

    I. Yerian.........................................................................................93

IX. THE JOINT DECLARATION SHOULD NOT BE STRICKEN ...................94

CONCLUSION..............................................................................................................95

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*131 Main St. Assocs. v. Manko*,
  897 F. Supp. 1507 (S.D.N.Y. 1995)......................................................................55

*4 K & D Corp. v. Concierge Auctions, LLC*,
  2 F. Supp. 3d 525 (S.D.N.Y. 2014)..............................................................53, 58

*828 Hamilton Inc. v. United Specialty Ins. Co.*,
  2018 WL 5817155 (E.D.N.Y. Nov. 6, 2018)...........................................................70

*Acco, Ltd. v. Rich Kids Jean Corp.*,
  2016 WL 3144053 (S.D.N.Y. Apr. 11, 2016).........................................................95

*Alix v. McKinsey & Co.*,
  23 F.4th 196 (2d Cir. 2022) ....................................................................... *passim*

*Ambassador Hotel Co. v. Wei-Chuan Inv.*,
  189 F.3d 1017 (9th Cir. 1999) .........................................................................72

*Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*,
  660 F. Supp. 1362 (D. Conn. 1987)...................................................................85

*Arizona v. California*,
  530 U.S. 392 (2000)..................................................................................69

*Ashland Oil v. Arnett*,
  875 F.2d 1271 (7th Cir. 1989) ...................................................................74, 75

*Baisch v. Gallina*,
  346 F.3d 366 (2d Cir. 2003)..................................................................70, 71, 76

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*,
  2000 WL 1694322 (S.D.N.Y. Nov. 13, 2000).........................................................56

*Bankers Tr. Co. v. Rhoades*,
  859 F.2d 1096 (2d Cir. 1988).........................................................................63

*Base Metal Trading SA v. Russian Aluminum*,
  253 F. Supp. 2d 681 (S.D.N.Y. 2003)..................................................................95

*Betulius v. Hanna*,
  1996 WL 900413 (W.D. Mich. Dec. 10, 1996) ........................................................55

## <u>TABLE OF AUTHORITIES (cont'd)</u>

<u>Page(s)</u>

*Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*,
    832 F. Supp. 585 (E.D.N.Y. 1993) ........................................................................92

*Blue Cross Blue Shield Ass'n v. Glaxosmithkline LLC*,
    2016 WL 6612804 (E.D. Pa. Nov. 9, 2016) ..........................................................64

*Bradley v. Franklin Collection Serv., Inc.*,
    2011 WL 13134961 (N.D. Ala. Mar. 24, 2011) ....................................................55

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008)...............................................................................................27

*Brock Capital Grp. LLC v. Siddiqui*,
    2022 WL 2047589 (S.D.N.Y. June 7, 2022) ........................................................95

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
    1996 WL 135336 (E.D. Pa. Mar. 19, 1996)..........................................................75

*Bucklew v. Hawkins, Ash, Baptie & Co.*,
    329 F.3d 923 (7th Cir. 2003) .................................................................................59

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001).........................................................................................57, 61

*Central Bank of Denver v. First Interstate Bank of Denver*,
    511 U.S. 164 (1994).........................................................................................55, 56

*CF 135 Flat LLC v. Triadou SPV S.A.*,
    2016 WL 5945933 (S.D.N.Y. June 21, 2016) ......................................................77

*Chevron Corp. v. Donziger*,
    871 F. Supp. 2d 229 (S.D.N.Y. 2012)..............................................................23, 31

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)...................................................................................78

*City of New York v. Bello*,
    579 F. App'x 15 (2d Cir. 2014) .............................................................................74

*Cohen v. S.A.C. Trading Corp.*,
    711 F.3d 353 (2d Cir. 2013)........................................................................63, 65, 85

*Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*,
    271 F.3d 374 (2d Cir. 2001)...................................................................................71

## <u>TABLE OF AUTHORITIES (cont'd)</u>

<u>**Page(s)**</u>

*Compound Prop. Mgmt., LLC v. Build Realty, Inc.*,
    462 F. Supp. 3d 839 (S.D. Ohio 2020) ...................................................................75

*Crab House of Douglaston, Inc. v. Newsday, Inc.*,
    418 F. Supp. 2d 193 (E.D.N.Y. 2006) ..............................................................81, 82

*Crawford v. Washington*,
    541 U.S. 36 (2004)....................................................................................................48

*Crown Chevrolet v. Gen. Motors, LLC*,
    2014 WL 246500 (N.D. Cal. Jan. 22, 2014) ...........................................................64

*Crown Chevrolet v. General Motors, LLC*,
    637 F. App'x 446 (9th Cir. Mar. 1, 2016)...............................................................64

*Cruz v. FXDirectDealer, LLC*,
    720 F.3d 115 (2d Cir. 2013)...............................................................................59, 61

*Curley v. Cumberland Farms Dairy, Inc.*,
    728 F. Supp. 1123 (D.N.J. 1989) .............................................................................75

*De Sole v. Knoedler Gallery, LLC*,
    974 F. Supp. 2d 274 (S.D.N.Y. 2013).....................................................................64

*De Sole v. Knoedler Gallery, LLC*,
    137 F. Supp. 3d 387 (S.D.N.Y. 2015).....................................................................93

*Dumann Realty, LLC v. Faust*,
    267 F.R.D. 101 (S.D.N.Y. 2010) .............................................................................72

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)...............................................................................35, 42

*Eliahu v. Jewish Agency for Israel*,
    919 F.3d 709 (2d Cir. 2019).....................................................................................54

*Elsevier, Inc. v. Grossman*,
    77 F. Supp. 3d 331 (S.D.N.Y. 2015)........................................................................62

*Estate of Gottdiener v. Sater*,
    35 F. Supp. 3d 386 (S.D.N.Y. 2014)........................................................................55

*Fabrico Mfg. Corp. v. Wilson Sporting Goods Co.*,
    1985 WL 1474 (N.D. Ill. May 22, 1985) .................................................................75

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Fed. Ins. Co. v. U.S.*,
    882 F.3d 348 (2d Cir. 2018)....................................................................................75

*Fin. Guar. Ins. Co. v. Putnam Advisory Co. LLC*,
    783 F.3d 395 (2d Cir. 2015)....................................................................................22

*First Cap. Asset Mgt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004)..............................................................................77, 93

*Friedman v. 24 Hour Fitness USA, Inc.*,
    580 F. Supp. 2d 985 (N.D. Cal. 2008) .....................................................................61

*Grauberger v. St. Francis Hosp.*,
    169 F. Supp. 2d 1172 (N.D. Cal. 2001) ...................................................................38

*Handeen v. Lemaire*,
    112 F.3d 1339 (8th Cir. 1997) .................................................................................89

*Harborview Master Fund, LP v. Lightpath Techs., Inc.*,
    601 F. Supp. 2d 537 (S.D.N.Y. 2009).....................................................................27

*Harris Tr. & Sav. v. John Hancock Mut.*,
    970 F.2d 1138 (2d Cir.1992)....................................................................................69

*Hecht v. Com. Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990)................................................................................76, 77

*Hesse v. Godiva Chocolatier, Inc.*,
    463 F. Supp. 3d 453 (S.D.N.Y. 2020)........................................................................9

*Hottinger v. Amcoal Energy Corp.*,
    1994 WL 652499 (S.D.N.Y. Nov. 17, 1994)...........................................................89

*In re Advanced Educ. Prod., Inc.*,
    2022 WL 2069243 (Bankr. W.D.N.Y. June 7, 2022) .........................................5, 64

*In re Am. Honda Motor Co.*,
    958 F. Supp. 1045 (D. Md. 1997)............................................................................55

*In re Andover Togs, Inc.*,
    2001 WL 262605 (S.D.N.Y. Mar. 15, 2001)...........................................................73

*In re AroChem Corp.*,
    176 F.3d 610 (2d Cir. 1999).....................................................................................73

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*In re Atl. Sporting Club*,
137 B.R. 550 (Bankr. N.D. Ga. 1991) ...............................................................7, 36

*In re BC Funding, LLC*,
519 B.R. 394 (Bankr. E.D.N.Y. 2014)...................................................................44

*In re Big Rivers Elec. Corp.*,
284 B.R. 580 (W.D. Ky. 2002) ..............................................................................34

*In re Big Rivers Elec. Corp.*,
355 F.3d 415 (6th Cir. 2004) .................................................................................34

*In re Brennan*,
187 B.R. 135 (Bankr. D.N.J. 1995) .........................................................................7

*In re Byington*,
454 B.R. 648 (Bankr. W.D. Va. 2011) .....................................................................5

*In re ClassicStar Mare Lease Litig.*,
727 F.3d 473 (6th Cir. 2013) .................................................................................58

*In re Condor Sys., Inc.*,
302 B.R. 55 (Bankr. N.D. Cal. 2003)  .....................................................................6

*In re Envirodyne*,
150 B.R. 1008 (Bankr. N.D. Ill. 1993) .....................................................................8

*In re Farrington*,
2007 WL 4365753 (Bankr. D. Ore. Dec. 11, 2007)................................................26

*In re Fibermark*,
2006 WL 723495 (D. Vt. Mar. 11, 2006) ..............................................................39

*In re Filene's Basement, Inc.*,
239 B.R. 850 (Bankr. D. Mass. 1999) ......................................................................6

*In re Final Analysis, Inc.*,
640 B.R. 633 (Bankr. D. Md. 2022) .........................................................................8

*In re Firestar Diamond, Inc.*,
634 B.R. 265 (Bankr. S.D.N.Y. 2021) ...................................................................78

*In re First Jersey Secs., Inc.*,
180 F.3d 504 (3d Cir. 1999)....................................................................................7

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*In re Gen. Motors LLC Igntion Switch Litig.*,
2016 WL 3920353 (S.D.N.Y. July 15, 2016) ............................................................60, 91, 92

*In re Gen. Wireless Operations Inc.*,
2017 WL 5404534 (Bankr. D. Del. Apr. 6, 2017) ....................................................................7

*In re Granite Partners, L.P.*,
219 B.R. 22 (Bankr. S.D.N.Y. 1998) .........................................................................4, 5, 8, 39

*In re HML Enters., LLC*,
2016 WL 5939737 (Bankr. E.D. Tex. Oct. 12, 2016)............................................................34

*In re Leslie Fay Cos., Inc.*,
175 B.R. 525 (Bankr. S.D.N.Y. 1994) ..............................................................................5, 39

*In re Lewis Rd., LLC*,
2011 WL 6140747 (Bankr. E.D. Va. Dec. 9, 2011) ................................................................8

*In re Matco Elecs. Grp., Inc.*,
383 B.R. 848 (Bankr. N.D.N.Y. 2008) ....................................................................... *passim*

*In re Mercury*,
280 B.R. 35 (Bankr. S.D.N.Y. 2002) ..............................................................................6, 73

*In re Mercury*,
122 F. App'x 528 (2d Cir. 2004) ...........................................................................................6

*In re Midway Indus. Contractors, Inc.*,
272 B.R. 651 (Bankr. N.D. Ill. 2001) ...............................................................................6, 27

*In re Miners Oil Co., Inc.*,
502 B.R. 285 (Bankr. W.D. Va. 2013) ..............................................................................6, 7

*In re Sumitomo Copper Litig.*,
995 F. Supp. 451 (S.D.N.Y. 1998)........................................................................................56

*In re Sumitomo Copper Litig.*,
104 F. Supp. 2d 314 (S.D.N.Y. 2000)...................................................................................60

*In re Sumitomo Copper Litig.*,
120 F. Supp. 2d 328 (S.D.N.Y. 2000)..............................................................................62, 63

*In re Teleglobe Commc'ns Corp.*,
493 F.3d 345 (3d Cir. 2007)..................................................................................................74

## TABLE OF AUTHORITIES (cont'd)

<u>Page(s)</u>

*In re Trust Am. Serv. Corp.*,
   175 B.R. 413 (Bankr. M.D. Fla. 1994) ........................................................................6

*Jacobson v. Cooper*,
   882 F.2d 717 (2d Cir. 1989)........................................................................................60

*Jensen v. Kimble*,
   1 F.3d 1073 (10th Cir. 1993) .......................................................................................27

*Kirwin v. Price Commc'ns Corp.*,
   391 F.3d 1323 (11th Cir. 2004) ...................................................................................74

*KLG Gates LLP v. Brown*,
   506 B.R. 177 (E.D.N.Y. 2014) ......................................................................................7

*Knight v. Mooring Cap. Fund, LLC*,
   749 F.3d 1180 (10th Cir. 2014) ...................................................................................86

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012)....................................................................................62, 63

*Kotler v. Donelli*,
   528 Fed. App'x 10 (2d Cir. 2013)................................................................................68

*Kriss v. Bayrock Grp. LLC*,
   2016 WL 7046816 (S.D.N.Y. Dec. 2, 2016) ...........................................................74, 76

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006).........................................................................63

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006)....................................................................................35, 70

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014).....................................................................................................71

*Liberty Ins. Corp. v. Brenman*,
   2016 WL 880170 (E.D.N.Y. Mar. 1, 2016).............................................................64, 65

*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*,
   879 F. Supp. 2d 243 (E.D.N.Y. 2012) .........................................................................58

*Loma Linda Univ. Med. Ctr., Inc. v. Farmers Grp.*,
   1995 WL 363441 (E.D. Cal. May 15, 1995) ................................................................60

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Lum v. Bank of Am.*,
    361 F.3d 217 (3d Cir. 2004)..........................................................................39

*Lynn v. McCormick*,
    760 F. App'x 51 (2d Cir. 2019) ..................................................................61

*Manhattan Telecomms. v. Dial Am. Mktg., Inc.*,
    156 F. Supp. 2d 376 (S.D.N.Y. 2001)........................................................61

*Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*,
    2015 WL 5719801 (D.P.R. Sept. 29, 2015)...............................................55

*Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*,
    137 F. Supp. 3d 430 (S.D.N.Y. 2015)..................................................79, 83

*Marvel Characters, Inc. v. Simon*,
    310 F.3d 280 (2d Cir. 2002)........................................................................68

*Mauriber v. Shearson/Am. Express*,
    567 F. Supp. 1231 (S.D.N.Y. 1983)...........................................................75

*Mayfield v. Asta Funding*,
    95 F. Supp. 3d 685 (S.D.N.Y. 2015)..........................................................90

*McCormick v. Fund Am. Cos.*,
    26 F.3d 869 (9th Cir. 1994)...................................................................27, 28

*McKinsey & Co. v. Alix*,
    2022 WL 6572113 (U.S. Oct. 11, 2022)......................................................3

*McLaughlin v. Anderson*,
    962 F.2d 187 (2d Cir. 1992)........................................................................53

*Miller v. Hyundai Motor Am.*,
    2017 WL 4382339 (S.D.N.Y. Sept. 29, 2017).......................................80, 81

*Mohr-Lercara v. Oxford Health Ins., Inc.*,
    2019 WL 1409479 (S.D.N.Y. Mar. 28, 2019) ...........................................87

*Monahan v. N.Y.C. Dep't of Corr.*,
    214 F.3d 275 (2d Cir. 2000)........................................................................68

*Montana v. United States*,
    440 U.S. 147 (1979)....................................................................................68

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Morin v. Trupin*,
  835 F. Supp. 126 (S.D.N.Y. 1993)..............................................................................92

*Napoli v. United States*,
  32 F.3d 31 (2d Cir. 1994) ..........................................................................................91

*Napoli v. United States*,
  45 F.3d 680 (2d Cir. 1995).........................................................................................81

*Nat'l Org. for Women, Inc. v. Scheidler*,
  510 U.S. 249 (1994)....................................................................................................61

*Neder v. United States*,
  527 U.S. 1 (1999)........................................................................................................27

*New York Dist. Council of Carpenters Pension Fund v. Forde*,
  939 F. Supp. 2d 268 (S.D.N.Y. 2013).......................................................................74

*Ong v. Chipotle Mexican Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018).......................................................................95

*OSRecovery, Inc. v. One Groupe Intern., Inc*,
  354 F. Supp. 2d 357 (S.D.N.Y. 2005).......................................................................71

*Ouaknine v. MacFarlane*,
  897 F.2d 75 (2d Cir. 1990).........................................................................................35

*Phillips v. Am. Intern. Grp., Inc.*,
  498 F. Supp. 2d 690 (S.D.N.Y. 2007).......................................................................44

*Plumbers' & Pipefitters' Local No. 562 v. J.P. Morgan Acceptance Corp.*,
  2012 WL 601448 (E.D.N.Y. Feb. 23, 2012).............................................................65

*Ramirez v. Temin & Co., Inc.*,
  2020 WL 6781222 (S.D.N.Y. Nov. 18, 2020)..........................................................95

*Regions Bank v. J.R. Oil Co., LLC*,
  387 F.3d 721 (8th Cir. 2004) .....................................................................................86

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993).............................................................................................. *passim*

*Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*,
  121 F. Supp. 3d 321 (S.D.N.Y. 2015).......................................................................73

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
    30 F.3d 338 (2d Cir. 1994)....................................................................................60

*Roseman v. Bloomberg L.P.*,
    2016 WL 3866375 (S.D.N.Y. June 17, 2016) ................................................68, 70

*Ross v. Patrusky, Mintz & Semel*,
    1997 WL 214957 (S.D.N.Y. Apr. 29, 1997)..........................................................56

*Rouse v. Rouse*,
    1990 WL 160194 (N.D.N.Y. Oct. 17, 1990) .........................................................75

*S.E.C. v. Egan*,
    994 F. Supp. 2d 558 (S.D.N.Y. 2014)...................................................................84

*S.E.C. v. Invest Better 2001*,
    2005 WL 2385452 (S.D.N.Y. May 4, 2005) .........................................................43

*S.E.C. v. Pentagon Cap. Mgmt. PLC*,
    612 F. Supp. 2d 241 (S.D.N.Y. 2009)..............................................................37, 44

*S.E.C. v. Power*,
    525 F. Supp. 2d 415 (S.D.N.Y. 2007)...................................................................43

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007)..................................................................................................38

*Saine v. A.I.A., Inc.*,
    582 F. Supp. 1299 (D. Colo. 1984).......................................................................75

*Shan Indus., LLC v. Tyco Int'l (US), Inc.*,
    2005 WL 8156842 (D.N.J. Sept. 12, 2005) ..........................................................75

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015).....................................................................31

*Shimon v. Equifax Info. Servs. LLC*,
    994 F.3d 88 (2d Cir. 2021)....................................................................................38

*Sky Med. Supply Inc. v. SCS Support Claims Servs. Inc.*,
    17 F. Supp. 3d 207 (E.D.N.Y. 2014) ........................................................64, 81, 87

*Smith v. Hogan*,
    794 F.3d 249 (2d Cir. 2015)..................................................................................95

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Page(s)**

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
   277 F. Supp. 3d 521 (S.D.N.Y. 2017) ....................................................................53

*Souza v. Exotic Island Enters.*,
   2021 WL 3501162 (S.D.N.Y. Aug. 9, 2021) .........................................................71

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008)..................................................................................62

*Stansell v. Revolutionary Armed Forces of Colombia (FARC)*,
   2022 WL 2530359 (S.D.N.Y. Mar. 29, 2022) ......................................................86

*State Farm Mut. Auto. Ins. Co. v. Abrams*,
   2000 WL 574466 (N.D. Ill. May 11, 2000) ..........................................................91

*Stone v. Williams*,
   970 F.2d 1043 (2d Cir. 1992)................................................................................68

*Sunwealth Glob. HK Ltd. v. Pinder Int'l, Inc.*,
   2021 WL 1145245 (S.D.N.Y. Mar. 23, 2021) ......................................................60

*Sykes v. Mel Harris Assocs.*,
   757 F. Supp. 2d 413 (S.D.N.Y. 2010) ..................................................................45

*Trib. Co. v. Purcigliotti*,
   869 F. Supp. 1076 (S.D.N.Y. 1994)................................................................91, 94

*U.S. Commodity Futures Trading Com'n v. McCrudden*,
   2013 WL 142377 (E.D.N.Y. Jan. 11, 2013)  ........................................................77

*U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*,
   303 F. Supp. 2d 432 (S.D.N.Y. 2004)............................................................85, 94

*U.S. v. Autuori*,
   212 F.3d 105 (2d Cir. 2000)..............................................................25, 29, 32, 33

*U.S. v. Baum*,
   32 F. Supp. 2d 642 (S.D.N.Y. 1999)....................................................................48

*U.S. v. Brown*,
   2012 WL 4103857 (W.D.N.Y. Sept. 17, 2012) ...................................................47

*U.S. v. Cianci*,
   378 F.3d 71 (1st Cir. 2004)...................................................................................61

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*U.S. v. Colton,*
231 F.3d 890 (4th Cir. 2000) ............................................................. 32, 33

*U.S. v. Gellene,*
182 F.3d 578 (7th Cir. 1999) ............................................................. *passim*

*U.S. v. Greenberg,*
835 F.3d 295 (2d Cir. 2016) ............................................................. 22

*U.S. v. Gurry,*
427 F. Supp. 3d 166 (D. Mass. 2019) ............................................................. 75

*U.S. v. Gurry,*
12 F.4th 1 (1st Cir. 2021) ............................................................. 75

*U.S. v. Kumar,*
617 F.3d 612 (2d Cir. 2010) ............................................................. 48

*U.S. v. Langella,*
776 F.2d 1078 (2d Cir. 1985) ............................................................. 48

*U.S. v. Moleski,*
641 Fed. App'x 172 (3d Cir. 2016) ............................................................. 42

*U.S. v. Myerson,*
18 F.3d 153 (2d Cir. 1994) ............................................................. 46

*U.S. v. Napoli,*
2010 WL 1687669 (E.D.N.Y. Apr. 27, 2010) ............................................................. 50

*U.S. v. Nekritin,*
2011 WL 2462744 (E.D.N.Y. June 17, 2011) ............................................................. 44

*U.S. v. O'Connor,*
874 F.2d 483 (7th Cir. 1989) ............................................................. 45

*U.S. v. Payne,*
591 F.3d 46 (2d Cir. 2010) ............................................................. 61, 62, 79

*U.S. v. Philip Morris USA, Inc.,*
449 F. Supp. 2d 1 (D.D.C. 2006) ............................................................. 75

*U.S. v. Silver,*
864 F.3d 102 (2d Cir. 2017) ............................................................. 50, 51

<u>**TABLE OF AUTHORITIES (cont'd)**</u>

<u>**Page(s)**</u>

*U.S. v. Smith*,
  198 F.3d 377 (2d Cir. 1999)..............................................................................54

*U.S. v. Sokolow*,
  91 F.3d 396 (3d Cir. 1996)................................................................................50

*U.S. v. Sun-Diamond Growers of Cal.*,
  138 F.3d 961 (D.C. Cir. 1998)..........................................................................43

*U.S. v. Thomas*,
  377 F.3d 232 (2d Cir. 2004)..............................................................................45

*U.S. v. Thompson*,
  76 F.3d 442 (2d Cir. 1996)................................................................................47

*U.S. v. Trapilo*,
  130 F.3d 547 (2d Cir. 1997)..............................................................................23

*U.S. v. Turkette*,
  452 U.S. 576 (1981)..........................................................................................61

*UlIT4Less, Inc. v. FedEx Corp.*,
  896 F. Supp. 2d 275 (S.D.N.Y. 2012)..............................................................59

*U1IT4Less, Inc. v. FedEx Corp.*,
  871 F.3d 199 (2d Cir. 2017)........................................................................58, 59

*Vickers Stock Research Corp. v. Quotron Sys., Inc.*,
  1997 WL 420265 (S.D.N.Y. July 25, 1997)....................................................81

*Webster v. Omnitrition Int'l, Inc.*,
  79 F.3d 776 (9th Cir. 1996) ..............................................................................74

*Weir v. Cenlar FSB*,
  2018 WL 3443173 (S.D.N.Y. July 17, 2018) ..................................................59

*U.S. ex rel. Yu v. Grifols USA, LLC*,
  2021 WL 4429375 (S.D.N.Y. Sept. 26, 2021)..................................................94

**Statutes and Rules**

11 U.S.C. § 101(14)..........................................................................................7, 24

11 U.S.C. § 101(14)(C)......................................................................................4, 7

11 U.S.C. § 327................................................................................................5, 52

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

11 U.S.C. § 327(a) ............................................................................................... *passim*

11 U.S.C. § 363 .............................................................................................................86

18 U.S.C. § 2 .................................................................................................................54

18 U.S.C. § 2(a) ............................................................................................................53

18 U.S.C. 152(2) ..........................................................................................33, 34, 51, 53

18 U.S.C. § 152(3) ............................................................................................... *passim*

18 U.S.C. § 152(6) ........................................................................................................51

18 U.S.C. § 152(8) ...................................................................................................51, 52

18 U.S.C. 1341 ..................................................................................................... *passim*

18 U.S.C. 1343 ..................................................................................................... *passim*

18 U.S.C. 1503(a) ..................................................................................................48, 49, 53

18 U.S.C. § 1512(b) .................................................................................................46, 47

18 U.S.C. § 1512(b)(1) .................................................................................................46

18 U.S.C. § 1512(b)(2)(A) ...........................................................................................46

18 U.S.C.§ 1512(c) ...................................................................................................48, 49

18 U.S.C. § 1515(a)(3)(A)-(C) .....................................................................................47

18 U.S.C. § 1515(a)(3)(E) ............................................................................................47

18 U.S.C. § 1956(c)(7) .............................................................................................51, 52

18 U.S.C. § 1956(c)(7)(a) .........................................................................................51, 52

18 U.S.C. § 1957 ......................................................................................................50, 51, 53

18 U.S.C. § 1957(a) .................................................................................................50, 51

18 U.S.C. § 1957(f) .......................................................................................................51

18 U.S.C. § 1957(f)(1) ..................................................................................................51

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

18 U.S.C. § 1961(1) ........................................................................................... *passim*

18 U.S.C. § 1961(1)(A) ................................................................................................51

18 U.S.C. § 1961(1)(B) ................................................................................................53

18 U.S.C. § 1961(1)(D) ................................................................................................51

18 U.S.C. § 1961(4) ..............................................................................................56, 57

18 U.S.C. § 1962(a) ....................................................................................................54

18 U.S.C. § 1962(c) ........................................................................................... *passim*

18 U.S.C. § 1962(d) ....................................................................................................74

18 U.S.C. §1964(c) ................................................................................................53, 86

18 U.S.C. § 2314 .........................................................................................................45

28 U.S.C. § 1331 .........................................................................................................86

28 U.S.C. § 1334 .........................................................................................................86

28 U.S.C. § 1334(e)(2) ................................................................................................86

28 U.S.C. § 1746 .........................................................................................................48

Fed. R. Bankr. P. 2014 ....................................................................................... *passim*

Fed. R. Civ. P. 8(a) ...............................................................................................56, 76

Fed. R. Civ. P. 9(b) ...........................................................................................22, 56, 77

Fed. R. Civ. P. 12 ............................................................................................... *passim*

Fed. R. Civ. P. 60 .......................................................................................................86

**Other Authorities**

*In re MIO Partners, Inc.*,
  SEC Release No. 5912, 2021 WL 5415361 (Nov. 19, 2021) ..................................................18

Plaintiff Jay Alix respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Second Amended Complaint, dated September 9, 2022, and the memorandum of law in support thereof (ECF 200) (the "**Motion**" or "**Mtn.**").

## PRELIMINARY STATEMENT

The Second Amended Complaint ("**SAC**") (ECF 177) pleads an almost two-decades-long racketeering scheme by Defendants to misrepresent and conceal disqualifying conflicts of interest in Chapter 11 cases, and thereby obtain lucrative consultancy assignments for which McKinsey was not qualified.[1]  For years, Defendants perpetrated and hid this illegal scheme by, *inter alia*, filing with bankruptcy courts dozens of materially false and misleading disclosures required by Federal Rule of Bankruptcy Procedure 2014 ("**Rule 2014**").   Defendants furthered their racketeering conspiracy through predicate acts of mail and wire fraud, bankruptcy fraud, obstruction of justice, money laundering, and witness tampering, and conspired with and aided and abetted each other in furtherance of their scheme.  By concealing McKinsey's disqualifying conflicts of interest, Defendants deprived Alix's assignor, AlixPartners ("**AP**"), of valuable business opportunities and tens of millions in profits.

Primarily owing to Alix's due diligence and litigation efforts, the broad outline of Defendants' scheme has been exposed.  In the wake of this action, Defendant McKinsey & Co., Inc. and its subsidiaries (collectively, "**McKinsey**") have paid or forfeited more than $40 million to settle disputes with the U.S. Trustee's Office ("**UST**") and the Securities and Exchange Commission regarding their inadequate bankruptcy disclosures and improper sharing of material non-public information with their supposedly "walled-off" investment arm, MIO.

---

[1]  Capitalized terms not defined herein shall have the meanings ascribed to them in the SAC.

The UST and the courts that have most recently examined Alix's claims have excoriated McKinsey for its disclosure misconduct and, at a minimum, found Alix's allegations plausible and deserving of factual development.  In January 2019, the bankruptcy court in the *ANR* Chapter 11 case (defined below) granted an application filed by an entity controlled by Alix, Mar-Bow Value Partners, LLP ("**Mar-Bow**"), and supported by the UST, to reopen that case, calling the allegations "some of the most serious allegations I've ever seen."  In its papers in support of reopening, the UST described McKinsey's statements as inaccurate and, "at best, misleading."

In the *Westmoreland* bankruptcy—which commenced in October 2018, months after Alix filed his First Amended Complaint ("**FAC**") and while the parties were briefing Defendants' first motion to dismiss—the court observed that McKinsey and its most senior corporate representatives did not "really get it" and utterly failed to grasp the seriousness of their misconduct.  The court made clear that Defendant Mark Hojnacki, the Rule 2014 declarant for applications to hire Defendant McKinsey RTS in both *SunEdison* and *Westmoreland*, made affirmative "statements in his declaration that are simply not true" and, as a result, questioned whether it should "refer Mr. Hojnacki to the US Attorney's Office for perjury."  Then, after presenting its entire case in a trial on Mar-Bow's objection to McKinsey's receipt of consulting fees in that case, and just before Mar-Bow was to put on its own case, McKinsey walked away from its opportunity to try to prove Alix wrong and demonstrate that it had complied with Rule 2014 and made full disclosure.  Its forfeiture of that opportunity, in addition to the $8 million in fees at issue in that case (not to mention the withering criticism of the *Westmoreland* court), cannot be reconciled with Defendants' claim here that their view of bankruptcy disclosure law falls within a range of reasonable interpretation and is not, as Alix alleges, the product of a long-running fraudulent scheme.

Most recently, the Second Circuit determined that Alix's FAC adequately alleged proximate causation under RICO. *See Alix v. McKinsey & Co.*, 23 F.4th 196 (2d Cir. 2022), *cert. denied*, No. 21-1608, 2022 WL 6572113 (U.S. Oct. 11, 2022). The Second Circuit took particular note of Defendants' conduct in connection with *GenOn*, finding it "implausible to conclude that GenOn would have retained McKinsey with knowledge of [its] serious conflicts of interests." *Alix*, 23 F.4th at 206 ("We are even more hard-pressed to conclude that the Bankruptcy Court, given these facts, could or would have found that McKinsey was 'disinterested' and did not 'hold or represent an interest adverse to the estate.'"). Finding that the various factual issues raised by Defendants "are more appropriately left for discovery," the Second Circuit remanded "for a more complete record to be developed: one that will disclose more about who did what, when, and with what reasonably likely consequences." *Id.* at 207, 209.

Notwithstanding judicial condemnation of their actions, the weight of judicial authority, and well-pleaded facts against them, Defendants' blunderbuss 95-page brief spews a shotgun spray of kitchen-sink arguments in an effort to avoid accountability. Each is without merit and either mischaracterizes or ignores the contents of the 289-page SAC and its 707 paragraphs of detailed factual allegations (as well as the SAC's hundreds of additional pages of exhibits cataloguing Defendants' false and misleading statements in more than a dozen Chapter 11 bankruptcies). Contrary to Defendants' claims, Alix has adequately alleged, with respect to Defendants' conduct in fourteen different Chapter 11 bankruptcy proceedings, RICO predicate acts of mail and wire fraud, bankruptcy fraud, money laundering, witness tampering, and obstruction of justice, and the aiding and abetting of these predicate acts by all of the Defendants. *See* Point I, *infra*. Alix's claims are timely as to all Defendants. *See* Point III, *infra*. And, Defendants' collateral estoppel argument with respect to the *ANR* bankruptcy fails because it is based entirely on rulings that

predated the reopening of the *ANR* case and that ultimately were settled without a final ruling on the merits and without Alix having had an opportunity to take any discovery.  *See* Point IV, *infra*. The SAC also adequately pleads all elements of its RICO claims, including multiple RICO enterprises and a RICO conspiracy.  *See* Points II, VII, *infra*.  And, as the Second Circuit has already ruled, Alix has adequately alleged RICO causation; Defendants' defiant renewal of arguments already rejected by the Court of Appeals under the guise of "zone of interests" and "causal chain" labels wastes the time and resources of the Court and counsel alike.  *See* Points V-VI, *infra*.

Discovery and fact-finding are required to adjudicate Alix's well-pleaded claims.  The Court should reject each of Defendants' arguments, and deny the Motion in full.

## BACKGROUND OF FEDERAL BANKRUPTCY RULE 2014

Rule 2014 requires professionals to set forth, in "a verified statement," "***all*** of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." Fed. R. Bankr. P. 2014(a) (emphasis added).  Rule 2014 implements 11 U.S.C. § 327(a), which permits a debtor to retain only those professionals who "do not hold or represent an interest adverse to the estate" and who are "disinterested persons."  11 U.S.C. § 327(a); *see also* SAC, Ex. C ¶¶ 24, 27, 29-32, 34, 40, 44-48, 68-73.  A "disinterested person" is defined as one who "does not have an interest materially adverse to the interest of the estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason."  11 U.S.C. § 101(14)(C).  This definition embraces "any interest or relationship, however slight, that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules."  *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998) (quotations omitted).

Importantly, "[t]he scope of disclosure" under Rule 2014 "is much broader than the question of disqualification" under § 327. *Id.* at 35. And the disclosure requirements are to be "strictly construed." *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994); *see also In re Byington*, 454 B.R. 648, 657 (Bankr. W.D. Va. 2011) ("Published bankruptcy court decisions are quite consistent in requiring that debtors-in-possession and their attorneys . . . be meticulous in disclosing 'all connections' with the debtor and other parties in interest . . . .").

"[I]t is the responsibility of the professional, not of the court, to make sure that all relevant connections have been brought to light." *Leslie Fay*, 175 B.R. at 533. "Bankruptcy courts could not function if they had to view every filed affidavit with suspicion, and investigate it. That is especially true as to a Rule 2014(a) 'Affidavit of Disinterestedness.'" *In re Advanced Educ. Prod., Inc.*, 2022 WL 2069243, at *1 (Bankr. W.D.N.Y. June 7, 2022). Indeed, "it is not only parties in interest (such as a trustee) who might be lulled by a Rule 2014 declaration into believing that there is no need to look behind the declaration and investigate the professional. The Court itself might be so lulled." *Id.* at *2. Thus, "[t]he professional must disclose all facts that bear on its disinterestedness . . . and cannot usurp the court's function by choosing, *ipse dixit,* which connections impact disinterestedness and which do not." *Granite Partners*, 219 B.R. at 35 (citation omitted); *see also In re Matco Elecs. Grp., Inc.*, 383 B.R. 848, 854 (Bankr. N.D.N.Y. 2008) ("BHPP seems to misinterpret the requirements of Fed. R. Bankr. P. 2014 by suggesting that its obligation under the Rule was somehow defined by what knowledge may already have been possessed by those parties to whom disclosure must be provided. Such an interpretation would stand the Rule on its head, making its application purely subjective and virtually impossible to enforce."); SAC, Ex. C ¶ 30.

Rule 2014 "is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the [UST], the court or other parties interest, and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure." *Matco*, 383 B.R. at 853-54. "Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." *In re Filene's Basement, Inc.*, 239 B.R. 850, 856 (Bankr. D. Mass. 1999) (quotations omitted). "The disclosures must be **explicit and complete**." *In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 662 (Bankr. N.D. Ill. 2001) (emphasis added). "[A]ny close or debatable issue ought to be resolved in favor of disclosure." *In re Miners Oil Co., Inc.*, 502 B.R. 285, 302 (Bankr. W.D. Va. 2013) (internal quotations omitted); *see also In re Condor Sys., Inc.*, 302 B.R. 55, 73 (Bankr. N.D. Cal. 2003) ("[T]he duty to disclose under Rule 2014 is a duty owed to the [bankruptcy courts].").

Accordingly, compliance with Rule 2014 requires, *inter alia*, making full disclosure for the full firm seeking retention—including all affiliates. Rule 2014 states that professionals must disclose their "connections" with the debtor and Interested Parties—by its terms, there is no limitation on which "connections" those are, and case law is clear that professionals must disclose *all* of their connections and may not select only those that they deem relevant. *See In re Mercury*, 280 B.R. 35, 56 (Bankr. S.D.N.Y. 2002) ("[P]rofessionals may not make unilateral determinations regarding the relevance of particular connections, or that certain connections to the debtor are too insignificant to disclose."), *aff'd*, 122 F. App'x 528 (2d Cir. 2004); *In re Trust Am. Serv. Corp.*, 175 B.R. 413, 420 (Bankr. M.D. Fla. 1994) ("To ensure themselves no conflict existed with respect to related debtors, the duty was not solely limited to Coopers and Lybrand in Tampa, **but was a duty of the whole organization** . . . . Coopers and Lybrand had a duty to ensure themselves of no conflict with all departments and locations of its partnership." (emphasis added)); *see also* SAC,

Ex. C ¶¶ 31, 58, 64.[2]  Indeed, Rule 2014 is designed to ensure that professionals are "disinterested

persons" that have no adverse interests "by reason of any direct **or indirect** relationship to,

connection with, or interest in, the debtor, **or for any other reason**."  11 U.S.C. § 101(14)(C)

(emphasis added).  A professional's connection to a debtor or Interested Party through an affiliate

relationship fits comfortably within the "indirect relationship" and "any other reason" language of

§ 101(14); *see also* 11 U.S.C. § 327(a).

Rule 2014 also requires that the professional's connections be identified by name.  Six

years before McKinsey's first bankruptcy retention, the Bankruptcy Court for the District of New

Jersey stated:

> [C]ase law is abundantly clear that *any* relationship or fact which
> might create a disqualifying conflict of interest must be disclosed. .
> . . Such disclosure must, at a minimum, include the existence, nature
> and extent of any claims between related debtors. . . . [T]here must
> also be disclosure of the ***identities*** of any other parties in interest or
> related persons whom the professional also represents, the nature
> and extent of the relationship between that person and the debtor,
> and between that person and the professional, and any facts which
> might be construed as creating actual or potential conflicts of
> interest.

*In re Brennan*, 187 B.R. 135, 144 (Bankr. D.N.J. 1995) (emphasis added), *rev'd on other grounds*,

*In re First Jersey Secs., Inc.*, 180 F.3d 504 (3d Cir. 1999).[3]  As noted above, Rule 2014 disclosures

must be explicit and complete to allow "the court and other parties to gauge whether the person to

---

[2]      *See also In re Gen. Wireless Operations Inc.*, 2017 WL 5404534, at \*2 (Bankr. D. Del. Apr. 6,
2017) ("A & G Realty shall disclose any and all facts that may have a bearing on whether A & G Realty,
its affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to
the Debtors, their creditors, or other parties in interest.").

[3]      Rule 2014 is so stringent that a law firm violated the Rule when it disclosed, by name, all 483
current and former clients with potential connections to the debtor but failed to identify the attorneys who
staffed the matters.  *KLG Gates LLP v. Brown*, 506 B.R. 177, 193-95 (E.D.N.Y. 2014); *see also Miners
Oil*, 502 B.R. at 307-09 (finding Rule 2014 disclosures inadequate where professional identified
"connection" to debtor company's principal but not that principal was company's largest debtor); *In re Atl.
Sporting Club*, 137 B.R. 550, 552-53 (Bankr. N.D. Ga. 1991) (counsel failed to disclose extent of past
representation of debtors' general partners, equity holder, and related entities).

be employed is not disinterred or holds an adverse interest." *In re Final Analysis, Inc.*, 640 B.R.
633, 641 (Bankr. D. Md. 2022).  "[M]ere boilerplate disclosure may cover an inadvertent failure
to disclose an insignificant connection, but does not suffice for known connections with parties
presenting a significant risk of adversity." *Granite Partners*, 219 B.R. at 35 (quotation omitted).

The decisions of *In re Lewis Rd., LLC*, 2011 WL 6140747 (Bankr. E.D. Va. Dec. 9, 2011),
and *In re Envirodyne*, 150 B.R. 1008 (Bankr. N.D. Ill. 1993), likewise are instructive.  In *Lewis
Road*, the court found that the debtor's counsel had failed to comply with Rule 2014 when its
application for employment stated only that it had "connections with a creditor," and "did not
disclose with whom it held connections nor did it describe what those connections were."  2011
WL 6140747, at *9.  Similarly, the bankruptcy court in *Envirodyne* found that the law firm Cleary,
Gottlieb acted in "disregard of its obligation under [Rule] 2014(a)" when it stated in its initial
disclosure affidavit that it "had represented creditors in the past and would likely represent them
in the future in matters unrelated to this case."  150 B.R. at 1021.  In reality, the firm represented
a substantial creditor and equity holder of the debtor and was thus disqualified because of its
"important economic interest in maintaining good relations" with the creditor/equity holder, which
was a "substantial client." *Id.*

*U.S. v. Gellene*, 182 F.3d 578, 589 (7th Cir. 1999), makes clear that violating Rule 2014
can, in circumstances like those here, constitute a crime.  In *Gellene*, the Seventh Circuit affirmed
the conviction of a partner of the law firm Milbank Tweed under 18 U.S.C. § 152(3) for failure to
disclose his firm's connections to a senior secured creditor and related parties in his Rule 2014
declaration.  *Gellene*, 182 F.3d at 581.  The court rejected the defendant's attempt to pass off his
failures to disclose as "an error in legal judgment," *id.* at 584, and "stupid, but not criminal," *id.* at
585, and further rejected the argument that his failures to disclose were not material:

We have no doubt that *a misstatement in a Rule 2014 statement* by an attorney *about other affiliations constitutes a material misstatement*. . . .   Bankruptcy Rule 2014 requires the potential attorney for the debtor to set forth under oath any connections with the debtor, creditors, and any other party in interest.  *The disclosure requirements apply to all professionals and are not discretionary*. The professionals cannot pick and choose which connections are irrelevant or trivial.

*Id.* at 588 (quotations, citations omitted; emphasis added).

## FACTUAL BACKGROUND

The following summary of the relevant factual background is based on the factual allegations set forth in the SAC.  While a court may take judicial notice of court filings on a Rule 12(b)(6) motion, it is well settled that such judicial notice "is for the limited purpose of noting what the documents state, rather than to prove the truth of their contents."  *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020).  Thus, Defendants' reliance on the purported truth of certain statements made by mediators (Mtn. at 3, 11-12, 14, 25) is improper.

### A.   Defendants' Fraudulent Scheme to Conceal McKinsey's Connections

Between 2001 and 2020, Defendants McKinsey US and (beginning in 2010 or 2011) McKinsey RTS (and, in some instances, additional McKinsey & Co. entities) were engaged as professionals in thirteen Chapter 11 bankruptcies, and Defendants unsuccessfully sought court approval for employment in a fourteenth case, *Westmoreland*.[4]  SAC ¶¶ 54, 57.  McKinsey RTS,

---

[4]      The fourteen bankruptcies are: 1) *In re Hayes Lemmerz Int'l, Inc.*, No. 01-BK-11490 (Bankr. D. Del.) (filed Dec. 5, 2001) ("*Hayes*"); 2) *In re UAL Corp.* (*United Airlines*), No. 02-BK-48191 (Bankr. N.D. Ill.) (filed Dec. 9, 2002) ("*UAL*"); 3) *In re Mirant Corp.*, No. 03-BK-46590 (Bankr. N.D. Tex.) (filed July 14, 2003) ("*Mirant*"); 4) *In re Lyondell Chem. Co.*, No. 09-BK-10023 (Bankr. S.D.N.Y.) (filed Jan. 6, 2009) ("*Lyondell*"); 5) *In re Harry & David Holdings, Inc.*, No. 11-BK-10884 (Bankr. D. Del.) (filed Mar. 28, 2011) ("*Harry & David*"); 6) *In re AMR Corp.* (*American Airlines*), No. 11-BK-15463 (Bankr. S.D.N.Y.) (filed Nov. 29, 2011) ("*AMR*"); 7) *In re AMF Bowling Worldwide, Inc.*, No. 12-BK-36495 (Bankr. E.D. Va.) (filed Nov. 13, 2012) ("*AMF*"); 8) *In re Edison Mission Energy*, No. 12-BK-49219 (Bankr. N.D. Ill.) (filed Dec. 17, 2012) ("*Edison Mission*"); 9) *In re NII Holdings, Inc. (Nextel)*, No. 14-BK-12611 (Bankr. S.D.N.Y.) (filed Sept. 15, 2014) ("*NII*"); 10) *In re Standard Register Co.*, No. 15-BK-10541 (Bankr. D. Del.) (filed Mar. 12, 2015) ("*Standard Register*"); 11) *In re Alpha Natural Resources,*

formed in or around late 2010, has served as a bankruptcy professional in nine Chapter 11 cases, for which it has received over $100 million in fees.  *Id.* ¶ 54.  Like all of McKinsey & Co.'s subsidiaries, McKinsey US and McKinsey RTS are wholly owned and controlled by McKinsey & Co., which is wholly owned and controlled by its individual partners.  *Id.* ¶¶ 35, 37-38.

To obtain bankruptcy court approval for their employment in the fourteen Chapter 11 bankruptcies, McKinsey RTS and McKinsey US submitted over forty false and misleading declarations that systematically and intentionally concealed and mischaracterized thousands of McKinsey connections to debtors and "Interested Parties."  *Id.* ¶¶ 9, 86-88, 162, 171, 188, 237, 283, 329, 354.  While Defendants' specific means of deception evolved over time, their goal remained consistent: to evade disclosure of McKinsey's conflicts and thereby obtain engagements for which McKinsey was not qualified under the law.

In the first ten Chapter 11 bankruptcies in which McKinsey US and/or McKinsey RTS were engaged as bankruptcy professionals, McKinsey named only a handful of connections to Interested Parties, and *zero* connections in the initial Rule 2014 declarations submitted with the applications to employ McKinsey.[5]  McKinsey US belatedly named a total of ten client connections in a supplemental declaration in its second bankruptcy, *UAL*, in 2003, and belatedly identified *one* client connection in a supplemental declaration in its fifth bankruptcy, *Harry & David*, in 2011.  *See Id.* ¶¶ 90, 103, 119.  In stark contrast to standard industry practice, McKinsey identified no other connections in its first ten bankruptcy assignments.  *See id.* ¶¶ 13, 90.

---

*Inc.*, No. 15-BK-33896 (Bankr. E.D. Va.) (filed Aug. 3, 2015) ("*ANR*"); 12) *In re SunEdison, Inc.*, No. 16-BK-10992 (Bankr. S.D.N.Y.) (filed Apr. 21, 2016) ("*SunEdison*" or *"SunEd"*); 13) *In re GenOn Energy, Inc.*, No. 17-BK-33695 (Bankr. S.D. Tex.) (filed June 14, 2017) ("*GenOn*"); 14) *In re Westmoreland Coal Co.*, No. 18-BK-35672 (Bankr. S.D. Tex.) (filed Oct. 9, 2018) ("*Westmoreland*").

[5]      SAC ¶¶ 90-94 (*Hayes*), 98-103 (*UAL*), 105-106 (*Mirant*), 111-112 (*Lyondell*), 118-119 (*Harry & David*), 121-124 (*AMR*), 128-130 (*AMF*), 131-133 (*Edison Mission*), 162-165 (*NII*), 171-173 (*Standard Register*).

Beginning in or around 2002 (and continuing through the Hojnacki declarations in *Westmoreland*), McKinsey used what it called its "direct commercial transaction or relationship" test, which was invented by Defendant Virginia Molino, to conceal McKinsey's connections. *Id.* ¶ 79. In the *Westmoreland* trial, Molino admitted that her invented "direct commercial relationship" test allowed McKinsey partners to withhold disclosures of firm engagements that were directly adverse to the interests of debtors in the bankruptcies for which McKinsey was applying. *Id.* ¶ 80. She also admitted that the test had no basis in Rule 2014 and that she was not aware of any other bankruptcy professionals using such a "test." *Id.*

In 2011, McKinsey concocted an additional strategy to perpetrate its scheme—"disclosure by category"—pursuant to which it would advise bankruptcy courts that it had a certain number of client connections within certain categories of Interested Parties while simultaneously failing to name any of the actual connections or conflicts. *Id.* ¶ 81. This "disclosure by category" approach was an improper and artificial construct used by McKinsey to conceal client connections. *Id.* As Molino admitted in *Westmoreland*, she was not aware of any other bankruptcy professional using it. *Id.* ¶ 82. Referencing "disclosure by category" in *ANR*, the UST stated that it merely "***gave the appearance of compliance without actually complying with Bankruptcy Rule 2014***." *Id.* ¶ 81. In other words, it achieved Defendants' goal of deceiving bankruptcy courts and participants.

McKinsey's illegal conduct did not stop there. In addition to failing to disclose the names of relevant connections, as required by law, McKinsey grossly understated the number of connections it had for many categories of Interested Parties. In *ANR*, for example, Defendant Carmody stated in his initial Rule 2014 declaration that McKinsey had connections to "two Revolving Facility Lenders" (without identifying them), whereas in reality McKinsey had connections to at least seventeen (17) Revolving Facility Lenders, none of which it identified by

name.  *Id.*  In total, Carmody submitted three Rule 2014 declarations on behalf of McKinsey RTS

in the *ANR* proceedings without naming a *single* connection.  *Id.* ¶¶ 188, 190-191.  It was not until

after the UST sought to compel McKinsey RTS to disclose its connections—and the bankruptcy

court in *ANR* ordered McKinsey to do so—that McKinsey began to disclose *some* connections,

while continuing to conceal many others, some of which were *per se* disqualifying.  *Id.* ¶¶ 188,

190-197, 208-233.

   Next, Defendants tried an incremental approach, delaying disclosure of specific client

connections until after McKinsey RTS was improperly entrenched in a case under false pretenses.

*Id.* ¶¶ 13-14, 193-194, 202, 205.   By delaying the disclosure of, or completely concealing,

egregious, disqualifying connections until late in a Chapter 11 case, sometimes even after plan

confirmation, McKinsey deceived bankruptcy courts and case participants until it was too late to

remove it.  *See id.*  In *ANR*, for instance, the bulk of Carmody's disclosures by name were not

made until August 5, 2016—more than eleven months after his initial inadequate disclosure, and

almost one month after the bankruptcy plan was confirmed and the case was effectively over.  *See

id.* ¶¶ 193-194.   This tactic of delayed disclosure furthered McKinsey's scheme to conceal

disqualifying connections, including (i) McKinsey's investment (through MIO) in Whitebox

Advisors LLC ("**Whitebox**"), a hedge fund that held a substantial investment in the very company

that was formed to acquire ANR's most valuable assets pursuant to the plan of reorganization, *see

id.* ¶¶ 26, 196, and (ii) the fact that McKinsey was simultaneously assisting one of ANR's largest

customers, U.S. Steel, in reducing the amount it paid to coal suppliers such as ANR, *see id.* ¶ 208.[6]

---

[6]      Defendants' insistence that McKinsey RTS did disclose its connection with U.S. Steel in *ANR* (Mtn.
at 23), while ignoring that it made the disclosure only after it was compelled to do so *in camera* nearly a
year **after it was retained and Carmody's initial Rule 2014 declaration was filed—and that public
disclosure was not made until after the bankruptcy was over and ANR's plan of reorganization had
been confirmed** (SAC ¶¶ 208-212)—does **not** make Carmody's initial Rule 2014 declaration in *ANR* any
less vague or misleading, nor does it absolve Defendants of their deliberate obfuscation.  *Id.* ¶ 222.

In *SunEdison*, *GenOn*, and *Westmoreland*, Defendants continued their pattern of concealing McKinsey's client and investment connections, including disqualifying conflicts of interest. *Id.* ¶¶ 237, 241-254, 283-286, 312-318, 329-337, 354-369. Although the Rule 2014 declarations submitted by Hojnacki and Carmody in those cases identified *some* of McKinsey's client connections, McKinsey used yet another deceptive device—Proshan and Molino's "*SunEd* Protocol"—to omit *hundreds* of others, and disclosed *no* investment connections. *Id.* ¶¶ 83-85, 241-246, 312-315, 336-338, 416. Indeed, in *GenOn*, Carmody failed even to disclose the *existence* of MIO, much less whether McKinsey had any investment connections to the debtors or Interested Parties. *Id.* ¶ 287. Additionally, in *SunEdison*, Defendants never disclosed that McKinsey issued false invoices to SunEdison's non-debtor affiliates to fraudulently re-characterize work performed for debtors and thereby conceal a disqualifying voidable preference, thus illegally diverting millions of dollars of assets away from the debtor estate for McKinsey's personal benefit. *Id.* ¶¶ 257-271.[7] And in *GenOn*, Carmody concealed that McKinsey RTS had connections to the debtor's parent company, NRG Energy, which was both a McKinsey client and an Interested Party against which GenOn potentially had multi-million dollar fraudulent transfer claims. *Id.* ¶¶ 288-304, 312-317.[8] "McKinsey also concealed at least 53 other known conflicts and connections, some of which

---

[7]    Defendants complain about a purported lack of "evidence" of the re-invoicing scheme. Mtn. at 23. But at the motion-to-dismiss stage, Alix's factual allegations govern, and the SAC pleads in detail that the public disclosures relied upon in the Motion were false and misleading in their description of the re-invoicing. SAC ¶ 265 (Defendants continued the scheme by "falsely representing in Hojnacki's Amended Declaration and First Supplemental Declaration in *SunEdison* that the 'round trip' payments were, in fact, owed by the Non-Debtor Affiliates in the first instance and McKinsey RTS's services had been provided for the benefit of the Non-Debtor Affiliates. . . . [T]his was revisionist history to cover up McKinsey's financial manipulations and to conceal the preference and the disqualifying interest that it created.").

[8]    There is no merit to Defendants' arguments that they should be absolved of this alleged misconduct on a motion to dismiss either because (a) McKinsey vaguely disclosed a connection to an un-named affiliate of the debtor (a disclosure that was itself misleading), or (b) another professional, Kirkland, "also represented GenOn in disputes with NRG," as purportedly revealed by a separate SEC filing dated five months *after* the cited bankruptcy retention order. Mtn. at 24. At most, these arguments raise factual issues

would have revealed that multiple McKinsey clients were GenOn's creditors." *Alix*, 23 F.4th at 206.

Hojnacki's initial declaration in *SunEdison* was so palpably deficient that the UST filed an Objection to McKinsey's retention.   SAC ¶¶ 242-243.   Likewise, the *Westmoreland* court described Hojnacki's declarations as "***so bad that it's got every hair raised on the back of my neck***." *Id.* ¶ 335 (emphasis added).   The *Westmoreland* court also made clear that the problem with Hojnacki's declarations is that they make false and misleading statements, stating: "[I]t's not that I believe that **Mr. Hojnacki** used the wrong approach or the wrong protocol.   He ***makes statements in his declaration that are simply not true***." *Id.* (emphasis added).

## B.   Defendants' Concealment of Connections Through MIO

Pursuant to each of these disclosure tactics, Defendants concealed their own partners' investment connections to Interested Parties through McKinsey's in-house investment firm, MIO. MIO is a private hedge fund, wholly owned and controlled by McKinsey & Co, that today invests and manages billions of dollars of McKinsey partners' personal wealth exclusively for the benefit of current and former McKinsey partners and employees. *Id.* ¶ 138.  Until September 2020, MIO's governing board of twelve directors consisted primarily of active McKinsey & Co. partners.  *Id.* ¶ 139.   Defendant Garcia served on MIO's board from 2006 to 2017, as well as its Audit and Investment Committee, and in those roles had visibility into and even ratified MIO's investments. *Id.*  Notwithstanding Garcia's involvement in nine of the bankruptcies at issue, Defendants never disclosed these facts in McKinsey's Rule 2014 declarations.  *Id.*

Evidence uncovered in *Westmoreland* indicates that Defendants failed to disclose potentially hundreds of disqualifying investment connections through MIO in each of McKinsey's

---

about the degree of conflict posed by McKinsey's relationship with NRG and whether its disclosures were false and misleading.

fourteen bankruptcy cases.  *Id.* ¶ 142.  For example, in addition to MIO's concealed Whitebox investment noted above, in the *NII*, *SunEdison*, *ANR*, and *GenOn* bankruptcies, McKinsey RTS concealed connections to multiple BlackRock entities listed as Interested Parties in those cases, despite MIO having over $600 million invested in BlackRock funds since 2011.  *Id.* ¶ 141.

## C.    Alix Attempts to Bring McKinsey into Compliance

Beginning in September 2014, Alix repeatedly confronted McKinsey's then-Managing Partner, Defendant Barton, with evidence of McKinsey's violations of bankruptcy law.  *Id.* ¶¶ 143-160.  Over the course of approximately three in-person meetings and eight telephone conferences, Barton admitted that its business model was fundamentally inconsistent with Rule 2014's broad disclosure requirements.  *Id.* ¶¶ 143, 154.  In an effort to prevent Alix from taking legal action, Barton also promised that McKinsey would exit the Chapter 11 restructuring business and that he would remove individuals that engaged in illegal conduct once he was reelected as Global Managing Partner.  *Id.* ¶¶ 155-156.  Barton, however, reneged and took no remedial action after his reelection in January 2015.  *Id.* ¶¶ 157-158.  Instead, he tried to buy Alix's silence by offering to introduce AP to two large international companies (Volvo and Fortescue) that Barton claimed needed restructuring services.  *Id.* ¶ 159.  Alix declined the proffered bribe.  *Id.*

## D.    The *Westmoreland* Objections and Reopening of *ANR*

In late 2018, both the UST and Alix's Mar-Bow objected to the employment of McKinsey RTS in *Westmoreland*.  *Id.* ¶¶ 331-333.  Pursuant to an order by the *Westmoreland* court (Hon. David R. Jones), Hojnacki was deposed on December 31, 2018.  *Id.* ¶ 343.  On January 3, 2019, Judge Jones found that Alix's allegations were credible and extremely serious.  *Id.* ¶ 344.  Emphasizing that McKinsey was facing credible allegations of criminal fraud, Judge Jones stated: "If what Mr. Alix alleges is true, then McKinsey has a Title 18 problem."  *Id.*

On January 9, 2019, based on allegations of McKinsey's false and misleading disclosures, the bankruptcy court in *ANR* (Hon. Kevin R. Huennekens) granted an application filed by Alix's Mar-Bow, and supported by the UST, to reopen that case.  *Id.* ¶¶ 234-236.[9]  In so doing, Judge Huennekens called the allegations concerning McKinsey RTS and Carmody "***some of the most serious allegations I've ever seen***."  *Id.* ¶ 236 (emphasis added).  In its papers in support of reopening, the UST described statements by Hojnacki and Carmody in both *ANR* and *SunEdison*— including statements which concealed Defendant Garcia's position as an MIO board member—as inaccurate and, "***at best, misleading***."  *Id.* ¶ 235.  As the UST explained: "McKinsey's repeated characterization in 2016 of MIO's status as a 'blind trust' was inaccurate.  ***MIO was not a blind trust and Jon Garcia, McKinsey [RTS]'s president, ratified MIO investment decisions***."  *Id.*

Subsequently, in February 2019, McKinsey entered into a settlement with the UST whereby McKinsey agreed to pay $15 million—with $5 million to go to the bankruptcy estates or reorganized debtors in each of *ANR*, *SunEdison*, and *Westmoreland*.  *Id.* ¶¶ 348-349.  The settlement, which was the largest of its kind, did ***not*** resolve any allegations that McKinsey was actually disinterested or that it had engaged in fraud.  *Id.* ¶ 349.  The UST announced that "***McKinsey failed to satisfy its obligations under bankruptcy law and demonstrated a lack of candor with the court* and [the UST]**."  *Id.* (emphasis added).

McKinsey withdrew the debtors' application to hire McKinsey RTS in *Westmoreland* and in July 2019 filed yet another defective and misleading application to hire McKinsey RTS, McKinsey US, and four other McKinsey subsidiaries.  *Id.* ¶ 354.  The second, do-over application,

---

[9]     Thus, Defendants' assertion that all of Mar-Bow's motions to reopen were rejected, Mtn. at 12, is false.  The *ANR* decisions cited by Defendants, *see id.*, are irrelevant because they dealt with the technical issue of whether Mar-Bow had standing as an objector in *ANR*, where (unlike in *Westmoreland*) it purchased its claim after the bankruptcy court's approval of McKinsey's employment.

which was improperly filed months after the *Westmoreland* bankruptcy was effectively over, sought approval to hire an *ad hoc* group of six McKinsey & Co. subsidiaries referred to by McKinsey as "the Proposed Professionals." *Id.* ¶¶ 354, 359.  The second application was supported by a Rule 2014 declaration sworn to by Dmitry Krivin, a McKinsey & Co. Partner with *no* prior bankruptcy experience who was hand-selected by McKinsey's top management.  *Id.* ¶¶ 354, 363. The Krivin declaration disclosed *hundreds if not thousands* of client and investment connections that were intentionally concealed in the Hojnacki declarations.  *Id.* ¶¶ 356-357.  However, Krivin still failed to disclose all of McKinsey's connections to Interested Parties as required by Rule 2014, and thus both Alix and the UST objected to the second application.  *Id.* ¶¶ 358-359, 373.

Before trial, the *Westmoreland* court ordered an abbreviated period of discovery, limited to the topics of McKinsey's disclosures in *Westmoreland* and Alix's allegations concerning his interactions with Barton and Sternfels in 2014 and 2015.  *Id.* ¶ 374.  McKinsey presented its case over eight days in court in February 2020 and rested its case in April 2020.  *Id.* ¶ 375.  After an extended hiatus due to the COVID-19 pandemic, the trial was scheduled to resume live in Houston in January 2021.  *Id.* ¶ 378.  In late December 2020, however, McKinsey announced that it had reached yet another settlement with the UST whereby it agreed to withdraw its second application in *Westmoreland*, thereby ending the trial and forfeiting $8 million in fees.  *Id.*

**None** of the decisions cited by Defendants, *see* Mtn. at 12 & n.12, made any findings against Alix or Mar-Bow on the merits.  *ANR* was, in fact, reopened, and other courts—like Judge Jones in *Westmoreland*—indicated that Mar-Bow's allegations, if true, were indicative of serious criminal violations by McKinsey.[10]  As described in the SAC, evidence in the *Westmoreland*

---

[10]    *See* SAC ¶ 236; *Edison Mission*, Dkt. 2749 (1/16/2020 Mem. Op.) at 14-15 ("The allegations of fraud and improper/incomplete disclosures are **extremely troubling and very serious**, if accurate.  **The court takes issue with RTS's position that these allegations are without merit. . . .  No court has examined these**

trial—which was largely limited to just *one* of McKinsey's fourteen Chapter 11 matters—has already confirmed many of Alix's allegations.  *See* SAC ¶¶ 80, 85, 142, 164, 331, 371.   And a recent order by the SEC, which levies an $18 million civil penalty on MIO and refers to evidence that first came to light during *Westmoreland*, likewise confirms Alix's allegations that McKinsey has had undisclosed investment interests in multiple Chapter 11 bankruptcies. *Id.* ¶¶ 384-389.  The SEC's censure of MIO expressly referenced MIO's investments in distressed assets, including details regarding its investments in the assets of McKinsey's bankruptcy consulting clients and debtors in the *ANR* and *SunEdison* bankruptcies, as well as the Chapter 11 proceedings commenced by the Commonwealth of Puerto Rico.  *See Id.* ¶¶ 386-389; *id.* at 148 n.41 (citing *In re MIO Partners, Inc.*, SEC Release No. 5912, 2021 WL 5415361, at *3-4 (Nov. 19, 2021)).

### E.    Individual Defendants

The non-entity defendants (collectively, the "**Individual Defendants**") consist of current and former McKinsey partners and high-level employees, all of whom were aware of, and facilitated and participated in, McKinsey's scheme to defraud:

**Virginia Molino**, McKinsey's General Counsel from 1985 until 2019 and a McKinsey partner from approximately 1991 until 2019, personally approved all of McKinsey's bankruptcy disclosures until she left McKinsey in 2019 and was the author of what she termed McKinsey's

---

*allegations and found them to be without merit*." (emphasis added)); *In re Old ANR, LLC*, No. 19-BK-00302 (Bankr. E.D. Va.) ("*Old ANR*"), ECF 54 (5/17/2019 Mem. Op.) at 12 n.12 ("[T]he United States Attorney retains the ability to institute an action *under title 18 of the United States Code* if so warranted." (emphasis added)); *SunEd* Dkt. 5999 (6/21/2019 Op.) at 24-25 ("[T]he United States Attorney retains the ability to prosecute any *crimes under title 18.*   According to Mar-Bow, McKinsey's nondisclosures have affected numerous bankruptcy cases and a single approach rather than a case-by-case approach is the most efficient way to deal with this issue.") (citation omitted; emphasis added)); *NII* 7/31/2019 Hrg. Tr. at 53:10-55:4 (extracting promise from U.S. Trustee, in its investigation of *NII*, to "liaise, as you deem appropriate, with other branches of the Department of Justice, including applicable US Attorneys' offices").

"unusual approach to compliance," which was in reality an illegal approach that no other bankruptcy professional utilized.  *Id.* ¶¶ 44, 79-80, 85, 96, 122.

**Alison Proshan**, who has served as in-house counsel for McKinsey for over a decade, was responsible for creating McKinsey's false and misleading disclosures from in or around 2011 until this suit was filed in May 2018.  *Id.* ¶ 45.  In *Westmoreland*, McKinsey witnesses (including Molino) confirmed that under Proshan's "*SunEd* Protocol" (which McKinsey used for the *SunEdison* and *GenOn* bankruptcies, and for the Hojnacki declarations in *Westmoreland*), McKinsey generated a list of ***all*** of McKinsey's clients on the Interested Parties list during (an unlawful) two- to three-year "lookback period" and ***then*** culled from that list before disclosing just a fraction of the connections that McKinsey was required to report.  *Id.* ¶¶ 84, 416.

**Dominic Barton**, McKinsey's Global Managing Partner from 2009 to 2018, became aware of McKinsey's unlawful bankruptcy practices by September 2014, when he met with Alix for the first of several meetings between September 2014 and October 2015 at which McKinsey's bankruptcy disclosures were discussed.  *Id.* ¶¶ 39, 143, 146-148.  Rather than stopping McKinsey's unlawful behavior, Barton sought to forestall Alix from taking any action by promising (falsely) that McKinsey would reform and begin to follow the law and offering large financial incentives by introducing AP to certain new business contacts as a bribery payment for not blowing the whistle on McKinsey.  *Id.* ¶¶ 154-159.

**Robert Sternfels**, McKinsey's Global Managing Partner since 2021, became aware of McKinsey's scheme no later than September 2014, when Alix met with Sternfels and Barton and explained that McKinsey was breaking the law by not disclosing to bankruptcy courts its connections to Interested Parties.  *Id.* ¶¶ 46, 143, 146-148.  Sternfels had ultimate authority over McKinsey RTS beginning in or around 2012 and continued McKinsey's unlawful acts.  *Id.* ¶ 46.

Indeed, Sternfels was the Senior Partner responsible for McKinsey's *SunEdison* engagement in 2016, during which McKinsey knowingly concealed at least hundreds of client and investment connections as well as various voidable preference payments. *Id.* ¶¶ 239-241, 255-271.

**Jon Garcia**, a graduate of Harvard Law School and a longtime McKinsey Senior Partner, has been President of McKinsey RTS since its founding in or about 2010. *Id.* ¶¶ 41, 149. Garcia was also a member of McKinsey's Recovery Oversight Committee—the internal McKinsey committee that approved its bankruptcy engagements until 2019—up through its approval of the *Westmoreland* engagement in or around July 2018. *Id.* ¶ 326. And from approximately 2006 until mid-2017, Garcia sat on the Board and Investment Committee of MIO, which ratified MIO's investments—including its investment in the reorganized debtors in *ANR* through Whitebox—which was never revealed to the UST or any court until McKinsey was forced to do so in late 2018. *Id.* ¶¶ 41, 227-229, 234, 326.

**Seth Goldstrom**, who is admitted to the bar in Georgia and a longtime McKinsey Senior Partner, is the former head of McKinsey RTS in North America. *Id.* ¶¶ 42, 149, 401. Goldstrom has signed and sworn to numerous false and misleading Rule 2014 declarations on behalf of McKinsey in multiple bankruptcies. *Id.* ¶¶ 118, 121, 401.

**Kevin Carmody** is a McKinsey Senior Partner and the head of McKinsey's Chapter 11 practice. *Id.* ¶ 40. Carmody has signed and sworn to numerous false and misleading Rule 2014 declarations on behalf of McKinsey, including in *ANR*, which the bankruptcy court ***reopened*** to address McKinsey's concealment of its investment interest. *Id.* ¶¶ 128, 162, 173, 190-191, 236.

**Mark Hojnacki** is a McKinsey Partner who has signed and sworn to multiple false and misleading Rule 2014 declarations on behalf of McKinsey in both the *SunEdison* and *Westmoreland* bankruptcies. *Id.* ¶¶ 43, 237, 242-246, 329-337.

**Jared Yerian** is a former McKinsey Partner who signed and swore to multiple false and misleading Rule 2014 declarations in the *Edison Mission* bankruptcy. *Id.* ¶¶ 47, 131, 133.

## ARGUMENT

## I.   ALIX ADEQUATELY PLEADS RICO PREDICATE ACTS

Defendants blithely contend that their long-running fraudulent scheme amounts to nothing more than a "good faith" dispute over the meaning of Rule 2014, claiming they have always been "transparent" about their non-disclosures.   *See* Mtn. at 14-16.   Defendants' narrative is incompatible with the SAC's well-pleaded allegations and the 150 pages of false and misleading statements and omissions identified for fourteen bankruptcy proceedings in Exhibit B of the SAC, to say nothing of objective reality.  As the UST, multiple bankruptcy courts, and the Second Circuit have acknowledged, Alix's allegations concern a pattern of criminally misleading conduct:

- In its May 3, 2016 motion to compel McKinsey RTS to comply with Rule 2014's disclosure requirements in *ANR*, the UST noted that McKinsey's disclosures misleadingly "***g[a]ve the appearance of compliance without actually complying with Bankruptcy Rule 2014***." SAC ¶ 213 (emphasis added).

- On November 30, 2018, the UST filed a brief in support of the reopening of *ANR*, stating that McKinsey's representations to both the UST and the bankruptcy courts in *ANR* and *SunEdison* regarding MIO were "***at best, misleading***." *Id.* ¶ 24 (emphasis added).

- On December 18, 2018, the *Westmoreland* court stated that Mar-Bow's Objection "***clearly implicated certain sections of Title 18 applicable to bankruptcy cases*** and . . . it puts [McKinsey] square right in the middle of those provisions." *Id.* ¶ 342 (emphasis added).

- On January 3, 2019, the *Westmoreland* court reiterated the criminal nature of the allegations against McKinsey, stating: "If what Mr. Alix alleges is true, then ***McKinsey has a Title 18 problem***." *Id.* ¶ 344 (emphasis added).

- On January 9, 2019, the *ANR* Court ***reopened*** the *ANR* bankruptcy to address Carmody and McKinsey RTS's misconduct, calling the allegations against McKinsey RTS "some of ***the most serious allegations I've ever seen***." *Id.* ¶ 236 (emphasis added).

- In February 2019, McKinsey paid a $15 million penalty related to its bankruptcy disclosures, which the UST announced in a press release stating: "***McKinsey … demonstrated a lack of candor with the court and USTP***." *Id.* ¶ 349 (emphasis added).

- During a June 5, 2020 hearing, the *Westmoreland* court emphasized the Hojnacki declarations were false and misleading, prompting the court to weigh whether it should "refer Mr. Hojnacki to the US Attorney's Office for perjury": "[I]t's not that I believe that **Mr. Hojnacki** used the wrong approach or the wrong protocol.  He **makes statements in his declaration that are simply not true**."  *Id.* ¶ 335 (emphasis added).

Alix's allegations do not arise from a mere difference in interpretation regarding Rule 2014 or its requirements, but from Defendants' knowing, wrongful, and concerted effort spanning two decades to willfully mislead bankruptcy courts and other parties by submitting declarations regarding McKinsey's connections that Defendants knew to be false and misleading.  The SAC painstakingly details with particularity Defendants' sundry fraudulent statements and omissions, identifies who made them, and explains why they were fraudulent.  *See Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, LLC, 783 F.3d 395, 402–03 (2d Cir. 2015) (describing required elements of heightened pleading standard under Rule 9(b)).

## A.      Alix Adequately Alleges a Scheme to Defraud under the Mail and Wire Fraud Statutes, 18 U.S.C. §§ 1341 and 1343

Alix alleges that Defendants committed and aided and abetted mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of  18 U.S.C. § 1343.  The "essential elements" of mail and wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *U.S. v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (citation omitted).  "The gravamen of the offense is the scheme to defraud." *Id.* (citation omitted).  "'Scheme to defraud' has been construed liberally to include any plan consummated by the use of the mails, in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property." *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 249-50 (S.D.N.Y. 2012) (citations, quotations omitted) (denying motion to dismiss RICO claims where defendant-attorney allegedly committed fraud on Ecuadorean court).  "The term 'scheme to defraud' is measured by a 'nontechnical standard.  It is a reflection of moral

uprightness, of fundamental honesty, fair play and right dealing in the general [and] business life of members of society.'" *U.S. v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997) (citation omitted).

The elements of mail and wire fraud are satisfied as to each Defendant because the SAC alleges that each Defendant engaged in a scheme to fraudulently obtain bankruptcy assignments for which McKinsey was disqualified, describes in detail how the mails and wires were used to further the scheme, and identifies specific instances in which each Defendant committed (and aided and abetted) multiple acts in violation of 18 U.S.C. §§ 1341 and 1343, including in connection with numerous false and misleading Rule 2014 disclosures. *E.g.*, SAC ¶¶ 426-437, 532-542, 608-618; *id.*, Exs. A-B. Indeed, Defendants utterly fail to grapple with Exhibit B to the SAC, which alleges in excruciating detail Defendants' false and misleading statements in fourteen cases.

In summary, Defendants conducted and concealed their scheme to defraud by: (1) declaring McKinsey "disinterested" under oath with knowledge that it was not, and that the internal searches conducted were insufficient to determine the full extent of McKinsey's lack of disinterestedness (*e.g.*, *id.* ¶¶ 10-11, 90-91); (2) hiding McKinsey's numerous disqualifying conflicts of interest and misdeeds in each of the fourteen cases (*e.g.*, *id.* ¶¶ 92-136, 161-207, 241-254, 283-287, 326-344, 354-372); (3) deliberately taking advantage of the deluge of initial filings in all large Chapter 11 proceedings and the relative indifference of litigants, which created ideal conditions for avoiding scrutiny of deficient disclosures (*e.g.*, *id.* ¶¶ 13, 192-195, 319); (4) continually changing their disclosure methodology (citing "confidentiality," utilizing disclosure by category, concocting a direct-commercial-relationship test, *etc.*) to conceal noncompliance (*e.g.*, *id.* ¶¶ 74-85); (5) concealing the very existence of MIO and later falsely positing a strict informational "wall" between McKinsey and MIO that would prevent conflicted advice based on pecuniary self-interest

(*e.g.*, *id.* ¶¶ 137-142); and (6) resisting disclosure of critical connections for as long as possible (despite an affirmative legal obligation to proactively disclose all relevant connections from the outset), and making incremental disclosures only when and to the extent absolutely necessary (*e.g.*, *id.* ¶¶ 13-14, 220-222, 319).  McKinsey employed all of the foregoing tactics in the context of a legally-prescribed disclosure process in which full compliance and candor are presumed.

These deceptive practices belie Defendants' facile claim that their disclosures were "fully transparent" and not misleading.  Mtn. at 15-16.  Defendants' disclosures were consistently "purposefully vague and misleading," *Matco*, 383 B.R. at 853, and were intended to conceal their disqualifying connections through a combination of affirmative misrepresentations, obfuscations, misleading half-truths, and omissions.  For example, Defendants made numerous affirmative misrepresentations to bankruptcy courts in furtherance of their fraudulent scheme:

- In each of the 14 bankruptcies, McKinsey US and/or RTS (and Goldstrom, Carmody, Yerian, and Hojnacki in certain cases) falsely said they believed, or that to the best of their knowledge, McKinsey RTS and/or McKinsey US was a "disinterested person" within the meaning of § 101(14) (thus implying McKinsey was not disqualified under § 327(a)) and that it did not hold or represent any interest adverse to the estate.[11]  Dozens of undisclosed, disqualifying McKinsey connections existed in each case.  *See* SAC ¶¶ 412-425.

- In *ANR*, McKinsey RTS, Carmody, Molino, Hojnacki, and Proshan induced the UST to withdraw a motion to compel by falsely representing that RTS's connections would be fully disclosed in a supplemental declaration.  *Id.* ¶¶ 213-224.  Carmody also stated that McKinsey RTS had connections to "two Revolving Facility Lenders," but it actually had connections to at least seventeen.  *Id.* ¶ 81; *id.*, Ex. B at 40.

- In *GenOn*, Carmody falsely stated that McKinsey RTS had no connections to a variety of categories of Interested Parties, including the debtor's parent company, NRG Energy, which was both a McKinsey client and an Interested Party against which GenOn potentially had multi-million dollar fraudulent transfer claims.  *Id.* ¶¶ 285-304, 312-317.

- In *UAL*, *Mirant*, and *Lyondell*, McKinsey US falsely stated it could not identify clients or describe work performed for them due to an obligation to "maintain strict client confidentiality," and in *ANR*, McKinsey RTS and Carmody cited this spurious

---

[11]   *See* SAC ¶¶ 89-91; *id.*, Ex. B at 3-4, 6-8, 10, 13, 15, 20, 30, 35-36, 45, 62, 67-68, 73, 81, 93, 120 (disinterested); *id.*, Ex. B at 26, 55, 62, 66, 68, 73, 120 (no adverse interest).

confidentiality obligation as justification for identifying certain clients only as "confidential clients."[12]  In fact, McKinsey's agreements with clients permitted it to disclose such matters when "legally required," and McKinsey in any event knew that its obligations under federal bankruptcy law and rules of procedure superseded any supposed contractual client confidentiality provisions.  *Id.* ¶¶ 10, 102, 522; *id.*, Ex. C ¶ 49.

• In *ANR, SunEdison*, and *Westmoreland*, McKinsey RTS, McKinsey US, Carmody, and Hojnacki said MIO was "walled off" and operated as a "blind trust," creating a false impression that MIO's investment positions could not affect McKinsey professionals' judgment.[13]  In fact, Garcia sat on MIO's board and approved its investments while he simultaneously served as President of McKinsey RTS—a fact that McKinsey did not reveal until late 2018 after repeated inquiry.  *Id.* ¶¶ 23-24, 41, 139.  McKinsey also claimed falsely that it lacked the ability to search MIO-related connections.  *Id.* ¶¶ 25 & n.8, 369-371.

Defendants also stated numerous misleading half-truths, from which there arose a duty to clarify.  *See U.S. v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) (a duty to disclose may arise "where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading").  For example, in *Harry & David*, after identifying no connections by name in two declarations, Goldstrom (on behalf of RTS) named a single client from years earlier, fostering the appearance of exacting compliance with Rule 2014—while concealing that McKinsey's connections included at least 13 current or recent McKinsey clients (and likely hundreds of client and investment connections).  SAC ¶ 119.

Defendants' systematic use of "disclosure by category" was itself a misleading half-truth because without knowing the identity of a connection and details of the relationship, it is difficult, if not impossible, to determine whether a connection is disqualifying.  *See id.*, Ex. C ¶¶ 29-30, 40, 93, 95; *Matco*, 383 B.R. at 854-55 (stating professional's vague description of relationship with significant creditor deprived court of opportunity to disqualify professional at outset of case); *In re Farrington*, 2007 WL 4365753, at *7 (Bankr. D. Ore. Dec. 11, 2007) (professional's failure to

---

[12]      *Id.* ¶¶ 10, 78, 99, 108, 115, 522, 607; *id.*, Ex. B at 4, 6-7; *id.*, Ex. C ¶ 46.

[13]      *Id.* ¶¶ 23–25, 137-142, 217, 230, 235, 338, 357, 369; *id.*, Ex. B at 54, 74.

disclose details of connection with creditor "left the court without sufficient information to make an informed decision"). For instance, in *ANR*, by disclosing only that at some point in the preceding three years McKinsey RTS had advised a "Major Customer" of the debtor on "procurement in the coal sector generally but with no specific focus on the Debtors or these chapter 11 cases," McKinsey RTS and Carmody made it difficult to determine that the "Major Customer" was U.S. Steel, a then-current McKinsey client whose lowered coal purchase costs would come at the debtor's expense—a blatant, disqualifying conflict of interest. SAC ¶¶ 210–212. The same is true of Hojnacki's intentionally vague description of McKinsey's (and Sternfels's) connections to SunEdison's then-CEO, Chatila, in *SunEdison*. *Id.* ¶¶ 272-279.

Additionally, none of Defendants' disclosure declarations affirmatively explained the deficiencies in their methodology for ascertaining connections, nor did they reveal that they were only partially disclosing connections, including through the intentionally deceptive "direct commercial relationship test" invented by Molino solely as a device to avoid complete disclosure. *Id.* ¶¶ 74-85. The SAC also alleges that, starting in *ANR*, Defendants engaged in a practice of delaying disclosures of connections until McKinsey's retention in a particular case was a *fait accompli*. *Id.* ¶¶ 194, 202-207.

Collectively and individually, these factual allegations establish a "scheme to defraud" in connection with Chapter 11 proceedings as required to plead fraudulent predicate acts. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648 (2008) ("Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO even if no one relied on any misrepresentation.").

Defendants cite three cases for their proposition that their failure to be "explicit and complete," *Midway*, 272 B.R. at 662, with respect to their Rule 2014 disclosures cannot, as a matter

of law, be fraudulent: *Jensen v. Kimble*, 1 F.3d 1073, 1078 (10th Cir. 1993), *Harborview Master Fund, LP v. Lightpath Techs., Inc.*, 601 F. Supp. 2d 537, 543 (S.D.N.Y. 2009), and *McCormick v. Fund Am. Cos.*, 26 F.3d 869, 879–80 (9th Cir. 1994).  All three cases are inapposite because they involve securities fraud claims, where it is "a well-established principle . . . that silence absent a duty to disclose cannot be actionably misleading."  *Harborview*, 601 F. Supp. 2d at 543.  That principle has no application where, as here, Rule 2014 creates an affirmative duty to disclose.

As the Supreme Court has made clear, the mail and wire fraud "statutes did not incorporate all the elements of common-law fraud" and "the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted."  *Neder v. United States*, 527 U.S. 1, 24-25 (1999).  Accordingly, Defendants' cited securities fraud cases are simply not relevant.  Unlike the investors in *Jensen*, *Harborview*, and *McCormick*, neither the UST, nor any Interested Party, nor the bankruptcy courts had any responsibility to seek additional disclosure from a professional so as to render the initial declarations not misleading.  Nor did the bankruptcy court or any participant knowingly accept the risk of non-disclosure.  To the contrary, Defendants had a legal duty to disclose all connections without being asked or prodded, and, as detailed above, went to great lengths to disguise the fact that they had not done so.  The notion that Defendants' bare bones and misleading disclosures put the UST, Interested Parties, and the bankruptcy courts "on notice" of what the Rule 2014 declarations failed to disclose is incompatible with Rule 2014's broad disclosure regime, related case law, and the SAC's factual allegations.  *See Matco*, 383 B.R. at 854; *Gellene*, 182 F.3d at 588 (Rule 2014's "disclosure requirements apply to all professionals and are not discretionary").  Accordingly, as further shown below, each of Defendants' attempts to characterize their scheme as "transparent," and therefore not misleading, fails.

***Client Confidentiality***.   Defendants contend their disclosures related to client confidentiality in *UAL*, *Mirant*, and *Lyondell* could be not be misleading because the reader would understand them to be merely a description of circumstances that might cause McKinsey US to withdraw as an advisor if complete disclosure were required.  Mtn. at 17-18.  But Defendants' disclosures ***do not***, as the Motion contends (*id.*), state merely that McKinsey's disclosures were incomplete because McKinsey ***"wished"*** to maintain client confidentially, but that, "[b]ecause of its responsibility to maintain strict client confidentiality, ***McKinsey cannot disclose*** the services performed, or even in some instances the fact that services were provided for clients."  SAC, Ex. B at 4, 6-7 (emphasis added).  As Molino testified in *Westmoreland*, McKinsey's statements to bankruptcy courts regarding client confidentiality were simply not true given that, among other things, McKinsey's client retainer agreements expressly authorized McKinsey to disclose client connections and all other disclosures required by law.  SAC ¶¶ 102, 522.

***Failure to Identify Connections by Name***.   Defendants argue that "disclosure by category" (*i.e.*, failure to disclose connections by name) could not be misleading because the declarations prepared using this approach "were clear on their face" as to what McKinsey was disclosing and what it was not.  Mtn. at 17.[14]  Defendants' transparency argument ignores the critical fact that the Rule 2014 disclosure process relies on truthful self-reporting and candor and creates the ideal conditions for deficiencies to hide in plain sight, and for unscrupulous professionals to take advantage of those conditions.  Disclosures are a small part of an avalanche of voluminous filings

---

[14]   Defendants' argument regarding "disclosure by category" covers disclosures made from around 2011 until the UST pressured (and the *ANR* court ordered) Defendants to name client connections in 2016 and they responded by shifting to a different—but equally misleading—disclosure methodology termed the "*SunEd* Protocol."  SAC ¶¶ 81-85.  Defendants' argument does not address, let alone refute, false and misleading disclosures made prior to 2011 in the *Hayes*, *UAL*, *Mirant*, and *Lyondell* bankruptcies or after Defendants shifted to the *SunEd* Protocol in the *SunEdison*, *GenOn*, and *Westmoreland* cases.  Nor does it address Defendants' utter failure to disclose any investment interests.

that occur in the beginning of a Chapter 11 case, and creditors rarely have the incentive to scrutinize a professional's disclosures. *Id.* ¶¶ 13-14.  Defendants' failure to identify connections by name contradicted the plain language of Rule 2014 and established case law, *see supra* at 7-9, deviated from the practice of every other bankruptcy professional, *see* SAC ¶¶ 13, 60-62, 74-85, and furthered Defendants' scheme to defraud.  This practice made Defendants' declarations woefully "incomplete or ambiguous," *Autuori*, 212 F.3d at 120, and the requirement to make complete disclosure under Rule 2014 imposed a duty on Defendants to provide additional information to make the initial declarations not misleading.  As the UST said in *ANR*, McKinsey RTS did "***not identify any specific interested parties by name, nor do they provide any useful context***," and thus deceitfully "***gave the appearance of compliance without actually complying with Bankruptcy Rule 2014***."  SAC ¶ 445.  The *ANR* court agreed and held that this approach was not valid.  *Id.* ¶¶ 217-218, 447-448.

Even if disclosure by descriptive category *were* sufficient—and plainly it is not—that would not explain Defendants' many other disclosure failures during the same period that they were employing disclosure by category, including, for example, (1) the many instances in which Defendants, like the defendant in *Gellene*, committed bankruptcy fraud by completely omitting (even by "category") connections that should have been disclosed, including current McKinsey clients, in violation of Rule 2014;[15] (2) Defendants' failure to make accurate (or any) disclosures regarding MIO and McKinsey's disqualifying investment interests;[16] or (3) Defendants' utilization of Molino's fundamentally flawed "direct commercial relationship" test.[17]

---

[15]     *See* SAC ¶¶ 20, 29, 94, 103, 106, 125, 130, 135, 189-190, 193, 195-197, 206, 210, 212-215, 228-231, 250-251, 287, 290-291, 302, 315-319; *id.* Ex. B at  5-7, 32-61, 66, 68-69, 81-86.

[16]     *See, e.g.*, *id.* ¶¶ 137-142, 188, 196, 217-219, 230, 240(c), 287(e), 330, 338, 357.

[17]     *See, e.g.*, *id.* ¶¶ 79, 188, 195-96, 218-19, 248, 312, 316-19, 330, 334; *id.*, Ex. B at Schedules 9-12.

_**Use of "Lookback Periods" and Limitations on Affiliate Disclosures**_.   Defendants

contend that they "stated explicitly that they were disclosing only the connections of particular

individuals and entities, for a specified Lookback Period," and where there were inconsistences,

that was "commonplace in bankruptcy practice."  Mtn. at 18.  To the extent Defendants hope to

pin their defense on purportedly common bankruptcy practices, such arguments present factual

disputes that cannot be resolved at the pleading stage.[18]  *See Sharette v. Credit Suisse Int'l*, 127 F.

Supp. 3d 60, 84 (S.D.N.Y. 2015) (defendants' argument that alleged stock price manipulation was

legitimate industry practice "merely raised a factual dispute inappropriate for resolution at the

pleading stage").

Additionally, as discussed above, Alix adequately alleges how Defendants' failure to

disclose connections, including with respect to MIO, and their improper use of "lookback periods"

advanced Defendants' scheme to defraud bankruptcy courts.  Among other things, Alix alleges

that McKinsey's self-chosen "lookback periods" were inconsistent, arbitrary and deliberately

selected so as to avoid disclosure of known, significant connections, all in violation of Rule 2014.

SAC ¶ 84.  In *ANR*, for example, Defendants applied a three-year lookback period; however, in

*SunEdison*, which was pending at the same time, and subsequent bankruptcies, Defendants applied

a two-year lookback period.  *Id.*; *id.*, Ex. B at 36 (applying three-year lookback in *ANR* on August

24, 2015) and 62 (applying two-year lookback in *SunEdison* on May 5, 2016).  These "lookback

periods," therefore, were critical components of the scheme to defraud, as their arbitrary nature

and application obscured McKinsey's lack of disinterestedness, and operated as an "artifice . . .

---

[18]      Similarly, Defendants' assertion that they should be excused from their decades of fraudulent
misrepresentations and omissions because AP purportedly omitted from one bankruptcy filing certain
connections that it had already disclosed in a different filing (*see* Mtn. at 19 n.21) is risible and, at most,
presents issues of fact.

employed to obtain something of value." *Donziger*, 871 F. Supp. 2d at 249. Similarly, Defendants' statements in their disclosures referring to McKinsey "affiliates" gave the false impression that Defendants were, in fact, disclosing McKinsey's connections to Interested Parties through all of its "affiliates," as required by Rule 2014. *See* SAC ¶¶ 119, 123, 316.[19]

***Conflicts-Checking Process***. Defendants' deliberately circumscribed conflicts-checking process was not, as Defendants contend, merely "substandard" (Mtn. at 20), but operated as part of their scheme to defraud. *See* SAC ¶ 71 ("McKinsey has purposefully maintained a substandard system for identifying conflicts that, even to this day, is incapable of identifying adverse interests. . . . McKinsey's system of searching for and disclosing conflicts is inadequate by design and intended to conceal rather than uncover adverse interests . . . ."). Far from transparent, Defendants' surface-level descriptions of the processes purportedly used to identify connections gave Interested Parties and the bankruptcy courts the false impression that they were designed to, and could, sufficiently identify potential conflicts. *See*, *e.g.*, *Id.* ¶ 316 ("Carmody further contributed to creating a false impression that McKinsey had conducted a diligent, thorough, and exhaustive search of its potential connections" by stating that he had searched a "global database" without disclosing that the database did not check for conflicts.). Defendants failed to perform their duty to clarify such "incomplete or ambiguous statements" regarding their conflicts checking processes. *Autuori*, 212 F.3d at 120; *see also U.S. v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) (scheme to defraud "can be shown by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or avert further inquiry into a material matter"). Defendants' argument also

---

[19]     Defendants also disclaim any responsibility to disclose their connections through former McKinsey employees, declaring that "Alix does not explain why anyone would have expected McKinsey to make such disclosures." Mtn. at 18 n.19. On the contrary, Alix clearly explained why such connections must be disclosed. *See, e.g.*, SAC ¶ 206.

ignores Alix's allegations that under the *SunEd* Protocol McKinsey **purposefully chose not to disclose the majority of its *known* connections to interested parties**.  SAC ¶¶ 83-85.

*__Lack of Disinterestedness__*.  The SAC alleges facts establishing Defendants' misrepresentation and omission of particular connections in specific bankruptcy cases, including instances where Defendants' connections created disqualifying conflicts.  For example, McKinsey never disclosed its client relationship with NRG Energy in the *GenOn* bankruptcy, where it was retained to investigate GenOn's potential claims *against* NRG Energy.  *See, e.g., id.* ¶¶ 290-296.  As the Second Circuit held: "Alix plausibly alleges that had McKinsey filed proper disclosure statements, GenOn would not have hired McKinsey, and even if it had, the bankruptcy court would not have approved McKinsey's retention."  *Alix*, 23 F.4th at 206.

Defendants' assertion that McKinsey's Rule 2014 declarations did not constitute fraud because Defendants couched their statements regarding McKinsey's disinterestedness in terms of "subjective belief" (Mtn. at 22) mischaracterizes Alix's allegations.  Alix alleges facts supporting the inference that each of those declarants (and other Defendants involved in preparing and submitting those disclosures), in fact, did *not* hold the belief that McKinsey was disinterested.  *See, e.g.*, SAC ¶¶ 249-250 (Defendants were aware of dozens of client connections intentionally omitted from *SunEdison* disclosures), 257-259 (orchestrated sham transactions to avoid disclosure of McKinsey RTS's creditor status and to evade disqualification).  Defendants systematically and purposefully made vague and misleading statements with respect to McKinsey's client and investment connections and the resulting disqualifying conflicts of interest.  These affirmative misstatements and half-truths constituted fraud in violation of 18 U.S.C. §§ 152(2), 152(3), 1341, and 1343.  *See Autuori*, 212 F.3d at 118-19 (holding reasonable jury could find defendant-accountant's statements regarding financial projections were actionable misrepresentations

contradicting his honest view, not merely subjective opinions of belief); *see also Colton*, 231 F.3d at 901 ("What is essential is proof of a 'scheme or artifice to defraud,' which can be shown by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or avert further inquiry into a material matter.").[20]

## B.   Alix Adequately Alleges Bankruptcy Fraud under 18 U.S.C. §§ 152(2)-(3)

With respect to the bankruptcy fraud predicate acts, it is unlawful to knowingly and fraudulently make either "a false oath or account," 18 U.S.C. § 152(2), or "a false declaration, certificate, verification, or statement under penalty of perjury," 18 U.S.C. § 152(3), in either case, "in or in relation to any case under title 11." 18 U.S.C. §§ 152(2)-(3). As set forth above, Alix adequately alleges that by knowingly and fraudulently filing or causing to be filed numerous false and misleading disclosure declarations under penalty of perjury in one or more of McKinsey's Chapter 11 bankruptcies, each Defendant participated in, and aided and abetted, multiple acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) or 152(3). *See* SAC ¶¶ 412-425, 522-531, 595-607; *id.*, Exs. A-B (describing specific false and misleading statements); *Gellene*, 182 F.3d at 587-588 (affirming conviction for bankruptcy fraud in connection with Rule 2014 disclosures where defendant had requisite "intent to deceive").

*18 U.S.C. § 152(2).*  Citing no case law, Defendants argue Alix has failed to allege that any of the Defendants made a false "oath or account," as required under 18 U.S.C. § 152(2). Mtn. at 30. But courts consider Rule 2014 declarations made under penalty of perjury to be made "under oath," and, as such, they constitute oaths. *See, e.g.*, *Gellene*, 182 F.3d at 588 ("Bankruptcy Rule

---

[20]   Far from mischaracterizing McKinsey's false *AMR* declarations, as Defendants contend (Mtn. at 22 n.22), Alix accurately alleges that Defendant "Goldstrom failed to *name* a single connection between McKinsey and any Interested Parties" in his initial declaration. SAC ¶ 123; *id.*, Ex. B at 12 (identifying statement at paragraph 24 of the initial declaration—not paragraph 7, as cited by Defendants—where Goldstrom failed to identify connections by name, including with respect to McKinsey's former Managing Partner).

2014 requires the potential [professional] for the debtor ***to set forth under oath*** any 'connections with the debtor, creditors, [and] any other party in interest.'" (emphasis added)); *In re Big Rivers Elec. Corp.*, 284 B.R. 580, 595 (W.D. Ky. 2002) ("Bankruptcy Rule 2014 outlines the procedural mechanism for maintaining disinterestedness by requiring the potential [professional] for the debtor ***to set forth under oath*** any 'connections with the debtor, creditors, [and] any other party in interest.'" (emphasis added)), *aff'd*, 355 F.3d 415 (6th Cir. 2004); *In re HML Enters., LLC*, 2016 WL 5939737, at *3 (Bankr. E.D. Tex. Oct. 12, 2016) (describing statements in attorney's Rule 2014 declaration as made "under oath").

***18 U.S.C. § 152(3).***   In any event, Defendants' argument regarding § 152(2) is academic, as Alix alleges fraud under both §§ 152(2) and 152(3), and Defendants do not dispute that § 152(3) applies to their Rule 2014 disclosures.  While Defendants contend that Alix fails to adequately plead bankruptcy fraud under § 152(3) against certain Individual Defendants (Barton, Garcia, Molino, Proshan, or Sternfels) who did not personally sign Rule 2014 declarations (Mtn. at 31), this argument ignores that each is alleged to have aided and abetted the fraudulent disclosures in violation of 18 U.S.C. § 152(3).  *See, e.g.*, SAC ¶¶ 414, 421, 524, 601 (Barton); *id.* ¶¶ 414-415, 525, 602 (Garcia); *id.* ¶¶ 414, 423, 522–523, 530, 603 (Molino); *id.* ¶¶ 414, 416, 523, 596 (Proshan); *id.* ¶¶ 414, 420, 523, 527, 598 (Sternfels).

## C.   Alix Adequately Alleges Scienter

"Allegations of scienter are sufficient if supported by facts giving rise to a strong inference of fraudulent intent."  *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990) (quotations omitted).  Such an inference arises from allegations (a) "show[ing] that defendants had both motive and opportunity to commit fraud, or (b) . . . constitut[ing] strong circumstantial evidence of conscious misbehavior or recklessness."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (quotations omitted).  Such "allegations may be based on information and belief when

facts are particularly within the opposing party's knowledge, provided that they adduce specific facts supporting a strong inference of fraud." *Alix*, 23 F.4th at 209 (quotations omitted).

### 1.     The SAC gives rise to a strong inference of fraudulent intent

Conscious misbehavior or recklessness may be alleged by showing, *inter alia*, that the defendants "engaged in deliberately illegal behavior." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (quotations, citation omitted). Contrary to Defendants' assertions, their deliberate, decades-long effort to obfuscate their connections to Interested Parties in fourteen bankruptcies was not merely the result of a difference in interpretation regarding Rule 2014, especially given Alix's allegations that they knew that their actions ran counter to established case law, their own internal guidance, their professional experience, and to other bankruptcy professionals' practices.

Despite clear obligations under Rule 2014, *see supra* at 4-9, Defendants disclosed virtually no connections in the first ten bankruptcies, over fifteen years.  This conduct is unprecedented. SAC ¶ 90; *id.*, Ex. C. ¶ 22 & n.4.  And despite its vast client base, McKinsey consistently disclosed far fewer connections than other professionals in its bankruptcy cases.  *Id.* ¶¶ 12-13, 90-91. McKinsey US and McKinsey & Co. formed McKinsey RTS to house McKinsey's bankruptcy practice for the specific purpose of erroneously and illegally claiming that only RTS's connections (and not those of the larger McKinsey organization) had to be disclosed.  *See id.* ¶ 395.

Defendants for years claimed that their nondisclosures were justified due to McKinsey's commitment to client confidentiality.  *Id.* ¶ 78.  However, this was nothing but pretext.  In truth, Defendants were fully aware that McKinsey's client engagement agreements provided exceptions allowing for disclosures pursuant to applicable bankruptcy law and rules, including Rule 2014, and that, in any event, such laws superseded any so-called private confidentiality agreements.  *Id.* Defendants Carmody, Hojnacki, and Yerian knew of the woefully incomplete nature of RTS's

disclosures from their earlier employment at AP. *Id.* ¶¶ 70, 163-164, 401(j), 401(l)-(m). Likewise, Defendants had access to sophisticated legal counsel, and several Individual Defendants had legal training. *See, e.g.*, *Atl. Sporting Club*, 137 B.R. at 553 ("M & S is a firm with experienced bankruptcy counsel, fully aware of the extent of their representation of other related entities . . . . The failure to disclose this information and other facts strongly indicates a deliberate attempt to circumvent the requirements of the Code."). Further, Carmody and Proshan, as prominently named authors of the internal McKinsey document titled "Bankruptcy 101"—which provided instructions for checking and disclosing McKinsey's bankruptcy connections, including the admonishment that failure to timely and properly disclose connections with interested bankruptcy parties may result in penalties, fines or fee disgorgement—knew that Defendants' disclosure practices did not comply with Rule 2014. *Id.* ¶ 170. And Molino, the primary architect of Defendants' disclosure methodology, admitted that she was aware that McKinsey employed an "unusual approach to compliance" with Rule 2014 and she was not aware of any other bankruptcy professionals that disclosed connections by descriptive category. *Id.* ¶ 82.

Notably, Defendants' illegal conduct continued even after Alix raised it with senior McKinsey management in September 2014—namely, Barton and Sternfels, who documented the criminal nature of the allegations and then proceeded to share the allegations with McKinsey internal counsel, Molino and Proshan, and other senior managers, including Garcia, the head of RTS. *Id.* ¶¶ 143–160.[21] In October 2015, after failing to deliver on his promise to cease McKinsey's illegal practices, Barton offered Alix bribes—to introduce him and AP to Fortescue and Volvo to obtain bankruptcy work—to induce Alix to drop his concerns. SAC ¶ 159. Despite

---

[21]   *See S.E.C. v. Pentagon Cap. Mgmt. PLC*, 612 F. Supp. 2d 241, 264 (S.D.N.Y. 2009) (facts alleged "constitute[d] strong circumstantial evidence that Defendants were aware that late trading was illegal, including an email from a U.S. broker-dealer to Chester that directly informed him of the fact").

repeated notice from Alix and Barton's repeated promises, Defendants knowingly made further illegally incomplete disclosures in *NII*, *Standard Register*, *ANR*, *SunEdison*, *GenOn*, and *Westmoreland*. *Id.* ¶¶ 161-379.  And when, in the eleventh bankruptcy, *ANR*, the UST demanded that RTS comply with Rule 2014, RTS promised to do so but did not.  *Id.* ¶¶ 213-224.

Throughout this period, Defendants also hid the very existence of McKinsey's internal investment arm, MIO, and the hundreds of client connections created through its management of investments for former McKinsey partners and employees.  *Id.* ¶¶ 138-142.  Then, when forced to disclose its existence, Defendants falsely claimed that MIO was walled off from McKinsey RTS, could not be searched for potential client connections, and operated as a blind trust.  *Id.* ¶¶ 217, 230.  All of these representations regarding MIO were revealed to be untrue.  *Id.* ¶¶ 338, 357.

After the *ANR* court compelled Defendants to abandon their disclosure-by-category approach in accordance with well-established bankruptcy law, *id.* ¶ 13; *id.*, Ex. C ¶¶ 22, 40, 48, Defendants adopted a new disclosure avoidance tactic: withholding the most critical disclosures until after reorganization plans were confirmed (*id.* ¶¶ 13-14, 193, 238, 319, 352–357) and completely withholding others (*id.* ¶¶ 248–250, 358, 367; *id.* at Ex. B, Schedules 4–8).  Pursuant to Defendants' new-found approach, and after Mar-Bow successfully moved the *ANR* court to compel RTS to disclose all connections by name (the court's decision explicitly rejected McKinsey's disclosure-by-category ruse), RTS violated the court order by delaying the public disclosure of at least one egregious, disqualifying connection, NRG Energy, until after the case was effectively over, *id.* ¶¶ 220–224, and never disclosed others, including McKinsey's investment interest in the reorganized debtor through Whitebox.  *Id.* ¶¶ 225–236.

Defendants attempt to wave off these (and other) allegations by asserting that their actions were merely the result of a difference in opinion regarding their disclosure obligations under Rule

2014, boldly claiming that their interpretation was "objectively reasonable." Mtn. at 25. Yet, they fail to identify a single other bankruptcy professional that adopted a disclosure approach that even remotely approximated McKinsey's. To the contrary, as Molino testified, McKinsey's methods of Rule 2014 disclosure were "unusual." SAC ¶¶ 44, 82, 84, 401(k).

Defendants cite a pair of inapposite cases involving the Fair Credit Reporting Act ("**FCRA**"), *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007), and *Shimon v. Equifax Info. Servs. LLC*, 994 F.3d 88, 94 (2d Cir. 2021). Mtn. at 26-27. These cases not only do not involve RICO (or even fraud claims), or bankruptcy disclosures, they also ultimately rely on a finding that "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation" of the relevant statutory provisions. *Safeco*, 551 U.S. at 70 n.20; *Shimon*, 994 F.3d at 94 (same; *Safeco's* objective inquiry permitted multiple reasonable interpretations of FCRA). Defendants also cite out-of-Circuit RICO cases involving disputes regarding statutory interpretation, both of which are readily distinguishable because they involved unsettled areas of law. *See* Mtn. at 25; *Grauberger v. St. Francis Hosp.*, 169 F. Supp. 2d 1172, 1177 (N.D. Cal. 2001) ("So far, state and federal trial courts have had differing opinions on this unsettled issue of state law, and there is no published state law precedent."); *Lum v. Bank of Am.*, 361 F.3d 217, 226–27 (3d Cir. 2004) (the dispute centered around the "proper interpretation of 'prime rate,'" a term whose "lack of precision" had been recognized by courts and Congress).

Here, by contrast, courts that have interpreted Rule 2014 leave no doubt that bankruptcy professionals cannot claim confusion about Rule 2014's dictate that all connections to Interested Parties must be disclosed. In *Gellene*, as discussed above, the Seventh Circuit expressly rejected a mistake-based defense similar to that offered by Defendants here. *See* 182 F.3d at 575-79. "A court should view the professional's claim of confusion about disclosure skeptically." *Granite*

*Partners*, 219 B.R. at 39 (internal citation omitted) (rejecting argument by Willkie Farr law firm "that until *Leslie Fay* clarified the law, its disclosure of prospective connections was 'state of the art'").  Given Defendants' sophistication (and the experience and legal training of their personnel), they cannot plausibly claim that their non-compliant practices were the result of a different, but still "reasonable," interpretation of Rule 2014.[22]

Defendants argue that specific disclosure practices—such as failing to disclose connections by name and the connections of affiliates—are not required by the text of Rule 2014, but that is only true if one employs a deliberately cramped reading of the text and outright ignores applicable case law interpreting it. As discussed above, disclosure by name is the only reasonable interpretation of Rule 2014, the purpose of which is to permit the bankruptcy court to make determinations regarding a bankruptcy professional's disinterestedness, *i.e.*, whether it possesses any actual or potential conflicts of interest.  That is only possible if the professional discloses its connections ***by name***.[23]  *See supra* at 7-9.  Notably, Defendants cite no examples of other professionals who engaged in disclosure by category.

---

[22]     Defendants cite *In re Fibermark*, 2006 WL 723495, at *10 (D. Vt. Mar. 11, 2006), for the proposition that "Rule 2014 compliance requires flexibility and practicality."  Mtn. at 26.  In *Fibermark*, the court declined, *on summary judgment*, to sanction a financial advisor that failed to disclose that it had participated on various sides of other bankruptcies along with several other professionals in the case, in the absence of "any pecuniary or attorney-client or adversarial relationship" with the other professionals. 2006 WL 723495, at *7-*8, *11.  Far from promoting a loose, open interpretation of Rule 2014, *Fibermark* reiterated: "There is no question that any connection that might reasonably be perceived to constitute a conflict of interest, or to support a determination that the applicant is not disinterested, must be disclosed. A professional seeking to be employed in a bankruptcy case should disclose all arguable conflicts, even if it is only to explain them away." *Id.* at *10.

[23]     While Defendants refer to a handful of Rule 2014 declarations submitted by other bankruptcy practitioners (including two by AP) purportedly invoking client confidentiality (Mtn. at 27 n.25-26 ), this "*tu quoque*" argument fails in multiple respects.  *First*, Defendants rely on cherry-picked, extrinsic evidence which must be disregarded as a matter of law on a motion to dismiss.  *Second*, each of the proffered declarations indisputably identifies the vast majority of connections by name (and AP's submissions also typically provide additional details concerning the connections).  *Third*, Defendants do not contend that any other practitioners, *unlike McKinsey*, systematically withheld virtually all connection details through ten consecutive bankruptcy engagements.  *Fourth*, Defendants do not claim that any other practitioners share

Defendants argue that they reasonably interpreted Rule 2014 to require them to disclose only the connections of the specific McKinsey subsidiaries, and not any affiliates of the engaged entity. Mtn. at 27-28. As shown above, the text of Rule 2014 and interpretative case law refutes this argument. *See supra* at 4-9. It is simply false to suggest that affiliate connections are somehow not the professional's connections, as the professional is connected *via* the affiliate (here, another wholly-owned, wholly-controlled McKinsey subsidiary). Contrary to Defendants' assertion (Mtn. at 28), Alix does not, for example, need to allege that MIO had any involvement in advising a debtor in a bankruptcy for MIO's relationship with the debtor or any Interested Party to raise a potential conflict for McKinsey RTS. Both RTS and MIO are, like all McKinsey entities, wholly owned and wholly controlled by McKinsey &. Co. (and thus by McKinsey's individual partners), and MIO's investments are investments exclusively funded by McKinsey partners and employees, with no other outside investors. SAC ¶¶ 37-38, 138. Therefore, if (for example) MIO had an investment interest in a creditor of a bankruptcy estate, the potential for tainted judgment is obvious, as confirmed by McKinsey's 2021 settlement with the SEC. *See id.* ¶ 69 (quoting the SEC's November 2021 settlement order concerning MIO, which stated: "***In numerous instances McKinsey provided consulting services to clients in which MIO funds were invested and about which MIO [material nonpublic information ('MNPI')] was potentially relevant***."). Simply put, to the extent that a professional's affiliates have business or financial interests that relate to a debtor

---

McKinsey's business model, with conflicts of interest inherent in simultaneously serving competitors, *see* SAC ¶ 11, which creates a unique and heightened probability that undisclosed connections will present a conflict with debtors or other Interested Parties. *Fifth*, no other professional has a $45 billion internal hedge fund that invests in its bankruptcy consulting clients' securities and debt instruments.

or Interested Party, the professional must disclose them for the court to make a proper assessment under § 327(a).[24]

With respect to Defendants' connection-checking process, Defendants mischaracterize Alix's allegations, suggesting that he complains that using email surveys and searching the "FPIS" database were merely "substandard," and thus violated Rule 2014. Mtn. at 28-29. FPIS is a client database containing information regarding McKinsey engagements back to 1975; as McKinsey has admitted, it is not a conflicts-checking database and is not adequate for conflicts-checking purposes. SAC ¶¶ 71, 75, 77. Beyond FPIS's inadequacy, however, Alix alleges that Defendants employed a *deliberately* circumscribed approach to identifying connections, including through the use of email surveys sent to selected personnel asking whether McKinsey had a "direct commercial relationship" with an Interested Party (a test invented by Molino with no basis in law), which **never** generated affirmative responses, and a database that Defendants knew would not, and was not designed to, identify potential conflicts. *Id.* ¶¶ 75-77, 79-80, 84-85. The allegations speak directly to Defendants' fraudulent intent—either through, at best, a reckless indifference to their disclosure obligations, or, more likely, a deliberate attempt to cull and limit the number of connections that would be disclosed to avoid disqualification (*id.* ¶¶ 489(b), 489(c), 664(a), 664(b)), in contravention of Rule 2014's requirement to disclose "all connections" (*see supra* at 4-5).

The nature of Defendants' limited disclosure—as well as its practice of delayed, piecemeal, and cryptic disclosure—provides further evidence of their conscious misbehavior or recklessness. Defendants' repeated pattern of supplementing or amending their prior incomplete or inaccurate

---

[24] Defendants cite declarations that specifically excluded "affiliates" from connections-checking processes, *see* Mtn. at 28 n.27, including investment affiliates. *Id.* at n.28. Again, reliance on such extrinsic evidence is improper in the Rule 12(b)(6) context, and should be disregarded. In any event, whether a handful of other bankruptcy professionals complied with their Rule 2014 obligations does not absolve McKinsey of its failures, or speak to Defendants' systematic effort over almost twenty years to obfuscate, diminish, and avoid disclosure of connections so as to hide disqualifying conflicts.

Rule 2014 declarations—as contemplated by McKinsey's improper "disclosure by category" methodology—establishes that Defendants "knew facts or had access to information suggesting that their statements were not accurate" and/or "failed to check information they had a duty to monitor." *JP Morgan*, 553 F.3d at 199.

Defendants next contend that the purported "transparency" of their declarations insulates them from a finding of fraudulent intent. Mtn. at 29. As discussed above in Point I.A, Defendants' declarations ***lacked*** transparency. But even if it *were* possible upon close examination to identify certain aspects of Defendants' Rule 2014 violations from the face of some of their declarations, that would not resolve scienter as a matter of law. As the UST stated in *ANR*, RTS's Rule 2014 declarations "g[a]ve the *appearance* of compliance without actually complying with Bankruptcy Rule 2014." SAC ¶ 213. Tens of thousands of filings were made in the massive bankruptcies at issue, and Defendants plainly sought to capitalize on the rush of business and volume of filings. *See id.* ¶ 13; *cf. U.S. v. Moleski*, 641 Fed. App'x 172, 175-76 (3d Cir. 2016) (rejecting mail fraud defendant's argument that fake financial instruments and letters sent to government and credit agencies in attempt to discharge tax and consumer debts were not materially false because attempt was too feeble to be believed: "Even if the demands in his documents were ultimately baseless, by obscuring them in obtuse legalese he could have confused the busy employees of financial institutions and the government who had to review them"). Indeed, it is clear in "content and context" (Mtn. at 29) that the barebones declarations were part of a deliberate plan to have their violations pass without notice in the flurry of more pressing business. There were 86 case filings entered on the same date as Defendants' initial November 8, 2018 declaration in the *Westmoreland* case and 188 docket entries filed contemporaneously with Defendants' December 9, 2002 disclosures in *UAL*. Even where Defendants' attempt to fly under the radar failed, they violated

the legal requirement of self-disclosure of all connections and succeeded in putting the onus on the UST and others to demand information.  McKinsey would (and did) strenuously resist the demands that eventually came in some of the later cases, giving ground only when and to the extent absolutely necessary, generally *after* plan confirmation, by which time the resolve of any objectors would be exhausted or it would be too late.[25]

That Defendants often brazenly sought to hide their omissions "in plain sight" *supports*, rather than defeats, Alix's scienter allegations.  *See S.E.C. v. Power*, 525 F. Supp. 2d 415, 421 (S.D.N.Y. 2007) ("Complaint alleges scienter . . . circumstantially from facts such as . . . the sheer audacity of [] 'adjustments' to the balance sheets of acquired companies designed to improperly inflate Tyco's reported financial results."); *S.E.C. v. Invest Better 2001*, 2005 WL 2385452, at *4 (S.D.N.Y. May 4, 2005) ("[T]he boldness of the fraud conclusively demonstrates the Defendant's high level of scienter . . . .").  Even if Defendants' omissions were detectible, various stakeholders' failure to challenge them does not demonstrate the absence of a scheme to defraud.  Indeed, Defendants' position is a variant of the discredited notion that one cannot be guilty of criminal fraud if the deception is too apparent.  *See U.S. v. Sun-Diamond Growers of Cal.*, 138 F.3d 961, 971 (D.C. Cir. 1998) ("[W]hen an individual is swindled, the offender does not escape mail or wire fraud liability just because the victim was unwary, or even gullible." (internal quotations omitted)); *U.S. v. Nekritin*, 2011 WL 2462744, at *7 (E.D.N.Y. June 17, 2011) ("Even if . . . Medicare reviewed the allegedly false claims in 2009 and 'allowed' them to be paid . . . negligence in failing to discover the fraud at that time is not a defense . . . .");  *Pentagon*, 612 F. Supp. 2d at 264-65 (rejecting assertion that funds were not deceived by defendants' illegal late-trading

---

[25]     *E.g.*, SAC ¶¶ 193-196, 199, 202-205, 213-224, 238, 241-251, 272-282, 294-295, 319, 354.

because, having the relevant tax identification numbers, funds could have blocked the trading; reasonableness of victim's response is irrelevant).[26]

### 2. Alix also adequately pleads motive and opportunity

Defendants do not dispute that the SAC sufficiently alleges opportunity. *See* Mtn. at 30. As to motive, Defendants mischaracterize the SAC as alleging merely that "Defendants were motivated by a desire to earn fees through bankruptcy engagements." *Id.* at 30. Alix has not alleged merely a "general motive" to profit, but specific motives why Defendants committed fraud, including: 1) the need to break into a market where McKinsey had been a non-player and where disclosure of client connections is required and conflicts are disqualifying; and 2) a desire to deepen ties to existing clients who would otherwise seek restructuring advice elsewhere (and thereby also obtain additional, post-bankruptcy work). *See* SAC ¶¶ 486(a)-(c), 661(c); *In re BC Funding, LLC*, 519 B.R. 394, 423 (Bankr. E.D.N.Y. 2014) (motive sufficiently pled where RICO defendants allegedly stood to benefit from fees as a result of fraud).

Simply put, because McKinsey's business model, which is built on serving conflicting interests, is inconsistent with Rule 2014's disclosure obligations—a point acknowledged by Barton—Defendants had to fraudulently evade disclosure requirements to pursue their Chapter 11 bankruptcy practice. SAC ¶¶ 154, 486(a), 661(a); *cf. Sykes v. Mel Harris Assocs.*, 757 F. Supp. 2d 413, 425 (S.D.N.Y. 2010) (motive sufficiently pled where RICO defendants allegedly made false court filings to secure default judgments).

---

[26]     Defendants also cite *Phillips v. Am. Int'l Grp., Inc.*, 498 F. Supp. 2d 690, 697 (S.D.N.Y. 2007), for the proposition that a plaintiff "could not allege intent to defraud" where the purportedly fraudulent information was "expressly provide[d]" in the relevant agreement. Mtn. at 29. Contrary to Defendants' description, the court in *Phillips* did not hold that the plaintiffs could not allege an intent to defraud on these facts, but that there was no misrepresentation or omission at all. 498 F. Supp. 2d at 697 ("[T]he disclosures in the Annuity Contracts at issue belie plaintiff's claim that those contracts contain any misrepresentation or omission.").

**D.    Alix Adequately Pleads a Violation of 18 U.S.C. § 2314**

The SAC adequately pleads violations of 18 U.S.C. § 2314 because it alleges that Defendants (1) devised a scheme intending to defraud a victim, AP, of a minimum of $5,000; and (2) induced Alix to travel in interstate commerce as a result of that scheme.  *U.S. v. Thomas*, 377 F.3d 232, 236 (2d Cir. 2004).  The SAC extensively details how Defendants executed a scheme to defraud AP by fraudulently obtaining bankruptcy consulting assignments worth millions in fees.  *See* Point I.A, *supra*.  It further describes how Barton and McKinsey & Co., aided and abetted by Sternfels, McKinsey Holdings, and McKinsey US, induced Alix to travel from Michigan to New York to meet with Barton on October 15, 2015, "to foster the false impression that McKinsey was pursuing corrective action" and "[b]y stringing Alix along in this fashion," they "sought to (and did) forestall legal action by AP, and thereby prolonged [Defendants'] scheme."  SAC ¶¶ 159–160, 479-480, 653-654; *see U.S. v. O'Connor*, 874 F.2d 483, 487-88 (7th Cir. 1989) (affirming § 2314 conviction; defendant's "repeated promises to pay," made during telephone calls and meetings for which creditor's agent travelled to Milwaukee, "were designed to postpone his creditors' investigation and to prevent detection of his scheme").

Contrary to Defendants' argument, Mtn. at 31, it is irrelevant whether the victim or the perpetrator of the scheme initiated the meeting.  *See Thomas*, 377 F.3d at 234-35, 240 (defendant "and his fraudulent scheme were a 'motivating force' in" travel of victim's agent, where victim's agent initially invited defendant to Memphis to explain investment scheme and travelled to New York only after defendant said he could not travel to Memphis).  Here, Defendants' fraudulent scheme was the "motivating force" in Alix's travel to New York.  Indeed, there was no reason for Alix's October 2015 meeting with Barton *except* for Defendants' fraudulent scheme; Barton met Alix for the sole purpose of concealing and prolonging Defendants' unlawful scheme.  SAC ¶¶ 143, 159-160 (in October 2015 Alix traveled to New York to follow up on prior discussions

regarding McKinsey's violations of bankruptcy disclosure rules and again to confront Barton on that topic).

Defendants' only cited case, *U.S. v. Myerson*, 18 F.3d 153 (2d Cir. 1994), Mtn. at 31, is distinguishable. In *Myerson*, an attorney was convicted of tax fraud and fraudulently overbilling clients. 18 F.3d at 155. The court found that Myerson's clients would have travelled to meet with their lawyers even if a different firm had represented them and even in the absence of Myerson's overbilling scheme; therefore, their travel "was not in furtherance of the overbilling fraud, but was instead in furtherance of their own legal business, and was only of peripheral importance to Myerson's fraud." *Id.* In contrast, the SAC alleges that Alix only traveled to New York to meet with Barton in connection with Barton's scheme. SAC ¶¶ 159-160, 479-480, 653-654.

## E.    Alix Adequately Pleads Violations of 18 U.S.C. § 1512(b)

It is a violation of 18 U.S.C. § 1512(b) if a person "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person" with the intent to, *inter alia*, (i) "influence, delay, or prevent the testimony of any person in an official proceeding," or (ii) "cause or induce any person to withhold testimony, or withhold a record, document, or other object, from an official proceeding." 18 U.S.C. §§ 1512(b)(1), (b)(2)(A). "[C]orruptly persuades" means "the defendant's attempts to persuade were motivated by an improper purpose." *U.S. v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996); *see also U.S. v. Brown*, 2012 WL 4103857, at *3 (W.D.N.Y. Sept. 17, 2012) ("To corruptly persuade means to act knowingly with a wrongful, immoral or evil purpose to convince or induce another person to engage in certain conduct." (internal quotations, citations omitted)). "Misleading conduct" is defined broadly to mean, *inter alia*: a) "knowingly making a false statement"; b) "intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading, or intentionally concealing a material fact, and thereby creating a false impression by

such statement"; c) intentionally "submitting or inviting reliance on" false or misleading documents; or d) "knowingly using a trick, scheme, or device with intent to mislead."  18 U.S.C. § 1515(a)(3)(A)-(C), (E).

The SAC alleges conduct by Defendants that meets the criteria for witness tampering through both "corrupt persuasion" and "misleading conduct."  For instance, in *ANR*, McKinsey & Co., McKinsey Holdings, McKinsey US, RTS, Molino, Hojnacki, and Proshan engaged in misleading conduct by knowingly causing Carmody to swear to, and causing to be filed, at least five false and misleading Rule 2014 disclosure declarations that omitted and concealed material facts regarding McKinsey's connections to Interested Parties, including disqualifying investment connections, SAC ¶¶ 190-236, 438-441, 443-457, 461-464, 635(a).  The SAC contains similar allegations with respect to *SunEdison* (*id.* ¶¶ 237–254, 465-466, 635(b), 636, 637, 640), *Westmoreland* (*id.* ¶¶ 326–353, 467, 635(b), 636, 640), and other bankruptcies.[27]

Contrary to Defendants' assertion, Mtn. at 31, Rule 2014 declarations made under penalty of perjury constitute "testimony."  *See Crawford v. Washington*, 541 U.S. 36, 51 (2004) ("'Testimony[]' . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'"); *see also* 28 U.S.C. § 1746 (verified statements, such as those made under Rule 2014, are made under penalty of perjury).  The SAC further alleges that Defendants were motived by an "improper purpose" in undertaking their actions, *i.e.*, obtaining and keeping bankruptcy engagements that McKinsey would not have received absent the deceit. SAC ¶¶ 457, 486-490, 568, 661; *see also* Point I.C.2, *supra*.

---

[27]    For example, McKinsey & Co., McKinsey Holdings, McKinsey US, and Molino also violated § 1512(b) in *Hayes*, *UAL*, *Mirant*, and *Lyondell*, by knowingly influencing and impeding the testimony of the individuals who submitted Rule 2014 disclosure declarations in those bankruptcies by causing or corruptly persuading them to provide false and misleading information with respect to McKinsey's connections to Interested Parties.  *Id.* ¶¶ 86–117, 642; *id.*, Ex. A at Nos. 1-8, Ex. B. at 2-6.

**F.     Alix Adequately Pleads Violations of 18 U.S.C. §§ 1503(a) and 1512(c)**

The omnibus clause of 18 U.S.C. § 1503(a) prohibits "corruptly . . . endeavor[ing] to influence, obstruct, or impede the due administration of justice," while 18 U.S.C. § 1512(c) prohibits conduct that "corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so."  Section 1503(a) is interpreted broadly and "embraces the widest variety of conduct that impedes the judicial process."  *U.S. v. Kumar*, 617 F.3d 612, 620 (2d Cir. 2010) (citation and quotation omitted).  False testimony made for an improper purpose may serve as the basis for a conviction under §§ 1503(a) and 1512(c).  *See U.S. v. Langella*, 776 F.2d 1078, 1081 (2d Cir. 1985).    Additionally, corrupt attempts to manipulate the government violate the obstruction statutes. *U.S. v. Baum*, 32 F. Supp. 2d 642, 643 (S.D.N.Y. 1999) (denying motion to dismiss obstruction charge, holding "an attorney who engages in a scheme to manipulate the government into filing a Rule 35 post-judgment motion for the reduction of sentence obstructs justice within the meaning of the statute").

The SAC alleges that Defendants violated both §§ 1503(a) and 1512(c) by filing or causing to be filed false and misleading disclosures on behalf of McKinsey in fourteen Chapter 11 bankruptcies with the improper purpose of preventing bankruptcy courts from performing their duties in ensuring that professionals are disinterested under § 327(a); impeding the *ANR* and *SunEdison* bankruptcies by making false and misleading statements to the bankruptcy court and the UST, with intent to cause the UST to withdraw its motion to compel and objection to McKinsey's retention, respectively;[28] and by causing false testimony to be submitted by others,

---

[28]      *See* SAC ¶¶ 213-224, 242-43, 438-458 (detailing efforts by McKinsey & Co., McKinsey Holdings, McKinsey US, Carmody, Molino, Hojnacki, and Proshan, aided and abetted by Barton, Sternfels, Garcia, and Goldstrom, to knowingly engage in misleading conduct toward and corruptly persuade the U.S. Trustee to withdraw its motion to compel disclosure and objection to McKinsey's retention by falsely representing that they had fully disclosed McKinsey's connections in the *ANR* and *SunEdison* bankruptcies).

including by misleading or influencing McKinsey employees so that they submitted declarations that were false and misleading.[29]

In addition to arguing that its disclosures were "transparent" and not corrupt—which fails for the reasons explained *supra*, Point I.A—Defendants argue that RTS could not have fraudulently induced the UST to withdraw its motion to compel in *ANR* because it supposedly "disclos[ed] the very information that the U.S. Trustee requested." Mtn. at 31. But the SAC alleges the opposite. Carmody's Third Supplemental Declaration in *ANR*, filed after the UST withdrew its motion, continued to conceal connections, because it identified only a small number of McKinsey's dozens of currently known connections to Interested Parties. SAC ¶ 215. Only after **Mar-Bow** filed its motion to compel did McKinsey disclose *in camera* more than one hundred additional connections, *id.* ¶ 219—connections that should have been disclosed in Carmody's Third Supplemental Declaration, but were not. And, of course, even McKinsey's *in camera* disclosures, mandated by a court order to compel, were incomplete: Defendants did not disclose McKinsey's disqualifying investment interest, through MIO, in Whitebox, through which McKinsey held a disqualifying interest in Contura, the new company formed out of ANR's main assets; Defendants also concealed other disqualifying conflicts of interests. *Id.* ¶¶ 220, 222 (connections with U.S. Steel), 223 (connections with NRG Energy), 225-236 (connections with Whitebox). The additional disclosures of numerous connections and conflicts, made following

---

[29] Specifically, McKinsey & Co., McKinsey US, and McKinsey Holdings each violated and aided and abetted violations of *§ 1503(a)* in all fourteen bankruptcies, *see* SAC ¶¶ 438-458, 629 (*ANR*), ¶¶ 459(a), 629 (*Harry & David*), ¶¶ 459(b), 629 (*AMR*), ¶¶ 459(c), 629 (*AMF Bowling*), ¶ 459(d) (*Edison Mission*), ¶¶ 459(e), 629 (*NII Holdings*) ¶¶ 459(f), 629 (*Standard Register*), ¶¶ 459(g), 629 (*SunEdison*), ¶¶ 459(h), 629 (*GenOn*), ¶¶ 459(i)-(j), 629 (*Westmoreland*), ¶¶ 630-631 (*Hayes*), ¶¶ 630, 632 (*UAL*), ¶¶ 630, 633 (*Mirant*), ¶¶ 630, 634 (*Lyondell*), and each violated *§ 1512(c)* in ANR, *id.* ¶¶ 469, 643; <u>RTS</u> violated and aided and abetted violations of *§ 1503(a)* in the *Harry & David*, *AMR*, *AMF Bowling*, *NII Holdings*, *Standard Register*, *ANR*, *SunEdison*, *GenOn*, and *Westmoreland* bankruptcies, *id.* ¶ 619, and violated and aided and abetted violations of *§ 1512(c)* in ANR, *id.* ¶ 644. *See infra* at Point VIII for the specific violations committed or aided and abetted by the Individual Defendants.

***Mar-Bow***'s motion to compel, and the connections that Defendants did not disclose, are strong evidence that Defendants' representations to the UST were deceitful and intended to ensure that the UST would not disrupt Defendants' scheme to avoid disclosure of McKinsey's disqualifying conflicts.  Indeed, in its brief supporting the re-opening of *ANR*, the UST cited numerous instances in which McKinsey RTS, Carmody, and Hojnacki, had made "at best, misleading" and false statements regarding Garcia and MIO—making it clear that the UST would have raised objections at the time but for McKinsey's deceit.  SAC ¶¶ 24, 235.

In any event, "the question whether a person acted with the intent to obstruct justice is almost always answered by resort to circumstantial evidence," *U.S. v. Napoli*, 2010 WL 1687669, at *3 (E.D.N.Y. Apr. 27, 2010) (citations omitted), and, therefore, the issue should not be decided on a Rule 12(b)(6) motion before any opportunity for discovery.

## G.     Alix Adequately Pleads Violations of 18 U.S.C. § 1957(a)

To allege violations of 18 U.S.C. § 1957(a), Alix need only plead facts indicating Defendants knowingly engaged in a monetary transaction involving proceeds of specified unlawful activity valued at more than $10,000.  *U.S. v. Silver*, 864 F.3d 102, 114-15 (2d Cir. 2017).  Section 1957 encompasses transactions involving unlawful proceeds commingled with "clean" funds, including salary.  *Id.*; *see also U.S. v. Sokolow*, 91 F.3d 396, 411 (3d Cir. 1996) (court properly included funds received by defendant as salary in "value of funds" for purposes of calculating guidelines range as salary included proceeds of specific unlawful activity).  Alix pleads extensive facts regarding Defendants' receipt of proceeds from a wide variety of RICO predicate acts,

including mail, wire, and bankruptcy fraud, all of which constitute "specified unlawful activity" under 18 U.S.C. §§ 1956(c)(7) and 1957(f).  *See, e.g.*, SAC ¶¶ 484-485, 564, 567.[30]

Ignoring the SAC's allegations, Defendants argue that "[b]ecause the fees earned by McKinsey for its work serving Chapter 11 debtors were lawfully obtained, Alix cannot establish the substantive element of his money-laundering claim."  Mtn. at 32.  But Alix explicitly and extensively alleges that McKinsey's bankruptcy fees ***were not*** lawfully obtained, but rather were the proceeds of Defendants' mail, wire, and bankruptcy fraud schemes.  *See* SAC ¶¶ 481-485, 564-567, 655-658; Points I.A-B, *supra*.  Specifically, Alix alleges Defendants' subsequent transfer of these fees (including in the form of salary), which Defendants each knew were earned through their scheme, violated § 1957.  *See Silver*, 864 F.3d at 114-15.

Defendants also assert that Alix alleges no facts about any specific monetary transaction[31] in which any Individual Defendant engaged.  Mtn. at 32.   But Alix pleads that "specific details of the monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial."  SAC ¶ 485; *see also id.* ¶¶ 566, 658; *Alix*, 23 F.4th at 209 ("'[A]llegations may be based on information and belief when facts are particularly within the opposing party's knowledge,' provided that they 'adduce specific facts supporting a strong

---

[30]    Under 18 U.S.C. § 1956(c)(7)(a), "specified unlawful activity" includes offenses defined as RICO "racketeering activity" under 18 U.S.C. § 1961(1), including violations of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud), and "any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title)," which includes violations of 18 U.S.C. §§ 152(2), 152(3), 152(6), and 152(8).  *See* 18 U.S.C. §§ 1961(1)(A), (D).

[31]    The term "monetary transaction" is defined as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds . . . by, through, or to a financial institution." 18 U.S.C. § 1957(f)(1).    Alix alleges, with respect to Count 1, that the "Count 1 Defendants' receipt of fees from McKinsey RTS's bankruptcy engagements . . . and their subsequent deposit or other financial transfers of such monies constituted violations of 18 U.S.C. § 1957(a)."  SAC ¶ 482; *see also id.* ¶¶ 564 (Count 2 Defendants), 655 (Count 3 Defendants).

inference of fraud.'") (citation omitted).  As shown above, Alix's factual allegations regarding Defendants' scheme "support[] a strong inference of fraud." *Id.*; *see also supra* Point I.C.

Also without merit is Defendants' argument that Alix's allegations regarding "re-invoiced" and "round trip" payments from non-debtor affiliates of SunEdison "merely claim that such payments violated § 327 and Rule 2014," which are not among the offenses that constitute "specified unlawful activity" under 18 U.S.C. § 1956(c)(7).  Mtn. at 32.  Alix pleads that "Defendants' falsification of invoices issued to SunEdison constituted the knowing and fraudulent concealment, falsification, or false entry in recorded information relating to the property or financial affairs of SunEdison in contemplation of SunEdison's pending bankruptcy proceeding, in violation of 18 U.S.C. § 152(8)."  SAC ¶ 483; *see also id.* ¶¶ 255-271 (describing re-invoicing/round-tripping scheme).[32]  Violations of 18 U.S.C. § 152(8) are within the definition of "specified unlawful activity" under § 1956(c)(7)(a), which defines "specified unlawful activity" to include offenses constituting RICO racketeering activity under 18 U.S.C. § 1961(1)).

## H.    Alix Adequately Alleges RICO Liability Based on Aiding and Abetting Predicate Acts

Defendants' argument that civil RICO liability does not exist for aiding and abetting predicate acts (Mtn. at 32-34) is unsupported by the text of the RICO statute and the decisions applying it.  Section 1964(c) makes it illegal, *inter alia*, "to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs through a pattern of racketeering activity

---

[32]      Alix *further* alleges that Defendants' scheme resulted in a liability to the SunEdison estate totaling more than $22 million, which would constitute an interest adverse to the bankruptcy estate and be disqualifying under § 327, and, accordingly, McKinsey RTS's representations to the bankruptcy court and the U.S. Trustee that it did not hold any adverse interests were false.  SAC ¶ 271.  Alix alleges in the alternative that the June 6, 2016, and June 14, 2016 Hojnacki Rule 2014(a) declarations fraudulently mischaracterized McKinsey RTS's services and billing related to the re-invoiced/round-trip transactions in an effort to obtain bankruptcy consulting fees in *SunEdison*, all in violation of 18 U.S.C. § 152(3) and 18 U.S.C. §§ 1341 and/or 1343. *Id.* ¶¶ 483 (Count 1 Defendants), 567 (Count 2 Defendants, excluding Yerian), 656 (Count 3 Defendants).

. . . ." 18 U.S.C. § 1962(c).  "Racketeering activity" is defined, in turn, to include "any act which is *indictable under*" numerous provisions of Title 18, including those identified in the SAC.  18 U.S.C. § 1961(1)(B) (emphasis added).  And under the aiding and abetting statute, "[w]hoever commits an offense against the United States or *aids, abets,* counsels, commands, induces or procures its commission, *is punishable as a principal*."  18 U.S.C. § 2(a) (emphasis added).

Accordingly, in pleading a RICO claim against multiple defendants, the "bare minimum of a RICO charge is that a defendant personally committed *or aided and abetted the commission of two predicate acts*."  *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992) (emphasis added); *see also Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 577 (S.D.N.Y. 2017) ("To state a claim under section 1962(c), plaintiffs must adequately allege that 'a defendant personally committed *or aided and abetted the commission of two predicate acts*.'") (quoting *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 537 (S.D.N.Y. 2014) (denying motion to dismiss RICO claim with respect to two defendants where plaintiffs "sufficiently alleged that [they] directed, caused, *or at least aided and abetted* multiple false statements to be made to specific sellers by use of the wires.") (emphases added)).

Here, Alix adequately pleads that each Defendant committed or  aided and abetted at least two or more predicate acts.  For instance, under Counts 1 and 3, Alix pleads that McKinsey & Co., McKinsey Holdings, and McKinsey US aided and abetted, *inter alia*, bankruptcy fraud, mail and wire fraud, obstruction of justice, and money laundering in violation of 18 U.S.C. §§ 152(2), 152(3), 1341, 1343, 1503(a), and 1957 in connection with the *Harry & David*, *AMR*, *AMF*, *Edison Mission*, *NII*, *Standard Register*, *ANR*, *SunEdison*, and *GenOn* bankruptcies.[33]  Defendants do not

---

[33]     *See* SAC ¶¶ 412-414, 425, 595, 605-606  (bankruptcy fraud); 426-431, 433-437, 616 (mail and wire fraud); 438-459, 629 (obstruction of justice); 481-485 (money laundering).

seriously dispute the sufficiency of these allegations, complaining only (and erroneously) that they are "conclusory." Mtn. at 33. As the SAC's detailed allegations demonstrate, they are not.

Instead, Defendants cite *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 713 (2d Cir. 2019), which affirmed a decision holding that "there is no private right of action that allows for Plaintiffs' claims of aiding and abetting a RICO violation" under 18 U.S.C. § 1962(c). Mtn. at 33. But as Defendants recognize, that decision is inapposite because Alix has not alleged that any Defendant aided and abetted a violation of 18 U.S.C. § 1962(c). Rather, Alix properly alleges Defendants aided and abetted *predicate acts* in violation of the RICO statute.

Defendants also seek to draw a distinction between 18 U.S.C. § 1962(c), which does not specifically reference the aiding and abetting statute (18 U.S.C. § 2) and 18 U.S.C. § 1962(a), which addresses the collection of an unlawful debt in which a person "has participated as a principal within the meaning of [18 U.S.C. § 2]." That analysis, however, ignores the plain language of 18 U.S.C. § 1961(1), which defines "racketeering activity" to include "any act indictable under" various provisions of Title 18, including the specific crimes alleged in the SAC. 18 U.S.C. § 2 is not listed among the substantive offenses that define "racketeering activity" because aiding and abetting "does not constitute a discrete criminal offense but only serves as a more particularized way of identifying persons involved." *U.S. v. Smith*, 198 F.3d 377, 383 (2d Cir. 1999) (internal quotation marks omitted)). It would have been redundant to list 18 U.S.C. § 2 in the definition of racketeering activity, because aiding and abetting is in fact covered by the phrase "indictable under": "when a person is charged with aiding and abetting the commission of a substantive offense, the 'crime charged' is . . . the substantive offense itself." *Id.* (citation omitted); *see also Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*, 2015 WL 5719801, at *13 n.36 (D.P.R. Sept. 29, 2015) ("RICO defines 'racketeering activity' to include conduct

- 54 -

'*indictable under*' the mail or wire fraud statutes.  **Aiding and abetting mail or wire fraud is**

**indictable under the substantive statute; thus it is a predicate under § 1961(1)**.") (internal

citations omitted) (second emphasis added).

The cases cited by Defendants (Mtn. at 33) are distinguishable because they rest on an

application of *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), in

the context of securities fraud allegations, which are not at issue here.  *Central Bank* held that there

is no implied private right of action for aiding and abetting civil violations of Section 10(b) of the

Securities and Exchange Act.  It said nothing about RICO and did not preclude RICO liability for

aiding and abetting predicate acts.  Following *Central Bank*, most courts have found viable RICO

claims premised on aiding and abetting predicate acts.[34]  Indeed, *Central Bank* has no "bearing on

the question of whether plaintiffs have adequately alleged RICO predicate acts of aiding and

abetting [RICO predicate offenses]."  *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1530

n.20 (S.D.N.Y. 1995) (plaintiffs adequately alleged RICO claims based on aiding and abetting

multiple offenses, including mail and wire fraud).  And while Defendants cite a few cases that

have applied *Central Bank* in the context of RICO, those cases involved predicate acts of securities

fraud, and are thus distinguishable.  *See Estate of Gottdiener v. Sater*,  35 F. Supp. 3d 386, 396,

393 (S.D.N.Y. 2014) (where, "[o]n the facts, Plaintiffs' RICO claims are in substance claims for

aiding and abetting securities fraud," "civil RICO claims cannot be based on predicate acts of

aiding and abetting securities fraud, because to conclude otherwise would impermissibly

---

[34]        *See, e.g.*, *Marrero-Rolon*, 2015 WL 5719801, at *13 n.36 (denying motion to dismiss RICO claim predicated on aiding and abetting mail and wire fraud); *Bradley v. Franklin Collection Serv., Inc.*, 2011 WL 13134961, at *9-*10 (N.D. Ala. Mar. 24, 2011) (denying motion to dismiss RICO claim based on aiding and abetting); *In re Am. Honda Motor Co.*, 958 F. Supp. 1045, 1057-59 (D. Md. 1997) (upholding claims against individuals who allegedly participated in RICO scheme by aiding and abetting mail fraud); *Betulius v. Hanna*, 1996 WL 900413, at *4 (W.D. Mich. Dec. 10, 1996) ("One who aids and abets two predicate acts can be civilly liable under RICO.").

circumvent the holding in *Central Bank*"); *cf. Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 2000 WL 1694322, at *5 (S.D.N.Y. Nov. 13, 2000) (upholding RICO claim based on aiding and abetting bank fraud; distinguishing *Central Bank* and its progeny: "[T]he reasoning of those cases does not apply to predicate violations of the statutes identified in § 1961(1).").[35]

## II.     ALIX VALIDLY PLEADS MULTIPLE RICO ENTERPRISES

The RICO Act defines "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The "enterprise" element is governed by Rule 8(a), not Rule 9(b). *See In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 454 (S.D.N.Y. 1998).

The SAC alleges three separate enterprises. ***Count 1*** alleges that McKinsey RTS is the RICO enterprise formed by McKinsey & Co., McKinsey Holdings, and McKinsey US, and their respective executives, as a separate and distinct corporate entity for the specific purpose of implementing Defendants' pattern of racketeering activity. While Defendants attack the Count 1 enterprise by arguing that McKinsey RTS is not "separate and distinct" from McKinsey & Co. and McKinsey US as racketeering persons, they do not challenge the distinctness of the Count 1 RICO enterprise from the Individual Defendants. *See* Mtn. at 75-77. ***Count 2*** alleges that McKinsey & Co., McKinsey Holdings, McKinsey US, and (beginning in or about 2010) McKinsey RTS collectively have constituted an enterprise. Defendants do not challenge the sufficiency of Alix's allegations regarding the Count 2 enterprise. *See* Mtn. at 75-78. ***Count 3*** alleges that McKinsey, on the one hand, and the bankruptcy consulting clients of McKinsey US and McKinsey RTS identified in the SAC, on the other hand, constituted an association-in-fact enterprise. Defendants

---

[35]     Defendants also cite *Ross v. Patrusky, Mintz & Semel*, 1997 WL 214957, at *11 (S.D.N.Y. Apr. 29, 1997), where the court relied on cases that addressed the issue of aiding and abetting a civil RICO violation, not aiding and abetting a predicate act.

challenge the Count 3 enterprise by arguing that McKinsey and its clients are not an association-in-fact enterprise. *See id.* at 75, 77-78. As discussed below, Defendants' arguments are without merit.

## A.      McKinsey RTS Is a Well-Pleaded RICO Enterprise (Count 1)

In Count 1, Alix alleges that McKinsey RTS is an "enterprise" within the meaning of § 1961(4), including because it is separate and distinct from each of the other Defendants as racketeering "persons." SAC ¶¶ 395, 402. To state a claim under § 1962(c), the RICO violator, *i.e.*, the "person," must be distinct from the enterprise. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). *Cedric* held that an individual who conducted the affairs of his wholly owned corporation through a pattern of racketeering activity was sufficiently distinct from the entity to be sued under § 1962(c), where the entity was not named as a defendant "person." *Id.* at 163 ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that.").

With *Cedric* firmly in mind, the Second Circuit recently considered whether FedEx and one of its subsidiaries—the alleged RICO "persons"—were sufficiently distinct from another FedEx subsidiary—the alleged RICO enterprise—to sustain a § 1962(c) claim, stating:

> Where, for example, a natural person controls two active corporations that operate independently in different lines of business, receive independent benefits from the illegal acts of the enterprise, and affirmatively use their separate corporate status to further the illegal goals of the enterprise, we will regard each of the three entities as distinct from their coordinated enterprise under Section 1962(c).

*U1IT4Less, Inc. v. FedEx Corp.*, 871 F.3d 199, 206 (2d Cir. 2017). The Second Circuit emphasized that the plaintiff in *U1IT4Less* failed to satisfy RICO's distinctness requirement only because it failed to present evidence *on summary judgment* that the defendant's "choice of

corporate structure was in any way related to (let alone used to further) the racketeering activity alleged in the complaint." 871 F.3d at 207.  The court elected not to "explain[] what 'more' needs to be shown" to satisfy RICO's distinctness requirement, *id.* at 208, and instead referred to the Sixth Circuit's observation that "the distinctness requirement may be satisfied when the parent corporation uses the separately incorporated nature of its subsidiaries to perpetrate a fraudulent scheme." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492-93 (6th Cir. 2013).

Courts in the Second Circuit have found allegations similar to those in the SAC adequate to satisfy the RICO distinctness requirement.  In *4 K & D Corp.*, for example, Judge Koeltl held that a corporate defendant was separate and distinct from its owners, RICO persons who consisted of a corporate affiliate and individual defendants that fraudulently used the enterprise to steer luxury estate auction business away from plaintiffs.  2 F. Supp. 3d at 533, 537; *see also Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 254, 274-75 (E.D.N.Y. 2012) (plaintiff adequately pled distinct RICO enterprise in the form of corporate entity wholly owned and created by individual and corporate defendants for purpose of conducting fraudulent scheme).

Unlike the plaintiff in *U1IT4Less*, Alix does not rely on the fact of McKinsey RTS's legal incorporation "without more" to establish the distinctness of the Count 1 enterprise.  871 F.3d at 209.  Rather, like the plaintiffs in *4 K & D* and *Liberty*, he alleges that McKinsey set up RTS for the primary purpose of conducting its fraudulent non-disclosure scheme.  For example, Alix alleges that "by encapsulating bankruptcy consulting activities in a separately incorporated legal entity—McKinsey RTS—McKinsey & Co., McKinsey Holdings, and McKinsey US purported to add a veneer of indirectness between them and bankruptcy debtors and other bankruptcy proceeding participants."  SAC ¶ 395.  The SAC also alleges that McKinsey & Co. and McKinsey US deliberately "used McKinsey RTS as a pretext to withhold their own multiplicity of

connections to debtors and bankruptcy proceeding participants." *Id.* Forming McKinsey RTS allowed Defendants to conduct their scheme from a separate legal entity and thereby attempt to wall off their illegal activities from the larger McKinsey operation. *See id.* ¶¶ 72, 395-399. These allegations, which Defendants ignore, distinguish Defendants' other cited authorities (Mtn. at 75-77) and demonstrate that Alix adequately pleads a RICO enterprise in Count 1 of the SAC. *Cf. Weir v. Cenlar FSB*, 2018 WL 3443173, at *7 n.7 (S.D.N.Y. July 17, 2018) (cited in Mtn. at 76) ("If [subsidiary] and [parent] were alleged to serve different roles within the Cenlar Enterprise, Plaintiffs might have plausibly pleaded the distinctness requirement.").

Defendants' contention that the Second Circuit in *U1IT4Less* "considered and refused to adopt" the "facilitation" test, whereby RICO's distinctness requirement is satisfied where corporate defendants use their separate legal incorporation to facilitate racketeering activity, Mtn. at 77, ignores that the panel was able to resolve the case without applying that principle to the facts presented. *See U1IT4Less*, 871 F.3d at 208 (noting that, if applicable, the plaintiff would have failed to satisfy the facilitation test). Notably, however, the district court in *U1IT4Less, Inc. v. FedEx Corp.*, 896 F. Supp. 2d 275 (S.D.N.Y. 2012), as well as the Sixth Circuit in *ClassicStar* and the Seventh Circuit in *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923 (7th Cir. 2003), all found the "facilitation" test appropriate for determining whether RICO's distinctness requirement is satisfied.

Similarly, *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013) (cited in Mtn. at 76), does not control here. The plaintiff in that case alleged that a corporate defendant conducted an enterprise consisting of itself, certain employees and officers who were unaware of the alleged misconduct and did not share a similar fraudulent purpose, and affiliated entities that operated in a unified corporate structure as the alleged RICO person. *See id.* at 121. Unlike here, the corporate

affiliates were not alleged to have been created or operated for the discrete purpose of effecting the racketeering conspiracy. Defendants' cited cases of *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 338 (2d Cir. 1994), *Sunwealth Glob. HK Ltd. v. Pinder Int'l, Inc.*, 2021 WL 1145245 (S.D.N.Y. Mar. 23, 2021), and *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353 (S.D.N.Y. July 15, 2016), *see* Mtn. at 76-77, fail for the same reasons.

**B.      McKinsey and Its Clients Are an Association-in-Fact Enterprise**

In Count 3, Alix adequately alleges an association-in-fact enterprise comprised of each corporate Defendant together with certain bankruptcy clients of McKinsey US and McKinsey RTS. SAC ¶¶ 581-584. McKinsey and its clients had an "interrelated management structure resulting from the assignment of McKinsey personnel to management positions in the bankruptcy consulting clients," giving the association a unified, quasi-corporate quality. SAC ¶ 582. These allegations are sufficient to plead an association in fact. *See In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 318 (S.D.N.Y. 2000) (allegation that contract established "group of companies . . . for the purpose of carrying on, inter alia, the buying and selling of non-ferrous metals" was sufficient to plead enterprise); *Loma Linda Univ. Med. Ctr., Inc. v. Farmers Grp., Inc.*, 1995 WL 363441, at *2 (E.D. Cal. May 15, 1995) ("It is clear that contractual relationships can establish a RICO enterprise"). Because the enterprise includes constituents other than Defendants, it is sufficiently distinct. *See, e.g., Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) ("Where the overlap between the defendants and the alleged RICO enterprise is only partial, a RICO claim may be sustained.").

Defendants argue the Count 3 enterprise is insufficient absent allegations showing why McKinsey's bankruptcy clients would join with Defendants with the common purpose of victimizing AP. Mtn. at 77-78. However, "[t]he definition[] of an enterprise in the RICO statute . . . in no way require[s] an enterprise to include nothing but criminal actors." *U.S. v. Cianci*, 378

F.3d 71, 88 n.9 (1st Cir. 2004); *see also Cedric*, 533 U.S. at 164 (RICO "protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed[.]'") (quoting *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994) (emphasis added); *U.S. v. Turkette*, 452 U.S. 576, 580-81 (1981) ("enterprise" includes legitimate enterprises); *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 992-93 (N.D. Cal. 2008) (association-in-fact enterprise may include unwitting participants in defendants' scheme).[36]

Thus, there is no requirement that McKinsey's clients shared Defendants' unlawful purpose. And the fact that the composition of the Count 3 Enterprise may have shifted over time as particular bankruptcy clients came and went does not affect its legal sufficiency. *See, e.g.*, *U.S. v. Payne*, 591 F.3d 46, 60 (2d Cir. 2010) ("An 'individuals associated in fact' enterprise . . . may continue to exist even though it undergoes changes in membership.") (internal quotations omitted).

## III. ALIX'S RICO CLAIMS ARE TIMELY

Defendants concede that Alix's claims against McKinsey are timely with respect to the *NII*, *Standard Register*, *ANR*, *SunEdison*, *GenOn* and *Westmoreland* bankruptcies. *See* Mtn. at 67-72. Defendants argue that Alix's RICO claims are untimely only to the extent such claims (a) are based on the eight bankruptcies in which McKinsey was retained before 2014,[37] or (b) have been brought against certain Individual Defendants. *See id.* These arguments fail.

---

[36]     Defendants' cited cases (Mtn. at 77-78) do not support dismissal because, unlike Alix, the plaintiffs in *Cruz*, 720 F.3d 115, *General Motors*, *Lynn v. McCormick*, 760 F. App'x 51 (2d Cir. 2019), and *Manhattan Telecomms. v. Dial Am. Mktg., Inc.*, 156 F. Supp. 2d 376 (S.D.N.Y. 2001), did not allege details regarding an integrated association among corporate personnel and clients structured by defendants for the unlawful purpose of depriving a competitor of client engagements. *See* SAC ¶ 582.

[37]     These 8 bankruptcies are *Hayes*, *UAL*, *Mirant*, *Lyondell*, *Harry & David*, *AMR*, *AMF*, and *Edison Mission*.

A.      **Alix's Claims Based on Pre-2014 Bankruptcy Retentions Are Timely**

The four-year statute of limitations for civil RICO claims begins to run when the plaintiff "discovered or should have discovered" the RICO injury—not when the underlying conduct occurs. *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988). Under Second Circuit precedent, the duty to inquire arises only once there are sufficient "storm warnings" such that "a person of ordinary intelligence would consider it 'probable' that *fraud* had occurred." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012) (quotation and citation omitted). "For inquiry notice to exist, the triggering information must relate directly to the misrepresentations and omissions the plaintiffs later allege in their action against the defendants." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) (quotations, citations omitted).

"[O]n a motion to dismiss, unless Defendants can produce uncontroverted evidence that irrefutably demonstrates when Plaintiff discovered or should have discovered the fraudulent scheme, they cannot satisfy the heavy burden of establishing inquiry notice as a matter of law." *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 348 (S.D.N.Y. 2015) (citation omitted). "Southern District courts have variously described defendants' burden in this regard as 'extraordinary' and appropriate only in 'extreme circumstances.'" *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000) (citation omitted; emphasis added).

Here, Defendants argue that Alix's RICO claims based on eight pre-2014 bankruptcies are untimely because they were brought more than four years after McKinsey's retentions in those cases. Mtn. at 68-69. This argument ignores the "inquiry notice" test as applied by the Second Circuit in *Koch*. *See* 699 F.3d at 148-53. Like the plaintiff in that case, who was not on inquiry notice until *after* he had received sufficient information indicating that the wine he purchased was counterfeit, *id.*, AP was not on inquiry notice of its RICO injuries until *after* it received sufficient "storm warnings" that it had been deprived of a fair opportunity to compete in an unrigged market

for restructuring assignments.  *See, e.g.*, SAC ¶¶ 493-96, 570-75, 673-77 (alleging RICO injuries).

Critically, the Second Circuit has expressly declined to adopt the rule that Defendants seek here,

whereby the statute of limitations would begin to run on the date AP's injury occurred, rather than

when AP discovered its RICO injury.  *See Koch*, 699 F.3d at 148-50 (inquiry notice test did not

require plaintiff to file RICO claim within four years of his 1988 wine purchase).

Defendants have not established when AP was put on inquiry notice of its RICO injuries.

Contrary to Defendants' argument (Mtn. at 68), even AP's constructive knowledge of McKinsey's

retentions would not, without more, trigger inquiry notice.  Bankruptcy professionals legitimately

earn fees every day, and such information would not have alerted AP that it probably had been

injured by McKinsey's predicate acts that prevented AP from obtaining restructuring assignments.

Nor do Defendants support their contention that information in public court filings put AP on

inquiry notice.  *See id.*  Imputing knowledge of such information to AP would absurdly require it

to have read more than a decade's worth of voluminous disclosure statements filed by McKinsey

(and indeed, all professionals) in countless bankruptcy proceedings, despite having no reason to

do so.   McKinsey's argument is particularly disingenuous given Defendants' fraudulent

concealment and that, as the UST noted, McKinsey's declarations "gave the appearance of

compliance without actually complying with Bankruptcy Rule 2014."  SAC ¶¶ 81, 243.

Courts have correctly declined to find inquiry notice under similar or more compelling

circumstances.  *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 363 (2d Cir. 2013) (no indication

prior lawsuit received publicity; denying motion to dismiss RICO claim); *Lapin v. Goldman Sachs

Grp., Inc.*, 506 F. Supp. 2d 221, 234-35 (S.D.N.Y. 2006) (defendant failed to show inquiry notice

by citing news articles and state court complaint referencing defendant's conflict of interest);

*Sumitomo*, 120 F. Supp. 2d at 347 (denying motion to dismiss; RICO defendant failed to show

inquiry notice based on "various news reports [] discussing manipulation of the copper market");

*Liberty Ins. Corp. v. Brenman*, 2016 WL 880170, at *3 (E.D.N.Y. Mar. 1, 2016) (plaintiffs not put

on inquiry notice by statement in complaint in action to which they were not parties).[38]

Citing the unpublished Ninth Circuit decision in *Crown Chevrolet v. General Motors, LLC*,

637 F. App'x 446 (9th Cir. Mar. 1, 2016) (Mtn. at 68), Defendants argue that AP should have

known of its RICO injury when it lost out on Chapter 11 assignments to McKinsey.  *Crown*  is

distinguishable, because the plaintiff in that case had *actual* knowledge of its RICO injuries—

specifically, the sale of plaintiff's car dealerships for below-market prices, and the breaches of side

agreements that were intended to make up the price difference—and thus inquiry notice was not

at issue.  *See id.* at 446; *see also Crown Chevrolet v. Gen. Motors, LLC*, 2014 WL 246500, at *1

(N.D. Cal. Jan. 22, 2014).  In contrast, courts hold that the loss of business alone is not sufficient

to create inquiry notice and trigger the statute of limitations.  *See Sky Med. Supply Inc. v. SCS

Support Claims Servs.*, Inc., 17 F. Supp. 3d 207, 222 (E.D.N.Y. 2014) (medical provider who lost

business as result of defendants' fraudulent insurance scheme pled timely RICO claim); *see also

De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 295 (S.D.N.Y. 2013) ("In the case of a

RICO claim predicated on fraud, a plaintiff should have discovered his injury when he has received

information sufficient to alert a reasonable person to the probability that he has been misled").

That principle is particularly apt where, as here, AP was losing business to the biggest and most

lucrative consulting firm in the world.  *See* SAC ¶¶ 54-55, 66, 140; *see also Advanced Educ. Prod.*,

2022 WL 2069243, at *2 (defendant alleged to have withheld information required to be disclosed

---

[38]     *See also Blue Cross Blue Shield Ass'n v. Glaxosmithkline LLC*, 2016 WL 6612804, at *9 (E.D. Pa.
Nov. 9, 2016) (denying motion to dismiss RICO claims, despite reports of FDA's investigation of and
consent decree with defendant, "[b]ecause factual issues remain as to whether the public disclosures  . . .
constituted 'storm warnings' establishing inquiry notice").

under Rule 2014 and relevant to fraudulent transfer claims "will not be heard to cry of 'untimeliness'").

In any event, Defendants' arguments regarding inquiry notice at best raise issues of fact for discovery. *See Cohen*, 711 F.3d at 362 (pleadings were insufficient to support finding of untimeliness, in part because "determining whether a plaintiff had sufficient facts to place her on inquiry notice is often inappropriate for resolution on a motion to dismiss") (citations omitted); *see also Liberty*, 2016 WL 880170, at *4 (when plaintiffs learned of alleged fraud and commenced and concluded investigation "are factual questions that cannot be determined from the face of the complaint and can only be ascertained through the discovery process"); *Plumbers' & Pipefitters' Local No. 562 v. J.P. Morgan Acceptance Corp.*, 2012 WL 601448, at *11 (E.D.N.Y. Feb. 23, 2012) (emphasizing "the wisdom of the observation that whether plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6), and that the more appropriate vehicle is a motion for summary judgment on a complete record.") (quotations, citation omitted).

## B.    Alix's Claims Against the Individual Defendants Are Timely

Defendants' timeliness arguments concerning Yerian, Goldstrom, Garcia, Hojnacki, and Molino fail for similar reasons.  Defendants erroneously assert that the claims against these individuals are time barred to the extent each purportedly is "not alleged to have committed any predicate acts that caused AlixPartners injury within the four-year limitations period."  Mtn. at 69. As just explained, however, the RICO statute of limitations runs from *discovery* of the plaintiff's injury, and nothing on the face of the SAC establishes that AP knew (or should have known) of its injury more than four years prior to filing, even as to bankruptcy retentions that occurred more than four years prior to filing of this lawsuit.  *See supra* at Point III.A.

The analysis is the same with respect to Yerian, who was joined as a defendant in the FAC on September 4, 2018.  Alix's September 2014 meeting with Barton and Sternfels does not, as Yerian implies, trigger the limitations period for claims against Yerian.  The allegations describing that meeting do not even reference Yerian, SAC ¶¶ 143-152, and Yerian cannot show that AP had notice requiring an investigation that would have revealed to AP an injury caused by Yerian more than four years prior to the filing of claims against him on September 4, 2018.

Similarly, Hojancki and Molino, who were added as defendants in the SAC, fail to establish that AP received "storm warnings" of RICO injuries caused by these Individual Defendants more than four years before Alix moved for leave to file the SAC on June 30, 2022.  Mtn. at 72-73.  To the contrary, the SAC demonstrates that Defendants successfully concealed their fraudulent conduct and false statements for years, including the falsity of Hojnacki's declarations in the *SunEdison* and *Westmoreland* bankruptcies and Molino's design and approval of Defendants' intentionally deceptive "direct commercial relationship test" and "disclosure by category" approaches to disclosing client connections.  It was not until Hojnacki submitted two declarations on behalf of RTS in November and December 2018 in the *Westmoreland* bankruptcy, and that court subsequently permitted deposition discovery and trial testimony from Hojnacki and Molino, that Hojnacki's and Molino's direct involvement and causation of AP's injuries was revealed.  *See, e.g.*, SAC ¶¶ 77, 80, 85, 100-101, 122, 152, 326-327 (Molino's testimony in *Westmoreland* revealed facts regarding details of RICO scheme and Molino's culpability); *id.* ¶¶ 329-333, 339-344 (client connections withheld and concealed in prior Rule 2014 disclosures, including by Hojnacki in *SunEdison* and *Westmoreland* and by all Defendants with respect to MIO's connections, were revealed during *Westmoreland* proceedings).  At the very least, factual issues exist regarding when AP was on inquiry notice of claims against Hojnacki and Molino.

Finally, while not required for the reasons stated above, Alix alleges that each Individual Defendant committed RICO predicate acts within the four years preceding the date on which they were named as a defendant.  *See* SAC ¶¶ 47, 422 (Yerian was responsible for overseeing bankruptcy disclosures and involved in concealing client connections until his 2016 departure); *id.* ¶¶ 178, 182 ,194, 241, 287, 419 (from 2015 to 2017, Goldstrom knowingly caused, authorized and facilitated McKinsey's misleading bankruptcy disclosures in *Standard Register*, *SunEdison*, *ANR*, and *GenOn*); *id.* ¶¶ 189, 194, 287, 299, 326, 401(g) (until at least 2018, Garcia approved McKinsey RTS's Chapter 11 engagements and knowingly authorized, approved and facilitated McKinsey's misleading disclosures in the *ANR*, *GenOn*, and *Westmoreland* bankruptcies); *id.* ¶¶ 329-30, 335, 401(l), 424 (Hojnacki filed multiple false Rule 2014 declarations in *Westmoreland* in November and December 2018); *id.* ¶¶ 44, 336-37, 339, 423 (Molino signed off on Hojnacki's false and misleading *Westmoreland* declarations in late 2018 and designed and implemented McKinsey's illegal disclosure protocols and conflicts-checking process up until 2019).

Each such predicate act causing AP harm starts a new statute-of-limitations period, and all such claims would be timely even if AP had inquiry notice on the date such acts occurred (which it did not).  *See Bankers Tr.*, 859 F.2d at 1102 (new cause of action and 4-year statute of limitations accrues "each time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962").

## IV.   COLLATERAL ESTOPPEL DOES NOT APPLY TO THE *ANR* BANKRUPTCY

Defendants' collateral estoppel argument (Mtn. at 73-75) is nonsensical and ignores the fundamental facts and procedural history of the *ANR* case.  In January 2019 the bankruptcy court reopened *ANR* for the express purpose of addressing new allegations and evidence that its prior McKinsey-related rulings had been predicated on inaccurate disclosures and fraudulent misrepresentations.  *See supra* at 15-18; SAC ¶¶ 22-26, 234-236.  After reopening proceedings,

the *ANR* court approved a partial settlement between McKinsey and the UST, leaving the broader issues pleaded here unresolved.  *See* SAC ¶¶ 348-351.

Defendants' omission of these critical facts from their account of the *ANR* proceedings demonstrates the futility of their argument and, by itself, warrants rejection of Defendants' argument.  *See Stone v. Williams*, 970 F.2d 1043, 1047, 1054 (2d Cir. 1992) (no preclusive effect given to trial court rulings that had been set aside due to fraud perpetrated on the court) (citing *Montana v. United States*, 440 U.S. 147, 159 (1979) (change in facts essential to a judgment and doubts regarding quality, extensiveness or fairness of prior proceedings bars estoppel)); *Kotler v. Donelli*, 528 Fed. App'x 10, 14 (2d Cir. 2013) (declining to apply collateral estoppel, noting "collateral estoppel is grounded on concepts of fairness and should not be rigidly or mechanically applied"); *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 290 (2d Cir. 2000) (collateral estoppel would not apply where "changed circumstances may sufficiently alter the factual predicate such that new as-applied claims would not be barred by the original judgment").  Unlike the *ANR* bankruptcy, none of the preclusive rulings at issue in Defendants' cited cases (Mtn. at 74-75) were reopened for further proceedings due to evidence of fraud on the issuing court.

In addition to the foregoing, Defendants fail to establish the four basic elements of collateral estoppel:  "'(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'"  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288-89 (2d Cir. 2002); *see also Roseman v. Bloomberg L.P.*, 2016 WL 3866375, at *4 (S.D.N.Y. June 17, 2016) (party seeking to apply preclusion has burden to demonstrate each element).

Most glaringly, Defendants cannot show the third or fourth requirements:  that Alix had a full and fair opportunity in the *ANR* bankruptcy to litigate its current allegations regarding Defendants' fraud or that the purported resolution thereof was necessary to support a valid and final judgment on the merits.  The *ANR* court's approval of McKinsey's settlement with the UST demonstrates that it never finally adjudicated the merits of any of Alix's claims.  SAC ¶¶ 348-351; *see also In re Old ANR, LLC*, ECF 43 (Settlement Order), No. 19-00302-KRH (Bankr. E.D. Va. Apr. 18, 2019); *In re Old ANR, LLC*, ECF 65 (Hr'g Tr.), No. 19-00302-KRH (Bankr. E.D. Va. May 29, 2019) at 31:5-34:21.  Nor can Alix be held to have fully and fairly litigated an issue on which it was never permitted discovery and that was resolved by a settlement it did not join.  *See Harris Tr. & Sav. v. John Hancock Mut.*, 970 F.2d 1138 (2d Cir.1992) (collateral estoppel did not apply to judgment vacated by settlement agreement); *see also Arizona v. California*, 530 U.S. 392, 414 (2000) ("settlements ordinarily occasion no issue preclusion").  Further, any rulings issued by the *ANR* court prior to January 2019 do not support preclusion because they were not necessary to the final settlement of that matter.  *See* SAC ¶¶ 236, 348-349.

Nor have Defendants established that an issue material to this Rule 12(b)(6) motion is *identical* to any issue raised in *ANR*.  The issue presented on Defendants' Motion is whether the SAC adequately alleges that Defendants engaged in a pattern of racketeering activity through two or more predicate acts of mail, wire, or bankrutpcy fraud or other RICO predicate acts.  By contrast, in 2016, Mar-Bow objected to certain releases and fees granted to McKinsey under the Chapter 11 plan on the grounds that McKinsey RTS had not made its required Rule 2014 disclosures and Mar-Bow could not determine whether the reorganization plan was tainted by McKinsey's conflicts.  *See In re Alpha Natural Resources, Inc.*, ECF 2860 (Mar-Bow Objection), No. 15-33896-KRH (Bankr. E.D. Va. June 29, 2016).  Defendants' inability to demonstrate an identity of issues

between the two cases, particularly given the different procedural postures and applicable legal standards in the *ANR* bankruptcy and the SAC, is fatal to their argument. *See Roseman*, 2016 WL 3866375, at \*4-\*5 (different procedural postures of two cases at issue bar application of collateral estoppel); *see also 828 Hamilton Inc. v. United Specialty Ins. Co.*, 2018 WL 5817155, at \*7 (E.D.N.Y. Nov. 6, 2018) (identity of issues did not exist where differences in facts in two proceedings could result in different determinations under the law).

Finally, even assuming *arguendo* that Alix's allegations in the SAC present an issue identical to one raised in *ANR* (and they do not), Defendants have not demonstrated that such issue was actually litigated in and decided by the *ANR* court. Indeed, they do not identify any docket filings, motions, or orders purportedly presenting or adjudicating what Defendants refer to as "McKinsey's disinterestedness and the sufficiency of its bankruptcy disclosures." Mtn. at 74. Instead, Defendants obliquely and misleadingly cite two district court decisions from 2017 affirming the *ANR* court's 2016 confirmation of the *ANR* debtor's plan of reorganization. *See id.* Those rulings preceded the *ANR* court's reexamination of its McKinsey-related rulings by more than a year, which fundamentally changed the bankruptcy court's decisions with respect to McKinsey's disinterestedness and Rule 2014 disclosures.

## V.     ALIX'S CLAIMS ARE SQUARELY WITHIN THE RICO ZONE OF INTERESTS

Defendants' argument that Alix's claims fall "outside the zone of interests protected by the bankruptcy disclosure provisions" (Mtn. at 90) also fails. The "test for proximate cause under RICO incorporates concepts of statutory standing and zones of interest." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 284 n.3 (2d Cir. 2006) (citing *Baisch v. Gallina,* 346 F.3d 366, 373 (2d Cir. 2003)). Thus, "it is inappropriate to apply a zone-of-interests test independent of this circuit's proximate cause analysis." *Baisch*, 346 F.3d at 373. And while Defendants suggest in a footnote (Mtn. at 91 n.68) that *Baisch* was silently overruled by the Supreme Court's subsequent decision

in *Lexmark*, that case addressed the Lanham Act, not RICO.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014).  Neither *Lexmark* nor Defendants' other cited case of *Souza v. Exotic Island Enters.*, 2021 WL 3501162 (S.D.N.Y. Aug. 9, 2021) (similarly addressing the Lanham Act), undermine *Baisch*'s clear holding.

Here, the Second Circuit has already held that Alix adequately alleges proximate cause. *Alix*, 23 F.4th at 204-05.  Under Second Circuit precedent, that ends the inquiry because, as a party determined to have pleaded injuries directly caused by Defendants' racketeering conduct, AP is clearly an intended beneficiary of the RICO statute.  *See Baisch*, 346 F.3d at 374 (plaintiff established it fell within RICO zone of interests where racketeering activity was the proximate cause of plaintiff's injury); *Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 384 (2d Cir. 2001) (finding standing for competitor where scheme "undercut its business rivals, thus qualifying them as direct targets of the RICO violation"); *OSRecovery, Inc. v. One Groupe Intern., Inc.*, 354 F. Supp. 2d 357, 372 (S.D.N.Y. 2005) ("[T]he reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise.").

## VI.   ALIX ADEQUATELY ALLEGES BUT-FOR CAUSATION

The Second Circuit held that Alix sufficiently alleges proximate causation by "alleg[ing] a sufficiently direct relationship between the asserted injury to AlixPartners and McKinsey's purported racketeering activities in all thirteen bankruptcies." 23 F.4th at 208. Despite this, Defendants argue that Alix fails to plead actual, or "but for," causation.  Mtn. at 91-92.  But the Second Circuit stated that "[t]his appeal implicate[d] the causation element," including both proximate and actual causation, "meaning that but for the RICO violation, he would not have been injured." 23 F.4th at 203.  And it held that "Alix plausibly allege[s] that McKinsey's fraud caused Alix some damage."  *Id.* at 207.  There is simply nothing in the Second Circuit opinion suggesting that the issue of but-for causation remains in doubt.  *See, e.g. id.* at 206 ("[W]e see nothing

implausible or speculative about the conclusion that AlixPartners and the other competitors would have secured additional engagements absent McKinsey's alleged misconduct."); *see also Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1029 (9th Cir. 1999) ("[A] wrong cannot be the proximate cause of harm if it was not an actual cause of that harm.").

Indeed, Defendants advance essentially the same argument with regard to actual causation that the Second Circuit rejected. Defendants contend that (i) "Alix fails to plausibly plead that McKinsey would have been disqualified if it had disclosed additional connections"; (ii) "Alix fails to allege that AlixPartners would have been qualified under Alix's exacting interpretation of Rule 2014"; and (iii) "AlixPartners had a disqualifying conflict in *SunEdison*."[39] Mtn. at 92-93. Alix, however, does allege—for each bankruptcy retention at issue—that McKinsey would have been disqualified had it fully disclosed its disabling conflicts. SAC ¶¶ 4, 95, 103-04, 109, 116, 119-120, 127, 129-130, 135, 142, 167, 177, 183, 207-209, 224, 257-259, 271, 305-311, 496-497, 574-575, 677, 705-706. The SAC further alleges that AP would have been qualified and well-positioned to earn those engagements. *Id.* ¶¶ 493-495; 571-73, 675, 704; *see also Alix*, 23 F. 4th at 207 (crediting Alix's allegations that, with proper disclosures, "McKinsey would have been disqualified and the thirteen assignments would have been added to the pool available to Alix Partners and McKinsey's other competitors" "[a]nd whatever uncertainty exists does not undermine the fact that Alix plausibly alleged that McKinsey's fraud caused Alix some damage"). The Second Circuit found those "steps" in the "alleged causal chain" to be sufficiently and directly alleged in the context of proximate causation, 23 F. 4th at 206-07, and Defendants provide no basis

---

[39] Defendants argue that "Alix does not even plead that four of the bankruptcies fit into his own self-defined market of $1 billion or more in assets." Mtn. at 93. But the relative size of the bankruptcy has no bearing on *causation*, and in any event the size of the bankruptcy and its impact on damages (if any) is a fact issue not appropriate for the pleading stage. *See Dumann Realty, LLC v. Faust*, 267 F.R.D. 101, 105 (S.D.N.Y. 2010) ("[T]he Court finds that the current dispute is highly fact-intensive and not appropriate for dismissal at the pleading stage.").

to reach a different outcome for actual causation, which is a less exacting standard. *See Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*, 121 F. Supp. 3d 321, 338 (S.D.N.Y. 2015).

Citing the very same authorities that the Second Circuit found unpersuasive on this issue, Defendants assert that McKinsey would not have been disqualified if it had disclosed the legions of connections it omitted because "[b]ankruptcy courts have discretion over disqualifications, and disqualifying conflicts are rare." Mtn. at 92. Defendants completely ignore the Second Circuit's ruling on this very point. *See, e.g.*, *Alix*, 23 F.4th at 206 ("Alix plausibly alleges that had McKinsey filed proper disclosure statements, . . . the [*GenOn*] bankruptcy court would not have approved McKinsey's retention."); *see also id.* at 206 (rejecting McKinsey's argument "that the causal chains in these thirteen bankruptcies are too tenuous" because of the "discretion" of intervening actors). Further, neither of Defendants' cited cases comes anywhere close to supporting the notion that courts have discretion to overlook actual conflicts or that "disqualifying conflicts are rare." Indeed, *In re AroChem Corp.*, 176 F.3d 610, 624 (2d Cir. 1999), expressly recognized that where "there is an actual conflict . . . disqualification is mandatory."[40] *See also* SAC, Ex. C ¶¶ 23, 37.

Additionally, whether AP would have been qualified or ultimately retained, as a matter of fact, is not an issue to decide on a motion to dismiss. *See Alix*, 23 F.4th at 205 ("McKinsey might ultimately prove the existence of intervening events, but that showing must await summary judgment or trial"). Assessing the very same "intervening events" that Defendants argue break the chain of causation alleged in the SAC, the Second Circuit held that, based on Alix's factual

---

[40]     *See also In re Mercury*, 280 B.R. 35, 55 (Bankr. S.D.N.Y. 2002) (courts lack power to authorize "employment of a professional who has a conflict of interest"); *In re Andover Togs, Inc.*, 2001 WL 262605, at *5 (S.D.N.Y. Mar. 15, 2001) (holding that where advisor was not "disinterested," its retention was "prohibited by the plain language of [Section 327], and the Bankruptcy Court erred in retaining the firm").

allegations, it is reasonable to infer that the bankruptcy courts that approved McKinsey's retention would have retained a different advisor, and AP in particular. *See id.*

## VII. ALIX'S RICO CONSPIRACY CLAIM IS WELL-PLEADED

Defendants' argument that Alix has failed to plead a claim for RICO conspiracy under § 1962(d) (Mtn. at 94) fails for three reasons. *First*, as explained above (*see supra* at 52-54, 57), Alix has stated a § 1962(c) claim. But even if that were not the case, "substantive elements of a RICO claim are not required to be plead as against defendants charged with RICO conspiracy pursuant to § 1962(d)." *New York Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 282 (S.D.N.Y. 2013); *see also City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) ("the existence of a RICO enterprise is not a required element of a RICO conspiracy claim" and "a party may be liable for RICO conspiracy even though he was incapable of committing the substantive offense"). Even the authority Defendants rely on confirms this well-established proposition. *See Kriss v. Bayrock Grp. LLC*, 2016 WL 7046816, at *18 (S.D.N.Y. Dec. 2, 2016) (cited in Mtn. at 94) ("Although the Salomon Defendants' alleged conduct did not satisfy the conduct element of a substantive RICO violation, as explained above, that does not foreclose liability under a RICO conspiracy claim.").

*Second*, the conspiracy claim is not barred by the intracorporate conspiracy doctrine. While there is a split of authority as to whether this doctrine, which originated in antitrust law, is applicable to RICO, and the Second Circuit has yet to weigh in, the majority of courts of appeals that have considered the question have found that it is *not* a defense to a RICO conspiracy claim. *See Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323, 1327 (11th Cir. 2004); *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 787 (9th Cir. 1996); *Ashland Oil v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989); *see also In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 371 n.26 (3d Cir. 2007) (citing *Ashland* approvingly as an example "of conspiracy-type statutes that *do* attach

liability to parent-subsidiary actions"). A host of district courts in this and other circuits agree. *See Mauriber v. Shearson/Am. Express Inc.*, 567 F. Supp. 1231, 1241 (S.D.N.Y. 1983); *Rouse v. Rouse*, 1990 WL 160194, at *14 (N.D.N.Y. Oct. 17, 1990).[41]

As these cases have held, the intracorporate conspiracy doctrine is incompatible with the remedial purposes of RICO, which differ from those of federal antitrust law. *E.g.*, *Ashland*, 875 F.2d at 1281 ("In contrast [to antitrust law], intracorporate conspiracies do threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits"); *Mauriber*, 567 F. Supp. at 1241 ("[W]here the 'action by an incorporated collection of individuals creates the 'group danger' at which conspiracy liability is aimed, ... the view of the corporation as a single legal actor becomes a fiction without a purpose.'") (citation omitted); *Curley v. Cumberland Farms Dairy, Inc.*, 728 F. Supp. 1123, 1135 (D.N.J. 1989) ("While antitrust law seeks to encourage inter-corporate competition even at a cost to intra-corporate competition, RICO seeks to eliminate all racketeering activity, both inter-corporate and intra-corporate.") (citation omitted). Indeed, "civil RICO actions are similar to criminal actions, and thus, intracorporate conspiracies present a 'group danger' that conspiracy liability should address." *Fabrico Mfg. Corp. v. Wilson Sporting Goods Co.*, 1985 WL 1474, at *2 (N.D. Ill. May 22, 1985); *see also Fed. Ins. Co. v. U.S.*, 882 F.3d 348, 368 (2d Cir. 2018) (noting Second Circuit has only extended the intracorporate conspiracy doctrine to "some civil contexts" but not criminal matters).

Defendants spend a single sentence on this issue, citing *Kriss*. Mtn. at 94. In *Kriss*, which did not grapple with the circuit split or any competing rationale, the complaint stated a conspiracy

---

[41]     *See also Compound Prop. Mgmt., LLC v. Build Realty, Inc.*, 462 F. Supp. 3d 839, 862 n.1 (S.D. Ohio 2020); *U.S. v. Gurry*, 427 F. Supp. 3d 166, 190 (D. Mass. 2019), *aff'd in part, rev'd in part and remanded on other grounds sub nom. U.S. v. Simon*, 12 F.4th 1 (1st Cir. 2021); *U.S. v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 906 n.77 (D.D.C. 2006); *Shan Indus., LLC v. Tyco Int'l (US), Inc.*, 2005 WL 8156842, at *11 (D.N.J. Sept. 12, 2005); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 1996 WL 135336, at *5 (E.D. Pa. Mar. 19, 1996); *Saine v. A.I.A., Inc.*, 582 F. Supp. 1299, 1307 n.9 (D. Colo. 1984).

claim against some but not all groups of defendants.  2016 WL 7046816, at *19. at *18.  To the extent the RICO conspiracy claims in that case failed because of the intracorporate conspiracy doctrine, Alix respectfully submits that it was wrongly decided and should have followed the majority approach.  For similar reasons, the Court should adopt the majority view and reject invocation of the intracorporate conspiracy doctrine here.  *See Baisch*, 346 F.3d at 376 ("The Supreme Court has advised that RICO is to be read broadly.").

*Third*, Defendants argue that Alix failed to plead agreement among the Defendants, but the SAC adequately alleges, in detail, the existence of an intricate criminal scheme involving each Defendant; each Defendants' knowledge of and communications regarding the scheme; the specific actions taken by each Defendant in furtherance thereof; and the benefits flowing to each Defendant.[42]  *See Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25 n.4 (2d Cir. 1990) (allegations of RICO conspiracy are "measured under the more liberal pleading requirements of Rule 8(a)" and require only facts suggesting "conscious agreement" among the defendants).

## VIII.   ALIX PLEADS THAT EACH INDIVIDUAL DEFENDANT CONDUCTED AND PARTICIPATED IN THE CONDUCT OF THE RICO ENTERPRISE THROUGH PREDICATE ACTS

In the Motion, the Individual Defendants point the finger at one another—senior executives contend that they did not actively participate in the racketeering acts of their subordinates, Mtn. at 43-44, while their subordinates claim they were simply following orders.  *Id.* at 41, 61.  Proshan and Molino (both of whom held corporate *and* legal titles) claim that their roles as attorneys shield them from liability, Mtn. at 60, 62, while the businesspeople claim that they acted on advice of counsel.  *Id.* at 41-42, 47, 55.  Long-serving executives plead that too much time has passed since

---

[42]      *See, e.g.*, SAC ¶¶ 401, 425-428, 430-438, 481-485, 489, 510-512, 523-531, 534-542, 549-556, 564-567, 595, 606-608, 616, 618-619, 629-636, 642-647, 652-656, 683-687, 695-698 (discussing entity defendants); *see id.* ¶¶ 688-698; *see also* Point VIII, *infra*, regarding the role of each Individual Defendant.

the inception of their scheme, *id.* at 45, 58-59, while newcomers argue the scheme was in progress when they arrived.   *Id.* at 41.   If credited together, the Individual Defendants' contradictory arguments would allow each and all of them to escape responsibility for their roles in Defendants' scheme.   In truth, the SAC sufficiently pleads specific racketeering acts against each of the Individual Defendants establishing his or her participation in designing, enacting, and perpetuating a decades-long scheme to defraud.

Defendants Carmody, Goldstrom, Hojnacki, and Yerian each argue that they relied on advice of counsel in signing fraudulent disclosures, Mtn. at 42, 47, 55-56, 67, but this argument constitutes an affirmative defense that is inappropriate for disposition on a motion to dismiss Alix's well-pled claims.   *See U.S. Commodity Futures Trading Com'n v. McCrudden*, 2013 WL 142377, at *5 (E.D.N.Y. Jan. 11, 2013) ("While the advice of counsel defense may be raised after discovery is completed, i.e., as part of a motion for summary judgment or at trial, it cannot serve as the basis to dismiss the Complaint on a Rule 12(b)(6) motion.").

Defendants further contend that none of the Individual Defendants "operated or managed" the affairs of the enterprise as required under *Reves v. Ernst & Young*, 507 U.S. 170 (1993).   Mtn. 78-79.   In *Reves*, the Supreme Court determined that § 1962(c) liability may be imposed on a person who plays "some part in directing the enterprise's affairs."   507 U.S. at 179.   The Court emphasized that "RICO liability is not limited to those with primary responsibility for the enterprise's affairs."   *Id.*   "In this Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear."   *First Capital Asset Mgt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004); *see also CF 135 Flat LLC v. Triadou SPY S.A.*, 2016 WL 5945933, at *11 (S.D.N.Y. June 21, 2016) ("allegations of participation need not comply with Rule 9(b)").   Alix easily meets this standard for all Individual Defendants.

A.      **Barton**

Barton served from 2009 until 2018 as Global Managing Partner of McKinsey & Co. and the senior-most executive in charge of the firm.  SAC ¶¶ 39, 155.  In addition to phone calls and meetings with Alix that clearly establish Barton's knowledge of the scheme, Barton's discussions at those meetings evidence his racketeering acts in furtherance of the scheme, including his affirmative decision to allow and authorize the fraudulent and misleading disclosures filed by McKinsey to continue in subsequent cases.  *Id.*  ¶¶ 89, 143-159, 421, 459-460, 466.  Rather than putting a stop to the practice, Barton rewarded key players like Garcia and Goldstrom by keeping them in active leadership roles, despite knowing they were violating federal law.  *Id.* ¶¶ 157-158, 186-187.  Barton discussed these schemes with senior McKinsey and McKinsey RTS leadership, as admitted under oath in *Westmoreland* by Molino, Barton, and Sternfels.  *Id.* ¶ 152.  Through these actions, the SAC pleads that Barton aided and abetted at least 30 specific acts of mail and wire fraud, *id.* ¶ 430, multiple acts of bankruptcy fraud, and obstruction of justice related to at least eight bankruptcy matters, from *Harry & David* through *GenOn.  Id.* ¶¶ 87-89, 421.  Alix further pleads Barton's knowledge of, and failure to address, McKinsey's "pay for play" scheme, which the Second Circuit held was adequately pled.  *Id.* ¶¶ 144-145; *Alix*, 23 F.4th at 208-10.

The SAC pleads facts sufficient to give rise to a strong inference of Barton's fraudulent intent, including to commit various acts of mail and wire fraud.  *See* SAC ¶¶ 486-90; *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (although "the  actual fraudulent statements or conduct and the fraud alleged must be stated with particularity," the requisite intent of the participant "need not be alleged with great specificity"); *In re Firestar Diamond, Inc.*, 634 B.R. 265, 290 (Bankr. S.D.N.Y. 2021) (intent requirement "is easily met here given the massive and detailed fraudulent scheme set forth in the Amended Complaint.").  Further, the SAC pleads that at an in-person meeting with Alix on October 15, 2015 Barton attempted to bribe Alix into

- 78 -

dropping his complaints regarding McKinsey's fraud by offering to introduce AP to two new clients (SAC ¶ 159), further demonstrating Barton's fraudulent intent and knowing participation in the scheme.

Similarly, arguments that Barton did not operate or manage the affairs of the alleged enterprise, Mtn. at 85, fall flat.  The SAC is rife with allegations that Barton, as head of the organization (and after acquiring direct knowledge of the scheme) discussed those issues with numerous partners and employees, yet nonetheless made an affirmative decision not to change course in favor of continuing to have McKinsey file fraudulent disclosures.  *See* SAC ¶¶ 152-160, 460, 466; *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 479 (S.D.N.Y. 2015) (executive participated in operation and management of the RICO enterprise where pleaded facts created inference of control over entity defendant and other participants).

## B.    Carmody

During the relevant period, Carmody was a Senior Partner of McKinsey & Co. and the global leader of McKinsey RTS's corporate restructuring practice.  SAC ¶ 40.  In furtherance of the RICO scheme, Carmody signed at least 14 false sworn declarations submitted to bankruptcy courts that failed to name almost every one of McKinsey's conflicted investments and client connections and affirmatively misrepresented McKinsey's disinterestedness under law.  *Id.* ¶¶ 89, 428.  Contrary to Carmody's argument, *see* Mtn. at 41, joining and participating in McKinsey's scheme while it was already in progress is not a shield from liability.  *See Payne*, 591 F.3d at 62-63 (defendant was guilty of racketeering after joining and continuing to participate in ongoing conspiracy).  Instead, as a long-tenured bankruptcy professional with exposure to other firms' Rule 2014 practices, Carmody was well-qualified to know that McKinsey's deceptive tactics violated Rule 2014 and misrepresented McKinsey's "disinterestedness."  *See* SAC ¶ 401(j); *id.*, Ex. A.

The Carmody declarations were fraudulent.  Carmody claimed under oath that McKinsey was "disinterested," when in fact McKinsey and its affiliates and clients had interests directly in conflict with the debtors.  *See, e.g.*, SAC ¶¶ 189-193, 210-212 (*ANR* declarations failed to disclose that a major customer of the debtor, U.S. Steel, was a McKinsey client while McKinsey was advising on ANR's restructuring).  Carmody's declarations also failed to disclose thousands of connections between McKinsey and Interested Parties, a feat accomplished both by failing to adequately search for connections and by indefensibly omitting known connections by using Molino's invented "direct commercial transaction or relationship" test.  SAC ¶¶ 81, 89, 128, 165, 171-172, 188-193.  These knowing omissions were fraudulent in light of Rule 2014's duty to speak.  *See supra* at 4-9; *see also Miller v. Hyundai Motor Am.*, 2017 WL 4382339, at *7 (S.D.N.Y. Sept. 29, 2017) (alleged material omissions sustained fraud claim).

The SAC also pleads Carmody's intent to deceive.  To begin, Carmody's joint authorship of the "Bankruptcy 101" document demonstrates his full understanding of the relevant standards. SAC ¶ 170.  Yet, Carmody disregarded his own guidance that "[f]ailure to disclose relevant connections with parties in interest, failure to update such disclosures, and failure to adequately detail material connections may result in severe penalties and fines including denial of retention applications and disgorgement of fees."  *Id.* ¶¶ 170, 401(j).  Carmody submitted misleading declarations because it was the only way McKinsey could win bankruptcy engagements and sustain the McKinsey RTS business in the face of its many conflicts.  *Id.* ¶¶ 200, 486-490.  As a partner, Carmody benefitted directly from these conflicts of interest and from the engagements that McKinsey RTS won through its fraudulent misrepresentations.  That Carmody eventually disclosed in later supplemental declarations some of McKinsey's conflicts that were known and should have been disclosed at the outset, *e.g.*, *id.* ¶ 189, evidences Carmody's intent to defraud

because the delays were intentionally orchestrated to ensure that the bankruptcy process was well underway before revealing conflicts that would have disqualified McKinsey. *Id.* ¶ 194; *id.*, Ex. A.

*Westmoreland* is illustrative. Carmody "urged the McKinsey personnel preparing the declarations not to disclose [ANR] as a McKinsey client" because the engagement fell one day outside the arbitrary two-year "lookback" period McKinsey imposed on its *Westmoreland* declarations, thereby intentionally concealing a known connection. SAC ¶ 418. McKinsey had an ongoing investment stake in ANR post-restructuring through Whitebox. *Id.* ¶¶ 26, 196.

Citing *Vickers Stock Research Corp. v. Quotron Sys., Inc.*, 1997 WL 420265, at *4 (S.D.N.Y. July 25, 1997), Carmody argues the SAC lacks "concrete facts" showing he exercised control over the enterprise. Mtn. at 83. But in *Vickers*, which was decided on summary judgment, the defendant was an independent contractual counterparty who merely provided data and marketing services. *Id.* Carmody was a McKinsey Partner directing and executing the scheme by, among other things, drafting and signing fraudulent declarations, and carefully culling what was eventually disclosed to disguise disqualifying conflicts. *See Sky Med. Supply*, 17 F. Supp. 3d at 225 (*Reves* test satisfied where defendants "were vital actors who enabled the scheme" by lending their names to reports and "testifying falsely in support of those reports").

Finally, the fact that in-house lawyers (Molino and Proshan) and other senior executives were involved in the scheme does not mean that Carmody did not operate or manage the affairs of the racketeering enterprise. *See Crab House of Douglaston, Inc. v. Newsday, Inc.*, 418 F. Supp. 2d 193, 207 (E.D.N.Y. 2006) ("Under the *Reves* operation-management test, even if a defendant is not acting in a managerial role, he can still be liable for directing the enterprise's affairs if he 'exercised broad discretion' in carrying out the instructions of his principal.") (quoting *Napoli v.*

*United States,* 45 F.3d 680, 683 (2d Cir. 1995)).[43]   The SAC alleges Carmody's exercise of significant discretion in concealing McKinsey's connections.   *See* SAC ¶¶ 40, 81, 128, 162-67, 170-77, 188, 191, 203-04, 230-31, 288, 311, 401(j).

## C.   Garcia

At all relevant times, Garcia was a Senior Partner at McKinsey & Co., the founder and President of McKinsey RTS, and served on the Recovery Oversight Committee, which approved McKinsey's Chapter 11 engagements.  SAC ¶¶ 41, 401(g).  Alix pleads that Garcia committed and aided and abetted acts of mail, wire, and bankruptcy fraud, money laundering, obstruction of justice, and witness tampering.  *Id.* ¶¶ 401(g), 415, 433(g), 438, 468, 470, 481.  Garcia perpetuated the scheme by communicating to new hires that McKinsey approached client disclosures differently than other restructuring firms, such as AP, and instructed subordinates to conceal connections in Rule 2014 disclosures (as confirmed by Carmody's testimony in the *Westmoreland* trial).  *Id.* ¶ 164.  Garcia also participated in the drafting process for certain disclosures, including those in *Edision Mission* that omitted relevant connections.  *Id.* ¶¶ 132-133.  Garcia further had supervisory authority to instruct the McKinsey RTS staff and signatories, including Carmody and Goldstrom, to make full and accurate disclosures, yet he did not.  Garcia was knowingly violating the disclosure rules based upon his training as a lawyer, *id.* ¶ 149, and professional experience, but also because he received direct notice of the scheme through Alix's warnings, which were relayed to him by Sternfels by no later than September 2014, and he admitted that he knew that McKinsey's approach was "different" from standard Rule 2014 practice by all other professionals.  SAC ¶¶ 152, 164, 489(h).

---

[43]      Carmody, Goldstrom, and Yerian rely on *Crab House*, *see* Mtn. at 82, but in that case the claims against certain individual defendants that failed (while others survived) did so because the allegations failed to identify which individual defendant took which actions in directing the enterprise. 418 F. Supp. 2d at 207.  The SAC does not suffer from that flaw.

Additionally, from 2006 to 2017, Garcia was a member of MIO's Board of Directors and served on its Audit & Investment Committees, charged with reviewing and approving MIO's investments. *Id.* ¶ 41. By nature of his dual position, Garcia had clear visibility into the actions of both McKinsey RTS and MIO. Yet, Garcia failed to disclose his position with MIO to any bankruptcy court until the conflict was finally revealed in a post-confirmation filing by the UST in *ANR* in late 2018. *Id.*¶ 139. Garcia thus failed to disclose his own personal knowledge of McKinsey and MIO's conflicts with debtors, including ANR, as required by Rule 2014. *Id.* ¶ 198. Through his role with MIO, Garcia ratified investments that placed the firm in direct conflicts of interest, including the ratification of McKinsey's investment in Whitebox, and that third-party fund's significant stake in the *ANR* debtor's senior secured debt, while at the same time McKinsey RTS was engaged as a Chapter 11 bankruptcy professional for the *ANR* debtor. SAC ¶¶ 217, 387, 688. Garcia had personal knowledge and a duty to disclose these connections but aided and abetted Carmody and McKinsey RTS to wrongfully conceal them instead. *Id.* ¶¶ 196-98.[44]

Ignoring this multitude of factual allegations, Garcia bizarrely claims the SAC "has little to say" about him and fails to allege he directed the enterprise. Mtn. at 84. But the SAC alleges that Garcia was both aware of and ***managed*** the fraudulent scheme as the co-founder and President of RTS. *E.g.*, SAC ¶¶ 73, 132, 152-154, 401(g); *see Martin Hilti*, 137 F. Supp. 3d at 479 (allegations against executive who knew of the scheme's fraudulent objective and was responsible for actions of subordinates sufficient to create plausible inference of operation and management).

---

[44]   Garcia also knowingly misled the court by allowing McKinsey RTS to represent to the court in *ANR*, through counsel, that MIO was "walled off" from McKinsey RTS and they "know nothing" about MIO's activities—despite the fact that he, personally, sat on both sides of the purported wall. SAC ¶ 217.

#### D.   Goldstrom

Goldstrom was at all relevant times a Senior Partner at McKinsey & Co. and served as a board member of McKinsey RTS.  SAC ¶ 42.  The SAC pleads that Goldstrom committed and aided and abetted bankruptcy, mail, and wire fraud by knowingly causing and authorizing at least 15 false and misleading declarations to be filed on behalf of McKinsey in the *Harry & David*, *AMR*, *AMF Bowling*, and *SunEdison* bankruptcies, including by signing and swearing to multiple false declarations in *Harry & David* and *AMR*, and by authorizing declarations to be filed in the *Edison Mission*, *NII*, *Standard Register*, *ANR*, and *GenOn* bankruptcies.  SAC ¶ 419.

Goldstrom's declarations were false and misleading.  His declarations failed to disclose McKinsey's conflicts and connections with Interested Parties, both by failing to adequately search for connections and by indefensibly omitting certain connections that were identified using the insufficient "direct commercial transaction or relationship" method.  *Id.* ¶¶ 118-119, 121-127, 129-130.  For example, in *AMR*, Goldstrom failed to disclose in seven different declarations filed between 2012 and 2013 significant conflicts, including that McKinsey was hired to help a key Interested Party, Royal Bank of Scotland, with its downsizing efforts only two months after the *AMR* bankruptcy action was filed.  *Id.* ¶¶ 121-125.  Goldstrom also took an active role in preparing later false and misleading declarations.  For example, McKinsey's fee applications in several bankruptcies, including *AMF Bowling* and *SunEdison*, include time entries for Goldstrom for conferring about draft declarations with Proshan and Sternfels.  *Id.* ¶ 419.

Goldstrom's position as an executive and board member for McKinsey RTS's bankruptcy practice, as well as his background and training as an attorney, *id.* ¶¶ 42, 149, support an inference of scienter.  *See S.E.C. v. Egan*, 994 F. Supp. 2d 558, 566 (S.D.N.Y. 2014) (allegations of GAAP violations together with defendants' training and expertise as auditor created inference of fraudulent intent); *see also* SAC ¶¶ 419, 489(h).  Goldstrom's assertion that "Alix does not allege

Goldstrom ever had an intent or motive to injure AlixPartners," Mtn. at 47, ignores the SAC's well-pleaded allegations that submitting false and misleading declarations was the only way McKinsey RTS could win bankruptcy engagements given its disqualifying conflicts.  SAC ¶¶ 200, 486-490.  As a McKinsey partner, Goldstrom benefitted directly from these conflicts of interest and from the engagements that McKinsey RTS won through its fraudulent misrepresentations.

For similar reasons, the allegation that Goldstrom conducted the enterprise for purposes of § 1962(c) is well-pled.  Goldstrom argues that "the number of signed declarations has no legal significance on this issue."  Mtn. at 82-83.  But the authority cited does not support such an assertion.  For instance, *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg* (cited in Mtn. at 83), is inapposite, as there the court merely determined that a "person that assists another in *some unknown activity* does not conduct the activity and is not a participant."  660 F. Supp. 1362, 1370 (D. Conn. 1987) (emphasis added).  Whether "reckless disregard of the truth" is sufficient (Mtn. at 83) is irrelevant, as it is clear that Goldstrom was a knowing and intentional participant in the scheme.  *Andreo*, 660 F. Supp. at 1370 (collecting cases upholding RICO claims where defendants had "both knowledge of the illegal activity and substantially assist[ed] in it"); *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 453 (S.D.N.Y. 2004) (allegations that defendants "were key participants, by making critical misrepresentations [and] creating false documents" satisfied the pleading standard of § 1962(c)).

Goldstrom also makes two arguments unique to him: (i) that the RICO claims are barred by Rule 60(b) as collateral attacks on final bankruptcy court orders; and (ii) that this Court lacks jurisdiction to reach Alix's claims for bankruptcies administered outside this district.  Mtn. at 48-52.  Unsurprisingly, no other Defendant joins these arguments, neither of which has any merit whatsoever.  *First,* Rule 60 expressly applies to a "party or its legal representative" seeking relief

"from a final judgment, order or proceeding."  Fed. R. Civ. P. 60(b).  Alix does not seek to set aside any bankruptcy court ruling to which he or AP was a party.  *See, e.g.*, *Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, 2022 WL 2530359, at *5 (S.D.N.Y. Mar. 29, 2022) (Rule 60 applies to "relieve *a party* or its legal representative from a final judgment.").  Even if Rule 60 did apply, the rule "does not limit a court's power to entertain an independent action to relieve a party from a judgment, order, or proceeding."  Fed. R. Civ. P. 60(d)(1).

Goldstrom's authority, Mtn. at 49-50, is inapposite.  In *Knight v. Mooring Capital Fund, LLC*, for example, the plaintiff was barred from litigating her damages theory by issue preclusion based upon an earlier case among the same parties.  749 F.3d 1180, 1187-88 (10th Cir. 2014).  *Regions Bank v. J.R. Oil Co., LLC* was not based on Rule 60 at all, but rather on the effect of 11 U.S.C. § 363, because it challenged the bankruptcy sale of debtors' assets.  387 F.3d 721, 731-32 (8th Cir. 2004).  Moreover, the plaintiff was a party to the bankruptcy proceeding.  *Id.* at 732.

*Second*, Goldstrom's invocation of 28 U.S.C. § 1334 (Mtn. at 52) is misplaced because this RICO action brought under 18 U.S.C. §1964(c) is not a case arising "under title 11," and is thus not subject to § 1334's exclusivity provision.  *See* 28 U.S.C. § 1334(e)(2) (applying solely to cases arising or pending "under title 11").  There is no such district-by-district limitation in the RICO statute or 28 U.S.C. § 1331, which provides subject matter jurisdiction in this matter.  SAC ¶ 48.

## E.   Hojnacki

Hojnacki is a McKinsey & Co. Partner.  SAC ¶ 43.  In addition to signing numerous false and misleading Rule 2014 declarations in *SunEdison*, Hojnacki signed two Rule 2014 declarations in the *Westmoreland* bankruptcy that were so facially deficient, fraudulent, and misleading that the bankruptcy judge described Hojnacki's first *Westmoreland* declaration as "so bad that it got every hair raised on the back of my neck," and later commented that "**[h]e makes statements in his declaration that are simply not true**."  *Id.* ¶ 335 (emphasis added); *see also id.* ¶ 424.

As a long-serving bankruptcy professional and former AP employee, *see id.* ¶ 401(l), Hojnacki knew from experience that McKinsey's "process" for concealing its conflicts violated Rule 2014, and that his sworn assertions of McKinsey's "disinterestedness" in at least six declarations was false. SAC ¶¶ 70, 489(m). The SAC further pleads that Hojnacki was on notice of the various undisclosed connections and conflicts of interest in *Westmoreland* because he admitted, under oath, that he was aware of deficiencies with McKinsey's disclosure process in other bankruptcy cases, which he read about in the news. *Id.* ¶ 424. Hojnacki's motive is also clear in that submitting misleading declarations was the only way McKinsey RTS could win bankruptcy engagements and sustain the Chapter 11 business in the face of McKinsey's many conflicts, which Hojnacki directly benefitted from as a partner. *Id.* ¶¶ 486-490.

In light of these allegations, Hojnacki's argument that he did not conduct the enterprise because "others coerced [him] into providing false declarations," Mtn. at 89, cannot be credited at the pleading stage. *See Mohr-Lercara v. Oxford Health Ins., Inc.*, 2019 WL 1409479, at *12 (S.D.N.Y. Mar. 28, 2019) (noting that the "'operation or management' question is 'essentially one of fact'"). As the signatory of false declarations submitted to the court, at a minimum, Hojnacki exercised control over the content of those declarations and thus played a part in directing the enterprise. *See Sky Med. Supply*, 17 F. Supp. 3d at 225 (sustaining claims against "vital actors" who submitted false reports). Hojnacki's argument that he was not identified as "senior leadership" is similarly unavailing. It is well established that "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Reves*, 507 U.S. at 185.

## F.     Molino

Molino was General Counsel of McKinsey & Co. from 1985 to 2019, a McKinsey & Co. Partner from approximately 1991 to 2019, and an officer of MIO from 2001 to 2016. SAC ¶¶ 44,

423.  Molino had a central role in shaping McKinsey's disclosure protocols from at least 2002 to 2019, including ongoing supervision of and participation in drafting at least thirty-five fraudulent and misleading declarations in various bankruptcy actions.  *Id.* ¶¶ 96, 100, 104, 105-110, 113-114, 120, 122, 129, 132, 162, 177, 189, 249, 287, 336, 430.  Crucially, Molino testified in *Westmoreland* that she devised the "direct commercial transaction or relationship" protocol, which instructed declarants to omit certain connections and conflicts from Rule 2014 disclosures as a matter of course.  *Id.* ¶¶ 79-80, 423.  Using this "test," McKinsey improperly self-selected which connections it would disclose to bankruptcy courts by applying arbitrary criteria.  *Id.* ¶ 79.  Molino further admitted that she used the direct commercial transaction or relationship test to withhold disclosures of firm engagements that were directly adverse to the interests of debtors, and that the "test" has no basis in Rule 2014.  *Id.* ¶ 80.  As alleged in the SAC, Molino committed aided and abetted acts of bankruptcy fraud by knowingly authorizing, facilitating, and causing false and misleading disclosure declarations to be filed on behalf of McKinsey RTS in the *Harry David*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* and *Westmoreland* bankruptcies.  *E.g.*, *id.* ¶¶ 412-414, 423.

The SAC also alleges Molino's intent to defraud.  McKinsey's conflict-checking process (or lack thereof), which Molino designed and perpetuated for nearly two decades, utterly failed to follow legal requirements and industry standards with no reasonable explanation, other than that McKinsey senior leadership, including Molino, designed these systems so that they would not effectively identify conflicts.  *Id.* ¶¶ 489(d), 489(i).[45]  As an attorney, Molino knew or should have

---

[45]     Molino further admitted that, under her tenure, McKinsey failed to follow industry-standard protocols for conflicts-checking by declining to use conflicts-checking software.  SAC ¶ 77.  The database

known that applicable law and best practices could not support omitting key connections from sworn declarations; limiting the scope of connections that were searched or checking; and imposing arbitrary date cut-offs for the purpose of concealing connections. *Id.* ¶¶ 44, 489(i). Molino knew that many parties, including the debtors, bankruptcy courts, UST, and other Interested Parties would rely on the misrepresentations and omission including in the fraudulent and misleading sworn statements she participated in submitting. *Id.* ¶ 437.  As a senior executive and partner at McKinsey, Molino benefitted from the engagements that McKinsey RTS won and kept through these fraudulent misrepresentations, as with the other Individual Defendants.

Molino argues that, rather than holding her to a higher standard, her legal training should shield her from liability.  Mtn. at 60, 87.  But it is well established that "[n]either *Reves* nor RICO itself exempts professionals, as a class, from the law's proscriptions, and the fact that a defendant has the good fortune to possess the title 'attorney at law' is, standing alone, completely irrelevant to the analysis dictated by the Supreme Court."  *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997); *see Hottinger v. Amcoal Energy Corp.,* 1994 WL 652499, at *2 (S.D.N.Y. Nov. 17, 1994) ("Whether she participated in the conduct of the racketeering enterprise depends not . . . on her status as a lawyer but on her actual conduct.") (citation omitted).  Indeed, "[b]ehavior prohibited by § 1962(c) will violate RICO regardless of the person to whom it may be attributed, and [courts] will not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise." *Handeen*, 112 F.3d at 1349.  Accordingly, where attorneys allegedly helped their clients cover up and falsify relevant information, as pled in the SAC against Molino (and Proshan), these acts may

---

used by Molino and her team, the FPIS database, is not a conflicts-checking software and is not capable of searching for or identifying adverse interests, as required by Rule 2014.  *Id.*

be the basis for RICO liability.  *E.g.*, *Mayfield v. Asta Funding*, 95 F. Supp. 3d 685, 697-98 (S.D.N.Y. 2015) (law firm defendants involved in obtaining fraudulent default judgments and preparing fraudulent affidavits and pleadings were part of fraudulent enterprise).

### G.    Proshan

The SAC pleads that Proshan "knowingly participated in the preparation of materially false and incomplete Rule 2014(a) submissions." SAC ¶ 401(i).  Proshan was either the "primary person responsible" or "participated in drafting" dozens of fraudulent and misleading disclosures for McKinsey RTS in at least *AMR*, *AMF, Edison Mission*, *NII*, *Standard Register*, *ANR*, *SunEdison*, and *GenOn*, despite her awareness that McKinsey's purported "disinterestedness" was unsupported by facts and contradicted by known conflicts.  *E.g.*, SAC ¶¶ 122-123, 129-130, 132, 162, 168, 182, 239, 285, 401(i), 416.  For example, in declarations drafted by Proshan, McKinsey named its connection to an interested party, NRG Energy, in *ANR* and *SunEdison*, but did not include this connection in a subsequent declaration for *GenOn*, although NRG Energy was an Interested Party in that case.  *Id.* ¶¶ 223-224, 287-291.  This omission was particularly significant because GenOn possessed potential claims against NRG Energy, meaning that McKinsey was involved in investigating its own client, which was not known by the estate and the court because of McKinsey's deception.  *Id.* ¶¶ 287-291.  The signatories of several of these declarations, Carmody and Hojnacki, contend in the Motion that they relied on Proshan as a primary drafter of these declarations, lending further plausibility to her central role in the scheme.  Mtn. at 41-42, 55.

The SAC also pleads that Proshan participated in and directed the exercise of culling from known connections and picking and choosing which to disclose—disclosing only a fraction of McKinsey's known conflicts and disclosing none at all prior to intervention by the UST and Mar-Bow in *ANR* in 2016.  *E.g.*, SAC ¶¶ 122-123, 127, 129-130, 132-33, 162, 168, 182.  Proshan was "responsible for drafting the *SunEd* Protocol" that directed declarants to identify only a fraction of

McKinsey's many conflicts, and then cull these further based on arbitrary criteria unsupported in bankruptcy law and not compliant with her obligations under Rule 2014. *Id.* ¶ 416. Proshan was also a co-author of "Bankruptcy 101" and, along with Carmody, disregarded her own guidance and understanding of obligations under Rule 2014. *Id.* ¶¶ 170.

Like Molino, Proshan argues that her status as a lawyer should shield her from liability. Mtn. at 62-63, 79-82. But § 1962(c) liability is appropriate where, as here, attorneys "were not merely providing peripheral advice, but had participated in the core activities that constituted the affairs" of the enterprise. *Napoli v. United States*, 32 F.3d 31, 36 (2d Cir. 1994); *see also Trib. Co. v. Purcigliotti*, 869 F. Supp. 1076, 1098 (S.D.N.Y. 1994) (sustaining claims against lawyer who helped to devise scheme, played integral role in managing it, and gave direction to others acting in furtherance of it); *State Farm Mut. Auto. Ins. Co. v. Abrams*, 2000 WL 574466, at *11 (N.D. Ill. May 11, 2000) (liability appropriate where an attorney "provides services that go to the heart of the allegedly fraudulent scheme"). As stated above, Proshan played a central role in directing the enterprise by determining the content of filings, providing a playbook for non-lawyers on how to manipulate the disclosure regime, and serving as the primary architect of the *SunEd* Protocol, which detailed how McKinsey RTS could systematically avoid meaningful disclosure while maintaining the veneer of compliance. SAC ¶¶ 83-84, 170, 416, 489(j), 691.

Each of the cases Proshan cites is distinguishable as none involved acts by an attorney that were at the heart of the scheme to defraud a court through legal filings. In *In re General Motors LLC Ignition Switch Litigation*, relied upon by both Molino and Proshan, the court found that outside counsel only took part in "legitimate acts" as an attorney, in contrast with cases like this where "the lawyer defendants shared in the fraudulent common purpose of the enterprise." 2016 WL 3920353, at *15 (S.D.N.Y. July 15, 2016). Further, unlike here, "there [was] no allegation

that New GM's settlements were fraudulently obtained," and the *General Motors* court had ruled that defendants had not acted fraudulently.  *Id.*  Similarly, in *Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.*, which was decided *on summary judgment*, the attorney did not take part in the decision to go forward with the scheme—theft of trade secrets—but simply participated in contract negotiations and other "ministerial legal tasks in advancing the project." 832 F. Supp. 585, 590 (E.D.N.Y. 1993).  Likewise, in *Morin v. Trupin*, the plaintiff's allegations that defendants merely "directed certain individuals to the appropriate signature lines in legal documents" were insufficient under *Reves*."  835 F. Supp. 126 (S.D.N.Y. 1993).

## H.   Sternfels

During the relevant time period, Sternfels was a senior McKinsey partner with ultimate responsibility for McKinsey RTS.  SAC ¶ 46.  The SAC pleads he knowingly committed and aided and abetted acts of bankruptcy, mail, and wire fraud by causing at least four false and misleading declarations to be filed on behalf of McKinsey RTS in *SunEdison*, and by authorizing false and misleading declarations to be filed in eight additional bankruptcies.  *Id.* ¶ 420.

The SAC pleads that Sternfels had a substantial, personal conflict of interest in *SunEdison* that he failed to disclose.  *Id.* ¶¶ 272-273.  Sternfels is a longtime personal friend of the *SunEdison* debtor's CEO, Chatila, and "Sternfels was instrumental in Chatila's elevation to CEO of SunEdison."  *Id.* ¶ 275.  As a key bankruptcy professional running the *SunEdison* engagement, Sternfels knew that this information about his relationship with Chatila would be material to understanding McKinsey's conflicts in that case and should have been disclosed.  Instead, he induced Hojnacki to omit this material conflict from McKinsey's disclosures to the *SunEdison* court.  *Id.* ¶¶ 272, 276-277, 465.  The SAC also pleads that Sternfels and Chatila had a *quid pro quo* arrangement to steer SunEdison business to McKinsey post-bankruptcy.  *Id.* ¶¶ 275-276, 401(f)).  The Motion also fails to acknowledge additional acts the SAC pleads, including the role

that Sternfels played in the *Westmoreland* bankruptcy.  The SAC pleads that Sternfels had access to MIO's investment information and could have provided such information to Krivin to allow him to appropriately update McKinsey RTS's *Westmoreland* disclosures, and instead he and other senior leaders "determined that Krivin would not be provided with that information."  *Id.* ¶ 369.

The SAC also adequately alleges facts giving rise to a strong inference that Sternfels had the requisite fraudulent intent.  *See supra* Point I.C.  For example, the SAC pleads not just that Sternfels discussed McKinsey's deficient disclosures with Alix and Barton, but also that he failed to correct any of McKinsey's illegal pay-for-play and bankruptcy disclosure practices under his purview, even after witnessing Barton admit that such practices were unacceptable and should be fixed.  SAC ¶¶ 143-45.  The SAC also pleads that Sternfels strategized with other Individual Defendants regarding potential responses to Alix's threat to expose them.  *Id.* ¶ 152.

These allegations show that Sternfels "played some part in directing the enterprise's affairs."  *First Capital*, 385 F.3d at 176; *see De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 403-04 (S.D.N.Y. 2015) (defendant "knowingly permit[ted]" fraudulent scheme to go forward and supervised, conducted, and monitored the conduct of the fraudulent scheme).

## I.  Yerian

From 2011 to March 2016, Yerian was a Partner at McKinsey & Co. and he was a founder and Practice Leader at McKinsey RTS.  SAC ¶¶ 47, 401(m).  In *Edison Mission*, Yerian signed three declarations and he signed McKinsey's engagement letter.  *Id.* ¶¶ 131-132.  Yerian's declarations in *Edison Mission* were false and misleading and failed to name any of McKinsey's many connections to Interested Parties.  *Id.* ¶ 133; *id.*, Ex. B at 16-31.

Yerian asserts that he did not have the requisite knowledge of wrongdoing because Alix's confrontation with Barton occurred after his declarations were submitted.  Mtn. at 67.  While Alix's warning to McKinsey's partnership evidences intent for the other Individual Defendants, it was

not necessary for Yerian to receive external confirmation to know that his own declarations were fraudulent and misleading.  Yerian is an experienced bankruptcy professional who had worked for more than a decade at AP and participated in many Rule 2014(a) submissions, and therefore had personal knowledge that these declarations "often require[] the disclosure of hundreds of connections," yet he signed three declarations that failed to name a single connection, let alone the long list of contacts identified in the SAC.  SAC ¶ 133; *id.*, Ex. B at 16-31.

Yerian attempts to downplay his role, insisting that the SAC does not allege any authority over the alleged enterprise or that he was in RTS's senior leadership.  Mtn. at 83-84.  The SAC plainly alleges that Yerian was a co-founder and Practice Leader at RTS and a partner at McKinsey & Co.  SAC ¶¶ 401(m), 422.  But even if it did not, Yerian's position beneath others on the organizational chart does not shield him from RICO liability.  *See Trib. Co.*, 869 F. Supp. at 1098 (sustaining claims against employees who participated "under the direction of the alleged decision-makers of the enterprises") (quoting *Reves*, 507 U.S. at 184).  Moreover, the SAC alleges that Yerian had the ability to direct and conduct the scheme by pleading that he actively advanced the scheme to omit connections to Interested Parties, including by submitting the declarations in *Edison Mission*.  *See U.S. Fire Ins. Co.*, 303 F. Supp. 2d at 453 (those making the "critical misrepresentations" and "creating false documents" were "key participants" in the scheme).

## IX.    THE JOINT DECLARATION SHOULD NOT BE STRICKEN

Defendants ask the Court to strike the Joint Declaration appended as Exhibit C to the SAC. As an initial matter, Defendants did not file a motion to strike or otherwise invoke Rule 12(f), and thus the issue is not properly before this Court.  *See U.S. ex rel. Yu v. Grifols USA, LLC*, 2021 WL 4429375, at *1-*2 (S.D.N.Y. Sept. 26, 2021) (denying motion to strike where movant did not address the "high burden associated with a motion to strike a document from the record in its entirety" or properly address Rule 12(f) factors).

In any event, the Court should decline to strike the Joint Declaration given the technical issues here. *See Ramirez v. Temin & Co., Inc.*, 2020 WL 6781222, at *4, *7 (S.D.N.Y. Nov. 18, 2020) (courts have discretion and should disfavor motions to strike); *see also Brock Capital Grp. LLC v. Siddiqui*, 2022 WL 2047589, at *3 (S.D.N.Y. June 7, 2022) ("[M]otions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute.") (citation omitted). As the Second Circuit explained, this case presents *sui generis* and weighty questions regarding the integrity of the bankruptcy process. 23 F.4th at 204. Accordingly, the Joint Declaration may be useful to the Court in assessing the disclosure standards under Rule 2014. *See Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 700 (S.D.N.Y. 2003) (denying motion to strike declarations from legal experts where the "submissions are helpful to the Court"). Nor do Defendants "articulate any prejudice they suffer as a result of plaintiffs' inclusion of the" Joint Declaration. *Acco, Ltd. v. Rich Kids Jean Corp.*, 2016 WL 3144053, at *3 (S.D.N.Y. Apr. 11, 2016) (denying motion to strike).

Defendants' cases (Mtn. at 94) are distinguishable. In *Smith v. Hogan*, the court disregarded an affidavit prepared by the plaintiff after his termination in an employment dispute, noting that he did not rely on it for his claim because the assertions "ha[d] no independent legal significance to the claim" and the document was "never even mentioned" in the Complaint. 794 F.3d 249, 255 (2d Cir. 2015). In *Ong v. Chipotle Mexican Grill, Inc.*, the expert declaration arose in the context of a run-of-the-mill securities case, and the court found the expert opinion could not substitute for facts under the PSLRA. 294 F. Supp. 3d 199, 223-24 (S.D.N.Y. 2018). Here, the Joint Declaration is not substituting for facts but rather providing a framework to assist the Court in assessing the severity of McKinsey's fraudulent scheme.

## CONCLUSION

Plaintiff respectfully requests that the Court deny the Motion in its entirety.

- 95 -

Dated:  November 9, 2022                    CADWALADER, WICKERSHAM & TAFT LLP
            New York, New York


                                             */s/  Sean F. O'Shea*
                                            Sean F. O'Shea
                                            Michael E. Petrella
                                            Amanda L. Devereux
                                            Matthew M. Karlan
                                            Joshua P. Arnold
                                            200 Liberty Street
                                            New York, New York 10281
                                            Telephone:  (212) 504-6000
                                            Facsimile:  (212) 504-6666

                                            *Counsel to Plaintiff Jay Alix*