UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                :
JAY ALIX,                :
                :
          Plaintiff,       :
                :          18-CV-4141 (JMF)
        -v-          :
                :      OPINION AND ORDER
MCKINSEY & CO., INC., et al.,   :
                :
          Defendants.     :
                :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiff Jay Alix, the founder of a bankruptcy consulting firm, AlixPartners LLP

("AlixPartners"), brings this lawsuit against McKinsey & Co., and various subsidiaries and

executives (collectively, "McKinsey" or "Defendants"), challenging its practices as a competitor

bankruptcy consultant.[1]  AlixPartners and McKinsey are two of four companies that dominate

the market for high-end bankruptcy consulting.  ECF No. 177 ("SAC"), ¶¶ 51, 54, 55.  In order

to be retained as restructuring consultants, bankruptcy professionals such as AlixPartners and

McKinsey are required to file declarations disclosing any connections to the debtor estate and

confirming that they are "disinterested persons."  *Id.* ¶¶ 58-59.  Alix alleges that, in connection

with fourteen bankruptcy proceedings, McKinsey concealed connections to parties with an

interest in the debtor estates and, in so doing, obtained bankruptcy consulting assignments under

---

[1]     The corporate Defendants are McKinsey & Co., Inc.; McKinsey Holdings, Inc.;
McKinsey & Company Inc. United States ("McKinsey US"); and McKinsey Recovery &
Transformation Services U.S., LLC ("McKinsey RTS").  The individual Defendants are Dominic
Barton, Kevin Carmody, Jon Garcia, Seth Goldstrom, Mark Hojnacki, Virginia Molino, Alison
Proshan, Robert Sternfels, and Jared D. Yerian.

false pretenses.  *Id.* ¶¶ 10-11.  He contends that McKinsey won these bankruptcy consulting assignments at the expense of AlixPartners.  *Id.* ¶ 6.[2]

Specifically, Alix alleges that McKinsey's pattern of filing false and misleading declarations constitutes racketeering activity under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968, and that this racketeering activity injured AlixPartner's business.  Alix brings three substantive RICO claims under Section 1962(c) and one claim of RICO conspiracy under Section 1962(d).  In an earlier Opinion and Order, the Court dismissed Alix's claims, principally on the ground that he had failed to adequately allege proximate causation; the Second Circuit then vacated and remanded.  *See Alix v. McKinsey & Co., Inc.* ("*Alix I*"), 404 F. Supp. 3d 827 (S.D.N.Y. 2019), *vacated and remanded by* 23 F.4th 196 (2d Cir. 2022) ("*Alix II*").  On remand, McKinsey moves, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss Alix's claims for a host of reasons that this Court and the Second Circuit did not address.  ECF No. 200 ("Defs.' Mem.").  For the reasons discussed below, taking the facts alleged as true and drawing all inferences in Alix's favor, as the Court must, McKinsey's motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following brief factual summary is drawn from the facts alleged in the Second Amended Complaint ("Complaint") — which are taken as true and construed in the light most favorable to Alix for purposes of this motion to dismiss — and from documents attached to the Complaint, statements or documents incorporated into the Complaint by reference or relied upon so heavily for their terms and effect as to be "integral" to the Complaint, and matters of which

---

[2]     AlixPartners purportedly assigned its claims to Alix.  *See* SAC ¶¶ 8, 34.

judicial notice may be taken.  *See, e.g.*, *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902

F.3d 132, 139 (2d Cir. 2018); *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## A.  Bankruptcy Rule 2014

Central to Alix's case are the disclosure requirements in bankruptcy proceedings.

Professionals, including restructuring consultants, must seek approval from the bankruptcy court

before a debtor can retain them.  *See* 11 U.S.C. § 327(a).  Such professionals cannot "hold or

represent an interest adverse to the [bankruptcy] estate" and must be "disinterested persons."  *Id.*

A disinterested person, in turn, cannot be a creditor or an insider of the estate.  Nor can it have

any "interest materially adverse to the interest of the estate . . . by reason of any direct or indirect

relationship to, connection with, or interest in, the debtor."  *Id.* § 101(14).  Rule 2014 of the

Federal Rules of Bankruptcy Procedure sets forth disclosure requirements used to ensure that the

bankruptcy professionals are disinterested.  Specifically, Rule 2014 requires that, with an

application for retention, a bankruptcy professional must submit "a verified statement . . . setting

forth the [applicant's] connections with the debtors, creditors, any other party in interest, their

respective attorneys and accountants, the United States trustee, or any person employed in the

office of the United States trustee."  Fed. R. Bankr. P. 2014(a).  Rule 2014 requires bankruptcy

professionals to disclose all connections, even those that would not necessarily be disqualifying.

*See, e.g.*, *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) ("The scope of

disclosure is much broader than the question of disqualification.").  A Rule 2014 declaration

must be made under penalty of perjury.  *See* SAC ¶ 63.

## B.  Alix's Allegations

Alix has been working as a bankruptcy consultant since 1981, when he founded the

company that would become AlixPartners.  SAC ¶ 51.  McKinsey entered the bankruptcy

consulting field in 2001.  *Id.* ¶ 54.  Since then, McKinsey — through its subsidiaries McKinsey

US and McKinsey RTS, the latter of which was formed in 2010 — has consulted on thirteen bankruptcies and sought employment in a fourteenth. *Id.*[3] Significantly, AlixPartners and McKinsey are two of only four companies that dominate the high-end bankruptcy consulting space. *Id.* ¶ 55. Since 2010, of the bankruptcies involving assets of more than $1 billion in which McKinsey was not engaged, 75% went to one of the other three competitors. *Id.* AlixPartners received almost 25% of those contracts. *Id.*

Alix's allegations concern the fourteen bankruptcy proceedings in which McKinsey was employed or sought employment. *See id.* ¶¶ 2, 57. Alix alleges that, in each of those cases, McKinsey "knowingly and intentionally submitted false and materially misleading affidavits and declarations" in support of its applications for employment. *Id.* ¶ 2. More specifically, McKinsey allegedly did not disclose its connections to interested parties, as required by Rule 2014 of the Bankruptcy Code. *Id.* ¶ 11. These connections were, in some instances, current or former clients of McKinsey's other consulting practices, *see, e.g.*, *id.* ¶ 208-11, 290-91, or were related to McKinsey's investment arm, MIO Partners, Inc. ("MIO"), *see, e.g.*, *id.* ¶ 137-42.

---

[3] The thirteen cases on which McKinsey consulted are: *In re GenOn Energy, Inc.*, No. 17-BK-33695 (Bankr. S.D. Tex. June 14, 2017); *In re SunEdison, Inc.*, No. 16-BK-10992 (Bankr. S.D.N.Y. Apr. 21, 2016); *In re Alpha Natural Resources, Inc.*, No. 15-BK-33896 (Bankr. E.D. Va. Aug. 3, 2015); *In re Standard Register Co.*, No. 15-BK-10541 (Bankr. D. Del. Mar. 12, 2015); *In re NII Holdings (Nextel)*, No. 14-12611 (Bankr. S.D.N.Y. Sept. 15, 2014); *In re Edison Mission Energy*, No. 12-BK-49219 (Bankr. N.D. Ill. Dec. 17, 2012); *In re AMF Bowling Worldwide, Inc.*, No. 12-BK-36495 (Bankr. E.D. Va. Nov. 13, 2012); *In re AMR Corp.*, No. 11-BK-15463 (Bankr. S.D.N.Y. Nov. 29, 2011); *In re Harry & David Holdings, Inc.*, No. 11-BK-10884 (Bankr. D. Del. Mar. 28, 2011); *In re Lyondell Chemical Co.*, No. 09-BK-10023 (Bankr. S.D.N.Y. Jan 6, 2009); *In re Mirant Corp.*, No. 03-BK-46590 (Bankr. N.D. Tex. July 14, 2003); *In re UAL Corp. (United Airlines)*, No. 02-BK-48191 (Bankr. N.D. Ill. Dec. 9, 2002); and *In re Hayes Lemmerz International, Inc.*, No. 01-BK-11490 (Bankr. D. Del. Dec. 5, 2001). The fourteenth, in which McKinsey RTS ultimately withdrew its application for engagement, is *In re Westmoreland Coal Co.*, No. 18-BK-35672 (Bankr. S.D. Tex. Oct. 9, 2018). *See* SAC ¶ 378.

"All or any one of McKinsey's undisclosed connections," Alix repeatedly asserts, "would have disqualified [McKinsey] from employment as a bankruptcy professional . . . .  However, because of Defendants' fraudulent concealment of those connections, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could meaningfully assess the nature and extent of McKinsey's conflicts."  *Id.* ¶ 95; *accord id.* ¶¶ 109, 116, 127, 200, 318.  In other words, the courts in each of the bankruptcies at issue approved of McKinsey's retention as a restructuring consultant, and subsequently signed off on McKinsey's fees, without knowing of McKinsey's extensive connections to interested parties.  The net result, Alix alleges, is that AlixPartners was deprived of work it otherwise would have secured.  That is, McKinsey's fraudulent Rule 2014 statements "caused [AlixPartners] to lose considerable revenue that it otherwise would have earned had Defendants complied with the law and truthfully disclosed McKinsey's disqualifying conflicts of interest."  *Id.* ¶ 6.

In connection with one bankruptcy — *SunEdison* — Alix also alleges that McKinsey RTS engaged in a fraudulent scheme to hide pre-petition payments from the debtor.  *Id.* ¶¶ 255-65.  In the ninety days before SunEdison filed for bankruptcy, it paid McKinsey RTS over $6 million.  *Id.* ¶ 256.  These payments could have disqualified McKinsey RTS from the bankruptcy engagement, so, according to Alix, McKinsey RTS re-invoiced the money to non-debtor affiliates of SunEdison.  *Id.* ¶¶ 256-57.  In so doing, McKinsey RTS concealed the payments from the bankruptcy court.  *Id.* ¶ 265.

Finally, Alix alleges an "unlawful 'pay-to-play' scheme whereby McKinsey made offers to bankruptcy attorneys to arrange exclusive meetings between bankruptcy counsel and high-level executives from McKinsey's most valued clients in exchange for exclusive referrals of bankruptcy assignments from those attorneys."  *Id.* ¶ 144.  Alix alleges that he confronted Barton, then McKinsey's Global Managing Partner, and Sternfels on several occasions in late

2014, informed them of the "pay-to-play" scheme, advised them that the scheme was illegal, and warned them of the "grave potential consequences of McKinsey's serious past misconduct." *Id.* ¶¶ 143-45.  At one of these meetings, Alix "explained McKinsey's disclosure obligations under bankruptcy law at length to Barton and Sternfels"; "provided a lengthy and detailed exposition of the relevant legal principles and demonstrated how all of McKinsey's past disclosure declarations were non-compliant and illegal because they failed to identify connections by name and failed to describe connections in sufficient detail"; "raised McKinsey's pay-to-play scheme"; and "explained . . . why it, too, was illegal." *Id.* ¶¶ 147-48.

According to Alix, Barton responded by "frankly express[ing] doubt about McKinsey RTS as a business," called him the next day to thank him, and later admitted the wrongdoing. *Id.* ¶¶ 150-51.  Thereafter, Barton promised that, once he was reelected as McKinsey's Global Managing Partner, he would remove the individual wrongdoers from their posts and that, "by March 2015, McKinsey RTS would exit the bankruptcy consulting business" altogether, including from active consulting engagements. *Id.* ¶¶ 155-56.  In consideration for that promise, Alix allegedly agreed on behalf of AlixPartners "to remain patient and refrain from acting at that time on the issues he had raised, including forbearance from legal action." *Id.* ¶ 156.  When Barton did not hold up his end of the alleged deal, Alix and Barton met one final time; at that meeting, Alix alleges, Barton "offered Alix bribes" — in the form of introductions to potential clients — "to keep quiet." *Id.* ¶ 159.  Alix refused the overture and negotiations apparently broke down. *Id.*

## C.  Procedural History

As noted, the Court previously dismissed Alix's RICO claims on the ground that he had failed to adequately allege proximate causation.  *See Alix I*, 404 F. Supp. 3d at 840.  The Court did not dismiss Alix's state-law claims, but Alix later voluntarily dismissed them.  *See Alix v.*

*McKinsey & Co.*, 470 F. Supp. 3d 310, 317 (S.D.N.Y. 2020).  Alix then appealed the Court's

dismissal of his RICO claims.  The Second Circuit vacated and remanded that decision.  *See Alix*

*II*, 23 F.4th at 204.  The Circuit concluded first that Alix had sufficiently alleged a direct

relationship between McKinsey's "injurious conduct" and Alix's injury, reasoning that

McKinsey entities likely would not have received their bankruptcy assignments had they been

found ineligible because of fraud; and that had the bankruptcy assignments not been awarded to

McKinsey entities, then they would likely have been awarded to other, similar restructuring

firms, including AlixPartners.  *Id.* at 205-06.  Central to the Circuit's reasoning was a concern

that "McKinsey's alleged misconduct targeted the federal judiciary" and that the Circuit

therefore had an obligation "to ensure the integrity of the Bankruptcy Court and its processes."

*Id.* at 204.  Indeed, the Court went so far as to acknowledge that its resolution of the case was

"*sui generis* and of little, if any, application to 'ordinary' RICO cases where these

responsibilities are not front and center."  *Id.*  Additionally, the Circuit concluded that Alix had

plausibly pleaded an unlawful "pay-to-play" scheme, reasoning that the operative complaint

"specifically allege[d] the influence of the pay-to-play scheme in" three bankruptcies based on

Alix's claim that his company was not even asked to pitch for the assignment, despite his

relationship with the debtors.  *Id.* at 208-09.  Following remand, Alix filed the operative

Complaint, and Defendants moved to dismiss on a variety of grounds not addressed in the

Second Circuit's opinion.

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts

set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See*,

*e.g.*, *Empire Merchs.*, 902 F.3d at 139; *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122,

124 (2d Cir. 2008).  Alix's claims will survive the motion, however, only if Alix alleges facts

sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  Thus,

Alix must show "more than a sheer possibility that [Defendants] ha[ve] acted unlawfully," *id.*,

and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.

If Alix's pleadings "have not nudged [his] claims across the line from conceivable to plausible,

[the] complaint must be dismissed." *Id.* at 570.

## DISCUSSION

Alix brings four claims: three RICO claims under 18 U.S.C. § 1962(c) and one RICO

conspiracy claim under 18 U.S.C. § 1962(d).  SAC ¶¶ 390-707.  The RICO Act creates a private

cause of action for "[a]ny person injured in his business or property by reason of a violation of

section 1962" of the statute.  18 U.S.C. § 1964(c).  Section 1962, in turn, makes it "unlawful for

any person employed by or associated with any enterprise engaged in, or the activities of which

affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity."  *Id.* § 1962(c).

"[R]acketeering activity" is defined to include a wide variety of criminal offenses, including, as

relevant here, bankruptcy fraud, wire fraud, mail fraud, and obstruction of justice.  *Id.* § 1961(1);

*see Empire Merchs.*, 902 F.3d at 139.  "To establish a RICO claim, a plaintiff must show: (1) a

violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3)

that the injury was caused by the violation of Section 1962.  To establish a violation

of § 1962(c), in turn, a plaintiff must show that a person engaged in (1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity."  *Cruz v. FXDirectDealer, LLC*, 720

F.3d 115, 120 (2d Cir. 2013) (cleaned up).  To establish a RICO conspiracy claim, a plaintiff

must allege that the defendant participated in "an agreement to violate RICO's substantive

provisions." *One World, LLC v. Onoufriadis*, No. 21-374-CV, 2021 WL 4452070, at *1 (2d Cir.

Sept. 29, 2021) (summary order) (internal quotation marks omitted).

McKinsey makes several arguments for dismissal: first, that many of Alix's claims are

time barred, Defs.' Mem. 67-73; second, that Alix fails to allege an enterprise for any of the

three substantive RICO counts, *id.* at 75-89; third, that Alix does not allege that any Defendant

committed at least two predicate acts, *id.* at 14-48, 53-67; fourth, that Alix's RICO conspiracy

claim is barred by the intracorporate conspiracy doctrine and, in any event, that Alix fails to

establish an agreement to commit a substantive RICO offense, *id.* at 94; fifth, that Alix's claims

fall outside the zone of interest protected by RICO, *id.* at 90-91; and sixth, that Alix fails to

establish but-for causation, *id.* at 91-93.  McKinsey further argues that Alix's claims with respect

to one bankruptcy, *Alpha Natural Resources*, are barred by collateral estoppel.  *See id.* at 73-75.

Defendant Goldstrom, on behalf of only himself, contends that Alix's claims are barred by Rule

60 of the Federal Rules of Civil Procedure and that the Court lacks subject-matter jurisdiction in

light of 28 U.S.C. § 1334(e)(2).  *See* Defs.' Mem. 48-52.  Finally, McKinsey moves to strike a

declaration Alix submitted as part of the Complaint.  *See id.* at 94.  The Court will address each

of these arguments in turn.

**A.  Timeliness**

The Court begins with McKinsey's argument that Alix's claims against all Defendants

based on the earliest eight bankruptcy engagements and certain claims against five individual

Defendants are time barred.  Defs.' Mem. 67-73.  Civil RICO claims are subject to a four-year

statute of limitations.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012).  The

limitations period runs from when the plaintiff discovered, or should have discovered, his *injury*;

it does not matter whether the plaintiff has uncovered the pattern of predicate acts necessary to

make out a civil RICO claim.  *See Rotella v. Wood*, 528 U.S. 549, 555-56 (2000); *accord Koch*, 699 F.3d at 150; *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58-60 (2d Cir. 1998) (holding that the limitations period begins to run once the plaintiff has actual or inquiry notice of the injury).  RICO also has a "separate-accrual rule," meaning that if a plaintiff "at a later date" suffers "a new and independent injury" from a RICO violation, "his right to sue for damages from [the later] injury accrues at the time he discovered or should have discovered that injury." *Elnenaey v. JP Morgan Chase Bank, N.A.*, No. 20-CV-5430 (RPK), 2022 WL 4539374, at *5 (E.D.N.Y. Sept. 28, 2022) (quoting *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988)) (cleaned up).  Here, Alix filed his first Complaint on May 9, 2018.  *See* ECF No. 1.  Thus, any claims based on injuries he discovered or should have discovered before May 9, 2014, are barred.

For the most part, McKinsey's arguments about timeliness, although not without force, cannot be resolved at this stage of the litigation.  It is well established that a pre-answer motion to dismiss on timeliness grounds "may be granted *only* if it is clear on the face of the complaint that the statute of limitations has run." *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) (emphasis added) (internal quotation marks omitted); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[A] defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint.").  Here, it is not clear from the face of the Complaint that Alix knew, or should have known, of AlixPartners's injuries prior to May 9, 2014.  In arguing otherwise, McKinsey contends that the relevant limitations period was triggered by its appointment as the restructuring consultant.  *See* Defs.' Mem. 67-68.  But that is not necessarily the case.  Alix's alleged injury was the loss of business opportunity, *see* SAC ¶¶ 493, 570, 673 — or, put differently, the loss of potential profits — and the Complaint does not establish that Alix was

aware, or should have been aware, that AlixPartners was deprived of a business opportunity the moment that McKinsey was appointed.  *See, e.g.*, *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 222 (E.D.N.Y. 2014) (Bianco, J.) (denying a motion to dismiss on the ground that the plaintiff had discovered its RICO injuries — the denial of insurance reimbursements — when it discovered that the claims were fraudulently denied, not when the claims were actually denied); *see also, e.g.*, *Levy v. BASF Metals Ltd.*, 917 F.3d 106, 108-09 (2d Cir. 2019) (holding that the statute of limitations was triggered when the plaintiff discovered financial losses, even if she was unaware of the defendant's statutory violation at that time).[4]

The Court reaches a different conclusion, however, with respect to Alix's claims against Hojnacki and Molino relating to all bankruptcies other than *Westmoreland*.  Alix did not name Hojnacki and Molino as Defendants until the Complaint, which he filed on June 30, 2022.[5]  And it is indisputable that Alix knew of his alleged injuries from the first thirteen bankruptcies more than four years before that date.  After all, he filed his original complaint on May 9, 2018 — more than four years earlier — and it explicitly alleged claims with respect to all thirteen of those bankruptcies.  Alix contends that he lacked "storm warnings" of Hojnacki's and Molino's

---

[4]     Defendants separately contend that Alix's claims against Jared Yerian, which are limited to the *Edison Mission* bankruptcy, are time barred because they were filed four years and one day after September 3, 2014, when Alix met with Barton for the first time and explained McKinsey's allegedly fraudulent bankruptcy disclosures.  *See* Defs.' Mem. 69-70; *see also* SAC ¶ 146.  That is true, but it is not clear from the face of the Complaint whether Alix was aware on that date of his alleged injuries relating to the *Edison Mission* bankruptcy in particular, as Alix does not allege which bankruptcies he discussed with Barton at that meeting.  *See* SAC ¶¶ 146-50.  Accordingly, Alix's claims against Yerian cannot be dismissed at this stage either.

[5]     Alix does not contend that his claims against Hojnacki or Molino relate to back to an earlier pleading.  Given that Defendants argue the point, *see* Defs.' Mem. 72-73, and Alix bears the burden of proof on the issue, *see, e.g.*, *Colo. Cap. Invs., Inc. v. Owens*, No. 03-CV-1126 & 03-CV-1032 (JS), 2005 WL 8161187, at *3 (E.D.N.Y Dec. 22, 2005), Alix has plainly forfeited any argument that the relation-back doctrine salvages his claims against Hojnacki or Molino.

particular roles in the alleged racketeering scheme until later.  ECF No. 236 ("Pl.'s Opp'n"), at 66.  But that is debatable, as Alix named both Hojnacki and Molino by name and job title in his prior complaints, *see, e.g.*, ECF No. 1, ¶ 122 (identifying Molino in the initial complaint); ECF No. 73, ¶¶ 253, 350(g) (identifying Hojnacki in the amended complaint and describing his role in the *SunEdison* bankruptcy), and, in any event, it is beside the point.  As noted above, the statute of limitations is triggered by discovery of *injury*, not discovery of each individual defendant's role in that injury.  *See Rotella*, 528 U.S. at 556-57.  Accordingly, Alix's claims against Hojnacki and Molino arising from the bankruptcies other than *Westmoreland* are time barred.  Otherwise, Defendants' motion to dismiss on statute-of-limitations grounds is denied.

## B.  Enterprise

Next, McKinsey contends that Alix fails to plausibly allege the existence of any RICO enterprise.  Defs.' Mem. 75-90.  A RICO enterprise may be a legal entity or "a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583 (1981); *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004).  Critically, because the statute makes it unlawful for a "person employed by or associated with any enterprise" to conduct the "enterprise's affairs *through* a pattern of racketeering activity," a plaintiff bringing a claim "must allege . . . the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."  *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017) (emphasis added) (internal quotation marks omitted); *accord Satinwood*, 385 F.3d at 173.  In other words, RICO "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

This "so-called 'distinctness' requirement," *Cruz*, 720 F.3d at 120 (internal quotation marks omitted), is especially important where, as here, a corporation is alleged to be one of the RICO persons.  That is "[b]ecause a corporation can only function through its employees and agents."  *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, *N.A.*, 30 F.3d 339, 344 (2d Cir. 1994).  Thus, "any act of the corporation can be viewed as an act of [a RICO] enterprise, and the enterprise is in reality no more than the defendant itself."  *Id.*  It follows that "where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation."  *Id.*  For similar reasons, "corporations that are legally separate but 'operate within a unified corporate structure' and 'guided by a single corporate consciousness' cannot be both the 'enterprise' and the 'person' under § 1962(c)."  *Cruz*, 720 F.3d at 121 (quoting *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996)).  At the same time, the purpose of RICO is, in part, to "protect[] the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which unlawful activity is committed," so a corporate owner or employee may be distinct from a corporation itself.  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163-65 (2001) (citation omitted).

In this case, Alix alleges three enterprises.  First, in connection with Count One, he alleges that McKinsey RTS constituted an enterprise consisting of the three other McKinsey entities and all individual Defendants (the "Count One Enterprise").  SAC ¶ 395.  Second, in connection with Count Two, he alleges that the McKinsey entities collectively constituted an enterprise consisting of all individual Defendants (the "Count Two Enterprise").  *Id.* ¶ 503. Finally, in connection with Count Three, he alleges a third association-in-fact enterprise

comprised of the McKinsey entities and its bankruptcy consulting clients (the "Count Three Enterprise"). *Id.* ¶¶ 581-82. The Court will address each alleged enterprise in turn.

### 1. Count One Enterprise

Defendants argue that the Count One Enterprise — McKinsey RTS — fails because it is not distinct from the corporate Defendants that Alix alleges are RICO persons. Defs.' Mem. 75-77. Assuming the truth of Alix's allegations and drawing all reasonable inferences in his favor, the Court disagrees. First, Alix plausibly alleges that the business of McKinsey RTS is separate from the business of the other McKinsey entities. It is true that McKinsey RTS is a wholly owned subsidiary of McKinsey U.S., SAC ¶ 38, which is, in turn, a wholly owned subsidiary of the other McKinsey entities, *id.* ¶ 36-37, and that it shares executives and employees with the other McKinsey entities, *e.g.*, *id.* ¶¶ 40-42, 45, 47. But McKinsey RTS operates a business separate from the other McKinsey entities — the bankruptcy restructuring consulting business. Moreover, Alix plausibly alleges that there is rhyme and reason to this separation: to avoid disclosing clients of other McKinsey entities who are interested parties in the bankruptcies for which McKinsey RTS is consulting. SAC ¶ 395. Indeed, the stark difference between the confidentiality required of McKinsey entities in its standard consulting practices and the broad disclosures required of McKinsey RTS in the bankruptcy space suggests that McKinsey RTS is not guided by the same "corporate consciousness" as the other McKinsey entities.[6] The McKinsey entities thus did not share client information with McKinsey RTS, belying the notion that McKinsey RTS operated within the same unified corporate structure as the other entities.

---

[6] Thus, for example, several individual Defendants specifically represented in declarations filed in the bankruptcy proceedings that because of McKinsey's practice of serving clients with competing interests, its "affiliates do not have in place any centralized conflicts identification process, and only have a central database of clients and engagements performed for those clients, which is kept principally for record keeping purposes." *E.g.*, ECF No. 199-12, ¶ 20.

These allegations distinguish this case from *U1it4less*, in which the Second Circuit refused to impose RICO liability on a parent corporation and its subsidiary for conducting an "enterprise" that was another subsidiary. There, the parent corporation operated exclusively through its subsidiaries, including the enterprise entity. *See* 871 F.3d at 206-07. By contrast, the allegations here support an inference that McKinsey RTS had a purpose separate and distinct from the other McKinsey entities, which is sufficient to at least raise a question of fact regarding the existence of an enterprise. *See, e.g.*, *DarkPulse, Inc. v. EMA Fin., LLC*, No. 22-CV-45 (LGS), 2023 WL 2307386 (S.D.N.Y. Mar. 1, 2023) (concluding that the plaintiff adequately alleged a RICO enterprise — a lender — distinct from the RICO persons — the lender's investment manager and its sole owner); *Weir v. Cenlar FSB*, No. 16-CV-8650 (CS), 2018 WL 3443173, at *7 n.7 (S.D.N.Y. July 17, 2018) ("If [the subsidiary] and [the parent] were alleged to serve different roles within the . . . Enterprise, Plaintiffs might have plausibly pleaded the distinctness requirement."); *Lavastone Cap. LLC v. Coventry First LLC*, Nos. 14-CV-7139, 14-CV-7967 (JSR), 2015 WL 1939711, at *6-7 (S.D.N.Y. Apr. 22, 2015) (holding that an association-in-fact enterprise was distinct from the corporate defendants that comprised it even though the corporate entities were a parent and its subsidiaries, because the entities performed different roles within the industry and maintained separate accounts); *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 537 (S.D.N.Y. 2014) (holding that RICO persons — individuals and corporations — who operated the enterprise corporation were sufficiently distinct from the enterprise). Accordingly, McKinsey's motion to dismiss Count One on the ground that it does not satisfy the requirement to plead an enterprise must be and is denied.[7]

---

[7]     To be clear, the Court's conclusion does not depend on the "facilitation" test, which permits a plaintiff to satisfy RICO's distinctness requirement by alleging that a defendant has

### 2. Count Two Enterprise

McKinsey's sole challenge to the Count Two Enterprise — consisting of the four McKinsey entities, with the individual Defendants as RICO persons — is that Alix fails to plead that any individual Defendant conducted or participated in the RICO enterprise. *See* Defs.' Mem. 78.[8]  It is true that RICO persons must "have some part in directing" the enterprise's affairs. *Reves*, 507 U.S. at 179.  But RICO liability "is not limited to upper management" or "those with primary responsibility for the enterprise's affairs." *Id.* at 179, 184.  Instead, "one is liable under RICO if he or she has discretionary authority in carrying out the instructions of the [enterprise's] principals, or played some part in directing the affairs of the RICO enterprise." *Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003) (cleaned up).  Generally, "the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *Satinwood*, 385 F.3d at 176 (citation omitted).

Applying these standards, the Court rejects Defendants' argument.  Defendants Carmody, Goldstrom, Yerian, and Hojnacki personally signed the allegedly fraudulent declarations submitted in the bankruptcy proceedings. *See, e.g.*, SAC ¶¶ 81, 118, 131, 329.  These declarations are at the heart of the alleged scheme.  And the declarations themselves suggest that the signers had discretion over their contents, *see, e.g.*, ECF No. 199-20, ¶¶ 17, 24 (Goldstrom making assertions based on his personal beliefs), satisfying the requirement that a RICO person has some "discretionary authority" in the affairs of the enterprise, *Gallina*, 346 F.3d at 376; *see*

---

created the RICO enterprise to facilitate its racketeering.  The Second Circuit has neither endorsed nor rejected the "facilitation" test. *See U1it4less*, 871 F.3d at 208 n.12.

[8]     Defendants make the same argument with respect to the individual Defendants' roles within the other two enterprises. *Id.*  The Court's analysis of the individual Defendants' roles for the Count Two Enterprise applies equally to the other enterprises.

*also Napoli v. United States*, 45 F.3d 680, 683 (2d Cir. 1995) (emphasizing that "lower-rung participants" acting under the direction of upper management can be held liable under RICO). Alix plausibly alleges that these four individual Defendants were not merely passive participants, but rather had each reviewed relevant information about McKinsey's connections to interested parties and chose what to disclose and what to keep hidden. *Compare Crab House of Douglaston, Inc. v. Newsday, Inc.*, 418 F. Supp. 3d 193, 208 (E.D.N.Y. 2006) (noting that allegations of passive actions were insufficient to show conduct or participation), *with City of New York v. LaserShip, Inc.*, 33 F. Supp. 3d 303, 310 (S.D.N.Y. 2014) (finding that allegations that the defendants had delivered contraband and exercised discretion in the transportation logistics were sufficient to plead conduct or participation in the RICO enterprise).

Next, Alix alleges that Defendants Garcia, Sternfels, and Barton directed McKinsey RTS's bankruptcy engagements and were integral to the scheme's continuity. Garcia founded McKinsey RTS, signed the engagement letter for the *Edison Mission* bankruptcy, consulted on the disclosures submitted to the bankruptcy court, and approved the *Westmoreland* engagement and Hojnacki's declarations submitted to the bankruptcy court for that engagement. SAC ¶¶ 41, 132, 326, 339. Sternfels directed client services for *SunEdison* and consulted on the disclosures submitted to the bankruptcy court for that engagement. *Id.* ¶ 239. And when Alix met with Barton in late 2014 to discuss McKinsey's unlawful disclosures and "pay-to-play" scheme, Barton purportedly promised to wind down McKinsey RTS and to fire the executives in charge of McKinsey RTS in exchange for Alix's silence. *Id.* ¶¶ 154-56. Instead, Barton allowed McKinsey RTS to continue in full force and allegedly tried to bribe Alix by offering a client introduction. *Id.* ¶ 159. Thus, each of these Defendants exercised some control over McKinsey's bankruptcy enterprise — to wit, Garcia and Sternfels directly supervised certain bankruptcy engagements, including the allegedly fraudulent disclosures, and Barton, the

managing partner of McKinsey & Co., SAC ¶ 39, allegedly misled and attempted to bribe a competitor to enable the scheme to continue.  *See, e.g.*, *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 476-79 (S.D.N.Y. 2015) (finding that the owner of a gallery who was well-informed about the gallery's fraud and supervised its former president met the participation and management test); *Crab House of Douglaston*, 418 F. Supp. 2d at 208 (holding that a defendant who instructed other employees to fraudulently inflate financials "exercised some control over the management of the enterprises' affairs").

The last two individual Defendants, Proshan and Molino, were lawyers for McKinsey. Lawyers performing ordinary legal services cannot be held liable under RICO, even if the services assist a racketeering enterprise.  *See, e.g.*, *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 3920353, at *15 (S.D.N.Y. July 15, 2016); *Nastro v. D'Onofrio*, 542 F. Supp. 2d 207, 217 (D. Conn. 2008) (citing cases and holding that lawyers' performance of their standard professional duties, even with knowledge of the enterprise's illicit nature, cannot lead to RICO liability); *Madanes v. Madanes*, 981 F. Supp. 241, 256-57 (S.D.N.Y. 1997) ("[P]roviding important services to a racketeering enterprise is not the same as directing the affairs of an enterprise . . . , even when the provision of services is essential to the operation of the RICO enterprise itself." (internal quotation marks omitted)).  But Alix alleges that Proshan and Molino did more than provide ordinary legal services to McKinsey.  For example, Proshan was the primary person responsible for preparing and revising the declarations in the *AMR* and *AMF Bowling* bankruptcies, and she was one of the three people responsible for preparing the disclosures in *GenOn*.  SAC ¶¶ 122, 129, 285.  Molino approved the *Westmoreland* engagement and participated in preparing the disclosures for *Westmoreland*.  *Id.* ¶¶ 239, 326, 329.  In so doing, Proshan and Molino did more than provide legal services that "facilitated the operation of the enterprise," *Morin v. Trupin*, 835 F. Supp. 126, 135 (S.D.N.Y. 1993); instead, both

participated in the conduct at the heart of the enterprise.  And, by virtue of their roles in drafting

and approving the disclosures, Proshan and Molino each had a measure of control over the

enterprise.  *See Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 466

(S.D.N.Y. 1996) (explaining the importance of "control" in assessing whether outside

professionals can be held liable under RICO); *Friedman v. Hartmann*, No. 91-CV-1523 (PKL),

1994 WL 97104, at *4 (S.D.N.Y. Mar. 23, 1994) ("Whether [they] participated in the conduct of

the racketeering enterprise depends not, however, on [their] status as . . . lawyer[s] but on [their]

actual conduct.").

In short, Alix sufficiently alleges that each individual Defendant conducted or

participated in the affairs of the Count Two Enterprise (and the two other enterprises).

Accordingly, McKinsey's motion to dismiss Count Two on the ground that it does not satisfy the

requirement to plead an enterprise must be and is denied.

### 3.  Count Three Enterprise

By contrast, the third enterprise Alix alleges — an association-in-fact enterprise between

the McKinsey entities and their bankruptcy consulting clients, SAC ¶ 581 — falls short.  An

association-in-fact enterprise "'is proved by evidence of an ongoing organization, formal or

informal, and by evidence that the various associates function as a continuing unit.'"  *D. Penguin

Bros. Ltd. v. City Nat. Bank*, 587 F. App'x 663, 667 (2d Cir. 2014) (summary order) (quoting

*Boyle v. United States*, 556 U.S. 938, 945 (2009)).  "The concept of an association-in-fact is

protean, and, as such, variability is invited by the statutory language and the Supreme Court's

construction of that language."  *D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018).

Nevertheless, a plaintiff pleading an association-in-fact must establish "at least three structural

features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3)

longevity sufficient to permit these associates to pursue the enterprise's purpose."  *D. Penguin*

*Bros.*, 587 F. App'x at 667 (quoting *Boyle*, 556 U.S. at 946).  It is critical that the associates "work together to achieve" their shared purpose.  *FXDirectDealer*, 720 F.3d at 120.  If the associates are alleged to have a relationship with a central figure, but they "are not all alleged to be connected in some overarching way (such as by an agreement to further a single design or purpose)," that is not an association-in-fact for purposes of RICO.  *D'Addario*, 901 F.3d at 101 (internal quotation marks omitted).

Measured against these standards, Alix's allegations plainly fall short.  In fact, Alix does not plead *any* actions by the bankruptcy clients, let alone actions showing that they "work[ed] together" with McKinsey.  *See* Defs.' Mem. 78.  At most, Alix alleges that, during the *SunEdison* bankruptcy, a SunEdison executive approved the re-invoicing scheme that McKinsey perpetrated.  *See* SAC ¶¶ 260-64, 279.  But this is insufficient to plead an association-in-fact enterprise because it is only one instance of conduct and does not come close to alleging the longevity required to allege an enterprise.  Conspicuously, even in his memorandum of law opposing Defendants' motion, Alix does not point to a single action that the bankruptcy clients took, relying instead on the fact that the clients had contracts with McKinsey and an "interrelated management structure."  Pl.'s Opp'n 60-61.  But contracts alone cannot give rise to a RICO enterprise; if they could, all types of "loose connection[s]" among corporate entities could carry a risk of RICO liability.  *Manhattan Telecomms. Corp. v. DialAmerica Mktg., Inc.*, 156 F. Supp. 2d 376, 383 (S.D.N.Y. 2001).  And Alix offers no indication as to what the "interrelated management structure" is; he claims that McKinsey personnel were assigned to management positions within the bankruptcy clients, but provides no additional details or examples.  Pl.'s Opp'n 60; SAC ¶ 582.

Moreover, far from having had a common purpose with McKinsey, the bankruptcy clients would seem to have had purposes at odds with those of McKinsey.  To take the most

egregious example, in the *GenOn* bankruptcy, the debtor allegedly hired McKinsey to investigate

its parent company, NRG, without the knowledge that NRG was an existing McKinsey client.

SAC ¶¶ 288-91.  That is, McKinsey's goal to conceal its relevant connections was necessarily at

odds with the debtor's goal of thoroughly investigating its parent company.  More broadly, Alix

repeatedly alleges that, had McKinsey disclosed its connections, McKinsey would not have been

retained.  *E.g.*, SAC ¶¶ 135, 167, 207.  McKinsey was allegedly concealing its potentially

disqualifying connections from the very entities that Alix alleges were part of an enterprise with

McKinsey.  It defies logic to suggest that the bankruptcy clients shared a common purpose with

McKinsey.  And without that, there could be no association in fact.  *D. Penguin Bros. Ltd.*, 587

F. App'x at 668; *Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at \*14.

Accordingly, Count Three must be and is dismissed for failure to allege an enterprise.[9]

## C.  Predicate Acts

Next, McKinsey moves to dismiss on the ground that the Complaint fails to plausibly

allege that each Defendant committed at least two predicate acts.  *See* Defs.' Mem. 14.  The

Complaint alleges that each Defendant committed two acts of (1) wire fraud, mail fraud, and

---

[9]      Neither party addresses whether the Count Three Enterprise can exist without the
bankruptcy consulting clients — that is, whether Alix plausibly alleges an association-in-fact
enterprise that is comprised of *only* the McKinsey entities.  In any event, such an enterprise
would plainly fail the distinctness requirement.  It would consist of parent corporations —
McKinsey & Co., McKinsey Holdings, and McKinsey US — and their subsidiary — McKinsey
RTS — carrying out the affairs of those entities.  The enterprise would therefore be identical to
the entities that comprise it.  *See, e.g.*, *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 553 (S.D.N.Y.
2014) ("Courts have repeatedly dismissed § 1962(c) claims alleging that a corporation was
simultaneously a RICO 'person' and a RICO 'enterprise' (or part of a RICO 'enterprise' from
which the corporation is not distinct).");  *Palatkevich v. Choupak*, No. 12-CV-1681 (CM), 2014
WL 1509236, at \*15 (S.D.N.Y. Jan. 24, 2014) (no distinct association-in-fact enterprise that
consists of merely related corporate entities and their agents).  This is distinct from the Count
One Enterprise, in which the enterprise was a corporate entity — McKinsey RTS — with a
purpose and operations distinct from the corporate entities that comprised it.

bankruptcy fraud; (2) obstruction of justice; (3) witness tampering; (4) bribery; (5) inducement to interstate travel, and (6) money laundering, *see, e.g.*, SAC ¶¶ 414, 430, 438, 461, 473-74, 479, 481, all of which qualify as RICO predicates, *see* 18 U.S.C. § 1961(1); *see also* Tex. Penal Code § 32.34(b), N.Y. Penal L. § 180.03, Ill. Crim. Code § 720 ILCS 5/29A-1 (all prohibiting the giving and receiving of bribes).  The Court will discuss each alleged offense in turn, focusing first on the entity Defendants and then on the individual Defendants.  But before doing so, the Court addresses two overarching issues: first, whether the McKinsey entities can be held vicariously liable for the acts of the individual Defendants; and second, whether a defendant can be held liable under RICO for aiding and abetting the commission of a predicate offense.

### 1.  Vicarious Liability

First, McKinsey contends, albeit only in a footnote, that Alix improperly seeks to hold the entity Defendants vicariously liable for the acts of the individual Defendants.  *See* Defs.' Mem. 75 n.62; *see also* SAC ¶¶ 491-92, 569.  As to three of the entity Defendants — McKinsey & Co., McKinsey U.S., and McKinsey RTS — the Court disagrees.

First, as discussed in more detail below, Alix plausibly alleges that high-level executives at McKinsey & Co. were aware of, and directly participated in, a fraudulent scheme.  *See, e.g.*, SAC ¶ 401(c); *id.* ¶ 327 (alleging that senior leaders at McKinsey & Co. approved McKinsey RTS's engagement in the *Westmoreland* bankruptcy).  Many of McKinsey & Co.'s partners and executives worked for McKinsey RTS, served the bankruptcy clients at issue here, and submitted the contested declarations.  *Id.*; *see also id.* ¶¶ 39-47.  Moreover, when these executives submitted their declarations to the bankruptcy courts, they did so in the course of their employment with McKinsey & Co. and to the benefit of McKinsey & Co.  *Id.* ¶¶ 401(c), 491. Finally, McKinsey and & Co. executives also approved at least one of the bankruptcy engagements.  *Id.* ¶ 326.  Accordingly, McKinsey & Co. may be vicariously liable for the acts of

its executives.  *See, e.g.*, *Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 459-60 (S.D.N.Y. 2018) (determining that a corporate entity was vicariously liable under RICO for the acts of its employees where the employees committed the racketeering acts in their corporate capacities and where the corporation benefitted from those acts); *Makowski v. United Bhd. of Carpenters & Joiners of Am.*, No. 08-CV-6150 (PAC), 2010 WL 3026510, at *6 (S.D.N.Y. Aug. 2, 2010) (describing the factors courts must consider in imposing vicarious RICO liability); *USA Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d 319, 328-29 (S.D.N.Y. 2003) (explaining that a corporation may be held vicariously liable under RICO for the acts of employees where the corporation benefitted from the scheme and was aware of the scheme, and if high-level employees were involved in the scheme).

Second, a similar analysis applies to McKinsey U.S. and McKinsey RTS.  In several of the bankruptcies at issue, the executives filing the declarations held senior positions in both McKinsey & Co. and McKinsey U.S.  *See, e.g.*, ECF No. 199-12, ¶ 11 (*AMR* declaration); ECF No. 199-43, ¶ 1 (*Westmoreland* declaration); *see also* SAC ¶ 401(l) (listing Hojnacki, a declarant in *SunEdison* and *Westmoreland*, as a partner of McKinsey & Co. and an employee of McKinsey U.S.); *id.* ¶ 407 (listing Carmody, a declarant in *NII Holdings* and *Standard Register* as a senior partner at McKinsey & Co. and an employee of McKinsey U.S.).  McKinsey U.S. also benefitted from the allegedly deficient disclosures because they enabled its subsidiary (and, at times, itself, *see, e.g.*, ECF No. 199-12) to obtain bankruptcy consulting business while McKinsey U.S. could maintain its client roster.  *See, e.g.*, SAC ¶ 395.  For McKinsey RTS, the executives filing the bankruptcy disclosures explicitly did so on behalf of McKinsey RTS.  *See, e.g.*, ECF No. 199-12, ¶ 1; ECF No. 199-20, ¶ 1; ECF No. 199-25, ¶¶ 1-2.  Accordingly, McKinsey U.S. and McKinsey RTS can also be held vicariously liable for the alleged racketeering acts of its executives.

McKinsey Holdings is a different story.  Alix alleges no specific acts by McKinsey Holdings or by executives acting within the scope of their employment with, or for the benefit of, McKinsey Holdings.  At most, he alleges that McKinsey Holdings is liable merely because it owns McKinsey U.S.  *See* SAC ¶ 401(a)-(b).  But a corporate parent generally cannot be held liable for the actions of its subsidiary unless the subsidiary was acting as its agent.  *See De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir. 1996); *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217, 225-26 (S.D.N.Y. 2013).  Here, the Complaint is devoid of any allegation that McKinsey Holdings authorized its subsidiaries to act on its behalf in the bankruptcy consulting business.  Moreover, Alix alleges nothing to show that McKinsey Holdings specifically "benefitted from or played a role in the alleged misconduct," which would be necessary to impose vicarious RICO liability on McKinsey Holdings.  *Moses v. Martin*, 360 F. Supp. 2d 533, 551 (S.D.N.Y. 2004).  Indeed, based on the allegations in the Complaint, it appears that McKinsey Holdings had no role whatsoever in the alleged racketeering scheme.  Because of that, Alix fails to plead any predicate acts against McKinsey Holdings.  Accordingly, McKinsey's motion to dismiss the remaining substantive RICO claim against McKinsey Holdings must be and is granted.

### 2.  Aiding and Abetting

Next, McKinsey argues that aiding and abetting a predicate act does not, itself, constitute a predicate act.  *See* Defs.' Mem. 32-34.  In the wake of the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994), which held that there is no aiding and abetting liability under Section 10(b) of the Securities Exchange Act of 1934, the Second Circuit has squarely held that "there is no private cause of action . . . for aiding and abetting" a violation of Section 1962(c).  *Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 713 (2d Cir. 2019) (per curiam); *see also Dep't of Econ. Dev.*, 924 F. Supp. at 475

(analyzing *Central Bank of Denver* and concluding that the RICO statute "does not create private civil liability for aiding and abetting a primary violation of § 1962"). But whether a defendant can be held liable for aiding and abetting a violation of Section 1962(c) and whether a defendant can be held liable under Section 1962(c) for aiding and abetting at least two predicate acts are distinct questions. The Second Circuit has not answered the latter, and district courts within the Circuit are divided. *Compare, e.g.*, *In re Trilegiant Corp.*, 11 F. Supp. 3d 132, 141 (D. Conn. 2014) (holding that aiding and abetting a predicate act is itself a predicate act); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, No. 93-CV-6876 (LMM), 2000 WL 1694322, at *5-6 (S.D.N.Y. Nov. 13, 2000) (same); *and Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 91-CV-2050 (LLS), 1995 WL 43669, at *4 (S.D.N.Y. Feb. 2, 1995) (same), *with Est. of Gottdiener v. Sater*, 35 F. Supp. 3d 386, 396 (S.D.N.Y. 2014) (holding the opposite), *on reconsideration*, 35 F. Supp. 3d 402 (S.D.N.Y. 2014), *aff'd on other grounds*, 602 F. App'x 552 (2d Cir. 2015); *and Ross v. Patrusky, Mintz & Semel*, No. 90-CV-1356 (SWK), 1997 WL 214957, at *11 (S.D.N.Y. Apr. 29, 1997) (same).

For several reasons, the Court sides with those courts that have held that aiding and abetting a predicate act itself qualifies as a predicate act. For starters, the Second Circuit has held that the "bare minimum of a RICO charge is that a defendant personally committed *or aided and abetted* the commission of two predicate acts." *McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992) (emphasis added). And more recently, the Circuit stated in *dicta* that "it is no great leap to find that one who assists in [a] fraud also conducts or participates in the conduct of the affairs of the enterprise," citing Section 2. *Satinwood*, 385 F.3d at 178. It is true that *McLaughlin* preceded the Supreme Court's decision in *Central Bank of Denver* by two years. But *Satinwood* was decided a decade after *Central Bank of Denver*. And the fact is that the Court, as a district court, is required to "follow a precedential opinion of the Second Circuit

unless and until it is overruled by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 653 (S.D.N.Y. 2021) (cleaned up).  As *Satinwood* and the cases on the pro-aiding-and-abetting side of the district court split suggest, it is certainly plausibly to reconcile the Second Circuit's decisions on aiding and abetting a predicate act with the Supreme Court's decision in *Central Bank of Denver*.  Thus, the Court is bound to follow them unless and until the Second Circuit or Supreme Court direct otherwise.

Second, and in any event, the definition of "racketeering activity" in Section 1961(1) includes "any act which is indictable under" a myriad of provisions of the criminal code.  18 U.S.C. § 1961(1).  And aiding and abetting criminal acts are indisputably "indictable" under 18 U.S.C. § 2.  *See id.* § 2.  Indeed, "an aider and abettor charge is implicit in all indictments for substantive offenses."  *Bank Brussels Lambert*, 2000 WL 1694322, at *6 (internal quotation marks omitted).  It is true that Section 1962(a) expressly refers to Section 2 in providing that those who aid and abet the collection of an unlawful debt can still be liable under RICO.  *See* 18 U.S.C. § 1962(a); *see also Est. of Gottdiener*, 35 F. Supp. 3d at 396.  But that does not preclude aiding-and-abetting liability from attaching for other predicate acts because collection of an unlawful debt is not included in the general definition of racketeering activities, *see* 18 U.S.C. §§ 1961(1), (6), and the definition of unlawful debt does not reference acts indictable under the criminal code, *see id.* § 1961(6).  Thus, absent a specific reference to Section 2, aiding and abetting the collection of an unlawful debt plainly would not qualify as a RICO predicate.  By contrast, a citation to Section 2 would be superfluous with respect to provisions of the criminal code for which an aider and abettor is "indictable."  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute . . . to be so construed

that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)).

Finally, the Supreme Court's decision in *Central Bank of Denver* does not foreclose RICO liability for aiding and abetting a predicate act. Allowing RICO liability for aiding and abetting predicate acts would not, as some courts warn, *see Est. of Gottdiener*, 35 F. Supp. 3d at 397; *Salas v. Int'l Union of Operating Engineers*, No. CV 12-10506, 2015 WL 728365, at *8 (C.D. Cal. Feb. 18, 2015), create a loophole to *Central Bank of Denver*'s limitation. The RICO statute still requires a plaintiff to establish that each defendant operated or managed the affairs of the racketeering enterprise, obviating the concern that imposing aiding-and-abetting liability will sweep up people who did not engage in proscribed activities at all. *See Central Bank of Denver*, 511 U.S. at 176. Moreover, because it is possible to "operate or manage an enterprise and yet, through delegation, avoid directly committing predicate acts," *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1528 n.17 (S.D.N.Y. 1995), prohibiting RICO liability for aiding and abetting predicate acts would unduly narrow the reach of the statute. In short, the Court concludes that a RICO claim may lie against a defendant who "personally committed *or aided and abetted* the commission of two predicate acts." *McLaughlin*, 962 F.2d at 192 (emphasis added).

### 3. Wire and Mail Fraud

With that, the Court turns to the specific predicate acts that Alix alleges, beginning with wire and mail fraud. In order to plead wire or mail fraud, Alix "must show (1) the existence of a scheme to defraud, (2) [the defendants'] knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996); *see also Lundy v. Cath. Health Sys. of Long Is. Inc.*, 711 F.3d 106, 119 (2d Cir. 2013). Allegations of

wire and mail fraud are generally subject to the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that a plaintiff "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *see, e.g.*, *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008); *Satinwood*, 385 F.3d at 178-79. Thus, Alix must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  *Olson v. Major League Baseball*, 29 F.4th 59, 71 (2d Cir. 2022) (internal quotation marks omitted).

Alix argues that McKinsey's declarations in all fourteen bankruptcies contained false and misleading statements and/or omissions.  *See* Pl.'s Opp'n 21.  Specifically, he contends that the declarations were fraudulent in eight distinct ways:  McKinsey (1) disclosed connections by category rather than by name, as required by Rule 2014; (2) hid many connections and conflicts of interest; (3) declared McKinsey disinterested in spite of conflicts of interest; (4) concealed the existence of McKinsey's investment entity, MIO, and its corresponding connections; (5) used an inadequate method of checking for conflicts; (6) changed the methodology by which McKinsey disclosed conflicts; (7) resisted disclosing connections for as long as possible; and (8) relied on its obligation to maintain strict client confidentiality, even though it had no such requirement. Pl.'s Opp'n 23-24; 25-26, 28.  For its part, McKinsey wisely does not dispute that Alix plausibly alleges the use of the mails and wires.  *See, e.g.*, SAC ¶¶ 426, 428, 431-32.  Instead, it argues that the declarations at issue were not, on their own terms, false or misleading because they explicitly stated what they did and did not disclose, and they accurately described McKinsey's methodology for identifying connections and conflicts.  Defs.' Mem. 14-16.  McKinsey also contends that Alix fails to plausibly allege scienter.  Defs.' Mem. 14.

**a.  Fraud**

The Court agrees with McKinsey that its disclosure of connections by category does not, in itself, amount to fraud.  As McKinsey points out, the declarations at issue were clear that they were disclosing connections by category, not name, so they were not misleading in that respect. *See, e.g.*, ECF No. 199-7, ¶ 11(b) (McKinsey's first declaration in *Lyondell Chemical Company*, stating that McKinsey US had provided services within the past three years to specific categories of interested parties); ECF No. 199-12, ¶ 17 (McKinsey's first declaration in *AMR Corporation*, stating that members of the McKinsey RTS team had provided services to specific categories of interested parties).  In other words, any reader of the declarations would know what he or she did not know.  *See, e.g.*, *Jensen v. Kimble*, 1 F.3d 1073, 1077-78 (10th Cir. 1993) (affirming dismissal of a securities fraud claim because the defendant had explicitly disclosed that he was withholding certain information and, thus, the plaintiff was aware of what he did not know); *accord McCormick v. Fund American Cos.*, 26 F.3d 869, 879-88 (9th Cir. 1994).  McKinsey's omission of names could give rise to a claim for fraud only if Alix had made "partial or ambiguous statements that require[d] further disclosure in order to avoid being misleading." *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000).  But the declarations, at least insofar as they disclose connections by category rather than name, were not partial or ambiguous.[10]

By the same token, McKinsey's different disclosure methodologies, *see* SAC ¶¶ 79-85, the fact that McKinsey may have changed its methodology for identifying conflicts, and that fact that McKinsey changed its "lookback period" from case to case, *see* Pl.'s Opp'n 23, 30, do not amount to fraud.  McKinsey was clear about its methodology for identifying conflicts of interest, about what it could and could not identify, and about the lookback period it used in each case.

---

[10]     Alix may or may not be right that disclosure by category violates Rule 2014, but that is a matter for the bankruptcy courts to address.  A violation of Rule 2014 is not a predicate act that can give rise to RICO liability.

*See, e.g.*, ECF No. 119-19, ¶ 17 (stating that McKinsey RTS determined whether it had connections to interested parties in *AMF Bowling* by identifying whether McKinsey employees had provided services "within the last three years to any client that focused on a direct commercial relationship or transaction with the Debtors," thereby explaining its methodology and lookback period); ECF No. 199-20, ¶ 16 (same); ECF No. 199-32, ¶ 24 (same but with a two-year lookback period).  Perhaps McKinsey's methodology should have raised questions for the bankruptcy courts, but these portions of the declarations were not themselves misleading.

That said, construing the facts alleged as true, the Court concludes that Alix plausibly alleges that executives at McKinsey & Co., McKinsey U.S., and McKinsey RTS made material misstatements and/or omissions with respect to the declarations in thirteen of the fourteen bankruptcies — namely, all but *AMF Bowling*.[11]  Put simply, although the declarations in these bankruptcies purported to be complete disclosures of McKinsey's connections, *see, e.g.*, ECF No. 199-9, ¶ 7 (declaration by Goldstrom attesting that "to the best of my knowledge, neither McKinsey RTS, nor any of its partners, principals or employees who will work on this engagement, has any connection with the Debtors. . . ."); ECF No. 199-12, ¶¶ 17, 21-26 (describing McKinsey's connections that McKinsey RTS identified), Alix identifies connections that omitted from its declarations by category and by name — that is, connections that McKinsey plausibly sought to conceal.  For example:

- In its supplemental disclosure in *UAL Corporation*, a manager at McKinsey U.S. identified by name ten parties-in-interest that it then served.  ECF No. 199-5, ¶ 3.

---

[11]     In the discussion that follows, the Court does not identify all of the misleading statements or omissions in McKinsey's declarations; instead, it provides a representative sample.  The Court notes that the time period for the enterprise alleged in Count One is 2010 to the present, SAC ¶ 395, which does not cover the first five bankruptcies.  But, as Alix also alleges that the McKinsey entities are vicariously liable for the acts of their executives in Count Two, which goes back to 2001, the Court assesses potential predicates acts in all fourteen bankruptcies.

But Alix identifies five other connections, by name, that McKinsey should have disclosed.  ECF No. 177-2, at 5.

- In *Lyondell*, a partner at McKinsey U.S. disclosed that McKinsey provided services to three interested parties, describing them by category, ECF No. 199-7, ¶¶ 11(b), but Alix identifies eleven interested parties, by name, with whom McKinsey had a relationship, SAC ¶ 113.

- In *Harry & David*, Goldstrom, a senior partner at McKinsey & Co. and writing on behalf of McKinsey RTS, disclosed that McKinsey RTS served, among others, five insurers, ECF No. 199-9, ¶ 10, but Alix identifies by name fourteen insurers with whom McKinsey entities had relationships, ECF No. 177-2, at 9; *see also* SAC ¶ 119.

- In *AMR*, Goldstrom, writing as a member of McKinsey RTS, and a director of McKinsey U.S., *see, e.g.*, ECF No. 199-12, ¶ 1, filed seven declarations; in the fifth, he disclosed that McKinsey U.S. had vendor agreements with specific parties-in-interest, one of which dated back to 2010, before the bankruptcy was filed.  SAC ¶ 124; ECF No. 199-16, ¶¶ 15-16.  But Goldstrom failed to disclose that connection, by name or by category, in his prior declarations, despite disclosing other connections by category, *see, e.g.*, ECF No. 199-12, ¶ 17.

- In *Edison Mission*, Yerian, a partner at McKinsey & Co. and writing on behalf of McKinsey RTS, initially disclosed that McKinsey RTS was connected to three vendors, ECF No. 199-20, ¶ 17(b); *see also* SAC ¶ 47, but Alix alleges that McKinsey entities had connections to thirty-three, ECF No. 177-2, at 17; *see also id.* at 18-25 (identifying the same issue for other categories of connections).

- Alix identifies similarly misleading disclosures made by Carmody, a senior partner at McKinsey & Co. and writing on behalf of McKinsey RTS, in *NII Holdings* and in *Standard Register*.  *Compare* ECF No. 199-23, ¶¶ 23(c), 25(c), (e), (g), *with* ECF No. 177-2, at 26-28; *compare* ECF No. 199-25, ¶ 24(a)-(d), *with* ECF No. 177-2, at 33-35; *see also* SAC ¶ 40.

- For several bankruptcies, Alix plausibly alleges that McKinsey RTS's omission of the connections of its investment arm, MIO, was misleading.  In *NII Holdings*, for example, Carmody attested that he had emailed "all employees of McKinsey RTS and its affiliates to request information on any relationships with the Debtors . . . ." ECF No. 199-23, ¶ 23.  Carmody did not disclose, however, that MIO had a connection to BlackRock.  SAC ¶ 141.  The same was true for *SunEdison*, *Alpha Natural Resources*, and *GenOn*.  *Id.*

For the final four bankruptcies, Alix alleges a whole host of misleading statements and

omissions.  For example:

- In *Alpha Natural Resources*, among other misleading disclosures, Carmody, writing on behalf of McKinsey RTS, disclosed that McKinsey RTS had, in the prior three years, served a major customer of the debtor, but did not disclose, until its fifth disclosure, that McKinsey entities were then serving that customer — U.S. Steel.  ECF No. 199-26, ¶ 20(h); SAC ¶¶ 209-11, 212(c)-(d).  Its first four disclosures, therefore, were plausibly misleading.

- Alix plausibly alleges, moreover, that McKinsey's work for U.S. Steel was adverse to the debtor, despite McKinsey RTS's representation to the contrary.  ECF No. 199-30, ¶ 1(c); *id.* at 15; SAC ¶¶ 211, 212(c)-(d).

- In *SunEdison*, Hojnacki, a partner at McKinsey & Co. and writing on behalf of McKinsey RTS, concealed connections that McKinsey RTS disclosed in *Alpha Natural Resources*, even though the bankruptcies were filed a mere eight months apart and contained many of the same interested parties.  ECF No. 199-32, ¶ 1; SAC ¶¶ 43, 247-49; *see also, e.g.*, ECF No. 177-2, at 62-66 (identifying, by name, the many connections McKinsey failed to disclose in *SunEdison*).

- In *SunEdison*, McKinsey RTS further concealed potentially disqualifying pre-petition payments from the debtor to McKinsey U.S. by "re-invoicing" them to non-debtor affiliates of the debtor.  SAC ¶¶ 255-64, 267.  McKinsey RTS did not disclose these payments in its first declaration, *see* ECF No. 199-32, waiting a month to disclose them in its second declaration, ECF No. 199-32, ¶¶ 22-24, and Alix plausibly alleges that McKinsey RTS's description of the invoices in its second disclosure was false, SAC ¶ 260.

- In *SunEdison*, Alix plausibly alleges that McKinsey entities entered into a business relationship with the former CEO of the debtor, who founded an entity that ended up purchasing some of the debtor's assets; Hojnacki disclosed the business arrangement but claimed that it was unrelated to the debtor, a misleading statement in light of the entity's purchase of debtor assets.  SAC ¶ 279; ECF No. 199-36, ¶ 7.

- In *GenOn*, among other failings, Carmody, writing on behalf of McKinsey RTS, concealed that the debtor's parent company, NRG Energy, was a McKinsey client, even though Hojnacki had disclosed this relationship in *SunEdison*.  ECF No. 199-37, ¶ 1; SAC ¶ 291.  This was a particularly egregious omission because the debtor had a fraudulent transfer claim against NRG Energy, SAC ¶¶ 288-90, so their interests were adverse.  NRG Energy was listed as a "Contractual Counterparty" — a category of interested parties — but Carmody disclosed only that "as McKinsey RTS is serving the debtors, members of McKinsey RTS currently serve, or in the past two years have served, various counterparties . . . that are affiliates of the Debtors."  ECF No. 199-37, ¶ 32; *id.* at 41; *see also* Defs.' Mem. 23-24.

- Finally, in *Westmoreland*, Hojnacki, writing on behalf of McKinsey RTS, concealed connections to numerous interested parties, despite disclosing a small selection of its connections by name.  *See, e.g.*, SAC ¶ 329; ECF No. 177-2, at 121-51.

Additionally, Alix plausibly alleges that the declarants' statements of disinterestedness in the thirteen bankruptcies — such as, "I believe McKinsey is a 'disinterested person' as that term is defined in" the Bankruptcy Code, *see, e.g.*, ECF No. 199-12, ¶ 31; ECF No. 199-19, ¶ 28; ECF No. 199-26, ¶ 33; ECF No. 199-32, ¶ 65 — were false.  To be sure, for statements of opinion to be actionable, they must be either contrary to the speaker's actual beliefs or they contain embedded factual assertions that are untrue.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184-86 (2015); *see also Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (holding that an opinion will be actionable if it omits facts that conflict with how a reasonable investor would interpret the statement).  But Alix plausibly alleges that, at least in some instances, McKinsey RTS's statements of disinterestedness both conflicted with the declarant's own knowledge and omitted facts that were in direct conflict with the opinion.  For example, with respect to McKinsey's first bankruptcy, *Hayes Lemmerz*, Alix specifically alleges that McKinsey had five current clients and/or subsidiaries of current clients who were interested parties, one of which was a secured creditor of the debtor, which, if true, belies McKinsey U.S.'s assertion of disinterestedness.  SAC ¶ 94.  Alix alleges the same issue with respect to the disclosures in *Mirant*.  SAC ¶ 106.  Similarly, in *GenOn*, Carmody asserted his belief that McKinsey RTS was disinterested, ECF No. 199-37, ¶ 68, but did not disclose McKinsey entities' relationship to the debtor's parent company, NRG, despite the adverse relationship between the two companies.  Pl.'s Opp'n 32; SAC ¶¶ 290-91.  Thus, Carmody's statement of belief omits a fact — McKinsey's relationship to NRG — that, if true, directly contradicts his opinion.  And it is reasonable to infer that Carmody knew about McKinsey's relationship with NRG because another McKinsey RTS partner, Hojnacki, disclosed the relationship in the *SunEdison* bankruptcy around the same time.  SAC ¶ 291.

More broadly, Alix alleges, and the declarations themselves show, that the McKinsey executives working on the bankruptcy consulting assignments searched its internal records and consulted McKinsey partners to identify connections to interested parties. *See id.* ¶¶ 71, 74; ECF No. 199-23, ¶ 23; ECF No. 199-25, ¶ 22. Based on these searches, McKinsey executives identified the connections they disclosed and, it is reasonable to infer, the connections they allegedly concealed. As such, McKinsey executives were aware of facts that contradicted, or at least cast serious doubt on, their "belief" that McKinsey RTS was disinterested.[12] Accordingly, Alix plausibly alleges that at least some of the statements of disinterest were fraudulent.

Finally, Alix plausibly alleges that Barton made material misstatements when he told Alix that he would close McKinsey RTS, fire its executives, and exit the bankruptcy consulting space entirely. SAC ¶¶ 154-59. Assuming the truth of Alix's allegations, Barton misled Alix into thinking he would end McKinsey's bankruptcy practice, something Barton had no intention of doing. *See id.* ¶¶ 160, 169. The upshot was that Alix waited longer than he otherwise would have to take legal action against McKinsey RTS. *Id.* ¶ 156. Barton allegedly made these statements while he was the managing partner of McKinsey & Co., *id.* ¶ 39, and implied to Alix that he was speaking on behalf of McKinsey & Co., *id.* ¶¶ 155-57. As alleged, McKinsey & Co. may be held liable for the statements of its managing partner. McKinsey vigorously disputes Alix's interpretation of these meetings, Defs.' Mem. 36-37, but at bottom, this is a factual dispute.

---

[12]     For the same reason, McKinsey executives' statements in some of the declarations that they identified connections to interested parties to the best of the declarant's "knowledge and belief," *see, e.g.*, ECF No. 199-12, ¶ 17, are actionable misstatements because they are contradicted by facts in the possession of McKinsey executives. Notably, McKinsey does not explicitly argue to the contrary.

By contrast, the Court concludes that Alix does *not* establish with the requisite particularity that the disclosures in *AMF Bowling* were fraudulent.  Alix does not identify any connections Carmody's declaration in that case concealed, either by name or by category.  At best, he complains that McKinsey RTS made the disclosures by category rather than by name, *see* ECF No. 177-2, at 15, but he does not identify any specific interested parties that Carmody allegedly concealed, *see* SAC ¶ 130.  In other words, Alix fails to identify what makes McKinsey's disclosures in that case misleading.  *See Olson*, 29 F.4th at 71.  Accordingly, the declaration submitted in *AMF Bowling* cannot constitute a fraud predicate act.

**b. Scienter**

Alix must also allege scienter to establish the wire and mail fraud predicates.  Specifically, Alix must "allege that each defendant had a specific intent to defraud either by devising, participating in, or aiding and abetting the scheme." *Targum v. Citrin Cooperman & Co.*, No. 12-CV-6909 (SAS), 2013 WL 6087400, at *4 (S.D.N.Y. Nov. 19, 2013) (internal quotation marks omitted); *see also United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (holding that "fraudulent intent" is "[e]ssential to a scheme to defraud.").  Rule 9(b) allows a plaintiff to allege intent "generally" rather than "with particularity," Fed. R. Civ. P. 9(b), but "'the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for [a] license to base claims of fraud on speculation and conclusory allegations,'" *Vaughn v. Air Line Pilots Ass'n, Int'l*, 395 B.R. 520, 548 (E.D.N.Y. 2008) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)), *aff'd*, 604 F.3d 703 (2d Cir. 2010) and 377 F. App'x 88 (2d Cir. 2010) (summary order).  Accordingly, the facts alleged in a complaint based on mail and wire fraud "must give rise to a strong inference of such intent" in one of two ways.  *Greene v. Hanover Direct, Inc.*, No. 06-CV-13308 (NRB), 2007 WL 4224372, at *5 (S.D.N.Y. Nov. 19, 2007), *aff'd*, 326 F. App'x 57 (2d Cir. 2009).  First, a plaintiff may establish that the defendants

"had both motive and opportunity to commit fraud"; or second, a plaintiff may allege "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006).

The Court need not and does not address Alix's motive-and-opportunity arguments because it concludes that Alix plausibly alleges conscious misbehavior on the part of McKinsey & Co., McKinsey U.S., and McKinsey RTS.  In particular, Alix plausibly alleges that the three entities, through their executives, made the misleading declarations with knowledge of their falsity.  *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (holding that a plaintiff may establish a strong inference of fraudulent intent by showing that the defendants "knew facts or had access to information suggesting that their public statements were not accurate"); *see also Glidepath*, 590 F. Supp. 2d at 456 (finding that the plaintiffs had established scienter with allegations that specific statements by the defendants "were consciously false").  For example, Alix alleges that McKinsey executives disclosed connections in one bankruptcy (*Alpha Natural Resources* and *SunEdison*) that they later concealed in subsequent bankruptcies (*SunEdison* and *GenOn*, respectively), SAC ¶¶ 247-49, 291, a clear demonstration that McKinsey executives knew the declarations in *SunEdison* and *GenOn* were false.  More broadly, the allegations, which the Court must assume to be true, establish a strong inference that the McKinsey entities knew about their connections — based on the searches they did of their client lists, *see, e.g.*, ECF No. 199-7, ¶ 11 (describing its search process); ECF No. 199-12, ¶ 16 (same); SAC ¶¶ 71, 84 (same), because their executives disclosed some connections in their declarations, and because they disclosed additional connections in supplemental declarations, *see, e.g.*, SAC ¶¶ 103, 243-44, 251; *see also* Pl.'s Opp'n 41-42 — but refused to disclose all of them, by name or by category.  Accordingly, Alix plausibly alleges that McKinsey & Co., McKinsey U.S., and McKinsey RTS, through their

executives, knew they were concealing connections in its bankruptcy disclosures, thus raising a strong inference of fraudulent intent.[13]

### 4. Bankruptcy Fraud, 18 U.S.C. § 152(2) and (3)

Next, Alix alleges that Defendants committed bankruptcy fraud in violation of Section 152(2) and (3). The former makes it unlawful to knowingly and fraudulently make "a false oath or account in or in relation to any case under title 11." 18 U.S.C. § 152(2). The latter makes it unlawful to knowingly and fraudulently make "a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11." *Id.* § 152(3). In light of the discussion above, there is little question that Alix plausibly pleads bankruptcy fraud under Subsection (3), as McKinsey & Co., McKinsey U.S., and McKinsey RTS, through their executives, made each of its allegedly false or misleading declarations under penalty of perjury. *See, e.g.*, ECF No. 199-9, at 9; ECF No. 199-37, at 1. Indeed, McKinsey does not really dispute the point, at least to some Defendants. Defs.' Mem. 31. McKinsey does challenge Alix's claims under Subsection (2) on the ground that it applies only to oral statements, not to statements in declarations, as here. *See id.* at 30-31; ECF No. 237 ("Defs.' Reply"), at 11-12. Given the plain language of the two provisions, there is

---

[13]     As discussed above, Alix's allegations that McKinsey violated Rule 2014 by disclosing connections by category, or by using one of the tests designed by McKinsey executives for deciding what to disclose, do not, in themselves, amount to fraud. Accordingly, the Court does not consider Alix's argument that McKinsey knowingly violated the Rule 2014 requirements amounts to fraudulent intent. *See* Pl.'s Opp'n 35-41. By the same token, the Court need not and does not address McKinsey's contention that its interpretation of Rule 2014 was objectively reasonable, *see* Defs.' Mem. 25-29, because the relevant question is whether McKinsey knowingly concealed connections to the debtors, not whether McKinsey complied with Rule 2014.

considerable force to its argument, but the issue appears to be one of first impression, and it is —

at least at this stage of the case — academic, so the Court need not and does not address it.[14]

### 5. Bribery, 18 U.S.C. § 152(6) and Various State Laws

Next, Alix alleges that, through the pay-to-play scheme, McKinsey & Co. and McKinsey

U.S. violated 18 U.S.C. § 152(6), which makes it unlawful for a defendant to bribe another

person in relation to a bankruptcy proceeding.  SAC ¶¶ 471-73.[15]  At bottom, the Complaint

alleges that executives at these entities offered to introduce bankruptcy attorneys to clients in

exchange for the attorneys recommending McKinsey RTS to their debtor clients.  *Id.*  Alix

alleges that this same conduct constitutes felony commercial bribery in Texas, New York, and

Illinois.  *Id.* ¶ 474.  In *Alix II*, the Second Circuit held that Alix sufficiently alleged this "pay-to-

play" scheme.  23 F.4th at 208-10.  Accordingly, McKinsey wisely does not contest that Alix

adequately pleads this predicate act against the McKinsey & Co. and McKinsey U.S.  *Cf.* Defs.'

---

[14]     Alix cites *United States v. Gellene*, 182 F.3d 578 (7th Cir. 1999), which observed that
Rule 2014 requires declarations "to set forth under oath" their connections.  *Id.* at 588.  But
*Gellene* involved a conviction under Subsection (3), and the court did not address the distinction
between Subsections (2) and (3).  At least two courts of appeals have affirmed convictions under
subsection (2) for false statements made in a bankruptcy petition.  *United States v. Kusi*, 20-1095
& 20-1138, 2021 WL 5505399, at *3 (3d Cir. Nov. 24, 2021) (unpublished); *United States v.
Marston*, 694 F.3d 131, 133 (1st Cir. 2012).  But the bulk of convictions under subsection (2)
appear to be for false testimony — in either depositions or at creditors' meetings.  *See, e.g.*,
*United States v. Foster*, 829 F. App'x 86, 88 (6th Cir. 2020) (unpublished) (deposition); *United
States v. Spalding*, 894 F.3d 173, 182 (5th Cir. 2018) (creditors' meeting); *United States v.
Saoud*, 595 F. App'x 182, 189 (4th Cir. 2014) (both); *see also Satinwood*, 385 F.3d at 169
(considering a RICO claim in which the defendant was alleged to have filed a materially false
bankruptcy petition in violation of Subsection (2) and, separately, made false statements at a
creditors meeting in violation of Subsection (3)).

[15]     Alix does not allege bribery as a predicate act for the Count Two Enterprise.  *See* SAC
¶¶ 510-67.  Accordingly, McKinsey RTS cannot be held vicariously liable for any alleged
bribery.  Moreover, Alix does not allege that any of the individual Defendants committed
bribery.  *Cf. id.* ¶¶ 471-77 (describing the bribery allegations against only McKinsey & Co.,
McKinsey Holdings, and McKinsey U.S.).

Mem. 30-32 (arguing that Alix failed to plead the other alleged predicate acts, but not mentioning bribery at all).

### 6.   Obstruction of Justice, 18 U.S.C. §§ 1503(a) and 1512(c)

Next, Alix alleges obstruction of justice under 18 U.S.C. §§ 1503(a) and 1512(c).  As relevant here, Section 1503(a) prohibits a defendant from "endeavoring to influence, obstruct, or impede the due administration of justice."  *United States v. Aguilar*, 515 U.S. 593, 598 (1995); *see also United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006) (holding that, to be convicted under section 1503, a defendant must have "corruptly intended to impede the administration of [a] judicial proceeding" (internal quotation marks omitted)).  It is "intended to prohibit all obstructive behavior," *United States v. Kumar*, 617 F.3d 612, 620 (2d Cir. 2010), although the behavior must have a "direct nexus to an official government proceeding," *id.* (internal quotation marks omitted).  Section 1512(c) "criminalizes corruptly obstructing, influencing, or impeding any official proceeding, or attempting to do so."  *United States v. Sampson*, 898 F.3d 287, 300 (2d Cir. 2018) (cleaned up).  A proceeding before a bankruptcy judge qualifies as an "official proceeding" for purposes of the statute.  *See* 18 U.S.C. § 1515(a)(1)(A).

Alix's primary obstruction of justice allegations rest on the actions of McKinsey & Co., McKinsey U.S., and McKinsey RTS in *Alpha Natural Resources* and *SunEdison*.  In the former proceeding, the U.S. Trustee filed a motion seeking an order to compel McKinsey RTS to comply with the disclosure requirements of Rule 2014.  SAC ¶ 444.  Alix alleges that, in an attempt to convince the U.S. Trustee to withdraw her motion, Carmody filed his fourth declaration, a mere fifteen days after the Trustee filed her motion, purporting to cure the deficiencies in the prior declarations.  *Id.* ¶¶ 214, 446; *see also* ECF No. 199-29.  But Carmody allegedly continued to conceal material connections.  SAC ¶¶ 215, 456; *compare* ECF No. 177-

2, at 51 (listing "Major Competitors" that Carmody failed to disclose in his third declaration), *with id.* at 54 (listing "Major Stakeholders and Major Competitors" that Carmody disclosed in his fourth declaration, but which does not include all of the "Major Competitors" Alix identified).  In *SunEdison*, the U.S. Trustee filed an objection to McKinsey RTS's retention based on its incomplete disclosures; less than a month later, Hojnacki filed an amended declaration purporting to cure the issue.  SAC ¶¶ 243-44.  But his declaration continued to conceal many alleged connections.  *Id.* ¶ 244; *see also* ECF No. 177-2, at 68-73.  These attempts to influence the conduct of the U.S. Trustee, Alix argues, amounts to obstruction of justice.  Pl.'s Opp'n 48-50.  And, more broadly, Alix alleges that all of the false or misleading declarations McKinsey executives submitted amounted to obstruction of justice because they sought to prevent the bankruptcy courts from determining whether McKinsey RTS was disinterested and could be appointed as a consultant.  *Id.* at 48-49; SAC ¶¶ 459, 543-56.

At this stage, Alix adequately pleads obstruction of justice under both statutes for all fourteen bankruptcies.  As discussed above, he alleges that McKinsey executives submitted false or misleading affidavits in thirteen federal bankruptcy proceedings, with the intent that McKinsey RTS's retention would be approved by the bankruptcy courts despite the McKinsey entities' extensive connections to interested parties.  *See, e.g.*, *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 594 (S.D.N.Y. 2014) (holding that the defendant's conduct in drafting a misleading declaration with the purpose of preventing certain information from coming to light in a federal proceeding fell "squarely within the federal obstruction of justice statute," Section 1503), *aff'd*, 833 F.3d 74 (2d Cir. 2016); *In re Firestar Diamond, Inc.*, 634 B.R. 265, 292-93 (Bankr. S.D.N.Y. 2021) (finding that the bankruptcy trustee had adequately pleaded obstruction of justice under Sections 1503 and 1512 based on allegations that, among other things, the defendants "made false and misleading statements under penalty of perjury" in the underlying

bankruptcy case with the intent to conceal assets); *Rothberg v. Chloe Foods Corp.*, No. 06-CV-5712 (CPS), 2007 WL 2128376, at *13 (E.D.N.Y. July 25, 2007) (finding that the plaintiff had adequately pleaded obstruction of justice predicate acts based on allegations that the defendants had submitted false documents in a prior proceeding).

Alix's allegations are particularly strong with respect to (1) McKinsey RTS's disclosures in *Alpha Natural Resources*, which concealed that McKinsey served U.S. Steel, a major customer of the debtor, at the same time as the bankruptcy proceeding, SAC ¶¶ 208-12; (2) McKinsey RTS's disclosures in *SunEdison*, which concealed that McKinsey had invoiced the debtor millions of dollars in potentially disqualifying pre-petition payments, *id.* ¶¶ 255-58, 260-61; and, as the Second Circuit all but held in *Alix II*, 23 F.4th at 206, (3) McKinsey RTS's disclosures in *GenOn*, which concealed that McKinsey served NRG, the debtor's parent company with whom the debtor had an adverse interest, SAC ¶¶ 288-90.  And, in the fourteenth bankruptcy, *AMF Bowling*, Alix alleges that McKinsey RTS concealed connections to "dozens of interested parties."  *Id.* ¶ 130.  As discussed above, this allegation was not sufficient to satisfy the particularity needed for fraud-based claims.  But Rule 9(b) does not apply to obstruction-of-justice claims, *see McLaughlin*, 962 F.2d at 194, and, thus, Alix's allegations regarding *AMF Bowling* pass muster here.

The same principles apply to Alix's allegations regarding Carmody's and Hojnacki's attempts to influence the U.S. Trustee in *Alpha Natural Resources* and *SunEdison*.  In both cases, Alix adequately alleges that McKinsey & Co., McKinsey U.S., and McKinsey RTS, through their executives, submitted false and misleading declarations that continued to conceal connections, with the intent that the Trustees would withdraw their respective motions and objections, thus influencing the progress of the bankruptcy proceedings.  That is sufficient to allege obstruction of justice.

### 7. Inducement to Travel 18 U.S.C. § 2314

By contrast, the Court concludes that Alix does not plausibly allege a violation of 18 U.S.C. § 2314, which prohibits, among other things, a defendant from inducing a victim to travel, interstate, for the purpose of defrauding the victim. 18 U.S.C. §2314. To plausibly plead a violation of the statute, a plaintiff must allege "(1) that the defendant devised a scheme intending to defraud a victim of money or property of a minimum value of $5,000, and (2) that as a result of this scheme, a victim was induced to travel in interstate commerce." *United States v. Thomas*, 377 F.3d 232, 236 (2d Cir. 2004). The statute requires a plaintiff to show that the defendant was "a motivating force in the victim's transportation." *United States v. Myerson*, 18 F.3d 153, 164 (2d Cir. 1994). Alix fails to fulfil this requirement. Indeed, Alix does not allege that any Defendant induced him to travel. Alix asserts that Barton prompted him to travel to New York City on October 15, 2015, in order to cover up McKinsey's ongoing fraud. Pl.'s Opp'n 45-46; SAC ¶¶ 479-80, 653-54. But the factual allegations in the complaint do not support this assertion. Alix alleges merely that, "[a]t 11:00 a.m. on Thursday, October 15, 2015, Alix met with Barton and McKinsey & Co.'s offices in New York City." SAC ¶ 159. Alix's citation to *United States v. O'Connor*, 874 F.2d 483 (7th Cir. 1989), *see* Pl.'s Opp'n 45, is therefore inapposite. In that case, the court affirmed the defendant's conviction under Section 2314 based on evidence showing that the defendant had invited the victim to travel in order to conceal his fraud. *O'Connor*, 874 F.2d at 487-88. By contrast, Alix's allegations show no similar invitation. This is fatal to his claim for liability based on violations of Section 2314.

### 8. Witness Tampering, 18 U.S.C. § 1512(b)

Alix's allegations under the witness tampering statute, 18 U.S.C. § 1512(b), also fall short. Section 1512(b) "makes it a crime to intimidate, threaten or 'corruptly persuade' a potential witness, or to attempt to do so, with intent to influence [the witness's] testimony in an

official proceeding." *United States v. Amato*, 86 F. App'x 447, 450 (2d Cir. 2004) (unpublished) (quoting 18 U.S.C. § 1512(b)).  The persuasion must be "corrupt" — that is, the defendant's attempts to persuade the potential witness must have been "motivated by an improper purpose." *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 703-04 (2005) (emphasizing the importance of narrowly interpreting "corruptly persuade" in the context of witness tampering to avoid penalizing "innocuous" persuasion (cleaned up)).  The statute further proscribes engaging "in misleading conduct toward another person" with the intent to influence testimony.  18 U.S.C. § 1512(b).

Assuming without deciding that the declarations at issue here constitute "testimony" within the meaning of the witness tampering statute, Alix still fails to plead any instances of witness tampering because he does not allege facts showing how any Defendant "corruptly persuaded" or engaged "in misleading conduct towards" the relevant declarant.  *See* 18 U.S.C. § 1512(b); *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 74 (E.D.N.Y. 2020) (finding that the plaintiff in a RICO case failed to allege witness tampering because the complaint did not explain how the defendant "corruptly persuaded" an affiant to write a false affidavit).  At best, he alleges that Molino and Proshan assisted Carmody and Hojnacki in preparing their disclosures in certain cases, consulted on the disclosures in certain cases, or approved the disclosures in before they were filed.  *See* SAC ¶¶ 190, 192, 239, 339, 462-68; *see* Pl.'s Opp'n 47 & n.27.  But assistance, consultation, and approval do not amount to corrupt persuasion or misleading conduct.  Because Alix does not allege that any Defendant misled or corruptly persuaded the declarants in any way, his claim of witness tampering must fail.  *See Rambarran v. Mount Sinai Hosp.*, No. 06-CV-5109 (DF), 2008 WL 850478, at *8 (S.D.N.Y. Mar. 28, 2008).[16]

---

[16]    In the Complaint, Alix also alleges that some Defendants corruptly persuaded the U.S. Trustee to abandon her efforts to procure additional disclosures in *Alpha Natural Resources*,

### 9.  Money Laundering, 18 U.S.C. § 1957(a)

Finally, Alix alleges money laundering in violation of 18 U.S.C. § 1957(a).  Section 1957(a) prohibits "knowingly engag[ing] . . . in a monetary transaction in criminally derived property of a value greater than $10,000."  18 U.S.C. § 1957(a); *see also United States v. Silver*, 864 F.3d 102, 114, 124 (2d Cir. 2017).  The property must be derived from specified unlawful activities, which include substantially all RICO predicate offenses.  *See* 18 U.S.C. §§ 1956(c)(7)(A), 1957(a).  Thus, to state a claim for money laundering as a RICO predicate, a plaintiff must plead "(1) that the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity . . . ; (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) that the defendant knew that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds."  *Entretelas Americanas S.A. v. Soler*, No. 19-CV-3658 (LAK), 2020 WL 9815186, at *9 (S.D.N.Y. Feb. 3, 2020) (cleaned up), *aff'd*, 840 F. App'x 601 (2d Cir. 2020).  McKinsey argues that Alix fails to allege money laundering because all of McKinsey's fees were lawfully obtained in their bankruptcy consulting work and because Alix has failed to plead any facts regarding the subsequent monetary transactions.  Defs.' Mem. 32.

The Court agrees with the latter point.  Alix alleges that the McKinsey entities received the fees from its wire, mail, and bankruptcy fraud scheme and subsequently deposited those fees or otherwise engaged in "financial transfers."  SAC ¶¶ 482, 485, 564, 567.  Alix further alleges

---

another form of witness tampering.  SAC ¶ 463.  Notably, neither side addresses this argument. *See* Defs.' Mem. 31; Pl.'s Opp'n 47.  Regardless, McKinsey's alleged actions do not amount to witness tampering because Alix fails to allege that any Defendant intended to prevent the U.S. Trustee's testimony or to cause the U.S. Trustee to withhold records.  *Cf.* 18 U.S.C. 1512(b). Accordingly, this allegation does not save Alix's claim of witness tampering.

that "[t]he specific chains of monetary transactions are within Defendants' exclusive knowledge and control."  *Id.* ¶¶ 482-83, 566, 655-56.  But Alix does not allege any specific facts regarding the deposits or other financial transfers.  *See Farag v. XYZ Two Way Radio Serv., Inc.*, No. 22-1795, 2023 WL 2770219, at *2 (2d Cir. Apr. 4, 2023) (summary order) (affirming the dismissal of the appellant's money laundering claims, which were based solely on the allegation that the defendants conduct "monetary transactions in fraud to criminally deprive" others of their equity).  Indeed, Alix does not allege any facts showing that McKinsey & Co. or McKinsey U.S. conducted financial transactions using their bankruptcy fees.  Nor does Alix allege that the transactions were designed to conceal the source of the fees.  Thus, Alix's allegations fall short.  *See Entretelas Americanas S.A.*, 2020 WL 9815186, at *10 (dismissing a RICO money laundering claim because, *inter alia*, the complaint had no non-conclusory allegations that the defendant knew it was transferring money to conceal its illicit source).

Alix further alleges that McKinsey & Co., McKinsey U.S., and McKinsey RTS, through their executives, laundered money in connection with the *SunEdison* bankruptcy by fraudulently re-invoicing pre-petition payments it had received from the debtor to non-debtor affiliates.  SAC ¶¶ 255-61, 483, 567.  But as McKinsey correctly points out, *see* Defs.' Mem. 32, Alix does not allege that the pre-petition payments it received from the debtor were the proceeds of unlawful activity.  Thus, even if McKinsey did engage in financial transactions to hide the source of these funds, that would not constitute money laundering because the funds are not from allegedly unlawful activity.  Accordingly, Alix fails to allege money laundering as a predicate act.

### 10. Individual Defendants' Predicate Acts

The foregoing discussion focused largely on the entity Defendants.  The Court now turns to Alix's allegations against the individual Defendants — who, unlike the entity Defendants, are also named in Count Two and, thus, may be held liable for their involvement in all of the

fourteen bankruptcies at issue in this case.  *See* SAC ¶ 503.  Alix sufficiently alleges that each

individual Defendant committed at least two predicate acts.  Put simply, based on the misleading

declarations submitted in all fourteen of the bankruptcies, Alix adequately pleads at least two

acts of mail or wire fraud, bankruptcy fraud, and obstruction of justice, or aiding and abetting the

same.  *See* SAC ¶¶ 146, 150, 153-59, 432 (Barton);[17] *id.* ¶¶ 417, 428(a), 436, 459, 528

(Carmody); *id.* ¶¶ 132, 339, 415, 525 (Garcia); *id.* ¶¶ ¶ 118-19, 121, 123, 239, 419, 428(a), 459,

526 (Goldstrom); *id.* ¶¶ 329-30, 334, 337, 531 (Hojnacki); *id.* ¶¶ 100, 122, 129, 132, 170, 173,

192, 285, 339, 423, 441, 522 (Molino); *id.* ¶¶ 122, 129, 132, 170, 173, 192, 239, 285, 416,

433(d), 438, 537 (Proshan); *id.* ¶¶ 239-40, 420, 527 (Sternfels); *id.* ¶¶ 132, 411, 529 (Yerian).

Defendants' arguments to the contrary fall into two buckets.  First, they argue that Alix

fails to allege fraudulent intent on the part of any individual Defendant.  *See* Defs.' Mem. 34-42,

44-48, 53-57, 59-64, 66-67.  As discussed above, however, Alix sufficiently pleads facts giving

rise to a strong inference of conscious misbehavior.  The individual Defendants all either drafted

or consulted on some of the misleading declarations.  These declarations included descriptions of

the searches McKinsey U.S. or McKinsey RTS had conducted to determine if it had conflicts of

interests.  *See, e.g.*, ECF 199-12, ¶ 16; ECF No. 199-32, ¶ 24.  Taking the declarations at their

word, these searches should have revealed the many connections that the declarations omitted;

---

[17]     Alix adequately alleges that Barton committed at least two acts of wire fraud based on his
meetings and communications with Barton regarding McKinsey RTS and Barton's promises to
exit the bankruptcy consulting business.  Alix does not adequately allege that Barton aided and
abetted any other predicate act because he fails to allege that Barton took affirmative steps to
assist the racketeering activity.  *See Rosemond v. United States*, 572 U.S. 65, 71 (2014)
(confirming that an "affirmative act in furtherance of" the underlying offense is required for
aiding and abetting liability); *United States v. Delgado*, 972 F.3d 63, 75-77 (2d Cir. 2020)
(reversing a conviction based on aiding and abetting liability where the evidence showed merely
the defendant's presence but no affirmative act).  Alix alleges nothing more than inaction on
Barton's part.  SAC ¶¶ 414, 421, 430, 441, 453, 46; *see also* Defs.' Mem. 37.

accordingly, it is reasonable to infer, at least at this stage of the litigation, that the individual

Defendants who wrote or consulted on the declarations knew, or should have known, that they

omitted certain connections.  This inference is especially strong for the *Standard Register* and

*SunEdison* bankruptcies, in which the declarants concealed connections that were disclosed at or

about the same time in other bankruptcies.  SAC ¶¶ 178-80, 274.  Moreover, for every

bankruptcy in which McKinsey RTS subsequently disclosed connections it had omitted in its

initial disclosures, *see, e.g.*, *id.* ¶¶ 103, 124, 238, it is reasonable to infer that the individual

Defendants responsible for the initial declarations knew that they had concealed connections.

Second, Defendants argue that Alix fails to allege with specificity how Garcia, Molino,

Proshan, and Sternfels participated in the fraud.  *See* Defs.' Mem. 42-45, 58-65.  But Alix's

allegations establish that these Defendants, at a minimum, aided and abetted other Defendants in

committing the predicate acts — namely, that each provided assistance by drafting or consulting

on the declarations, with the knowledge that the declarations omitted some of McKinsey's

connections.  *See Sanchez v. ASA Coll., Inc.*, No. 14-CV-5006 (JMF), 2015 WL 3540836, at *8

(S.D.N.Y. June 5, 2015) (explaining that a plaintiff need not allege that each individual

defendant "personally committed at least two of the predicate acts of mail and/or wire fraud" as

long as the plaintiff can show that the individual defendants "direct[ed] the enterprise . . . to use

the mails and/or wires to further the fraudulent scheme" and the complaint "inform[s] each

defendant of the nature of his [or her] alleged participation in the fraud" (cleaned up));

*Rosemond*, 572 U.S. at 71 (explaining the requirements for aiding and abetting liability under 18

U.S.C. § 2); *131 Main St. Assocs.*, 897 F. Supp. at 1529-30 (finding that the plaintiffs had

sufficiently alleged that certain defendants aiding and abetted RICO predicate acts based on the

substantial assistance they provided and their intent to further the predicate acts).

**D.  RICO Conspiracy**

For the foregoing reasons, the Court concludes that Alix plausibly alleges at least one substantive RICO claim against all Defendants other than McKinsey Holdings.  In his fourth cause of action, Alix alleges that all Defendants participated in a RICO conspiracy, in violation of 18 U.S.C. § 1962(d).  *See* SAC ¶ 680.  Notably, "the requirements for RICO's conspiracy charges under § 1962(d) are less demanding than those for substantive violations."  *City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) (cleaned up).

McKinsey's most substantial argument for dismissal of the conspiracy charge rests on the intracorporate conspiracy doctrine.  *See* Defs.' Mem. 94.  "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy.  Simply put, the doctrine states that under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."  *Kirwin v. Price Comm'cns Corp.*, 391 F.3d 1323, 1326 (11th Cir. 2004) (internal quotation marks omitted).  Notably, there is a circuit split on whether the doctrine — which the Supreme Court first adopted in the antitrust context, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768-74 (1984) — applies to RICO conspiracy claims.  *Compare Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 787 (9th Cir. 1996) (rejecting application of the doctrine to RICO), *and Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989) (same), *and Kirwin*, 391 F.3d at 1326 (same), *with Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997) (applying the doctrine to RICO), *and Fogie v. THORN Ams., Inc.*, 190 F.3d 889, 898-99 (8th Cir. 1999) (same); *see also United States v. Gurry*, 427 F. Supp. 3d 166, 190 & n.85 (D. Mass. 2019)

(discussing the circuit split), *aff'd in part, rev'd in part on other grounds sub nom. United States v. Simon*, 12 F.4th 1 (1st Cir. 2021).[18]   The Second Circuit has not yet addressed the issue.

As the circuit split suggests, the issue is not clear cut, but the Court concludes that the Seventh, Ninth, and Eleventh Circuits have the better of the argument and that the intracorporate conspiracy doctrine does not apply to RICO.   As the Seventh Circuit reasoned, the Supreme Court's holding in *Copperweld* "does not extend to RICO's provisions in 18 U.S.C. § 1962(c) primarily because the Sherman Act is premised, as RICO is not, on the 'basic distinction between concerted and independent action.'   The policy considerations discussed in *Copperweld* therefore do not apply to RICO."   *Haroco, Inc. v. American Nat. B. & T. Co. of Chicago*, 747 F.2d 384, 403 n.22 (7th Cir. 1984) (internal citations omitted), *aff'd*, 473 U.S. 606 (1985). Indeed, unlike in the antitrust context, excluding intracorporate conspiracies from RICO's reach would not comport with the broad remedial purpose of the RICO statute, *see, e.g.*, *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985), because such conspiracies "threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits," *Ashland Oil*, 875 F.2d at 1281.   Finally, at least some of the courts applying the intracorporate conspiracy doctrine to RICO have done so on grounds that resemble the distinctness requirement discussed above.   *See, e.g.*, *Fogie*, 190 F.3d at 899.   Where, as here

---

[18]      District courts within the Second Circuit are similarly divided.   *Compare Rouse v. Rouse*, No. 89-CV-597, 1990 WL 160194, at *14 (N.D.N.Y. Oct. 17, 1990) (concluding, on a motion to dismiss, that parent and subsidiary corporations can conspire for RICO purposes), *and Mauriber v. Shearson/Am. Exp., Inc.*, 567 F. Supp. 1231, 1241 (S.D.N.Y. 1983) ("RICO should be construed as being unconcerned with intracorporate conspiracies."), *with Kriss v. Bayrock Grp. LLC*, No. 10-CV-3959 (LGS), 2017 WL 1901966, at *3 (S.D.N.Y. May 8, 2017) (applying the intracorporate conspiracy doctrine to a RICO conspiracy claim but finding that an exception applied), *and Merhej v. I.C.S. Int'l Custody Sys., Inc.*, No. 13-CV-869 (JGK), 2014 WL 104908, at *4 (S.D.N.Y. Jan. 9, 2014) (adopting the intracorporate conspiracy doctrine), *adopted* 2014 WL 948108 (S.D.N.Y. Mar 11, 2014).

(at least as to Counts One and Two), the distinctness requirement is satisfied, that rationale does not apply.

McKinsey also asserts in passing that the Complaint "fails to plead that any Defendant agreed with at least one other entity to commit a substantive RICO offense."  Defs.' Mem. 94 (internal quotation marks omitted).  To be sure, "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."  *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990); *accord Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 230 (E.D.N.Y. 2014).  But an agreement may be shown "by circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing."  *City of New York v. Chavez*, No. 11-CV-2691 (BSJ), 2012 WL 1022283, at *7 (S.D.N.Y. Mar. 26, 2012) (internal quotation marks omitted).  Here, because each of the Defendants other than McKinsey RTS and McKinsey Holdings committed predicate acts in furtherance of the racketeering scheme, *see, e.g.*, SAC ¶¶ 688-93, "'the inference of an agreement'" on those Defendants' part "to join the conspiracy 'is unmistakable.'"  *Sky Med. Supply Inc.*, 17 F. Supp. 3d at 230 (quoting *United States v. O'Malley*, 796 F.2d 891, 899 (7th Cir. 1986)); *see also Angermeir v. Cohen*, 14 F. Supp. 3d 134, 154-155 (S.D.N.Y. 2014) (citing cases); *City of New York v. Hatu*, No. 18-CV-848 (PAE), 2019 WL 2325902, at *14 (S.D.N.Y. May 31, 2019).

McKinsey Holdings and McKinsey RTS are a different story.  Alix's conspiracy claim against the former founders for the same reasons his substantive claims did: The Complaint does not allege that McKinsey Holdings did anything, let alone agreed to commit any RICO predicates.  By contrast, Alix's conspiracy claim against McKinsey RTS passes muster.  Granted, Alix alleges that McKinsey RTS conspired to violate RICO only as alleged in Count Three, which the Court dismissed.  *See* SAC ¶ 686.  Moreover, McKinsey RTS is alleged to be a

RICO person only with respect to Count Three. That said, "the existence of a RICO enterprise is not a required element of a RICO conspiracy claim." *Bello*, 579 F. App'x at 17. More broadly, there is no requirement that Alix plead a substantive RICO claim against McKinsey RTS in order to plead a RICO conspiracy claim. *See id.*; *accord State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 150-51 (E.D.N.Y. 2005). Instead, Alix need only plausibly allege that McKinsey RTS "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Satinwood*, 385 F.3d at 178; *see also United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008) ("[T]o be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme."). And Alix has certainly alleged that. As discussed, the Complaint alleges that McKinsey RTS, through its employees, filed knowingly false declarations in several bankruptcies. *See* SAC ¶ 687. In so doing, McKinsey RTS agreed to further the fraudulent scheme, even if it was not actually conducting the affairs of an enterprise, as required to plead a substantive RICO offense.

### E.  RICO Zone of Interest

Defendants' next argument for dismissal — that Alix is not within the "zone of interests" protected by RICO or the statutes underlying the predicate acts he alleges, Defs.' Mem. 90-91; Defs.' Reply 37-38 — can be quickly rejected. The Second Circuit has squarely held that "it is inappropriate to apply a zone-of-interests test independent of this circuit's proximate cause analysis" because the "RICO proximate cause analysis adequately incorporates the zone-of-interests test's concerns in most cases." *Baisch v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 121 n.6 (2d Cir. 2003) ("[T]he reasonably foreseeable victim of a RICO enterprise will often be, unsurprisingly, the type of victim the RICO statute seeks to protect."). Defendants contend that these cases are no longer good law in light of the

Supreme Court's later decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).  *See* Defs.' Reply 37 & n.20.  But there are reasons to doubt that contention.  *See D'Addario*, 901 F.3d at 96-97 & n.8 (after *Lexmark*, identifying proximate causation as an element of a RICO claim and saying nothing about a separate zone-of-interest test); *Empire Merchs., LLC*, 902 F.3d at 141-46 (same); *see also, e.g.*, *Empire Merchs., LLC v. Reliable Churchill LLP*, No. 16-CV-5226 (ARR), 2017 WL 5559030, at *4 & n.7 (E.D.N.Y. Mar. 16, 2017), *aff'd* 902 F.3d 132.  And regardless, as noted above, this Court "must follow a precedential opinion of the Second Circuit unless and until it is overruled by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit."  *Grytsyk*, 527 F. Supp. 3d at 653 (cleaned up).  *Baisch* and *Lerner* have not been "so undermine[d] that [they] will almost inevitably be overruled," so the Court is bound to follow them.  And because the Second Circuit already held that Alix adequately pleads proximate causation, *see Alix II*, 23 F.4th at 208, Defendants' argument must be and is rejected.

## F.  But-For Causation

McKinsey's next argument for dismissal is that, notwithstanding the Second Circuit's conclusion that Alix adequately pleads proximate causation, Alix fails to allege but-for causation.  Defs.' Mem. 91-93.  Specifically, McKinsey argues that (1) Alix fails to plead that McKinsey would have been disqualified had it disclosed its additional connections; (2) Alix fails to plead that AlixPartners would have been qualified; (3) Alix had a clearly disqualifying conflict for *SunEdison*; and (4) four the bankruptcies do not fit into AlixPartner's market share, so AlixPartners could not have been appointed.  *Id.* 92-93.

It is certainly true that but-for causation and proximate causation are two distinct requirements that a RICO plaintiff must plead and prove.  *See Alix II*, 23 F.4th at 203; *see also*

*City of New York v. FedEx Ground Package Sys., Inc.*, 175 F. Supp. 3d 351, 370-71 (S.D.N.Y. 2016).  To allege but-for causation, Alix must allege that his injuries would not have occurred absent McKinsey's conduct.  *Alix II*, 23 F.4th at 203.  Put differently, McKinsey's conduct "is not a cause-in-fact of [Alix's] injury or loss if the injury or loss would have occurred regardless of the conduct."  *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 179 (2d Cir. 2013).  Meanwhile, proximate causation means that "there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct."  *UFCW Loc. 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010) (internal quotation marks omitted).  Generally, but-for causation is "less stringent" than proximate causation.  *Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*, 121 F. Supp. 3d 321, 338-39 (S.D.N.Y. 2015).

By its own terms, *Alix II* addressed *only* proximate causation.  *See* 23 F.4th at 203.  But the Second Circuit relied on allegations that, at a minimum, support a plausible inference of but-for causation in reaching its conclusion that Alix plausibly alleges proximate causation.  The Circuit reasoned that the debtors would not have retained, and the bankruptcy courts would not have approved the retention of, McKinsey had the full scope of its connections to interested parties been revealed.  *Id.* at 206-07.  The Circuit further held that Alix plausibly alleges that, if the bankruptcy consulting assignments had not been awarded to McKinsey, AlixPartners would have been awarded those assignments in proportion to its market share.  *Id.* at 205-06.  Necessary to the Second Circuit's ruling on proximate cause, therefore, was a conclusion that, had McKinsey not submitted allegedly fraudulent statements, Alix would have competed for and received some proportion of the fourteen bankruptcy assignments.  *Id.*  Accordingly, the Second Circuit's opinion forecloses McKinsey's argument that Alix fails to plausibly allege that McKinsey would have been disqualified had it disclosed its connections.  Arguably, it also

forecloses McKinsey's other three arguments regarding AlixPartner's qualifications and market share.

In any event, to the extent these arguments remain live notwithstanding the Second Circuit's opinion, they turn on factual issues that cannot be resolved on a motion to dismiss. Alix's failure to affirmatively allege that AlixPartners was disinterested in every bankruptcy, and his failure to respond directly to McKinsey's argument regarding *SunEdison*, *see* Defs.' Reply 39, do not compel a different result. At bottom, these are factual disputes concerning whether or not a bankruptcy court would have appointed AlixPartners. The extent to which a bankruptcy court considers connections disqualifying is, as Alix's allegations regarding McKinsey demonstrate, not a straightforward inquiry. And McKinsey's argument that AlixPartners works on bankruptcies for companies with assets valued at over $1 billion, and therefore would not have worked on four of the bankruptcies at issue here, is plainly belied by the allegations in the Complaint. SAC ¶ 495. Nowhere does Alix allege that AlixPartners limited itself to bankruptcies for companies with assets valued at over $1 billion. *Id.* ¶¶ 1; 54. Accordingly, and in light of *Alix II*, the Court concludes that Alix adequately alleges but-for causation.

**G. Collateral Estoppel (*Alpha Natural Resources*)**

Next, McKinsey argues that collateral estoppel bars all of Alix's claims related to the *Alpha Natural Resources* bankruptcy. Defs.' Mem. 73-75. Collateral estoppel, or issue preclusion, requires that "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the parties had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Wyly v. Weiss*, 697 F.3d 131, 141 (2d Cir. 2012) (cleaned up). McKinsey argues that the doctrine applies here because, in the *Alpha Natural Resources* bankruptcy proceeding, Alix's wholly owned litigation vehicle, Mar-Bow Value

Partners, LLC ("Mar-Bow"), challenged McKinsey's Rule 2014 disclosures.  Defs.' Mem. at 74.

McKinsey argues that Mar-Bow's complaints about McKinsey's disclosures in connection with

the bankruptcy were "repeatedly rejected" by the bankruptcy court and that Alix should be

precluded from re-litigating the same issues here.  *Id.* at 74-75.

McKinsey's argument can be swiftly rejected.  Most importantly, Mar-Bow's initial

challenges to McKinsey's disclosures were rejected on standing grounds, not on the merits.  *See

Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs. US, LLC*, 578

B.R. 325, 353-55 (E.D. Va. 2017), *aff'd sub nom. In re Alpha Nat. Res., Inc.*, 736 F. App'x 412

(4th Cir. 2018); *Mar-Bow Value Partners, LLC v. McKinsey Recovery & Transformation Servs.

US, LLC*, No. 16-CV-799, 2017 WL 4414155, at *16 (E.D. Va. Sept. 30, 2017), *aff'd sub nom.

In re Alpha Nat. Res., Inc.*, 736 F. App'x 412 (4th Cir. 2018).  The bankruptcy proceeding was

re-opened in 2019, upon Mar-Bow's motion, *see* Doc. No. 2, *In re: Alpha Nat. Res., Inc.*, 19-302

(Bankr. E.D. Va. Jan. 16, 2019), but Mar-Bow's renewed challenge was dismissed once again

for lack of standing, *see In re Old ANR, LLC*, No. 19-00302, 2019 WL 2179717, at *1 (Bankr.

E.D. Va. May 17, 2019).[19]  A dismissal on standing does not have preclusive effect with respect

to the underlying merits, so Alix remains free to challenge the sufficiency of McKinsey's

disclosures here.  *See In re Teligent, Inc.*, 640 F.3d 53, 61 (2d Cir. 2011) (holding that a law firm

was not collaterally estopped from a asserting a defense in a malpractice case related to a

bankruptcy settlement agreement where the law firm lacked standing to challenge the settlement

agreement in bankruptcy court).

---

[19]     As Alix points out, McKinsey ultimately entered into a settlement with the U.S. Trustee
regarding its disclosures in *Alpha Natural Resources*, *SunEdison*, and *Westmoreland*, but the
agreement does not purport to bind Mar-Bow.  *See* Pl.'s Opp'n 69; Doc. No. 43, *In re: Old ANR,
LLC*, 19-302 (Bankr. E.D. Va. Apr. 18, 2019).

### H.  Rule 60 and Section 1334 (Defendant Goldstrom)

Unsupported by any other Defendant, Goldstrom raises two additional arguments for dismissal: first, that Alix's claims are collateral attacks on the orders of bankruptcy courts and, thus, barred by Rule 60 of the Federal Rules of Civil Procedure; and second, that the Court lacks jurisdiction under 28 U.S.C. § 1334(e)(2), which grants exclusive jurisdiction to the "district court in which a cause under title 11 is . . . pending . . . over all claims or causes of action that involve construction" of 11 U.S.C. § 327 — which relates to the employment of professionals, including attorneys and consultants, in bankruptcy cases — "or rules relating to disclosure requirements under section 327."  *See* Defs.' Mem. 48-52; Defs.' Reply 28-29.

The Court is unpersuaded.  By its own terms, Rule 60 applies only to *parties* seeking relief from a judgment.  Fed. R. Civ. P. 60(b); *Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, No. 16-MC-405 (LGS), 2022 WL 2530359, at *5 (S.D.N.Y. Mar. 29, 2022) (refusing to allow non-parties to attack a judgment), *adopted*, 2022 WL 17830551 (S.D.N.Y. Dec. 21, 2022).  Neither Alix nor Mar-Bow was involved at all in any of the bankruptcies other than *Alpha Natural Resources* and *Westmoreland*.  *Cf.* SAC ¶ 216 (Mar-Bow's involvement in *Alpha Natural Resources*); *id.* ¶331 (Mar-Bow's involvement in *Westmoreland*).  And while bankruptcy orders may operate "against the world," *In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 92 (2d Cir. 2005), an un-involved third party, as Alix was in most of the bankruptcies, cannot challenge the bankruptcy court's orders, *cf.* 11 U.S.C. § 1109(b) (providing that "[a] party in interest . . . may raise and may appear and be heard on any issue in a case under" Chapter 11).  On top of that, as noted, the bankruptcy court in *Alpha Natural Resources* rejected Mar-Bow's Rule 60 motion for lack of standing.  *See Old ANR, LLC*, 2019 WL 2179717, at *4-8, meaning that Alix was precluded from challenging that court's orders under Rule 60.

Moreover, and perhaps more importantly, Alix is not seeking relief from the judgments of the bankruptcy courts.[20]  Yes, he must establish that the bankruptcy courts would have, more likely than not, declined to approve McKinsey's retention had they known about the undisclosed connections.  *See* Defs.' Mem. 48-49.  But Alix is not actually seeking to have those retention orders overturned.  The cases Goldstrom cites to support his argument to the contrary are inapposite because they involved plaintiffs using RICO to set aside prior judgments or avoid their preclusive effect.  *See, e.g.*, *Knight v. Mooring Cap. Fund, LLC*, 749 F.3d 1180, 1187-88 (10th Cir. 2014) (citing cases and concluding that the plaintiff's RICO claim collaterally attacking the outcome of, and costs incurred in, a prior proceeding was barred by issue preclusion); *Harbinger Cap. Partners LLC v. Egan*, 103 F. Supp. 3d 1251, 1265-66 (D. Colo. 2015) (finding that the plaintiff could not seek damages under RICO based on a bankruptcy court's previous order disrupting its right to control the debtor's business because it was functionally an attack on that order).  Because Alix is not seeking to overturn prior judgments, and because Alix was not a party who can challenge those prior judgments pursuant to Rule 60, Goldstrom's Rule 60 argument fails.

Goldstrom's reliance on Section 1334(e)(2) is also misplaced.  There is limited case law interpreting the scope of that provision.  It appears to have been invoked when courts have reviewed the retention or fee applications of bankruptcy professionals, *see, e.g.*, *In re NIR West Coast, Inc.*, 638 B.R. 441, 443 (Bankr. E.D. Cal. 2022); *In re Young Mens Christian Assoc. of Marquette Cty.*, 570 B.R. 64, 65-66 (Bankr. W.D. Mich. 2017), or upon a debtor's application to challenge a professional's lack of disinterestedness, *see, e.g.*, *In re Trigee Found., Inc.*, No. 12-

---

[20]     And even if he were, Rule 60 explicitly provides that it "does not limit a court's power to . . . entertain an independent action to relieve a party from a judgment, order, or proceeding." Fed. R. Civ. P. 60(d)(1).

624, 2016 WL 3971734, at *2 (Bankr. D.D.C. July 19, 2016).  Goldstrom does not cite, and the Court has not found, any case suggesting, let alone holding, that the statute would apply to a case such as this, involving claims under RICO.  In fact, Goldstrom does not cite any case whatsoever in support of his argument under Section 1334(e)(2).  Moreover, Alix's claims do not appear to rest primarily on a construction of 11 U.S.C. § 327 or rules relating to disclosure requirements under that provision.  The primary question before the Court is whether McKinsey's disclosures were misleading, not whether they complied with the bankruptcy disclosure requirements.  Accordingly, Section 1334(e)(2) does not apply to this case.

## I.   Joint Declaration

Finally, McKinsey contends that a joint declaration from three bankruptcy professionals that Alix appended to the Complaint, *see* ECF No. 177-3 ("Decl."), must be stricken.  Defs.' Mem. 94.  The Court agrees.[21]  Although courts may consider materials extrinsic to the complaint — as the Court has done in this case — such materials must be incorporated by reference into the complaint or otherwise integral to it.  *Empire Merchs.*, 902 F.3d at 139; *see* Fed. R. Civ. P. 10(c).  Affidavits — even when submitted with a complaint — are not "written instruments" that may be considered.  *Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 223 (S.D.N.Y. 2018).  *Ong* is especially instructive.  There, the plaintiff submitted an expert declaration with the complaint.  The court refused to consider it on the ground that it "was created long after the events giving rise to [the] litigation and is thus not the type of 'written instrument' falling within the purview of Rule

---

[21]     The fact that "Defendants did not file a motion to strike or otherwise invoke Rule 12(f)," Pl.'s Opp'n 94, is neither here nor there.  Among other things, Rule 12(f) explicitly provides that a court "may act . . . *on its own*" to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f)(1) (emphasis added).  That is, the Court would have been on firm ground striking the joint declaration even without a motion.

10(c)." *Ong*, 294 F. Supp. 3d at 224.  The declaration "was drafted *for the purpose of this litigation*; Plaintiffs therefore could not have relied on its terms while drafting their complaint." *Id.* (emphasis in original).  So too here.  As Alix himself acknowledges, *see* Pl.'s Opp'n 95, the expert declaration was plainly drafted for the purpose of litigation.  Moreover, the declaration relies on the Complaint, *e.g.*, Decl. ¶¶ 24, 26, not vice versa.  Accordingly, the declaration must be and is stricken.

## CONCLUSION

For the foregoing reasons, McKinsey's motion to dismiss is GRANTED in part and DENIED in part.  More specifically:

- McKinsey's motion to dismiss Count Three is GRANTED;

- McKinsey's motion to dismiss all claims against McKinsey Holdings is GRANTED;

- McKinsey's motion to dismiss all claims against Molino and Hojnacki arising out of the bankruptcies other than *Westmoreland* is GRANTED;

- McKinsey's motion to dismiss Alix's claims based on the predicate acts of inducement to travel; witness tampering; and money laundering is GRANTED; and

- Alix's joint declaration is STRICKEN.

Otherwise, McKinsey's motion to dismiss is DENIED.  Needless to say, that does not mean that Alix will be able to prove the claims that survive; it merely means that, assuming the truth of the allegations in the Complaint and drawing all reasonable inferences in Alix's favor, the Complaint states plausible claims (except as noted above).

That leaves the question of whether Alix should be granted leave to amend to cure the claims that have been dismissed.  Although leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is "within the sound discretion of the district court to grant or deny leave to amend," *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir.

2019).  Notably, Alix does not seek leave to amend.  Moreover, Alix has already amended his complaint twice, *see* ECF Nos. 73, 177, both times after McKinsey had moved to dismiss, *see* ECF Nos. 62, 88, raising many of the same arguments it did in its current motion.  Accordingly, the Court declines to grant Alix leave to amend *sua sponte*.  The Defendants shall file an answer to the remaining claims within **four weeks of the date of this Opinion and Order**.  By separate order today, the Court will schedule an initial pretrial conference.

The Clerk of Court is directed to terminate ECF No. 198 and to terminate McKinsey Holdings as a party.

SO ORDERED.

Dated: August 18, 2023
       New York, New York

_____
JESSE M. FURMAN
United States District Judge