UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAY ALIX,<br><br>         *Plaintiff*,<br><br>    v.<br><br>MCKINSEY & CO., INC.; MCKINSEY HOLDINGS, INC.; MCKINSEY & COMPANY INC. UNITED STATES; MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC; DOMINIC BARTON; KEVIN CARMODY; JON GARCIA; SETH GOLDSTROM; MARK HOJNACKI; VIRGINIA MOLINO; ALISON PROSHAN; ROBERT STERNFELS; and JARED YERIAN,<br><br>         *Defendants*.<br><br>———————————————————<br><br>SETH GOLDSTROM,<br><br>         *Counterclaim Plaintiff*,<br><br>    v.<br><br>JAY ALIX and ALIXPARTNERS, LLP,<br><br>         *Counterclaim Defendants*. | No. 18-CV-04141 (JMF) |

**PLAINTIFF JAY ALIX'S MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION TO DISMISS DEFENDANT SETH GOLDSTROM'S COUNTERCLAIM**

CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, New York 10281
(212) 504-6000

*Counsel for Plaintiff Jay Alix*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND...................................................................................................6

ARGUMENT ........................................................................................................................12

I.   GOLDSTROM'S COUNTERCLAIM IS NOT GOVERNED BY GEORGIA
     LAW ............................................................................................................................12

II.  GOLDSTROM'S COUNTERCLAIM IS ENTIRELY BARRED BY THE ONE-
     YEAR STATUTE OF LIMITATIONS FOR DEFAMATION CLAIMS........................14

III. GOLDSTROM'S COUNTERCLAIM BASED ON THE 2014 ALIX-BARTON
     MEETINGS IS BARRED BY THE ABSOLUTE LITIGATION PRIVILEGE...............16

IV.  THE COUNTERCLAIM IS BARRED BY QUALIFIED PRIVILEGE...........................18

V.   GOLDSTROM'S COUNTERCLAIM FAILS TO STATE A CLAIM............................21

     A.   The 2018 BizNews Podcast ..................................................................................22

     B.   The October 2014 Meeting in London...................................................................24

     C.   The September 2014 Meeting in New York ...........................................................25

CONCLUSION.....................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................13, 25

*Averitt v. Rozier*,
   119 N.C. App. 216 (1995) .........................................................................................19

*Biospherics, Inc. v. Forbes, Inc.*,
   151 F.3d 180 (4th Cir. 1998) ....................................................................................22

*Bogovich v. Embassy Club of Sedgefield, Inc.*,
   211 N.C. App. 1 (2011) .............................................................................................15

*Bouvier v. Porter*,
   279 N.C. App. 528 (2021) .........................................................................................16

*Brewer v. Dungan*,
   1993 WL 441306 (N.C. Super. June 30, 1993) ........................................................24

*Broadspring, Inc. v. Congoo, LLC*,
   2014 WL 4100615, (S.D.N.Y. Aug. 20, 2014)..........................................................12

*Captiva RX, LLC v. Daniels*,
   2014 WL 5428295 (M.D. Ga. Oct. 23, 2014)............................................................15

*Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*,
   976 F. Supp. 2d 706 (M.D.N.C. 2013) .................................................................23, 25

*Connecticut Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*,
   988 F.3d 127 (2d Cir. 2021)......................................................................................15

*DaimlerChrysler Corp. v. Kirkhart*,
   148 N.C. App. 572 (2002) .........................................................................................19

*Daniels v. Metro Mag. Holding Co.*,
   179 N.C. App. 533 (2006) .....................................................................................22, 23

*Demarco v. Charlotte-Mecklenburg Hosp. Auth.*,
   268 N.C. App. 334 (2019) .........................................................................................21

*Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC*,
   34 N.Y.3d 327 (2019) ...............................................................................................15

*El Omari v. Buchanan,*
2022 WL 4454536 (2d Cir. Sept. 26, 2022) .................................................................12

*Front, Inc. v. Khalil,*
24 N.Y.3d 713 (2015) .................................................................................................19

*Gertz v. Robert Welch, Inc.,*
418 U.S. 323 (1974).....................................................................................................22

*Gottwald v. Sebert,*
40 N.Y.3d 240 (2023) .................................................................................................16

*Grasso v. Mathew,*
564 N.Y.S.2d 576 (App. Div. 1991) ...........................................................................16

*Harris v. NCNB Nat. Bank of N. Carolina,*
85 N.C. App. 669 (1987) .................................................................................16, 17, 18

*Hodges v. Lutwin,*
No. 22-974-CV, 2023 WL 3362836 (2d Cir. May 11, 2023) .................................21

*Hoesten v. Best,*
821 N.Y.S.2d 40 (App. Div. 2006)..............................................................................15

*Horne v. Cumberland Cnty. Hosp. Sys., Inc.,*
228 N.C. App. 142 (2013) .....................................................................................15, 24

*Houpe v. City of Statesville,*
128 N.C. App. 334 (1998) .....................................................................................16, 17

*Hustedt Chevrolet, Inc. v. Newsday, Inc.,*
951 N.Y.S.2d 681 (App. Div. 2012).............................................................................22

*Izydore v. Tokuta,*
242 N.C. App. 434 (2015) .....................................................................................21, 25

*Kinesis Advert., Inc. v. Hill,*
187 N.C. App. 1 (2007) ...............................................................................................18

*Koly v. Enney,*
269 F. App'x 861 (11th Cir. 2008) ..............................................................................22

*Lee v. Bankers Tr. Co.,*
166 F.3d 540 (2d Cir. 1999)..........................................................................................12

*Liberman v. Gelstein,*
80 N.Y.2d 429 (1992) .................................................................................................21

*Matthews v. Oskouei*,
2023 WL 6936360 (Ga. Ct. App. Oct. 20, 2023)....................................................20

*MB Realty Grp., Inc. v. Gaston Cnty. Bd. of Educ.*,
2019 WL 2106081 (W.D.N.C. May 14, 2019) ......................................................22

*McDougal v. Fox News Network, LLC*,
489 F. Supp. 3d 174 (S.D.N.Y. 2020)....................................................................6

*Mummies of the World Touring Co., LLC v. Design & Prod., Inc.*,
2013 WL 3490535 (E.D.N.C. July 11, 2013) .......................................................16

*Neff v. McGee*,
346 Ga. App. 522 (2018) ......................................................................................19

*Norales v. Acevedo*,
2021 WL 739111 (S.D.N.Y. Feb. 24, 2021)
*aff'd*, 2022 WL 17958450 (2d Cir. Dec. 27, 2022).................................................7

*Nucor Corp. v. Prudential Equity Grp., LLC*,
189 N.C. App. 731 (2008) .....................................................................................23

*Pharmaresearch Corp. v. Mash*,
163 N.C. App. 419 (2004) .....................................................................................15

*Pierce v. Atl. Grp., Inc.*,
219 N.C. App. 19 (2012) .......................................................................................25

*Prince v. Intercept*,
634 F. Supp. 3d 114 (S.D.N.Y. 2022).....................................................................13

*Rema Tip Top/N. Am., Inc. v. Shaw-Almex Indus., Ltd.*,
2015 WL 11492540 (N.D. Ga. Nov. 18, 2015) ....................................................21

*Skinner v. Reynolds*,
237 N.C. App. 150 (2014) ................................................................................22, 23

*Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*
864 F.3d 236, 240 (2d Cir. 2017)..........................................................................24

*Taube v. Hooper*,
270 N.C. App. 604 (2020) .....................................................................................24

*Thea v. Kleinhandler*,
807 F.3d 492 (2d Cir. 2015)..................................................................................15

**Statutes**

11 U.S.C. § 327 ........................................................................................................6

18 U.S.C. § 152 ......................................................................................................25

Ga. Code § 9-3-33 ..................................................................................................15

Ga. Code § 51-5-4 ..................................................................................................21

Ga. Code § 51-5-7 ................................................................................................. 19

Ga. Code § 51-5-8 ..................................................................................................18

N.C. Gen. Stat. § 1-54(3) .......................................................................................15

**Rules**

CPLR 202 .............................................................................................................4, 15

CPLR 215(3) ...........................................................................................................15

Fed. R. Bankr. P. 2014 .................................................................................6, 14, 24

Fed. R. Civ. P. 12(b)(6) ............................................................................................1

Fed. R. Civ. P. 26 ...................................................................................................17

**Other Authorities**

Restatement (Second) of Torts § 587 (1977) ..........................................................17

Plaintiff Jay Alix respectfully submits this memorandum of law in support of his Motion to Dismiss Defendant Seth Goldstrom's counterclaim (ECF No. 244) (the "Counterclaim" or "CC") for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Some people can dish it out but they just can't take it. Defendant Seth Goldstrom—whose former counsel once referred to Alix's concerns regarding McKinsey's bankruptcy misconduct as the "vanity project of a narcissistic billionaire,"[1] and whose firm, McKinsey, dedicates an entire webpage to defaming Alix for "abusive and wholly improper anticompetitive behavior" while falsely stating that McKinsey's disclosures were "entirely lawful"[2]—is now suing Alix for defamation.

Goldstrom's makeweight defamation claim, which comes almost a decade after Alix first raised concerns about McKinsey's corruption of the nation's bankruptcy system, is plainly time-barred by the one-year statute of limitations. There is little wonder why Goldstrom neglected to bring his claim sooner. Goldstrom takes issue with Alix's statement that McKinsey has "ignored" federal laws in its bankruptcy practice (a polite way of saying McKinsey has intentionally failed to comply with well-established bankruptcy law), claiming in both the Counterclaim and his Answer that he acted on the advice of counsel (an issue now ripe for discovery, regardless of whether the Counterclaim proceeds). But with each passing year, it has only become clearer how prescient Alix was in sounding the alarm and blowing the whistle on McKinsey's illegal scheme. Indeed, as a McKinsey Senior Partner and proud co-founder of its allegedly "enormously successful" bankruptcy unit, CC ¶ 1, Goldstrom cannot be unaware that McKinsey has already

---

[1] Ex. P, Michelle Celarier, *The Man Who Would Take Down McKinsey*, Institutional Investor (Mar. 18, 2019). All exhibits are attached to the declaration of Matthew Karlan filed herewith.

[2] Ex. R, McKinsey, *Statement Concerning Jay Alix Dispute with McKinsey* (Jan. 6, 2020).

paid tens of millions of dollars in settlements, fines, and forfeitures due to its continual and intentional flouting of federal laws in connection with filing 43 false affidavits and declarations in 14 different bankruptcy cases.

To date, McKinsey's misdeeds have caused several courts and regulators—*not* Alix—to say at least the following concerning McKinsey's misconduct in bankruptcy:

- In its May 3, 2016 motion to compel McKinsey to comply with bankruptcy disclosure requirements, the U.S. Department of Justice, through the U.S. Trustee (not Alix), noted that McKinsey's disclosures "*give the appearance of compliance without actually complying with Bankruptcy Rule 2014.*"[3]

- On November 30, 2018, the U.S. Trustee (not Alix) stated that McKinsey's representations regarding its in-house investment office, McKinsey Investment Office ("MIO"), being a blind trust were "*at best, misleading in a way that deflected further questions about MIO.*"[4]

- In February 2019, the U.S. Trustee (not Alix) announced that McKinsey would "*pay $15 million in three bankruptcy cases*"—Westmoreland, SunEdison, and Alpha Natural Resources ("ANR")—"*to remedy inadequate disclosures of connections,*" noting this was "*one of the highest repayments made by a bankruptcy professional for alleged non-compliance with disclosure rules.*"[5]

- The U.S. Trustee further stated: "*McKinsey failed to satisfy its obligations under bankruptcy law and demonstrated a lack of candor with the court and USTP.*"[6]

- During a June 5, 2020 hearing in the *Westmoreland* bankruptcy, the bankruptcy court (not Alix) asked whether it should "*refer Mr. Hojnacki to the US Attorney's Office for perjury,*" noting that McKinsey's declarant, Defendant Mark Hojnacki, "*makes statements in his declaration that are simply not true.*"[7]

---

[3] Ex. K, *ANR* Dkt. 2308 at 14 (emphasis added).

[4] Ex. N, *ANR* Dkt. 4164 at 4-5 ¶ 5.

[5] Ex. O, DOJ, *U.S. Trustee Program Reaches $15 Million Settlement with McKinsey & Company to Remedy Inadequate Disclosures in Bankruptcy Cases* (Feb. 19, 2019).

[6] *Id.* It was later revealed (in April 2019) that this $15 million was on top of a December 2018 settlement in which McKinsey agreed to pay $17.5 million to the SunEdison Bankruptcy Litigation Trust to settle "claims and causes of action asserted by the Litigation Trust against McKinsey and RTS." Ex. Q, *SunEd* Dkt. 5884 (Dec. 27, 2018 *SunEd* Agreement, filed Apr. 4, 2019) at 3-4.

[7] Ex. T, 6/5/2020 *Westmoreland* Hrg. Tr. 199:22-200:12.

- On December 3, 2020, the U.S. Trustee (not Alix) stated that it entered into a settlement with McKinsey "*requiring McKinsey to forego payment of fees in the Westmoreland Coal bankruptcy*"—roughly $8 million[8]—to resolve the U.S. Trustee's allegations that "*the disclosures remained deficient because McKinsey failed to disclose the connections of all of its affiliates, failed to make adequate disclosures regarding its investments in entities that could create a conflict of interest, and failed to address inconsistencies concerning its disclosure of confidential client connections*."[9]

- On November 19, 2021, the United States Securities and Exchange Commission (SEC) (not Alix) announced that McKinsey "*has agreed to pay an $18 million penalty for compliance failures*," noting that "*[c]ertain McKinsey partners oversaw MIO's investment choices and also had access to material nonpublic information [MNPI] as a result of their McKinsey consulting work.*"[10]

- The SEC Order found that McKinsey partners "*were routinely privy to MNPI relating to, for example, … planned bankruptcy filings*," citing McKinsey's involvement in the *ANR*, *SunEdison*, and *Puerto Rico* bankruptcies.[11]

- And of course, all of this is in addition to the egregious misconduct allegations leveled against McKinsey by numerous governments, regulators, and private litigants around the globe in connection with McKinsey's non-bankruptcy work. To take but one example: McKinsey has agreed to pay nearly $1 billion[12] to resolve litigations and investigations into McKinsey's role in "*profiting from the opioid epidemic*," prompting the Massachusetts Attorney General to state that "*[a]s a result, … the truth [will be] exposed about McKinsey's illegal and dangerous partnership with Purdue Pharma.*"[13]

---

[8] Ex. V, Tom Corrigan, *McKinsey Forgoes $8 Million in Bankruptcy Fees Under Government Settlement*, WSJ Pro (Dec. 3, 2020).

[9] Ex. U, DOJ, *Settlement Addresses Disclosure Deficiencies and Possible Conflicts Relating to McKinsey's Retention in In Re Westmoreland Coal* (Dec. 3, 2020).

[10] Ex. X, SEC, *McKinsey Affiliate to Pay $18 Million for Compliance Failures in Handling of Nonpublic Information* (Nov. 19, 2021) ("[T]he affiliate [MIO] maintained inadequate policies and procedures to prevent McKinsey partners from misusing material nonpublic information they obtained as consultants to public companies and other McKinsey clients while they were simultaneously overseeing the affiliate's investment decisions.").

[11] Ex. Y, SEC, *Order Instituting Admin. Cease-and-Desist Proc.*, ¶¶ 17, 19-28 (Nov. 19, 2021).

[12] *See, e.g.*, Nate Raymond, *Consulting Firm McKinsey to Pay $230 Million in Latest US Opioid Settlements*, Reuters (Sept. 27, 2023) ("The money is on top of $641.5 million that McKinsey already paid to resolve claims by state attorneys-general."). McKinsey reportedly agreed to pay an additional $39.5 million to certain Native American Tribes.

[13] Ex. W, Massachusetts Office of Attorney General, *AG's Office Secures $573 Million Settlement With McKinsey for 'Turbocharging' Opioid Sales and Profiting From the Epidemic* (Feb. 4, 2021).

In short, Goldstrom's Counterclaim is doomed to fail for the simple and obvious reason that Alix's statements were substantially true—McKinsey clearly has, at the very least, "ignored" federal bankruptcy laws, among others. In fact, it has done much worse, intentionally and systematically violating them in an illegal scheme of racketeering.

Even taking Goldstrom's well-pleaded allegations as true and affording him every reasonable inference, Goldstrom has pleaded himself out of court. Goldstrom's claim centers on two factual predicates. First, he relies on Alix's allegations in the Second Amended Complaint ("SAC") concerning a pair of meetings in September and October 2014 between Alix and McKinsey's then-Global Managing Partner, Dominic Barton. During those meetings, which took place in New York and London, respectively, Alix attempted to settle a lawsuit between McKinsey employees and AlixPartners LLP ("AlixPartners") that was pending in Delaware Chancery Court (the "Delaware Action"), and also sought to resolve the issues underlying the present action, prior to bringing suit. *See* CC ¶¶ 52-54. Second, Goldstrom incorporates the recording of a May 4, 2018 "BizNews Radio" podcast, in which Alix participated while in Barcelona, Spain, five days before filing this action. In the podcast, Alix discussed his views regarding a recent Wall Street Journal article concerning McKinsey's bankruptcy misconduct. *See id.* ¶¶ 61-65. Neither factual predicate can support a plausible claim for relief.

*First*, the 2023 Counterclaim, based on alleged statements during 2014 and 2018, is time-barred on its face by the one-year statute of limitations. Under the law of the state where the cause of action accrued (here, Goldstrom's domicile, North Carolina), the statute was not tolled by the pendency of Alix's RICO claims, and therefore bars the claim entirely. *See* CPLR 202. Even if Georgia law applied, as Goldstrom insists, any claim based on the 2014 statements is out of time.

*Second*, Alix's statements are privileged. Goldstrom affirmatively pleads that the Alix-Barton communications took place in the context of private settlement negotiations related to the Delaware Action, during which Alix also agreed to forbear on taking further legal action in return for Defendant Dominic Barton's (false) assurances that reform would be forthcoming at McKinsey. Accordingly, the litigation privilege serves as an absolute bar to any defamation claim based on the 2014 statements. Moreover, the Counterclaim is entirely barred by qualified privilege because Alix acted reasonably and in good faith to protect his interests, and Goldstrom fails to plausibly allege malice.

*Third*, the Counterclaim fails to state a claim because it fails to identify any false and defamatory statement of fact concerning Goldstrom. To the extent the Counterclaim identifies any specific, negative statements about Goldstrom, they are at most non-actionable statements of opinion by Alix concerning his belief that McKinsey's publicly filed bankruptcy disclosures—which for years failed to disclose hidden investments, self-dealing and other connections by name—were not compliant with federal bankruptcy rules. McKinsey claims it had a different view—a "good faith dispute" over matters of "interpretation," as it is fond of saying. *E.g.*, ECF No. 200 at 3, 11 (Goldstrom arguing that "[r]easonable disputes about the interpretation of Rule 2014 cannot, as a matter of law, give rise to an inference of illicit intent"). Of course, as noted above, Alix's views have largely been adopted by courts and regulators, undermining any notion that McKinsey's interpretation was "reasonable." But if the debate was reasonable as Goldstrom claims, Alix's statements were statements of opinion on matters of public debate and importance, and therefore cannot support a claim for defamation.

Accordingly, the Counterclaim should be dismissed in its entirety and with prejudice.

## FACTUAL BACKGROUND

The following summary of the relevant factual background is based on the factual allegations in the Counterclaim and "statements or documents incorporated into the [Counterclaim] by reference or relied upon so heavily for their terms and effect as to be 'integral' to the [Counterclaim], and matters of which judicial notice may be taken." ECF No. 239 at 2-3.[14]

Defendant Goldstrom, a Senior Partner of McKinsey & Co., Inc. (together with its subsidiaries, "McKinsey") residing in North Carolina, alleges that he is an experienced management consultant with decades of experience advising clients on "business transformations," including bankruptcies. CC ¶¶ 1, 8, 13. Goldstrom helped found McKinsey's restructuring unit, Recovery & Transformation Services ("McKinsey RTS"), starting around 2010. *Id.* ¶ 1. He claims it was "enormously successful." *Id.* Goldstrom admits he "signed declarations on behalf [of] McKinsey RTS in certain Chapter 11 proceedings." *Id.* ¶ 36. As Goldstrom previously conceded, "the Court may take judicial notice of [those] declarations." ECF No. 200 at 6; *see* ECF No. 199 (attaching Goldstrom's declarations in support of Goldstrom's motion to dismiss). Thus, the Court may also take judicial notice of the fact that none of Goldstrom's initial disclosure declarations identifies a single McKinsey connection or hidden investment by name under Federal Rule of Bankruptcy Procedure 2014 ("Rule 2014"). Exs. A, D.[15]

---

[14] In ruling on motions to dismiss, courts routinely consider the statements alleged to constitute defamation, even if not attached to the complaint. *See, e.g.*, *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 179 n.5 (S.D.N.Y. 2020) (noting "Fox News provided the Court with a recording and transcript of the entire episode of 'Tucker Carlson Tonight'" at issue, and that "regardless of what law applies to Plaintiff's defamation claims, … the Court is required to examine the purported defamatory statements in context").

[15] As the Counterclaim acknowledges, "[u]nder the federal bankruptcy laws, for a professional advisor to receive payment from a bankruptcy estate, the advisor must, among other things, file a declaration with the bankruptcy court addressing the advisor's qualifications and disinterestedness." CC ¶ 36. *See* 11 U.S.C. § 327; Fed. R. Bankr. P. 2014.

### 2014 Alix-Barton Meetings

As to the September and October 2014 Alix-Barton meetings, the Counterclaim is explicit that Goldstrom's allegations are based on "Alix's own allegations" in the SAC. CC ¶ 53 (alleging September 2014 meeting based on "Alix's own allegations"); *see also id.* ¶ 54 (alleging October 2014 meeting "[a]ccording to Alix's allegations in the Second Amended Complaint"); *id.* ¶ 73 ("According to Alix's allegations in the Second Amended Complaint, Alix … made defamatory statements about Goldstrom to Dominic Barton, McKinsey's former Global Managing Partner, on September 3, 2014, and October 16, 2014."). Goldstrom was not present for these statements and bases his claim on the SAC, which is referenced throughout and integral to the Counterclaim.[16]

According to Goldstrom, the September 3, 2014 meeting was a settlement communication: "Less than one month after Goldstrom's deposition [in the Delaware Action], on September 3, 2014, Alix met in New York, New York with McKinsey's then Global Managing Partner, Dominic Barton, to negotiate a settlement of the litigation brought against McKinsey employees Thompson and Naumann." CC ¶ 52. Goldstrom alleges that during this meeting, Alix made statements regarding McKinsey's pay-to-play scheme, CC ¶ 53, a topic which he admits had also been the subject of testimony during Goldstrom's deposition in the Delaware Action, *id.* ¶ 51. As to the October 2014 meeting, Goldstrom states only that "Alix requested that Barton terminate Goldstrom and other senior leaders of McKinsey RTS," which Goldstrom claims amounted to making unspecified "defamatory statements in an effort to end Goldstrom's career." *Id.* ¶ 54.

---

[16] *See, e.g.*, *Norales v. Acevedo*, 2021 WL 739111, at *4 (S.D.N.Y. Feb. 24, 2021) (where complaint "contains assertions about the video, the substance of D.T.'s [proffer] agreement and the trial testimony … these exhibits are properly considered as incorporated by reference"), *aff'd*, 2022 WL 17958450, at *2 (2d Cir. Dec. 27, 2022) (noting "[k]ey allegations in the complaint rested on the content of" these materials outside the complaint).

Goldstrom admits that these statements—which were made privately to McKinsey's then-Global Managing Partner, Defendant Dominic Barton, and another Senior Partner, Defendant Robert Sternfels, who currently serves as McKinsey's Global Managing Partner—did not harm McKinsey's business or cause Barton or McKinsey to terminate Goldstrom's employment. *See* CC ¶ 57 ("Between 2014 and 2018, McKinsey RTS successfully competed for client engagements and was retained to serve companies in need of its restructuring and transformation expertise ...."); *id.* ¶ 1 (Goldstrom is a McKinsey Senior Partner, whose group was "enormously successful").

## 2018 BizNews Podcast

Goldstrom's Counterclaim expressly incorporates the contents of a 2018 BizNews podcast, including by providing the Court with a link to the public recording. CC ¶¶ 63-64 & n.1. The impetus for, and primary focus of, the podcast was an April 27, 2018 Wall Street Journal article by Gretchen Morgenson and Tom Corrigan titled "McKinsey Is Big in Bankruptcy—and Highly Secretive." *See* Ex. L. The BizNews podcast begins with the South African host, Gareth van Zyl, noting that Alix was "recently quoted by The Wall Street Journal regarding a story about McKinsey's alleged lack of public disclosure when dealing with Chapter 11 bankruptcy cases in the US," and asking for Alix to "give us the background to the story."[17] Tr. 2:7-13.

For context, the Wall Street Journal article explains: "A Wall Street Journal analysis of disclosure filings in all 13 chapter 11 cases in which McKinsey's restructuring unit, called McKinsey RTS, has participated shows the company routinely discloses far fewer names and descriptions of connections than other advisers." Ex. L at 1. The Journal—not Alix—reported, for example, that "McKinsey's initial SunEdison disclosures were missing millions of dollars in payments made to the firm by SunEdison and its affiliates." *Id.* at 3. And in GenOn, McKinsey's

---

[17] A certified transcript of the podcast is attached as Exhibit M hereto and cited as "Tr."

amended disclosures still "omitted 24 firms involved in the GenOn matter that McKinsey had identified in other cases as potential conflicts." *Id.* at 2. As to ANR, the Journal reported:

> The creditors, however, didn't have all the facts about ANR adviser McKinsey when they voted to support the plan a month before the hearing. They didn't know a McKinsey retirement plan had a $110 million investment in a hedge fund, run by Whitebox Advisors, which held a stake in ANR's senior debt. That gave McKinsey a financial interest in the new company's fate. Nor did they know that another senior lender, Barclays Bank PLC, was a McKinsey client.

*Id.* at 1.

As The Wall Street Journal noted, this and other conduct had caused courts and regulators alike to take issue with McKinsey's practices. For instance: "the U.S. Trustee … criticized McKinsey's disclosures in the ANR bankruptcy and another case, calling them 'vague and amorphous' and saying they gave 'the appearance of compliance without actually complying.'" *Id.* at 1; *see also id.* at 4 (noting that after Alix "complained to the U.S. Trustee about McKinsey's disclosure practices," the U.S. Trustee made "similar criticism of the firm in court papers"); *id.* at 1 ("The judge later required additional disclosure of McKinsey's clients at a private meeting in his chambers …. By then, creditors had already voted on the plan.").

The Wall Street Journal also cited "Al Togut, a bankruptcy ethics expert," for the position that "the Whitebox investment needed to be disclosed at the outset." *Id.* at 2. "It's not a shade of gray," Togut said, "You're not supposed to hide the ball or make judgment calls about what's relevant and what's not." *Id.* at 2. The Journal noted McKinsey's disagreement with these conclusions, stating that, according to McKinsey, "Alix is trying to derail a competitor"; "Courts have repeatedly rejected his attempts to use litigation to push McKinsey RTS out of the chapter 11 advisory business"; and "Mr. Barton doesn't agree with Mr. Alix's characterization of the conversations." *Id.* at 3-4. To Alix's knowledge, neither Goldstrom nor McKinsey, nor any other McKinsey partner, took any action against The Wall Street Journal in response to this article.

Against this backdrop, Alix was asked to provide some "background to the story." Tr. 2:7-13. In response, Alix stated that about four years ago (*i.e.*, in 2014), upon learning that McKinsey was participating in Chapter 11 bankruptcies, Alix reviewed "some of ***their public disclosures***, [and] came to realize that McKinsey was in violation of The United States Bankruptcy Code and not following the Bankruptcy Code rules and the law regarding disclosures of conflicts of interest in Chapter 11 bankruptcy cases." Tr. 2:16-22 (emphasis added).

Alix noted that, prior to going public with his concerns, he had "approached McKinsey and spoke with them about it"—specifically, McKinsey's Managing Partner Dominic Barton and Senior Partner Robert Sternfels, two of the "very top people of McKinsey and Company"—and "then when they were unresponsive, [he] approached the United States Justice Department and reported it." Tr. 6:4-7:2.[18] Alix explained that he "gave [McKinsey] the benefit of the doubt," noting that "McKinsey is a big company" with "many fine" and "honest" people and that Alix was "sure that they probably did not know this was happening." Tr. 7:3-9. In total, Alix discussed these issues with Barton on eleven separate occasions over fourteen months, during which Alix says that Barton repeatedly promised, but failed, to correct the issues Alix identified. Tr. 7:10-25.

As the moderator was careful to note, McKinsey had publicly denied any allegations of wrongdoing and disagreed with Alix's view of the bankruptcy disclosure requirements. Tr. 8:15-18 ("GARETH VAN ZYL: Now, McKinsey told The Wall Street Journal that its disclosures regarding bankruptcy cases in the US have been sufficient and above board, but you've challenged that?"). In response, Alix (who is not, and did not claim to be, a lawyer) explained his opinion that the Bankruptcy Code and Rules required disclosure of "all" connections, not merely disclosures

---

[18] Goldstrom does not, and cannot, claim that Alix's discussions with the U.S. Trustee or objections filed in bankruptcy courts constituted defamation.

that were "adequate" or "good enough." Tr. 8:19-9:7. Alix also disagreed with McKinsey's narrative that Alix was just an "unhappy competitor." Tr. 9:7-20. As he noted, journalists at The Wall Street Journal and the U.S. Trustee had reached similar conclusions. Tr. 13:7-14:21.

The 30-page transcript of the 40-minute podcast mentions Goldstrom only once. And in doing so, Alix explicitly based his views on the investigation reported by the Journal. Alix stated:

> So we find ourselves here today, now, with ***The Wall Street Journal*** having figured this out. ***The Wall Street Journal*** has studied it. It's an excellent article. It was well done. It was deeply researched.
>
> Gretchen Morgenson and Tom Corrigan are two very fine investigative journalists. The editors of ***The Wall Street Journal*** as well as ***The Wall Street Journal*** lawyers, I'm sure, have reviewed all this. And that article is astounding when you stop and read it slowly and think about what they're saying there, and the conflicts of interest that they have identified, and they have proven to themselves with high journalistic integrity. So all of this has brought us to this moment in time where a few people at McKinsey have decided to risk the firm's name and the firm's brand, ***I think,*** just to make some money for themselves.
>
> And they've put all the other people in McKinsey at risk. They put the whole firm at risk of its reputation, and its integrity, and its brand because a few people, led by Mr. Garcia and **Mr. Goldstrom** and Mr. Carmody, a woman named Alison Proshan, these people have actively gone about ignoring federal laws just to make more money for themselves, ***as from what I can tell.*** And the firm does not appear to be able to stop them. I don't know -- I don't know who's in charge of these people.

Tr. 14:10-15:8 (emphasis added).[19]

Near the end of the podcast, Alix was asked whether the Journal article impacted his views:

> JAY ALIX: Absolutely. ***The Wall Street Journal story opened up even more, really, violations than I was aware of.*** I had stumbled into the lack of disclosure and the intentional lack of disclosure across multiple federal bankruptcy cases, which, in itself, is a very

---

[19] While the Journal article does not mention Goldstrom by name, it analyzes disclosures Goldstrom publicly filed in both *Harry & David* and *AMR*, so there was no leap of logic required from what the Journal reported to Goldstrom's public responsibility for those declarations.

> serious set of violations. But beyond that, The Wall Street Journal
> discovered that McKinsey had a financial interest, had a secret, and
> really a concealed financial interest in the reorganization of a large
> coal company called, "Alpha Natural Resources."

Tr. 22:6-17 (emphasis added); *see also id.* at 23:13-19 ("[T]here are other transactions that The

Journal was also pointing at …. In the GenOn case, they pointed to a large number of undisclosed

connections, while McKinsey's also working in the GenOn case on the claims of GenOn, the

creditor claims, where they have many clients. … *[t]here's many, many new revelations that The*

*Wall Street Journal has found. I've watched this unfold.*" (emphasis added)).

Alix concluded the interview by expressing again his "hope that McKinsey will see what

the law requires, and they will come in compliance with the law." Tr. 28:8-13.

## ARGUMENT

## I.   GOLDSTROM'S COUNTERCLAIM IS NOT GOVERNED BY GEORGIA LAW

As a threshold matter, while Goldstrom's Counterclaim will fail under any potentially

applicable state law, it is clear that Goldstrom's claim is either governed by either North Carolina

or New York law—either of which is fatal to his claim—not Georgia law, as he insists. As this

Court noted in *Broadspring, Inc. v. Congoo, LLC*, under New York's choice-of-law rules for

defamation, "there is a presumptive rule that the law of the plaintiff's domicile applies." 2014 WL

4100615, at *6 (S.D.N.Y. Aug. 20, 2014) (Furman, J.); *see Lee v. Bankers Tr. Co.*, 166 F.3d 540,

545 (2d Cir. 1999); *El Omari v. Buchanan*, 2022 WL 4454536, at *2-3 (2d Cir. Sept. 26, 2022).

Here, Goldstrom admits he "resides in Jackson County in the State of North Carolina" CC ¶ 8, and

does not claim to have resided elsewhere ever.[20]

---

[20] Oddly, while Goldstrom notes "Alix has alleged that Goldstrom resides in Georgia … in the instant RICO action," CC ¶ 78; *see* SAC ¶ 42, in his Answer Goldstrom *denies* this allegation. Goldstrom Ans. ¶ 42. Presumably, Goldstrom knows where he lives.

Despite this, Goldstrom claims that "Alix's defamatory statements about Goldstrom's business dealings affected him in and had the most significant relationship to Georgia, his place of business at the time of the statements." CC ¶ 78. This "legal conclusion" is entitled to no weight. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

While in cases of nationwide publication, some courts have looked to factors beyond domicile, such as "where [the] plaintiff suffered the greatest injury; [from] where the statements emanated and were broadcast; where the activities to which the allegedly defamatory statements refer took place; and the policy interests of the states whose law might apply," none of these factors favors Georgia law. *Prince v. Intercept*, 634 F. Supp. 3d 114, 133 (S.D.N.Y. 2022) (cleaned up). The statements at issue were allegedly made in New York, London, and Spain (during an interview conducted by a journalist in South Africa). CC ¶¶ 52-54, 61; Tr. 6:20-24, 10:24-11:6, 2:7-8, 16:2-6. McKinsey & Co., Inc., in which Goldstrom is a Senior Partner, is a New York corporation with its headquarters in New York. Ex. AA. at 177. McKinsey's operations span the globe and its bankruptcy practice is national in scope, as evidenced by its publicly filed disclosures. *See, e.g.*, ECF No. 199 ¶¶ 2–42 (Weisgerber Declaration noting McKinsey filed disclosures in bankruptcy courts in Delaware, Illinois, Texas, New York, and Virginia). Indeed, Goldstrom currently identifies himself on McKinsey's website as resident in the "Carolinas," and bills himself as "the *global* leader of McKinsey's enterprise transformation work …." Ex. Z (emphasis added).

Moreover, while Goldstrom alleges that he previously "worked out of" a "Georgia office," CC ¶ 46, that fact is entitled to little, if any, weight. Goldstrom submitted his declarations in Chapter 11 cases pending outside of Georgia: *Harry & David* (Bankr. D. Del.) and *AMR* (Bankr. S.D.N.Y.). In fact, McKinsey has *never* been retained in connection with a Chapter 11 case pending in Georgia. Each of the ten disclosure declarations filed by Goldstrom stated that he was

affiliated with McKinsey, "with an office at 55 East 52nd Street, New York, NY 10055." Exs. A-J ¶ 1. Goldstrom's first two disclosure declarations in *Harry & David* were executed in "New York, NY," and the third was executed in "Cashiers, North Carolina." Ex. A at 9; Ex. B at 3; Ex. C at 3. All three *Harry & David* declarations also stated that the debtors were located in Medford, Oregon. Exs. A-C n.1. Similarly, Goldstrom's initial and first supplemental declarations in *AMR* were executed in Fort Worth, Texas, where AMR Corporation was based. Ex. D at 16; Ex. E at 5.[21]

Nor does Goldstrom's Georgia bar license (CC ¶¶ 8, 78) change the analysis, as none of the purportedly defamatory statements relates to his role (if any) as an attorney. Indeed, "[o]ther than working as a summer associate during law school" more than twenty years ago, Goldstrom has "*never* been paid to practice law."[22]

Thus, the Counterclaim is either governed by the law of North Carolina (Goldstrom's domicile) or New York (where some of the alleged statements were made, where Goldstrom submitted certain declarations, and where McKinsey is based). Regardless, the claim fails.

## II. GOLDSTROM'S COUNTERCLAIM IS ENTIRELY BARRED BY THE ONE-YEAR STATUTE OF LIMITATIONS FOR DEFAMATION CLAIMS

According to Goldstrom, he was defamed twice: first in September-October 2014, in connection with communications between Alix and Barton, CC ¶¶ 52-54, 73, and second in May 2018 as a result of the BizNews podcast, which his "colleagues were aware of … shortly after it was posted." CC ¶ 64, 74. Under any arguably applicable state law, Goldstrom's claims, if any, accrued at the time of publication (*i.e.*, in 2014 and 2018, respectively) and he had only one year

---

[21] That some supplemental declarations in *AMR* were executed in Georgia is not significant—under Rule 2014, Goldstrom was required to disclose all connections in his *initial* declaration. *See* Fed. R. Bankr. P. 2014(a) ("[t]he *application shall be accompanied* by a verified statement of the person to be employed" setting forth the professional's "connections" (emphasis added)).

[22] Goldstrom Decl. ISO Opp. Mot. to Comp. Arb. ¶ 3, *Goldstrom v. Selendy Gay Elsberg PLLC*, No. 1:23-cv-07527-JMF, (S.D.N.Y. Oct. 27, 2023), ECF No. 58 (emphasis added).

to bring suit, which he failed to do, filing his claim years too late in 2023. *See Horne v. Cumberland Cnty. Hosp. Sys., Inc.*, 228 N.C. App. 142, 150 (2013) (a "defamation action must be commenced within one year from the date the action accrues, which is the date of the publication of the defamatory words"); *Captiva RX, LLC v. Daniels*, 2014 WL 5428295, at *5 (M.D. Ga. Oct. 23, 2014) (same rule under Georgia law); *Hoesten v. Best*, 821 N.Y.S.2d 40 (App. Div. 2006) (same rule under New York law); *see also* N.C. Gen. Stat. § 1-54(3); Ga. Code § 9-3-33; CPLR 215(3).

Goldstrom does not allege any basis for tolling, and any attempt to do so would be futile. In particular, Goldstrom cannot claim the benefit of any tolling based on the pendency of Alix's complaint in this action. State-law tolling rules apply to Goldstrom's state-law Counterclaim. *See Connecticut Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 988 F.3d 127, 136 (2d Cir. 2021). And under New York's borrowing statute, CPLR 202, the Court must apply the *shorter* statute of limitations of either (a) New York or (b) the state in which Goldstrom's claim accrued (here, North Carolina)—in either case applying "all relevant tolling provisions" of each state to determine the net, or "entire," limitations period. *Thea v. Kleinhandler*, 807 F.3d 492, 497, 500 (2d Cir. 2015).[23]

Here, North Carolina law rejects the "proposition that litigation initiated by a plaintiff tolls the statute of limitations with respect to a defendant's counterclaim." *Bogovich v. Embassy Club of Sedgefield, Inc.*, 211 N.C. App. 1, 22 (2011) (noting that tolling "would be contrary to the relevant decisions"); *see also Pharmaresearch Corp. v. Mash*, 163 N.C. App. 419, 427 (2004) ("counterclaims do not 'relate back' to the date the plaintiff's action was filed"). Goldstrom chose

---

[23] The Counterclaim accrued in North Carolina within the meaning of the borrowing statute even if another state has a more significant relationship to the dispute. *See Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC*, 34 N.Y.3d 327, 331 (2019) (under CPLR 202, a claim accrues in the place of injury, which, for economic injury, "is usually where the plaintiff resides").

to sit on his purported defamation claim for years while the statute elapsed, and he cannot revive his claim now by claiming the benefit of Alix's filing date.

## III.   GOLDSTROM'S COUNTERCLAIM BASED ON THE 2014 ALIX-BARTON MEETINGS IS BARRED BY THE ABSOLUTE LITIGATION PRIVILEGE

In North Carolina, as in other jurisdictions, "[i]t is now well-established that defamatory statements made in the course of a judicial proceeding are absolutely privileged and will not support a civil action for defamation, even if made with malice." *Harris v. NCNB Nat. Bank of N. Carolina*, 85 N.C. App. 669, 672 (1987). "[A]n absolute privilege exists not only with respect to statements made in the course of a pending judicial proceeding but also with respect to communications relevant to proposed judicial proceeding." *Id.* at 674. "The test for relevancy is generous," failing only if the statement is "so palpably irrelevant to the subject matter of the controversy that no reasonable man can doubt its irrelevancy or impropriety." *Houpe v. City of Statesville*, 128 N.C. App. 334, 346 (1998) (cleaned up). If the statements "may have 'become the subject of inquiry in the course' of the" proceeding, the privilege applies. *Bouvier v. Porter*, 279 N.C. App. 528, 543 (2021) (citation omitted). New York applies similar principles.[24]

Based on this principle, state and federal courts regularly grant motions to dismiss defamation claims at the pleading stage.[25] In *Harris*, for instance, the North Carolina Court of Appeals upheld the Rule 12(b)(6) dismissal of plaintiff's defamation claim based on absolute

---

[24] *See Grasso v. Mathew*, 564 N.Y.S.2d 576, 578 (App. Div. 1991) ("In the context of a legal proceeding, statements by parties and their attorneys are absolutely privileged if, by any view or under any circumstances, they are pertinent to the litigation. … This test of pertinency is extremely liberal and encompasses both words and writings, including correspondence between litigating parties and unsolicited offers of settlement, which is the situation here.") (citations omitted). For anticipated litigation, there is a qualified privilege, which is lost only where "the statements were not pertinent to a good faith anticipated litigation." *Gottwald v. Sebert*, 40 N.Y.3d 240 (2023).

[25] *See, e.g.*, *Mummies of the World Touring Co., LLC v. Design & Prod., Inc.*, 2013 WL 3490535, at *4 (E.D.N.C. July 11, 2013) (granting Rule 12(b)(6) dismissal based on litigation privilege).

privilege where the plaintiff alleged that in connection with a potential lawsuit, "defendant had caused its attorney … to prepare a document which accused plaintiff of obtaining property by false pretense," which was published to an "attorney representing plaintiff's employer." 85 N.C. App. at 671. While the case involved a communication through counsel, the court was careful to note that "[t]he absolute privilege extends to parties," not just their counsel. *Id.* at 674 (citing Restatement (Second) of Torts § 587 (1977)).

Here, the litigation privilege serves as an absolute bar to Goldstrom's claim at least with respect to the 2014 Alix-Barton meetings. Goldstrom alleges that the September 2014 meeting was convened "to negotiate a settlement" of the pending Delaware Action. CC ¶ 52. During this meeting, Alix raised McKinsey's bankruptcy misconduct, including the "pay-to-play" scheme, with Barton. *Id.* ¶ 53. Anticipating that his defamation claim is barred by the absolute privilege, Goldstrom protests that these issues were "irrelevant" to the Delaware Action. *Id.* ¶ 48. But he admits that these same topics—including "pay to play" and McKinsey's improper bankruptcy disclosures—were the subject of inquiry during the Delaware Action; indeed, Goldstrom himself was "compelled" to testify about them during his August 2014 deposition in the Delaware Action. *Id.*[26] Thus, these topics were not "palpably irrelevant." *Houpe*, 128 N.C. App. at 346.

---

[26] *See* CC ¶ 48 ("Goldstrom was compelled to testify about McKinsey's bankruptcy disclosure practices in the United States and McKinsey RTS's general business strategy…."); *id.* ¶ 49 ("Goldstrom testified extensively about the declaration he submitted in connection with the Harry & David bankruptcy …."); *id.* ¶ 50 ("Goldstrom testified to the process McKinsey RTS followed to disclose McKinsey's connections to interested parties identified by the debtor in the bankruptcy court. Goldstrom also testified about specific portions of the Harry & David declaration."); *id.* ¶ 51 ("Goldstrom also testified he had no knowledge of McKinsey entering into arrangements with any law firm or investment bank to exchange referrals for work in bankruptcy proceedings, and questioned whether a law firm could ethically make such referrals."). If these topics were irrelevant, he would not have been "compelled" (CC ¶ 48) to so testify. *See* Fed. R. Civ. P. 26.

Similarly, at the October 2014 meeting, Alix allegedly "requested that Barton terminate Goldstrom and other senior leaders of McKinsey RTS" based on the same bankruptcy misconduct raised during the Delaware Action. CC ¶ 54. Goldstrom expressly incorporates and relies upon Alix's allegations in the SAC that this meeting was directly in connection with *potential* litigation, including Alix's agreement to forbear on bringing certain of the claims underlying this action. *See* SAC ¶ 156 (alleging that during the October 2014 meeting, "Alix agreed to remain patient and refrain from acting at that time on the issues he had raised, including forbearance from legal action," in exchange for Barton's assurances of reform); *id.* ¶ 31 (alleging Barton promised reform "if Alix would forebear action"); *see also* CC ¶¶ 53-54, 73 (incorporating SAC's allegations). Accordingly, Alix's statements regarding potential litigation were likewise absolutely privileged; *See Harris*, 85 N.C. App. at 674 (absolute privilege applies to proposed litigation).[27]

## IV.    THE COUNTERCLAIM IS BARRED BY QUALIFIED PRIVILEGE

Under any potentially applicable law, Alix's statements are additionally protected by qualified privilege. "The essential elements for the qualified privilege to exist are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion and publication in a manner and to the proper parties only." *Kinesis Advert., Inc. v. Hill*, 187 N.C. App. 1, 18-19 (2007). "[Q]ualified privilege exists with respect to those communications which, even though defamatory, are made in good faith and without actual malice upon a subject in which the communicating party has an interest or with respect to which he has some duty." *Harris*, 85 N.C. App. at 673. "Where the privilege exists, a presumption arises that the communication was made in good faith and without malice. To rebut this presumption, the plaintiff must show actual malice

---

[27] Georgia's absolute privilege applies to statements "in regular pleadings filed in a court of competent jurisdiction, which are pertinent and material to the relief sought." Ga. Code § 51-5-8. Even if Georgia law applies, the 2014 statements are protected by conditional privilege.

or excessive publication." *DaimlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 583 (2002).

"Actual malice may be proven by a showing that the defamatory statement was made with knowledge that it was false, with reckless disregard for the truth or with a high degree of awareness of its probable falsity." *Averitt v. Rozier*, 119 N.C. App. 216, 219 (1995).[28]

Here, Alix made his statements in good faith as evidenced, *inter alia*, by the fact that he privately attempted to convince Dominic Barton to remedy McKinsey's misconduct on eleven separate occasions before going public and based his statements on review of public disclosures, investigative reporting by professional journalists, and statements by the courts and the U.S. Trustee. He acted with an interest to be upheld, by virtue of his minority interest in AlixPartners, his role in negotiating a settlement of the Delaware Action for AlixPartners, and the public interest in compliance with federal bankruptcy laws. His statement was limited in scope to McKinsey's actions in bankruptcy. And he made these statements on a proper occasion to the proper persons— *i.e.*, to McKinsey's Global Managing Partner, Barton, and a Senior Partner, Sternfels, all in private.

The Counterclaim also fails to plead malice. Goldstrom claims that Alix supposedly "knew" that his September 2014 statements about the pay-to-play scheme were false because during deposition testimony in 2020, former AlixPartners CEO Frederick Crawford did not specifically recall discussing this issue with Alix and thought it might be a rumor. CC ¶ 55. But Crawford's cloudy recollection six years after the fact presents nothing more than conjecture

---

[28] New York and Georgia law are similar. Under Georgia law, a conditional privilege applies if Alix acted with "good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons." *Neff v. McGee*, 346 Ga. App. 522, 525-26 (2018) (statements in "article and media interviews" were "conditionally privileged" where "related to the complaint that his clients filed … and were in connection with an issue of public concern" (citing Ga. Code § 51-5-7)). *Accord Front, Inc. v. Khalil*, 24 N.Y.3d 713, 719 (2015) ("[A] statement is subject to a qualified privilege when it is fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his [or her] own affairs, in a matter where his [or her] interest is concerned.").

regarding Alix's mindset at the time he made the statements. Moreover, Goldstrom's position ignores the full contents of Crawford's testimony on the subject, even while incorporating that testimony into his Counterclaim. Crawford testified consistently with Alix that as of late 2013 there were "rumors" that "McKinsey was trading access to executives for leads in bankruptcy in turnaround situations." Ex. S, Crawford Dep. 41:7-42:2. As alleged in the SAC, Alix did not rely on Crawford to substantiate the rumors, and instead discussed the issue directly and privately with Barton, who ultimately confirmed to Alix that the rumors were true.[29]

Similarly, while Goldstrom alleges that Crawford testified that the AlixPartners Board "evaluated a strategy proposal designed to respond to a 'growing concern that McKinsey was becoming active in the turnaround industry and restructuring space,'" CC ¶ 32, the deposition testimony Goldstrom incorporates belies any inference of malice. Rather, Crawford testified that the proposals were either not discussed by the Board or, if considered, were rejected.[30]

Because the Counterclaim fails to allege facts giving rise to a plausible inference of bad faith or malice, dismissal is appropriate. *See, e.g.*, *Matthews v. Oskouei*, 2023 WL 6936360, at *4-5 (Ga. Ct. App. Oct. 20, 2023) (holding lower court erred in failing to strike complaint based on conditional privilege, where defendant had a "good faith basis" for making statements, noting that "[u]nsupported inferences or conjecture regarding a defendant's motivation do not suffice to show

---

[29] *See* SAC ¶ 153 (during October 16, 2014 London meeting "Barton informed Alix that he had looked into Alix's allegations" and "revealed that … McKinsey had, in fact, been making pay-to-play offers to bankruptcy lawyers"); CC ¶ 54 (Goldstrom alleging "an October 2014 meeting with Barton in London" "[a]ccording to Alix's allegations in the Second Amended Complaint").

[30] *See* Ex. S, Crawford Dep. 73:1-3 ("Q. … Was this strategy adopted? A. Not to my knowledge."); *id.* at 84:13-16 ("Q. Does AlixPartners follow the strategy on page 15 as it competes with McKinsey? A. No."). Likewise, Crawford testified that AlixPartners was not pursuing these strategies through Mar-Bow or Alix. *See id.* at 83:14-17, 86:11-24 (no discussion with AlixPartners Board or with Alix regarding Mar-Bow's media strategy); *id.* at 89:15-17, 90:22-91:1 (no discussions with Alix about Westmoreland litigation).

malice"); *Rema Tip Top/N. Am., Inc. v. Shaw-Almex Indus., Ltd.*, 2015 WL 11492540, at *6-7 (N.D. Ga. Nov. 18, 2015) (granting Rule 12(b)(6) motion in tortious interference case under conditional privilege where "no facts sufficiently alleging bad faith have been alleged"); *Hodges v. Lutwin*, No. 22-974-CV, 2023 WL 3362836, at *2 (2d Cir. May 11, 2023) (affirming Rule 12(b)(6) dismissal of defamation claim under "qualified privilege" where "plaintiffs have failed to plausibly allege either excessive publication or malice in the complaint.").

## V. GOLDSTROM'S COUNTERCLAIM FAILS TO STATE A CLAIM

Even if it were timely, and even if not barred by privilege, the Counterclaim is dead on arrival because it fails to identify any plausibly false and defamatory statements regarding Goldstrom. The elements of defamation are well established:

> [A] plaintiff must allege that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person. If a statement cannot reasonably be interpreted as stating actual facts about an individual, it cannot be the subject of a defamation suit. In determining whether a statement can be reasonably interpreted as stating actual facts about an individual, courts look to the circumstances in which the statement is made. The truth of an allegedly defamatory statement is a complete defense ….

*Demarco v. Charlotte-Mecklenburg Hosp. Auth.*, 268 N.C. App. 334, 343-44 (2019) (cleaned up). Goldstrom only purports to allege a "per se" claim, meaning he must plead "an oral communication to a third party which amounts to (1) an accusation that the plaintiff committed a crime involving moral turpitude; (2) an allegation that impeaches the plaintiff in his trade, business, or profession; or (3) an imputation that the plaintiff has a loathsome disease." *Izydore v. Tokuta*, 242 N.C. App. 434, 445 (2015) (cleaned up). None of Goldstrom's allegations satisfy these standards.[31]

---

[31] The elements are similar under New York and Georgia law. *See* Ga. Code § 51-5-4; *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992) (per se categories include statements "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman").

A.      **The 2018 BizNews Podcast**

The sole reference to Goldstrom in the 2018 podcast states that "Goldstrom [and others] have actively gone about ignoring federal laws just to make more money for themselves, as from what I can tell." Tr. 14:21-15:8. Taken in context, the reference to Goldstrom constituted a statement of opinion based on disclosed facts, which cannot support a claim for defamation.

"Rhetorical hyperbole and expressions of opinion not asserting provable facts are protected speech." *Daniels v. Metro Mag. Holding Co.*, 179 N.C. App. 533, 539 (2006); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974) (noting "there is no such thing as a false idea"). In addressing the fact vs. opinion distinction, courts "consider[] how the alleged defamatory publication would have been understood by an average [listener]," *Skinner v. Reynolds*, 237 N.C. App. 150, 153 (2014), given "the circumstances in which the statement is made." *Daniels*, 179 N.C. App. at 539-40 (citing *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998)).

Here, Alix was clear that his opinion was based on (1) his "review" of McKinsey's "public disclosures" in bankruptcy courts, Tr. 2:16-25, (2) the "investigative" journalism of The Wall Street Journal, which he personally found "highly credible," Tr. 23:20-23, and (3) public statements and orders by courts and regulators, including the U.S. Trustee, *e.g.*, Tr. 22:22-25. "Because the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation." *MB Realty Grp., Inc. v. Gaston Cnty. Bd. of Educ.*, 2019 WL 2106081, at *2 (W.D.N.C. May 14, 2019).[32]

---

[32] *Accord Koly v. Enney*, 269 F. App'x 861, 865 (11th Cir. 2008) (no liability under Georgia law for "statements clearly recognizable as pure opinion because their factual premises are revealed"); *Hustedt Chevrolet, Inc. v. Newsday, Inc.*, 951 N.Y.S.2d 681, 682 (App. Div. 2012) (statement "nonactionable as an expression of pure opinion based upon disclosed facts") (citations omitted).

More broadly, Alix repeatedly signaled to listeners that his statements represented his personal beliefs, qualifying his statements with phrases like "I think" (14 times) and "I feel" (5 times). In fact, the sole reference to Goldstrom is caveated by the statement that it is only "as from what I can tell" based on public disclosures and reporting. Tr. 14:21-15:8. This clarified that Alix's statements were "matter[s] of personal interpretation and opinion which the average reader is free to reject." *Daniels*, 179 N.C. App. at 540; *see also Skinner*, 237 N.C. App. at 155 (considering that the defendant qualified his statement by stating "from my experience," holding that this qualifier is tantamount to the phrase "in my opinion," and concluding that the statement is a nonactionable opinion); *Nucor Corp. v. Prudential Equity Grp., LLC*, 189 N.C. App. 731, 738 (2008) (holding statements were nonactionable opinion, in part because plaintiff provided a disclaimer stating that the "views expressed accurately reflect [the] research analyst's personal views").

Alix also framed the issues in terms of his personal moral values ("somebody has to stand up and say, 'That's wrong'"), his lack of understanding of McKinsey's conduct ("I don't know why the board of directors of McKinsey doesn't stop this"), and his personal responses to hypothetical situations ("I'd want our people to stop, correct it, and do the right thing"). Tr. 20:12-13, 15:9-10, 10:14-15. Courts hold that these types of "personal opinions that are 'incapable of being actually or factually proven or disproven'" are nonactionable. *Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*, 976 F. Supp. 2d 706, 715-716 (M.D.N.C. 2013). Likewise, Alix's conclusions that "a few people" "put the whole firm at risk of its reputation, and its integrity, and its brand," Tr. 15:1-2, or that McKinsey founding father "Marvin Bower … would be rolling in his grave if he knew all this," *id.* at 19:24-20:03, are "loose, figurative, or hyperbolic language" insufficient to state a claim. *Daniels*, 179 N.C. App. at 540 (citation omitted).

- 23 -

Finally, to the extent Alix's statement concerning Goldstrom during the 2018 podcast can be deemed factual, it is "substantially true."[33] While Goldstrom quibbles with the statement that he was "ignoring" federal laws—alleging that he "testified in 2014" that he "relied on counsel to ensure that he was in full compliance with the law," CC ¶ 70—that argument overlooks the plain meaning of the word "ignoring," which is a synonym for "disregarding."[34] The statement that Goldstrom's declarations "ignore"—*i.e.*, "disregard"—federal disclosure rules is substantially true, as shown by Goldstrom's publicly filed declarations, each of which failed to name McKinsey's connections despite Rule 2014 and applicable case law. Exs. A-J. And as to Goldstrom's economic motivation, he alleges that he acted for profit as a McKinsey Senior Partner. *See* CC ¶¶ 1, 8, 13. Because Alix's statement was true, dismissal is appropriate.[35]

## B.    The October 2014 Meeting in London

As to the October 2014 meeting, the Counterclaim alleges only that "Alix requested that Barton terminate Goldstrom and other senior leaders of McKinsey RTS," asserting in a conclusory fashion that this means Alix "made defamatory statements in an effort to end Goldstrom's career." CC ¶ 54. Goldstrom's failure to identify the statements "'substantially' *in haec verba*" is, by itself, a "sufficient basis" for dismissal. *Horne*, 228 N.C. App. at 150 (citation and quotation marks

---

[33] *See, e.g.*, *Brewer v. Dungan*, 1993 WL 441306, at *1 (N.C. Super. June 30, 1993) (where "gravamen of plaintiff's complaint is that defendant Dungan … erroneously stated … that plaintiff was not promoted to chief of security … because she had previously been convicted of a 'felony assault,'" the court granted a motion to dismiss because the "'gist' or 'sting' of the publications … would be no different than had the publications correctly characterized her assault conviction").

[34] Merriam-Webster, *Ignoring*, https://www.merriam-webster.com/thesaurus/ignoring (last visited Nov. 9, 2023); *see also* DISREGARD, Black's Law Dictionary (11th ed. 2019) ("disregard *n.* (17c) 1. The action of ignoring or treating without proper respect or consideration. …").

[35] *See Taube v. Hooper*, 270 N.C. App. 604, 612 (2020) (Rule 12(b)(6) dismissal based on truth); *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 240 (2d Cir. 2017) (same).

omitted). Indeed, Goldstrom's bare legal conclusion that the unidentified statements were "defamatory" is entitled to no weight. *Iqbal*, 556 U.S. at 678; *see Izydore*, 242 N.C. App. at 446 ("conclusory allegation that the statements were 'false and defamatory'" was insufficient).

Moreover, to the extent Goldstrom alleges that Alix called for him to be fired for his dishonest disclosures, "North Carolina cases have held consistently that alleged false statements made by defendants, calling plaintiff 'dishonest' or charging that plaintiff was untruthful and an unreliable employee, are not actionable per se." *Pierce v. Atl. Grp., Inc.*, 219 N.C. App. 19, 35 (2012). In any event, Alix's view that Barton should fire Goldstrom is a non-actionable opinion, not a statement of fact. *See Champion Pro Consulting Grp.*, 976 F. Supp. 2d at 715 (statements regarding what plaintiff's business practices "should" have been are nonactionable opinion).

C.    **The September 2014 Meeting in New York**

Finally, Goldstrom alleges that during the September 2014 meeting Alix "falsely accused Goldstrom … of orchestrating a purported illegal 'pay-to-play' scheme" that could "potentially expose the entire firm to criminal prosecution." CC ¶ 53. Even assuming the allegation were sufficiently specific, timely, and non-privileged (none of which is true), Alix's opinion that Goldstrom "potentially expose[d]" the firm to "criminal prosecution" is again a non-actionable opinion, particularly since (1) it was true that there was a risk of criminal prosecution under 18 U.S.C. § 152 and applicable case law, and (2) as noted, Alix disclosed the basis (and limits) of his knowledge on the subject to Barton, presenting it as an issue for Barton to investigate and confirm.

<u>**CONCLUSION**</u>

Plaintiff respectfully requests that the Court dismiss Goldstrom's Counterclaim in its entirety and with prejudice.

Dated: November 14, 2023          CADWALADER, WICKERSHAM & TAFT LLP
      New York, New York

                                   */s/  Sean F. O'Shea*
                                   Sean F. O'Shea
                                   Michael E. Petrella
                                   Matthew M. Karlan
                                   Joshua P. Arnold
                                   200 Liberty Street
                                   New York, New York 10281
                                   Telephone:  (212) 504-6000
                                   Facsimile:  (212) 504-6666
                                   Sean.OShea@cwt.com

                                   *Counsel to Plaintiff Jay Alix*