

Balwara LLC
P.O. Box 194443
San Francisco, CA 94119

January 16, 2024

**BYEMAIL**

**The Honorable Judge Jesse M. Furman**
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007
Email: Pro_Se_Filing@nysd.uscourts.gov

Re: ***Jay Alix v. McKinsey & Co., Inc., et al.***, No. 1:18-cv-04141

Dear Judge Furman:

Balwara LLC ("Balwara") and Baraa Shaheen respectfully move through this letter for leave to file Motion for Sanctions & Disqualification of Kobre & Kim LLP ("K&K") as Defendants Counsel in the above-captioned case.

First, Balwara is an unsecured creditor in the SunEdison bankruptcy which is at the core of the above-mentioned case. Both Balwara and its sole shareholder, Mr. Shaheen are interested parties in the bankruptcy as shown on the interested party list filed by debtors as part of their first day motions on April 21, 2016. Balwara and Mr. Shaheen suffered pre and post-petition economic, professional, and reputational, damages from Defendants conduct.

Second, Defendants lead counsel, K&K, is Balwara's former legal counsel and advised Balwara on a substantially similar matter that is before this Court and there current representation of Defendant is adverse to Balwara's interests and is therefore conflicted. K&K also acted as Conflicts Counsel to the Official Committee of Unsecured Creditors in SunEdison's bankruptcy and owed fiduciary duty to Balwara. Balwara provided K&K with credible, confidential, and privileged information about the bankruptcy fraud scheme in SunEdison pre-petition. K&K then misrepresented, by omission, the true nature of its relationship with Balwara in Mr. Michael Kim's deceleration to the SunEdison Bankruptcy Court. Balwara also approached K&K post-petition and informed them that their work for the Unsecured Creditors Committee lacks depth and offered Balwara's research to help the committee pursue valuable claims for the bankruptcy estate, however, K&K deliberately refused the research. In fact, the entity Balwara wanted to expose is

The Honorable Judge Jesse M. Furman
Re: Jay Alix v. McKinsey & Co., Inc., et al., No. 1:18-cv-04141
January 16, 2024
Page 2 of 2

the very same client McKinsey is concealing from the Court as part of a cover-up scheme in favor of TPG Capital.

Third, Balwara met with McKinsey in 2017 met and exchanged Whatsapp messages in 2017 pertaining to TPG's role in SunEdison implosion. McKinsey's efforts to defend its self in this case, and in prior proceedings should be viewed by this Court as offenses of obstruction of justice and as additional acts in furtherance of the overarching scheme of Fraud on the Court. K&K should be viewed with a prism of aiding and abetting McKinsey.

Accordingly, Balwara respectfully requests that this Court (i) grant leave to file Motion for Sanctions & Disqualification of K&K as Defendants Counsel in this matter, which is attached, and (ii) grant such other relief as the Court may deem just and appropriate.

Respectfully submitted,

*/s/ Baraa Salem Shaheen*
Founder & Managing Partner
Balwara LLC

*Enclosures*

cc:      All counsel (via ECF)

Balwara LLC
P.O. Box 194443
San Francisco, CA 94119

2

**UNITED STATES DISTRICT COURT**
**FOR THE SOURTHERN DISTRICT OF NEW YORK**

_____

      JAY ALIX,

          Plaintiff,


          v.                                        No. 1:18-cv-04141(JMF)


      MCKINSEY & CO, INC., et al.

          Defendants.

_____



**MOTION FOR SANCTIONING & DISQUALIFIYING DEFENDANTS COUNSEL,**
**KOBRE & KIM LLP, BY BARAA SHAHEEN & BALWARA LLC**
<u>**IN THE INSTANT ACTION**</u>


1.    Pursuant to Rule 1.9 of the New York Rules of Professional Conduct, and all other relevant laws, rules and regulations, Baraa Shaheen and Balwara LLC ("Balwara") respectfully move for Sanctions & Disqualification of Kobre & Kim LLP ("K&K") as Defendants Counsel.  Balwara is a former client of K&K on exactly the same matter in the instant case where Balwara's interests are adverse to McKinsey.   K&K did not, verbally nor in-writing, seek a waiver or consent from Balwara.  Balwara discovered K&K's involvement in the instant case when it reviewed the Defendants Supreme Court petition for writ of certiorari and has been made K&K aware of the conflict of interest on February 15, 2023.  K&K denies the conflict.

## I.  AUTHORITY

2.   Rule 1.9 of the New York Rules of Professional Conduct is titled "Duties to Former Clients" and provides:

> a.  A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

## II.  BACKGROUND

3.   K&K received confidential and privileged information including information about TPG Capital's role in SunEdison from Balwara and Mr. Shaheen during the course of attorney-client relationship ending on May 5, 2016, of which K&K used to further Defendants fraud on the court scheme and to Balwara's detriment.  The information provided to K&K represented the parameters used by Defendants in developing the SunEdison Protocol before SunEdison filed for bankruptcy.

4.   In March 2017, Balwara approached K&K in their role as conflicts counsel for the UCC in SunEdison and informed them that their work lacks depth and offered its expertise and further original analysis surrounding TPG in support of UCC.  Contrary to their duties as fiduciaries and officers of the court, K&K rejected Balwara's support.  Balwara inquired K&K to reengage on the bankruptcy fraud claim against TPG but K&K claimed that the contemplated engagement will cause "logistical challenges" while representing the UCC. In October 2017,  and unaware of Defendants role in SunEdison, Balwara met and exchanged WhatsApp messages with McKinsey and informed them about TPG's role in SunEdison.  McKinsey also conveyed to Balwara that they are aware of Balwara's is at unease to how its agreement ended with SunEdison.

5.    On April 2018, Defendants acting in concert with the debtors and others, filed a frivolous adversary claim in the SunEdison Court in retaliation for Balwara's efforts to expose TPG. Balwara intended to proceed for jury trial and counter-claim in district court which threatened to expose the massive, self-concealing, egregious and unconscionable Fraud on the Court in the SunEdison Bankruptcy Court and other courts, by and through, corrupting the integrity of the U.S. Federal Bankruptcy judicial machinery, judges, officers of the court and the United States Trustee Program, essentially targeting the federal judiciary. As such the claim against Balwara was dismissed.

6.    Defendants are aware of Balwara's legal claims as of January 13,  2022.  Balwara discovered K&K's involvement in the instant case when it reviewed the Defendants Supreme Court petition for writ of certiorari and has been made K&K aware of the conflict of interest on February 15, 2023.  K&K denies the conflict.

## III.  ARGUMENT

7.    In the years leading up to the Great Depression, particularly, in 1923, the New York Times published an article about bankruptcy fraud entitled: *Wolves of Bankruptcy and the Tactics they Employ—Real Rings are Engaged in Aiding Bankrupts to Victimize Creditors.*   The article describes the operations of "Bankruptcy Rings,"  at the time, as:

> *"Too often, however, to speak frankly, these ringsters among the practitioners in bankruptcy (for such class the bankruptcy practitioners constitute the real and only bankruptcy ringsters) seem to find apparent favor or indulgence with some of the referees and courts, who evidently do not fully apprehend their real character, nor the real harm they are doing to right bankruptcy practice in the eyes of the public.*
>
> *These ringsters are as well acquainted with the machinery of bankruptcy practice as are the genuine bankruptcy practitioners.  They are careful never to give offense to the courts, nor, what is also of some*

*importance, to the courts' clerks.  Their operations are well oiled and make little noise. As long as they are left alone nothing occurs to destroy the calm serenity of the bankruptcy court, and bankruptcy "business" is smoothly dispatched.*

*So the way of the investigator gets to be really a hard way where his opponent is a member of the bankruptcy ring and is in charge of the estate. In cases where the ringster is in control the outside lawyer always is working, too, at  a disadvantage. Always the outsider represents a mere minority, for the ringster, being early on the job and knowing everything from the inside, has corralled most of the creditors' claims by the time the outsider comes along; for creditors are a good deal like sheep, only less intelligent, for they have not even the instinct to distinguish friends from foes. And almost always some few of the creditors are virtually bribed by promises of payment in full if they…[play along]."*

8.   Subsequently, in 1925, Congress held hearings on bankruptcy law revision.  In 1929, federal judges in SDNY ordered a sweeping grand jury investigation into abuse and corruption among bankruptcy practitioners which evolved quickly into a general public inquiry that led to indictments of attorneys and laid the grounds for impeachment of a federal judge.

9.   More recently, Former Attorney General Ashcroft was quoted by Francis C. P. Knize in his testimony to the judicial conference in 2007:

*"Bankruptcy court corruption is not just a matter of bankruptcy trustees in collusion with corrupt bankruptcy judges. The corruption is supported, and justice hindered by high ranking officials in the United States Trustee Program.  The corruption has advanced to punishing any and all who mention the criminal acts of trustees and organized crime operating through the United States Bankruptcy Courts.  As though greed is not enough, the trustees, in collusion with others, intentionally go forth to destroy lives. Exemptions provided by law are denied debtors.  Cases are intentionally, and unreasonably kept open for years.  Parties in cases are sanctioned to discourage them from pursuing justice.  Contempt of court powers are misused to coerce litigants into agreeing with extortion demands. This does not ensure integrity and restore public confidence. The American public, victimized and held hostage by bankruptcy court corruption, have nowhere to turn."—**Former Attorney General Ashcroft**[1]*

---

[1] Public comment on RULES GOVERNING JUDICIAL CONDUCT AND DISABILITY PROCEEDINGS UNDERTAKEN PURSUANT TO 28 U.S.C. §§ 351-364. Presented Pursuant [FR Doc. E7-14268 Filed 7-20-07; 8:45 am] BILLING CODE 2210-55-P DEPARTMENT OF

10.  Currently, the conduct of Defendants and their counsel in the instant case is exactly the same conduct that Congress was targeting in their revision of bankruptcy laws and should be the same conduct that this Court must hold Defendants accountable for.

## IV.  CONCLUSION

11.  Accordingly, Balwara respectfully requests that this Court (i) grant the Motion for Leave and permit Shaheen and Balwara to file Motion for Sanctions & Disqualification of K&K as Defendants Counsel in this matter, which is attached in the interest of efficiency along with true and original copies of Balwara's communication with K&K and McKinsey as Exhibits A – O, and (ii) grant such other relief as the Court may deem just and appropriate.

Dated this 16th day of January, 2024.

Respectfully submitted,

*/s/ Baraa Salem Shaheen*
Founder & Managing Partner
**BALWARA LLC**
P.O. Box 194443
San Francisco, CA 94119
(415) 943 - 4346
baraa.shaheen@balwara.com

---

JUSTICE United States Parole Commission Public Announcement, Pursuant to the Government in the Sunshine Act (Pub. L. 94-409) [5 U.S.C. Section552b].See,https://www.uscourts.gov/sites/default/files/knize_0.pdf#:~:text=Our%20own%20former%20U.S.%20Attorney,branch%20as%20%22organized%20crime%22.&text=with%20corrupt%20bankruptcy%20judges.,the%20United%20States%20Trustee%20Program.

**EXHIBIT A**

 **Enron Mail**

[                    ] [ Search ]

From:    **sherri.sera@enron.com**
To:      **bill_meehan@mckinsey.com**
Subject: **RE: Jeff Skilling for TPG CEO Conference**
Cc:
Bcc:
Date:    Tue, 20 Feb 2001 09:27:00 -0800 (PST)


Bill, many thanks for the invitation to speak at the the conference outlined
below. Believe it or not, I'm already committed to be out of the country on
the dates of the conference, so I'll have to decline. I do appreciate the
offer, though.

It was nice hearing from you. Take care, Jeff



<Bill_Meehan@mckinsey.com< on 02/20/2001 01:02:54 PM
To: jskilli@enron.com
cc:

Subject: RE: Jeff Skilling for TPG CEO Conference


Jeff, next October 23, 24, 25 in Laguna Niguel, Texas Pacific is hosting
their annual portfolio company CEO conference (about 50 CEO;s in
attendance). TPG ( a client of mine), you may know, is a premier private
equity investor--known best perhaps for Continental Airlines or if you ride
motorcycles Ducati,. $10billion in funds investment and good guys, you may
have met Jim Coulter, or David Bonderman or Bill Price, the senior
partners. They love to have you as their keynote speaker and I think it
would be worth your while. Let me know if it works or whether I can
connect you up with them directly. I hope all is going well and
congratulations on your formal recognition as CEO.. Cheers Bill P.S. Steve
Ballmer mentioned to me a couple of weeks ago that his meeting with you
last year was "one of the most influential he's had"
----- Forwarded by Bill Meehan/SFO/NorthAmerica/MCKINSEY on 02/20/2001
10:53 AM -----

"Boyce, Dick"

<dboyce@texpa To: "'Bill_Meehan@mckinsey.com'"
c.com< <Bill_Meehan@mckinsey.com<,
02/17/2001 Gary_Pinkus@mckinsey.com
08:48 PM cc: "Boyce, Dick"
<dboyce@texpac.com<
Subject: RE: Jeff Skilling for
TPG CEO
Conference

thx for the effort here

10/23 dinner, 10/24 all day, 10/25 am
at ritz carlton, laguna nigel, near Newport Beach

-----Original Message-----
From: Bill_Meehan@mckinsey.com [mailto:Bill_Meehan@mckinsey.com]
Sent: Saturday, February 17, 2001 4:09 PM
To: Gary_Pinkus@mckinsey.com
Cc: dboyce@texpac.com
Subject: Re: Jeff Skilling for TPG CEO Conference

I'm happy to call Jeff he and I arranged a mutually beneficial meeting last
year with a client CEO. As always, who knows and the date ane place always
matter--Dick date and place?

Gary Pinkus

02/17/2001 To: Bill

12:36 PM
Meehan/SFO/NorthAmerica/MCKINSEY@MCKINSEY
cc: dboyce@texpac.com

Subject: Jeff Skilling for TPG
CEO Conference

Bill --

As we discussed by voicemail, it would be great if you could connect with Jeff Skilling to see if he would be interested in speaking at the TPG CEO conference on the topic of Growth. Kristina sent over to Dick a copy of our growth pamphlet, which he may also wish to use at the conference. Enron is featured prominently in the pamphlet as a great example of a growth story.

By way of background for Jeff, TPG has combined funds of well over $10 billion under management including its most recent $4.5 billion fund. Their investments are loosely split between telecom, high tech, Europe and all other. They also have partial interests in a number of specialty funds including Newbridge (Asia and Latin American), Aqua (water-related investments), Colony (real estate), Gryphon (early stage, growth) and a number of others including newly created venture and crossover funds. There will be over 50 CEOs at their conference, including Continental Airlines, America West, Del Monte, Beringer, Ducati, Bally, and a host of others.

I can't remember the exact date for the conference, but I think Dick mentioned the fall time frame.

Please let me/Dick know if Jeff would be interested in speaking with Dick further.

_____

Gary S Pinkus
W 415 954-5227
F 415 675-4997
Right-fax: 415 318-4656
_____

```
+----------------------------------------------------------+
| This message may contain confidential and/or privileged |
| information. If you are not the addressee or authorized to |
| receive this for the addressee, you must not use, copy, |
| disclose or take any action based on this message or any |
| information herein. If you have received this message in |
| error, please advise the sender immediately by reply e-mail |
| and delete this message. Thank you for your cooperation. |
+----------------------------------------------------------+
```

```
+-----------------------------------------------------------+
| This message may contain confidential and/or privileged |
| information. If you are not the addressee or authorized to |
| receive this for the addressee, you must not use, copy, |
| disclose or take any action based on this message or any |
| information herein. If you have received this message in |
| error, please advise the sender immediately by reply e-mail |
| and delete this message. Thank you for your cooperation. |
+-----------------------------------------------------------+
```

**EXHIBIT B**

Sunday, January 14, 2024 at 08:46:23 Pacific Standard Time

**Subject:** Re: News
**Date:** Thursday, June 4, 2015 at 2:56:41 AM Pacific Daylight Time
**From:** Baraa Shaheen <baraa.shaheen@balwara.com>
**To:** Abdulrahman Hammad <ahammad@balwara.com>

Also what was shocking to me is that SunEdison made a very mysterious move last year and wiped out many emails by reducing the allowed storage space on the exchange servers. In a discussion with Al Dahya during a meeting at his office in Istanbul, who is the executive in charge of the downstream for MENA, he told me that the Compnay elected this action to avoid the requirement to comply with court request or subpoena to hand over emails.

Best,

Baraa

KSA mobile: +966556011146
USA mobile: 415-568-6805

On Jun 4, 2015, at 12:50 PM, Baraa Shaheen <baraa.shaheen@balwara.com> wrote:

Interesting and thanks for sharing. SunEdison has been hiring a lot of people from competitors recently, namely:

- Archie Flores, formerly with REC where he was leading their strategy efforts and now is working for SUNEDISON as Director of Strategy and Business Development for Solar Materials Division.

- SunEdison also hired the CTO of GCL.

It's also worth mentioning that the Chairman of SunEdison was previously the CFO of SunPower.


Best,

Baraa

KSA mobile: +966556011146
USA mobile: 415-568-6805

On Jun 4, 2015, at 11:18 AM, Abdulrahman Hammad <ahammad@balwara.com> wrote:

I read this blip in the news today.

**1 of 2**



# INVOICE

Invoice # 1
Date: 26/03/2016
Due On: 25/04/2016

## SME Law

Boulevard Plaza, Tower 2, Level 23
Dubai
United Arab Emirates

Balwara LLC

## 00001-Balwara LLC

## 10515-012-002 - SunEdison - General Advisory

| Type | Date | Description | Quantity | Rate | Total |
|------|------|-------------|----------|------|-------|
| Service | 07/01/2016 | HMCo - 01178 - Rasha Zuhair Abunijem - Financial Satatements on SMP | 3.00 | SAR1,080.00 | SAR3,240.00 |
| Service | 08/01/2016 | Draft a response to SunEdison re termination of CCSA | 0.75 | SAR1,080.00 | SAR810.00 |
| Service | 10/01/2016 | Attend to various correspondence w/ SunEdison | 0.25 | SAR1,080.00 | SAR270.00 |
| Service | 12/01/2016 | HMCo - 01178 - Rasha Zuhair Abunijem - Financial Statements of SMP | 3.00 | SAR1,080.00 | SAR3,240.00 |
| Service | 12/01/2016 | HMCo - 02009 - Abdul Rahman M. Hammad - Attention to call with K&K. Attention to termination K&K briefing. Attention to Client correspondence. | 1.75 | SAR1,080.00 | SAR1,890.00 |
| Service | 14/01/2016 | HMCo - 02009 - Abdul Rahman M. Hammad - Attention to K&K Briefing. Attention to client correspondence. Send briefing and RFQ to K&K. | 1.50 | SAR1,080.00 | SAR1,620.00 |
| Service | 19/01/2016 | HMCo - 02009 - Abdul Rahman M. Hammad - Attend call with client re assessment of SE contract | 0.25 | SAR1,080.00 | SAR270.00 |
| Service | 20/01/2016 | HMCo - 02009 - Abdul Rahman M. Hammad - Attention to SunEdison correspondence re office lease | 0.75 | SAR1,080.00 | SAR810.00 |
| Service | 27/01/2016 | HMCo - 01178 - Rasha Zuhair Abunijem - Drafting Memo - Financial Statements | 2.50 | SAR1,080.00 | SAR2,700.00 |

| Service | 28/01/2016 | HMCo - 02009 - Abdul Rahman M. Hammad - Attend call with client re assessment of SE contract | 0.25 | SAR1,080.00 | SAR270.00 |

| | |
|---|---|
| **Total** | **SAR15,120.00** |
| **Payment (26/03/2016)** | **-SAR15,120.00** |
| **Balance Owing** | **SAR0.00** |

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|---|---|---|---|---|
| 1 | 25/04/2016 | SAR15,120.00 | SAR15,120.00 | SAR0.00 |

Please make all amounts payable to: SME Law

Please pay within 30 days.

**EXHIBIT C**

**Tuesday, January 9, 2024 at 09:11:15 Pacific Standard Time**

| | |
|---|---|
| **Subject:** | Balwara - SE Contract - Fee Proposal |
| **Date:** | Saturday, January 16, 2016 at 12:58:30 AM Pacific Standard Time |
| **From:** | Abdulrahman Hammad <A.Hammad@smelaw.com> |
| **To:** | Brian Murphy <brian.murphy@kobrekim.com>, Jonathan D. Cogan <Jonathan.Cogan@kobrekim.com> |
| **CC:** | Baraa Shaheen <baraa.shaheen@balwara.com> |
| **Attachments:** | 1D1DD4B9-0739-407C-AC3E-365C3CFB2238[44].png, B SE CS&AA EV Partially Signed.pdf, B SE CS&AA v13 BLW.docx, 2015-11-27 - BLW Termination Letter v.1 .docx, 2015-11-30 - SE Termination Letter.pdf, 2015-12-16 - SE Response Letter.pdf, 2015-12-xx - BLW Response Letter.docx, B-SE CS&AA EV.docx, B-SE CS&AA Executed.pdf, B SE RELEASE AND SETTLEMENT AGREEMENT EV Signed.pdf, B SE RELEASE AND SETTLEMENT AGREEMENT v6 SE.docx |

Dear Jonathan, dear Brian,

Many thanks for your time Tuesday.

As discussed, please find attached scans of the first Consulting Services and Agency Agreement (CS&AA), the Release and Settlement Agreement, and the second Consulting Services and Agency Agreement, along with the MS Word last or execution versions for search convenience. Also attached are some recent correspondence between SE and Balwara with respect to the termination of the second CS&AA (the draft letters are assumed sent as drafted).

Balwara would like to receive a fee proposal for advice with respect to the following questions:

- Whether and on what basis in light of the documents and the outline of the factual scenario forwarded Balwara would be entitled to claim to recover its foregone $1.2m in fees from SE.
  - Kindly provide input with respect to a fraudulent inducement theory.
  - Kindly provide input with respect to Balwara's damages entitlement potential with respect to the various recovery theories.
  - Kindly advise on the nature of evidence Balwara will need to marshal with relation thereto.
- If the Release and Settlement Agreement is set aside, whether Balwara's entitlement to the extended Success Fee Protection Period under the second CS&AA would be impacted.
- Whether Balwara would be entitled to compensation where Balwara had procured transactions pursuant to the CS&Aas but SE failed to consummate such transaction due reasons other than financial feasibility and profitability of the transactions.
  - Kindly provide input with respect to the thresholds of transaction availability, if any.
- Whether Balwara is entitled to participate as a witness in the various law suits filed against SE, and the extent to which it may disclose information obtained during (but not necessarily from) its engagement with SE.
- Whether the no-competition restrictions set out in the Contract (Section 8.6) is likely to reach restricting Balwara from leading an acquisition of SE assets where the investors are likely to include some of the parties Balwara worked to develop transactions for SE with pursuant to its mandate under the CS&Aas.

We request that you budget for a draft memo, a call to discuss the draft with Balwara, then a revision for a final memo. Kindly include the time frame to produce the draft memo.

# KOBRE & KIM LLP

800 THIRD AVENUE
NEW YORK, NEW YORK 10022
WWW.KOBREKIM.COM

TEL +1 212 488 1200
FAX +1 212 488 1220

NEW YORK
LONDON
HONG KONG
SEOUL
WASHINGTON DC
SAN FRANCISCO
MIAMI
CAYMAN ISLANDS
BVI

January 27, 2016

**BY EMAIL**

Baraa Shaheen
Balwara LLC

Re:    **Balwara LLC Representation**

Dear Mr. Shaheen:

We understand that Balwara LLC ("you" or "Client") has chosen Kobre & Kim LLP ("Kobre & Kim" or the "Firm") to represent and advise it in connection with this matter.[1]  This letter confirms our mutual understanding as to the scope and terms of this engagement.

*Scope and Terms of this Engagement*

Kobre & Kim is acting as counsel to Client in preparing a memorandum to respond to questions raised in Abdulrahman Hammad's email to Jonathan Cogan and Brian Murphy dated January 16, 2016 and conducting an in-person or telephone meeting with Client to discuss the same (the "Covered Services"). We are not being retained for any other purpose.[2]

---

[1] "Kobre & Kim LLP" herein refers to Kobre & Kim LLP, a New York limited liability partnership practicing law from offices at 800 Third Avenue, New York, New York, U.S.A. and other locations.  As needed, Kobre & Kim LLP expects to draw upon the services of other affiliated entities, including but not limited to Kobre & Kim (UK) LLP, a limited liability partnership organized under the laws of England and Wales, operating from offices at Tower 42, 25 Old Broad Street, London EC2N 1HQ, United Kingdom.  The Client is entering into an engagement and attorney-client relationship only with Kobre & Kim LLP; however, the Client by entering into this agreement consents to Kobre & Kim LLP performing its services by drawing upon other Kobre & Kim LLP-affiliated entities.

[2] In this regard, Kobre & Kim is not acting in any other role or for any other party than what is stated above.  For example, Kobre & Kim is not acting as counsel related to disclosure, compliance, employment, insurance coverage, or bankruptcy matters unless specifically agreed to herein.  To the extent that matters related to such or other matters beyond the scope of the engagement set forth in this letter arise in the course of our work, it is not intended that any opinions expressed by Kobre & Kim are for the purpose of providing independent legal advice.  To that end, it is expected and agreed upon that Client will obtain formal advice from another law firm without relying on our opinions.  Obviously, in its role as counsel for this matter, Kobre & Kim relies upon the veracity of information provided to it by Client.  In addition, the mere fact that we are counsel of record on a particular court case does not

Baraa Shaheen
January 27, 2016
Page 2

Client has also informed us that we may rely on instructions from any of the following persons without the need for approval from any other representative of the Client: Baraa Shaheen and Abdulrahman Hammad.

We have reviewed our records in accordance with our customary procedures to prevent conflicts of interest and on the basis of this review we are not aware of any other representation which would preclude us from undertaking this engagement or adversely affect our ability to complete it.

Kobre & Kim represents and in the future will represent many other clients. Some may be direct competitors of Client or otherwise may have business interests that are contrary to Client's interests.  It is even possible that, during the time we are working for you, an existing or future client may seek to engage us in connection with an actual or potential transaction or pending or potential litigation or other dispute resolution proceeding in which such client's interests are or potentially may become adverse to your interests.

Kobre & Kim cannot enter into this engagement if it could interfere with our ability to represent existing or future clients who develop relationships or interests adverse to Client.  We therefore ask Client to confirm that Kobre & Kim may continue to represent or may undertake in the future to represent any existing or future client in any matter even if the interests of that client in that other matter are directly adverse to Kobre & Kim's representation of Client, as long as that other matter is not substantially related to this or our other engagements on behalf of Client.

In other words, we request that Client confirm that no engagement that we have undertaken or may undertake on behalf of Client will be asserted by Client either as a conflict of interest with respect to, or as a basis to preclude, challenge or otherwise disqualify Kobre & Kim from, any current or future representation of any client in any matter, including litigation adverse to Client, as long as that other matter is not substantially related to any of our engagements on behalf of Client.

*Billing Matters*

<u>Fees</u>

In this engagement, we have agreed that the Firm will forego hourly billing and that you will pay a flat fee of US $15,000 for the Covered Services (the "Flat Fee").  Please note that our engagement responsibilities will commence only upon the receipt of the agreed-upon fee. Disbursements are not covered in the Flat Fee.

Our hourly equivalent fees for this engagement will be based upon the hourly billing rates assigned to the individuals performing the services. Our US lawyers charge US $650 to US $975

---

mean we are acting for the client on matters generally relating to the subject matter of the case. We note that where required by law, under certain limited circumstances we may be obliged to disclose information that Client provides, including evidence.

Baraa Shaheen
January 27, 2016
Page 3

per hour.  Our non-lawyer professionals charge US $195 to US $485 per hour.  Client and Kobre & Kim agree that if (1) the hourly equivalent fees exceed $15,000; (2) Client is satisfied with our work; and (3) Client chooses to engage us in projects beyond the Covered Services, Client may, in its sole discretion, pay the difference between the Flat Fee and the hourly equivalent fees.

Under any circumstances, in addition to the terms set forth below under the "Termination" section which explains that either Client or we can terminate this engagement for any reasons consistent with the rules of professional responsibility, Client specifically agrees that we may withdraw from representing Client in this matter at our discretion if Client fails to, pay our invoices when due, or otherwise to cooperate in our efforts to represent your interests.

If any items in this engagement letter do not comport with Client's understanding of the payment arrangements, please let us know in writing upon receipt of this letter.

Disbursements

In this engagement, in lieu of routine disbursements (such as regular on-line legal research fees, court testimony transcription program usage fees, international and domestic long-distance telecommunications fees, late night work expenses, routine duplication, and other items typically customarily charged as disbursements by other law firms), Client and Kobre & Kim agree that such disbursements shall not be charged, and an administrative fee of 2% of the invoice is agreed upon, to include all such routine disbursements.  Please note that extraordinary disbursements, such as expert witness fees, court filing fees, large amounts of duplication, court reporter fees, special database usage in electronic research services, travel expenses and the like will be invoiced separately and in addition to the routine administrative services fee.

Client will advance funds for any fees and expenses associated with the retention of outside experts throughout the course of the representation which fees shall be considered in addition to and separate and apart from the fee arrangements contained herein.  Furthermore, Client will be responsible for any fees incurred in connection with arbitrations which require payment of a user fee.

Terms of Payment

Our invoices are due upon receipt.

Payment may be paid either by delivering a check to our offices in New York (Kobre & Kim LLP, 800 Third Avenue, New York, New York 10022) payable to the order of "Kobre & Kim LLP" or by wire transfer or EFT to the coordinates on our invoices.  All amounts due to us will be paid in United States dollars, free and clear of all local taxes including any withholding or similar tax.

By signing this letter, Client is acknowledging that it is obligated to pay our fees and other charges.  The issue of payments or reimbursements from insurance carriers or other third

Baraa Shaheen
January 27, 2016
Page 4

parties is a matter solely between Client and such third party and in no way affects Client's obligation to pay our charges when due, in accordance with the terms of this engagement letter. Kobre & Kim is neither responsible for the reporting of this matter to any and all insurance companies nor for the submission of its invoices. However, upon request, Kobre & Kim will submit invoices to insurance companies as a courtesy. To the extent that, as part of this courtesy, we interface with insurance companies regarding coverage issues, Client understands that we are not acting as coverage counsel. To the extent that Client requires an attorney specialized in coverage issues, such does not fall within the terms and scope of this engagement.

*Miscellaneous*

Termination

Client may terminate this engagement, and we may terminate this engagement, at any time for any reason by written notice, subject on our part to applicable rules of professional responsibility. Unless previously terminated, this engagement will terminate upon our sending Client our final statement for services rendered. If, upon such termination, Client wishes to have documents returned, please advise us. For various reasons, including the minimization of unnecessary storage expenses, we reserve the right to destroy or otherwise dispose of any documents retained by us.

Indemnity

Client will indemnify and hold harmless Kobre & Kim and its partners, affiliates, principals, associates and employees (collectively, the "Indemnified Person") from and against any claims, damages, liabilities, losses or costs, from third parties, arising from, concerning, in connection with, or relating to this engagement and will advance and reimburse each Indemnified Person for all expenses (including fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, or defending any action, claim, suit, investigation or proceeding related to, arising out of, or in connection with the engagement whether or not pending or threatened and whether or not any Indemnified Person is a party.

Privilege

We believe it is in the interest of our clients that the Firm has the protection of the privilege in connection with internal reviews of its work for them. Client agrees that any communications between our lawyers and staff working on their matter and the lawyer at the firm who may be reviewing that work for compliance with professional conduct rules will be protected by the Firm's own attorney-client privilege and that any such review will not constitute a conflict between our interests and those of Client.

Baraa Shaheen
January 27, 2016
Page 5

The terms of this engagement letter are confidential and will not, except as required by law, be disclosed by Client or us to any third party without the consent of the other.  Where the fact of our representation of Client is a matter of public record, we agree that Client or Kobre & Kim shall be permitted to inform third parties of the representation.

File Retention

Unless otherwise required by applicable law or rules, Kobre & Kim reserves in its absolute discretion the right to retain or destroy documents once a matter has concluded.

Arbitration

Any dispute, controversy, difference or claim arising out of or relating to this agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Arbitration Rights

If a dispute arises between us with respect to our fees, Client may have a right to have such a dispute arbitrated pursuant to Part 137 of the Rules of the Chief Administrator of the Courts of the State of New York, provided that, among other things, the amount in dispute is not greater than US $50,000.  Please note that this is not an arbitration clause but rather a court-mandated notice about the availability of optional arbitration.

Choice of Law

This Agreement and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of New York, United States of America, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of New York.

\*                                    \*                                    \*

[THE REST OF THIS PAGE LEFT INTENTIONALLY BLANK]

Baraa Shaheen
January 27, 2016
Page 6


       If you wish to discuss any of the foregoing terms of engagement, please contact me in writing upon receipt of this letter.  Otherwise, we will proceed with our engagement on the terms set forth above.  Please sign below to acknowledge your receipt of this letter and return the same to us.  Please note that our engagement responsibilities formally commence only upon receipt of the agreed-upon fee.  We look forward to working with you.


                            Very truly yours,


                            KOBRE & KIM LLP


_____
Baraa Shaheen, Authorized to Enter into an Agreement on behalf of Balwara LLC

# KOBRE & KIM LLP

800 THIRD AVENUE
NEW YORK, NEW YORK 10022
WWW.KOBREKIM.COM

TEL +1 212 488 1200
FAX +1 212 488 1220

NEW YORK
LONDON
HONG KONG
SEOUL
WASHINGTON DC
SAN FRANCISCO
MIAMI
CAYMAN ISLANDS
BVI

February 10, 2016

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**DRAFT**

Abdulrahman Hammad
Managing Partner
SME Law Ltd.
Boulevard Plaza Tower 2; Level 23
Mohammed Bin Rashid Boulevard
Dubai, United Arab Emirates

**Re:    Balwara – SunEdison Contract Dispute**

This memorandum addresses the questions set forth in your e-mail dated January 16, 2016 concerning Balwara LLC's ("Balwara") commercial dealings with SunEdison, Inc. and certain subsidiaries and affiliates (together, "SunEdison").  We look forward to discussing any comments or questions you may have.

*Executive Summary*

Based on our review of the facts and documents provided, we think Balwara would be best served by focusing its time and efforts on (1) developing as strong a record as possible that SunEdison did not properly terminate the Second Consulting Services & Agency Agreement, dated September 1, 2015 ("Second CSAA"), "for cause"; and (2) subject to further factual and legal development, potentially commencing an arbitration in New York seeking a ruling that the termination "for cause" was not valid. The absence of such a ruling creates risk that SunEdison will take the position that the "for cause" termination was valid and that, therefore, Balwara is not entitled to a success fee under the Second CSAA.

On the other hand, based on the materials provided, we think it likely would <u>not</u> be a good allocation of Balwara's resources to try to invalidate the Settlement and Release Agreement, dated September 1, 2015 ("SRA") by advancing a fraudulent inducement claim.  To be sure, there may be potential grounds for such a claim if

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**DRAFT**

SunEdison made specific representations to Balwara that it knew to be false at the time and upon which Balwara reasonably relied when it entered into the SRA.  However, New York law presents a steep bar to recovery on a fraudulent inducement theory— particularly when the claim is based on a promise of future business opportunities, as we understand to be the case here.

We have likewise sought to answer the questions you raised as to the operation of the various underlying agreements.  In sum, we think Balwara would have a good argument that the Success Fee Protection Period would still apply even if the SRA is invalidated.  We also think that Balwara likely would have good arguments that the No Competition provisions in the agreements should not bar it from leading an acquisition of certain SunEdison assets, although more information would be helpful to make a complete assessment.  On the other hand, we do not think that Balwara would have a high likelihood of success on a claim that SunEdison improperly passed over other business opportunities identified by Balwara, due in large part to the very permissive language in the contract.  We also suggest that Balwara keep in mind the fairly strict confidentiality / disclosure requirements in the agreements if Balwara were considering volunteering any arguably confidential information to third parties.

## I.      Viability of Recovery of Fees Due Under the Consulting Services & Agency Agreement, Dated May 3, 2013 (the "CSAA").

Based on the facts presented, there appears to be a small likelihood of recovery of approximately $1.2 million in fees due under the CSAA that Balwara forewent by entering into the SRA.  Although Balwara could attempt to set the SRA aside on the theory that SunEdison fraudulently induced Balwara into entering into it, New York law presents significant obstacles to prevailing on such a theory.[1]

### A.  Relevant Background Facts and Assumptions

The facts and assumptions set forth in this memorandum are based on our review of the materials provided, as well as our January 12, 2016 telephone conference.  If any of the facts or assumptions are incorrect, please let us know.

The CSAA provides that Balwara is entitled to certain fees for providing "market intelligence, research, business development, and advisory services" to SunEdison. (CSAA § 2.1.)   Under the SRA, Balwara received $750,000 in consideration for providing SunEdison a release "in connection with all matters relating to the payment of the Fixed Fee, the Transaction Fee, the Licensing Fee, and the No Competition Fee set out in the [CSAA]."  The SRA was predicated on Balwara and SunEdison entering into a new consulting agreement within seven days of the SRA's execution.  Balwara and SunEdison accordingly entered into a Second CSAA on September 1, 2015.   We understand that, by entering into the SRA, Balwara agreed to forgo approximately $1.2 million in fees that would have been due to it under the CSAA.

---

[1] We assume New York law applies for purposes of this memo.  (*See* CSAA §10.1.)

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**DRAFT**

We understand based on our discussions and the materials provided that SunEdison may have made certain statements or promises that induced Balwara to terminate the CSAA and enter into the SRA. Specifically, as we understand it, Balwara entered into the SRA based on SunEdison's statements that Balwara and SunEdison would have further, potentially lucrative, business dealings that would be governed by the Second CSAA. Within a few months of entering into the Second CSAA, however, SunEdison informed Balwara that it was terminating the Second CSAA "for cause"—the validity of which Balwara disputes.

    B.   <mark>May Balwara recover its foregone $1.2 million in fees from SunEdison under a fraudulent inducement theory?</mark>

Theoretically, if (1) SunEdison made specific representations of fact to Balwara that it knew to be false at the time it made them; and (2) Balwara reasonably relied on those specific misrepresentations when it entered into the SRA, it might be possible to prevail on a fraudulent inducement theory. If such specific statements were made, we should discuss them when we meet to discuss this memorandum. As set forth below, however, New York law presents significant obstacles to recovery on a fraudulent inducement theory and, for that reason, our preliminary assessment is that Balwara likely should not devote significant resources towards pressing such a claim.

To maintain a cause of action for fraudulent inducement of contract under New York law, Balwara must show the existence of "a material representation, known to be false, made with the intention of inducing reliance, upon which [it] actually relie[d], consequentially sustaining a detriment". *Frank Crystal & Co., Inc. v Dillmann*, 84 A.D.3d 704, 704 (1st Dep't 2011) (citing *Merrill Lynch, Pierce, Fenner Smith, Inc. v Wise Metals Group, LLC*, 19 A.D.3d 273, 275 (1st Dep't 2005)); *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 348 (1999). The threshold to prevail on a fraudulent inducement claim is steep. As New York's Court of Appeals has cautioned, "[a] practice may carry the capacity to mislead or deceive a reasonable person but not be fraudulent." *Gaidon*, 94 N.Y.2d at 348. Moreover, "[g]eneral allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support the claim." *New York University v. Continental Ins. Co.*, 87 N.Y.2d 308, 318 (1995).

Courts have often dismissed cases based on the promise of future business as nonactionable statements that do not rise to a fraud claim. *See Int'l Fin. Corp. v. Carrera Holdings Inc.*, 82 A.D.3d 641, 641-42 (1st Dep't 2011) ("[T]he purportedly fraudulent statements amounted to little more than expressions of hope and opinion, and related to future expectations, and hence cannot constitute actionable fraud); *see also Laduzinski v. Alvarez & Marsal Taxand LLC*, 132 A.D.3d 164, 168 (1st Dep't 2015) (One "cannot state a fraudulent inducement claim on the basis of … any representations of future intentions as to the duration or security of his employment").

Moreover, under New York law, "[f]raud . . . has generally been defined by behavior involving intentional, false representations and other connotations of scienter

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**DRAFT**

such as willfulness, knowledge, design and bad faith." *Gaidon*, 94 N.Y.2d at 348. Courts have likewise dismissed cases at later stages due to insufficient evidence, particularly of scienter. *See, e.g.*, *Frank Crystal*, 84 A.D.3d at 705 (granting summary judgment for defendants where there was no "evidence that [plaintiff] intentionally misrepresented that fact, or that she never intended to try to achieve the projections in her proposed business plan.")

### i.   Potential Damages / Remedy

Under the law of fraudulent inducement, a "contract induced by fraud . . . is subject to rescission, rendering it unenforceable by the culpable party." *Merrill Lynch*, 19 A.D.3d at 275. Thus, if the SRA were voided, Balwara would have a colorable argument that it would be entitled to recover all fees due under the CSAA, at least up to the date it was terminated. In addition, a fraudulent inducement plaintiff may alternatively bring an action for damages. *See J.P. Morgan Sec. Inc. v. Ader*, 127 A.D.3d 506, 508 (1st Dep't 2015) ("[A] party alleging fraudulent inducement that elects to bring an action for damages, as opposed to opting for rescission may, under certain circumstances, still challenge the validity of the agreement"). Note that if Balwara succeeded in getting the SRA invalidated, it would likely need to return the $750,000 payment that it received as part of the settlement.

## II.   Viability of Recovery of Fees Under the Second CSAA

### A.   If the Release and Settlement Agreement is set aside, whether Balwara's entitlement to the extended Success Fee Protection Period under the second CSAA would be impacted.

The threshold question is whether rescission of the SRA would, by operation of contract or law, invalidate the Second CSAA. The terms of the SRA itself would not support this argument. Nor do we believe that a reviewing arbitration panel ("panel") would find the Second CSAA invalidated.[2]

*First,* the recitals of the SRA state that the SunEdison submitted "notice of termination" to Balwara, and that the parties mutually "agreed to terminate the Consulting Agreement." (SRA at 1.) Assuming that is correct, absent some showing that SunEdison did not validly terminate the CSAA, it is likely that a panel would view the CSAA as being validly terminated by SunEdison. There is thus little chance, in our opinion, that a panel would find *both* the CSAA and the Second CSAA were operative and a panel would have to parse out which provisions of which agreement control. *Second*, as noted above, there are no contractual provisions, in either the SRA or the Second CSAA, that condition the existence of the Second CSAA on the continued

---

[2] The Second CSAA provides that "any dispute, controversy, or claim arising out of or relating to this Agreement, or the formation, breach, termination or invalidity thereof, shall be settled by submission to final, binding, and non-appealable arbitration . . . in accordance with the Rules of Arbitration of the International Chamber of Commerce (the 'ICC')." (Second CSAA § 10.2.) The location shall be New York.

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**DRAFT**

validity of the SRA.  As such, we think it likely that a panel would view (i) the termination of the CSAA, (ii) the execution of the Second CSAA, and (iii) the execution of the SRA as independent events.[3]  In other words, while the validity of the SRA was conditioned upon the parties executing the Second CSAA, it is not the case that the second CSAA was conditioned upon the execution of the SRA.  If the SRA were to be invalidated, we think the best reading of the contracts is that the Second CSAA should remain in effect.

      B.   <u>Is Balwara otherwise at risk of losing the benefit of the extended Success Fee Protection Period?</u>

Based on our review of the contracts and related correspondence provided,[4] we believe that SunEdison may argue that it properly terminated the Second CSAA "for cause."  If a panel were to find that the Second CSAA was properly terminated "for cause", then such a finding would impact Balwara's ability to invoke the Success Fee Protection Period in that agreement.

Under the terms of the Second CSAA, if SunEdison terminates the agreement "for cause", the Success Fee Protection Period shall *not* apply.  (Second CSAA § 8.3.)  As we understand it, SunEdison alleges that it provided notice to Balwara on November 30, 2015 that it was "formally terminating the Consulting Agreement effective February 1, 2016." (11/30/2016 Letter at 1.)  Although the letter from SunEdison is cryptic, it states that "[a]s we mutually agreed, this termination is for cause (for the reasons you and I discussed) pursuant to the Agreement". (*Id.*)  The Second CSAA provides for a sixty (60) day cure period once notice is provided.  If SunEdison's "notice" of November 30, 2015 were deemed valid by a panel, there is a colorable argument that SunEdison validly terminated the agreement for cause on February 1, 2016.  In that case, there is risk that a panel would find that the Success Fee Protection Period does not apply.

We understand, of course, that Balwara challenges that SunEdison issued a proper Default Notice.  We also note that Balwara informed SunEdison that it was terminating the Second CSAA for convenience reasons, although the date of that notice is not clear to us.[5]  Based on our preliminary assessment of the situation, we think that this issue is likely the most important legal question to arise out of the transaction with SunEdison, particularly if SunEdison does enter into an agreement with a counterparty introduced by Balwara that would trigger the Success Fee Protection Period and SunEdison seeks to renege on its obligations.  Accordingly, we would like to gather additional facts concerning the purported termination for cause.  In particular, it would be helpful to know:

---

[3] This interpretation is further supported by the recitals in the Second CSAA, which stated that "SunEd LLC and [Balwara] agreed to terminate the [CSAA]" as an independent "WHEREAS" clause.  (Second CSAA at 3.)
[4] NOTE:  We have seen reference to a letter from Balwara dated 11/27/2014, but we have not seen such a document in the materials provided.
[5] For instance, SunEdison references a letter from Balwara on November 27, 2015, but we have not received such letter from Balwara.

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT

(i)     the stated reasons why SunEdison sought to terminate the contract;

(ii)    the basis for their statement that the parties mutually agreed to such termination;

(iii)   further detail about the timing and circumstances of Balwara's termination for convenience;

(iv)    more information about potential business opportunities that Balwara brought to SunEdison that might have served as motivation for SunEdison's decision to terminate "for cause;"

(v)     if there were any discussions between the parties about Balwara curing the alleged deficiency that led to the termination, including if there was further correspondence on the subject;

(vi)    if SunEdison ever provided written notice of the termination after February 1, the date after which the purported cure period expired.

## III.   Questions Pertaining to Certain Provisions in the Second CSAA

A.   <u>Whether Balwara would be entitled to compensation where Balwara had procured transactions pursuant to the CS&AAs but SE failed to consummate such transactions due to reasons other than financial feasibility and profitability of the transactions.</u>

The terms of the Second CSAA provide that Balwara will be entitled to the success fee only if a deal is "successfully negotiated and executed by [SunEdison]." (Second CSAA § 4.3(c).)  The language of the Second CSAA gives SunEdison wide latitude to enter into (or not enter into) transactions with counterparties identified by Balwara, and it does not put any conditions or restrictions on SunEdison's ability to decline to enter into such deals.  Under New York law, courts will typically not read terms into contracts that do not exist.

In light of the foregoing, we believe that an attempt to recover on this theory would face significant challenges.  That said, under New York law, "implicit in every contract is a covenant of good faith and fair dealing." *New York University,* 87 N.Y.2d at 318.  Cases construing the covenant of good faith and fair dealing have explained that even when a contract gives one party sole discretion to do (or not do) something, that discretion generally needs to be exercised in good faith.  Thus, if there are specific facts of which you are aware that lead you to believe that SunEdison failed to consummate a transaction for the purpose of frustrating Balwara's rights under the contract or for some other improper purpose, we should discuss this issue further.

**PRIVILEGED & CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**
**DRAFT**

  B. <mark>Whether Balwara is entitled to participate as a witness in the various law suits filed against SE</mark>, and the extent to which it may disclose information obtained during (but not necessarily from) its engagement with SE

  Both the CSAA and Second CSAA have strong confidentiality provisions. The confidentiality provisions of the Second CSAA (which are substantively identical to those in the CSAA) provide that:

> The Parties shall not, at any time during or after the term of this Agreement, in any manner, either directly or indirectly, divulge, disclose, or communicate to any person, firm, corporation or other entity, or use for its own benefit or for the benefit of any person, firm, corporation or other entity, any information of the other Party that is (a) marked as confidential, or (b) **is confidential in nature** (collectively, the "Party Confidential Information") without the express prior written consent of the disclosing Party. (Second CSAA § 7.4(a) (emphasis added).)

  The Second CSAA further provides that the confidentiality provisions *do not* apply to the following categories of information:

- Information that Balwara had in its possession prior to SunEdison providing it. (*Id*. at § 7.4(b)(i).)

- Information that was "**developed in the course of work entirely independent of any disclosure made hereunder or the subject matter of this Agreement**". (*Id*. (emphasis added).)

- Information that is or becomes part of the public domain. (*Id*. at § 7.4(b)(ii).)

- Information that "is or becomes available to [Balwara] from a source which has no obligation to the other Party in respect thereof". (*Id*. at § 7.4(b)(iii).)

- Information that is required to be disclosed by subpoena, law, or other directive by a court, administrative agency, or arbitration panel. (*Id*. at § 7.4(b)(iv).)

  If Balwara is considering voluntarily disclosing information, it would be important to know more facts about where and how Balwara obtained the information in order to assess whether that particular information is likely to be considered protected by these confidentiality provisions.

**<u>PRIVILEGED & CONFIDENTIAL</u>**
**<u>ATTORNEY WORK PRODUCT</u>**
**<u>DRAFT</u>**

    C.   <mark>Whether the no-competition restrictions set out in the Contract (Section 8.6) is likely to reach restricting Balwara from leading an acquisition of SunEdison assets where the investors are likely to include some of the parties Balwara worked to develop transactions for SE with pursuant to its mandate under the CS&AAs.</mark>

As a threshold matter, the No Competition provisions only apply if SunEdison (i) timely pays the $600,000 No Competition Fee[6] *or* (ii) if SunEdison validly terminates the Second CSAA "for cause". (*Id*. at § 8.7.)  If SunEdison does not pay the fee and/or if it is not deemed to have terminated the agreement "for cause", the No Competition provisions would not apply to Balwara.

Assuming, however, that Balwara is bound by No Competition provisions in § 8.6, Balwara would be restricted from engaging in certain activities pursuant to the terms language:

> "[Balwara] shall not compete with [Sun Edison] in the Territory with relation to developing business and sales potential in the same sectors and subsectors as the Client and form competing or similar products and services as the Client."

The provisions of the Second CSAA would not, on their face, appear to prevent Balwara from leading an acquisition of SunEdison assets, although more information (such as whether Balwara itself was an investor or just a facilitator) would be needed to assess the likelihood that SunEdison would take a contrary view.  If SunEdison is *willingly* selling certain of its assets to investors, it would likely have difficulty arguing that it was "compet[ing]" with Balwara with regards to those assets.  Moreover, Balwara would potentially have an argument that SunEdison had waived its No Competition rights under the Second CSAA by willingly selling its assets, even if such sale would enable Balwara (or investors affiliated with Balwara) to "develop[] business and sales potential in the same sectors [as SunEdison]."  The degree of transparency in the deal (i.e., is SunEdison aware of Balwara's involvement) may be an important factor in this analysis.

> Jonathan D. Cogan
> Michael A. Sanfilippo
> + 1 212 488 1200

---

[6] Assuming the Second CSAA is deemed terminated by Balwara effective February 1, 2016, SunEdison will have thirty days from that date to pay the No Competition Fee.  (Second CSAA § 8.7.)

**EXHIBIT D**



# INVOICE

Invoice # 46
Date: 30/03/2016
Due On: 29/05/2016

## SME Law

Boulevard Plaza, Tower 2, Level 23
Dubai
United Arab Emirates

Balwara LLC

## 00002-Balwara LLC

## 10515-012-001 - General Advisory

| Type | Date | Notes | Quantity | Rate | Total |
|------|------|-------|----------|------|-------|
| Service | 29/02/2016 | HMco - 02009 - Abdul Rahman M. Hammad - Suhaib - discussion of Sun Edison bribery issue | 0.25 | SAR1,080.00 | SAR270.00 |
| Service | 29/02/2016 | HMCo - 01112 - Suhaib Hammad - AMH - discussion of Sun Edison bribery issue | 0.25 | SAR1,080.00 | SAR270.00 |

|  |  |  |  | **Total** | **SAR540.00** |
|--|--|--|--|-----------|---------------|

## Detailed Statement of Account

### Current Invoice

| Invoice Number | Due On | Amount Due | Payments Received | Balance Due |
|----------------|--------|------------|-------------------|-------------|
| 46 | 29/05/2016 | SAR540.00 | SAR0.00 | SAR540.00 |
|  |  |  | **Outstanding Balance** | **SAR540.00** |
|  |  |  | **Total Amount Outstanding** | **SAR540.00** |

Please make all amounts payable to: SME Law

Please pay within 60 days.

Sunday, January 14, 2024 at 09:31:34 Pacific Standard Time

**Subject:** RE: Balwara - Questions re SunEdison Payments 2016-02-29
**Date:** Sunday, March 6, 2016 at 3:34:46AM Pacific Standard Time
**From:** Abdulrahman Hammad <A.Hammad@smelaw.com>
**To:** Baraa Shaheen <baraa.shaheen@balwara.com>
**CC:** Hala Bakhsh <hala.bakhsh@hmco.com.sa>
**Attachments:** image002.png, image003.png, 2016-03-06 - Questions Regarding the SE Payments v.3 HB.docx

Dear Baraa,

Please find attached our filtration of the information provided. As you will note, there are certain missing items. Would you like to schedule a call to provide us with the information?

Best regards,



Abdulrahman Hammad
Managing Partner

T: + 971 (0) 4 409 6829
M: + 971 (0) 50 818 4489
E: A.Hammad@SMELaw.com

www.SMELaw.com

Boulevard Plaza Tower 2; Level 23
Mohammed Bin Rashid Boulevard
Dubai, United Arab Emirates

---

**From:** Abdulrahman Hammad
**Sent:** Thursday, March 3, 2016 2:14 PM
**To:** 'Baraa Shaheen' <baraa.shaheen@balwara.com>
**Cc:** 'Hala Bakhsh' <hala.bakhsh@hmco.com.sa>
**Subject:** RE: Balwara - Questions re SunEdison Payments 2016-02-29

Many thanks for this Baraa,

It is a good start. We will organize this information into tables, filter some of it, and send that to you see whether you wish to add further input.

Best regards,

Abdulrahman Hammad
Managing Partner

T: + 971 (0) 4 409 6829
M: + 971 (0) 50 818 4489
E: A.Hammad@SMELaw.com

www.SMELaw.com

Boulevard Plaza Tower 2; Level 23
Mohammed Bin Rashid Boulevard
Dubai, United Arab Emirates

---

**From:** Baraa Shaheen [mailto:baraa.shaheen@balwara.com]
**Sent:** Wednesday, March 2, 2016 7:05 PM
**To:** Abdulrahman Hammad <A.Hammad@smelaw.com>
**Subject:** <no subject>

Updated

SME Law Ltd.
Boulevard Plaza Tower 2; Level 23
Mohammed Bin Rashid Boulevard; Downtown
Dubai, UAE

+971 (0)4 409 6829
www.smelaw.com

This email and it's attachments are the confidential property of SME Law Ltd., and are legally privileged. If you received this message in error (not the intended recipient), destroy the message and all it's attachments. Do not retain, distribute, disclosing or use any information contained herein.

Please consider our planet before you print this. Save paper!

### Questions regarding the Payment to SE executives matter:

**Q1: Please list each incident where money was paid to a SE person**

Please state the name, amount, approximate date, and reason for payment

| No. | Date of Payment | Payee Name and Position | Amount Paid | Location of Payment | Reason |
|---|---|---|---|---|---|
| 1 | | Shihab Kuran, President – Advanced Solutions | $10.000 | Riyadh, Ritz-Carlton Hotel | |
| 2 | July, 2013 | Shihab Kuran, President – Advanced Solutions and Jinan Qutub | $ 10.000 | New York City | |
| 3 | | Shihab Kuran, President – Advanced Solutions | | Riyadh | |
| 4 | December, 2014 | Shihab Kuran, President – Advanced Solutions | | Riyadh | |
| 5 | | Shihab Kuran, President – Advanced Solutions | | Dubai | |
| 6 | | Ahmed Chatila, President and CEO of SunEdison | $ 1,500 | | To cover his companionship/ entertainment. BOA Check 3546 dated 2/2/14 |
| 7 | February 21, 2015 | Ahmed Chatila, President and CEO of SunEdison | GBP 1,000 | London, Four Seasons Hotel | |
| 8 | | Karen Durso | Flight expenses that should be reimburse by SunEdison | | A.Chatila upgraded her return flight using his (reg flyer. LAX to East cost. |

Mr. Shihab Kuran, President- Advanced Solutions, SunEdison (February 27, 2013 – September 2014) and Mrs. Jinan Qutub of 507 Cardinal Lane, Greenbrook, NJ, 08812, USA.

1. Riyadh, Ritz-Carlton Hotel. $10,000.  I believe Hisham Othman, who is also a contractor for SE implicitly knew that there is an arrangement.  I asked Shihab to sign a document for receiving the funds but he was not willing to indicate any name or amount on the log I intend to keep.

2. On July 2013 in DC, Shihab drives to the nearest branch so that I can withdraw cash from the Citi bank branch in metropolitan DC area.  lunch time. Shihab waits in the car before drive to NYC.

3. Saturday before lunch where Jinan came from NJ by train with the Kids (Nora, Rayan, and Dani) Cash withdrawal from Citi bank, Madison where Shihab gave her the cash $10,000

**Baraa Shaheen**

| | |
|---|---|
| **From:** | AutoNotification@concursolutions.com |
| **Sent:** | Friday, October 10, 2014 7:34 PM |
| **To:** | Baraa Shaheen |
| **Subject:** | Report: Employee Information |
| **Attachments:** | Employee Information - 1 page per employee.pdf |

## Employee Validation Report

Hello,

Concur requires a large amount of master data to continue to work properly.  If any of this data becomes out of date/incorrect, errors can occur and unauthorized transactions can be processed.  To minimize issues, you will be asked to validate your master data periodically.

Below is an extract of your master data.  Please take a minute and notify the administrators of any incorrect information.  For updates to employees in the US, please contact Donna McAllister and for updates to employees in the Asia or South Africa regions, please contact Ritesh Rawal.

The Concur Team

| | |
|---|---|
| **Employee Name** | Shaheen, Albaraa Salem |
| **Email Address** | bshaheen@sunedison.com |
| **Manager** | Chatila, Ahmad Ramadan |
| **Company** | 021 SunEdison Inc |
| **Cost Center/Department** | 1211001 - Administration CEO |
| **Expense Group** | MEMC |
| **Role** | Expense User |
| **Authorized Approver Type** | |
| **Expense Report Approval Limit** | |
| **Limit Currency** | |

1

**EXHIBIT E**

Sunday, January 14, 2024 at 09:12:08 Pacific Standard Time

**Subject:** RE: SUNE: SunEdison receives subpoena from DOJ over alleged employee wrongdoing, other financing issues
**Date:** Monday, April 4, 2016 at 12:40:39 PM Pacific Daylight Time
**From:** Jonathan D. Cogan <Jonathan.Cogan@kobrekim.com>
**To:** 'Baraa Shaheen' <baraa.shaheen@balwara.com>

We do not have a conflict with those entities.

Jonathan D. Cogan
+1 212 488 1206

**KOBRE & KIM LLP**
www.kobrekim.com

New York | London | Hong Kong | Seoul | Washington DC | San Francisco | Miami | Cayman
Islands | BVI

**From:** Baraa Shaheen [mailto:baraa.shaheen@balwara.com]
**Sent:** Thursday, March 31, 2016 6:15 PM
**To:** Jonathan D. Cogan
**Subject:** Fwd: SUNE: SunEdison receives subpoena from DOJ over alleged employee wrongdoing, other financing issues

Hi Jon

I want to call you for a brief discussion about the latest legal developments re SUNEDISON Group.  I'll send a document but it's still in draft format in separate email but I ask that you to look through the board/governance analysis section.

But before I send, can you please confirm any conflict(s) with the following entities:
- TPG Capital
- Blackstone Group
- DE Shaw
- Altai Capital Management
- Goldman Sachs
- Deutsche Bank

Please let me know when is good to call.

Thanks again,

Baraa

Sent from my iPhone

**1 of 3**

**EXHIBIT F**

**Balwara, LLC**
101 California Street
Suite 2710
San Francisco, CA, 94111



**PRIVLEGED & CONFIDENTIAL**
**MEMORANDOM**


Date:        4/8/2016


To:        **Mr. Abdulrahman Hammad,** Managing Partner, SME Law

           **Mr. Jonathan Cogan**, Partner, Kobre & Kim LLP


**Subject: Analysis of SunEdison**

Dear Sirs,

Based on careful consideration, research, review and independent analysis and conclusions, we have strong reason to believe, beyond reasonable doubt, that the Executive Management and SunEdison Group ("Collectively meaning SunEdison, Inc., TerraForm Power, TerraForm Global and all affiliates").   SunEdison Executive Management and Board of Directors have strong reason to believe that SunEdison violated SEC regulations with respect to the TerraForm IPO and has intentionally and knowingly engaged in capital market manipulation and other forms of misconduct that may have caused or will cause sustainable injury to investors and to the integrity of the US capital markets.


**The Theory:**

- TPG acquired MEMC (now SunEdison) with the objective of syphoning the cash balance which it reported that it made ~$2.5 billion profit from the transaction.  This was mainly executed by John Marren, TPG Capital Technology Chief and Partner from 2000 through May 2015. Marren was Chairman of MEMC from November 2001 through December 31, 2012. Please note the period Marren steps down as Technology Chief coincides with peak stock price levels of $30/share and about 60-days ahead of the nose dive to todays price of $0.363/share  http://www.reuters.com/article/tpg-technology-idUSL8N0XO55G20150512
- MEMC changes name to SunEdison as part of a "face-lift" strategy.  TPG capital executed similar strategy in 2004 changing its legal name from Texas Pacific Group
- Board willful breach of oversight and fiduciary responsibilities
- Executive misconduct and abuse of executive authority
- Cherry-picking disclosures related to directors and executives conflict of interest
  - Steven Tesoriere, Altai Capital
  -

**EXHIBIT G**



# SunEdison®

# Report to the Audit Committee of the Board of Directors

March 31, 2016

*ATTORNEY-CLIENT PRIVILEGED;*
*ATTORNEY WORK PRODUCT*
*Do Not Redistribute*

PAUL HASTINGS

SUNEMDL-INDDEFS_00014422

CONFIDENTIAL