# Former Puerto Rico bankruptcy attorney sues bankruptcy firms for illegal activities

By Robert Slavin                                    February 27, 2020, 3:38 p.m. EST

    

A former Puerto Rico bankruptcy attorney has sued a large number of the most prominent Puerto Rico bankruptcy law firms for allegedly engaging in illegal activities, advancing their own financial interests over those of their clients.

Former Paul Hastings attorney Andrew Hennigan filed the 850-page complaint (part 1, part 2) in the U.S. District Court for the Central District of California on Feb. 18. The court entered the document into its system Monday.



**Puerto Rico Oversight Board Attorney Martin Bienenstock was one of the attorneys sued for alleged illegal activities in a California federal court.**

Hennigan sued over 160 parties including consultant to the Puerto Rico Oversight Board, McKinsey & Co., board law firm Proskauer Rose, Puerto Rico Fiscal Agency and Financial Advisory Authority law firm O'Melveny & Myers, Unsecured Creditors Committee law firm Paul Hastings, law firm to the Ad Hoc Group of COFINA Seniors Quinn Emanuel, and law firm to OppenheimerFunds and Franklin Mutual Kramer Levin. He also sued Greenberg Traurig, Jones Day, Norton Rose Fulbright, Rothschild & Co., Ernst & Young, KPMG, Citigroup, Bank of America Merrill Lynch, Deutsche Bank, Barclays, Goldman Sachs, BlackRock, and Proskauer Rose and

board attorney Martin Bienenstock.

Hennigan filed the case under the Racketeer Influenced and Corrupt Organizations Act. He alleged that the defendants conducted a criminal operation as an in-fact "hub and spoke" enterprise. In a hub and spoke enterprise a central firm at the hub is the mastermind and various other entities or people collaborate with it in advancing illegal operations.

According to Hennigan, from 2001 to the present, McKinsey has been the hub enterprise. Paul Hastings Partner Luc Despins and McKinsey & Co. didn't immediately respond to requests for comment for this story. Despins leads Paul Hastings work for the Unsecured Creditors Committee in the Puerto Rico bankruptcy.

"Co-conspirator law firms entered into an unlawful agreement to fix legal outcomes in Puerto Rico's bankruptcy, and committed acts in the performance of said unlawful agreement, in order to enrich members of the Hub-and-Spoke Enterprise," Hennigan said.

He continued, "The unlawful scheme to fix legal outcomes has three main facets: (1) The sharing of work product, i.e., inside information, among the law firm conspirators even when each represent separate clients with adverse interests to one another; (2) Knowingly and intentionally weakening legal arguments that favor their respective clients in order to give an exaggerated impression of 'litigation risk'; and (3) the settlement of claims before the legal merits of the dispute can be adjudicated in public court."

Hennigan's suit extends to alleged illegal practices of others besides Puerto Rico bankruptcy firms. According to him, between 2014 and the present, defendants intentionally made false and materially misleading statements to the United States executive and judicial branch officials. McKinsey filed "false and materially misleading affidavits and declarations under oath in the Title III and Title VI" Puerto Rico bankruptcies.

The participants in the conspiracy "entered into an unlawful agreement to not seriously

challenge, if at all, the false representations made by other co-conspirators," Hennigan said.

Hennigan said that Paul Hastings terminated him because he operated in a moral and ethical fashion and that the illegal "hub-and-spoke enterprise" retaliated against him because he threatened it.

Hennigan said there have been six interlocking conspiracies since 2001. First, to commit fraud on the judicial branch through filing false declarations, deliberate misrepresentations of law, and omissions of controlling authority. Second, to defraud the United States government through misappropriating federal funds allocated for drinking water programs for Puerto Ricans. Third, to commit bank fraud through misappropriation of deposit accounts held by the Government Development Bank for Puerto Rico.

Fourth, to price-fix restructuring professional fees in restraint of trade. Fifth, to commit securities fraud on innocent bondholders through a Ponzi scheme using Puerto Rico bonds. Sixth and finally, to engage in a cover-up by disseminating disinformation and injuring witnesses capable of exposing conspiracies one through five.

**Robert Slavin** Caribbean Reporter



REPRINT

For reprint and licensing requests for this article, click here.

Puerto Rico    Commonwealth of Puerto Rico    Lawsuits

McKinsey & Company    Paul Hastings



KOBRE & KIM | DISPUTES AND INVESTIGATIONS

# The Financial Oversight & Management Board for Puerto Rico

## Independent Investigator

## FINAL INVESTIGATIVE REPORT

Kobre & Kim LLP  |  AUGUST 20, 2018

# THE INDEPENDENT INVESTIGATOR'S

# FINAL INVESTIGATIVE REPORT

# THE FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO

## SPECIAL INVESTIGATION COMMITTEE

## INDEPENDENT INVESTIGATOR'S

## FINAL INVESTIGATIVE REPORT

\*

### SUBMITTED BY:

**THE FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO**

**SPECIAL INVESTIGATIVE COMMITTEE**

**INDEPENDENT INVESTIGATOR**

**KOBRE & KIM LLP**

Pursuant to The Puerto Rico Oversight, Management and Economic Stability Act of 2016, Sections 101(b), 104(o) and PROMESA Investigative Procedures Sections 1.3(10), 2.1(b)(1), 3.1(a).

# CONTENTS

Financial Oversight & Management Board for Puerto Rico…………………………………iv

Executive Summary……………………………………….......................1
Part I:        Procedural Background……………………………………………15
Part II:       Historical Background……………………………………………..31
Part III:      Bond Issuance Process…………………………………………….51
Part IV:       GDB………………………………………………………………70
Part V:        Puerto Rico's Public Utilities……………………………………111
Part VI:       COFINA………………………………………………………….156
Part VII:      ERS………………………………………………………………195
Part VIII:     Puerto Rico's Budgeting, External Reporting, and Accounting Functions….219
Part IX:       Calculation of the Constitutional Debt Limit……………………….252
Part X:        Credit Rating Agencies…………………………………………….268
Part XI:       Selling Practices for Puerto Rico-Related Bonds…………………..334
Part XII:      Puerto Rico's Government Ethics Framework……………………..394
Part XIII:     Issuers' Use of Interest Rate Swaps ………………………………...412
Part XIV:      Puerto Rico's Lack of a Clear Mechanism for Validating Puerto Rico-Related
               Bonds Before They Issue………………………………………………446
Part XV:       The Possession Tax Credit…………………………………………465
Part XVI:      Independent Investigator's Overview of Potential Causes of Action………..475
Part XVII:     Public Comments………………………………………………….572
Appendix A:    Defined Terms…………………………..…………………………..A
Appendix B:    PREPA Analysis……………………………………………………B

**EXHIBIT H**

Sunday, January 14, 2024 at 09:13:48 Pacific Standard Time

| | |
|---|---|
| **Subject:** | RE: SUNE: SunEdison receives subpoena from DOJ over alleged employee wrongdoing, other financing issues |
| **Date:** | Thursday, May 5, 2016 at 2:26:10 PM Pacific Daylight Time |
| **From:** | Jonathan D. Cogan <Jonathan.Cogan@kobrekim.com> |
| **To:** | 'Baraa Shaheen' <baraa.shaheen@balwara.com> |
| **Attachments:** | image001.jpg, image002.png, image003.png, image004.png, image005.png, image006.gif, 2016 05 05 Kobre & Kim Disengagement Letter.pdf |

Hi Baraa –

I hope all is well with you.  I assume that, in light of recent developments with SunEdison, you have decided not to proceed with engaging us to further assist you.  Per our standard procedures, I am attaching for your records a letter concerning the closing of our engagement with you.  If, in the future, you would like to explore engaging us again, we would be very happy to discuss.

Best regards,

Jon



Jonathan D. Cogan
+1 212 488 1206

**KOBRE & KIM LLP**
www.kobrekim.com

New York  |  London  |  Hong Kong  |  Seoul  |  Washington DC  |  San Francisco  |  Miami  |  Cayman Islands  |  BVI

**From:** Baraa Shaheen [mailto:baraa.shaheen@balwara.com]
**Sent:** Tuesday, April 05, 2016 4:12 PM
**To:** Jonathan D. Cogan
**Subject:** Re: SUNE: SunEdison receives subpoena from DOJ over alleged employee wrongdoing, other financing issues

Hi Jon,

Thanks for your confirmation.  I apologize for my slow reply. I'm simply overwhelmed with the series of events that are unfolding each day.  I will send across the draft early morning your time.


Best,

Baraa

Sent from my iPhone

**1 of 3**

# KOBRE & KIM LLP

800 THIRD AVENUE
NEW YORK, NEW YORK 10022
WWW.KOBREKIM.COM

TEL +1 212 488 1200
FAX +1 212 488 1220

NEW YORK
LONDON
HONG KONG
SEOUL
WASHINGTON DC
SAN FRANCISCO
MIAMI
CAYMAN ISLANDS
BVI

May 5, 2016

**BY EMAIL**

Baraa Shaheen
Balwara LLC

Re:    **Balwara LLC Representation**
       Reference No. 01096.001

Dear Mr. Shaheen:

As per our standard procedures, this letter is to inform you that as of February 11, 2016 we have completed our services in this engagement and have closed our files. If the matter appears to require our services in the future, we would be very pleased to discuss working together again. Please let me know upon receipt of this letter if there is anything else we can do for you or if you wish any materials sent to you. We reserve the right to destroy those aspects of the client file permissible under the relevant laws and professional rules.

Thank you for the opportunity to work on this matter.

Sincerely,

Jonathan D. Cogan
+1 212 488 1206

**EXHIBIT I**

| | |
|---|---|
| **Subject:** | RE: SunEdison Bankruptcy - Submission of Claim |
| **Date:** | Tuesday, May 17, 2016 at 10:47:33 AM Pacific Daylight Time |
| **From:** | Abdulrahman Hammad <A.Hammad@smelaw.com> |
| **To:** | Baraa Shaheen <baraa.shaheen@balwara.com>, Baraa Shaheen <albaraa.shaheen@gmail.com> |
| **CC:** | Hala Bakhsh <hala.bakhsh@hmco.com.sa> |
| **Attachments:** | image004.png, image003.png |

Dear Baraa,

I hope this finds you well.

Naturally it is our pleasure to be of service.

We have enrolled for updates to the case docket, and will in-turn keep you appraised of matters requiring your attention.

We also note that the list of claims has grown significantly since our email on the 11th. As it stands, 174 claims against SunEdison group have been filed, with a significant majority being against SunEdison, Inc. itself. While the timing of claim submission does not determine priority, we strongly recommend submission at the soonest. We await your instructions in that regard.

Best,

**SMELAW**
مستشارو المشاريع الصغيرة

Abdulrahman Hammad
Managing Partner

T: + 971 (0) 4 409 6829
M: + 971 (0) 50 818 4489
E: A.Hammad@SMELAw.com

www.SMELaw.com

Boulevard Plaza Tower 2; Level 23
Mohammed Bin Rashid Boulevard
Dubai, United Arab Emirates

---

**From:** Baraa Shaheen [mailto:baraa.shaheen@balwara.com]
**Sent:** Thursday, 12 May, 2016 2:34 PM
**To:** Abdulrahman Hammad <A.Hammad@smelaw.com>; Baraa Shaheen <albaraa.shaheen@gmail.com>
**Cc:** Hala Bakhsh <hala.bakhsh@hmco.com.sa>
**Subject:** Re: SunEdison Bankruptcy - Submission of Claim

Dear Abdulrahman,

Thanks for your prompt and detailed reply and initial for providing a high-level assessment and highlighting key concerns relating to understanding the submission of claims under the bankruptcy proceedings of SunEdison.

As usual, we will need your assistance, support and valued advice to help navigate and successfully claim all amounts owed to Balwara.

We will share with you today the outstanding invoices so that we may agree on the best path forward.  We would also appreciate it if you can keep us appraised of any updates related to this case and needed advise on how to proceed.

Best,

Baraa

---

**From:** Abdulrahman Hammad <A.Hammad@smelaw.com>
**Date:** Wednesday, May 11, 2016 at 6:41 PM
**To:** Baraa Shaheen <albaraa.shaheen@gmail.com>, Baraa Shaheen <baraa.shaheen@balwara.com>
**Cc:** Hala Bakhsh <hala.bakhsh@hmco.com.sa>
**Subject:** SunEdison Bankruptcy - Submission of Claim

Dear Baraa,

I hope this finds you well.

At your request, we reviewed SunEdison, Inc.'s (as Debtor) Amended Motion for Order Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 1015, 2002, 9007, and 9036 and Local Bankruptcy Rule 2002 Authorizing the Establishment of Certain Notice, Case Management, and Administrative Procedures [Docket No. 120] (the "*Motion*").

The deadline to file responses or objections to the Motion is 4:00pm Eastern Time 12 May 2016 (tomorrow).

Our review of the Motion shows that the Motion is to organize the notice and bankruptcy case procedures, mostly allowing for electronic notice provisions and case management through a web-based system provided by **Prime Clerk**, rather than notifying, serving, and taking up procedures manually with every single party related to the bankruptcy case, which, at the very least, will include all suppliers and to creditors of the SunEdison group of Companies.

The use of a web-based system in managing notices and service in large cases such as this one is common, and Prime Clerk is published to be approved by the United States Bankruptcy Courts for the Sothern District of New York and other prominent courts in the US. We are comfortable with the use of Prime Clerk to file and receive

notices and service.

Though we had very limited time to review the full details of the case management procedures proposed through the Motion, we are of the view that to the extent any such procedures were proposed to frustrate creditor (such as Balwara's) claims, they will objected-to by the larger trade and unsecured creditors to SunEdison.

As such, we are not of the view that Balwara's creditor claim is likely to be hindered or frustrated by not filing an objection to the Motion by tomorrow.

Separately, we note to you that Balwara, as a Prepetition creditor (i.e. a creditor who is owed a debt from SunEdison prior to the filing of bankruptcy) must file a proof of claim for its amounts due through a claims processing center. The court has not yet set a deadline for the proof of claim filings, but you should consider that such deadline is likely to be set soon. We stand ready to help you prepare and file the proof of claim necessary to ensure that Balwara's dues from SunEdison are considered in the bankruptcy case.

It is not yet apparent whether the creditor claims will be paid in full or according to a certain timeframe. If you wish, we may remain appraised on your behalf of updates in the case so that we are able to, where appropriate, provide advice to you on how to proceed or act.

We await your confirmation with respect to the above.

Best regards,

SMELAW
مستشارو المشاريع الصغيرة

www.SMELaw.com

Abdulrahman Hammad
Managing Partner

T: + 971 (0) 4 409 6829
M: + 971 (0) 50 818 4489
E: A.Hammad@SMELaw.com

Boulevard Plaza Tower 2; Level 23
Mohammed Bin Rashid Boulevard
Dubai, United Arab Emirates

SME Law Ltd.
Boulevard Plaza Tower 2; Level 23
Mohammed Bin Rashid Boulevard; Downtown
Dubai, UAE

+971 (0)4 409 6829
www.smelaw.com

This email and it's attachments are the confidential property of SME Law Ltd., and are legally privileged. If you received this message in error (not the intended recipient), destroy the message and all it's attachments. Do not retain, distribute, disclosing or use any information contained herein.

Please consider our planet before you print this. Save paper.

SME Law Ltd.
Boulevard Plaza Tower 2; Level 23
Mohammed Bin Rashid Boulevard; Downtown
Dubai, UAE

+971 (0)4 409 6829
www.smelaw.com

This email and it's attachments are the confidential property of SME Law Ltd., and are legally privileged. If you received this message in error (not the intended recipient), destroy the message and all it's attachments. Do not retain, distribute, disclosing or use any information contained herein.

Please consider our planet before you print this. Save paper.

**EXHIBIT J**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------X
                                    :

| | | |
|---|---|---|
| In re: | : | Case No. 16-10992 (SMB) |
| | : | |
| SUNEDISON, INC. *et al.*[1] | : | Chapter 11 |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------X

### MEMORANDUM DECISION AND ORDER DENYING MOTIONS SUBMITTED BY STEPHEN MILLER

**A P P E A R A N C E S :**

STEPHEN A. MILLER
83 WALDORF AVENUE
Bridgeport, Connecticut 06605

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      *Pro se* shareholder Stephen A. Miller has submitted several motions as well as numerous emails seeking, *inter alia,* to inform the Court of the purported fraud underlying the Debtors' insolvency, to demand an investigation and to identify the path to a successful reorganization. (*Motion to Recognize Fraud that Created Bankruptcy,* dated Sept. 19, 2016 ("*Fraud Motion*") (ECF Doc. # 1216); *Motion to Meet in Chambers,*

---

[1]      The Debtors in these chapter 11 cases include SunEdison, Inc.; SunEdison DG, LLC; SUNE Wind Holdings, Inc.; SUNE Hawaii Solar Holdings, LLC; First Wind Solar Portfolio, LLC; First Wind California Holdings, LLC; SunEdison Holdings Corporation; SunEdison Utility Holdings, Inc.; SunEdison International, Inc.; SUNE ML 1, LLC; MEMC Pasadena, Inc.; Solaicx; SunEdison Contracting, LLC; NVT, LLC; NVT Licenses, LLC; Team-Solar, Inc.; SunEdison Canada, LLC; Enflex Corporation; Fotowatio Renewable Ventures, Inc.; Silver Ridge Power Holdings, LLC; SunEdison International, LLC; Sun Edison LLC; SunEdison Products Singapore Pte. Ltd.; SunEdison Residential Services, LLC; PVT Solar, Inc.; SEV Merger Sub Inc.; Sunflower Renewable Holdings 1, LLC; Blue Sky West Capital, LLC; First Wind Oakfield Portfolio, LLC; First Wind Panhandle Holdings III, LLC; DSP Renewables, LLC; Hancock Renewables Holdings, LLC; EverStream Holdco Fund I, LLC; Buckthorn Renewables Holdings, LLC; Greenmountain Wind Holdings, LLC; Rattlesnake Flat Holdings, LLC; Somerset Wind Holdings, LLC; SunE Waiawa Holdings, LLC; SunE MN Development, LLC; SunE MN Development Holdings, LLC; SunE Minnesota Holdings, LLC.  The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

dated Sept. 26, 2016 ("*Conference Motion*") (ECF Doc. # 1266); *Motion to Compel a Plan that Guarntees* [*sic*] *Full and Prompt Payment to the Debtors in Possession*, dated Sept. 29, 2016 ("*Plan Motion*") (ECF Doc. # 1294); *Motion to Give Debtors in Possession a Choice*, filed Sept. 30, 2016 ("*Choice Motion*") (ECF Doc. # 1301); *Motion to Compel Court to Order an Investigation* [*etc.*], dated Oct. 5, 2016 ("*Investigation Motion*") (ECF Doc. #1325); *Motion to Prevent Bidding to Buy the Solar Materials Division*, dated Oct. 5, 2016 ("*Bid Prevention Motion I*") (ECF Doc. # 1337); *Motion to Prevent any Bidding for any Entity or Project to Raise Funds to Pay any Lender Before the Court is Aware of Numerous Criminal Attempts that Has* [*sic*] *Directly Put SunEdison into Bankruptcy and the Failure of the FBI to Respond Appropriately to Criminal Complaints*, dated Oct. 10, 2016 ("*Bid Prevention Motion II*") (ECF Doc. # 1359); and *Motion to Order a Legitimate Criminal Investigation*, filed Oct. 19, 2016 ("*Second Investigation Motion*") (ECF Doc. # 1433), and collectively, the "*Motions*").) For the reasons stated below, the *Motions* are denied.

On April 21, 2016 (the "Petition Date"), SunEdison, Inc. ("SunEdison") and twenty-five affiliates filed chapter 11 petitions.[2] SunEdison is a holding company that, along with approximately two thousand direct and indirect debtor and non-debtor affiliates, is in the business of developing, operating and selling renewable energy projects.

---

[2]        Since then, several other affiliates have commenced chapter 11 cases in this Court (collectively, with the initial twenty-six debtors, the "Debtors").  The current universe of Debtors is identified in footnote 1.

Beginning on May 20, 2016 and continuing over the course of these chapter 11 cases, Miller has submitted nearly two dozen emails to the Court questioning the competence and integrity of the Debtors and their professionals.  (*See, e.g.*, *Letter Re: Concerns Filed by Stephen Miller*, filed May 20, 2016 (ECF Doc. # 355) (threatening to sue Debtors' counsel due to counsel's purported lack of understanding of "the unique features of [SunEdison]"); *Letter Dated 5/21/16 Re: Shareholder Concerns Filed by Stephen Miller*, filed May 23, 2016 ("*May 21 Letter*") (ECF Doc. # 379) (alleging that the Debtors' counsel is engaged in a scheme "intended to destroy the value of [SunEdison] shareholders").)

The various *Motions* have raised the level of accusatory, incendiary language. They criticize former management (*Bid Prevention Motion I* at ¶ 4) (referring to the "flagrant crimes of embezzlement by the management who fleeced the shareholders. Like most criminals this entire group of mismanagement had glaring mental defects"); *Choice Motion* at ¶ 5) (referring to the "psychotic and criminal decisions of the prior management who have been terminated and should be prosecuted"); Debtors' counsel (*Plan Motion* at ¶ 2) (referring to a "glaring mistake by counsel representing the debtors who have victimized the sune shareholders while counsel ignores or covers up fraud that created the bankruptcy"); KPMG (*Investigation Motion* at ¶ 3) (referring to the "criminal acts of KPMG (destroyed the financial records)"); the FBI and/or the SEC (*Fraud Motion* at ¶ 4) ("The FBI and SEC are too incompetent to realize the fraud."); (*Bid Prevention Motion I* at ¶ 5) ("The FBI's inability to discern probable cause of this and other glaring criminal events by Carlos Domenech is glaring incompetence.") and Goldman Sachs (*Investigation Motion* at ¶ 2) (likening Goldman Sachs to a "gang

rapist"). Miller also accuses the prepetition lenders of conspiring with management to make loans the lenders knew management would embezzle and the Debtors could never repay.[3] (*Second Investigation Motion* at ¶¶ 1-2) (referring to an active conspiracy between the lenders and management to bankrupt the shareholders through bogus, criminal loans to support a "massive embezzlement scheme"); (*Bid Prevention Motion II* at ¶ 2) (stating that "the lenders have no legitimate claim on loans made while lenders knew sune could never repay").) Generally, Miller wants to stop sales of the Debtors' assets or distributions to its lenders until an appropriate criminal investigation has been concluded. (*E.g., Investigation Motion* at ¶ 3; *see Bid Prevention Motion II* at ¶ 2.)

The Court declines to stay the proceedings or, to the extent requested, order an investigation into the criminal activity alleged by Miller. The nub of Miller's economic argument is that the Debtors' business is sound and solvent (once the prepetition debt is cancelled based on the lenders' fraud and the insurance underwriters that received premiums to indemnify the Debtors' management and KPMG are required to pay) and should not be sold piecemeal. He also argues in the *Choice Motion* that the Debtors should not be allowed to sell project assets "until financial statements are deemed accurate by the court and the SEC." (*Choice Motion* at ¶ 6.)

The Court previously concluded that the Debtors appeared to be "hopelessly insolvent" when it declined to appoint an official equity committee. *In re SunEdison, Inc.*, 556 B.R. 94 (Bankr. S.D.N.Y. 2016). While the Court did not determine the value of the Debtors' assets, Miller has offered nothing but speculation to contradict the

---

3       Miller does not explain why a lender would make a loan it knew could not be repaid.

Court's conclusion that their assets are worth less than their debts.  Miller remains free to object when the Debtors seek approval of specific transactions, as he has in the past, but he has failed to demonstrate that the debtors' management should be precluded from exercising its business judgment, and if it deems it appropriate, selling assets owned by the Debtors.

Nor has he shown any factual or legal basis for this Court to conduct its own investigation or refer any matter for investigation to the Department of Justice.  The Court is not an investigative body and does not "order" the Department of Justice to investigate anything.  Under 18 U.S.C. § 3057, the Court is required to report to the United States Attorney the details of any violation of title 18, chapter 9 that it has "reasonable grounds for believing" has been committed.  It is then up to the Department of Justice to decide whether an investigation is warranted.

Notwithstanding his inflammatory language, Miller has not offered facts that support a reasonable belief that a bankruptcy crime has occurred or that an investigation is appropriate.  Rather, Miller focuses on two pre-bankruptcy events: the Debtors' failed merger with Vivint and the payments to KPMG whose computer system allegedly obliterated the Debtors' financial records. (*Plan Motion* at ¶ 1.)  The Department of Justice and the SEC are already investigating the failed merger, and Miller has not identified any facts suggesting that KPMG intentionally destroyed the Debtors' records or committed a criminal act related to those records.  Miller is free to deal directly with the Department of Justice if he believes a crime has been committed.

- 5 -

Finally, the Court declines to hold a chambers conference with Miller so he can gauge the Court's agreement to an exit strategy pursuant to which Bank of America will commit to finance the Debtors' emergence from bankruptcy.  The Court does not pre-approve proposed plans.  Miller may discuss his proposed plan with the Debtors and/or anyone else willing to speak with him or propose his own plan once exclusivity terminates.  If he does, the Court will determine whether it can be confirmed under Bankruptcy Code § 1129.

Accordingly, the *Motions* are denied.

So ordered.

Dated: New York, New York
           October 19, 2016

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge

- 6 -

**EXHIBIT K**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **SUNEDISON, INC.,** *et al.*, | : | **Case No. 16-10992 (SMB)** |
|  | : |  |
| Debtors.[1] | : | **(Jointly Administered)** |
|  | : |  |

## DECLARATION AND DISCLOSURE STATEMENT OF MICHAEL S. KIM IN SUPPORT OF APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING RETENTION AND EMPLOYMENT OF KOBRE & KIM LLP AS CONFLICTS COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS *NUNC PRO TUNC* TO SEPTEMBER 15, 2016

Michael S. Kim makes this declaration under 28 U.S.C. § 1746:

1.     I am a member of the firm of Kobre & Kim LLP ("**K&K**" or the "**Firm**"), an international law firm with principal offices at 800 Third Avenue, New York, New York 10022, and other U.S. offices in Washington D.C., San Francisco and Miami, and non-U.S. offices in London, Hong Kong, Seoul, the Cayman Islands and the British Virgin Islands. Kobre & Kim LLP focuses exclusively on disputes and investigations, with an emphasis on matters arising out of insolvencies.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are as follows: SunEdison, Inc. (5767); SunEdison DG, LLC (N/A); SUNE Wind Holdings, Inc. (2144); SUNE Hawaii Solar Holdings, LLC (0994); First Wind Solar Portfolio, LLC (5014); First Wind California Holdings, LLC (7697); SunEdison Holdings Corporation (8669); SunEdison Utility Holdings, Inc. (6443); SunEdison International, Inc. (4551); SUNE ML 1, LLC (3132); MEMC Pasadena, Inc. (5238); Solaicx (1969); SunEdison Contracting, LLC (3819); NVT, LLC (5370); NVT Licenses, LLC (5445); Team-Solar, Inc. (7782); SunEdison Canada, LLC (6287); Enflex Corporation (5515); Fotowatio Renewable Ventures, Inc. (1788); Silver Ridge Power Holdings, LLC (5886); SunEdison International, LLC (1567); Sun Edison LLC (1450); SunEdison Products Singapore Pte. Ltd. (7373); SunEdison Residential Services, LLC (5787); PVT Solar, Inc. (3308); SEV Merger Sub Inc. (N/A); Sunflower Renewable Holdings 1, LLC (6273); Blue Sky West Capital, LLC (7962); First Wind Oakfield Portfolio, LLC (3711); First Wind Panhandle Holdings III, LLC (4238); DSP Renewables, LLC (5513); Hancock Renewables Holdings, LLC (N/A); EverStream HoldCo Fund I, LLC (9564); Buckthorn Renewables Holdings, LLC (7616); Greenmountain Wind Holdings, LLC (N/A); Rattlesnake Flat Holdings, LLC (N/A); Somerset Wind Holdings, LLC (N/A); SunE Waiawa Holdings, LLC (9757); SunE Minnesota Holdings, LLC (8926); SunE MN Development Holdings, LLC (5388); and SunE MN Development, LLC (8669).  The address of the Debtors' corporate headquarters is 13736 Riverport Dr., Maryland Heights, Missouri 63043.

2.      I submit this Declaration in connection with the Application submitted on the date hereof (this "**Application**") of the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") of SunEdison, Inc. and its affiliates that are debtors and debtors in possession in these chapter 11 cases (collectively, the "**Debtors**") for authority to employ and retain K&K as its attorneys in the chapter 11 cases, *nunc pro tunc* to September 15, 2016, at its normal hourly rates in effect from time to time and in accordance with its normal reimbursement policies, in compliance with sections 328 and 1103 of title 11 of the United States Code (the "**Bankruptcy Code**"), and to provide the disclosure required under Rules 2014(a) and 2016(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.  To the extent any information disclosed herein requires amendment or modification upon K&K's completion of further review, or as additional party in interest information becomes available to K&K, a supplemental declaration will be submitted to the Court reflecting such amended or modified information.

### K&K Disclosure Procedures

3.      K&K has a large and diversified litigation practice that encompasses the representation of various clients in numerous disputes and investigations.  K&K has in the past represented, currently represents, and may in the future represent, entities that are claimants or interest holders of the Debtors in matters unrelated to these chapter 11 cases.  Some of those entities are, or may consider themselves to be, creditors or parties in interest in these chapter 11 cases or to otherwise have interests in these cases.

4.      In preparing this Declaration, I used a set of procedures developed by K&K to ensure compliance with the requirements of the Bankruptcy Code, the Bankruptcy

Rules, and the Local Rules regarding the retention of professionals under the Bankruptcy Code
(the "**Firm Disclosure Procedures**").  Pursuant to the Firm Disclosure Procedures, I performed,
or caused to be performed, the following actions to identify the parties relevant to this
Declaration and to ascertain K&K's connection to such parties:

(i)      A comprehensive list of entities who were creditors or parties in interest as of the Petition Date (as supplemented by Weil to include entities on whose behalf a notice of appearance had been filed, as members of the Creditors' Committee and their representative counsel, the Creditors' Committee's professionals, and additional professionals that represent major parties in these cases, the "**Interested Parties**") was obtained from Weil.  A copy of the Interested Parties is attached hereto as **Schedule "1."**

(ii)      K&K maintains a master client database as part of its conflict clearance and billing records.  The master client database includes the names of the entities for which any attorney time charges have been billed since the database was first created (the "**Client Database**").  The Client Database includes the name of each current or former client, the names of the parties who are or were related or adverse to such current or former client, and the names of the K&K personnel who are or were responsible for current or former matters for such client.

(iii)      K&K compared the names of each of the Interested Parties to client matters and recent potential client matters in the Client Database for which professional time was recorded.[2]  Any matches to names in the Client Database generated by the comparison were compiled, together with the names of the respective K&K personnel responsible for the identified client matters (the "**Client Match List**").

(iv)      A K&K employee then reviewed the Client Match List and deleted obvious name coincidences and individuals or entities that were adverse to K&K's clients in both this matter and the matter referenced on the Client Match List.

(v)      Using information in the Client Database concerning entities on the Client Match List and making general and, if applicable,

---

[2] For purposes of the Firm Disclosure Procedures, K&K considers an entity a "former client" if professional time was recorded within the past two years, even if all matters for such client have since been closed.  Because the Firm Disclosure Procedures only reflect client activity during the past two years, matches to client matters outside that timeframe are not reflected in this Declaration.

specific inquires of K&K personnel, K&K verified that it does not represent and has not represented any entity on the Client Match List in connection with the Debtors or these chapter 11 cases except as set forth herein.

(vi)     In addition, a general inquiry to all K&K personnel (attorneys and staff) was sent by electronic mail to determine whether any such individual or any member of his or her household (i) owns any debt or equity securities of the Debtors; (ii) holds a claim against or interest adverse to the Debtors; (iii) is or was an officer, director, or employee of the Debtors; (iv) is related to or has any connections to Bankruptcy Judges in the Southern District of New York; or (v) is related to or has any connections to anyone working in the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**").

**K&K's Connections with Interested Parties**

4.     K&K compiled responses to the foregoing inquiries for the purpose of preparing this Declaration.  Responses to the inquiry described in paragraph 4(vi) above reflect that, as of the Petition Date, no K&K personnel or member of the household of any K&K personnel holds any claims against, stock of, or other interests in the Debtors and that no such individuals held significant employment with the Debtors.[3]

5.     Prior to the Petition Date, attorneys at K&K advised or consulted with certain parties in interest on a formal and informal basis.   In an engagement that is now concluded, K&K was retained by a company to evaluate potential legal claims relating to that company's commercial dealings with SunEdison, Inc. and certain subsidiaries and affiliates.  No action was taken and the matter has been closed.  On a separate occasion, K&K considered representing SunEdison in an investigation in connection with a potential business opportunity being considered by SunEdison.  No time was billed to the potential new matter and we did not

---

[3] Certain K&K personnel or members of the household of K&K personnel may unknowingly hold stock or other interests in the Debtors in blind or discretionary accounts.  In addition, the spouse of an attorney resident in one of K&K's non-US offices was employed by debtor NVT Licenses LLC in the United Kingdom for approximately one year between March 2014 and March 2015.  K&K does not believe this connection creates any conflict of interest, but out of an abundance of caution will not staff that attorney to this engagement.

4

Case 1:18-cv-04141-JMF  Document 287-1  Filed 04/17/24  Page 27 of 32

initiate any engagement.  In addition, K&K considered representing a potential client in

connection with an intellectual property dispute potentially involving SunEdison, Inc.  No action

was taken and we did not initiate any engagement.

### K&K's Connections with Parties in Interest
### In Matters Unrelated to These Chapter 11 Cases

6.    Either I, or an attorney working under my supervision, reviewed the

connections between K&K and the clients identified on the Client Match List, and the

connections between those entities and the Debtors, the Debtors' creditors, and other parties in

interest.  After such review, either I, or an attorney working under my supervision, determined,

in each case, that K&K does not hold or represent an interest that is adverse to the Debtors'

estates and that K&K is a "disinterested person" as such term is defined in section 101(14) of the

Bankruptcy Code, for the reasons discussed below.

7.    K&K previously represented, currently represents, and may represent in

the future the entities described below (or their affiliates) in matters unrelated to the Debtors'

chapter 11 cases.  These disclosures, attached hereto as **Schedule "2,"** are the product of

implementing the Firm Disclosure Procedures.  An entity is listed as a "Current Client" on

Schedule 2 if K&K has any open matters for such entity or a known affiliate of such entity and

attorney time charges have been recorded on any such matters within the past two years.  An

entity is listed as a "Former Client" on Schedule 2 if K&K represented such entity or a known

affiliate of such entity within the past two years based on recorded attorney time charges on a

matter, but all matters for such entity or any known affiliate of such entity have been formally

closed.  K&K has not represented (except as disclosed herein), does not represent, and will not

represent any entities list on Schedule 2 in matters directly related to the Debtors or these chapter

11 cases.  In addition to the above, in K&K's government enforcement defense practice, from

5

time to time our clients in particular matters may have indemnification rights against a current or former employer or company for which they serve as a Director; accordingly, such companies may pay legal fees and expenses to K&K to satisfy their indemnification obligations.  No client relationship is formed thereby between K&K and such institutions, but we note that it is possible that present or future parties in interest in the instant proceedings may, in certain cases, have legal obligations to K&K clients that result in their paying fees and expenses to K&K in their capacity as a third party funder of legal fees and expenses.

8.      To the best of my knowledge and information, the annual fees for each of the last two years paid to K&K by any entity listed on Schedule 2 or its affiliates did not exceed 1% of the Firm's annual gross revenue, except Elliott Management.  This entity and its affiliates did not, however, exceed 4.5% of the Firm's gross revenue over the last 12 months.  K&K has represented and continues to represent Elliott Management in a variety of matters, all of which are unrelated to these chapter 11 cases.

9.      In addition to the foregoing, through diligent inquiry, I have ascertained no connection, as such term is used in section 101(14)(C) of the Bankruptcy Code and Bankruptcy Rule 2014(a), between K&K and (i) the U.S. Trustee or any person employed by the U.S. Trustee, (ii) any attorneys, accountants, or financial consultants in these chapter 11 cases, or (iii) any investment bankers that represent the Debtors, claimants, or other parties in interest in these chapter 11 cases, except as set forth herein.  As part of its practice, K&K appears in cases, proceedings, and transactions involving many different attorneys, accountants, financial consultants, and investment bankers, some of which now, or may in the future, represent claimants and other parties in interest in these cases.  K&K has not represented, and will not represent, any of such parties in relation to these chapter 11 cases.  K&K does not have any

6

relationship with any such attorneys, accountants, financial consultants, or investment bankers that would be adverse to the Debtors' estates.

10.     Additionally, K&K may have represented, and may currently represent, entities that hold, or may in the future hold, certain of the Debtors' debt in beneficial accounts on behalf of unidentified parties. Because distressed debt is actively traded in commercial markets, K&K may be unaware of the actual holder of such debt at any given moment. K&K also represents numerous entities in unrelated matters that may buy and/or sell distressed debt or claims of chapter 11 debtors.

11.     Despite the efforts described herein to identify and disclose K&K's connections with the parties in interest in these chapter 11 cases, because the Debtors have numerous relationships, K&K is unable to state with certainty that every client relationship or other connection has been disclosed. In this regard, K&K will continue to apply the Firm Disclosure Procedures. If any new material, relevant facts, or relationships are discovered or arise, K&K will promptly file a supplemental disclosure with the Court. Furthermore, certain K&K attorneys are contacted from time to time by various entities that buy and/or sell distressed debt to provide restructuring advice and to analyze the capital structure of a distressed company, in either case based on a review of publicly available information. The Firm does not undertake such reviews after it has been engaged to represent a client in connection with a particular chapter 11 case, including the Creditors' Committee.

## K&K is Disinterested

12.     Based on the foregoing, insofar as I have been able to ascertain after diligent inquiry, I believe K&K does not hold or represent an interest adverse to the Debtors'

7

estates in the matters upon which K&K is to be employed, and K&K is "disinterested" as such

term is defined in section 101(14) of the Bankruptcy Code.

### K&K's Rates and Billing Practices

13.    K&K is not a creditor of the Debtors.    K&K intends to charge the

Creditors' Committee for services rendered in these chapter 11 cases at K&K's normal hourly

rates in effect at the time the services are rendered.    K&K's current customary hourly rates,

subject to change from time to time, are US $975 to US $1,200 for partners, US $825 for

principals, US $650 for associates, and US $195 to US $485 for paraprofessionals.    K&K does

not recruit junior lawyers and all of our lawyers come to us after several years of experience at

other law firms or other institutions.

14.    K&K also intends to seek reimbursement for expenses incurred in

connection with its representation of the Creditors' Committee in accordance with K&K's

normal reimbursement policies, subject to any modifications to such policies that K&K may be

required to make to comply with the General Order M-412 (*Order Establishing Procedures for

Monthly Compensation and Reimbursement of Expenses of Professionals*, dated December 21,

2010 (Gonzalez, C.J.)), Administrative Order M-447 (*Amended Guidelines for Fees and

Disbursements for Professionals in Southern District of New York Bankruptcy Cases*, dated

January 29, 2013 (Morris, C.J.)), and the *U.S. Trustee Guidelines for Reviewing Applications for

Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 by Attorneys in

Larger chapter 11 cases*, effective November 1, 2013 (collectively, the "**Fee Guidelines**");

sections 330 and 331 of the Bankruptcy Code; the Bankruptcy Rules; the Local Rules; and the

*Order Granting Debtors' Motion for Order Pursuant to Bankruptcy Code Sections 105(A) and

331, Bankruptcy Rule 2016, and Local Bankruptcy Rule 2016-1 Establishing Procedures for*

*Interim Compensation and Reimbursement of Expenses of Professionals* [ECF No. 258] and any further order of the Court (collectively, the "**Orders**"). K&K's disbursement policies pass through all out-of-pocket expenses at actual cost or an estimated actual cost when the actual cost is difficult to determine. For example, as it relates to computerized research, K&K believes that it does not make a profit on that service as a whole, although the cost of any particular search is difficult to ascertain. Other reimbursable expenses (whether the service is performed by K&K in-house or through a third-party vendor) include, but are not limited to deliveries, court costs, cost of food at meetings, transcript fees, travel, and clerk fees. While K&K normally charges a 2% administrative fee to account for ordinary disbursements that are not itemized, we have voluntarily waived such provision for this case.

15.     No promises have been received by K&K, or any member of, counsel to, or associate of K&K, as to payment or compensation in connection with these chapter 11 cases other than in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Fee Guidelines. Furthermore, K&K has no agreement with any other entity to share compensation received by K&K or by such entity.

16.     The Application requests approval of K&K's retention on rates, terms, and conditions consistent with what K&K charges non-chapter 11 clients, namely, prompt payment of K&K's hourly rates, as adjusted from time to time, and reimbursement of out of pocket disbursements at cost or based on formulas that approximate the actual cost where the actual cost is not easily ascertainable. Subject to these terms and conditions, K&K intends to apply for allowance of compensation for professional services rendered in these chapter 11 cases and for reimbursement of actual and necessary expenses relating thereto in accordance with the

9

applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Fee Guidelines, and the Orders.

**Coordination with Other Professionals**

17.      K&K is aware that the Creditors' Committee has retained, *inter alia,* Weil, Morrison & Foerster LLP as special counsel, Lazard Freres & Co. LLC as investment banker, Alvarez & Marsal North America, LLC, as financial advisors, and Prime Clerk LLC, as noticing and information agent.  K&K intends to work closely with these professionals and to carefully monitor and coordinate the efforts of all professionals retained by the Creditors' Committee in these chapter 11 cases, and the parties will delineate their respective duties so as to prevent duplication of services performed or charged to the Debtors' estates whenever possible. Specifically, K&K is being to retained to prosecute the Creditors' Committee Litigation and will work with Weil to ensure that services performed on behalf of the Creditors' Committee are not unnecessarily duplicated.

**Attorney Statement Pursuant to Fee Guidelines**

18.      The following is provided in response to the request for additional information set forth in Paragraph D.1 of the Fee Guidelines.

**Question**:      Did you agree to any variations from, or alternatives to, your standard or customary billing arrangements for this engagement?

**Response**:      Yes.  We are not charging our customary administrative fee of 2% of the invoice amounts to account for ordinary disbursements.

**Question**:      Do any of the professionals included in this engagement vary their rate based on the geographic location of the bankruptcy case?

**Response**:      No.

**Question**:      If you represented the client in the 12 months prepetition, disclose your billing rates and material financial terms for the prepetition engagement, including any adjustments during the 12 months

10