**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAY ALIX,<br><br>       *Plaintiff*,<br><br>    v.<br><br>MCKINSEY & CO., INC.; MCKINSEY HOLDINGS, INC.; MCKINSEY & COMPANY INC. UNITED STATES; MCKINSEY RECOVERY & TRANSFORMATION SERVICES U.S., LLC; DOMINIC BARTON; KEVIN CARMODY; JON GARCIA; SETH GOLDSTROM; MARK HOJNACKI; VIRGINIA MOLINO; ALISON PROSHAN; ROBERT STERNFELS; and JARED D. YERIAN,<br><br>       *Defendants.* | Case No. 18-cv-04141 (JMF) |

| |
|---|
| SETH GOLDSTROM,<br><br>       *Counterclaim Plaintiff*,<br><br>    v.<br><br>JAY ALIX and ALIXPARTNERS, LLP,<br><br>       *Counterclaim Defendants.* |

| |
|---|
| KEVIN CARMODY,<br><br>       *Counterclaim Plaintiff*,<br><br>    v.<br><br>JAY ALIX and ALIXPARTNERS, LLP,<br><br>       *Counterclaim Defendants*. |

<u>**OPPOSITION TO MOTION TO DISMISS**</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ..........................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

LEGAL STANDARD ...........................................................................................................8

ARGUMENT ........................................................................................................................8

I.    The Court Has Jurisdiction ......................................................................................8

      A.    The Counterclaims Are Compulsory Counterclaims ...................................9

      B.    The Court Has Jurisdiction Even If the Counterclaims Are Permissive ...............12

      C.    The Court Has Diversity Jurisdiction, or Should At Least Order Discovery ........13

II.   Goldstrom's Counterclaim Is Not Barred By the Statute of Limitations ...........................14

III.  Carmody and Goldstrom Have Adequately Pled Defamation Claims............................16

      A.    Alix's Statements Were False ...............................................................17

      B.    Alix's Statements Were Not Privileged ..................................................19

      C.    Alix and AlixPartners Acted With the Required Degree of Fault ......................19

      D.    Alix's Statements Were Defamatory Per Se ...........................................25

      E.    Alix and AlixPartners' Defamatory Statements Cannot Be Dismissed As
            Non-Actionable "Opinions".................................................................25

      F.     Mr. Alix's Statements Are "Of and Concerning" Carmody and Goldstrom ........30

IV.   The Defamatory Statements are Attributable to AlixPartners ...........................................31

CONCLUSION.....................................................................................................................35

# TABLE OF AUTHORITIES

Page

## CASES

*Adams v. Jacobs*,
950 F.2d 89 (2d Cir. 1991)....................................................................................9

*Aleph Towers, LLC v. Ambit Texas, LLC*,
2013 WL 4517278 (E.D.N.Y. Aug. 23, 2013)....................................................14

*Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Publ'g Co.*,
580 F. Supp. 2d 285 (S.D.N.Y. 2008)................................................................23

*Amusement Indus., Inc. v. Stern*,
693 F. Supp. 2d 327 (S.D.N.Y. 2010).........................................................31, 35

*Appletree v. City of Hartford*,
555 F. Supp. 224 (D. Conn. 1983).............................................................10, 11

*Arnold v. Dormire*,
675 F.3d 1082 (8th Cir. 2012) ...........................................................................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................8

*Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*,
554 F.3d 595 (5th Cir. 2009) .............................................................................13

*Camp Summit of Summitville, Inc. v. Visinski*,
2007 WL 1152894 (S.D.N.Y. Apr. 16, 2007).............................................17, 27

*Catzin v. Thank You & Good Luck Corp.*,
899 F.3d 77 (2d Cir. 2018)................................................................................13

*CBS, Inc. v. Stokely-Van Camp, Inc.*,
522 F.2d 369 (2d Cir. 1975)..............................................................................33

*Celle v. Filipino Reporter Enters. Inc.*,
209 F.3d 163 (2d Cir. 2000)..........................................................................8, 29

*Elias v. Rolling Stone LLC*,
872 F.3d 97 (2d Cir. 2017)................................................................................31

*Elmaliach v. Bank of China, Ltd.*,
971 N.Y.S.2d 504 (N.Y. App. Div. 2013) .........................................................24

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
  194 F. Supp. 3d 263 (S.D.N.Y. 2016)..........................................................34, 35

*Epifani v. Johnson*,,
  882 N.Y.S.2d 234 (N.Y. App. Div. 2009) ............................................16, 19, 25

*Excess Ins. Co. v. Factory Mut. Ins. Co.*,
  769 N.Y.S.2d 487 (N.Y. App. Div. 2003) .......................................................23

*Federman v. Empire Fire & Marine Ins. Co.*,
  597 F.2d 798 (2d Cir. 1979)...............................................................................9

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974).........................................................................................20

*Ginsberg v. Valhalla Anesthesia Assocs., P.C.*,
  971 F. Supp. 144 (S.D.N.Y. 1997) .....................................................................9

*Giuffre v. Maxwell*,
  165 F. Supp. 3d 147 (S.D.N.Y 2016)...............................................................26

*Global Fin. Corp. v. Triarc Corp.*,
  93 N.Y.2d 525 (1999) ......................................................................................14

*Glocoms Grp., Inc. v. Ctr. For Public Integrity*,
  2018 WL 2689434 (N.D. Ill. June 5, 2018) ................................................ 22-23

*Goldfarb v. Channel One Russia*,
  663 F. Supp. 3d 280 (S.D.N.Y. 2023)..............................................................28

*Goldwater v. Ginzburg*,
  414 F.2d 324 (2d Cir. 1969).............................................................................25

*Gottwald v. Sebert*,
  148 N.Y.S.3d 37 (N.Y. App. Div. 2021), *aff'd as modified by*,
  220 N.E.3d 621 (N.Y. 2023).............................................................................20

*Gottwald v. Sebert*,
  165 N.Y.S.3d 38 (N.Y. App. Div. 2022), *rev'd on other grounds*,
  220 N.E.3d 621 (N.Y. 2023).............................................................................21

*Gottwald v. Sebert*,
  220 N.E.3d 621 (N.Y. 2023)................................................................ 19-20, 22

iii

*Grass v. News Grp. Publ'ns, Inc.*,
    570 F. Supp. 178 (S.D.N.Y. 1983) ...................................................................23

*Gross v. New York Times Co.*,
    623 N.E.2d 1163 (N.Y. 1993)........................................................................27

*Harris v. Steinem*,
    571 F.2d 119 (2d Cir. 1978)..........................................................................11

*Hayashi v. Ozawa*,
    2019 WL 1409389 (S.D.N.Y. Mar. 28, 2019) ...............................................28

*Held v. Pokorny*,
    583 F. Supp. 1038 (S.D.N.Y. 1984)...............................................................26

*Hickory Pine Assocs. Ltd. P'ship v. Purchase Env't Prot. Ass'n, Inc.*,
    1995 WL 231311 (S.D.N.Y. Apr. 19, 1995)...................................................11

*Hobbs v. McIntosh*,
    2022 WL 17551853 (S.D.N.Y. Dec. 9, 2022) ...............................................22

*Jewell v. NYP Holdings, Inc.*,
    23 F. Supp. 2d 348 (S.D.N.Y. 1998)..............................................................17

*Jones v. Ford Motor Credit Co.*,
    358 F.3d 205 (2d Cir. 2004)........................................................................9, 13

*Kapetanovic v. Stephen J. Prods., Inc.*,
    2002 WL 475193 (N.D. Ill. Mar. 27, 2002).....................................................22

*Kipper v. NYP Holdings Co.*,
    12 N.Y.3d 348 (2009) .....................................................................................20

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941)........................................................................................23

*Lan Sang v. Ming Hai*,
    951 F. Supp. 2d 504 (S.D.N.Y. 2013).......................................................17, 30

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)........................................................................................22

*Lucking v. Maier*,
    2003 WL 23018787 (S.D.N.Y. Dec. 23, 2003) .............................................18

*Meisel v. Grunberg*,
    651 F. Supp. 2d 98 (S.D.N.Y. 2009)..................................................................32

*Meserole v. Sony Corp. of Am., Inc.*,
    2009 WL 1403933 (S.D.N.Y. May 19, 2009) ...................................................14

*Minskoff v. Am. Express Travel Related Servs. Co.*,
    98 F.3d 703 (2d Cir. 1996)................................................................................32

*Moore v. New York Cotton Exch.*,
    270 U.S. 593 (1926)..........................................................................................12

*Motorola Credit Corp. v. Uzan*,
    388 F.3d 39 (2d Cir. 2004)................................................................................13

*Newman & Schwartz v. Asplundh Tree Expert Co.*,
    102 F.3d 660 (2d Cir. 1996)..............................................................................34

*Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*,
    51 F. Supp. 2d 457 (S.D.N.Y.1999)..................................................................31

*Painter v. Harvey*,
    863 F.2d 329 (4th Cir. 1988) ............................................................................11

*Palin v. New York Times Co.*,
    510 F. Supp. 3d 21 (S.D.N.Y. 2020).................................................................22

*Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*,
    943 F.3d 613 (2d Cir. 2019)..............................................................................14

*Reeves v. ABC, Inc.*,
    580 F. Supp. 84 (S.D.N.Y. 1983) ...............................................................10, 11

*Regina Metro. Co., LLC v. N.Y. State Div. of Housing and Cmty. Renewal*,
    154 N.E.3d 972 (N.Y. 2020).............................................................................22

*Reiss v. Société Centrale Du Groupe Des Assurances Nationales*,
    235 F.3d 738 (2d Cir. 2000)..............................................................................33

*Restis v. Am. Coalition Against Nuclear Iran, Inc.*,
    53 F. Supp. 3d 705 (S.D.N.Y. 2014)............................................................29, 30

*Robbins v. 315 W. 103 Enters. LLC*,
    204 A.D.3d 551 (N.Y. App. Div. 2022) ............................................................21

*Rogers v. Grimaldi,*
    875 F.2d 994 (2d Cir. 1989)...................................................................................23

*Ruder & Finn Inc. v. Seaboard Sur. Co.,*
    52 N.Y.2d 663 (1981) .........................................................................................25

*Sanders v. New World Design Build, Inc.,*
    2020 WL 1957371 (S.D.N.Y. Apr. 23, 2020)...................................................11

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.,*
    659 F.3d 234 (2d Cir. 2011)...............................................................................13

*Silsdorf v. Levine,*
    449 N.E.2d 716 (N.Y. 1983) ........................................................................18, 26

*Sleepy's LLC v. Select Comfort Wholesale Corp.,*
    779 F.3d 191 (2d Cir. 2015)...............................................................................26

*Small Business Bodyguard Inc. v. House of Moxie, Inc.,*
    230 F. Supp. 3d 290 (S.D.N.Y. 2017)...............................................................28

*Smith v. Railworks Corp.,*
    2011 WL 2016293 (S.D.N.Y. May 17, 2011) ...................................................14

*Smith v. Soros,*
    2003 WL 22097990 (S.D.N.Y. Sept. 5, 2003)...................................................16

*S. Const. Co. v. Pickard,*
    371 U.S. 57 (1962)................................................................................................9

*Suk Joon Ryu v. Hope Bancorp, Inc.,*
    2018 WL 1989591 (S.D.N.Y. Apr. 26, 2018).............................................. 10-11

*Sweigert v. Goodman,*
    2022 WL 168080 (S.D.N.Y. Jan. 19, 2022) ......................................................28

*Tannerite Sports, LLC v. NBCUniversal News Grp.,*
    864 F.3d 236 (2d Cir. 2017)..........................................................................18, 19

*TBA Global, LLC v. Proscenium Events, LLC,*
    980 N.Y.S.2d 459 (N.Y. App. Div. 2014) .................................................. 23-24

*Treppel v. Biovail Corp.,*
    2005 WL 2086339 (S.D.N.Y. Aug. 30, 2005).............................................17, 18

*Triangle Publ'ns, Inc. v. Chumley*,
　　317 S.E.2d 534 (Ga. 1984) .........................................................................22

*Trinh v. Nguyen*,
　　180 N.Y.S.3d 735 (N.Y. App. Div. 2022) ........................................................21

*Trump v. Chi. Tribune Co.*,
　　616 F. Supp. 1434 (S.D.N.Y. 1985) ...............................................................26

*United States for Use & Benefit of D'Agostino Excavators, Inc. v. Heyward-Robinson Co.*
　　430 F.2d 1077 (2d Cir. 1970) ........................................................................9

*Unlimited Cellular, Inc. v. Red Points Solutions SL*,
　　2023 WL 4029824 (S.D.N.Y. June 14, 2023) .....................................................20

*Valencia ex rel. Franco v. Lee*,
　　316 F.3d 299 (2d Cir. 2003) .........................................................................12

*VIP Pet Grooming Studio, Inc. v. Sproule*,
　　2024 WL 172927 (N.Y. App. Div Jan. 17, 2024) .............................................21, 22

*Waldbaum v. Fairchild Publ'ns, Inc.*,
　　627 F.2d 1287 (D.C. Cir. 1980) .....................................................................20

*White v. CoreLogic Nat'l Background Data, LLC*,
　　2023 WL 2712778 (D. Conn. Mar. 30, 2023) .....................................................15

*Wolston v. Reader's Digest Ass'n, Inc.*,
　　443 U.S. 157 (1979) ..................................................................................20

*Worldhomecenter.com, Inc. v. M.J. Resurrection, Inc.*,
　　2012 WL 12922 (S.D.N.Y. Jan. 3, 2012) ...........................................................8

*Zu Guo Yang v. Shanghai Cafe Inc.*,
　　2012 WL 398641 (S.D.N.Y. Feb. 8, 2012) ........................................................28

**STATUTES**

28 U.S.C. § 1367(a) ....................................................................................9

28 U.S.C. § 1367(c) ................................................................................12, 13

Ga. Code Ann. S 9-3-97 ...............................................................................15

N.Y. Civ. Rights Law § 76-a ...........................................................................21

N.Y. C.P.L.R. § 202 ................................................................................................................14

N.Y. C.P.L.R. § 203(d) ...........................................................................................................15

**RULES**

Fed. R. Civ. P. 9(b). ...............................................................................................................25

Fed. R. Civ. P. 13(a). ...............................................................................................................9

**OTHER MATERIALS**

Restatement (Second) of Conflict of Laws .........................................................................15, 16

Restatement (Third) of Agency ............................................................................................33

Counterclaim Plaintiffs Kevin Carmody and Seth Goldstrom respectfully submit this memorandum of law in opposition to Counterclaim Defendants Jay Alix and AlixPartners' motion to dismiss Carmody's Counterclaim, ECF No. 277, and Goldstrom's Amended Counterclaim, ECF No. 286 (together "the Counterclaims").

## PRELIMINARY STATEMENT

In 2010, McKinsey & Co., Inc. – one of the world's most successful management consulting firms – formed McKinsey RTS, a new affiliate dedicated to serving clients facing restructuring challenges, including clients seeking protection under the federal bankruptcy laws. Counterclaim Defendant AlixPartners, LLP offers bankruptcy-related consulting services. McKinsey RTS posed a significant competitive threat to AlixPartners, which lacked the expertise to effectively compete with McKinsey. McKinsey's new offering also jeopardized the life's work of Jay Alix, AlixPartners' eponymous founder, director, and 35% owner.

Counterclaim Plaintiffs Kevin Carmody and Seth Goldstrom are Senior Partners at McKinsey, and both worked to develop and build McKinsey RTS. From the outset, McKinsey RTS succeeded in advising debtors in several bankruptcies, crystallizing the growing competitive threat to Alix and AlixPartners.

Alix and AlixPartners responded by attacking McKinsey and its professionals, including Carmody and Goldstrom. In 2013, AlixPartners commenced a formal campaign to make it "public and painful" for McKinsey to continue to offer transformation and restructuring services. The campaign was designed to smear McKinsey and its restructuring professionals' reputations, including by "planting stories with both local and national media." AlixPartners targeted high-performing McKinsey RTS professionals (including Carmody and Goldstrom specifically) with a years-long series of premeditated reputational attacks and harassment through litigation. That campaign continued from 2013 to at least 2019.

1

On May 4, 2018, Alix gave an interview accessible to a global audience.  During that interview, Alix, with AlixPartners' knowledge and authorization, defamed Carmody and Goldstrom.  Alix falsely stated, among other things, that McKinsey was "breaking the law" and that "Mr. Goldstrom and Mr. Carmody . . . have actively gone about ignoring federal laws just to make more money for themselves"; that McKinsey's restructuring professionals (a group including Carmody and Goldstrom) engaged in illegal activities comparable to those of Enron executives; and that they should be subject to criminal investigations by the New York Attorney General and the United States Attorney's Office.  Alix knew these statements were false.

Five days later, Alix filed his first complaint in this lawsuit, accusing Carmody and Goldstrom (and others) of operating a criminal racketeering enterprise.  Carmody and Goldstrom timely filed answers asserting defamation counterclaims against Alix and AlixPartners based on Alix's public statements that were made before Alix filed the instant RICO action.

Alix and AlixPartners move to dismiss these defamation counterclaims.  Their arguments ignore the facts and misapply the law.  Among other things, Alix and AlixPartners contend that this Court lacks jurisdiction because the counterclaims are somehow unrelated to the allegations underlying the RICO claims, ignoring that the conduct at issue arises from McKinsey RTS's bankruptcy work and AlixPartners' inability to compete.  They contend that Carmody and Goldstrom did not allege Alix's statements were false, ignoring that each Counterclaim explains in detail not only why the statements were false but why Alix knew they were false.  Alix and AlixPartners even contend that Alix's statements in the podcast did not "concern" Carmody and Goldstrom, even though Alix attacked them by name.

Each of these arguments, and the others Alix and AlixPartners raise, is without merit. The Court has jurisdiction; the Counterclaims are timely; and the Counterclaims plausibly allege

all of the required elements of a defamation per se claim against Alix and AlixPartners. The motion should be denied.

## FACTUAL BACKGROUND

Counterclaim Plaintiffs Kevin Carmody and Seth Goldstrom are Senior Partners at McKinsey. Goldstrom has worked at McKinsey for more than 25 years; starting in early 2010, he worked to develop McKinsey Recovery & Transformation Services ("McKinsey RTS"), an affiliate through which McKinsey could offer its expertise to companies in need of restructuring and business transformation support. Goldstrom Am. Counterclaim, ECF No. 286 ("Goldstrom CC") ¶¶ 1, 8. Carmody left AlixPartners and joined McKinsey in 2011 to help build McKinsey RTS. Carmody Counterclaim, ECF No. 277 ("Carmody CC") ¶¶ 1, 8.

McKinsey RTS's early success in serving clients in bankruptcy posed a significant competitive threat to Counterclaim Defendants Alix and AlixPartners, the namesake bankruptcy consulting firm that Alix founded and led for decades, and in which he continues to hold a 35% equity interest valued at approximately $350 million. Carmody CC ¶ 29; Goldstrom CC ¶ 29. AlixPartners lacked the skill and expertise to compete with McKinsey RTS, thereby threatening to damage AlixPartners' business and to reduce the value of Alix's stake in the firm. Carmody CC ¶¶ 21, 24; Goldstrom CC ¶¶ 19, 24.

In response to the threat posed by McKinsey RTS, in 2013, at the urging of Jay Alix, AlixPartners embarked on a campaign to drive McKinsey RTS from the restructuring and transformation market. Carmody CC ¶ 30; Goldstrom CC ¶ 30. A presentation on the campaign commissioned by AlixPartners' board of directors included a slide titled, "Make it public and painful," a recommendation for a plan to make McKinsey RTS's work in the bankruptcy and restructuring industry "as visible and painful as possible." Carmody CC ¶¶ 34, 38; Goldstrom CC ¶¶ 34, 38. The plan targeted specific members of the McKinsey RTS leadership team – a

group that included Carmody and Goldstrom – and included a recommendation for "[p]lanting stories with both local and national media regarding McKinsey's roles in restructuring cases." Carmody CC ¶¶ 34, 35; Goldstrom CC ¶¶ 34, 35.  It also included plans to litigate against McKinsey and to disparage publicly its individual employees, including Carmody and Goldstrom.  Carmody CC ¶ 37; Goldstrom CC ¶ 37.

Shortly thereafter, Alix and AlixPartners began to execute on this campaign, which was designed to inflict significant reputational injury on Carmody and Goldstrom.  Alix and AlixPartners targeted Goldstrom both in and out of litigation.  In 2014, Alix and AlixPartners brought employment-related claims against two former AlixPartners employees who had left AlixPartners to work for McKinsey RTS.  Carmody CC ¶ 43; Goldstrom CC ¶ 43.  As part of the litigation, AlixPartners deposed Goldstrom.  Goldstrom answered questions targeted to learning about McKinsey's bankruptcy disclosure practices and McKinsey RTS's business strategy – issues that were irrelevant to the contract and employment claims in the litigation, but that were important to AlixPartners' "public and painful" campaign and that were included in Alix's RICO complaint.  Goldstrom CC ¶ 48.

In 2014, Alix met with McKinsey's Global Managing Partner, Dominic Barton, on multiple occasions.  Goldstrom CC ¶¶ 53-54.  In those meetings, Alix disparaged Goldstrom, falsely alleging that Goldstrom was involved in an illegal "pay-to-play" scheme in which McKinsey RTS agreed to recommend that its clients retain certain law firms in exchange for promises from those law firms to refer restructuring clients to McKinsey RTS.  *Id.* ¶¶ 53, 54.  Alix also asked Barton to fire Goldstrom.  *Id.* ¶ 54.  Throughout those meetings, as Alix freely admits, Alix was speaking on behalf of AlixPartners.  *Id.* ¶¶ 53, 54.  His intent in these meetings was "to end Goldstrom's career."  *Id.* ¶ 54.

Alix and AlixPartners targeted Carmody as well.  Shortly after Carmody left AlixPartners, AlixPartners worked to "set a bear trap" for him.  Carmody CC ¶ 15.  In 2016, in furtherance of AlixPartners' "public and painful" campaign, Alix created a special-purpose litigation vehicle, Mar-Bow Value Partners, LLC, to harass McKinsey.  Carmody CC ¶ 62. Through Mar-Bow, Alix purchased debt in bankruptcy cases to manufacture standing to challenge debtors' applications to retain McKinsey.  *Id.*  In court filings through Mar-Bow, Alix falsely accused Carmody of making incomplete and misleading disclosures to federal courts and threatened, behind the protections of the litigation privilege, that Carmody could be "sent to federal prison."  Carmody CC ¶ 66.  The bankruptcy court for the Eastern District of Virginia soundly rejected Mar-Bow's challenges to the applications.  *Id.* ¶ 74.

Alix thereafter escalated these attacks on Carmody and Goldstrom.  On May 4, 2018, while in Barcelona for an AlixPartners partner meeting, Alix gave an interview to BizNews Radio, a podcast, in which he repeatedly accused Carmody and Goldstrom of committing federal crimes.  Carmody CC ¶ 84; Goldstrom CC ¶ 62.  These statements were made in furtherance of Alix and AlixPartners' joint "public and painful" strategy, which was still in full effect (indeed, an AlixPartners Managing Director confirmed that it was still in effect a year after the podcast). Carmody CC ¶ 97; Goldstrom CC ¶ 95.  Alix also confirmed that he was acting for the benefit of AlixPartners during the interview.  He explained that his efforts were "clearly . . . of my interest because I'm still a minority shareholder at AlixPartners" and that he "really want[ed] to protect the firm I spent my life building."  ECF No. 302-8 at 28:22-29:10.

The podcast host introduced Alix as a source for a Wall Street Journal article regarding McKinsey's disclosures in the ANR and SunEdison bankruptcies.  During the interview, Alix

disingenuously claimed to be shocked by the article, then made disparaging false claims of his own that went far beyond what the Wall Street Journal reported.

Alix falsely claimed that Carmody, Goldstrom, and other McKinsey RTS employees were knowingly violating federal law.  Carmody CC ¶ 87; Goldstrom CC ¶ 65.  Alix said:

> [T]hey've put all the other people in McKinsey at risk; they've put the whole firm at risk and its reputation and its integrity and its brand because a few people—led by Mr. Garcia and Mr. Goldstrom and Mr. Carmody, someone named Alison Proshan—these people have actively gone about ignoring federal laws just to make more money for themselves is [sic] from what I can tell.  And the firm does not appear to be able to stop them.  I don't know who's in charge of these people; I don't know why the board of directors of McKinsey doesn't stop this.

Carmody CC ¶ 90; Goldstrom CC ¶ 68.  Alix further claimed that professionals at McKinsey (an obvious reference to Carmody and Goldstrom) "weren't interested in complying with the law" because "[t]hey didn't feel it applied to them."  Carmody CC ¶ 87; Goldstrom CC ¶ 65.  Alix falsely asserted that McKinsey RTS and its employees (another obvious reference to Carmody and Goldstrom) were making "false disclosure by omission," by withholding "dozens and dozens of important disclosures."  Carmody CC ¶ 87; Goldstrom CC ¶ 65.[1]  Alix referred to Carmody and Goldstrom as "rogue employees," compared them to notorious corporate criminals at Enron, and suggested that their activities could "bring down" the firm.  Carmody CC ¶ 91; Goldstrom CC ¶ 69.  Alix called on the New York Attorney General and the United States Attorney's Office to investigate McKinsey's disclosures.  Carmody CC ¶ 91; Goldstrom CC ¶ 69.

---

[1] Alix and AlixPartners have made false representations to this Court in this motion. Referring to declarations signed by Carmody and Goldstrom, Alix and AlixPartners unequivocally and falsely state (at 3) that the "declarations do not identify a single McKinsey connection or hidden investment by name."  The exhibits Alix and AlixPartners themselves attached in support of their motion on their face disprove that statement.  *See, e.g.*, ECF No. 302-3 ¶¶ 31-55 (listing over a dozen connections by name).  Alix and AlixPartners' knowingly false statements only confirm (among other things) that Alix and AlixPartners continue to target the reputations and professional livelihoods of Carmody and Goldstrom.

These statements were false.  Goldstrom CC ¶ 70; Carmody CC ¶ 72.  At no time did Goldstrom or Carmody "ignore" federal law, much less submit disclosures in bankruptcy proceedings "just to make more money for themselves."  Goldstrom CC ¶ 70; Carmody CC ¶ 72. Far from "rogue" employees "ignoring" federal law, it is undisputed that Carmody and Goldstrom were part of large teams of McKinsey professionals, working directly with McKinsey lawyers as well as experienced outside bankruptcy counsel, to provide consulting services to debtors in full compliance with federal law.  Carmody CC ¶ 92; Goldstrom CC ¶¶ 50, 70.  Alix knew these statements were false when he made them, because he had been scrutinizing McKinsey's disclosures since 2013 and knew Carmody and Goldstrom testified under oath that they obtained advice from experienced counsel regarding bankruptcy law compliance.  Carmody CC ¶ 92; Goldstrom CC ¶ 70.  Moreover, Carmody and Goldstrom's Counterclaims allege in detail that Alix made these statements as part of an increasingly desperate and baseless effort to drive McKinsey RTS from the bankruptcy restructuring industry.  Carmody CC ¶¶ 4-7; Goldstrom CC ¶¶ 4-7.  The reasonable inference from those allegations is that Alix and AlixPartners knew the statement that Carmody and Goldstrom intended to "ignore" the requirements of federal law was false and contradicted by overwhelming evidence.

Alix and AlixPartners' efforts to target Carmody and Goldstrom as part of their campaign to push McKinsey out of the restructuring marketplace did not end with Alix's defamatory interview.  On May 9, 2018 – five days after defaming Carmody and Goldstrom – Alix, acting as the purported assignee of AlixPartners' claims, filed the instant action.  On August 19, 2019, this Court dismissed Alix's RICO claims, including all claims against Carmody and Goldstrom.  The Second Circuit reversed that dismissal.  On August 18, 2023, this Court denied a subsequent motion to dismiss the claims against Carmody and Goldstrom.  Goldstrom timely filed his

answer and counterclaim on October 2, 2023, and timely amended his counterclaim on January 12, 2024.  Carmody timely filed his answer and counterclaim on January 5, 2024.

## LEGAL STANDARD

In ruling on a motion to dismiss, the Court must accept all allegations in the Counterclaims as true and draw all inferences in favor of the pleaders.  *See Worldhomecenter.com Inc. v. M.J. Resurrection, Inc.*, 2012 WL 12922, at *2 (S.D.N.Y. Jan. 3, 2012).  Counterclaim Defendants cannot rely on a self-serving interpretation of their words; in defamation cases, even if the words "are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 178 (2d Cir. 2000) (internal quotation marks omitted).  A party's claim should not be dismissed where the allegations of the complaint "allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I.    The Court Has Jurisdiction

The Court has supplemental jurisdiction over Carmody's and Goldstrom's counterclaims, contrary to Alix and AlixPartners' motion (at 12-15), because they are compulsory counterclaims.  Even if the counterclaims were permissive and not compulsory, they would still be subject to this Court's supplemental jurisdiction.  There is no basis in law or logic for the Court to decline to exercise supplemental jurisdiction.  Finally, even if the Court were to decline to exercise supplemental jurisdiction, it would still have diversity jurisdiction, contrary to Alix and AlixPartners' argument (at 11-12), or at the very least should order jurisdictional discovery.

A.       The Counterclaims Are Compulsory Counterclaims

All compulsory counterclaims are within federal courts' supplemental jurisdiction under

28 U.S.C. § 1367(a).  *See Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 810 (2d

Cir. 1979).  The counterclaims here are compulsory counterclaims, so the Court has jurisdiction.

Compulsory counterclaims "aris[e] out of the transaction or occurrence that is the subject

matter of the [plaintiff's] claim."  Fed. R. Civ. P. 13(a).  The same "transaction or occurrence"

standard is met "when there is a 'logical relationship' between the counterclaim and the main

claim."  *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004).  This test "does not

require an 'absolute identity of factual backgrounds.' "  *Id.*  Instead, the question is whether the

"essential facts of the claims are so logically connected that considerations of judicial economy

and fairness dictate that all the issues be resolved in one lawsuit."  *Adams v. Jacobs*, 950 F.2d 89,

92 (2d Cir. 1991) (internal quotation marks omitted).  Courts interpret the logical relationship

test "broadly,"  *United States for Use & Benefit of D'Agostino Excavators, Inc. v. Heyward-*

*Robinson Co.*, 430 F.2d 1077, 1081 (2d Cir. 1970), in order "to prevent multiplicity of actions

and to achieve resolution in a single lawsuit of all disputes arising out of common matters,"  *S.*

*Const. Co. v. Pickard*, 371 U.S. 57, 60 (1962).

Carmody's and Goldstrom's counterclaims have the required "logical relationship" to

Alix's affirmative claims.  Alix and AlixPartners themselves argue (at 4) that Alix's complaint

"is referenced throughout and integral to the counterclaims."  Nothing more is required.  If

Alix's complaint is "integral to" the counterclaims, then it certainly has a "logical relationship"

to them.  *See, e.g., Ginsberg v. Valhalla Anesthesia Assocs., P.C.,* 971 F. Supp. 144, 147

(S.D.N.Y. 1997) (finding a logical relationship where "the 'essential facts' of the . . .

counterclaim and the allegations in the complaint are . . . identical").

If that were not enough, the content of the counterclaims makes clear that they concern the same operative facts alleged in Alix's complaint. Alix, as purported assignee of AlixPartners' claims, alleges that Carmody and Goldstrom engaged in criminal activity in their bankruptcy practice, including by (among other things) filing inadequate declarations to federal courts. *See, e.g.*, Second Am. Complaint, ECF No. 177 ¶¶ 401(h), 401(j), 689, 690 ("SAC"). Carmody and Goldstrom assert that Alix and AlixPartners defamed them by making public statements that they "ignored" federal law and committed criminal offenses in their bankruptcy practice, including by filing inadequate declarations. *See* Carmody CC ¶¶ 87, 100-106; Goldstrom CC ¶¶ 65, 78-85. The same actions, and bankruptcy disclosures, underlie both sides' legal claims. If, for example, the factfinder concludes that Carmody and Goldstrom acted in good faith when they signed bankruptcy disclosures on behalf of McKinsey RTS, that finding would extinguish at least parts of Alix's claims against Carmody and Goldstrom and would establish at least part of their counterclaims against Alix and AlixPartners. *Compare, e.g.*, Carmody CC ¶ 72 ("Alix . . . impugned Carmody's integrity [in the Alpha Natural Resources proceeding], falsely accusing him of submitting 'intentionally misleading' declarations") *with* SAC ¶ 210 ("Carmody's . . . declarations in Alpha Natural Resources were . . . plainly designed to mislead and conceal.").

Where such overlapping factual issues are present, courts have repeatedly found a "logical relationship" between claim and counterclaim. *See, e.g., Reeves v. ABC, Inc.*, 580 F. Supp. 84, 88 (S.D.N.Y. 1983) ("The counterclaims and many of the allegations of the complaint arise out of the same set of operative facts . . . the purported scheme engaged in by [counterclaim plaintiffs].");  *Appletree v. City of Hartford*, 555 F. Supp. 224, 229-30 (D. Conn. 1983) (same "essential issue of fact"); *Suk Joon Ryu v. Hope Bancorp, Inc.*, 2018 WL 1989591, at *10

(S.D.N.Y. Apr. 26, 2018) (same issue of "truth or falsity").  Moreover, the affirmative claims and the counterclaims will involve substantially overlapping discovery, such that the interests of judicial economy and fairness are best served by adjudicating both the counterclaims and the original claims in the same lawsuit.[2]  Accordingly, Carmody's and Goldstrom's counterclaims are compulsory, and the Court therefore has supplemental jurisdiction over them.

Alix and AlixPartners' reliance (at 13-15) on *Harris v. Steinem*, 571 F.2d 119 (2d Cir. 1978), to argue that the counterclaims here are merely permissive is misplaced.  The alleged defamation in *Harris* was the filing of the affirmative lawsuit itself, together with "subsequent publicity surrounding the suit," such that the "artfully drafted" defamation counterclaim "in essence [was] a claim for malicious prosecution."  *Id.* at 124.  Relying on a "well-established narrow line of decisions involving counterclaims based *solely* on the filing of the main complaint and allegedly libelous publications thereafter," the Second Circuit held the counterclaim was permissive.  *Id.* at 125 (emphasis added).  *Harris* applies only to that narrow fact pattern, where the defamation follows the filing of the complaint itself and the public repetition of those claims – it has no application to defamatory public statements made prior to the complaint.  Subsequent cases, including the two unpublished opinions upon which Alix and AlixPartners rely, have applied *Harris* only in that context.[3]  These counterclaims fall well outside the holding, and rationale, of *Harris*.  The counterclaims allege that Alix and AlixPartners engaged in a long

---

[2] *See* ECF No. 271 (Order denying AlixPartners' motion to stay discovery on Goldstrom's counterclaims for reasons including "the nature of the discovery that is underway").

[3] *See, e.g.*, *Painter v. Harvey*, 863 F.2d 329, 333 (4th Cir. 1988); *Reeves v. ABC, Inc.*, 580 F. Supp. 84, 88-89 (S.D.N.Y. 1983); *Appletree v. City of Hartford*, 555 F. Supp. 224, 229-30 n.3 (D. Conn. 1983); *see also Sanders v. New World Design Build, Inc.*, 2020 WL 1957371, at *3 (S.D.N.Y. Apr. 23, 2020); *Hickory Pine Assocs. Ltd. P'ship v. Purchase Env't Prot. Ass'n, Inc.*, 1995 WL 231311, at *3 (S.D.N.Y. Apr. 19, 1995).

series of defamatory actions against Carmody and Goldstrom *before* the filing of Alix's RICO action here.  There is nothing in the counterclaim that remotely suggests that Carmody and Goldstrom's defamation claims arise from Alix's filing of the RICO action, much less "solely" from that filing, as occurred in *Harris* and its progeny.[4]

### B.    The Court Has Jurisdiction Even If the Counterclaims Are Permissive

Supplemental jurisdiction would still be appropriate if the counterclaims were permissive.  Alix and AlixPartners do not dispute that the Court *could* still exercise supplemental jurisdiction even if the counterclaims are permissive; they merely argue (at 12-15) that the supplemental jurisdiction statute *permits* the Court to decline to exercise that jurisdiction and urge the Court to do so.  Alix and AlixPartners are wrong on the law.

As a matter of statute, courts can decline to exercise supplemental jurisdiction only when the claims at issue involve "novel or complex issue[s] of State law" (or in three other situations not relevant here).  28 U.S.C. § 1367(c).  State law issues are novel and complex when they present "unresolved" questions better "left for decision by the state courts."  *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003) (internal quotation marks omitted).  The only supposedly "novel or complex" issue Alix and AlixPartners identify (at 12, 14) is a choice of law question.  But these choice of law questions do not raise "unresolved" or "complex" issues of

---

[4] Alix and AlixPartners also (at 13-14) rely on *Harris* for the proposition that a counterclaim with "essential issues" different from those in the complaint is "attenuated" from the action and therefore more likely to be a permissive counterclaim.  That argument ignores the facts of *Harris*: the original complaint there concerned a stock purchase, whereas the counterclaim concerned the filing of the original complaint.  Here, both the original complaint and the counterclaims concern Carmody and Goldstrom's business conduct and their good faith bankruptcy disclosures.  In any event, Alix and AlixPartners' overreading of *Harris* would "rob" the compulsory counterclaim rule "of all serviceable meaning, since the facts relied upon by the plaintiff rarely, if ever, are, in all particulars, the same as those constituting the defendant's counterclaim."  *Moore v. New York Cotton Exch.*, 270 U.S. 593, 610 (1926).

state law; choice of law rules are well developed and Alix and AlixPartners do not seriously argue otherwise. *See Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 603 (5th Cir. 2009) (holding that district court abused its discretion in declining supplemental jurisdiction over state law claims that involved "routine choice of law" questions); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 57 (2d Cir. 2004) (district court properly exercised supplemental jurisdiction over state law claims raising international choice-of-law issues). And the substantive claims present "a standard [defamation] question," *Jones*, 358 F.3d at 214, which "will likely hinge on factual findings," not novel or complex questions of law. *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 246 (2d Cir. 2011). Section 1367(c) cannot logically be read to permit this Court to decline to exercise supplemental jurisdiction.

Moreover, a district court may not decline supplemental jurisdiction based on one of the Section 1367(c) factors unless it also determines that "economy, convenience, fairness, and comity" are better served by declining supplemental jurisdiction. *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018) (internal quotation marks omitted). Because of the substantial overlap between the claims and counterclaims, and the largely overlapping discovery that will be required, these values are best served by hearing the counterclaims together with the underlying RICO action. This Court has jurisdiction over Carmody's and Goldstrom's counterclaims; it does not have discretion to decline that jurisdiction; and even if it did have such discretion, it should retain jurisdiction to promote efficiency.

### C.       The Court Has Diversity Jurisdiction, or Should At Least Order Discovery

Finally, even if the court were to decline supplemental jurisdiction, diversity jurisdiction would remain. It is undisputed that Goldstrom and Carmody are diverse from Alix, and that the amount in controversy exceeds $75,000. Alix and AlixPartners argue (at 11-12) that the Counterclaims do not allege the citizenship of every single one of AlixPartners' members, but

they notably stop short of claiming that AlixPartners' presence defeats diversity. AlixPartners is in unique possession of information about its partners' citizenship, so if the Court finds that diversity jurisdiction is the only basis for the Counterclaims and that Goldstrom and Carmody must allege the citizenship of each partner of AlixPartners, it should order jurisdictional discovery to evaluate the parties' diversity on a complete record. *See Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 617–18 (2d Cir. 2019); *Aleph Towers, LLC v. Ambit Texas, LLC*, 2013 WL 4517278, at *3 (E.D.N.Y. Aug. 23, 2013).

## II.      Goldstrom's Counterclaim Is Not Barred By the Statute of Limitations

Goldstrom's counterclaim is timely, contrary to Alix and AlixPartners' assertions (at 15-17). Pursuant to New York's "borrowing statute," N.Y. C.P.L.R. § 202, a claim brought in New York court is not barred by the statute of limitations so long as it is timely both in New York and in the state where the cause of action accrued. *See id.* Alix and AlixPartners do not argue that Goldstrom's counterclaim would be time-barred if it accrued in Georgia; their position depends on the counterclaim accruing in North Carolina. But determining where Goldstrom's claim accrued is a fact-intensive inquiry unsuited for resolution on a motion to dismiss. *See Smith v. Railworks Corp.*, 2011 WL 2016293, at *6 n. 12 (S.D.N.Y. May 17, 2011) ("Because a choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage."); *Meserole v. Sony Corp. of Am., Inc.*, 2009 WL 1403933, at *5 n.6 (S.D.N.Y. May 19, 2009) (same). The Court should not undertake that fact-intensive inquiry.

If the Court does attempt the inquiry at this stage, the allegations in the counterclaim, accepted as true, establish that Goldstrom's defamation claim accrued in Georgia. Goldstrom CC ¶¶ 8, 83. Defamation claims accrue where the plaintiff "suffered injury." *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 527 (1999). For Goldstrom, that is Georgia: Goldstrom's professional life and reputation was centered there. *See* Goldstrom CC ¶ 8. Goldstrom was

based out of McKinsey's Atlanta, Georgia office from 2001 to 2019. *Id*. He maintained several of his most significant business relationships with clients headquartered or with significant operations in Georgia. *Id*. ¶¶ 8, 83. Goldstrom was, at all relevant times, a member of the Georgia bar. *Id* ¶ 8. And he had a house in Atlanta. *Id*. Because the claim accrued in Georgia, and Georgia tolls counterclaims from the filing of the initial complaint, only five days have run on Goldstrom's counterclaim (from the defamation on May 4, 2018 to Alix's filing of his complaint on May 9, 2018). *See* Ga. Code Ann. S 9-3-97; N.Y. C.P.L.R. § 203(d). It is timely.

Alix and AlixPartners suggest that North Carolina law should apply, but that is not where Goldstrom's injury accrued. The only North Carolina nexus Alix and AlixPartners identify is Goldstrom's legal residency. Contrary to Alix and AlixPartners' arguments (at 16 n.9), residency alone is an improper basis upon which to decide the highly fact-bound question of the locus of accrual of injury on a motion to dismiss. There is a presumption that a plaintiff was injured in his state of residence, but that presumption may be rebutted when the facts show the plaintiff suffered greater injury in another state. *See, e.g.*, *White v. CoreLogic Nat'l Background Data, LLC*, 2023 WL 2712778 (D. Conn. Mar. 30, 2023) (holding that an Oklahoma resident who was fired from a job in Connecticut as a result of a false statement was injured in Connecticut); Restatement (Second) of Conflict of Laws § 150 cmt. e. ("the greatest injury to [a plaintiff's] reputation" may arise in "[a] state, which is not the state of the plaintiff's domicil.").

The allegations in Goldstrom's Counterclaim are more than sufficient to demonstrate that his injury did not occur in North Carolina, or at the very least that it is premature to determine the location of his injury. During the relevant time period, Goldstrom served no client headquartered in North Carolina, and performed no on-site client work in North Carolina – in contrast to Georgia, where he did both. Goldstrom CC ¶ 83. Indeed, Goldstrom's extensive

professional affiliations in Georgia led Alix himself to assume, in 2018 and again in 2022, that Goldstrom is a Georgia resident.  Complaint, ECF No. 1 ¶ 37; SAC ¶ 42.  Goldstrom's fellow professionals also viewed him as based in Georgia at the time of the defamation.  Goldstrom CC ¶ 83.  *See* Restatement (Second) of Conflict of Laws § 150 cmt. e (reputational injury may be greater where "the plaintiff is better known in this state than in the state of his domicil.").

The lone case that Alix and AlixPartners cite in support of their argument, *Smith v. Soros*, 2003 WL 22097990 (S.D.N.Y. Sept. 5, 2003), is inapposite.  In *Soros*, a lawyer whose primary residence was in New Jersey and who lived and had her professional "base" in Washington D.C. argued that she had suffered economic injury as the result of fraud in New York, solely on the basis that she held a bar membership there.  *Id.* at \*6.  The court held that, on those facts, the presumption in favor of the plaintiff's residence had not been overcome.  Here, by contrast, Goldstrom's counterclaim alleges that his professional life was centered in Georgia, and he maintained a home there.  These circumstances are vastly different from those in *Soros*.

Accordingly, should the Court reach Alix and AlixPartners' statute of limitations argument at this stage – and it should not – the proper conclusion is that his claim accrued in Georgia and is timely under New York and Georgia law.

## III.    Carmody and Goldstrom Have Adequately Pled Defamation Claims

Carmody and Goldstrom have adequately pled the elements of their defamation claims.  Alix and AlixPartners offer a series of arguments (at 17-32) purporting to find pleading deficiencies, but their arguments are divorced from the law.  In New York, the elements for defamation are:  "a 'false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se.'"  *Epifani v. Johnson*, 882 N.Y.S.2d 234, 242 (N.Y. App. Div. 2009) (citations omitted).  Defamatory statements are defamation per se when they

16

impugn the target's integrity or disparage the target's professional reputation (among other things). Both counterclaims allege facts sufficient to prove those elements under a defamation per se theory.

The "threshold" for allowing defamation claims to proceed is a low one: claims will be permitted to go forward if "the statements at issue are *reasonably susceptible* of a defamatory meaning." *Treppel v. Biovail Corp.*, 2005 WL 2086339, at *7 (S.D.N.Y. Aug. 30, 2005) (emphasis added) (internal quotation marks omitted); *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 518 (S.D.N.Y. 2013). A statement is "reasonably susceptible" of a defamatory meaning when it "tend[s] to expose a person to . . . unsavory opinion[s] of him in the minds of a substantial number in the community." *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 360 (S.D.N.Y. 1998) (citation omitted). Alix and AlixPartners have not contested that the statements at issue here are "reasonably susceptible" of a defamatory meaning, and the Counterclaims more than adequately allege they are. *See, e.g.*, Carmody CC ¶¶ 90-91, Goldstrom CC ¶¶ 68-69. Statements that someone has "engaged in criminal or illegal conduct" are "undoubtedly defamatory." *Camp Summit of Summitville, Inc. v. Visinski*, 2007 WL 1152894, at *10-11 (S.D.N.Y. Apr. 16, 2007). That is more than sufficient for the Counterclaims to proceed here.

Alix and AlixPartners ignore this permissive standard and offer no argument that the Counterclaims fail to satisfy it, because they cannot. Moreover, the arguments Alix and AlixPartners raise misstate the law as to the pleading requirements for defamation claims. The Court should reject each of those arguments.

### A. Alix's Statements Were False

First, contrary to the Motion (at 41-43), Carmody and Goldstrom have adequately pled falsity. They have each pled that Alix disparaged them by making the "false statement" that each "actively" "ignor[ed] federal laws just to make more money for themselves." Carmody CC

¶ 90; Goldstrom CC ¶ 68.  Alix made additional defamatory statements, including that Carmody

and Goldstrom were "rogue" employees.  Carmody CC ¶ 91; Goldstrom CC ¶ 69.  Each

expressly pled that the defamatory statements at issue, including all of the foregoing, were

"demonstrably false."  Carmody CC ¶ 92; Goldstrom CC ¶ 70.  As a matter of law, nothing more

is required: because this "Court accepts the allegations as true," it "*assumes that the alleged*

*statements are false*" and that defendants "were culpable in making the statements" at this stage

of litigation.  *Treppel*, 2005 WL 2086339, at *8 (emphasis added); *Silsdorf v. Levine*, 449 N.E.2d

716, 720 (N.Y. 1983) (accepting statements as false at the pleading stage while stating that

plaintiff will ultimately have to "demonstrate the falsity" before the trier of fact to recover

damages); *Lucking v. Maier,* 2003 WL 23018787, at *3 n.4 (S.D.N.Y. Dec. 23, 2003) ("The

falsity of the accused passage and defendants' fault are both presumed at this [motion to dismiss]

juncture").

Alix and AlixPartners rely primarily on one case – *Tannerite Sports, LLC v.

NBCUniversal News Grp.*, 864 F.3d 236 (2d Cir. 2017) – to argue (at 21) that a "mere allegation

that a statement is 'false' does not suffice."  But that decision is inapplicable.  It holds only that

plaintiff "must plead facts that, if proven, would establish that the defendant's statements were

not substantially true."  *Id.*  There, a rifle manufacturer failed to offer *any* allegation as to "why"

the allegedly defamatory statements were false.  *Id.* at 251.  Unlike the plaintiff in *Tannerite

Sports*, who failed to plead *any* facts supporting an inference that the statements were false,

Carmody and Goldstrom have provided detailed factual allegations explaining why Alix's

statements were false.  For example, each took good faith steps to ensure compliance with

applicable law, relying on counsel when preparing their disclosures.  Carmody CC ¶ 92;

Goldstrom CC ¶¶ 50, 70.  That allegation alone is sufficient to allege that Alix's statement that

they "actively [went] about ignoring federal laws" is false.  The same allegations show that Alix's statements that they were "rogue" was false: "rogue" employees do not consult with company counsel to ensure their conduct is lawful.  Taking allegations in the counterclaims as true, as this Court must but Alix and AlixPartners fail to do, Carmody and Goldstrom have pled facts "that, if proven" at a later stage, "would establish that [Alix's] statements were not substantially true."  *Tannerite Sports*, 864 F.3d at 247.  Nothing more is required.

### B.      Alix's Statements Were Not Privileged

On the second element – that the statements were "published without privilege or authorization to a third party," *Epifani*, 882 N.Y.S.2d at 242, Alix and AlixPartners argue (at 17-19) that Alix's 2014 statements to Barton are covered by a litigation privilege.  That argument is inapt because neither Goldstrom nor Carmody claim the 2014 statements are independently actionable.[5]  Alix and AlixPartners do not otherwise dispute that the Counterclaims satisfy this element; in particular, they do not dispute that Alix's 2018 podcast interview was published to third parties worldwide and was not privileged.

### C.      Alix and AlixPartners Acted With the Required Degree of Fault

The third element of defamation is fault.  The Counterclaims adequately allege it.

#### 1.      The Proper Standard of Fault Is Negligence, and Carmody and Goldstrom Have Adequately Pled It

Carmody and Goldstrom are private figures, not general or limited purpose public figures.[6]  Alix and AlixPartners do not argue otherwise.  "[I]n New York, the accepted standard for private figures is negligence."  *Gottwald v. Sebert*, 220 N.E.3d 621, 627 (N.Y. 2023).

---

[5] To be sure, Alix's 2014 statements are *relevant* to Carmody's and Goldstrom's claims and are highly probative of Alix's intent and his relationship to AlixPartners.

[6] Neither Carmody nor Goldstrom is "a celebrity" whose "name [is] a 'household word' whose ideas and actions the public follows with great interest," as is required to be a general

Carmody and Goldstrom each allege facts more than sufficient to plead negligence, and Alix and AlixPartners make no argument to the contrary on this issue.  In applying the negligence standard, courts consider "whether the defendants failed to exercise ordinary care in . . . publishing false statements which defamed [plaintiff], considering the foreseeable danger of injury from the publication and the reasonableness of defendants' conduct in proportion to that danger."  *Unlimited Cellular, Inc. v. Red Points Solutions SL*, 2023 WL 4029824, at *3 (S.D.N.Y. June 14, 2023) (citations omitted).  Even innocent, inadvertent false statements can satisfy that standard.  *Cf. Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348, 356, 359 (2009) (finding defendant acted with "mistake or negligence" on the mere fact that the publication contained "two erroneous statements" despite no evidence that defendants "seriously doubted the truth" or were even "highly aware" that statements were "incorrect" prior to publishing).

Carmody and Goldstrom allege more than an innocent misstatement: they allege that Alix and AlixPartners made their false statements as part of a years-long campaign intended to inflict massive reputational injury on Carmody and Goldstrom, and that they did so while in possession of information demonstrating that their statements were false.  For example, Alix and AlixPartners were aware that both Carmody and Goldstrom had previously testified under oath,

---

public figure.  *Gottwald v. Sebert*, 148 N.Y.S.3d 37, 43 (N.Y. App. Div. 2021) (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C. Cir. 1980); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974) ("Absent clear evidence of general fame or notoriety in the community, and pervasive involving in the affairs of society, an individual should not be deemed a public personality for all aspects of his life.").  Nor is Carmody or Goldstrom a "limited purpose public figure."  A limited purpose public figure is "an individual who has voluntarily injected himself or is drawn into a particular public controversy with a view toward influencing it."  *Gottwald*, 148 N.Y.S.3d at 43.  "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."  *Wolston v. Reader's Digest Ass'n Inc.*, 443 U.S. 157, 167 (1979).  Carmody and Goldstrom have taken no steps to inject themselves into the controversies Alix and AlixPartners have started, and have, in fact, been unwillingly dragged into this dispute.  They are therefore private figures for purposes of defamation law.

in litigation brought by AlixPartners and by Alix, respectively, that they had worked with in-house and outside legal counsel to ensure compliance with the law. Goldstrom CC ¶¶ 50, 70; Carmody CC ¶ 92. Despite that knowledge, Alix falsely stated that Carmody and Goldstrom were "rogue" employees committing crimes by "ignoring" federal law, as part of a concerted effort to discredit and ruin them. Goldstrom CC ¶¶ 50, 70; Carmody CC ¶ 92.

Unable to contest that Carmody and Goldstrom easily satisfy the negligence standard, Alix and AlixPartners argue instead (at 18-20) that an "actual malice" standard applies pursuant to amendments to New York Civil Rights Law § 76-a, which was enacted in 2020. They are wrong. It is true that, in 2020, the New York Legislature amended Civil Rights Law § 76-a to require, among other things, a showing of actual malice for any "claim based upon any communication in a place open to the public or a public forum in connection with an issue of public interest." N.Y. Civ. Rights Law § 76-a. But the 2020 amendments were not in effect at the time Alix defamed Carmody and Goldstrom in 2018. And New York state courts have held squarely and unanimously that the 2020 amendments to Civil Rights Law § 76-a do not apply retroactively. *See VIP Pet Grooming Studio, Inc. v. Sproule*, 2024 WL 172927 (N.Y. App. Div. Jan. 17, 2024) (holding that the 2020 amendments to Civil Rights Law § 76-a do not apply retroactively); *Trinh v. Nguyen*, 180 N.Y.S.3d 735, 737 (N.Y. App. Div. 2022) (holding with respect to the 2020 amendments that "the presumption against retroactivity is not overcome because nothing in the text expressly or by necessary implication requires retroactive application of the statute as amended . . . nor does the legislative history support such an interpretation.") (cleaned up); *Gottwald v. Sebert*, 165 N.Y.S.3d 38 (N.Y. App. Div. 2022), *rev'd on other grounds*, 220 N.E.3d 621 (N.Y. 2023) (same); *Robbins v. 315 W. 103 Enters. LLC*, 204 A.D.3d 551 (N.Y. App. Div. 2022) (same). Accordingly, the statute Alix and AlixPartners rely on does

not apply to Carmody and Goldstrom's claims, which are based on defamatory statements made in 2018.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 278 (1994) (explaining the "traditional presumption against" retroactivity); *Regina Metropolitan Co., LLC v. N.Y. State Div. of Housing and Cmty. Renewal*, 154 N.E.3d 972, 988 (N.Y. 2020) (adopting the *Landgraf* framework for determining retroactivity).

Alix and AlixPartners ignore this body of controlling case law.  They rely solely on *Palin v. New York Times Co.*, 510 F. Supp. 3d, 21, 27 (S.D.N.Y. 2020), which pre-dated all of the state court cases described above and which has been expressly rejected by New York's courts.  *See Sproule*, 2024 WL 172927, at *4.  Because "a federal court may 'not second-guess the decision of a . . . state court on [that state's] law,'" *Hobbs v. McIntosh*, 2022 WL 17551853, at *4 (S.D.N.Y. Dec. 9, 2022) (quoting *Arnold v. Dormire*, 675 F.3d 1082, 1086 (8th Cir. 2012)), those decisions are binding on this Court, which should accord no weight to *Palin*.[7]

### 2.   Even If New York Law Required Actual Malice, Illinois and Georgia Law Would Govern and Impose a Negligence Standard

The laws of Georgia and Illinois require private figures (like Carmody and Goldstrom) to demonstrate that the defendant in a defamation case acted with negligence only, not with actual malice.  *See, e.g., Triangle Publ'ns, Inc. v. Chumley*, 317 S.E.2d 534, 536 (Ga. 1984) (holding that the standard of care for defamation against a private plaintiff is "ordinary care."); *Kapetanovic v. Stephen J. Prods., Inc.*, 2002 WL 475193, at *3 (N.D. Ill. Mar. 27, 2002) ("If plaintiffs are strictly private figures, they need only show that the defendants acted with

---

[7] There is an exception to this rule if there is reason to believe a state's highest court would rule differently.  But there is no persuasive evidence that the Court of Appeals would reach a different decision from the unanimous intermediate appellate courts.  In fact, the Court of Appeals recently had an opportunity to reverse that unanimous position but declined to reach the question.  *Gottwald v. Sebert*, 220 N.E.3d 621, 631-32 (N.Y. 2023).

negligence in order to succeed on their defamation claims."); *Glocoms Grp., Inc. v. Ctr. For Public Integrity*, 2018 WL 2689434, at *6 (N.D. Ill. June 5, 2018) ("As a private figure, [plaintiff] need only plead negligence rather than actual malice for its defamation claims to proceed.").  Because there is no conflict between New York, Georgia, and Illinois law on this point, the Court may apply the pre-2020 law of New York to the defamation claims in this case. *See Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Publ'g Co.*, 580 F. Supp. 2d 285, 290 (S.D.N.Y. 2008) ("If no conflict is found between the law of the forum and any other jurisdiction whose law is invoked, then the Court should apply the law of the forum.").

However, even if actual malice were required under New York law, that would do nothing more than establish a conflict between the laws of New York and Illinois (for Carmody) and Georgia (for Goldstrom).  And New York conflicts of laws principles would mandate application of Illinois and Georgia law, which require negligence only, rather than the actual malice standard from New York law.  "A federal court . . . adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2d Cir. 1989) (citing *Klaxon Co. v. Stentor Elec. Mfg Co.*, 313 U.S. 487, 496 (1941)).  Under New York's choice of law rules, "the first consideration is whether there is any actual conflict between the laws of the competing jurisdictions." *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 769 N.Y.S.2d 487, 489 (N.Y. App. Div. 2003).  If an actual conflict exists, New York law requires the application of the law of the state "with the most significant contacts [to] the" defamation.  *See Grass v. News Grp. Publ'ns, Inc.*, 570 F. Supp. 178, 185 (S.D.N.Y. 1983).  "For an actual conflict to exist, 'the laws in question must provide different substantive rules in each jurisdiction that are 'relevant' to the issue at hand and have a 'significant possible effect on the outcome of the trial.'" *TBA Global, LLC v. Proscenium*

*Events, LLC*, 980 N.Y.S.2d 459, 461 (N.Y. App. Div. 2014) (quoting *Elmaliach v. Bank of China, Ltd.*, 971 N.Y.S.2d 504 (N.Y. App. Div. 2013)).

Accepting *arguendo* Alix and AlixPartners' position that actual malice is required, this would be an actual conflict, because Georgia and Illinois require only negligence.  Therefore, the laws of the states with the greatest contacts would govern.  For the reasons discussed above, the question of which state has the greatest contacts is not suited for resolution on a motion to dismiss.  *See supra* p. 14.  But should the Court undertake the inquiry at this stage, the Counterclaims establish that the states with the most significant contacts are Illinois and Georgia, for Carmody and Goldstrom respectively.  Illinois has the most significant contacts with the defamation against Carmody, because he works and lives there; no other state has any contacts of a comparable magnitude.  Carmody CC ¶¶ 8, 86.  Georgia has the most significant contacts with the defamation against Goldstrom because his professional life is based there and because he maintains a house there.  *See supra* pp. 14-15. Accordingly, a negligence standard would govern both Counterclaims, and both Counterclaims have met that standard.

> ### 3.  Even If New York's Actual Malice Standard Applies, Carmody and Goldstrom Have Alleged Actual Malice

Finally, even if the actual malice standard under Civil Rights Law § 76-a did apply, Carmody and Goldstrom have alleged sufficient facts to demonstrate actual malice.  As Alix and AlixPartners concede (at 19-20), this standard can be satisfied by allegations that Alix and AlixPartners knew that the statements were false or were reckless as to their falsity.  As shown above, Carmody and Goldstrom have alleged such knowledge based on Alix and AlixPartners' awareness of their sworn deposition testimony demonstrating that the statements were false.  *See*

*supra* pp. 20-21.  That is all they need to show, particularly given that the Federal Rules allow

states of mind to "be alleged generally." Fed. R. Civ. P. 9(b).[8]

### D.      Alix's Statements Were Defamatory Per Se

The final element of a defamation claim is that the statement caused special harm or was

defamatory per se.  Alix and AlixPartners do not dispute that Carmody and Goldstrom have

alleged defamation per se.  Statements are defamatory per se where they "tend to injure another

in his or her trade, business or profession, *Epifani*, 882 N.Y.S.2d at 242, or "impugn[]the basic

integrity" of another, *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670 (1981).

Carmody and Goldstrom each plead that the false statements did just that.  *See* Carmody CC

¶ 102 (accusing him of "lack of integrity in his business dealings"); Goldstrom CC ¶ 81 (same).

### E.      Alix and AlixPartners' Defamatory Statements Cannot Be Dismissed As Non-Actionable "Opinions"

Alix and AlixPartners argue at length (at 24-30) that their statements are "non-actionable

opinions," invoking an exception to defamation liability for injurious statements that express

what listeners understand is merely an "opinion" rather than a provable assertion.  This argument

is based principally on an aside made by Alix at the end of one sentence.  After unambiguously

asserting that Carmody and Goldstrom had committed serious federal crimes and "actively"

"ignor[ed] federal laws just to make more money for themselves," Alix added "from what I can

---

[8] Alix and AlixPartners concede (at 22) that the Counterclaims adequately allege their motives to defame Carmody and Goldstrom, but argue that motive evidence is not sufficient. While it is not alone sufficient, "[t]here is no doubt that evidence . . . of motive . . . may be adduced" to prove actual malice.  *See, e.g.*, *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir. 1969).  And Carmody and Goldstrom do not rely on motive evidence alone.  They also allege Alix and AlixPartners' knowledge of facts proving that their statements were false, and Alix and AlixPartners' pattern of harassment deliberately targeting Carmody and Goldstrom over a period of years.  That is more than sufficient to infer actual malice, particularly at the pleading stage.

tell." Carmody CC ¶ 90; Goldstrom CC ¶ 68. The statements alleged in the Counterclaim cannot be rendered non-actionable by this argument, which fails for three independent reasons.

First, the "non-actionable opinion" exception that Alix and AlixPartners seek to invoke is inapplicable to "accusations of criminal or illegal activity, even in the form of opinion." *Silsdorf*, 449 N.E.2d at 720. That is because even if the speaker couches his criminal accusation in the form of an opinion, statements that ultimately can be proved or disproved are not opinions. *Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 152 (S.D.N.Y 2016) ("Either Maxwell was involved or she was not. The issue is not a matter of opinion."); *see also Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 203 (2d Cir. 2015) (salesman's statements about competitor's business practices were defamatory, even though prefaced with apparent opinion "[I'm] not wild about the way they [do] business," because it "attributed to [the competitor] a regular business practice of intentional[]" "dishonest" conduct, which is "capable of being proven true or false"); *Trump v. Chi. Tribune Co.*, 616 F. Supp. 1434, 1435 (S.D.N.Y. 1985) ("[W]hen the criticism takes the form of accusations of criminal or unethical conduct, or derogation of professional integrity . . . the borderline between fact and opinion has been crossed."); *Held v. Pokorny*, 583 F. Supp. 1038, 1040 (S.D.N.Y. 1984) ("[a]ccusations of criminal or unethical activity . . . are expressions of fact . . . that are susceptible of proof"). The touchstone is whether the statement "*might* reasonably be interpreted" to assert that the target committed a crime; if it might, then the "complaint must be deemed legally sufficient." *Silsdorf*, 449 N.E.2d at 721 (emphasis added).

Under that governing standard, Alix's statements were plainly statements of fact, not opinion. Despite the one throwaway phrase "from what I can tell," Alix repeatedly made unambiguous assertions that "for a fact" McKinsey and its professionals committed crimes and "ignor[ed]" the law. *See, e.g.*, Carmody CC ¶¶ 87-90 ("There are hundreds of cases and case

laws that are all decided in favor of full disclosure and McKinsey is in complete violation of all of it"; "McKinsey is still not in compliance with these federal laws"; "There are recent cases that they've been involved in, where I know *for a fact* that they have withheld dozens and dozens of important disclosures, basically false disclosure by omission"; "[T]hey weren't interested in complying with the law. They didn't feel it applied to them"; "Mr. Goldstrom and Mr. Carmody . . . have actively gone about ignoring federal laws just to make more money for themselves is [sic] from what I can tell.") (emphasis added); Goldstrom CC ¶¶ 65-68 (same).[9]  The statements at issue "have a precise and readily understood meaning" and "may be proven false." *Camp Summit*, 2007 WL 1152894, at *11.  Like the plaintiff in *Camp Summit*, either Carmody or Goldstrom "broke the law" or they "did not." *Id.*  McKinsey and its professionals either were or were not "in complete violation" of bankruptcy laws; they either were or were not violating those laws deliberately; they either were or were not actively ignoring federal law.  None express any uncertainty, ambiguity, or opinion.  Each "might reasonably be interpreted" as accusing McKinsey and its professionals of crimes that either did or did not occur, and that is all that is necessary at this stage.

Although they do not acknowledge this legal rule, Alix and AlixPartners ask the Court to rely on a handful of cases where defendants' comments were inactionably vague or hyperbolic.  Those cases are inapposite, because context here makes clear that Alix was not speaking hyperbolically.  *Compare Gross v. New York Times Co.*, 623 N.E.2d 1163, 1169 (N.Y. 1993) (statement that public official was "corrupt" was not hyperbole because "the accusation was

---

[9] Alix and AlixPartners also (at 28) note that Alix said "I think" or "I feel" a handful of times in other unrelated places, but that only highlights that he made no such qualifications at the repeated points, including those quoted above, where he accused McKinsey and its professionals of breaking the law.

made . . . only after what purported to be a thorough investigation") *with* ECF No. 302-8 at 4:10-11 ("I pursued this investigation personally"); *id.* at 2:16-3:21 (describing purported years-long investigation); *see also Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280, 305 (S.D.N.Y. 2023) (statements were actionable because "context clearly suggests that participants on the show believed crimes were committed and did not mention criminality merely for hyperbole"). Each of the cases cited by Alix and AlixPartners involves statements that were non-definitive or nonspecific,[10] clear rhetorical overstatement,[11] or found to be actionable.[12]  Nothing in Alix's statements was vague or rhetorical overstatement; he presented his false claims as the product of a careful investigation, which he claimed was corroborated by the Wall Street Journal, and repeatedly and unambiguously accused McKinsey and its professionals of criminal activity as a factual matter, not as a rhetorical flourish.

---

[10] *See Sweigert v. Goodman*, 2022 WL 168080 at *4 & n.11 (S.D.N.Y. Jan. 19, 2022) (on summary judgment, statement that "I intend to get [plaintiff] prosecuted criminally" was not a verifiable accusation because defendant was talking about his own intentions and because no actual crime was "readily apparent" from the statements he gave); *Hayashi v. Ozawa*, 2019 WL 1409389, at *3-4 (S.D.N.Y. Mar. 28, 2019) (statements in blog posts that it was misleading for plaintiff to call herself a doctor were not actionable because defendant's posts were "fraught with imprecision and ambiguity," "incoherent," and "being used loosely").

[11] *See Small Business Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 311-13 (S.D.N.Y. 2017) (on summary judgment, statement that defendant was the victim of "varying degrees of what many people might view as extortion, manipulation, fraud, and deceit . . . by someone I know" was vague and hyperbolic because it did not "anywhere" identify the person at issue and because it was surrounded by other clear embellishments, such as a statement that defendant was "going insane," such that it was "clear that this is not an accusation of a criminal offense").

[12] *See Zu Guo Yang v. Shanghai Cafe Inc.*, 2012 WL 398641, at *4-5 (S.D.N.Y. Feb. 8, 2012) (although statement that owner "exploits" workers was non-actionable opinion, because that word "is itself without concrete and specific meaning, and therefore apt to be regarded as hyperbole," an accusation that owner "is a thief" who "stole[] from workers" was actionable statement that "accuse[d] [the owner] of a serious crime" because it implied to listeners that there were provable facts behind it).

Second, even if there were some ambiguity as to what Alix meant or how listeners would understand it (and there is not), at the motion to dismiss stage, this Court cannot credit Alix and AlixPartners' argument that the statements would have been interpreted as mere opinions. *See Celle*, 209 F.3d at 178 (if words "are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood"). Their argument hinges on the proposition that the aside "from what I can tell" or comments like "I feel" might cause some listeners to interpret all of Alix's statements in the podcast to be opinions. That factual determination cannot properly be made on a motion to dismiss – particularly where, as here, the statement "from what I can tell" on its face appears to relate only to Alix's statements about Carmody and Goldstrom's motives ("just to make more money for themselves, from what I can tell") and not to the accusation that they "actively" "ignor[ed] federal laws."

Finally, even if the Court finds that portions of Alix's statements expressed an opinion (and it should not at the pleadings stage), those statements remain actionable because they "impl[y] that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader." *Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 723 (S.D.N.Y. 2014). Alix's statements about Carmody and Goldstrom are grounded in assertions of fact that purport to rely on his own investigative work. *See* Carmody CC ¶ 87 ("I came to realize that McKinsey was in violation of the United States Bankruptcy Code"; "I have found out that McKinsey has been breaking the law"); Goldstrom CC ¶ 65 (same). In their motion, Alix and AlixPartners acknowledge (at 16-17) that Alix pursued an "investigation personally" to look into the compliance of McKinsey, Carmody, and Goldstrom with the "laws"

of the United States.  Accordingly, even if Alix qualified his statements with "as far as I can tell," his statements remain actionable "because a reasonable listener" would "infer that the speaker or writer 'knows certain facts, unknown to the audience, which support the opinion and are detrimental to the person toward whom the communication is directed.'" *Restis*, 53 F. Supp. 3d at 723 (citation omitted); *see also Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 520 (S.D.N.Y. 2013) (explaining a statement is actionable if it "impl[ies] that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader.").

As an afterthought, Alix and AlixPartners also argue (at 29-30) that Alix did not actually compare Carmody and Goldstrom to Enron executives.  They openly admit that they intend to "contradict[]" the Counterclaims' allegations with this argument.  That is improper on a motion to dismiss, particularly because the Counterclaims are *consistent* with the transcript Alix and AlixPartners cite.  Drawing all inferences in Carmody and Goldstrom's favor, context makes clear that Alix was invoking Enron to suggest that McKinsey's professionals committed serious crimes.  *See* ECF No. 302-8 at 19:1-4; Carmody CC ¶ 91; Goldstrom CC ¶ 69.  Alix and AlixPartners may later seek to present evidence that listeners would not likely draw that conclusion; but the Court should not make that determination as a matter of law on a motion to dismiss.

**F.      Alix's Statements Are "Of and Concerning" Carmody and Goldstrom**

Alix and AlixPartners also argue (at 22-24) that "[a]lmost all" the defamatory statements are not "of and concerning" Carmody and Goldstrom because the statements did not mention them by name.  The Court can quickly reject this argument, because it is beyond dispute that at least one of the defamatory statements *did* identify Carmody and Goldstrom by name.  Carmody CC ¶ 90 (quoting Alix's statement that "Mr. Goldstrom and Mr. Carmody . . . have actively gone about ignoring federal laws just to make more money for themselves"); Goldstrom CC ¶ 68

30

(same).  Moreover, there is no requirement that the plaintiff be mentioned by name to make a statement defamatory.  Imposing this pleading requirement would insulate countless artifices and clever means of defaming and injuring individuals.  Rather, "it is sufficient if those who know the plaintiff can make out that she is the person meant." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 105 (2d Cir. 2017).  Carmody and Goldstrom "need only plead sufficient facts to make it plausible—not probable or even reasonably likely—that [someone] familiar with [plaintiff] would identify him as the subject of the statements at issue." *Id.*  They have done so:  anyone familiar with the role of Carmody and Goldstrom at McKinsey RTS would readily know they were the subjects of Alix's accusations.

## IV.     The Defamatory Statements are Attributable to AlixPartners

In a final argument (at 32-35), AlixPartners seeks dismissal of the counterclaims against it by arguing that Alix was acting only in a personal capacity – and not on behalf of AlixPartners – when he defamed Carmody and Goldstrom.  This argument fails for multiple reasons.

First, it is premature.  "[T]he existence and scope of an agency relationship is a factual issue that a court cannot properly adjudicate on a motion to dismiss." *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,* 51 F. Supp. 2d 457, 471 (S.D.N.Y.1999) (citing cases).

Second, even if the Court were to consider this issue now, Carmody and Goldstrom have adequately alleged that AlixPartners may be liable for Alix's defamatory statements.  "[T]o survive a motion to dismiss . . . a plaintiff need only raise a sufficient inference that some sort of agency relationship existed between the purported principal and agent." *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 344 (S.D.N.Y. 2010) (internal quotation marks omitted). "[C]ircumstantial evidence is sufficient." *Id.* at 345.  The Counterclaims allege facts sufficient to support the inference that Alix was acting as AlixPartners' agent for two independent reasons.

One recognized form of agency, sufficient to impose defamation liability, is actual agency, which arises from a "direct manifestation of consent from the principal to the agent." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009). Actual agency "may be express or implied" and is present "where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act." *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996). The factual allegations in the Counterclaims are more than sufficient to support an inference that AlixPartners expressly or implicitly authorized Alix to execute a campaign against Carmody, Goldstrom, and others at McKinsey on its behalf. The complaint expressly alleges that Alix had AlixPartners' "knowledge and authorization" and that Alix was assisting AlixPartners in its "multi-year strategy" to "destroy the careers of McKinsey RTS's leading professionals." Carmody CC ¶¶ 4, 100; Goldstrom CC ¶¶ 4, 78-79. The former CEO of AlixPartners, Frederick Crawford, testified that, in 2013, the board of directors — including Alix — considered a plan to make McKinsey's expansion into the restructuring market "public and painful." Carmody CC ¶¶ 32-34; Goldstrom CC ¶¶ 32-34. The plan, as set out in a presentation to the board, included "[p]lanting stories with both local and national media regarding McKinsey's roles in restructuring cases" and focusing on "[i]nformation sourced from [McKinsey's] bankruptcy filings." Carmody CC ¶¶ 34-36; Goldstrom CC ¶¶ 34-36. These facts support the inference that Alix acted with AlixPartners' approval when he defamed Carmody and Goldstrom.

In fact, the counterclaims allege that Alix himself admitted that, after his purported retirement, he nonetheless acted as AlixPartners' agent in 2014 in connection with a series of meetings with McKinsey's Global Managing Partner. *See* Carmody CC ¶¶ 48, 49; Goldstrom CC ¶¶ 53, 54. In that capacity, Alex defamed and disparaged Goldstrom and his McKinsey RTS

32

colleagues with falsehoods he would later repeat in the 2018 interview.  *See* Carmody CC ¶¶ 48-
50, 87-92; Goldstrom CC ¶¶ 53-55, 65-70.  Carmody and Goldstrom have also alleged facts
tending to show that Alix's agency relationship with AlixPartners continued through at least May
2018, when Alix made his defamatory podcast remarks in Barcelona, where he traveled to attend
an AlixPartners meeting.  *See* Carmody CC ¶ 101; Goldstrom CC ¶ 80.  AlixPartners' Managing
Director Jay Marshall affirmed in 2019 that the "public and painful" strategy was still in effect at
that time.  Carmody CC ¶¶ 94-98; Goldstrom CC ¶ 80.  This deliberate campaign, continuing
unabated from 2013 to 2019, coupled with the allegations that Alix acted as AlixPartners' agent
to execute that campaign before and after the podcast, is more than enough to support an
inference that Alix was authorized to act on AlixPartners' behalf in 2018.

    The Counterclaims also allege a second form of agency, apparent agency, which
independently demonstrates that AlixPartners may be held accountable for Alix's defamatory
statements.  *See* Restatement (Third) Of Agency § 7.08, cmt. d ("An agent who acts with
apparent authority in making a defamatory statement may subject the principal to liability").
Apparent agency "arises if the principal conducts himself in a manner that leads *a third party* to
believe that the purported agent possesses authority."  *Reiss v. Société Centrale Du Groupe Des
Assurances Nationales*, 235 F.3d 738, 748 (2d Cir. 2000) (emphasis added).  The "extent of an
authorization" depends on "the accompanying circumstances, including the situation of the
parties, their relations to one another, and the business in which they are engaged."  *CBS, Inc. v.
Stokely-Van Camp, Inc.*, 522 F.2d 369, 375–76 (2d Cir. 1975).  This necessarily is a highly fact-
specific inquiry, unsuited to determination on a motion to dismiss.

    Carmody and Goldstrom have alleged facts that support a reasonable inference of
apparent agency.  Alix is the founder of AlixPartners and a 35% shareholder, holding a roughly

$350 million personal financial interest in AlixPartners.  Carmody CC ¶¶ 2, 29; Goldstrom CC ¶¶ 2, 29.  He is also the company's eponymous founder.  Carmody CC ¶ 5; Goldstrom CC ¶ 5.  He is (and at all relevant times was) a member of AlixPartners' board of directors.  *Id.*  And despite his purported retirement, Alix has continued to participate in AlixPartners partner meetings and carry out negotiations on AlixPartners' behalf.  *See* Carmody CC ¶¶ 47, 48, 83; Goldstrom CC ¶¶ 52, 53, 61.  Indeed, Alix appeared on the podcast where he defamed Carmody and Goldstrom while in Barcelona to attend an AlixPartners partner meeting.  Carmody CC ¶¶ 83-84; Goldstrom CC ¶¶ 61-62.  These and other allegations in the counterclaim readily support the inference that when Alix accused McKinsey of harming AlixPartners by engaging in criminal conduct, listeners plausibly could have understood him to be speaking on behalf of, and for the benefit of AlixPartners, creating a factual question about whether Alix was an apparent agent of the company.[13]

On this issue, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 272 (S.D.N.Y. 2016), is illustrative.  There, the software developer Enigma sued Bleeping, the operator of a computer support website, for defamation.  *Id.* at 269.  The allegedly defamatory posts were made by a moderator called "Quietman7," but Enigma argued that Bleeping was liable because "Quietman7 was acting as Bleeping's agent when he posted them."  *Id.* at 274.  The district court denied Bleeping's motion to dismiss, noting that Bleeping had allegedly given Quietman7 the title "Global Moderator" and thereby held him out as someone

---

[13] AlixPartners emphasizes (at 34) that Alix claimed to be acting for himself during the 2018 podcast.  But it ignores that Alix also discussed in detail his continuing connections to the company and, more importantly, that he was expressly working to benefit and "protect" AlixPartners.  *See* ECF No. 302-8 at 5:21-6:2, 28:22-29:10.  In context, Alix's statement of independence does not undermine a reasonable inference of apparent or actual agency, especially taking all allegations in the light most favorable to Carmody and Goldstrom, as the court must. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996).

who "could be 'trusted to give correct . . . answers' to users' questions." *Id.* at 275.  The Court held that this led to an inference that "Bleeping represented to its users that Quietman7 was authorized to post on its behalf." *Id.* at 275.[14]  Here too, the allegations that AlixPartners knew that Alix – its founder, namesake, largest individual shareholder, and board member – had been engaged in its years-long campaign to attack McKinsey and its partners is more than sufficient to establish a plausible inference that AlixPartners "created the appearance" that Alix had authority to speak on the company's behalf.  Accordingly, Carmody and Goldstrom have more than adequately pleaded "some sort of agency relationship."

AlixPartners' argument for dismissal does not seriously grapple with these separate agency theories and instead relies (at 34) on inapposite cases dealing with the analytically distinct respondeat superior doctrine.  That principle and the cases AlixPartners cites are inapposite: they address the unrelated question of when a corporation can be held responsible for an *employee's* torts.  Carmody and Goldstrom have never alleged that Alix is an employee of AlixPartners and do not rely on a respondeat superior theory.  Instead, they rely on actual and apparent agency, which provide independent bases for attributing liability to AlixPartners and do not require AlixPartners to exercise "control" over Alix.  The counterclaims allege facts that more than establish a "sufficient inference" that Alix made his defamatory statement while maintaining "some sort of agency relationship," whether actual or apparent, with AlixPartners. *Amusement Indus., Inc.*, 693 F.Supp.2d at 344.

## CONCLUSION

The Court should deny the motion to dismiss the Counterclaims in its entirety.

---

[14] The decision applies the apparent agency test but uses the moniker "implied agency" for it. *See Enigma*, 194 F. Supp. 3d at 274.

Dated:  March 1, 2024

Respectfully submitted,

  _/s/_ Reid M. Figel_____
Reid M. Figel
Bradley E. Oppenheimer
Robert C. Klipper
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
rfigel@kellogghansen.com
boppenheimer@kellogghansen.com
rklipper@kellogghansen.com

*Counsel for Kevin Carmody and Seth Goldstrom*