# EXHIBIT 7

IN RE: WESTMORELAND COAL COMPANY, et al. CONFIDENTIAL

DOMINIC BARTON
January 28, 2020

Page 29

1  time of your last contacts with Mr. Alix?
2     A.  Yes.
3     Q.  Okay.  And you mention in your last
4  answer, are you a thousand percent sure.
5         What -- tell us the rest of that
6  conversation, sir.
7     A.  Well, you know, Jay Alix kept coming
8  with the same story over and over again.  And I
9  would tell him that our legal counsel is very
10 comfortable with what's happening.  And I, you
11 know, wanted to listen, if there was anything
12 new that was coming on.  It was the same story.
13        And so, you know, Tom was a new CRO,
14 had some legal training by background as well,
15 and I thought it would just be good.  I said,
16 you know, you should take a look.  Gordon had
17 before.  Gordon was comfortable.  You should.
18 That was the nature of it.
19    Q.  Now, you mentioned in one of your
20 earlier answers, in OPCO, there were updates, I
21 think you said.
22        And the updates included saying to
23 the OPCO members that Jean was all over it; is
24 that fair?
25    A.  Yeah.  I guess what I would say on

Page 30

1  that is there were lots of issues to talk about
2  in our OPCO.  This was not a major issue at
3  all.  There were lots of other things that we
4  were dealing with or working on, right?
5         So, you know, I think the point I
6  wanted to make is that Jean Molino, our general
7  counsel, was all over the issues, right,
8  understanding what was going on, what the
9  allegations were and so forth.
10    Q.  Okay.  Did anyone in OPCO say, in
11 words or substance, well, isn't Ms. Molino
12 someone who was involved in the disclosures
13 that Mr. Alix is complaining about and perhaps
14 we should get an independent look at this?
15        MS. GAY: Objection to form.
16        You may answer.
17    A.  You know, I think that we had
18 outside counsel as well as Jean in
19 understanding what our disclosure practices
20 should be.
21        So, you know, we were very
22 comfortable with where Jean was and Jean made
23 that very clear, that there needed to be an
24 external counsel to look at it as well.

Page 31

8         Did Mr. Alix, at any time in your
9  meetings, express a sense of urgency with
10 respect to the issues he was raising?
11    A.  He was always urgent.
12    Q.  Okay.  What is the professional
13 standards committee, sir?
14    A.  The professional standards committee
15 is a group of senior partners that will
16 evaluate whether a partner is, you know, if
17 they are misbehaving in any particular manner.
18 If someone raises a complaint across the board,
19 they will be investigated by that group and
20 they will make a decision as to whether there's
21 an issue.  And if there is an issue, what the
22 sanction is.
23    Q.  And can you tell us, in the 2014
24 time frame, who was on that professional
25 standards committee?

Page 32

1     A.  I can't remember all the particular
2  names.  I think Larry Kanarek, Jean-Christophe
3  Mieszala.  I can't remember all the names.
4     Q.  Now, Jean-Christophe Mieszala, he
5  was also, at one point, the chief risk officer?
6     A.  After Tom Barkin left to become a
7  federal reserve governor, Jean-Christophe -- JC
8  became the risk officer.
9     Q.  That will make it easier for me,
10 too.  Thank you.
11    A.  Yeah.
12    Q.  So did you speak to JC about the
13 issues that Mr. Alix was raising?
14    A.  He was aware of them.  Yeah, he was
15 aware.  I can't remember having the
16 conversation with him, but he was aware -- of
17 any issues that were out there, he would know.
18    Q.  Okay.  So, fair to say that Mr. Orr,
19 the chief risk officer in 2014, his successor,
20 Mr. Barkin, and also Mr. Barkin's successor,
21 Mr. Mieszala, all were aware of the issues that
22 Mr. Alix was raising beginning in September of
23 2014.
24        Would that be fair?
25    A.  Yeah, I think so.  I don't think