UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                      :

JAY ALIX,                              :

                    Plaintiff,     :

                              :          18-CV-4141 (JMF)

         -v-                  :

                              :       <u>OPINION AND ORDER</u>

MCKINSEY & CO., INC. et al.,      :

                   Defendants.   :

                              :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      AlixPartners LLP ("AlixPartners") and McKinsey & Co. (together with its relevant

subsidiaries, "McKinsey") are bitter rivals in the highly competitive market for high-end

bankruptcy consulting.  This suit involves claims that McKinsey and certain executives (the

"Individual Defendants") obtained bankruptcy consulting engagements through a pattern of

deception that constitutes racketeering activity in violation of the Racketeer Influenced and

Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961-1968.  Notably, however, the case was

not filed by AlixPartners, the party allegedly injured by Defendants' conduct.  Instead, it was

filed by Plaintiff Jay Alix, the founder and a part owner of AlixPartners, "as assignee of"

AlixPartners.  ECF No. 177 ("SAC"), at 1.  After years of litigation, including two motions to

dismiss, an appeal, and a remand, Alix finally produced to Defendants a copy of the Assignment

pursuant to which he brings this suit.  *See* ECF Nos. 333-1, 336-1 ("Assignment").  The question

presented here, by way of motions to dismiss filed by Defendants, is whether the Assignment

validly assigned to Alix the claims that he brings in this suit and, if not, whether that problem can

be cured through Rule 17(a)(3) of the Federal Rules of Civil Procedure, which provides that a

court "may not dismiss an action for failure to prosecute in the name of the real party in interest

until, after an objection, a reasonable time has been allowed for the real party in interest to ratify,

join, or be substituted into the action."  *See* ECF Nos. 328, 332.

For the reasons that follow, the Court holds that the Assignment did not assign to Alix the

claims that he brings here and that he therefore lacked Article III standing to sue, a defect that

cannot be cured in the manner that Alix and AlixPartners propose, namely by ratification under

Rule 17(a)(3).  More specifically, applying federal law to assess the validity of the Assignment,

the Court concludes first that the Assignment did not encompass the RICO claims that Alix

brings here and, thus, that Alix lacked standing to bring his claims.  Whether that defect is

curable through ratification under Rule 17(a)(3) is a harder question, if only because the Second

Circuit's case law on Rule 17 is not altogether pellucid.  But the Court concludes that it cannot

be cured because the defect is not a mere technical error in the caption of Alix's pleading for

which Rule 17(a)(3) would allow correction, but a substantive problem that deprives the Court of

the power to adjudicate the case.  Accordingly, the case must be and is dismissed.  The parties'

other motions — including a motion by Alix and AlixPartners to dismiss counterclaims filed by

two Individual Defendants, *see* ECF No. 300, and discovery-related motions, *see* ECF Nos. 397,

399, 400 — are therefore moot.

## BACKGROUND

The lengthy and substantial background to this case is, for the most part, irrelevant to the

motions now before the Court.  In brief, Alix founded the corporation that would later become

AlixPartners in 1981, working with underperforming companies in bankruptcies, out-of-court

restructurings, and corporate turnarounds.  SAC ¶ 51.[1]  Alix currently serves on the board of

---

[1]     The following brief factual summary is, unless otherwise noted, drawn from the Second
Amended Complaint and assumed to be true.  *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp.,
PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

directors of AlixPartners and maintains an approximately thirty-five percent equity stake in the company.  *See* SAC ¶ 51.  McKinsey entered the bankruptcy consulting field in or around 2001, and later formed McKinsey Recovery & Transformation Services U.S., LLC.  *See id.* ¶ 54. AlixPartners and McKinsey were — and remain — rivals in the competitive high-end bankruptcy consulting space.  *See id.* ¶ 55.

The gravamen of Alix's claims here — namely, three substantive RICO claims under Section 1962(c) and one claim of RICO conspiracy under Section 1962(d) — is that McKinsey (and various of its subsidiaries and executives) engaged in a criminal enterprise by misrepresenting and concealing disqualifying conflicts of interest in its required disclosures as a bankruptcy professional, allowing it to improperly secure assignments to the exclusion of AlixPartners and other competitors.  *See, e.g.*, *id.* ¶¶ 1-5, 9-11, 390-707.  Alix alleges that "[AlixPartners] is the direct victim and target of Defendants' unlawful scheme" and that "Defendants' criminal enterprise has caused [AlixPartners] to lose considerable revenue that it otherwise would have earned had Defendants complied with the law," *id.* ¶ 6, but he seeks treble damages for himself, purportedly "as assignee of" AlixPartners, *id.* ¶¶ 8, 498, 576, 678, 707; *see also id.* ¶ 34 ("All claims asserted herein have been fully and lawfully assigned to Alix by [AlixPartners].").

In August 2019, the Court dismissed Alix's claims, principally on the ground that he had failed to adequately allege proximate causation.  *See Alix v. McKinsey & Co., Inc.*, 404 F. Supp. 3d 827 (S.D.N.Y. 2019) (ECF No. 104).[2]  The Second Circuit vacated and remanded for further

---

[2]      After the Court dismissed the RICO claims, Alix voluntarily dismissed his remaining state-law claims and then sought to reinstate them. *See* ECF Nos. 107, 108, 111, 124.  Of note here, in ruling on that request, the Court held that the Assignment was presumptively collusive given the relationship between Alix and AlixPartners, that Alix had failed to overcome that presumption, and that diversity jurisdiction over the state-law claims was therefore barred by 28

proceedings.  *See Alix v. McKinsey & Co., Inc.*, 23 F.4th 196 (2d Cir. 2022).  At a May 31, 2022 hearing following remand, Defendants explicitly raised for the first time concerns regarding the Assignment, noting that Alix had not yet disclosed the Assignment and voicing doubts as to its validity and scope.  *See* ECF No. 168 ("May 31, 2022 Hearing Tr."), at 20-21; *see also* ECF No. 183 (July 14, 2022 letter filed by McKinsey proposing a schedule for a potential Rule 17 motion).  Shortly thereafter, Alix sought and obtained leave to file a Second Amended Complaint (the operative Complaint), and Defendants once again moved to dismiss.  *See* ECF No. 198.  This time, the Court granted in part and denied in part the motion.  *See Alix v. McKinsey & Co., Inc.*, No. 18-CV-4141 (JMF), 2023 WL 5344892 (S.D.N.Y. Aug. 18, 2023) (ECF No. 239).

The Court then set an expedited schedule for discovery related to an anticipated motion to dismiss pursuant to Rule 17.  *See* ECF No. 263.  In January 2024, as part of Rule 17 discovery, Alix produced — for the first time — the executed Assignment upon which this suit is premised.  The document consists of a single short paragraph:

> **FOR VALUE RECEIVED,** AlixPartners, LLP does hereby irrevocably sell, convey, transfer and assign to Jay Alix, individually, all of its rights and interest in, to and under claims or causes of action against McKinsey & Co., Inc. and affiliates for illegal competitive activity in the crisis management and consulting business involving major bankruptcy cases, to the extent the claims or causes of action arose prior to the date of this assignment (the "Claim"). This assignment shall be deemed an absolute and unconditional assignment of the Claim for the purpose of litigation, collection and satisfaction.  From and after the date set forth below, Jay Alix shall be deemed owner of the Claim, and shall be entitled to identify himself to any court of competent jurisdiction for all purposes as the owner of the Claim.

---

U.S.C. § 1359.  *See Alix v. McKinsey & Co.*, 470 F. Supp. 3d 310, 319-22 (S.D.N.Y. 2020) (ECF No. 139).

Assignment.[3]  The Assignment is signed by Kathryn Koorenny, AlixPartners's General Counsel

at the time.  It is not signed by Alix.  Alix acknowledges that the Assignment is the "full and

complete statement of the assignment upon which" he relies "to bring the claims in this case."

*See* ECF No. 334 ("Individual Defs.' Mem."), at 5.[4]  It has never been amended or

supplemented.  *See id.*

On March 19, 2024, McKinsey filed a motion to dismiss pursuant to Rule 17, arguing

that the Assignment was invalid and that Alix thus lacks authority to bring RICO claims for

harms to AlixPartners.  *See* ECF No. 332; *see also* ECF No. 339 ("McKinsey Mem."); ECF No.

371 ("McKinsey Reply").[5]  On the same date, the Individual Defendants filed a separate (partial)

motion to dismiss pursuant to Rules 12(b)(1) and 17, arguing that even if the RICO claims

generally were validly assigned, the Assignment did not encompass the claims filed against them

*individually*.  *See* ECF No. 328; *see also* Individual Defs.' Mem.; ECF No. 369 ("Individual

---

[3]      The Court granted leave to temporarily file the Assignment under seal, but as discussed
below, the Court now finds that it must be unsealed in its entirety, and thus may be discussed
fully herein without need for any sealing or redaction.

[4]      The parties' memoranda include redactions because they refer to materials that are
currently filed under seal.  As the Court discusses below, although the majority of such materials
may remain sealed (and references thereto may remain redacted), the excerpts explicitly referred
to in this Opinion and Order are deemed unsealed by virtue of their inclusion herein.

[5]      McKinsey styles its motion as a motion to dismiss pursuant to Rule 17 alone, but it
plainly also implicates Alix's standing — and thus the Court's subject-matter jurisdiction.  *See*
McKinsey Mem. 14 ("[T]he purported Assignment is Alix's only basis for standing, and thus his
only basis for invoking this Court's subject matter jurisdiction.").  Accordingly, the Court can
and does also treat it as a motion brought pursuant to Rule 12(b)(1) — or, more precisely, Rule
12(h)(3) — of the Federal Rules of Civil Procedure.  *See, e.g.*, *Odyssey Marine Expl., Inc. v.
Shipwrecked & Abandoned SS Mantola*, 333 F. Supp. 3d 292, 300 n.4 (S.D.N.Y. 2018); *see also
Now-Casting Econ., Ltd. v. Econ. Alchemy LLC*, 628 F. Supp. 3d 501, 512 (S.D.N.Y. 2022)
("The standard governing a Rule 12(h)(3) motion is the same as that governing a motion under
Rule 12(b)(1)."); *Tasini v. N.Y. Times Co., Inc.*, 184 F. Supp. 2d 350, 354 (S.D.N.Y. 2002) ("An
objection to standing is properly made on a Rule 12(b)(1) motion.").

Defs.' Reply").  More specifically, Defendants argue in their motions that the Assignment did

not encompass the claims brought by Alix, was collusive, was not entered into for legitimate

business purposes, and was designed to improperly shield AlixPartners from the burdens of

litigation while allowing Alix to pursue a windfall payout.  *See* McKinsey Mem. 11-21;

Individual Defs.' Mem. 1 n.3.  In conjunction with his opposition to these motions, *see* ECF No.

354 ("Alix Opp'n"), Alix submitted a Declaration of Simon Freakley, Chief Executive Officer of

AlixPartners, which purports to "ratif[y] and confirm[] Alix's entitlement to pursue the Claims

asserted in the above-captioned action" "for purposes of Federal Rule of Civil Procedure 17," *see*

ECF No. 358-1 ("Ratification"), ¶¶ 1, 12.  Alix contends that, "if the Assignment is found

defective, the Rule 17 ratification filed herewith cures any defect."  Alix Opp'n 4.

On May 29, 2024, the Court held oral argument on the motions.  *See* ECF No. 392 ("Oral

Argument Tr.").

## LEGAL STANDARDS

Defendants' motions to dismiss are brought under Rule 17 and Rule 12(b)(1) or (h)(3) of

the Federal Rules of Civil Procedure.  A motion under Rule 12(b)(1) or (h)(3) challenges the

court's subject-matter jurisdiction to hear the case.  "A case is properly dismissed for lack of

subject matter jurisdiction under [these] Rule[s] . . .  when the district court lacks the statutory or

constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.

2000).  In reviewing a motion to dismiss under Rule 12(b)(1) or (h)(3), a court "must take all

facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but

jurisdiction must be shown affirmatively, and that showing is not made by drawing from the

pleadings inferences favorable to the party asserting it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547

F.3d 167, 170 (2d Cir. 2008) (internal quotation marks and citation omitted), *aff'd*, 561 U.S. 247

(2010).  "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence."  *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).  By contrast, "the question of which party bears the burden of proof in the Rule 17 context is unsettled."  *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2021 WL 3541153, at *4 (S.D.N.Y. Aug. 11, 2021), Here, as in *Nastasi*, however, "the issue is immaterial" because "the relevant fact[s]," namely the existence and contents of the Assignment, are "undisputed," *id.*  It is the legal implications of the Assignment — both for Rule 17 real-party-in-interest purposes and Article III standing purposes — that are hotly disputed and now at issue before the Court.

## DISCUSSION

Defendants challenge Alix's ability to bring the claims in this case by way of the Assignment on a host of grounds: because the Assignment was "collusive" and made for "impermissible purposes," McKinsey Mem. 14-17; because it was champertous and thus void under New York law, *see id.* at 17-21; and because it was, at best, a partial assignment and did not effect a valid assignment of the particular claims asserted, *see id.* at 21-23; Individual Defs.' Mem. 6-16.  The Court need not and does not reach the first of these arguments and rejects the second because it concludes that federal law, not New York law, governs the validity of the Assignment.  But the Court agrees with the third argument because federal law provides that, to effect assignment of a RICO claim, such assignment must be "express," and the Assignment here — which referred only to "claims or causes of action . . . for illegal competitive activity" — did not meet that standard.  The more difficult question is what to make of that fact, namely whether the defect defeats subject-matter jurisdiction or whether it can be cured by AlixPartners's purported ratification under Rule 17(a)(3).  Although not free from doubt, the Court concludes

that well-established principles of law and Second Circuit precedent dictate that the defect is jurisdictional and cannot be cured.

## A. Choice of Law

The Court begins with the question of what law applies.  McKinsey argues that it should prevail whether federal or New York state law applies, but the choice obviously affects the analysis, if not the outcome.  The parties agree that federal law governs the *assignability* of federal claims, but they dispute what law should govern the *validity* of the Assignment.  *See* McKinsey Reply 6 n.2; *see also Farey-Jones v. Buckingham*, 132 F. Supp. 2d 92, 100 (E.D.N.Y. 2001) ("[F]ederal law governs the assignability of claims under the federal securities laws." (citing *Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 85 F.3d 970, 973 (2d Cir. 1996)).

The Second Circuit has not squarely ruled on the question of whether courts assessing the validity of an assignment of federal claims should apply state law or federal common law.  The two Circuits that have weighed in — the Third and the Fifth — arrived at different conclusions. *Compare Martin v. Morgan Drive Away, Inc.*, 665 F.2d 598 (5th Cir. Unit A 1982), *with Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir. 1993).  In *Martin*, the Fifth Circuit applied Louisiana champerty law in considering the validity of an assignment of federal antitrust claims.  *See* 665 F.2d at 604-05; *accord Koehler v. NationsBank Corp.*, No. 96-CV-2050, 1997 WL 112836, at *1 (N.D. Ill. Mar. 10, 1997) ("There is no federal law of assignments."); *Nicolls Pointing Coulson, Ltd. v. Transp. Underwriters of La., Inc.*, 777 F. Supp. 493, 496 (E.D. La. 1991) (same).  Notably, in doing so, the *Martin* court relied on *Sampliner v. Motion Picture Patents Co.*, 255 F. 242 (2d Cir. 1918), *reversed on other grounds*, 254 U.S. 233 (1920), an ancient Second Circuit decision on which McKinsey also relies here.

*See* 665 F.2d at 604-05; *see* McKinsey Reply 5-6.[6]   *Martin* reads *Sampliner* to hold that, "as a matter of federal law, . . . the federal courts should look to state law" in determining the validity of an assignment of federal claims.  *Id.* at 604-05.  But putting aside the fact that *Sampliner* is from a bygone era (for example, it predated *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), by two decades), the decision did not go so far.  Yes, it applied Ohio champerty law in assessing the validity of an assignment of federal claims, but it did so in the context of an assignment that explicitly designated Ohio law as the law governing the assignment's validity.  *See Sampliner*, 255 F. at 250 ("It is said . . . that whether the lex loci contractus or the lex loci solutionis is to determine the validity of the assignment that law in this case is the law of Ohio.  There is no disagreement on either side on this phase of the subject.").  *Sampliner* made no broader pronouncement that would bind the Court here.

On the other side of the split, the Third Circuit found it "clear that the validity of the assignment of an antitrust claim is a matter of federal common law."  *Gulfstream III Associates*, 995 F.2d at 437.  The *Gulfstream III Associates* court offered two principal grounds for this holding.  First, "the issue of assignment is appropriate for the development of interstitial federal common law in harmony with the overall purposes of the antitrust statutes."  *Id.* at 438.  Second, "assignments of antitrust claims cannot appropriately be left to determination under possibly differing state law standards."  *Id.*  Or as one district court following the Third Circuit put it: "[T]here is no doubt that states have the authority to dictate how *state* claims are transferred and assigned to parties.  But it would be intolerable to permit the states to determine the

---

[6]     The only other case McKinsey cites for the proposition that "[t]he question of whether a valid assignment exists is determined under state law" is entirely off point as the quoted language pertains to the assignment of *state-law* claims over which the court had supplemental jurisdiction.  *King v. Tuxedo Enters., Inc.*, 975 F. Supp. 448, 451 (E.D.N.Y. 1997); McKinsey Reply 6.

transferability, and thus the value, of interests created by federal law." *In re Turkey Antitrust Litig.*, No. 19-C-8318, 2024 WL 1328824, at *3 (N.D. Ill. Mar. 28, 2024) (cleaned up).

In *DNAML Pty, Ltd. v. Apple, Inc.*, No. 13-CV-6516 (DLC), 2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015), which involved the assignment of federal antitrust claims, Judge Cote took the Third Circuit's side in this debate. After noting that "[w]hether a federal antitrust claim may be assigned is itself a matter of federal law," she turned to the "issue [of] what law will be used to determine whether [the plaintiff's] causes of action have been validly assigned." *Id.* at *3. To answer that question, she looked not only to the Third Circuit's decision in *Gulfstream III Associates*, but also to *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728-29 (1979), in which the Supreme Court held that "courts determining whether federal common law should displace state law must consider whether: "(1) the issue requires a nationally uniform body of law; (2) application of state law would frustrate specific objectives of the federal programs; and (3) application of a federal rule would disrupt commercial relationships predicated on state law." 2015 WL 9077075, at *3. Applying that test, and observing that the Supreme Court had "concluded long ago that the first two sections of the Sherman Act, with their 'sweeping language,' are among those instances in which courts are empowered to create governing rules of law," she held that federal common law governs the validity of the assignment of antitrust claims. *Id.* (quoting *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 644 (1981)).[7]

The Court agrees with the Third Circuit and Judge Cote and, thus, concludes that federal common law governs the validity of the Assignment here. Granted, their decisions addressed the

---

[7]   Judge Cote did not explicitly address *Sampliner*, presumably finding — as the Court did above — that it does not control. Nevertheless, her opinion appears to implicitly distinguish the circumstances in *Sampliner*, noting that "[t]he Agreement does not contain a choice of law provision, nor do the parties argue for the application of any law outside of the Third Circuit's federal common law framework." *DNAML*, 2015 WL 9077075, at *4 n.3.

assignment of antitrust claims, not RICO claims.  But the Supreme Court has explicitly noted the "similarities in purpose and structure" between RICO and federal antitrust statutes in the context of applying federal common law.  *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 152 (1987) (applying the four-year statute of limitations used for Clayton Act claims to RICO's civil enforcement provision); *see also Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 230 (E.D.N.Y. 1999) ("[T]he RICO statute contains an express admonition that the statute be read broadly in order to effectuate its policies.  It provides that, '[t]he provisions of this title shall be liberally construed to effectuate its remedial purposes.'" (quoting Pub. L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970))).  And consistent with that observation, courts have regularly applied federal common law to other aspects of RICO actions. *See, e.g.*, *Allstate Ins. Co. v. Yehudian*, No. 14-CV-4826 (AKT), 2018 WL 1767873, at *18 (E.D.N.Y. Feb. 15, 2018) ("Courts apply federal common law to determine whether the set-off rule is applicable to a plaintiff's claim for RICO damages."); *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 35-37 (2d Cir. 2002) (holding that federal common law governs statute of limitations and tolling thereof in RICO actions); *Epstein v. Epstein*, 966 F. Supp. 260, 260-61 (S.D.N.Y. 1997) (holding that federal common law governs survival of RICO claims). Accordingly, the Court holds that the validity of the Assignment is governed by federal law.[8]

## B.  AlixPartners Did Not Assign Its RICO Claims to Alix

Having determined that federal common law governs both the assignability of federal claims and the validity of the Assignment, the Court must now apply that law.  On the assignability front, it is well settled that "RICO claims are assignable."  *Kalimantano GmbH v.*

---

[8]      It follows that McKinsey's challenge to the Assignment on the ground that it violates New York's champerty law, *see* McKinsey Mem. 17-21, fails.

*Motion in Time, Inc.*, 939 F. Supp. 2d 392, 400 n.2 (S.D.N.Y. 2013); *accord Zap Cellular, Inc. v. Kurland*, No. 15-CV-682 (BMC), 2015 WL 8207315, at *6 (E.D.N.Y. Dec. 6, 2015). Meanwhile, on the validity (or scope) front, it is equally well settled that, "in order to make [an] assignment valid, 'the owner must manifest an intention to make the assignee the owner of the claim.'" *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 403 F. Supp. 3d 257, 263 (S.D.N.Y. 2019) (quoting *Advanced Magnetics Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 21 (2d Cir. 1997)); *see DNAML*, 2015 WL 9077075, at *4 (applying "ordinary principles of contract law" to determine whether the assignment at issue "effectively made an assignment of the right to bring an antitrust claim"). "[I]f the accrued causes of action are not expressly included in the assignment, the assignee will not be able to prosecute them." *Sonterra Cap. Master Fund*, 403 F. Supp. 3d at 263 (quoting *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 404 (2d Cir. 2018)).

The express assignment requirement applies "with particular force" in the antitrust and RICO contexts. *Id.*; *see Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir. 1993) ("[A]n assignment of a RICO claim must . . . be express." (internal quotation marks omitted)); *JGIAP RH 160 LLC v. CRI Holding Corp.*, No. 21-CV-2489 (DG) (JRC), 2023 WL 5979125, at *7-8 (E.D.N.Y. Aug. 16, 2023) (requiring "language in the assignments demonstrating an intent to assign the [RICO] claims at issue"), *report and recommendation adopted by* 2023 WL 6307320 (E.D.N.Y. Sept. 28, 2023); *Zap Cellular*, 2015 WL 8207315, at *6 (finding an assignment that "broadly includes all causes of action, which encompasses the RICO claims since such claims are generally assignable," sufficiently express (cleaned up)). It means that a "transferee must expressly assign the right to bring that cause of action, either by making specific reference to the [] claim or by making an unambiguous assignment of causes of action in a manner that would

clearly encompass the [] claim." *DNAML*, 2015 WL 9077075, at *3.  In the case of RICO,

examples of the latter would include an assignment of claims that "aris[e] in tort" because civil

RICO "is often described as [a] statutory tort," *Lateral Recovery, LLC v. Cap. Merch. Servs.,*

*LLC*, 632 F. Supp. 3d 402, 444 (S.D.N.Y. 2022) (internal quotation marks omitted), or, more

broadly, an assignment of "all . . . causes of action formerly attributed to [the assignor]," *Zap*

*Cellular*, 2015 WL 8207315, at *6; *accord Lerman*, 10 F.3d at 112 (holding that assignment of

"all of [the assignor's] causes of action and claims . . . of whatsoever nature" was "unambiguous

and all-inclusive" and thus "express" (internal quotation marks omitted)).

     At oral argument, counsel for Alix contended that the express assignment requirement (if

it exists at all) requires only that *claims* generally — as opposed to other forms of property — be

expressly assigned, not specific causes of action.  *See* Oral Argument Tr. 29-30.  But that

argument misunderstands the rationale behind the requirement, which is intended to avoid "the

difficulty of determining on a case-by-case basis whether an assignment . . . had been intended

by the parties to transfer" the specific claims at issue.  *Lerman*, 10 F.3d at 112.  Nor can that be

squared with Second Circuit precedent, which has parsed assignments to determine whether they

encompass the particular claims at issue.  *Compare, e.g.*, *Sonterra*, 403 F. Supp. 3d at 264

(applying the express assignment requirement and finding that the phrase "securities class action

lawsuit" in an assignment did not encompass "'any kind of class action lawsuit' related to

FrontPoint's transaction in financial products"), *with, e.g.*, *Zap Cellular*, 2015 WL 8207315, at

*6 (finding that an assignment including "all 'causes of action'" encompassed RICO claims); *see*

*also Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 151 (2d

Cir. 1995) ("Under New York law, the assignment of the right to assert contract claims does not

automatically entail the right to assert tort claims arising from that contract.").

Thus, whether the Assignment included the RICO claims that Alix brings here turns on whether it made "specific reference" to those claims or made "an unambiguous assignment of causes of action in a manner that would clearly encompass" them. *DNAML*, 2015 WL 9077075, at *3. It did neither. It plainly made no "specific reference" to RICO (or to related terms, such as racketeering or organized crime). Nor did it make "an *unambiguous* assignment of causes of action in a manner that would clearly encompass" RICO claims. To the contrary, the Assignment made specific reference to "claims or causes of action against McKinsey & Co., Inc. and affiliates *for illegal competitive activity* in the crisis management and consulting business involving major bankruptcy cases." Assignment (emphasis added). And the phrase "illegal competitive activity" is naturally construed to mean antitrust, not RICO, claims. *See, e.g.*, *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013) (discussing the "three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury," including that "the party asserting that it has been injured by an *illegal anticompetitive practice* must identify the practice complained of and the reasons such a practice is or might be anticompetitive" (cleaned up)); *7 West 57th St. Realty Co., LLC v. Citigroup, Inc.*, 314 F. Supp. 3d 497, 512 (S.D.N.Y. 2018) (finding that antitrust injury was plausibly alleged where the plaintiff had "identified an illegal anticompetitive practice" (internal quotation marks omitted)); *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11-MDL-2262 (NRB), 2015 WL 4634541, at *1 (S.D.N.Y. Aug. 4, 2015) ("Plaintiffs failed to state antitrust claims because their injuries were not 'antitrust injuries' that flowed from the *anti-competitive nature of defendants' alleged conduct*." (emphasis added)). Indeed, the *Black's Law Dictionary* entry for the similar term "competition law" simply incorporates by reference the entry for "antitrust law," which, in turn, is defined as "[t]he body of law designed to protect trade and commerce from restraints,

monopolies, price-fixing, and price discrimination." BLACK'S LAW DICTIONARY 115, 344 (10th ed. 2014).[9]

 That is true even though, as discussed above, RICO and the federal antitrust statutes share some structural similarities. At their substantive core, they are aimed at distinct types of conduct. "Whereas antitrust law and statutes are ultimately intended to prevent corporations from exerting monopolizing anticompetitive force, the language of RICO is clearly aimed at individual 'racketeers' infiltrating legitimate business." *USA Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d 319, 329 n.3 (S.D.N.Y. 2003) (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 165-66 (2001)). *But see* Virginia G. Maurer, *Antitrust and RICO: Standing on the Slippery Slope*, 25 GA. L. REV. 711, 747-48 (1991) ("[RICO], like antitrust laws, provides both criminal and civil sanctions for illegal competitive activity."). Indeed, "RICO was enacted to prevent organized crime from infiltrating America's legitimate business organizations" and operates by proscribing a "pattern of racketeering activity," which, in turn, is "defined to include a variety of federal and state crimes, including murder, kidnapping, gambling, arson, robbery, bribery, extortion, wire fraud, and mail fraud." *Frederick v. Wells Fargo Home Mortg.*, No. 13-CV-7364 (DLI), 2015 WL 1506394, at *8 (E.D.N.Y. Mar. 30, 2015) (citing 18 U.S.C. § 1961(1) (internal quotation marks omitted)); *see also Stevenson v. Thornburgh*, No. 23-CV-4458 (CM), 2024 WL 645187, at *9 (S.D.N.Y. Feb. 14, 2024) ("Congress's goal in enacting the RICO statute was to prevent legitimate businesses from becoming infiltrated by organized crime, although the statute's reach is not limited to mobsters"). True to RICO's focus, Alix rests his RICO claims

---

[9] Whether the Assignment met the express assignment requirement and thus encompassed Alix's RICO claims is an objective question of law for the Court. But it is worth noting that AlixPartners' own General Counsel admitted in an email (filed under seal) that she was "surprise[d]" that Alix had brought RICO claims. *See* ECF No. 336-14, at 3.

here on bankruptcy fraud, mail and wire fraud, obstruction of justice and witness tampering, inducement to interstate or foreign travel, and money laundering. *See, e.g.*, SAC ¶ 510. His claims are not based on "illegal competitive activity," the realm of antitrust law, *per se*.

Moreover, the similarities between antitrust claims and RICO claims are ultimately beside the point. Under the express assignment requirement, the question is not whether the phrase "illegal competitive activity" squarely and unambiguously *excludes* RICO claims, but rather whether the language "unambiguous[ly]" and "clearly" *includes* such claims. *DNAML*, 2015 WL 9077075, at *3. Thus, it is not enough to argue — as counsel for Alix did at oral argument — that the phrase "illegal competitive activity" could encompass some kinds of RICO claims. Neither plausibility nor possibility alone satisfies the requirements of federal law. It follows that AlixPartners did not effectively assign to Alix the RICO claims that he brought in this action. And because RICO claims were not validly assigned at all, it necessarily follows that the RICO claims that Alix brought against individuals associated with McKinsey also were not validly assigned, rendering the independent arguments raised by the Individual Defendants moot.

## C. Alix Lacks Standing and Cannot Obtain Standing Through Ratification

What the implications of that conclusion are for purposes of this case is a more complex question, if only because the applicable precedent is confusing, if not internally inconsistent. The question turns on the complex interplay between Article III standing — which generally requires proof that, at the time a case was filed, the plaintiff suffered a cognizable injury — and Rule 17 — which allows a "real party in interest" to ratify, join, or be substituted into an action.

The Court begins with undisputed first principles. Article III of the Constitution "restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.'" *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). "That case-or-controversy

requirement is satisfied only where a plaintiff has standing" to bring suit, which requires the

plaintiff to "adequately establish," among other things, "an injury in fact (*i.e.,* a 'concrete and

particularized' invasion of a 'legally protected interest')." *Id.* (quoting *Lujan v. Defenders of*

*Wildlife,* 504 U.S. 555, 560-61 (1992)).  Standing helps to "ensure, in every case or controversy,

that concrete adverseness which sharpens the presentation of issues upon which the court so

largely depends for illumination." *Id.* at 288 (internal quotation marks omitted).  And

significantly, it is a threshold requirement that must be met at the outset of a case.  *See Lujan*,

504 U.S. at 570 n.5 ("[S]tanding is to be determined as of the commencement of suit."); *see also*

*Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("The standing inquiry focuses on

whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was

filed." (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180

(2000))).  On top of the requirement of Article III standing, a plaintiff generally must also stay

on the right side of the so-called "prudential standing" line, which "normally bars litigants from

asserting the rights or legal interests of others in order to obtain relief from injury to themselves."

*Patterson v. Patterson*, No. 20-CV-2552 (PMH), 2022 WL 356513, at *4 (S.D.N.Y. Feb. 7,

2022) (quoting *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 40 (2d Cir. 2015)).

 All of that said, there is at least one circumstance in which a plaintiff can sue to obtain

relief for an injury caused to another party: when the relevant claim was assigned to the plaintiff

by the injured party.  Any doubt on that score was settled by the Supreme Court's decision in

*Sprint*, which held that "[l]awsuits by assignees . . . are cases and controversies of the sort

traditionally amenable to, and resolved by, the judicial process."  554 U.S. at 285 (internal

quotation marks omitted).  The assignment of a claim from an injured party to a plaintiff allows

the plaintiff "to 'stand in the place of the injured party' and satisfy constitutional standing

requirements." *Cortlandt St. Recovery Corp. v. Hellas Telecomm., S.a.r.l*, 790 F.3d 411, 418 (2d Cir. 2015) (quoting *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008)).  But "[t]o assign a claim effectively, the claim's owner must manifest an intention to make the assignee the owner of the claim." *Id.* (internal quotation marks omitted). That is, a "would-be assignor" must "transfer *at least title or ownership, i.e.,* to accomplish a completed transfer of the entire interest of the assignor in the particular subject of assignment," as opposed to, say, creating a mere "power of attorney." *Id.* (internal quotation marks omitted).

At first glance, a straightforward application of these fundamental principles would seem to doom Alix's claims.  First, Alix did not suffer injury-in-fact (or, to be more precise and as discussed in more detail below, the injury-in-fact alleged in his Complaint); AlixPartners did. Thus, Alix lacked Article III standing at the time this lawsuit was filed, seemingly depriving this Court of subject-matter jurisdiction over the case.  Second, for the reasons discussed above, AlixPartners did not manifest an intention to make Alix the owner of the RICO claims that he brings in this case.  Thus, at least when Alix filed his case, he did not "stand in the place" of AlixPartners for purposes of those claims "and satisfy constitutional standing requirements" in that way.  *Cortlandt St. Recovery Corp.*, 790 F.3d at 418.  But the plot is thicker than that because the Second Circuit has held that some defects of these sorts can be cured under Rule 17, which requires that "[a]n action must be prosecuted in the name of the real party in interest," Fed. R. Civ. P. 17(a)(1), but provides, in more relevant part, that a "court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action," Fed. R. Civ. P. 17(a)(3).  "After ratification, joinder, or substitution," the Rule

continues, "the action proceeds as if it had been originally commenced by the real party in interest." *Id.*

Two of the Circuit's decisions loom especially large here. In the first, *Cortlandt Street Recovery Corp.*, the plaintiff, Cortlandt, sued to collect on defaulted notes as the assignee of certain noteholders. The district court held that Cortlandt lacked Article III standing because it did not allege that it had title to the noteholder's claims and denied Cortlandt the opportunity to cure the deficiency under Rule 17(a)(3). *See* 790 F.3d at 416. On appeal, the Second Circuit affirmed both decisions. As to the former, the Court held that Cortlandt alleged neither "direct injury" of its own, *id.* at 417-18, nor a valid assignment from the injured noteholders, *see id.* at 418-19. At most, the Court reasoned, Cortlandt alleged something akin to a power of attorney, which is not enough for a plaintiff "to bring the claim in his or her own name and satisfy the requirements of constitutional standing." *Id.* at 420.

As to the latter, the Circuit observed that it had never addressed the question — previously answered by the Sixth Circuit in the negative, *see Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002) — "whether a plaintiff may use Rule 17(a)(3) to remedy a standing deficiency when it lacks standing as to *all* of its claims," *Cortlandt St. Recovery Corp.*, 790 F.3d at 423. But the Court declined to answer the question, concluding that it need not do so "because neither of the requests made by Cortlandt in its effort to cure the standing problem would have been consistent with Rule 17(a)(3)." *Id.* at 423. Cortland's first request — to substitute the noteholders for it as plaintiffs — failed because it would have created "a different, fatal jurisdictional defect," i.e., lack of complete diversity ("the only potential basis for federal subject matter jurisdiction"). *Id.* at 423-24. More relevant here, Cortland's second request — for leave to obtain a new assignment — failed because it would have required amendment of

19

"the original complaint's factual allegations as to the events or the participants" and, thus, exceeded the bounds of what Rule 17(a)(3) permits.  *Id.* at 424; *see id.* ("We have ordinarily allowed amendments under Rule 17 only when a mistake has been made as to the person entitled to bring suit and such substitution will not alter the substance of the action." (internal quotation marks omitted)).  "Cortlandt's legal claims might remain unaltered if a new assignment were substituted for the old one," the Court explained, "but the factual allegations supporting them would not.  Unlike a substitution, . . . pleading the existence of a new and substantively different assignment would require more than a merely formal alteration of the complaint."  *Id.* (internal quotation marks omitted).

Six years later, in *Fund Liquidation Holdings LLC v. Bank of America Corporation*, 991 F.3d 370 (2d Cir. 2021), the Second Circuit answered the question it had ducked in *Cortlandt Street Recovery Corp.*, parting ways with the Sixth Circuit.  *Fund Liquidation Holdings* involved a suit by two Cayman Islands investment funds regarding the manipulation of certain benchmark interest rates.  After the suit was filed, the defendants discovered that the two funds "had been dissolved years earlier, and that the case was actually being prosecuted by a separate entity, Fund Liquidation Holdings LLC," which alleged that it had been "assigned the dissolved entities' claims."  *Id.* at 375.  The district court initially permitted Fund Liquidation Holdings to join the case in its own name pursuant to Rule 17(a)(3).  *See id.* at 377.  But later, following a challenge by the defendants, the district court dismissed the case for lack of subject-matter jurisdiction on the ground that, because the two funds (the "Dissolved Funds") had "lacked capacity to sue" at the outset, "there was no real 'case or controversy' before the court," and this jurisdictional defect could not be retroactively cured under Rule 17.  *See id.* at 377-78.

The Second Circuit vacated and remanded.  The Court began by rejecting the defendants'
argument that the Dissolved Funds' "pre-filing assignment of their claims stripped [them] of
Article III standing," citing the well-established principle that "an assignment does not erase an
injury."  *Id.* at 380-81 (citing *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730-31 (6th Cir.
2016)).  "[T]he Dissolved Funds' alleged injury," the Court reasoned, was no less real and "no
less redressable through an award of damages simply because legal title to their claims" had been
transferred to Fund Liquidation Holdings.  *Id.* at 381.  But, the Court concluded, the Dissolved
Funds lacked standing because, under Cayman Islands law, they "did not legally exist when the
case was filed."  *Id.* at 384.  "After all," the Court explained, "the most elemental requirement of
adversary litigation is that there be two or more parties, meaning that absent a plaintiff with legal
existence, there can be no Article III case or controversy."  *Id.* (cleaned up).

The Court then turned to "what to make of that fact."  *Id.* at 386.  The Court explained
that the evolution of pleading requirements culminating in Rule 17 revealed, first, that "the rule
concerning which party's name a case must be prosecuted under (either the nominal plaintiff or
the real party in interest) is non-jurisdictional," and, second, that there is "no constitutional
magic behind whether the name of a nominal plaintiff or a real party in interest is initially put in
the caption of a pleading."  *Id.* at 388.  "When viewed this way," the Court continued, "filing a
complaint in the name of a deceased or non-existent nominal plaintiff is akin to an error in the
complaint's *allegations* of jurisdiction.  And it is well-understood that a plaintiff may cure
defective jurisdictional allegations, unlike defective jurisdiction itself, through amended
pleadings."  *Id.* at 388-89 (citing cases).  Parting ways with the Sixth Circuit's decision in *Zurich
Insurance*, which had concluded that a case started in the name of a plaintiff that lacks standing
is a legal nullity, the Court thus held: "Article III is satisfied so long as a party with standing to

prosecute the specific claim in question exists at the time the pleading is filed.  If that party (the real party in interest) is not named in the complaint, then it must ratify, join, or be substituted into the action within a reasonable time."  *Id.* at 386.

The Circuit, applying that holding, concluded that the district court had erred in dismissing the case for lack of subject-matter jurisdiction.  Substitution of Fund Liquidation Holdings for the Dissolved Funds, the Court reasoned, "does not substitute a new cause of action over which there is subject-matter jurisdiction for one in which there is not.  Rather, a real party in interest who has been assigned a claim is the functional equivalent of the original plaintiff — an assignee steps into the shoes of the assignor.  So even though Fund Liquidation is replacing the Dissolved Funds as the named party, it is prosecuting the *Dissolved Funds'* claims."  *Id.* at 389 (cleaned up); *see In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2022 WL 3018104, at *4 (S.D.N.Y. July 29, 2022) (noting that "the dissolved funds [in *Fund Liquidation Holdings*] were plainly asserting their own injuries based on the defendants' manipulation of benchmark interest rates").  Pointedly, the Court noted that these facts were different from those in *Zurich Insurance*, "in which the originally named plaintiff never possessed a claim against the defendant."  *Id.* at 389 n.10 (citing *Zurich Ins.*, 297 F.3d at 532).

Applying these cases here, the Court concludes that the defect in Alix's suit is not amenable to cure, whether by way of ratification (which Alix proposes here), substitution (which Alix does not propose), or joinder (same).  Alix sued for damages in his own name and for his own benefit, but he neither suffered the injury for which he sued nor was assigned the claims he brought by the party that did suffer that injury.  Put simply, unlike *Fund Liquidation Holdings*, this *is* a case "in which the originally named plaintiff never possessed a claim against the defendant."  *Id.* at 389 n.10.  It is not enough to say that AlixPartners would have had Article III

standing to bring its own RICO claims against Defendants or to say that Alix would have had Article III standing to bring some other claim against Defendants because "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for *each claim* that they press and for *each form of relief* that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (emphasis added).  In other words, the defect in this case is not merely a "technical error in the original pleading's caption" — the type of "merely formal" error that the *Fund Liquidation Holdings* Court held could be cured under Rule 17(a)(3) without giving offense to Article III. 991 F.3d at 391, 392 n.14.  Instead, it goes directly to "the concerns animating a constitutional principle." *Id.* at 391 (internal quotation marks omitted).  Had AlixPartners brought this suit on its own behalf (and for its own benefit) in the first instance, Defendants would be facing a different party with different substantive rights and interests at issue in the action.  A cure here would thus require more than an amendment to the caption of the operative Complaint; it would require either "substitut[ing] a new cause of action over which there is subject-matter jurisdiction for one in which there is not," *id.* at 389, or "pleading the existence of a new and substantively different assignment," *Cortlandt Str. Recovery Corp.*, 790 F.3d at 424.[10]

---

[10]     Alix relies here only on ratification.  *See* Alix Opp'n 39-43.  But the other remedies available under Rule 17 — namely, substitution and joinder — would fare no better.  Neither would endow Alix with standing, and AlixPartners does not have standing to bring the specific claims Alix has brought, which seek to recover damages in Alix's name and for his benefit.  In any event, AlixPartners has not only failed to seek substitution or joinder, but it has affirmatively sought to distance itself from this suit.  *See, e.g.*, ECF No. 262, at 5 (AlixPartners contending that it "is a nonparty in the lawsuit" and thus "defendants may only seek discovery from AlixPartners pursuant to Federal Rule of Civil Procedure 45"); ECF No. 350, at 1-2 (AlixPartners opposing a motion to compel discovery in part on the grounds that "AlixPartners did *not* file the SAC and has not levied any of the allegations therein" and "[t]here is no evidence reflecting that AlixPartners had any involvement in the filing of this action, is in any way behind its allegations, or has any knowledge of what Mr. Alix was thinking when he made any of the allegations therein").  That is, AlixPartners has shown no indication that it "is willing to join the case." *Fund Liquidation Holdings*, 991 F.3d at 388.  Quite the opposite.  *See also Branch of Citibank NA v. De Nevares*, 74 F.4th 8, 21 (2d Cir. 2023) ("Unlike Fund Liquidation Holdings, however,

Indeed, to hold otherwise would be to permit by way of ratification what the *Cortlandt Street Recovery Corp.* Court prohibited by way of substitution — with nothing in the language of Rule 17 justifying the distinction.  As discussed above, in *Cortlandt Street Recovery Corp.*, the Court rejected the plaintiff's request for an opportunity "to create and execute a new assignment transferring complete title and ownership of the claims in issue."  790 F.3d at 424.  Amendments under Rule 17, the Court explained, are "ordinarily allowed . . . only when a mistake has been made as to the person entitled to bring suit and such substitution will not alter the substance of the action.  Cortlandt's legal claims might remain unaltered if a new assignment were substituted for the old one, but the factual allegations supporting them would not."  *Id.* (cleaned up).  So too here.  Allowing Alix to obtain a new, broader assignment or allowing him to do the functional equivalent through ratification (especially when that would fall short of the complete transfer of title required for an assignee to step into the shoes of the assignor for purposes of Article III) would be to allow "more than a 'merely formal' alteration of the complaint."  *Id.*[11]  Such an amendment would not be "consistent with Rule 17(a)(3)."  *Id.* at 423; *see Fund Liquidation*

---

Citibank has not moved to substitute itself into this action.  Far from it: The Branch's theory of the case, from the first few pages of the Petition onward, has fundamentally been premised on the claim that Citibank and the Branch are distinct entities.").

[11]     It is true that the complaint in *Cortlandt Street Recovery Corp.* alleged that the plaintiff had been "assigned 'full rights under the assignments to collect principal and interest due and to pursue all remedies,'" 790 F.3d at 424, while the Second Amended Complaint here alleges only in conclusory fashion that the claims asserted were "fully and lawfully assigned to Alix by [AlixPartners]," SAC ¶ 34.  But it would elevate form over substance to hold that a party can cure a subject-matter jurisdiction problem by way of Rule 17 so long as the party's allegations are entirely conclusory, especially in light of the well-established rule that courts may consider evidence outside of the pleadings in assessing whether they have subject-matter jurisdiction.  *See, e.g.*, *Makarova*, 201 F.3d at 113.

*Holdings*, 991 F.3d at 392 n.14 (citing *Cortlandt Street Recovery Corp.* for the proposition that

Rule 17 limits the scope of permissible amendment to the "merely formal").[12]

Holding that ratification retroactively vests Alix with Article III standing would also run

afoul of the Rules Enabling Act, 28 U.S.C. § 2072.  "The Rules Enabling Act provides that the

Federal Rules of Civil Procedure 'shall not abridge, enlarge[,] or modify any substantive right.'"

*Bugliotti v. Republic of Argentina*, 67 F.4th 102, 107 (2d Cir. 2023) (quoting 28 U.S.C.

§ 2072(b)).  Accordingly, "the procedural mechanisms set forth in Rule 17(a) for ameliorating

real-party-in-interest problems may not be employed to expand substantive rights."  *Id.* (cleaned

up) (quoting *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het

Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 49 (2d Cir. 2005)).  Applying that

principle, the Second Circuit held in *Federal Treasury Enterprise Sojuzplodoimport v. SPI

Spirits Ltd.*, 726 F.3d 62 (2d Cir. 2013), that even when a ratifying entity "endorses [the

plaintiff's] authority to bring [the] suit and is willing to be bound" by its results — as Alix argues

is the case here — "plaintiffs cannot deploy Rule 17 to bypass" a statutory standing requirement,

*id.* at 83.  "[T]o extend standing to [a plaintiff] through 'ratification' under Rule 17(a)," the

Court explained, "would do more than alter 'the manner and the means' for enforcing the

[ratifying entity's] rights" — it would "extend the entitlement to sue to a new party that is

otherwise unauthorized . . . to bring suit to enforce whatever rights it may claim."  *Id.* (citation

omitted); *see also Del Re v. Prudential Lines, Inc.*, 669 F.2d 93, 97-98 (2d Cir. 1982) (holding

---

[12]     The *Fund Liquidation Holdings* Court suggested that "more substantive amendments" might be permissible "through a motion made jointly under both Rule 15 *and* Rule 17."  991 F.3d at 392 n.14.  But it did not take a position on the issue.  *See also id.* at 390 (noting that the Court had "never taken a position on" whether Rule 15(d) could be used to cure a jurisdictional defect that existed at the time of the initial filing and declining to do so there).  Neither does the Court here, as Alix has not relied on Rule 15 or any "other rule of civil procedure . . . .  [He] has relied upon only Rule 17."  *Cortlandt Street Recovery Corp.*, 790 F.3d at 424-25.

that a "purported 'ratification' under Rule 17(a) must be rejected" where giving effect to the ratification would defeat the purposes of the relevant congressional statutory scheme).  The same is true here: To find ratification sufficient would be to permit expansion of the scope of the Assignment (or creation of a new Assignment from whole cloth), and thus permit an enlargement or modification of Alix's substantive rights, in a manner prohibited the Rules Enabling Act.

Permitting Alix to continue prosecuting the claims asserted in this action by virtue of AlixPartners's ex post ratification would also be antithetical to the "long established principle that 'parties may not confer subject matter jurisdiction on the court by consent.'"  *Sharehold Representative Servs. LLC v. Sandoz Inc.*, No. 12-CV-6154 (DLC), 2013 WL 4015901, at *9 (S.D.N.Y. Aug. 7, 2013) (quoting *United States v. 27.09 Acres of Land*, 1 F.3d 107, 111 (2d Cir. 1993)).  "[T]he term 'ratification' in Rule 17(a) 'implies that the [ratifier] is the party in interest for whom the present action was commenced."  *Alaska Russia Salmon Caviar Co., Inc. v. M/V "Marit Maersk,"* No. 98-CV-7685 (DLC), 2000 WL 145124, at *5 (S.D.N.Y. Feb. 2, 2000) (quoting *Del Re*, 669 F.2d at 97).  Here, because Alix "has brought this suit in [his] own name to benefit [himself,] . . . this is not a case of 'ratification.'"  *See id.*  That is, ratification would not change the fact that Alix has no enforceable interest in the claims he asserts and would therefore still result in a party lacking injury-in-fact (Alix) litigating against Defendants in federal court.

In arguing that the defect here may be cured, Alix relies on the Second Circuit's decision in *Advanced Magnetics*.  *See* Alix Opp'n 40-42.  In that case, the plaintiff company ("AMI") brought suit against the defendants for "shorting" stock ahead of a secondary public offering in which AMI and five of its shareholders planned to sell 1.75 million shares.  *See* 106 F.3d at 13-14.  AMI sued "partially in its own right and partially as assignee of the selling shareholders," relying in part on purported assignments that gave "AMI the power to commence and prosecute

to final consummation or compromise any suits, actions or proceedings at law or in equity in any court of competent jurisdiction which arise from the above-[described] claims." *Id.* at 14.  On appeal, the Circuit held that the assignments transferred only power of attorney with respect to the shareholders' claims, not ownership of the claims themselves, and thus AMI was not entitled to bring those claims "in [its] own name." *Id.* at 17-18.  But it also held that the district court should have permitted substitution of the selling shareholders as the named plaintiffs with respect to their claims, noting that Rule 17 "is applicable in the present case because if AMI has no standing to pursue the claims of the selling shareholders, it is precisely because the selling shareholders are, with respect to those claims, the real parties in interest." *Id.* at 20.  *Advanced Magnetics* thus stands for the proposition that "[a] Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Id.*

  *Advanced Magnetics* does complicate the picture somewhat because it suggests, contrary to the discussion above, that a plaintiff's lack of standing at the outset of a case can be cured by way of Rule 17(a)(3), but the decision ultimately does not bear the weight that Alix would put on it for the simple reason that the decision did not "examine the relationship between constitutional standing requirements and Rule 17." *Cortlandt St. Recovery Corp.*, 790 F.3d at 422 n.6.[13]

---

[13]     Some courts (including, arguably, the Second Circuit in *Cortlandt Street Recovery Corp.*) have attempted to square the decision in *Advanced Magnetics* with general Article III principles on the ground that AMI "had standing irrespective of any amendment under Rule 17 to pursue at least *some* of its claims against the defendants."  790 F.3d at 422 (citing cases).  That explanation is not fully satisfactory, however, because "judgments about standing are made based on an independent analysis of each particular claim." *Digizip.com, Inc. v. Verizon Servs. Corp.*, 139 F. Supp. 3d 670, 678 (S.D.N.Y. 2015).  An alternative, and perhaps more persuasive explanation, drawn from the subtext of the Circuit's opinion and suggested by Defendants at oral argument in this case, is that the *Advanced Magnetics* Court viewed the error as "akin to an error in the complaint's *allegations* of jurisdiction," rather than a substantive lack of jurisdiction over the at-issue claims. *Fund Liquidation Holdings*, 991 F.3d at 388; *see also* Oral Argument Tr. at 42-43.

Indeed, it is well established that "[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144-45 (2011); *see, e.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("[D]rive-by jurisdictional rulings . . . have no precedential effect.").  In any event, the Second Circuit has since made clear that *Advanced Magnetics* does not stand for the proposition that a lack of Article III standing at the inception of a case is curable by way of Rule 17.  Indeed, in *Fund Liquidation Holdings* itself, the Circuit characterized *Advanced Magnetics* as "indicating that courts have the power to permit a real party in interest to join an action under Federal Rule of Civil Procedure 17 *where the originally named plaintiff had standing*."  991 F.3d at 380 (emphasis added).  In short, in the face of the Circuit's more recent and direct confrontations with the interplay of Article III and Rule 17, *Advanced Magnetics* does not alter the Court's conclusion.

In a last-ditch effort to salvage his claims, Alix invokes *Franchise Tax Board of California v. Alcan Aluminium Ltd.*, 493 U.S. 331 (1990), to assert that he may have Article III standing separate and apart from the Assignment by virtue of his position as "a major shareholder in AlixPartners."  Oral Argument Tr. 24-25.  But this argument is too little, too late. It is too late because Alix failed to raise it until oral argument.  *See, e.g.*, *Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 555 (S.D.N.Y. 2010) ("[T]his argument was raised for the first time at oral argument and so was waived in terms of this motion."); *Gao v. Barr*, 968 F.3d 137, 141 n.1 (2d Cir. 2020) ("It is well established that arguments raised for the first time at oral argument are

---

That interpretation is bolstered by the fact that there was no dispute in *Advanced Magnetics* that AMI had the authority to bring and prosecute the shareholders' claims — it merely had to name the shareholders as the real parties in interest.  *See Advanced Magnetics*, 106 F.3d at 18-21.  In other words, AMI did not purport to bring any claims it did not have authority to bring, and the defects in the assignments indeed resulted in only a nominal error.

deemed 'waived.'").  And it is too little because, at most, *Franchise Tax Board* supports the notion that, prudential considerations aside, Alix *could* have Article III standing to seek relief from Defendants for *his own injuries* by virtue of his ownership stake in AlixPartners.  *See* 493 U.S. at 336 (holding that foreign companies had Article III standing to challenge the way in which their wholly owned subsidiaries' locally taxable income was calculated on the ground that the challenged method of calculation "threatens to cause actual financial injury to [the companies themselves] by illegally reducing the return on their investments in [the subsidiaries] and by lowering the value of their stockholdings").  But Alix does not seek relief for his own injuries. To the contrary, he alleges standing only as assignee of AlixPartners and seeks relief only for the injuries to AlixPartners, not for any injuries to himself.  *See* SAC ¶¶ 8, 34, 498, 576, 678, 707. In fact, in his briefing, he explicitly disavows "any personal claims against Defendants."  Alix Opp'n 19 n.16.

      All told, because AlixPartners never validly assigned its right, title, and interests in any RICO claims to Alix, Alix never had (and still does not have) Article III standing to bring the RICO claims asserted in this lawsuit.  "That being so, Rule 17 provides no alternative avenue for [Alix] to bring suit in federal court."  *Bugliotti*, 67 F.4th at 107 (citing *Fed. Treasury*, 726 F.3d at 83).  It follows that Alix's claims must be and are dismissed for lack of subject-matter jurisdiction.  At first glance, that result may smack of a technicality — especially in light of the lengthy history of this litigation.  But it is no mere technicality.  Defendants raise colorable arguments (albeit arguments that the Court ultimately need not reach) that Alix and AlixPartners were playing games in the execution of the Agreement and their conduct surrounding this litigation more broadly and that permitting Alix to proceed would arguably leave Defendants vulnerable to a later suit by AlixPartners.  *See, e.g.*, McKinsey Mem. 4-9, 14-17, 21-24.  In any

event, Alix and AlixPartners could easily have protected against this result by being more careful and precise in their negotiation of the Assignment.  And regardless, because the defect goes to the Court's subject-matter jurisdiction, the Court lacks authority to reach a different disposition. *See, e.g.*, *Steel Co.*, 523 U.S. at 94.

### D.  The Individual Defendants' State-Law Counterclaims

With the dismissal of Alix's claims, the only claims remining in this case are counterclaims brought by two Individual Defendants, Seth Goldstrom and Kevin Carmody, against Alix and AlixPartners for defamation under state law.  *See* ECF Nos. 277, 286.  It is well settled that when, as here, a district court "dismisses all federal claims for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the district court is thereby precluded from exercising supplemental jurisdiction over related state-law claims."  *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 399 (2d Cir. 2017).  It follows that the counterclaims must be and are dismissed without prejudice to refiling in state court, and the motion to dismiss those claims filed by Alix and AlixPartners, *see* ECF No. 300, is moot.

### E.  Sealing

One housekeeping matter remains.  The parties filed a slew of letter motions to seal portions of their motion papers and supporting exhibits, *see, e.g.*, ECF Nos. 329, 331, 341, 342, 352, 361, 364, 366, 376, 377, which the Court granted temporarily, pending its decision on the underlying motions, *see, e.g.*, ECF Nos. 340, 343, 357, 363, 374, 375, 378, 379.  Filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  A three-part test applies to whether documents may be placed under seal.  First, "a court must . . . conclude that

the documents at issue are indeed 'judicial documents' . . . and that therefore a common law presumption of access attaches." *Id.* at 119.  Second, the court "must determine the weight of that presumption," which is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* (internal quotation marks omitted).  "Finally, . . . the court must balance competing considerations against" the presumption of access, including "the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." *Id.* at 120 (internal quotation marks omitted).  The party or parties seeking to maintain information filed under seal bear "the burden . . . to demonstrate that the interests favoring non-access outweigh those favoring access." *United States v. Amodeo*, 44 F.3d 141, 148 (2d Cir. 1995).  To justify sealing on the ground that a party's business interests may be harmed, that party "must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *Ashmore v. CGI Grp. Inc.*, 138 F. Supp. 3d 329, 351 (S.D.N.Y. 2015), *aff'd*, 923 F.3d 260 (2d Cir. 2019).

Applying these standards here, the Court concludes that the text of the Assignment itself — and any language therefrom discussed in the parties' memoranda of law — must be unsealed. First, the weight of the presumption in favor of public access to the Assignment itself is heavy given the central role that it played in the Court's resolution of Defendants' motions.  *See Lugosch*, 435 F.3d at 119 ("[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995))).  And second, Alix fails to overcome the

presumption as to the Assignment.  He cites the fact that the Assignment is subject to a

confidentiality agreement.  *See* ECF No. 341, at 1.  But, without more, that is not "a valid basis

to overcome the presumption."  *Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17-CV-8457 (JMF),

2023 WL 6314939, at *20 (S.D.N.Y. Sept. 28, 2023).  And while sealing may be appropriate to

protect "specific business information and strategies," *Louis Vuitton Malletier S.A. v. Sunny*

*Merch. Corp.*, 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015), Alix fails to explain how that interest

calls for protection of the Assignment itself as opposed to documents and information that might

reveal his "negotiation style and strategy" behind the Assignment, ECF No. 341, at 2.

By contrast, the Court concludes that the remainder of the parties' sealed or redacted

materials may remain in that form, with the exception of the handful of excerpts from sealed

filings that are quoted in this Opinion and Order.  At best, "[t]he weight of any presumption is

limited" with respect to these other documents because "the Court did not need to reference or

otherwise rely on" them in resolving Defendants' motions.  *In re Accent Delight Int'l, Ltd.*, No.

16-MC-125 (JMF), 2019 WL 2849724, at *6 (S.D.N.Y. June 11, 2018).  And to the extent that

the presumption applies to these documents at all, Alix's legitimate "interest in sealing

documents regarding his negotiation style and strategy with respect to the Assignment" would

overcome it.  ECF No. 341, at 2.  Accordingly, the Assignment aside, the parties' requests to

maintain the documents referenced in their various letter-motions to seal in sealed or redacted

form are GRANTED, albeit "without prejudice to any future application — by a party or any

third party — for reconsideration as to a particular document or documents."  *Golden Unicorn*

*Enters., Inc. v. Audible, Inc.*, No. 21-CV-7059 (JMF), 2023 WL 6143567, at *5 (S.D.N.Y. Sept.

20, 2023).  **Within two weeks of the date of this Opinion and Order**, (1) McKinsey shall refile

the materials filed at ECF No. 338 with Exhibit 1 and references thereto unsealed; (2) the

Individual Defendants shall refile the materials filed at ECF No. 335 with Exhibit 1 and references thereto unsealed; and (3) the parties shall refile their memoranda of law with amended redactions in light of this Opinion and Order — namely, with quotations from and references to the Assignment unredacted.

## CONCLUSION

In light of the foregoing, Alix's claims must be and are dismissed for lack of subject-matter jurisdiction and, in light of that conclusion, the Court cannot and does not exercise supplemental jurisdiction over Goldstrom and Carmody's state-law counterclaims.  The Court does not reach that conclusion lightly given that it comes after six years of litigation, including two motions to dismiss and one appeal.  But Alix has no one to blame but himself — or perhaps AlixPartners.  It is not clear whether Alix and AlixPartners were merely careless in drafting the Assignment or if they tried to play fast and loose in an effort to permit Alix to seek relief from Defendants while shielding AlixPartners from the risks and obligations that would fall on a party to a federal case and preserving AlixPartners's ability to bring its own claims.  Either way, they did not take the steps that were necessary for Alix to press the claims he brings here.

In any event, because the Court concludes that it lacks subject-matter jurisdiction, it has no choice but to dismiss.  To proceed would "carr[y] the [C]ourt[] beyond the bounds of authorized judicial action and thus offend[] fundamental principles of separation of powers." *Steel Co.*, 523 U.S. at 94; *see also Murthy v. Missouri*, — S. Ct. —, No. 23-411, 2024 WL 3165801, at *7 (U.S. June 26, 2024) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." (cleaned up)).  Moreover, the principles leading the Court to the conclusion that this case must be dismissed are neither trivial nor merely technical.  To the contrary, the Article III standing requirement —

demanding that parties have a direct stake in the claims that they assert — serves to safeguard

fundamental principles of adversary litigation, fairness to litigants, and judicial modesty.  As the

Supreme Court recently observed, the Article III standing requirement "helps ensure that courts

decide litigants' legal rights in specific cases," "serves to protect the 'autonomy' of those who

are most directly affected so that they can decide whether and how to challenge the defendant's

action," and "implements 'the Framers' concept of the proper — and properly limited — role of

the courts in a democratic society.'"  *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602

U.S. 367, 379-80 (2024).  Indeed, "[n]o principle is more fundamental to the judiciary's proper

role in our system of government than the constitutional limitation of federal-court jurisdiction to

actual cases or controversies."  *Id.* at 397 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S.

26, 37 (1976)).

Accordingly, McKinsey's motion to dismiss is GRANTED, and both the Individual

Defendants' motion to dismiss and Alix's and AlixPartners' motion to dismiss the counterclaims

are deemed moot.  (The parties' latest discovery disputes, *see* ECF Nos. 397 & 400, are also

moot.)  The Clerk of Court is directed to terminate ECF Nos. 300, 328, 332, 397, 399, and 400;

to enter judgment in favor of Defendants in accordance with this Opinion and Order; and to close

the case.

SO ORDERED.

Dated: July 3, 2024
      New York, New York

                                            JESSE M. FURMAN
                               United States District Judge